## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA
## MIAMI DIVISION

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION** | MDL No. 2599 |
| This Document Relates to All Economic Loss Class Actions and: | Master File No.15- MD 2599-FAM |
| | S.D. Fla. Case No. 1:14-cv-24009-FAM |
| PAM KOEHLER, et al., individually and on behalf of all others similarly situated, | |
| Plaintiffs, | |
| v. | **JURY TRIAL DEMANDED** |
| TAKATA CORPORATION, TK HOLDINGS, INC., HONDA MOTOR CO., LTD., AMERICAN HONDA MOTOR CO., INC., BAYERISCHE MOTOREN WERKE AG, BMW OF NORTH AMERICA, LLC, BMW MANUFACTURING CO., LLC, FORD MOTOR COMPANY, TOYOTA MOTOR CORPORATION, TOYOTA MOTOR SALES, U.S.A., INC., AND TOYOTA MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC., MAZDA MOTOR CORPORATION, MAZDA MOTOR OF AMERICA, INC., MITSUBISHI MOTORS CORP., MITSUBISHI MOTORS NORTH AMERICA, INC., NISSAN MOTOR CO., LTD., NISSAN NORTH AMERICA, INC., FUJI HEAVY INDUSTRIES, LTD., SUBARU OF AMERICA, INC., GENERAL MOTORS LLC, | |
| Defendants. | |

## AMENDED CONSOLIDATED CLASS ACTION COMPLAINT

# TABLE OF CONTENTS

**Page**

NATURE OF CLAIMS ................................................................................................ 1

JURISDICTION AND VENUE ................................................................................. 8

THE PARTIES ............................................................................................................. 9

    I.       Takata Defendants ................................................................................... 9

    II.      Vehicle Manufacturer Defendants ....................................................... 10

    III.    Plaintiffs ................................................................................................ 14

          A.      Consumer Plaintiffs ................................................................. 14

          B.      Automotive Recycler Plaintiffs............................................... 72

GENERAL FACTUAL ALLEGATIONS ............................................................... 73

    I.       Takata is a Major Manufacturer of Airbags and Inflators. ............... 79

    II.      Takata's Airbags Have A Common, Uniform Defect ........................ 80

          A.      Takata Recklessly Chose An Inexpensive and Dangerous Propellant .................................................................................. 80

          B.      Takata's Knowledge of the Inflator Defect ............................ 83

    III.    Takata Airbag Failures and Defendants' Inadequate Reaction........... 85

          A.      2003-2008: Early Incidents and the 2008 Honda Recall (08V-593) ....... 85

          B.      2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA........ 89

          C.      2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations........................................................................... 93

          D.      2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V-260)................................................................. 94

          E.      2013-2014: Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132)........................................ 96

          F.      2014-2015: Forced National Recall and Increased Government Scrutiny ............................................................ 101

    IV.    The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe" and "Reliable"......................................................... 105

    V.      Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers.... 106

          A.      Slow and Inadequate Recalls ................................................ 106

          B.      Failure to Pursue National Passenger-Side Recall................ 108

          C.      Failure to Provide Replacement Vehicles............................. 109

          D.      Defective Replacement Airbags ........................................... 110

# TABLE OF CONTENTS
## (continued)

Page

VI. Automotive Recyclers Purchased Recalled Vehicles Containing Defective Airbags for Amounts Greater than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale ................................................... 110

CHOICE OF LAW ALLEGATIONS ................................................................................ 111

I. Takata ................................................................................................................ 111

II. BMW .................................................................................................................. 112

III. Ford ................................................................................................................... 112

IV. GM .................................................................................................................... 113

V. Honda ................................................................................................................ 113

VI. Mazda ................................................................................................................ 113

VII. Mitsubishi ......................................................................................................... 114

VIII. Nissan ............................................................................................................... 114

IX. Subaru ............................................................................................................... 115

X. Toyota ............................................................................................................... 115

TOLLING OF THE STATUTE OF LIMITATIONS ....................................................... 116

CLASS ACTION ALLEGATIONS ................................................................................. 117

CLAIMS FOR RELIEF ................................................................................................... 125

I. Nationwide Consumer Claims ......................................................................... 125

A. Federal Claims ...................................................................................... 125

1. Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), against the Takata Defendants .......................................................................... 125

2. Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced And Corrupt Organizations Act ("RICO"), against the Takata Defendants and the Honda Defendants .............................. 136

3. Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.* .................................................................... 142

B. Common Law and State Law Claims against the Takata Defendants ............................................................................................. 146

# TABLE OF CONTENTS
## (continued)

Page

4. Fraudulent Concealment ................................................................ 146

5. Breach of Implied Warranty .......................................................... 148

6. Unjust Enrichment ......................................................................... 149

7. Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.903, *et seq.* .................................................... 150

8. Negligence ..................................................................................... 154

C. Common Law and State Law Claims Against the Honda Defendants ...................................................................................... 156

9. Fraudulent Concealment ................................................................ 156

10. Violation Of Song-Beverly Consumer Warranty Act For Breach Of Implied Warranty Of Merchantability (California Lemon Law) ................................................................ 158

11. Unjust Enrichment ......................................................................... 160

12. Violation of the California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.* .............................................. 161

13. Violation of the Consumer Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.* ................................................................... 165

14. Violation of the California False Advertising Law Cal. Bus. & Prof. Code §§ 17500, *et seq.* ...................................................... 171

15. Negligent Failure to Recall ............................................................ 173

D. Common Law and State Law Claims Against BMW ........................... 174

16. Fraudulent Concealment ................................................................ 174

17. Breach of Implied Warranty of Merchantability, N.J. Stat. Ann. § 12a:2-314 ........................................................................... 177

18. Unjust Enrichment ......................................................................... 178

19. Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ........................................................ 179

E. Common Law and State Law Claims Against Ford ............................. 183

# TABLE OF CONTENTS
## (continued)

Page

20.   Fraudulent Concealment ............................................................... 183

21.   Breach of Implied Warranty of Merchantability ............................ 185

22.   Unjust Enrichment ....................................................................... 186

23.   Violation of the Michigan Consumer Protection Act ..................... 187

24.   Negligence .................................................................................. 191

F.   Common Law and State Law Claims Against Mazda ......................... 193

25.   Fraudulent Concealment ............................................................... 193

26.   Violation Of Song-Beverly Consumer Warranty Act For
      Breach Of Implied Warranty Of Merchantability
      (California Lemon Law) ............................................................... 195

27.   Unjust Enrichment ....................................................................... 197

28.   Violation of the California Unfair Competition Law Cal.
      Bus. & Prof. Code §§ 17200, *et seq.*.................................................. 198

29.   Violation of the Consumer Legal Remedies Act Cal. Civ.
      Code §§ 1750, *et seq.* ..................................................................... 202

30.   Violation of the California False Advertising Law Cal. Bus.
      & Prof. Code §§ 17500, *et seq.* ........................................................ 208

31.   Negligent Failure to Recall ............................................................ 210

G.   Common Law and State Law Claims Against Nissan .......................... 211

32.   Fraudulent Concealment ............................................................... 211

33.   Breach of Implied Warranty .......................................................... 214

34.   Unjust Enrichment ....................................................................... 215

35.   Violation of the Tennessee Consumer Protection Act Tenn.
      Code Ann. §§ 47-18-101, *et seq.* ..................................................... 216

H.   Common Law and State Law Claims Against Subaru .......................... 220

36.   Fraudulent Concealment ............................................................... 220

37.   Breach of Implied Warranty of Merchantability (N.J. Stat.
      Ann. § 12a:2-314) ........................................................................ 222

38.   Unjust Enrichment ....................................................................... 223

39.   Violation of the New Jersey Consumer Fraud Act,  N.J.
      Stat. Ann. §§ 56:8-1, *et seq.* ........................................................... 224

I.   Common Law and State Law Claims Against Toyota .......................... 228

# TABLE OF CONTENTS
## (continued)

Page

40. Fraudulent Concealment .................................................................. 228

41. Violation Of Song-Beverly Consumer Warranty Act For Breach Of Implied Warranty Of Merchantability (California Lemon Law) ............................................................ 231

42. Unjust Enrichment ......................................................................... 233

43. Violation of the California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.* ............................................... 234

44. Violation of the Consumer Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.* ............................................................... 237

45. Violation of the California False Advertising Law Cal. Bus. & Prof. Code §§ 17500, *et seq.* ............................................... 244

46. Negligent Failure to Recall ........................................................... 245

II. State Sub-Class Claims ............................................................................ 247

   A. Claims Brought on Behalf of the Florida Sub-Class ............................ 247

   47. Violation of the Florida Deceptive and Unfair Trade Practices Act Fla. Stat. §§ 501.201, *et seq.* ...................................... 247

   48. Breach of Implied Warranty of Merchantability Fla. Stat. § 672.314, *et seq.* ............................................................... 250

   B. Claims Brought on Behalf of the Alabama Sub-Class........................... 251

   49. Violation of the Alabama Deceptive Trade Practices Act Ala. Code §§ 8-19-1, *et seq.* ........................................................ 251

   C. Claims Brought on Behalf of the Arizona Sub-Class ........................... 256

   50. Violation of the Consumer Fraud Act Ariz. Rev. Stat. §§ 44-1521, *et seq.* .............................................................. 256

   D. Claims Brought on Behalf of the California Sub-Class......................... 259

## TABLE OF CONTENTS
### (continued)

Page

|   |   |   |   |
|---|---|---|---|
|   | 51. | Violation of the California Unfair Competition Law Cal. Bus. & Prof. Code §§ 17200, *et seq.* | 259 |
|   | 52. | Violation of the Consumer Legal Remedies Act Cal. Civ. Code §§ 1750, *et seq.* | 263 |
|   | 53. | Violation of the California False Advertising Law Cal. Bus. & Prof. Code §§ 17500, *et seq.* | 269 |
|   | 54. | Violation of the Song-Beverly Consumer Warranty Act for Breach of the Implied Warranty of Merchantability Cal. Civ. Code §§ 1791.1 & 1792 | 271 |
|   | 55. | Negligent Failure to Recall | 273 |
| E. |   | Claims Brought on Behalf of the Colorado Sub-Class | 274 |
|   | 56. | Violation of the Colorado Consumer Protection Act Colo. Rev. Stat. §§ 6-1-101, *et seq.* | 274 |
|   | 57. | Breach of the Implied Warranty of Merchantability Colo. Rev. Stat. § 4-2-314 | 278 |
| F. |   | Claims Brought on Behalf of the Connecticut Sub-Class | 279 |
|   | 58. | Violation of the Connecticut Unlawful Trade Practices Act Conn. Gen. Stat. §§ 42-110A, *et. seq.* | 279 |
| G. |   | Claims Brought on Behalf of the Georgia Sub-Class | 283 |
|   | 59. | Violation of the Georgia Fair Business Practices Act Ga. Code Ann. §§ 10-1-390, *et seq.* | 283 |
|   | 60. | Violation of the Georgia Uniform Deceptive Trade Practices Act Ga. Code Ann. §§ 10-1-370, *et seq.* | 287 |
| H. |   | Claims Brought on Behalf of the Hawaii Sub-Class | 291 |
|   | 61. | Unfair and Deceptive Acts in Violation of Hawaii Law Haw. Rev. Stat. §§ 480, *et seq.* | 291 |
|   | 62. | Breach of the Implied Warranty of Merchantability Haw. Rev. Stat. §490:2-314 | 295 |
| I. |   | Claims Brought on Behalf of the Illinois Sub-Class | 296 |
|   | 63. | Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act 815 ILCS 505/1, *et seq.* | 296 |
|   | 64. | Violation of the Illinois Uniform Deceptive Trade Practices Act 815 ILCS 510/1, *et seq.* | 300 |
| J. |   | Claims Brought on Behalf of the Indiana Sub-Class | 301 |

# TABLE OF CONTENTS
## (continued)

Page

65. Violation of the Indiana Deceptive Consumer Sales Act Ind. Code §§ 24-5-0.5-3 .................................................................. 301

66. Breach of the Implied Warranty of Merchantability Ind. Code § 26-1-2-314 ...................................................................... 306

K. Claims Brought on Behalf of the Louisiana Sub-Class ........................ 307

67. Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law La. Rev. Stat. §§ 51:1401, *et seq.* ...................................................................................................... 307

68. Breach of the Implied Warranty of Merchantability/Warranty Against Redhibitory Defects La. Civ. Code Art. 2520, 2524 .............................................................. 311

L. Claims Brought on Behalf of the Massachusetts Sub-Class .................. 312

69. Deceptive Acts or Practices Prohibited by Massachusetts Law Mass. Gen. Laws Ch. 93A, §§ 1, *et seq.* .................................. 312

70. Breach of the Implied Warranty of Merchantability ALM GL. Ch. 106, § 2-314, *et seq.* ...................................................... 316

M. Claims Brought on Behalf of the Michigan Sub-Class .......................... 317

71. Violation of the Michigan Consumer Protection Act Mich. Comp. Laws §§ 445.903 *et seq.* ...................................................... 317

72. Breach of Implied Warranty of Merchantability Mich. Comp. Laws § 440.2314 ................................................................ 321

N. Claims Brought on Behalf of the Minnesota Sub-Class ........................ 322

73. Violation of the Minnesota Prevention of Consumer Fraud Act Minn. Stat. §§ 325F.68, *et seq.* .............................................. 322

74. Violation of the Minnesota Uniform Deceptive Trade Practices Act Minn. Stat. §§ 325D.43-48, *et seq.* ........................... 326

75. Breach of the Implied Warranty of Merchantability Minn. Stat. § 336.2-314 ......................................................................... 330

O. Claims Brought on Behalf of the Missouri Sub-Class ........................... 331

76. Violation of the Missouri Merchandising Practices Act Mo. Rev. Stat. §§ 407.010 *et seq.* .......................................................... 331

77. Breach of the Implied Warranty of Merchantability Mo. Rev. Stat. § 400.2-314 ...................................................................... 335

P. Claims Brought on Behalf of the Nevada Sub-Class ............................. 336

## TABLE OF CONTENTS
### (continued)

Page

78. Violation of the Nevada Deceptive Trade Practices Act Nev. Rev. Stat. §§ 598.0903, *et seq.* ................................................. 336

79. Breach of the Implied Warranty of Merchantability Nev. Rev. Stat. § 104.2314 ........................................................................ 340

Q. Claims Brought on Behalf of the New York Sub-Class ........................ 341

80. Violation of the New York General Business Law N.Y. Gen. Bus. Law § 349 ................................................................ 341

81. Violation of the New York General Business Law N.Y. Gen. Bus. Law § 350 ................................................................ 345

R. Claims Brought on Behalf of the North Carolina Sub-Class ................ 346

82. Violation of the North Carolina Unfair and Deceptive Trade Practices Act N.C. Gen. Stat. §§ 75-1.1, *et seq.* .................. 346

83. Breach of the Implied Warranty of Merchantability N.C. Gen. Stat. § 25-2-314 ........................................................................ 350

S. Claims Brought on Behalf of the Ohio Sub-Class ................................ 351

84. Violation of the Consumer Sales Practices Act Ohio Rev. Code §§ 1345.01, *et seq.* ................................................................ 351

T. Claims Brought on Behalf of the Oregon Sub-Class ............................ 356

85. Violation of the Oregon Unlawful Trade Practices Act Or. Rev. Stat. §§ 646.605, *et seq.* ............................................................ 356

U. Claims Brought on Behalf of the Pennsylvania Sub-Class ................... 359

86. Violation of the Unfair Trade Practices and Consumer Protection Law Pa. Stat. Ann. §§ 201-1, *et seq.* .............................. 359

87. Breach of the Implied Warranty of Merchantability 13 PA. Stat. Ann. §2314 ................................................................ 364

V. Claims Brought on Behalf of the Rhode Island Sub-Class ................... 365

88. Violation of the Rhode Island Unfair Trade Practices and Consumer Protection Act R.I. Gen. Laws §§ 6-13.1, *et seq.* ........... 365

89. Breach of the Implied Warranty of Merchantability R.I. Gen Laws § 6A-2-314 ................................................................ 369

W. Claims Brought on Behalf of the South Carolina Sub-Class ................ 370

# TABLE OF CONTENTS
## (continued)

Page

90. Violation of the South Carolina Unfair Trade Practices Act S.C. Code Ann. §§ 39-5-10, *et seq.* .................................................. 370

91. Violation of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act S.C. Code Ann. §§56-15-10, *et seq.*............................................... 374

92. Breach of the Implied Warranty of Merchantability S.C. Code § 36-2-314 ....................................................... 375

X. Claims Brought on Behalf of Tennessee Sub-Class ............................. 376

93. Violation of the Tennessee Consumer Protection Act Tenn. Code Ann. §§ 47-18-101, *et seq.* ..................................... 376

Y. Claims Brought on Behalf of the Texas Sub-Class ............................. 380

94. Violation of the Deceptive Trade Practices Act Tex. Bus. & Com. Code §§ 17.41, *et seq.* ....................................... 380

95. Breach of the Implied Warranty of Merchantability Tex. Bus. & Com. Code § 2.314 ........................................... 384

Z. Claims Brought on Behalf of the Virginia Sub-Class........................... 385

96. Violation of the Virginia Consumer Protection Act Va. Code Ann. §§ 59.1-196, *et seq.*....................................... 385

97. Breach of the Implied Warranty of Merchantability Va. Code Ann. § 8.2-314.............................................. 389

AA. Claims Brought on Behalf of the Washington Sub-Class..................... 390

98. Violation of the Consumer Protection Act Wash. Rev. Code Ann. §§ 19.86.010, *et seq.* .............................. 390

BB. Claims Brought on Behalf of the West Virginia Sub-Class ................. 394

99. Violation of the Consumer Credit and Protection Act W. Va. Code §§ 46A-1-101, *et seq.*....................................... 394

100. Breach of the Implied Warranty of Merchantability W. Va. Code § 46-2-314 .......................................... 399

III. Automotive Recycler Claims .......................................................... 400

**TABLE OF CONTENTS**
**(continued)**

**Page**

101. Fraudulent Misrepresentation & Fraudulent Concealment.............. 400

102. Violations of State Deceptive Trade Practices Statutes ................... 401

103. Violation of Florida's Deceptive and Unfair Trade
     Practices Act, Fla. Stat. § 501.201, et. seq....................................... 404

PRAYER FOR RELIEF ........................................................................................... 406

DEMAND FOR JURY TRIAL ................................................................................ 407

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      People trust and rely on the manufacturers of motor vehicles and of critical safety devices to make safe products that do not give rise to a clear danger of death or personal injury. An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to inflate rapidly during an automobile collision to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.

2.      An airbag supplier must take all necessary steps to ensure that its products— which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended.  Profits must take a back seat to safety for the airbag manufacturer, and also for the automobile manufacturer when it makes its product sourcing decisions.

3.      This action concerns defective airbags manufactured by Defendant Takata Corporation and its related entities ("Takata"), and equipped in vehicles manufactured by Honda, BMW, Ford, General Motors, Mazda, Mitsubishi, Nissan, Subaru, and Toyota, and their related entities (collectively the "Vehicle Manufacturer Defendants"), and in vehicles manufactured by Chrysler.[1]

---

[1] GM and Chrysler, prior to their bankruptcies, also manufactured vehicles with defective Takata airbags.  Certain actions consolidated in and transferred to this MDL asserted claims against the post-bankruptcy versions of GM and Chrysler based on vehicles manufactured and sold by the pre-bankruptcy versions of those entities.  Although claims against Chrysler and GM based on their pre-bankruptcy vehicles have not been asserted in this Amended Consolidated Class Action Complaint, such claims against those entities remain pending in "civil suspense" pursuant to the Court's Order Appointing Plaintiffs' Counsel and Setting Schedule.  (Dkt. 9 at 2.)  As a result, this Amended Consolidated Class Action Complaint neither waives nor dismisses any claims for relief against any defendant not included in this pleading that are asserted by any other plaintiffs in actions that have been or will be made part of this MDL proceeding, except by operation of the class notice and any opt-out provisions on claims or common questions asserted in this Complaint and certified by this Court. Certain claims for certain parties may, consistent with 28 U.S.C. § 1407 and the caselaw thereunder, be matters for determination on remand by transferor courts.

4.     All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators (the "Inflator Defect").  The inflator, as its name suggests, is supposed to inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.

5.     The following basic illustration depicts Takata's airbag module:



6.     In the late 1990s, Takata shelved a safer chemical propellant in favor of ammonium nitrate, a far cheaper and more unstable compound that is much better suited for large demolitions in mining and construction.

7.      Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior ranging from inertness to violent combustion.  When Takata decided to abandon the safer propellant in favor of the more dangerous but cheaper one, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan. Tellingly, Takata appears to be the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

8.      As a result of the common, uniform Inflator Defect, instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often either fail to deploy or violently explode, sometimes expelling metal debris and shrapnel at vehicle occupants.  As of January 2015, complaints to regulators blame Takata airbags for at least six deaths and 139 injuries, including at least 37 reports of airbags that ruptured or spewed metal or chemicals.

9.      The instability of Takata's ammonium nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.

10.     Takata and the Vehicle Manufacturer Defendants first received word of startling airbag failures no later than 2004, when a Takata airbag in a Honda Accord in Alabama exploded, shot out metal shrapnel, and severely injured the car's driver.  Honda and Takata deemed the incident "an anomaly."  Honda did not issue a recall.  Neither Honda nor Takata sought the involvement of federal safety regulators.

11.     The serious danger posed by the Inflator Defect was not disclosed to U.S. safety regulators until 2008, despite red flags raised by the exploding airbag incident in 2004.  It took three additional reports of airbag rupture incidents in 2007 to prompt the 2008 disclosure, and even then, Takata and Honda falsely assured regulators that they needed to recall only approximately 4,000 Honda vehicles, claiming that they had identified all "possible vehicles that could potentially experience the problem."

12.     Behind the scenes, however, Takata and Honda were busy conducting tests that revealed far more serious problems.  As reported in *The New York Times*, Takata conducted secret tests in 2004, which confirmed that its inflators were defective, and then destroyed those test results to conceal the defect.  After the 2007 airbag rupture, Honda began collecting inflators for further testing as well.

13.     Tragically, these airbag failures were the first of many to come.  Honda and Takata were forced to issue further recalls in 2009, 2010, and 2011, but they did so in a limited and misleading way, apparently in an effort to avoid the huge costs and bad publicity that would have been associated with appropriately-sized and broader recalls.  Despite the repeated Takata/Honda recalls, and though the other Vehicle Manufacturer Defendants knew their vehicles were also equipped with Takata airbags, they failed to take reasonable measures to investigate.

14.     Over a decade after the first incidents of airbag ruptures, Defendants' obfuscation and inaction broke down in the face of mounting incidents and increased scrutiny by regulators and the press.  By the middle of 2013, the pace of the recalls increased exponentially as the National Highway Traffic Safety Administration ("NHTSA") began to force Defendants into action.  Whereas approximately 3 million vehicles had been recalled up until that point (the vast majority of which were Hondas), the April-May 2013 recalls added 4 million more vehicles to the list, across ten manufacturers.  Just one year later, in June 2014, another 5.6 million vehicles were recalled.  By October 2014, global recalls reached 16.5 million vehicles.

15.     Even then, Defendants worked hard to limit the scope of the recall to humid parts of the country.  They strenuously and falsely claimed that the risks caused by the Inflator Defect disappeared to the north of some arbitrary latitude in the American South.

16.     By November 2014, Defendants' regional recall approach failed.  In anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California.  Incredibly, Takata refused, and

testified at Congressional hearings that vehicles in non-humid regions were safe, *even as it claimed that it had not yet determined the root cause of the failures*.

17.     With additional pressure and public scrutiny, the Vehicle Manufacturer Defendants eventually agreed to NHTSA's demand.  At that point, the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million worldwide. The large majority of those recalls were issued only within the last year, even though many of the vehicles were manufactured with a defective and dangerous airbag over a decade ago.

18.     After delaying the recalls for years, Defendants are now failing to implement the recalls effectively.  They have acknowledged that the process could take *years* because of supply constraints.  To quote Honda's spokesman, "[t]here's simply not enough parts to repair every recalled single car immediately."

19.     Even if there were enough airbags, dealers are unable to keep up with the volume of customers rushing to get their Takata airbags replaced.  Following the expanded recalls in late 2014, some dealers reported receiving up to *900 calls per day* about the recalls, and told customers that they may have to wait months before airbags can be replaced.

20.     Consumers are, therefore, in the frightening position of having to drive dangerous vehicles for many months (or even years) while they wait for Defendants to replace the defective airbags in their cars.  Most of the Defendants are not providing replacement or loaner vehicles, even though there is an immediate need to provide safe vehicles to Plaintiffs and Class members. For example, Toyota has simply disabled the dangerous passenger-side airbags in vehicles, and has offered stickers to paste onto the dashboard as a reminder not to sit in that seat.  Likewise, General Motors has recommended owners prohibit anyone from riding in the passenger seat.  As a result, many consumers are effectively left without a safe vehicle to take them to and from work, to pick up their children from school or childcare, or, in the most urgent situations, to transport themselves or someone else to a hospital.

21.     Worse yet, the passenger-side airbag recall remains regional in scope.  This is an indefensible and unnecessarily risky approach because: (a) Defendants have claimed they have

yet to uncover the root cause of the Inflator Defect, making their geographic boundaries arbitrary at best; (b) the passenger-side airbags are made with the same unstable and dangerous ammonium nitrate propellant that is prone to overly-aggressive combustion and becoming inert; (c) vehicles are by definition mobile and therefore can and likely will be operated in high humidity regions; and (d) weather and climate are unpredictable and variable.

22.     Even more troubling, many of the replacement airbags that Takata and the vehicle manufacturers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed—they use unstable and dangerous ammonium nitrate as the propellant within the inflator.

23.     Takata and the Vehicle Manufacturer Defendants knew or should have known that the Takata airbags installed in millions of vehicles were defective.  Both Takata and the Vehicle Manufacturer Defendants, who concealed their knowledge of the nature and extent of the defect from the public while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety.  Moreover, the Vehicle Manufacturer Defendants have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

24.     The actions of Defendants Takata and Honda have been especially disturbing. Despite the shocking record of injuries and failures in Honda vehicles, Takata and Honda were slow to report the full extent of the danger to drivers and passengers, and they failed to issue appropriate recalls.  Honda and Takata provided contradictory and inconsistent explanations to regulators for the Inflator Defect in Takata's airbags, which led to more confusion and delay. Indeed, the danger of defective airbags and the number of vehicles affected was concealed for years after it became apparent there was a potentially lethal problem.  Although Takata and Honda repeatedly had actual knowledge and/or were on notice of, and failed to fully investigate, the problem and issue proper recalls, they allowed the problem to proliferate and cause numerous injuries and several deaths over the last 13 years.

25.     The Vehicle Manufacturer Defendants were on notice of the Inflator Defect at the latest in 2008, when Honda first notified regulators of a problem with its Takata airbags. Because their vehicles also contained Takata airbags, they knew or should have known at that time that there was a safety problem with their airbags, and the Vehicle Manufacturer Defendants should have launched their own investigations and notified their customers.  That responsibility only grew as incidents multiplied.

26.     Instead, Defendants put profits ahead of safety.  Takata cut corners to build cheaper airbags, and the Vehicle Manufacturer Defendants sold Class members vehicles that they knew or should have known contained those defective airbags.  For several years Defendants engaged in a pattern of reckless disregard, deception, concealment, and obfuscation. Only very recently – on the heels of media scrutiny – have Defendants begun recalling some of the millions of vehicles in the United States with the Inflator Defect.

27.     As a result of Defendants' misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages.  The defective Takata airbags significantly diminish the value of the vehicles in which they are installed.

28.     Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.

29.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.

30.     In addition, as a result of Defendants' misconduct, the class of Automotive Recyclers, as defined below, has suffered economic damage.  Automotive Recyclers have purchased recalled vehicles and the defective Takata airbags contained in the vehicles, but are now unable to sell the airbags, which are essentially valueless.  Had Automotive Recyclers

known the truth about the problems associated with the Inflator Defect, they would not have purchased the recalled vehicles and airbags contained therein or would have paid a reduced amount.  Moreover, Automotive Recyclers have suffered economic injury as they have stored and maintained and continue to store and maintain the defective Takata airbags.

### JURISDICTION AND VENUE

31.     This Amended Consolidated Class Action Complaint formally amends the initial complaint filed in *Dunn, et al., v. Takata Corporation, et al.,* No. 14-cv-24009 (S.D. Fla.), pursuant to the Court's Order Setting Schedule (Dkt. 9 at 2), while all other cases asserting economic loss claims will be placed in "civil suspense"' and provisionally closed, with leave to reopen after all pre-trial proceedings have concluded.  This Amended Consolidated Class Action Complaint, therefore, does not supersede any individual complaint in this MDL except for the complaint filed in *Dunn, et al., v. Takata Corporation, et al.,* No. 14-cv-24009 (S.D. Fla.).

32.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' RICO claims arise under federal law, and this Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

33.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.  This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were

engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.

34.     This Court also has personal jurisdiction over the Takata Defendants and the Honda Defendants under 18 U.S.C. § 1965 because they are found or have agents or transact business in this District.

35.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this district.  Also, venue is proper in this district pursuant to 18 U.S.C. § 1965.

## THE PARTIES

### I.     Takata Defendants

36.     Defendant Takata Corporation ("Takata") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan. Takata is a specialized supplier of automotive safety systems that designs, manufactures, tests, markets, distributes, and sells airbags.  Takata is a vertically-integrated company and manufactures component parts in its own facilities.  Takata delivers its products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

37.     Defendant TK Holdings Inc. ("TK Holdings") is a subsidiary of Takata Corporation and is headquartered in Auburn Hills, Michigan.  TK Holdings sells, designs, manufactures, tests, marks, and distributes airbags in the United States.  TK Holdings both directly and through subsidiaries, owns and operates 56 manufacturing plants in twenty countries.  TK Holdings manufactures airbags in the United States, including airbags at issue in this litigation.   TK Holdings delivers its products into the stream of commerce with the

expectation that they will be purchased by consumers in the United States and the State of Florida.

38.     Defendants Takata and TK Holdings are collectively referred to as "Takata" or the "Takata Defendants."  Takata is the manufacturer of all the defective airbags that are the subject of this Complaint.

## II.     <u>Vehicle Manufacturer Defendants</u>

39.     Defendant Honda Motor Co., Ltd. ("Honda Motor") is a foreign for-profit corporation with its principal place of business in Tokyo, Japan.  Honda Motor manufactures and sells motorcycles, automobiles, and power products through independent retail dealers, outlets, and authorized dealerships primarily in Japan, North America, Europe, and Asia.

40.     Defendant American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor headquartered in Torrance, California.  American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States. American Honda manufactures and assembles its vehicles for sale in the United States in automobile plants located in Greensburg, Indiana; East Liberty, Ohio; Lincoln, Alabama; and Marysville, Ohio.

41.     Defendants Honda Motor and American Honda are collectively referred to as "Honda" or "Honda Defendants."  Honda vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The Honda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

42.     Defendant Bayerische Motoren Werke AG ("BMW AG") is a German holding company and automobile manufacturer.  BMW AG is headquartered in Munich, Bavaria, Germany.  BMW Group is a subsidiary of BMW AG and is also headquartered in Munich. BMW AG, together with its subsidiaries, develops, manufactures, and sells cars and motorcycles worldwide.

43.     Defendant BMW of North America, LLC ("BMW North America") is a subsidiary of BMW AG and is headquartered in Woodcliff Lake, New Jersey.  BMW of North America is the United States importer of BMW vehicles.

44.     Defendants BMW AG, and BMW North America are collectively referred to as "BMW" or "BMW Defendants."   BMW vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The BMW Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

45.     Defendant Ford Motor Company ("Ford") is headquartered in Dearborn, Michigan.  Ford develops, manufactures, distributes, and services vehicles, parts, and accessories worldwide, including in the United States.  Ford vehicles sold in the United States contain airbags manufactured by the Takata Defendants.

46.     Defendant General Motors LLC ("GM") is a limited liability company formed under the laws of Delaware with its principal place of business located at 300 Renaissance Center, Detroit, Michigan.  The sole member and owner of General Motors LLC is General Motors Holding LLC.  General Motors Holdings LLC is a Delaware limited liability company with its principal place of business in the State of Michigan.  The sole member and owner of General Motors Holdings LLC is General Motors Company.  General Motors Company is a Delaware Corporation, which has its principal place of business in the State of Michigan, and is a citizen of the States of Delaware and Michigan.  GM develops, manufactures, distributes, and services vehicles, parts, and accessories worldwide, including in the United States.  GM vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  GM is named as a Defendant in this Amended Class Action Complaint solely with respect to vehicles it sold after July 10, 2009.

47.     Defendant Mazda Corporation, along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide.  Mazda's global headquarters are located in Hiroshima, Japan.

48.     Defendant Mazda Motor of America, Inc. doing business as Mazda North American Operations ("Mazda North American"), a subsidiary of Mazda, is a California corporation with its corporate headquarters located in Irvine, California.  Mazda North American is responsible for the distribution, marketing and sales of Mazda brand automobiles in the United States.

49.     Defendants Mazda and Mazda North American are collectively referred to as "Mazda" or the "Mazda Defendants."  Mazda vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The Mazda Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

50.     Defendant Mitsubishi Motors Corporation ("Mitsubishi"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide.  Mitsubishi's global headquarters are located in Tokyo, Japan.

51.     Defendant Mitsubishi Motors North America, Inc. ("Mitsubishi North America"), a subsidiary of Mitsubishi, is a California corporation with its corporate headquarters located in Cypress, California.  Mitsubishi North America is responsible for the distribution, marketing and sales of Mitsubishi brand automobiles in the United States.

52.     Defendants Mitsubishi and Mitsubishi North America are collectively referred to as "Mitsubishi" or the "Mitsubishi Defendants."  Mitsubishi vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The Mitsubishi Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

53.     Defendant Nissan Motor Company, Ltd. ("Nissan"), along with its subsidiaries, develops, manufactures, and sells automotive vehicles worldwide.  Nissan's global headquarters are located in Yokohama, Japan.

54.     Defendant Nissan North America, Inc. ("Nissan North America"), a subsidiary of Nissan, is a California corporation with its corporate headquarters located in Franklin,

Tennessee.  Nissan North America is responsible for the distribution, marketing and sales of Nissan and Infiniti brand automobiles in the United States.

55.    Defendants Nissan and Nissan North America are collectively referred to as "Nissan" or the "Nissan Defendants."  Nissan vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The Nissan Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

56.    Defendant Fuji Heavy Industries ("Fuji"), the parent company of Subaru, is a transportation conglomerate.  Along with its subsidiaries, Fuji develops, manufactures, and sells automotive vehicles worldwide.  Fuji's global headquarters are located in Tokyo, Japan.

57.    Defendant Subaru ("Subaru"), a subsidiary of Fuji, develops, manufactures, and sells automotive vehicles worldwide.  Subaru's global headquarters are located in Tokyo, Japan.

58.    Defendant Subaru of America, Inc. ("Subaru America"), a subsidiary of Fuji, is a New Jersey corporation with its corporate headquarters located in Cherry Hill, New Jersey. Subaru of America is responsible for the distribution, marketing and sales of Subaru brand automobiles in the United States.

59.    Defendants Fuji, Subaru and Subaru America are collectively referred to as "Subaru" or the "Subaru Defendants."  Subaru vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The Subaru Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

60.    Defendant Toyota Motor Corporation ("Toyota") is the world's largest automaker and the largest seller of automobiles in the United States.  Toyota is a Japanese Corporation headquartered in Toyota City, Aichi Prefecture, Japan.

61.    Defendant Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a wholly-owned subsidiary of Toyota Motor Corporation and is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota Motor Corporation.

Toyota U.S.A. is headquartered in Torrance, California and is a subsidiary of Toyota Motor Corporation.

62.     Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is headquartered in Erlanger, Kentucky with major operations in Arizona, California, and Michigan.  TEMA is responsible for Toyota's engineering design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada.  TEMA is a subsidiary of Toyota Motor Corporation.

63.     Defendants Toyota, Toyota U.S.A., and TEMA are collectively referred to as "Toyota" or the "Toyota Defendants."  Toyota vehicles sold in the United States contain airbags manufactured by the Takata Defendants.  The Toyota Defendants deliver these products into the stream of commerce with the expectation that they will be purchased by consumers in the United States and the State of Florida.

64.     All of the non-Takata Defendants are collectively referred to as the "Vehicle Manufacturer Defendants."

III.     **Plaintiffs**

        A.     **Consumer Plaintiffs**

65.     Unless otherwise indicated, all Plaintiffs identified below purchased their Class Vehicles primarily for personal, family, and household use.

Joseph Aliscio—Florida

66.     Plaintiff Joseph Aliscio resides in Port Saint Lucie, Florida.  Plaintiff Aliscio owns a 2004 Ford Ranger, which was purchased used for approximately $11,000.00 on October 22, 2009 at Bev Smith Toyota in Ft. Pierce, Florida.  Plaintiff Aliscio believes that both the driver and passenger side airbags in his 2004 Ford Ranger were replaced in March 2015.  The value of his 2004 Ford Ranger has been diminished as a result of the Inflator Defect.  Plaintiff

Aliscio would not have purchased the 2004 Ford Ranger or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Keile Allen—Florida

67.     Plaintiff Keile Allen resides in Miami, Florida.  Plaintiff Allen owns a 2002 Honda Odyssey, which was purchased used for approximately $7,000.00 in 2010 from a private seller in Weston, Florida.  Plaintiff Allen has received numerous safety recall notices relating to the vehicle's airbags.  Plaintiff Allen believes that both the driver and passenger side airbags in the 2002 Honda Odyssey were replaced.  Plaintiff Allen has taken the 2002 Honda Odyssey twice to be serviced for the airbags, in response to recalls.   The value of Plaintiff Allen's 2002 Honda Odyssey has been diminished as a result of the Inflator Defect.  Prior to purchasing the 2002 Honda Odyssey, Plaintiff Allen viewed or heard about the Honda Odyssey through television commercials, ads in newspapers, and magazines, which reinforced and repeated the message that Hondas are safe, reliable, and appropriate for family use.  In particular, Plaintiff Allen recalls seeing advertisements representing that the Honda Odyssey was best in its class for safety.  These representations influenced Plaintiff Allen to purchase the 2002 Honda Odyssey.  Plaintiff Allen would not have purchased the 2002 Honda Odyssey or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Timothy L. Archer—Hawaii

68.     Plaintiff Timothy L. Archer resides in Mililani, Hawaii.  Plaintiff Archer owns a 2004 Honda CRV, which was purchased new for approximately $24,000.00 in April 2004 at the Tony Honda dealership in Waipahu, Hawaii. Plaintiff Archer's 2004 Honda CRV was covered under the original manufacturer's warranty.  Plaintiff Archer purchased a three-year extended warranty at the time of the vehicle purchase in April 2004. Plaintiff Archer subsequently

purchased another three-year extended warranty in approximately 2011.  Plaintiff Archer believes that both the driver and passenger side airbags in his 2004 Honda CRV were replaced due to the most recent recall notice.  But after having the repairs completed, Plaintiff Archer received another recall notice for the passenger side airbag.  The value of Plaintiff Archer's 2004 Honda CRV has been diminished as a result of the Inflator Defect.  Prior to purchasing the 2004 Honda CRV, Plaintiff Archer heard about the vehicle from general dealership advertisements on the radio as well as from dealer discussions and Honda pamphlets that were provided to him at the dealership.  Plaintiff Archer would not have purchased the 2004 Honda CRV or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Richard Arnold—Georgia

69.     Plaintiff Richard Arnold resides in Atlanta, Georgia.  Plaintiff Arnold owns a 2006 Honda Pilot, which was purchased used for $16,500.00 on October 14, 2012 at Atlanta Toyota in Duluth, Georgia. Plaintiff Arnold believes that the airbags in his vehicle were replaced between December 2014 and January 2015.  The value of Plaintiff Arnold's 2006 Honda Pilot has been diminished as a result of the Inflator Defect.  Plaintiff Arnold would not have purchased the 2006 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Marjorie Michelle Avery—North Carolina

70.     Plaintiff Marjorie Michelle Avery resides in Winterville, North Carolina.  Plaintiff Avery owns a 2006 Honda Ridgeline which was purchased new for $32,000.00 in August 2005 at Bob Barbour Honda in Greenville, North Carolina.  Plaintiff Avery's 2006 Honda Ridgeline is currently covered or was covered by her new car warranty.   The value of Plaintiff Avery's 2006

Honda Ridgeline has been diminished as a result of the Inflator Defect.  Plaintiff Avery would not have purchased the 2006 Honda Ridgeline or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Jina Bae—California

71.    Plaintiff Jina Bae resides in Riverside, California.  Plaintiff Bae owns a 2004 Honda Accord, which was purchased used for $18,000.00 in September 2008 at Honda Cars of Corona in Corona, California. Plaintiff Bae believes that the airbags in the 2004 Honda Accord were replaced.  The value of Plaintiff Bae's 2004 Honda Accord has been diminished as a result of the Inflator Defect.  Plaintiff Bae would not have purchased her 2004 Honda Accord or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Nancy Barnett—Texas

72.    Plaintiff Nancy Barnett resides in Austin, Texas.  Plaintiff Barnett owns a 2007 Ford Mustang, which was purchased used for $18,000.00 on July 7, 2008 at Henna Chevrolet LP in Austin, Texas.   When she became aware of the Takata airbag recall, Plaintiff Barnett contacted Maxwell Ford in Austin, Texas regarding the airbags in her 2007 Ford Mustang, but she was specifically told that the recall did not apply to her vehicle.  To Plaintiff Barnett's knowledge, the airbags in her 2007 Ford Mustang have never been repaired or replaced.  The value of her 2007 Ford Mustang has been diminished as a result of the Inflator Defect. Plaintiff Barnett would not have purchased her 2007 Ford Mustang or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Robert A. Barto—Pennsylvania

73.     Plaintiff Robert A. Barto resides in Kitanning, Pennsylvania.  Plaintiff Barto owns a 2004 Nissan Sentra, which was purchased used for $5,350.00 in March 2011 in Pittsburgh, Pennsylvania.  Plaintiff Barto received a written notice in the mail that his 2004 Nissan Sentra was subject to a recall for the front passenger airbags.  Plaintiff Barto communicated with Nissan and a Nissan Dealer, who replaced the front passenger airbags on November 6, 2014.  The value of Plaintiff Barto's 2004 Nissan Sentra has been diminished as a result of the Inflator Defect. Plaintiff Barto would not have purchased the 2004 Nissan Sentra or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Ellen Bonet—Florida

74.     Plaintiff Ellen Bonet resides in Miami, Florida.   Plaintiff Bonet owns a 2008 Dodge Durango, which was purchased new for approximately $30,000.00 on February 22, 2009 at Planet Dodge in Miami, Florida. Plaintiff Bonet's 2008 Dodge Durango came with a warranty. The value of Plaintiff Bonet's 2008 Dodge Durango has been diminished as a result of the Inflator Defect.  Prior to purchasing the 2008 Dodge Durango, Plaintiff Bonet viewed or heard about the Dodge Durango through internet websites, television advertisements, radio advertisements, print advertisements, bill boards and mailings from Planet Dodge.   Ultimately, Plaintiff Bonet's decision to purchase the 2008 Dodge Durango was influenced or affected by internet websites, television advertisements, radio advertisements, print advertisements, bill boards and mailings from Planet Dodge.  Specifically Plaintiff Bonet received mailings that her existing vehicle had a strong trade-in value and that it would be an excellent time to purchase the new model. The Dodge Durango was promoted as an excellent family vehicle having a third-seat option.  Plaintiff Bonet would not have purchased the 2008 Dodge Durango or would not have

paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Erik Boone—Michigan

75.     Plaintiff Erik Boone resides in East Lansing, Michigan.  Plaintiff Boone owns a 2004 Honda Pilot, which was purchased used for $8,695.00 at Williams Autoworld in Lansing, Michigan on March 28, 2014.  Plaintiff Boone has not received a safety recall notice regarding the airbags in his 2004 Honda Pilot.  To Plaintiff Boone's knowledge, the airbags in his 2004 Honda Pilot have never been repaired or replaced.  His 2004 Honda Pilot has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2004 Honda Pilot, Plaintiff Boone viewed or heard about the vehicle through his research on the vehicle through different websites like Kelly BlueBook, Cars.com, and the NHTSA Ratings.  Ultimately, Plaintiff Boone's decision to purchase his 2004 Honda Pilot was influenced by the websites and safety ratings giving the vehicle 5 stars.  Plaintiff Boone would not have purchased his 2004 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Peter Breschnev—Illinois

76.     Plaintiff Peter Breschnev resides in Chicago, Illinois.  Plaintiff Breschnev owns a 2002 Acura TL, which was purchased new for $30,500.00 in April 2002 at McGrath Acura in Westmont, Illinois.  Plaintiff Breschnev's 2002 Acura TL is now covered or was covered by a written warranty. Plaintiff Breschnev believes there have been three recalls regarding his 2002 Acura TL, but is uncertain whether any of those recalls have resulted in the replacement of the vehicle's airbags.  The value of Plaintiff Breschnev's 2002 Acura TL has been diminished as a result of the Inflator Defect.  Plaintiff Breschnev would not have purchased his 2002 Acura TL

or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

<u>Charles and Vickie Burd—Indiana</u>

77. Plaintiffs Charles and Vickie Burd reside in Fort Wayne, Indiana. The Burd Plaintiffs purchased a used 2004 Honda Odyssey for approximately $21,000.00 in March/April of 2007 at Don Ayres Honda in Fort Wayne, Indiana. The Burd Plaintiffs' 2004 Honda Odyssey is currently covered by a written warranty. The Burd Plaintiffs purchased an extended warranty on the 2004 Honda Odyssey in 2011. The Burd Plaintiffs received a written communication from Honda regarding the SRS system and their eligibility for airbag replacements, but have been informed that replacement parts are on backorder until July 2015. The value of the Burd Plaintiffs' 2004 Honda Odyssey has been diminished as a result of the Inflator Defect. The Burd Plaintiffs would not have purchased their 2004 Honda Odyssey or would not have paid as much for it if they had known of the problems associated with the vehicle's Inflator Defect.

<u>Lonnee Cataldo—Florida</u>

78. Plaintiff Lonee Cataldo resides in Stuart, Florida. Plaintiff Cataldo owns a 2003 Honda Element, which was purchased used in 2004 at Spreen Honda in Loma Linda, California. Plaintiff Cataldo's 2003 Honda Element is currently covered or was covered at some point by a written factory warranty. To Plaintiff Cataldo's knowledge, the airbags in his 2003 Honda Element were replaced in December 2014 by Johnson Honda. The value of his 2003 Honda Element has been diminished. Plaintiff Cataldo would not have purchased his 2003 Honda Element or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Mario Cervantes—Alabama

79.     Plaintiff Mario Cervantes resides in Jasper, Alabama.  Plaintiff Cervantes owns a 2003 Honda Pilot, which was purchased used for $10,900.00 in 2007 at Honda of Jasper in Jasper, Alabama.  Plaintiff Cervantes purchased an extended warranty from his dealership for the drivetrain in his 2003 Honda Pilot.  To Plaintiff Cervantes' knowledge, the airbags in his 2003 Honda Pilot have never been repaired or replaced.  The value of his 2003 Honda Pilot has been diminished as a result of the Inflator Defect.  Additionally, potential buyers have rescinded their offers to purchase his vehicle because they heard about defects in that vehicle.  Prior to purchasing his 2003 Honda Pilot, Plaintiff Cervantes viewed or heard about the vehicle through television ads played during and in-between football games.  Plaintiff Cervantes also viewed or heard about the 2003 Honda Pilot through written materials provided at the dealership.  Ultimately, Plaintiff Cervantes' decision to purchase the 2003 Honda Pilot was influenced or affected by promotional materials, advertisings, and/or dealership communications stressing the safety of the Honda Pilot.  Plaintiff Cervantes relied on the representations made in the Honda Pilot Owners' Manual's safety and features sections discussing the safety of that vehicle's airbags.  Plaintiff Cervantes would not have purchased his 2003 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Ana and Kangyi Chen—Oregon

80.     Plaintiffs Ana and Kangyi Chen reside in Katy, Texas.  The Chen Plaintiffs own a 2006 Honda Accord, which was purchased new for approximately $17,000.00 plus the value of a trade-in vehicle on May 24, 2006 in Corvallis, Oregon.  The Chen Plaintiffs do not believe that the airbags in their 2006 Honda Accord have been repaired or replaced.  The value of the Chen Plaintiffs' 2006 Honda Accord has been diminished as a result of the Inflator Defect.  Prior to

purchasing their 2006 Honda Accord, the Chen Plaintiffs listened to and viewed various types of advertising for the vehicle.  The Chen Plaintiffs would not have purchased the 2006 Honda Accord or would not have paid as much for it if they had known of the problems associated with the vehicle's Inflator Defect.

Gwendolyn Cody—Arizona

81.     Plaintiff Gwendolyn Cody resides in Flagstaff, Arizona.  Plaintiff Cody owns a 2006 Honda CRV, which was purchased new for approximately $25,271.11 on September 29, 2006 at Flagstaff Honda in Flagstaff, Arizona.  Plaintiff Cody's 2006 Honda CRV was originally covered by a written warranty.   Plaintiff Cody believes that the airbags in her 2006 Honda CRV were replaced through the recall.  The value of her 2006 Honda CRV has been diminished as a result of the Inflator Defect.  Plaintiff Cody recalls hearing advertisements regarding the Honda CRV on the radio prior to purchasing the vehicle.  Plaintiff Cody would not have purchased or would have paid much less for the 2006 Honda CRV or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Connie Collins—Florida

82.     Plaintiff Connie Collins resides in Port Charlotte, Florida.  Plaintiff Collins owns a 2005 Toyota Sequoia, which was purchased new for $41,000.00 in December 2004 at Fort Myers Toyota in Fort Myers, Florida.  Plaintiff Collins' 2005 Toyota Sequoia is currently covered or was covered at some point by a written factory warranty.  In late October 2014 or early November 2014, Plaintiff Collins received a safety recall notice regarding the airbags in her 2005 Toyota Sequoia.  On November 12, 2014, Plaintiff Collins contacted Palm Toyota in Punta Gorda for servicing of the recalled airbag, but she was informed that the replacement parts for the defective airbag were not available.  The dealership also explained that Plaintiff Collins

needed to bring in her vehicle for inspection to determine whether her vehicle contained the defective inflator assembly.  Only after that determination was made would her name be put on the waiting list for replacement parts.  The dealership was not able to give her an estimated time for when the parts would arrive for her vehicle.  On November 14, 2014, the dealership disabled the airbags in her vehicle, and she was instructed not to drive her vehicle until the recalled part was received and installed in her vehicle.  To Plaintiff Collins' knowledge, the airbag inflator mechanisms in her 2005 Toyota Sequoia were replaced on February 16, 2015 at Palm Toyota. The value of her vehicle has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2005 Toyota Sequoia, Plaintiff Collins recalls seeing Toyota's advertising concerning airbags.  At the time of purchasing her 2005 Toyota Sequoia, the availability of driver and passenger airbags was a feature she was looking for.  Plaintiff Collins would not have purchased her 2005 Toyota Sequoia or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Henry Collins—California

83.     Plaintiff Henry Collins resides in Jamestown, California.  Plaintiff Collins owns a 2007 Dodge Dakota, which was purchased new for approximately $26,000.00 in October 2007 in Folsom, California.  Plaintiff Collins's 2007 Dodge Dakota was covered by a written warranty. To Plaintiff Collins's knowledge, the airbags in his 2007 Dodge Dakota have not been repaired or replaced.   Plaintiff Collins takes his 2007 Dodge Dakota to the dealership for regular maintenance, and at his last oil change, Plaintiff Collins specifically asked if there was a recall for the airbags on his 2007 Dodge Dakota, and was advised that there was not one.  The value of his 2007 Dodge Dakota has been diminished as a result of the Inflator Defect.  Plaintiff Collins has been driving his motorcycle and his second vehicle much more often as a result of the

- 23 -

Inflator Defect.  Plaintiff Collins chose the Dodge Dakota in part because of the lifetime bumper to bumper warranty on the drivetrain that the Dodge Dakota offered.  Plaintiff Collins had seen many commercials describing Dodge trucks as "Ram tough."  As a result of this and other commercials, he thought he was buying a safe truck.  Plaintiff Collins would not have purchased his 2007 Dodge Dakota or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Camila Corteleti—Florida

84.    Plaintiff Camila Corteleti resides in Coconut Creek, Florida.  Plaintiff Corteleti owns a 2004 Honda Civic, which was purchased used for approximately $5,500.00 on April 1, 2011 in Pompano Beach, Florida.  Plaintiff Corteleti does not know whether the airbags in her vehicle have been replaced or repaired.  The value of her 2004 Honda Civic has been diminished as a result of the Inflator Defect.  Plaintiff Corteleti would not have purchased her 2004 Honda Civic or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Christopher Day—Florida

85.    Plaintiff Christopher Day resides in Jacksonville, Florida.  Plaintiff Day owns a 2002 BMW 330i, which was purchased used for approximately $10,000.00 in Tampa, Florida. Plaintiff Day purchased an extended warranty on the vehicle.  To Plaintiff Day's knowledge, the airbags in his 2002 BMW 330i have not been repaired or replaced.  The value of his 2002 BMW 330i has been diminished as a result of the Inflator Defect. Plaintiff Day stopped driving his 2002 BMW 330i when he became aware of the Inflator Defect.  Plaintiff Day would not have purchased the 2002 BMW 330i or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Sandeep Dewan—Florida

86.     Plaintiff Sandeep Dewan resides in Wellington, Florida.  Plaintiff Dewan owns a 2003 BMW 330ci, which was purchased used from a private owner for approximately $10,000.00 in January 2013 from a private party in West Palm Beach, Florida.  Plaintiff Dewan purchased an extended warranty for the vehicle.  To Plaintiff Dewan's knowledge, the airbags in his 2003 BMW 330ci have not been repaired or replaced.  The value of his 2003 BMW 330ci has been diminished as a result of the Inflator Defect.  Plaintiff Dewan would not have purchased the BMW 330ci or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

William Dougherty—California

87.     Plaintiff William Dougherty resides in Santa Fe, California.  Plaintiff Dougherty owns a 2001 BMW 325ci, which was purchased used for approximately $10,000.00 in or around August 2003 in San Diego, California.  Plaintiff Dougherty called BMW of Carlsbad regarding the airbags in his 2001 BMW 325ci, and he has an appointment to take his vehicle to the dealership in mid-May 2015.  To Plaintiff Dougherty's knowledge, the airbags in his 2001 BMW 325ci have never been repaired or replaced.   The value of his 2001 BMW 325ci has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2001 BMW 325ci, Plaintiff Dougherty viewed or heard about the vehicle through internet searches for that vehicle's safety, reliability, and resale value.  Prior to purchasing his 2001 BMW 325ci, Plaintiff Dougherty also viewed or heard about the vehicle through TV ads promoting that vehicle and its safety and reliability.   Ultimately, Plaintiff Dougherty's decision to purchase the 2001 BMW 325ci was influenced or affected by his desire to purchase the best, safest, most reliable vehicle, and Plaintiff Dougherty was influenced by what he saw and heard in the ads regarding that BMW

vehicle.  Plaintiff Dougherty would not have purchased his 2001 BMW 325ci or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Leslie A. Flaherty—California

88.     Plaintiff Leslie A. Flaherty resides in San Jose, California.  Plaintiff Flaherty owns a 2008 Honda Element, which was purchased new for $29,000.00 on December 1, 2007 in Girloy, California.  Plaintiff Flaherty's 2008 Honda Element was covered by a written warranty. In addition, Plaintiff Flaherty purchased an extended warranty for her 2008 Honda Element.  To Plaintiff Flaherty's knowledge, the airbags in her 2008 Honda Element were replaced through a recall.  The value of her 2008 Honda Element has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2008 Honda Element, Plaintiff Flaherty viewed or heard about the vehicle through TV advertisements and her online research into cars.  Plaintiff Flaherty also remembers advertisements promoting the vehicle's ten-year warranty.  Ultimately, Plaintiff Flaherty's decision to purchase the 2008 Honda Element was influenced or affected by promotional materials, advertising, and/or communications with dealerships describing the safety features of the Honda Element.  Plaintiff Flaherty would not have purchased her 2008 Honda Element or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Ryvania Fuentes—Florida

89.     Plaintiff Ryvania Fuentes resides in Miami, Florida.  Plaintiff Fuentes owns a 2007 Honda Accord, which was purchased used for approximately $27,312.26 in December 2007 in Hollywood, Florida.  Plaintiff Fuentes does not know if any airbags in the vehicle have been replaced. She telephoned the dealership, which said it would call her back if she needed to bring the car in, but it has not called her back yet.  The value of her 2007 Honda Accord has been

diminished as a result of the Inflator Defect.  Plaintiff Fuentes would not have purchased her 2007 Honda Accord or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Terri Gamino—California

90.     Plaintiff Terri Gamino resides in Santa Ana, California.  Plaintiff Gamino owns a 2006 Honda Accord, which was purchased new in October 2007 at Hardin Honda in Anaheim, California.  The vehicle was purchased with a new-car warranty.  Plaintiff Gamino does not believe that her vehicle's airbags have been replaced.  Prior to purchasing her 2006 Honda Accord, Plaintiff Gamino received an advertisement for it in the mail and then researched it further online.  Plaintiff Gamino would not have purchased her 2006 Honda Accord or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Rafael A. Garcia—New York

91.     Plaintiff Rafael A. Garcia resides in Bronx, New York.  Plaintiff Garcia owns a 2007 Honda Pilot, which was purchased used for approximately $18,188.11 on March 30, 2013 at Yonkers Motor Corporation in Yonkers, New York.  To Plaintiff Garcia's knowledge, the airbags in his 2007 Honda Pilot have not been repaired or replaced.  The value of his 2007 Honda Pilot has been diminished as a result of the Inflator Defect.  Plaintiff Garcia would not have purchased his 2007 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Kristen Go—California

92.     Plaintiff Kristen Go resides in Walnut Creek, California.  Plaintiff Go owns a 2001 Honda Accord, which was purchased new for approximately $20,000.00 - $25,000.00 in

December 2000 in Phoenix, Arizona.  Plaintiff Go's 2001 Honda Accord was initially covered by a written warranty. To Plaintiff Go's knowledge, the airbags in her 2001 Honda Accord have been replaced through a recall.  Plaintiff Go heard about the dangers of Takata airbags, and as soon as she learned that her vehicle was included in the recall, she scheduled an appointment to get the airbags replaced.  Plaintiff Go had to wait at least 2-3 weeks to get an appointment scheduled to have the airbags replaced.  Plaintiff Go does not know exactly which airbags or components have been replaced in her vehicle.  The value of her 2001 Honda Accord has been diminished as a result of the Inflator Defect.  Based on the reputation of the Honda Accord and the advertisements that she saw at that time, Plaintiff Go believed that the Honda Accord was safe and reliable and required minimal maintenance when she purchased it.  Plaintiff Go would not have purchased her 2001 Honda Accord or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Robert F. Goodwin—Washington

93.     Plaintiff Robert F. Goodwin resides in Omak, Washington.  Plaintiff Goodwin owns a 2004 Honda CRV 4WD, which was purchased used for approximately $18,350.00 in 2005 at Lynwood Honda in Edmonds, Washington.  Plaintiff Goodwin previously purchased a written Limited Power Train Warranty for the vehicle.  To Plaintiff Goodwin's knowledge, the airbags in his 2004 Honda CRV were replaced on March 2, 2015.  The value of his 2004 Honda CRV has been diminished as a result of the Inflator Defect.  Plaintiff Goodwin would not have purchased his 2004 Honda CRV or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

David Gunther—Florida

94.     Plaintiff David Gunther resides in Coconut Creek, Florida.   Plaintiff Gunther owns a 2003 BMW 325i, which was purchased used for $7,200.00 exclusive of taxes and fees at Gunther Volkswagen in Florida on December 25, 2011.  Plaintiff Gunther's 2003 BMW 325i is subject to safety recall #14V-428, but the replacement parts were unavailable as of at least March 24, 2015.  To Plaintiff Gunther's knowledge, the airbags in his 2003 BMW 325i have never been repaired or replaced.   The value of his 2003 BMW 325i has been diminished as a result of the Inflator Defect.   Prior to purchasing his 2003 BMW 325i, Plaintiff Gunther viewed or heard about the vehicle through his research on Internet websites such as Car and Driver as well as Consumer Reports.   Ultimately, Plaintiff Gunther's decision to purchase the 2003 BMW 325i was influenced or affected by the fact that it had a great safety rating.  Plaintiff Gunther would not have purchased his 2003 BMW 325i or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Coleman Haklar—California

95.     Plaintiff Coleman Haklar resides in La Canada Flintridge, California.   Plaintiff Haklar owns a 2002 Infiniti I-35, which was purchased new for approximately $36,000.00 in November 2002 at Alhambra Nissan in Alhambra, California.  Plaintiff Haklar's 2002 Infiniti I-35 was initially covered by a written warranty.  Plaintiff Haklar has not received any notice from Nissan or Takata for any airbag repairs, but has made an appointment with the dealership to take the 2002 Infiniti I-35 in to replace the airbags.  To Plaintiff Haklar's knowledge, the airbags in the 2002 Infiniti I-35 have never been repaired or replaced.   After Plaintiff Haklar read the newspaper articles and watched television reports regarding the Takata airbags, he stopped driving the 2002 Infiniti I-35 and did not let anyone in his family drive the vehicle either.  The

value of his 2002 Infiniti I-35 has been diminished as a result of the Inflator Defect.  Prior to purchasing the 2002 Infiniti I-35, Plaintiff Haklar viewed or heard about the vehicle through websites and TV advertisements.  Plaintiff Haklar remembers seeing or hearing that Nissan made some of the safest cars, which was an important factor to Plaintiff Haklar in deciding to purchase the vehicle.  Ultimately, Plaintiff Haklar's decision to purchase the 2002 Infiniti I-35 was influenced or affected by his belief that Nissan had a very good safety history.   Plaintiff Haklar would not have purchased the 2002 Infiniti I-35 or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Mary Hasley—Rhode Island

96.     Plaintiff Mary Hasley resides in West Warwick, Rhode Island.  Plaintiff Hasley owns a 2002 Honda Accord VXS, which was purchased new for approximately $23,971.92 on August 30, 2002 at Metro Honda in Johnston, Rhode Island.  Plaintiff Hasley's 2002 Honda Accord VXS was covered by a written warranty.  Plaintiff Hasley purchased an extended service contract for that vehicle.  Plaintiff Hasley received a recall letter from Honda notifying her that her vehicle was subject to the airbag recall.  Pursuant to that recall notice, the Majestic Honda dealership in Warwick, Rhode Island subsequently inspected the airbags in Plaintiff Hasley's 2002 Honda Accord VXS and specifically told Plaintiff Hasley that her vehicle was not affected by the recall notice.  Plaintiff Hasley relied on those communications but she recently found out that the airbags in her 2002 Honda Accord VXS are in fact subject to the airbag recall.  Plaintiff Hasley's dealership is waiting for replacement parts to arrive before they can replace the airbags in her vehicle.  To Plaintiff Hasley's knowledge, the airbags in her 2002 Honda Accord have never been replaced or repaired.  The value of Plaintiff Hasley's 2002 Honda Accord VXS has been diminished as a result of the Inflator Defect.  Prior to purchasing the 2002 Honda Accord

VXS, Plaintiff Hasley viewed or heard about the Honda Accord through television advertisements, radio advertisements and print advertisements promoting the Honda Accord as a safe and reliable vehicle that was the better buy over other vehicles. Ultimately, Plaintiff Hasley relied on these advertisements and their message that a Honda Accord was a safe vehicle when she decided to purchase her 2002 Honda Accord VXS. Plaintiff Hasley would not have purchased the 2002 Honda Accord or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

James Herron—Florida

97.     Plaintiff James Herron resides in Coral Springs, Florida. Plaintiff Herron owns a 2005 Dodge Ram Truck, which was purchased new for $28,400.00 in February 2005 at a Dodge dealership in Pembroke Pines, Florida. Plaintiff Herron's 2004 Dodge Ram Truck was initially covered by a written 6 years or 100,000 mile warranty. Plaintiff Herron purchased an extended warranty as well. To Plaintiff Herron's knowledge, the airbags in his 2004 Dodge Ram Truck have not been repaired or replaced. Plaintiff Herron is waiting for the Dodge dealership to receive the parts necessary to replace the airbags in his 2004 Dodge Ram Truck. As soon as the dealership receives the parts, Plaintiff Herron intends to take his 2004 Dodge Ram Truck to the dealership to have the airbags replaced. The value of his 2004 Dodge Ram Truck has been diminished as a result of the Inflator Defect. Plaintiff Herron would not have purchased his 2004 Dodge Ram Truck or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Amber Hodgson—Missouri

98.     Plaintiff Amber Hodgson resides in Lee's Summit, Missouri. Plaintiff Hodgson owns a 2004 Honda CRV, which was purchased new for $22,089.00 on January 4, 2004 in

Kansas City, Missouri.  Plaintiff Hodgson's 2004 Honda CRV was covered by a written five year warranty from the date of purchase.  Plaintiff Hodgson also purchased a five year extended warranty from the Honda dealership.  To Plaintiff Hodgson's knowledge, none of the airbags in her 2004 Honda CRV have been repaired or replaced.  The value of her 2004 Honda CRV has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2004 Honda CRV, Plaintiff Hodgson researched various pricing and user review websites, including Consumer Reports and Kelly Blue Book.  Plaintiff Hodgson also viewed or heard about the 2004 Honda CRV based on general television and media advertisements.  Plaintiff Hodgson would not have purchased her 2004 Honda CRV or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Russell Holland—Missouri

99.     Plaintiff Russell Holland resides in Springfield, Missouri.  Plaintiff Holland owns a 2007 Honda Pilot, which was purchased new for $23,000.00 - $24,000.00 in April 2007 at Don Wessel in Springfield, Missouri.  Plaintiff Holland purchased an extended warranty for the vehicle.  To Plaintiff Holland's knowledge, the airbags in his 2007 Honda Pilot have not been repaired or replaced.  Plaintiff Holland knows this because, in March of 2015, he took his 2007 Honda Pilot to the dealership for an oil change and was told that his vehicle was part of the Takata airbag recall.  Plaintiff Holland was advised at the dealership that they would order parts to replace the airbags and that the parts would be available in a few weeks.  Plaintiff Holland will take his 2007 Honda Pilot to the dealership to have the airbags replaced as soon as the parts come in.  Plaintiff Holland was advised that this would take hours to do.  Plaintiff Holland has not received anything in the mail, to date, regarding the airbag recall on his vehicle.  The value of his 2007 Honda Pilot has been diminished as a result of the Inflator Defect.  Prior to

purchasing his 2007 Honda Pilot, Plaintiff Holland performed some online internet research regarding the size of the vehicle, safety and mileage, as these were issued that concerned him. Plaintiff Holland would not have purchased his 2007 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Judith Hollywood—California

100.    Plaintiff Judith Hollywood resides in Nevada City, California.   Plaintiff Hollywood owns a 2004 Honda Accord LX, which was purchased new for $21,958.58 on December 28, 2003 at Auburn Honda in Auburn, California.  Plaintiff Hollywood's 2004 Honda Accord LX was initially covered by a written warranty.  To Plaintiff Hollywood's knowledge, the airbags in her 2004 Honda Accord LX have never been repaired or replaced.  The value of her 2004 Honda Accord LX has been diminished as a result of the Inflator Defect.  Plaintiff Hollywood would not have purchased her 2004 Honda Accord LX or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Kimberly Holmes—Florida

101.    Plaintiff Kimberly Holmes resides in Coconut Creek, Florida.  Plaintiff Holmes owns a 2002 Honda Odyssey, which was purchased new for approximately $26,691.00 on February 11, 2002 at Pompano Honda (now Hendrick Honda) in Pompano Beach, Florida. Plaintiff Holmes's 2002 Honda Odyssey was initially covered by a written warranty, and she purchased an extended warranty.  To Plaintiff Holmes's knowledge, the airbags in her 2002 Honda Odyssey were looked at by a mechanic at the dealership but not replaced.  Plaintiff Holmes received a recall notice for a subsequent airbag recall.  The value of her 2002 Honda Odyssey has been diminished as a result of the Inflator Defect.  Plaintiff Holmes stopped driving the 2002 Honda Odyssey and has rented another vehicle to drive.  Plaintiff Holmes would not

have purchased the 2002 Honda Odyssey or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

John Huebner—Ohio

102.    Plaintiff John Huebner resides in Camarillo, California.  Plaintiff Huebner owns a 2005 Ford Mustang, which was purchased used for approximately $7,500.00 in March 2011 in Burbank, California. Plaintiff Huebner also owns a 2003 Pontiac Vibe, which was purchased used for approximately $5,500.00 in July 2012 at Steeltown Motors, Inc. in Youngstown, Ohio. To Plaintiff Huebner's knowledge, the airbags in his 2005 Ford Mustang and 2003 Pontiac Vibe have never been repaired or replaced.  The value of both of his vehicles has been diminished as a result of the Inflator Defect.  Plaintiff Huebner and his wife stopped driving both vehicles in 2014, after learning of the Inflator Defect.  Plaintiff Huebner has attempted to sell his Mustang and Vibe.  Plaintiff Huebner's efforts to sell the vehicles included listing them on Craigslist and taking them into Dodge, Chevy, and Buick dealerships for a trade in.   Potential buyers have rescinded their offers to purchase Plaintiff Huebner's vehicles because they heard about the defects in the vehicles.  Prior to purchasing his vehicles, Plaintiff Huebner viewed or heard about the vehicles through Consumer Report reliability ratings, NHTSA safety ratings, 2005 Mustang sales brochures, and 2003 Pontiac Vibe sales brochures.  Plaintiff Huebner also viewed or heard about the vehicles through websites, print ads, television advertisements, internet websites, and radio ads.  Plaintiff Huebner would not have purchased either vehicle or would not have paid as much for either vehicle if he had known of the problems associated with the vehicles' Inflator Defects.

David M. Jorgensen—Hawaii

103.     Plaintiff David M. Jorgensen resides in Wailuku, Hawaii.  Plaintiff Jorgensen owns a 2006 Honda Ridgeline, which was leased new in 2006 from Island Honda in Kahalui, Maui.  Plaintiff Jorgensen subsequently purchased the vehicle.  Plaintiff Jorgensen's 2006 Honda Ridgeline is currently covered or was covered by a written warranty.  To Plaintiff Jorgensen's knowledge, the airbags in his 2006 Honda Ridgeline were replaced through the recall.  The value of his 2006 Honda Ridgeline has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2006 Honda Ridgeline, Plaintiff Jorgensen viewed or heard about the vehicle through TV ads, radio ads, and print ads in the papers.  Plaintiff Jorgensen also viewed or heard about the 2006 Honda Ridgeline through research on some Internet sites as well as some comparison shopping on the cost of purchasing on other islands in Hawaii.  Plaintiff Jorgensen was told that the 2006 Honda Ridgeline came with airbags, which was an important safety feature to him.  Plaintiff Jorgensen would not have purchased his 2006 Honda Ridgeline or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Constantine Kazos—Florida

104.     Plaintiff Constantine Kazos resides in Los Gatos, California.  Plaintiff Kazos owns a 2004 BMW M3, which was purchased used for $24,000.00 on May 8, 2011 from Autos of Palm Beach in Palm Beach, Florida.  Plaintiff Kazos also owns a 2008 Honda Element, which was purchased new for approximately $20,000.00 from Capital Honda in San Jose, California in August 2008.  Plaintiff Kazos' 2008 Honda Element was covered by a written warranty.  In mid-April 2015, Plaintiff Kazos received a safety recall notice regarding his 2008 Honda Element.  To Plaintiff Kazos's knowledge, the airbags in his 2008 Honda Element have never been

repaired or replaced.  Plaintiff Kazos's 2004 BMW M3 was subject to a safety recall for a passenger side airbag and an update on computer software.  To Plaintiff Kazos's knowledge, the airbags in his 2004 BMW M3 were replaced in February 2015 by Stevens Creek BMW.   Prior to purchasing his 2004 BMW M3, Plaintiff Kazos had viewed or heard about BMWs through advertisements on TV and car magazines for various years.  The value of his 2004 BMW M3 has been diminished as a result of the Inflator Defect.  The value of his 2008 Honda Element has also been diminished as a result of the Inflator Defect.  Plaintiff Kazos would not have purchased his 2004 BMW M3 or his 2008 Honda Element or would not have paid as much for either vehicle if he had known of the problems associated with the vehicles' Inflator Defects.

Laura M. Killgo—Oregon

105.    Plaintiff Laura M. Killgo resides in Sandpoint, Idaho.  Plaintiff Killgo owns a 2003 Honda Element, which was purchased used for around $8,000.00 in 2009 at a Honda dealership in Eugene, Oregon.  She has not received a safety recall notice from Honda regarding the airbags in her 2003 Honda Element.  After repeated calls to her Honda dealership in Coeur D'Alene, she was informed that her vehicle was subject to the secondary round of the airbag recall.  To Plaintiff Killgo's knowledge, the airbags in her 2003 Honda Element were replaced through the secondary recall.   The value of her 2003 Honda Element has been diminished as a result of the Inflator Defect.  Plaintiff Killgo purchased her 2003 Honda Element due to Honda vehicles' purported safety and reliability.  Plaintiff Killgo would not have purchased her 2003 Honda Element or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Richard D. Klinger—California

106.    Plaintiff Richard D. Klinger resides in Sherman Oaks, California.    Plaintiff Klinger owns a 2003 Honda Civic Hybrid, which was purchased used for $15,500.00 in 2006 in Los Angeles, California.  On October 23, 2014, after reading an article in the L.A. Times about Takata airbags, he brought his 2003 Honda Civic Hybrid to the Miller Honda dealership.  The dealership told Plaintiff Klinger that it needed to replace the driver and passenger airbags, but it did not have the parts.  Plaintiff Klinger left his vehicle at the dealership and rented replacement vehicles until October 30, 2014.  To Plaintiff Klinger's knowledge, the airbags in his 2003 Honda Civic Hybrid were replaced by October 30, 2014.  The value of his 2003 Honda Civic Hybrid has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2003 Honda Civic Hybrid, Plaintiff Klinger viewed or heard about the vehicle through newspaper and magazine advertisements and consumer reports evaluations.  Plaintiff Klinger also researched the 2003 Honda Civic Hybrid through other materials, such as a lengthy review in "Car and Driver" magazine. Ultimately, Plaintiff Klinger's decision to purchase his 2003 Honda Civic Hybrid was influenced or affected by promotional materials, advertisements, and/or communications with dealerships.  Plaintiff Klinger would not have purchased his 2003 Honda Civic Hybrid had he known of the problems associated with the vehicle's Inflator Defect.

Jonathan Knight—West Virginia

107.    Plaintiff Jonathan Knight resides in Cross Lanes, West Virginia.  Plaintiff Knight owns a 2006 Honda Pilot, which was purchased used for $16,806 on January 6, 2009 at Lester Raines Honda in South Charleston, West Virginia.  Plaintiff Knight purchased an extended warranty to extend coverage for that vehicle.  Plaintiff Knight has not received a safety recall notice regarding the Takata airbags in his 2006 Honda Pilot.  To Plaintiff Knight's knowledge,

the airbags in his 2006 Honda Pilot have never been repaired or replaced. The value of his 2006 Honda Pilot has been diminished as a result of the Inflator Defect. Plaintiff Knight would not have purchased his 2006 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Pam H. Koehler—Florida

108.   Plaintiff Pam H. Koehler resides in Augustine, Florida. Plaintiff Koehler owns a 2006 Honda Pilot, which was purchased new for approximately $27,000.00 in March 2006 from a Honda dealership in Naples, Florida. Plaintiff Koehler's 2006 Honda Pilot was covered by a written 3 years or 36,000 miles warranty. Sometime in late September 2014, Plaintiff Koehler received a safety recall notice regarding the Takata airbags in her 2006 Honda Pilot. She was told that there was a backup in getting the repair done because so many people were calling regarding the airbag recall. Thus, Plaintiff Koehler had to wait over three weeks to get her vehicle repaired. To Plaintiff Koehler's knowledge, the airbags in her 2006 Honda Pilot were replaced on November 4, 2014. As a result of the Inflator Defect, the value of her 2006 Honda Pilot has been diminished. Prior to purchasing her 2006 Honda Pilot, Plaintiff Koehler viewed or heard about the vehicle through written ads, including newspaper ads, discussing the vehicle's safety and reliability. She relied on the vehicle's window sticker regarding its 5-star safety rating. Plaintiff Koehler would not have purchased her 2006 Honda Pilot or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

David Kopelman—Florida

109.   Plaintiff David Kopelman resides in Plantation, Florida. Plaintiff Kopelman owns a 2004 Honda Pilot EXL DVD, which was purchased new for $32,103.69 on August 6, 2004 at Pompano Honda in Pompano Beach, Florida. Plaintiff Kopelman's vehicle was originally

covered by a standard warranty, the American Honda Service Contract ("Honda Care"), covering the vehicle up to 75,000 miles.  Plaintiff Kopelman purchased an extended warranty for the vehicle, covering his vehicle up to 125,000 miles.  Plaintiff Kopelman has participated in all of the available recalls.  When he received one of the recall letters for his vehicle's airbags, Plaintiff Kopelman contacted Holman Honda in Fort Lauderdale, Florida, and that dealership told Plaintiff Kopelman that it would have to order the airbag replacement.  To Plaintiff Kopelman's knowledge, his 2004 Honda Pilot's airbags were replaced during the recall in March 2015.  The value of his 2004 Honda Pilot has been diminished as a result of the Inflator Defect.  Plaintiff unsuccessfully attempted to sell or dispose of his 2004 Honda Pilot.  In deciding whether to purchase his vehicle, Plaintiff Kopelman researched the safety and durability of the Honda pilot.  Plaintiff Kopelman also periodically received direct mail advertisements for the product.  Plaintiff Kopelman also watched a commercial about the Honda Pilot.   The promotional materials, advertising, and/or communications with dealerships affected Plaintiff Kopelman's decision to buy his 2004 Honda Pilot because the vehicle was represented as a safe sports utility vehicle that would retain its retail value as the car aged.   Plaintiff Kopelman would not have purchased his 2004 Honda Pilot if he had known of the problems associated with the vehicle's Inflator Defect, because he would not willingly put his entire family at risk of sustaining injuries of any kind.

Kostan Lathouris—Nevada

110.    Plaintiff Kostan Lathouris resides in Henderson, Nevada.   Plaintiff Lathouris owns a 2005 Honda Civic, which was purchased used for $17,829.93 on April 10, 2006 at Honda West in Las Vegas, Nevada.  Around late 2014, he went to a dealership to determine whether his airbags were subject to a recall, but was specifically told that his vehicle was not subject to an

airbag recall.  To Plaintiff Lathouris' knowledge, the airbags in his 2005 Honda Civic have never been repaired or replaced.  The value of his 2005 Honda Civic has been diminished as a result of the Inflator Defect. Plaintiff Lathouris would not have purchased his 2005 Honda Civic or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Richard Lee—Pennsylvania

111.    Plaintiff Lee Richard resides in Wyomissing, Pennsylvania.  Plaintiff Richard owns a 2003 BMW 325i, which was purchased new for $34,981.74 in June 25, 3003 at Crevier BMW in Santa Ana, California.  Plaintiff Richard's 2003 BMW 325i was covered by a written manufacturer's warranty and an extended Manufacturer's Full Maintenance warranty.  He also purchased a Service Protection Direct warranty, which expires on June 27, 2018.  Plaintiff Richard received a safety recall for the airbags in his 2003 BMW 325i in September 2014, but BMW has not had the parts to conduct this recall.  His vehicle's red alarm light for the airbag in his car has remained on too.  To Plaintiff Richard's knowledge, the airbags in his 2003 BMW 325i have never been repaired or replaced.  The value of his 2003 BMW 325i has been diminished as a result of the Inflator Defect.  Plaintiff Richard would not have purchased his 2003 BMW 325i or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Sonya Annette Leonard—Tennessee

112.    Plaintiff Sonya Annette Leonard resides in Asheville, North Carolina.  Plaintiff Leonard owns a 2007 Honda Accord, which was purchased new for approximately $24,000.00 in the spring of 2007 at Johnson City Honda in Johnson City, Tennessee.  Plaintiff Leonard's 2007 Honda Accord was covered at some point by a written warranty and an extended warranty.

Plaintiff Leonard has never received a safety recall notice regarding her 2007 Honda Accord, but simply read about the Takata airbag recall on a news website.  When she called the Appletree Honda dealership in North Carolina in November 2014 regarding the airbag recall, they told her that despite the fact that her vehicle is subject to the airbag recall, her vehicle did not need to have the airbags checked, repaired, or replaced.  To Plaintiff Leonard's knowledge, the airbags in her 2007 Honda Accord have never been repaired or replaced.  The value of her 2007 Honda Accord has been diminished as a result of the Inflator Defect.  Plaintiff Leonard would not have purchased her 2007 Honda Accord or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Rebecca Lew—Tennessee

113.    Plaintiff Rebecca Lew resides in Oak Ridge, Tennessee.  Plaintiff Lew owns a 2004 Honda Civic, which was purchased new for $15,000.00 with a "trade in" in July 2004 at Airport Honda in Knoxville, Tennessee.  Plaintiff Lew's 2004 Honda Civic is currently covered or was covered by a written warranty.  To Plaintiff Lew's knowledge, an airbag inflator in her 2004 Honda Civic was replaced on January 9, 2015 at AutoNation in Knoxville, Tennessee as part of a "Safety Improvement Campaign."  The value of her 2004 Honda Civic has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2004 Honda Civic, Plaintiff Lew viewed or heard about the vehicle through the internet, radio, and TV.  Plaintiff Lew would not have purchased her 2004 Honda Civic or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Kathy Liberal—Florida

114.    Plaintiff Kathy Liberal resides in Royal Palm Beach, Florida.  Plaintiff Liberal owns a 2004 Nissan Sentra, which was purchased used for $5,000.00 in Palm Beach County,

Florida in October 2012.  To Plaintiff Liberal's knowledge, the airbags in her 2004 Nissan Sentra were replaced on October 25, 2014 pursuant to recall #14V-701.  The value of her 2004 Nissan Sentra has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2004 Nissan Sentra, Plaintiff Liberal viewed or heard about the vehicle through internet sites discussing the vehicle's features.  Ultimately, Plaintiff Liberal's decision to purchase the 2004 Nissan Sentra was influenced or affected by promotional materials and communications with owners and/or dealerships stating that the vehicle is one of the safest and dependable cars on the road.  Plaintiff Liberal would not have purchased her 2004 Nissan Sentra or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Gail Markowitz—Florida

115.    Plaintiff Gail Markowitz resides in Sunrise, Florida.  Plaintiff Markowitz owns a 2007 Honda Accord, which was purchased used for $15,000.00 on May 15, 2009 at A&J Auto Brokers in Hollywood, Florida.  Plaintiff Markowitz's 2007 Honda Accord was covered by a written warranty. To Plaintiff Markowitz's knowledge, the airbags in her 2007 Honda Accord have never been repaired or replaced.  The value of her 2007 Honda Accord has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2007 Honda Accord, Plaintiff Markowitz viewed or heard about the vehicle through TV and radio ads, and was looking to buy a Honda because of Honda's reputation for reliability and safety.  Plaintiff Markowitz would not have purchased her 2007 Honda Accord or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Roy Martin—Alabama

116.    Plaintiff Roy Martin resides in Jasper, Alabama.  Plaintiff Martin owns a 2004 Toyota Sequoia, which was purchased used for $19,811.62 in 2011 at Scott Crump Toyota in

Jasper, Alabama.  Plaintiff Martin's 2004 Toyota Sequoia is currently covered by a written warranty.  To Plaintiff Martin's knowledge, the airbags in his 2004 Toyota Sequoia have never been repaired or replaced.  The value of his 2004 Toyota Sequoia has been diminished as a result of the Inflator Defect.  Plaintiff Martin would not have purchased his 2004 Toyota Sequoia or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

### Yessica Martinez—Florida

117.    Plaintiff Yessica Martinez resides in Miami, Florida.  Plaintiff Martinez owns a 2004 Honda Civic, which was purchased new for approximately $14,210.00 in May 2004 in Miami, Florida.  To Plaintiff Martinez's knowledge, her vehicle's airbags have never been repaired or replaced.  The value of her vehicle has been diminished as a result of the Inflator Defect.  Plaintiff Martinez would not have purchased her 2004 Honda Civic or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

### David McLaughlin—South Carolina

118.    Plaintiff David B. McLaughlin resides in Hanahan, South Carolina.  Plaintiff McLaughlin owns a 2005 Dodge Ram 1500 Daytona, which he purchased used for approximately $8,906.00 on January 22, 2014 at Rick Hendrick Dodge in Charleston, South Carolina.  Plaintiff McLaughlin's 2005 Dodge Ram 1500 Daytona initially had been covered by a factory warranty.  To Plaintiff McLaughlin's knowledge, the airbags in the 2005 Dodge Ram 1500 Daytona were not replaced.  The value of his 2005 Dodge Ram has been diminished as a result of the Inflator Defect.  Plaintiff McLaughlin would not have purchased his 2005 Dodge

Ram 1500 Daytona vehicle or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Michael McLeod—California

119.    Plaintiff Michael McLeod resides in Napa, California.  Plaintiff McLeod owns a 2007 Honda Accord, which was purchased new for approximately $23,000.00 in January 11, 2007 at Kastner Honda in Napa, California.   Plaintiff McLeod's 2007 Honda Accord is currently covered by a written warranty.  Plaintiff McLeod never received a safety recall regarding his vehicle, instead learning of the airbag defect on the Today Show.  To Plaintiff McLeod's knowledge, the airbags in his 2007 Honda Accord have never been repaired or replaced.  The value of his 2007 Honda Accord has been diminished as a result of the Inflator Defect.  Plaintiff McLeod would have purchased his 2007 Honda Accord or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

John Meiser—North Carolina

120.    Plaintiff John Meiser resides in Wilmington, North Carolina.  Plaintiff Meiser owns a 2007 Honda Pilot, which was purchased used for $19,661 in 2009 at Auto Wholesale in Wilmington, North Carolina.  To Plaintiff Meiser's knowledge, the driver's side airbags in his 2007 Honda Pilot were replaced at the end of 2014.  The value of his 2007 Honda Pilot has been diminished as a result of the Inflator Defect.  Plaintiff Meiser would not have purchased his 2007 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Jason Moehlman—Missouri

121.    Plaintiff Jason Moehlman resides in Raymore, Missouri.  Plaintiff Moehlman owns a 2005 Honda Civic, which was purchased used for approximately $13,200.00 in July 2007

at Hendrick Automotive in Kansas City, Missouri.  To Plaintiff Moehlman's knowledge, the airbags in his 2005 Honda Civic have never been repaired or replaced.  The value of his 2005 Honda Civic has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2005 Honda Civic, Plaintiff Moehlman visited multiple websites, researched consumer reviews and ratings, including Consumer Reports and Cars.com.  Ultimately, Plaintiff Moehlman made the purchase of his 2005 Honda Civic based on that vehicle's safety, reliability, and fuel economy. Plaintiff Moehlman would not have purchased his 2005 Honda Civic or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Deborah T. Morgan—Pennsylvania

122.    Plaintiff Deborah T. Morgan resides in Jupiter, Florida.  Plaintiff Morgan owns a 2008 Honda Element, which was purchased new for approximately $18,000.00 in Uniontown, Pennsylvania in October 2008.  Plaintiff Morgan's 2008 Honda Element was covered by a written manufacturer's warranty.  Plaintiff Morgan purchased an extended warranty for that vehicle in 2013.  Plaintiff Morgan received a safety recall notice regarding the airbags in her 2008 Honda Element.  To Plaintiff Morgan's knowledge, the airbags in her 2008 Honda Element were repaired or replaced on December 4, 2014, pursuant to the safety recall notice. The value of her 2008 Honda Element has been diminished as a result of the Inflator Defect. Her vehicle will always have the stigma regarding the defective airbags, and it will be difficult to sell should she choose to do so.  Plaintiff Morgan would not have purchased her 2008 Honda Element or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Howard S. Morris—Virginia

123.    Plaintiff Howard S. Morris resides in Bryn Mawr, Pennsylvania.  Plaintiff Morris owns a 2004 BMW 330ci, which was purchased new for approximately $50,000.00 in October 2003 at BMW of Arlington (now operating as BMW of Alexandria) in Arlington, Virginia. Plaintiff Morris' vehicle was initially covered under a manufacturer's warranty. To Plaintiff Morris' knowledge, the airbags on his 2004 BMW 330ci have been replaced through a recall. The value of his 2004 BMW 330ci has been diminished as a result of the Inflator Defect. Plaintiff Morris purchased his 2004 BMW 330ci because he was familiar with BMW's promotion of safety and handling.  Plaintiff Morris would not have purchased his 2004 BMW 330ci or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Barbara E. Mulroy—Colorado

124.    Plaintiff Barbara E. Mulroy resides in Lakewood, Colorado.  Plaintiff Mulroy owns a 2006 BMW X-3, which was purchased used for $23,000.00 on October 29, 2011 at Murray Motors in Denver, Colorado.  To Plaintiff Mulroy's knowledge, the airbags in her 2006 BMW X-3 have never been repaired or replaced.  Prior to purchasing her 2006 BMW X-3, Plaintiff Mulroy viewed or heard about the vehicle through general BMW print and TV ads that described the vehicle as safe, trustworthy, and reliable, which influenced her purchasing decision.  Plaintiff Mulroy also viewed or heard about the 2006 BMW X-3 through Internet websites for BMW X-3s and the BMW blog called "Bimmer."  Plaintiff Mulroy would not have purchased her 2006 BMW X-3 or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

<u>Marita K. Murphy—Alabama</u>

125.    Plaintiff Marita K. Murphy resides in Cottondale, Alabama.  Plaintiff Murphy owns a 2003 Honda Pilot EX, which was purchased new for approximately $31,010.35 on April 22, 2003 at Townsend Honda in Tuscaloosa, Alabama.  Plaintiff Murphy's 2003 Honda Pilot was covered by the standard Honda new car warranty.  The value of her 2003 Honda Pilot has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2003 Honda Pilot, Plaintiff Murphy learned about the vehicle by consulting Consumer Reports (where it was highly rated) and researched it on the Internet, including researching reviews on Kelley Blue Book and comparable websites.  Prior to purchasing that vehicle, Plaintiff Murphy also heard about the vehicle from Honda advertising and informational literature provided by the dealership.  Ultimately, Plaintiff Murphy's decision to purchase that vehicle was strongly influenced by the uniformly positive external reviews as well as the Honda literature.  Safety was a principal factor in Plaintiff Murphy's purchasing decision.  The Honda promotional and descriptive literature she reviewed at the time of purchasing her vehicle made substantial representations about the safety features of that vehicle, including the driver and passenger side airbags.  These representations included the general brochure for the 2003 Pilot and a separate brochure entitled "SRS Airbags Seat Belts: Understanding your car's safety features."   Plaintiff Murphy would not have purchased her 2003 Honda Pilot or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

<u>Valerie M. Nannery—California</u>

126.    Plaintiff Valerie M. Nannery resides in Washington D.C.  Plaintiff Nannery owns a 2004 Honda Civic Hybrid, which was purchased new for $21,800.47 on September 30, 2004 in Los Angeles, California.   To Plaintiff Nannery's knowledge, the airbags in her 2004 Honda

Civic Hybrid have never been repaired or replaced.  The value of her 2004 Honda Civic Hybrid has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2004 Honda Civic Hybrid, Plaintiff Nannery viewed or heard about the vehicle through research on the Internet, including the Honda website, Edmunds.com, and Consumer Reports.  At the time of purchasing her 2004 Honda Civic Hybrid, Plaintiff Nannery's three criteria for a new car were that it was safe, fuel efficient, and small.  Plaintiff Nannery would not have purchased her 2004 Honda Civic or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Anthony Palmieri—New York

127.    Plaintiff Anthony Palmieri resides in Brooklyn, New York.  Plaintiff Palmieri owns a 2005 Honda Accord, which was purchased used for approximately $10,000.00 in October 2009 in Brooklyn, New York.  To Plaintiff Palmieri's knowledge, his 2005 Honda Accord was covered by a written warranty.  Despite Plaintiff Palmieri's repeated efforts to determine whether his vehicle was affected by the defective airbags, Honda has failed to provide him with the requisite information or replacement parts in his vehicle.  To Plaintiff Palmieri's knowledge, the airbags in his 2005 Honda Accord have not been repaired or replaced.  The value of his 2005 Honda Accord has been diminished as a result of the Inflator Defect.  Plaintiff Palmieri would sell his 2005 Honda Accord if he thought he could get fair market value for the car before the defect was revealed.  Plaintiff Palmieri does not think he could get that fair market value because he has reviewed ads on Craigslist and other Internet sites and noticed that the value of cars similar to his has dropped.  Prior to purchasing his 2005 Honda Accord, Plaintiff Palmieri heard about the vehicle through postcards and related promotion materials from his local dealership, Bay Ridge Honda.  Plaintiff Palmieri also viewed or heard about the 2005 Honda Accord from

television ads, Consumer Reports, and assorted Internet ads that conveyed safety, customer satisfaction, reliability, and resale value of Honda automobiles.  Ultimately, Plaintiff Palmieri's decision to purchase a 2005 Honda Accord was influenced by advertisements, promotional materials, and/or dealer communications.  Plaintiff Palmieri would not have purchased his 2005 Honda Accord or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Crystal Pardue—Alabama

128.   Plaintiff Crystal Pardue resides in Odenville, Alabama.  Plaintiff Pardue owns a 2007 Mazda 6, which was purchased used for $12,421.50 on January 12, 2012 from Robert Cobb Motors in Boaz, Alabama.  Plaintiff Pardue's 2007 Mazda 6 was covered by a written warranty.  Plaintiff Pardue received a notice from Mazda informing her that there was an airbag recall on her 2007 Mazda 6, but the airbags in her vehicle have not been replaced yet.  The value of her 2007 Mazda 6 has been diminished as a result of the Inflator Defect.  Plaintiff Pardue would not have purchased her 2007 Mazda 6 or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Nicole Peaslee—Connecticut

129.   Plaintiff Nicole Peaslee resides in Norwood, Massachusetts.  Plaintiff Peaslee owns a 2004 Honda Accord EX, which was purchased new for $20,000.00 in October 2004 at Lia Honda in Enfield, Connecticut.  Plaintiff Peaslee's 2004 Honda Accord EX is currently covered or was covered by a written standard warranty.  To Plaintiff Peaslee's knowledge, the airbags in her 2004 Honda Accord EX have never been repaired or replaced.  The value of her 2004 Honda Accord EX has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2004 Honda Accord EX, Plaintiff Peaslee viewed or heard about the vehicle

through TV advertising, brochures, and posters in the dealership. Plaintiff Peaslee saw various advertisements, including brochures and posters in the dealership, which listed features of the Honda Accord EX, including the airbags and its safety rating.  Ultimately, Plaintiff Peaslee purchased the 2004 Honda Accord EX because the promotional materials, advertising, and/or dealership communications persuaded her to do so.  Plaintiff Peaslee would not have purchased her 2004 Honda Accord EX or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Chris Pedersen—Arizona

130.    Plaintiff Chris Pedersen resides in Lexington, Kentucky.  Plaintiff Pedersen owns a 2004 Honda Odyssey, which was purchased new for $30,450.00 in October 2003 in Phoenix, Arizona.  Plaintiff Pedersen's 2004 Honda Odyssey was covered by a written warranty.  To Plaintiff Pedersen's knowledge, the airbags in his 2004 Honda Odyssey were replaced on March 10, 2015 through a recall.  The value of his 2004 Honda Odyssey has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2004 Honda Odyssey, Plaintiff Pedersen viewed or heard about the vehicle through television and print advertisements.  Plaintiff Pedersen also viewed or heard about the vehicle through brochures or mail he received in the mail as well as brochures he picked up at the dealership.  Ultimately, Plaintiff Pedersen's decision to purchase the 2004 Honda Odyssey was influenced by safety and reliability concerns.  Plaintiff Pedersen would not have purchased his 2004 Honda Odyssey or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Dan Peoples—Tennessee

131.    Plaintiff Dan Peoples resides in Cypress, Texas.  Plaintiff Peoples owns a 2004 Honda Accord, which was purchased new for $28,900.00 in April 2004 at Wolfchase Honda in

Germantown, Tennessee.  He has not received any notice in the mail about any recalls related to airbags.  To Plaintiff Peoples's knowledge, the airbags in his 2004 Honda Accord have never been repaired or replaced.  The value of his 2004 Honda Accord has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2004 Honda Accord, Plaintiff Peoples viewed or heard about the vehicle through TV commercials discussing crash safety and reliability of Honda vehicles as well as radio and TV ads talking about discount offers on Honda vehicles. Ultimately, Plaintiff Peoples's decision to purchase the 2004 Honda Accord was influenced by ads about the vehicle's safety, reliability and value.  Plaintiff Peoples would not have purchased his 2004 Honda Accord or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

### Henry H. Pham—California

132.    Plaintiff Henry H. Pham resides in San Francisco, California.  Plaintiff Pham owns a 2005 BMW M3 Coupe, which was purchased used for $50,000.00 on August 4, 2007 at Rusnak Volvo Pasadena in Pasadena, California.  Plaintiff Pham's 2005 BMW M3 Coupe was covered by a written warranty.  To Plaintiff Pham's knowledge, the airbags in his 2005 BMW M3 Coupe have never been repaired or replaced.  Ultimately, Plaintiff Pham's decision to purchase the 2005 BMW M3 Coupe was influenced or affected by the promotional materials for this vehicle stressing its design, build, and high performance.   The value of his 2005 BMW M3 Coupe has been diminished as a result of the Inflator Defect.  Plaintiff Pham would not have purchased the 2005 BMW M3 Coupe or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Corene L. Quirk—South Carolina

133.     Plaintiff Corene L. Quirk resides in Summerville, South Carolina.  Plaintiff Quirk owns a 2004 Toyota Sequoia, which was purchased used for $24,492.00 on March 14, 2007 at Gene Reed Toyota Dealer in North Charleston, South Carolina.  Plaintiff Quirk believes that the airbags in her 2004 Toyota Sequoia have not been replaced.  The value of her 2004 Toyota Sequoia has been diminished as a result of the Inflator Defect.  Plaintiff Quirk would not have purchased the 2004 Toyota Sequoia or would have paid much less for it or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Marc Raiken—Pennsylvania

134.     Plaintiff Marc Raiken resides in Jeffersonville, Pennsylvania.  Plaintiff Raiken owns a 2004 Toyota Corolla, which was purchased new for $12,880.00 on July 29, 2003 at Conicelli Toyota in Conshohocken, Pennsylvania.  Plaintiff Raiken's 2004 Toyota was covered by a written warranty.  Plaintiff Raiken purchased an extended Extra Care warranty for that vehicle.  To Plaintiff Raiken's knowledge, the airbags in his 2004 Toyota Corolla have never been repaired or replaced.  The value of his 2004 Toyota Corolla has been diminished as a result of the Inflator Defect.   Plaintiff Raiken would not have purchased his 2004 Toyota Corolla or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Maureen Gilick Rash—Florida

135.     Plaintiff Maureen Gilick Rash resides in Hollywood, Florida.  Plaintiff Rash owns a 2007 Honda Pilot, which was leased new for approximately $30,458.70 on March 13, 2007 and subsequently purchased in February 2011 for a payoff amount of $14,075.00 at Maroone Honda in Hialeah, Florida.  Plaintiff Rash's 2007 Honda Pilot is either currently covered or was covered

by a written warranty.  Plaintiff Rash's 2007 Honda Pilot was subject to a September 2014 Honda recall, and she was told by Honda in Hollywood, Florida that her airbag needed to be replaced.  But when Plaintiff Rash first took her 2007 Honda Pilot in to the dealership, the Honda dealership did not have any airbags or component parts in stock.  The value of her 2007 Honda Pilot has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2007 Honda Pilot, Plaintiff Rash viewed or heard about the vehicle from television ads for the Pilot and Honda, as well as from Consumer Reports.  At the time of purchasing her 2007 Honda Pilot, Plaintiff Rash only considered purchasing or leasing the Honda Pilot because of Honda's reputation for safety.  Plaintiff Rash would not have purchased her 2007 Honda Pilot or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Regina M. Reilly—Alabama

136.    Plaintiff Regina M. Reilly resides in Eufaula, Alabama.  Plaintiff Reilly owns a 2004 Subaru Legacy Outback, which was purchased used in $5,500.00 on July 1, 2013 in Eufaula, Alabama.  Plaintiff Reilly's 2004 Subaru Legacy Outback was covered by a written manufacturer's warranty.  To Plaintiff Reilly's knowledge, the airbags in her 2004 Subaru Legacy Outback have never been repaired or replaced.  The value of her 2004 Subaru Legacy Outback has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2004 Subaru Legacy Outback, Plaintiff Reilly viewed or heard about the vehicle through many ads promoting the Subaru as dependable and reliable. Plaintiff Reilly also viewed or heard about the 2004 Subaru Legacy Outback through TV ads and radio ads discussing how safe Subaru vehicles are.  Plaintiff Reilly would never have purchased her 2004 Subaru Legacy Outback or would not

have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Billy Richardson—Alabama

137.    Plaintiff Billy Richardson resides in Jasper, Alabama.  Plaintiff Richardson owns a 2003 BMW 330i, which was purchased used for $16,000 .00in June 2008 at Tom Williams BMW in Irondale, Alabama.  Plaintiff Richardson's 2003 BMW 330i is subject to an airbag recall.  To Plaintiff Richardson's knowledge, the airbags in his 2003 BMW 330i have never been repaired or replaced.  The value of his 2003 BMW 330i has been diminished as a result of the Inflator Defect.

Kelly Ritter—Texas

138.    Plaintiff Kelly Ritter resides in St. Louis Park, Minnesota.  Plaintiff Ritter owns a 2005 Honda Civic-LX, which was purchased used for $16,311.16 on February 9, 2006 at Gun Honda in San Antonio, Texas.  Plaintiff Ritter's 2005 Honda Civic-LX was covered by a written manufacturer's warranty.  Plaintiff Ritter's 2005 Honda Civic-LX was subject to the Takata airbag recall.  To Plaintiff Ritter's knowledge, the driver side airbags in her 2005 Honda Civic-LX were replaced on November 17, 2014.  The value of her 2005 Honda Civic-LX has been diminished as a result of the Inflator Defect.  Plaintiff Ritter would not have purchased her 2005 Honda Civic-LX or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Angela Ruffin—Florida

139.    Plaintiff Angela Ruffin resides in Riviera Beach, Florida.  Plaintiff Ruffin owns a 2005 Toyota Corolla CE, which was purchased new at Earl Steward Toyota in Lake Park, Florida.  Plaintiff Ruffin's vehicle was originally covered by a written warranty.  Plaintiff

- 54 -

received a safety recall notice in the mail regarding the defective airbags in her 2005 Toyota Corolla CE.  To Plaintiff Ruffin's knowledge, the airbags in her 2005 Toyota Corolla CE were replaced on or around March 7, 2015 at Earl Stewart Toyota.  The value of her 2005 Toyota Corolla CE has been diminished as a result of the Inflator Defect. Plaintiff Ruffin would not have purchased her 2005 Toyota Corolla CE or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Holly Ruth—California

140.    Plaintiff Holly Ruth resides in Hawthorne, California.  Plaintiff Ruth owns a 2002 Honda Accord EX, which was purchased used for $16,800.00 in May 2007 at Manhattan Beach Toyota in Manhattan Beach, California.  Plaintiff Ruth's 2002 Honda Accord EX is currently covered or was covered by a written warranty.  Plaintiff Ruth purchased an extended warranty for that vehicle. To Plaintiff Ruth's knowledge, the airbags in her 2002 Honda Accord EX were repaired or replaced pursuant to two different recalls, with the driver airbag inflator first replaced in April 2010 and the driver airbag then replaced in October 2014.  The value of her 2002 Honda Accord EX has been diminished as a result of the Inflator Defect. Prior to purchasing her 2002 Honda Accord EX, Plaintiff Ruth viewed or heard about the vehicle through many ads and knew of Honda's reputation.  Plaintiff Ruth would not have purchased the 2002 Honda Accord EX or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Richard H. Sayler—California

141.    Plaintiff Richard H. Sayler resides in Bentleyville, Ohio.  Plaintiff Sayler owns a 2002 BMW M3 which was purchased used for $17,000.00 in May 2003 from his son-in-law in California and then shipped to Plaintiff Sayler in Ohio.  Plaintiff Sayler's 2002 BMW M3 is

- 55 -

currently covered or was covered by a written warranty.  Plaintiff Sayler purchased an extended warranty for the vehicle.  To Plaintiff Sayler's knowledge, the passenger side airbags in his 2002 BMW M3 were replaced pursuant to a September 2014 recall by BMW Cleveland in Solon, Ohio.  His driver side airbag has not been replaced.   The value of his 2002 BMW M3 has been diminished as a result of the Inflator Defect.  Plaintiff Sayler would not have purchased his 2002 BMW M3 or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Megan Sayre-Scibona—Massachusetts

142.    Plaintiff Megan Sayre-Scibona resides in Dorchester, Massachusetts.  Plaintiff Sayre-Scibona owns a 2005 Honda CRV, which was purchased used for $15,000.00 in 2010 at Honda North in Danvers, Massachusetts.  Plaintiff Sayre-Scibona never received a safety recall from Honda, Takata, or her Honda dealership.  She learned about the recall by reading about it on the Internet.  To Plaintiff Sayre-Scibona's knowledge, the airbags in her 2005 Honda CRV have never been repaired or replaced.  The value of her 2005 Honda CRV has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2005 Honda CRV, Plaintiff Sayre-Scibona viewed or heard about the vehicle through ads on TV as well as "happy Honda days" ads on the radio.  Plaintiff Sayre-Scibona also viewed or heard about the 2005 Honda CRV through her review of a Consumer Reports Magazine, rating that vehicle.  The safety factor was one she considered when buying her 2005 Honda CRV.  Plaintiff Sayre-Scibona would not have purchased her 2005 Honda CRV or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Robert Schmidt—California

143.   Plaintiff Robert Schmidt resides in Corona, California.  Plaintiff Schmidt owns a 2003 BMW 325 XI Wagon, which was purchased used for $9,700.00 on May 30, 2011 at Lakewood Motors in Lakewood, California.  To Plaintiff Schmidt's knowledge, the airbags in his BMW 325 XI Wagon have never been repaired or replaced.  The value of his BMW 325 XI Wagon has been diminished as a result of the Inflator Defect.  Plaintiff Schmidt would not have purchased his BMW 325 XI Wagon or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Steven P. Schneider—Florida

144.   Plaintiff Steven P. Schneider resides in Pinecrest, Florida.  Plaintiff Schneider owns a 2002 Acura TL, which was purchased used for $5,800.00 in May or June 2012 in Miami, Florida.  To Plaintiff Schneider's knowledge, the airbags in his 2002 Acura TL were replaced in 2014 pursuant to a recall for service on the passenger side airbags at South Motors Honda.  The value of his 2002 Acura TL has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2002 Acura TL, Plaintiff Schneider viewed or heard about the 2002 Acura TL through the internet.  Plaintiff Schneider would not have purchased his 2002 Acura TL or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Tasha Severio—Louisiana

145.   Plaintiff Tasha Severio resides in Denham Springs, Louisiana.  Plaintiff Severio owns a 2007 Honda Pilot, which was purchased used for $18,000.00 in February 2013 at Capitol Buick GMC in Baton Rouge, Louisiana.  Plaintiff Severio's 2007 Honda Pilot was covered at some point by a written warranty.  To Plaintiff Severio's knowledge, the airbags in her 2007

Honda Pilot have never been repaired or replaced.  The value of her 2007 Honda Pilot has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2007 Honda Pilot, Plaintiff Severio viewed or heard about the vehicle through internet websites providing information and ratings on that vehicle, including safety ratings.  Newspapers and TV ads made representations regarding her 2007 Honda Pilot's safety. Ultimately, Plaintiff Severio purchased the 2007 Honda Pilot because of the Honda name and the good safety ratings.   Plaintiff Severio would not have purchased her 2007 Honda Pilot or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Shelley Shader—Florida

146.    Plaintiff Shelley Shader resides in Boca Raton, Florida.  Plaintiff Shader owns a 2002 Lexus SC430, which was purchased used for $24,781.00 in November 2010 at JM Lexus in Coconut Creek, Florida.  Plaintiff Shader received several recall notices from Lexus beginning approximately in May 2013 but was advised that replacement parts were not available.  On July 13, 2013, Plaintiff Shader was involved in a frontal impact accident in which the airbags failed to deploy, despite the fact that the front of the car suffered severe damage.  The airbags in the vehicle were finally replaced in September 2014.  The value of his 2002 Lexus SC430 has been diminished as a result of the Inflator Defect.  Plaintiff Shader would not have purchased his 2002 Lexus SC430 or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Katherine E. Shank—Ohio

147.    Plaintiff Katherine E. Shank resides in Berea, Ohio.  Plaintiff Shank owns a 2002 Honda Civic, which was purchased used for $14,900.00 in July 6, 2009 at Sunnyside Honda in Middleburg Heights, Ohio.  Plaintiff Shank contacted Sunnyside Honda on March 12, 2015

regarding an update on her vehicle and was told that they do not have a confirmed date of when the replacement airbag parts will be available for her vehicle. To Plaintiff Shank's knowledge, the airbags in her 2002 Honda Civic have never been repaired or replaced. The value of her 2002 Honda Civic has been diminished as a result of the Inflator Defect. Plaintiff Shank would not have purchased her 2002 Honda Civic or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Daniel N. Silva—Texas

148.    Plaintiff Daniel N. Silva resides in Austin, Texas. Plaintiff Silva owns a 2004 Honda Pilot, which was purchased used for $23,500.00 on December 1, 2006 at CarMax in Austin, Texas. Plaintiff Silva's vehicle was subject to recalls 14V-351 and 14V-353 on June 19, 2014. To Plaintiff Silva's knowledge, the driver and passenger side airbag inflators in his 2004 Honda Pilot were replaced on December 17, 2014 by First Texas Honda. The value of his 2004 Honda Pilot has been diminished as a result of the Inflator Defect. Plaintiff Silva would not have purchased his 2004 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Eugennie Sinclair—Florida

149.    Plaintiff Eugennie Sinclar resides in Tamarac, Florida. Plaintiff Sinclair owns a 2007 Ford Mustang, which was purchased used for $24,000.00 in September 2012 at CarMax in Davie, Florida. Plaintiff Sinclair's 2007 Ford Mustang is currently covered or was covered at some point by a written warranty. Plaintiff Sinclair also purchased an extended warranty for that vehicle. To Plaintiff Sinclair's knowledge, the airbags in her 2007 Ford Mustang have never been repaired or replaced. The value of his 2007 Ford Mustang has been diminished as a result of the Inflator Defect. Plaintiff Sinclair would not have purchased her 2007 Ford Mustang or

would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

### Darla Spiess—Minnesota

150.    Plaintiff Darla Spiess resides in St. Paul, Minnesota.  Plaintiff Spiess owns a 2005 Acura MDX, which was purchased used for $36,660.65 in Bloomington, Minnesota.  To Plaintiff Spiess's knowledge, the airbags in her Acura MDX have never been repaired or replaced.  The value of her Acura MDX has been diminished as a result of the Inflator Defect.  Prior to purchasing her Acura MDX, Plaintiff Spiess viewed or heard about the vehicle through Consumer Reports where it was rated one of the safest vehicles on the road.  Plaintiff Spiess would not have purchased her Acura MDX or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

### David Takeda—California

151.    Plaintiff David Takeda resides in Encino, California.  Plaintiff Takeda owns a 2005 Honda Element, which was purchased new for approximately $21,000.00 in July 2005 from a car broker and acquired through Metro Honda in Montclair, California.  Plaintiff Takeda's 2005 Honda Element is currently covered or was covered at some point by a written factory warranty.  Plaintiff Takeda never received a safety recall notice for his 2005 Honda Element.  To Plaintiff Takeda's knowledge, the airbags in his 2005 Honda Element have never been repaired or replaced.  The value of his 2005 Honda Element has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2005 Honda Element, Plaintiff Takeda viewed or heard about the vehicle through internet websites.  Plaintiff Takeda would not have purchased his 2005 Honda Element or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

<u>Charles and Dana Talamantes—Nevada</u>

152.    Plaintiffs Charles and Dana Talamantes reside in Las Vegas, Nevada. Plaintiffs Talamantes own a 2004 Toyota Tundra, which was purchased used for $12,991.00 on July 8, 2009 at Desert Toyota Scion in Las Vegas, Nevada.  Plaintiffs Talamantes' 2004 Toyota Tundra is subject to the Takata airbag recall. To Plaintiffs Talamantes' knowledge, the airbags in their 2004 Toyota Tundra have not been repaired or replaced.  The value of their 2004 Toyota Tundra has been diminished as a result of the Inflator Defect. Plaintiffs Talamantes would not have purchased their 2004 Toyota Tundra had they known of the problems associated with the vehicle's Inflator Defect.

<u>Cathryn Tanner—Alabama</u>

153.    Plaintiff Cathryn Tanner resides in Birmingham, Alabama.  Plaintiff Tanner owns a 2003 Honda Civic, which was purchased used for approximately $6,211.50 on October 8, 2009 at Eastside Wholesale Used Cars in Gadsden, Alabama.  To Plaintiff Tanner's knowledge, the airbags in her 2003 Honda Civic have not been repaired or replaced.  The value of her 2003 Honda Civic has been diminished as a result of the Inflator Defect.  Plaintiff Tanner would not have purchased her 2003 Honda Civic or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

<u>Shaun Taylor—Florida</u>

154.    Plaintiff Shaun Taylor resides in Jacksonville, Florida.  Plaintiff Taylor owns a 2004 Honda Accord, which was purchased used for $8,000.00 on March 28, 2011 at Arlington Toyota in Jacksonville, Florida.  To Plaintiff Taylor's knowledge, the airbags in his 2004 Honda Accord were repaired or replaced on December 27, 2014 as part of the airbag recall.  Plaintiff Taylor was told that the replacement parts were made by the same manufacturer.  The value of

his 2004 Honda Accord has been diminished as a result of the Inflator Defect. Prior to purchasing his 2004 Honda Accord, Plaintiff Taylor viewed or heard about the vehicle through advertisements in the local paper and auto trader magazine as well as through television commercials describing the safety and reliability of that vehicle. Plaintiff Taylor also viewed or heard about the 2004 Honda Accord through Internet searches he performed, including viewing numerous sites touting the Honda Accord's safety and reliability. His research results about the Honda Accord's safety and reliability was a huge factor for Plaintiff Taylor because he wanted the safest vehicle for his family. Plaintiff Taylor would not have purchased his 2004 Honda Accord or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Oswald Tessier—Florida

155.    Plaintiff Tessier C. Oswald resides in Apopka, Florida. Plaintiff Oswald owns a 2003 Honda Accord, which was purchased new for $23,000.00 on August 8, 2003 at Classic Honda in Orlando, Florida. Plaintiff Oswald's 2003 Honda Accord has been subject to two airbag recalls. The first recall notice letter came from Takata and Honda, and the second letter came from Honda requesting that he replace his airbags again. To Plaintiff Oswald's knowledge, the airbags in his 2003 Honda Accord were replaced in November 2014 at Classic Honda dealership. The value of his 2003 Honda Accord has been diminished as a result of the Inflator Defect. Ultimately, Plaintiff Oswald's decision to purchase the 2003 Honda Accord was influenced or affected by an ad for the vehicle in the Orlando Sentinel Newspaper. Plaintiff Oswald would not have purchased his 2003 Honda Accord or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

<u>Daniel Thies—California</u>

156.    Plaintiff Daniel Thies resides in Chula Vista, California.  Plaintiff Thies leased a 2012 Honda Civic, which was leased new in May 2012 at Ball Honda in National City, California.  Plaintiff Thies's 2012 Honda Civic is currently covered or was covered by the manufacturer's warranty.  To Plaintiff Thies's knowledge, the airbags in his 2012 Honda Civic were replaced in July 2014 at Fuller Honda, National City, California after an airbag malfunction.  The value of his 2012 Honda Civic has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2012 Honda Civic, he also received advertising about lease termination for prior 2007 Honda Civic and incentive to lease 2012 Honda Civic.  Ultimately, Plaintiff Thies's decision to lease his 2012 Honda Civic was influenced by promotional materials, advertisements, and/or communications that made him think that the Civic was a very safe and economical vehicle.  Plaintiff Thies would not have leased his 2012 Honda Civic or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

<u>Kathryn A. Tillisch—Virginia</u>

157.    Plaintiff Kathyrn A. Tillisch resides in South Riding, Virginia.  Plaintiff Tillisch owns a 2005 Honda Pilot LX, which was purchased new for $27,033.85 on February 26, 2005 at Rosenthal Honda in Vienna, Virginia.  Plaintiff Tillisch's 2005 Honda Pilot LX was subject to a recall dated June 19, 2014 for the driver side frontal airbag, although she has never received any formal recall notices regarding her airbags.   To Plaintiff Tillisch's knowledge, the driver side frontal airbag in her 2005 Honda Pilot LX was replaced on January 21, 2015.  To Plaintiff Tillisch's knowledge, the passenger side airbag has never been repaired or replaced despite her repeated requests.  Honda has claimed that the passenger side airbag in her 2005 Honda Pilot LX

does not meet Honda's recall guidelines, as explained in a February 17, 2015 phone call to her and confirmed in a February 21, 2015 letter.  The value of her 2005 Honda Pilot LX has been diminished as a result of the Inflator Defect.  Plaintiff Tillisch would not have purchased her 2005 Honda Pilot LX had she known of the problems associated with the vehicle's Inflator Defect.

Gerdgene K. Veser—Florida

158.   Plaintiff Veser resides in Riverview, Florida.  Plaintiff Veser owns a 2005 BMW 325i, which was purchased new for approximately $36,000.00 in February 2005 at Bert Smith BMW in St. Petersburg, Florida.  The value of his 2005 BMW 325i has been diminished as a result of the Inflator Defect.  Plaintiff Veser would not have purchased his 2005 BMW 325i or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Mickey Vukadinovic—Florida

159.   Plaintiff Mickey Vukadinovic resides in Middleburg, Florida.   Plaintiff Vukadinovic owns a 2004 Mazda MPV, which was purchased new in early 2005 for approximately $20,000.00 - $25,000.00 at Mazda City in Orange Park, Florida.   Plaintiff Vukadinovic's 2004 Mazda MPV is currently covered or was covered by a written warranty for new cars.  On several occasions, Plaintiff Vukadinovic's 2004 Mazda MPV has had its airbag light turn on while being driven.  Plaintiff Vukadinovic has taken his vehicle into the Mazda dealership, which has told him it is nothing to worry about.   To Plaintiff Vukadinovic's knowledge, the airbags in his 2004 Mazda MPV have never been repaired or replaced.   The value of his 2004 Mazda MPV has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2004 Mazda MPV, Plaintiff Vukadinovic viewed or heard about the vehicle

through his own research, which included viewing or hearing about the vehicle through internet searches.  Prior to purchasing his 2004 Mazda MPV, Plaintiff Vukadinovic also viewed or heard about the vehicle through TV ads, radio ads, newspaper ads, and billboards.   Plaintiff Vukadinovic would not have purchased his 2004 Mazda MPV or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Michael A. Walker—Florida

160.   Plaintiff Michael A. Walker resides in Spring Hill, Florida.  Plaintiff Walker owns a 2005 Subaru Legacy, which was purchased used for $9,900.00 in February 2014 at Universal Hyundai in Orlando, Florida.  To Plaintiff Walker's knowledge, the airbag inflator and related materials in his 2005 Subaru Legacy were replaced by the dealership pursuant to a recall.  The value of his 2005 Subaru Legacy has been diminished.  Prior to purchasing his 2005 Subaru Legacy, Plaintiff Walker viewed or heard about the vehicle through a posting on AutoTrader.  Plaintiff Walker would not have purchased his 2005 Subaru Legacy or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Trey Watley—Georgia

161.   Plaintiff Trey Watley resides in Columbus, Georgia.  Plaintiff Watley owns a 2006 Honda Pilot, which was purchased new for $33,500.00 in June 2006 at Honda Carland in Roswell, Georgia.  To Plaintiff Watley's knowledge, the airbags in his 2006 Honda Pilot have never been repaired or replaced.  He has not received any notifications from Takata or Honda regarding the recall.  The value of his 2006 Honda Pilot has been diminished as a result of the Inflator Defect.  Prior to purchasing his 2006 Honda Pilot, Plaintiff Watley viewed or heard about the vehicle through the Honda website.  Plaintiff Watley would not have purchased his

2006 Honda Pilot or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Robert E. Weisberg—Florida

162.    Plaintiff Robert E. Weisberg resides in Miami, Florida.  Plaintiff Weisberg owns a 2005 Honda CRV, which was purchased new for approximately $20,000.00 in November 2004 at South Honda in Miami, Florida.  To Plaintiff Weisberg's knowledge, the airbags in his 2005 Honda CRV were repaired or replaced on February 9, 2015.   The value of his 2005 Honda CRV has been diminished as a result of the Inflator Defect.  Plaintiff Weisberg would not have purchased his 2005 Honda CRV or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Brooks Weisblat—Florida

163.    Plaintiff Brooks Weisblat resides in Miami, Florida.  Plaintiff Weisblat owns a 2005 Ford GT, which was purchased used for $143,000.00 in February 2011 at CNC Exotics in Miami, Florida.  To Plaintiff Weisblat's knowledge, the airbags in the 2005 Ford GT have never been repaired or replaced.  The value of her 2005 Ford GT has been diminished as a result of the Inflator Defect.

Charlotte Whitehead—Alabama

164.    Plaintiff Charlotte Whitehead resides in Eufaula, Alabama.  Plaintiff Whitehead owns a 2003 Honda Civic LX, which was purchased used for $10,000.00 in 2007 in Dothan, Alabama.  To Plaintiff Whitehead's knowledge, the airbags in her 2003 Honda Civic LX were replaced after November 3, 2014.  The value of her vehicle has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2003 Honda Civic LX, Plaintiff Whitehead viewed or heard about her vehicle through television and radio ads over the years stating that Honda Civics

are safe and reliable.  Ultimately, Plaintiff Whitehead's decision to purchase the 2003 Honda Civic LX was made because she believed the advertising.  Plaintiff Whitehead would not have purchased her 2003 Honda Civic LX or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Kathleen Wilkinson—Oregon

165.    Plaintiff Kathleen Wilkinson resides in Grants Pass, Oregon.  Plaintiff Wilkinson owns a 2006 Acura MDX, which was purchased used for $23,910.00 on April 23, 2009 in Grants Pass, Oregon.  To Plaintiff Wilkinson's knowledge, the airbags in her 2006 Acura MDX have never been repaired or replaced.  The value of her 2006 Acura MDX has been diminished as a result of the Inflator Defect.  Prior to purchasing her 2006 Acura MDX, Plaintiff Wilkinson viewed or heard about the vehicle through online research where she looked up reviews comparing the Acura MDX to the BMW.  Plaintiff Wilkinson also viewed or heard about the 2006 Acura MDX through other Internet websites like Kelley Blue Book, JD Power, and other sites that do vehicle comparisons.  She remembers hearing or seeing that Acura has a very good safety record, and that was important to her and her family.  Ultimately, because safety is important to Plaintiff Wilkinson, she looked at some promotional materials and/or ads that made her believe that the 2006 Acura MDX was safe and equipped with safety features. Plaintiff Wilkinson would not have purchased her 2006 Acura MDX or would not have paid as much for it if he had known of the problems associated with the vehicle's Inflator Defect.

Pamela Wilsey—Rhode Island

166.    Plaintiff Pamela A. Wilsey resides in West Warwick, Rhode Island.  Plaintiff Wilsey owns a 2002 Honda Accord VLX, which was purchased used for approximately $2,000.00 in March 2010 at Balise Honda (formerly Majestic Honda) in Warwick, Rhode Island.

Plaintiff Wilsey received a notice from Honda regarding the airbag recall of her 2002 Honda Accord VLX, but the Balise Honda dealership in Warwick, Rhode Island is waiting for replacement parts to arrive before they can replace the airbags in Plaintiff Wilsey's vehicle.  To Plaintiff Wilsey's knowledge, the airbags in her 2002 Honda Accord VLX have never been replaced or repaired.  The value of Plaintiff Wilsey's 2002 Honda Accord VLX has been diminished as a result of the Inflator Defect.  Prior to purchasing the 2002 Honda Accord VLX, Plaintiff Wilsey viewed or heard about the Honda Accord through television advertisements, radio advertisements and print advertisements, which influenced or affected her decision to purchase the 2002 Honda Accord VLX.  Specifically Plaintiff Wilsey relied on TV ads promoting the Honda Accord as a vehicle that was safe, reliable, and a better buy.  Plaintiff Wilsey would not have purchased her 2002 Honda Accord VLX or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

### Cynthia B. Wishkovsky—Pennsylvania

167.    Plaintiff Cynthia B. Wishkovksy resides in Bola Cynwyd, Pennsylvania.  Plaintiff Wishkovksy owns a 2004 Toyota Corolla, which was purchased new for approximately $17,433.00 on April 1, 2004 at Conicelli Toyota in Conshohocken, Pennsylvania.  To Plaintiff Wishkovksy's knowledge, the airbags in her 2004 Toyota Corolla have not been repaired or replaced.  The value of her 2004 Toyota Corolla has been diminished as a result of the Inflator Defect.  Plaintiff Wishkovksy would not have purchased her 2004 Toyota Corolla or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Bonnie Young—Georgia

168.   Plaintiff Bonnie W. Young resides in Wilmington, North Carolina.   Plaintiff Young owns a 2006 Acura MDX, which was purchased new for approximately $30,000.00 in November 2006 in Atlanta, Georgia.   To Plaintiff Young's knowledge, the airbags in her vehicle have never been repaired or replaced.   The value of her 2006 Acura MDX has been diminished as a result of the Inflator Defect.   Plaintiff Young would not have purchased her 2006 Acura MDX or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

Susana Zamora—California

169.   Plaintiff Susana Zamora resides in Vista, California.   Plaintiff Zamora owns a 2004 Honda Accord Sedan, which was purchased new in 2004 at Norm Reeves Honda Dealership in Cerritos, California.   The value of her 2004 Honda Accord Sedan has been diminished as a result of the Inflator Defect.   Prior to purchasing her 2004 Honda Accord Sedan, Plaintiff Zamora viewed or heard about the vehicle through TV and radio advertisements. Ultimately, Plaintiff Zamora's decision to purchase her 2004 Honda Accord Sedan was influenced or affected by advertisements that Honda was a highly ranked car, that it was a safe and reliable car, and that it had good mileage.   Plaintiff Zamora would not have purchased her 2004 Honda Accord Sedan or would not have paid as much for it if she had known of the problems associated with the vehicle's Inflator Defect.

John Zielinski—Illinois

170.   Plaintiff John Zielinski resides in Mokena, Illinois.   Plaintiff Zielinski owns a 2002 BMW 330ci, which was purchased used in April 2013 for $9,000.00 at a used car dealership in at World Class Motors Cars in Downers Grove, Illinois.   To Plaintiff Zielinski's

knowledge, the airbags in his 2002 BMW 330ci have never been repaired or replaced.  The value of his 2002 BMW 330ci has been diminished as a result of the Inflator Defect.  Plaintiff Zielinski would not have purchased his 2002 BMW 330ci or would have paid much less for it had he known of problems with the vehicle.

171.    For ease of reference, the following chart organizes the Consumer Plaintiffs by the state in which they acquired the Class Vehicle:

| No. | State | Class Representative Plaintiff | Vehicle |
|---|---|---|---|
| 1 | Alabama | Mario Cervantes | Honda Pilot (2003) |
| 2 | Alabama | Roy Martin | Toyota Sequoia (2004) |
| 3 | Alabama | Marita Murphy | Honda Pilot (2003) |
| 4 | Alabama | Crystal Pardue | Mazda 6 (2007) |
| 5 | Alabama | Regina M. Reilly | Subaru Legacy Outback (2004) |
| 6 | Alabama | Billy Richardson | BMW 330i (2003) |
| 7 | Alabama | Cathryn Tanner | Honda Civic (2003) |
| 8 | Alabama | Charlotte Whitehead | Honda Civic LX (2003) |
| 9 | Arizona | Gwendolyn Cody | Honda CRV (2006) |
| 10 | Arizona | Christopher Pedersen | Honda Odyssey (2004) |
| 11 | California | Jina Bae | Honda Accord (2004) |
| 12 | California | Henry Collins | Dodge Dakota (2007) (Chrysler) |
| 13 | California | William & Kathy Dougherty | BMW 325ci (2001) |
| 14 | California | Leslie Flaherty | Honda Element (2008) |
| 15 | California | Terri Gamino | Honda Accord (2006) |
| 16 | California | Kristin Go | Honda Accord (2001) |
| 17 | California | Coleman Haklar | Infiniti I-35 (2002) (Nissan) |
| 18 | California | Judith Hollywood | Honda Accord (2004) |
| 19 | California | Richard Klinger | Honda Civic  (2003) |
| 20 | California | Michael McLeod | Honda Accord (2007) |
| 21 | California | Valerie M. Nannery | Honda Civic Hybrid (2004) |
| 22 | California | Henry H. Pham | BMW M32 Couple (2005) |
| 23 | California | Holly Ruth | Honda Accord (2002) |
| 24 | California | Richard H. Sayler | BMW M3 (2002) |
| 25 | California | Robert Schmidt | BMW 32 Xi Wagon (2003) |
| 26 | California | David Takeda | Honda Element (2005) |
| 27 | California | Daniel Thies | Honda Civic (2012) |
| 28 | California | Susana Zamora | Honda Accord (2004) |
| 29 | Colorado | Barbara E. Mulroy | BMW X-3 (2006) |
| 30 | Connecticut | Nicole Peaslee | Honda Accord (2005) |
| 31 | Florida | Joseph Aliscio | Ford Ranger (2004) |
| 32 | Florida | Keile Allen | Honda Odyssey (2002) |
| 33 | Florida | Ellen Bonet | Dodge Durango (2008) (Chrysler) |
| 34 | Florida | Lonee Cataldo | Honda Element (2003) |
| 35 | Florida | Connie Collins | Toyota Sequoia (2005) |
| 36 | Florida | Camila G. Corteleti | Honda Civic (2004) |

| No. | State | Class Representative Plaintiff | Vehicle |
|---|---|---|---|
| 37 | Florida | Christopher Day | BMW 330i (2002) |
| 38 | Florida | Sandeep Dewan | BMW 330ci (2006) |
| 39 | Florida | Ryvania M. Fuentes | Honda Accord LX (2007) |
| 40 | Florida | David Gunther | BMW 325i (2003) |
| 41 | Florida | James Herron | Dodge Ram 1500 SLT (2005) (Chrysler) |
| 42 | Florida | Kimberly Holmes | Honda Odyssey (2002) |
| 43 | Florida | Constantine Kazos | BMW M3 (2004) |
| 44 | Florida | Constantine Kazos | Honda Element (2008) |
| 45 | Florida | Pam Koehler | Honda Pilot (2006) |
| 46 | Florida | David Kopelman | Honda Pilot EXL w/DVD (2004) |
| 47 | Florida | Kathy Liberal | Nissan Sentra (2004) |
| 48 | Florida | Gail Markowitz | Honda Accord (2007) |
| 49 | Florida | Yessica Martinez | Honda Civic (2004) |
| 50 | Florida | Maureen Rash | Honda Pilot (2007) |
| 51 | Florida | Angela Ruffin | Toyota Corolla (2005) |
| 52 | Florida | Steven P. Schneider | Acura TL (2002) (Honda) |
| 53 | Florida | Shelley Shader | Lexus SC430 (Toyota) |
| 54 | Florida | Eugennie Sinclair | Ford Mustang (2007) |
| 55 | Florida | Shaun Taylor | Honda Accord (2004) |
| 56 | Florida | Oswald C.Tessier | Honda Accord (2003) |
| 57 | Florida | Gerdgene Veser | BMW 325i (2005) |
| 58 | Florida | Mickey Vukadinovic | Mazda MPV |
| 59 | Florida | Michael Walker | Subaru Legacy (2005) |
| 60 | Florida | Robert E. Weisberg | Honda CRV (2005) |
| 61 | Florida | Brooks Weisblat | Ford GT (2005) |
| 62 | Georgia | Richard Arnold | Honda Pilot (2006) |
| 63 | Georgia | Trey Watley | Honda Pilot (2006) |
| 64 | Georgia | Bonnie W. Young | Acura MDX (2006) (Honda) |
| 65 | Hawaii | Timothy Archer | Honda CRV (2004) |
| 66 | Hawaii | David M. Jorgensen | Honda Ridgeline (2006) |
| 67 | Illinois | Peter Breschnev | Acura TL (2002) (Honda) |
| 68 | Illinois | John Zielinski | BMW 330ci (2002) |
| 69 | Indiana | Charles & Vickie Burd | Honda Odyssey (2004) |
| 70 | Louisiana | Tasha R.Severio | Honda Pilot (2007) |
| 71 | Massachusetts | Megan Sayre-Scibona | Honda CRV (2005) |
| 72 | Michigan | Erik Boone | Honda Pilot (2004) |
| 73 | Minnesota | Darla Spiess | Acura MDX (2005) (Honda) |
| 74 | Missouri | Amber Hodgson | Honda CRV (2004) |
| 75 | Missouri | Russell Holland | Honda Pilot (2007) |
| 76 | Missouri | Jason Moehlman | Honda Civic (2005) |
| 77 | Nevada | Kostan Lathouris | Honda Civic (2005) |
| 78 | Nevada | Charles & Dana Talamantes | Toyota Tundra (2004) |
| 79 | New York | Rafael A. Garcia | Honda Pilot (2007) |
| 80 | New York | Anthony Palmieri | Honda Accord (2005) |
| 81 | North Carolina | Marjorie Michelle Avery | Honda Ridgeline (2006) |
| 82 | North Carolina | John Meiser | Honda Pilot (2007) |
| 83 | Ohio | John Huebner | Ford Mustang (2005) |
| 84 | Ohio | John Huebner | Pontiac Vibe (2003) |

| No. | State | Class Representative Plaintiff | Vehicle |
|---|---|---|---|
| 85 | Ohio | Katherine E. Shank | Honda CRV (2002) |
| 86 | Oregon | Anna and Kangyi Chen | Honda Accord (2006) |
| 87 | Oregon | Laura Killgo | Honda Element (2003) |
| 88 | Oregon | Kathleen Wilkinson | Acura MDX (2006) (Honda) |
| 89 | Pennsylvania | Robert Barto | Nissan Sentra (2004) |
| 90 | Pennsylvania | Richard Lee | BMW 325i (2003) |
| 91 | Pennsylvania | Deborah Morgan | Honda Element (2008) |
| 92 | Pennsylvania | Marc Raiken | Toyota Corolla (2004) |
| 93 | Pennsylvania | Cynthia Wishkovsky | Toyota Corolla (2004) |
| 94 | Rhode Island | Mary Hasley | Honda Accord VXS (2002) |
| 95 | Rhode Island | Pamela Wilsey | Honda ULX (2002) |
| 96 | South Carolina | David McLaughlin | Dodge Ram 1500 Daytona (2005) (Chrysler) |
| 97 | South Carolina | Corene L. Quirk | Toyota Sequoia (2004) |
| 98 | Tennessee | Sonya Annette Leonard | Honda Accord (2007) |
| 99 | Tennessee | Rebecca Lew | Honda Civic (2004) |
| 100 | Tennessee | Dan Peoples | Honda Accord (2004) |
| 101 | Texas | Nancy Barnett | Ford Mustang (2007) |
| 102 | Texas | Kelly Ritter | Honda Civic LX (2005) |
| 103 | Texas | Daniel N. Silva | Honda Pilot (2004) |
| 104 | Virginia | Howard Morris | BMW 330ci (2003) |
| 105 | Virginia | Kathryn A. Tillisch | Honda Pilot (2005) |
| 106 | Washington | Robert Goodwin | Honda CRV (2004) |
| 107 | West Virginia | Jonathan Knight | Honda Pilot (2006) |

## B.     Automotive Recycler Plaintiffs

172.    Plaintiff Automotive Dismantlers and Recyclers Association, Inc. d/b/a Automotive Recyclers Association ("ARA" or "Plaintiff") is incorporated in New York with its principal place of business in Virginia. ARA is an international trade association of businesses dedicated to the efficient removal and reuse of automotive parts, and the safe disposal of inoperable motor vehicles. ARA directly services approximately 1,050 member companies and approximately 3,500 additional companies through affiliated organizations.

173.    ARA proceeds with this litigation pursuant to an assignment of claims by Rigsby's Auto Parts & Sales, Inc., M&K Used Auto Parts, Inc., and Quarno's Auto Salvage (collectively the "Assignors").

174.    Rigsby's Auto Parts & Sales, Inc. ("Rigsby's") is an automotive parts recycler and Florida corporation with its principal place of business at 40147 Lynbrook Drive,

Zephyrhills, Florida 33540.  Rigsby's purchased Recalled Vehicles, as defined below, which contained Takata airbags, prior to the recalls set forth herein, and Rigsby's still possesses and maintains the Takata airbags that were contained in the Recalled Vehicles. Had Rigsby's known of the Inflator Defect, it would not have purchased the Recalled Vehicles or it would not have paid as much for them as it did.

175.    M&K Used Auto Parts, Inc. ("M&K") is an automotive parts recycler and Florida corporation with its principal place of business at 3100 N. Sparkman Avenue, Orange City, Florida 32763-2006. M&K purchased Recalled Vehicles, which contained Takata airbags, prior to the recalls set forth herein, and M&K still possesses and maintains the Takata airbags that were contained in the Recalled Vehicles. Had M&K known of the Inflator Defect, it would not have purchased the Recalled Vehicles or it would not have paid as much for them as it did.

176.    Quarno's Auto Salvage ("Quarno's") is an automotive parts recycler with its principal place of business at 550 Quarno Road, Cocoa, Florida 32927-4840. Quarno's purchased Recalled Vehicles, which contained Takata airbags, prior to the recalls set forth herein, and Quarno's still possesses and maintains the Takata airbags that were contained in the Recalled Vehicles. Had Quarno's known of the Inflator Defect, it would not have purchased the Recalled Vehicles or it would not have paid as much for them as it did.

## GENERAL FACTUAL ALLEGATIONS

177.    Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles manufactured, distributed, or sold by the Vehicle Manufacturer Defendants.  Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture or use of Defective Airbags in the Class Vehicles, including but not limited to diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties, and injunctive relief/equitable relief.

178.    Airbags with the Inflator Defect are referred to as "Defective Airbags."   On information and belief, all Takata airbags manufactured from at least 2000 to the present contain the Inflator Defect and are therefore Defective Airbags.   As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

179.    "Class Vehicles" refers to all vehicles purchased or leased in the United States that have Defective Airbags.

180.    As detailed in this Complaint, over the course of seven years Takata and the Vehicle Manufacturer Defendants have issued a series of partial, misleading, and ultimately ineffective recalls to address the Defective Airbags.   For reference, the following table identifies the recalled vehicles by manufacturer, and which of the front airbags were included in the recall for each vehicle (driver or passenger) (hereinafter "Recalled Vehicles"):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 13V172 | BMW | 325Ci | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325i | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325iT | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325xi | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 325xiT | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330Ci Convertible | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330Ci Coupe | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330i | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | 330xi Sedan | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | M3 Convertible | 2002-2003 | Passenger |
| BMW | 13V172 | BMW | M3 Coupe | 2002-2003 | Passenger |
| BMW | 14V348 | BMW | 325i | 2004-2006 | Both |
| BMW | 14V348 | BMW | 325xi | 2004-2005 | Both |
| BMW | 14V348 | BMW | 330i | 2004-2006 | Both |
| BMW | 14V348 | BMW | 330xi | 2004-2005 | Both |
| BMW | 14V348 | BMW | M3 | 2004-2006 | Both |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| BMW | 14V428 | BMW | 323i | 2000 | Passenger |
| BMW | 14V428 | BMW | 325i | 2001-2006 | Passenger |
| BMW | 14V428 | BMW | 325xi | 2001-2005 | Passenger |
| BMW | 14V428 | BMW | 328i | 2000 | Passenger |
| BMW | 14V428 | BMW | 330i | 2001-2006 | Passenger |
| BMW | 14V428 | BMW | 330xi | 2001-2005 | Passenger |
| BMW | 14V428 | BMW | M3 | 2001-2006 | Passenger |
| Chrysler | 14V354 | Chrysler | 300 | 2005-2008 | Both |
| Chrysler | 14V354 | Chrysler | Aspen | 2007-2008 | Both |
| Chrysler | 14V354 | Dodge | Dakota | 2005-2008 | Both |
| Chrysler | 14V354 | Dodge | Durango | 2004-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 1500 | 2003-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 2500 | 2005-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 3500 | 2006-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 3500 Cab Chassis | 2007-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 4500 Cab Chassis | 2006-2008 | Both |
| Chrysler | 14V354 | Dodge | Ram 5500 | 2008 | Both |
| Chrysler | 14V770 | Chrysler | 300 | 2005 | Passenger |
| Chrysler | 14V770 | Chrysler | SRT8 | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Dakota | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Durango | 2004-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Magnum | 2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 1500 | 2003-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 2500 | 2003-2005 | Passenger |
| Chrysler | 14V770 | Dodge | Ram 3500 | 2003-2005 | Passenger |
| Chrysler | 14V817 | Chrysler | 300 | 2005-2007 | Driver |
| Chrysler | 14V817 | Chrysler | 300C | 2005-2007 | Driver |
| Chrysler | 14V817 | Chrysler | Aspen | 2007 | Driver |
| Chrysler | 14V817 | Chrysler | SRT8 | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Charger | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Dakota | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Durango | 2004-2007 | Driver |
| Chrysler | 14V817 | Dodge | Magnum | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 1500 | 2004-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 2500 | 2005-2007 | Driver |
| Chrysler | 14V817 | Dodge | Ram 3500 | 2006-2007 | Driver |
| Chrysler | 14V817 | Mitsubishi | Raider | 2006-2007 | Driver |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Ford | 14V343 | Ford | GT | 2005-2006 | Both |
| Ford | 14V343 | Ford | Mustangs | 2005-2008 | Driver |
| Ford | 14V343 | Ford | Ranger | 2004-2005 | Both |
| Ford | 14V787 | Ford | GT | 2005-2006 | Passenger |
| Ford | 14V787 | Ford | Ranger | 2004-2005 | Passenger |
| Ford | 14V802 | Ford | GT | 2005-2006 | Driver |
| Ford | 14V802 | Ford | Mustang | 2005-2008 | Driver |
| GM | 14V372 | Chevrolet | Cruze | 2013-2014 | Driver |
| GM | 14V471 | Saab | 9-2X | 2005 | Passenger |
| GM/Toyota | 13V133 | Pontiac | Vibe | 2003-2004 | Passenger |
| Honda | 08V593 | Honda | Accord | 2001 | Driver |
| Honda | 08V593 | Honda | Civic | 2001 | Driver |
| Honda | 09V259 | Acura | TL/CL | 2002 | Driver |
| Honda | 09V259 | Honda | Accord | 2001-2002 | Driver |
| Honda | 09V259 | Honda | Civic | 2001 | Driver |
| Honda | 10V041 | Acura | CL | 2003 | Driver |
| Honda | 10V041 | Acura | TL | 2002-2003 | Driver |
| Honda | 10V041 | Honda | Accord | 2001-2002 | Driver |
| Honda | 10V041 | Honda | Civic | 2001-2003 | Driver |
| Honda | 10V041 | Honda | CR-V | 2002 | Driver |
| Honda | 10V041 | Honda | Odyssey | 2002 | Driver |
| Honda | 10V041 | Honda | Pilot | 2003 | Driver |
| Honda | 11V260 | Acura | CL | 2003 | Driver |
| Honda | 11V260 | Acura | TL | 2002-2003 | Driver |
| Honda | 11V260 | Honda | Accord | 2001-2002 | Driver |
| Honda | 11V260 | Honda | Civic | 2001-2003 | Driver |
| Honda | 11V260 | Honda | Civic Hybrid | 2003 | Driver |
| Honda | 11V260 | Honda | CR-V | 2002-2004 | Driver |
| Honda | 11V260 | Honda | Odyssey | 2002-2003 | Driver |
| Honda | 11V260 | Honda | Pilot | 2003 | Driver |
| Honda | 13V132 | Honda | Civic | 2001-2003 | Passenger |
| Honda | 13V132 | Honda | CR-V | 2002-2003 | Passenger |
| Honda | 13V132 | Honda | Odyssey | 2002 | Passenger |
| Honda | 14V349 | Acura | MDX | 2003 | Passenger |
| Honda | 14V349 | Honda | Accord | 2003 | Passenger |
| Honda | 14V349 | Honda | Civic | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | CR-V | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | Element | 2003 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Honda | 14V349 | Honda | Odyssey | 2002-2003 | Passenger |
| Honda | 14V349 | Honda | Pilot | 2003 | Passenger |
| Honda | 14V351 | Acura | MDX | 2003-2006 | Driver |
| Honda | 14V351 | Acura | TL/CL | 2002-2003 | Driver |
| Honda | 14V351 | Honda | Accord | 2001-2007 | Driver |
| Honda | 14V351 | Honda | Accord | 2001-2002 | Driver |
| Honda | 14V351 | Honda | Civic | 2001-2005 | Driver |
| Honda | 14V351 | Honda | CR-V | 2002-2006 | Driver |
| Honda | 14V351 | Honda | Element | 2003-2011 | Driver |
| Honda | 14V351 | Honda | Odyssey | 2002-2004 | Driver |
| Honda | 14V351 | Honda | Pilot | 2003-2007 | Driver |
| Honda | 14V351 | Honda | Ridgeline | 2006 | Driver |
| Honda | 14V353 | Acura | MDX | 2003-2005 | Passenger |
| Honda | 14V353 | Acura | RL | 2005 | Passenger |
| Honda | 14V353 | Honda | Accord | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | Civic | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | CR-V | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | Element | 2003-2004 | Passenger |
| Honda | 14V353 | Honda | Odyssey | 2003-2004 | Passenger |
| Honda | 14V353 | Honda | Pilot | 2003-2005 | Passenger |
| Honda | 14V353 | Honda | RidgeLine | 2006 | Passenger |
| Honda | 14V700 | Acura | MDX | 2003-2005 | Passenger |
| Honda | 14V700 | Acura | RL | 2005 | Passenger |
| Honda | 14V700 | Honda | Accord | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | Civic | 2001-2005 | Passenger |
| Honda | 14V700 | Honda | Civic (CNG) | 2003-2004 | Passenger |
| Honda | 14V700 | Honda | Civic Hybrid | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | CR-V | 2002-2005 | Passenger |
| Honda | 14V700 | Honda | Element | 2003-2004 | Passenger |
| Honda | 14V700 | Honda | Odyssey | 2002-2004 | Passenger |
| Honda | 14V700 | Honda | Pilot | 2003-2005 | Passenger |
| Honda | 14V700 | Honda | Ridgeline | 2006 | Passenger |
| Honda | 15V153 | Honda | Accord | 2001 | Driver |
| Honda | 15V153 | Honda | Civic | 2004 | Driver |
| Honda | 15V153 | Honda | Pilot | 2008 | Driver |
| Mazda | 13V130 | Mazda | Mazda6 | 2003-2004 | Passenger |
| Mazda | 13V130 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 14V344 | Mazda | B-Series | 2004 | Both |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Mazda | 14V344 | Mazda | Mazda6 | 2003-2008 | Both |
| Mazda | 14V344 | Mazda | MazdaSpeed6 | 2006-2007 | Both |
| Mazda | 14V344 | Mazda | MPV | 2004-2005 | Both |
| Mazda | 14V344 | Mazda | RX-8 | 2004-2008 | Both |
| Mazda | 14V362 | Mazda | Mazda6 | 2003-2004 | Passenger |
| Mazda | 14V362 | Mazda | RX-8 | 2004 | Passenger |
| Mazda | 14V773 | Mazda | B-Series | 2004-2005 | Passenger |
| Mazda | 14V773 | Mazda | Mazda6 | 2003-2006 | Passenger |
| Mazda | 14V773 | Mazda | MPV | 2004-2005 | Passenger |
| Mazda | 14V773 | Mazda | RX-8 | 2004-2005 | Passenger |
| Mitsubishi | 14V354 | Mitsubishi | Raider | 2006-2007 | Both |
| Mitsubishi | 14V421 | Mitsubishi | Lancer | 2004-2005 | Passenger |
| Mitsubishi | 14V752 | Mitsubishi | Lancer | 2004-2005 | Passenger |
| Nissan | 13V136 | Infiniti | FX35 | 2003 | Passenger |
| Nissan | 13V136 | Infiniti | FX45 | 2003 | Passenger |
| Nissan | 13V136 | Infiniti | I-30 | 2001 | Passenger |
| Nissan | 13V136 | Infiniti | I35 | 2002-2003 | Passenger |
| Nissan | 13V136 | Infiniti | QX4 | 2002-2003 | Passenger |
| Nissan | 13V136 | Nissan | Maxima | 2001-2003 | Passenger |
| Nissan | 13V136 | Nissan | Pathfinder | 2001-2003 | Passenger |
| Nissan | 13V136 | Nissan | Sentra | 2002-2003 | Passenger |
| Nissan | 14V340 | Infiniti | FX | 2003-2005 | Passenger |
| Nissan | 14V340 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 14V340 | Infiniti | M | 2006 | Passenger |
| Nissan | 14V340 | Nissan | Pathfinder | 2003-2004 | Passenger |
| Nissan | 14V340 | Nissan | Sentra | 2004-2006 | Passenger |
| Nissan | 14V701 | Infiniti | FX35 | 2003-2005 | Passenger |
| Nissan | 14V701 | Infiniti | FX45 | 2003-2005 | Passenger |
| Nissan | 14V701 | Infiniti | I35 | 2003-2004 | Passenger |
| Nissan | 14V701 | Infiniti | M35 | 2006 | Passenger |
| Nissan | 14V701 | Infiniti | M45 | 2006 | Passenger |
| Nissan | 14V701 | Nissan | Pathfinder | 2003-2004 | Passenger |
| Nissan | 14V701 | Nissan | Sentra | 2004-2006 | Passenger |
| Nissan | 15V226 | Nissan | Sentra | 2006 | Passenger |
| Subaru | 14V399 | Subaru | Baja | 2003-2004 | Passenger |
| Subaru | 14V399 | Subaru | Impreza | 2004 | Passenger |
| Subaru | 14V399 | Subaru | Legacy | 2003-2004 | Passenger |
| Subaru | 14V399 | Subaru | Outback | 2003-2004 | Passenger |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Subaru | 14V471 | Subaru | Baja | 2003-2005 | Passenger |
| Subaru | 14V471 | Subaru | Impreza | 2004-2005 | Passenger |
| Subaru | 14V471 | Subaru | Legacy | 2003-2005 | Passenger |
| Subaru | 14V471 | Subaru | Outback | 2003-2005 | Passenger |
| Subaru | 14V763 | Saab | 9-2X | 2005 | Passenger |
| Subaru | 14V763 | Subaru | Baja | 2003-2005 | Passenger |
| Subaru | 14V763 | Subaru | Impreza | 2004-2005 | Passenger |
| Subaru | 14V763 | Subaru | Legacy | 2003-2005 | Passenger |
| Subaru | 14V763 | Subaru | Outback | 2003-2005 | Passenger |
| Toyota | 13V133 | Lexus | SC430 | 2002-2004 | Passenger |
| Toyota | 13V133 | Toyota | Corolla | 2003-2004 | Passenger |
| Toyota | 13V133 | Toyota | Matrix | 2003-2004 | Passenger |
| Toyota | 13V133 | Toyota | Sequoia | 2002-2004 | Passenger |
| Toyota | 13V133 | Toyota | Tundra | 2003-2004 | Passenger |
| Toyota | 14V312 | Lexus | SC | 2002-2004 | Passenger |
| Toyota | 14V312 | Toyota | Corolla | 2003-2004 | Passenger |
| Toyota | 14V312 | Toyota | Matrix | 2003-2004 | Passenger |
| Toyota | 14V312 | Toyota | Sequoia | 2002-2004 | Passenger |
| Toyota | 14V312 | Toyota | Tundra | 2003-2004 | Passenger |
| Toyota | 14V350 | Lexus | SC430 | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Corolla | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Matrix | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Sequoia | 2003-2005 | Passenger |
| Toyota | 14V350 | Toyota | Tundra | 2003-2005 | Passenger |
| Toyota | 14V655 | Lexus | SC | 2002-2005 | Passenger |
| Toyota | 14V655 | Toyota | Corolla | 2003-2005 | Passenger |
| Toyota | 14V655 | Toyota | Matrix | 2003-2005 | Passenger |
| Toyota | 14V655 | Toyota | Sequoia | 2002-2005 | Passenger |
| Toyota | 14V655 | Toyota | Tundra | 2003-2005 | Passenger |
| Toyota/GM | 14V312 | Pontiac | Vibe | 2003-2004 | Passenger |
| Toyota/GM | 14V350 | Pontiac | Vibe | 2003-2005 | Passenger |
| Toyota/GM | 14V655 | Pontiac | Vibe | 2003-2005 | Passenger |

## I.   __Takata is a Major Manufacturer of Airbags and Inflators.__

181.   Defendant Takata is the world's second largest manufacturer of automotive safety devices, including airbags.  Takata was one of the first companies to market driver-side airbags

in the early 1980s.  Airbags made up 38.2 percent of its business in its most recently reported quarter.

182.    Takata has supplied airbags to automakers for U.S. vehicles and to state and local governmental purchasers since at least 1983.  By 2014, Takata had captured 22 percent of the global automotive airbag market.

183.    Takata Corporation has claimed to prioritize driver safety as its "dream," "dedication," and "commitment."

184.    Takata claims to be "motivated by the preciousness of life" and pledges to "communicate openly and effectively."  Takata has failed to live up to these assurances by:

> a.    manufacturing, distributing, and selling airbags that can cause serious bodily injury or death;
>
> b.    intentionally concealing the foregoing from Plaintiffs, Class members, and federal regulators; and
>
> c.    making incomplete representations about the safety and reliability of its airbags, while purposefully withholding material facts from Plaintiffs, Class members, and federal regulators that contradicted these representations.

## II.    Takata's Airbags Have A Common, Uniform Defect

### A.    Takata Recklessly Chose An Inexpensive and Dangerous Propellant

185.    The part of the airbag at issue in this matter is the inflator.  The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module.  Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

186.    The following basic illustration, included earlier in the complaint as well, depicts Takata's airbag module:



187.    When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.  In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.

188.    In  the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.  Ammonium nitrate is a dangerous material that should not be used in airbags.  It is an inherently volatile and unstable chemical.

189.    Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility.  It also readily absorbs moisture from the atmosphere.  The chemical's sensitivity to temperature and moisture cause it to break

down over time, which in turn results in violent detonation or the chemical becoming effectively inert.   As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

190.    From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks.  Indeed, Takata expressed concern in a patent document in 1995 that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up."  Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit.  If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

191.    Takata further admitted in a patent document from 1999 that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

192.    In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington, raised objections and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion.  As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team was given only "a couple days" to do its review.

193.    Not surprisingly, other major airbag manufacturers, including Autoliv, Key Safety Systems, and TRW Automotive, have reportedly avoided using ammonium nitrate as a propellant.

194.    The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap." Indeed, Takata had originally planned to use tetrazole as its propellant, which is not only more

stable than ammonium nitrate, but also yields other desired benefits, such as being more environmentally friendly.  But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

195.   Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years.  Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

196.   For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture."  The 2006 patent document purportedly contained a fix for that sort of rupturing.

197.   Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused an injury, and incidents continued to mount after that time as well.  Takata submitted a patent application with other purported "fixes" as recently as 2013.  These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

### B.    Takata's Knowledge of the Inflator Defect

198.   Takata became further aware of the instability of its ammonium nitrate propellant from the persistent and glaring quality control problems it encountered in its manufacturing operations.  The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

199.   At a House hearing in December 2014, Mr. Hiroshi Shimizu, Takata's Senior Vice President for Global Quality Assurance, admitted: "We considered it a main contribution to the problem is [sic] the high temperature and absolute humidity, together with age of the

products and probably maybe a combination with manufacturing issues." Nonetheless, Mr. Shimizu claimed that Takata still had not determined the root cause of the defect: "At this moment, we don't have the root cause.  We know the factors may contribute to this problems [sic], so that is why we are still researching these inflators collected from regions."  Executive Vice President of Honda North America, Rick Schostek, echoed that claim at the House hearing: "we have theories, but we don't know the cause."

200.    Mr. Shimizu grossly understated the problem.  Starting in 2001, engineers at the Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail.    Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

201.    On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.  Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant, leaving at least a dozen workers injured.

202.    Apparently, not even that terrible accident could prompt serious and lasting improvements: in a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

203.    Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

204.    Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags.  Putting profits ahead of safety, Takata exhibited shoddy and reckless

- 84 -

behavior in the handling of its ammonium nitrate propellant.  In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" This shoddy and reckless attitude permeated all of Takata's operations and facilities.

205.    Yet, handling problems at Takata facilities persisted: another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly."  A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

206.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like General Motors.

207.    Moreover, while Defendants, and particularly Takata, have repeatedly assured the public that the Defective Airbags have been remedied and that the new airbags being placed in recalled vehicles are safe, in fact, GM was recently required to recall model year 2013 and 2014 Chevy Cruze vehicles because of the risk of the Takata airbags rupturing.

### III.   Takata Airbag Failures and Defendants' Inadequate Reaction

#### A.    2003-2008: Early Incidents and the 2008 Honda Recall (08V-593)

208.    Honda was among the first automakers to use Takata's new air bags, and installed them in some models beginning in 1998.  Since then, Takata airbags have been installed in vehicles manufactured by at least ten automakers.

209.    On November 1, 2003, Charlene Weaver of Arizona—one of the least humid states in the country—was a passenger in a 2004 Subaru Impreza when she was killed in a Takata airbag-related accident.  As summarized in a later section of this Complaint, her car was not recalled until July 2014, more than a decade later.

210.    In 2003, an inflator ruptured in a BMW, prompting a January 2004 investigation by Takata and BMW.  That investigation took place at Takata's LaGrange, Georgia, facility, and involved inflators sold to BMW, Honda, and Toyota.  The testing was ordered by a senior Takata executive, and the results indicated that the inflators were defective.

211.    In 2004, a Takata airbag violently exploded in a Honda Accord in Alabama, shooting out metal fragments and injuring the car's driver.  Honda was notified of the incident, and at least one Takata employee recalled being told that Honda examined the part before turning it over to Takata.  Takata reported back to Honda that it was unable to find a cause for the incident.  Ultimately, the companies deemed the incident "an anomaly," and conducted no further investigation or analysis to the public's knowledge.  Notably, Honda and Takata did not issue a recall or even involve federal safety regulators beyond completing a reporting form in a cursory and incomplete manner.

212.    Yet, by this time, Takata was aware of the broad problems associated with its choice of the unstable and volatile ammonium nitrate as a propellant.  As noted above, between 2001 and 2003, internal Takata reports titled "potential failures" showed that Takata struggled with at least 45 different inflator problems, and that, in 2002, the Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's own quality control limit.  In light of this accumulated knowledge, Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

213.    Even as it downplayed the incident publicly, engineers at Takata's American headquarters in Auburn Hills, Michigan, began conducting secret tests on 50 airbags it had retrieved from scrapyards.  The tests were conducted by Al Bernat, Takata's then-vice president of engineering, and took place over weekends and holidays during the summer of 2004.

214.    Steel inflators in at least two of the airbags cracked during the tests, a condition which can lead to rupture.  The result was so startling that engineers began designing possible fixes in anticipation of a recall.

215.    But Takata executives ordered the lab technicians to delete the test data, including video and computer backups, from company computers and to dispose of the airbag inflators. Prototypes of design alternatives were also trashed.  One former Takata employee stated that "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.'  It was not standard procedure."

216.    Takata did not disclose these tests to the public or federal regulators.   In regulatory filings, Takata has stated instead that it began testing Defective Airbags in 2008. Because Honda and Takata agreed to describe the 2004 incident in Alabama as an "anomaly," and because Honda and Takata were communicating about the defective inflators by 2004, Plaintiffs allege, upon information and belief, that Honda was aware of Takata's secret testing that occurred shortly after the Honda airbag explosion.

217.    In June and August of 2007, Honda notified Takata of three additional airbag explosion incidents.  All three accidents involved metal fragments propelling into the faces and bodies of car passengers upon deployment of the airbags.  As with the 2004 incident, Honda did not initiate a recall or provide information about the ruptures to federal investigators.  Rather, it callously risked vehicle occupants' safety as it awaited a failure mode analysis being conducted by Takata.

218.    After the 2007 incidents, Honda and Takata began another internal investigation, including a survey of inflators.  Starting in late 2007 or early 2008, Honda began collecting inflators returned to dealers for reasons unrelated to the exploding-airbag defect, and sent them to Takata for investigation, all without informing vehicle owners or regulators.  Honda also collected inflators from scrap yards for the same purpose.

219.    Takata began what became a year-long study of the Inflator Defect. Takata's engineers ultimately claimed that workers at a Takata factory in Monclova, Mexico, had left

moisture-sensitive explosives out on the plant floor, making them prone to overly energetic combustion.  Takata advised Honda that by November 2002, it had corrected any such handling deficiencies.

220.     The victims of the four Honda incidents – one in 2004 and three in 2007 – brought legal claims against Honda, which the automaker settled on a strictly confidential basis. While Honda filed a standard report with U.S. safety regulators for each of these four incidents, its reports tellingly omitted the most critical detail of these incidents: the Defective Airbags posed a substantial risk of serious injury or death when deployed.   In later submissions to NHTSA, Honda admitted that it had received still other complaints in this timeframe:

a.      On July 25, 2008, Honda received an unidentified complaint related to Takata driver airbag ruptures.

b.      On September 11, 2008, Honda received notice of a complaint regarding "unusual" driver airbag deployment.

221.     Takata shared the results of the inflator survey analysis with Honda on October 2, 2008. That analysis indicated an airbag inflator problem. Honda and Takata claimed, however, that only a small number or inflators were affected.

222.     As a result, Honda issued a recall, but only for 3,940 vehicles in the United States. This November 2008 recall involved certain 2001 Honda Accord and Civic vehicles with airbags that "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall").   Honda reported that it learned of the problem from a June 2007 claim, and assured regulators that it had identified all "possible vehicles that could potentially experience the problem."

223.     Even as Takata and Honda advocated a minuscule recall focused on older models—less than 0.1 percent of the total Honda recall to date—at about the same time, in April 2009, Takata engineers scrambled to repair a flaw in a machine at the Monclova, Mexico factory that made the airbag propellant more volatile, according to materials from a company presentation given that year.

**B.**     **2008-2009: Additional Incidents, the 2009 Honda Recall (09V-259), and Honda's and Takata's Misleading Reporting to NHTSA**

224.    Additional incidents took place after the 2008 Recall that underscored its inadequacy:

a.      On April 27, 2009, six months after the limited 2008 recall, a Takata airbag in Jennifer Griffin's 2001 Honda Civic exploded after a minor accident in Orlando, Florida.  The explosion sent a two-inch piece of shrapnel from the Defective Airbag flying into Ms. Griffin's neck.  Although Ms. Griffin survived, when highway troopers found her, she was bleeding from a severe gash in her neck.  Ms. Griffin's car was not part of the 2008 Recall.  Honda received notice of the incident no later than September 2009, and likely months earlier in July towards the beginning of its correspondence with NHTSA regarding the upcoming 2009 recall.

b.      On May 28, 2009, 18-year-old Ashley Parham of Oklahoma was killed while driving a 2001 Honda Accord when the Takata airbag in her car exploded after her car bumped another car in a parking lot.  While she apparently survived the accident itself, the metal shrapnel that shot out of the exploding Defective Airbag sliced open her carotid artery and she bled to death.  Ms. Parham's car was not part of the 2008 Recall.

c.      Another Takata airbag-related incident took place in Virginia on June 9, 2009, and Honda ultimately settled a lawsuit brought by the decedent's family.

d.      According to one of its submissions related to the upcoming 2009 Recall, Honda received three additional Takata airbag unusual deployment complaints on July 27, July 31, and August 31, 2009.

225.    With incidents mounting, Takata and Honda revisited the issue yet again.  In June 2009, Takata reported to Honda that the defective airbag components had been made at its factory in Moses Lake, Washington.  At the time, Takata engineers claimed that between 2000 and 2002, a flaw in a machine that presses air bag explosives into wafers had made the explosives unstable.  The Takata engineers further claimed that with the defective air bags,

explosives in the metal inflator, which would normally burn down and produce the nitrogen gas to inflate the air bag, instead burn aggressively and cause the inflator to burst, shooting hot fragments through the air bag's fabric.

226.    After two years of investigation, Honda and Takata claimed that a machine at Takata's Moses Lake factory in Washington state had failed to compress chemicals firmly enough.  That left the inflators vulnerable to moisture, potentially causing the bags to inflate more forcefully than they were supposed to.  At that time, Takata also acknowledged that the defect covered a wider range of vehicles than initially estimated, but claimed that the plant had made numerous upgrades to its machinery in late 2002, which it claimed had improved the quality of its explosives.

227.    In June 2009, Takata provided a follow up report to Honda on its November 2008 analysis, stating that issues related to propellant production appeared to have caused the improper inflator performance.

228.    As a result of Takata's June 2009 follow-up report and the additional claims of "unusual deployments," on June 30, 2009, Honda issued another recall, this one covering 2001 and 2002 Civic, Accord, and Acura vehicles ("2009 Recall").  Thus, it was only two months *after* Ms. Parham's death that Honda expanded its 2008 Recall to include the model she drove.

229.    In August 2009, NHTSA's Recall Management Division sent Honda an information request to explain why it did not include 2009 Recall vehicles in the 2008 Recall, and "to evaluate the timeliness of [Honda's] recent defect decision."

230.    NHTSA also wanted to know "the difference between the driver's airbag inflators in those vehicles from the inflators in the 09V-259 vehicles and explain how this distinction, or any other between the two sets of vehicles, convinced [Honda] at the time that it did not need to include the latter set in the 08V-593 recall population."

231.    NHTSA's Recall Management Division further requested that Honda provide complaints, lawsuits, warranty claims, and field reports, along with an explanation of the "unusual driver airbag deployments" and Honda's investigative efforts.

232. In Honda's September 16, 2009 reply to NHTSA, the automaker said that its information about the "unusual driver airbag deployments" came from Takata: "[w]e understood the causal factors to be related to airbag propellant due to handling of the propellant during airbag inflator module assembly."

233. Honda also reported, based on information from Takata, that the problem with the airbags was isolated to the "production of the airbag propellant prior to assembly of the inflators." Specifically, the cause was "related to the process of pressing the propellant into wafers that were later installed into the inflator modules," and limited to "a specific production process" involving one high-precision compression press that was used to form the propellant into wafers, the automaker told NHTSA.

234. Honda also disclosed to NHTSA that it had fielded nine complaints and one lawsuit related to the 2008 and 2009 Recalls. Honda also finally informed NHTSA about the 2004 incident involving an "unusual deployment" of the vehicle's airbag. Honda claimed that it "only recently [was] reminded of this incident," and that, until recently, Honda "had not associated it with the [2008 Recall] campaign."

235. Through a November 20, 2009 request, NHTSA also sought information from Takata. Takata submitted a partial response to NHTSA on December 23, 2009 ("Partial Response"), and then a full response on February 19, 2010 ("Full Response"). Both responses provided vague and misleading information about the seriousness of the problem.

236. Takata claimed that there were no substantive design differences between the inflators in the airbags at issue in the two recalls, but cited differences in the production processes between the lots.

237. Takata also claimed that the defects only existed in specific lots manufactured between certain dates. It claimed that the inflators involved in the 2008 Recall were manufactured between October 29, 2000 and December 1, 2000, and that inflators involved in the 2009 Recall were manufactured between August 23, 2000 and February 25, 2001. Takata did

not provide the dates the inflators were shipped, as NHTSA requested, because, as Takata admitted, its records did not have that information. Instead, it gave just the manufacturing dates.

238. In its Full Response, Takata claimed that the defect identified in the 2009 Recall was the result of a single compression press (the "Stokes press") in a single plant. Takata further claimed that while it did manufacture 2,400 inflators using the same process as the defective inflators, the design was different and "[t]herefore, Takata is convinced that the inflators sold [redacted] contain no safety-related defect."

239. Takata wrote in its Full Response that it "believed - [redacted] - that expanding the recall to include all vehicles equipped with inflators manufactured with Stokes propellant produced through and including February 28, 2001 would capture all inflators with tablets that had a risk of producing overly energetic combustion. This recommendation, as well as the analysis that supported it, was presented to Honda on June 12, 2009."

240. In both the Partial Response and the Full Response, Takata stated: "Takata has not provided any airbag inflators that are the same or substantially similar to the inflators in vehicles covered by Recalls 08V-593 [in 2008] and 09V-259 [in 2009] to any customers other than Honda. The physical characteristics of the inflator housing used in the Honda vehicles subject to these recalls are unique to Honda." This statement would prove to be false.

241. On May 6, 2010, NHTSA closed its investigation into the Takata airbags.

242. In the months following NHTSA's 2009/2010 request for information, Takata engineers came up with yet another explanation for the ruptures; specifically, that in September 2001, machine operators at the Moses Lake, Washington plant could have inadvertently switched off an "auto reject" function that weeded out poorly made explosives that can become unstable. However, Takata assured Honda at the time that, "as part of the upgrades at that plant, in September 2002, the supplier had added a locking mechanism that prevented workers from turning the auto-reject function off.

243. The *Wall Street Journal* further reported that "Honda and Takata discovered more problems. At Moses Lake, employees had switched off a mechanism that automatically checked

whether the right amount of propellant was loaded in inflators; at a plant in Monclova, Mexico, a dehumidifier that kept parts dry hadn't been turned on. At times poor record-keeping meant Honda and Takata couldn't figure out which cars had defective bags."

### C. 2010: The 2010 Recall (10V-041) and Honda's Shifting Explanations

244.    Honda's and Takata's ongoing cover-up and ineffective recalls continued to cost lives.  In December 2009, a 2001 Honda Accord driven by Gurjit Rathore, 33, hit a mail truck in Richmond, Virginia.  Her air bag exploded, propelling shrapnel into her neck and chest, and she bled to death in front of her three children, according to a lawsuit filed by her family.

245.    In February 2010, only months after its previous recall, Honda announced a third recall for an additional 379,000 vehicles across a number of models ("2010 Recall").

246.    Honda's explanation for the airbag defect changed yet again.  Honda explained that of the two different manufacturing processes used in the preparation of an airbag propellant, one process was within specification and the other was not.  Honda's expanded recall supposedly reached those vehicles employing airbags that had utilized manufacturing processes not within specification.

247.    Once again, however, injuries continued to mount:

a.    In April 2010, two months after the 2010 Recall, the Takata airbag in Kristy Williams's 2001 Honda Civic exploded while she was stopped at a traffic light in Morrow, Georgia, sending metal shards into her neck and causing profuse bleeding.   She survived only because she applied pressure with her fingers to stem the arterial bleeding.

b.    On November 8, 2010, Suetania Emmanuel of St. Croix, U.S. Virgin Islands, was driving a 2002 Honda Civic when the Takata airbag exploded and sent shards of metal into her face and throat.

### D.  2011-2012: Mounting Honda Recalls, Including the 2011 Recall (11V-260)

248.    In April 2011, Honda filed a Part 573 Defect and Noncompliance report for 2,430 replacement service part airbag modules that might have been installed in vehicles covered by previous recall expansions ("2011 Recall").  Honda was unable to determine which vehicles contained the defective replacement parts, forcing it to recall all 833,277 vehicles that might have had the part installed.

249.    According to documents submitted with the 2011 Recall, on August 15, 2011, Honda became aware of an August 1, 2011 "energetic deployment of a driver's airbag inflator that was outside of the prior range of suspect inflators."  On September 2, 2011, Honda and Takata began an analysis of these so-called "outside of range" occurrences.

250.    Further underscoring the instability of the ammonium nitrate propellant, on or about September 14, 2011, Honda and Takata began investigating the possibility that airbag inflator propellant lots were mixed during airbag inflator assembly, prompting further analysis of airbag inflator production records for the period when propellant was processed by the suspect method.

251.    Honda reported its death and injury tallies to regulators only in a confidential submission in December 2011, when it issued a fifth limited recall for the rupture defect, according to NHTSA.  That recall expanded Recall No. 11V-260 (April 2011), to include an additional 272,779 Honda and Acura vehicles.  The expanded recall also included another 640 airbags sold as replacement parts; however, because Honda could not determine on which vehicles the 640 replacement air bags were installed, an additional 603,241 vehicles had to be recalled.  Collectively, 1.7 million Honda and Acura vehicles had been recalled by the end of 2011 because they contained Takata-manufactured airbags.

252.    In the meantime, Honda and Takata quietly continued their internal investigation into the Inflator Defect.  According to Honda, an exploding airbag in Puerto Rico in October 2011 prompted Honda to ask permission from NHTSA to collect "healthy" airbag modules to see

if "abnormal combustion was possible."  The collection began on March 14, 2012, and by November 21, 2012, Honda in fact found that even its so-called "healthy" airbags could abnormally combust in certain conditions.

253.    Notably, in or about December 2012, NHTSA's Office of Defects Investigation ("ODI") notified Honda that there were numerous injury or death incidents listed on a spreadsheet Honda provided to NHTSA in connection with NHTSA's Takata investigation that were *not* previously provided to NHTSA under the early warning reporting system established by the TREAD Act.  In late 2014, Honda ultimately admitted that it failed to report 1,729 serious accidents resulting in injuries or deaths to NHTSA between 2003 and 2014.  Eight of these incidents involved Takata airbags.  In January 2015, Honda agreed to pay a $70 million fine for this startling failure.

254.    Toyota also received additional direct notice of the Inflator Defect in this timeframe.  Starting in September 2012, Toyota received field reports of three U.S. vehicles with fractured inflators—two were front passenger side airbags that deployed inadvertently.  Toyota recovered 144 in-use inflators from both the Japan and U.S. markets for Takata to evaluate.  In February 2013, Takata informed Toyota that some of the propellant wafers found within the recovered inflators were cracked, possibly due to lower material density.

255.    Dangerous incidents continued to mount during this period.

a.    On April 20, 2011, an unidentified man was hurt in Puerto Rico when the Takata driver airbag ruptured in his 2001 Honda Accord LX.  His attorney notified NHTSA on May 26, 2011.

b.    On September 20, 2011, Eddie Rodriguez crashed his Honda Civic in Puerto Rico, deploying airbags that launched sharp pieces of metal toward him.  Honda reached a confidential settlement with the driver in 2013.

c.    On October 20, 2011, there was an alleged rupture of a passenger side airbag in Puerto Rico; Honda obtained the vehicle for analysis on February 3, 2012.

d.      On December 4, 2011, Miranda Perez suffered left eye blindness due to a Defective Airbag rupture while driving her 2003 BMW M3 in Buffalo, New York.

e.      On March 2, 2012, Angelina Sujata suffered chest injuries due to a Takata airbag rupture while driving her 2001 Honda Civic in Chapin, South Carolina.

f.      On March 8, 2012, Sharonda Blowe of Jacksonville, Florida was severely injured while driving a 2001 Honda Accord when she was struck in the head by pieces of metal exploding out of a Defective Airbag.  Ms. Blowe brought suit and reached a confidential settlement.

g.      On September 2, 2012, Monique Roig suffered facial injuries due to a Defective Airbag rupture while riding in a 2001 Honda Civic in Miami-Dade County, Florida.

**E.      2013-2014: Takata's Belated Admissions of Broader Defects and the 2013 Recall (13V-132)**

256.    By 2013, it became clear that the defective airbag issue, and the number of Defective Airbags, was much more significant than Takata or Honda initially reported to NHTSA.

257.    On February 8, 2013, NHTSA and Honda met to discuss the "ongoing investigation" into Honda's defective Takata airbags.  By March 6, 2013, Honda claimed that:

> A recreation of propellant production using the same methods as were used during 2001-2002 production periods indicated that it was possible for propellant produced during 2001-2002 to be manufactured out of specification without the manufacturing processes correctly identifying and removing the out of specification propellant. Separately, Honda was informed by the supplier of another potential concern related to airbag inflator production that could affect the performance of these airbag modules.

258.    In February and March 2013, Takata notified Nissan and Mazda that it was investigating airbag quality.  Separately, Takata advised Honda "of another potential concern related to airbag inflator production that could affect the performance of these airbag modules."

259.   On April 10, 2013, Honda filed a Recall Notification ("2013 Recall") for an additional 561,422 vehicles that could be affected by the following part defect:

**Defect description:**

In certain vehicles, the passenger's (frontal) airbag inflator could produce excessive internal pressure. If an affected airbag deploys, the increased internal pressure may cause the inflator to rupture. In the event of an inflator rupture, metal fragments could be propelled upward toward the windshield, or downward toward the front passenger's foot well, potentially causing injury to a vehicle occupant.

260.   On April 11, 2013, Takata filed a Defect Information Report titled "Certain Airbag Inflators Used as Original Equipment" ("Takata DIR").  In that report, Takata described the defective airbags as follows:

Some propellant wafers produced at Takata's plant in Moses Lake, Washington, between April 13, 2000 and September 11, 2002 may have been produced with an inadequate compaction force. . . .  In addition some propellant wafers used in inflators produced at Takata's plant in Monclova, Mexico between October 4, 2001 and October 31, 2002, may have been exposed to uncontrolled moisture conditions. Those wafers could have absorbed moisture beyond the allowable limits . . . . In both cases, the propellant could potentially deteriorate over time due to environmental factors, which could lead to over-aggressive combustion in the event of an air bag deployment. This could create excessive internal pressure within the inflator, and the body of the inflator could rupture.

261.   It was not until its April 2013 Report that Takata finally admitted that the defective inflators were installed as original equipment in vehicles manufactured by companies other than Honda, including Toyota, Nissan, Mazda, and BMW.  Takata did not know, however, how many inflators were installed as original equipment in vehicles manufactured by companies other than Honda.

262.   In April 2013, based on Takata's new admissions, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags.

- 97 -

263.    With the increased awareness and scrutiny, news of incidents became more widespread:

a.    On August 5, 2013, Joseph Nasworthy of Jacksonville, Florida suffered severe lacerations to his eye and nose when the Takata airbag exploded upon deployment in his 2005 Honda Civic.

b.    On September 1, 2013, Stephanie Erdman of Destin, Florida was driving a 2002 Honda Civic when she was hit in the eye by shards of metal that shot from the Takata airbag.  Ms. Erdman filed suit and reached a confidential settlement.

c.    Also in September 2013, when police got to the scene of a minor car accident in Alhambra, California, they thought the driver, Hai Ming Xu, had been shot in the face.  In fact, he was killed by shrapnel exploding from the Takata airbag in his 2002 Acura TL that deployed when it hit the wall of a building.  As *The New York Times* reported:

> The authorities have not determined a reason for the injuries, though his coroner's report cited tears in his airbag and facial trauma from a foreign object.  And problems persist with Honda's reporting of potential defects.
>
> In at least four more recent suspected ruptures, including the one linked to [the California driver's] death, Honda has not filed a so-called early warning report with safety regulators, as is required in cases where there is a claim of defect that resulted in an injury or death, according to case lawyers and legal filings.

d.    On October 12, 2013, Brandi Owens of Forsyth County, Georgia was injured in a low-speed accident when the driver's side Takata airbag of her 2013 Chevy Cruze exploded and detached from the steering wheel.  According to a lawsuit, metal from the airbag hit Owens in the face and left her blind in one eye.

264.    By 2014, the incident rate picked up even more dramatically.  In 2014 and 2015, there have been over a dozen incidents involving injury or fatalities in Nissan, Honda, Toyota, Chevy, and Mazda vehicles, taking place in a variety of regions in the country, from humid Puerto Rico to far drier Massachusetts and California.  For example:

a. On February 19, 2014, a Takata passenger airbag ruptured and sprayed metal fragments at the passenger following a crash in a 2007 Chrysler 300.

b. On February 20, 2014, a Takata driver's side airbag in a 2003 Dodge Ram 1500 ruptured and ejected metal fragments following an accident. The driver suffered severe physical injury as a result.

c. On March 14, 2014, Susan Cosgrove of Fremont, California was injured in a low-speed accident while driving a 2013 Chevy Cruze. The Takata-related recall notice on her car arrived at her residence after the incident.

d. On May 29, 2014, Corey Burdick of Eustes, Florida, was driving a 2001 Honda Civic when the airbag deployed and sent shards of metal into his eye.

e. In June 2014, a low-speed accident involving a 2005 Honda Accord in Los Angeles, California, caused the car's driver airbag to "detonate," sending hot metal and plastic shrapnel into the cabin.

265. With accidents proliferating, Takata met with NHTSA officials on May 20, 2014 to provide information about inflator ruptures not covered by previous recalls. At that meeting, Takata noted that "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." The referenced incidents included both passenger and driver side airbags. This statement omitted one of the earliest incidents, Ms. Weaver's 2003 accident in Arizona, as well as later incidents in drier locales, as noted above.

266. On June 11, 2014, NHTSA's ODI published an ODI Resume for a preliminary evaluation of Investigation No. PE 14-016. That document stated that NHTSA was opening an investigation "in order to collect all known facts from [Takata] and the vehicle manufacturers that it believes may have manufactured vehicles equipped with inflators produced during the same period as those that have demonstrated rupture events in the field."

267. Also on June 11, 2014, Takata informed NHTSA that it "believes that an [sic] number of the inflators identified above were provided to the following vehicle manufacturers for use in vehicles sold in the United States (the manufacturers are listed in alphabetical order):

- 99 -

BMW, Chrysler, Ford, Honda, Mazda, Nissan, and Toyota."   Takata's June 11, 2014 letter further stated:

> If we determine that any of those inflators were sold to other vehicle manufacturers, we will let you know promptly. Takata is not certain which models or model years of vehicles are equipped with the subject inflators, and it does not know how many of those vehicles were sold in or are registered in the States to be covered by the requested field actions. That information will need to be obtained from the affected vehicle manufacturers. (Emphasis added)

268.   On June 20, 2014, Honda issued additional recalls for a total of nearly 4.5 million Honda and Acura vehicles that contained Defective Airbags.

269.   On June 26, 2014, GM recalled over 29,000 Chevrolet Cruze vehicles because the Defective Airbags have a tendency to not deploy at all or rupture and cause metal fragments to strike and severely injure vehicle occupants.

270.   By the end of June 2014, the number of vehicles that had been recalled due to Takata's Defective Airbags had increased to over 6 million.   The Vehicle Manufacturer Defendants, including the Honda Defendants, however, had still not recalled all of the vehicles containing Defective Airbags.

271.   On July 8, 2014, Honda expanded a "two million vehicle air bag recall by as many as one million more vehicles in California."   *The New York Times* reported that "[a] defective inflator could explode in a crash, sending shards of its metal casing into the passenger compartment. The inflator was made by Takata Corporation, which has said the propellant inside the inflator was not properly prepared and was too powerful."

272.   In August 2014, Honda issued yet another recall of Honda and Acura vehicles, its ninth for the defect – bringing the total of recalled Honda and Acura vehicles to six million.

273.   The tragic pattern of mounting injuries and casualties in the face of Defendants' sluggish response continued:

a.      On July 7, 2014, Claribel Nunez of Hialeah, Florida, suffered severe wounds to her forehead from shrapnel that exploded out of a Takata airbag in her 2001 Honda Civic.

b.      On August 17, 2014, a Takata airbag ruptured after an accident in a 2007 Ford Mustang, deploying with abrupt force and ejecting a metal fragment into the driver's leg. Ford was notified of the incident.

c.      On October 2, 2014, Florida resident Hien Tran died, four days after her 2001 Honda Accord struck another car in Orlando and the Takata airbag exploded, sending shrapnel into her neck.  The medical examiner stated that the shrapnel tore through the airbag, hitting Ms. Tran and causing "stab-type wounds" and cutting her trachea.  Indeed, her death was initially investigated as a homicide by detectives.  A week after she died, she received a letter in the mail from Honda urging her to get her car fixed because of faulty airbags that could explode.

**F.      2014-2015: Forced National Recall and Increased Government Scrutiny**

274.    On October 22, 2014, NHTSA expanded the recall list to cover ten automakers and 7.8 million vehicles, over 5 million of which were Hondas.  In a Consumer Advisory dated October 22, 2014, NHTSA sent an urgent warning to the owners of the now "7.8 million Affected Vehicles":

> The National Highway Traffic Safety Administration urges owners of certain Toyota, Honda, Mazda, BMW, Nissan, Mitsubishi, Subaru, Chrysler, Ford and General Motors vehicles to act immediately on recall notices to replace defective Takata airbags. Over seven million vehicles are involved in these recalls, which have occurred as far back as 18 months ago and as recently as Monday. The message comes with urgency, especially for owners of vehicles affected by regional recalls in the following areas: Florida, Puerto Rico, limited areas near the Gulf of Mexico in Texas, Alabama, Mississippi, Georgia, and Louisiana, as well as Guam, Saipan, American Samoa, Virgin Islands and Hawaii.

275.    On October 29, 2014, NHTSA sent letters to ten automakers regarding the safety risks posed by the Takata airbags.  The letter stated that "[t]he ongoing cooperation of all manufacturers who have recalled vehicles is essential to address this safety risk," and that the

"NHTSA team is engaged with you in critical work to better understand the failures and take action to remedy the safety risk…."  NHTSA's letter also asked the automakers to provide NHTSA with information as to their recall process, urged a faster response from them, and stated that "more can and should be done as soon as possible to prevent any further tragedies."

276.    The U.S. Department of Justice is also investigating whether Takata committed any crimes.  On November 13, 2014, the United States District Court for the Southern District of New York issued a federal grand jury subpoena to Takata and Honda.

277.    By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient.  NHTSA therefore demanded a national recall of Chrysler, Ford, Honda, Mazda, and BMW vehicles with certain driver airbags made by Takata.

278.    Takata refused to support a national recall at a hearing before the U.S. House of Representatives Energy and Commerce Subcommittee on December 3, 2014, claiming there was "not enough scientific evidence" to support a national recall.  Yet, as NHTSA Administrator David Friedman stated, "when we saw real-world incidents on the driver side, one in California, we pushed Honda to make sure that their recall covered that region. Then very recently, we became aware of a driver side incident in North Carolina. With six total incidents, two of which are outside that region, we can no longer support a regional recall. Our policy is clear: Recalls must be nationwide unless the manufacturers can demonstrate that they are regional. With the new data, it is clear they can no longer demonstrate that the region that was used before was appropriate for driver side airbags."

279.    The geographic scope of the incidents undermined Takata's focus on humidity as the defining contributor to the dangerous ruptures.  As Mr. Friedman explained, "[o]ne of the most frustrating parts about this is that neither the automakers nor Takata have been able to get to the bottom of the root cause on this. We have been pushing them to do so."

280.    As of the December 3, 2014 House hearing, Honda, Ford, Chrysler, and Toyota had all agreed to a nationwide recall, principally for driver side airbags.  Days later, Mazda

expanded the geographic scope of its recall.  By December 23, BMW had also agreed to a nationwide recall.

281.    Having neglected nature and scope of the Inflator Defect for over a decade, the 10 vehicle manufacturers met in December 2014 to "sort out a way to understand the technical issues involved."   A few months later, in March 2015, Honda announced an advertising campaign to promote the recall—a step it could and should have taken a decade ago.  A few days later, Honda announced another 105,000 vehicles that needed to be recalled (Recall 15V-153), consisting of vehicles that should have been part of the 2014 recalls.

282.    Frustrated by Takata's continual foot-dragging, NHTSA imposed a $14,000 per day fine that started on Friday, February 20, 2015, concluding that Takata had not been forthcoming with the information.  Days later, NHTSA demanded that Takata preserve all airbag inflators removed through the recall process.

283.    In the meantime, the risk of injury remains very real, and is exacerbated by Defendants' poor execution of the recalls, as discussed in the next section.

a.    On June 25, 2014, Patricia Mincey was rendered quadriplegic due to a Takata airbag rupture while driving her 2001 Honda Civic in Jacksonville, Florida.

b.    On July 22, 2014, Joshua Reliford suffered severe facial and brain injuries due to a Takata airbag rupture while driving his 2001 Honda Civic in McCraken County, Kentucky.

c.    On July 28, 2014, Francisco Demarco died due to a Takata airbag rupture while riding in the passenger seat of a 2007 Honda Accord in Palm Beach County, Florida.

d.    On October 4, 2014, Devon Rideout suffered permanent loss of vision due to an alleged Takata airbag rupture while riding passenger in a 2001 BMW 330i in Chesapeake City, Virginia.

e.    On November 19, 2014, Racquel Hudson suffered extensive first and second degree burns due to a Takata airbag rupture while driving her 2004 Honda Odyssey in San Antonio, Texas.

f.      On December 12, 2014, the driver airbag in a 2002 BMW 325 parked in the owner's driveway deployed with such energy that it melted and burned the dashboard and ceiling panel, created burn marks throughout the cabin, and shattered the front windshield.

g.      On December 31, 2014, the Takata driver airbag in a 2008 Mazda 6 deployed following an accident, ejecting metal fragments that injured the driver's face.

h.      On January 18, 2015, Carlos Solis was killed in an accident in Houston, Texas, and a ruptured Takata airbag was the suspected cause.

284.    Over the past 13 years that Takata has known there was a problem with the safety of its airbags, there have been at least six deaths and 139 injuries linked to defective Takata airbags.  As detailed above, the incidents date back to at least 2003, and involve vehicles made by Acura, BMW, Chevrolet, Honda, Mazda, Subaru, and Toyota.  Each of the Defendants knew of the Inflator Defect by virtue of these incidents, but failed to disclose the nature and scope of the Inflator Defect.

285.    The Defendants were on further notice due to unusual Takata airbag deployments that should have prompted further inquiry into the airbags' fitness for use.  A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in the Class Vehicles, an event that may be tied to the unstable and volatile ammonium nitrate propellant.  These complaints started as early as September 2005, and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota.  Some of these incidents showed still further signs of the Inflator Defect, including airbags that deployed with such force that they caused the windshield to crack, break, or shatter, and others that caused unusual smoke and fire (or both).  For example:

a.      Takata airbags inadvertently deployed and caused windshields to crack, shatter, or break in a 2004 Mitsubishi Lancer on November 23, 2006, a 2003 Toyota Corolla on May 3, 2010, a 2003 Toyota Matrix on August 17, 2010 (in addition to causing unusual smoke), and a 2003 Toyota Matrix on January 29, 2012 (in addition to damaging the dashboard).

b.      Takata airbags inadvertently deployed and caused unusual smoke and heat in a 2003 Acura MDX on January 29, 2012, causing the driver skin burns, and a 2003 Toyota Corolla on March 17, 2014.

## IV.    The Vehicle Manufacturer Defendants Sold Their Vehicles As "Safe" and "Reliable"

286.    In advertisements and promotional materials, the Vehicle Manufacturer Defendants maintained that their vehicles were safe and reliable.

287.    For example, the Vehicle Manufacturer Defendants represented:

a.      **Acura:** "Acura believes driving a luxury car should be a highly enjoyable experience. And while we tend to dwell on the more exhilarating aspects of our vehicles, we consider your safety a top priority. . . .  Safety has been top of mind with Acura engineers since day one. . . .  Over the years, we've added many advanced safety technologies to the list, and the vast majority of them are now standard on every model."

b.      **BMW**: "There is no end to our quest for the next innovation. And it's not just about greater power and more efficient performance. It's also about safety. We prepare our vehicles to expect the unexpected."

c.      **Dodge:** "Decades of rigorous safety, security and quality testing go into every model before the rubber hits the road."

d.      **Ford:** "At Ford, we hold ourselves to very high standards for vehicle safety. The fact is, vehicle safety is a critical part of our brand promise to Go Further. We aim to give customers peace of mind and make the world safer by developing advanced safety technologies and making them available across a wide range of vehicles."

e.      **GM**: "Nothing is more important than the safety of our customers"; and "The safety of all our customers is our utmost concern."

f.      **Honda:** "Honda is committed to providing safety for everyone—that means crash protection not only for our own drivers and passengers, but also for the occupants of

other vehicles, and injury mitigation for pedestrians." "As a leader, Honda looks beyond government regulations, studying real world situations to develop new safety technologies for everyone."

g.      **Mazda**: "In the realm of safety, Mazda's aim is to achieve a safe and accident-free automotive society from the three viewpoints of vehicles, people, and roads and infrastructure. Specifically, the Company carries out research and development into safety technologies based on the Mazda Proactive Safety philosophy, which particularly respects the driver, and has released vehicles featuring the full suite of Mazda's advanced safety technologies…."

h.      **Mitsubishi**: "We are committed to providing the utmost driving pleasure and safety for our valued customers and our community. On these commitments we will never compromise. This is the Mitsubishi Motors way."

i.      **Nissan/Infiniti**: "Nissan is committed to its position as a leader in the world of automotive safety. This dedication to comprehensive safety goes into the engineering and design of every vehicle we make…."

j.      **Subaru**: "Safety drives Subaru design."

k.      **Toyota/Lexus**: "For us, the journey towards a safe road never ends. This belief, along with our collaborative research efforts, drives us to create advancements and innovations in safety that have helped (and continue to help) prevent crashes and protect people."

## V.      Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers

### A.      Slow and Inadequate Recalls

288.    So far, approximately 17 million cars have been recalled in the United States.  By some estimates, however, a full-scale national recall of all vehicles containing Defective Airbags could involve 30 million vehicles in the United States.

289.    In a September 16, 2014 report to NHTSA, Takata disclosed that it expected to produce nearly 1.5 million replacement inflators through February 2015—well short of the number required to supply the ten automakers that have issued recalls.

290.    Takata has built two new production lines in its plant in Monclova, Mexico, to increase its monthly output of replacement inflators to 450,000 units, with hopes that it will increase the monthly production to 900,000 units by September 2015.  At the current rate, it will take at least two years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner.

291.    Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated car owners they can expect to wait many months before their airbags can be replaced.

292.    Honda stated that it would not send recall letters to car owners or lessees until there are parts available, meaning that many drivers would not receive notices for weeks or longer, as they continue to drive vehicles with potentially deadly airbags.  Honda owners who have received recall notices have been told to wait at least a month before their authorized dealer has availability to assess their vehicle.

293.    Toyota dealers are reporting that wait times for customers who own affected vehicles to get their Takata airbags replaced could be as long as one to three months.

294.    In response to the airbag replacement shortage, Toyota has taken the extreme step of disabling passenger airbags entirely and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.  In the alternative, Toyota is advising customers to refrain from driving their vehicles until the airbags can be replaced.

295.    Like Toyota, other automakers have also chosen to "repair" their customers' vehicles not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

296. Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation (DOT), said they were "alarmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags."

297. As the manufacturers finally took steps to issue national recalls—after forceful prodding by NHTSA—commentators noted not only the potential supply constraints, but also a more frightening concern: "no one knows if the replacement inflators currently being installed will suffer the same issue."

### B. Failure to Pursue National Passenger-Side Recall

298. Incredibly, Takata and many of the Vehicle Manufacturer Defendants are still unwilling to replace passenger side airbags on millions of affected vehicles. Of the Vehicle Manufacturer Defendants, only BMW and Toyota have issued national passenger-side recalls for all of their vehicles, while Nissan and Subaru have done so only for some of their recalled vehicles. The rest of the passenger-side recalls remain regional in scope, with the focus only on high humidity regions.

299. Vehicle Manufacturer Defendants' regional recall approach for passenger airbags is indefensible, just as it was for driver airbags. Critically, the passenger-side airbags show serious failure rates. According to the testimony of Takata's Hiroshi Shimizu at the House hearing on December 3, 2014, Takata had tested 4,000 airbags after the June 19, 2014 recall, of which 3,600 were passenger-side airbags, and approximately 60 of which failed.

300.    Further, the regional approach is especially questionable, if not callous, because: (a) Defendants have claimed they have yet to uncover the root cause of the Inflator Defect, making their geographic boundaries arbitrary at best; (b) the passenger-side airbags are made with the same unstable and volatile ammonium nitrate propellant that is prone to overly-aggressive combustion and becoming inert; (c) vehicles are by definition mobile and therefore can and likely will be operated in high humidity regions; and (d) weather and climate are unpredictable and variable.

301.    Moreover, Defendants have seemingly already forgotten that the driver-side recall *began* as a regional recall, only to be expanded after horrific accidents in the relatively low-humidity states of California and Arizona.

### C.       Failure to Provide Replacement Vehicles

302.    The Class Vehicles are not safe to drive.  They have been recalled, and yet replacement of the Defective Airbags could take years.  Due to Defendants' failures, Plaintiffs and Class members are left with poor options: be without use of a vehicle; purchase, lease, or rent a new vehicle until Vehicle Manufacturer Defendants complete the recall; or use a vehicle with a dangerous or disabled airbag over an extended period of time.

303.    As Senators Blumenthal and Markey asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."   The Senators urged NHTSA to demand that of the Vehicle Manufacturer Defendants.

304.    Vehicle Manufacturer Defendants are not providing loaner or replacement vehicles on a comprehensive basis.  While BMW, Honda, and Toyota pledged at the House hearing that they would provide loaner or rental vehicles at no cost to consumers, the full scope of their commitment is unclear.  The other Vehicle Manufacturer Defendants made no such assurances, and on information and belief, have announced no such program.

### D.        Defective Replacement Airbags

305.    Perhaps most alarming, the replacement components manufactured by Takata that the Vehicle Manufacturer Defendants are using to "repair" recalled Class Vehicles suffer from the same Inflator Defect that plagues the parts being removed: they use ammonium nitrate as the inflator's primary propellant.

306.    In fact, inspection of inflators manufactured by Takata as recently as 2014 and installed in Class Vehicles by Vehicle Manufacturer Defendants through the recall process reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, the tendency to clump together, and size variations.  As a result, contrary to Takata's representations, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

## VI.      Automotive Recyclers Purchased Recalled Vehicles Containing Defective Airbags for Amounts Greater than Their Actual Value and Maintained the Defective Airbags for the Purposes of Resale

307.    Generally, automotive recycling businesses purchase vehicles from a number of sources, including insurance salvage auctions, tow operators, charities and the public.

308.    Automotive recycling businesses calculate the purchase price for individual vehicles based, in part, on the presence and condition of the automotive parts contained in the vehicle. In particular, the presence of undeployed airbags is taken into account by automotive recycling businesses in determining the appropriate purchase price for the vehicle.

309.    When a vehicle with an undeployed airbag is purchased by an automotive recycling business, the automotive recycling business transports the vehicle to its facility.

310.    Automotive recycling businesses then resell the airbags to consumers, automotive repair shops, automotive dealerships, wholesalers or other automotive recyclers.

311.    Here, Automotive Recyclers purchased Recalled Vehicles, which contained Takata airbags, at insurance salvage auctions and from tow operators, charities and the public.

312.    Automotive Recyclers calculated the purchase prices for each of the Recalled Vehicles based on the presence and condition of the automotive parts contained therein.

313.    After Automotive Recyclers purchased the Recalled Vehicles containing the Takata airbags, Automotive Recyclers transported the vehicles to their facilities. An inspection of the airbags by Automotive Recyclers would not have revealed the Inflator Defect.

314.    At the time that Automotive Recyclers purchased the Recalled Vehicles, Automotive Recyclers had a reasonable expectation that Defendants would abide by federal, state and common law obligations to affirmatively disclose known defects in a timely manner.

315.    This did not happen and, as a result, Automotive Recyclers purchased the Recalled Vehicles containing Takata airbags for amounts greater than their worth.

316.    As detailed above, national and regional media outlets around the country have reported extensively about the defective airbags in recent months, raising public awareness of their defect and its safety implications. The value of any Takata airbags in the Recalled Vehicles has been negatively impacted and the resale value of these airbags has diminished to zero.

## CHOICE OF LAW ALLEGATIONS

317.    Plaintiffs allege that the law across all states and territories is uniform and does not contain any true conflicts with respect to Plaintiffs' claims for unjust enrichment and fraudulent concealment.  In the alternative, under Florida's operative choice of law rules and consistent with due process, the law of each Defendant's home (headquarters) state may be applied nationwide to Plaintiffs' claims for fraudulent concealment, unjust enrichment, and breach of the implied warranty of merchantability, based in part on the following allegations.

## I.    Takata

318.    Takata's United States headquarters is in Auburn Hills, Michigan.  The Michigan headquarters is responsible for sales, administration and testing.

319.    Takata does substantial business in Michigan, with a significant portion of the proposed Nationwide Class located in Michigan.

- 111 -

320.   On information and belief, Michigan hosts a significant number of Takata's U.S. operations.

321.   In addition, the conduct that forms the basis for each and every Class members' claims against Takata emanated from Takata's headquarters in Auburn Hills, Michigan.

322.   Takata personnel responsible for customer communications are located at Takata's Michigan headquarters, and the core decision not to disclose the Inflator Defect to consumers was made and implemented from there.

323.   The engineering teams responsible for developing, designing, and testing the ammonium nitrate propellant, and investigating airbag ruptures, were located in Michigan.

324.   Takata's presence is more substantial in Michigan than any other state.

## II.   **BMW**

325.   BMW of North America's Corporate Headquarters is located in Woodcliff Lake, New Jersey.  Its Eastern Regional Headquarters and Technical Training Center is located in Woodcliff Lake, New Jersey.  A Vehicle Preparation Center is in Port Jersey, New Jersey.

326.   BMW does substantial business in New Jersey, with a significant portion of the proposed Nationwide Class located in New Jersey.

327.   On information and belief, New Jersey hosts a significant number of BMW's U.S. operations.

328.   BMW's presence is more substantial in New Jersey than any other state.

## III.   **Ford**

329.   Ford Motor Company ("Ford") is headquartered in Dearborn, Michigan.

330.   Ford does substantial business in Michigan, with a significant portion of the proposed Nationwide Class located in Michigan.

331.   On information and belief, Michigan hosts a significant number of Ford's operations.

332.    Ford's presence is more substantial in Michigan than any other state.

## IV.    GM

333.    General Motors LLC ("GM") is headquartered in Detroit, Michigan.

334.    GM does substantial business in Michigan, with a significant portion of the proposed Nationwide Class located in Michigan.

335.    On information and belief, Michigan hosts a significant number of GM's operations.

336.    GM's presence is more substantial in Michigan than any other state.

## V.    Honda

337.    American Honda Motor Co., Inc. ("American Honda") is a subsidiary of Honda Motor Corporation, and is headquartered in Torrance, California.  American Honda conducts the sale, marketing, and operational activities for Honda cars, trucks, sport utility vehicles, and automobile parts in the United States.

338.    Honda North America, Inc. ("HNA") is a subsidiary of Honda Motor Corporation, and is headquartered in Torrance, California.  HNA is responsible for overseeing Honda's North American sales, manufacturing, and research and development for Honda's product lines.

339.    American Honda and HNA (together, "Honda"), do substantial business in California, with a significant portion of the proposed Nationwide Class located in California.  On information and belief, California hosts a significant number of American Honda's operations.

340.    Honda's presence is more substantial in California than any other state.

## VI.    Mazda

341.    Mazda Motor of America, Inc. is a subsidiary of Mazda Motor Corporation, and is headquartered in Irvine, California.

342. Mazda Motor of America is responsible for the research and development, sales and marketing, distribution, parts, and customer services of Mazda Motor Corporation in the United States.

343. Mazda Motor of America does substantial business in California, with a significant portion of the proposed Nationwide Class located in California.

344. On information and belief, California hosts a significant number of Mazda Motor of America's operations.

345. Mazda Motor of America's presence is more substantial in California than any other state.

## VII.  Mitsubishi

346. Mitsubishi Motors North America Inc. ("MMNA") is a subsidiary of Mitsubishi Motors Corporation, and is headquartered in Cypress, California.

347. MMNA oversees the sales, manufacturing, finance, and research and development functions of Mitsubishi Motors Corporation in North America.

348. MMNA does substantial business in California, with a significant portion of the proposed Nationwide Class located in California.

349. On information and belief, California hosts a significant number of MMNA's operations.

350. MMNA's presence is more substantial in California than any other state.

## VIII.  Nissan

351. Nissan North America, Inc. ("NNA") is a subsidiary of Nissan Motor Company, Ltd., and is headquartered in Franklin, Tennessee.

352. NNA coordinates all of Nissan Motor Company's operations in the United States, including the design, development, manufacturing, marketing, and sales of Nissan vehicles.

353. NNA does substantial business in Tennessee, with a significant portion of the proposed Nationwide Class located in Tennessee.

354. On information and belief, Tennessee hosts a significant number of NNA's operations.

355. NNA's presence is more substantial in Tennessee than any other state.

## IX. Subaru

356. Subaru of America, Inc., is a subsidiary of Fuji Heavy Industries, and is headquartered in Cherry Hill, New Jersey.

357. Subaru of America, Inc. is responsible for the distribution, marketing, sales, and service of Subaru vehicles in the United States.

358. Subaru of America, Inc. does substantial business in New Jersey, with a significant portion of the proposed Nationwide Class located in New Jersey.

359. On information and belief, New Jersey hosts a significant number of Subaru of America, Inc.'s operations.

360. Subaru of America Inc.'s presence is more substantial in New Jersey than any other state.

## X. Toyota

361. Toyota Motor Sales, U.S.A., Inc. ("Toyota U.S.A.") is a subsidiary of Toyota Motor Corporation, and is headquartered in Torrance, California.  It is responsible for the marketing, sales, and distribution in the United States of automobiles manufactured by Toyota Motor Corporation.

362. Toyota Motor Engineering & Manufacturing North America, Inc. ("TEMA") is a subsidiary of Toyota Motor Corporation, and is headquartered in Erlanger, Kentucky, with major operations in Arizona, California, and Michigan.  TEMA is responsible for Toyota's engineering

- 115 -

design and development, research and development, and manufacturing activities in the U.S., Mexico, and Canada.

363.    Toyota U.S.A. and TEMA (together, "Toyota") do substantial business in California, with a significant portion of the proposed Nationwide Class located in California.

364.    On information and belief, California hosts a significant number of Toyota's operations.

365.    Toyota's presence is more substantial in California than any other state.

## TOLLING OF THE STATUTE OF LIMITATIONS

### Fraudulent Concealment

366.    Upon information and belief, Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least 1990s. Defendant Honda has known of the Inflator Defect in the Takata airbags in Honda's vehicles since 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in Takata's airbags no later than 2008. Defendants have concealed from or failed to notify Plaintiffs, Class members, and the public of the full and complete nature of the Inflator Defect.

367.    Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue and in fact downplayed the widespread prevalence of the problem.

368.    Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### Estoppel

369.    Defendants were and are under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles and knowingly made

misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

### Discovery Rule

370.    The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective Airbags.

371.    Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective until – at the earliest – after either the Defective Airbag exploded or their vehicles were recalled.  And even then, Plaintiffs and Class members had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect.

## CLASS ACTION ALLEGATIONS

372.    The Classes' claims all derive directly from a single course of conduct by Takata and the Vehicle Manufacturer Defendants.  This case is about the responsibility of Takata and the Vehicle Manufacturer Defendants, at law and in equity, for their knowledge, their conduct, and their products.  Takata and the Vehicle Manufacturer Defendants have engaged in uniform and standardized conduct toward the Classes.  They did not differentiate, in degree of care or candor, their actions or inactions, or in the content of their statements or omissions, among individual Class members.  The objective facts on these subjects are the same for all Class members.  Within each Claim for Relief asserted by the respective Classes, the same legal standards govern.  Additionally, many states, and for some claims all states, share the same legal standards and elements of proof, facilitating the certification of multistate classes for some or all claims.  Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf and on behalf of all other persons similarly situated as members of the proposed Class pursuant to Federal Rules of Civil Procedure 23(a) and (b)(3) and/or (b)(2) and/or (c)(4). This action satisfies

the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

**The Nationwide Consumer Class**

373.   Plaintiffs bring this action and seek to certify and maintain it as a class action under Rules 23(a); (b)(2); and/or (b)(3); and/or c(4) of the Federal Rules of Civil Procedure on behalf of themselves and a Nationwide Consumer Class defined as follows:

> **All persons in the United States who entered into a lease or bought a Class Vehicle, prior to November 18, 2014, and who (i) own or lease the Class Vehicle, or (ii) sold the Class Vehicle after November 18, 2014, or (iii) had declared a total loss of the Class Vehicle after an accident occurring after November 18, 2014.**

**The State Consumer Classes**

374.   Plaintiffs allege statewide class action claims on behalf of classes in the following states: Alabama; Arizona; California; Colorado; Connecticut, Florida; Georgia; Hawaii; Illinois; Indiana; Louisiana; Massachusetts; Michigan; Minnesota; Missouri; Nevada; New York; North Carolina; Ohio; Oregon; Pennsylvania; Rhode Island; South Carolina; Tennessee; Texas; Virginia; Washington; and West Virginia.   Each of these State Consumer Classes is initially defined as follows:

> **All persons who entered into a lease or bought a Class Vehicle in the state of _____ (e.g., Florida), prior to November 18, 2014, and who (i) own or lease the Class Vehicle, or (ii) sold the Class Vehicle after November 18, 2014, or (iii) had declared a total loss of the Class Vehicle after an accident occurring after November 18, 2014.**

**The Automotive Recycler Classes**

375.    ARA, as assignee of the claims of Rigsby's, M&K and Quarno's, brings this action pursuant to Federal Rules of Civil Procedure 23(a), (b)(2) and/or (b)(3) on behalf of the following Classes:

> **All automotive recyclers who purchased, prior to November 18, 2014, and have in their possession Recalled Vehicles containing undeployed Takata airbags in the United States (the "Nationwide Automotive Recycler Class");**
>
> **All automotive recyclers who purchased, prior to November 18, 2014, and have in their possession Recalled Vehicles containing undeployed Takata airbags in the states of Alaska, Arizona, Arkansas, California, Colorado, Connecticut, Delaware, Florida, Idaho, Illinois, Kansas, Maine, Massachusetts, Michigan, Minnesota, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, South Dakota, Texas, Washington, and Wisconsin (the "State Deceptive Trade Practices Statute Automotive Recycler Class"); and/or**
>
> **All automotive recyclers who purchased, prior to November 18, 2014, and have in their possession Recalled Vehicles containing undeployed Takata airbags in Florida (the "Florida Automotive Recycler Class").**

376.    Automotive Recyclers include full service and self-service automotive recyclers, which remove automotive parts from motor vehicles for disposal or resale to and reuse by consumers.

377.    The Nationwide Consumer Class, Statewide Consumer Classes, and Automotive Recyclers Classes, and their members are sometimes referred to herein as the "Class" or "Classes."

378.    Excluded from each Class are Takata and the Vehicle Manufacturer Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Takata and the Vehicle Manufacturer Defendants; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

- 119 -

**Numerosity and Ascertainability**

379.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).  There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

380.     Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Takata and the Vehicle Manufacturer Defendants or third parties in the usual course of business and within their control.  Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A) and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

**Predominance of Common Issues**

381.     This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3) because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.     Whether the Class Vehicles suffer from the Inflator Defect;

b.     Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

c.     Whether Defendants knew or should have known about the Inflator Defect, and, if so, how long Defendants have known of the defect;

d.     Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle;

e.     Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

f.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

g.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

h.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

i.      Whether Defendants misrepresented that the Class Vehicles were safe;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

k.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

l.      Whether Defendants' statements, concealments and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

m.      Whether Defendants violated each of the States' consumer protection statutes, and if so, what remedies are available under those statutes;

n.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

p.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

q.      Whether Defendants have been unjustly enriched by their conduct;

r. Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

s. Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

t. What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

u. How such penalties should be most equitably distributed among Class members;

v. Whether certain Defendants conspired together to violate RICO; and

w. Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

**Typicality**

382. This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3) because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Takata and the Vehicle Manufacturer Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

**Adequate Representation**

383. Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

384.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

**Superiority**

385.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2) because Defendants Takata and the Vehicle Manufacturer Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

386.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3) because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The common questions of law and of fact regarding Takata and the Vehicle Manufacturer Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

387.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

388.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation.  Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially

outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

389.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

390.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims.  Plaintiffs are informed and believe that injuries suffered in crashes as a result of the defective airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the installation of Defective Airbags as replacement airbags.  The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

391.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, Choice of Law Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

I. **Nationwide Consumer Claims**

    A.    **Federal Claims**

### COUNT 1

**Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), against the Takata Defendants**

392.    Consumer Plaintiffs bring this Count on behalf of the Nationwide Consumer Class.

393.    The Takata Defendants are all "persons" under 18 U.S.C. § 1961(3).

394.    The Takata Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Takata RICO Enterprise through a pattern of racketeering activity.

395.    Plaintiffs and Class members are "person[s] injured in his or her business or property" by reason of the Takata Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The Takata RICO Enterprise

396.    The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Takata RICO Enterprise:

    a.    The Takata Defendants, who designed, manufactured, and sold millions of Defective Airbags knowing that they contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade and still refuse to entirely acknowledge.

    b.    The Takata Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiffs and Class members.

c.      The Vehicle Manufacturer Defendants, who purchased the Defective Airbags from the Takata Defendants, equipped their vehicles with the Defective Airbags, and falsely and inaccurately represented that their vehicles were safe, thereby deceiving Plaintiffs and Class members.

d.      Dealerships that sell vehicles manufactured by the Vehicle Manufacturer Defendants, which sold or leased the Class Vehicles containing Defective Airbags to Plaintiffs and Class members, and continue to install replacement airbags manufactured by Takata into recalled Class Vehicles that suffer from the same Inflator Defect that plagues the removed airbags.

397.     The Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose.   The Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

398.     While the Takata Defendants participated in the conduct of the Takata RICO Enterprise, they had an existence separate and distinct from the Takata RICO Enterprise. Further, the Takata RICO Enterprise was separate and distinct from the pattern of racketeering in which the Takata Defendants have engaged.

399.     At all relevant times, the Takata Defendants operated, controlled or managed the Takata RICO Enterprise, through a variety of actions.  The Takata Defendants' participation in the Takata RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Takata Defendants manufactured the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

400.     The members of the Takata RICO Enterprise all served a common purpose: to sell as many airbags, and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the Takata RICO Enterprise's members.  The members of the Takata

- 126 -

RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  Each member of the Takata RICO Enterprise benefited from the common purpose: the Vehicle Manufacturer Defendants sold or leased more Class Vehicles, and received more for those vehicles, than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; the Takata Defendants sold more Defective Airbags to the Vehicle Manufacturer Defendants than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiffs and Class members.

**Pattern of Racketeering Activity**

401.    The Takata Defendants conducted and participated in the conduct of the affairs of the Takata RICO Enterprise through a pattern of racketeering activity that has lasted for more than a decade, beginning no later than 2004 and continuing to this day, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

402.    For the Takata Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags worldwide in order to sell more airbags, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with repairing the Inflator Defect.  By concealing the scope and nature of the Inflator Defect in its millions of Defective Airbags, the Takata Defendants also maintained and boosted consumer confidence in the Takata brand and the brands of the Vehicle Manufacturer Defendants, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the Takata Defendants sell more airbags than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

403.    As detailed in the General Factual Allegations, the Takata Defendants were well aware of the risks of using ammonium nitrate as the propellant in its inflators, but intentionally subjected Plaintiffs and Class members to those risks or consciously disregarded those risks in order to maximize their profits.  Moreover, once the Inflator Defect began maiming and killing vehicle occupants, the Takata Defendants secretly engaged in testing that revealed the dangers associated with the Inflator Defect, but then destroyed the evidence of their testing to continue to conceal the nature and scope of the Inflator Defect.

404.    To further the scheme to defraud, the Takata Defendants repeatedly misrepresented and concealed the nature and scope of the Inflator Defect.  The Takata Defendants repeatedly described the defect as a contained and corrected manufacturing defect that only manifested itself in certain areas of the country, when in fact the Takata Defendants knew that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every Takata airbag and manifests itself across the country.

405.    To further the scheme to defraud, the Takata Defendants concealed the nature and scope of the Inflator Defect from federal regulators, enabling it to escape investigation and costs associated with recalls for more than a decade.

406.    To further the scheme to defraud, the Takata Defendants would promote and tout the safety, reliability, and quality of their airbags while simultaneously concealing the nature and scope of the Inflator Defect.

407.    To further the scheme to defraud, the Takata Defendants permitted or caused the Vehicle Manufacturer Defendants to promote the safety, reliability, and quality of the airbags contained in Class Vehicles while simultaneously concealing the nature and scope of the Inflator Defect.

408.    To carry out, or attempt to carry out the scheme to defraud, the Takata Defendants have conducted or participated in the conduct of the affairs of the Takata RICO Enterprise

through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.  The Takata Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Takata website, communications with NHTSA, statements to the press, and communications with other members of the Takata RICO Enterprise, as well as advertisements and other communications to the Takata Defendants' customers, including Plaintiffs and Class members; and

b.  The Takata Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

409.  The Takata Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included but was not limited to the following:

a.  As early as the 1990s and in subsequent years, the Takata Defendants transmitted, or caused to be transmitted (which hereinafter also means that the Takata Defendants acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Japan and/or Michigan and/or Washington, D.C., communications concerning the instability and volatility of ammonium nitrate, recognizing that the casing of inflators using the compound as a propellant "might even blow up."

b.  In mid-to-late 2004, following the May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, the Takata Defendants transmitted or caused to be transmitted, by means of mail travelling in interstate commerce, from scrapyards around the country to its offices in Michigan, inflators to perform secret testing that revealed the Inflator Defect.

c.      In mid-to-late 2004, following the May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, the Takata Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of Defendant Honda in California and offices of regulators in Washington, D.C., representations that the rupture was an "anomaly."

d.      In September of 2007, the Takata Defendants caused to be transmitted, by means of mail travelling in interstate commerce, from scrapyards around the country to its offices in Michigan, inflators to perform testing, the results of which they misrepresented showed that a manufacturing defect was solely responsible for exploding airbag incidents, thereby concealing the nature and scope of the Inflator Defect.

e.      In November 2008, the Takata Defendants caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., regulatory filings stating that the approximately 4,000 vehicles subject to its 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

f.      In December 2008, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  This letter did not sufficiently communicate the severity of the threat to life and limb, and concealed the scope and nature of the Inflator Defect.  Owners are merely advised to make an appointment to have their vehicle repaired, with no sense of urgency.  In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

g.      On July 29, 2009, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the 08V-953 recall.  In this report, Honda stated "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."   In light of the 100-fold recall expansion, and what Plaintiffs believe Honda knew about Takata's internal difficulties dealing with the recall, this statement was false and concealed the nature and scope of the Inflator Defect.   Honda's chronology lists three "unusual deployments"—a euphemistic way of describing Ashley Parham's death in May 2009, Jennifer Griffin's shrapnel injuries in June 2009, and one other incident.   This regulatory filing was misleading and served to conceal and/or minimize the threats posed by the Defective Airbags.

h.      On September 16, 2009, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C. information concerning safety recalls 08V-593 and 09V-259.  This letter was co-drafted by Honda and Takata.  NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall. Among other things, Honda and Takata explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter recall.  But Honda and Takata fraudulently omitted that one of those deployments caused Ashley Parham's death.  Also, Honda and Takata claimed that the manufacturing problem was limited to only one high-precision compression press.  Because Takata was by then aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving for both Honda and Takata.  In addition to the quality control problems stated above, during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks found in inflators in the Monclova, Mexico plant.  Furthermore, Takata and Honda omitted the existence of the secret testing in 2004 and the negative results of those tests.  Once again, NHTSA, and by extension the

- 131 -

public, were deprived of accurate and complete information.  As a result of this letter, the ODI closed its investigation into these two recalls.  The Takata Defendants thereby concealed the nature and scope of the Inflator Defect.

i.      On February 9, 2010, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., another recall communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."  Honda's "chronology" was false and misleading because it did not mention any injuries.  Honda's explanation of the defect—that two processes were used to prepare the inflator propellant and that one of them was not within specifications—was misleading in light of what the Takata Defendants knew, or at least should have known in light of the extensive problems at Takata's Monclova, Mexico plant.

j.      On February 19, 2010, the Takata Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan and/or Japan a response to the ODI's November 20, 2009 letter seeking more information about recalls 08V-593 and 09V-259 conducted by Honda.  Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08V-593 and 09V-259 to any customers other than Honda."  This statement was patently incorrect, as over 10 manufacturers have recalled vehicles containing Defective Airbags since that statement was made.  This statement concealed the nature and scope of the Inflator Defect.

k.      On April 27, 2011, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to federal regulators in Washington, D.C., additional recall communications again misleadingly stating that the recall covered "all possible vehicles" with the problem.  As before, the letter to owners and lessees did not sufficiently raise a sense of urgency.  This statement concealed the nature and scope of the Inflator Defect.

l.       On April 11, 2013, the Takata Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of federal regulators in Washington, D.C., misrepresentations that the defect was limited to inflators produced at a specific plant between certain dates due to a manufacturing error, again concealing the nature and scope of the Inflator Defect.

m.       In April or May 2013, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Toyota's offices in California to Plaintiff Shader in Florida a recall notice stating that the front passenger airbag should be replaced due to a defect. This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication, and several follow-up communications that the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, concealed the nature and scope of the Inflator Defect and inaccurately assured Plaintiff Shader that "the remedy is complete on your vehicle."

n.       On June 11, 2014, the Takata Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan or Japan to the ODI in Washington, D.C., a letter titled "Takata Support for Regional Field Actions to Address Potential Inflator Issues." Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the Virgin Islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." Takata misleadingly omitted Ashely Parham's death in Oklahoma in May 2009, Gurjit Rathore's death in December 2009 in Virginia, and Brandi Owens's injury in October 2013 in Georgia. By focusing on areas of high humidity, this communication concealed the nature and scope of the Inflator Defect.

o.      In September 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from BMW's offices in New Jersey to Plaintiff Gunther in Florida a recall notice stating that the front passenger airbag should be replaced due to a defect.  This notice misleadingly indicates that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect.  This communication concealed the nature and scope of the Inflator Defect.

p.      In October 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to Plaintiff Archer in Hawaii, a recall notice stating that the front driver's side and/or passenger airbag should be replaced due to a defect.   This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect.   This communication concealed the nature and scope of the Inflator Defect.

q.      In late 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Nissan's offices in Tennessee to Plaintiff Liberal in Florida a recall notice that the front passenger airbag should be replaced due to a defect.  This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect. This communication concealed the nature and scope of the Inflator Defect.

r.      In late 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Chrysler's offices in Michigan to Plaintiff Herron in Florida a recall notice stating that the front driver's side and/or passenger airbag should be replaced due to a defect.  This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect.  This communication concealed the nature and scope of the Inflator Defect.

s.      In November 2014, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Ford's offices in Michigan to Plaintiff Sinclair in Florida a recall notice that the front driver and/or passenger airbag should be replaced due to a defect.  This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect.  This communication concealed the nature and scope of the Inflator Defect.

t.      In April 2015, the Takata Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Honda's offices in California to Plaintiff Severio in Louisiana a recall notice that the driver's side airbag should be replaced due to a defect.  This notice misleadingly suggests that the replacement airbag will be free of a defect, when in fact, if it is a Takata airbag, it is also plagued by the Inflator Defect.  This communication concealed the nature and scope of the Inflator Defect.

u.      To this day, the Takata Defendants continue to transmit, or cause to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan, advertisements and communications with the public and NHTSA misrepresenting that the replacement airbags are safe and reliable, when in fact they too suffer from the Inflator Defect.

410.   The Takata Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class members were directly harmed as a result of the Takata Defendants' intentional conduct.  Plaintiffs, Class members, and federal regulators, among others, relied on the Takata Defendants' material misrepresentations and omissions.

411.   As described throughout this Complaint, the Takata Defendants engaged in a pattern of related and continuous predicate acts for more than a decade.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them while providing Defective Airbags worth significantly less than the purchase price

paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

412. The predicate acts all had the purpose of generating significant revenue and profits for the Takata Defendants at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the Takata Defendants through their participation in the Takata RICO Enterprise and in furtherance of its fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Inflator Defect.

413. By reason of and as a result of the conduct of the Takata Defendants, and in particular, its pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

      a.     overpayment for leased or purchased Class Vehicles, in that Plaintiffs believed they were paying for vehicles with safe airbag systems and obtained vehicles with anything but; and

      b.     the value of the Class Vehicles has diminished, thus reducing their resale value.

414. The Takata Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. § 1964(c).

## COUNT 2

**Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced And Corrupt Organizations Act ("RICO"), against the Takata Defendants and the Honda Defendants**

415. Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class against the Takata Defendants and the Honda Defendants.

416.     In addition to the General Factual Allegations re-alleged and incorporated herein through the general Reallegation and Incorporation by Reference Paragraph above, Plaintiffs re-allege and incorporate the allegations set forth in Count 1.

417.     At all relevant times, the Takata Defendants and the Honda Defendants were associated with the Takata RICO Enterprise and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Takata RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

418.     Over the course of the past decade, the Honda Defendants and Takata Defendants shared information about injurious airbag deployments—jointly and secretly—investigated the possible causes of those deployments, delayed and/or prevented the release of inculpatory information, misled regulatory authorities, and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed.  The Honda Defendants' and Takata Defendants' close cooperation on issues surrounding the Inflator Defect and joint participation in predicate acts described below is evidence of the conspiracy.

### Overt Acts

419.     The Takata Defendants and Honda Defendants committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof.

420.     More specifically, the following conduct and overt acts demonstrate the ongoing conspiracy between Honda and Takata:

a.     After an airbag in a 2002 Honda Accord exploded in Alabama in 2004, Honda and Takata investigated the incident.  Honda stated that, after the accident, it "immediately shared all available information with the airbag supplier [Takata]."  Honda claimed that Takata had provided a reasonable explanation of the defect as an "anomaly" because Takata claimed it could not find a cause for the explosion, and neither studied the

- 137 -

matter any further.  Yet, by this time Honda was aware of the Honda Passport recall in February 2001 necessitated by the Defective Airbags, and Takata was aware of faulty welding and rust in the inflators produced at its plant in Monclova, Mexico, which Takata engineers believed could cause the inflators to fail.  Also, between 2001 and 2003 various internal Takata reports titled "potential failures" show that Takata struggled with at least 45 inflator problems.  Moreover, in 2002 Takata's Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers—six to eight times beyond Takata's quality control limit.  In light of this accumulated knowledge, Honda's and Takata's dismissal of the explosion as an anomaly without further study was reckless at best.

b.     Also in 2004, Takata concealed and destroyed negative results from secret airbag tests it conducted in response to the explosion in Alabama.  Over weekends and holidays during the summer of 2004 at Takata's American headquarters in Auburn Hills, Michigan, Takata conducted secret tests on 50 airbags it had retrieved from scrapyards.  The tests were conducted by Al Bernat, Takata's then-vice president of engineering.  In two of the airbags, the steel inflators cracked.  According to employees involved in the testing, Takata engineers began designing possible fixes.  But Takata executives ordered the lab technicians to delete the test data from company computers and to dispose of the airbag inflators in the trash.  Prototypes of design alternatives were also trashed.  According to a former Takata employee, "[a]ll the testing was hush-hush. . . . Then one day, it was, 'Pack it all up, shut the whole thing down.'  It was not standard procedure."  In regulatory filings, Takata has since stated that it began testing the problematic airbags in 2008—four years after these secret tests.  Because Honda and Takata agreed to

describe the 2004 incident in Alabama as an "anomaly," and Honda and Takata were by 2004 communicating about the defective inflators, Plaintiffs allege, upon information and belief, that Honda was aware of Takata's secret testing.

c.      Between February 2007 and June 2007, Honda reported three airbag ruptures, all causing injuries, to Takata.  Honda decided not to order a recall but rather to await the results of a "failure mode analysis" to be performed by Takata.  Honda and Takata again chose to keep vitally important, safety-related information between only the two of them.  In light of what the two companies knew about the Defective Airbags, this "failure mode analysis" was nothing more than an attempt to divert the attention of regulators and the public.  Honda and Takata had no need for further analysis; they already knew the airbags were defective.

d.      In September 2007, Honda began collecting inflators returned to dealers, and sent them to Takata for investigation, all without informing vehicle owners or regulators.  Honda also collected inflators from scrapyards for the same purpose.  Takata began what turned out to be a year-long study of the Inflator Defect.

e.      In September 2008, Takata completed the year-long study and determined that moisture was at the root of the defect.  In light of the serious safety risks of which Takata and Honda were aware, that the study took an entire year and that Honda did not compel Takata to complete its investigation any faster were wholly unreasonable and evidence of recklessness.  Moreover, there was no need for this study in the first place; Honda and Takata already knew the airbags were defective.

f.      On September 16, 2009, Honda and Takata jointly drafted a letter to NHTSA's ODI in response to the ODI's request for additional information concerning

safety recall 09V-259.  The ODI had requested an explanation about why Honda's recall on July 8, 2010 (Recall No. 09V-259, 440,000 vehicles) had expanded by almost 100-fold the number of vehicles recalled on November 11, 2008 (Recall No. 08V-593,  3,940 vehicles).  Although signed by Honda's managing counsel, the letter clearly indicates joint drafting, as it is written in the "we" form and defines "we" as "Honda and TK Holding, Inc."  In spite of what Honda and Takata both knew by this time, the letter asserts that the defects were from a limited production run and were caused by a lone faulty high-compression production press.  The letter did not mention the numerous problems that Takata's Monclova, Mexico plant had been suffering for years, which underscored the volatility and instability of the ammonium nitrate propellant; nor did it mention Takata's secret airbag tests in 2004.  Thus, Honda and Takata, in concert, knowingly and consciously omitted and withheld crucial information from government regulators in order to prevent regulatory action that likely would have resulted in a broader recall and possibly regulatory sanctions.

g.      Honda and Takata have jointly settled at least one personal injury lawsuit arising from a Defective Airbag.  On May 20, 2010, Kristy Williams filed a personal injury action against both Honda and Takata in Georgia State Court in Clayton County, Georgia.[2]  Shrapnel from an exploding Takata airbag in Ms. Williams's 2001 Honda Civic severed her carotid artery, and she survived only because she applied pressure with her fingers to stem the arterial bleeding.  Honda and Takata entered into a confidential settlement with Ms. Williams, and the case was dismissed without prejudice in January 2011.  This settlement demonstrates the joint desire and effort by Takata and Honda to

---

[2] Case No. 2010-CV-04232-MG.

conceal the existence of the Inflator Defect and the risks posed by it from regulators and from the public, and joint action to achieve that end.  Although this lawsuit occurred after the recent wave of recalls began in November 2008, the suit preceded the massive Honda recall expansions of December 2011 (Recall No. 11V-260), April 2013 (Recall No. 13V-132), and June 2014 (Recall Nos. 14V-349, 14V-351, and 14V-353).

h.     In September 2011, Honda and Takata initiated a joint analysis into an "outside of range" incident that occurred on August 1, 2011.

i.     At no point did either Takata or Honda "break rank" with the other to give a full reporting to government regulators or to the public, even though several people had been killed and dozens injured.  Only when backed against the proverbial wall did they start to release a trickle of information, leading to a series of seemingly ever-expanding recalls, commencing in November 2008 and continuing to the present.

421.   Honda and Takata agreed to and did conduct and participate in the conduct of the Takata RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs and Class members, as more fully described in the prior Count.

422.   As a direct and proximate result of Honda's and Takata's conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.     overpayment for leased or purchased Class Vehicles, in that Plaintiffs believed they were paying for vehicles with safe airbag systems and obtained vehicles with anything but; and

b.     the Class Vehicles' value has diminished, thus reducing their resale value.

423.   Had Takata and/or Honda been entirely forthcoming with NHTSA and with the public in a timely manner about the vast scope of the Inflator Defect and the grave risks it posed to countless vehicle occupants, as was their duty, Plaintiffs would not have suffered these harms.

Takata's and Honda's conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension, and was committed with reckless indifference to the truth if not the outright intent to deceive.

424.    Honda's and Takata's conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiffs to treble damages under 18 U.S.C. § 1964(c).

## COUNT 3

### Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 *et seq.*

425.    Consumer Plaintiffs bring this Count against all Vehicle Manufacturer Defendants except for GM and Mitsubishi, on behalf of members of the Nationwide Consumer Class who are residents of the District of Columbia and the following States: Alaska, Arkansas, California, Colorado, Florida, Delaware, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Carolina, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia and Wyoming.

426.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

427.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

428.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

429.    The Vehicle Manufacturer Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

430.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

431.    The Vehicle Manufacturer Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).  As a part of the implied warranty of merchantability, the Vehicle Manufacturing Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

432.    The Vehicle Manufacturer Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).  Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect.  The Vehicle Manufacturer Defendants have admitted that the Class Vehicles are defective in issuing its recalls, but the recalls are woefully insufficient to address the Inflator Defect.

433.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

434.    Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between the Vehicle Manufacturer Defendants and Plaintiffs and the other Class members.

435.    Any limitations on the warranties are substantively unconscionable.  The Vehicle Manufacturer Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired.  The Vehicle Manufacturer Defendants failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, the Vehicle Manufacturer Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

436.     Plaintiffs and each of the other Class members have had sufficient direct dealings with either the Vehicle Manufacturer Defendants or its agents (dealerships) to establish privity of contract.

437.     Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between the Vehicle Manufacturer Defendants and their dealers, and specifically, of the implied warranties.   The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.   Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

438.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give the Vehicle Manufacturer Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

439.     Furthermore, affording the Vehicle Manufacturer Defendants an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, the Vehicle Manufacturer Defendants knew, should have known, or was reckless in not knowing of its misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford the Vehicle Manufacturer Defendants a reasonable opportunity to cure its breach of warranties is excused and thereby deemed satisfied.

440.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because the Vehicle Manufacturer Defendants are refusing to acknowledge any revocation of

acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

441.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law, including diminution in value of their vehicles, in an amount to be proven at trial.  In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

442.    Further, Plaintiffs and the Class are also entitled to equitable relief under 15 U.S.C. § 2310(d)(1).   Based on the inadequacy of the recalls implemented by the Vehicle Manufacture Defendants and the failure of any of Defendants to even identify a root cause of the defect, Plaintiffs seek a declaration that the Vehicle Manufacturer Defendants have not adequately implemented their recall commitments and requirements and general commitments to fix its failed processes, and injunctive relief in the form of judicial supervision over the recall process is warranted.

443.    Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

444.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for the Vehicle Manufacturer Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by

Court decree and administration under Court supervision of a program funded by the Vehicle Manufacturing Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

**B.       Common Law and State Law Claims against the Takata Defendants**

**COUNT 4**

**Fraudulent Concealment**

445.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

446.    Takata concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

447.    Takata took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

448.    On information and belief, Takata still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Defective Airbags.

449.    Takata had a duty to disclose the Inflator Defect because it:

a.      Had exclusive and/or far superior knowledge and access to the facts than Plaintiffs and Class Members, and Takata knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs; and

c.      Made incomplete representations about the safety and reliability of the Defective Airbags and, by extension, the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

450.   These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Plaintiffs and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

451.   Takata concealed and suppressed these material facts to falsely assure purchasers and consumers that its airbags were capable of performing safely, as represented by Takata and reasonably expected by consumers.

452.   Takata actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and cost Takata money.  Takata concealed these facts at the expense of Plaintiffs and the Class.

453.   Plaintiffs and the Class were unaware of these omitted material facts, and would not have acted as they did if they had known of the concealed and/or suppressed facts.

454.   Had they been aware of the Defective Airbags and Takata's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Takata's fraudulent concealment.

455.     Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Takata's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Takata's conduct.

456.     The value of all Class members' vehicles has diminished as a result of Takata's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

457.     Accordingly, Takata is liable to the Class for their damages in an amount to be proven at trial.

458.     Takata's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Takata.  Takata's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 5

### Breach of Implied Warranty

459.     Consumer Plaintiffs bring this Claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

460.     Takata is a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

461.     Under Mich. Comp. Laws § 440.2314, a warranty that the Defective Airbags, and by extension, the Class Vehicles, were in merchantable condition was implied by law in the transactions when Plaintiffs and Class Members purchased their Class Vehicles.

462.     The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect, leading to an unreasonable likelihood of serious bodily injury and death.

463.     Takata was provided notice of the airbag problems through numerous complaints filed against it, internal investigations, and by many individual letters and communications sent by Plaintiffs and the Class before or within a reasonable amount of time after Takata and the other Defendants issued the recalls and the allegations of the Inflator Defect became public. Moreover, Takata and the other defendants were aware of these problems long before Plaintiffs and the Class and had ample notice and opportunity to correct them.

464.     As a direct and proximate result of Takata's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 6

### Unjust Enrichment

465.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.   In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

466.     Takata has received and retained a benefit from the Plaintiffs and inequity has resulted.

467.     Takata benefitted through its unjust conduct, by selling Defective Airbags with a concealed safety-and-reliability related defect, at a profit, for more than these Defective Airbags

were worth, to Plaintiffs, who overpaid for these Defective Airbags by overpaying for their Class Vehicles, and/or would not have purchased these Defective Airbags and Class Vehicles at all; and who have been forced to pay other costs.

468.   It is inequitable for Takata to retain these benefits.

469.   Consumer Plaintiffs do not have an adequate remedy at law.

470.   As a result of Takata's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 7

### Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws §§ 445.903, *et seq.*

471.   Consumer Plaintiffs bring this Claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

472.   Consumer Plaintiffs are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

473.   At all relevant times hereto, the Takata Defendants were "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

474.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).  The Takata Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the

represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them, the Takata Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

475. In the course of their business, the Takata Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. The Takata Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

476. The Takata Defendants have known of the Inflator Defect in the Defective Airbags since at least the late 1990s.

477. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by permitting the Class Vehicles to be marketed as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Takata Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA. The Takata Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

478. In the course of the Takata Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious

Inflator Defect discussed above.  The Takata Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

479.    The Takata Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

480.    The Takata Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Consumer Plaintiffs.

481.    The Takata Defendants knew or should have known that their conduct violated the Michigan CPA.

482.    As alleged above, the Takata Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

483.    To protect their profits and to avoid remediation costs and a public relations nightmare, the Takata Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

484.    The Takata Defendants owed Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the Takata Defendants:

      a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.     Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

485.   Because the Takata Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

486.   The Takata Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Consumer Plaintiffs. A vehicle containing components produced by a reputable manufacturer is worth more than an otherwise comparable vehicle containing critical safety components made by a disreputable manufacturer of unsafe products that conceals defects rather than promptly remedies them.

487.   Consumer Plaintiffs suffered ascertainable loss caused by the Takata Defendants' misrepresentations and their failure to disclose material information.   Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and the Takata Defendants' complete disregard for safety, Consumer Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.   Consumer Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

488.   The Takata Defendants' violations present a continuing risk to Consumer Plaintiffs, as well as to the general public.   Defendants' unlawful acts and practices complained of herein affect the public interest.

489.   As a direct and proximate result of the Takata Defendants' violations of the Michigan CPA, Consumer Plaintiffs have suffered injury-in-fact and/or actual damage.

490.    Consumer Plaintiffs seek injunctive relief to enjoin the Takata Defendants from continuing its unfair and deceptive acts; monetary relief against the Takata Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs Class member; (c) reasonable attorneys' fees; and (d) any other just and proper relief available under Mich. Comp. Laws § 445.911.

491.    Consumer Plaintiffs also seek punitive damages against the Takata Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  The Takata Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or Defective Airbags installed in them, deceived Consumer Plaintiffs on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them.  The Takata Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 8

### Negligence

492.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

493.    The Takata Defendants owed a duty of care to the Consumer Plaintiffs, who were foreseeable end users, to design and manufacture their airbags so that they would not be defective or unreasonably dangerous to foreseeable end users, including Consumer Plaintiffs.

494. The Takata Defendants breached their duty of care by, among other things:

a. Negligently and recklessly failing to take all necessary steps to ensure that its products-which literally can make the difference between life and death in an accident-function as designed, specified, promised, and intended;

b. Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

c. Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

d. Negligently and recklessly concealing the nature and scope of the Inflator Defect.

495. Takata's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Consumer Plaintiffs, as well as ongoing foreseeable damages that Consumer Plaintiffs continue to suffer to this day.

496. As a direct, actual, and proximate result of Takata's misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages, which are continuing in nature, including:

a. the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b. the continued exposure of Consumer Plaintiffs to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

497. Defendant Takata's negligence is ongoing and continuing, because Takata continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which

- 155 -

poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

498.    In addition to damages, Consumer Plaintiffs seek injunctive relief to enjoin the Takata Defendants from continuing its negligence by using the same dangerous chemical in the replacement airbags that the Takata Defendants are manufacturing to this date.

### C.    Common Law and State Law Claims Against the Honda Defendants

### COUNT 9

### Fraudulent Concealment

499.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Honda Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under California law, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

500.    Honda concealed and suppressed material facts regarding the Class Vehicles— most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

501.    Honda took steps to ensure that its employees did not reveal known the Inflator Defect to regulators or consumers.

502.    On information and belief, Honda still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect that exists in the Class Vehicles.

503.    Honda had a duty to disclose the Inflator Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and Honda knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing from Plaintiffs; and

c.    Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

504.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class.  Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Plaintiffs and Class Members trusted Honda not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

505.    Honda concealed and suppressed these material facts to falsely assure purchasers and consumers that its vehicles were capable of performing safely, as represented by Honda and reasonably expected by consumers.

506.    Honda actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and to avoid recalls that would hurt the brand's image and cost Honda money.  It did so at the expense of Plaintiffs and the Class.

507.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

508.    Had they been aware of the Defective Airbags installed in the Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Honda's fraudulent concealment.

509.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Honda's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Honda's conduct.

510.    The value of all Class members' vehicles has diminished as a result of Honda's fraudulent concealment of the Defective Airbags, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

511.    Accordingly, Honda is liable to the Class for their damages in an amount to be proven at trial.

512.    Honda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Honda.  Honda's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 10

**Violation Of Song-Beverly Consumer Warranty Act For Breach Of Implied Warranty Of Merchantability (California Lemon Law)**

513.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Honda Consumer Class against the Honda Defendants under the laws of California, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

514.    Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

515.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

516.    Honda is a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

517.    Honda impliedly warranted to Plaintiffs and the Class that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

518.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

519.    The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective Airbags, which among other things, have a tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, instead of protecting vehicle occupants from bodily injury during accidents.

520.    Because of the Inflator Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

521.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Inflator Defect. Honda failed to warn about that dangerous Inflator Defect in the Class Vehicles.

- 159 -

522.     Honda breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective Airbags containing the Inflator Defect which among other things, causes the airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.  The Defective Airbags have deprived Plaintiffs and the Class of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

523.     Notice of breach is not required because the Plaintiffs and the Class did not purchase their automobiles directly from Honda.  Further, on information and belief, Honda had notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

524.     As a direct and proximate result of Honda's breach of its duties under California's Lemon Law, Plaintiffs and the Class received goods whose dangerous condition substantially impairs their value. Plaintiffs and the Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

525.     Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the  Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

526.     Under Cal. Civ. Code § 1794, Plaintiffs and the Class are entitled to costs and attorneys' fees.

## COUNT 11

### Unjust Enrichment

527.     Consumer Plaintiffs bring this claim against the Honda Defendants on behalf of the Nationwide Honda Consumer Class under the common law of unjust enrichment, as there are

no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under California law, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

528.    Honda has received and retained a benefit from the Plaintiffs and inequity has resulted.

529.    Honda benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

530.    It is inequitable for Honda to retain these benefits.

531.    Consumer Plaintiffs do not have an adequate remedy at law.

532.    As a result of Honda's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 12

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

533.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Honda Consumer Class against the Honda Defendants under the slaws of California, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

534.    Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or

misleading advertising. . . ."  Defendants engaged in conduct that violated each of this statute's three prongs.

535.    The Honda Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

536.    The Honda Defendants also violated the unlawful prong because they have engaged in violations of the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and failing to promptly remedy the Inflator Defect.

537.    Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

538.    The Honda Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the Inflator Defect or any of the other dangers or risks posed by the Defective Airbags within five days of determining the Inflator Defect existed, and failing to recall all Class Vehicles.

539.    The Honda Defendants violated the common-law claim of negligent failure to recall, in that the Honda Defendants knew or should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; the Honda Defendants became aware of the attendant risks after the Class Vehicles and/or the Defective Airbags installed in them were sold; the Honda Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by it; and the Honda Defendants failed to adequately recall the Class Vehicles in a timely manner, which failure was a substantial factor in causing harm to Consumer Plaintiffs, including diminished value.

540.    The Honda Defendants committed unfair business acts and practices in violation of § 17200 when it concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  The Honda Defendants represented that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

541.    The Honda Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with Defective Airbags installed in them.  As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for the Nationwide Consumer Class whose vehicles are in the process of being repaired.

542.    The Honda Defendants violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

543.    The Honda Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.  The Honda Defendants' active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them are likely to mislead the public with regard to their true defective nature.

544.    The Honda Defendants have violated the unfairness prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they

- 163 -

cause to consumers greatly outweighs any benefits associated with those practices. The Honda Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the Defective Airbags installed in them and/or the price to be paid to purchase or lease them.

545.    Plaintiffs and the Class have suffered injuries in fact, including the loss of money or property, as a result of the Honda Defendants' unfair, unlawful, and/or deceptive practices. As set forth above, each member of the Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of the Honda Defendants with respect of the safety and reliability of the vehicles. Had Plaintiffs and the Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

546.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Honda Defendants' businesses. The Honda Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

547.    As a direct and proximate result of the Honda Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

548.    Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin the Honda Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

549.    Plaintiffs and Class Members also request equitable and injunctive relief in the form of Court supervision of the Honda Defendants' numerous recalls of the various Class Vehicles and/or the Defective Airbags installed in them, to ensure that all affected vehicles are recalled and that the recalls properly and adequately cure the dangers and risks posed.

## COUNT 13

### Violation of the Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*

550.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Honda Consumer Class against the Honda Defendants under the laws of California, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

551.    The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

552.    Plaintiffs, the Class, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

553.    Plaintiffs and the Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

554.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

555.    The Honda Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

556.    In the course of their business, the Honda Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

557.    The Honda Defendants also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to lease or sell them as advertised; and omitting material facts in describing them.  The Honda Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA.  The Honda Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

558.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Honda Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

559.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Honda Defendants engaged in unfair or deceptive business practices in violation of the CLRA. The Honda Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

560.    The Honda Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

561.   The Honda Defendants knew or should have known that their conduct violated the CLRA.

562.   As alleged above, the Honda Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

563.   To protect their profits and to avoid remediation costs and a public relations nightmare, the Honda Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

564.   The Honda Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the Honda Defendants:

> a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.   Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

565.   The Class Vehicles and/or the Defective Airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs and the Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

566.   The Honda Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs and the Class, about the true safety and

reliability of the Class Vehicles and/or the Defective Airbags installed in them.  The Honda Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class members.

567.    The Honda Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

568.    Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

569.    Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

570.    Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include:  the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

571.    The manufacturer must also promptly inform NHTSA regarding:  the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty

claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

572. The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government. The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000." 49 C.F.R. § 578.6(c).

573. The Honda Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.* by failing to disclose and by actively concealing dangers and risks posed by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

574. The Honda Defendants knew that the Class Vehicles and/or the Defective Airbags installed in them contained a defect that could cause the airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, but the Honda Defendants failed for many years to inform NHTSA of the Inflator Defect. Consequently, the public, including Plaintiffs and the Class, received no notice of the Inflator Defect. The Honda Defendants failed to inform NHTSA or warn the Plaintiffs, the Class, and the public about these inherent dangers, despite having a duty to do so.

575. The Honda Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Class members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

576. Because the Honda Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by the Honda Defendants' conduct, they are now worth significantly less than they otherwise would be.

577. The Honda Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

578. Plaintiffs and the Class suffered ascertainable loss caused by the Honda Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and the Honda Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of the Honda Defendants' misconduct.

579. Plaintiffs and the Class risk irreparable injury as a result of the Honda Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the Class as well as to the general public. The Honda Defendants' unlawful acts and practices complained of herein affect the public interest.

580. The recalls and repairs instituted by Defendants have not been adequate. The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with Defective Airbags susceptible to the malfunctions described herein. Moreover, the Honda Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiffs and the Class.

581. As a direct and proximate result of the Honda Defendants' violations of the CLRA, Plaintiffs and Class members have suffered injury-in-fact and/or actual damage and, if not stopped, will continue to harm the Class. Plaintiffs and Class members currently own or lease, or within the class period have owned or leased, Class Vehicles with Defective Airbags installed in them that are defective and inherently unsafe. Plaintiffs and the Class risk irreparable

injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the Class, as well as to the general public.

582.     Plaintiffs, on behalf of themselves and for all those similarly situated, demand judgment against the Honda Defendants under the CLRA for an injunction requiring Defendants to adequately and permanently repair the Class Vehicles and/or the Defective Airbags installed in them, or provide a suitable alternative, free of charge, and an award of attorneys' fees pursuant to Civil Code § 1780(d).  Plaintiffs seek this injunctive relief for the Honda Defendants' myriad violations of the CLRA, including Cal. Civ. Code §§ 1770(a)(5), (7), and (9).

583.     In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of California Civil Code § 1770(a) relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the California Sub-Class, and demand that Defendants correct or agree to correct the actions described therein.  If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 14

### Violation of the California False Advertising Law
### Cal. Bus. & Prof. Code §§ 17500, *et seq.*

584.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Honda Consumer Class against the Honda Defendants under the laws of California, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

585.     California Bus. & Prof. Code § 17500 states:   "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or

other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

586.    The Honda Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Honda Defendants, to be untrue and misleading to consumers, including Plaintiffs and the Class.

587.    The Honda Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were material and likely to deceive a reasonable consumer.

588.    Plaintiffs and the Class have suffered an injury in fact, including the loss of money or property, as a result of the Honda Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the Class relied on the misrepresentations and/or omissions of the Honda Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  The Honda Defendants' representations turned out not to be true because the Class Vehicles and/or the Defective Airbags installed in them are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.  Had Plaintiffs and the Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

589.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Honda Defendants' business.  The Honda Defendants' wrongful conduct is

part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

590.     Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 15

### Negligent Failure to Recall

591.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Honda Consumer Class against the Honda Defendants under the laws of California, because the Honda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, if it is found that the laws of California do not apply to the Nationwide Honda Consumer Class's claim for negligent recall, Consumer Plaintiffs assert a negligence claim against Honda under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles, and hereby incorporate the allegations pled in Count 8, as Honda has breached the same duties that Takata has breached, and has proximately injured Plaintiffs in the same manner.

592.     The Honda Defendants knew or reasonably should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

593.     The Honda Defendants either knew of the dangers posed by the Class Vehicles and/or the Defective Airbags installed in them before the Class Vehicles they were sold, or became aware of them and their attendant risks after they were sold.

594.    Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. The Honda Defendants have known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Honda Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

595.    The Honda Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by the Class Vehicles and/or the Defective Airbags installed in them.  The Honda Defendants failed to adequately recall them in a timely manner.

596.    Purchasers of the Class Vehicles, including Plaintiffs and the Class were harmed by Defendants' failure to adequately recall all the Class Vehicles and/or the Defective Airbags installed in them in a timely manner and have suffered damages, including, without limitation, damage to other components of the Class Vehicles caused by the Inflator Defect, the diminished value of the Class Vehicles, and the cost of modification of the dangerous and life-threatening Defective Airbags.

597.    The Honda Defendants' failure to timely and adequately recall the Class Vehicles and/or the Defective Airbags installed in them was a substantial factor in causing the purchasers' harm, including that of Plaintiffs and the Class.

### D.    Common Law and State Law Claims Against BMW

### COUNT 16

### Fraudulent Concealment

598.    Consumer Plaintiffs bring this claim on behalf of the Nationwide BMW Consumer Class against the BMW Defendants under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide BMW Consumer Class under New Jersey law, because BMW's United States operations are headquartered in New Jersey and New Jersey has the most significant

relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

599.   BMW concealed and suppressed material facts regarding the Class Vehicles—most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

600.   BMW took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

601.   On information and belief, BMW has still not made full and adequate disclosure regarding the Inflator Defect that exists in the Class Vehicles, and continues to defraud and conceal material information from Plaintiffs and the Class.

602.   BMW had a duty to disclose the Inflator Defect because it:

a.   Had exclusive and/or far superior knowledge and access to the facts, and BMW knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

603.   These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiffs and Class

Members trusted BMW not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

604.    BMW concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by BMW and reasonably expected by consumers.

605.    BMW actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost BMW money, and it did so at the expense of Plaintiffs and the Class.

606.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

607.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of BMW's concealment of, and failure to timely disclose, the Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by BMW's conduct.

608.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of BMW's fraudulent concealment.

609.    The value of all Class members' vehicles has diminished as a result of BMW's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

610.    Accordingly, BMW is liable to the Class for their damages in an amount to be proven at trial.

611.    BMW's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching BMW.  BMW's conduct, which exhibits the highest degree of

reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety,  warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 17

### Breach of Implied Warranty of Merchantability,
### N.J. Stat. Ann. § 12a:2-314

612.    Consumer Plaintiffs bring this claim on behalf of the Nationwide BMW Consumer Class against the BMW Defendants under the laws of New Jersey, because their United States Operations are headquartered in New Jersey and New Jersey has the most significant relationship to the facts and issues relevant to this claim.

613.    BMW is a merchant with respect to motor vehicles.

614.    When Plaintiffs and the Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles were in merchantable condition.

615.    At the time of sale and all times thereafter, the Class Vehicles were not merchantable and not fit for the ordinary purpose for which cars and airbags are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with Defective Airbags with the Inflator Defect which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

616.    On information and belief, BMW had notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after BMW issued the recalls and the allegations of the Inflator Defect became public.

617.    As a direct and proximate result of BMW's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 18

### Unjust Enrichment

618.    Consumer Plaintiffs bring this claim on behalf of the Nationwide BMW Consumer Class against the BMW Defendants under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide BMW Consumer Class under New Jersey law, because BMW's United States operations are headquartered in New Jersey and New Jersey has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

619.    BMW has received and retained a benefit from the Plaintiffs and inequity has resulted.

620.    BMW benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

621.    It is inequitable for BMW to retain these benefits.

622.    Consumer Plaintiffs do not have an adequate remedy at law.

623.    As a result of BMW's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 19

**Violation of the New Jersey Consumer Fraud Act,
N.J. Stat. Ann. §§ 56:8-1, *et seq.***

624.     Consumer Plaintiffs bring this claim on behalf of the Nationwide BMW Consumer Class against the BMW Defendants under the laws of New Jersey, because their United States Operations are headquartered in New Jersey and New Jersey has the most significant relationship to the facts and issues relevant to this claim.

625.     Plaintiffs, the Class, and Defendants are or were "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

626.     The BMW Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

627.     The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.  The BMW Defendants engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

628.     In the course of their business, the BMW Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

629.     The BMW Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

630. Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. The BMW Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

631. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the BMW Defendants engaged in unfair or deceptive business practices in violation of the New Jersey CFA. The BMW Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

632. In the course of the BMW Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. The BMW Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

633. The BMW Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles

- 180 -

and/or the Defective Airbags installed in them, the quality of the BMW Defendants' brands, and the true value of the Class Vehicles.

634.    The BMW Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the New Jersey Sub-Class.

635.    The BMW Defendants knew or should have known that their conduct violated the New Jersey CFA.

636.    As alleged above, the BMW Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

637.    To protect their profits and to avoid remediation costs and a public relations nightmare, the BMW Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving these highly dangerous vehicles.

638.    The BMW Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the BMW Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

639.    Because the BMW Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

- 181 -

diminished.  In light of the stigma attached to Class Vehicles by the BMW Defendants' conduct, they are now worth significantly less than they otherwise would be.

640.    The BMW Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the New Jersey Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

641.    Plaintiffs and the Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

642.    The BMW Defendants' violations present a continuing risk to Plaintiffs, the Class, as well as to the general public.  The BMW Defendants' unlawful acts and practices complained of herein affect the public interest.

643.    As a direct and proximate result of the BMW Defendants' violations of the New Jersey CFA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

644.    Plaintiffs and the Class are entitled to recover legal and/or equitable relief including an order enjoining the BMW Defendants' unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

**E.**     **Common Law and State Law Claims Against Ford**

**COUNT 20**

**Fraudulent Concealment**

645.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Ford Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Consumer Class under Michigan law, because Ford is headquartered in Michigan and Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

646.    Ford concealed and suppressed material facts regarding the Class Vehicles—most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

647.    Ford took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

648.    On information and belief, Ford has still not made full and adequate disclosure regarding the Inflator Defect that exists in the Class Vehicles, and continues to defraud and conceal material information from Plaintiffs and the Class.

649.    Ford had a duty to disclose the Inflator Defect because it:

        a.      Had exclusive and/or far superior knowledge and access to the facts, and Ford knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

        b.      Intentionally concealed the foregoing from Plaintiffs; and/or

> c.     Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

650.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiffs and Class Members trusted Ford not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

651.    Ford concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Ford and reasonably expected by consumers.

652.    Ford actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Ford money, and it did so at the expense of Plaintiffs and the Class.

653.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

654.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Ford's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Ford's conduct.

655.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Ford's fraudulent concealment.

656.    The value of all Class members' vehicles has diminished as a result of Ford's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

657.    Accordingly, Ford is liable to the Class for their damages in an amount to be proven at trial.

658.    Ford's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Ford.  Ford's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety,   warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 21

### Breach of Implied Warranty of Merchantability

659.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Ford Consumer Class against the Ford Defendants under the laws of Michigan, where Ford's United States operations are headquartered, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

660.    Ford is a merchant with respect to motor vehicles within the meaning of Mich. Comp. Laws § 440.2314(1).

661.    Under Mich. Comp. Laws § 440.2314, a warranty that the Class Vehicles, and by extension, the Defective Airbags, were in merchantable condition was implied by law in the transactions when Plaintiffs and the Class purchased their Class Vehicles.

662.    These Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect which causes,

among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

663.   On information and belief, Ford was provided notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Ford issued the recalls and the allegations of the Inflator Defect became public.

664.   As a direct and proximate result of Ford's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 22

### Unjust Enrichment

665.   Consumer Plaintiffs bring this claim on behalf of the Nationwide Ford Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.   In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Ford Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.   In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

666.   Ford has received and retained a benefit from the Plaintiffs and inequity has resulted.

667.   Ford benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

- 186 -

668.    It is inequitable for Ford to retain these benefits.

669.    Consumer Plaintiffs do not have an adequate remedy at law.

670.    As a result of Ford's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 23

**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws §§ 445.903, *et seq.***

671.    Consumer Plaintiffs bring this Claim on behalf of the Nationwide Ford Consumer Class under Michigan law, because Michigan has the most significant relationship to the facts and issues relevant to this claim.

672.    Consumer Plaintiffs are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

673.    At all relevant times hereto, the Ford Defendants were "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

674.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).  The Ford Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).  By failing to disclose and actively concealing the

dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them, the Ford Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

675.   In the course of their business, the Ford Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  The Ford Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

676.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008.

677.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by permitting the Class Vehicles to be marketed as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Ford Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA.  The Ford Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

678.   In the course of the Ford Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  The Ford Defendants compounded the deception by repeatedly

asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

679.    The Ford Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

680.    The Ford Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Consumer Plaintiffs.

681.    The Ford Defendants knew or should have known that their conduct violated the Michigan CPA.

682.    As alleged above, the Ford Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

683.    To protect their profits and to avoid remediation costs and a public relations nightmare, the Ford Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

684.    The Ford Defendants owed Consumer Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the Ford Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

685.    Because the Ford Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

686.    The Ford Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Consumer Plaintiffs. A vehicle containing components produced by a reputable manufacturer is worth more than an otherwise comparable vehicle containing critical safety components made by a disreputable manufacturer of unsafe products that conceals defects rather than promptly remedies them.

687.    Consumer Plaintiffs suffered ascertainable loss caused by the Ford Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and the Ford Defendants' complete disregard for safety, Consumer Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Consumer Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

688.    The Ford Defendants' violations present a continuing risk to Consumer Plaintiffs, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

689.    As a direct and proximate result of the Ford Defendants' violations of the Michigan CPA, Consumer Plaintiffs have suffered injury-in-fact and/or actual damage.

690.    Consumer Plaintiffs seek injunctive relief to enjoin the Ford Defendants from continuing their unfair and deceptive acts; monetary relief against the Ford Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory

damages in the amount of $250 for Plaintiffs Class member; (c) reasonable attorneys' fees; and (d) any other just and proper relief available under Mich. Comp. Laws § 445.911.

691.    Consumer Plaintiffs also seek punitive damages against the Ford Defendants because they carried out despicable conduct with willful and conscious disregard of the rights and safety of others.  The Ford Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or Defective Airbags installed in them, deceived Consumer Plaintiffs on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them.   The Ford Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 24

### Negligence

692.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Ford Consumer Class under Michigan law, because Michigan has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

693.    The Ford Defendants owed a duty of care to the Consumer Plaintiffs, who were foreseeable end users, to design and manufacture their vehicles so that they would not be defective or unreasonably dangerous to foreseeable end users, including Consumer Plaintiffs.

694.    The Ford Defendants breached their duty of care by, among other things:

a.      Negligently and recklessly equipping their vehicles with Defective Airbags;

b.      Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended;

c.      Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

e.      Negligently and recklessly concealing the nature and scope of the Inflator Defect.

695.    Ford's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Consumer Plaintiffs, as well as ongoing foreseeable damages that Consumer Plaintiffs continue to suffer to this day.

696.    As a direct, actual, and proximate result of Ford's misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages, which are continuing in nature, including:

a.      the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.      the continued exposure of Consumer Plaintiffs to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

697.    Defendant Ford's negligence is ongoing and continuing, because Ford continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

698.   In addition to damages, Consumer Plaintiffs seek injunctive relief to enjoin the Ford Defendants from continuing its negligence by continuing to install Defective Airbags in Class Vehicles.

## F.   Common Law and State Law Claims Against Mazda

### COUNT 25

### Fraudulent Concealment

699.   Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.   In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class under California law, because the Mazda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.   In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

700.   Mazda concealed and suppressed material facts regarding the Class Vehicles—most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

701.   Mazda took steps to ensure that its employees did not reveal known safety Inflator Defect to regulators or consumers.

702.   On information and belief, Mazda has still not made full and adequate disclosure regarding the Inflator Defect that exists in the Class Vehicles, and continues to defraud and conceal material information from Plaintiffs and the Class.

703.   Mazda had a duty to disclose the Inflator Defect because it:

- 193 -

a.      Had exclusive and/or far superior knowledge and access to the facts, and Mazda knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

704.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiffs and Class Members trusted Mazda not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

705.    Mazda concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Mazda and reasonably expected by consumers.

706.    Mazda actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Mazda money, and it did so at the expense of Plaintiffs and the Class.

707.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

708.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Mazda's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Mazda's conduct.

709.     Had they been aware of the Defective Airbags installed in their Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Mazda's fraudulent concealment.

710.     The value of all Class members' vehicles has diminished as a result of Mazda's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

711.     Accordingly, Mazda is liable to the Class for their damages in an amount to be proven at trial.

712.     Mazda's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Mazda.   Mazda's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety,  warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 26

### Violation Of Song-Beverly Consumer Warranty Act For Breach Of Implied Warranty Of Merchantability (California Lemon Law)

713.     Plaintiffs bring this claim on behalf of the Nationwide Mazda Class against the Mazda Defendants ("Mazda") under the laws of California, where their United States operations are headquartered.  In the alternative, if California law does not apply, it is brought under the laws of the states where Plaintiffs and Class Members reside.

714.     Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

715.     The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

716.    Mazda is a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

717.    Mazda impliedly warranted to Plaintiffs and the Class that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

718.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

719.    The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective Airbags containing the Inflator Defect which among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

720.    Because of the Inflator Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

721.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Inflator Defect. Mazda failed to warn about the dangerous safety Inflator Defect in the Class Vehicles.

722.    Mazda breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective Airbags containing the Inflator Defect which

among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether. These Defective Airbags have deprived Plaintiffs and the Class of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

723.    Notice of breach is not required because the Plaintiffs and the Class did not purchase their automobiles directly from Mazda.  Further, on information and belief, Mazda had notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Mazda issued the recalls and the allegations of the Inflator Defect became public.

724.    As a direct and proximate result of Mazda's breach of its duties under California's Lemon Law, Plaintiffs and the Class received goods whose dangerous condition substantially impairs their value. Plaintiffs and the Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

725.    Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

726.    Under Cal. Civ. Code § 1794, Plaintiffs and the Class are entitled to costs and attorneys' fees.

## COUNT 27

### Unjust Enrichment

727.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class under

California law, because the Mazda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

728. Mazda has received and retained a benefit from the Plaintiffs and inequity has resulted.

729. Mazda benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

730. It is inequitable for Mazda to retain these benefits.

731. Consumer Plaintiffs do not have an adequate remedy at law.

732. As a result of Mazda's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 28

### Violation of the California Unfair Competition Law
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

733. Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class against the Mazda Defendants ("Mazda") under the laws of California, because the Mazda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

734. Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ." Defendants engaged in conduct that violated each of this statute's three prongs.

735.     The Mazda Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

736.     The Mazda Defendants also violated the unlawful prong because it has engaged in violations of the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

737.     Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

738.     The Mazda Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the Inflator Defect or any of the other dangers or risks posed by the Defective Airbags within five days of determining the defect existed, and failing to recall all Class Vehicles.

739.     The Mazda Defendants violated the common-law claim of negligent failure to recall, in that the Mazda Defendants knew or should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; the Mazda Defendants became aware of the attendant risks after the Class Vehicles and/or the Defective Airbags installed in them were sold; the Mazda Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by it; and the Mazda Defendants failed to adequately recall them in a timely manner, which failure was a substantial factor in causing harm to Consumer Plaintiffs, including diminished value.

740.     The Mazda Defendants committed unfair business acts and practices in violation of § 17200 when it concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.   The Mazda

- 199 -

Defendants represented that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

741.    The Mazda Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with Defective Airbags installed in them.  As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for the Nationwide Consumer Class whose vehicles are in the process of being repaired.

742.    The Mazda Defendants violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

743.    The Mazda Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.  The Mazda Defendants' active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them are likely to mislead the public with regard to their true defective nature.

744.    The Mazda Defendants have violated the unfair prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices.  The Mazda Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to

purchase or lease Class Vehicles and/or the Defective Airbags installed in them and/or the price to be paid to purchase or lease them.

745.    Plaintiffs and the Class have suffered injuries in fact, including the loss of money or property, as a result of the Mazda Defendants' unfair, unlawful, and/or deceptive practices. As set forth above, each member of the Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of the Mazda Defendants with respect of the safety and reliability of the vehicles.  Had Plaintiffs and the Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

746.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Mazda Defendants' businesses.  The Mazda Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

747.    As a direct and proximate result of the Mazda Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

748.    Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin the Mazda Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

749.    Plaintiffs and Class Members also request equitable and injunctive relief in the form of Court supervision of the Mazda Defendants' numerous recalls of the various Class Vehicles and/or the Defective Airbags installed in them, to ensure that all affected vehicles are recalled and that the recalls properly and adequately cure the dangers and risks posed.

## COUNT 29

### Violation of the Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*

750.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class against the Mazda Defendants under laws of California, because the Mazda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

751.    The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

752.    Plaintiffs, the Class, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

753.    Plaintiffs and the Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

754.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

755.    The Mazda Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

756.    In the course of their business, the Mazda Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

757. The Mazda Defendants also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and omitting material facts in describing them. The Mazda Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA. The Mazda Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

758. Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. The Mazda Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

759. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, The Mazda Defendants engaged in unfair or deceptive business practices in violation of the CLRA. The Mazda Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

760. The Mazda Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

761. The Mazda Defendants knew or should have known that their conduct violated the CLRA.

762. As alleged above, the Mazda Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

763. To protect their profits and to avoid remediation costs and a public relations nightmare, the Mazda Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

764. The Mazda Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the Mazda Defendants:

  a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

  b.    Intentionally concealed the foregoing from Plaintiffs; and/or

  c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

765. The Class Vehicles and/or the Defective Airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs and the Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

766. The Mazda Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs and the Class, about the true safety and

reliability of the Class Vehicles and/or the Defective Airbags installed in them.  The Mazda Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class members.

767.    The Mazda Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

768.    Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

769.    Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

770.    Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include:  the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

771.    The manufacturer must also promptly inform NHTSA regarding:  the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty

claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

772.    The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000."  49 C.F.R. § 578.6(c).

773.    The Mazda Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.* by failing to disclose and by actively concealing dangers and risks posed by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

774.    The Mazda Defendants knew that the Class Vehicles and/or the Defective Airbags installed in them contained the Inflator Defect that could cause the airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, but the Mazda Defendants failed for many years to inform NHTSA of the Inflator Defect. Consequently, the public, including Plaintiffs and the Class, received no notice of the Inflator Defect.  The Mazda Defendants failed to inform NHTSA or warn the Plaintiffs, the Class, and the public about these inherent dangers, despite having a duty to do so.

775.    The Mazda Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Class members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

776.    Because the Mazda Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to Class Vehicles by the Mazda Defendants' conduct, they are now worth significantly less than they otherwise would be.

777.    The Mazda Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

778.    Plaintiffs and the Class suffered ascertainable loss caused by the Mazda Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and the Mazda Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of the Mazda Defendants' misconduct.

779.    Plaintiffs and the Class risk irreparable injury as a result of the Mazda Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the Class as well as to the general public.  The Mazda Defendants' unlawful acts and practices complained of herein affect the public interest.

780.    The recalls and repairs instituted by Defendants have not been adequate.  The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with Defective Airbags susceptible to the malfunctions described herein.  Moreover, the Mazda Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiffs and the Class.

781.    As a direct and proximate result of the Mazda Defendants' violations of the CLRA, Plaintiffs and Class members have suffered injury-in-fact and/or actual damage and, if not stopped, will continue to harm the Class.  Plaintiffs and Class members currently own or lease, or within the class period have owned or leased Class Vehicles with Defective Airbags installed in them that are defective and inherently unsafe.  Plaintiffs and the Class risk irreparable

injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the Class, as well as to the general public.

782.    Plaintiffs, on behalf of themselves and for all those similarly situated, demand judgment against the Mazda Defendants under the CLRA for an injunction requiring Defendants to adequately and permanently repair the Class Vehicles and/or the Defective Airbags installed in them, or provide a suitable alternative, free of charge, and an award of attorneys' fees pursuant to Civil Code § 1780(d).  Plaintiffs seek this injunctive relief for the Mazda Defendants' myriad violations of the CLRA, including Cal. Civ. Code §§ 1770(a)(5), (7), and (9).

783.    In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of California Civil Code § 1770(a) relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the California Sub-Class, and demand that Defendants correct or agree to correct the actions described therein.  If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 30

**Violation of the California False Advertising Law
Cal. Bus. & Prof. Code §§ 17500, *et seq.***

784.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class against the Mazda Defendants under the laws of California, because the Mazda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

785.    California Bus. & Prof. Code § 17500 states:  "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to

be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

786.    The Mazda Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Mazda Defendants, to be untrue and misleading to consumers, including Plaintiffs and the Class.

787.    The Mazda Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were material and likely to deceive a reasonable consumer.

788.    Plaintiffs and the Class have suffered an injury in fact, including the loss of money or property, as a result of the Mazda Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the Class relied on the misrepresentations and/or omissions of the Mazda Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  The Mazda Defendants' representations turned out not to be true because the Class Vehicles and/or the Defective Airbags installed in them are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.  Had Plaintiffs and the Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

789.     All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Mazda Defendants' business.  The Mazda Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

790.     Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 31

### Negligent Failure to Recall

791.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Mazda Consumer Class against the Mazda Defendants under the laws of California, because the Mazda Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, if it is found that the laws of California do not apply to the Nationwide Mazda Consumer Class's claim for negligent recall, Consumer Plaintiffs assert a negligence claim against Mazda under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles, and hereby incorporate the allegations pled in Count 8, as Mazda has breached the same duties that Takata has breached, and has proximately injured Plaintiffs in the same manner.

792.     The Mazda Defendants knew or reasonably should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

793.    The Mazda Defendants either knew of the dangers posed by the Class Vehicles and/or the Defective Airbags installed in them before they were sold, or became aware of them and their attendant risks after they were sold.

794.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. The Mazda Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

795.    The Mazda Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by the Class Vehicles and/or the Defective Airbags installed in them.  The Mazda Defendants failed to adequately recall them in a timely manner.

796.    Purchasers of the Class Vehicles, including Plaintiffs and the Class were harmed by Defendants' failure to adequately recall all the Class Vehicles and/or the Defective Airbags installed in them in a timely manner and have suffered damages, including, without limitation, damage to other components of the Class Vehicles caused by the Inflator Defect, the diminished value of the Class Vehicles, and the cost of modification of the dangerous and life-threatening Defective Airbags.

797.    The Mazda Defendants' failure to timely and adequately recall the Class Vehicles and/or the Defective Airbags installed in them was a substantial factor in causing the purchasers' harm, including that of Plaintiffs and the Class.

### G.    Common Law and State Law Claims Against Nissan

### COUNT 32

### Fraudulent Concealment

798.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Nissan Consumer Class against the Nissan Defendants under the common law of fraudulent

- 211 -

concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Nissan Consumer Class under Tennessee law, because Nissan's United States operations are headquartered in Tennessee and Tennessee has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

799.   Nissan concealed and suppressed material facts regarding the Class Vehicles—most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

800.   Nissan took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

801.   On information and belief, Nissan has still not made full and adequate disclosure regarding the Inflator Defect that exists in the Class Vehicles, and continues to defraud and conceal material information from Plaintiffs and the Class.

802.   Nissan had a duty to disclose the Inflator Defect because it:

a.     Had exclusive and/or far superior knowledge and access to the facts, and Nissan knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.     Intentionally concealed the foregoing from Plaintiffs; and/or

c.     Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

803.   These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because

they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiffs and Class Members trusted Nissan not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

804.    Nissan concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Nissan and reasonably expected by consumers.

805.    Nissan actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Nissan money, and it did so at the expense of Plaintiffs and the Class.

806.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

807.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Nissan's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Nissan's conduct.

808.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Nissan's fraudulent concealment.

809.    The value of all Class members' vehicles has diminished as a result of Nissan's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

810.    Accordingly, Nissan is liable to the Class for their damages in an amount to be proven at trial.

811.    Nissan's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Nissan.   Nissan's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety,  warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 33

### Breach of Implied Warranty

812.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Nissan Consumer Class against the Nissan Defendants under the laws of Tennessee, where their United States operations are headquartered, because Tennessee has the most significant relationship to the issues and facts relevant to this claim.

813.    Nissan is a merchant with respect to motor vehicles within the meaning of Tenn. Code Ann. § 47-2-314.

814.    A warranty that the Class Vehicles, and by extension, the Defective Airbags, were in merchantable condition was implied by law in the transactions when Plaintiffs and the Class purchased their Class Vehicles.

815.    The Class Vehicles, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used, because they are fitted with Defective Airbags containing the Inflator Defect which causes, among other things, the Defective Airbags to (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

816.    On information and belief, Nissan had notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the

consumers before or within a reasonable amount of time after Nissan issued the recalls and the allegations of the Inflator Defect became public.

817.   As a direct and proximate result of Nissan's breach of the implied warranty of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 34

### Unjust Enrichment

818.   Consumer Plaintiffs bring this claim on behalf of the Nationwide Nissan Consumer Class against the Nissan Defendants under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Nissan Consumer Class under Tennessee law, because Nissan's United States operations are headquartered in Tennessee and Tennessee has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

819.   Nissan has received and retained a benefit from the Plaintiffs and inequity has resulted.

820.   Nissan benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

821.   It is inequitable for Nissan to retain these benefits.

822.   Consumer Plaintiffs do not have an adequate remedy at law.

823.   As a result of Nissan's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

**COUNT 35**

**Violation of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-101, *et seq.***

824. Consumer Plaintiffs bring this claim on behalf of the Nationwide Nissan Consumer Class against the Nissan Defendants under the laws of Tennessee, where its United States Operations are headquartered, because Tennessee has the most significant relationship to the issues and facts relevant to this claim.

825. Plaintiffs and the Class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

826. Nissan Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2) (the "Act").

827. Nissan Defendants' conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

828. The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. The Nissan Defendants violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell or lease them as advertised.

829. In the course of their business, the Nissan Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing

- 216 -

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them.

830.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. The Nissan Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

831.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Nissan Defendants engaged in unfair or deceptive business practices in violation of the Tennessee CPA.  The Nissan Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

832.    In the course of the Nissan Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.   The Nissan Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

833.    The Nissan Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive

reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of the Nissan Defendants' brands, and the true value of the Class Vehicles.

834.    The Nissan Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

835.    The Nissan Defendants knew or should have known that their conduct violated the Tennessee CPA.

836.    As alleged above, the Nissan Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

837.    To protect their profits and to avoid remediation costs and a public relations nightmare, the Nissan Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

838.    The Nissan Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

839.    Because the Nissan Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative

publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

840.    The Nissan Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Class.   A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies it.

841.    Plaintiffs and the Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.   Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.   Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

842.    The Nissan Defendants' violations present a continuing risk to Plaintiffs, the Class, as well as to the general public.   The Nissan Defendants' unlawful acts and practices complained of herein affect the public interest.

843.    As a direct and proximate result of the Nissan Defendants' violations of the Tennessee CPA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

844.    Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs and the Class seek monetary relief against the Nissan Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

**H.**      **Common Law and State Law Claims Against Subaru**

**COUNT 36**

**Fraudulent Concealment**

845.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Subaru Consumer Class against the Subaru Defendants under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Subaru Consumer Class under New Jersey law, because Subaru's United States operations are headquartered in New Jersey and New Jersey has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

846.    Subaru concealed and suppressed material facts regarding the Class Vehicles— most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

847.    Subaru took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

848.    On information and belief, Subaru has still not made full and adequate disclosure regarding the Inflator Defect that exists in the Class Vehicles, and continues to defraud and conceal material information from Plaintiffs and the Class.

849.    Subaru had a duty to disclose the Inflator Defect because it:

a.      Had exclusive and/or far superior knowledge and access to the facts, and Subaru knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

- 220 -

c.      Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

850.    These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiffs and Class Members trusted Subaru not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

851.    Subaru concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Subaru and reasonably expected by consumers.

852.    Subaru actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Subaru money, and it did so at the expense of Plaintiffs and the Class.

853.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

854.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Subaru's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Subaru's conduct.

855.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Subaru's fraudulent concealment.

856.     The value of all Class members' vehicles has diminished as a result of Subaru's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

857.     Accordingly, Subaru is liable to the Class for their damages in an amount to be proven at trial.

858.     Subaru's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Subaru.   Subaru's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety,  warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 37

### Breach of Implied Warranty of Merchantability (N.J. Stat. Ann. § 12a:2-314)

859.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Subaru Consumer Class against the Subaru Defendants ("Subaru") under the laws of New Jersey, where their United States operations are headquartered, because New Jersey has the most significant relationship to the facts and issues relevant to this claim.

860.     Subaru is a merchant with respect to motor vehicles.

861.     When Plaintiffs and the Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles were in merchantable condition.

862.     At the time of sale and all times thereafter, the Class Vehicles were not merchantable and not fit for the ordinary purpose for which cars and airbags are used because they are equipped with Defective Airbags containing the Inflator Defect which causes, among other things, the Defective Airbags to (a) rupture and expel metal shrapnel that tears through the

airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

863.    On information and belief, Subaru had notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Subaru issued the recalls and the allegations of the Inflator Defect became public.

864.    As a direct and proximate result of Subaru's breach of the warranties of merchantability, Plaintiffs and the Class have been damaged in an amount to be proven at trial.

## COUNT 38

### Unjust Enrichment

865.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Subaru Consumer Class against the Subaru Defendants under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Subaru Consumer Class under New Jersey law, because Subaru's United States operations are headquartered in New Jersey and New Jersey has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

866.    Subaru has received and retained a benefit from the Plaintiffs and inequity has resulted.

867.    Subaru benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were

worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

868.    It is inequitable for Subaru to retain these benefits.

869.    Consumer Plaintiffs do not have an adequate remedy at law.

870.    As a result of Subaru's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 39

**Violation of the New Jersey Consumer Fraud Act,  N.J. Stat. Ann. §§ 56:8-1, *et seq.***

871.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Subaru Consumer Class against the Subaru Defendants under the laws of New Jersey, because their United States Operations are headquartered in New Jersey and New Jersey has the most significant relationship to the facts and issues relevant to this claim.

872.    Plaintiffs, the Class, and Defendants are or were "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

873.    The Subaru Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

874.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2.  The Subaru Defendants engaged in unconscionable or deceptive acts or practices that violated the

- 224 -

New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

875.    In the course of their business, the Subaru Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

876.    The Subaru Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them

877.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008.  The Subaru Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

878.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, the Subaru Defendants engaged in unfair or deceptive business practices in violation of the New Jersey CFA.  The Subaru Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

879. In the course of the Subaru Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. The Subaru Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

880. The Subaru Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of the Subaru Defendants' brands, and the true value of the Class Vehicles.

881. The Subaru Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the New Jersey Sub-Class.

882. The Subaru Defendants knew or should have known that their conduct violated the New Jersey CFA.

883. As alleged above, the Subaru Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

884. To protect their profits and to avoid remediation costs and a public relations nightmare, the Subaru Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

885.   The Subaru Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the Subaru Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

886.   Because the Subaru Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.   In light of the stigma attached to Class Vehicles by the Subaru Defendants' conduct, they are now worth significantly less than they otherwise would be.

887.   The Subaru Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the New Jersey Sub-Class.   A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies it.

888.   Plaintiffs and the Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.   Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.   Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

889.    The Subaru Defendants' violations present a continuing risk to Plaintiffs, the Class, as well as to the general public.  The Subaru Defendants' unlawful acts and practices complained of herein affect the public interest.

890.    As a direct and proximate result of the Subaru Defendants' violations of the New Jersey CFA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

891.    Plaintiffs and the Class are entitled to recover legal and/or equitable relief including an order enjoining the Subaru Defendants' unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

## I.        Common Law and State Law Claims Against Toyota

### COUNT 40

### Fraudulent Concealment

892.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class against the Toyota Defendants under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class under California law, because Toyota's United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

893.    Toyota concealed and suppressed material facts regarding the Class Vehicles— most importantly, the fact that they were equipped with Defective Airbags which, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

894.   Toyota took steps to ensure that its employees did not reveal the known safety Inflator Defect to regulators or consumers.

895.   On information and belief, Toyota has still not made full and adequate disclosure regarding the Inflator Defect that exists in the Class Vehicles, and continues to defraud and conceal material information from Plaintiffs and the Class.

896.   Toyota had a duty to disclose the Inflator Defect because it:

a.   Had exclusive and/or far superior knowledge and access to the facts, and Toyota knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

897.   These omitted and concealed facts were material because they would typically be relied on by a person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Indeed, Plaintiffs and Class Members trusted Toyota not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety.

898.   Toyota concealed and suppressed these material facts in order to falsely assure purchasers and consumers that its vehicles were capable of performing safely as represented by Toyota and reasonably expected by consumers.

899.   Toyota actively concealed and/or suppressed these material facts, in whole or in part, to protect its profits and avoid recalls that would hurt the brand's image and cost Toyota money, and it did so at the expense of Plaintiffs and the Class.

900.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed and/or suppressed facts.

901.    Because of the concealment and/or suppression of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Toyota's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Toyota's conduct.

902.    Had they been aware of the Defective Airbags installed in their Class Vehicles, and the company's callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Toyota's fraudulent concealment.

903.    The value of all Class members' vehicles has diminished as a result of Toyota's fraudulent concealment of the Defective Airbags and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

904.    Accordingly, Toyota is liable to the Class for their damages in an amount to be proven at trial.

905.    Toyota's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Toyota.  Toyota's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety,  warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 41

**Violation Of Song-Beverly Consumer Warranty Act For Breach Of Implied Warranty Of Merchantability (California Lemon Law)**

906.    Plaintiffs bring this claim on behalf of the Nationwide Toyota Class against the Toyota Defendants ("Toyota")  under the laws of California where their United States operations are headquartered, because California has the most significant relationship to the issues and facts relevant to this claim.

907.    Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

908.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

909.    Toyota is a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

910.    Toyota impliedly warranted to Plaintiffs and the Class that its Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

911.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)    Pass without objection in the trade under the contract description.

(2)    Are fit for the ordinary purposes for which such goods are used.

(3)    Are adequately contained, packaged, and labeled.

(4)    Conform to the promises or affirmations of fact made on the container or label.

912.    The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective Airbags containing the Inflator Defect, which among

- 231 -

other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

913.    Because of the Inflator Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

914.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Inflator Defect. Toyota failed to warn about the dangerous Inflator Defect in the Class Vehicles.

915.    Toyota breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective Airbags containing the Inflator Defect which among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether. These Defective Airbags have deprived Plaintiffs and the Class of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

916.    Notice of breach is not required because the Plaintiffs and the Class did not purchase their automobiles directly from Toyota.  Further, on information and belief, Toyota had notice of these issues by its knowledge of the issues, by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Toyota issued the recalls and the allegations of the Inflator Defect became public.

917.    As a direct and proximate result of Toyota's breach of its duties under California's Lemon Law, Plaintiffs and the Class received goods whose dangerous condition substantially impairs their value. Plaintiffs and the Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

918.     Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

919.     Under Cal. Civ. Code § 1794, Plaintiffs and the Class are entitled to costs and attorneys' fees.

## COUNT 42

### Unjust Enrichment

920.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class against the Toyota Defendants under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class under California law, because Toyota's United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles.

921.     Toyota has received and retained a benefit from the Plaintiffs and inequity has resulted.

922.     Toyota benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

923.     It is inequitable for Toyota to retain these benefits.

924.     Consumer Plaintiffs do not have an adequate remedy at law.

925.     As a result of Toyota's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## COUNT 43

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

926.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class against the Toyota Defendants ("Toyota") under the laws of California, because the Toyota Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

927.    Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ."  Defendants engaged in conduct that violated each of this statute's three prongs.

928.    The Toyota Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

929.    The Toyota Defendants also violated the unlawful prong because it has engaged in violations of the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

930.    Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

931.    The Toyota Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the Inflator Defect or any of the other dangers or risks posed by

the Defective Airbags within five days of determining the defect existed, and failing to recall all Class Vehicles.

932.    The Toyota Defendants violated the common-law claim of negligent failure to recall, in that the Toyota Defendants knew or should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; the Toyota Defendants became aware of the attendant risks after they were sold; the Toyota Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by it; and the Toyota Defendants failed to adequately recall them in a timely manner, which failure was a substantial factor in causing harm to Consumer Plaintiffs, including diminished value.

933.    The Toyota Defendants committed unfair business acts and practices in violation of § 17200 when it concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  The Toyota Defendants represented that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

934.    The Toyota Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with the Defective Airbags installed in them.  As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for the Nationwide Consumer Class whose vehicles are in the process of being repaired.

935.    The Toyota Defendants violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

936.    The Toyota Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect,

- 235 -

dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not. The Toyota Defendants' active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them are likely to mislead the public with regard to their true defective nature.

937.    The Toyota Defendants have violated the unfair prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. The Toyota Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the Defective Airbags installed in them and/or the price to be paid to purchase or lease them.

938.    Plaintiffs and the Class have suffered injuries in fact, including the loss of money or property, as a result of the Toyota Defendants' unfair, unlawful, and/or deceptive practices. As set forth above, each member of the Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of the Toyota Defendants with respect of the safety and reliability of the vehicles. Had Plaintiffs and the Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

939.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Toyota Defendants' businesses. The Toyota Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

940.    As a direct and proximate result of the Toyota Defendants' unfair and deceptive practices, Plaintiffs and the Class have suffered and will continue to suffer actual damages.

941.     Plaintiffs and the Class request that this Court enter such orders or judgments as may be necessary to enjoin the Toyota Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

942.     Plaintiffs and Class Members also request equitable and injunctive relief in the form of Court supervision of the Toyota Defendants' numerous recalls of the various Class Vehicles and/or the Defective Airbags installed in them, to ensure that all affected vehicles are recalled and that the recalls properly and adequately cure the dangers and risks posed.

<u>COUNT 44</u>

**Violation of the Consumer Legal Remedies Act**
**Cal. Civ. Code §§ 1750, *et seq.***

943.     Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class against the Toyota Defendants under the laws of California, because the Toyota Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

944.     The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

945.     Plaintiffs, the Class, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

946.     Plaintiffs and the Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

947.     California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

948.     The Toyota Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that the Class Vehicles and/or the Defective Airbags installed in them have

characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

949.   In the course of their business, the Toyota Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

950.   The Toyota Defendants also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and omitting material facts in describing them.  The Toyota Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA.  The Toyota Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

951.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. The Toyota Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

952.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, The Toyota Defendants engaged in unfair or deceptive business practices in violation of the CLRA.

The Toyota Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

953.    The Toyota Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class.

954.    The Toyota Defendants knew or should have known that their conduct violated the CLRA.

955.    As alleged above, the Toyota Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

956.    To protect their profits and to avoid remediation costs and a public relations nightmare, the Toyota Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

957.    The Toyota Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because the Toyota Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

958.    The Class Vehicles and/or the Takata airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs and the Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

959.    The Toyota Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs and the Class, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  The Toyota Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Class members.

960.    The Toyota Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or Defective Airbags installed in them, and remedying the Inflator Defect.

961.    Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

962.    Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

963.    Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include:  the manufacturer's name; the identification of the vehicles or equipment

containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

964.    The manufacturer must also promptly inform NHTSA regarding:  the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

965.    The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000."  49 C.F.R. § 578.6(c).

966.    The Toyota Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.* by failing to disclose and by actively concealing dangers and risks posed by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

967.    The Toyota Defendants knew that the Class Vehicles and/or the Defective Airbags installed in them contained the Inflator Defect that could cause the airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, but the Toyota Defendants failed for many years to inform NHTSA of this defect. Consequently, the public, including Plaintiffs and the Class, received no notice of the Inflator Defect.  The Toyota Defendants failed to inform NHTSA or warn the Plaintiffs, the Class, and the public about these inherent dangers, despite having a duty to do so.

968. The Toyota Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Class members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

969. Because the Toyota Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by the Toyota Defendants' conduct, they are now worth significantly less than they otherwise would be.

970. The Toyota Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

971. Plaintiffs and the Class suffered ascertainable loss caused by the Toyota Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and the Toyota Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of the Toyota Defendants' misconduct.

972. Plaintiffs and the Class risk irreparable injury as a result of the Toyota Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the Class as well as to the general public. The Toyota Defendants' unlawful acts and practices complained of herein affect the public interest.

973. The recalls and repairs instituted by Defendants have not been adequate. The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with the Defective Airbags susceptible to the malfunctions described herein. Moreover, the Toyota

Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiffs and the Class.

974.    As a direct and proximate result of the Toyota Defendants' violations of the CLRA, Plaintiffs and Class members have suffered injury-in-fact and/or actual damage and, if not stopped, will continue to harm the Class.  Plaintiffs and Class members currently own or lease, or within the class period have owned or leased Class Vehicles with the Defective Airbags installed in them that are defective and inherently unsafe.  Plaintiffs and the Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the Class, as well as to the general public.

975.    Plaintiffs, on behalf of themselves and for all those similarly situated, demand judgment against the Toyota Defendants under the CLRA for an injunction requiring Defendants to adequately and permanently repair the Class Vehicles and/or the Defective Airbags installed in them, or provide a suitable alternative, free of charge, and an award of attorneys' fees pursuant to Civil Code § 1780(d).  Plaintiffs seek this injunctive relief for the Toyota Defendants' myriad violations of the CLRA, including Cal. Civ. Code §§ 1770(a)(5), (7), and (9).

976.    In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of California Civil Code § 1770(a) relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the California Sub-Class, and demand that Defendants correct or agree to correct the actions described therein.  If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 45

**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

977.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class against the Toyota Defendants under the laws of California, because the Toyota Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.

978.    California Bus. & Prof. Code § 17500 states:   "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

979.    The Toyota Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to the Toyota Defendants, to be untrue and misleading to consumers, including Plaintiffs and the Class.

980.    The Toyota Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were material and likely to deceive a reasonable consumer.

981.    Plaintiffs and the Class have suffered an injury in fact, including the loss of money or property, as a result of the Toyota Defendants' unfair, unlawful, and/or deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the Class relied on the misrepresentations and/or omissions of the Toyota Defendants with respect to the safety and

reliability of the Class Vehicles and/or the Defective Airbags installed in them.  The Toyota Defendants' representations turned out not to be true because the Class Vehicles and/or the Defective Airbags installed in them are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.  Had Plaintiffs and the Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.  Accordingly, Plaintiffs and the other Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

982.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of the Toyota Defendants' business.  The Toyota Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

983.    Plaintiffs, individually and on behalf of the other Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 46

### Negligent Failure to Recall

984.    Consumer Plaintiffs bring this claim on behalf of the Nationwide Toyota Consumer Class against the Toyota Defendants under the laws of California, because the Toyota Defendants' United States operations are headquartered in California and California has the most significant relationship to the issues and facts relevant to this claim.  In the alternative, if it is found that the laws of California do not apply to the Nationwide Toyota Consumer Class's claim

for negligent recall, Consumer Plaintiffs assert a negligence claim against Toyota under the laws of the states where Plaintiffs and Class Members reside and/or purchased their Class Vehicles, and hereby incorporate the allegations pled in Count 8, as Toyota has breached the same duties that Takata has breached, and has proximately injured Plaintiffs in the same manner.

985.   The Toyota Defendants knew or reasonably should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

986.   The Toyota Defendants either knew of the dangers posed by the Class Vehicles and/or the Defective Airbags installed in them before they were sold, or became aware of them and their attendant risks after they were sold.

987.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. The Toyota Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

988.   The Toyota Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by the Class Vehicles and/or the Defective Airbags installed in them.  The Toyota Defendants failed to adequately recall them in a timely manner.

989.   Purchasers of the Class Vehicles, including Plaintiffs and the Class were harmed by Defendants' failure to adequately recall all the Class Vehicles and/or the Defective Airbags installed in them in a timely manner and have suffered damages, including, without limitation, damage to other components of the Class Vehicles caused by the Inflator Defect, the diminished value of the Class Vehicles, and the cost of modification of the dangerous and life-threatening Defective Airbags.

990.     The Toyota Defendants' failure to timely and adequately recall the Class Vehicles and/or the Defective Airbags installed in them was a substantial factor in causing the purchasers' harm, including that of Plaintiffs and the Class.

## II.      State Sub-Class Claims

### A.      Claims Brought on Behalf of the Florida Sub-Class

### COUNT 47

**Violation of the Florida Deceptive and Unfair Trade Practices Act**
**Fla. Stat. §§ 501.201, *et seq.***

991.     This claim is brought only on behalf of the Florida Consumer Sub-Class against Takata, Honda, BMW, Ford, Mazda, Nissan, Subaru, and Toyota.

992.     Plaintiffs are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

993.     Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

994.     FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce …" Fla. Stat. § 501.204(1).  Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

995.     In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

996.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

997.    Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

998.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

999.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1000.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1001. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Florida Sub-Class.

1002. Defendants knew or should have known that their conduct violated the FDUTPA.

1003. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1004. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1005. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1006. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1007. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Florida Sub-

Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1008.  Plaintiffs and the Florida Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1009.  Plaintiffs and the Florida Sub-Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, the Florida Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1010.  As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Sub-Class have suffered injury-in-fact and/or actual damage.

1011.  Plaintiffs and the Florida Sub-Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1).

1012.  Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## COUNT 48

### Breach of Implied Warranty of Merchantability
### Fla. Stat. § 672.314, *et seq.*

1013.  In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the Florida Consumer Sub-Class against Takata, Honda, BMW, Ford, Mazda, Nissan, Subaru, and Toyota.

1014.   Defendants are and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Fla. Stat. § 672.104(1).

1015.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Fla. Stat. § 672.314.

1016.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable or fit for the ordinary purpose for which cars are used.   Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

1017.   Plaintiffs and the Florida Consumer Sub-Class, at all relevant times, were intended third-party beneficiaries of:   (a) Takata's sale of the Defective Airbags to the Vehicle Manufacturer Defendants, and (b) the Vehicle Manufacturer Defendants' sale of vehicles containing the Defective Airbags to Plaintiffs and the Florida Consumer Sub-Class.

1018.   Defendants were provided notice of these issues by their knowledge of the issues, prior complaints filed against them and/or others, and internal investigations.

1019.   As a direct and proximate result of Defendants' breach of the warranties of merchantability and fitness for a particular purpose, Plaintiffs and the Florida Sub-Class have been damaged in an amount to be proven at trial.

### B.   Claims Brought on Behalf of the Alabama Sub-Class

### COUNT 49

**Violation of the Alabama Deceptive Trade Practices Act**
**Ala. Code §§ 8-19-1, *et seq.***

1020.   This claim is brought only on behalf of the Alabama Consumer Sub-Class against Takata, Honda, BMW, Mazda, Subaru, and Toyota.

1021.   Plaintiffs and the Alabama Sub-Class are "consumers" within the meaning of Ala. Code § 8-19-3(2).

1022.   Plaintiffs, the Alabama Sub-Class, and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

1023.   The Class Vehicles and/or the Defective Airbags installed in them are "goods" within the meaning of Ala. Code. § 8-19-3(3).

1024.   Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

1025.   The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

1026.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Alabama DTPA, including: representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

1027.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission

of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1028.  Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1029.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Alabama DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1030.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1031.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1032.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Alabama Sub-Class.

1033.  Defendants knew or should have known that their conduct violated the Alabama DTPA.

1034.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1035.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1036.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants: Possessed exclusive knowledge of the dangers and risks posed by the foregoing;  Intentionally concealed the foregoing from Plaintiffs; and/or Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1037.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1038.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Alabama Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an

otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

1039.  Plaintiffs and the Alabama Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1040.  Defendants' violations present a continuing risk to Plaintiffs, the Alabama Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1041.  As a direct and proximate result of Defendants' violations of the Alabama DTPA, Plaintiffs and the Alabama Sub-Class have suffered injury-in-fact and/or actual damage.

1042.  Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Sub-Class member.

1043.  Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala. Code § 8-19-1, *et seq.*

1044.  In accordance with Ala. Code § 8-19-10(e), Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of the Alabama DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Alabama Sub-Class, and demand that Defendants correct or agree to correct the actions described therein.  If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

C.      **Claims Brought on Behalf of the Arizona Sub-Class**

**COUNT 50**

**Violation of the Consumer Fraud Act**
**Ariz. Rev. Stat. §§ 44-1521, *et seq.***

1045.   This claim is brought only on behalf of the Arizona Consumer Sub-Class against Takata and Honda.

1046.   Plaintiffs, the Arizona Sub-Class, and Defendants are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

1047.   The Class Vehicles and/or the Defective Airbags installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

1048.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice."  Ariz. Rev. Stat. § 44-1522(A).

1049.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1050.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1051.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags

in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1052.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Arizona CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1053.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1054.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1055.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Arizona Sub-Class.

1056.   Defendants knew or should have known that their conduct violated the Arizona CFA.

1057.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1058.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1059.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.      Intentionally concealed the foregoing from Plaintiffs; and/or

    c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1060.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1061.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Arizona Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an

otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

1062. Plaintiffs and the Arizona Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1063. Defendants' violations present a continuing risk to Plaintiffs, the Arizona Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1064. As a direct and proximate result of Defendants' violations of the Arizona CFA,

1065. Plaintiffs and the Arizona Sub-Class have suffered injury-in-fact and/or actual damage.

1066. Plaintiffs and the Arizona Sub-Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs and the Arizona Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

1067. Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

### D. Claims Brought on Behalf of the California Sub-Class

### COUNT 51

**Violation of the California Unfair Competition Law**
**Cal. Bus. & Prof. Code §§ 17200, *et seq.***

1068. This claim is brought only on behalf of the California Consumer Sub-Class against Takata, Honda, BMW, and Nissan.

1069.  Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ."  Defendants engaged in conduct that violated each of this statute's three prongs.

1070.  Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth above, by the acts and practices set forth in this Complaint.

1071.  Defendants also violated the unlawful prong because it has engaged in violations of the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

1072.  Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

1073.  Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the Inflator Defect or any of the other dangers or risks posed by the Defective Airbags within five days of determining the defect existed, and failing to recall all Class Vehicles.

1074.  Defendants violated the common-law claim of negligent failure to recall, in that Defendants knew or should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; Defendants became aware of the attendant risks after they were sold; Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by them; and Defendants failed to adequately recall them in a timely manner, which failure was a substantial factor in causing harm to Plaintiffs and the California Sub-Class, including diminished value and out-of-pocket costs.

1075.   Defendants committed unfair business acts and practices in violation of § 17200 when it concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  Defendants represented that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

1076.   Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with the Defective Airbags installed in them. As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for the California Class whose vehicles are in the process of being repaired.

1077.   Defendants violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

1078.   Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.  Defendants' active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them are likely to mislead the public with regard to their true defective nature.

1079.   Defendants have violated the unfair prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they cause to

consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the California Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the Defective Airbags installed in them and/or the price to be paid to purchase or lease them.

1080.  Plaintiffs and the California Sub-Class have suffered injuries in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. As set forth above, each member of the California Sub-Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of Defendants with respect of the safety and reliability of the vehicles.  Had Plaintiffs and the California Sub-Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

1081.  All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

1082.  As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the California Sub-Class have suffered and will continue to suffer actual damages.

1083.  Plaintiffs and the California Sub-Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

1084.  Plaintiffs and Class Members also request equitable and injunctive relief in the form of Court supervision of Defendants' numerous recalls of the various Class Vehicles and/or the Defective Airbags installed in them, to ensure that all affected vehicles are recalled and that the recalls properly and adequately cure the dangers and risks posed.

## COUNT 52

### Violation of the Consumer Legal Remedies Act
### Cal. Civ. Code §§ 1750, *et seq.*

1085.   This claim is brought only on behalf of the California Consumer Sub-Class against Takata, Honda, BMW, and Nissan.

1086.   The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

1087.   Plaintiffs, the California Sub-Class, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

1088.   Plaintiffs and the California Sub-Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

1089.   California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

1090.   Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

1091.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

1092.   Defendants also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and

qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and omitting material facts in describing them.  Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA. Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

1093.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1094.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the CLRA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1095.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the California Sub-Class.

1096.   Defendants knew or should have known that their conduct violated the CLRA.

1097.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1098.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1099.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.      Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1100.   The Class Vehicles and/or the Defective Airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs and the California Sub-Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1101.   Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs and the California Sub-Class, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective

Airbags installed in them with an intent to mislead Plaintiffs and the California Sub-Class Members.

1102.   Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

1103.   Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

1104.   Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

1105.   Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include:   the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

1106.   The manufacturer must also promptly inform NHTSA regarding:   the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

1107.   The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000."  49 C.F.R. § 578.6(c).

1108.   Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.* by failing to disclose and by actively concealing dangers and risks posed by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

1109.   Defendants knew that the Class Vehicles and/or the Defective Airbags installed in them contained the Inflator Defect that could cause the airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, but Defendants failed for many years to inform NHTSA of this defect.  Consequently, the public, including Plaintiffs and the California Sub-Class, received no notice of the Inflator Defect. Defendants failed to inform NHTSA or warn the Plaintiffs, the California Sub-Class, and the public about these inherent dangers, despite having a duty to do so.

1110.   Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the California Sub-Class Members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

1111.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1112.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the California

Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1113.  Plaintiffs and the California Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1114.  Plaintiffs and the California Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the California Sub-Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1115.  The recalls and repairs instituted by Defendants have not been adequate.  The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with Defective Airbags susceptible to the malfunctions described herein.  Moreover, Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiffs and the California Sub-Class.

1116.  As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and Class Members have suffered injury-in-fact and/or actual damage and, if not stopped, will continue to harm the California Sub-Class.  Plaintiffs and Class Members currently own or lease, or within the class period have owned or leased Class Vehicles with Defective Airbags installed in them that are defective and inherently unsafe.  Plaintiffs and the California Sub-Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the California Sub-Class, as well as to the general public.

1117.  Plaintiffs, on behalf of themselves and for all those similarly situated, demand judgment against Defendants under the CLRA for an injunction requiring Defendants to adequately and permanently repair the Class Vehicles and/or the Defective Airbags installed in them, or provide a suitable alternative, free of charge, and an award of attorneys' fees pursuant to Civil Code § 1780(d).  Plaintiffs seek this injunctive relief for Defendants' myriad violations of the CLRA, including Cal. Civ. Code §§ 1770(a)(5), (7), and (9).

1118.  In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of California Civil Code § 1770(a) relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the California Sub-Class, and demand that Defendants correct or agree to correct the actions described therein.  If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 53

**Violation of the California False Advertising Law**
**Cal. Bus. & Prof. Code §§ 17500, *et seq.***

1119.  This claim is brought only on behalf of the California Consumer Sub-Class against Takata, Honda, BMW, and Nissan.

1120.  California Bus. & Prof. Code § 17500 states:   "It is unlawful for any … corporation … with intent directly or indirectly to dispose of real or personal property … to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated … from this state before the public in any state, in any newspaper or other publication, or any advertising device, … or in any other manner or means whatever, including over the Internet, any statement … which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

1121.   Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the California Sub-Class.

1122.   Defendants have violated § 17500 because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were material and likely to deceive a reasonable consumer.

1123.   Plaintiffs and California Sub-Class have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. In purchasing or leasing their Class Vehicles, Plaintiffs and the California Sub-Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.   Defendants' representations turned out not to be true because the Class Vehicles and/or the Defective Airbags installed in them are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.   Had Plaintiffs and the California Sub-Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.   Accordingly, Plaintiffs and the other California Sub-Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

1124.   All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.   Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

1125.   Plaintiffs, individually and on behalf of the other California Sub-Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the California Sub-Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

## COUNT 54

### Violation of the Song-Beverly Consumer Warranty Act for Breach of the Implied Warranty of Merchantability
### Cal. Civ. Code §§ 1791.1 & 1792

1126.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the California Consumer Sub-Class against Takata, Honda, BMW, and Nissan.

1127.   Plaintiffs and members of the California Sub-Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

1128.   The Class Vehicles and/or the Defective Airbags installed in them are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

1129.   Defendants are all considered a "manufacturer" within the meaning of Cal. Civ. Code § 1791(j).

1130.   Defendants impliedly warranted to Plaintiffs and the California Sub-Class that the Class Vehicles and/or the Defective Airbags installed in them were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) & 1792, however, they do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

1131.   Cal. Civ. Code § 1791.1(a) states:
"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

1)  Pass without objection in the trade under the contract description.

2) Are fit for the ordinary purposes for which such goods are used.

3) Are adequately contained, packaged, and labeled.

4) Conform to the promises or affirmations of fact made on the container or label.

1132.  The Class Vehicles and/or the Defective Airbags installed in them would not pass without objection in the automotive trade because Defective Airbags containing the Inflator Defect, among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.

1133.  Because of the Inflator Defect, the Class Vehicles are not safe to drive and thus not fit for ordinary purposes.

1134.  The Class Vehicles and/or the Defective Airbags installed in them are not adequately labeled because the labeling fails to disclose the Inflator Defect in them.  Defendants failed to warn about the dangerous Inflator Defect in the Class Vehicles.

1135.  Defendants breached the implied warranty of merchantability by manufacturing and selling the Class Vehicles and/or the Defective Airbags installed in them which among other things, (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether.  These Defective Airbags have deprived Plaintiffs and the California Sub-Class of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

1136.  Notice of breach is not required because the Plaintiffs and the California Sub-Class did not purchase their automobiles directly from Defendants.  Further, on information and belief, Defendants had notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a

reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1137.  As a direct and proximate result of Defendants' breach of their duties under California's Lemon Law, Plaintiffs and the California Sub-Class received goods whose dangerous condition substantially impairs their value. Plaintiffs and the California Sub-Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

1138.  Under Cal. Civ. Code §§ 1791.1(d) & 1794, Plaintiffs and the California Sub-Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

1139.  Pursuant to Cal. Civ. Code § 1794, Plaintiffs and the California Sub-Class are entitled to costs and attorneys' fees.

## COUNT 55

### Negligent Failure to Recall

1140.  This claim is brought only on behalf of the California Consumer Sub-Class against Takata, Honda, BMW, and Nissan.

1141.  Defendants knew or reasonably should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner.

1142.  Defendants either knew of the dangers posed by the Class Vehicles and/or the Defective Airbags installed in them before they were sold, or became aware of them and their attendant risks after they were sold.

1143.  Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or

- 273 -

should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1144. Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by the Class Vehicles and/or the Defective Airbags installed in them. Defendants failed to adequately recall them in a timely manner.

1145. Purchasers of the Class Vehicles, including Plaintiffs and the California Sub-Class were harmed by Defendants' failure to adequately recall all the Class Vehicles and/or the Defective Airbags installed in them in a timely manner and have suffered damages, including, without limitation, damage to other components of the Class Vehicles caused by the Inflator Defect, the diminished value of the Class Vehicles, the cost of modification of the dangerous and life-threatening Defective Airbags, and the costs associated with the loss of use of the Class Vehicles.

1146. Defendants' failure to timely and adequately recall the Class Vehicles and/or the Defective Airbags installed in them was a substantial factor in causing the purchasers' harm, including that of Plaintiffs and the California Sub-Class.

### E.    Claims Brought on Behalf of the Colorado Sub-Class

### COUNT 56

**Violation of the Colorado Consumer Protection Act**
**Colo. Rev. Stat. §§ 6-1-101, *et seq.***

1147. This claim is brought on behalf of Colorado Consumer Sub-Class against Takata and BMW.

1148. Defendants are "persons" under § 6-1-102(6) of the Colorado Consumer Protection Act ("Colorado CPA"), Col. Rev. Stat. § 6-1-101, *et seq.*

1149.   Plaintiffs and Colorado Sub-Class members are "consumers" for purposes of Col. Rev. Stat. § 6-1-113(1)(a) who purchased or leased one or more Class Vehicles with the Defective Airbags installed in them.

1150.   The Colorado CPA prohibits deceptive trade practices in the course of a person's business. Defendants engaged in deceptive trade practices prohibited by the Colorado CPA, including: (1) knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles that had the capacity or tendency to deceive Colorado Sub-Class members; (2) representing that the Class Vehicles are of a particular standard, quality, and grade even though Defendants knew or should have known they are not; (3) advertising the Class Vehicles and/or the Defective Airbags installed in them with the intent not to sell or lease them as advertised; and (4) failing to disclose material information concerning the Class Vehicles and/or the Defective Airbags installed in them that was known to Defendants at the time of advertisement or sale with the intent to induce Colorado Sub-Class members to purchase, lease or retain the Class Vehicles and/or the Defective Airbags installed in them.

1151.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1152.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1153.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or

- 275 -

should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1154. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Colorado CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1155. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1156. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1157. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Colorado Sub-Class.

1158. Defendants knew or should have known that their conduct violated the Colorado CPA.

1159.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1160.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1161.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1162.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1163.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Colorado Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1164.   Plaintiffs and the Colorado Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1165.   Plaintiffs and Colorado Sub-Class members risk irreparable injury as a result of Defendants' act and omissions in violation of the Colorado CPA, and these violations present a continuing risk to Plaintiffs, the Colorado Sub-Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1166.   As a direct and proximate result of Defendants' violations of the Colorado CPA, Plaintiffs and the Colorado Sub-Class have suffered injury-in-fact and/or actual damage.

1167.   Pursuant to Colo. Rev. Stat. § 6-1-113, Plaintiffs individually and on behalf of the Colorado Sub-Class, seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and discretionary trebling of such damages, or (b) statutory damages in the amount of $500 for each Plaintiff and each Colorado Sub-Class member.

1168.   Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the Colorado CPA.

**COUNT 57**

**Breach of the Implied Warranty of Merchantability**
**Colo. Rev. Stat. § 4-2-314**

1169.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of Colorado Consumer Sub-Class against Takata and BMW.

1170.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Colo. Rev. Stat. § 4-2-314.

1171.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Colo. Rev. Stat. § 4-2-314.

1172.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1173.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1174.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Colorado Sub-Class have been damaged in an amount to be proven at trial.

**F.**  **Claims Brought on Behalf of the Connecticut Sub-Class**

**COUNT 58**

**Violation of the Connecticut Unlawful Trade Practices Act**
**Conn. Gen. Stat. §§ 42-110A,** *et. seq.*

1175.   This claim is brought on behalf of the Connecticut Consumer Sub-Class against Takata and Honda.

1176.   The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

1177.   Plaintiffs, the Connecticut Sub-Class, and Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3).   Defendants are in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

1178.   Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1179.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1180.   Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.   Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them.

1181.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Connecticut UTPA.   Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1182.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1183.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1184.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or Defective Airbags installed in them with an intent to mislead Plaintiffs and the Connecticut Sub-Class.

1185.   Defendants knew or should have known that their conduct violated the Connecticut UTPA.

1186.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1187.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1188.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.      Intentionally concealed the foregoing from Plaintiffs; and/or

    c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1189.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1190.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Connecticut Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

1191.  Plaintiffs and the Connecticut Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1192.  Defendants' violations present a continuing risk to Plaintiffs, the Connecticut Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1193.   As a direct and proximate result of Defendants' violations of the Connecticut UTPA, Plaintiffs and the Connecticut Sub-Class have suffered injury-in-fact and/or actual damages.

1194.   Plaintiffs and the Connecticut Sub-Class are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

1195.   Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

### G.      Claims Brought on Behalf of the Georgia Sub-Class

### COUNT 59

**Violation of the Georgia Fair Business Practices Act**
**Ga. Code Ann. §§ 10-1-390, *et seq.***

1196.   This claim is brought only on behalf of the Georgia Consumer Sub-Class against Takata and Honda.

1197.   Plaintiffs and the Georgia Sub-Class are "consumers" within the meaning of Ga. Code Ann. §§ 10-1-392(6).

1198.   Plaintiffs, the Georgia Sub-Class, and Defendants are "persons" within the meaning Ga. Code Ann. §§ 10-1-392(24).

1199.   Defendants were and are engaged in "trade" and "commerce" within the meaning of Ga. Code Ann. §§ 10-1-392(28).

1200.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and

"[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

1201.   By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in unfair or deceptive practices prohibited by the FBPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them  have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised. Defendants participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

1202.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1203.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1204.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1205.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia FBPA.

Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1206.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1207.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1208.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Georgia Sub-Class.

1209.   Defendants knew or should have known that their conduct violated the Georgia FBPA.

1210.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1211.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting

new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1212.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.      Intentionally concealed the foregoing from Plaintiffs; and/or

        c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1213.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1214.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Georgia Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1215.  Plaintiffs and the Georgia Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1216.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1217.  As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs and the Georgia Sub-Class have suffered injury-in-fact and/or actual damage.

1218.  Plaintiff and the Georgia Sub-Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

1219.  Plaintiffs also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

1220.  In accordance with Ga. Code Ann. § 10-1-399(b), Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of the Georgia FBPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Georgia Sub-Class, and demand that Defendants correct or agree to correct the actions described therein.  If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 60

**Violation of the Georgia Uniform Deceptive Trade Practices Act
Ga. Code Ann. §§ 10-1-370, *et seq.***

1221.  This claim is brought on behalf of Georgia Consumer Sub-Class against Takata and Honda.

1222.  Plaintiffs, the Georgia Sub-Class, and Defendants are "persons" within the meaning of Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

1223.  The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive trade practices prohibited by the Georgia UDTPA.

1224.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1225.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1226.  Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1227.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia UDTPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants

- 288 -

from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1228. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1229. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1230. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Georgia Sub-Class.

1231. Defendants knew or should have known that their conduct violated the Georgia UDTPA.

1232. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1233. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1234.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.     Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1235.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1236.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Georgia Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1237.  Plaintiffs and the Georgia Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1238.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1239.   As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Plaintiffs and the Georgia Sub-Class have suffered injury-in-fact and/or actual damage.

1240.   Plaintiffs seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

### H.        Claims Brought on Behalf of the Hawaii Sub-Class

### COUNT 61

**Unfair and Deceptive Acts in Violation of Hawaii Law
Haw. Rev. Stat. §§ 480, *et seq.***

1241.   This claim is brought only on behalf of the Hawaii Consumer Sub-Class against Takata and Honda.

1242.   Defendants are "persons" under Haw. Rev. Stat. § 480-1.

1243.   Plaintiffs and the Hawaii Sub-Class are "consumer[s]" as defined by Haw. Rev. Stat. § 480-1, who purchased or leased one or more Class Vehicles with the Defective Airbags installed in them.

1244.   Defendants' acts or practices as set forth above occurred in the conduct of trade or commerce.

1245.   The Hawaii Act § 480-2(a) prohibits "unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce.…" By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in unfair and deceptive trade practices prohibited by the Hawaii Act.

1246.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing

deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1247.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1248.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Hawaii Act. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1249.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1250.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the

Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1251.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Hawaii Sub-Class.

1252.   Defendants knew or should have known that their conduct violated the Hawaii Act.

1253.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1254.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1255.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1256.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1257.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Hawaii Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1258.  Plaintiffs and the Hawaii Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1259.  Defendants' violations present a continuing risk to Plaintiffs, the Hawaii Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1260.  As a direct and proximate result of Defendants' violations of the Hawaii Act, Plaintiffs and the Hawaii Sub-Class have suffered injury-in-fact and/or actual damage.

1261.  Pursuant to Haw. Rev. Stat. § 480-13, Plaintiffs and the Hawaii Sub-Class seek monetary relief against Defendants measured as the greater of (a) $1,000 and (b) threefold actual damages in an amount to be determined at trial.

1262.  Under Haw. Rev. Stat. § 480-13.5, Plaintiffs seek an additional award against Defendants of up to $10,000 for each violation directed at a Hawaiian elder.  Defendants knew or should have known that their conduct was directed to one or more Class members who are elders. Defendants' conduct caused one or more of these elders to suffer a substantial loss of property set aside for retirement or for personal or family care and maintenance, or assets essential to the health or welfare of the elder.  One or more Hawaii Sub-Class members who are

elders are substantially more vulnerable to Defendants' conduct because of age, poor health or infirmity, impaired understanding, restricted mobility, or disability, and each of them suffered substantial physical, emotional, or economic damage resulting from Defendants' conduct.

## COUNT 62

### Breach of the Implied Warranty of Merchantability
### Haw. Rev. Stat. §490:2-314

1263.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Hawaii Consumer Sub-Class against Takata and Honda.

1264.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Haw. Rev. Stat. § 490:2-104(1).

1265.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Haw. Rev. Stat. § 490:2-314.

1266.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1267.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1268. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Hawaii Sub-Class have been damaged in an amount to be proven at trial.

**I.        Claims Brought on Behalf of the Illinois Sub-Class**

**COUNT 63**

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act**
**815 ILCS 505/1, *et seq.***

1269. This claim is brought on behalf of the Illinois Consumer Sub-Class against Takata, Honda, and BMW.

1270. Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

1271. Plaintiff and the Illinois Sub-Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

1272. The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

1273. Defendants participated in misleading, false, or deceptive acts that violated the Illinois CFA. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Illinois CFA.

1274. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

- 296 -

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1275.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1276.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1277.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Illinois CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1278.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1279.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to

- 297 -

create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1280.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Illinois Sub-Class.

1281.  Defendants knew or should have known that their conduct violated the Illinois CFA.

1282.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1283.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1284.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1285.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the

Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1286.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Illinois Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1287.  Plaintiffs and the Illinois Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1288.  Defendants' violations present a continuing risk to Plaintiffs as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1289.  As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Illinois Sub-Class have suffered injury-in-fact and/or actual damage.

1290.  Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Sub-Class seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

1291.  Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS § 505/1 *et seq.*

## COUNT 64

**Violation of the Illinois Uniform Deceptive Trade Practices Act**
**815 ILCS 510/1, *et seq.***

1292.   This claim is brought on behalf of the Illinois Consumer Sub-Class against Takata, Honda, and BMW.

1293.   Illinois's Uniform Deceptive Trade Practices Act ("Illinois UDTPA"), 815 ILCS 510/2, prohibits deceptive trade practices, including among others, "(2) caus[ing] likelihood of confusion or of misunderstanding as to the source, sponsorship, approval, or certification of goods or services; … (5) represent[ing] that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have …; (7) represent[ing] that goods or services are of a particular standard, quality, or grade … if they are of another; … (9) advertis[ing] goods or services with intent not to sell them as advertised; … [and] (12) engag[ing] in any other conduct which similarly creates a likelihood of confusion or misunderstanding."

1294.   Defendants are "persons" as defined in 815 ILCS 510/1(5).

1295.   In the course of Defendants' business, Defendants failed to disclose and actively concealed the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them as described above.   Accordingly, Defendants engaged in deceptive trade practices as defined in 815 ILCS 510/2, including representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and otherwise engaging in conduct likely to deceive.

1296.   Defendants intended for Plaintiff and the Illinois Sub-Class to rely on their aforementioned unfair and deceptive acts and practices, including the misrepresentations and omissions alleged hereinabove.

1297.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

1298.   Defendants' conduct proximately caused injuries to Plaintiff and the Illinois Sub-Class.

1299.   Plaintiff and the Illinois Sub-Class were injured as a result of Defendants' conduct in that Plaintiff and the Illinois Sub-Class overpaid for their Class Vehicles and did not receive the benefit of their bargain, and their Class Vehicles have suffered a diminution in value.  These injuries are the direct and natural consequence of Defendants' misrepresentations and omissions.

1300.   Plaintiffs seek an order enjoining Defendants' deceptive practices, attorneys' fees, and any other just and proper relief available under the Illinois UDTPA per 815 ILCS 510/3.

## J.      Claims Brought on Behalf of the Indiana Sub-Class

### COUNT 65

**Violation of the Indiana Deceptive Consumer Sales Act**
**Ind. Code §§ 24-5-0.5-3**

1301.   This claim is brought only on behalf of the Indiana Consumer Sub-Class against Takata and Honda.

1302.   Defendants are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2) and "suppliers" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

1303.   Plaintiffs' and Indiana Sub-Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

1304.   Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or

should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

1305.   Defendants participated in misleading, false, or deceptive acts that violated the Indiana DCSA,  by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  Defendants also engaged in unlawful trade practices by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard and quality when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct likely to deceive.

1306.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

1307.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1308.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1309.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Indiana DCSA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1310.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1311.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1312.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Indiana Sub-Class.

1313.   Defendants knew or should have known that their conduct violated the Indiana DCSA.

1314.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1315.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1316.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.    Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1317.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1318. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Indiana Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1319. Plaintiffs and the Indiana Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1320. Defendants' violations present a continuing risk to Plaintiffs, to the Indiana Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1321. As a direct and proximate result of Defendants' violations of the Indiana DCSA, Plaintiffs and the Indiana Sub-Class have suffered injury-in-fact and/or actual damage.

1322. Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and the Indiana Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana Sub-Class member, including treble damages up to $1,000 for Defendants' willfully deceptive acts.

1323. Plaintiffs also seek punitive damages based on the outrageousness and recklessness of Defendants' conduct and Defendants' high net worth.

1324. In accordance with IND. CODE § 24-5-0.5-5(a), Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their "curable" alleged violations of the Indiana DCSA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Indiana Sub-Class, and demand that Defendants correct or agree to correct the

actions described therein. If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled. Plaintiffs presently seek full relief for Defendants' "incurable" acts.

## COUNT 66

### Breach of the Implied Warranty of Merchantability
### Ind. Code § 26-1-2-314

1325.  In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Indiana Consumer Sub-Class against Takata and Honda.

1326.  Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Ind. Code § 26-1-2-104(1).

1327.  A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Ind. Code § 26-1-2-314.

1328.  The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1329.  Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1330.  As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs' and the Indiana Sub-Class have been damaged in an amount to be proven at trial.

### K.  Claims Brought on Behalf of the Louisiana Sub-Class

### COUNT 67

**Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law**
**La. Rev. Stat. §§ 51:1401, *et seq.***

1331.  This claim is brought only on behalf of the Louisiana Consumer Sub-Class against Takata and Honda.

1332.  Plaintiffs, the Louisiana Consumer Sub-Class, and Defendants are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

1333.  Plaintiffs and the Louisiana Consumer Sub-Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

1334.  Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

1335.  The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).  Defendants both participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Louisiana CPL.

1336.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1337.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.

1338.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Louisiana CPL. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1339.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1340.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1341.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Louisiana Sub-Class.

1342.  Defendants knew or should have known that their conduct violated the Louisiana CPL.

1343.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1344.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1345.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1346.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1347.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Louisiana Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1348.  Plaintiffs and the Louisiana Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1349.  Defendants' violations present a continuing risk to Plaintiffs, the Louisiana Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1350.  As a direct and proximate result of Defendants' violations of the Louisiana CPL, Plaintiffs and the Louisiana Sub-Class have suffered injury-in-fact and/or actual damage.

1351.  Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana Sub-Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

## COUNT 68

### Breach of the Implied Warranty of Merchantability/Warranty
### Against Redhibitory Defects
### La. Civ. Code Art. 2520, 2524

1352.  In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Louisiana Consumer Sub-Class against Takata and Honda.

1353.  At the time Plaintiffs and the Louisiana Sub-Class acquired their Class Vehicles, those vehicles had a redhibitory defect within the meaning of La. Civ. Code Art. 2520, in that (a) the Class Vehicles and/or the Defective Airbags installed in them were rendered so inconvenient that Plaintiffs either would not have purchased the Class Vehicles had they known of the Inflator Defect, or, because the Defective Airbags so diminished the usefulness and/or value of the Class Vehicles such that it must be presumed that the Plaintiffs would have purchased the Class Vehicles, but for a lesser price.

1354.  No notice of the defect is required under La. Civ. Code Art. 2520, since Defendants had knowledge of the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them at the time they were sold to Plaintiffs and the Louisiana Sub-Class.

1355.  Under La. Civ. Code Art. 2524, a warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs purchased their Class Vehicles.

1356.  The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents.

1357.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1358.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs' and the Louisiana Sub-Class have been damaged in an amount to be proven at trial.

### L.    Claims Brought on Behalf of the Massachusetts Sub-Class

### COUNT 69

**Deceptive Acts or Practices Prohibited by Massachusetts Law**
**Mass. Gen. Laws Ch. 93A, §§ 1, *et seq.***

1359.   This claim is brought only on behalf of the Massachusetts Consumer Sub-Class against Takata and Honda.

1360.   Plaintiffs, the Massachusetts Sub-Class, and Defendants are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

1361.   Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws 93A, § 1(b).

1362.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce."   Mass. Gen. Laws ch. 93A, § 2. Defendants both participated in misleading, false, or deceptive acts that violated the Massachusetts Act.  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Massachusetts Act.

1363.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1364.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1365.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1366.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Massachusetts Act.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1367.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1368. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1369. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Massachusetts Sub-Class.

1370. Defendants knew or should have known that their conduct violated the Massachusetts Act.

1371. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1372. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1373. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1374.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1375.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Massachusetts Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1376.   Plaintiffs and the Massachusetts Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1377.   Defendants' violations present a continuing risk to Plaintiffs, to the Massachusetts Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1378.   As a direct and proximate result of Defendants' violations of the Massachusetts Act, Plaintiffs and the Massachusetts Sub-Class have suffered injury-in-fact and/or actual damage.

1379.   Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Massachusetts Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Sub-Class member. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each

Massachusetts Sub-Class member, up to three times actual damages, but no less than two times actual damages.

1380.   Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

1381.   On October 27, 2014, Plaintiffs' counsel, on behalf of Plaintiffs, sent a letter to Defendants complying with Mass. Gen. Laws ch. 93A, § 9(3), providing Defendants with notice of their alleged violations of the Massachusetts Act relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Massachusetts Sub-Class, and demanding that Defendants correct or agree to correct the actions described therein. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the Massachusetts Sub-Class are entitled.

## COUNT 70

### Breach of the Implied Warranty of Merchantability
### ALM GL. Ch. 106, § 2-314, *et seq.*

1382.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Massachusetts Consumer Sub-Class against Takata and Honda.

1383.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of ALM GL Ch. 106, § 2-104(1).

1384.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to ALM GL Ch. 106, § 2-314.

1385.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which

cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1386.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1387.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Massachusetts Sub-Class have been damaged in an amount to be proven at trial.

### M.   Claims Brought on Behalf of the Michigan Sub-Class

### COUNT 71

**Violation of the Michigan Consumer Protection Act**
**Mich. Comp. Laws §§ 445.903 *et seq.***

1388.   This claim is brought only on behalf of the Michigan Consumer Sub-Class against Takata and Honda.

1389.   Plaintiffs and the Michigan Sub-Class are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

1390.   At all relevant times hereto, Defendants were "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

1391.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).  Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that

goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner."  Mich. Comp. Laws § 445.903(1).  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

1392.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1393.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in Takata's airbags since at least 2008.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1394.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and

of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1395. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1396. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1397. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Michigan Sub-Class.

1398. Defendants knew or should have known that their conduct violated the Michigan CPA.

1399. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1400. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1401. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1402. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1403. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Michigan Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1404. Plaintiffs and the Michigan Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1405.   Defendants' violations present a continuing risk to Plaintiffs, the Michigan Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1406.   As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiffs and the Michigan Sub-Class have suffered injury-in-fact and/or actual damage.

1407.   Plaintiffs seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan Sub-Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

1408.   Plaintiffs also seek punitive damages against Defendants because it carried out despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the Michigan Sub-Class on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## COUNT 72

### Breach of Implied Warranty of Merchantability
### Mich. Comp. Laws § 440.2314

1409.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Michigan Consumer Sub-Class against Takata and Honda.

1410.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mich. Comp. Laws § 440.2314(1).

1411.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mich. Comp. Laws § 440.2314.

1412.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents.

1413.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1414.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Michigan Sub-Class have been damaged in an amount to be proven at trial.

### N.        Claims Brought on Behalf of the Minnesota Sub-Class

### COUNT 73

**Violation of the Minnesota Prevention of Consumer Fraud Act
Minn. Stat. §§ 325F.68, *et seq.***

1415.   This claim is brought only on behalf of the Minnesota Consumer Sub-Class against Takata and Honda.

1416.   Plaintiffs, the Minnesota Sub-Class, and Defendants are "persons" within the meaning of Minn. Stat. § 325F.68(3).

1417.   The Minnesota Prevention of Consumer Fraud Act ("Minnesota CFA") prohibits "[t]he act, use, or employment by any person of any fraud, false pretense, false promise, misrepresentation, misleading statement or deceptive practice, with the intent that others rely thereon in connection with the sale of any merchandise, whether or not any person has in fact been misled, deceived, or damaged thereby . . ." Minn. Stat. § 325F.69(1).   Defendants participated in misleading, false, or deceptive acts that violated the Minnesota CFA.  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Minnesota CFA.

1418.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

1419.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them

1420.   Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1421.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and

of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Minnesota CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1422.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1423.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1424.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Minnesota Sub-Class.

1425.   Defendants knew or should have known that their conduct violated the Minnesota CFA.

1426.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1427.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1428.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1429.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1430.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Minnesota Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1431.   Plaintiffs and the Minnesota Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1432.   Defendants' violations present a continuing risk to Plaintiffs, to the Minnesota Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1433.   As a direct and proximate result of Defendants' violations of the Minnesota CFA, Plaintiffs and the Minnesota Sub-Class have suffered injury-in-fact and/or actual damage.

1434.   Pursuant to Minn. Stat. § 8.31(3a), Plaintiffs and the Minnesota Sub-Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota CFA.

1435.   Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## COUNT 74

### Violation of the Minnesota Uniform Deceptive Trade Practices Act
### Minn. Stat. §§ 325D.43-48, *et seq.*

1436.   This claim is brought only on behalf of the Minnesota Consumer Sub-Class against Takata and Honda.

1437.   The Minnesota Deceptive Trade Practices Act ("Minnesota DTPA") prohibits deceptive trade practices, which occur when a person "(5) represents that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have or that a person has a sponsorship, approval, status, affiliation, or connection that the person does not have;" "(7) represents that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and "(9) advertises goods or services with intent not to sell them as advertised."  Minn. Stat. § 325D.44.

1438.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1439.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1440.  Defendant Takata has known of the Inflator Defect in the Defective Airbags since at least the 1990s.  Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1441.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Minnesota DTPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1442.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1443.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1444.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Minnesota Sub-Class.

1445.  Defendants knew or should have known that their conduct violated the Minnesota DTPA.

1446.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1447.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1448.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.  Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.  Intentionally concealed the foregoing from Plaintiffs; and/or

c.  Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1449.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1450.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Minnesota Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1451.   Plaintiffs and the Minnesota Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1452.   Defendants' violations present a continuing risk to Plaintiffs, the Minnesota Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1453.   As a direct and proximate result of Defendants' violations of the Minnesota DTPA, Plaintiffs and the Minnesota Sub-Class have suffered injury-in-fact and/or actual damage.

1454.   Pursuant to Minn. Stat. § 8.31(3a) and 325D.45, Plaintiffs and the Minnesota Sub-Class seek actual damages, attorneys' fees, and any other just and proper relief available under the Minnesota DTPA.  Plaintiffs also seek punitive damages under Minn. Stat. § 549.20(1)(a) given the clear and convincing evidence that Defendants' acts show deliberate disregard for the rights or safety of others.

## COUNT 75

### Breach of the Implied Warranty of Merchantability
### Minn. Stat. § 336.2-314

1455.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Minnesota Consumer Sub-Class against Takata and Honda.

1456.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Minn. Stat. § 336.2-104(1).

1457.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Minn. Stat. § 336.2-314.

1458.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1459.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1460.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Minnesota Sub-Class have been damaged in an amount to be proven at trial.

**O.      Claims Brought on Behalf of the Missouri Sub-Class**

**COUNT 76**

**Violation of the Missouri Merchandising Practices Act**
**Mo. Rev. Stat. §§ 407.010 *et seq.***

1461.   This claim is brought only on behalf of the Missouri Consumer Sub-Class against Takata and Honda.

1462.   Plaintiffs, the Missouri Sub-Class, and Defendants are "persons" within the meaning of Mo. Rev. Stat. § 407.010(5).

1463.   Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

1464.   The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

1465.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein.  By failing to disclose the Inflator Defect or facts about the Inflator Defect described herein known to them or that were available to Defendants upon reasonable inquiry, Defendants deprived consumers of all material facts about the safety and functionality of their vehicle.  By failing to release material facts about the Inflator Defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of Serv. Reg. § 60-9.110.  Moreover, Defendants have otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely

upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1466. Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1467. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Missouri MPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1468. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1469. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1470.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Missouri Sub-Class, including without limitation by failing to disclose the Inflator Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by Defendants about the safety or reliability of the Class Vehicles and/or the Defective Airbags installed in them. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of Serv. Reg. §60-9.090.

1471.   Because Defendants knew or believed that their statements regarding safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the Inflator Defect, Defendants engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of Serv. Reg.60-9.100.

1472.   Defendants' conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles were inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents. Such acts are unfair practices in violation of 15 Mo. Code of Serv. Reg. 60-8.020.

1473.   Defendants knew or should have known that their conduct violated the Missouri MPA.

1474.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1475.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the

- 333 -

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1476.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1477.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1478.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Missouri Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1479.   Plaintiffs and the Missouri Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1480.   Defendants' violations present a continuing risk to Plaintiffs, to the Missouri Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1481.   As a direct and proximate result of Defendants' violations of the Missouri MPA, Plaintiffs and the Missouri Sub-Class have suffered injury-in-fact and/or actual damage.

1482.   Defendants are liable to Plaintiffs and the Missouri Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT 77

### Breach of the Implied Warranty of Merchantability
### Mo. Rev. Stat. § 400.2-314

1483.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Missouri Consumer Sub-Class against Takata and Honda.

1484.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mo. Rev. Stat. § 400.2-314(1).

1485.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mo. Rev. Stat. § 400.2-314.

1486.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure

occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1487.   Defendants were provided  notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

1488.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Missouri Sub-Class have been damaged in an amount to be proven at trial.

### P.      Claims Brought on Behalf of the Nevada Sub-Class

### COUNT 78

**Violation of the Nevada Deceptive Trade Practices Act**
**Nev. Rev. Stat. §§ 598.0903, *et seq.***

1489.   This claim is brought only on behalf of the Nevada Consumer Sub-Class against Takata, Honda, and Toyota.

1490.   The Nevada Deceptive Trade Practices Act ("Nevada DTPA"), Nev. Rev. Stat. § 598.0903, *et seq.* prohibits deceptive trade practices.  Nev. Rev. Stat. § 598.0915 provides that a person engages in a "deceptive trade practice" if, in the course of business or occupation, the person: "5. Knowingly makes a false representation as to the characteristics, ingredients, uses, benefits, alterations or quantities of goods or services for sale or lease or a false representation as to the sponsorship, approval, status, affiliation or connection of a person therewith"; "7. Represents that goods or services for sale or lease are of a particular standard, quality or grade, or that such goods are of a particular style or model, if he or she knows or should know that they are of another standard, quality, grade, style or model"; "9. Advertises goods or services with

intent not to sell or lease them as advertised"; or "15. Knowingly makes any other false representation in a transaction."

1491. Defendants engaged in deceptive trade practices that violated the Nevada DTPA, including: knowingly representing that Class Vehicles and/or the Defective Airbags installed in them have uses and benefits which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and knowingly making other false representations in a transaction.

1492. Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1493. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1494. Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1495. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and

of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Nevada DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1496.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1497.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1498.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Nevada Sub-Class.

1499.   Defendants knew or should have known that their conduct violated the Nevada DTPA.

1500.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1501.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1502.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.     Intentionally concealed the foregoing from Plaintiffs; and/or

        c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1503.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1504.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Nevada Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1505.   Plaintiffs and the Nevada Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1506.   Defendants' violations present a continuing risk to Plaintiffs, to the Nevada Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1507.   As a direct and proximate result of Defendants' violations of the Nevada DTPA, Plaintiffs and the Nevada Sub-Class have suffered injury-in-fact and/or actual damage.

1508.   Accordingly, Plaintiffs and the Nevada Sub-Class seek their actual damages, punitive damages, an order enjoining Defendants' deceptive acts or practices, costs of Court, attorney's fees, and all other appropriate and available remedies under the Nevada Deceptive Trade Practices Act. Nev. Rev. Stat. § 41.600.

## COUNT 79

### Breach of the Implied Warranty of Merchantability
### Nev. Rev. Stat. § 104.2314

1509.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Nevada Consumer Sub-Class against Takata, Honda, and Toyota.

1510.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Nev. Rev. Stat. § 104.2104(1).

1511.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Nev. Rev. Stat. § 104.2314.

1512.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure

occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1513. Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1514. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Nevada Sub-Class have been damaged in an amount to be proven at trial.

## Q.   **Claims Brought on Behalf of the New York Sub-Class**

### **COUNT 80**

**Violation of the New York General Business Law**
**N.Y. Gen. Bus. Law § 349**

1515. This claim is brought on behalf of the New York Consumer Sub-Class against Takata and Honda.

1516. Plaintiffs and New York Sub-Class are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

1517. Defendants are "persons," "firms," "corporations," or "associations" within the meaning of N.Y. Gen. Bus. Law § 349.

1518. The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct directed toward consumers, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

1519. Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1520.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1521.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1522.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1523.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New York GBL. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1524.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1525.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1526.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the New York Sub-Class.

1527.  Defendants knew or should have known that their conduct violated the New York GBL.

1528.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1529.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1530.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1531. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1532. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the New York Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1533. Plaintiffs and the New York Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1534. Defendants' violations present a continuing risk to Plaintiffs as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1535. As a direct and proximate result of Defendants' violations of the New York GBL, Plaintiffs and the New York Sub-Class have suffered injury-in-fact and/or actual damage.

1536. New York Sub-Class members seek punitive damages against Defendants because Defendants' conduct was egregious. Defendants misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived Plaintiffs and the New York Sub-Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class

Vehicles and/or the Defective Airbags installed in them.   Defendants' egregious conduct warrants punitive damages.

1537.   Because Defendants' willful and knowing conduct caused injury to the New York Sub-Class, the New York Sub-Class seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT 81

### Violation of the New York General Business Law
### N.Y. Gen. Bus. Law § 350

1538.   This claim is brought on behalf of the New York Consumer Sub-Class against Takata and Honda.

1539.   Defendants were and are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

1540.   N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

1541.  Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and the New York Sub-Class.

1542.  Defendants have violated § 350 because the misrepresentations and omissions regarding the Inflator Defect, and Defendants' failure to disclose and active concealing of the

dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, as set forth above, were material and likely to deceive a reasonable consumer.

1543.   New York Sub-Class members have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising.   In purchasing or leasing Class Vehicles with the Defective Airbags installed in them, New York Plaintiffs and the New York Sub-Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them. Defendants' representations were false and/or misleading because the concealed the Inflator Defect and safety issues seriously undermine the value of the Class Vehicles.   Had Plaintiffs and the New York Sub-Class known this, they would not have purchased or leased their vehicles and/or paid as much for them.

1544.   Pursuant to N.Y. Gen. Bus. Law § 350 e, the New York Sub-Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Sub-Class member. Because Defendants' conduct was committed willfully and knowingly, New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

1545.   The New York Sub-Class also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law § 350.

### R.      Claims Brought on Behalf of the North Carolina Sub-Class

### COUNT 82

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act**
**N.C. Gen. Stat. §§ 75-1.1, *et seq.***

1546.   This claim is brought on behalf of the North Carolina Consumer Sub-Class against Takata and Honda.

1547.  Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

1548.  The North Carolina Act broadly prohibits "unfair or deceptive acts or practices in or affecting commerce."  N.C. Gen. Stat. § 75-1.1(a).  As alleged above and below, Defendants willfully committed unfair or deceptive acts or practices in violation of the North Carolina Act.

1549.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1550.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them

1551.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1552.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the North Carolina Act.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants

from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1553.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1554.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1555.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the North Carolina Sub-Class.

1556.   Defendants knew or should have known that their conduct violated the North Carolina Act.

1557.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1558.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1559.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.     Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1560.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1561.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the North Carolina Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1562.   Plaintiffs and the North Carolina Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1563.   Defendants' violations present a continuing risk to Plaintiffs, the North Carolina Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1564.   As a direct and proximate result of Defendants' violations of the North Carolina Act, Plaintiffs and the North Carolina Sub-Class have suffered injury-in-fact and/or actual damage.

1565.   North Carolina Sub-Class members seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

1566.   Defendants fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived North Carolina Sub-Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them.   Because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants punitive damages.

1567.   Plaintiffs seek an order for treble their actual damages, an order enjoining Defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina Act, N.C. Gen. Stat. § 75-16.

## COUNT 83

### Breach of the Implied Warranty of Merchantability
### N.C. Gen. Stat. § 25-2-314

1568.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the North Carolina Consumer Sub-Class against Takata and Honda.

1569.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of N.C. Gen. Stat. § 25-2-314.

1570.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to N.C. Gen. Stat. § 25-2-314.

1571. The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1572. Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1573. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the North Carolina Sub-Class have been damaged in an amount to be proven at trial.

### S.    Claims Brought on Behalf of the Ohio Sub-Class

#### COUNT 84

**Violation of the Consumer Sales Practices Act
Ohio Rev. Code §§ 1345.01, *et seq.***

1574. This claim is brought only on behalf of the Ohio Consumer Sub-Class against Takata, Honda, and Ford.

1575. Plaintiffs and the Ohio Sub-Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Class Vehicles with the Defective Airbags installed in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

1576.   Defendants are "suppliers" as that term is defined in Ohio Rev. Code § 1345.01(C).   The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (I) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not.  *Id.*  Defendants' conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

1577.   By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

1578.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1579.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1580.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1581. Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1582. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Ohio CSPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1583. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1584. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1585.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Ohio Sub-Class.

1586.   Defendants knew or should have known that their conduct violated the Ohio CSPA.

1587.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1588.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1589.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.      Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1590.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1591.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Ohio Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1592.  Plaintiffs and the Ohio Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1593.  Defendants' violations present a continuing risk to Plaintiffs, the Ohio Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1594.  As a direct and proximate result of Defendants' violations of the Ohio CSPA, Plaintiffs and the Ohio Sub-Class have suffered injury-in-fact and/or actual damage.

1595.  Ohio Sub-Class members seek punitive damages against Defendants because their conduct was egregious.  Defendants misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived the Ohio Sub-Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them.  Defendants' egregious conduct warrants punitive damages.

1596.  As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the Ohio Sub-Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining

Defendants' deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code § 1345.09, *et seq.*

**T.      Claims Brought on Behalf of the Oregon Sub-Class**

**COUNT 85**

**Violation of the Oregon Unlawful Trade Practices Act**
**Or. Rev. Stat. §§ 646.605, *et seq.***

1597.   This claim is brought only on behalf of the Oregon Consumer Sub-Class against Takata and Honda.

1598.   Plaintiffs, the Oregon Sub-Class, and Defendants are persons within the meaning of Or. Rev. Stat. § 646.605(4).

1599.   The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: "(e) Represent[ing] that … goods … have … characteristics … uses, benefits, … or qualities that they do not have; (g) Represent[ing] that … goods … are of a particular standard [or] quality … if they are of another; (I) Advertis[ing] … goods or services with intent not to provide them as advertised;" and "(u) engag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

1600.   Defendants engaged in unlawful trade practices, including representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in other unfair or deceptive acts.

1601.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1602.  Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1603.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1604.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Oregon UTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1605.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1606.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1607. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Oregon Sub-Class.

1608. Defendants knew or should have known that their conduct violated the Oregon UTPA.

1609. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1610. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1611. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b. Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1612. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1613.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Oregon Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1614.  Plaintiffs and the Oregon Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1615.  Defendants' violations present a continuing risk to Plaintiffs, the Oregon Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1616.  As a direct and proximate result of Defendants' violations of the Oregon UTPA, Plaintiffs and the Oregon Sub-Class have suffered injury-in-fact and/or actual damage.

1617.  Plaintiffs and the Oregon Sub-Class are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1).  Plaintiffs and the Oregon Sub-Class are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

**U.**     **Claims Brought on Behalf of the Pennsylvania Sub-Class**

### COUNT 86

**Violation of the Unfair Trade Practices and Consumer Protection Law**
**Pa. Stat. Ann. §§ 201-1, *et seq.***

1618.  This claim is brought only on behalf of the Pennsylvania Consumer Sub-Class against Takata, Honda, BMW, Nissan, and Toyota.

1619.   Plaintiffs purchased or leased their Class Vehicles with Defective Airbags installed in them primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

1620.   All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

1621.   The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have … characteristics, …. Benefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade … if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

1622.   Defendants engaged in unlawful trade practices, including representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

1623.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1624.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1625. Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1626. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Pennsylvania CPL. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1627. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1628. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1629.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Pennsylvania Sub-Class.

1630.   Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

1631.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1632.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1633.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.      Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1634.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1635. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Pennsylvania Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1636. Plaintiffs and the Pennsylvania Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1637. Defendants' violations present a continuing risk to Plaintiffs, the Pennsylvania Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1638. As a direct and proximate result of Defendants' violations of the Pennsylvania CPL, Plaintiffs and the Pennsylvania Sub-Class have suffered injury-in-fact and/or actual damage.

1639. Defendants are liable to Plaintiffs and the Pennsylvania Sub-Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiffs and the Pennsylvania Sub-Class are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 87

### Breach of the Implied Warranty of Merchantability
### 13 PA. Stat. Ann. §2314

1640.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Pennsylvania Consumer Sub-Class against Takata, Honda, BMW, Nissan, and Toyota.

1641.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of 13 Pa. Stat. Ann. § 2104.

1642.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to 13 Pa. Stat. Ann. § 2314.

1643.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1644.   Defendants were provided  notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1645.  As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Pennsylvania Sub-Class have been damaged in an amount to be proven at trial.

## V. Claims Brought on Behalf of the Rhode Island Sub-Class

### COUNT 88

**Violation of the Rhode Island Unfair Trade Practices and Consumer Protection Act
R.I. Gen. Laws §§ 6-13.1, *et seq.***

1646.  This claim is brought only on behalf of the Rhode Island Consumer Sub-Class against Takata and Honda.

1647.  Plaintiffs are persons who purchased or leased one or more Class Vehicles with Defective Airbags installed in them primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws § 6-13.1-5.2(a).

1648.  Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: "(v) Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have"; "(vii) Representing that goods or services are of a particular standard, quality, or grade …, if they are of another"; "(ix) Advertising goods or services with intent not to sell them as advertised"; "(xii) Engaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding"; "(xiii) Engaging in any act or practice that is unfair or deceptive to the consumer"; and "(xiv) Using any other methods, acts or practices which mislead or deceive members of the public in a material respect." R.I. Gen. Laws § 6-13.1-1(6).

1649.  Defendants engaged in unlawful trade practices, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

1650.  Defendants' actions as set forth above occurred in the conduct of trade or commerce.

1651.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them.

1652.   Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in Takata's airbags since at least 2008.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1653.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Rhode Island CPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1654.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1655.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1656.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Rhode Island Sub-Class.

1657.  Defendants knew or should have known that their conduct violated the Rhode Island CPA.

1658.  As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1659.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.     Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1660.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1661.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Rhode Island Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1662.  Plaintiffs and the Rhode Island Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1663.  Defendants' violations present a continuing risk to Plaintiffs, the Rhode Island Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1664.  As a direct and proximate result of Defendants' violations of the Rhode Island CPA, Plaintiffs and the Rhode Island Sub-Class have suffered injury-in-fact and/or actual damage.

1665.  Plaintiffs and the Rhode Island Sub-Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws § 6-13.1-5.2(a).  Plaintiffs also seek punitive damages in the discretion of the Court because of Defendants' egregious disregard of consumer and public safety and their long-running concealment of the serious Inflator Defect and its tragic consequences.

## COUNT 89

### Breach of the Implied Warranty of Merchantability
### R.I. Gen Laws § 6A-2-314

1666.   In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Rhode Island Consumer Sub-Class against Takata and Honda.

1667.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of R.I. Gen. Laws § 6A-2-314.

1668.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to R.I. Gen. Laws § 6A-2-314.

1669.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents.

1670.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1671.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Rhode Island Sub-Class have been damaged in an amount to be proven at trial.

**W.**     **Claims Brought on Behalf of the South Carolina Sub-Class**

**COUNT 90**

**Violation of the South Carolina Unfair Trade Practices Act**
**S.C. Code Ann. §§ 39-5-10, *et seq.***

1672.   This claim is brought only on behalf of the South Carolina Consumer Sub-Class against Takata and Toyota.

1673.   Defendants are "persons" under S.C. Code Ann. § 39-5-10. 2740.   The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a). Defendants engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

1674.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them

1675.   Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.   The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1676.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the South Carolina UTPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1677.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1678.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1679.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the South Carolina Sub-Class.

1680.  Defendants knew or should have known that their conduct violated the South Carolina UTPA.

1681. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1682. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1683. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.     Intentionally concealed the foregoing from Plaintiffs; and/or

      c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1684. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1685. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the South Carolina Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1686.   Plaintiffs and the South Carolina Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1687.   Defendants' violations present a continuing risk to Plaintiffs, the South Carolina Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1688.   As a direct and proximate result of Defendants' violations of the South Carolina UTPA, Plaintiffs and the South Carolina Sub-Class have suffered injury-in-fact and/or actual damage.

1689.   Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief against Defendants to recover for their economic losses.  Because Defendants' actions were willful and knowing, Plaintiffs' damages should be trebled. *Id.*

1690.   Plaintiffs further allege that Defendants' malicious and deliberate conduct warrants an assessment of punitive damages because Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the South Carolina Sub-Class to cruel and unjust hardship as a result.  Defendants' intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the South Carolina Sub-Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting a deadly flaws in the Class Vehicles and/or the Defective Airbags installed in them.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices.

## COUNT 91

**Violation of the South Carolina Regulation of Manufacturers,
Distributors, and Dealers Act
S.C. Code Ann. §§56-15-10, *et seq.***

1691.  This claim is brought only on behalf of the South Carolina Consumer Sub-Class against Takata and Toyota.

1692.  The Vehicle Manufacturing Defendants are "manufacturers" as set forth in S.C. Code Ann.§ 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

1693.  The Vehicle Manufacturing Defendants committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

1694.  The Vehicle Manufacturing Defendants engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the South Carolina Sub-Class, and to the public.

1695.  The Vehicle Manufacturing Defendants' bad faith and unconscionable actions include, but are not limited to: (1) representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have, (2) representing that they are of a particular standard, quality, and grade when they are not, (3) advertising them with the intent not to sell or lease them as advertised, (4) representing that a transaction involving them confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

1696.  The Vehicle Manufacturing Defendants resorted to and used false and misleading advertisements in connection with their business.  As alleged above, they made numerous material statements and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Each of these

statements and omissions contributed to the deceptive context of Defendants' unlawful advertising and representations as a whole.

1697.   Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the South Carolina Sub-Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1698.   Plaintiffs and the South Carolina Sub-Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiffs also seek injunctive relief under S.C. Code Ann. § 56-15-110.   Plaintiffs also seek treble damages because the Vehicle Manufacturing Defendants acted maliciously.

## COUNT 92

### Breach of the Implied Warranty of Merchantability
### S.C. Code § 36-2-314

1699.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the South Carolina Consumer Sub-Class against Takata and Toyota.

1700.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of S.C. Code Ann. § 36-2-314.

1701.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to S.C. Code Ann. § 36-2-314.

1702.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure

occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1703.   Defendants were provided  notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1704.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the South Carolina Sub-Class have been damaged in an amount to be proven at trial.

## X.       Claims Brought on Behalf of Tennessee Sub-Class

### COUNT 93

**Violation of the Tennessee Consumer Protection Act**
**Tenn. Code Ann. §§ 47-18-101, *et seq.***

1705.   This claim is brought only on behalf of the Tennessee Consumer Sub-Class against Takata and Honda.

1706.   Plaintiffs and the Tennessee Sub-Class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

1707.   Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2) (the "Act").

1708.   Defendants' conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

1709.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "Representing that goods or services have … characteristics, [or] … benefits … that they do not have…;" "Representing that goods or services are of a particular standard, quality or

grade… if they are of another;" and "Advertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. Defendants violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell or lease them as advertised.

1710. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them.

1711. Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004. The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1712. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Tennessee CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1713. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1714. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1715. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Tennessee Sub-Class.

1716. Defendants knew or should have known that their conduct violated the Tennessee CPA.

1717. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1718. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1719. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1720.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1721.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Tennessee Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1722.   Plaintiffs and the Tennessee Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1723.   Defendants' violations present a continuing risk to Plaintiffs, the Tennessee Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1724.   As a direct and proximate result of Defendants' violations of the  Tennessee CPA, Plaintiffs and the Tennessee Sub-Class have suffered injury-in-fact and/or actual damage.

1725.   Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs and the Tennessee Sub-Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

### Y.   Claims Brought on Behalf of the Texas Sub-Class

### COUNT 94

**Violation of the Deceptive Trade Practices Act**
**Tex. Bus. & Com. Code §§ 17.41,** *et seq.*

1726.   This claim is brought only on behalf of the Texas Consumer Sub-Class against Takata, Honda, and Ford.

1727.   Plaintiffs and the Texas Sub-Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).  *See* Tex. Bus. & Com. Code § 17.41.

1728.   The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree."  Tex. Bus. & Com. Code § 17.45(5); Tex. Bus. & Com. Code § 17.50(a)(3).  Defendants have committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

1729.   Defendants also violated the Texas DTPA by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as

advertised; and (4) failing to disclose information concerning them with the intent to induce consumers to purchase or lease them.

1730.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1731.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1732.   Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1733.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Texas DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, and/or fail to deploy, instead of protecting vehicle occupants from bodily injury during accidents and/or failing to deploy altogether, in order to ensure that consumers would purchase the Class Vehicles.

1734.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1735. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1736. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Texas Sub-Class.

1737. Defendants knew or should have known that their conduct violated the Texas DTPA.

1738. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1739. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1740. Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1741. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1742. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Texas Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1743. Plaintiffs and the Texas Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1744. Defendants' violations present a continuing risk to Plaintiffs, the Texas Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1745. As a direct and proximate result of Defendants' violations of the Texas DTPA, Plaintiffs and the Texas Sub-Class have suffered injury-in-fact and/or actual damage.

1746. Pursuant to Tex. Bus. & Com. Code § 17.50(a)(1) and (b), Plaintiffs and the Texas Sub-Class seek monetary relief against Defendants measured as actual damages in an

amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1747. For those Texas Sub-Class members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

1748. Plaintiffs and the Texas Sub-Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

1749. In accordance with Tex. Bus. & Com. Code § 17.505(a), Plaintiffs' counsel, on behalf of Plaintiffs, will serve Defendants with notice of their alleged violations of the Texas DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Texas Sub-Class, and demand that Defendants correct or agree to correct the actions described therein. If Defendants fail to do so, Plaintiffs will amend this Complaint as of right (or otherwise seek leave to amend the Complaint) to include compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 95

### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code § 2.314

1750. In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Texas Consumer Sub-Class against Takata, Honda, and Ford.

1751. Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Tex. Bus. & Com. Code § 2.104.

1752. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Tex. Bus. & Com. Code § 2.314.

1753.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1754.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1755.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Texas Sub-Class have been damaged in an amount to be proven at trial.

### Z.      Claims Brought on Behalf of the Virginia Sub-Class

### COUNT 96

**Violation of the Virginia Consumer Protection Act
Va. Code Ann. §§ 59.1-196, *et seq.***

1756.   This claim is brought only on behalf of the Virginia Consumer Sub-Class against Takata, Honda, and BMW.

1757.   Defendants are "suppliers" under Va. Code Ann. § 59.1-198.

1758.   The sale of the Class Vehicles with the Defective Airbags installed in them to the Class members was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

1759.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that good or services have certain

characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.  Defendants violated the Virginia CPA by misrepresenting that the Class Vehicles and/or the Defective Airbags installed in them had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that they were of a particular standard, quality, grade, style, or model when they were another; advertising them with intent not to sell or lease them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

1760.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1761.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1762. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Virginia CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1763. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1764. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1765. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Virginia Sub-Class.

1766. Defendants knew or should have known that their conduct violated the Virginia CPA.

1767. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1768.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1769.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1770.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1771.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Virginia Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1772.  Plaintiffs and the Virginia Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have

paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1773.  Defendants' violations present a continuing risk to Plaintiffs, the Virginia Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1774.  As a direct and proximate result of Defendants' violations of the Virginia CPA, Plaintiffs and the Virginia Sub-Class have suffered injury-in-fact and/or actual damage.

1775.  Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Virginia Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Virginia Sub-Class member.  Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Virginia Sub-Class member, the greater of (a) three times actual damages or (b) $1,000.

1776.  Plaintiffs also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq.*

## COUNT 97

### Breach of the Implied Warranty of Merchantability
### Va. Code Ann. § 8.2-314.

1777.  In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Virginia Consumer Sub-Class against Takata, Honda, and BMW.

1778.  Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Va. Code Ann. § 8.2-314.

1779.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Va. Code Ann. § 8.2-314.

1780.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1781.   Defendants were provided  notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1782.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Virginia Sub-Class have been damaged in an amount to be proven at trial.

**AA.**    **Claims Brought on Behalf of the Washington Sub-Class**

**COUNT 98**

**Violation of the Consumer Protection Act**
**Wash. Rev. Code Ann. §§ 19.86.010,** *et seq.*

1783.   This claim is brought only on behalf of the Washington Consumer Sub-Class against Takata and Honda.

1784.   Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code Ann. § 19.96.010.

1785.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."  Wash. Rev. Code Ann. § 19.96.010.  Defendants engaged in unfair and deceptive acts and practices and violated the Washington CPA by failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them.

1786.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1787.   Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1788.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Washington CPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants

from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1789. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1790. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1791. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Washington Sub-Class.

1792. Defendants knew or should have known that their conduct violated the Washington CPA.

1793. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1794. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1795.  Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.      Intentionally concealed the foregoing from Plaintiffs; and/or

      c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1796.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1797.  Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Washington Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1798.  Plaintiffs and the Washington Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1799.  Defendants' violations present a continuing risk to Plaintiffs, the Washington Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1800. As a direct and proximate result of Defendants' violations of the Washington Act, Plaintiffs and the Washington Sub-Class have suffered injury-in-fact and/or actual damage.

1801. Defendants are liable to Plaintiffs and the Washington Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code Ann. § 19.86.090.

### BB.    Claims Brought on Behalf of the West Virginia Sub-Class

### COUNT 99

**Violation of the Consumer Credit and Protection Act**
**W. Va. Code §§ 46A-1-101,** *et seq.*

1802. This claim is brought only on behalf of the West Virginia Consumer Sub-Class against Takata and Honda.

1803. Defendants is a "person" under W. Va. Code § 46A-1-102(31).

1804. Plaintiff and the West Virginia Sub-Class are "consumers," as defined by W. Va. Code §§ and 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Class Vehicles with the Defective Airbags installed in them.

1805. Defendants engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

1806. The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. Va. Code § 46A-6-104. Without limitation, "unfair or deceptive" acts or practices include: (I) Advertising goods or services with intent not to sell them as advertised; (K) Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions; (L) Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding; (M) The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission,

in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; (N) Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.  W. Va. Code § 46A-6-102(7).

1807.  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the West Virginia CCPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; (4) representing that a transaction involving them confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

1808.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1809.  Defendant Takata has known of the Inflator Defect in its Defective Airbags since at least the 1990s. Defendant Honda has known of the Inflator Defect in the Defective Airbags in

Honda's vehicles since at least 2004.  The Vehicle Manufacturer Defendants have known or should have known of the Inflator Defect in the Defective Airbags since at least 2008. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1810.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the West Virginia CCPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1811.  In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1812.  Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1813.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the West Virginia Sub-Class.

1814.   Defendants knew or should have known that their conduct violated the West Virginia Act.

1815.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

1816.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1817.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.      Intentionally concealed the foregoing from Plaintiffs; and/or
>
> c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1818.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1819.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the West Virginia Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more

than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1820.  Plaintiffs and the West Virginia Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1821.  Defendants' violations present a continuing risk to Plaintiffs, the West Virginia Sub-Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

1822.  As a direct and proximate result of Defendants' violations of the West Virginia CCPA, Plaintiffs and the West Virginia Sub-Class have suffered injury-in-fact and/or actual damage.

1823.  Pursuant to W. Va. Code § 46A-1-106, Plaintiffs seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each Plaintiff and each member of the West Virginia Sub-Class they seek to represent.

1824.  Plaintiffs also seek punitive damages against Defendants because Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs to cruel and unjust hardship as a result.  Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs on life or death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

1825.   Plaintiffs further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101, *et seq.*, and any other just and proper relief available under the West Virginia CCPA.

1826.   On December 19, 2014, Plaintiffs' counsel, on behalf of certain Plaintiffs, sent a letter to Defendants complying with W. Va. Code § 46A-6-106(b), providing Defendants with notice of their alleged violations of the West Virginia CCPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the West Virginia Sub-Class, and demanding that Defendants correct or agree to correct the actions described therein.   Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which Plaintiffs and the West Virginia Sub-Class are entitled.

## COUNT 100

### Breach of the Implied Warranty of Merchantability
### W. Va. Code § 46-2-314

1827.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the West Virginia Consumer Sub-Class against Takata and Honda.

1828.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of W. Va. Code § 46A-6-107 and § 46-2-314.

1829.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to W. Va. Code § 46-2-314.

1830.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.   Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; (b) hyper-aggressively deploy and seriously injure

occupants through contact with the airbag; and (c) fail to deploy altogether, instead of protecting vehicle occupants from bodily injury during accidents.

1831.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Defendants issued the recalls and the allegations of the Inflator Defect became public.

1832.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the West Virginia Sub-Class have been damaged in an amount to be proven at trial.

## III.   <u>Automotive Recycler Claims</u>

### <u>COUNT 101</u>

### Fraudulent Misrepresentation & Fraudulent Concealment

1833.   This claim is brought on behalf of the Nationwide Automotive Recycler Class against all Defendants.

1834.   As described above, Defendants made material omissions and affirmative misrepresentations regarding the Recalled Vehicles and the Defective Airbags contained therein.

1835.   Defendants knew these representations were false when made.

1836.   The Recalled Vehicles purchased by Automotive Recyclers were defective, unsafe, and unreliable because they contained a defective airbag that failed to properly operate.

1837.   Defendants had a duty to disclose that Recalled Vehicles and/or airbags were defective, unsafe, and unreliable in that the vehicles contained a defective airbag that would unexpectedly fail to properly operate when needed.

1838.   The aforementioned concealment was material because if it had been disclosed, Automotive Recyclers would not have purchased the Recalled Vehicles at the same price, or would not have bought the Recalled Vehicles at all.

1839.   The aforementioned representations were material because they were facts that would typically be relied upon by someone purchasing a motor vehicle.

1840.   Defendants knew or recklessly disregarded that their representations as to the Recalled Vehicles were false, and/or Defendants intentionally made the false statements in order to sell and maintain a market for the vehicles.

1841.   In purchasing the Recalled Vehicles, Automotive Recyclers relied upon Defendants' representations and/or their failure to disclose the Inflator Defect.

1842.   As a result of their reliance, Automotive Recyclers have been injured in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain and overpayment at the time of purchase, the diminished value of the defective airbags, and/or the costs incurred in storing the defective, valueless airbags.

1843.   Defendants' conduct was knowing, intentional, with malice, demonstrated a complete lack of care, and was in reckless disregard for the rights of Automotive Recyclers. Automotive Recyclers are therefore entitled to an award of punitive damages.

## COUNT 102

### Violations of State Deceptive Trade Practices Statutes

1844.   This claim is brought on behalf of the State Deceptive Trade Practices Statute Automotive Recycler Class against all Defendants.

1845.   Defendants engaged in unfair, unconscionable, deceptive, or fraudulent acts or practices with respect to the Defective Airbags and the sale of the Recalled Vehicles, in violation of the following state deceptive trade practices statutes:

(a) Alaska Stat. 45-50-471 *et seq.*

(b) Ariz. Rev. Stat. § 44-1521 *et seq.*

(c) Arkansas Code § 4-88-101 *et seq.*

(d) Cal. Civ. Code § 1770 *et seq.*, Cal. Bus. & Prof. Code § 17200 *et seq.*, and Cal. Bus. & Prof. Code § 17070.

(e) Colo. Rev. Stat. § 6-1-101 *et seq.*

(f) Conn. Gen. Stat. § 42-110A, *et seq.*

(g) 6 Del. Code § 2513 *et seq.* and 6 Del. Code § 2532 *et seq.*

(h) Florida Stat. § 501.201 *et seq.*

(i) Idaho Code § 48-601 *et seq.*

(j) 815 Ill. Comp. Stat. 505/1 *et seq.* and 815 Ill. Comp. Stat. 510/1 *et seq.*

(k) Ind. Code § 24-5-0.5-3.

(l) Kan. Stat. Ann. § 50-623 *et seq.*

(m) Me. Rev. Stat. Ann. Tit. 5 § 205-A *et seq.*

(n) Mass. Gen. Laws chapter 93A § 1 *et seq.*

(o) Mich. Comp. Laws § 445.901.

(p) Minn. Stat. § 325F.69 *et seq.* and Minn. Stat. § 325D.43 *et seq.*

(q) Neb. Rev. Stat. § 87-302 and Neb. Rev. Stat. § 59-1601 *et seq.*

(r) Nev. Rev. Stat. § 598.0903 *et seq.*

(s) New Hampshire Rev. Stat. § 358-A:1 *et seq.*

(t) N.J. Stat. Ann. § 56:8-1, *et seq.*

(u) New Mexico Stat. Ann. § 57-12-1 *et seq.*

(v) N.Y. Gen. Bus. Law § 349 *et seq.*

(w) North Carolina Gen. Stat. § 75-1.1 *et seq.*

(x) N.D. Cent. Code § 51-15-02.

(y) S.D. Codified Laws § 37-24-6 *et seq.*

(z) Tex. Bus. & Com. Code § 17.41 *et seq.*

(aa) Rev. Code Wash. Ann. § 19.86.010 *et seq.*

(bb) Wisc. Stat. § 100.18 *et seq.*

1846.   Defendants' misrepresentations and omissions regarding the safety and reliability of the Recalled Vehicles and/or defective airbags, as set forth in this Complaint, were likely to deceive a reasonable purchaser, and the information would be material to a reasonable purchaser.

1847.   Defendants' intentional and purposeful acts, described above, were intended to and did cause purchasers, such as Automotive Recyclers, to pay artificially inflated prices for Recalled Vehicles purchased in the states listed above, and Automotive Recyclers relied on Defendants' misrepresentations and omissions in purchasing the Recalled Vehicles. Had Automotive Recyclers known that the Recalled Vehicles contained serious safety defect, they would either not have purchased the Recalled Vehicles and Defective Airbags or would have paid less for them than they did.

1848.   As a direct and proximate result of Defendants' unlawful conduct, Automotive Recyclers have been injured in their business and property in that they paid more for Recalled Vehicles and Defective Airbags than they otherwise would have paid in the absence of Defendants' unlawful conduct.

1849.   All of the wrongful conduct alleged herein occurred in the conduct of Defendants' business. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that was perpetrated nationwide.

1850.   Automotive Recyclers are therefore entitled to all appropriate relief as provided for by the laws of the states listed above, including but not limited to, actual damages, injunctive relief, attorneys' fees, and equitable relief, such as restitution and/or disgorgement of all

revenues, earnings, profits, compensation, and benefits which may have been obtained by Defendants as a result of their unlawful conduct.

## COUNT 103

### Violation of Florida's Deceptive and Unfair Trade Practices Act, Fla. Stat. § 501.201, et. seq.

1851.   This claim is brought on behalf of the Florida Automotive Recycler Class against all Defendants

1852.   Florida's Deceptive and Unfair Trade Practices Act ("FDUTPA") prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce.…" FLA. STAT. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

1853.   In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous Defective Airbags in the Recalled Vehicles, as described herein, and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, concealment, suppression or omission of any material fact with intent that others rely upon such concealment, and suppression or omission, in connection with the sale of the Recalled Vehicles.

1854.   As alleged above, Defendants knew of the defective airbags, while the Florida Class was deceived, by Defendants statements and omissions, into believing that the Recalled Vehicles and the Defective Airbags contained therein were in good and safe condition. Information regarding the defective airbags could not have reasonably been known by Automotive Recyclers.

1855.   Defendants knew or should have known that their conduct violated the FDUTPA.

1856.  As alleged above, Defendants made material statements about the safety and reliability of Recalled Vehicles that were either false or misleading. Defendants engaged in deceptive trade practices when they failed to disclose material information concerning the Recalled Vehicles, which it knew at the time the vehicles were sold. Defendants, moreover, deliberately withheld the information about the dangerous Defective Airbags in order to ensure that the public would purchase its vehicles.

1857.  Defendants owed Automotive Recyclers a duty to disclose the defective nature of airbags and the Recalled Vehicles, because they: (a) Possessed exclusive knowledge of the Inflator Defect rendering the Recalled Vehicles inherently more dangerous and unreliable than similar vehicles; (b) Intentionally concealed the hazardous situation with the Recalled Vehicles through their deceptive marketing campaign and recall program that they designed to hide the life-threatening problems from the Florida Class; and/or (c) Made incomplete representations about the safety and reliability of the Recalled Vehicles generally, while purposefully withholding material facts from Automotive Recyclers that contradicted these representations.

1858.  The Recalled Vehicles and the Defective Airbags contained therein posed and/or pose an unreasonable risk of death or serious bodily injury to the public at large, because they are susceptible to rupture and propel metal shrapnel and chemicals at the vehicle's driver and/or passengers.

1859.  Automotive Recyclers suffered ascertainable loss, which was caused by Defendants' failure to disclose material information related to the Defective Airbags. Automotive Recyclers overpaid for the Recalled Vehicles and the Defective Airbags contained therein and did not receive the benefit of their bargain. As the result of the concealment and failure to remedy the serious defect, the value of the airbags contained in the Recalled Vehicles has diminished to zero.

1860.  Automotive Recyclers have been damaged by Defendants' misrepresentations, concealment, and non-disclosure of the Inflator Defect in the Recalled Vehicles, as they have been forced to store airbags, which are now valueless. Defendants' egregious and widely

publicized conduct and the piecemeal nature of recalls have so tarnished the Defective Airbags contained in the Recalled Vehicles that no reasonable consumer would purchase them.

1861.   Automotive Recyclers risk irreparable injury as a result of Defendants' acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to Automotive Recyclers as well as to the general public.

1862.   Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

1863.   As a direct and proximate result of Defendants' violations of the FDUTPA, Automotive Recyclers have suffered injury-in-fact and/or actual damage. Automotive Recyclers are entitled to recover their actual damages under Fla. Stat. § 501.211(2) and attorneys' fees under Fla. Stat. § 501.2105(1). Automotive Recyclers also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.      An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23.;

B.      A declaration that the airbags in Class Vehicles are defective;

C.      A declaration that Defendants are financially responsible for notifying all Class Members about the defective nature of the Class Vehicles;

D.      An order enjoining Defendants to desist from further deceptive distribution, sales,

and lease practices with respect to the Class Vehicles, and directing Defendants to permanently, expeditiously, and completely repair the Class Vehicles;

E.     An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

F.     An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

G.     A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recall of the vehicles and correction of the Defective Airbags;

H.     A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

I.     An award of attorneys' fees and costs, as allowed by law;

J.     An award of prejudgment and post judgment interest, as provided by law;

K.     Leave to amend this Complaint to conform to the evidence produced at trial; and

L.     Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury trial as to all issues triable by a jury.

DATED: April 30, 2015

**PODHURST ORSECK, P.A.**

 /s/ Peter Prieto
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
John Gravante  (FBN 617113)
Matthew P. Weinshall (FBN 84783)
25 West Flagler Street, Suite 800
Miami, Florida 33130
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com
apodhurst@podhurst.com
srosenthal@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com

*Chair Lead Counsel for Plaintiffs*

| **COLSON HICKS EIDSON** | **POWER ROGERS & SMITH, P.C.** |
|---|---|
| Lewis S. "Mike" Eidson | Todd A. Smith |
| mike@colson.com | tsmith@prslaw.com |
| Curtis Bradley Miner | 70 West Madison St., 55th Floor |
| curt@colson.com | Chicago, IL 60602 |
| 255 Alhambra Circle, PH | T: 312-236-9381 |
| Coral Gables, FL 33134 | |
| T: 305-476-7400 | By: /s/ Todd A. Smith |
| | |
| By: /s/ Curtis Bradley Miner | *Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| | |
| *Plaintiffs' Personal Injury Track Lead Counsel* | |

<table>
<tr>
<td>

**BOIES, SCHILLER & FLEXNER LLP**
David Boies, Esq.
Motty Shuhnan, Esq. (Fla Bar. No. 175056)
333 Main Street
Armonk, NY 10504
Tel: (914) 749-8200
Fax: (914) 749-8300
dboies@bsfllp.com
mshulman@bsfllp.com

Stephen N. Zack, Esq. (Fla. Bar. No. 145215)
Mark J. Heise, Esq. (Fla. Bar. No. 771090)
100 Southeast 2nd Street, Suite 2800
Miami, FL 33131
Tel: (305) 539-8400
Fax: (305) 539-1307
szack@bsfllp.com
mheise@bsfllp.com

Richard B. Drubel, Esq.
Jonathan R. Voegele, Esq.
26 South Main Street
Hanover, NH 03755
Tel: (603) 643-9090
Fax: (603) 643-9010
rdrubel@bsfllp.com
jvoegele@bsfllp.com

By: /s/ David Boies, Esq.

*Plaintiffs' Economic Damages Track Co-Lead
Counsel*

</td>
<td>

**BARON & BUDD, PC**
Roland Tellis
rtellis@baronbudd.com
David Fernandes
dfernandes@bardonbudd.com
Mark Pifko
mpifko@baronbudd.com
15910 Ventura Blvd.,
Suite 1600
Encino, CA 91436
T: 818-839-2333

J.Burton LeBlanc
9015 Bluebonnet Blvd.
Baton Rouge, LA 70810
T: 225-761-6463

By: /s/ Roland Tellis

*Plaintiffs' Steering Committee*

</td>
</tr>
</table>

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO,PC** | **LIEFF CABRASER HEIMANN AND BERNSTEIN LLP** |
|---|---|
| James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ   07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br>By: /s/ James E. Cecchi<br><br>*Plaintiffs' Steering Committee* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>Phong-Chau Gia Nguyen<br>pgnguyen@lchb.com<br>Todd Walburg<br>twalburg@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T: 415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>NY, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>By: /s/ Elizabeth Cabraser<br><br>*Plaintiffs' Steering Committee* |

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on April 30, 2015, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: <u>/s/Peter Prieto                    </u>
       Peter Prieto
