

1 of 11 DOCUMENTS

Copyright 2015 Federal News Service, Inc.
All Rights Reserved
Federal News Service

June 2, 2015 Tuesday

**LENGTH:** 30946 words

**HEADLINE:** House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)

**BODY:**

Subject: Takata Airbag Ruptures and Recalls Update

Participants: Representative Michael Burgess (R-TX)

Witnesses: Mark Rosekind, administrator of the National Highway Traffic Safety Administration; Kevin Kennedy, executive vice president, Takata; John Bozzella, CEO of Global Automakers; Mitch Bainwol, president and CEO of the Alliance of Automobile Manufacturers; David Kelly, project director of the Independent Testing Coalition

Location: 2123 Rayburn House Office Building

Time: 14:00:00

Date: 2015-06-02

BURGESS: If we can get everyone to take their seats, I want to welcome Dr. Rosekind to our committee hearing today, Subcommittee On Commerce, Manufacturing, and Trade will now come to order.

The chair recognizes himself for five minutes for the purposes of an opening statement.

So again, I want to extend my welcome to everyone.

As we revisit a very serious motor vehicle deficit, six months ago this sub-committee held a hearing looking at the same issue and members of the subcommittee were assured that everything was being done and that testing and expertise were being brought to bear.

But there were still a lot of unanswered questions. I was not chairman at that time, but I did sit in on the subcommittee hearing, and I remember raising the concern that safer does not mean the same thing as safe.

Here we are six months later. I was hoping we were getting down the road of safer, but it is still unclear to me how far away we are from safe. A few weeks ago, the National Highway Traffic Safety Administration launched the largest motor vehicle safety recall in our nation's history due to defective Takata airbags.

EXHIBIT A

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

This recall may impact 13 percent of the country's driving stock, affecting an unknown number of vehicles, and spanning 11 vehicle manufacturers.

Since our last hearing, tragically, there has been an additional death attributed to an exploding Takata airbag in my home state of Texas. Every morning, I fear I am playing headline roulette waiting for another rupture, another injury, another death.

While it has now been confirmed that there is a defect affecting at least six Takata airbag inflators, we don't have any great clarity as to the root cause and how we will know when we get to that point when we are safe? Clarity and transparency are indeed needed.

One thing that certainly isn't clear is why we are launching this national recall now, instead of almost a year ago when basically the same information was before us. The American people deserve much better. They deserve to know when a national recall is announced if their car part is of the recall. I am repeatedly visited by vehicle manufacturers who lament the challenges of getting drivers to respond to recall notices, especially following a year of record recalls and an overwhelming sense of recall fatigue.

Yet when we do have the attention of consumers, how is it helpful to tell them that there is a recall but to check back later to see if you need to do something.

NHTSA serves a fundamental and critical role in ensuring vehicle safety. It is critically important that it be part of the solution in every step of the recall process in removing defective vehicles from the road.

The supply of replacement parts is also of concern. I am glad that the agency has acknowledging that it has a role to play. United States drivers are competing against a global supply chain, and recalls in many parts of the world. I also acknowledge that Dr. Rosekind is still fairly new to NHTSA, and was not yet the administrator at our last hearing.

I hope that we will see more action going forward, as this is now direct and timely.

I have serious concerns about where we are in the process. It's inconceivable to me that none of the tests conducted by Takata over the past year on over 30,000 inflators has given us a clearer picture and dictated more direct action.

And why is it that we still don't have any deployment testing being done by anyone besides Takata?

At what point do we accept that we need to completely eliminate defective inflators and implement a new design and a new manufacturing process.

Are all the driver-side airbag replacements now using different inflator compounds? What is different about the passenger side inflators? We do have many questions today. The most important question of all, however, does not involve compounds, desiccant, o- rings, or moisture. It is simply this: when will we have a plan that can be presented to the public, identifies who was affected, and when they will have a safe, not a safer, but a safe replacement part available? Nothing is more important and nothing else is acceptable.

In the meantime, the driving public should continue checking their vehicle identification numbers against the NHTSA database to see if their vehicle is affected, and this includes vehicles that have previously been recalled.

Chair now recognizes -- I would happy to yield Ms. Blackburn the balance of the time.

BLACKBURN: Thank you, Mr. Chairman.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

And I want to thank the witnesses for both panels for being here. As Chairman Burgess has said, this is an issue that we have followed, are continuing to work on, and you're going to see us stay with this issue. The fact that we have these airbag ruptures, that they have caused serious injury and death is of concern to us.

I questioned Takata at the last hearing about a November 19th, 2014 New York Times article which noted that engineers at Takata's Moses Lake (ah) Washington facility had raised serious concern about the use of ammonium nitrate as an airbag propellant. They had done that as far back as 1999. Yet they persist with this. Questions persist, and I thank you all for being here for our hearing.

I yield back.

BURGESS: Gentlelady yields back. The chair thanks the gentlelady. The chair recognizes the subcommittee ranking member, Ms. Schakowsky, five minutes for an opening statement please.

SCHAKOWSKY: Thank you, Mr. Chairman, for holding today's hearing on the Takata -- Takata airbag recall. The American people deserve to know what went wrong with Takata's airbags and why it took so long to discover and how the committee and this Congress will respond to ensure that it never happens again. Chairman Upton recently remarked about his airbag deployment after hitting a deer and said, "maybe I'm lucky it wasn't a Takata," unquote.

But at least 34 million Americans aren't so lucky. We have a guest here today, Angelina Sujarta, (ph) who was a victim, raise your hand, was a victim of a Takata air rupture. At least six people have been killed by their airbag. And Angelina's case, it was three years ago. She was in a car accident and at only 25 miles an hour. Shrapnel from a defective airbag ripped her chest, and we're just very thankful to have her here today.

Here's an example of such a -- an airbag that has these holes in it, where the -- am I on the wrong side? Here we go.

That shows where the shrapnel came out. This is an example. These are examples of these sharp pieces that landed in her chest in two places. These are not the exact ones, but shrapnel -- shrapnel like this. And it is very, very dangerous. We need to stop it.

SCHAKOWSKY: My big concern about this recall is that the root cause really has not been yet determined. We've been told that a combination of factors including humidity and age contribute to airbag ruptures, but we don't know whether the flaws in the design, manufacture, installation, or some other aspect of the airbag, which means that we still can't be sure that replacement airbags being installed right now are any safer.

Well, this is really dangerous. And we need to know what caused this failure to make sure that it doesn't happen again. But as we wait for those questions to be answered, there are steps we can take right now to improve vehicle safety.

Many of those are included in H.R. 1181, the Vehicle Safety Improvement Act legislation that I introduced earlier this year, along with my colleague and several others, Frank Pallone, the ranking Democrat on the full committee. And I'm hopeful that my colleagues on both sides of the aisle will join me in this bill.

2014 was the year of the recall. Almost half of all cars on our roads were recalled. G.M., Honda, and other major auto companies failed their customers and lives were lost as a result. The Vehicle Safety Improvement Act takes valuable lessons from those recalls and addresses existing weaknesses in information sharing, oversight, and accountability regarding auto safety.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee
hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

The legislation includes several provisions that would have benefited consumers
whose cars have those faulty airbags.

One, the bill would more than double NHTSA's funding for vehicle safety programs,
a priority that has been severely underfunded by this Congress.

Two, H.R. 1181 would increase the quantity and quality of information shared by
auto manufacturers, not only with NHTSA, but with the public and with Congress. Had
more information about Takata airbag ruptures been catalogued and diagnosed earlier,
I believe lives could've been saved.

Three, the bill would require manufacturers to fix all recalled vehicles free of
charge rather than just those that were purchased within the past 10 years, and Takata
has indicated that age of airbags is a contributing factor to ruptures, and many of
the vehicles with defective Takata airbags are more than 10 years old. They should
clearly be subject to mandatory fixes.

Under the legislation, NHTSA would also have new imminent hazard authority to
expedite recalls related to dangerous defects. It would eliminate the regional recall
program, ensuring that all cars subject to a recall are repaired regardless of their
location. Both of those changes would have improved the speed, scope, and efficacy
of the Takata recall.

The ongoing investigation into Takata airbag ruptures may identify additional
policies that would limit the risk of similar recalls during the -- in the future.
If it does, we should enact them as soon as possible. In the meantime, we can't afford
to wait to act on legislation that we know would save lives.

It's not just committee Democrats who want action. A who's who of leading consumer
and auto safety organizations support H.R. 1181, and I really implore my Republican
colleagues to join me in this legislation.

I ask unanimous consent that this advocate's letter be added to the record.

BURGESS: Without objection, so ordered.

SCHAKOWSKY: And I am eager to hear answers from our witnesses about what led to
this massive failure, how to prevent another one in the future. And in the meantime,
we can't delay common-sense safety improvements that will save lives. I urge the
Committee to advance the Vehicle Safety Improvement Act without delay.

And I yield back.

BURGESS: The gentlelady yields back. The chair thanks the gentlelady.

The chair recognizes the gentleman from Michigan, five minutes, for an opening
statement, please.

UPTON: Thank you, Mr. Chairman.

An airbag is a safety measure that you hope that you never have to use. And if
you do need it, you need to have it work exactly right. Yes, I had my own incident,
going back for the Memorial Day break in Michigan less than two weeks ago. It was
dark, it was at night. There wasn't much of a moon. And I was driving at 70 miles
an hour when I hit not one deer, but two.

I was lucky. The seat belt worked, airbag deployed, just as they were designed.
It was a scary moment for anyone. And I remember thinking, "You know, I'm lucky I
didn't have a defective Takata airbag at the time." And then I thought, "The safety
of your airbag can't be just a game of luck."

Being from the auto state, which includes Takata's headquarters in Auburn Hills,
Michiganders understand better than most just how complicated cars are and how much
goes into each and every part.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

Cars are certainly safer today than ever before. As miles driven and as the age of the car goes up, deaths and injuries have gone down. What concerns me today, though, are the multi-year safety investigations where we can identify a problem, but a solution is nowhere in sight. Where the preferred approaches are band-aids instead of an effective cure.

In these Takata airbags, we have a problem. It has persisted for years. And, again, we have NHTSA opening up an initial investigation and closing it before revisiting it years later.

The technology truly is rocket science, but you don't need to be a rocket scientist to see that more needs to be done and it should have been done a lot quicker.

When lives are put in jeopardy, delay is deadly. There wasn't much doubt at our December hearing last year that the airbags were defective, but it still took six months to say so.

Dr. Rosekind was not the administrator when we held our last hearing in December. And there's been some -- certainly some positive movement of late. Now Takata is changing its formulation of propellant in a replacement on the driver's side either because someone else is making it or because they were using improved formulations of their own.

But this isn't the case on the passenger side. Instead, they continue to try to perfect an innumerable set of manufacturing variables which for 10 years or more, have resisted perfection. So we trust that this time, the moisture won't get in, and everything else will be just perfect.

Once we have safe replacements, we need people to actually be able to replace them.

Recall rates of 15 percent to 30 percent are unacceptable. We have to understand what the plan is from NHTSA and the auto makers. NHTSA will be for the first time, act as a central coordinator. Such a move seems warranted, if not overdue. But we need to clearly understand the plan so that it can be relayed to the public.

The messaging around these airbag recalls has been tortured at best. We need more information, clear information from consumers. I'm concerned that NHTSA and Takata decided to release head-turning, headline-grabbing recall numbers at a time when the information is not yet actionable for consumers.

Drivers read about the recall -- the biggest one in history -- but could not look up if their own car was part of the recall, including mine a week or two after my incident. How does that help safety? Surely a better way exists.

The time when this Committee should be focusing on how to update NHTSA, how to incentivize the rollout of better safety technologies and how to improve recall take (ph) rates, we are instead forced to understand why safety, our very highest priority, seems relegated to the back lot.

Testing is overdue. Change is overdue. Safe replacement parts are overdue. Six months, I asked the question, "What should I say to the mom in Michigan who asked me if she and her family are safe behind the wheel?" Six months later, I, un-fortunately, have to ask the same question.

We will have as many hearings as needed and require as much reporting to this Committee as needed to ensure that this problem is finally resolved, restoring the safety of our nation's roadways and trust of the American people.

And I yield back the balance of my time to Mr. Lance.

LANCE: Thank you, Chairman Upton and distinguished members of the Committee.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

I telephoned my car dealer last week. I have a 2004 Honda Accord. I did not indicate my title. I just telephoned as a regular and ordinary citizen. And I was told that I will need a new airbag.

It seems to me that one of the main purposes of this hearing is to make sure that Mr. and Mrs. John Q. Public are aware of the recall, are able to be informed quickly as to whether their automobile is affected -- one of 34 million inflators recalled -- and be confident that the replacement is safe.

During this Subcommittee's hearing six months ago, Takata's witness indicated extreme reluctance to cooperate with NHTSA's request for an expanded recall. And I characterized the testimony at that time as tendentious.

I'm extremely dissatisfied with the company's obstinate attitude during the majority of this process. And I hope that its recent change of heart will be sincere. It occurs, of course, after being fined $14,000 a day.

I look forward to discussing this with the distinguished person now in charge, Mr. Rosekind. And, Mr. Chairman, I hope that this will be a hearing of great substance for the American people.

BURGESS: The chair thanks the gentleman. The gentleman yields back.

The chair recognizes the ranking member of the full Committee, Mr. Pallone, five minutes for opening statement, please.

PALLONE: Thank you, Mr. Chairman.

Though it has taken months, I'm glad that Takata finally admitted that its airbags are defective and finally moved forward with national recalls.

Getting dangerous cars off the road is crucial. Airbags are supposed to safe lives, and not take lives.

But these national recalls came after a full year in which we have seen a rather sloppy rollout of recalls of these exploding airbags. Each automaker seems to have handled the recalls differently. Some automakers conducted regional safety im-provement campaigns in (ph) high absolute humidity areas. At the same time, others conducted regional recalls in the same areas. Some automakers expanded their recalls to more states. Some eventually conducted national recalls of certain cars.

One automaker advised against passengers using front seats until the airbags are fixed, even offering to disable passenger airbags as a precaution.

All of this has led to considerable confusion for the public. Drivers are unsure if their cars are part of the recall. Those who have already had their airbag replaced do not know if they need to have them replaced again. But most importantly, people do not know if their cars are safe to drive.

This is the second hearing the Subcommittee has held on the Takata airbag recalls, and our first hearing was six months ago. And yet, in that time, we're still left with many of the same questions. We still do not know the root cause of the Takata airbag defects. We certainly know enough to take action, however. And while I appreciate and share the majority's concerns about this Takata crisis, I am disappointed by its lack of action.

Auto safety is not a partisan issue. However, even after the GM ignition switch issues, the Takata airbag ruptures, and even going back to the Toyota sudden acceleration problems, this Committee has failed to take appropriate legislative action.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

Earlier this year, the Subcommittee Ranking Member Schakowsky and I -- and, of course, she mentioned it -- with a number of other members of the Subcommittee, introduced the Vehicle Safety Improvement Act of 2015.

Many provisions in our bill would address problems that occurred in the Takata airbag and the GM ignition switch recalls. I -- I mentioned to -- to Congresswoman Schakowsky that my car -- I had a Chevy Impala -- I think it was a 2008 -- I still have it -- was, you know, subject to the ignition switch issue. And, you know, I received a notice in the mail. But there was still some confusion even on my part as to what this was all about. I was that until I actually had the opportunity to go to the Chevy dealer, that I should separate the two parts of the -- the key from the -- from the key chain, or whatever this thing is called. And, you know, I continue to do that even after the -- even after they soldered (ph) and fixed the -- the key.

And, of course, I had to look up and see if my VIN number was one of the -- one of the Impalas that had to be recalled. But even in my mind, there's a lot of confusion about, you know, what was being accomplished. And I think that's why we need legislation.

The National Highway Transportation Safety Administration -- and NHTSA has received much of the blame in both the GM recall and this Takata recall -- but it's clear that NHTSA simply does not have the resources and authorities it needs to protect drivers and passengers and to hold automakers and automobile parts suppliers accountable for safety defects. Our bill provides more resources and tools to NHTSA, increasing fines for manufacturers that violate vehicle safety laws. Also, in both cases, auto makers and parts suppliers failed to timely produce critical information that may have helped NHTSA identify problems earlier.

The bill improves the early warning reporting system by making more reported information public and requiring manufacturers provide significantly more in-formation about any fatal accident involving a safety defect.

So, Chairman Burgess and Chairman Upton, I appreciate your interest and, you know, what you've said today in terms of continued oversight of these recalls, but I think that we need to begin our legislative work, and not just talk about more inves-tigations.

I hope that we can work together to move forward with a bill to keep our citizens safe on the roads.  I yield back.

BURGESS: The chair thanks the gentleman. The gentleman yields back.

That concludes member opening statements. The chair would remind members that pursuant to committee rules, all members' opening statements will be made part of the record.

We do want to thank all of our witnesses for being here today, taking the time to testify before the subcommittee. Today's hearing will consist of two panels. Each panel of witnesses will have an opportunity to give an opening statement, followed by a round of questions from members. Once we conclude with the questions on the first panel, we will take a very brief recess to set up for the second panel.

Our first panel today will consist of a single witness, Administrator Mark Rosekind of the National Highway Traffic Safety Administration.

Dr. Rosekind, we appreciate you being here today and you are now recognized for five minutes to summarize your opening statement.

ROSEKIND: Chairman Burgess, Ranking Member Schakowsky and members of the subcommittee, thank you for the opportunity to provide an update on NHTSA's efforts to address defective Takata airbags. There's a more detailed explanation of our

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee
hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

efforts in my prepared statement, but let me summarize what NHTSA has done and what
we are doing.

All of NHTSA's actions are focused on achieving one main goal, the only acceptable
goal: a safe airbag in every American vehicle. On May 19th, Secretary Foxx and NHTSA
announced that Takata had filed four defect information reports with the agency,
covering an estimated 33.8 million defective airbag inflators that Takata had shipped
to automakers.

Takata, as an original equipment supplier, does not know into which vehicles those
inflators were installed. Prior to the filing, automakers had recalled a total of
18.5 million vehicles. All of the May 19th filed defect reports involved recalls that
are national in scope. Since May 19th, 11 auto manufacturers have been scouring their
own records to determine which vehicles are affected. To date, automakers have filed
additional recalls, bringing the total to an estimated 30.4 million vehicles.

During that May 19th announcement, NHTSA made clear that consumers might have to
wait to determine if their vehicles were covered by the expanded recall, while
automakers made their own recall filings. As you know, Takata's defect filings were
a necessary first step before the automakers would initiate their own filings. The
automakers' filings contained a detailed make and model information and vehicle
identification number or VIN numbers that allow individual vehicle owners to
determine if they are affected by this recall.

Obviously, this delay is frustrating. And if there's any way to avoid that anxiety,
it would have been done. In NHTSA's public communications philosophy, and like all
of our other interactions, we follow a very simple philosophy: to make information
available to consumers as quickly as possible.

To that end, NHTSA has establish a microsite called "Recalls Spotlight." It is
located at safercar.gov, and includes key consumer information on recall issues of
high public interest. It includes continuously updated information on the Takata
recalls.

