**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**

---

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO ECONOMIC DAMAGES TRACK CASES** | **MDL No. 2599**<br>**Master File No. 15- 2599-MD-MORENO/**<br>**McALILEY** |

**REPLY OF DEFENDANTS TOYOTA MOTOR SALES, U.S.A., INC., TOYOTA
MOTOR ENGINEERING & MANUFACTURING NORTH AMERICA, INC.,
FORD MOTOR COMPANY, SUBARU OF AMERICA, INC. AND NISSAN NORTH
AMERICA, INC. TO PLAINTIFFS' RESPONSE TO MOTION TO STAY BASED ON
THE PRIMARY JURISDICTION OF THE
<u>NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION</u>**

Plaintiffs' Response to Defendants' Motion to Stay suggests that this Court ignore the ongoing comprehensive actions by the NHTSA, which is in the midst of an unprecedented regulatory effort to determine the nature and extent of the safety issues involving Takata airbags and to ensure they are adequately remedied in millions of vehicles. Plaintiffs cite inapposite authority and rely on carefully selected quotes in cases with very different facts and circumstances, while failing to acknowledge that this Court only recently granted a stay based on primary jurisdiction in a case involving far less regulatory activity than is present here. *See Herago v. Whole Foods Mkt. Inc.*, No. 14-61909-CIV-MORENO, 2015 U.S. Dist. LEXIS 96811 (S.D. Fl. July 24, 2015). The moving Defendants (Toyota Motor Sales, U.S.A., Inc., Toyota Motor Engineering & Manufacturing North America, Inc., Nissan North America, Inc., Ford Motor Company and Subaru of America, Inc.) respectfully submit that, under the circumstances, the arguments for a stay based on the doctrine of primary jurisdiction are compelling, and urge the Court to defer to the NHTSA. [1]

## I.   NHTSA'S UNPRECEDENTED ACTIVITIES, THE APPLICABLE LAW, AND THE HIGH LIKELIHOOD OF CONFLICT SUPPORT THE USE OF PRIMARY JURISDICTION IN THIS CASE

Plaintiffs do not seriously attempt to deny NHTSA's unprecedented involvement in the Takata airbag issue, nor could they. That involvement seems to grow with each passing week. Just since the Motion to Stay was filed, NHTSA has obtained from Takata a proposed plan for testing and reporting on the safety of the defect remedy and service life of the replacement parts, and for maximizing recall completion rates. *See* http://www.safercar.gov/rs/takata/index.html. The number of recalled inflators in the U.S. now exceeds 23 million, and NHTSA continues to move forward with its Coordinated Remedy Program, per the Federal Register notice it issued in early June. 82 Fed. Reg. 32197 (June 5, 2015). Although Plaintiffs characterize NHTSA's activities as "primarily, a recall process" (Pl. Resp. at 1), NHTSA itself has stated that its goals include "to investigate challenges and solutions related to the Takata air bag inflator recalls" and "to craft solutions that further mitigate

---

[1]   Defendants BMW of North America, LLC and Mazda Motor of America, Inc. dba Mazda North American Operations do not formally join in this reply, but have adopted the Motion to Stay by reference and request the same relief in their Motions to Dismiss. *See* BMW of North America, LLC's Motion to Dismiss Plaintiffs' Second Amended Consolidated Class Action Complaint, at Section X; Defendant Mazda Motor of America, Inc.'s Motion to Dismiss, at Section I.

and control the risk of harm by ensuring safe air bags in every motor vehicle in the United States." 82 Fed. Reg. 32197.

