**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION**

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION**<br><br>This Document Relates to All Economic Loss Class Actions and:<br><br>DAVID WHITAKER, *et al.*, individually and on behalf of all others similarly situated,<br><br>    Plaintiffs,<br><br>  v.<br><br>GENERAL MOTORS COMPANY, GENERAL MOTORS HOLDINGS LLC, and GENERAL MOTORS LLC,<br><br>    Defendants. | MDL No. 2599<br><br>Master File No.15- MD 2599-FAM<br><br>S.D. Fla. Case No. 1:14-cv-24009-FAM<br><br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

NATURE OF CLAIMS ...................................................................................................... 1

JURISDICTION AND VENUE ........................................................................................ 8

THE PARTIES ................................................................................................................. 9

    I.     Defendants ........................................................................................... 9

    II.    Plaintiffs ............................................................................................ 10

GENERAL FACTUAL ALLEGATIONS ........................................................................ 28

    I.     Definitions .......................................................................................... 28

    II.    Takata's Airbags Have a Common, Uniform Defect ........................... 35

        A.    Takata Recklessly Chose an Inexpensive and Dangerous Propellant ...... 35

        B.    The Risks of the Inflator Defect Were Exacerbated by Takata's and Defendants' Abysmal Quality Control. ................................................... 39

    III.    Defendants' Knowledge of the Defective Airbag ................................ 41

        A.    Defendants' Inherited Knowledge ......................................... 41

        B.    Defendants' Acquisition of Additional Post-Sale Knowledge ............... 44

    IV.    Inadequate Recalls and Failure to Assist Affected Consumers .......................... 47

        A.    Defendants Belatedly Issue Recalls ....................................... 47

        B.    Defendants Delay Repairs and Continue to Put Customers at Risk ........ 50

        C.    Slow and Inadequate Recalls ................................................. 52

        D.    Defective Replacement Airbags ............................................. 53

        E.    Failure to Provide Replacement Vehicles ............................... 54

    V.    Defendants Sold GM Vehicles as "Safe" and "Reliable" .................... 54

TOLLING OF THE STATUTE OF LIMITATIONS .......................................................... 57

    I.     Fraudulent Concealment ..................................................................... 57

    II.    Estoppel ............................................................................................. 58

    III.    Discovery Rule ................................................................................... 58

    IV.    *American Pipe* Tolling ....................................................................... 58

CLASS ACTION ALLEGATIONS ................................................................................. 59

    I.     The Classes ......................................................................................... 60

    II.    Numerosity ......................................................................................... 61

    III.    Predominance of Common Issues ....................................................... 61

    IV.    Typicality .......................................................................................... 63

    V.    Adequate Representation ..................................................................... 64

    VI.    Superiority .......................................................................................... 64

REALLEGATION AND INCORPORATION BY REFERENCE ........................................ 66

CLAIMS FOR RELIEF .................................................................................................... 66

I.    Nationwide Claims ................................................................................. 66
      A.    Federal Claims ........................................................................... 66
            1.    Violation of the Magnuson-Moss Warranty Act, 15 U.S.C.
                  § 2301 .............................................................................. 66
            2.    Violation of the Racketeer Influenced and Corrupt
                  Organizations Act ("RICO"), 18 U.S.C. § 1962(c) .......................... 70
            3.    Violation of the Racketeer Influenced and Corrupt
                  Organizations Act ("RICO"), 18 U.S.C. § 1962(d) ......................... 81
      B.    Common Law Claims ....................................................................... 89
            4.    Fraud ................................................................................. 89
            5.    Negligence ......................................................................... 92
            6.    Unjust Enrichment ............................................................... 94
II.   State Class Claims ................................................................................ 95
      A.    Claims Brought on Behalf of the Alabama Consumer Class ................... 95
            7.    Violation of the Alabama Deceptive Trade Practices Act
                  Ala. Code § 8-19-1 .............................................................. 95
      B.    Claims Brought on Behalf of the California Consumer Class .............. 100
            8.    Violation of the California Unfair Competition Law, Cal.
                  Bus. & Prof. Code § 17200 .................................................. 100
            9.    Violation of the California False Advertising Law, Cal.
                  Bus. & Prof. Code § 17500 .................................................. 104
            10.   Violation of the California Consumer Legal Remedies Act,
                  Cal. Civ. Code § 1750 ......................................................... 106
            11.   Violation of the Song-Beverly Consumer Warranty Act for
                  Breach of the Implied Warranty of Merchantability, Cal.
                  Civ. Code § 1791 .............................................................. 113
      C.    Claims Brought on Behalf of the Florida Consumer Class ................... 116
            12.   Violation of the Florida Deceptive and Unfair Trade
                  Practices Act, Fla. Stat. § 501.201 ..................................... 116
      D.    Claims Brought on Behalf of the Georgia Consumer Class ................. 121
            13.   Violation of the Georgia Fair Business Practices Act Ga.
                  Code Ann. § 10-1-390 .......................................................... 121
            14.   Violation of the Georgia Uniform Deceptive Trade
                  Practices Act Ga. Code Ann. § 10-1-370 ................................. 126
      E.    Claims Brought on Behalf of the Indiana Consumer Class ................... 130

15. Violation of the Indiana Deceptive Consumer Sales Act,
    Ind. Code § 24-5-0.5-1 ................................................................... 130

16. Breach of the Indiana Implied Warranty of Merchantability,
    Ind. Code § 26-1-2-314 ................................................................. 136

F.   Claims Brought on Behalf of the Kentucky Consumer Class ............... 137

17. Breach of Implied Warranty of Merchantability,  Kentucky
    Rev. Stat. §§ 355.2, *et. seq.* ........................................................ 137

G.   Claims Brought on Behalf of the Louisiana Consumer Class ............... 140

18. Breach of the Implied Warranty of
    Merchantability/Warranty Against Redhibitory Defects La.
    Civ. Code Ann. arts. 2520, 2524 ................................................... 140

19. Violation of the Louisiana Unfair Trade Practices and
    Consumer Protection Law, La. Rev. Stat. § 51:1401 ..................... 141

H.   Claims Brought on Behalf of the Michigan Consumer Class ............... 146

20. Violation of the Michigan Consumer Protection Act, Mich.
    Comp. Laws § 445.903 ................................................................... 146

21. Breach of the Michigan Implied Warranty of
    Merchantability, Mich. Comp. Laws § 440.2314 ........................... 151

I.   Claims Brought on Behalf of the Mississippi Consumer Class ............. 152

22. Breach of the Implied Warranty of Merchantability, Miss.
    Code Ann. § 75-2-315 .................................................................... 152

J.   Claims Brought on Behalf of the Missouri Consumer Class ................. 154

23. Violation of the Missouri Merchandising Practices Act,
    Mo. Rev. Stat. § 407.010 ............................................................... 154

24. Breach of the Missouri Implied Warranty of
    Merchantability, Mo. Rev. Stat. § 400.2-314 ................................. 159

K.   Claims Brought on Behalf of the New Jersey Consumer Class ............. 160

25. Violation of the New Jersey Consumer Fraud Act, N.J.
    Stat. Ann. § 56:8-1 ........................................................................ 160

26. Breach of the New Jersey Implied Warranty of
    Merchantability, N.J. Stat. Ann. § 12a:2-314 ................................. 165

L.   Claims Brought on Behalf of the New York Consumer Class .............. 166

27. Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 349......................................................................... 166

28. Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 350......................................................................... 171

29. Breach of the Implied Warranty of Merchantability, N.Y. U.C.C. Law §§ 2-315, 2-A-213 ...................................... 173

M.  Claims Brought on Behalf of the North Carolina Consumer Class ....... 174

30. Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. § 75-1.1 ................................ 174

N.  Claims Brought on Behalf of the Pennsylvania Consumer Class.......... 179

31. Violation of the Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. § 201-1............................................ 179

32. Breach of the Implied Warranty of Merchantability, 13 PA. Stat. Ann. § 2314 ............................................................ 184

O.  Claims Brought on Behalf of the Tennessee Consumer Class ............. 185

33. Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. § 47-18-101.................................................... 185

P.  Claims Brought on Behalf of the Texas Consumer Class..................... 190

34. Violation of the Texas Deceptive Trade Practices Act, Tex. Bus. & Com. Code § 17.41. ............................................ 190

35. Breach of the Texas Implied Warranty of Merchantability, Tex. Bus. & Com. Code § 2.314...................................... 195

Q.  Claims Brought on Behalf of the Vermont Consumer Class................. 196

36. Violation of the Vermont Consumer Fraud Act, 9 V.S.A. § 2451............................................................................................ 196

R.  Claims Brought on Behalf of the Virginia Consumer Class.................. 201

37. Violation of the Virginia Consumer Protection Act, Va. Code Ann. § 59.1-196................................................................ 201

38. Breach of the Virginia Implied Warranty of Merchantability, Va. Code Ann. § 8.2-314...................................... 206

S.  Claims Brought on Behalf of the West Virginia Consumer Class......... 207

39. Violation of the West Virginia Consumer Credit and Protection Act, W. Va. Code § 46A-1-101 ...................................... 207

40. Breach of the West Virginia Implied Warranty of Merchantability, W. Va. Code § 46-2-314 ...................................... 214

PRAYER FOR RELIEF ........................................................................................... 215

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      The things meant to protect us should not be made in a way that harms or even kills us.  This is particularly true of cars because they are a tool millions of people use every day. People trust that their cars were designed and built to keep them safe.  And they expect that automakers take every reasonable step to make sure that nothing in their cars endangers the lives of those who ride in them.

2.      This action concerns defective airbags manufactured by Takata Corporation and its related entities, including TK Holdings, Inc. ("Takata"), which contain inflators using the notoriously volatile and unstable compound, ammonium nitrate, but which were nevertheless equipped in vehicles that Defendants General Motors Company ("GM Parent"), General Motors Holdings LLC ("GM Holdings"), and General Motors LLC ("New GM") (collectively, "Defendants") manufactured, sold, or leased.  Defendants knowingly misrepresented as safe GM vehicles and deceptively concealed the fact that inflators in these vehicles were prone aggressively deploy and/or violently explode and maim or kill drivers and passengers.

3.      Defendants were created on or about July 10, 2009, in connection with the sale of substantially all of the assets of General Motors Corporation ("Old GM") pursuant to a Master Sale and Purchase Agreement ("Sale Agreement") approved by the United States Bankruptcy Court for the Southern District of New York under Section 363 of the U.S. Bankruptcy Code (the "363 Sale").  As a result of the 363 Sale, New GM acquired substantially all of Old GM's books, records, and personnel, including Rita Kauppi (Global Commodity Manager for Airbags), Leo Knowlden (Lead Engineer for Inflators), and Tony Popovski (Global Purchasing Manager for

Airbags)—all of whom had specific knowledge of the defective Takata airbags.  New GM then transferred some of these assets to GM Holdings.  Defendants thereby acquired from Old GM knowledge about the defective Takata airbags that those books, records, and personnel held.  GM Parent and New GM also took responsibility for any necessary recalls of both New and Old GM vehicles going forward.

4.     The causes of action in this Complaint are directed solely to GM Parent, GM Holdings, and New GM and are based solely on their wrongful conduct.

5.     An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.  An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.  The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

6.     All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators (the "Inflator Defect").  Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium-nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior resulting in violent combustion.  Ammonium nitrate is well-known for its explosive power.  Indeed, it is the explosive that Timothy McVeigh and Terry Nichols used in April 1995 to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City.

7.     Because of the common, uniform Inflator Defect, Takata airbags often fail to perform as they should.  Instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags aggressively deploy and/or violently explode, sometimes expelling metal debris and shrapnel at drivers and passengers.  As of February 2018, Takata airbags have been responsible for at least 22 deaths and hundreds of serious injuries in the United States alone.

8.     In the late 1990s, when Takata shelved a safer propellant in favor of the far cheaper ammonium nitrate, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan.  Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

9.     Indeed, in the late 1990s, Takata approached Old GM and offered to equip Old GM vehicles with the newly developed ammonium nitrate inflator.  Enticed by the cheaper price of Takata's inflator, Old GM asked its long-standing airbag supplier, Autoliv (which did not use ammonium nitrate in its inflators) to match Takata's price.  To better understand how Takata could price its airbags so low, Autoliv began testing the airbag, including the ammonium-nitrate propellant.  The results of Autoliv's tests were shocking.  The ammonium nitrate was so unstable that it "bl[e]w[] the inflator to bits," "totally destroyed the fixture," and "turned it into shrapnel." The testing was so conclusive that Autoliv determined it could never put ammonium nitrate in its own inflators, and it notified Old GM of the lethal instability of Takata's ammonium-nitrate based inflator by no later than 1999.  Upon information and belief, Rita Kauppi, Old GM's Global Commodity Manager for Airbags, who stayed on with New GM after the 363 Sale, was involved in these discussions.  Old GM therefore had knowledge of the Inflator Defect before it purchased a single airbag from Takata.

- 3 -

10.     Takata's own testing of the ammonium-nitrate based airbag from 2000 to 2007 confirmed problems with the inflator's stability.  The testing results revealed the propellant exhibited ballistic shifts and overly aggressive behavior when deployed, which can lead to explosive airbag ruptures.  The testing also revealed the inflator's tendency to "flame" or catch fire when the airbag ruptured.  Takata shared the results of this testing with Old GM personnel, including within presentations to Leo Knowlden, Old GM's head of Inflator Technology who stayed on with New GM after the 363 Sale.  As early as 2003 and throughout the following years, Knowlden expressed concern about the inflators' ballistic variability, flaming, and ruptures, and he openly questioned Takata's inability to meet specifications.  Knowlden, Kauppi, and Tony Popovski, Old GM's Global Purchasing Manager for Airbags who stayed on with New GM after the 363 Sale, were also aware of significant concerns raised by others, including the concerns raised by Old GM engineer, Bob Bowser, during and after a site visit to Takata's Moses Lake facility in April 2003.

11.     By at least July 2008, Old GM began to see problems with the inflator outside of testing laboratories, when Takata detected an "energetic disassembly" (*i.e.*, explosion) of an airbag in one of its manufacturing lots.  In May 2009, another energetic disassembly of a Takata inflator made for Old GM at a different Takata facility was detected.

12.     On July 10, 2009, the 363 Sale closed.  Thereafter, Defendants, carrying with them the same knowledge about the Takata Inflator Defect as Old GM, sold and leased vehicles to consumers that contained the deadly Takata airbags, without disclosing the Inflator Defect and/or misrepresenting the safety of both New and Old GM vehicles containing the defective airbags.

13.     Moreover, Defendants became aware of more evidence of the Inflator Defect. For example, in the summer of 2009, Honda initiated its first significant recall of Takata airbags in the United States, recalling approximately 440,000 vehicles as a result of numerous deaths and injuries caused by the Inflator Defect. Knowing that GM vehicles used the same Takata airbags that likewise contained the same ammonium-nitrate propellant, in August 2009, Knowlden expressed concern to Takata about "AN [ammonium nitrate] propellant stability." However, Defendants ultimately did nothing to follow up.

14.     Meanwhile, Takata continued to report testing results to New GM showing "energetic disassembles" and "non-conformances" involving "high performing ballistics," but Defendants took no meaningful action in response.

15.     It was not long before the Inflator Defect began to emerge in GM vehicles in the field as well. In 2011, New GM reported to Takata that a driver in a GM vehicle suffered from burns when a Takata airbag deployed. Then in late 2013 and early 2014, airbag explosions occurred in two 2013 Chevrolet Cruze vehicles, in one case completely blinding the driver in one eye. Knowlden convinced Takata to come up with an excuse to limit the scope of the problem, allowing GM Parent and New GM to blame the Takata airbag ruptures on a manufacturing defect and issue only a limited recall. In doing so, GM Parent and New GM concealed and/or misrepresented the cause and scope of the Inflator Defect and omitted information they knew about the Defective Airbags (defined below) in other New and Old GM vehicles.

16.     During 2014, other automakers recalled millions of additional vehicles due to the Inflator Defect, all the while strenuously and falsely working to limit the scope of the recall to humid parts of the country. During that same period of time, employees at New GM were communicating with other automakers about the true root cause of the airbag ruptures and

- 5 -

recalls.  But GM Parent and New GM did not issue any additional recalls, withholding vital information from occupants of other New GM and Old GM vehicles on the road.

17.    In May 2015, in the face of pressure from the National Highway Traffic and Safety Administration ("NHTSA"), Congress, and the public, Takata finally admitted the existence of the Inflator Defect and agreed to phase out the use of ammonium nitrate.  In response, GM Parent and New GM have had no choice but issue their own recalls.  To date, GM Parent and New GM have recalled approximately 4 million New GM and Old GM vehicles containing the deadly Takata airbags.  Yet, GM Parent and New GM continue to misrepresent these vehicles as safe and have delayed the repair of nearly all of them while they plead with NHTSA for permission to conduct more tests.  GM Parent and New GM have not yet recalled an additional 2.4 million vehicles that contain the same defective inflators, leaving the occupants of those vehicles in grave danger.

18.    The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury.  Defendants put profits ahead of safety by continuing to equip vehicles with Takata airbags year after year, even though they knew or should have known those airbags were defective.  Despite the shocking record of airbag failures, injuries, and deaths caused by the Inflator Defect, Defendants were slow to fully investigate the problem and were slow to report the full extent of the danger to drivers and passengers of New and Old GM vehicles.  Only relatively recently—on the heels of media scrutiny—have GM Parent and New GM begun recalling the millions of vehicles in the United States with the Inflator Defect.  And these recalls are just a public relations illusion, as GM Parent and New GM have delayed repairing the Defective Airbags, continuing to misrepresent them as safe.

19.     As a result of this misconduct, Plaintiffs and the proposed Classes were harmed and suffered actual damages.  Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers or lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.  Plaintiffs and the Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

20.     Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.  Also, as a direct result of misconduct by Defendants, each Plaintiff and Class member has out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring vehicles in for repair.

21.     Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of New GM and Old GM vehicles with the defective Takata airbags.  Defendants' false representations and omissions concerning the safety and reliability of those vehicles, and their concealment of the known safety defects plaguing those vehicles and their brands, caused certain Plaintiffs and Class members to purchase or retain GM vehicles of diminished value.

## JURISDICTION AND VENUE

22.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs.  Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' RICO, Magnusson-Moss, and Lanham Act claims arise under federal law.  This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

23.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction.

24.     This Court has personal jurisdiction over Defendants pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries, Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.  This Court also has personal jurisdiction over Defendants because they consented to jurisdiction by registering to do business in Florida.  This Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

- 8 -

25.     This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965(d) because they are found or have agents or transact business in this District.

26.     This Court also has personal jurisdiction over Defendants, because transferor courts that have transferred actions to this MDL have general jurisdiction over Defendants, and this Court, under 28 U.S.C. § 1407, has personal jurisdiction over Defendants to the same extent as any transferor court has personal jurisdiction over them.  The Eastern District of Michigan, which is located in the state in which Defendants are headquartered, is a transferor court for this MDL, and thus this Court may exercise general jurisdiction over Defendants.  To the extent necessary for personal jurisdiction purposes, any claims asserted by non-Florida Plaintiffs in this Consolidated Class Action Complaint may be deemed to have been filed in a transferor court that may exercise personal jurisdiction over Defendants for such claims.

27.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a) because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2) because they are subject to personal jurisdiction in this District.  Venue is also proper under 18 U.S.C. § 1965.  Also, venue is proper in this district pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1407.

## THE PARTIES

### I.     Defendants

28.     General Motors LLC ("New GM") is a Delaware limited liability company with its principal place of business located at 300 Renaissance Center, Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  The sole member and owner of New GM is General Motors Holdings LLC.

- 9 -

29.     General Motors Holdings LLC ("GM Holdings") is a Delaware limited liability company with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.   The sole member and owner of GM Holdings is General Motors Company.

30.     General Motors Company ("GM Parent") is a Delaware corporation with its principal place of business in Detroit, Michigan, and is a citizen of the States of Delaware and Michigan.  GM Parent's only asset is 100% ownership interest in GM Holdings.  In SEC filings, GM Parent states: "We [defined as GM Parent] design, build and sell cars, trucks, crossovers and automobile parents worldwide."  According to SEC filings, GM Parent sells vehicles "through [its] dealer network to retail customers."  As stated in SEC filings, GM Parent is also responsible for determining when a recall should be conducted and for making reports to NHTSA.

31.      GM Parent and GM Holdings have complete domination and control over New GM.

**II.     <u>Plaintiffs</u>**

32.     All Plaintiffs identified below own, lease, or formerly owned or leased, a Class Vehicle with the Inflator Defect.

33.     All Plaintiffs identified below and the proposed Classes were harmed and suffered actual damages.

34.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to all identified Plaintiffs below and the proposed Classes.

35.     The defective airbags significantly diminish the value of the vehicles in which they are installed.   Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags, and by the widespread publicity of the Inflator Defect.

36.     The Inflator Defect that Defendants concealed throughout the Class Period related to the safety and reliability of the Class Vehicles, and affected the brand perception and market value of all Class Vehicles.   Information concerning the safety of these vehicles, and whether Defendants would implement necessary corrective measures for these vehicles, was material. Reasonable consumers would consider that information important in deciding whether to operate, trade in, or sell these vehicles, or whether to purchase or lease GM vehicles.   Provided with the truth regarding these vehicles, Plaintiffs and Class Members would not have purchased or leased their GM vehicles and/or would have paid less; and would not, to their practical ability to do so, have continued to drive and/or resell the Class Vehicles without corrective safety measures or other affirmative steps by Defendants to make these vehicles safe and protect their economic value.

37.     Further, all Plaintiffs identified below and the proposed Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.   All Plaintiffs identified below and the proposed Classes, either through a higher purchase price or higher lease payments, paid more than they would have, had the Inflator Defect been disclosed.   All Plaintiffs identified below and the proposed Classes were deprived of having a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in

- 11 -

recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

38.     All Consumer Plaintiffs identified below and the proposed Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including but not limited to expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

39.     All Consumer Plaintiffs identified below and members of the proposed Consumer Classes who have brought their vehicles to dealerships have suffered out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring the vehicles in for repair.

40.     All Consumer Plaintiffs identified below purchased or leased their Class Vehicles primarily for personal, family, and household use.