On May 19th and 20th, after the DOT NHTSA announcement, more than 1.5 million people
conducted VIN lookup searches on safercar.gov, including nearly 1 million on May 20th.
On May 19th, Secretary Foxx also announced a consent order with Takata that gives
NHTSA oversight into the company's testing, requires its full cooperation with our
investigation, and importantly, gives us the ability to fully evaluate the adequacy
of proposed remedies.

It was also announced that NHTSA has launched an administrative process, a
coordinated remedy program to prioritize and coordinate the actions of Takata and
the manufacturers. NHTSA is using this authority provided under the SAFETY Act and
by Congress in the TREAD Act for the very first time. We need to acknowledge
Congressman Upton for driving that vision and working with others to provide a
mechanism to address the challenges and circumstances that are now faced in this
recall.

Many Americans have asked whether we can trust remedy inflators any more than the
defective inflators. NHTSA's consent order with Takata, the coordinated remedy
program, and NHTSA's own testing are all essential actions designed to provide full
and final answers to that critical question. NHTSA will continue pursuing answers
until the American people can have a safe airbag in every vehicle. There continues
to be great interest in establishing the root cause of these defects. While some
factors appear to have a role, such as time and absolute humidity, the full story
is not yet known and a definitive root cause has not been identified. In my recent
experience as an NTSB board member and a veteran of many major transportation
investigations, it may be that there is no single root cause or the root cause may
never be known.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee
hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

Secretary Foxx addressed this directly on May 19th, clearly stating that un-
certainty cannot stop NHTSA from acting to protect safety. In areas of uncertainty,
NHTSA must act, focused firmly on our safety mission.

Lastly, whatever the final numbers turn out to be, this may be the largest, most
complicated consumer safety recall in our nation's history. Fixing this problem is
a monumental task. It will require tremendous effort from the auto industry. It will
also require tremendous effort from NHTSA. And yet the agency must manage this
enormous and necessary task with too few people and insufficient funding.

The same people managing the Takata recall must also continue to analyze thousands
of consumer complaints, investigate scores of other potential defects, and oversee
more than 1,200 other recall campaigns that automakers and equipment manufacturers
now have underway. NHTSA must accomplish this task with a defects investigation budget
that, when adjusted for inflation, is actually 23 percent lower than its budget 10
years ago.

NHTSA needs your help to protect the safety of Americans on our country's roads.
The president has submitted a budget request that would fund significant improvements
in NHTSA's defect investigation efforts, providing the people and technology needed
to keep Americans safe.

The administration has proposed the Grow America Act, which would provide stable,
increased funding for our agency and important safety authorities to help us in our
mission. As proposed, the Grow America Act and in a recently introduced bill, is
imminent hazard authority had been available to NHTSA, this hearing would have a very
different focus. At NHTSA, we address safety risks every day.

I urge the members of the subcommittee and your colleagues in Congress to help
NHTSA address these safety risks and keep the traveling public safe on America's
roadways.

Thank you.

BURGESS: The chair thanks the gentleman.

We'll move into the question-answer portion of the hearing. I will start by
recognizing myself for five minutes for questions.

And Mr. Administrator, again thank you very much for being here. Thank you for
making yourself available to me both in person on the telephone, as you've worked
your way through this process. Just so that people are clear, the VIN number that
we keep talking about, vehicle identification number, people can access that number
at the lower left-hand of their windshield or inside the driver's door.

ROSEKIND: I hope they're paying attention to you. They can find that VIN in that
location and go to safercar.gov to see if their vehicle is in the recall.

BURGESS: And that's the website, safercar.gov. Now, if someone checked their VIN
number and got the all clear on May 1st, do they need to do anything further? Or are
they good to go?

ROSEKIND: We suggest people check that on a weekly basis.

BURGESS: You issued the additional recall in the middle part of May. How quickly
can people assume that you're getting the uploaded information into your website so
that if they check the website, they can be confident that the information they get
is current?

ROSEKIND: So, thank you for that question, because clarity for consumers is
critical here. And Takata had to file their defect reports before the auto man-
ufacturers could put together their information. And what's clear is we can't just

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee
hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

get numbers. They have to be accurate. So they have to do their due diligence and
then we have to do ours.

At this point, we have seven out of the 11 manufacturers have provided the
information, which are now covering up to 30.4 million vehicles. But weekly, people
should be checking.

BURGESS: So, let me just ask you this. Is there anything else that you can do or
we can do to make certain that this process is clearly and effectively communicated
to the driving public?

ROSEKIND: I think you just did part of it, and we're trying to do the same thing,
which is get people to safercar.gov and helping them on a weekly basis go. I do have
to acknowledge the auto manufacturers have stepped up and really provided an
accelerated production of those numbers, which we're checking. So they're getting
out there very quickly.

BURGESS: OK, but then that brings up the other point, their ability to access the
remedy inflators. Where do we stand with that? The production and distribution of
those remedy inflators, where -- where are you?

ROSEKIND: Again, very important for people to understand the whole process. And
I won't give the whole list now, but part of what we're -- this whole hearing is really
addressing is before May 19th, there was denial of a defect. There was mostly a focus
on root cause. There was concern about the supply chain, whether the remedy even worked
or not.

So that all changed on May 19th.

BURGESS: Well, let me stop you there. We're no longer concerned if the remedy works?

ROSEKIND: I'm sorry?

BURGESS: We are no longer concerned if the remedy works?

ROSEKIND: Oh, we absolutely are. And that's what I'm saying, on May 19th, the focus
changed. There's been acknowledgement by Takata that there's a recall and they're
all national. The second is a consent order with NHTSA which allows us to be directly
involved in oversight for testing to make sure that the remedy is going to be adequate
or not.

And then the third part of that is a coordinated remedy program, which goes to
your question, and that is now NHTSA is in the driver seat, and we will coordinate
and prioritize to make sure that the supplies were available and that they get out
there as quickly as possible.

BURGESS: But just so people are clear, to cut through any of the talk surrounding
this, are the replacement devices safe? Not safer, but safe: unequivocally safe.

ROSEKIND: And thank you, because again, that's a very important confusing point.
People need to look up their VIN number now, and if they have a recall to go get a
-- a replacement inflator, they need to do that.

And we've got to point out, there are millions of airbags that are out there every
day protecting people, including millions by Takata that are functioning properly.
We are trying to get the defective ones off.

And so yes, they need to go get it fixed. What we will do is identify if there
is an interim remedy, because you are correct, some of these may not have the longevity
that is needed to make sure that it's a lifelong for the entire life of the vehicle
fix.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BURGESS: So, you know what am I supposed to do? One of my kids calls me and says "hey, I've got a bad VIN number, but good news, they've got a replacement and I'm going to get it fixed," am I OK with that? Am I OK letting my child drive that car?

ROSEKIND: And your dealer should be able to tell you whether they have a fix that is long-term or they have an interim remedy. And the bad news is, if there is an interim remedy, you should get a call back from the dealer when it's time to get that fixed for the long term.

BURGESS: OK. So even somebody who gets it fixed may not really have it fixed.

ROSEKIND: And the dealer better make that clear.

BURGESS: I just want to ask you one thing quickly. I was being interviewed on a national business show the other, or last week, and they pointed out to me that in New York, I guess is where the show originated, that they called dealers around the town and they said they were laughed at when they said, "can we bring our vehicle in to get our airbag changed," that they -- they did not have a supply.

So, I did the next logical thing and called my local guy who does all things cars, back in the district, and he actually provided me some, what I think is some, and this was recent information, number one, no one is reporting any panicked or irate customers as a result of the recall. I do remember a few months ago some dealers were complaining about mad customers. I'm going to assume this was when there was no process in place.

And only one dealer had a real volume for replacements. Another one had maybe a thousand that needed to be replaced, but no one was bringing their vehicles in. And that is and will continue to be a problem that people aren't recognizing that their vehicle needs to be fixed.

My time is expired. I'll recognize the gentlelady from Illinois. Five minutes for your questions, please.

SCHAKOWSKY: I think it's really important what you said earlier. Not all of the VIN numbers are up yet. Is that true? So the people need to be checking. They may be driving a -- with the Takata airbag that will, and their vehicle may be recalled, but it's not up -- online right now, right?

ROSEKIND: That's correct.

SCHAKOWSKY: OK, so...

ROSEKIND: We have seven out of the 11 manufacturers...

SCHAKOWSKY: OK, so people should not necessarily feel secure, but they should just keep checking.

I wanted to talk about one of the authorities that would be in the Vehicle Safety Improvement Act, and that would be to give NHTSA more authority itself for recalls.

The -- the first known Takata airbag inflator rupture occurred in 2004, May, 2004. That's 11 years ago. And months after NHTSA called for national recalls, which was last November, Takata has finally relented, because it is still within their authority to do that.

NHTSA currently has no authority to take emergency action even in cases where defects are known, and there are strong and immediate risk of serious injury or death.

So Dr. Rosekind, in November of last year, NHTSA called for this national recall of certain vehicles with defective driver-side airbags, Takata had refused to conduct the national recall. I know you weren't there at the -- the time, but if NHTSA had had the authority to mandate emergency recalls, do you think the agency or let me put it this way, would you have used it with regard to Takata?

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: And thank you for the rephrasing. Starting my confirmation hearing, I made it clear NHTSA will use every tool available. If imminent hazard authority had been available, we would've used it.

SCHAKOWSKY: Thank you.

The vehicle -- as I said, this legislation does allow for imminent hazard authority to recall, and NHTSA has testified before the subcommittee in the past asking for that authority. So I guess you've already stated you agree with the need for that authority.

ROSEKIND: Absolutely.

SCHAKOWSKY: And would it have been beneficial to NHTSA in carrying out its mission to reduce deaths, injuries, and economic losses resulting from motor vehicle crashes?

ROSEKIND: Absolutely. And just to highlight, what you're focused on is an imminent hazard would have allowed us to get these airbags off the road. And there are still procedures to make sure everything is done transparently officially, but we wouldn't have been waiting. There could have been lives saved and people -- injuries prevented with imminent hazard authority.

SCHAKOWSKY: There are a number of other provisions in the Vehicle Safety Improvement Act. It would double the funding for NHTSA. So, first let me have you comment on that in terms of the resources that you have to do the job that needs to be done and that I think Americans all expect is being done.

ROSEKIND: At my confirmation hearing in December, I highlighted people, technology, and authorities that we needed to look at those. I got to NHTSA and found out it was more under-resourced than I had ever imagined from the outside. And since I've been there, we have done everything we are -- we can and will be doing with what we have available to us.

I could give you a list of 29 different things that have already gone on, process improvements et cetera. At some point, you need people and authority to actually get the job done, and that's a concern.

I highlighted even in December, there are eight people looking at 80,000 complaints coming in, and there are now eight people in the recall group that have to do with this recall, 34 million vehicles, and the other 1200 campaigns that are going on at the same time.

SCHAKOWSKY: I think it actually would be helpful to this committee that if you had additional resources to tell us exactly how that would be used and how then it would impact consumer safety, so I would appreciate seeing that. ROSEKIND: And I'd be happy to do that, because in fact, in the president's 2016 proposal, we've identified what our request for enhanced funding, so we can actually talk about a trend analysis division, a special investigation division for defects. We can provide that to you.

SCHAKOWSKY: I would appreciate it.

The legislation that some of us are co-sponsoring would increase civil penalties, it would limit -- eliminate most statutory maximum penalties to make sure that bad actors have every incentive to get unsafe vehicles off the -- the road. It would also make sure that would eliminate what I think is really the farce of regional recalls. I wonder if you could comment on those provisions.

ROSEKIND: Sure, just as far as the cap goes, GROW AMERICA goes to 300 million. Yours has no cap. Clearly the message there is $35 million is not enough to really get an effect. So, anything that gets us to $300 million or beyond would be great.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

And I think as far as regional recalls, my perspective is that everything is national.

SCHAKOWSKY: Thank you. I yield back.

BURGESS: Gentlelady yields back. Gentlelady's time has expired.

The chair recognizes the chairman of the full committee, Mr. Upton, five minutes for questions please.

UPTON: Well, thank you Mr. Chairman. And again, we welcome your appearance before us and wish you all the best. I want you to know that I've made an inquiry. I don't know what the appropriation committee did with regard to the NHTSA budget, but I'm -- I will find out soon.

Prior to the May 19th announcement, what efforts did you do to coordinate with the auto manufacturers so that they could identify the -- the VIN numbers impacted by the recall.

ROSEKIND: And before I go specifically to that, let me just say there were a lot of actions and inactions before May 19th, so it's already been raised here that Takata was pressured to go for a national recall, denied any defect.

We do have to acknowledge...

UPTON: We saw that in December, back here too, before you were on board.

ROSEKIND: That's exactly correct. And -- and the auto manufacturers stepped up to actually take on those recalls, service campaigns, and other things, even though Takata was denying.

So, there was some action before that. UPTON: So just to use my own little personal experience, I don't do this very often, but with my incident coming back to Michigan for the memorial day break, so I did plug in the safercars.com with my VIN number, and I'm not sure that we still can determine today it was a Ford Explorer '06, and I can't really tell today even if it was a Takata airbag or TRW or whoever it was, the information was not readily available when I got online last week.

ROSEKIND: And that's why the information is coming back in safercar.gov is really just calling it recall or not, it won't give you the specifics.

UPTON: Yeah, it didn't have it on the recall list.

ROSEKIND: Yeah, which means you'd be clear if it wasn't there as a recall.

UPTON: Although I am supposed to be checking every week, is what you're saying.

ROSEKIND: On a weekly basis, which by the way, is a good thing to do anyway because of the number of recalls that are coming out, is just to check that on a regular basis. Airbags aside, that's a good source to have bookmarked for you to go back.

UPTON: So, so the auto manufacturers really did step up then, is what you're saying? All of them?

ROSEKIND: And that was to -- again, previously, when Takata denied the manu-facturers stepped up to look at recalls and what they could do. To your question specifically, we had contact with them the day before to let them know something was coming related to the defect, so they would have a heads up and since then have been in contact with them about the coordination that's coming forward.

UPTON: So you and I talked in advance of the announcement, and what is the time-table, what is -- what is the goal, the time-table for completely resolving the issue, being able to identify which vehicles have these defective airbags, getting them replaced, making sure that the owners are -- are there, what's your -- what's your hopeful time-frame for this to be resolved, and we can move to the next issue.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner) Federal News Service

ROSEKIND: At this point, I believe if anybody gave you a number, they don't know what they're talking about. Here's our plan to get there, and that is we've already initiated contact and had meetings with both the auto manufacturers and suppliers, other meetings bringing all of them together, that will create a plan that will look at the effectiveness of the remedy, the supply, and try -- and basically getting to 100 percent recall. We hope to have a public hearing by the fall that will lay all of that out, all three of those elements.

UPTON: What steps have you taken to you know, has NHTSA taken to ensure that the propellant safety and evaluation for the integrity of the studies and testing being submitted to NHTSA by various parties? It seems to be a real element here.

ROSEKIND: Yes, again, thank you for highlighting that, because part of the consent order actually allows NHTSA to directly focus the testing, so we could make sure that goes to both the adequacy of the remedy as well as the root cause. So, now we have some direct oversight and involvement with that. Before, we were just on the receiving end. Now we can actually direct.

And as you know, everybody was focused on root cause, which is still not determined nobody focusing on the remedies.

UPTON: So, when someone has one of these defective airbags, they have to replace the whole thing. They can't replace just the propellant, is that right? They've got to take the whole thing out and put a whole new -- new device in with a different propellant. Is that right?

ROSEKIND: That's correct.

UPTON: OK. Thank you. Thank you very much for being here.

I yield back.

BURGESS: Chair thanks the gentleman. Chair recognizes the ranking member of the full committee, Mr. Pallone, for five minutes for questions please.

PALLONE: Thank you, Mr. Chairman.

On February 20th of this year, NHTSA sent a letter to Takata informing the company that its failure to cooperate with NHTSA's investigation of the airbag defect as well as Takata's prior knowledge of the defect will result in fines of $14,000 per day for each day Takata failed to cooperate. By the time those fines were suspended under the consent order last month, Takata had been fined about $1.2 million.

So Director, how much of the $1.2 million that Takata owes in fines has the company paid to NHTSA?

ROSEKIND: Basically, with the consent order, we made sure that the investigation continues as well as the potential for future penalties. And so at this point, nothing's been collected, because we're looking at an open investigation with potentially future panels needs to be collected.

PALLONE: So when do you expect that the penalties will actually be paid to the agency?

ROSEKIND: That could be at any time. And part of that, I think, will come as the investigation continues. We're focused right now on the safety element of it. As it unfolds, there may be need for, again, further penalties, and I'm sure that would be part of the package that would be...

PALLONE: I was going to ask you about further penalties, but you obviously think you do -- there's a possibility of additional civil penalties against Takata.

ROSEKIND: Yes.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

PALLONE: OK.

A Reuters article last week cited a source within Takata explaining that the daily fine was a factor motivating Takata to agree to a national recall, but it still took three months of daily fines to get Takata to agree.

Are financial incentives an effective means of ensuring compliance amongst manufacturers in your opinion?

ROSEKIND: No question. And I think from the earlier question, going from 35 to 300 or no cap is critical. If I can take just a moment, I would highlight that there was the penalty, there was a preservation order, and frankly NHTSA was working on a unilateral program to go after this that we made sure was communicated to Takata as well.

PALLONE: Do you believe that increasing the size of the statutory penalties would have allowed NHTSA to put more pressure on Takata and other automakers and in turn, to reach an agreement to conduct a national recall sooner?

ROSEKIND: No question.

PALLONE: OK.

Last year, G.M. was fined the statutory maximum of $35 million for its failed handling of the ignition switch recall. Many regulators and advocates, including Transportation Secretary Anthony Foxx asked Congress to raise or eliminate those statutory maximums in order to send a stronger message to bad actors.

I mean, it's impossible to put a price on the cost of a serious injury or loss of life. No financial penalty or compensation can bring back a family member. But stronger financial incentives can go a long way in deterring manufacturers from hiding defects and not cooperating with federal investigations.

So, you know, as I mentioned, Congresswoman Schakowsky and others on the committee have introduced the Vehicle Safety Improvement Act, which would not only raise per violation civil penalties, but also eliminate most statutory maximum penalties. So do you believe stronger financial penalties would discourage automakers and part suppliers from hiding possible defects, or incentivize quicker action for manufacturers?

ROSEKIND: Absolutely.

PALLONE: All right.

And lastly, I wanted to ask you, would increased fines make automakers more likely to cooperate with NHTSA investigations?

ROSEKIND: Yes.

PALLONE: All right. Thank you very much.

Thank you, Mr. Chairman.

BURGESS: Chair thanks the gentleman. Gentleman yields back.

Chair recognizes the gentlelady from Tennessee. Five minutes for questions please.

BLACKBURN: Thank you, Mr. Chairman.

And Mr. Rosekind, I thank you so much for taking your time in being here. Let's go back to your November 18th second special order to Takata, where they were to come to you with information, further information about their propellant mix. And what we would like to know is what you have been given, what you know about that mix, what is the specific use of that mix and the replacement parts or the remedy parts as you call them and in new vehicles.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: And I can provide as much technical information as you'd like. What you've identified is one of the special orders that actually triggered the daily penalties that started, because we basically had 2.4 million documents dumped on us with all of that information and tried to understand where the meaningful pieces were.