Plaintiffs nonetheless argue that their claims for economic damages under federal and state law are "within the conventional experience of the Court," (Pl. Resp. at 3) and, therefore, need not be delayed even for a short period to allow the NHTSA to address the core issues that underlie all of Plaintiffs' claims – the scope of the problem and whether the airbags at issue are unsafe. Plaintiffs concede that they "will have to discover and establish an underlying defect" in order to recover in the economic loss class actions, just as they do in the personal injury cases. (Pl. Resp. at 8.) Apparently, they would prefer to do this in a vacuum, without waiting for the Defendants, defense experts, Takata, NHTSA, Orbital-ATK (engaged by the Independent Testing Coalition to investigate root cause) or any other interested parties to complete their investigations. Plaintiffs are free to pursue their own investigation and no doubt their experts will at some point opine on what they think the root cause is and the extent of the affected vehicle population. But the Court should not allow Plaintiffs to race to a self-prescribed finish line while the rest of the world continues to investigate and before any conclusions have been reached.

Defendants agree that, when the dust has settled, this Court can adjudicate Plaintiffs' claims for economic damages, if any viable claims remain. But in the meantime, without NHTSA's determinations as to the appropriate scope of the recalls, proceeding with this litigation would inevitably involve vast inefficiencies and would create the very real likelihood of inconsistencies resulting in inequities and public confusion. The reason for this is apparent. Plaintiffs' Second Amended Consolidated Class Action Complaint alleges that all airbags containing ammonium nitrate as a propellant are unsafe. (SAC, ¶ 302) ("the Inflator Defect is manifest in each of Takata's airbags containing ammonium nitrate"). As a corollary, Plaintiffs allege that the replacement inflators with ammonium nitrate are equally defective and unsafe. (SAC, ¶ 303) The scope of the vehicle population at issue determines the scope of discovery, and any changes will result in serious inefficiencies (*e.g.*, document searches would need to be re-run, depositions re-taken or expanded in scope, etc.) that could be avoided with a stay.

The potential for inconsistencies between any finding made by this Court and conclusions drawn by NHTSA, including those relating to the scope of the vehicles affected, should give the Court pause. If, as Plaintiffs apparently envision, the litigation proceeds to a conclusion while the NHTSA and other investigations are ongoing, there could be serious real-world implications that would be avoided by staying the litigation now. For example, the Court could conclude that

certain airbags are defective, only to have NHTSA make the opposite determination. Presumably, some plaintiffs could receive compensatory damages despite the fact that they purchased vehicles with inflators that the responsible regulatory agency finds to have been defect-free. If nothing else, such inconsistences have the potential to undermine public confidence in the court system or the regulatory authorities (or both), and could cause confusion that interferes with the goal of ensuring maximum possible implementation of the recall remedies. And if the Court's determination regarding the safety of replacement inflators differs from NHTSA, these sorts of problems would only multiply. For Plaintiffs to claim, notwithstanding, that Defendants "have not pointed to a single concrete issue upon which completion of the recall – which may take years – would materially assist this Court in resolving this action" simply defies common sense. (Pl. Resp. at 9.) Similarly erroneous is the statement in the United States' Statement of Interest (Dkt. 692 at 5) that the Moving Defendants "have not argued that the resolution of Plaintiffs' claims *depends* on NHTSA's resolution of any particular issue, such as identification of a root cause or the proper scope of any vehicle recall."  To the contrary, the Moving Defendants forcefully contend that completion of the NHTSA investigation, with a determination of the scope and extent of the safety problem, would greatly simplify and streamline this Court's proceedings by avoiding the equivalent of a run down the litigation rabbit-hole relating to airbags that are determined not to pose a safety risk. Moreover, there is a risk of the litigation interfering with NHTSA's process because it takes up limited resources of the auto companies that could be devoted to NHTSA and recall-related activities.

The cases referenced by Plaintiffs as similar – Toyota unintended acceleration, GM ignition switch, Bridgestone/Firestone tires (Pl. Resp. at 4-5) – are, in reality, much more limited in scope, as these matters involved one or two defendants at most. Similarly, *Sanchez-Knutson v. Ford Motor Co*., 52 F. Supp. 3d 1223 (S.D. Fl. 2014), on which Plaintiffs rely, involved three model years of a single vehicle (the Ford Explorer), as to which there was no active NHTSA investigation, no determination of any safety defect and no recalls at the time the case was being litigated. None of these cases involved numerous auto companies (manufacturers and distributors) as this MDL does, or the sheer number of recalls. And, of course, there was no Coordinated Remedy Proceeding involved in any of these other matters, as NHTSA has, by its own admission, never in its history had this level of involvement in the recall and remedy process. 80 Fed. Reg. 32197, 32198.