Sarie Bevins—Indiana

41.     Plaintiff Sarie Bevins resides in Homer Glen, Illinois.  Plaintiff owns a 2010 Cadillac Escalade Hybrid, which she purchased used on December 24, 2014 for $37,510.48 from Hubbard GM Center, Inc., a New GM dealership in Monticello, Indiana.  Plaintiff Bevins viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  To Plaintiff Bevins's knowledge, the airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff's 2010 Cadillac Escalade Hybrid has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

John Brugaletta—California

42.     Plaintiff John Brugaletta resides in Petaluma, California.  Plaintiff Brugaletta owns a 2014 Chevrolet Silverado 1500, which he purchased new on June 11, 2014 for approximately $55,000 from Stewart Chevrolet, a New GM dealership in Colma, California.  To Plaintiff Brugaletta's knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff Brugaletta viewed advertisements and reviews on television and online that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff's 2014 Chevrolet Silverado 1500 has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

John Condon—New York

43.     Plaintiff John Condon resides in Bronxville, New York.  Plaintiff owns a 2013 Chevrolet Silverado, which he purchased new on June 10, 2013 for approximately $26,500 from New Rochelle Chevrolet, a New GM dealership in New Rochelle, New York.  To Plaintiff Condon's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Condon viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  In October 2017, Plaintiff Condon took his vehicle to a New GM dealership and asked if his vehicle was subject to any recalls.  Plaintiff Condon was told that there were no recalls for his 2013 Chevrolet Silverado.  Plaintiff Condon currently does not allow anyone to sit in the passenger seat of his 2013 Chevrolet Silverado because he fears for their safety.  The value of Plaintiff's 2013 Chevrolet Silverado has been diminished as a result of the Inflator Defect.  If Plaintiff had

known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

David Cox—Missouri

44.    Plaintiff David Cox resides in Platte City, Missouri.  Plaintiff David Cox owns a 2013 Chevrolet Silverado, which he purchased used on April 5, 2017 for approximately $36,900 from Victory Chevrolet, a New GM dealership in Savannah, Missouri.  To his knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Cox originally researched another vehicle online and intended to purchase it.  However, after seeing online and other print advertisements that the 2013 Chevrolet Silverado was safe and reliable and that New GM made safe and reliable vehicles, Plaintiff Cox instead decided to purchase the 2013 Chevrolet Silverado.  The value of the 2013 Chevrolet Silverado has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Kimberly Dominick—Pennsylvania

45.    Plaintiff Kimberly Dominick resides in Latrobe, Pennsylvania.  Plaintiff Dominick owns a 2012 GMC Sierra 1500 which she purchased used on April 6, 2015 for $31,482.29 from Jim Shorkey Family Auto Group, a New GM dealership in McKeesport, Pennsylvania.  Plaintiff Dominick viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  To Plaintiff Dominick's knowledge, the airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff Dominick's 2012 GMC Sierra 1500 has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Kory Fugazzi—Texas

46.     Plaintiff Kory Fugazzi resides in Kerrville, Texas.  Plaintiff Fugazzi owns a 2011 Chevrolet Suburban, which she purchased used in November of 2014 for approximately $27,000 from Crenwelge Motors in Kerrville, Texas.  To Plaintiff Fugazzi's knowledge, the airbags in her vehicle have not been repaired or replaced.  Plaintiff Fugazzi viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  The value of Plaintiff's 2011 Chevrolet Suburban has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Ramand Giddings—New Jersey

47.     Plaintiff Ramand Giddings resides in Brooklyn, New York.  Plaintiff Giddings owns a 2008 GMC Yukon Denali, which he purchased used on November 10, 2014 for $30,349.33 from EMG Auto Sales in Avenel, New Jersey.  To Plaintiff Giddings's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Giddings viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and GM vehicles generally.  In July 2017, Plaintiff Giddings became aware of the Inflator Defect and called the dealership three times in an attempt to have the airbag replaced but received no answer.  The value of Plaintiff's 2008 GMC Yukon Denali has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Judith Gross—New York

48.     Plaintiff Judith Gross resides in Coudersport, Pennsylvania.  Plaintiff Gross owns a 2011 GMC Sierra HD which she purchased new on June 2, 2011 for $41,597.76 from Rick Bokman Buick GMC Cadillac, a New GM dealership in Olean, New York.  Plaintiff Gross viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  To Plaintiff Gross's knowledge, the airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff Gross's 2011 GMC Sierra HD has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Clyde Holmes—Missouri

49.     Plaintiff Clyde Holmes resides in Natchez, Missouri.  Plaintiff Holmes owns a 2009 GMC Sierra, which he purchased used on May 3, 2014 for approximately $21,000 at Toyota of Brookhaven in Brookhaven, Missouri.  To Plaintiff Holmes's knowledge the airbags in his vehicle have not been repaired or replaced.  Plaintiff Holmes viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and GM vehicles generally.   The value of Plaintiff's 2009 GMC Sierra has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

April Hughes-Cox—Missouri

50.     Plaintiff April Hughes-Cox resides in Platte City, Missouri.  Plaintiff April Hughes-Cox owns a 2012 GMC Sierra HD, which she purchased used on February 14, 2017 for approximately $21,000 from Morris Auto in Belton, Missouri.  To her knowledge, the airbags in

- 16 -

her vehicle have not been repaired or replaced.  Plaintiff Cox viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  The value of the 2012 GMC Sierra HD has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Donovan J. Jacobs—California

51.    Plaintiff Donovan J. Jacobs resides in Alpine, California.  Plaintiff Jacobs owns a 2011 Chevrolet Tahoe, which he purchased new on October 13, 2010 for $40,351.00 from Mark Christopher Auto Center, a New GM dealership in Ontario, California using carsdirect.com.  To Plaintiff Jacobs's knowledge, the airbags in his 2011 Chevrolet Tahoe were never repaired or replaced.  Plaintiff Jacobs viewed or heard commercials and reviews through television, radio, and the internet, including on Chevrolet's website, that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff's 2011 Chevrolet Tahoe has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Marlene S. Karu—New Jersey

52.    Plaintiff Marlene S. Karu resides in West Orange, New Jersey.  Plaintiff Karu owns a 2008 Saab 9-3 Convertible, which she purchased used on August 26, 2010 for approximately $26,000 from Reinertsen Motors, a Saab dealership located in Denville, New Jersey.  To the best of Plaintiff's knowledge, the airbags in her Saab were replaced in or around May 2017, when she brought her vehicle in for service after receiving a Safety Recall indicating that the parts were available to repair her vehicle.  The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she

- 17 -

would not have purchased the 2008 Saab 9-3 Convertible or would not have paid as much as she did for it.

Vicky Keen—Tennessee

53.     Plaintiff Vicky Keen resides in Bristol, Virginia.  Plaintiff Keen owns a 2011 Chevrolet Silverado 1500, which she purchased used on March 30, 2015 for approximately $28,900 from Courtesy Chevrolet, a New GM dealership in King Sport, Tennessee.  To Plaintiff Keen's knowledge, the airbags in her vehicle have not been repaired or replaced.  Plaintiff Keen viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  The value of Plaintiff's 2011 Chevrolet Silverado LD has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Dyeshawn Lodge—Georgia

54.     Plaintiff Dyeshawn Lodge resides in Powder Springs, Georgia.  Plaintiff Lodge owns a 2010 Chevrolet Suburban which she purchased used on September 22, 2011 for $29,930.67 from Hennessy Buick GMC, a New GM dealership in Morrow, Georgia.  Plaintiff Lodge viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  To Plaintiff Lodge's knowledge, the airbags in her vehicle have not been repaired or replaced.  The value of Plaintiff Lodge's 2010 Chevrolet Suburban has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Michael McBride—Michigan

55.     Plaintiff Michael David McBride resides in Marshall, Michigan.   Plaintiff
McBride owns a 2007 Chevrolet Avalanche LT, which he purchased used in 2017 for
approximately $16,000 from a used vehicle dealership, Cedar Car Company in Cedar Springs,
Michigan.   Upon information and belief, Cedar Car Company is owned by Sparta Chevrolet, a
New GM dealership in Sparta, Michigan.  To Plaintiff McBride's knowledge, the airbags in his
2007 Chevrolet Avalanche LT were never repaired or replaced.  Plaintiff McBride researched the
2007 Chevrolet Avalanche LT before purchasing and found advertisements that touted the safety
and reliability of his vehicle and GM vehicles generally.  The value of Plaintiff's 2007 Chevrolet
Avalanche LT has been diminished as a result of the Inflator Defect.  If Plaintiff had known
about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as
much as he did for it.

Gordon McFarland—Michigan

56.     Plaintiff Gordon McFarland resides in Webberville, Michigan.   Plaintiff
McFarland owns a 2013 GMC Sierra 1500 which he purchased used in 2016 for approximately
$20,000 from Sundance Buick GMC, a New GM dealership in Saint Johns, Michigan.   To
Plaintiff McFarland's knowledge, the airbags in his vehicle have not been repaired or replaced.
Plaintiff McFarland viewed or heard commercials and reviews through television, radio, and the
internet that touted the safety and reliability of her vehicle and New GM vehicles generally.  The
value of Plaintiff's 2013 GMC Sierra 1500 has been diminished as a result of the Inflator Defect.
If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or
would not have paid as much as he did for it.

Calaundra Miller—Missouri

57.     Plaintiff Calaundra Miller resides in Yazoo City, Mississippi.  Plaintiff owns a 2011 Chevrolet Silverado, which was purchased used in March 2015 for $27,029.50 from Joe Machen's Autogroup in Columbia, Missouri.  To Plaintiff Miller's knowledge, the airbags in her 2011 Chevrolet Silverado have not been repaired or replaced.  Plaintiff Miller viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of her vehicle and New GM vehicles generally.   The value of Plaintiff's 2011 Chevrolet Silverado has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, she would have not purchased the vehicle, or would not have paid as much as she did for it.

Kenneth Morgan—Pennsylvania

58.     Plaintiff Kenneth Morgan resides in Trafford, Pennsylvania. Plaintiff owns a 2009 GMC Sierra 1500, which he purchased new on September 26, 2009 for approximately $45,000 from Joe Ball GMC & Pre-Owned Superstore in Glenshaw, Pennsylvania.  Plaintiff also owns a 2012 Chevrolet Tahoe that he purchased new on April 28, 2012 for approximately $56,019 from Kenny Ross Chevy Buick GMC in North Huntingdon, Pennsylvania.  Prior to purchasing his vehicles, Plaintiff Morgan viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicles and New GM vehicles generally.  To Plaintiff Morgan's knowledge, the airbags in his vehicles have not been repaired or replaced.  The value of Plaintiff's 2009 GMC Sierra 1500 and 2012 Chevrolet Tahoe has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicles, or would not have paid as much he did for them.

Gerald Muehl—Vermont

59.      Plaintiff Muehl resides in Tampa, Florida.  Plaintiff Muehl owns a 2014 GMC Sierra, which he purchased used on August 11, 2014 for approximately $40,000 from Handy Chevrolet, a New GM dealership in St. Albans, Vermont.  To Plaintiff Muehl's knowledge, his airbags have been replaced.  Plaintiff Muehl viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff's 2014 GMC Sierra has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Kolmon Nemes Jr.—New Jersey

60.      Plaintiff Kolmon Nemes Jr. resides in Bayville, New Jersey.  Plaintiff Nemes owns a 2008 Chevrolet Tahoe Hybrid, which he purchased used on February 23, 2015 for approximately $14,975.00 from Automotive Avenues, LLC in Wall, New Jersey.   To his knowledge, the airbags in his 2008 Chevrolet Tahoe Hybrid were never repaired or replaced. The value of Plaintiff's 2008 Chevrolet Tahoe Hybrid has been diminished as a result of the Inflator Defect.  Prior to purchasing the vehicle, Plaintiff Nemes did not receive notice of the Defective Airbags or Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Ralph Wayne Packett—Virginia

61.      Plaintiff Ralph Wayne Packett resides in Haynesville, Virginia.  Plaintiff Packett owns a 2011 GMC Sierra, which he purchased used in 2012 for approximately $18,000 from Northern Neck Chevrolet, a New GM dealership in Montross, Virginia.  To Plaintiff Packett's knowledge, the airbags in his 2011 GMC Sierra were never repaired or replaced.  Plaintiff

- 21 -

Packett viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff's 2011 GMC Sierra has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Gene Paleno—California

62.     Plaintiff Gene Paleno resides in Granada Hills, California.  Plaintiff Paleno owned a 2007 GMC Yukon Denali XL, which he purchased used for approximately $30,000 on or around July 8, 2011 in a private party sale in California.  To Plaintiff Paleno's knowledge, the airbags in his vehicle have not been repaired or replaced.  Plaintiff Paleno viewed or heard commercials and reviews through television, radio, print advertisements, and the internet that touted the safety and reliability of his vehicle and GM vehicles generally.  Plaintiff Paleno received a recall notice for his airbags in July 2016.  After receiving the recall notice, Plaintiff Paleno has requested a repair at every service appointment, only to be told by the dealership that there are no parts available for his vehicle.  The value of Plaintiff's 2007 GMC Yukon Denali XL has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Jay Riojas—California

63.     Plaintiff Jay Riojas resides in Atascadero, California.  Plaintiff Riojas owns a 2011 Chevrolet Tahoe, which he purchased new on June 8, 2011 for $56,713.84 from Courtesy Chevrolet Center, a New GM dealership in San Diego, California.  Plaintiff Riojas viewed or heard commercials and reviews through television, radio, and the internet that touted the safety

- 22 -

and reliability of his vehicle and New GM vehicles generally. To Plaintiff Riojas's knowledge, the airbags in his 2011 Chevrolet Tahoe were never repaired or replaced. On December 7, 2017, Plaintiff Riojas contacted Paso Robles Chevrolet about the Inflator Defect recalls. The service agent at the dealership informed Plaintiff Riojas that they were aware of the recalls but there was nothing that could be done about the recalls until they received authorization from New GM. The value of Plaintiff's 2011 Chevrolet Tahoe has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Tommy and Mary Rivers—Alabama

64. Plaintiffs Tommy and Mary Rivers reside in Alpine, Alabama. The Rivers Plaintiffs own a 2009 Chevrolet Avalanche, which they purchased new in November 2009 for $34,000.00 from Harbin Chevrolet in Scottsboro, Alabama. To the Rivers Plaintiffs' knowledge, the airbags in their 2009 Chevrolet Avalanche have never been repaired or replaced. The value of their 2009 Chevrolet Avalanche has been diminished as a result of the Inflator Defect. If the Rivers Plaintiffs had known about the Inflator Defect, they would not have purchased the 2009 Chevrolet Avalanche or would not have paid as much as they did for it.

Leonard Shinhoster—North Carolina

65. Plaintiff Leonard Shinhoster resides in Monroe, North Carolina. Plaintiff Shinhoster owns a 2010 GMC Yukon XL C1500 SLT, which he purchased used on January 15, 2015 for $20,239.24 from Keith Hawthorne Hyundai in Gastonia, North Carolina. To Plaintiff Shinhoster's knowledge, the airbags in his vehicle have not been repaired or replaced. Plaintiff Shinhoster viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally. The value of

Plaintiff's 2010 GMC Yukon XL C1500 SLT has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Tarus Sibley—Louisiana

66.    Plaintiff Tarus Sibley resides in Ponchatoula, Louisiana. Plaintiff owns a 2007 GMC Sierra 1500, which he purchased used in or around 2013 for approximate $21,000 from Ross Downing Buick GMC, a New GM dealership in Hammond, Louisiana. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally. To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced. The value of Plaintiff's 2007 GMC Sierra 1500 has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Arkil Truss—Mississippi

67.    Plaintiff Arkil Truss resides in Sharon, Mississippi. Plaintiff owns a 2007 GMC Sierra 1500, which he purchased used in or around March 2014 for $21,000 from CS Auto Sales in Jackson, Mississippi. Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally. To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced. The value of Plaintiff's 2007 GMC Sierra 1500 has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

David Whitaker—Florida

68.     Plaintiff David Whitaker resides in Boynton Beach, Florida.  Plaintiff Whitaker owns a 2011 Chevrolet Tahoe, which he purchased used on November 11, 2014 for $21,994.00 from Autonation Chevrolet, a New GM dealership in Fort Lauderdale, Florida.   To his knowledge, the airbags in his 2011 Chevrolet Tahoe were never repaired or replaced.  Plaintiff Whitaker viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  Plaintiff Whitaker has made multiple phone calls to New GM dealerships to have his airbags replaced. However, each time the New GM dealerships inform him that there are no replacement parts available for his vehicle.  The value of Plaintiff's 2011 Chevrolet Tahoe has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Tremain Willis—Kentucky

69.     Plaintiff Tremain Willis resides in Avon, Indiana.  Plaintiff owns a 2007 GMC Yukon XL, which he purchased used in or around 2015 for $15,000 from Paducah Ford in Paducah, Kentucky.  Plaintiff viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.   To Plaintiff's knowledge, the airbags in his vehicle have not been repaired or replaced.  The value of Plaintiff's 2007 GMC Yukon XL has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

Craig Wise—Louisiana

70.    Plaintiff Craig Wise resides in Picayune, Mississippi.  Plaintiff Wise owns a 2007 GMC Yukon XL, which he purchased used on or around July 10, 2014, from Walt Massey Automotive in Lucedale, Mississippi for approximately $13,300.  In addition, Plaintiff Wise owns a 2009 GMC Sierra 2500, which he purchased used on or around August 28, 2015, for approximately $17,000 from Alpine Motors, a New GM dealership in Alexandria, Louisiana.  Plaintiff Wise viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicles and GM vehicles generally.  To Plaintiff Wise's knowledge, the airbags in both of his vehicles have not been repaired or replaced.  The value of Plaintiff Wise's 2007 GMC Yukon XL and 2009 GMC Sierra 2500 have been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicles, or would not have paid as much as he did for them.

Jay Wymer—West Virginia

71.    Plaintiff Jay Wymer resides in Winfield, West Virginia.  Plaintiff Wymer owns a 2011 Chevrolet Silverado, which he purchased used in 2012 for approximately $18,000 from Mike Ferrell Toyota in Logan County, West Virginia.  To his knowledge, the airbags in his 2011 Chevrolet Silverado were never repaired or replaced.   Plaintiff Wymer viewed or heard commercials and reviews through television, radio, and the internet that touted the safety and reliability of his vehicle and New GM vehicles generally.  The value of Plaintiff Wymer's 2011 Chevrolet Silverado has been diminished as a result of the Inflator Defect.  If Plaintiff had known about the Inflator Defect, he would have not purchased the vehicle, or would not have paid as much as he did for it.

72.     For ease of reference, the following chart organizes the Consumer Plaintiffs by the state in which they acquired their Class Vehicles:

| No. | State of Purchase | Plaintiff | Vehicle |
|---|---|---|---|
| 1 | Alabama | Tommy and Mary Rivers | 2009 Chevrolet Avalanche |
| 2 | California | John Brugaletta | 2014 Chevrolet Silverado 1500 |
| 3 | California | Donovan J. Jacobs | 2011 Chevrolet Tahoe |
| 4 | California | Gene Paleno | 2007 GMC Yukon Denali XL |
| 5 | California | Jay Riojas | 2011 Chevrolet Tahoe |
| 6 | Florida | David Whitaker | 2011 Chevrolet Tahoe |
| 7 | Georgia | Dyeshawn Lodge | 2010 Chevrolet Suburban |
| 8 | Indiana | Sarie Bevins | 2010 Cadillac Escalade Hybrid |
| 9 | Kentucky | Tremain Willis | 2007 GMC Yukon XL |
| 10 | Louisiana | Tarus Sibley | 2007 GMC Sierra 1500 |
| 11 | Louisiana | Craig Wise | 2009 GMC Sierra 2500L |
| 12 | Michigan | Michael McBride | 2007 Chevrolet Avalanche |
| 13 | Michigan | Gordon McFarland | 2013 GMC Sierra 1500 |
| 14 | Mississippi | Arkil Truss | 2007 GMC Sierra 1500 |
| 15 | Mississippi | Craig Wise | 2007 GMC Yukon XL |
| 16 | Missouri | David Cox | 2013 Chevrolet Silverado |
| 17 | Missouri | Clyde Holmes | 2009 GMC Sierra 1500 |
| 18 | Missouri | April Hughes-Cox | 2012 GMC Sierra HD |
| 19 | Missouri | Calaundra Miller | 2011 Chevrolet Silverado |
| 20 | New Jersey | Ramand Giddings | 2008 GMC Yukon Denali |
| 21 | New Jersey | Marlene S. Karu | 2008 Saab 9-3 Convertible |
| 22 | New Jersey | Kolmon Nemes Jr. | 2008 Chevrolet Tahoe Hybrid |
| 23 | New York | John Condon | 2013 Chevrolet Silverado |
| 24 | New York | Judith Gross | 2011 GMC Sierra HD |
| 25 | North Carolina | Leonard Shinhoster | 2010 GMC Yukon XL |
| 26 | Pennsylvania | Kimberly Dominick | 2012 GMC Sierra 1500 |
| 27 | Pennsylvania | Kenneth Morgan | 2009 GMC Sierra 1500 2012 Chevrolet Tahoe |
| 28 | Tennessee | Vicky Keen | 2011 Chevrolet Silverado LD |

| No. | State of Purchase | Plaintiff | Vehicle |
|---|---|---|---|
| 29 | Texas | Kory Fugazzi | 2011 Chevrolet Suburban |
| 30 | Vermont | Gerald Muehl | 2014 GMC Sierra HD |
| 31 | Virginia | Ralph Wayne Packett | 2011 GMC Sierra |
| 32 | West Virginia | Jay Wymer | 2011 Chevrolet Silverado |

**GENERAL FACTUAL ALLEGATIONS**

I.   **Definitions**

73.   Plaintiffs bring this action on behalf of themselves and all persons similarly situated who purchased or leased Class Vehicles (defined below) after July 10, 2009. Plaintiffs seek redress individually and on behalf of those similarly situated for economic losses stemming from Defendants' manufacture, sale, lease, and false representations concerning the Defective Airbags in the Class Vehicles, including but not limited to diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages, statutory penalties, and injunctive relief/equitable relief.

74.   "Class Vehicles" refers to all vehicles in the United States that have Defective Airbags (defined below) that were (1) manufactured, sold, distributed, or leased by Defendants or (2) manufactured, sold, distributed, or leased by Old GM and purchased or leased by a Plaintiff or Class member after July 10, 2009.

75.   "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use ammonium nitrate as the propellant in their inflators (the "Inflator Defect"), including (a) all airbags that are subject to the recalls identified in the tables set forth in paragraph 77 below; (b) all Takata airbags in GM vehicles subject to recalls relating to Takata's May 18, 2015 Defect Information Reports ("DIRs"), the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy*

- 28 -

*Program Proceeding*, and amendments thereto, concerning Takata's ammonium-nitrate inflators, and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and (c) all Takata airbags in GM vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy or rupture.

76.     As a result of the Inflator Defect, all Defective Airbags have an unreasonably dangerous tendency to (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

77.     The following table identifies the GM vehicles subject to current or future recalls due to the Inflator Defect, which total more than 6 million vehicles.  All of these recalls have been or will be issued by GM Parent or New GM, including the recalls for vehicles manufactured by Old GM.