So, we have some of the meaningful pieces now identified, and we can certainly bring you as much technical information was provided.

BLACKBURN: Are you satisfied with the information that Takata has provided to you on their propellant mix?

ROSEKIND: We're still -- we're working our way through that information. They have been open about providing us testing data.

BLACKBURN: OK.

ROSEKIND: But the information that you're asking about was millions of millions of pages that have grown from that 2.4. So we're still making our way through that.

BLACKBURN: OK. Are they being forthcoming in bringing clarity to that? We want to know what the mix is -- the propellant mix is.

So, are they satisfying the -- the questions that will -- that consumers will have, that when they want to know this component that is in their vehicle that is to make the vehicle safe now explodes, it causes injury and the question is, have they arrived at something that is going to make certain that indeed it is safe?

ROSEKIND: And I would say they will now. That's part of the consent order...

BLACKBURN: OK.

ROSEKIND: That they are required to provide that information. BLACKBURN: So you're satisfied? I think if you could just have someone from your team provide a summary so that we will have that for the record, that would be helpful to us for future hearings and for legislation.

Also, let me go to the point that was made, back to that December hearing we had that ammonium nitrate was used as a propellant in the 1990s.

And so what we would like to know, have you all found any evidence of ruptures from the -- that occurred in the '90s and if not, does NHTSA have any insight into why not?

ROSEKIND: And that's a good question. Again, I'll go back and make sure that that's part of the information that we provide you. What's really important about the consent order is we now get to be in the driver's seat to direct this kind of testing. We'll be looking at it both historically and see how that informs what we need to do now.

BLACKBURN: OK, we would love to have that as a follow-on if you will as to what occurred in the '90s and as you go back and do a revisit of the information that you have, that would be helpful. One last thing, you mentioned this to auto manufacturers, and Chairman Upton mentioned that they had been doing their part in needing this.

I want to know if you're satisfied with how the dealers are being compensated for this, if they are being made whole. Because if everyone is taking their car in for the replacement, that's a lot of loaner cars, that's a lot of man hours, so would you speak to that?

ROSEKIND: Actually, I'd suggest you ask that of the individuals on the next panel, because we would be focused on that only if it interfered with the recall.

BLACKBURN: OK. We are going to ask the next panel that, but wanted your insight also. And with that, Mr. Chairman, I yield back.

BURGESS: Chair thanks the gentlelady. Gentlelady yields back.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

Chair recognizes the gentleman from Massachusetts. Five minutes for questions please.

KENNEDY: Thanks very much Administrator. Great for you to be here, and I appreciate your -- your service to the country and you're willing to testify today.

I want to touch base with you a little bit. You've heard some of my colleagues already mention the Vehicle Safety Improvement Act, and I want to touch on that, and particularly the need for safety upgrades for used cars.

User car sales in March and April of this year reached more than 3 million cars sold for each month, but purchasers of these cars now face major loopholes when it comes to auto safety. Most do not know it. The Vehicle Safety Improvement Act would take two concrete steps toward making our used car market safer. First, the bill would require the buyer's guide window form to include information about a vehicle's history of damage and of recall repair history.

Second, the bill would also prohibit dealers from selling or leasing used vehicles subject to a recall until the dealer has repaired the defects.

So, Dr. Rosekind, I -- concerned that consumers have an implicit perception that used cars are safe and free of defect and that dealers have made all necessary repairs. Is that true, or what light can you shine on that problem?

ROSEKIND: This is part of the GROW AMERICA proposal. It's part of what you're describing, and I guess I just -- I can't imagine that you would sell a new car, used, leased, et cetera, if you knew there was a defect involved, not to have it fixed before you put it in somebody's hands. Just seems like we don't have the system working properly.

KENNEDY: I would agree.

So Doctor, a purchase of a used car and can find some vehicle history information through the National Motor Vehicle Title Information System. But that information is available only if the purchaser knows where to find it and pays a fee.

So do you agree that purchasers of used cars can benefit from knowing that a used car they intend to purchase has been previously junked, salvaged, or marked as a total loss?

ROSEKIND: Any information that's going to help them determine the safety of that vehicle is going to be useful to that consumer, no question.

KENNEDY: So, the Vehicle Safety Improvement Act requires information from vehicle history report to be made available through the National Motor Vehicle Title Information System to be included in a buyer guide window form. Do you think that's a smart provision to go for?

ROSEKIND: Every piece of safety information is going to be helpful.

KENNEDY: Finally sir, current dealers are prohibited from selling or leasing new vehicles subject to recall unless a dealer makes the necessary repairs, but the same regulation does not apply to used cars, which means that used cars may be sold or leased to consumers with unrepaired defects.

The average recall completion rate for vehicles is about 75 percent, meaning that a full 25 percent of all recalled cars are not being repaired. For the Takata airbag recall, the completion rate so far has been much, much lower. In many of these cases, the cars are not being repaired, because the current owner of the vehicle doesn't know anything about the recall.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

So, what efforts does -- has NHTSA undertaken to increase the awareness of used car buyers and lessees about the potential safety defects. And what does NHTSA -- or what obstacles does NHTSA face in getting this information out to consumers?

ROSEKIND: I don't think there's any question this is a huge part of the whole system. And we've identified -- Secretary Foxx and I have really emphasized finding defects is great, but if you don't get them fixed, it doesn't really matter. So we actually held at the end of April an event called Retooling Recalls, asking the industry for new ideas and have set the standard as 100 percent target to get recalls done.

KENNEDY: So, do you agree then that the provision of the Vehicle Safety Improvement Act to prohibit the sale or lease of used cars until any defect has been remedied would help increase recall completion rates?

ROSEKIND: Absolutely.

KENNEDY: And would it make drivers of used cars safer?

ROSEKIND: Absolutely.

KENNEDY: Are there other tools that would help NHTSA improve the safety of those cars? What would they be?

ROSEKIND: And I would say from our event in April, there's a great list of possible things that could be done, and we're looking at all of them.

So we had manufacturers come in and talk about some of their new strategies, and there were some new things that only one manufacturer was doing. We need to figure out what NHTSA could do to get those basically across the entire industry.

KENNEDY: And Doctor, how can this committee be of any service to you as you try to get that information out?

ROSEKIND: Frankly, I think the bill has been introduced and GROW AMERICA Act are two of the most critical things right now as far as our authorities and budget, and then directly there's the budget, which allows us not just people, but the authorities and other kinds of opportunities.

KENNEDY: And briefly, I only have a short period of time left, but if -- did I hear you say earlier in your testimony Doctor that there were -- you had eight staff that were working on this recall of 34 million vehicles, and that same staff of eight people working on 1,200 other recalls?

ROSEKIND: There are 51 in the Office of Defect Investigations. Eight of them look at the 80,000 complaints that come in. A different eight are handling this recall.

KENNEDY: But so eight people -- eight?

ROSEKIND: Correct.

KENNEDY: OK. Thank you, I yield back.

BURGESS: Chair thanks the gentleman. The gentleman yields back.

Chair recognizes the gentleman from New Jersey, Mr. Lance. Five minutes for questions please.

LANCE: Thank you Mr. Chairman.

Dr. Rosekind, I went online regarding my own situation, and the website is safecar.gov.

ROSEKIND: Safercar.gov.

LANCE: Spell that out for the public please.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: Thank you. S-A-F-E-R-C-A-R-dot-G-O-V. Safercar.gov

LANCE: And it has on it how many millions of VIN numbers?

ROSEKIND: The total number of VINs, I can't tell you specifically. For the Takata right now, we're up to 30.4 million vehicles (inaudible) manufacturers.

LANCE: And I know you're working as quickly as you can but at the moment, not all of the VIN numbers are on that site. And I was just lucky that my VIN number had already come up. But you're informing the American people through this committee hearing, which is being televised across this country, that the American people should go on that website frequently.

ROSEKIND: Weekly.

LANCE: Weekly.

Now, can you estimate, Dr. Rosekind, as to when you might have all of the numbers up on the site?

And I know that's a difficult question and I'm just asking, is there a time frame that you think you might be able to -- to have?

ROSEKIND: We have seven out of 11, and the manufacturers are working quickly. I would hope within the next two weeks, we should have that complete data set.

LANCE: So, within the next two weeks.

ROSEKIND: The plan.

LANCE: Very good. Now, I didn't ask this because then I called the dealer, and the dealer was very, very cooperative, and said that he thought he'd have a new airbag within one week to four weeks. And did I need a loaner car?

But I didn't think to ask, should the American people ask, is this for the driver or for the passenger? And I have no idea at the moment, and perhaps I should, as to whether in my personal situation, it's the driver or the passenger? And as I understand it, in some situations it's both.

Could you enlighten the committee, and through the committee, the American people on that aspect of all of this?

ROSEKIND: Safercar.gov will tell you what the recall is for specifically: driver, passenger, both, it will give you that information. So you'll know what to ask the dealer. Don't have to rely -- you don't have to rely on the dealer to tell you what needs to be fixed.

LANCE: And are there situations where there will be the need for a new airbag for both the driver and the passenger in the same automobile?

ROSEKIND: That could be.

LANCE: Do the auto manufacturers themselves have the responsibility, I trust, to inform those who have purchased their automobiles of these potential defects?

ROSEKIND: And they make that information both through safercar.gov, they're the ones who provide us the make and model and VIN numbers, as well as most of them provide that on their own websites as well.

LANCE: And are they mailing letters to -- to those who own the vehicles?

ROSEKIND: Yes, there are recall letters that are officially labeled for people to know specifically what is being recalled.

LANCE: And do you know, Dr. Rosekind, how many of those letters have gone out so far?

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: That, I would have to look into and get back to you.

LANCE: Thank you. The Wall Street Journal says today based upon a German study that there may be at least four factors that could lead to all of this, and the factors include damaged or problematic inflator components, the positioning of the inflator, and airbag system and vehicles, prolonged exposure to heat and humidity, and manufacturing variability.

Are you now analyzing the new study from the Germans as to whether what -- what they suggest may be true? ROSEKIND: So we are looking -- we're both aware of that report and looking at that, plus there are multiple folks doing testing. You're going to hear from an independent testing coalition of the auto manufacturers. Takata's doing its own, automakers are doing their own. The consent order's going to give us access to all of that data.

And you've just highlighted last quick comment, why this was so difficult. There are over 10 different configurations of the inflator across all the different makes and models. That's part of the problem of trying to figure out what the root cause is now.

LANCE: As I understand it, part of this is using batwing-shaped wafers inside airbags. Would you through the committee explain to the American people what that means?

ROSEKIND: That has to do with the shape or design basically of the propellant container. And that's a perfect example of the different design configurations that are in over 10 different of these inflators, and so that's part of the problem.

In fact, there are some Takata airbags in certain manufacturers that have ruptured in some manufacturers' but not other manufacturers' cars.

LANCE: Thank you. You've been very helpful.

And let me say I look forward to the testimony of the second panel. And Mr. Chairman, I yield back the balance of my time.

BURGESS: The gentleman yields back. Chair thanks the gentleman.

Chair recognizes the gentleman from California, Mr. Cardenas. Five minutes for questions, please.

CARDENAS: Thank you, Mr. Chairman.

Thank you, Dr. Rosekind, for all of your service and for answering our questions today, not only for us, but for the people we represent throughout the country.

I'm going to start off by talking about the -- your administration to get an understanding of how, what we are or are not doing to make sure you have the resources to protect the American public or to help protect the American public.

One estimate puts the number of vehicles on U.S. roads in 2014 at about 253 million, which is nearly 4 million more than the estimate of 2013. Meanwhile, in spite of the growing volume of vehicles and the increase in complexity of newer vehicles, NHTSA's budget has remained relatively flat over the past few years.

For fiscal year 2016 budget appropriation of $837 million continues this trend, coming in more then $70 million short of NHTSA's request. Dr. Rosekind, do you believe that the stagnant funding for NHTSA's is part of the do more with less culture that has resulted from sequestration, has made it harder for the administration to do its job of keeping unsafe vehicles off the roads?

ROSEKIND: There is no question. Where NHTSA is addressing safety risks every day, that the budget and personnel and authority issues are helping -- helping create more risk for us. From my confirmation hearing, I've identified needing to deal with

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

peoples (ph) we've done and we'll continue to do everything internally, process wise, procedurally, that we can to be more effective, but at some point, eight people to look at 80,000 complaints, up from 45,000 the year before, now you're just talking you know, people that can get the job done.

CARDENAS: Well, I constantly hear, I've been elected to office 18 years at various levels, and I constantly hear some of my colleagues talk about fiscal conservativeness and talking about how government needs to operate more like a business.

i don't know of too many businesses that responsibly act with eight human beings trying to handle 80,000 you know, moving parts of issues and constituents.

That -- that's not efficiency. I think that's -- that's, well, it's delinquency to be honest with you. And not delinquent on you, but delinquent on us, the appropriators. I think we need to do a better job of protecting the American public, or helping you to do your job of helping to protect the American public.

The office of defect investigation, which is responsible for screening and reviewing 40,000 consumer complaints per year and conducting investigations of possible defects, had 51 full-time staff in March of 2014, down from 64 in 2002.

NHTSA's fiscal year 2016 budget request includes a request for funds to do -- to more than double the number of ODI personnel.

Dr. Rosekind, is the $837 million that the House Appropriations committee approved for the 2016 fiscal year, is it sufficient for increasing the number of ODI personnel?

ROSEKIND: No, that basically flatlines where we are today.

And just -- and just to inflate that for you appropriately, that 40,000 number was last year. Because of all the attention last year, that number is now 80,000 complaints coming in. It's doubled.

CARDENAS: So that's where you get to the 80,000?

ROSEKIND: Yes sir.

CARDENAS: Thank you.

It's clear that additional funding sources for NHTSA will be critical to ensure the -- ensuring the administration can keep drivers and passengers safe. That's why in addition to new appropriations specifically for NHTSA's vehicle safety programs, H.R. 1181 would authorize a new vehicle safety user fee. This fee would be paid by vehicle manufacturers for each U.S. vehicle certified to be federal -- to meet federal safety standards beginning at $3 per vehicle and increasing annually to $9 per vehicle. But this could potentially generate tens of millions of dollars for NHTSA to spend specifically on safety. Dr. Rosekind, do you think NHTSA would be able to find efficient and effective ways to channel the money raised by such a fee into consumer safety?

ROSEKIND: No question. And I think if anything, it's all about the safety mission, I think for the agency and for me, so you give us more resources and we'll give you more safety.

CARDENAS: OK. And once again, looking at the numbers, the number of vehicles on American roads is growing, correct?

ROSEKIND: Yes.

CARDENAS: And fortunately and unfortunately, when we have better systems of identifying when there is a defect, that means that we are much more aware quicker of how many more, in this case, millions of people need to be notified and coordinated with et cetera so that we can actually get them in a safer place with a product that has been identified as being defective, correct?

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: No question. We want to move the whole industry to a more proactive safety culture. Early identification means early intervention. Small numbers, we wouldn't be where we are today.

CARDENAS: Well, I think that Americans take it for granted that we do have these systems. Unfortunately, I think that too many Americans ignore the idea that Congress is not doing its job of properly appropriating so that they are safe.

Thank you very much.

BURGESS: Chair thanks the gentleman. The gentleman yields back.

The chair recognizes the gentleman from Kentucky, Mr. Guthrie, for five minutes for questions please.

GUTHRIE: Thank you Mr. Chairman, for recognition.

Thank you for being here today. Really appreciate it.

I have a question. You mentioned talking about going to the site and putting in your VIN number, that you have the information from seven of 11 manufacturers. Is there a timeline you think you'll have the other four?

ROSEKIND: That was asked earlier, and our plan is to have that within two weeks, if not sooner. The manufacturers are moving very quickly, not just about getting the numbers, but checking the accuracy, which both they and NHTSA have to do.

GUTHRIE: So that's the process is taking...

ROSEKIND: Yes.

GUTHRIE: OK.

Takata suggested that the particular make and model of a vehicle may be contributing to the inflator defects.

Has -- has NHTSA reviewed that analysis and come to the come to some conclusion with that?

ROSEKIND: And that's part of the problem with the root cause right now. There are not just 10-plus different designs of the inflators, but we're looking at different makes and models, so that's exactly what the difficulty is. There are some Takata inflators in a make and model that is not ruptured. The same Takata inflator in a different make and model might rupture. But when you think about all the different variations you have to look for, that's why it's a challenge right now trying to come to root cause.

GUTHRIE: Yeah, earlier in my life I was a certified quality engineer, and so it seems like it's difficult to recreate the problem. I mean, it's just -- you can't figure out exactly the root cause, and so we're getting at -- and I was, you know, vehicles last a lot longer than they used to, and people have them for quite a while, and they tell you to change your oil every 3,000 miles, your tires every so many thousand, rotate them.

Is there any manufacturer of a vehicle out there that says routine maintenance at all on airbags that you know of?

ROSEKIND: That's a very good question. I don't believe so, but I'll get a specific answer for you. And right now, the average vehicle's in service for 11.4 years.

So even many of the statutes that are out there that only go to 10 are surpassed by the vehicles that are on the road now.

GUTHRIE: So, I mean obviously people who buy a vehicle expect their airbag to last as long as their vehicle lasts, but as far as we know, there's not a routine kind

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

of maintenance to check -- it's hard to check. I mean it's one of those things that's destructive tests, and to check -- to check your airbag and you move forward.

I have a question. Since December 3rd, the hearing that we had in 2014, how many additional fatalities and injuries? You might have mentioned that, but I'm not sure I heard that when you were -- when you were -- you were speaking?

ROSEKIND: Specifically, we're aware of six worldwide, people that have lost their lives, and at least 100 injured.

GUTHRIE: And also, Mr. Friedman, I know you weren't here, testified in December that you were going to hire an expert in propellant and bag production, airbag production within a week of the last hearing. Has that taken place, hasn't it?

ROSEKIND: Yes, it has. And I've tried to identify -- we have at least four people on staff that know airbags quite well, but now we have someone with particular expertise in the areas we're looking at that's been on staff.

GUTHRIE: Well, these four people that know airbags, are they part of the eight that you were describing, so they're also looking at the other problems as well?

ROSEKIND: We have three or four staff people that have the expertise as well as a consultant that's outside that's been added, and the three or four staff people who are part of the eight that we -- part of the eight you were describing.

GUTHRIE: Well and so has ever been an airbag consultant before? This is new, I guess, due to this issue?

ROSEKIND: And this individual was picked specifically because of expertise on the propellant side, because even with the inflator, if you think about design and all the other elements, we're really focused on the chemistry of the propellant.

GUTHRIE: Well thank you, and I appreciate you being here, and I know we're all here trying to find an answer because of the even since December 6 and the hundreds of injuries, and we need to get to the bottom of it, and thank you for being here today.

And I yield back, Mr. Chairman.

BURGESS: Gentleman yields back. The chair thanks the gentleman.

The chair recognizes the gentlelady from New York, Ms. Clarke. Five minutes for your questions please.

CLARKE: Thank you very much, Mr. Chairman.

I thank our ranking member.

Dr. Rosekind, thank you for all of your work and testimony here today. NHTSA first asked Takata to conduct a national recall in November of 2014. Takata responded by questioning NHTSA`s authority to order the company to undertake a national recall.