That Plaintiffs do not directly challenge a safety standard or other NHTSA regulation is irrelevant. While that situation has been cited by some courts as a particular reason to invoke primary jurisdiction, its absence has never been held to preclude the exercise of this discretionary doctrine. As discussed above, there is no question that the interests of consistency and uniformity require a stay of the litigation to allow the NHTSA investigation to proceed.[2] That other courts in other situations have declined to enter a stay is not dispositive, as the primary jurisdiction doctrine "is a matter of deference, policy, and comity." *Karhu v. Vital Pharms., Inc.*, 2013 U.S. Dist. LEXIS 112613, *10 (S.D. Fla. Aug. 9, 2013) (citation omitted).

This Court only recently stayed a case involving allegedly deceptive labels on homeopathic products in deference to the Food and Drug Administration, under circumstances arguably less compelling than those present here. In *Herazo*, the Court held that "given the extensive regulatory scheme to oversee homeopathic drug marketing and the questions presented over the labels in this case, the Court finds abstention appropriate under the primary jurisdiction doctrine." 2015 U.S. Dist. LEXIS 96811, at *15.  In that case, there appears to be no ongoing FDA action, but the Court said there was "no indication that the Agency is declining to oversee the indications for use that are at issue." *Id*. at *14. To avoid any prejudice to the parties, the Court stayed the case, rather than dismissing it, as Defendants similarly request the Court to do here. *Id*. at *15.

Another recent case, *Backus v. General Mills*, No. 15-cv-01964-THE, 2015 U.S. Dist. LEXIS 109839 (N.D. Cal. Aug. 18, 2015), is also instructive. *Backus* is a putative class action alleging economic loss due to the use of trans fats (specifically, partially hydrogenated vegetable oils) in certain baking mixes sold by General Mills, which are claimed to create a risk to public health. The Court stayed the case under the primary jurisdiction doctrine to allow the FDA to address the safety of trans fats as a food additive. The court noted that "although the FDA does not have jurisdiction over these state law claims, Congress nonetheless granted the FDA authority to regulate food safety by requiring the pre-market approval of food additives and exempting foods that are generally recognized as safe…. If the FDA finds that small amounts of trans fats are permissible as a food additive, this will significantly undermine Backus's UCL

---

[2] It is premature to say whether the NHTSA investigation has to *conclude* before the litigation goes forward, but certainly more time is needed for NHTSA, Orbital-ATK and others to investigate. For this reason, Defendants propose a 6-month stay initially.

claims." *Id*. at *51 (citation omitted). Similarly, here, if NHTSA finds, for example, that some inflators that use ammonium nitrate are not defective, it will obviously undermine Plaintiffs' claims. As with the determinations of food ingredient safety, issues surrounding the safety of airbag inflators "require both specialized expertise and uniformity in administration." *Id*.  Saying it was "splitting hairs" to argue that FDA's jurisdiction is not "comprehensive" and state law issues could be resolved by federal courts sitting in diversity, the court in *Backus* explained that the "elements and arguments of [Plaintiffs' California Unfair Competition Law claim] are firmly rooted in the FDA's determinations regarding the safety of trans fats." *Id*. at *53. Noting that the FDA had not been silent on the issue, but had set a compliance date for its final order in June of 2018, and that "the case ultimately turns on the safety of the ingredient, not whether a reasonable consumer would be misled," the court stayed the case. *Id*. at *52-55. Similarly, here the resolution of this case ultimately turns on the safety of the inflators, because while the parties may dispute whether plaintiffs who own recalled airbags have a legal claim or have sustained economic loss, no one disputes that there can be no consumer fraud or economic loss arising from a transaction involving an airbag that is not defective or unsafe.