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 6/26/2014 | 14V372 | Chevrolet | Cruze | 2013-2014 | N/A | Driver |
| 5/28/2015 | 15V324 | GMC | Sierra HD | 2007-2008 | HAH, Non-HAH[2] | Passenger |
| 5/28/2015 | 15V324 | Chevrolet | Silverado HD | 2007-2008 | HAH, Non-HAH | Passenger |
| 10/16/2015 | 15V666 | Chevrolet | Camaro | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Chevrolet | Equinox | 2015 | N/A | Side |

[1] Future recall dates are based on the schedule announced by NHTSA, available at https://www.nhtsa.gov/takata-air-bags/takata-recall-expansion-what-consumers-need-know  (last visited Dec. 5, 2017).
[2] The Non-HAH zone was identified as the zone applicable to vehicles originally sold or ever registered in any U.S. state not included in the HAH zone, and the District of Columbia.

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 10/16/2015 | 15V666 | Buick | LaCrosse | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Chevrolet | Malibu | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | GMC | Terrain | 2015 | N/A | Side |
| 10/16/2015 | 15V666 | Cadillac | XTS | 2015 | N/A | Side |
| 2/3/2016 | 16V063 | Saab | 9-3 | 2006-2011 | N/A | Driver |
| 2/3/2016 | 16V063 | Saab | 9-5 | 2006-2009 | N/A | Driver |
| 2/3/2016 | 16V063 | Saturn | Astra | 2008-2009 | N/A | Driver |
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Avalanche | 2007-2008 | A, B[3] | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Avalanche | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Cadillac | Escalade | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Cadillac | Escalade | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Cadillac | Escalade ESV | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Cadillac | Escalade ESV | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Cadillac | Escalade EXT | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Cadillac | Escalade EXT | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381 | GMC | Sierra HD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | GMC | Sierra LD | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | GMC | Sierra LD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Silverado HD | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Silverado LD | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Silverado LD | 2009-2011 | A | Passenger |

---

[3] The B zone was identified as the zone applicable to vehicles originally sold or ever registered in Arizona, Arkansas, Delaware, District of Columbia, Illinois, Indiana, Kansas, Kentucky, Maryland, Missouri, Nebraska, Nevada, New Jersey, New Mexico, North Carolina, Ohio, Oklahoma, Pennsylvania, Tennessee, Virginia, and West Virginia.

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Suburban | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Suburban | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | Chevrolet | Tahoe | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | Chevrolet | Tahoe | 2009-2011 | A | Passenger |
| 5/27/2016 | 16V381, 16V383 | GMC | Yukon | 2007-2008 | A | Passenger |
| 5/27/2016 | 16V381 | GMC | Yukon | 2009-2011 | A, B | Passenger |
| 5/27/2016 | 16V381, 16V383 | GMC | Yukon XL | 2007-2008 | A, B | Passenger |
| 5/27/2016 | 16V381 | GMC | Yukon XL | 2009-2011 | A | Passenger |
| 1/9/2017 | 17V006 | Pontiac | Vibe | 2009 | B | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Avalanche | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Avalanche | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Avalanche | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Cadillac | Escalade | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Cadillac | Escalade | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Cadillac | Escalade | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Cadillac | Escalade ESV | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Cadillac | Escalade ESV | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Cadillac | Escalade ESV | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Cadillac | Escalade EXT | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Cadillac | Escalade EXT | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Cadillac | Escalade EXT | 2012 | A | Passenger |
| 1/10/2017 | 17V019 | GMC | Sierra HD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Sierra HD | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | GMC | Sierra LD | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | GMC | Sierra LD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Sierra LD | 2012 | A | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Silverado HD | 2009 | B | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 1/10/2017 | 17V010 | Chevrolet | Silverado HD | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Silverado LD | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Silverado LD | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Silverado LD | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Suburban | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Suburban | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Suburban | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | Chevrolet | Tahoe | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | Chevrolet | Tahoe | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | Chevrolet | Tahoe | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | GMC | Yukon | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | GMC | Yukon | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Yukon | 2012 | A | Passenger |
| 1/10/2017 | 17V021 | GMC | Yukon XL | 2007-2008 | C | Passenger |
| 1/10/2017 | 17V019 | GMC | Yukon XL | 2009 | B | Passenger |
| 1/10/2017 | 17V010 | GMC | Yukon XL | 2012 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Avalanche | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Avalanche | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Avalanche | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Cadillac | Escalade | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Cadillac | Escalade | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Cadillac | Escalade | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Cadillac | Escalade ESV | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Cadillac | Escalade ESV | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Cadillac | Escalade ESV | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Cadillac | Escalade EXT | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Cadillac | Escalade EXT | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Cadillac | Escalade EXT | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Sierra HD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Sierra HD | 2010 | B | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| 1/2/2018 | 18E001 | GMC | Sierra HD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Sierra LD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Sierra LD | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | GMC | Sierra LD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Silverado HD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Silverado HD | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Silverado HD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Silverado LD | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Silverado LD | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Silverado LD | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Suburban | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Suburban | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Suburban | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | Chevrolet | Tahoe | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | Chevrolet | Tahoe | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | Chevrolet | Tahoe | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Yukon | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Yukon | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | GMC | Yukon | 2013 | A | Passenger |
| 1/2/2018 | 18E003 | GMC | Yukon XL | 2009 | C | Passenger |
| 1/2/2018 | 18E002 | GMC | Yukon XL | 2010 | B | Passenger |
| 1/2/2018 | 18E001 | GMC | Yukon XL | 2013 | A | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Avalanche | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Avalanche | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade | 2011-2013 | B, C | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| On or about 12/31/2018 | N/A | Cadillac | Escalade | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade ESV | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade ESV | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade ESV | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade EXT | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Cadillac | Escalade EXT | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra HD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra HD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra HD | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra LD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Sierra LD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado HD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado HD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado HD | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado LD | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Silverado LD | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Suburban | 2010 | C | Passenger |

| Recall Date[1] | NHTSA Recall Nos. | Make | Model | Model Years | Zones | Airbag |
|---|---|---|---|---|---|---|
| On or about 12/31/2018 | N/A | Chevrolet | Suburban | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Suburban | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Tahoe | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Tahoe | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | Chevrolet | Tahoe | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon | 2014 | A, B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon XL | 2010 | C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon XL | 2011-2013 | B, C | Passenger |
| On or about 12/31/2018 | N/A | GMC | Yukon XL | 2014 | A, B, C | Passenger |

II.    **Takata's Airbags Have a Common, Uniform Defect**

A.    **Takata Recklessly Chose an Inexpensive and Dangerous Propellant**

78.    The part of the airbag at issue in this matter is the inflator.  The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag.  This process occurs within milliseconds.

79.    The following basic illustration depicts Takata's airbag module:



80.   When it began manufacturing airbags in the 1980s, Takata used a compound called sodium azide as the propellant within its inflators.  In the mid-1990s, Takata began using a different propellant called 5-aminotetrazole, in part due to toxicity issues associated with sodium azide.  In the late-1990's, Takata's managers pressured its engineers in Michigan to devise a lower-cost propellant based upon ammonium nitrate, a compound used in fertilizer and explosives.

81.   Ammonium nitrate is an inherently volatile and unstable chemical.  Daily temperature swings are large enough for the ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility.  It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture cause it to break down over time, which can lead to unpredictable and dangerous results, such as violent detonation.  As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate "shouldn't be used in airbags," and is better suited to large demolitions in mining and construction.

82.     From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks.  Indeed, in a 1996 patent document, Takata expressed concern that an ammonium-nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up."  Takata further recognized "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit.  If ammonium nitrate undergoes this type of temperature change, the compound may "expand and contract and change shape resulting in growth and cracking" of the propellant, which might cause an airbag inflator to "not operate properly or might even blow up because of the excess pressure generated."

83.     Takata further admitted in a 1999 patent document that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable."

84.     In 1999, as the ammonium-nitrate design was being considered, Takata's engineering team in Moses Lake, Washington raised objections and pointed to publicly available explosives manuals that warned of the risk of disintegration and irregular, overly energetic combustion.  As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," and yet his team had only "a couple days" to do its review.

85.     Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems, have reportedly avoided using ammonium nitrate as a primary propellant.  Indeed, at a Congressional hearing in June 2015, Takata's representative confirmed Takata was the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

86.     The only conceivable advantage to the compound for an airbag manufacturer, according to the expert quoted in *The New York Times*, is that it is "cheap, unbelievably cheap."

Takata had originally planned to use tetrazole as its propellant, which is both more stable than ammonium nitrate and also more environmentally friendly, among other benefits. But tetrazole was too expensive for Takata, and executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

87.     Takata began receiving complaints regarding the Inflator Defect shortly after introducing the redesigned airbag to the market, and those complaints continued to multiply over the years. Nevertheless, rather than switch to the compound it knew would be safer, even if more expensive, Takata recklessly opted to try, over the course of many years, to stabilize a compound that resists stabilization.

88.     For example, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing.

89.     Notably, the alleged fix in 2006 came *after* a rupture incident in 2004 that caused a serious injury, and incidents continued to mount after that time as well. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

90.     In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive designed to retain moisture in an effort to prevent these catastrophic ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the

ballistic performance was very aggressive and did not meet USCAR specification.  After 200 cycles the ballistic performance was so aggressive that the inflator ruptured due to extremely high internal pressures.

91.     The inflators were "grenades" in the glove box or steering wheel waiting to detonate after going through 100 or 200 cycles of thermal cycling, which, of course, is something cars in the real world will eventually do.

92.     The use of this additive (or any other) designed to address ammonium nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix because at some point the additive will no longer be able to absorb the excess moisture and the ballistic curves will again exceed specification leading to ruptures.

### B.     The Risks of the Inflator Defect Were Exacerbated by Takata's and Defendants' Abysmal Quality Control.

93.     Takata and Defendants became further aware of the instability of ammonium-nitrate propellant from the persistent and glaring quality control problems Takata encountered in its manufacturing operations.  The Takata plants that manufactured the airbags and inflators at issue in this Complaint include plants located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico.

94.     Starting in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail.  Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*.

95.     On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations.  In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

- 39 -

96.     Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions in containers loaded with propellant.  Defendants' employees were made aware of this incident soon after it occurred.

97.     Apparently, not even that terrible accident could prompt serious and lasting improvements.  In a February 2007 email to multiple colleagues, one manager stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium-nitrate propellant from failing.

98.     Takata engineers also scrambled as late as 2009 to address its propellant issues after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

99.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags.  Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium-nitrate propellant.   In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees stating: "A part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!"  This shoddy and reckless attitude permeated all of Takata's operations and facilities.

100.    Yet handling problems at Takata facilities, which Defendants regularly visited, persisted.  Another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . .  Here you can see why it is important to handle our product

properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

101.    Despite knowing it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium-nitrate propellant, Takata resisted taking back damaged or wet airbag modules, in part because Takata struggled to keep up with a surge in demand for its airbags through the early and mid-2000s as it won big new clients like Old GM.

## III.    Defendants' Knowledge of the Defective Airbag

### A.    Defendants' Inherited Knowledge

102.    Old GM had knowledge of the Inflator Defect before it purchased a single airbag from Takata. According to the *New York Times*, in the late 1990s, Takata, then a little-known Japanese supplier, contacted Old GM and offered to supply Old GM with a much cheaper automotive airbag. Leo Knowlden of Old GM was told by Takata that its "2004 propellant" contained ammonium nitrate and was even handed copies of Takata's patent documents, which explicitly highlighted the stabilization problems of ammonium nitrate. Nonetheless, attracted to Takata's lower prices, Old GM turned to its existing airbag supplier—the Swedish-American company Autoliv—and asked it to match Takata's cheaper design or risk losing the automaker's business. When Autoliv's scientists studied the Takata airbag, they learned that it utilized the dangerously volatile compound, ammonium nitrate.

103.    Robert Taylor, Autoliv's head chemist at the time, analyzed every facet of the Takata airbag, including the propellant, ammonium nitrate. The takeaway, he said, was that when the airbag was detonated, "the gas generated so fast, it blows the inflator to bits." Chris

Hock, a former member of Mr. Taylor's team, said a mock ammonium nitrate inflator test "totally destroyed the fixture" and "turned it into shrapnel."

104.    The former Autoliv scientists considered their verdict against the use of ammonium nitrate irrefutable and alerted Old GM to the dangers of equipping its vehicles with Takata's airbags.  According to Mr. Taylor, no later than 1999, Autoliv specifically told Old GM, "[n]o, we can't do it, we're not going to use [ammonium nitrate]."  Upon information and belief, Rita Kauppi, Old GM's Global Commodity Manager for Airbags, who stayed on with New GM after the 363 Sale, was involved in these discussions.  Mr. Taylor and Mr. Hock stated that Autoliv was so concerned about the use of ammonium nitrate, that it likewise warned other manufacturers of the dangers of using Takata's airbag.

105.    Old GM began equipping its vehicles with Takata's airbags in the early 2000s, in the face of Autoliv's warning about ammonium nitrate.

106.    The proof of the Inflator Defect did not end there.  Beginning in the early 2000s, Old GM closely reviewed proposed airbag designs from Takata, and employed extensive design and product validation processes, before approving them for us in its vehicles.  Old GM also regularly audited and reviewed Takata's manufacturing processes, including with site visits of Takata's facilities.  The results of Old GM's review of the Takata inflator were troubling to say the least.

107.    According to internal Takata documents, Old GM expressed concern to Takata about the inflator's "ballistic variability," which refers to the inflator's tendency to underinflate (causing the airbag to fail to deploy) or overinflate (causing dangerously aggressive deployments or explosions).  As early as April 2003, Old GM communicated to Takata that "GM [was] very concerned about the variability of [Takata's inflator] products."  In order to discuss these

concerns, Old GM employees, including Tony Popovski (Old GM's Global Purchasing Manager for Airbags who stayed on with New GM after the 363 Sale), visited Takata's Moses Lake facility.  During the visit, Bob Bowser, an Old GM engineer, voiced numerous concerns about Takata's inadequate ballistic testing, moisture control issues, and inability to meet inflator specifications.  Bowser repeated these concerns in a memorandum, which was received by Popovski, Rita Kauppi (Global Commodity Manager for Airbags), and Leo Knowlden (Lead Engineer for Inflators)—all three of whom stayed on with New GM after the 363 Sale.

108.  In September 2004, Takata representatives met with Knowlden, Old GM's principal on inflator technology, to discuss Old GM's concern over the inflator's dangerous "ballistic shift," and tendency to "flame" in instances of airbag rupture.  At the meeting, Knowlden openly "question[ed] the ability of inflator products from Takata to meet specifications that most other suppliers [had] met 'years ago.'"

109.  There is no indication that Takata ever solved these issues.  In March 2006, Takata inflators being tested for GM vehicles continued to show "aggressive behavior."  In May 2006, Takata representatives met with Knowlden to discuss the status of inflator development for GM vehicles.  In tests conducted just a few weeks before, "molten propellant" escaped the airbag, and a Takata employee admitted "we cannot get good results" with the inflator design.  At the meeting, Knowlden told Takata that "GM is more than ever sensitiv[e] to inflator flaming due to [air]bag ruptures and associated conditions."

110.  Indeed, ruptures occurred in Takata's airbags made for Old GM before the airbags could even be installed in Old GM's vehicles.  In July 2008, an "energetic disassembly" of a Takata inflator was detected during testing of an airbag inflator made for Old GM at Takata's Freiberg facility.  Energetic disassembly is a euphemism for an explosion of the inflator that

causes the inflator to break apart and fire metal particulate out of the airbag.  As a result of this incident, Old GM issued a limited recall in Europe only.

111.    In May 2009, another energetic disassembly of a Takata inflator made for Old GM at Takata's Monclova facility was detected and reported to Old GM.

112.    In June 2009, Old GM filed for bankruptcy.  On July 5, 2009, under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of New York approved the sale of substantially all of Old GM's assets pursuant to a Master Sale and Purchase Agreement ("Sale Agreement").  The Sale Agreement officially closed on July 10, 2009, by which New GM acquired substantially all of Old GM's books, records, and personnel, including Rita Kauppi (Global Commodity Manager for Airbags), Leo Knowlden (Lead Engineer for Inflators), and Tony Popovski (Global Purchasing Manager for Airbags).  New GM then transferred some of these assets to GM Holdings.  Defendants thereby acquired the knowledge of the Inflator Defect that those books, records, and personnel held.

### B.    Defendants' Acquisition of Additional Post-Sale Knowledge

113.    In addition to the knowledge of the Inflator Defect inherited from Old GM through acquired books, records, and personnel, Defendants independently knew, or should have known, of the Inflator Defect almost immediately after the closing of the 363 Sale.

114.    In the summer of 2009, Honda initiated its first recall of Takata airbags in the United States, in the wake of the death of a driver of a 2001 Honda Accord.  Given that GM vehicles used Takata airbags containing the same ammonium-nitrate propellant, in August 2009, Leo Knowlden, now New GM's head of inflator technology, expressed concern to Takata about "AN [ammonium nitrate] propellant stability."  However, Defendants ultimately did nothing about it, and New GM instead ordered a million more inflators from Takata.

- 44 -

115.    On March 11, 2010, an energetic disassembly of a Takata inflator made for New GM at Takata's Monclova facility, was detected during standard lot acceptance testing.  In its failure mode analysis, Takata reported to New GM that the inflator suffered from a "body rupture" caused by the propellant.

116.    On March 19, 2010, another energetic disassembly of a Takata inflator, made for New GM at Takata's Monclova facility, was detected during production validation testing.  In its failure mode analysis, Takata again reported to New GM that the inflator suffered from a "body rupture" caused by the propellant.

117.    On April 17, 2010, yet another energetic disassembly of a Takata inflator made for New GM at Takata's Monclova facility was detected during lot acceptance testing.  Takata yet again told New GM that the inflator suffered from a "body rupture" caused by the propellant.

118.    Despite three separate instances of energetic disassembly detected in inflators made for New GM, occurring within a 36-day span, Defendants did nothing to meaningfully investigate the problem, notify the appropriate regulators, or notify the Class.

119.    Signs that these ruptures were beginning to occur in the field emerged no later than 2011.  In February 2011, New GM reported to Takata that a driver in a GM vehicle claimed his thighs were burned when a Takata airbag deployed and expelled searing hot inflator gases into the cabin.

120.    In February 2012, Takata noted "several non-conformances" in a New GM inflator "due to high performing ballistics."  Takata reported the incident to New GM but blamed the problem on a supplier.  Defendants took no meaningful action in response.

121.    On May 9, 2014, Takata informed New GM of a "field event with a ruptured inflator," involving a 2013 Chevrolet Cruze vehicle.  Defendants and Takata were already aware

of a previous incident in October 2013, when a Takata airbag exploded in another 2013 Chevy Cruze, leaving the driver completely blind in one eye.  Rather than publicize the truth, both Takata and New GM blamed the ruptures on a manufacturing problem.  Indeed, Knowlden demanded that Takata "put the story together that may potentially limit the scope" of a recall, rather than disclose the Inflator Defect to ensure the safety of drivers and passengers in New and Old GM vehicles.  Takata abided, and on June 26, 2014, GM Parent and New GM issued only a limited recall for approximately 29,000 2013-2014 Chevrolet Cruze vehicles.  Defendants' spokesperson, Jim Cain, denied any connection to the ever-increasing Takata airbag recalls by other vehicle manufacturers, stating that "[t]heirs is a chemistry issue, and ours is a mechanical issue."  Thus, Defendants misrepresented the cause and scope of the problem and omitted information they knew about the defective Takata airbags in other New and Old GM vehicles.

122.    As a matter of fact, Knowlden, the man charged with approving Takata's airbag for Old GM and New GM, also happened to be an ex-Takata employee who was known by Takata as a "pro-Takata products guy."  With Mr. Knowlden at the helm, Takata did not "expect any issues" from GM (Old or New), no matter how many problems with the Takata airbag Old GM or New GM encountered.

123.    Notably, this is not the first instance in which Defendants have engaged in fraudulent conduct to sell vehicles.  On September 17, 2015, New GM was charged with one count of engaging in a scheme to conceal material facts from NHTSA and one count of wire fraud, and entered into a deferred prosecution agreement, in which it admitted that it failed to disclose a safety defect to NHTSA and misled U.S. consumers about the same defect and agreed to a $900 million forfeiture.

IV.     **Inadequate Recalls and Failure to Assist Affected Consumers**

      A.     **Defendants Belatedly Issue Recalls**

124.    With pro-Takata Leo Knowlden in charge of inflator technology, Defendants kept mum, even as the pace of recalls increased exponentially as NHTSA began to force Takata and the auto industry into action.  In April and May 2013 alone, approximately 4 million vehicles were recalled by ten auto manufacturers as a result of the Inflator Defect.  During that same period of time, employees at New GM were communicating with other automakers about the true root cause of the airbag ruptures and recalls.  For example, in an e-mail to Ford and Chrysler, Knowlden said that the explanation for the recall given by a Honda spokesperson in April 2013—that the problem stemmed from human errors during production—was "Bull S%$t," and expressed his view that the Takata defect "has to be a core design issue or process issue, not a 'mistake.'"  Yet, GM Parent and New GM did not recall any vehicles beyond the limited number of Chevrolet Cruze models, withholding vital information from occupants of other New and Old GM vehicles on the road.

125.    In June 2014, another 5.6 million vehicles were recalled, and by October 2014, global recalls had reached 16.5 million vehicles.  By November 2014, in anticipation of a United States Senate hearing to be attended by Takata and the major automakers, NHTSA demanded that the recall be expanded to the entire country for certain driver's side airbags, citing airbag rupture incidents in North Carolina and California.  Incredibly, Takata refused, and testified at Congressional hearings that vehicles in non-humid regions were safe, *even as it claimed that it had not yet determined the root cause of the failures*.  Amid mounting pressure and public scrutiny, the automakers eventually agreed to NHTSA's demand.  At that point, the total number of recalled vehicles escalated to approximately 17 million in the United States and 25 million

worldwide.  During this time, GM Parent and New GM did not recall any additional vehicles, despite their knowledge that the Class Vehicles contained the Defective Inflators that had by this point caused numerous injuries and deaths.

126.   In response to the additional pressure and public scrutiny, the automakers— including Defendants—were forced to consult with external explosives and airbag specialists, and performed additional testing on Takata's airbags.  This testing confirmed what the automakers already knew: Takata's airbags containing ammonium nitrate were defective and prone to rupture.