In a December hearing held by this subcommittee, Takata reiterated its belief that a national recall was unwarranted. Although I should note that many of the auto manufacturers expended their recalls anyway, nearly six months to the day since the last hearing, we are in a much different place, but also six months behind where we should be in getting these dangerous airbags out of our cars.

Dr. Rosekind, in today's world goods and services cross state lines without a second thought. Our cars have an average lifetime of 11 years on the road and frequently spend time in all corners of the country during their lifetimes.

Given the realities of the world in which we live today, is it possible for NHTSA to guarantee that a regional recall will be sufficient?

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: Our approach has been -- my approach has been to make sure we focus on national recalls, and that was part of the challenge previously, was Takata's denial that there was even a defect, and even though manufacturers stepped up, there was a wide range of patchwork basically of service campaigns, some recalls, some regional, some national. It was all over the place. May 19th, NHTSA took the driver seat, and our quarter rated -- our coordinated remedy will change all of that.

CLARKE: Yeah, I don't think so either. H.R. 1181, the Vehicle Safety Improvement Act, would eliminate the farce of regional recalls by making clear that all safety recalls of motor vehicles and replacement parts must be carried out on a national basis. The bill will also allow NHTSA to prioritize certain parts of the country when the quantity of replacement parts is limited.

Dr. Rosekind, in the past, NHTSA has supported regional recalls. Early in this hearing, you said that from your perspective, recalls are national. Can I then assume you support this provision of the Vehicle Safety Act?

ROSEKIND: We are interested in safety for everybody, so we start with the national recall.

CLARKE: Very well.

Takata's written testimony explains that for two of the Takata airbags being recalled, the recall will be regional and NHTSA will have to order Takata to expand the recalls nationally. Will you commit to expanding all of the Takata recalls nationally now?

ROSEKIND: And I think it's been interesting to watch people's response to those two -- those two passenger airbag inflators are the most problematic. And so that basically is trying to ensure that the people at the highest risk get their fix as quickly as possible. If you read those defect reports, it expected that those will be national.

CLARKE: So that means that we are looking to have a national recall now?

ROSEKIND: Yes, with a very specific focus to make sure those problematic ones, we get those high risk people covered as quickly as possible.

CLARKE: The recalls of Takata airbags began as safety improvement campaigns and regional recalls in all -- only certain parts of the country with high absolute humidity. As NHTSA, Takata and car manufacturers learn more about the defect and as inflator ruptures occurred outside those high humidity areas, the air automakers each responded differently. Some expanded their recalls to additional states. Others expanded recalls nationally.

And the information for consumers was hard to find. It seems to me that the regional recalls in this case only added to consumer confusion. I believe that conducting national recalls from the start with an allowance for prioritization of placement parts to a most vulnerable geographic areas first would have lessened the consumer confusion in this case.

Dr. Rosekind, do you agree that the rollout of the recalls could have been handled better from the very beginning? ROSEKIND: What I am going to do is focus, which Chairman Burgess already said, I think you beat me by about a month or so of being in the chairs, and so I can speak to the last five months that we're going after national recalls for these to make sure every -- every American gets a safe airbag in their vehicle.

CLARKE: I just want to make sure that we learn from this lesson.

ROSEKIND: Absolutely.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

CLARKE: You know, it's very interesting that you know, we are trying to reorganize how we do things if we know from the very outset that we can administer best practices going forward.

ROSEKIND: Absolutely.

CLARKE: Very well.

Mr. Chairman, I yield back.

BURGESS: Chair thanks the gentlelady. Gentlelady yields back. The chair now recognizes the gentleman from the high humidity city of Houston, Texas.

Five minutes for your questions please.

OLSON: Thank you, Mr. Chairman.

And welcome, Dr. Rosekind.

For my questions, I would put a human face on last victim of a defective Takata airbag.

His name was Carlos Salise (ph). He was 35 years old. Lived in Spring, Texas. Went to Spring High School. He loved working with his brothers at Progressive Pumps. He bought a used 2002 Honda Accord, was involved in a minor crash on January 18th of this year.

His airbag deployed. It was supposed to save his life and took his life.

He left behind a wife, Nicole, and three kids: Devon, Alyssa, and Angelina.

His vehicle had a recall that was put out in 2011. He bought the car in 2014. He had no clue that the vehicle may be defective. He fell through the cracks.

My question is, how can NHTSA make sure Carlos never happens again? How can we track the ownership of the vehicle with recall notices?

ROSEKIND: First, thank you for recounting that. Everyone at NHTSA could give you a number. In 2013, there were 32,719 lives lost on our roadways. We know the exact number, thank you, because you gave to the six people that have lost their lives worldwide, you gave a name and a face to one of those victims.

And I think the concern which has been raised here earlier is that was a person that had a used car that had a recall notice out. And so people are buying used cars or renting cars that have recalls, defects, acknowledged defects, that are not being fixed beforehand. So we are looking for -- through GROW AMERICA, the improvement act that's been introduced, ways of trying to fix that gap.

OLSON: Well some of us have to find a way -- as Mr. Kennedy said, to make sure that the owners of the car follows recall notices, because Carlos had no clue that his car was defective. He was driving what he thought a great vehicle, had been out there since 2002, and gets in a minor accident and dies because his airbag killed him.

I want to talk about Deputy Administrator Friedman came here in December. He stated that NHTSA would look into the safety of replacement airbags, the ones replacing. And he said that NHTSA was examining the airbag manufacturers that use the same propellant.

My question is, what is -- those investigations -- the new -- the new devices and the propellant?

ROSEKIND: Thank you, because this allows me to highlight the consent order that has been signed to allow us to direct testing. Previously, that was almost exclusively on root cause.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

Now, we will have an ability to make sure the testing goes to the adequacy of the remedy. Right to your question, which is there are a variety of possible solutions and we need to make sure that testing goes on to examine those and make sure that the replacements will be effective long-term.

OLSON: Are there other inflators that need to be examined from different models of vehicles?

ROSEKIND: And thank you. I think you know, one of the concerns is we do not know the root cause at this point. On the other hand, we do know that there are plenty of inflators that are functioning successfully. In 2013, 611,000 crashes were airbags deployed.

So, we know they can function, and we know there are even different versions of Takata airbags that are not rupturing. So that's the good news is we have other models or examples that can be pursued to understand what to change now.

OLSON: Final question about fatigue of recalls.

I mean, last year, the American people have been subject with G.M. ignition switch recalls and massive recalls, Takata airbags out there, all the recalls. I'd just start with them. I mean heck, this past year I got a new pickup truck. Got a little notification from G.M. that there'll be some sort of defect in some sort of sensor. So I had that taken at the dealership.

My question is, do you think there is recall fatigue? I mean, how can we fight the fact that recall after recall after recall are hitting the American public, if I have (inaudible) say I'm tired of this. I'm driving my car. It's fine. So how can we fight recall fatigue? Any ideas?

ROSEKIND: First of all, I think it absolutely exists. And we held an event in April called retooling recalls, one to readjust 75 percent may be good, but we've readjusted the target to be 100 percent completion.

And then it was actually fantastic to see the number of manufacturers that are coming up with creative ways. Some manufacturers are actually taking their creative teams to help them sell vehicles, and now applying them to the recall. So they're having special hours, they're having weekends with you know, things for the kids. Private investigators are going to homes to locate these people. A whole list of new ideas. And we're going to try and find a way to make sure everybody in the industry has access to those -- access to those ideas and actually are following up to take action.

OLSON: By the time -- on the behalf of Carlos Salise, (ph) thank you.

Yield back.

BURGESS: Chair thanks the gentleman. Gentleman yields back.

Chair recognize the gentleman from North Carolina. Five minutes for questions please.

BUTTERFIELD: Thank you very much, Mr. Chairman.

First, let me thank you, Chairman Burgess, for holding today's hearing.

I think this is a very important hearing, and hopefully we can get some good information into the record that can have a bearing directly on the issue that we're talking about.

This is an important issue. I am somewhat surprised Mr. Chairman to learn that the Takata airbag malfunctions have been linked to areas of high humidity. I am not sure that I really knew that. If I knew it, I didn't fully appreciate it until recently.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

I represent a very humid district down in North Carolina, maybe not as humid as the districts are down in Texas, Mr. Chairman, but we are indeed a region that is very humid from time to time.

Though North Carolina is outside the designated high absolute humidity area, one of these airbag malfunctions occurred in my state, causing me a great deal of worry about the safety and efficacy of airbags manufactured by Takata, and the potential for my constituents to be seriously harmed or even worse.

I also have concerns about what practical impact this recall, and any recall, will have on the rental car market, and so I will be concentrating on this aspect during my question time today. The U.S. rental market is huge. We all acknowledge that, in fact, one study estimates that there were nearly 2.1 million rental cars in service last year.

However despite the scale of the market, federal law does not require rental car companies to remedy defects in rental cars before renting them to consumers, so a company could rent a car subject to this recall without an airbag that has yet to be replaced.

So, Dr. Rosekind, again, thank you for your testimony. Do you believe that rental car companies should be prohibited from renting a car unless all known recalls and defects have been repaired?

ROSEKIND: If a defect has been identified, used cars and recalls should be fixed before they're allowed to put keys in consumers' hands.

BUTTERFIELD: That's as clear as it can be.

Do you think that most consumers would assume -- assume that a rental car, which may be newer than their own vehicle, is a safe vehicle?

ROSEKIND: And that's the problem. While we can have this hearing and talk about getting people for Takata to go to safercar.gov, almost nobody who rents a guy, buys a used one, will probably ever do that, and that's a gap we have to fill.

BUTTERFIELD: Well, I drive a 1995 Toyota and a 2000 Ford Explorer, and all of the rental cars that I rent are much better than my personal vehicles.

Dr. Rosekind, do you think consumers have a right to free loaner cars while their cars are getting repaired? Regardless if consumers are given loaner cars should there be a requirement those loaners themselves before being loaned have no outstanding recalls?

ROSEKIND: So thank you for raising that question. It comes up often of what people should do, and we're telling people if there's concern about their Takata inflator they should talk to their dealer or manufacturer about a loaner or A rental car.

BUTTERFIELD: Recently congresswoman Capps and myself introduced a bill that would prohibit a rental car that receives a notification about any defect or non-compliance with federal motor vehicle safety standards to rent or sell the vehicle unless the defect is remedied.

Dr. Rosekind, NHTSA has in the past supported similar legislation that prohibits rental companies from renting vehicles subject to a recall unless the defect is remedied. As the new NHTSA administrator, do you continue to support this type of legislation?

ROSEKIND: And the administration and Secretary Fox have done that as well through Grow America, which specifically has both used car and rental car defect issues covered just that way.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BUTTERFIELD: All right. You're very clear in your responses, and I thank you for the manner in which you responded.

Thank you very much, Mr. Chairman. I yield back.

BURGESS: The chair thanks the gentleman. The gentleman yields back.

The chair recognizes the gentleman from Florida, Mr. Bilirakis for five minutes for questions.

BILIRAKIS: Thank you, Mr. Chairman, I appreciate it.

And thank you, Dr. Rosekind, for testifying today.

It is my opinion that the Takata SPI inflator rupture may have been -- it's my understanding anyway that it may have been caused by high humidity. What is the minimum exposure period before an inflator is considered by Takata to be at risk in a high-humidity area? And if you have an opinion as to whether it was caused by high humidity, I'd like to hear it as well.

ROSEKIND: I'm going to put my NTSB hat on and just say I'd be cautious saying probable cause at this point, because there is no root cause, but to your question there's no -- there's absolutely data that shows humidity, because of the moisture, can have an effect on the inflator and we could get into the chemistry but your main question is what we've seen in the data, somewhere between 7.5 to about 12.3 years is where we're seeing that inflator can rupture?

BILIRAKIS: Thank you. All right, next question is, I understand that NHTSA is helping prioritize the most urgently need replacements to various parts of the country that need it most. In theory this approach would help manage a finite supply, and ensure that the consumers who are most in danger are protected more quickly, but this phased approach does not appear to match with NHTSA's rollout May 19th which grabbed headlines by covering 34 million vehicles.

My constituents are in a high-humidity area, I represent Florida, but it is unclear whether they can now obtain replacement parts, and if not, at which point can they obtain replacement parts in the future -- I'd like for to you answer that question. Are replacement parts available now in Florida but maybe not available in financial New Jersey and other parts of the country? And again, are there enough replacement parts available, period?

ROSEKIND: So first I would say safercar.gov is going to let them know if they're checking that. They see a recall for the vehicle. They need to call their dealer, because they will tell them if the part is available.

For the second part, there is no question that one of the issues that we have with our coordinated remedy program is to make sure that sufficient supply of inflators are available across the country.

BILIRAKIS: Thank you very much. And Representative Clark covered the additional questions, so I appreciate it very much and I yield back. BURGESS: The chair recognizes thanks the gentleman. The gentleman yields back.

The chair recognizes the gentlelady from Indiana, Mrs. Brooks, five minutes for your questions, please.

BROOKS: Thank you, Mr. Chairman. I have to say, when you've testified, Dr. Rosekind, that NHTSA was working hard -- or you testified that working hard to stand up some testing facilities of your own so that you can verify the work Takata is doing. It was in your written testimony. Can you give us a status update on the validation activities, and is there a new NHTSA testing facility for these airbag inflators? Can you just share with us what is happening with that progress?

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

ROSEKIND: And thank you for asking about that, because previously what NHTSA did was to arrange to have data available to us, but this now provides us another resource to actually verify the testing, and any testing, so whether it's Takata's or the independent coalition, we'll be able to look at all of that.

So we have a facility in Ohio that allows us to do some testing but because of the inflator rupture, we're talking about ballistics testing, you got to blow them up and have them rupture. So Battel (ph) is helping us do that, and we basically have a plan already outlined, so as of May 19th that plan is under way.

How many have been tested by this point, I can't say, but we have our own independent testing being done by an outside laboratory to help us do that.

BROOKS: So you are now using -- because it required a different kind of testing than you had capabilities for, you are now using an outside tester?

ROSEKIND: Correct.

BROOKS: And do you have any idea how long the testing's been going on and how is it going?

ROSEKIND: I'll get you specifics. I know the contract with Battel (ph) was signed a while ago and the most important thing was to get a plan, which as I tried to emphasize is not just -- you know, we've tried to not just look at the root cause, which is what everyone else -- we're now also trying to focus on the remedy. So I can get you information when the contract was signed, what the plan is, and basically that should tell you what the calendar expectations are as well.

BROOKS: Thank you.

And so you have mentioned several times in your testimony today that we may never know the root cause and the root cause is a problem, and so problems associated with the beta inflators persisted for years, and it feels as if we're not making any progress in determining the root cause. So given that, how will we know, how will we be satisfied you have enough data to determine the adequacy of the proposed remedy if it we don't know the original root cause?

ROSEKIND: So I've often around NHTSA, even though they wonder why I keep bringing this up -- while I was at the NTSB, it's when we investigated the 787 Dreamliner Boeing lithium ion battery fire. That was a year investigation. And some people would question whether the root cause was ever discovered. The entire fleet was grounded. And so that required Boeing coming up with a solution without fully knowing the root cause, which was identifying all the potential failure points, engineering a solution to that, testing it, and now they're flying again very quickly.

So we have that possibility, including the fact there are all kinds of airbags, including Takata inflators, that are out there, that are not rupturing. So between those two things there is an opportunity, without root cause, to still get a solution.

BROOKS: So essentially taking your experience from NTSB and how that would be the proposal that you'll use going forward with Takata?

ROSEKIND: Yes, and let me just add, because I haven't had a chance to say this, but you've just raised one of the core questions we've been asking since I've been there in January, how long do you wait?

I've been at the NTSB -- we couldn't wait a year to come up with an answer or not come up with an answer, so that is part of why we have pushed to basically take the driver's seat to get a focus on the remedy, and the supply and all the other factors that will make a difference to get that safe airbag in everybody's vehicle.

BROOKS: Thank you. And thank you for your work on this. You're right, we can't wait, and so encourage your persistence in fighting for this. Thank you.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BURGESS: The chair thanks the gentlelady. The gentlelady yields back.

The chair recognizes the gentleman from Illinois Mr. Kinzinger. Fives minutes for your questions please.

KINZINGER: Thank you, Mr. Chairman, and sir, thank you for being here and answering our questions. Most of them have been asked. I just have a couple of ones, so I probably won't take all of my five minutes, but you talk about the coordinated remedy program. What's going to be involved and when will you have a plan for acting as the central coordinator for the coordinated remedy program?

ROSEKIND: So thanks, because that gives me a chance to really focus on the end game here. I keep talking about NHTSA sitting in the driver's seat, because up until this point it was unclear how this was all going to happen. And so now we have a plan be to meeting with the manufacturers. We've already made contact with then. We'll be meeting with suppliers. We'll have joint meetings. And our intent once that plan is together is to have a public meeting so there's transparency to the entire plan and schedule. We're hoping for that hearing to occur in the early fall. KINZINGER: Okay, all right. And who then -- NHTSA with recall logistics recall expertise will lead this coordination, or is this something that you're going to probably need to contract out?

ROSEKIND: Actually right now there's an internal team at NHTSA that's overseeing this, so I have people from the defects/engineering group, a group that's dealing with the legal enforcement issues and communications. So those three groups have come together to basically provide oversight for the process.

KINZINGER: And do you believe that they have enough expertise to carry out this process, enough recall logistics expertise?

ROSEKIND: At this point, yes, and I think during our development of a future plan, if we find other resources are needed, I'll be the first one to let everybody know, to make sure that we get this done right.

KINZINGER: So if you don't have it, you'd be willing to look at outside whatever you need to get this done right?

ROSEKIND: Yes.

KINZINGER: Okay.

Well, you've answered pretty much all the questions I have, with that I yield back the three minutes remaining.

BURGESS: The chair thanks the gentleman.

You'll yield your remaining time to me?

KINZINGER: Yes, I'll yield it to you.

BURGESS: And I thank the gentleman for that.

Mr. Rosekind, as you're probably aware, last night at the Rules Committee we did the rule for the transportation appropriations bill; it will be on the floor either this week or next week. So recognizing we were having this hearing today, I asked the subcommittee of the Transportation Subcommittee in appropriations if they would share with me the spending plan submitted to their subcommittee by NHTSA. Every agency and department is required to submit a spending plan to the Appropriations Committee or Appropriations subcommittee as they do their work and build the appropriations bills that we will then vote on.

So I've got to say what I was given is pretty sparse, so I am going to give you the benefit of the doubt, and if you would like to provide me with the spending plan

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner) Federal News Service

that you provided to the Appropriations subcommittee, I would be happy to review it, and review it with you, if you would like.

Chairman Upton said -- made reference to the fact that we need to make sure the appropriations are in line. Mrs. Schakowsky has talked about, so again, I'll make this available to you, if it is as written. Then that's fine if you think there is a different spending plan that I should be looking at, I'll be happy to do that. And again, I'll be happy to follow up with you.

And I do want to stress you've always been very good about keeping me as the chairman of the subcommittee informed about what you're doing, and for that, I'm very grateful. I'm filibustering just a little bit because Mr. Engel is allegedly on his way here.