*Kent v. DaimlerChrysler Corp*., 200 F. Supp. 2d 1208 (N.D. Cal. 2002), on which Plaintiffs rely, is distinguishable. That case involved an alleged dangerous propensity to shift from park into reverse in certain 1995-1999 Jeep Grand Cherokee vehicles. Although there was an ongoing NHTSA investigation, it was nothing remotely of the scope involved with the Takata airbags. Most of the Court's discussion involves preemption, not primary jurisdiction, and the Court's finding that the claims were not preempted was based on the view that splitting of remedies was not permitted and that there was, at that early stage of the litigation, no actual and specific conflict between NHTSA's investigation and the Court's activities. *Id*. at 1217-1218. For much the same reasons, in just a few paragraphs, the Court did not find the exercise of primary jurisdiction "necessary at this stage of the case." 200 F. Supp. 2d at 1218.

Plaintiffs also rely on *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Practices, & Prods. Liab. Litig*., 754 F. Supp. 2d 1145, 1199-1200 (C.D. Cal. 2010), but that case also devotes most of its attention to the preemption argument, which it rejected because "Toyota has not shown that an actual conflict exists between Plaintiffs' claims or requested relief and the NHTSA investigation." The court declined to apply the primary jurisdiction doctrine, citing the same lack of an "actual conflict" (*id.*), but there is no requirement of an "actual

conflict" for the doctrine of primary jurisdiction to apply.[3] The court also did not find NHTSA better-equipped to address the issues than it was (*id.* at 1200), a conclusion that may or may not have been correct in those circumstances, but is anything but dispositive here.

Plaintiffs erroneously contend that primary jurisdiction is only applicable in a case in which recall-related injunctive relief is requested, and suggest that their recent agreement not to pursue a limited form of injunctive relief (court supervision of NHTSA recalls) somehow renders the Motion to Stay moot. First, while Plaintiffs have agreed to strike certain requests for injunctive relief, they have not abandoned all claims for such relief[4] and are vague in preserving their right to seek whatever type of injunctive relief they deem advisable in the future. *See* Plaintiffs' Corrected Omnibus Response in Opposition to Defendants' Motion to Dismiss the Second Amended Consolidated Class Action Complaint, at 120-121.

Second, and more importantly, this argument is a straw man.  Defendants do not contend that claims under state or federal law for economic damages can be determined by NHTSA. Obviously, these can only be addressed by the courts, including this Court, assuming the need exists after the scope of the recalls is determined. But whether they should be allowed to proceed *at this time*, while NHTSA is in the midst of the largest investigation in its history and implementing an historic Coordinated Remedy Proceeding in which the auto companies and suppliers are participating, is indisputably a proper consideration for this Court in determining whether to apply the primary jurisdiction doctrine. The likelihood that the Court's actions and NHTSA's could conflict, sowing confusion and inequity not just for the parties, but the public at large, is so manifest here that the argument for deferring to NHTSA is compelling.

The cases cited by Plaintiffs are not to the contrary. In *Bussian v. DaimlerChrysler Corp.*, 411 F. Supp. 2d 614 (M.D. N.C. 2005), the Court's ruling came *after* NHTSA's investigation had concluded, but the Court nonetheless applied the doctrine of primary jurisdiction to vehicles

---

[3] Since preemption and primary jurisdiction are often argued in the same case, there is a tendency for confusion as to the relevant factors and legal principles. Plaintiffs fall prey to this same confusion, citing the savings clause in the Safety Act, 49 U.S.C. § 30103(d), which bears on whether a particular state law claim is preempted by the Act, but has nothing whatsoever to do with primary jurisdiction. (Pl. Resp. at 6-7.)