127.   In light of this testing, Takata was unable to deny the existence of the Inflator Defect any longer.  On May 18, 2015, Takata filed four Defect Information Reports ("DIRs") with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver airbag inflators; (2) SPI passenger airbag inflators; (3) PSPI-L passenger airbag inflators; and (4) PSPI passenger airbag inflators, respectively.  After concealing the Inflator Defect for more than a decade, Takata finally admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators."   In testimony presented to Congress following the submission of its DIRs, Takata's representative also admitted that the use of ammonium nitrate was a factor that contributes to the tendency of Takata's airbags to rupture, and that, as a result, Takata would phase out the use of ammonium nitrate.  Still, Takata's defect admission is inaccurate and misleading, as the Inflator Defect is manifest in each of Takata's inflators containing ammonium nitrate.

128.   As a result of Takata's admission that its inflators are defective, GM Parent and New GM had no choice but to issue recalls in 2015.  However, they continued to minimize the problem, recalling only certain 2007-2008 Chevrolet Silverado HD and GMC Sierra HD models

(approximately 330,000 total vehicles)—falsely representing that other GM-branded vehicles were safe, and omitting information about the deadly Takata airbags they contained.

129.     In May 2015, New GM also began administering recalls for 2003-2010 Pontiac Vibe, and 2005-2006 Saab 9-2x models, which were issued by GM's manufacturing partners, Toyota and Subaru, respectively.

130.     In October 2015, New GM Parent and New GM recalled side-mounted Takata airbag modules in a mere 395 total vehicles,[4] due to potential under- and over-inflation, but claimed they did not know the cause of the problem and refused to admit any connection with the tens of millions of inflators that had now been recalled due to the Inflator Defect.

131.     Then, in February 2016, New GM Parent and New GM issued a recall for 2006-2011 Saab 9-3, 2006-2009 Saab 9-5, and 2008-2009 Saturn Astra models (approximately 180,000 vehicles total).

132.     Defendants, however, continued to deny the scope of the Inflator Defect, and misrepresent other GM models as safe until May 2016, when Takata issued additional DIRs implicating more GM models.  In response, New GM Parent and New GM were forced to issue recalls for 2007-2011 Chevrolet Avalanche, Escalade, Escalade ESV, Escalade EXT, Sierra LD, Silverado LD, Suburban, Tahoe, Yukon, and Yukon XL vehicles; and expand the recall of Sierra HD and Silverado HD vehicles to encompass 2009-2011 models—approximately 2.5 million vehicles total.   In January 2017, New GM Parent and New GM subsequently added approximately 820,000 more of these models to the recall, which now included model year 2012 vehicles, again in response to DIRs issued by Takata.

---

[4] 2015 Buick LaCrosse, Cadillac XTS, Chevrolet Camaro, Chevrolet Equinox, Chevrolet Malibu, and GMC Terrain vehicles.

133.    GM Parent and New GM have admitted that an additional 2.4 million of their vehicles, from model years 2009-2014, contain Defective Airbags, but they have not yet issued recalls for these vehicles.  This includes approximately 630,000 vehicles subject to Takata's most recent DIRs, issued on or about January 2, 2018.

134.    Over the past 15 years, there have been at least 22 deaths and hundreds of serious injuries linked to defective Takata airbags worldwide, in a myriad of vehicles made by various manufacturers, including Defendants.  Though Defendants were aware of these incidents, as well as problems with their own airbag inflators, they continued to equip their vehicles with Takata airbags, and maintain publicly that they were safe.

135.    Defendants knew, or should have known, that the Takata airbags installed in millions of vehicles were defective and potentially deadly.  Takata and Defendants, who concealed their knowledge of the nature and extent of the defect from the public, while continuing to advertise their products as safe and reliable, have shown a blatant disregard for public welfare and safety.  Moreover, GM Parent and New GM have violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

**B.    Defendants Delay Repairs and Continue to Put Customers at Risk**

136.    Defendants have used their considerable clout within the U.S. auto industry to delay repairs of nearly all the GM vehicles that are currently under recall due to the Inflator Defect.  In November 2016, GM Parent and New GM appealed to NHTSA to allow them to delay repairs on all 2.5 million vehicles recalled in May 2016, so that they could conduct more tests on the Defective Airbags.  When GM Parent and New GM recalled the additional 820,000 vehicles in January 2017, they requested that NHTSA allow repair of those vehicles to be

deferred as well.  Accordingly, GM Parent and New GM have asked to delay repair of nearly 90% of the vehicles that they have recalled due to the Inflator Defect.  Undoubtedly, GM Parent and New GM will ask to defer recalls of the 630,000 vehicles subject to the most recent January 2018 DIRs as well, leaving even more vehicle occupants at risk.

137.   GM Parent and New GM claim the Takata airbags used in these vehicles should be "safe" to drive for a few more years, which obviates the need for an immediate recall, despite the fact that these airbags utilize the same ammonium-nitrate propellant contained in every other defective Takata airbag.

138.   Notably, if GM Parent and New GM convince regulators that the Takata airbags in these vehicles are somehow safe, the recalls will be cancelled—saving Defendants $880 million, according to a GM Parent filing with securities regulators.

139.   Initially, GM Parent and New GM requested until August 31, 2017, to prove that these vehicles were safe, and recently asked for a further extension until March 31, 2018—a delay of nearly 2 years since the first of these vehicles were recalled.  Consumers are, therefore, forced to play "Russian Roulette" with their vehicles: they must drive dangerous vehicles for years while they wait for Defendants to replace the defective airbags in their cars, all the while exposing themselves and their passengers to the terrifying risk of being seriously injured or killed by their airbags in the event of a collision.

140.   Defendants' persistent attempts to limit the scope of their recalls demonstrate a modus operandi of putting profits over people.

**C.    Slow and Inadequate Recalls**

141.    Even without the delay request, vehicles that have been recalled have little chance of being repaired in the near term.  Of the GM vehicles under recall, and not subject to the request for delay, only 45% have been repaired to date.

142.    Approximately 44 million vehicles have been recalled in the United States due to the Inflator Defect, and as of February 2018, global recalls exceed 60 million vehicles.

143.    As a result of the concealment of the Inflator Defect by Takata and automakers like Defendants for more than a decade, the recalls now underway cannot be implemented effectively.  Indeed, both Takata and the automakers have acknowledged that the process could take several *years* because of supply constraints.

144.    In response to the airbag replacement shortage, certain automakers, including Defendants, have taken the extreme step of disabling passenger airbags entirely, and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.

145.    Congress has voiced concerns about this serious problem.  Senators Richard Blumenthal and Edward J. Markey, in a letter to the U.S. Department of Transportation ("DOT"), stated that they were "alarmed and astonished that NHTSA [] endorsed a policy recently announced by . . . GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable.  As a matter of policy, this step is extraordinarily troubling and potentially dangerous.  As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of [such] an exemption [] in the case of Takata airbags."

D.     **Defective Replacement Airbags**

146.    As the manufacturers finally took steps to issue national recalls—after forceful prodding by NHTSA—commentators noted not only the potential supply constraints, but more frighteningly, that "no one knows if the replacement inflators currently being installed will suffer the same issue."  Indeed, in response to repeated questioning at a Congressional hearing in June 2015, Takata's representative repeatedly refused to assure the public that Takata's replacement air bags are safe and defect-free.

147.     Moreover, inspection of inflators manufactured by Takata as recently as 2014, and installed by manufacturers through the recall process, reveals that the ammonium nitrate pellets within the inflators already show signs of moisture-induced instability, such as rust stains, a tendency to clump together, and size variations.  As a result, Takata cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

148.     By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been determined by Takata or any other credible source, or Takata has not otherwise demonstrated the safety and/or service life of the parts by December 31, 2019.  As of July 2017, however, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda, and Nissan vehicles.

149.     Moreover, while Takata and automakers—including Defendants—previously assured the public that the Defective Airbags had been remedied, and that new airbags being placed in recalled vehicles were safe, several automakers—including Defendants—have in fact

been, or will be, required to recall some vehicles from model year 2013 and later due to the risk of Takata's airbags rupturing.  Moreover, Takata has now admitted that replacement airbags installed in some recalled vehicles are defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

150.    As of August 2017, New GM told NHTSA that it had still not come up with a safe replacement for the Defective Inflators currently being used in millions of its vehicles.

### E.    Failure to Provide Replacement Vehicles

151.    The Class Vehicles are not safe to drive.  They have been recalled, and yet replacement of the Defective Airbags could take years.  Due to Defendants' failures, Plaintiffs and Class members are left with poor options: be without the use of a vehicle—to get to and from work, pick up their children from school or childcare, or, in the most urgent situations, transport themselves or someone else to a hospital; purchase, lease, or rent a new vehicle until GM Parent and New GM complete the recall; or use a vehicle with dangerous or disabled airbags for an extended period of time.

152.    As Senators Blumenthal and Markey asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

153.    New GM is not providing loaner or replacement vehicles on a comprehensive basis.

## V.    Defendants Sold GM Vehicles as "Safe" and "Reliable"

154.    At all relevant times, in advertisements and promotional materials, Defendants continuously maintained that GM-branded vehicles were safe and reliable, and uniformly concealed the Inflator Defect.   Plaintiffs, directly or indirectly, were exposed to these

advertisements or promotional materials prior to purchasing or leasing Class Vehicles.  The misleading statements about Class Vehicles' safety in Defendants' regulatory filings, advertisements, and promotional materials were material to Plaintiffs' decisions to purchase or lease Class Vehicles.

155.   Examples of Defendants' safety and reliability representations include the following:

a.   In 2017, Defendants' website stated: "Safety is always our priority.  It's the main concern with each and every car we design and a driving principle of our company."

b.   In a February 2015 news release, Defendants advertised high rankings in a J.D. Power Vehicle Dependability Study for several models subject to the Inflator Defect recalls. The news release highlighted the GMC Sierra (which is subject to the Inflator Defect recalls) for becoming "the first full-size pickup to receive the highest-possible five-star Overall Vehicle Score for safety."

c.   In December 2014, Defendants issued a news release touting the Insurance Institute for Highway Safety (IIHS)'s designation of four Chevrolet vehicle models as "Top Safety Picks," including some models subject to recalls due to the Inflator Defect.

d.   During a presentation at the May 2014 North American Conference on Elderly Mobility, Gay Kent (General Motors Director of Global Vehicle Safety) stated that "[t]he safety of all our customers is our utmost concern."

e.    GM Parent's 2013 Annual Report asserts that "[n]othing is more important than the safety of our customers."

f.   In a July 10, 2012, news release, Chris Perry (Chevrolet Global Vice President of Marketing) stated, "[w]e think customers who have been driving competitive makes

or even older Chevrolets will be very pleased by today's Chevrolet designs, easy-to-use technologies, comprehensive safety and the quality built into all of our cars, trucks and crossovers."

g.     An April 2012, New GM national advertising campaign slogan proclaimed: "Safety. Utility. Performance."

h.     Defendants published on their website a December 27, 2011, an interview with Gay Kent (General Motors Executive Director of Vehicle Safety and Crashworthiness), who stated, "[o]ur safety strategy is about providing continuous protection for our customers before, during and after a crash. . . . We design safety and crashworthiness into our vehicles very early in development."   In the interview, Kent touted "GM's own internal requirements for vehicle safety and crashworthiness, which go above and beyond federal requirements."

i.     The promotional brochure for New GM's 2011 Cadillac Escalade series noted: "Passenger safety is a primary consideration throughout the engineering process."   It also advised potential customers that "[a] look beneath the beautiful exterior reveals a comprehensive approach to safety."

j.     An August 29, 2011, advertisement on Defendants' website stated that "Chevrolet provides consumers with fuel-efficient, safe and reliable vehicles that deliver high quality, expressive design, spirited performance and value."

k.     New GM's brochure for the 2010 Chevy Avalanche called the truck a "Four-Wheel Bodyguard," in connection with its airbags, and an "all-encompassing approach to safety."   This model is subject to the Inflator Defect recalls.

l.     On November 10, 2010, New GM published a video that told consumers that New GM actually prevents any defects from reaching consumers. The video, titled "Andy

Danko: The White Glove Quality Check," explains that there are "quality processes in the plant[s] that prevent any defects from getting out."

m.    In an April 2010 video advertisement, GM Parent Chairman and CEO, Ed Whitacre, stated that New GM was "designing, building, and selling the best cars in the world," and has "unmatched lifesaving technology" to keep customers safe.

n.    In its 2010 Annual Report, GM Parent proclaimed its products would "improve safety and enhance the overall driving experience for our customers."

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.    Fraudulent Concealment

156.   Defendants have known of the Inflator Defect since July 10, 2009, when New GM obtained substantially all of Old GM's books, records, and personnel and the knowledge of the Inflator Defect they held, including the results of Autoliv's testing of ammonium nitrate-based inflators, Takata's own testing, numerous incidents of energetic disassembly in Defective Airbags made for GM vehicles, and recalls initiated by other automakers.  Defendants obtained further knowledge of the Inflator Defect after July 10, 2009, when they learned of the results of additional Takata testing, field incidents involving the Defective Airbags, and mounting recalls by other automakers.  Defendants have concealed from or failed to notify, Plaintiffs, Class members, and the public, of the full and complete nature of the Inflator Defect.

157.   Although Defendants have now acknowledged to safety regulators that Takata's airbags are defective, for years, Defendants did not fully investigate or disclose the seriousness of the issue, and in fact downplayed the widespread prevalence of the problem.

158.    Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

**II.     Estoppel**

159.    Defendants were and are under a continuous duty to disclose to Plaintiffs and proposed Class members the true character, quality, and nature of the Class Vehicles.  They actively concealed the true character, quality, and nature of the vehicles; and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and proposed Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations and/or active concealment of these facts.  Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

**III.    Discovery Rule**

160.    The causes of action alleged herein did not accrue until Plaintiffs and proposed Class members discovered that their vehicles had the Defective Airbags.

161.    Plaintiffs and proposed Class members, however, had no realistic ability to discern that the vehicles were defective until—at the earliest—after the Defective Airbag aggressively deployed or violently exploded, or their vehicles were recalled.  Even then, Plaintiffs and proposed Class members would have had no reason to discover their causes of action, because of Defendants' active concealment of the true nature of the defect.

**IV.    *American Pipe* Tolling**

162.    A putative class action suit on behalf of a nationwide class was brought against New GM on October 31, 2014.  *See Bonet v. Takata Corporation, et al.*, No. 14-cv-24087 (S.D.

Fla.). At the time it was brought, Plaintiffs and the other Class members in this case were part of the classes alleged in the action.

163.    Accordingly, pursuant to *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), the claims of Plaintiffs and other Class members were tolled from at least October 31, 2014.  Additional class actions filed by Plaintiffs, following the *Bonet* action, provide additional bases for *American Pipe* tolling.

## CLASS ACTION ALLEGATIONS

164.    The proposed Classes' claims all derive directly from a single course of conduct by Defendants.  This case is about the responsibility of Defendants, at law and in equity, for their knowledge, their conduct, and their products.  Defendants have engaged in uniform and standardized conduct toward the proposed Classes.  They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members.  The objective facts on these subjects are the same for all Class members.  Within each Claim for Relief asserted by the respective proposed Classes, the same legal standards govern.  Additionally, many—and for some claims, all—states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims.  Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a); and (b)(3), and/or (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.   <u>The Classes</u>

165.   The Consumer Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rules of Civil Procedure 23(a); and (b)(2), and/or (b)(3), and/or c(4); on behalf of themselves and a Nationwide Consumer Class, defined as follows:

> All persons in the United States who, prior to the date on which the Class Vehicle was recalled and after July 10, 2009, (a) entered into a lease for a Class Vehicle, or (b) bought a Class Vehicle and (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

166.   The Consumer Plaintiffs allege statewide class action claims on behalf of separate classes in the following states: California, Florida, Georgia, Indiana, Kentucky, Louisiana, Michigan, Mississippi, Missouri, New Jersey, New York, North Carolina, Pennsylvania, Tennessee, Texas, Vermont, Virginia, and West Virginia.   These State Consumer Classes are initially defined as follows:

> All persons who, prior to the date on which the Class Vehicle was recalled and after July 10, 2009, (a) entered into a lease for a Class Vehicle in the state of ____ (*e.g.,* Florida), or (b) bought a Class Vehicle in the state of ____ (*e.g.*, Florida) and (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

167.   The proposed Nationwide Consumer Class and Statewide Consumer Classes, and their members, are sometimes referred to herein as the "Class" or "Classes."

168.   Excluded from each Class are Takata and Defendants, their employees, officers, directors, legal representatives, heirs, successors and wholly or partly owned subsidiaries or affiliates of Defendants; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## II.   Numerosity

169.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1).   There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

170.    Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business, and within their control.   Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A), and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## III.   Predominance of Common Issues

171.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3), because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

a.    Whether the Class Vehicles suffer from the Inflator Defect;

b.    Whether the Class Vehicles have suffered a diminution of value as a result of those Vehicles' incorporation of the airbags at issue;

c.    Whether Defendants knew, or should have known, about the Inflator Defect; and, if so, how long Defendants have known of the defect;

d.    Whether the defective nature of the Class Vehicles constitutes a material fact reasonable consumers would have considered in deciding whether to purchase a Defective Vehicle;

e.      Whether Defendants have a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

f.      Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

g.      Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

h.      Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

i.      Whether Defendants misrepresented that the Class Vehicles were safe;

j.      Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

k.      Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

l.      Whether Defendants' statements, concealments, and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

m.      Whether Defendants violated each of the States' consumer protection statutes, and, if so, what remedies are available under those statutes;

n.      Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

o.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

p.      Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

q.      Whether Defendants have been unjustly enriched by their conduct;

r.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

s.      Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect, and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

t.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants and to vindicate statutory and public policy;

u.      How such penalties should be most equitably distributed among Class members;

v.      Whether Defendants conspired with others to violate RICO; and

w.      Whether Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

## IV.    **Typicality**

172.    This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants.  The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## V.     **Adequate Representation**

173.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes.  Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

174.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so.  Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## VI.    **Superiority**

175.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2), because Defendants have acted and refused to act on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

176.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy.  The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

177.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation by even a small fraction of the Class would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

178.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation.  Compared to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

179.    Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

180.    The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims.  Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles, constitute evidence supporting various claims, including diminution of value, and are continuing to occur because of Takata and Defendants' delays and inaction regarding the commencement and completion of recalls, and because of the installation of Defective Airbags

as replacement airbags.  The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

**REALLEGATION AND INCORPORATION BY REFERENCE**

181.   Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

**CLAIMS FOR RELIEF**

**I.**     **Nationwide Claims**

    **A.**     **Federal Claims**

**COUNT 1**

**Violation of the Magnuson-Moss Warranty Act,**
**15 U.S.C. § 2301**

182.   Consumer Plaintiffs bring this Count against Defendants, on behalf of themselves and members of the proposed Nationwide Consumer Class who purchased a Class Vehicle in the District of Columbia, or one the following States: Alaska, Arkansas, California, Colorado, Delaware, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

183.   This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301, by virtue of 28 U.S.C. § 1332 (a)-(d).

184.   The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

- 66 -

185.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3).   They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

186.    Each Defendant is a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

187.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

188.    Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7).   As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

189.    Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1).   Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect.   Defendants have admitted that the Class Vehicles are defective in issuing their recalls, but the recalls are woefully insufficient to address the Inflator Defect.

190.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

191.    Any limitations on the warranties are procedurally unconscionable.  There was unequal bargaining power between Defendants on the one hand, and Plaintiffs and the other Class members, on the other.

192.    Any limitations on the warranties are substantively unconscionable.  Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired.  Defendants failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

193.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either Defendants or their agents (dealerships) to establish privity of contract.

194.    Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties.  The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers.  Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the Inflator Defect.

195.    Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the

Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal
Rules of Civil Procedure.

196.    Furthermore, affording Defendants an opportunity to cure their breach of written
warranties would be unnecessary and futile here.  At the time of sale or lease of each Class
Vehicle, Defendants knew, should have known, or were reckless in not knowing of their
misrepresentations and omissions concerning the Class Vehicles' inability to perform as
warranted, but nonetheless failed to rectify the situation and/or disclose the defective design.
Under the circumstances, the remedies available under any informal settlement procedure would
be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution
procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is
excused and thereby deemed satisfied.

197.    Plaintiffs and the other Class members would suffer economic hardship if they
returned their Class Vehicles but did not receive the return of all payments made by them.
Because Defendants are refusing to acknowledge any revocation of acceptance and return
immediately any payments made, Plaintiffs and the other Class members have not re-accepted
their Defective Vehicles by retaining them.

198.    The amount in controversy of Plaintiffs' individual claims meets or exceeds the
sum of $25.  The amount in controversy of this action exceeds the sum of $50,000, exclusive of
interest and costs, computed on the basis of all claims to be determined in this lawsuit.  Plaintiffs,
individually and on behalf of the other Class members, seek all damages permitted by law,
including diminution in value of their vehicles, in an amount to be proven at trial.  In addition,
pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover
a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on

actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

199.    Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in their vehicles.  Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

200.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law.  Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

## COUNT 2

### Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(c)

201.    Plaintiffs bring this claim against Defendants on behalf of themselves, and the members of the proposed Nationwide Consumer Class.

202.    Defendants and Takata are "persons" under 18 U.S.C. § 1961(3).

203.    Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the New GM-Takata RICO Enterprise through a pattern of racketeering activity.

204.    Plaintiffs and Class members are "person[s] injured in his or her business or property," by reason of Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

**The New GM-Takata RICO Enterprise**

205.    The following persons, and others currently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the New GM-Takata RICO Enterprise:

a.      Defendants, who designed, manufactured, and sold millions of vehicles equipped with Defective Airbags that they knew, or were reckless in not knowing, contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators since July 10, 2009, while falsely and inaccurately representing that their vehicles were safe, thereby deceiving Plaintiffs and Class members.

b.      Takata, who, with Defendants' guidance, designed, manufactured, and sold millions of Defective Airbags knowing that they contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for years.

c.      Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the New GM-Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles, and actively concealed the danger and Inflator Defect from Plaintiffs and Class members.

d.      Takata's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the New GM-Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles, and actively concealed the danger and Inflator Defect from Plaintiffs and Class members.

206.    The New GM-Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4) and consists of "persons" associated together for a common purpose.  The New GM-Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

207.    While Defendants participated in the conduct of the New GM-Takata RICO Enterprise, each had an existence separate and distinct from the New GM-Takata RICO Enterprise.  Further, the New GM-Takata RICO Enterprise was separate and distinct from the pattern of racketeering in which Defendants have engaged.

208.    At all relevant times, Defendants operated, controlled, or managed the New GM-Takata RICO Enterprise through a variety of actions.  Defendants' participation in the New GM-Takata RICO Enterprise was necessary for the successful operation of their scheme to defraud because Defendants manufactured, marketed, and sold Class Vehicles with the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

209.    The members of the New GM-Takata RICO Enterprise all served a common purpose: to sell as many airbags, and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the New GM-Takata RICO Enterprise's members. The members of the New GM-Takata RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud.  Each member of the New GM-Takata RICO Enterprise benefited from the common purpose: Defendants sold or leased more Class Vehicles, and received more for those

vehicles, than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; Takata sold more Defective Airbags to Defendants than it would have otherwise, had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiffs and Class members.