So let me just ask --

ROSEKIND: Can I --

BURGESS: Yes, oh, please.

ROSEKIND: I want to thank you for that opportunity, because when we -- the president's budget has much detail about new --

BURGESS: Mr. Rosekind, I have to interrupt you. The president's budget never gets a single vote. Republican Senate -- or House Senate, Republican or Democrat, no one would even offer the president's budget up for a vote this year. So that is -- you know the president. And this was not unique to the Obama administration. President Bush's budget when I was here in the majority earlier, frequently those would not pass on the floor of the House or the Senate.

So sure, the president sends up a wish list that balances never, and yes, it's got everything funded to a level that would be great if we lived in a world of unlimited resources.

But you are the administrator. And I've run a business. You understand that as the administrator sometimes you have to prioritize spending, and that's what we really are looking for you to do. That's what we want to you do, just the same as the director of NIH, just the same as Dr. Frieden at the CDC; we want to you prioritize and spend appropriately.

But again, I'll give you the benefit of the doubt. This looks pretty thin to me. I just welcome the chance to go through the spending plan with you.

And then finally, last year on a bipartisan basis, this committee requested that the Government Accountability Office review NHTSA's internal structure procedures to assess the agency's ability to keep pace with advancements in vehicle technology. At the committee's hearing in December, Deputy Administrator Friedman committed to cooperating with the Government Accountability Offices review. Will you reaffirm this commitment to cooperate with GAO in this review?

ROSEKIND: Absolutely. We already are.

BURGESS: I appreciate that that very much.

Do you have any -- okay, at this point, we're going to have to forego questions by Mr. Engel. And I apologize, we'll get his questions to you in writing, and any member of the committee may have further questions.

But seeing there are no further members wishing to ask questions for this panel, I do want to thank Administrator Rosekind for being here today. This will conclude our first panel. We will take a brief recess to set up the second panel, thank you, sir.

(RECESS)

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee
hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BURGESS:  (OFF-MIKE) the subcommittee back to order.  Thanks everyone for their
patience and for taking time to be here today.  We are moving to the second panel
for today's hearing.  Going to follow the same format as the first panel.  Each
witness will be given five minutes to summarize their opening statement, followed
by questions from the members.

For our second panel we want to welcome the following witnesses.  Mr. Kevin
Kennedy, the executive vice president of North America Takata.  Mr. David Kelly,
project director, Independent Testing Coalition.  Mr. Mitch Bainwol, president and
CEO of the Alliance of Automobile Manufacturers.  And Mr. John Bozzella, the chief
executive officer of Global Automakers.

We'll begin our second panel with Mr. Kennedy.  Sir, you are recognized for five
minutes for your opening statement, please.

K. KENNEDY:  Chairman Burgess, Ranking Member Schakowsky and distinguished
members of the subcommittee.  I am honored to be here on behalf of Takata and our
employees throughout the United States.  For Takata, safety is the core of who we
are and what we do.  We are proud that Takata airbags have saved thousands of lives
and prevented serious injuries in hundreds of thousands of accidents.

It is unacceptable to us for even one of our products to fail to perform as intended.
We deeply regret each instance in which someone has been injured or killed.  We are
committed to doing everything in our power to address the safety concerns raised by
airbag ruptures.  Our chairman has made that commitment personally to Administrator
Rosekind.

So let me tell you what we're doing.  After months of testing and extensive
analysis, we have agreed with NHTSA to take broad actions in conjunction with
automakers to respond to your concerns and those of the public.  We have recommended
dramatically expanded recalls, including national recalls, that go well beyond what
is suggested by the science and testing.

Most of the ruptures on the road and all of the fatalities in the U.S. have involved
older Takata driver airbag inflators with batwing shaped propellants -- propellant
wafers, pardon me -- that were originally subjected to previous recalls.  And most
of those have occurred in the regions of the country with high heat and absolute
humidity.

Nevertheless, we are proposing expanded national recalls to replace all of these
batwing driver inflators, from the start of production through the end of production,
in any vehicle registered anywhere in the United States.

The recommended recalls will proceed in stages.  The final stage will include the
replacement of all batwing driver inflators previously installed as remedy parts.
Takata will cease producing the batwing driver inflators altogether.

There have been far fewer field ruptures involving passenger airbags.  Nev-
ertheless, our agreement with NHTSA also contemplates significantly expanded recalls
for passenger airbag inflators, including a nationwide recall for one type of
inflator.  The recalls for the other passenger inflators will cover specific vehicle
models ever registered in the high absolute humidity states, but with the potential
for the recalls to expand to other states if ordered by NHTSA.

We will continue to test inflators beyond the scope of the recalls to determine
whether further action is appropriate.  For both driver and passenger airbags, all
analysis to date indicates that the potential for rupturing is limited to an extremely
small fraction of older inflators.  That is not meant to minimize the issue.  One
rupture is too many.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

It does explain, however, why Takata's filing states that a safety-related defect may arise in some of the inflators.  Not all of the inflators covered by the proposed recalls are defective.  Based on 50,000 tests to date and research involving leading experts from around the world, our best current judgment is that the potential for rupture is related to long-term exposure over many years, to persistent conditions of high heat and high absolute humidity, as well as other potential factors, including possible manufacturing and vehicle-specific issues.

Nonetheless, we have proposed a broader remedy program.  NHTSA will play a central role in overseeing this remedy program.  Takata will prepare a plan for NHTSA outlining steps to help determine the safety and expected service life of the remedy parts.  We will also work with NHTSA and our customers to get the word out to consumers to help maximize recall completion rates.

In addition to increasing our own testing, we are actively supporting the testing work of the automakers and NHTSA.  We also continue to support the work of the independent quality assurance panel led by former secretary of Transportation Sam Skinner.  And we are continually ramping up our production of replacement kits.

In December, we were producing approximately 350,000 kits per month.  We are now producing more than 700,000, and by September we expect our monthly production to reach 1 million units.

Half of the replacement kits we shipped last month contained inflators made by other suppliers, and by the end of the year we expect that to reach 70 percent.  We have confidence in the inflators we are making today, the integrity of our engineering and manufacturing, and we believe that, properly made and installed, these inflators will work as designed to save lives.

We will continue to do everything we can to ensure uncompromised safety and the success of the recall efforts, and we will keep Congress, NHTSA and the public updated on our progress.  Thank you, Mr. Chairman.

BURGESS:  The chair thinks the gentleman.  Mr. Kelly is recognized for five minutes for your opening statement, please.

KELLY:  Chairman Burgess, Ranking Member Schakowsky, members of the subcommittee, thank you for the invitation to appear before you to discuss the activities of the Independent Testing Coalition.  The ITC is comprised of 10 automakers that have Takata airbags in their passenger vehicles and is committed to an independent and comprehensive investigation of the technical issues associated with Takata airbag inflators and look forward to the results of this process as we focus on the safety, security and peace of mind of all motorists. Our primary goal is to find the root cause of this problem.

As we have started to look at this issue of energetic disassembling, it is apparent that there is no silver bullet or easy solution to be found.  The public needs to understand that experts have been studying this problem for years.  If this was anything but the complex project that it is, a root cause would have been identified by now.  Unfortunately, that is not the case and a final determination is not imminent.

We have devised a detailed testing plan that, when completed, will examine every identified aspect of this problem.  We will conduct tens of thousands of chemical tests alone.  This will be supplemented by a similar number of nondisruptive tests and many thousands of advanced computer simulation runs.  In addition, there will be a significant amount of data generated from our tests that then must be analyzed. This issue is too important for any stone to be left unturned.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

I do want to stress that we intend to conduct our investigation in an independent manner.  We will work with Takata, we will work with NHTSA, we will work with all the affected parties, but we will conduct this investigation in an independent manner.

We very much appreciate any input and suggestion from all the parties, but we will do our own analysis of others' data and testing procedures.  When we finish our investigation, we do intend to make our findings public.  Thank you.

BURGESS:  The chair thanks the gentleman.  The chair recognizes Mr. Bainwol for five minutes for your testimony, please.

BAINWOL:  Chairman Burgess, Ranking Member Schakowsky, members of the sub-committee, thanks for this opportunity.  On behalf of the 12 leading global OEMs, including the U.S. companies and non-European and Japanese-based companies, I appreciate this opportunity to testify.

I'd like to make four summary points.  First, the hearing today is timely and welcomed and we are fully committed to doing our part to successfully complete this recall, while continuing to build on the very significant safety advances of recent years.  The magnitude of the Takata airbag recall is unprecedented and global.  There are no easy answers or quick fixes.

That's why we support Administrator Rosekind's decision to use NHTSA authority to organize and prioritize affected manufacturers' remedy programs.  We all want a clear, unified approach.  We share this committee's frustration.  It is very difficult for us to be able to tell our customers, your constituents, how long this will take to be fully resolved.

Second, while the logistics in a global economy with about 80 million units sold each year around the world are highly complex and there are legal impediments to the industry led coordination, the key challenge in most recalls is more basic, and that is getting consumers to take advantage of the free fix, especially in older vehicles.  The average consumer participation rate for light vehicle recalls after about a year and a half is about 83 percent for newer vehicles, but falls to 44 percent for vehicles five to 10 years old, and falls further to 15 percent for vehicles older than 10 years.

Because of these concerns, our members have tasked the alliance to conduct the most intensive public opinion research ever on recalls to learn what motivates some consumers to respond and why others don't.  What motivates consumers to go into the dealership and get it done, what messages work and what messengers are most effective.  Work is underway now and we will share the results with NHTSA and you to help forge a multi-pronged effort to strengthen consumer participation.

Third, this is worth said in the context.  Recall policy is vitally important and we are committed to strengthening the process to resolving defects.  That said, this is just one piece of the safety equation and, as a share of fatalities on the road, a relatively fractional one.  Most fatalities, certainly 90 percent-plus, result from human error, principally impaired driving and failure to use seatbelts.

While we have seen profound gains in safety over the last 50 years, and especially over the last decade, technology does offer the promise of even greater advances as we build on crashworthiness and introduce the idea of crash avoidance functionality.  All the new jargon we hear, driver assist, V-to-V, V-to-X, and ultimately self-driving vehicles, are part of a continuum that thankfully will save thousands of lives by helping to compensate for driver error.  This isn't speculation, this is our emerging reality.

Fourth, and finally, let me state the obvious.  OEM's are passionately committed to improving safety and we are very proud of the results we have achieved, both because it is the right thing to do and because it is good business.  Safety innovation is critical to the competitive landscape.  Auto companies are investing about $100

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

billion -- billion with a B -- every year in research and development to comply and to compete, to comply with the various public policy requirements in the U.S. and elsewhere, and to compete in the globally dynamic marketplace.

That investment is paying off and our polling shows that your consumers, that your customers, your constituents do see the progress.  Relative to 10 years ago, your constituents say cars are safer by 86 to 5 percent.  They get better fuel economy by 89 to 3 percent, and they are of higher quality by 79 to 12 percent.   So the progress is being recognized, and that's terrific.

Thanks for this opportunity to share our thinking.  We stand ready to work with you and your staffs to make our roads as safe as possible.

BURGESS:  The chair thanks the gentleman.  The chair recognizes Mr. Bozzella for five minutes for your statement, please.

BOZZELLA: Chairman Burgess, Ranking Member Schakowsky, members of the committee, I really appreciate the opportunity to appear before you today.  Global Automakers represents international automotive manufacturers that design, build and sell cars and light trucks in the United States.   Our members sold 43 percent of new vehicles purchased in the U.S. last year, and produced 40 percent of all vehicles built here.

Individually and jointly, our member companies are committed to working toward a future in which there are zero highway fatalities.  The safety of Americans traveling on our roadways remains a priority.

Mr. Chairman, this hearing presents an opportunity to further this important discussion on improving auto safety.  The Takata recall is an unprecedented situation.  The number of manufacturers and the number and age of affected vehicles involved, along with the sophistication and complexity of the technology makes this unique.

As such, affected automakers are taking extraordinary measures to locate and communicate recall information to vehicle owners so that they know to take their vehicles in for repair.   Our members have gone far beyond what the law requires.  They are distributing multiple rounds of recall notices.  They are sending express mail to ensure that the notifications are not discarded.  They're using multiple platforms such as advertising, social media and electronic communications.  They are working closely with their dealer networks to ensure that dealers have the capacity to service vehicles with open recalls.

Additionally, they created the ITC to conduct independent testing of recall parts, as led by David Kelly.  Of course, recall campaigns are only one component of creating a safer driving environment.  The Takata recall highlights the complex nature of the industry and the challenges we face today.  All stakeholders must work together in the effort to improve vehicle and highway safety.  Critical areas of focus include proper oversight of existing safety systems, the development and introduction of new technologies, and driver and passenger behavior.

This committee, through its authorship of the TREAD Act, has given NHTSA ability to require reporting and tracking of safety-related data that better allows us to identify problems in the existing fleet of vehicles and to address and solve them.

In part, the number of recalls that have occurred in recent years is evidence that the requirements of the TREAD Act, NHTSA's ongoing vigilance, and the commitment of the manufacturers are advancing the goal of improved vehicle safety.  Automakers are now deploying advanced technologies which will accelerate the move from crash survival to crash avoidance, including forward collision warning and braking, and soon vehicle-to-vehicle and vehicle-to-infrastructure communications.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

According to the DOT, vehicle-to-vehicle communications, when fully deployed, could address 80 percent of crashes involving unimpaired drivers.  Holistic approach to vehicle and highway safety must include human behavior, which plays a role in a voluntary recall system.  For newer vehicles, the recall completion rate is upwards of 80 percent.  The completion rate falls dramatically as vehicles age.  This is a key challenge in resolving the Takata recall and raises an important question:  are there limits to the success of a voluntary system?

Global automakers and our members are exploring ways the industry can achieve better outcomes.  We are working with NHTSA officials and are happy to talk with you about new methods for getting useful, effective and actionable recall information to our customers, such as including recall notifications and annual vehicle registration processes.

Mr. Chairman, it is important to keep in mind that highway safety is improving.  This past December NHTSA announced that traffic fatalities decreased by 3.1 percent over the previous year, and by nearly 25 percent since 2004.  However, there is clearly more work to be done.

Regarding the Takata recall, the most important thing we can do right now is to make sure people are aware of the status of their vehicle.  Every vehicle owner should go to saftercar.gov and enter their VIN, the vehicle identification number, to determine whether additional action is needed.

This needs to be done now and it needs to be done several weeks from now, when manufacturers will have posted the specific VINs of the vehicles that have just been added to the recall list.  Personally, I did this myself for my vehicle and my children's vehicle, and it gave me the peace of mind to knowing where we are at.

Global Automakers and our members will continue to work toward our mutual goal of 100 percent recall completion and zero traffic fatalities.  Thank you for the opportunity to appear before you today.

BURGESS:  The chair thanks the gentleman.  The chair thanks the entire panel for their testimony today.  We will move into the question portion of the hearing and I will recognize myself for five minutes for questions.

I've got a couple of questions that relate to the propellant in the inflator, and Mr. Kennedy, primarily I'm going to ask you, but Mr. Kelly, if you have information because of your independent testing role, please feel free to add.

Mr. Kennedy, is Takata the only airbag manufacturer that uses sodium nitrate in its air bags?

K. KENNEDY:  It's ammonium nitrate, sir.  I believe we are the only one that uses it as a main propellant.  There are other manufacturers that use it as a supplemental propellant.

BURGESS:  Is there any other airbag other than those manufactured by Takata that has experienced this energetic disruption, that I think you called it, Mr. Kelly?

KELLY:  I can't really speak to all the recalls for the other suppliers, Chairman Burgess.  I really don't know the answer to that.

BURGESS:  It's just that we've had, you know, this is the second hearing that I've been involved in on this issue and ammonium nitrate just keeps coming up.  It is a pretty powerful compound and it just begs the question, is there a linear relationship between the ammonium nitrate used as an inflator and these accidents that are happening.

K. KENNEDY:  The studies that we've done and the research that we have from some of the leading experts in the world seem to indicate that ammonium nitrate is certainly

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

a factor in the inflator ruptures.  There are many, many other factors.  I think you heard Dr. Rosekind talk about some of them are.  You've heard Mr. Kelly talk about some of them.

It takes a long time, as Dr. Rosekind said, seven to 12 years.  It takes high absolute humidity, it takes high heat.  But what is difficult about the situation is, you can put two inflators in that situation, one of them is fine and one of them is not.  So that is really what the struggle has been with getting to the root cause.  But ammonium nitrate appears to be one of the factors that contributes.

BURGESS:  Since high humidity is an issue, my understanding is some of these are manufactured with a desiccant to absorb humidity, which would then go along with a seven to 12-year timeframe of presumably the desiccant is going to get completely used up over some period of time.  Is that correct?

K. KENNEDY:  I don't know that it would completely used up, sir.  It depends on the amount of moisture that is in a particular inflator and the amount of desiccant.  Many of our later generation inflators do contain desiccant, along with ammonium nitrate.  We have not seen this issue with those inflators in the field, so we know that that is a factor that contributes to the life of the inflator.

BURGESS:  Does Takata manufacture any airbags that's used in any make or model vehicle that uses sodium -- I'm sorry, ammonium nitrate without a desiccant?

K. KENNEDY:  Yes.  Some of our -- all of these inflators that are involved in these issues that we are talking about were all ammonium nitrate without desiccant.

BURGESS:  And are you still manufacturing ammonium nitrate without a desiccant as a...

K. KENNEDY:  For a few platforms that we have not transitioned out of yet, but we are working to transition out of them as quickly as possible.

BURGESS:  I'm sorry.  You go out and buy a brand-new car off the showroom floor and it could have one of these instruments in it?

K. KENNEDY:  It could have an ammonium nitrate-based inflator that does not have desiccant.  That's correct.

BURGESS:  Is there any obligation to warn the consumer that they are buying something that may be problematic?

K. KENNEDY:  The recalls that are in process at this point are for certain time frames, certain vehicles, certain technologies.  Those would not be involved in a brand-new vehicle at this point.  But that's why we are continuing as part of the consent order to test outside of the boundaries of what is involved in the recall, to really understand what the total scope is.

BURGESS:  Well, I'm sorry, you're not providing me much reassurance with that answer.  But let me just ask you this.  You said that by September you will be up to a billion units.

K. KENNEDY:  Yes.  Then we will continue to go up after that as well.

BURGESS:  But under just simple math, if it's for 34 million vehicles, I mean, it's almost 3 years as a timeframe.

K. KENNEDY:  Well, it's about -- I mean roughly.  The exact numbers are in the DIR's, but the additional due to these DIR's is about 16, 17.  I don't mean to minimize it.  It's obviously a huge number whichever way you look at it.  But previously there had been about 18 million of that 34 that have already been under recall.

We supplied over 4 million kits already since January of last year, and now, as I said, we are up to 750,000 a month, going to 1 million a month, going beyond that...

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BURGESS:  OK, let me just ask you this.  I don't mean to interrupt but my time is up.

K. KENNEDY:  That's OK.

BURGESS:  Are any of the replacement modules that you are putting in, reinstalling in vehicles that are brought in to have their airbag system changed out, are any of those ammonium nitrate propellants without desiccants?