[4] Plaintiffs still seek to bar Defendants from continuing to install allegedly defective airbags (SAC, ¶ 716) and to enjoin Defendants from continuing their allegedly unlawful, unfair and deceptive trade practices under the laws of many states, which could encompass an array of activities. (SAC, ¶¶ 662, 708, 808, 909, 959 and 1001.)

that NHTSA found to have a safety defect, and then proactively held that such vehicles – as to which NHTSA had already accorded owners a full remedy – could not be included in any prospective class when the time came to determine class certification. *Id*. at 628. Plaintiffs' monetary damages claims were allowed to proceed only as to vehicles that NHTSA did not require to be recalled and had stated that its findings were not equivalent to a finding of no problem or defect. *Id*. at 629.[5]  *Silvas v. GM, LLC*, 2014 U.S. Dist. LEXIS 52979 (S.D. Tex. Apr. 17, 2014), was not even a class action. Deferring to the primary jurisdiction of NHTSA, the court denied a request to issue an order alerting 2.6 million owners that they their vehicles were too dangerous to drive because of a defective ignition switch. The court stated that NHTSA had "proceeded substantially into the recall process" and is "far better equipped than this Court to address the broad and complex issues of automotive safety and the regulation of automotive companies in connection with a nationwide recall." *Id*. at *8. In contrast, in *Mazerolle v. DaimlerChrysler Corp.*, 2002 Me. Super. LEXIS 149, *8-9 (Me. Super. Ct. Sept. 19, 2002), there was no evidence that Plaintiffs had petitioned NHTSA to act or had any intent to do so, so the court refused to apply primary jurisdiction. None of these cases undermine the Moving Defendants' position.

## II.  DEFERRING TO NHTSA MAKES SENSE FOR ADDITIONAL PRACTICAL REASONS

Plaintiffs argue that a stay would result in inefficiencies in this litigation because discovery in the personal injury cases presumably would not be stayed, but would overlap with issues relevant to the economic loss class actions. However, this concern is exaggerated. First, the majority of the auto company defendants are not involved in the personal injury cases, and so would not be subject to discovery in them anyway.[6]  Plaintiffs do not dispute that there is no need to understand root cause in a true rupture case that results in personal injury, as all parties agree that the inflator should not rupture when an airbag deploys. In a case alleging "overly aggressive" deployment, plaintiffs must show that the airbag deployed in a fashion that was not

---

[5] In *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales, Practices & Prods. Liab. Litig.*, 890 F.Supp. 2d 1210, 1224 (C.D. Cal. 2011), the NHTSA investigation into alleged braking defects had closed at the time the court declined to apply primary jurisdiction.

[6] If discovery were taken of Takata or the few involved auto companies, other manufacturers might choose to monitor it or attend depositions, but this would only promote efficiency when the stay is lifted and does not undercut the need for a stay now.

as designed, and that its "overly aggressive" characteristics caused the alleged injury. And to the extent punitive damages are sought, the issue of what a company knew and when it knew it can be probed for that particular company without need of wide-ranging discovery of most of the auto industry.[7]

Plaintiffs finally resort to the argument that NHTSA is not well-positioned to investigate the Takata issue due to lack of personnel and funding. The United States has now weighed in, and does not appear to share that view. Moreover, the Court should make its own determination as to whether it would be more efficient *for the Court* to allow the scope of the recalls to be determined before the economic loss class action litigation proceeds. While NHTSA says its investigation "will benefit from information and data from all available sources," a stay of the economic loss litigation would not affect the flow of information to NHTSA from the testing and root cause analysis that is underway. Under these circumstances, NHTSA's view that a stay is not necessary from its standpoint does not answer the question of whether it would be most efficient and sensible from the perspective of the Court.