**Pattern of Racketeering Activity**

210.    Defendants conducted and participated in the conduct of the affairs of the New GM-Takata RICO Enterprise through a long-running pattern of racketeering activity, beginning July 10, 2009, and continuing to this day, consisting of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

211.    For Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States in order to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with repairing the Inflator Defect in GM vehicles that Defendants were obligated to recall.  By concealing the scope and nature of the Inflator Defect in millions of Defective Airbags, Defendants also maintained and boosted consumer confidence in the GM brand and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped Defendants and Takata sell more vehicles and airbags than they otherwise would have sold, and to sell them at a much higher price or for a higher profit.

212.    As detailed in the General Factual Allegations, Defendants were well aware of the risks of using ammonium nitrate as the propellant in their inflators, but intentionally subjected Plaintiffs and Class members to those risks or consciously disregarded those risks in order to maximize their profits.  Moreover, even after Defendants became aware of multiple ruptures in Takata inflators being used in New GM vehicles and vehicles for which Defendants are responsible to recall, and after the Inflator Defect began maiming and killing vehicle occupants in other manufacturers' vehicles in the field, Defendants continued to conceal the nature and scope of the Inflator Defect.

213.    To further the scheme to defraud, Defendants misrepresented and concealed the nature and scope of the Inflator Defect.  Defendants repeatedly described the defect as a contained and corrected manufacturing defect that only manifested itself in certain areas of the country, when in fact Defendants knew that the Inflator Defect is a fundamental, uniform defect that manifests itself across the country, in every Takata airbag equipped in a New GM vehicle, or vehicle for which Defendants are responsible to recall.

214.    To further the scheme to defraud, Defendants concealed the nature and scope of the Inflator Defect from federal regulators, enabling Defendants to escape and delay investigation and costs associated with recalls.

215.    To further the scheme to defraud, Defendants promoted and touted the safety, reliability, and quality of their vehicles while simultaneously concealing the nature and scope of the Inflator Defect.

216.    To carry out, or attempt to carry out the scheme to defraud, Defendants have conducted or participated in the conduct of the affairs of the New GM-Takata RICO Enterprise

through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.      Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire facilities travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Takata website, communications with NHTSA, statements to the press, and communications with other members of the New GM-Takata RICO Enterprise, as well as advertisements and other communications to Defendants' customers and other purchasers of New GM vehicles and vehicles for which Defendants are responsible to recall, including Plaintiffs and Class members; and

b.      Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.

217.    Since July 10, 2009, to present, Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included, but was not limited to, the following:

a.      Defendants transmitted, or caused to be transmitted (which hereinafter also means that Defendants acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonable foreseeable), by means of mail and wire communication travelling in interstate or foreign commerce, between their offices in the United States, communications concerning the repeated failure of Takata's inflators to meet the USCAR Specifications, thereby recognizing that Takata's inflators installed in New GM vehicles and vehicles for which Defendants are responsible to recall could not meet Defendants' own safety standards.

b.      From July 10, 2009 through at least 2017, Defendants repeatedly transmitted, or caused to be transmitted, by means of the mail and wire facilities travelling in interstate or foreign commerce, between Defendants in Michigan and Takata's facilities in Georgia, Mexico, and/or Japan, countless shipments of, and payments for, millions of inflators. These regular, repeated shipments facilitated and furthered the scheme to defraud.

c.      In or around August 2009, Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Defendants in Michigan and Takata in Georgia, Washington, Mexico, and/or Michigan, communications regarding the instability of Takata's ammonium-nitrate propellant.  Defendants failed to timely disclose these facts to the public and regulators in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

d.      In or around March 2010, Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Defendants in Michigan and Takata in Mexico, communications concerning inflator ruptures that occurred during validation testing in Monclova, Mexico.  Defendants failed to timely disclose these facts and events to the public and regulators in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

e.      Between or around February 9, 2011 and February 16, 2011, Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Defendants' facilities in South Korea, Japan, and/or Michigan and Takata's offices in Japan, Michigan, and/or Germany, communications regarding a Takata airbag deployment resulting in burns to the driver's legs and related testing results for

- 76 -

Takata airbags.  Defendants failed to timely disclose these facts and events to the public and regulators in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

       f.     In or around February 2012, Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Defendants in Michigan and Takata in Mexico and/or Japan, communications concerning several "non-conformances" in inflators built for Defendants "due to high performing ballistics" that occurred during lot acceptance testing in Monclova, Mexico.  Defendants failed to timely disclose these facts and events to the public and regulators in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

       g.     In or around April 2013, Defendants transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Defendants in Michigan and other U.S. automakers that also used Takata's airbags, communications concerning the instability and ballistic variability of ammonium nitrate, thereby recognizing that Takata's inflators installed in New GM vehicles, and vehicles for which Defendants are responsible to recall, exposed vehicle occupants to an unacceptable risk of injury or death.  Defendants failed to timely disclose these facts to the public and regulators in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

       h.     On or around May 5, 2014, Defendants caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Defendants in Michigan and Takata in Japan, Mexico, and/or Michigan, communications concerning "a field event with a ruptured inflator" involving a 2013 Chevrolet Cruze vehicle.

Defendants failed to timely disclose the relationship between this rupture and the Inflator Defect
to the public and regulators in order to conceal the scope and nature of the Inflator Defect and to
promote the purported safety of GM vehicles.

        i.     On or around June 17, 2014, Defendants caused to be transmitted, by
means of mail and wire communication travelling in interstate or foreign commerce, between
Defendants in Michigan and Takata's facilities in Japan, Mexico, Georgia, and/or Michigan,
communications in which Leo Knowlden of Defendants demanded that Takata "put the story
together that may potentially limit the scope" of a recall, following the field rupture in a 2013
Chevrolet Cruze, in order to conceal the scope and nature of the Inflator Defect and to promote
the purported safety of GM vehicles.

        j.     On June 25, 2014, Defendants transmitted or caused to be transmitted, by
means of mail and wire communication travelling in interstate or foreign commerce, from their
offices in Michigan to federal regulators in Washington D.C., a recall notice announcing a
limited recall of approximately 29,000 2013-2014 Chevrolet Cruze vehicles, blaming the recall
on a manufacturing flaw instead of the Inflator Defect, in accordance with the story that
Defendants convinced Takata to endorse to "limit the scope" of a recall, in order to conceal the
scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

        k.     In or around the summer of 2014, Defendants caused to be transmitted, by
means of mail and wire communication travelling in interstate or foreign commerce, from
Defendants in Michigan to Class members in different states across the country, recall notices
stating that the front driver's side and/or passenger airbag should be replaced due to a defect.
This notice misleadingly suggests that the replacement airbag will be free of a defect, when in
fact, if it was replaced with a Takata airbag, it also would be plagued by the Inflator Defect.  This

communication was misleading and concealed the nature and scope of the Inflator Defect.

l.      On or about May 28, 2015, Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Defendants in Michigan to federal regulators in Washington D.C., a report announcing a limited recall of certain GM vehicles.  In the report's chronology, Defendants misleadingly stated that Defendants had only been investigating the safety of Takata airbag inflators "since October 26, 2014," when, in fact, Defendants had been aware for more than a decade of the risks inherent in Takata airbag inflators.  Defendants also misleadingly reported that they had "no evidence of any humidity-related ruptures in Takata airbags in GM vehicles," omitting the numerous prior ruptures about which Defendants were well aware.  Defendants made these misleading omissions and statements in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles.

m.      On or about February 3, 2016, Defendants transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Defendants in Michigan to federal regulators in Washington, D.C., a report of a limited recall of certain GM vehicles.  In the report's chronology, Defendants again misleadingly stated that Defendants had only been investigating the safety of Takata airbag inflators "since October 26, 2014," when, in fact, Defendants had been aware for more than a decade of the risks inherent in Takata airbag inflators.  Defendants also misleadingly reported that they had "no evidence of any humidity-related ruptures in Takata PSDI-5 airbag inflators in GM vehicles," omitting the numerous prior ruptures about which Defendants were well aware.  Defendants made these misleading omissions and statements in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of GM vehicles, for which Defendants are

responsible to recall.

n.     To this day, Defendants continue to transmit, or cause to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from their offices in Michigan, advertisements and communications with the public and NHTSA misrepresenting the nature and scope of the Inflator Defect.

218.   Defendants' conduct in furtherance of this scheme was intentional.  Plaintiffs and Class members were directly harmed as a result of their intentional conduct.  Plaintiffs, Class members, and federal regulators, among others, relied on Defendants' material misrepresentations and omissions.

219.   As described throughout this Complaint, on or after July 10, 2009, Defendants engaged in a pattern of related and continuous predicate acts.  The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them while providing vehicles with Defective Airbags worth significantly less than the purchase price paid.  The predicate acts also had the same or similar results, participants, victims, and methods of commission.  The predicate acts were related and not isolated events.

220.   The predicate acts all had the purpose of generating significant revenue and profits for Defendants and the New GM-Takata RICO Enterprise at the expense of Plaintiffs and Class members.  The predicate acts were committed or caused to be committed by Defendants through their participation in the New GM-Takata RICO Enterprise, and in furtherance of their fraudulent scheme, and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds, and avoiding the expenses associated with remediating the Inflator Defect.

221.     By reason of and as a result of the conduct of Defendants, and in particular, their pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.     overpayment for leased or purchased Class Vehicles, in that Plaintiffs paid for vehicles with safe airbag systems, and obtained vehicles with anything but, and were deprived of the benefit of their bargain; and

b.     the values of Class Vehicles have diminished, thus reducing their resale values.

222.     Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs; and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive relief, equitable relief, and costs and reasonable attorneys' fees, pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT 3

### Violation of the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1962(d)

223.     Plaintiffs bring this claim against Defendants on behalf of themselves and the members of the proposed Nationwide Consumer Class.

224.     In addition to the General Factual Allegations re-alleged and incorporated herein, Plaintiffs re-allege and incorporate the allegations set forth in Count 2 above.

225.     At all relevant times, Takata and Defendants were associated with the New GM-Takata RICO Enterprise, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the New GM-

Takata RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d).

226.   Since the 363 sale to New GM in July 2009, Takata and Defendants shared information about erroneous or injurious airbag deployments; jointly and secretly investigated the possible causes of those deployments; delayed and/or prevented the release of inculpatory information, misled regulatory authorities; and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed. Defendants' close cooperation with Takata on issues surrounding the Inflator Defect, and joint participation in predicate acts described below, is evidence of the conspiracy to participate in a RICO enterprise and conspiracy to conduct the affairs of such an enterprise through a pattern of racketeering activity.

## Overt Acts

227.   Defendants committed, and caused to be committed, a series of overt acts in furtherance of the conspiracy and to affect the objects thereof.  More specifically, the following conduct and overt acts demonstrate the ongoing conspiracy between Defendants and Takata:

a.   The volatility and instability of ammonium-nitrate propellant has been underscored by the glaring and persistent quality control problems that have plagued Takata's manufacturing operations.  These problems were well known or should have been well known to Defendants almost immediately after the 363 sale.

b.   In the summer of 2009, Honda initiated its first significant recall of Takata airbags in the United States, recalling approximately 440,000 vehicles as a result of the Inflator Defect.  Defendants, knowing that they used the same Takata airbags in their own vehicles that likewise contained the same ammonium-nitrate propellant, expressed concern to Takata about

"AN [ammonium nitrate] propellant stability."  However, Defendants ultimately did nothing to remedy the problem and kept purchasing inflators from Takata.

c.      Defendants continued to encounter ruptures in Takata airbags in New GM vehicles and vehicles for which Defendants are responsible to recall.  From the period of March 2010 to April 2010, three more energetic disassemblies were detected during testing of Takata airbag inflators made for New GM at Takata's Monclova facility. Again, Defendants failed to take proper action and concealed from Plaintiffs and Class members their knowledge of these events.

d.      These energetic disassemblies began to emerge in the field as well.  In 2011, New GM reported to Takata that a driver in a GM vehicle suffered from burns when a Takata airbag deployed.  In 2014, an energetic disassembly occurred in a New GM vehicle in the field.  However, both Takata and Defendants deceptively blamed the airbag rupture on a manufacturing problem and issued only a limited recall.

e.      Defendants did not commence recalls for their vehicles until approximately February 2014.  Defendants mischaracterized the Inflator Defect as the product of idiosyncratic manufacturing flaws.  Later, Defendants limited the scope of additional recalls to humid parts of the country.  Defendants falsely claimed that the risks caused by the Inflator Defect disappeared to the north of some arbitrary latitude in the American South.

228.    In addition, Takata engaged in the following predicate acts in furtherance of the conspiracy:

a.      In mid-to-late 2004, following a May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, Takata transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign

commerce, from its offices in Japan and/or Michigan to the offices of Honda in California and offices of regulators in Washington, D.C., representations that the rupture was an "anomaly," even though it resulted from the Inflator Defect, thereby concealing the nature and scope of the Inflator Defect.

b.      In November 2008, Takata caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., regulatory filings stating that approximately 4,000 vehicles subject to a 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

c.      In December 2008, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  This letter did not sufficiently communicate the severity of the threat to life and limb, and concealed the scope and nature of the Inflator Defect.  Owners were merely advised to make an appointment to have their vehicle repaired, with no sense of urgency.  In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

d.      On July 29, 2009, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the earlier recall.  This report stated that "[t]he VIN

range reflects all possible vehicles that could potentially experience the problem."  In light of the 100-fold recall expansion, this filing was misleading and served to conceal and/or minimize the threats posed by the Defective Airbags.

e.       On September 16, 2009, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C. information concerning the initial, narrow recalls of Takata's inflators.  NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall.  Among other things, this letter explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter recall.  But the letter fraudulently omitted that one of those deployments caused Ashley Parham's death.  Also, the letter claimed that the manufacturing problem was limited to only one high-precision compression press.  Because Takata was by then aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving and misleading. In addition to the quality control problems stated above, during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks found in inflators in the Monclova, Mexico plant.  Once again, NHTSA, and by extension the public, were deprived of accurate and complete information.  As a result of this letter, the Office of Defect Investigation closed its investigation into these two recalls.  Takata thereby concealed the nature and scope of the Inflator Defect.

f.       On February 9, 2010, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., another recall communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all possible vehicles that could potentially

experience the problem."  The explanation of the defect in this communication—that two processes were used to prepare the inflator propellant and that one of them was not within specifications—was misleading in light of what Takata knew, or at least should have known in light of the extensive problems at Takata's Monclova, Mexico plant.

g.      On February 19, 2010, Takata transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan and/or Japan a response to NHTSA's November 20, 2009 letter seeking more information about earlier inflator recalls.  Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08V-593 and 09V-259 to any customers other than Honda."  This statement was patently incorrect, as over 10 manufacturers have recalled vehicles containing Defective Airbags since that statement was made.  This statement concealed the nature and scope of the Inflator Defect.

h.      On April 27, 2011, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., additional recall communications again misleadingly stating that another recall covered "all possible vehicles" with the problem.  As before, the letter to owners and lessees did not sufficiently raise a sense of urgency.  This statement concealed the nature and scope of the Inflator Defect.

i.      On April 11, 2013, Takata transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of federal regulators in Washington, D.C., misrepresentations that the defect was limited to inflators produced at a specific plant between

- 86 -

certain dates due to a manufacturing error, again concealing the nature and scope of the Inflator Defect.

j.      On June 11, 2014, Takata transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan or Japan to the ODI in Washington, D.C., a letter titled "Takata Support for Regional Field Actions to Address Potential Inflator Issues."  Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the Virgin Islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico."  Takata misleadingly omitted Ashely Parham's death in Oklahoma in May 2009, Gurjit Rathore's death in December 2009 in Virginia, and Brandi Owens's injury in October 2013 in Georgia.  By focusing on areas of high humidity, this communication concealed the nature and scope of the Inflator Defect.

229.    Defendants agreed to, and did engage and participate in, the conduct of the New GM-Takata RICO Enterprise's affairs, through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs and Class members, as more fully described above.

230.    As a direct and proximate result of Defendants' conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.      overpayment for leased or purchased Class Vehicles, in that Plaintiffs paid for vehicles with safe airbag systems, and obtained vehicles with anything but, and have been deprived of the benefit of their bargain; and

        b.      the values of Class Vehicles have diminished, thus reducing their resale values.

231.    Plaintiffs and Class Members seek to hold Defendants liable only for damages resulting from conduct of Defendants, their co-conspirators, and the New GM-Takata RICO Enterprise that occurred on or after July 10, 2009.

232.    Had Defendants been entirely forthcoming with NHTSA and with the public in a timely manner about the vast scope of the Inflator Defect and the grave risks it posed to countless vehicle occupants, as was their duty, Plaintiffs would not have suffered these harms. Defendants' conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension, and was committed with reckless indifference to the truth if not the outright intent to deceive.

233.    Defendants' conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiffs to treble damages under 18 U.S.C. § 1964(c).

234.    Defendants' violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

B.      **Common Law Claims**

**COUNT 4**

**Fraud**

235.    Plaintiffs bring this claim against Defendants on behalf of themselves and the members of the Nationwide Consumer Class (excluding Class Members who purchased a Class Vehicle in Florida or Pennsylvania) under the common law of fraud, as there are no true conflicts (case-dispositive differences) among various states' laws of fraud.  In the alternative, Plaintiffs bring this claim against Defendants under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

236.    As described above, Defendants made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

237.    Defendants concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag, and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy, and seriously injure occupants through contact with the airbag.

238.    Defendants took steps to ensure that their employees did not reveal the known Inflator Defect to regulators or consumers.

239.    On information and belief, Defendants still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect.

240.    Defendants had a duty to disclose the Inflator Defect because they:

a.      Had exclusive and/or far superior knowledge and access to the facts, and Defendants knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.      Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.      Made incomplete representations about the safety and reliability of the Defective Airbags and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

241.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer.  Plaintiffs and Class Members trusted Defendants not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety, and to uphold their recall obligations under the Sale Agreement and governing laws.

242.    Defendants concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective Airbags and Class Vehicles were capable of performing safely, as represented by Defendants and reasonably expected by consumers.

243.    Defendants also misrepresented the safety and reliability of the Defective Airbags and Class Vehicles, because they either (a) knew but did not disclose the Inflator Defect; (b) knew that they did not know whether their safety and reliability representations were true or false; or (c) should have known that their misrepresentations were false.

- 90 -

244.    Defendants actively concealed or suppressed these material facts, in whole or in part, to maintain a market for their vehicles, to protect their profits, and to avoid recalls that would hurt the brand's image and cost Defendants money.  Defendants did so at the expense of Plaintiffs and the Class.

245.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

246.    Had they been aware of the Defective Airbags installed in the Class Vehicles, and Defendants' callous disregard for safety, Plaintiffs and the Class either would have paid less for their Class Vehicles, or they would not have purchased or leased them at all.  Plaintiffs and Class members did not receive the benefit of their bargain as a result of Defendants' fraudulent conduct.

247.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Defendants' concealment of, failure to timely disclose, and/or misrepresentations concerning the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Defendants' conduct.

248.    The value of all Class members' vehicles has diminished as a result of Defendants' fraudulent conduct in connection with the Inflator Defect, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

249.    Accordingly, Defendants are liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the

Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

250.    Defendants' acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Defendants.  Defendants' conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 5

### Negligence

251.    Consumer Plaintiffs bring this claim against Defendants on behalf of themselves and the members of the Nationwide Consumer Class (excluding Class Members who purchased a Class Vehicle in Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, or South Carolina), under the common law of negligence, as there are no true conflicts (case-dispositive differences) among various states' laws of negligence.  In the alternative, Plaintiffs bring this claim against Defendants under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

252.    Defendants owed a duty of care to the Consumer Plaintiffs and Class members, who were foreseeable end users, to design and manufacture their vehicles so that they would not be defective or unreasonably dangerous to foreseeable end users, including Consumer Plaintiffs and Class members.

253.    Defendants breached their duty of care by, among other things:

a.      Negligently and recklessly equipping the Class Vehicles with Defective Airbags;

b.      Negligently and recklessly failing to take all necessary steps to ensure that their products function as designed, specified, promised, and intended—which can mean the difference between life and death in an accident;

c.      Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect—e.g., use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in its inflators; and

e.      Negligently and recklessly concealing the nature and scope of the Inflator Defect.

254.    Defendants' negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Consumer Plaintiffs and Class members, as well as ongoing foreseeable damages that Consumer Plaintiffs and Class members continue to suffer to this day.

255.    As a direct, actual, and proximate result of Defendants' misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages, which are continuing in nature, including:

a.      the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.      the continued exposure of Consumer Plaintiffs and Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

- 93 -

256.     Defendants' negligence is ongoing and continuing, because Defendants continue to obfuscate the facts and critical nature of the situation; not fully cooperate with regulatory authorities; and manufacture replacement airbags that are defective and unreasonably dangerous—suffering from the same serious Inflator Defect of the original airbags at issue in this litigation, and posing the same unreasonable risk of serious foreseeable harm or death.

257.     In addition to damages, Consumer Plaintiffs and Class Members seek injunctive relief to enjoin Defendants from continuing their negligence by continuing to install Defective Airbags in Class Vehicles.

## COUNT 6

### Unjust Enrichment

258.     Consumer Plaintiffs (excluding those who did not purchase a Class Vehicle from a New GM dealership) bring this claim on behalf of themselves, and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment.  In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

259.     Defendants have received and retained a benefit from the Plaintiffs and inequity has resulted.

260.     Defendants benefitted through their unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

261.     It is inequitable for Defendants to retain these benefits.

262.     Consumer Plaintiffs do not have an adequate remedy at law.

263. As a result of Defendants' conduct, the amount of their unjust enrichment should be disgorged, in an amount to be proven at trial.

## II.     State Class Claims

### A.     Claims Brought on Behalf of the Alabama Consumer Class

### COUNT 7

#### Violation of the Alabama Deceptive Trade Practices Act
#### Ala. Code § 8-19-1

264. This claim is brought by the Alabama Consumer Plaintiffs on behalf of themselves and the Alabama Consumer Class against Defendants.

265. Alabama Consumer Plaintiffs and the Alabama Consumer Class are "consumers" within the meaning of Ala. Code § 8-19-3(2).

266. Defendants, the Alabama Consumer Plaintiffs, and the Alabama Consumer Class members are "persons" within the meaning of Ala. Code § 8-19-3(5).

267. The Class Vehicles are "goods" within the meaning of Ala. Code. § 8-19-3(3).

268. Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

269. The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including: "(5) [r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have," "(7) [r]epresenting that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another," and "(27) [e]ngaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce." Ala. Code § 8-19-5.