K. KENNEDY:  Some of them are.  As I said, we have gotten about 50 percent with outside inflators that are non-ammonium nitrate.  On the driver side, where we have had most of the issues, as I mentioned in my opening remarks, we are completely transitioning out of the bat wings and we will be using either a desiccated inflator without batwings, or we will be using a competitor's inflator.

BURGESS:  All right, thank you.  My time is expired.

Ms. Schakowsky, five minutes for questions, please.

SCHAKOWSKY:  I want to follow up on the chairman's question.  You have talked about what are the possible reasons, including ammonium nitrate perhaps being part of the cause.  And you are saying, if I understand you correctly, that you are providing replacement bags that have ammonium nitrate without a desiccant.

K. KENNEDY:  Yes, ma'am, that's correct.

SCHAKOWSKY:  So I don't understand that.  What is under recall right now?

K. KENNEDY:  Certain model years, certain designs on certain vehicles.

SCHAKOWSKY:  Why, if ammonium nitrate may be a problem, would you, and why would I buy, why would you put in a car, why would I buy a car that has a potentially dangerous airbag?  I'm not understanding.

K. KENNEDY:  Well, we are working to move away from those as quickly as we can, but in a vehicle it's not as easy as just changing the color of the car or changing a bolt.

SCHAKOWSKY:  You're - I'm talking about about replacements now, not even the...

K. KENNEDY:  Yes.

SCHAKOWSKY:  So the replacement could be as dangerous as the current.  Why would you even replace it?

K. KENNEDY:  As I said, without really exactly understanding the root cause, and continuing to test outside of the bounds of what we have already recalled, we are trying to determine that.  We're trying to understand exactly what are the factors that lead to this, and should we do something different than what we're doing right now.

We know it does, as you heard Dr. Rosekind say, it takes seven-and-a-half to 12 years.  So putting in a brand new part is a huge improvement in safety.  And as we continue to test it, if it shows that we need to take additional actions, we will take additional actions.

SCHAKOWSKY:  So, does the recall affect cars that are over ten years old?

K. KENNEDY:  Yes, some of them, I think -- well, the original recalls did.  These new ones announced, I'd have to look at the DIRs and see because of that overlap that I talked about.  But some of them go back to as early as, I think, 2000, 2001 --

SCHAKOWSKY:  OK.

K. KENNEDY:  -- were the first ones involved.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

SCHAKOWSKY:  My understanding is that you are doing that on older cars, but you're not required to do so.  So I wanted to ask you if Takata has taken a position on the Vehicle Safety Improvement Act, H.R. 1181?

K. KENNEDY:  No, we have not publicly.  I'm aware of the bill, I'm not aware of all the particulars in the bill.  But we certainly support any effort that would help improve the return rate on recalls.

SCHAKOWSKY:  So let me give you some of the items in the bill and see if you would support that.  H.R. 1181 would increase the quantity and quality of information shared by auto manufacturers with NHTSA, the public and Congress.

Specifically, requires manufacturers to include in their quarterly submissions to NHTSA additional information on fatal incidents, possibly caused by a defect and assess why the incident may have occurred, and removes the limitation on the number of model years that should be reported.  Is this something that sounds supportable to you?

K. KENNEDY:  Well, it's a little disingenuous for me because it's not a requirement for our company to comment on it, but it would seem like that would be a good idea in order to increase the visibility on some of these issues that have been going on in the field.

SCHAKOWSKY:  Do you think it would be a good idea to not limit to 10 years the number of mandatory -- of recalls, asking that cars older than 10 years be part of the required recall?

K. KENNEDY:  Quite frankly, I didn't know there was a limit of 10 years because, as I said, some of these vehicles are 15 years old.

SCHAKOWSKY:  Would you think that it's a good idea for NHTSA to have new imminent hazard authority to expedite recalls related to dangerous defects?

K. KENNEDY:  That's, again, a difficult one for a supplier, I think, to answer.  But I think anything that improves the safety on the road is certainly a step in the right direction.

SCHAKOWSKY:  Do you think there's any reason to support regional recalls as opposed to national recalls?

K. KENNEDY:  Well, you know, on -- obviously, ours started off as a regional recall.  And the reason that it was doing -- a couple of reasons it was doing that, number one, was because that's what the science and data showed where the issues were.  And there are going to be some cases where I think that is probably correct.  And it also helps --

SCHAKOWSKY:  But people do drive their cars to other places.

K. KENNEDY:  Yes.  That is true.  But the other thing I was going to say, it also helps with getting parts into the priority areas as quickly as possible, which is part of the four DIRs that we came to agreement with NHTSA on in the last couple of weeks.

SCHAKOWSKY:  Mr. Kennedy, can I work with you as well, obviously, primarily, with the members, but talk to you about the legislation?

K. KENNEDY:  Absolutely.

SCHAKOWSKY:  Thank you.  I yield back.

K. KENNEDY:  You're welcome.

BURGESS:  The chair thanks the gentlelady.  The chair recognizes the gentlelady from Tennessee for five minutes for your questions, please.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BLACKBURN:  Thank you, Mr. Chairman.  Mr. Kennedy, I'm going to stay right with you.  Do you drive a car that has a Takata airbag?

K. KENNEDY:  Yes, I do.

BLACKBURN:  You do.

K. KENNEDY:  Yes, I do.

BLACKBURN:  What about your family?

K. KENNEDY:  Yes.  Every one of them.

BLACKBURN:  Are you concerned ...

K. KENNEDY:  No, I'm not

BLACKBURN:  ... about the safety of those?

OK.  I was listening to your statement, and I think I must have missed something here because you talked about manufacturing the -- stopping the manufacture of the bat-winged airbags, but you never mentioned the ammonium nitrate.  You kind of left the propellant ...

K. KENNEDY:  Correct.

BLACKBURN:  ... out of the mix, and then addressed it with Mr. Burgess a little bit.

I want to ask if you agree with this statement.  This is from an explosives expert at Missouri University of Science and Technology.  And he said the following about ammonium nitrate.  "It shouldn't be used in airbags, but it is cheap, unbelievably cheap."  Do you agree with that statement?

K. KENNEDY:  That it's unbelievably cheap, or that it shouldn't be used?  Are you ...

BLACKBURN:  Both.

K. KENNEDY:  I wouldn't say that it's unbelievably cheap.  I would say it's competitive with some of the other propellant formulations that are out there, like guanidine nitrate which some of our competitors use, and which we use in some other inflators.

I don't think it -- I mean, it's a blanket statement that says it should not be used.  No, I don't agree with that because obviously we use it.  We've had some issues with some of our ammonium nitrate inflators, but many of them have performed very well.

BLACKBURN:  Are you an explosives expert?

K. KENNEDY:  No, ma'am, I'm not.

BLACKBURN:  You are not.

K. KENNEDY:  I am an engineer, but I'm not a chemist, ...

BLACKBURN:  OK.

K. KENNEDY:  ... I'm not an explosives expert.

BLACKBURN:  All right.  Then let's go to what Ms. Schakowsky was saying.  You're still using this.  So isn't it true that ammonium nitrate is a dangerous substance to be used in airbag inflators?

K. KENNEDY:  No, I don't believe it's a dangerous substance to be used in airbag inflators.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner) Federal News Service

BLACKBURN:  OK, you do not believe ...

K. KENNEDY:  We use phase-stabilized ammonium nitrate.  Most of the issues that you hear about ammonium nitrate are it losing its phase-stabilization ...

BLACKBURN:  All right.  Then, isn't it true that ammonium nitrate is cheaper than other compounds, such as tetrazole?

K. KENNEDY:  Probably.  Maybe tetrazole.  But at the time when we started to use ammonium nitrate, the competing material out there was guanidine nitrate ...

BLACKBURN:  OK.

K. KENNEDY:  ... and those two are very similar in costs.  There is not a huge difference between those two.

BLACKBURN:  OK.  You're an engineer.  And isn't it true that your own engineers at Takata warned you about using ammonium nitrate?

K. KENNEDY:  Well, I am -- from some of the newspaper articles I've read, I assume you're referring to Mr. Lillie's comments.  Is that correct?

BLACKBURN:  Mr. Britton and Mr. Lillie.

K. KENNEDY:  OK.  And what I can tell you is this.  Every development program, every product that any supplier ever makes, there is always a spirited debate about what are the right components, what's the right design, what -- and there are tradeoffs for all of those things.

The previous materials that we used for propellant was sodium azide.  Sodium azide was extremely toxic.  It also had the unwanted effect that, when it was deployed, it did not burn very cleanly and there was a lot of effluents that were put into the vehicle.  And a lot of people that had respiratory issues were bothered by those.

So we -- you know, every propellant, every design, there is always a spirited discussion ...

BLACKBURN:  OK.

K. KENNEDY:  ... and you can probably find people ...

BLACKBURN:  All right.  OK.

K. KENNEDY:  ... who are always on one side and not on the other.

BLACKBURN:  I want to move on because I'm about to run out of time here.

OK, given that you're recalling cars that may have already been repaired, have there been any field incidents reported in inflators that were installed as parts? Any of the remedied situations?  Have you had any occurrences with those?

K. KENNEDY:  Not that I'm aware of, ma'am.

BLACKBURN:  So all of the replacement parts have performed 100 percent sat- isfactorily in the cars in which they have been installed?

K. KENNEDY:  Well, what I said was I am not aware of any of the replacement parts have those issues.

BLACKBURN:  Would you doublecheck that and get back to us and let us know?

K. KENNEDY:  Yes, ma'am, I will.

BLACKBURN:  What does Takata believe we know from testing today that we didn't know a year ago?

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

K. KENNEDY:  We know a lot, and not just from our testing.  I know -- I heard some of the gentlemen refer to the Fraunhofer Report which was released.   We brought Dr. Noitz (ph) from the Fraunhofer Institute into our facility in February.  We brought a team from NHTSA in ...

BLACKBURN: What kind of changes are you making with that information then, if you're still using the propellant that's the problem?

K. KENNEDY:  Well, as I said, we do have later designs that -- they use desiccants, that is one of the things that has been proven to improve the situation.  We also have alternate propellants now, with guanidine nitrate, that we have -- we started production a year or two ago, and we're continuing to ramp those up.

I think overall you will see our production of ammonium nitrate go down rapidly.

BLACKBURN:  I yield back.

BURGESS:  The gentlelady yields back.  The chair thanks the gentlelady, and the chair recognizes the gentleman from Massachusetts, five minutes for your questions, please.

J. KENNEDY:  Thank you, Mr. Chairman.  Thank you to the witnesses for being here.  I apologize.  I had to step out, but I'm glad to come back.

Mr. Kennedy, you indicated that you expect that the use of the ammonium nitrate would decrease in the future.  Why is that?

K. KENNEDY:  Well, it's certainly got a bad reputation through all of this.  And it -- as I said, it is one of the contributing factors that everyone believes is involved in this issue.

J. KENNEDY:  Can you ...

(CROSSTALK)

J. KENNEDY:  ... signify that -- or guarantee that as long as ammonium nitrate is used in those products, the products are safe?

K. KENNEDY:  I'm sorry?

J. KENNEDY:  Do you guarantee that as long as ammonium nitrate is used in those products, that the products are safe?

K. KENNEDY:  Well, we believe properly manufactured and designed ammonium nitrate, phase-stabilized ammonium nitrate, can be done properly.

J. KENNEDY:  So the -- I guess -- you indicated in your testimony, written testimony, a little while ago, that in certain circumstances, these conditions can result in an alteration in the propellant wafers and the inflators that could potentially lead to over-aggressive combustion.

K. KENNEDY:  Right.

J. KENNEDY:  And so it's -- your statement, though, is that if it is properly manufactured and then under the right circumstances, those conditions would not exist.

K. KENNEDY:  Well, we have seen those in very rare cases.  And that goes back to the root cause discussion we were having a little bit earlier.  We do not have the definitive root cause.  We know a lot, and we know a lot more than we did in December based on all the testing that we've done and all the testing that our outside experts have done.

J. KENNEDY:  So the testing that you've done has indicated that -- if I understand you correctly, and please correct me if I don't, but -- is that the ammonium nitrate,

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

or the substances used in the production of these wafers, and then under certain conditions of humidity and heat, over time, could lead to a malfunction.

K. KENNEDY:  Could lead to, correct.

J. KENNEDY:  Correct.  Could lead to.  But that -- and you're going to -- your plans are to phase out the use of ammonium nitrate in your products.

K. KENNEDY:  Well, we have been phasing that down and phasing later propellants. But a lot of them -- even some of the ammonium nitrate ones were with desiccants. We had gone from non-desiccated ammonium nitrate to desiccated ammonium nitrate, and now are moving to a guani -- what's called a guanidine nitrate.

J. KENNEDY:  And the guanidine nitrate, you said, is a similar cost.

K. KENNEDY:  Yes, similar cost, yes.

J. KENNEDY:  So then why not adopt it earlier?

K. KENNEDY:  You know, it was -- we made investments in order to process ammonium nitrate.  We were having good success with ammonium nitrate.  It was competitive.

As I said, it had a number of these other advantages to it that our customers enjoyed, so it was not something that -- until some of these recent issues, really thought -- and gave us a reason to rethink it.

J. KENNEDY:  Some fairly significant disadvantages of late, though, yes?

K. KENNEDY:  I'm sorry.

J. KENNEDY:  Some fairly significant disadvantages of late, though, I would imagine.

K. KENNEDY:  Yes.

J. KENNEDY:  So - and then sir, I think you tried to touch on this, but forgive me if I'm still a little bit confused. In -- an article in the New York Times yesterday indicated that -- the headline I believe says "Takata says it will no longer make side inflator linked to airbag defects."

K. KENNEDY:  I'm sorry, what did it say?

J. KENNEDY:  "Takata says it will no longer make side inflator linked to airbag defect," and basically says that you will not be using ammonium nitrate.  There was another piece in another newspaper I saw today, saying that ammonium nitrate still would be manufactured, and a piece in Reuters that I think said that it wasn't going to be, and then the piece was withdrawn.

So can you try to clarify for me, is ammonium nitrate still being used in the products?  And should people -- what should people do?  Do they -- can they have confidence in the airbag product that is going into their cars?

K. KENNEDY:  Yes, I'm glad you asked that question.  I know there was a lot of confusion yesterday, once our written testimony was released.

J. KENNEDY:  Both cited your written testimony, one said that you are and one said you're not.  So --

K. KENNEDY:  Well ...

J. KENNEDY:  I appreciate the clarification.

K. KENNEDY:  It's a long story.  We've had people working on that since it came out.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

As I think I mentioned earlier, we are continuing to use ammonium nitrate in our propellants.  Phased-stabilized ammonium nitrate, both with and without desiccants, but there is not many without desiccants that are still out there.

J. KENNEDY:  OK.

K. KENNEDY:  What we did say we were going to quit making were these batwing-shaped inflators, because that seemed to be, again, one of the issues that we've seen from all the testing that we've done.  It's more prevalent in the batwing propellant wafers.

J. KENNEDY:  OK.  Given that I only have about 30 seconds left, I'll stop going forward, and Mr. Chairman, I'll yield back.  Thank you.  Thank you to the witness.

K. KENNEDY:  You're welcome.

BURGESS:  The gentleman yields back.  The chair thanks the gentleman, and recognizes the gentleman from New Jersey, Mr. Lance, five minutes for your questions, please.

LANCE:  Thank you, Mr. Chairman.  Good afternoon to you all, gentlemen.

I was at the hearing in December.  I was the vice chair then, as I am now.  Mr. Terry was in the chair in December.  I quote from the transcript, Mr. Kennedy, directly from the transcript of the December hearing on this matter.  I had asked your colleague, Mr. Shimizu, about this whole matter, and I had stated, quote, "Takata's current view, based upon reliable information, does not support a nationwide determination of a safety defect in all vehicles equipped with the subject driver's side inflators.

"This is not the view of the agency of the federal government", obviously NHTSA, "that protects the American people.  And so you are dramatically and diametrically in opposition to the view of NHTSA.  Is that accurate?"

And then Mr. Shimizu discussed this with his colleagues.  There was a translation problem, but he then answered the question.  And he said, quote, and this is a direct quote from the transcript, "Yes, correct.  That is our statement."

And then I went on to say, "In conclusion, and we will be asking this of NHTSA later in the hearing" -- on November 26th, NHTSA demanded a national recall, and of course, that was not the view of Takata at that time.

What has changed, Mr. Kennedy, between then and now?

K. KENNEDY:  Much has changed.  Much.

LANCE:  There has been one additional death.

K. KENNEDY:  There was the one additional death that we are also aware of ...

LANCE:  That certainly has changed.

K. KENNEDY:  ... in Texas, that was, as I think was also mentioned, was a vehicle that had been recalled four years ago, unfortunately.

LANCE:  But not to the owner.  This was a subsequent ...

K. KENNEDY:  I know.  And that's ...

LANCE:  That's an important factor for the American people to know.

K. KENNEDY:  It is a very important factor.  A very important factor, I agree with you.

But back to your original question of what has changed, at that time we had, I think, 8,000 tests done.  Now we've got 50,000 tests done.  We've seen some patterns

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

start to emerge in some of the testing and the data that we've accumulated.  That's what's led us -- and all of the other testing and analysis that's been done by outside experts.  We've hired experts.  I think you've seen the Fraunhofer Report now.

LANCE:  Yes.  I was the person who quoted that.

K. KENNEDY:  Yes.

LANCE:  Moving on, the issue of ruptures was first known by Takata in 2004, and the first six deaths, I believe, occurred approximately in 2009.  And so this has been an ongoing problem of great significance.  In the last six months, how much have you been fined?  I believe it's $14,000 a day.  How much in total have you been fined, Mr. Kennedy?

K. KENNEDY:  I think Dr. Rosekind answered that.  I think it was ...

LANCE:  I'm asking for your answer, Mr. Kennedy.

K. KENNEDY:  I believe it totals up to about $1.2 million.

LANCE:  And have you paid that?

K. KENNEDY:  To my knowledge, no.

LANCE:  And why is that?

K. KENNEDY:  That's part of the discussion and negotiation with NHTSA.  They've agreed to suspend it as part of the consent order, and -- but they have reserved the right to incur further penalties as they see fit.

LANCE:  Now, based upon your testimony to the chairman and to the ranking member, is it possible that replacement airbags will continue to have ammonium nitrate in them?

K. KENNEDY:  Yes, sir.  They will.  Some of them will.

LANCE:  And you are confident that they will be safe for some period of time, or an extended period of time?

K. KENNEDY:  We feel that they are safe, and that's why -- again, as part of the consent order, we are continuing to test outside of the scope of the recalls, and we are continuing to test to make sure that the remedy parts are safe.

LANCE:  Should those who are having an airbag replaced ask whether or not their new airbag will contain ammonium nitrate?  And perhaps ask for a different replacement airbag?

K. KENNEDY:  I'm not really sure how to answer that, sir.

LANCE:  And are there new automobiles, fresh off the assembly line, that contain ammonium nitrate airbags?

K. KENNEDY:  Yes, there are.

LANCE:  Thank you.

K. KENNEDY:  You're welcome.

LANCE:  Mr. Bozzella, you indicate that the rate of compliance with recalls dropped dramatically.  And did I hear you right that it's 15 percent for older vehicles?  And could you explain exactly the years involved where it would be as low as 15 percent?