NHTSA's recent actions, including opening an unprecedented Coordinated Remedy Program, further evidence its intent and ability to sweep in not only the auto companies and Takata, but all major inflator suppliers, in order to ensure the safety of all vehicles on the road as expeditiously as possible. A public hearing is now scheduled for October 22, 2015.[8] As the regulatory agency authorized to investigate and remediate motor vehicle safety defects, it is respectfully submitted that NHTSA is far better positioned than the judicial system to reach conclusions as to the safety of the Takata airbags, including the replacement inflators. Since Plaintiffs base all of their theories of recovery, including those alleging consumer fraud, on the existence of a defect, allowing the NHTSA process to run its course – or at least to advance significantly farther – before the Court wades in just makes sense. Even if all of the root causes are never fully known, as NHTSA's administrator Mark Rosekind has suggested, it does not matter, as NHTSA will reach a conclusion as to the safety of the airbags, regardless of whether

---

[7] Indeed, defendants' pending Motions to Dismiss address the complete lack of plausible facts alleged to suggest that any company other than Takata had knowledge of the airbag rupture problems until long after the vehicles in the putative class were sold.

[8] *See* https://www.federalregister.gov/articles/2015/09/11/2015-22712/notice-of-public-information-meeting-and-comment-deadline-in-the-coordinated-remedy-program.

root cause is definitively determined for each of the inflators, timeframes and vehicles at issue. It has to, in order to decide whether to require additional recalls or other remedial actions.

Finally, Plaintiffs' unsupported suggestion that the Safety Act's regulatory scheme is not "comprehensive" is baseless. The Motion to Stay details the comprehensive nature and extent of NHTSA's authority to conduct motor vehicle safety recalls, and this is only a small part of NHTSA's regulatory purview over the auto industry. Numerous courts have acknowledged the comprehensive scope of the Safety Act. *See, e.g.*, *In re Bridgestone/Firestone Inc., ATX, ATX II & Wilderness Tires Prods. Liab. Litig.*, 153 F. Supp. 2d 935, 944 (S.D. Ind. 2001) ("Safety Act likewise sets forth a comprehensive scheme for prospective relief from dangerous features in vehicles"); *Carden v. Bridgestone/Firestone, Inc.*, 2000 U.S. Dist. LEXIS 21367, *8 (S.D. Fl. Oct. 18, 2000) ("Safety Act sets forth a fairly comprehensive plan to remedy tire defects"); *Juvenile Products Mfrs. Assn. v. Edmisten*, 568 F. Supp. 714, 718 (E.D. N.C. 1983) ("Safety Act reflected a congressional vision for a comprehensive regulatory approach to motor vehicle safety… designed…[to insure] national uniformity"); *see also Ayres v. GMC*, 234 F.3d 514, 522 (11th Cir. 2000) (detailing "extensive administrative scheme" under the Safety Act regarding notification obligations of manufacturers in concluding that a violation of the Safety Act's notification requirements cannot be the basis for a private civil RICO action). No court has ever declined to apply the primary jurisdiction doctrine in an automotive case because it found the Safety Act's regulatory scheme to be less than comprehensive.

## CONCLUSION

Plaintiffs present no plausible argument that their claims for alleged economic loss associated with the Takata airbag recalls would be affected, much less harmed, in any way if the Court stays the economic loss track of the MDL to allow NHTSA to determine the extent of the Takata airbag problem and the safety of the remedies. The outcome of NHTSA's investigation has the potential to significantly affect the outcome of Plaintiffs' claims, particularly as to damages (if any remain after the recalls are carried out). The proceeding that deserves priority is obvious.

Dated:  September 11, 2015                    Respectfully submitted,

                                    By:     /s/ E. Colin Thompson

                                            Joel A. Dewey *(admitted pro hac vice)*
                                            joel.dewey@dlapiper.com
                                            Jeffrey M. Yeatman *(admitted pro hac vice)*
                                            jeffrey.yeatman@dlapiper.com
                                            DLA Piper LLP (US)
                                            The Marbury Building
                                            6225 Smith Avenue
                                            Baltimore, MD 21209
                                            T: (410) 580-3000
                                            F: (410) 580-3001