270.    By misrepresenting the Class Vehicles and/or the Defective Airbags as safe and
by failing to disclose and actively concealing the Inflator Defect, Defendants engaged in
deceptive business practices prohibited by the Alabama DTPA, including:

a.    Knowingly making a false representation as to the characteristics, uses,
and benefits of the Class Vehicles and/or the Defective Airbags;

b.    Knowingly making a false representation as to whether the Class Vehicles
and/or the Defective Airbags are of a particular standard, quality, or grade;

c.    Advertising the Class Vehicles and/or the Defective Airbags with the
intent not to sell them as advertised; and

d.    Engaging in unconscionable, false, or deceptive acts or practices in
connection with the sale of the Class Vehicles and/or the Defective Airbags.

271.    Defendants have known of the Inflator Defect in the Defective Airbags since at
least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and
personnel and the knowledge about the defective Takata airbags those books, records, and
personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed
by the Class Vehicles and/or the Defective Airbags installed in them.

272.    By failing to disclose and by actively concealing the Inflator Defect in the Class
Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and
of high quality, and by presenting themselves as reputable manufacturers that value safety,
Defendants engaged in unfair or deceptive business practices in violation of the Alabama DTPA.
Defendants deliberately withheld the information about the propensity of the Defective Airbags
to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

273.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

274.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers and were likely to and did in fact deceive reasonable consumers, including the Alabama Consumer Plaintiffs and the Alabama Consumer Class members about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

275.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead the Alabama Consumer Plaintiffs and the Alabama Consumer Class members.

276.    Defendants knew or should have known that their conduct violated the Alabama DTPA.

277.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

278.   To protect their profits, and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, and their tragic consequences and allowed unsuspecting new and used car purchasers to continue to buy, lease, and drive the highly dangerous Class Vehicles.

279.   Defendants owed the Alabama Consumer Plaintiffs and the Alabama Consumer Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from the Alabama Consumer Plaintiffs and the Alabama Consumer Class; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Alabama Consumer Plaintiffs and the Alabama Consumer Class that contradicted these representations.

280.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

281.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Alabama Consumer Plaintiffs and the Alabama Consumer Class.  A vehicle made by a reputable manufacturer of safe

vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

282.    The Alabama Consumer Plaintiffs and the Alabama Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them and Defendants' complete disregard for safety, the Alabama Consumer Plaintiffs and the Alabama Consumer Class members either would not have paid as much for their vehicles or would not have purchased or leased them at all.  The Alabama Consumer Plaintiffs and the Alabama Consumer Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

283.    Defendants' violations present a continuing risk to the Alabama Consumer Plaintiffs and the Alabama Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

284.    As a direct and proximate result of Defendants' violations of the Alabama DTPA, the Alabama Consumer Plaintiffs and the Alabama Consumer Class have suffered injury-in-fact and/or actual damage.

285.    Pursuant to Ala. Code § 8-19-10, Alabama Consumer Plaintiffs and the Alabama Consumer Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Sub-Class member.

286.    Alabama Consumer Plaintiffs and the Alabama Consumer Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Ala. Code § 8-19-1.

287.    In accordance with Ala. Code § 8-19-10(e), Plaintiffs' counsel, on behalf of Alabama Consumer Plaintiffs and the Alabama Consumer Class, served Defendants with notice of their alleged violations of the Alabama DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Alabama Sub-Class and demanded that Defendants correct or agree to correct the actions described therein.   As Defendants has failed to do so, Plaintiffs seek compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

**B.    Claims Brought on Behalf of the California Consumer Class**

**COUNT 8**

**Violation of the California Unfair Competition Law,
Cal. Bus. & Prof. Code § 17200**

288.    Plaintiffs bring this claim on behalf of themselves and the California Consumer Class against Defendants.

289.    Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ."  Defendants engaged in conduct that violated each of this statute's three prongs.

290.    Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, as set forth below, by the acts and practices set forth in this Complaint.

291.    Defendants also violated the unlawful prong because they have engaged in violations of the TREAD Act, 49 U.S.C. § 30101, and its accompanying regulations, by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

292.    Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify the NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related.  *See* 49 C.F.R. § 573.6.

293.    Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the Inflator Defect or any of the other dangers or risks posed by the Defective Airbags within five days of determining the defect existed, and failing to recall all Class Vehicles.

294.    Defendants violated the common law claim of negligent failure to recall, in that Defendants knew, or should have known, that the Class Vehicles and/or the Defective Airbags installed in them were dangerous, and/or were likely to be dangerous when used in a reasonably foreseeable manner; Defendants became aware of the attendant risks after they were sold; Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by them; and Defendants failed to adequately recall them in a timely manner, which failure was a substantial factor in causing harm to Plaintiffs and the California Consumer Class, including diminished value and out-of-pocket costs.

295.    Defendants committed unfair business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  Defendants represented that

the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

296.   Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with the Defective Airbags installed in them. As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for Plaintiffs and the California Consumer Class whose vehicles are in the process of being repaired.

297.   Defendants violated the fraudulent prong of § 17200, because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles, and/or the Defective Airbags installed in them, as set forth in this Complaint, were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

298.   Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.  Defendants' active concealment of the dangers and risks posed by the Class Vehicles, and/or the Defective Airbags installed in them, are likely to mislead the public with regard to their true defective nature.

299.   Defendants violated the unfair prong of § 17200, because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them, and Defendants' failure to adequately investigate, disclose

and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the California Class from making fully informed decisions about whether to purchase or lease Class Vehicles, and/or the Defective Airbags installed in them, and/or the price to be paid to purchase or lease them.

300. Plaintiffs and the California Consumer Class have suffered injuries in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or deceptive practices. As set forth above, each member of the California Consumer Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of Defendants with respect of the safety and reliability of the vehicles. Had Plaintiffs and the California Consumer Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

301. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

302. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the California Consumer Class have suffered and will continue to suffer actual damages.

303. Plaintiffs and the California Consumer Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

## COUNT 9

### Violation of the California False Advertising Law,
### Cal. Bus. & Prof. Code § 17500

304.    Plaintiffs bring this claim against Defendants on behalf of themselves and the California Consumer Class.

305.    California Bus. & Prof. Code § 17500 provides that "[i]t is unlawful for any . . . corporation . . . with intent directly or indirectly to dispose of real or personal property . . . to induce the public to enter into any obligation relating thereto, to make or disseminate or cause to be made or disseminated . . . from this state before the public in any state, in any newspaper or other publication, or any advertising device, . . . or in any other manner or means whatever, including over the Internet, any statement . . . which is untrue or misleading, and which is known, or which by the exercise of reasonable care should be known, to be untrue or misleading."

306.    Defendants caused to be made or disseminated through California and the United States, through advertising, marketing and other publications, statements that were untrue or misleading, and which were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and the California Consumer Class.

307.    Defendants violated § 17500, because the misrepresentations and omissions regarding the safety, reliability, and functionality of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were material and likely to deceive a reasonable consumer.

308.    Plaintiffs and the California Consumer Class have suffered an injury in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or

deceptive practices.  In purchasing or leasing their Class Vehicles, Plaintiffs and the California Consumer Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them. Defendants' representations turned out not to be true because the Class Vehicles and/or the Defective Airbags installed in them are inherently defective and dangerous in that the Defective Airbags violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.  Had Plaintiffs and the California Consumer Class known the truth, they would not have purchased or leased their Class Vehicles and/or paid as much for them.   Accordingly, Plaintiffs and the California Consumer Class members overpaid for their Class Vehicles and did not receive the benefit of their bargain.

309.    All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' business.  Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated, both in the State of California and nationwide.

310.    Plaintiffs, individually and on behalf of the California Consumer Class members, request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices and to restore to Plaintiffs and the California Consumer Class any money Defendants acquired by unfair competition, including restitution and/or restitutionary disgorgement, and for such other relief set forth below.

**COUNT 10**

**Violation of the California Consumer Legal Remedies Act,
Cal. Civ. Code § 1750**

311.  Plaintiffs bring this claim on behalf of themselves and the members of the California Consumer Class, under the laws of California against Defendants.

312.  The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

313.  Plaintiffs, the California Consumer Class, and Defendants, are "persons," as defined in Cal. Civ. Code § 1761(c).

314.  Plaintiffs and the California Consumer Class members are "consumers," as defined in Cal. Civ. Code § 1761(d).

315.  California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code § 1750, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

316.  Defendants engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, as described above and below, by among other things, representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

317.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

318.    Defendants also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and omitting material facts in describing them.  Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA. Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

319.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles, and/or the Defective Airbags installed in them.

320.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the CLRA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

321.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles, and/or the Defective Airbags installed in them, with an intent to mislead Plaintiffs and the California Consumer Class.

322.    Defendants knew or should have known that their conduct violated the CLRA.

323.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

324.    To protect their profits, and avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles, and/or the Defective Airbags installed in them, along with their tragic consequences, allowed unsuspecting new and used car purchasers or lessees to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

325.    Defendants owed Plaintiffs and California Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles, and/or the Defective Airbags installed in them, because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from the Plaintiffs and California Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing

- 108 -

generally, while purposefully withholding material facts from Plaintiffs and California Consumer Class that contradicted these representations.

326.    The Class Vehicles and/or the Defective Airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs and California Consumer Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

327.    Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs and California Consumer Class, about the true safety and reliability of the Class Vehicles, and/or the Defective Airbags installed in them.  Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the California Consumer Class.

328.    Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. § 30101, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

329.    Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect.  49 U.S.C. § 30118(c)(1) & (2).

330.     Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect.  49 U.S.C. § 30118(b)(2)(A) & (B).

331.     Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist."  49 C.F.R. § 573.6(a) & (b).  At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

332.     The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect.  49 C.F.R. § 276.6(b) & (c).

333.     The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government.  The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000."  49 C.F.R. § 578.6(c).

334.    Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, by failing to disclose and by actively concealing dangers and risks posed by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

335.    Defendants knew that the Class Vehicles and/or the Defective Airbags installed in them contained the Inflator Defect that could cause the airbags to aggressively deploy and/or violently explode and expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, but Defendants failed for many years to inform NHTSA of this defect.  Consequently, the public, including Plaintiffs and the California Consumer Class, received no notice of the Inflator Defect. Defendants failed to inform NHTSA or warn Plaintiffs, the California Consumer Class, and the public about these inherent dangers, despite having a duty to do so.

336.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and California Consumer Class members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

337.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

338.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and California

Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

339.    Plaintiffs and the California Consumer Class suffered ascertainable losses caused by Defendants' misrepresentations and failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles, and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and California Consumer Class members either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs and California Consumer Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

340.    Plaintiffs and California Consumer Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the California Consumer Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

341.    The recalls and repairs instituted by Defendants have not been adequate.  The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with Defective Airbags susceptible to the malfunctions described herein.  Moreover, Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiffs and the California Consumer Class.

342.    As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and California Consumer Class have suffered injury-in-fact and/or actual damage.  Plaintiffs and California Consumer Class currently own or lease, or within the class period have owned or

leased Class Vehicles with Defective Airbags installed in them that are defective and inherently unsafe.  Plaintiffs and California Consumer Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and California Consumer Class, as well as to the general public.

343.   In accordance with § 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of all Plaintiffs and the California Consumer Class, served Defendants with notice of their alleged violations of California Civil Code § 1770(a) relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the California Consumer Class, and demanded that Defendants correct or agree to correct the actions described therein.  Defendants have failed to do so.  Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and the California Consumer Class are entitled.

## COUNT 11

### Violation of the Song-Beverly Consumer Warranty Act for
### Breach of the Implied Warranty of Merchantability,
### Cal. Civ. Code § 1791

344.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Plaintiffs bring this claim on behalf of themselves and the California Consumer Class, under the laws of California against Defendants.

345.   Plaintiffs and members of the Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

346.   The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

347.   Each Defendant is a "manufacturer" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

348.   Defendants impliedly warranted to Plaintiffs and the Class that their Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

349.   Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)   Pass without objection in the trade under the contract description.

(2)   Are fit for the ordinary purposes for which such goods are used.

(3)   Are adequately contained, packaged, and labeled.

(4)   Conform to the promises or affirmations of fact made on the container or label.

350.   The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective Airbags, which among other things, have a tendency to: (a) rupture and expel metal shrapnel that tears through the airbag, and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, instead of protecting vehicle occupants from bodily injury during accidents.

351.   Because of the Inflator Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

352.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Inflator Defect.  Defendants failed to warn about that dangerous Inflator Defect in the Class Vehicles.

353.    Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective Airbags containing the Inflator Defect which among other things, causes the airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.   The Defective Airbags have deprived Plaintiffs and the California Consumer Class of the benefit of their bargain, and have caused the Class Vehicles to depreciate in value.

354.    Notice of breach is not required because Plaintiffs and the California Consumer Class did not purchase their automobiles directly from Defendants.  Further, on information and belief, Defendants had notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

355.    As a direct and proximate result of Defendants' breach of their duties under California's Lemon Law, Plaintiffs and the California Consumer Class received goods whose dangerous condition substantially impairs their value.  Plaintiffs and the California Consumer Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

356.    Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the California Consumer Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

357.    Under Cal. Civ. Code § 1794, Plaintiffs and the California Consumer Class are entitled to costs and attorneys' fees.

C.    **Claims Brought on Behalf of the Florida Consumer Class**

**COUNT 12**

**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. § 501.201**

358.    This claim is brought by Plaintiffs, individually and on behalf of the Florida Consumer Class, against Defendants.

359.    The Florida Consumer Plaintiffs and the Florida Consumer Class members are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

360.    Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

361.    The FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Fla. Stat. § 501.204(1).  Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

362.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

363.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

364.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

365.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

366.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class

- 117 -

Vehicles, and/or the Defective Airbags installed in them, were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

367.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including the Florida Consumer Plaintiffs and the Florida Consumer Class members, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

368.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles, and/or the Defective Airbags installed in them with an intent to mislead the Florida Consumer Plaintiffs and the Florida Consumer Class.

369.   Defendants knew or should have known that their conduct violated the FDUTPA.

370.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

371.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

372.    Defendants owed the Florida Consumer Plaintiffs and the Florida Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles, and/or the Defective Airbags installed in them, because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from the Florida Consumer Plaintiffs and the Florida Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from the Florida Consumer Plaintiffs and the Florida Consumer Class that contradicted these representations.

373.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles, and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

374.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Florida Consumer Plaintiffs and the Florida Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

375.    The Florida Consumer Plaintiffs and the Florida Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or

- 119 -

the Defective Airbags installed in them, and Defendants' complete disregard for safety the Florida Consumer Plaintiffs and the Florida Consumer Class members either would have paid less for their vehicles or would not have purchased them at all.  The Florida Consumer Plaintiffs and the Florida Consumer Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

376.    The Florida Consumer Plaintiffs and the Florida Consumer Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the FDUTPA, and these violations present a continuing risk to the Florida Consumer Plaintiffs and the Florida Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

377.    As a direct and proximate result of Defendants' violations of the FDUTPA, the Florida Consumer Plaintiffs and the Florida Consumer Class have suffered injury-in-fact and/or actual damage.

378.    The Florida Consumer Plaintiffs and the Florida Consumer Class members are entitled to recover their actual damages under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat. § 501.2105(1).

379.    The Florida Consumer Plaintiffs and the Florida Consumer Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**D.      Claims Brought on Behalf of the Georgia Consumer Class**

**COUNT 13**

**Violation of the Georgia Fair Business Practices Act**
**Ga. Code Ann. § 10-1-390**

380.    This claim is brought by the Georgia Consumer Plaintiffs individually and on behalf of the Georgia Consumer Class against Defendants.

381.    Georgia Consumer Plaintiffs and the Georgia Consumer Class members are "consumers" within the meaning of Ga. Code Ann. § 10-1-392(6).

382.    Georgia Consumer Plaintiffs, the Georgia Consumer Class members, and Defendants are "persons" within the meaning Ga. Code Ann. § 10-1-392(24).

383.    Defendants were and are engaged in "trade" and "commerce" within the meaning of Ga. Code Ann. § 10-1-392(28).

384.    The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade … if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

385.    By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in unfair or deceptive practices prohibited by the Georgia FBPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and

qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised.  Defendants participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

386.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

387.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

388.  Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

389.  By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia FBPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

390.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

391.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

392.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Georgia Consumer Plaintiffs and the Georgia Consumer Class.

393.    Defendants knew or should have known that their conduct violated the Georgia FBPA.

394.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

395.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

396.    Defendants owed Georgia Consumer Plaintiffs and the Georgia Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Georgia Consumer Plaintiffs and the Georgia Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Georgia Consumer Plaintiffs and the Georgia Consumer Class that contradicted these representations.

397.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

398.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Georgia Consumer Plaintiffs and the Georgia Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles

is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

399.   Georgia Consumer Plaintiffs and the Georgia Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Georgia Consumer Plaintiffs and the Georgia Consumer Class would have paid less for their vehicles or would not have purchased or leased them at all.  Georgia Consumer Plaintiffs and the Georgia Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

400.   Defendants' violations present a continuing risk to Georgia Consumer Plaintiffs and the Georgia Consumer Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

401.   As a direct and proximate result of Defendants' violations of the Georgia FBPA, Georgia Consumer Plaintiffs and the Georgia Consumer Class have suffered injury-in-fact and/or actual damage.

402.   Georgia Consumer Plaintiffs and the Georgia Consumer Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

403.   Georgia Consumer Plaintiffs and the Georgia Consumer Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

404.    In accordance with Ga. Code Ann. § 10-1-399(b), Plaintiffs' counsel, on behalf of Plaintiffs, served Defendants with notice of their alleged violations of the Georgia FBPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and Class Members, and demanded that Defendants correct or agree to correct the actions described therein.  Defendants have failed to do so.  Plaintiffs therefore seek compensatory and monetary damages to which Plaintiffs and Class Members are entitled.

## COUNT 14

### Violation of the Georgia Uniform Deceptive Trade Practices Act
### Ga. Code Ann. § 10-1-370

405.    This claim is brought by the Georgia Consumer Plaintiffs individually and on behalf of the Georgia Consumer Class against Defendants.

406.    Georgia Consumer Plaintiffs, the Georgia Consumer Class members, and Defendants are "persons" within the meaning of the Georgia Uniform Deceptive Trade Practices Act ("Georgia UDTPA"), Ga. Code Ann. § 10-1-371(5).

407.    The Georgia UDTPA prohibits "deceptive trade practices," which include the "misrepresentation of standard or quality of goods or services," and "engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding." Ga. Code Ann. § 10-1-372(a).  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive trade practices prohibited by the Georgia UDTPA.

408.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

409.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

410.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

411.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia UDTPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

412.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

413.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

414.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Georgia Consumer Plaintiffs and the Georgia Consumer Class.

415.    Defendants knew or should have known that their conduct violated the Georgia UDTPA.

416.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

417.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

418.    Defendants owed Georgia Consumer Plaintiffs and the Georgia Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Georgia Consumer Plaintiffs and the Georgia Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Georgia Consumer Plaintiffs and the Georgia Consumer Class that contradicted these representations.

419.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

420.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Georgia Consumer Plaintiffs and the Georgia Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

421.    Georgia Consumer Plaintiffs and the Georgia Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or

the Defective Airbags installed in them, and Defendants' complete disregard for safety, Georgia Consumer Plaintiffs and the Georgia Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

422.    Defendants' violations present a continuing risk to Georgia Consumer Plaintiffs and the Georgia Consumer Class as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

423.    As a direct and proximate result of Defendants' violations of the Georgia UDTPA, Georgia Consumer Plaintiffs and the Georgia Consumer Class have suffered injury-in-fact and/or actual damage.

424.    Georgia Consumer Plaintiffs and the Georgia Consumer Class seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia UDTPA per Ga. Code Ann. § 10-1-373.

**E.    Claims Brought on Behalf of the Indiana Consumer Class**

**COUNT 15**

**Violation of the Indiana Deceptive Consumer Sales Act,**
**Ind. Code § 24-5-0.5-1**

425.    This claim is brought by the Indiana Consumer Plaintiffs individually and on behalf of the Indiana Consumer Class against Defendants.

426.    Each Defendant is a "person" within the meaning of Ind. Code § 24-5-0.5-2(2) and "suppliers" within the meaning of Ind. Code § 24-5-0.5-2(a)(3).

427.    The Indiana Consumer Plaintiffs' and the Indiana Consumer Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

428.    Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval, status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

429.    Defendants participated in misleading, false, or deceptive acts that violated the Indiana DCSA, by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.  Defendants also engaged in unlawful trade practices by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard and quality when they are not; (3) advertising

them with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct likely to deceive.

430.    Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

431.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

432.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

433.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Indiana DCSA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

434.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

435.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Indiana Consumer Plaintiffs and the Indiana Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

436.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Indiana Consumer Plaintiffs and the Indiana Consumer Class.

437.    Defendants knew or should have known that their conduct violated the Indiana DCSA.

438.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

439.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

440.    Defendants owed the Indiana Consumer Plaintiffs and the Indiana Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Indiana Consumer Plaintiffs and the Indiana Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Indiana Consumer Plaintiffs and the Indiana Consumer Class that contradicted these representations.

441.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

442.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Indiana Consumer Plaintiffs and the Indiana Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is

- 134 -

worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

443.    Indiana Consumer Plaintiffs and the Indiana Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Indiana Consumer Plaintiffs and the Indiana Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

444.    Defendants' violations present a continuing risk to Indiana Consumer Plaintiffs and the Indiana Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

445.    As a direct and proximate result of Defendants' violations of the Indiana DCSA, Indiana Consumer Plaintiffs and the Indiana Consumer Class have suffered injury-in-fact and/or actual damage.

446.    Pursuant to Ind. Code § 24-5-0.5-4, Indiana Consumer Plaintiffs and the Indiana Consumer Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Indiana Consumer Plaintiffs and the Indiana Consumer Class member, including treble damages up to $1,000 for Defendants' willfully deceptive acts.

447.    Indiana Consumer Plaintiffs and the Indiana Consumer Class also seek punitive damages based on the outrageousness and recklessness of Defendants' conduct and Defendants' high net worth.

448.    In accordance with Ind. Code § 24-5-0.5-5(a), Plaintiffs' counsel, on behalf of all Plaintiffs and Class Members, served Defendants with notice of their "curable" alleged violations of the Indiana DCSA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and Class Members, and demanded that Defendants correct or agree to correct the actions described therein.  Because Defendants failed to do so, Plaintiffs and Class Members seek compensatory and monetary damages to which they are entitled.  Plaintiffs and Class Members presently seek full relief for Defendants' "incurable" acts.

## COUNT 16

### Breach of the Indiana Implied Warranty of Merchantability, Ind. Code § 26-1-2-314

449.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Indiana Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Indiana Consumer Class under the laws of Indiana against Defendants.

450.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Ind. Code § 26-1-2-104(1).

451.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Ind. Code § 26-1-2-314.