BOZZELLA:  Yes, I don't know that I mentioned exactly the number ...

LANCE:  I thought you did.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BOZZELLA:  But the truth -- you're exactly right, Congressman.  The trend is that further out into the ownership

LANCE:  Yes.

BOZZELLA:  ... of the vehicle, the recall completion rate is lower.  The question is, why is that?  Second and third owners are -- of these vehicles are often owned by second and third owners.

LANCE:  Yes.

BOZZELLA: They are difficult to find.  And so the manufacturers are doing everything they can right now, working very hard to increase those completion ...

LANCE:  Yes, but thank you.

In conclusion, because my time has expired, I'm concerned about those who have vehicles that they purchased not new.  This would be people who might not be aware, necessarily, to the greatest extent of someone who's purchased a new automobile.  We want to protect all of the American people, and this is of great concern.  And I want to work with you and others and the committee, to make sure that all Americans are protected.

Thank you, Mr. Chairman.

BURGESS:  The Chair thanks the gentleman.  The gentleman yields back.  The Chair recognizes the gentlelady from New York, Ms. Clarke.  Five minutes for your questions, please.

CLARKE:  I thank you very much, Mr. Chairman.  I thank our panelists.

The day before the subcommittee's hearing in December, Takata sent a letter to NHTSA in which the company rejected a national recall.  Part of the stated reason of -- for rejecting the national recall was Takata's contention that it was not required by law to make a good faith determination of whether its product contained a safety related defect or to conduct a recall because Takata is not a manufacturer of motor vehicles or of replacement equipment.

Mr. Kennedy, this question was asked of Mr. Shimizu in December.  But I want to hear from you now.  Do you agree with that statement, made by your company in December?

K. KENNEDY:  It sounds like a lot of legal -- response (ph) to me.  I'm certainly not a lawyer.

CLARKE:  It's not legal.  It's very simple.  It says here that it is your contention that you are not required by law to make a good faith determination of whether a product that contained a safety-related defect or to conduct a recall because Takata is not a manufacturer of motor vehicles or of replacement equipment.

K. KENNEDY:  I really don't know the answer to that.  I would have -- I would have to do a little bit of research and get back with you on that.

CLARKE:  All right.  Very well.  By entering into the consent order with NHTSA, it is my understanding that Takata has submitted to NHTSA's jurisdiction.  Is that correct?

K. KENNEDY:  I believe that would probably be the proper term.

CLARKE:  That's correct.

K. KENNEDY:  We've come to an agreement with NHTSA.

CLARKE:  So that's correct.

K. KENNEDY:  Yes.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

CLARKE:  Very well.  Do you know -- do you now agree that Takata is subject to the jurisdiction of NHTSA at least as to the laws and regulations related to safety-related defects?

K. KENNEDY:  Again, it's an area of the -- you're asking me a law question that I'm not really properly qualified to answer.  I could certainly look into it and get back with you.

I mean, certainly we recognize the NHTSA authority, if that's really the question that you're asking.  And we've worked very hard with NHTSA, especially over the last three or four months, to come to the agreement on the consent agreement, the preservation order, the DIRs ...

CLARKE:  So let me ask you this.  Do you now agree that Takata is required to decide in good faith whether your product contained a safety-related defect?

K. KENNEDY:  Well, we did -- we clearly did say in the DIRs that a defect may arise in some of the subject parts.  So I guess the answer to that question would be yes.

CLARKE:  Mr. Kennedy, is Takata paying for all of the replacement airbags?

K. KENNEDY:  I'm not sure what you mean by -- are we?  We're selling them.

CLARKE:  Well, there -- airbags that now need to be replaced/

K. KENNEDY:  Correct.

CLARKE:  Right.  Are you paying for them?

K. KENNEDY:  Oh, we are working with each one of the OEM -- each one of our auto maker customers to discuss financial responsibility and let ...

CLARKE:  What does that mean?

K. KENNEDY:  That means that we're having discussions with each one of the auto makers ...

CLARKE:  So, you're not paying for them.

K. KENNEDY:  I wouldn't say that we're paying 100 percent for everything, with every auto maker.

CLARKE:  So, you're negotiating what you will pay and what you won't?

K. KENNEDY:  Which is a normal course of business on ...

CLARKE:  I'm just asking.

K. KENNEDY:  Yes.  It's a normal course of business in the automotive industry.

CLARKE:  The New York Times article from May 20th stated that Takata said auto makers shared the blame for this massive recall because, quote, "Testing speci-fications prescribed by the vehicle manufacturers failed to uncover faults," unquote. Is that correct?

K. KENNEDY:  That was one of the conclusions from the Fraunhofer Report that was referenced...

CLARKE:  But is that correct?

K. KENNEDY:  We believe that is correct.

CLARKE:  OK.  Can you explain that statement a little bit more?

K. KENNEDY:  Yes.  What it means is, whenever a supplier provides a product to an automaker, there's a specification that you're required to meet.  There's a certain set of tests that you have to run, a certain quantity of tests that you have

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

to run.  And we do that.  And as a general rule, you know, we do that with every new product.  We review it with the OEM and they sign off on it and say, "Yes, we accept this" or "No, we don't."  And these products went through that process.

So what the report was trying to say is that the specifications that were out there at the time don't -- did not capture the issues that we're seeing in the field today.

CLARKE:  So you're saying the manufacturers failed to uncover the faults, so ...

K. KENNEDY:  What we're saying is the specifications that we tested to and provided parts to did not encompass the scope of this problem.

CLARKE:  And so they -- because you're saying that they failed to uncover these faults.

K. KENNEDY:  I am not -- I'm maybe not going to quibble about the wording, but that's exactly -- I mean, that's what I'm ...

CLARKE:  So you're not taking any responsibility ...

K. KENNEDY:  No, ma'am, that is not what I said at all.

CLARKE:  OK.

K. KENNEDY:  That is not what I said at all.

CLARKE:  OK.  So you're saying they share the blame because they should have uncovered the faults during this ...

K. KENNEDY:  Well, I'm ...

CLARKE:  ... testing of specifications.

K. KENNEDY:  What I'm saying is that, in the automotive industry, products are developed to meet specifications.  Typically if you meet the specification, you've provided a part that is acceptable.

CLARKE:  I thank you, Mr. Kennedy.

K. KENNEDY:  You're welcome.

CLARKE:  I yield back, Mr. Chairman.

BURGESS:  Well, gentlelady, Mr. Bainwol was trying to provide an answer for you as well.

CLARKE:  Oh, OK.

BURGESS:  With unanimous consent that Mr. Bainwol be allowed to answer.

CLARKE:  Thank you, Mr. Chair.

BAINWOL:  I appreciate that, Mr. Chairman.  And I say this not as a lawyer or an engineer or someone who negotiates these contracts, but the specs that are let out when a contract like this is negotiated relate to performance specifications and do not relate to the fundamental notion that the product should be safe.

You know, this is about the form of the deployment and items like that in terms of which cars it's going to be appropriate fitted for.  But there is an understanding that the supplier will provide a product that complies with FMVSS.  And part of that is making sure that a controlled explosion is a controlled explosion.

CLARKE:  Thank you.

BURGESS:  The gentlelady yields back.  The chair thanks the gentlelady, the chair thanks Mr. Bainwol.  Mr. Guthrie, you're recognized for five minutes for questions, please.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

GUTHRIE:  Thank you very much.  And Mr. Kennedy, I guess I'll direct the questions to you as well.

It is an understanding if you really don't know the root cause, then you really don't know if the product that failed was manufactured to specification.  Now, the test might have met the specification, but you don't -- I mean, was it manufactured to specification, and it failed anyway?  So therefore, the specification that came from the OEM was the issue or -- I mean, if you don't know the root cause, you don't really know the answer to that, I guess, do you?

K. KENNEDY:  Yes, that's part of the difficulty that we have with this issue.  And I think you've heard Mr. Kelly talk about it.  You've heard Dr. Rosekind talk about it.  It's a very multifaceted, very complex issue as to what's going on.  And there are different types of inflators.  You heard, I think, Dr. Rosekind say 10 different inflator types involved in this.  And one of them -- in the parts that we've gotten back in the past few months, we have seen what looks like a manufacturing defect that we think allowed moisture into the inflator.  That's on one of those.

The other ones, we haven't been able to make that determination.  So, I mean, we have expended a lot of effort with a lot of experts to try to get to that.  But unfortunately, we have not yet got to a definitive root cause across every one of these inflators.

GUTHRIE:  And that leads to -- and understand, I'm an automotive -- that's my background, the automotive industry.  So you get the product specifications, the blueprint and you meet to that ...

K. KENNEDY:  Right.

GUTHRIE:  And you ship to that.  And if they fail within the specification, then that's an engineering issue.  If you didn't manufacture it to the specification, that's your issue.

K. KENNEDY:  Correct.

GUTHRIE:  And it seems like you don't know exactly where that is.

But following on what my friend from Tennessee, Ms. Blackburn, was talking about, I mean, if you don't know the root cause -- and this is a question I don't know if we got a good answer to -- how do you know the replacement parts or -- that they bring in for the recall are not going to fail?  I mean, how -- what's the surety of that?  And I think Mr. Lance actually asked -- tried to get to that as well.

K. KENNEDY:  Yes.  And that's a very good question.  Many of the replacement parts that we're using are different designs now.  Everything on the driver's side will be a completely different design.

As I said, about 50 percent of what we shipped last month were with our competitor's inflators that do not use ammonium nitrate and have not demonstrated issues in the field, to my knowledge.  That will go up to 70 percent here in the next months or so.  And so we are looking to change to different inflator designs or alternate designs for the replacement parts as quickly as we can.

GUTHRIE:  But you're already sending replacement parts now, right?

K. KENNEDY:  We are sending -- yes, and we have been sending replacement parts.

GUTHRIE:  So, I mean, how do you know those are -- if you're going to bring in a car for a recall to replace, how do you know those aren't going to ...

K. KENNEDY:  Well, that's the reason that the consent order is written the way that it is in order to require that we continue to test the remedy parts and we continue to test outside of the scope of the recalls in order to make that judgment.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

GUTHRIE:  But you tested before you shipped the first parts.

K. KENNEDY:  We did.  We did.  Yes.

GUTHRIE:  And they passed the test.

K. KENNEDY:  Yes.

GUTHRIE:  And there could be a manufacturing defect that you did that made them fail.  So how do you - so we don't know.  I mean, you don't -- if you don't know the root cause, you don't know that these replacement parts are not going to have the same ...

K. KENNEDY:  We have confidence in the ones we're making.  The process has changed a bit over the years.  And as I said, a lot of them were using alternate designs that really have never experienced issues, to our knowledge.

But there is a percentage of them, and that's exactly why the consent order is written the way that it is, and why we're continuing to do the testing and the analysis that we're doing.

GUTHRIE:  OK.  And then I think you said earlier you are shipping, I think I wrote down, about 700,000 replacement kits?

K. KENNEDY:  Yes, we shipped 740,000 in May.

GUTHRIE:  And up to a million ...

(CROSSTALK)

... shipping daily. I guess you ship daily to the...

(CROSSTALK)

K. KENNEDY:  ... multi (inaudible) every day.  And we get multiple trucks back every day with parts back from the field.

GUTHRIE:  And how are you prioritizing who gets those.  Is it regional?  Are you prioritizing ...

K. KENNEDY:  You know, up to this point we have been able to keep up with demand for replacement parts.  There are a couple of part numbers that are on back-order right now.  We expect to have that back-order completed in the next two weeks.

Now, obviously it's going to expand with this expansion when the letters start going out to the consumers.  But that's why we're adding additional capacity both internally -- we've got seven new inflator lines coming in over the next six to 12 months.  We've got additional inflator lines going in at our competitors.  We've got additional kit lines going in in our manufacturing facility.  So we're continuing to ramp up.

GUTHRIE:  And you also have to maintain current production at the same time.

K. KENNEDY:  We also have to maintain current production.  That's a very good point.

GUTHRIE:  I have a questions that the others -- since we're -- would you all talk about the replacement part if it's in your -- if you're about to comment on the replacement kit process that's going on.  Is there anything you guys would like to comment on, or is it within your purview?

K. KENNEDY:  Thank you, Congressman.  Yes, we will be looking at the replacement parts, and the efficacy of the replacement parts as part of our investigation.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BAINWOL:  And I'd simply note that the complexity of this one is enormous.  It's not just the 30 million-34 million units in the U.S.  There are global issues as well.  And so production, allocation, prioritization are all hugely significant issues.

And that's why we think that in this instance it was appropriate to assert a coordination capacity.  And there's no other way to solve this in a fashion that guarantees fairness and guarantees as expeditious a response as possible.  That's why we've done that.

BOZZELLA:  I would just add, congressman, that the manufacturers are doing what they need to do to take care of their customers, knowing what they know now.

GUTHRIE:  Thanks a lot.  And I appreciate it.  And you know I've worked in manufacturing.  We didn't have any what we would call inverted diamond or safety issues in our product, but trying to find the root cause.  And when you can recreate the problem is when you know you've found the root cause.  And we're all anxious to get to that point, so...

K. KENNEDY:  And that has been one of the most difficult parts of this whole things is, as I said, any one failure is unacceptable to us.  But in the analysis, the failure rate is so low, it's hard to -- you know as you

(CROSSTALK)

K. KENNEDY:  -- turn it on and turn it off.  Just we haven't been able to do that.

GUTHRIE:  Once you can do that, you know what's turning it on and turning it off...

K. KENNEDY:  Then we just want to turn it off, yes.

GUTHRIE:  We're looking forward to getting to the bottom of it.  Thank you.  I yield back.  I'm out of time.

BURGESS:  The chair thanks the gentleman.  The gentleman yields back.  Chair recognizes the gentleman from New Jersey.  Five minutes for your questions, please.

PALLONE:  Thank you, Mr. Chairman.

We've been hearing conflicting reports on whether the -- this is for Mr. Kennedy.  We've been hearing conflicting reports on whether the replacement parts are different than the defective inflators.  Some news reports have talked about a change in the chemical composition and shape of the propellant used in the inflators.

At the December hearing, Mr. -- I guess it's Shimizu of Takata talked about improvements made to the manufacturing process in recent years that said the inflators were the same.  So I just wanted to understand this issue a little better.  Mr. Kennedy, is there any difference between the replacement inflators and the original defective inflators?

K. KENNEDY:  It depends on each one of the different inflators that you're talking about.  As I mentioned, about 50 percent of what we've been sent last month was outside inflators.  Those are obviously completely different than our original inflators.

On the driver side we will be using either alternate Takata designs or alternate outside for everything.  And the driver side is the one that has had the most issues and the most severe issues.

On the passenger sides, right now there are a percentage of those that are outside inflators, but there is still a percentage that are the same design inflator that was in the original modules, but obviously manufactured at a later time.

PALLONE:  All right.

In Takata's defect information report to NHTSA regarding PSDI-4 inflators, Takata notes that, and I quote, "it continues to produce a small number of PSDI-4 inflators

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

for use as remedy parts.  Takata intends to cease production of the subject inflators, including for use as remedy parts."  So again, when does Takata intend to stop producing the PSDI-4 inflators as replacements?

K. KENNEDY:  We have a couple of car makers with some older vehicles that have not qualified at the new inflator yet.  We are working -- and they've been working very hard to do that with us and with our competitor.  And what the plan is in that DIR is, I think they call it phase four.  The phase four would be to go out and get all of the remedy parts that we supplied that were of that design, the PSDI-4.

PALLONE:  But then when that happens and then they stop producing these PSDI-4 inflators as a replacement, what will Takata use to replace the old one?

K. KENNEDY:  We have -- it depends on the vehicle and the manufacturer.  Some of them are our competitors' inflators.  We're buying inflators primarily I think on driver side for from TRW and Autoliv.  And we also have a later generation Takata inflator called PSDI-X with desiccant in it that has proven to be very robust.  And in some of them we will be using PSDI-X.

PALLONE:  Then are we to assume that the reason Takata's stopping its production of these PSDI inflators is because they're unsafe?

K. KENNEDY:  The PSDI -- the batwing propellant geometry was one of the factors that was called out in some of the testing in the analysis that we have done and some of our outside experts have done as a factor.  So in order to just eliminate that factor completely we said we would quit making that...

PALLONE:  So you...

K. KENNEDY:  We don't make it for production any longer.  It was only for replacement parts.

PALLONE:  You're not sure, but you suspect there could be a problem?

K. KENNEDY:  Correct.

PALLONE:  OK.  Now you say you're going to replace the inflators in four stages.  You mentioned, I guess, that the fourth stage will include subject inflators previously installed as remedy parts, right?

K. KENNEDY:  Yes, sir.

PALLONE:  Well, will the people that have their original PSDI-4 inflators replaced with the new PSDI inflators, say for example in December 2014, will they have to have them replaced again?

K. KENNEDY:  Anyone that had an inflator replaced with a PSDI-4 inflator would have to have that replaced again.  Yes, that's correct.

PALLONE:  So I imagine that someone who's already had their inflator replaced as part of this recall may not realize that they've had -- that they have to have it replaced again.  So how do you plan to communicate that to the consumer?

K. KENNEDY:  You know, that's another -- that's another great question, sir.  And that's another part of the consent order and the agreement we have with NHTSA.  We are going to work with NHTSA and the automakers to do a proactive safety campaign.  We have been working with a professional media firm that has done these kinds of things in the past.

We know that Honda last year had initiated kind of a media campaign where on your cellphone if you called up Google there would be a banner at the bottom that said check your airbag.  We talked to Honda.  We know what worked, what didn't work.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

So we're - we have 60 days from the consent order signing on the 19th to come back with this plan to NHTSA and work with the OEMs in order to help increase that visibility and get that message out to people whose cars need to come back in.

PALLONE:  All right.  Thank you.  Thank you, Mr. Chairman.

K. KENNEDY:  You're welcome.

BURGESS:  Gentleman yields back.  Chair thanks the gentleman.  Chair recognizes the gentleman from Houston.  Five minutes for your questions, please.

OLSON:  Thank you, Mr. Chairman.  And welcome to our witnesses.

My first questions are for you, Mr. Kennedy.  One theme that's come through loud and at clear this hearing from Dr. Rosekind and all of you-all is the lack of we still don't know about the root cause of these defects.  We have ties to humidity, heat, desiccants, batwings, all sorts of things, but no root cause.  And that bothers me.

The plane I) flew in the United States Navy was a P-3 Orion.  It was a modified version of Lockheed L-10  L-182 Electra.  That plane had a bad defect.  It was called whirl mode.  That meant the wings fell off the plane.  That was the root cause of two crashes.

That's hard to find because those planes were torn up when they hit the ground.  They didn't know what happened.  But yet we found out what happened, found the root cause.  And those planes have been flying for six years in our Navy.

And so I've heard you say you know that again there's heat, humidity, desiccants, propellants.  You've mentioned -- there's a tie with -- you have some propellants out there without desiccants, correct?

K. KENNEDY:  Correct.

OLSON:  How many of those, sir, are out there right now?

K. KENNEDY:  I would have to check and get back with you, sir.  But it's a significant number.

OLSON:  How many in my home, Houston, Texas?  Because we are 95-95 most of the year: 95 percent humidity and 95 degrees.  So we're ground zero for these problems.  How about there?  Do I tell my people back home, guys, they're all here, 100,000 cars, 50,000 cars?  Any idea?