                                            E. Colin Thompson
                                            Florida Bar No. 684929
                                            colin.thompson@dlapiper.com
                                            J. Trumon Phillips
                                            Florida Bar No. 0084568
                                            trumon.phillips@dlapiper.com
                                            DLA Piper LLP (US)
                                            100 North Tampa Street, Suite 2200
                                            Tampa, FL 33602
                                            T: (813) 229-2111
                                            F: (813) 229-1447

                                            ***Counsel for Ford Motor Company***

11

*/s/ Kimberly A. Cook*

E. Paul Cauley, Jr.
paul.cauley@sedgwicklaw.com
Sedgwick LLP
1717 Main Street, Suite 5400
Dallas, TX 75201-7367
T: (469) 227-8200
F: (469) 227-8004
*(admitted pro hac vice)*

Kimberly A. Cook
kimberly.cook@sedgwicklaw.com
Sedgwick LLP
One Biscayne Tower, Suite 1500
Two South Biscayne Boulevard
Miami, FL 33131
T: (305) 670-4777
F: (305) 670-7007

**Counsel for Nissan North America, Inc.**

*/s/ Stanley H. Wakshlag*

Jeffrey L. Chase
jchase@herzfeld-rubin.com
Michael Gallub
mgallub@herzfeld-rubin.com
Herzfeld & Rubin, P.C.
125 Broad Street
New York, NY 10004
T: (212) 471-8500
F: (212) 344-3333
*(admitted pro hac vice)*

Stanley H. Wakshlag
shw@knpa.com
Robert D.W. Landon III
rdl@knpa.com
Kenny Nachwalter, P.A.
1100 Miami Center
201 South Biscayne Boulevard
Miami, FL 33131
T: (305) 373-1000
F: (305) 372-1861

**Counsel for Subaru of America, Inc.**

_/s/ Robert M. Brochin_

Terri S. Reiskin
treiskin@dykema.com
Dykema Gossett PLLC
1300 I Street, N.W., Suite 300 West
Washington, D.C. 20005
T: (202) 906-8600
F: (855) 216-7884
_(admitted pro hac vice)_

John C. Seipp, Jr.
jseipp@seippflick.com
Donald A. Blackwell
dblackwell@seippflick.com
Seipp Flick & Hosley
Two Alhambra Plaza, Suite 800
Miami, FL 33134
T: (305) 995-5600
F: (305) 995-6100

Robert M. Brochin
rbrochin@morganlewis.com
Morgan, Lewis & Bockius LLP
200 South Biscayne Boulevard, Suite 5300
Miami, FL 33131-2339
T: (305) 415-3456
F: (305) 415-3001

**_Counsel for Toyota Motor Sales, U.S.A., Inc. and Toyota Motor Engineering & Manufacturing North America, Inc._**

## ATTESTATION REGARDING SIGNATURES

Pursuant to the CM/ECF Administrative Procedures for the United States District Court, Southern District of Florida, I, Robert M. Brochin, counsel for defendants Toyota Motor Sales, U.S.A., Inc., and Toyota Motor Engineering & Manufacturing North America, Inc., hereby attests that Ford Motor Company, Subaru of America, Inc., and Nissan North America, Inc. (on whose behalf this filing is submitted), concur in the content and have authorized the filing of the REPLY TO PLAINTIFFS' RESPONSE TO MOTION TO STAY BASED ON THE PRIMARY JURISDICTION OF THE NATIONAL HIGHWAY TRAFFIC SAFETY ADMINISTRATION.

Dated: September 11, 2015                    Respectfully submitted,


By:      */s/ Robert M. Brochin*

         **Counsel for Toyota Motor Sales, U.S.A., Inc.
         and Toyota Motor Engineering &
         Manufacturing North America, Inc.**

15

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on September 11, 2015, I electronically filed the foregoing

document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is

being served this day on all counsel of record via transmission of Notice of Electronic Filing

generated by CM/ECF.


By:     <u>*/s/  Robert M. Brochin*</u>
          Robert M. Brochin