452.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which

cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

453.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

454.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Indiana Consumer Plaintiffs and the Indiana Consumer Class have been damaged in an amount to be proven at trial.

## F.    Claims Brought on Behalf of the Kentucky Consumer Class

### COUNT 17

**Breach of Implied Warranty of Merchantability,**
**Kentucky Rev. Stat. §§ 355.2, *et. seq.***

455.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Kentucky Consumer Sub-Class against Defendants.

456.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kentucky Rev. Stat. §§ 355.2-105(1) and 355.2A-103(h).

457.    Each Defendant was at all relevant times a "seller" and "merchant" with respect to the Class Vehicles under Kentucky Rev. Stat. §§ 355.2-103 and 355.2-104, and, with respect

to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Kentucky Rev. Stat. § 355.2A-103.

458.    Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of Kentucky Rev. Stat. §§ 355.2-103(1) and 355.2A-103(n).

459.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

460.    Plaintiffs and Class Members bought or leased Class Vehicles manufactured, marketed to them, warranted, and intended to be purchased by buyers or lessees such as them, by Defendants, and are in privity with Defendants through their purchases.

461.    Plaintiffs and Class Members have had sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract between Plaintiff and Class Members and Defendants. Further, the written, express warranties issued by Defendants with buyers/lessees of the Class Vehicles as its intended beneficiaries create a direct contractual relationship between Defendants and Plaintiffs and Class Members.

462.    Further, Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Defendants and New GM dealers; specifically, they are the intended beneficiaries of Defendants' express and implied warranties. The dealers were not intended to be the ultimate buyers or lessees of the Class Vehicles and have no rights under the warranties provided with the Class Vehicles; the warranties were designed for and intended to benefit the ultimate buyers and lessees only. Moreover, privity is not required where a manufacturer makes representations directly to intended buyers and lessees, as Defendants did here.

463.    When it sold or leased its Class Vehicles, Defendants extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Kentucky Rev. Stat. §§ 355.2-314 and 355.2A-212.

464.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.  Moreover, because of the Inflator Defect, the Class Vehicles would not pass without objection in the trade.

465.    Any attempt by Defendants to disclaim the implied warranty of merchantability is unenforceable and unconscionable because it does not meet the requirements of Kentucky Rev. Stat. § 355.2-316(2).

466.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

467.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Kentucky Consumer Sub-Class have been damaged in an amount to be proven at trial.

G.     **Claims Brought on Behalf of the Louisiana Consumer Class**

**COUNT 18**

**Breach of the Implied Warranty of Merchantability/Warranty
Against Redhibitory Defects
La. Civ. Code Ann. arts. 2520, 2524**

468.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Louisiana Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Louisiana Consumer Class under the laws of Louisiana against Defendants.

469.    At the time Louisiana Consumer Plaintiffs and the Louisiana Consumer Class members acquired their Class Vehicles, those vehicles had a redhibitory defect within the meaning of La. Civ. Code Ann. art. 2520, in that the Class Vehicles and/or the Defective Airbags installed in them were rendered so inconvenient that Louisiana Consumer Plaintiffs and the Louisiana Consumer Class either would not have purchased the Class Vehicles had they known of the Inflator Defect, or, because the Defective Airbags so diminished the usefulness and/or value of the Class Vehicles such that it must be presumed that the Plaintiffs would not have purchased the Class Vehicles, but for a lesser price.

470.    No notice of the defect is required under La. Civ. Code Ann. art. 2520, since Defendants had knowledge of the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them at the time they were sold to Louisiana Consumer Plaintiffs and the Louisiana Consumer Class.

471.    Under La. Civ. Code Ann. art. 2524, a warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs purchased their Class Vehicles.

- 140 -

472.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

473.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

474.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Louisiana Consumer Plaintiffs and the Louisiana Consumer Class have been damaged in an amount to be proven at trial.

## COUNT 19

**Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law,
La. Rev. Stat. § 51:1401**

475.    This claim is brought by the Louisiana Consumer Plaintiffs individually and on behalf of the Louisiana Consumer Class against Defendants.

476.    Louisiana Consumer Plaintiffs, the Louisiana Consumer Class, and Defendants are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

477.    Louisiana Consumer Plaintiffs and the Louisiana Consumer Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

478.   Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

479.   The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A).  Defendants both participated in misleading, false, or deceptive acts that violated the Louisiana CPL.  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Louisiana CPL.

480.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

481.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

482.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety,

Defendants engaged in unfair or deceptive business practices in violation of the Louisiana CPL. Defendants deliberately withheld the information about the propensity of the Defective Airbags aggressively deploying and/or violently exploding and spraying vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

483.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

484.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

485.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Louisiana Consumer Plaintiffs and the Louisiana Consumer Class.

486.    Defendants knew or should have known that their conduct violated the Louisiana CPL.

487.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either

false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

488. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

489. Defendants owed Louisiana Consumer Plaintiffs and the Louisiana Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Louisiana Consumer Plaintiffs and the Louisiana Consumer Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

490. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

491.     Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Louisiana Consumer Plaintiffs and the Louisiana Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

492.     Louisiana Consumer Plaintiffs and the Louisiana Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Louisiana Consumer Plaintiffs and the Louisiana Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

493.     Defendants' violations present a continuing risk to Louisiana Consumer Plaintiffs and the Louisiana Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.

494.     As a direct and proximate result of Defendants' violations of the Louisiana CPL, Louisiana Consumer Plaintiffs and the Louisiana Consumer Class have suffered injury-in-fact and/or actual damage.

495.     Pursuant to La. Rev. Stat. § 51:1409, Louisiana Consumer Plaintiffs and the Louisiana Consumer Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**H.**   **Claims Brought on Behalf of the Michigan Consumer Class**

**COUNT 20**

**Violation of the Michigan Consumer Protection Act,**
**Mich. Comp. Laws § 445.903**

496.   This claim is brought by the Michigan Consumer Plaintiffs individually and on behalf of the Michigan Consumer Class against Defendants.

497.   Michigan Consumer Plaintiffs and the Michigan Consumer Class are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

498.   At all relevant times hereto, each Defendant was a "person" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

499.   The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1).   Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1).  By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them,

Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

500.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

501.   Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

502.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags aggressively deploying and/or violently exploding and spraying vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

503.   In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above.   Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

504.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Michigan Consumer Plaintiffs and the Michigan Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

505.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Michigan Consumer Plaintiffs and the Michigan Consumer Class.

506.   Defendants knew or should have known that their conduct violated the Michigan CPA.

507.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.   Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

508.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

509.    Defendants owed Michigan Consumer Plaintiffs and the Michigan Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

   a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

   b. Intentionally concealed the foregoing from Michigan Consumer Plaintiffs and the Michigan Consumer Class; and/or

   c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Michigan Consumer Plaintiffs and the Michigan Consumer Class that contradicted these representations.

510.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

511.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Michigan Consumer Plaintiffs and the Michigan Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

512. Michigan Consumer Plaintiffs and the Michigan Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Michigan Consumer Plaintiffs and the Michigan Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all. Michigan Consumer Plaintiffs and the Michigan Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

513. Defendants' violations present a continuing risk to Michigan Consumer Plaintiffs and the Michigan Consumer Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

514. As a direct and proximate result of Defendants' violations of the Michigan CPA, Michigan Consumer Plaintiffs and the Michigan Consumer Class have suffered injury-in-fact and/or actual damage.

515. Michigan Consumer Plaintiffs and the Michigan Consumer Class seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Michigan Consumer Plaintiffs and the Michigan Consumer Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

516. Michigan Consumer Plaintiffs and the Michigan Consumer Class also seek punitive damages against Defendants because they carried out their despicable conduct with

willful and conscious disregard of the rights and safety of others.  Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Michigan Consumer Plaintiffs and the Michigan Consumer Class on life-or-death matters, and concealed material facts that only they knew—all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them.  Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

## <u>COUNT 21</u>

### Breach of the Michigan Implied Warranty of Merchantability, Mich. Comp. Laws § 440.2314

517.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Michigan Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Michigan Consumer Class under the laws of Michigan against Defendants.

518.    Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mich. Comp. Laws § 440.2314(1).

519.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mich. Comp. Laws § 440.2314.

520.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants

- 151 -

with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

521.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

522.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Michigan Consumer Plaintiffs and the Michigan Consumer Class have been damaged in an amount to be proven at trial.

I.    **Claims Brought on Behalf of the Mississippi Consumer Class**

**COUNT 22**

**Breach of the Implied Warranty of Merchantability,**
**Miss. Code Ann. § 75-2-315**

523.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Mississippi Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Mississippi Consumer Class under the laws of Mississippi against Defendants.

524.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Miss. Code Ann. §§ 75-2-104(1) and 75-2A-103(3), and "seller[s]" of motor vehicles under § 75-2-103(1)(d).

525.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Miss. Code Ann. § 75-2A-103(1)(p).

- 152 -

526.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code Ann. §§ 75-2-105(1) and 75-2A-103(1)(h).

527.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code Ann. §§ 75-2-315.

528.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

529.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

530.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Mississippi Consumer Class have been damaged in an amount to be proven at trial.

**J.**      **Claims Brought on Behalf of the Missouri Consumer Class**

**COUNT 23**

**Violation of the Missouri Merchandising Practices Act,
Mo. Rev. Stat. § 407.010**

531.    This claim is brought by the Missouri Consumer Plaintiffs individually and on behalf of the Missouri Consumer Class against Defendants.

532.    Missouri Consumer Plaintiffs, Missouri Consumer Class members, and Defendants are each a "person" within the meaning of Mo. Rev. Stat. § 407.010(5).

533.    Defendants engaged in "trade" or "commerce" in the State of Missouri within the meaning of Mo. Rev. Stat. § 407.010(7).

534.    The Missouri Merchandising Practices Act ("Missouri MPA") makes unlawful the "act, use or employment by any person of any deception, fraud, false pretense, misrepresentation, unfair practice, or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise." Mo. Rev. Stat. § 407.020.

535.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein. By failing to disclose the Inflator Defect or facts about the Inflator Defect described herein known to them or that were available to Defendants upon reasonable inquiry, Defendants deprived consumers of all material facts about the safety and functionality of their vehicle. By failing to release material facts about the Inflator Defect, Defendants curtailed or reduced the ability of consumers to take notice of material facts about their vehicle, and/or it affirmatively operated to hide or keep those facts from consumers. 15 Mo. Code of Serv. Reg. § 60-9.110. Moreover, Defendants have otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by

employing deception, deceptive acts or practices, fraud, misrepresentations, unfair practices, and/or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

536.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

537.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Missouri MPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

538.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

539.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Missouri Consumer Plaintiffs and the Missouri Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

540.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Missouri Consumer Plaintiffs and the Missouri Consumer Class, including without limitation by failing to disclose the Inflator Defect in light of circumstances under which the omitted facts were necessary in order to correct the assumptions, inferences or representations being made by Defendants about the safety or reliability of the Class Vehicles and/or the Defective Airbags installed in them. Consequently, the failure to disclose such facts amounts to misleading statements pursuant to 15 Mo. Code of Serv. Reg. § 60-9.090.

541.    Because Defendants knew or believed that their statements regarding safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them were not in accord with the facts and/or had no reasonable basis for such statements in light of their knowledge of the Inflator Defect, Defendants engaged in fraudulent misrepresentations pursuant to 15 Mo. Code of Serv. Reg. § 60-9.100.

542.    Defendants' conduct as described herein is unethical, oppressive, or unscrupulous and/or it presented a risk of substantial injury to consumers whose vehicles were inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b)

- 156 -

hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents. Such acts are unfair practices in violation of 15 Mo. Code of Serv. Reg. § 60-8.020.

543. Defendants knew or should have known that their conduct violated the Missouri MPA.

544. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

545. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

546. Defendants owed Missouri Consumer Plaintiffs and the Missouri Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Missouri Consumer Plaintiffs and the Missouri Consumer Class; and/or

- 157 -

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Missouri Consumer Plaintiffs and the Missouri Consumer Class that contradicted these representations.

547. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

548. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Missouri Consumer Plaintiffs and the Missouri Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

549. Missouri Consumer Plaintiffs and the Missouri Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Missouri Consumer Plaintiffs and the Missouri Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all. Missouri Consumer Plaintiffs and the Missouri Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

550. Defendants' violations present a continuing risk to Missouri Consumer Plaintiffs and the Missouri Consumer Class, as well as to the general public. Defendants' unlawful acts

and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

551.    As a direct and proximate result of Defendants' violations of the Missouri MPA, Missouri Consumer Plaintiffs and the Missouri Consumer Class have suffered injury-in-fact and/or actual damage.

552.    Defendants are liable to Missouri Consumer Plaintiffs and the Missouri Consumer Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and punitive damages, as well as injunctive relief enjoining Defendants' unfair and deceptive practices, and any other just and proper relief under Mo. Rev. Stat. § 407.025.

## COUNT 24

### Breach of the Missouri Implied Warranty of Merchantability,
### Mo. Rev. Stat. § 400.2-314

553.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Missouri Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Missouri Consumer Class under the laws of Missouri against Defendants.

554.    Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mo. Rev. Stat. § 400.2-314(1).

555.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mo. Rev. Stat. § 400.2-314.

556.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the

Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

557.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

558.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Missouri Consumer Plaintiffs and the Missouri Consumer Class have been damaged in an amount to be proven at trial.

### K.    Claims Brought on Behalf of the New Jersey Consumer Class

### COUNT 25

**Violation of the New Jersey Consumer Fraud Act,
N.J. Stat. Ann. § 56:8-1**

559.    This claim is brought by the New Jersey Consumer Plaintiffs individually and on behalf of the New Jersey Consumer Class against Defendants.

560.    New Jersey Consumer Plaintiffs, the New Jersey Consumer Class members, and Defendants each is or was a "person" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

561.    Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

562.    The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception,

fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Defendants engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

563.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

564.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

565.   Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

566.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and

of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New Jersey CFA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

567.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

568.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including New Jersey Consumer Plaintiffs and the New Jersey Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of the Defendants' brands, and the true value of the Class Vehicles.

569.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead New Jersey Consumer Plaintiffs and the New Jersey Consumer Class.

570.    Defendants knew or should have known that their conduct violated the New Jersey CFA.

571.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

572.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving these highly dangerous vehicles.

573.    Defendants owed New Jersey Consumer Plaintiffs and the New Jersey Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from New Jersey Consumer Plaintiffs and the New Jersey Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from New Jersey Consumer Plaintiffs and the New Jersey Consumer Class that contradicted these representations.

574.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

575.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to New Jersey Consumer Plaintiffs and the New Jersey Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

576.    New Jersey Consumer Plaintiffs and the New Jersey Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, New Jersey Consumer Plaintiffs and the New Jersey Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  New Jersey Consumer Plaintiffs and the New Jersey Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

577.    Defendants' violations present a continuing risk to New Jersey Consumer Plaintiffs and the New Jersey Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

578.    As a direct and proximate result of Defendants' violations of the New Jersey CFA, New Jersey Consumer Plaintiffs and the New Jersey Consumer Class have suffered injury-in-fact and/or actual damage.

579.    New Jersey Consumer Plaintiffs and the New Jersey Consumer Class are entitled to recover legal and/or equitable relief including an order enjoining Defendants' unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

### COUNT 26

**Breach of the New Jersey Implied Warranty of Merchantability,**
**N.J. Stat. Ann. § 12a:2-314**

580.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, New Jersey Consumer Plaintiffs bring this claim on behalf of themselves and the members of the New Jersey Consumer Class under the laws of New Jersey against Defendants.

581.    Each Defendant is a merchant with respect to motor vehicles and/or airbags.

582.    When New Jersey Consumer Plaintiffs and the New Jersey Consumer Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition.

583.    At the time of sale and all times thereafter, the Class Vehicles and/or the Defective Airbags installed in them were not merchantable and not fit for the ordinary purpose for which cars and airbags are used.  Specifically, the Class Vehicles are inherently defective in that they are equipped with Defective Airbags with the Inflator Defect which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

584.    On information and belief, Defendants had notice of the Inflator Defect by their knowledge of the issues, by customer complaints, by numerous complaints filed against them

and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

585.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, New Jersey Consumer Plaintiffs and the New Jersey Consumer Class have been damaged in an amount to be proven at trial.

L.    **Claims Brought on Behalf of the New York Consumer Class**

**COUNT 27**

**Violation of the New York General Business Law,
N.Y. Gen. Bus. Law § 349**

586.    This claim is brought by the New York Consumer Plaintiffs individually and on behalf of the New York Consumer Class against Defendants.

587.    New York Consumer Plaintiffs and the New York Consumer Class members are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

588.    Each Defendant is a "person," "firm," "corporation," or "association" within the meaning of N.Y. Gen. Bus. Law § 349.

589.    The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct directed toward consumers, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

590.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

591.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

592.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

593.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

594.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New York GBL. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

595.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed

above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

596.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including New York Consumer Plaintiffs and the New York Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

597.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead New York Consumer Plaintiffs and the New York Consumer Class.

598.    Defendants knew or should have known that their conduct violated the New York GBL.

599.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

600.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting

new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

601.    Defendants owed New York Consumer Plaintiffs and the New York Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.    Intentionally concealed the foregoing from New York Consumer Plaintiffs and the New York Consumer Class; and/or

        c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from New York Consumer Plaintiffs and the New York Consumer Class that contradicted these representations.

602.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

603.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to New York Consumer Plaintiffs and the New York Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

604.    New York Consumer Plaintiffs and the New York Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, New York Consumer Plaintiffs and the New York Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  New York Consumer Plaintiffs and the New York Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

605.    Defendants' violations present a continuing risk to New York Consumer Plaintiffs and the New York Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

606.    As a direct and proximate result of Defendants' violations of the New York GBL, New York Consumer Plaintiffs and the New York Consumer Class have suffered injury-in-fact and/or actual damage.

607.    New York Consumer Plaintiffs and the New York Consumer Class members seek punitive damages against Defendants because Defendants' conduct was egregious.  Defendants misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived New York Consumer Plaintiffs and the New York Consumer Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them.  Defendants' egregious conduct warrants punitive damages.

608.    Because Defendants' willful and knowing conduct caused injury to the New York Consumer Class, New York Consumer Plaintiffs and Class Members seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT 28

### Violation of the New York General Business Law,
### N.Y. Gen. Bus. Law § 350

609.    This claim is brought by the New York Consumer Plaintiffs individually and on behalf of the New York Consumer Class against Defendants.

610.    Each Defendant is engaged in the "conduct of business, trade or commerce," within the meaning of N.Y. Gen. Bus. Law § 350.

611.    N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce."  False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the extent to which the advertising fails to reveal facts material in light of … representations [made] with respect to the commodity …." N.Y. Gen. Bus. Law § 350-a.

612.    Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers and the New York Consumer Class.

613.    Defendants violated § 350 because the misrepresentations and omissions regarding the Inflator Defect, and Defendants' failure to disclose and active concealing of the

dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, as set forth above, were material and likely to deceive a reasonable consumer.

614.    New York Consumer Class members have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising.  In purchasing or leasing Class Vehicles with the Defective Airbags installed in them, New York Consumer Plaintiffs and the New York Consumer Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.  Defendants' representations were false and/or misleading because the concealed the Inflator Defect and safety issues seriously undermine the value of the Class Vehicles.  Had New York Consumer Plaintiffs and the New York Consumer Class known this, they would not have purchased or leased their vehicles and/or paid as much for them.

615.    Pursuant to N.Y. Gen. Bus. Law § 350 e, the New York Consumer Class seeks monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Consumer Class member.   Because Defendants' conduct was committed willfully and knowingly, New York members are entitled to recover three times actual damages, up to $10,000, for each New York Class member.

616.    The New York Consumer Class also seeks an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under General Business Law § 350.

## COUNT 29

**Breach of the Implied Warranty of Merchantability,**
**N.Y. U.C.C. Law §§ 2-315, 2-A-213**

617.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, New York Consumer Plaintiffs bring this claim on behalf of themselves and the members of the New York Consumer Class under the laws of New York against Defendants.

618.    Each Defendant is and was at all relevant times a "merchant" with respect to motor vehicles under N.Y. U.C.C. Law §§ 2-104(1) and 2-A-103(3), and a "seller" of motor vehicles under § 2-103(1)(d).

619.    With respect to leases, each Defendant is and was at all relevant times a "lessor" of motor vehicles under N.Y. U.C.C. Law § 2-A-103(1)(p).

620.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2-A-103(1)(h).

621.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. U.C.C. Law §§ 2-315 and 2-A-213.

622.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

- 173 -

623.     Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after the Inflator Defect became public.

624.     As a direct and proximate result of Defendants' breach of the warranties of merchantability, New York Consumer Plaintiffs and the New York Consumer Class have been damaged in an amount to be proven at trial.

**M.     Claims Brought on Behalf of the North Carolina Consumer Class**

**COUNT 30**

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,
N.C. Gen. Stat. § 75-1.1**

625.     This claim is brought by the North Carolina Consumer Plaintiffs individually and on behalf of the North Carolina Consumer Class against Defendants.

626.     Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

627.     The North Carolina Unfair and Deceptive Trade Practices Act (the "North Carolina DTPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a).   As alleged above and below, Defendants willfully committed unfair or deceptive acts or practices in violation of the North Carolina DTPA.

628.     In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

629.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

630.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

631.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the North Carolina DTPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase Class Vehicles.

632.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

633.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in purchasers, and were likely to and did in fact deceive reasonable consumers, including North Carolina Consumer Plaintiffs and the North Carolina Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

634.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead North Carolina Consumer Plaintiffs and the North Carolina Consumer Class.

635.   Defendants knew or should have known that their conduct violated the North Carolina DTPA.

636.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

637.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

638.    Defendants owed North Carolina Consumer Plaintiffs and the North Carolina Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.     Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.     Intentionally concealed the foregoing from North Carolina Consumer Plaintiffs and the North Carolina Consumer Class; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from North Carolina Consumer Plaintiffs and the North Carolina Consumer Class that contradicted these representations.

639.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

640.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to North Carolina Consumer Plaintiffs and the North Carolina Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

641.    North Carolina Consumer Plaintiffs and the North Carolina Consumer Class members suffered ascertainable loss caused by Defendants' misrepresentations and their failure

to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, North Carolina Consumer Plaintiffs and the North Carolina Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.

642.    North Carolina Consumer Plaintiffs and the North Carolina Consumer Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the North Carolina Act, and these violations present a continuing risk to North Carolina Consumer Plaintiffs and the North Carolina Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

643.    As a direct and proximate result of Defendants' violations of the North Carolina DTPA, North Carolina Consumer Plaintiffs and the North Carolina Consumer Class have suffered injury-in-fact and/or actual damage.

644.    North Carolina Consumer Plaintiffs and the North Carolina Consumer Class seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith.

645.    Defendants fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived North Carolina Consumer Plaintiffs and the North Carolina Consumer Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them.  Because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith, it warrants punitive damages.