K. KENNEDY:  No, I do not know the number, sir.

OLSON:  What's the problem then with finding these cars and putting desiccant in it, replacing it with a desiccant and make sure -- if that's a factor, how about take that out of the equation?  Put that in there right now.

K. KENNEDY:  Well, that's exactly what we're doing with every one of those PSDI, PSDI-4, PSDI-4K inflators.

OLSON:  OK...

K. KENNEDY:  That's exactly what the first DIR is.

OLSON:  So by the end of this year there'll be no bags out there without some sort of desiccant with their propellant, correct, with ammonium nitrate.  Is that right?

K. KENNEDY:  No, no.  That's not what I'm saying, sir.

OLSON:  Oh.  That's a problem.  You said that's one of the problems -- we don't know what's going on out there.  I think it's safe to me that's if it's a propellant having some sort of problem with the humidity and the heat, how about putting the

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

desiccant with all the propellants?  Make sure that goes out of the equation.  Maybe you find the root cause.

K. KENNEDY:  Or an alternate inflator.  That's the plan with the ones that have shown to the issues in the field, which are these -- we refer to as PSDI, PSDI-4s.  That is what we're doing.  The later inflators that we're replacing those with will either have desiccant or they'll be from one of our competitors.

OLSON:  OK.

My questions now are for the gentleman here from the manufacturers.  There'll be big costs with these recalls.  Who's going to pay for that?  Will it be Takata, the manufacturers, the dealers?  I mean, who's going to pay for all this recall?  Mr. Bainwol, any idea, sir?

BAINWOL:  I can tell you that consumers do not pay.  That's the critical point.  My hunch is there may be some debate about who actually bears the cost.  I think our perspective on where that should end up is pretty clear.

OLSON:  Mr. Bozzella?

BOZZELLA:  I would agree with Mr. Bainwol.  The consumer will not pay.  We need to...

OLSON:  Good to hear.

BOZZELLA:  -- we need to take care of the customer.  Manufacturers need to take care of the customer, working with the dealers, the suppliers and with the regulator to do so.

OLSON:  How about the dealers?  We hear about them about the costs, because for example, my truck had a little small recall notice.  I got that taken care of when I replaced the oil.  So I went there to have, like, five minutes done.  I probably was there for about an hour having something fixed.

Any reply from those guys on how this is hurting their business, spending more time on recalls than actually selling cars and fixing cars that they normally have to maintain?

BOZZELLA:  Well the dealers come out whole.  They are reimbursed for the recall.  And it's oftentimes governed by state franchise rules.  But they're made whole.

OLSON:  And one final question for you, Mr. Bainwol and Mr. Bozzella.  A member of the first panel I talked about the last victim of these airbags, got him cost lease (ph) from Spring, Texas.  As you know, he bought a used car, a 2002 Accord, and the defect came out - the recall notice came out in 2011.  He got in a crash this year.  Never knew that his car was defective.  How can you guys help make sure we track those cars from recall to actual owner so there's not sort of a gap?  Because he had no chance to have that recall -- he had no idea his car was defective.

BAINWOL:  It's an important point, and it's one we're very sensitive to.  The fundamental notion with safety is that it's a shared responsibility.  We have a piece of it, consumers have a piece of it, the dealers do, certainly NHTSA and certainly the states.  And so we've all got to do a better job of tracing the ownership so we can communicate.

And that's one of the reasons why we've gone through this exercise that I mentioned in my opening statement about conducting research to figure out what makes people go in and get the job done.  We've got to find a way to turn that trigger so that they go in and get the work done.

BOZZELLA:  It's a great question.  And I would simply add to that that that's, as I mentioned in my testimony, that we ought to consider looking at the point at

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

which an owner registers or re-registers his or her car as a point for further notification.

In the case of the incident that you mentioned, it -- had that approach or procedure been in place, that owner may have been notified at the point of registering that used car that there was an open recall.  So we think that merits some -- that's worthy of merit.

OLSON:  Thank you.  Out of time.  I yield back.

BURGESS:  Chair thanks the gentleman.  Gentleman yields back.  Chair recognizes the gentleman from Florida, Mr. Bilirakis for five minutes for your questions, please.

BILIRAKIS:  Thank you, Mr. Chairman.  I appreciate it so very much, and thank the panel for their testimony.

Mr. Kennedy, can you verify that some cars that were previously recalled and supposedly fixed will have to be recalled again for a second airbag replacement?

K. KENNEDY:  Yes, sir.

BILIRAKIS:  Yes.  Do you have any initial numbers on how many consumers are affected?  If not, when will you know and how will the consumers be notified?

K. KENNEDY:  You mean consumers that would've had to bring their cars in twice?

BILIRAKIS:  Correct.

K. KENNEDY:  I don't have that information yet, sir.  As I think Dr. Rosekind said, a lot of the OEMs, a lot of the automakers are still entering their VINs and getting the quantities and the exact vehicles.  So after that it would be easier...

BILIRAKIS:  How do you plan to notify the consumers?

K. KENNEDY:  We're still working on that plan.  As part of the consent order we were given 60 days to develop this plan.  And we certainly want to do it in conjunction with the automakers.  We don't want to do something that's going to be at odds with the automakers.

So we have, as I mentioned, a media firm that is familiar with these types of activities.  We have some ideas on paper.  We're working, and we will certainly be reviewing those with NHTSA and having NHTSA's involvement as well as the automakers.

BILIRAKIS:  So, why weren't these issues dealt with the first time they were recalled?  In other words, why -- I don't -- there's no excuse.  It's inexcusable as far as I'm concerned.  But give me an answer.

K. KENNEDY:  It's...

BILIRAKIS:  Why weren't these issues dealt with the first time?

K. KENNEDY:  It's a fair question, sir, and it's a difficult question.  I think you've heard from a lot of different people today it's an extremely complex issue.

There are -- when we first started seeing some issues back in 2005 we did national recalls on a large number of parts.  And we thought we had identified root causes.  We thought we had gotten everything from the field.  We thought we were doing all the right things.  And then we started seeing these sporadic issues in the field, and that's what led to the action that started last year.

So it's been very elusive to us.  And it's been very, very difficult to get a consistent pattern that would tell us exactly what the root cause is...

BILIRAKIS:  OK.  Mr. Kennedy, let me -- I have a couple more questions.

K. KENNEDY:  OK.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

BILIRAKIS:  How can you possibly ensure consumers, my constituents, the second replacement will be effective and a third replacement will not be necessary?

K. KENNEDY:  Well, on most...

BILIRAKIS:  Can you assure my constituents that that will be the case?

K. KENNEDY:  On most of the replacement parts, as I said, there're going to be later designs or from our competitors when we're putting those in.  There are still a few.

And that's why, as part of the consent order, we are still testing the remedy parts to make sure that those are going to be sufficient for the life of the vehicle and why we are continuing to test outside of the ranges of the recalls that were in the DIRs that were announced a couple of weeks ago.

So we're trying to cover that.  I can't tell you right now that everything is done.  But we are -- we've anticipated that problem, and we have an agreement with NHTSA that allows us to continue to look at that.  And if actions are required, we will take actions.

BILIRAKIS:  OK.  Since the first airbag inflator ruptured in 2004, it is true that Takata tested roughly 128 airbags from 2004 and 2000.  Is that correct?

K. KENNEDY:  I'm not familiar with...

BILIRAKIS:  In 2004 to 2008.  Is that correct?

K. KENNEDY:  I'm not familiar with that number, sir.  I can double check and get back to you...

BILIRAKIS:  Please get back to me on that.

K. KENNEDY:  Yes, I will.

BILIRAKIS:  Do you believe that enough was done to investigate this issue and bring awareness to consumers on the potential risk and threat of defective airbags?  Was enough done?

K. KENNEDY:  You mean on those original ones?

BILIRAKIS:  Yes, the original ones.

K. KENNEDY:  Yes.  We were able to identify what we thought and what our automaker customers thought was a very solid root cause.  We had manufacturing data.  We had test data.  We were able to recreate the problem.  But clearly there was something else going on...

BILIRAKIS:  Could more have been done?

K. KENNEDY:  Again, you could probably always say more could be done.  But what we did, we thought and our automaker customers thought was sufficient to get to root cause and to take action.  And that's what we did.

BILIRAKIS:  Mr. Bainwol, one last question, Mr. Chairman.  Have any companies requested that Takata remove ammonium nitrate from the propellant formula used in the airbag deflators?

BAINWOL:  That's an answer I don't know the answer to -- question.  And I will find out and report back.

BILIRAKIS:  Please get back to us.  Thank you very much.  I yield back, Mr. Chairman.

BURGESS:  Chair thanks the gentlemen.  Gentleman yields back.  Chair recognizes the gentleman from Oklahoma, Mr. Mullin.  Five minutes for your questions, please.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

MULLIN:  Thank you, Mr. Chairman.

Mr. Kennedy, you have -- I've actually sit here and enjoyed watching you.  You're very skillful on the way you approach the answers.  I could probably take a lesson or two from that.

But at the same time, we just don't seem to be getting the answers.  I mean, you can tell the frustration that this panel is getting.  We got a young lady that's setting over your shoulder that's bearing the scars of a mistake that was made, and we're still not getting the answers.

I mean I'm a business owner.  I understand when we fail.  I understand when we make a mistake.  But now what?  What their solution was is we did a recall and we're replaced them with other things that were still faulty?  There's no excuse for that. Zero.

Maybe this panel is just looking to hear you say, "We screwed up."  But I know that causes legal issues for you-all.  But a screw up's a screw up.  Taking blame is just that, hey we messed up.

I mean we heard just a while ago.  Who's going to be responsible for this?  I don't know.  What do you mean we don't know?  Who made the product?  Whose product was it?  Whose name was on it?  That's who should pay for it.

I just wonder -- I'm sitting here thinking, well OK, maybe that's why we haven't been moving very fast, because you haven't took ownership of it.  At the same time we got no telling how many vehicles are out there.  More young ladies or young men are going to bear the scars again?  Or worse than that, someone's going to not be able to finish out their life.

What is that worth to you?  How do you put a dollar amount on that?  What if that was your daughter?  I got three at home.  I can tell you what it's worth.  Do you have a daughter?

K. KENNEDY:  I have.  I have a daughter and a son.

MULLIN:  And a son.  Wouldn't you be pretty passionate about it?

K. KENNEDY:  Absolutely.

MULLIN:  Wouldn't you want the owner to be owning up to it and say we're going to do whatever it takes?  We'll take responsibility for it?

K. KENNEDY:  Yes.  And we believe we...

MULLIN:  But -- you know, but sir, you're still making, what we believe, 2004. We're 2015.  How long have you been making airbags?

K. KENNEDY:  Since I believe 1987.

MULLIN:  How many more studies do you need to have?

K. KENNEDY:  As I said, and I think -- I'm not trying to be evasive.  I mean you've heard it from other people that have been involved in this, they're very smart people too.  It's...

MULLIN:  Evasive.

K. KENNEDY:  ... a very multifaceted issue that...

MULLIN:  Multifaceted.  That is a great term to use.  We use political terms here all the time.  We know how to talk a little bit around circles.

We're looking for ownership.  I understand it's complex.  The product you make is very complex.  I've been hit in the face with a few of them.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner) Federal News Service

K. KENNEDY:  Me too.

MULLIN:  Yes.  Fortunately, I survived.  I understand the issue about from impact to stopping you, the safety behind it it's going to be complex.  But a problem's a problem.  It's not that complex.  You do what it takes.  You know, you have to figure out, OK, what's a life worth?  Put a dollar amount on it.  I don't know how you can.

K. KENNEDY:  I don't know how you can either, sir.

MULLIN:  You get them replaced.

K. KENNEDY:  Certainly do not.

MULLIN:  Instead you said that the complexity of it, we don't really know the make-up of it.  But our competitors are finding out a product to replace.  Your competitors?

K. KENNEDY:  Well, we...

MULLIN:  It sounds like to me you're willing to do anything but take ownership.  Your competitors?  I can't imagine sitting up here and saying my competitor's going to fix my problem.

K. KENNEDY:  Well, we were doing that in order to get parts in the field faster.  Some of our competitors have products that...

(CROSSTALK)

MULLIN:  You've known about it since 2004.

K. KENNEDY:  Not to the level that we have here, sir.  2004...

MULLIN:  In 2004 you identified that there's a problem.  You said that you could recreate the problem.  You knew there was a problem.

K. KENNEDY:  And we thought we had a root cause at that time too.

MULLIN:  Did it replace them?

K. KENNEDY:  Yes.  Yes.  We initiated...

MULLIN:  How did you track them down?

K. KENNEDY:  Pardon me?

MULLIN:  How did you track them down?

K. KENNEDY:  We worked with the automakers that were involved.

MULLIN:  But we still haven't gotten the people notified.

K. KENNEDY:  And that is a problem...

MULLIN:  I mean I...

K. KENNEDY:  That is a huge problem.

MULLIN:  -- we raise cattle.  And if my cow, for some reason, I sell and ends up in California and somehow ends up with mad cow disease, it's not born with a birth certificate or a serial number or a barcode, but yet we're able to track it all the way back to my farm.

K. KENNEDY:  Right.

MULLIN:  And we can't do that with an airbag?

K. KENNEDY:  Well, we can tell you exactly what airbag we sent and the OEMs, the automakers can tell you what vehicle it's in.  The issue for the most part has been getting that recall rate back up...

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

MULLIN:  No, it's the cost.  I believe we already found the root of the problem.  It's the cost.

K. KENNEDY:  No, sir.  I disagree with...

MULLIN:   No one wants to bear the cost.

K. KENNEDY:  I disagree with that.

MULLIN:   If we wanted to find the problem, you cannot convince me we couldn't find a solution, except we haven't even agreed on the panel that's in front of me who's going to pay for it.  I think that's the root of the problem.   Mr. Chairman, I yield back.

BURGESS:  Chair thanks the gentleman.  Gentleman yields back. The chair recognizes the gentleman from Illinois, Mr. Kinzinger, for five minutes for questions, please.

KINZINGER:  Well, thank you, Mr. Chairman.  And for the four of you, thank you for being here.  And thanks for being willing to talk with us about these very important issues.

You know at the December hearing I asked our panel, which included BMW, Toyota and Honda if they agreed that sharing OEM part numbers and other identifiable information with the automotive recycling industry would help increase safety.   They agreed and expressed support for the efforts to improve methods to identify parts and to share part numbers with recyclers.

Earlier this year in February Transportation Secretary Foxx stated that he also supports auto manufacturers providing part numbers to recyclers.  And that furthermore, manufacturers should provide this information in an easy-to-use format.  The key here is that this approach would not require the creation of any new government program or bureaucracy, but it's something that the industry should tackle on its own.

To Mr. Bozzella and Mr. Bainwol, it appears that we have a unique incidence where regulators and industry seem to agree on an approach to address a problem, in large part because everyone understands that sharing this information will improve safety.

But my question is this.  If you know the answer, when and how do your members plan on making this information available to recyclers?  And are you aware of any discussions in the industry to help share this information to improve safety?  Mr. Bozzella, yes, if you can go first.

BOZZELLA:  Congressman, I don't know the answer to your question.  I'll certainly go back to our members that were on the panel and get back to you.

KINZINGER:  OK.  And Mr. Bainwol, you have any idea?

BAINWOL:  (OFF-MIKE)

KINZINGER:  OK.  So if you guys could, because I understand that you may be unaware of the issue, if you could maybe get that information and follow up with my office, that would be helpful as we continue to explore this issue going forward.

I'll ask you this.  What can your organizations do to kind of help facilitate this, and to make something like this happen?

BOZZELLA:  I'll get -- we'll have a conversation within our association and we'll be able to get back to you after that point.

KINZINGER:  OK.  Great.

BAINWOL:  So, I'd simply note that this question of resolving and getting expeditious recalls done is an important priority for everybody.  And we do view this,

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner)
Federal News Service

as I said earlier, a shared responsibility.  And we're willing to work with anybody to make sure we can get this job done as quickly as humanely possible.

KINZINGER:  OK.  Great.  Mr. Chairman, that's all the questions I have.  If you'd like my time I can yield it to you.  Or I can yield back.

BURGESS:  We'll accept you yielding back.

KINZINGER:  I yield back.

BURGESS:  And I thank the gentleman.  The gentleman yields back.  Chair recognizes Ms. Clarke.

CLARKE:  Thank you, Mr. Chairman.  I'd like to request unanimous consent to submit a written statement of the American Car Rental Association and the Consumers for Auto Reliability and Safety into the record.

BURGESS:  Without objection so ordered.

CLARKE:  Thank you, sir.

BURGESS:  I'll recognize myself just for one follow-up.  And I dwelled a lot on the ammonium nitrate as a propellant.  And this question really is for anyone.

In my prior life I was a physician, and I did work some in emergency rooms.  And I remember airbag deployments with sodium azide.  And I remember burns and eye injuries, forearm burns and knee burns when the bag went off.

But also recall that there were environmental concerns about sodium azide.  And Mr. Kinzinger brought up about salvage yards.  And there was concern about this sodium azide just eventually getting into the environment.

So are there any other propellants that are being worked on?  Is there like a purely a gas propellant, carbon dioxide, or something that can -- or nitrogen, something that wouldn't have the characteristics, the explosive characteristics of ammonium nitrate or the toxic characteristics of a sodium azide?

K. KENNEDY:  Yes, sir.  There are a wide variety of inflators out there. Some we call them cold gas inflators.  They are just a cylinder that's filled with gas under high pressure.  And you'd have a small igniter that hits a little burst disk and the gas comes out.

There are some that we call hybrids that have gas and then have a little bit of propellant that kind of heats it up.  Usually it's not ammonium nitrate in most of them.

Then there are alternate solid fuels out there, primarily guanidine nitrate is what most of the industry uses now and what we're transitioning to.

We can provide all kinds of information if you'd like to take a look at.  And some are better in other applications than others.

BURGESS:  What's the barrier for getting something that is less explosive than ammonium nitrate and less toxic than sodium azide?

K. KENNEDY:  You know, it really goes back to some of the tradeoffs that I was talking about earlier: size, weight, performance.

BURGESS:  Cost.

K. KENNEDY:  And cost is certainly one of them too, yes.  I mean some of those gas inflators are bigger so it's harder to get them in a steering wheel, for instance. So there are those kinds of tradeoffs.  But we can certainly provide any kind of information that you're interested in attaining.

House Energy and Commerce Committee, Commerce, Manufacturing, and Trade Subcommittee hearing on "An Update on the Takata Airbag Ruptures and Recalls." (3 day or sooner) Federal News Service

BURGESS:  I would appreciate you making that available to the subcommittee.  I think that would be helpful to us.

K. KENNEDY:  Very well, Chairman Burgess.

BURGESS:  Well, seeing there are no further members who wish to ask questions, I do want to thank all of our witnesses for their participation in today's hearing. It has been a long one.

Pursuant to committee rules, I remind members they have 10 business days to submit additional questions for the record.  I ask the witnesses submit their response within 10 business days upon receipt of those questions.

And without objection, subcommittee's adjourned.

END

**LOAD-DATE:** June 5, 2015