646.    North Carolina Consumer Plaintiffs and the North Carolina Consumer Class seek an order for treble their actual damages, an order enjoining Defendants' unlawful acts, costs of Court, attorney's fees, and any other just and proper relief available under the North Carolina DTPA, N.C. Gen. Stat. § 75-16.

**N.      Claims Brought on Behalf of the Pennsylvania Consumer Class**

**COUNT 31**

**Violation of the Unfair Trade Practices and Consumer Protection Law,
Pa. Stat. Ann. § 201-1**

647.    This claim is brought by the Pennsylvania Consumer Plaintiffs individually and on behalf of the Pennsylvania Consumer Class against Defendants.

648.    Pennsylvania Consumer Plaintiffs and Pennsylvania Consumer Class members purchased or leased their Class Vehicles with Defective Airbags installed in them primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

649.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

650.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (i) "Representing that goods or services have . . . characteristics, . . . [b]enefits or qualities that they do not have;" (ii) "Representing that goods or services are of a particular standard, quality or grade . . . if they are of another;:" (iii) "Advertising goods or services with intent not to sell them as advertised;" and (iv) "Engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding."  73 P.S. § 201-2(4).

651.    Defendants engaged in unlawful trade practices, including representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and

- 179 -

qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

652.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

653.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

654.   Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

655.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Pennsylvania CPL.  Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal

amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

656.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

657.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

658.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class.

659.    Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

660.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

- 181 -

661.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

662.    Defendants owed Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class that contradicted these representations.

663.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

664.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class.  A vehicle made by a reputable manufacturer of

safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

665.    Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Pennsylvania Consumer Plaintiffs and Pennsylvania Consumer Class members would have paid less for their vehicles or would not have purchased or leased them at all.  Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

666.    Defendants' violations present a continuing risk to Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

667.    As a direct and proximate result of Defendants' violations of the Pennsylvania CPL, Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class have suffered injury-in-fact and/or actual damage.

668.    Defendants are liable to Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a).  Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

## COUNT 32

### Breach of the Implied Warranty of Merchantability,
### 13 PA. Stat. Ann. § 2314

669.    In the event the Court declines to certify a Nationwide Consumer Class under the

Magnuson-Moss Warranty Act, Pennsylvania Consumer Plaintiffs bring this claim on behalf of

themselves and the members of the Pennsylvania Consumer Class under the laws of

Pennsylvania against Defendants.

670.    Defendants are and were at all relevant times merchants with respect to motor

vehicles and/or airbags within the meaning of 13 Pa. Stat. Ann. § 2104.

671.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them

were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to 13

Pa. Stat. Ann. § 2314.

672.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and

at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which

cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the

Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a

threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously

injure occupants through contact with the airbag, instead of protecting vehicle occupants from

bodily injury during accidents.

673.    Defendants were provided notice of these issues by their knowledge of the issues,

by customer complaints, by numerous complaints filed against them and/or others, by internal

investigations, and by numerous individual letters and communications sent by consumers before

or within a reasonable amount of time after Honda issued the first recalls and the allegations of

the Inflator Defect became public.

674.     As a direct and proximate result of Defendants' breach of the warranties of merchantability, Pennsylvania Consumer Plaintiffs and the Pennsylvania Consumer Class have been damaged in an amount to be proven at trial.

**O.     Claims Brought on Behalf of the Tennessee Consumer Class**

**COUNT 33**

**Violation of the Tennessee Consumer Protection Act,**
**Tenn. Code Ann. § 47-18-101**

675.     This claim is brought by the Tennessee Consumer Plaintiffs individually and on behalf of the Tennessee Consumer Class against Defendants.

676.     Tennessee Consumer Plaintiffs and the Tennessee Consumer Class members are "consumers" within the meaning of Tennessee Consumer Protection Act, Tenn. Code § 47-18-103(2).

677.     The Tennessee Consumer Protection Act ("TCPA") prohibits "unfair or deceptive acts or practices affecting the conduct of any trade or commerce."  Tenn. Code Ann. § 47-18-104(b).  Defendants have committed unfair or deceptive acts or practices affecting the conduct of any trade or commerce as described herein.

678.     Defendants also violated the TCPA by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, or benefits which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell them as advertised; and (4) using statements or illustrations in advertisements which created a false impression of their grade, quality, value or usability.

679.     In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

- 185 -

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

680.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

681.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009 when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

682.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the TCPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents and/or failing to deploy altogether, in order to ensure that consumers would purchase Class Vehicles.

683.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class

- 186 -

Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

684.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in purchasers, and were likely to and did in fact deceive reasonable consumers, Tennessee Consumer Plaintiffs and the Tennessee Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

685.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Tennessee Consumer Plaintiffs and the Tennessee Consumer Class.

686.   Defendants knew or should have known that their conduct violated the TCPA.

687.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

688.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

689.    Defendants owed Tennessee Consumer Plaintiffs and the Tennessee Consumer Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Tennessee Consumer Plaintiffs and the Tennessee Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Tennessee Consumer Plaintiffs and the Tennessee Consumer Class that contradicted these representations.

690.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

691.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Tennessee Consumer Plaintiffs and the Tennessee Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

692.    Tennessee Consumer Plaintiffs and the Tennessee Consumer Class members suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class

- 188 -

Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Tennessee Consumer Plaintiffs and the Tennessee Consumer Class would have paid less for their vehicles or would not have purchased them at all. Tennessee Consumer Plaintiffs and the Tennessee Consumer Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

693.   Tennessee Consumer Plaintiffs and the Tennessee Consumer Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the TCPA, and these violations present a continuing risk to Tennessee Consumer Plaintiffs and the Tennessee Consumer Class members, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

694.   As a direct and proximate result of Defendants' violations of the TCPA, Tennessee Consumer Plaintiffs and the Tennessee Consumer Class have suffered injury-in-fact and/or actual damage.

695.   Pursuant to Tenn. Code Ann. § 47-18-109(a), Tennessee Consumer Plaintiffs and the Tennessee Consumer Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing or willful violations of the TCPA, and any other just and proper relief available under the TCPA.

696.   Tennessee Consumer Plaintiffs and the Tennessee Consumer Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the TCPA.

P.      **Claims Brought on Behalf of the Texas Consumer Class**

**COUNT 34**

**Violation of the Texas Deceptive Trade Practices Act,**
**Tex. Bus. & Com. Code § 17.41.**

697.    This claim is brought by the Texas Consumer Plaintiffs individually and on behalf of the Texas Consumer Class against Defendants.

698.    Texas Consumer Plaintiffs and the Texas Consumer Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets).  See Tex. Bus. & Com. Code § 17.41.

699.    The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code §§ 17.45(5), 17.50(a)(3).  Defendants have committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce as described herein.

700.    Defendants also violated the Texas DTPA by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) failing to disclose information concerning them with the intent to induce consumers to purchase or lease them.

- 190 -

701.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

702.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

703.   Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the Defective Airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

704.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Texas DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

705.   In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect

discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

706.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Texas Consumer Plaintiffs and the Texas Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

707.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Texas Consumer Plaintiffs and the Texas Consumer Class.

708.    Defendants knew or should have known that their conduct violated the Texas DTPA.

709.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

710.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting

new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

711.    Defendants owed Texas Consumer Plaintiffs and the Texas Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Texas Consumer Plaintiffs and the Texas Consumer Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Texas Consumer Plaintiffs and the Texas Consumer Class that contradicted these representations.

712.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

713.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Texas Consumer Plaintiffs and the Texas Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

714.     Texas Consumer Plaintiffs and the Texas Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Texas Consumer Plaintiffs and the Texas Consumer Class members would have paid less for their vehicles or would not have purchased them at all.  Texas Consumer Plaintiffs and the Texas Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

715.     Texas Consumer Plaintiffs and the Texas Consumer Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the Texas DTPA, and these violations present a continuing risk to Texas Consumer Plaintiffs and the Texas Consumer Class, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

716.     As a direct and proximate result of Defendants' violations of the Texas DTPA, Texas Consumer Plaintiffs and the Texas Consumer Class have suffered injury-in-fact and/or actual damage.

717.     Pursuant to Tex. Bus. & Com. Code §§ 17.50(a)(1) and (b), Texas Consumer Plaintiffs and the Texas Consumer Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

718. For those Texas Consumer Class members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

719. Texas Consumer Plaintiffs and the Texas Consumer Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

720. In accordance with Tex. Bus. & Com. Code § 17.505(a), Plaintiffs' counsel, on behalf of all Plaintiffs and Class Members, served Defendants with notice of their alleged violations of the Texas DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and Class Members, and demanded that Defendants correct or agree to correct the actions described therein.  Defendants have failed to do so.

## COUNT 35

**Breach of the Texas Implied Warranty of Merchantability,**
**Tex. Bus. & Com. Code § 2.314**

721. In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Texas Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Texas Consumer Class under the laws of Texas against Defendants.

722. Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Tex. Bus. & Com. Code § 2.104.

723. A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Tex. Bus. & Com. Code § 2.314.

724.     The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

725.     Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

726.     As a direct and proximate result of Defendants' breach of the warranties of merchantability, Texas Consumer Plaintiffs and the Texas Consumer Class have been damaged in an amount to be proven at trial.

**Q.     Claims Brought on Behalf of the Vermont Consumer Class**

**COUNT 36**

**Violation of the Vermont Consumer Fraud Act,
9 V.S.A. § 2451**

727.     This claim is brought by Vermont Consumer Plaintiff individually and on behalf of the Vermont Consumer Class against Defendants.

728.     Vermont Consumer Plaintiffs and the Vermont Consumer Class members are consumers within the meaning of Vermont Consumer Fraud Act ("VCFA"), 9 V.S.A. § 2451a(a).

729.    Each Defendant is engaged in "commerce" within the meaning of 9 V.S.A. § 2453(a).

730.    The VCFA prohibits "[u]nfair methods of competition in commerce and unfair or deceptive acts or practices in commerce . . . ."  9 V.S.A. § 2453(a).  Defendants participated in unfair and deceptive trade practices that violated the VCFA as described herein.

731.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

732.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

733.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

734.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the VCFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags

to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

735.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

736.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Vermont Consumer Plaintiff and Vermont Consumer Class members, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

737.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Vermont Consumer Plaintiff and Vermont Consumer Class members.

738.    Defendants knew or should have known that their conduct violated the VCFA.

739.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

740.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

741.    Defendants owed Vermont Consumer Plaintiff and Vermont Consumer Class members a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Vermont Consumer Plaintiff and Vermont Consumer Class members; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Vermont Consumer Plaintiff and Vermont Consumer Class members that contradicted these representations.

742.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

743.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Vermont Consumer Plaintiff and Vermont Consumer Class members.  A vehicle made by a reputable manufacturer of safe

vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

744.    Vermont Consumer Plaintiff and Vermont Consumer Class members suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Vermont Consumer Plaintiff and Vermont Consumer Class members either would have paid less for their vehicles or would not have purchased them at all.  Vermont Consumer Plaintiff and Vermont Consumer Class members did not receive the benefit of their bargain as a result of Defendants' misconduct.

745.    Vermont Consumer Plaintiff and Vermont Consumer Class members risk irreparable injury as a result of Defendants' acts and omissions in violation of the VCFA, and these violations present a continuing risk to Vermont Consumer Plaintiff and Vermont Consumer Class members, as well as to the general public.  Defendants' unlawful acts and practices complained of herein affect the public interest.  The recalls and repairs instituted by Defendants have not been adequate.

746.    As a direct and proximate result of Defendants' violations of the VCFA, Vermont Consumer Plaintiff and Vermont Consumer Class have suffered injury-in-fact and/or actual damage.

747.    Vermont Consumer Plaintiff and Vermont Consumer Class members are entitled to recover their actual damages, or consideration or the value of the consideration given and attorneys' fees under 9 V.S.A. § 2461(b).

748.    Vermont Consumer Plaintiff and Vermont Consumer Class members seek exemplary damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith.

749.    Defendants fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Vermont Consumer Plaintiff and Vermont Consumer Class members on life-or-death matters, and concealed material facts that only they knew, all to avoid the expense and public relations nightmare of correcting the myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them. Because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent and in bad faith, it warrants exemplary damages.

750.    Vermont Consumer Plaintiff and Vermont Consumer Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the VCFA.

**R.    Claims Brought on Behalf of the Virginia Consumer Class**

**COUNT 37**

**Violation of the Virginia Consumer Protection Act,
Va. Code Ann. § 59.1-196**

751.    This claim is brought by the Virginia Consumer Plaintiffs individually and on behalf of the Virginia Consumer Class against Defendants.

752.    Each Defendant is a "supplier" under Va. Code Ann. § 59.1-198.

753.    The sale of the Class Vehicles with the Defective Airbags installed in them to the Class members was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

754.    The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices" which include: "5. Misrepresenting that good or services have certain

- 201 -

characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.  Defendants violated the Virginia CPA by misrepresenting that the Class Vehicles and/or the Defective Airbags installed in them had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that they were of a particular standard, quality, grade, style, or model when they were another; advertising them with intent not to sell or lease them as advertised; and otherwise using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction.

755.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

756.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and

personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

757.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Virginia CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

758.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

759.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Virginia Consumer Plaintiffs and the Virginia Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

760.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Virginia Consumer Plaintiffs and the Virginia Consumer Class.

761.    Defendants knew or should have known that their conduct violated the Virginia CPA.

762.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

763.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

764.    Defendants owed Virginia Consumer Plaintiffs and the Virginia Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Virginia Consumer Plaintiffs and the Virginia Consumer Class; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Virginia Consumer Plaintiffs and the Virginia Consumer Class that contradicted these representations.

765.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

766.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Virginia Consumer Plaintiffs and the Virginia Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

767.    Virginia Consumer Plaintiffs and the Virginia Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Virginia Consumer Plaintiffs and the Virginia Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  Virginia Consumer Plaintiffs and the Virginia Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

768.    Defendants' violations present a continuing risk to Virginia Consumer Plaintiffs and the Virginia Consumer Class, as well as to the general public.  Defendants' unlawful acts

and practices complained of herein affect the public interest.   The recalls and repairs instituted by Defendants have not been adequate.

769.    As a direct and proximate result of Defendants' violations of the Virginia CPA, Virginia Consumer Plaintiffs and the Virginia Consumer Class have suffered injury-in-fact and/or actual damage.

770.    Pursuant to Va. Code Ann. § 59.1-204, Virginia Consumer Plaintiffs and the Virginia Consumer Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Virginia Consumer Plaintiff and each Virginia Consumer Class member.  Because Defendants' conduct was committed willfully and knowingly, Virginia Consumer Plaintiffs and the Virginia Consumer Class members are each entitled to recover the greater of (a) three times actual damages or (b) $1,000.

771.    Virginia Consumer Plaintiffs and the Virginia Consumer Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under Va. General Business Law § 59.1-204.

## COUNT 38

### Breach of the Virginia Implied Warranty of Merchantability,
### Va. Code Ann. § 8.2-314

772.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, Virginia Consumer Plaintiffs bring this claim on behalf of themselves and the members of the Virginia Consumer Class under the laws of Virginia against Defendants.

773.    Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Va. Code Ann. § 8.2-314.

774.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Va. Code Ann. § 8.2-314.

775.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

776.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

777.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Virginia Consumer Plaintiffs and the Virginia Consumer Class have been damaged in an amount to be proven at trial.

S.    **Claims Brought on Behalf of the West Virginia Consumer Class**

**COUNT 39**

**Violation of the West Virginia Consumer Credit and Protection Act,
W. Va. Code § 46A-1-101**

778.    This claim is brought by the West Virginia Consumer Plaintiffs individually and on behalf of the West Virginia Consumer Class against Defendants.

779.   Each Defendant is a "person" under W. Va. Code § 46A-1-102(31).

780.   West Virginia Consumer Plaintiffs and the West Virginia Consumer Class members are "consumers," as defined by W. Va. Code §§ 46A-1-102(12) and 46A-6-102(2), who purchased or leased one or more Class Vehicles with the Defective Airbags installed in them.

781.   Defendants engaged in trade or commerce as defined by W. Va. Code § 46A-6-102(6).

782.   The West Virginia Consumer Credit and Protection Act ("West Virginia CCPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce …." W. Va. Code § 46A-6-104.   Without limitation, "unfair or deceptive" acts or practices include: Advertising goods or services with intent not to sell them as advertised; Making false or misleading statements of fact concerning the reasons for, existence of or amounts of price reductions; Engaging in any other conduct which similarly creates a likelihood of confusion or of misunderstanding; The act, use or employment by any person of any deception, fraud, false pretense, false promise or misrepresentation, or the concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any goods or services, whether or not any person has in fact been misled, deceived or damaged thereby; Advertising, printing, displaying, publishing, distributing or broadcasting, or causing to be advertised, printed, displayed, published, distributed or broadcast in any manner, any statement or representation with regard to the sale of goods or the extension of consumer credit including the rates, terms or conditions for the sale of such goods or the extension of such credit, which is false, misleading or deceptive or

- 208 -

which omits to state material information which is necessary to make the statements therein not false, misleading or deceptive.  W. Va. Code § 46A-6-102(7).

783.    By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the West Virginia CCPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; (4) representing that a transaction involving them confers or involves rights, remedies, and obligations which it does not; and (5) representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

784.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

785.    Defendants have known of the Inflator Defect in the Defective Airbags since at least July 10, 2009, when New GM acquired substantially all of Old GM's books, records, and personnel, and the knowledge about the defective Takata airbags those books, records, and

personnel held.  Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

786.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the West Virginia CCPA.  Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

787.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above.  Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

788.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including West Virginia Consumer Plaintiffs and the West Virginia Consumer Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

789.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead West Virginia Consumer Plaintiffs and the West Virginia Consumer Class.

790.    Defendants knew or should have known that their conduct violated the West Virginia Act.

791.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

792.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

793.    Defendants owed West Virginia Consumer Plaintiffs and the West Virginia Consumer Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from West Virginia Consumer Plaintiffs and the West Virginia Consumer Class; and/or

c.     Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from West Virginia Consumer Plaintiffs and the West Virginia Consumer Class that contradicted these representations.

794.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

795.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to West Virginia Consumer Plaintiffs and the West Virginia Consumer Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

796.    West Virginia Consumer Plaintiffs and the West Virginia Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, West Virginia Consumer Plaintiffs and the West Virginia Consumer Class either would have paid less for their vehicles or would not have purchased or leased them at all.  West Virginia Consumer Plaintiffs and the West Virginia Consumer Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

797. Defendants' violations present a continuing risk to West Virginia Consumer Plaintiffs and the West Virginia Consumer Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

798. As a direct and proximate result of Defendants' violations of the West Virginia CCPA, West Virginia Consumer Plaintiffs and the West Virginia Consumer Class have suffered injury-in-fact and/or actual damage.

799. Pursuant to W. Va. Code § 46A-1-106, West Virginia Consumer Plaintiffs and the West Virginia Consumer Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $200 per violation of the West Virginia CCPA for each West Virginia Plaintiff and each member of the West Virginia Consumer Class they seek to represent.

800. West Virginia Consumer Plaintiffs and the West Virginia Consumer Class also seek punitive damages against Defendants because Defendants carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting West Virginia Consumer Plaintiffs and the West Virginia Consumer Class to cruel and unjust hardship as a result. Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived West Virginia Consumer Plaintiffs and the West Virginia Consumer Class on life or death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags installed in them. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

801.    West Virginia Consumer Plaintiffs and the West Virginia Consumer Class further seek an order enjoining Defendants' unfair or deceptive acts or practices, restitution, punitive damages, costs of Court, attorney's fees under W. Va. Code § 46A-5-101, and any other just and proper relief available under the West Virginia CCPA.

802.    In accordance with W. Va. Code § 46A-6-106(b), Plaintiffs' counsel, on behalf of all Plaintiffs and Class Members, served Defendants with notice of their alleged violations of the West Virginia CCPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and Class Members, and demanded that Defendants correct or agree to correct the actions described therein.   Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs seek all damages and relief to which West Virginia Consumer Plaintiffs and the West Virginia Consumer Class are entitled.

## COUNT 40

### Breach of the West Virginia Implied Warranty of Merchantability, W. Va. Code § 46-2-314

803.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, West Virginia Consumer Plaintiffs bring this claim on behalf of themselves and the members of the West Virginia Consumer Class under the laws of West Virginia against Defendants.

804.    Each Defendant is and was at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of W. Va. Code § 46A-6-107 and § 46-2-314.

805.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to W. Va. Code § 46-2-314.

806.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

807.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the first recalls and the allegations of the Inflator Defect became public.

808.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, West Virginia Consumer Plaintiffs and the West Virginia Consumer Class have been damaged in an amount to be proven at trial.

**PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.    An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R. Civ. P. 23;

B.    A declaration that the airbags in Class Vehicles are defective;

C.    An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.    An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.    An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.    A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recalls of the vehicles and correction of the Defective Airbags;

G.    A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.    Disgorgement of Defendants' profits;

I.    An award of attorneys' fees and costs, as allowed by law;

J.    An award of prejudgment and post-judgment interest, as provided by law;

K.    Leave to amend this Complaint to conform to the evidence produced at trial; and

L.    Such other relief as may be appropriate under the circumstances.

## DEMAND FOR JURY TRIAL

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

DATED: May 18, 2018                        **PODHURST ORSECK, P.A.**

/s/ Peter Prieto
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
John Gravante  (FBN 617113)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One Southeast 3rd Ave, Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
pprieto@podhurst.com
apodhurst@podhurst.com
srosenthal@podhurst.com
jgravante@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

*Chair Lead Counsel for Plaintiffs*

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **POWER ROGERS & SMITH, P.C.**<br>Todd A. Smith<br>tsmith@prslaw.com<br>70 West Madison St., 55th Floor<br>Chicago, IL 60602<br>T: 312-236-9381<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman, Esq. (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel: (914) 749-8200<br>Fax: (914) 749-8300<br>dboies@bsfllp.com<br>mshulman@bsfllp.com<br><br>Stephen N. Zack, Esq. (Fla. Bar. No. 145215)<br>Mark J. Heise, Esq. (Fla. Bar No. 771090)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307<br>szack@bsfllp.com<br>mheise@bsfllp.com<br><br>Richard B. Drubel, Esq.<br>Jonathan R. Voegele, Esq.<br>26 South Main Street<br>Hanover, NH 03755<br>Tel: (603) 643-9090<br>Fax: (603) 643-9010<br>rdrubel@bsfllp.com<br>jvoegele@bsfllp.com<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **BARON & BUDD, PC**<br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J.Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC** | **LIEFF CABRASER HEIMANN AND BERNSTEIN LLP** |
|---|---|
| James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ   07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br><br>*Plaintiffs' Steering Committee* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>Nimish R. Desai<br>ndesai@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T: 415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>NY, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br><br>*Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on May 18, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: <u>Peter Prieto</u>
        Peter Prieto