**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION**<br><br>This Document Relates to All Economic Loss Class Actions and:<br><br><br>Stephanie Puhalla, et al., individually and on behalf of all others similarly situated,<br><br>　　　　　　Plaintiffs,<br><br>　　v.<br><br>VOLKSWAGEN AKTIENGESELLSCHAFT, VOLKSWAGEN GROUP OF AMERICA, AUDI AKTIENGESELLSCHAFT, AUDI OF AMERICA, LLC, MERCEDES-BENZ USA, LLC, and DAIMLER AG,<br><br>　　　　　　Defendants. | MDL No. 2599<br><br>Master File No.15- MD 2599-FAM<br><br>S.D. Fla. Case No. 1:14-cv-24009-FAM<br><br><br><br><br>**JURY TRIAL DEMANDED** |

**AMENDED CONSOLIDATED CLASS ACTION COMPLAINT**

# TABLE OF CONTENTS

**Page**

NATURE OF CLAIMS ................................................................................................ 1

JURISDICTION AND VENUE .................................................................................. 6

THE PARTIES............................................................................................................. 7

    I.     Defendants ................................................................................................ 7

    II.    Plaintiffs .................................................................................................. 9

GENERAL FACTUAL ALLEGATIONS ................................................................ 51

    I.     Definitions............................................................................................... 51

    II.    Takata's Airbags Have a Common, Uniform Defect............................. 59

           A.     Defendants Chose an Inexpensive and Dangerous Propellant................ 59

           B.     The Risks of the Inflator Defect Were Exacerbated by Takata's and Defendants' Abysmal Quality Control ...................................................... 62

    III.    Defendants' Knowledge of the Defective Airbag.................................. 64

           A.     Volkswagen................................................................................. 64

           B.     Mercedes ..................................................................................... 67

           C.     Defendants' Knowledge Through the German Car Consortium ............ 72

           D.     Defendants' Knowledge Through Escalating Field Incidents and Recalls...................................................................................................... 73

    IV.    Defendants Sold Their Vehicles As "Safe" and "Reliable"................... 76

    V.    Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers...... 79

           A.     Slow and Inadequate Recalls ..................................................... 79

           B.     Failure to Provide Replacement Vehicles................................... 80

           C.     Defective Replacement Airbags ................................................. 81

TOLLING OF THE STATUTE OF LIMITATIONS................................................. 82

    I.     Fraudulent Concealment ........................................................................ 82

    II.    Estoppel................................................................................................... 82

    III.    Discovery Rule......................................................................................... 83

    IV.    *American Pipe* Tolling .......................................................................... 83

CLASS ACTION ALLEGATIONS ......................................................................... 83

    I.     The Classes ............................................................................................. 84

    II.    Numerosity.............................................................................................. 85

    III.    Predominance of Common Issues........................................................... 85

    IV.    Typicality ................................................................................................ 87

**TABLE OF CONTENTS**
**(continued)**

Page

| | | | | |
|---|---|---|---|---|
| V. | Adequate Representation | | | 88 |

V.     Adequate Representation ........................................................... 88

VI.    Superiority.................................................................................. 88

REALLEGATION AND INCORPORATION BY REFERENCE ........................................... 90

CLAIMS FOR RELIEF ................................................................................ 90

I.     Nationwide Claims................................................................................ 90

    A.     Federal Claims ................................................................... 90

        1.     Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Volkswagen ................................ 90

        2.     Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Volkswagen. ............................... 99

        3.     Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Mercedes........................................ 106

        4.     Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Mercedes........................................ 117

        5.     Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq. .................................... 124

    B.     Common Law and State Law Claims Against Volkswagen ................. 127

        6.     Fraudulent Concealment ............................................. 127

        7.     Negligence .................................................................. 130

        8.     Unjust Enrichment ..................................................... 132

    C.     Common Law and State Law Claims Against Mercedes ..................... 133

        9.     Fraudulent Concealment ............................................. 133

        10.    Negligence .................................................................. 135

        11.    Unjust Enrichment ..................................................... 137

II.    State Consumer Sub-Class Claims................................................. 138

    A.     Claims Brought on Behalf of the Alabama Consumer Sub-Class ......... 138

        12.    Violation of the Alabama Deceptive Trade Practices Act, Ala. Code §§ 8-19-1, et seq. ............................... 138

    B.     Claims Brought on Behalf of the Arizona Consumer Sub-Class........... 143

**TABLE OF CONTENTS**
**(continued)**

Page

13. Violation of the Arizona Consumer Fraud Act, Ariz. Rev. Stat. §§ 44-1521, *et seq.* ..................................... 143

C. Claims Brought on Behalf of the Arkansas Consumer Sub-Class......... 147

14. Breach of the Implied Warranty of Merchantability Ark. Code Ann. §§ 4-2-314 and 4-2A-212, *et seq.* .................... 147

15. Violation of the Arkansas Deceptive Trade Practice Act Ark. Code Ann. §§ 4-88-101, *et seq.* ......................... 148

D. Claims Brought on Behalf of the California Consumer Sub-Class ....... 153

16. Violation of Song-Beverly Consumer Warranty Act for Breach of Implied Warranty of Merchantability (California Lemon Law) ............................................ 153

17. Violation of the California Unfair Competition Law, Cal. Bus. & Prof. Code §§ 17200, *et seq.* ................................ 155

18. Violation of the Consumer Legal Remedies Act, Cal. Civ. Code §§ 1750, *et seq.* ......................................... 158

E. Claims Brought on Behalf of the Connecticut Consumer Sub-Class .... 165

19. Violation of the Connecticut Unlawful Trade Practices Act, Conn. Gen. Stat. §§ 42-110A, *et seq.* ................................ 165

F. Claims Brought on Behalf of the Florida Consumer Sub-Class ............ 168

20. Violation of the Florida Deceptive and Unfair Trade Practices Act, Fla. Stat. §§ 501.201, *et seq.* ............................... 168

G. Claims Brought on Behalf of the Georgia Consumer Sub-Class........... 172

21. Violation of the Georgia Fair Business Practices Act, Ga. Code Ann. §§ 10-1-390, *et seq.* .......................................... 172

H. Claims Brought on Behalf of the Illinois Consumer Sub-Class ............ 177

22. Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act, 815 ILCS 505/1, *et seq.* ...................... 177

I. Claims Brought on Behalf of the Indiana Consumer Sub-Class............ 181

23. Breach of the Implied Warranty of Merchantability, Ind. Code § 26-1-2-314 ............................................ 181

24. Violation of the Indiana Deceptive Consumer Sales Act, Ind. Code §§ 24-5-0.5-3 .................................... 182

J. Claims Brought on Behalf of the Iowa Consumer Sub-Class............... 187

- iii -

**TABLE OF CONTENTS**
**(continued)**

Page

25. Violation of the Private Right of Action for Consumer Frauds Act, Iowa Code § 714H.1, *et seq.* ................................. 187

K. Claims Brought on Behalf of the Kentucky Consumer Sub-Class ........ 191

26. Breach of Implied Warranty of Merchantability, Kentucky Rev. Stat. §§ 355.2, et. seq. ....................................... 191

L. Claims Brought on Behalf of the Louisiana Consumer Sub-Class ........ 193

27. Breach of the Implied Warranty of Merchantability/Warranty Against Redhibitory Defects La. Civ. Code Ann. art. 2520, 2524 ........................................... 193

28. Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law, La. Rev. Stat. §§ 51:1401, *et seq.* ............................................................. 195

M. Claims Brought on Behalf of the Massachusetts Consumer Sub-Class .................................................................. 199

29. Breach of the Implied Warranty of Merchantability Mass. Gen. Laws Ann. ch. 106, § 2-314, *et seq.* ........................ 199

30. Deceptive Acts or Practices Prohibited by Massachusetts Law, Mass. Gen. Laws Ann. ch. 93A, §§ 1, *et seq.* .............................................................. 200

N. Claims Brought on Behalf of the Michigan Consumer Sub-Class ........ 204

31. Breach of the Implied Warranty of Merchantability Mich. Comp. Laws § 440.2314 .................................................... 204

32. Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, *et seq.* ....................................... 205

O. Claims Brought on Behalf of the Mississippi Consumer Sub-Class ..... 210

33. Breach of the Implied Warranty of Merchantability Miss. Code Ann. §§ 75-2-315 and 75-2-212, *et seq.* ................. 210

P. Claims Brought on Behalf of the New Jersey Consumer Sub-Class ..... 211

34. Breach of the Implied Warranty of Merchantability N.J. Stat. Ann. § 12a:2-314 ............................................................. 211

35. Violation of the New Jersey Consumer Fraud Act, N.J. Stat. Ann. §§ 56:8-1, *et seq.* ....................................................... 212

Q. Claims Brought on Behalf of the New York Consumer Sub-Class ....... 216

- iv -

**TABLE OF CONTENTS**
**(continued)**

Page

36. Breach of the Implied Warranty of Merchantability N.Y. U.C.C. Law §§ 2-315 and 2-A-213, *et seq.* ........................ 216

37. Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 349 ................................................................. 217

38. Violation of the New York General Business Law, N.Y. Gen. Bus. Law § 350 ................................................................. 221

R. Claims Brought on Behalf of the North Carolina Consumer Sub-Class ................................................................................... 223

39. Violation of the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. §§ 75-1.1, *et seq.* ............. 223

S. Claims Brought on Behalf of the Ohio Consumer Sub-Class ............... 227

40. Violation of the Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.* .................................................... 227

T. Claims Brought on Behalf of the Oregon Consumer Sub-Class ........... 232

41. Violation of the Oregon Unlawful Trade Practices Act, Or. Rev. Stat. §§ 646.605, *et seq.* .............................................. 232

U. Claims Brought on Behalf of the Pennsylvania Consumer Sub-Class ................................................................................... 236

42. Breach of the Implied Warranty of Merchantability 13 Pa. Stat. and Cons. Stat. Ann. § 2314 ....................................... 236

43. Violation of the Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. §§ 201-1, *et seq.* ...................... 237

V. Claims Brought on Behalf of the Rhode Island Consumer Sub-Class ................................................................................... 241

44. Breach of the Implied Warranty of Merchantability R.I. Gen. Laws Ann. § 6A-2-314 .................................................... 241

45. Violation of the Rhode Island Unfair Trade Practices and Consumer Protection Act R.I. Gen. Laws Ann. § 16-13.1, *et seq.* ....................................................................... 242

W. Claims Brought on Behalf of the South Carolina Consumer Sub-Class ................................................................................... 246

**TABLE OF CONTENTS**
**(continued)**

**Page**

|  |  |  |
|---|---|---|
| | 46. | Violation of the South Carolina Unfair Trade Practices Act S.C. Code Ann. §§ 39-5-10, et seq. ..................................... 246 |
| | 47. | Violation of the South Carolina Regulation of Manufacturers,  Distributors, and Dealers Act S.C. Code Ann. §§56-15-10, et seq. .................................. 251 |
| | 48. | Breach of the Implied Warranty of Merchantability S.C. Code § 36-2-314 ....................................................... 252 |
| X. | | Claims Brought on Behalf of the Tennessee Consumer Sub-Class ....... 254 |
| | 49. | Violation of the Tennessee Consumer Protection Act, Tenn. Code Ann. §§ 47-18-101, et seq. .................................. 254 |
| Y. | | Claims Brought on Behalf of the Texas Consumer Sub-Class ............. 258 |
| | 50. | Breach of the Implied Warranty of Merchantability Tex. Bus. & Com. Code Ann. § 2.314 ...................................... 258 |
| | 51. | Violation of the Deceptive Trade Practices Act, Tex. Bus. & Com. Code Ann. §§ 17.41, et seq. ............................... 259 |
| Z. | | Claims Brought on Behalf of the Virginia Consumer Sub-Class .......... 264 |
| | 52. | Violation of the Virginia Consumer Protection Act Va. Code Ann. §§ 59.1-196, et seq. .................................. 264 |
| | 53. | Breach of the Implied Warranty of Merchantability Va. Code Ann. § 8.2-314 ................................................. 269 |
| AA. | | Claims Brought on Behalf of the Washington Consumer Sub-Class .... 270 |
| | 54. | Violation of the Consumer Protection Act, Wash. Rev. Code Ann. §§ 19.86.010, *et seq.* .................................. 270 |
| BB. | | Claims Brought on Behalf of the Wisconsin Consumer Sub-Class ....... 274 |
| | 55. | Violation of the Wisconsin Deceptive Trade Practices Act, Wisc. Stat. §§ 100.18(1), *et seq.* ......................... 274 |
| PRAYER FOR RELIEF | | ........................................................... 277 |
| DEMAND FOR JURY TRIAL | | ............................................... 279 |

Plaintiffs, based on personal knowledge as to themselves, and upon information and belief as to all other matters, allege as follows:

## NATURE OF CLAIMS

1.      The things meant to protect us should not be made in a way that harms or even kills us.  This is particularly true of cars because they are a tool millions of people use every day. People trust that their cars are designed and built to keep them safe; and they expect that automakers (also known as "original equipment manufacturers" or "OEMs") take every reasonable step to make sure that nothing in their cars endangers their lives, or those of any passengers who ride in them.

2.      This action concerns defective airbags manufactured by Takata Corporation and its related entities, including TK Holdings, Inc. ("Takata"), which contain inflators using the notoriously volatile and unstable compound, ammonium nitrate, but were nevertheless equipped in vehicles that Defendants Volkswagen, Mercedes, and their related entities (collectively "Defendants"), manufactured, sold or leased—and knowingly misrepresented as safe, when in fact they could explode and maim or kill drivers and passengers.

3.      An airbag is a critical safety feature of any motor vehicle.  Airbags are meant to prevent occupants from striking hard objects in the vehicle, such as the steering wheel, dashboard, or windshield.  An airbag's inflator, as its name suggests, is supposed to rapidly inflate the airbag upon vehicle impact.  In the milliseconds following a crash, the inflator ignites a propellant to produce gas that is released into the airbag cushion, causing the airbag cushion to expand and deploy.  The term "airbag" shall be used herein to refer to the entire airbag module, including the inflator.

4.      All Takata airbags at issue in this litigation share a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in Defendants' defectively designed inflators (the "Inflator Defect"). Under ordinary conditions, including daily temperature swings and contact with moisture in the air, Takata's ammonium nitrate propellant transforms and destabilizes, causing irregular and dangerous behavior,

resulting in violent combustion.  Ammonium nitrate is well-known for its explosive power. Indeed, it is the very explosive that Timothy McVeigh and Terry Nichols used in April 1995, to bomb the Alfred P. Murrah Federal Building in downtown Oklahoma City.  Likewise, in 2006, a Takata factory suffered a severe explosion because of ammonium nitrate—a fact known to its automaker clients, including Defendants. In August 2016, a truck carrying Takata airbag parts crashed on a Texas road, detonating the ammonium nitrate it carried in an immense blast, destroying a home, killing its elderly owner, and injuring four of her visitors.

5.     Because of the common, uniform Inflator Defect, Takata airbags often fail to perform as they should.  Instead of protecting vehicle occupants from bodily injury during accidents, the defective Takata airbags too often violently explode, sometimes expelling metal debris and shrapnel to unsuspecting drivers and passengers.  As of February 2018, Takata airbags have been responsible for at least 22 deaths, and hundreds of serious injuries, worldwide.

6.     In the late 1990s, when Takata shelved a safer propellant in favor of the far cheaper ammonium nitrate, it was aware of these risks and did so over the objections and concerns of its engineers in Michigan.  Tellingly, Takata is the only major airbag manufacturer that uses ammonium nitrate as the primary propellant in its airbag inflators.

7.     Defendants were intimately involved in the design and testing of the airbags that contained the Inflator Defect. When the Defendants approved Takata's airbags and purchased them for installation in their vehicles, they were aware that the airbags used the volatile and unstable ammonium nitrate as the primary propellant in the inflators.

8.     Volkswagen knew not only that the airbags used ammonium nitrate propellant, but that propellant degradation could cause a loss of the inflator's structural integrity. Nevertheless, it approved the airbags for use in its vehicles.

9.     Persistent quality problems and disturbing test results provided further warning to Volkswagen, including a number of inflators coming apart during testing in 2004, and ruptures during testing in February 2009. This pattern was punctuated by a rupture in April 2009 that led Volkswagen and Takata to directly discuss precisely the failure mechanisms and risks that have

led to a series of the largest recalls in history—and that should have led to immediate recalls, and the use of a safer propellant long ago.

10.     Before it began equipping its vehicles with defective Takata airbags, Mercedes likewise expressed concern over clear signs of overpressurization, module cover tearing, cushion tearing, output variability, and module integrity during post-deployment—all signs of potentially serious inflator and propellant problems.

11.     Despite these concerns, and despite its knowledge that Takata's airbags could not meet a key set of industry standards, Mercedes approved multiple models of ammonium-nitrate inflators. Indeed, it went so far as to waive key performance variables and accept deviations in order to push the airbags through the approval process.

12.     Apart from the notice and warnings they received through their internal review and testing, as well as interactions with Takata, Defendants Volkswagen and Mercedes also belong to a German car consortium that—no later than 2007 (and likely well before)—was discussing the risks of ammonium-nitrate inflators with Takata.

13.     All of this was against the backdrop of Defendants' knowledge that the Takata airbags were experiencing the same problems in other automakers' vehicles. Takata and its automaker customers first received word of startling airbag failures in the field no later than 2003, when a Takata inflator ruptured in the vehicle of Defendants' consortium partner, BMW. Other ruptures and injuries took place in Honda vehicles in 2004 and 2007. After years of downplaying the danger, Honda issued a public recall in the United States in 2008, putting all automakers, including Defendants, on even greater notice of the danger. The alarm bells should have only grown louder in the coming years, as Honda and Takata issued further United States recalls of airbags with the Inflator Defect in 2009, 2010, 2011, and 2013, leading up to the record-breaking recalls that followed from 2014 onward. Yet, despite the repeated recalls of others in the auto industry, and their independent concerns arising out of the use of these dangerous inflators, Defendants utterly failed to take reasonable, let alone sufficient, measures to investigate the issue or protect purchasers, lessees, or the general public. Indeed, even as other

automakers began taking proactive, remedial measures (however belated and ineffective), Defendants remained silent on the sidelines.

14.     By May 2015, Takata had filed Defect Information Reports ("DIRs") admitting the defect and continued to add inflator models through additional DIRs in the coming years. Despite overwhelming evidence of the defect, Defendants did not issue recalls, warn consumers, or otherwise protect them from the risk, through, for example, systematic loaner vehicle programs. Indeed, in correspondence with the National Highway Traffic Safety Administration ("NHTSA") in early 2016, Volkswagen went so far as to try to *avoid* a recall, even as other automakers were undertaking their own and moving ahead. Additionally, in correspondence to Plaintiffs and consumers, in December 2017 and January 2018, Mercedes acknowledged that "the availability of replacement parts [was] taking longer than anticipated." It also indicated that it needed to obtain an extension of time from NHTSA to provide replacement parts, and that for certain vehicle owners belonging to a particular priority group established by NHTSA, replacement parts would not be expected to be available until March 31, 2018. The Defendants' delay is consequential—it exposes purchasers, lessees, drivers, passengers, and, indeed, the general public, to an ongoing and unnecessary risk of harm.

15.     Plaintiffs and consumers are in the frightening position of having to drive dangerous vehicles for many months or years while they wait for Defendants to replace the defective airbags in their cars. They are effectively left without safe vehicles to take them to and from work, pick up their children from schools or daycares, or, in the most urgent of situations, transport themselves or others to hospitals.

16.     Even more troubling—many of the replacement airbags that Takata and the automakers are using to "repair" recalled vehicles suffer from the same common, uniform defect that plagues the airbags being removed; they continue to use unstable and dangerous ammonium nitrate as the propellant—a fact that Takata's representative admitted at a Congressional hearing in June 2015. Takata's representative also repeatedly refused to provide assurances that Takata's replacement airbags were safe and defect-free.

17.     Defendants knew, and certainly should have known, that the Takata airbags installed in millions of vehicles were defective. By concealing their knowledge of the nature and extent of the defect from the public, while continuing to advertise their products as safe and reliable, Defendants demonstrated a blatant disregard for public welfare and safety. Moreover, Defendants violated their affirmative duty, imposed under the Transportation Recall Enhancement, Accountability, and Documentation Act (the "TREAD Act"), to promptly advise customers about known defects.

18.     As a result of this misconduct, Plaintiffs and members of the proposed Classes were harmed and suffered actual damages.  Plaintiffs and the Classes did not receive the benefit of their bargain; rather, they purchased or leased vehicles that are of a lesser standard, grade, and quality than represented, and they did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation.  Purchasers and lessees of the Class Vehicles paid more, either through a higher purchase price or higher lease payments, than they would have had the Inflator Defect been disclosed.  Plaintiffs and the Classes were deprived of a safe, defect-free airbag installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they simultaneously avoided incurring the costs associated with recalls and installing replacement parts for many years.

19.     Plaintiffs and the Classes also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.  Also, as a direct result of misconduct by Defendants, each Plaintiff and Class member has out-of-pocket economic damage by virtue of having incurred the expense of taking the time to bring vehicles in for recall repairs.

20.     Plaintiffs and the Classes also suffered damages as a result of Defendants' concealment and suppression of the facts concerning the safety, quality, and reliability of their vehicles with defective Takata airbags.  Defendants' false representations and omissions concerning the safety and reliability of those vehicles, and their concealment of the known safety

defects plaguing their vehicles and brands, caused certain Plaintiffs and Class members to purchase or retain vehicles of diminished value.

## JURISDICTION AND VENUE

21.     Jurisdiction is proper in this Court pursuant to the Class Action Fairness Act, 28 U.S.C. § 1332(d), because members of the proposed Plaintiff Class are citizens of states different from Defendants' home states, and the aggregate amount in controversy exceeds $5,000,000, exclusive of interest and costs. Also, jurisdiction is proper in this Court pursuant to 28 U.S.C. § 1331, because Plaintiffs' RICO, Magnusson-Moss, and Lanham Act claims arise under federal law. This Court has supplemental jurisdiction over Plaintiffs' state law claims under 28 U.S.C. § 1367.

22.     This Court has personal jurisdiction over Plaintiffs because Plaintiffs submit to the Court's jurisdiction. This Court has personal jurisdiction over Defendants, pursuant to Florida Statutes § 48.193(1)(a)(1), (2), and (6), because they conduct substantial business in this District; some of the actions giving rise to the Complaint took place in this District; and some of Plaintiffs' claims arise out of Defendants operating, conducting, engaging in, or carrying on a business or business venture in this state or having an office or agency in this state, committing a tortious act in this state, and causing injury to property in this state arising out of Defendants' acts and omissions outside this state; and at or about the time of such injuries Defendants were engaged in solicitation or service activities within this state, or products, materials, or things processed, serviced, or manufactured by Defendants anywhere were used or consumed within this state in the ordinary course of commerce, trade, or use.  This Court also has personal jurisdiction over Defendants because they consented to jurisdiction by registering to do business in Florida.  This Court has pendant or supplemental personal jurisdiction over the claims of non-Florida Plaintiffs.

23.     This Court also has personal jurisdiction over Defendants under 18 U.S.C. § 1965, because they are found or have agents or transact business in this District, and supplemental or pendant jurisdiction over Defendants for Plaintiffs' state law claims.

24.     This Court also has nationwide personal jurisdiction over the Defendants under 28 U.S.C. § 1407, both in its own right and by standing in the shoes of transferor courts that have transferred actions to this MDL. The District of New Jersey, the Western District of Virginia, and the Middle, Southern, and Northern Districts of Georgia are transferor courts for this MDL, and are also the states where Volkswagen, Audi, and Mercedes are located; and thus, this Court may exercise general jurisdiction over Defendants.   To the extent necessary for personal jurisdiction purposes, any claims asserted in this Consolidated Class Action Complaint may be deemed to have been filed in a transferor court that may exercise personal jurisdiction over Defendants for such claims.

25.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(a), because a substantial part of the events or omissions giving rise to these claims occurred in this District, Defendants have caused harm to Class members residing in this District, and Defendants are residents of this District under 28 U.S.C. § 1391(c)(2), because they are subject to personal jurisdiction in this District. Also, venue is proper in this District pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1407.

## **THE PARTIES**

### I.     **Defendants**

26.     Volkswagen Aktiengesellschaft ("VW AG") is a German corporation with its principal place of business in Wolfsburg, Germany. VW AG is one of the largest automobile manufacturers in the world, and is in the business of designing, developing, manufacturing, marketing, and selling automobiles. VW AG is the parent corporation of Audi AG.

27.     Volkswagen Group of America ("VW America") is a New Jersey corporation doing business throughout the United States. VW America's corporate headquarters is located in

Herndon, Virginia. VW America is a wholly-owned U.S. subsidiary of VW AG, and it engages in business activities in furtherance of the interests of VW AG, including the advertising, marketing and sale of Volkswagen automobiles worldwide.

28.     Audi Aktiengesellschaft ("Audi AG") is a German corporation with its principal place of business in Ingolstadt, Germany. Audi AG is the parent of Audi of America, LLC, and a subsidiary of the Audi Group, which is a wholly-owned subsidiary of VW AG. Audi AG designs, develops, manufacturers, and sells luxury automobiles.

29.     Audi of America, LLC ("Audi America") is a Delaware limited liability company, with its principal place of business located at 2200 Ferdinand Porsche Drive, Herndon, Virginia 20171. Audi America is a wholly-owned U.S. subsidiary of Audi AG, and it engages in business, including the advertising, marketing and sale of Audi automobiles, in all 50 states.

30.     As used in this Complaint, "Audi" and "Audi Defendants" refers to Audi AG and Audi America. "Volkswagen" and "Volkswagen Defendants" refers to VW AG, VW America, Audi AG, and Audi America.

31.     The Volkswagen Defendants engineered, designed, developed, manufactured, or installed the Defective Airbags in the Volkswagen- and Audi-branded Class Vehicles (defined below), and approved the Defective Airbags for use in those vehicles. They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles.

32.     Daimler Aktiengesellschaft ("Daimler AG") is a foreign corporation headquartered in Stuttgart, Baden-Württemberg, Germany. Daimler AG is in the business of designing, developing, manufacturing, marketing, and selling luxury automobiles.

33.     Mercedes-Benz USA, LLC ("MBUSA") is a Delaware limited liability corporation, whose principal place of business is 303 Perimeter Center North, Suite 202, Atlanta, Georgia 30346. Until approximately July 2015, Mercedes's principal place of business was 1 Mercedes Drive, Montvale, New Jersey 07645. Daimler AG is the parent corporation of MBUSA. Daimler AG and MBUSA are collectively referred to as "Mercedes" or "Mercedes

Defendants." The Mercedes Defendants engineered, designed, developed, manufactured, or installed the Defective Airbags in the Mercedes-branded Class Vehicles, and approved the Defective Airbags for use in those vehicles. They also developed, reviewed, and approved the marketing and advertising campaigns designed to sell these Class Vehicles.

## II.     Plaintiffs

34.     Unless otherwise indicated, all Plaintiffs identified below purchased their Class Vehicles primarily for personal, family, and household use. All Plaintiffs identified below and the proposed Classes were harmed and suffered actual damages. The defective Takata airbags significantly diminish the value of the vehicles in which they are installed. Such vehicles have been stigmatized as a result of being recalled and equipped with Takata airbags and the widespread publicity of the Inflator Defect.

35.     Further, Plaintiffs and the proposed Classes did not receive the benefit of their bargain; rather, they purchased and leased vehicles that are of a lesser standard, grade, and quality than represented, and did not receive vehicles that met ordinary and reasonable consumer expectations regarding safe and reliable operation. All Plaintiffs identified below and the Classes, either through a higher purchase price or higher lease payments, paid more than they would have had the Inflator Defect been disclosed. All Plaintiffs identified below and the Classes were deprived of having safe, defect-free airbags installed in their vehicles, and Defendants unjustly benefited from their unconscionable delay in recalling their defective products, as they avoided incurring the costs associated with recalls and installing replacement parts for many years.

36.     All Plaintiffs identified below, and the proposed Classes, also suffered damages in the form of out-of-pocket and loss-of-use expenses and costs, including, but not limited to, expenses and costs associated with taking time off from work, paying for rental cars or other transportation arrangements, and child care.

37.     All Plaintiffs identified below, and members of the proposed Classes, who have brought their vehicles to dealerships, have suffered out-of-pocket economic damage by virtue of their having incurred the expense of taking the time to bring their car in for repairs.

38.     The defective Takata airbags create a dangerous condition that gives rise to a clear, substantial, and unreasonable danger of death or personal injury to all identified Plaintiffs below, and the proposed Classes.

39.     Plaintiff April Rockstead Barker resides in Waukesha, Wisconsin. Plaintiff owned a 2012 Volkswagen Passat, which she purchased used in or about 2014 for approximately $12,000 from Hall Volkswagen in Brookfield, Wisconsin. Plaintiff's 2012 Volkswagen Passat was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Volkswagen's long record of durability and safety. Plaintiff contacted Hall Volkswagen to inquire about scheduling a repair or replacement of the airbags in her 2012 Volkswagen Passat after she heard the news reports, and was initially told that the repair or replacement parts were not yet available. Later, on August 14, 2017, the airbag in Plaintiff's 2012 Volkswagen Passat was replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it. On or about November 17, 2017, Plaintiff's 2012 Volkswagen Passat was declared a total loss as a result of an accident.

40.     Plaintiff Dave Battinieri resides in West Chester, Pennsylvania. Plaintiff owned a 2014 Volkswagen Passat, which he purchased new on or about August 10, 2014 for approximately $20,967 from YBH Volkswagen in Newtown Square, Pennsylvania. Plaintiff's 2014 Volkswagen Passat was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Volkswagen's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff communicated with YBH Volkswagen dealership about scheduling a repair or replacement of the airbags in his 2014 Volkswagen Passat, and was told that there "were no options to correct the issue at this time."

The dealership told Plaintiff that he would receive another notification when a solution became available, but no such notification has been forthcoming. To Plaintiff's knowledge, the airbags in his 2014 Volkswagen Passat have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

41.     Plaintiff Ericka Black resides in Boston, Massachusetts. Plaintiff Black owns a 2013 Mercedes C-250, which she purchased used on July 1, 2017 for approximately $15,497 from Imotobank Dealership in Walpole, Massachusetts. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted Mercedes's positive reputation for manufacturing safe and dependable vehicles. To Plaintiff Black's knowledge, the airbags in her 2013 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

42.     Plaintiff Tiffany Bolton resides in Waco, Texas. Plaintiff owns a 2012 Mercedes-Benz GL 450, which she purchased new in October 2012 for $64,640.00 from Mercedes-Benz of Waco in Waco, Texas. To Plaintiff's knowledge, the airbags in her 2012 Mercedes-Benz GL 450 have never been repaired or replaced. The value of her 2012 Mercedes-Benz GL 450 has been diminished as a result of the Inflator Defect. Prior to purchasing her 2012 Mercedes-Benz GL 450, Plaintiff viewed or heard about the vehicle's safety features through TV advertisements and the Internet. If Plaintiff Bolton had known about the Inflator Defect, she would not have purchased the vehicle or would not have paid as much as she did for it.

43.     Plaintiff Darren Boyd resides in New Windsor, New York. Plaintiff owns a 2009 Mercedes ML350, which he purchased used in or about 2010 for approximately $38,000 from the Benzel-Busch Mercedes-Benz dealership in Englewood, New Jersey. Plaintiff's 2009 Mercedes ML350 was covered by a factory warranty. Prior to purchasing the vehicle, Plaintiff

- 11 -

viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls when he visited the dealership to potentially trade in the vehicle. Plaintiff visited Benzel-Busch and called Mercedes's corporate office to inquire about scheduling a repair or replacement of the airbags in his 2009 Mercedes ML350, and was told by a Mercedes employee or representative that the repair or replacement parts were not yet available. To Plaintiff's knowledge, the airbags in his 2009 Mercedes ML350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

44.     Plaintiff Daphne Bridges resides in Charlotte, North Carolina. Plaintiff owns a 2014 Mercedes C-250, which she purchased used in or about April 2015 for approximately $22,019 from Hendrick Motors of Charlotte Mercedes-Benz in Charlotte, North Carolina. Plaintiff's 2014 Mercedes C-250 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety generally. The sales representative at Hendrick Motors emphasized the superior features, including safety features of the Mercedes C-250. Plaintiff learned of these recalls through news reports and received a postcard from Mercedes on or about November 1, 2017 regarding the availability of replacement parts. To Plaintiff's knowledge, the airbags in her 2014 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

45.     Plaintiff Randy Brown resides in Milford, Ohio. Plaintiff Brown owns a 2008 Mercedes C-300, which he purchased new on May 31, 2008, for approximately $38,853 from Mercedes-Benz of West Chester, Ohio. Plaintiff's Mercedes C-300 is covered by a written warranty, and Plaintiff Brown also purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, magazines, and brochures that

touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Brown learned of the recalls from letters he received from Defendant Mercedes in or about May and August 2016, notifying him that the Takata driver-side and passenger-side frontal airbags in Plaintiff's 2008 C-300 were subject to recall. To Plaintiff Brown's knowledge, the airbags in his 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

46.     Plaintiff Edward J. Burki resides in Sun City Center, Florida. Plaintiff owned a 2007 Audi A4 Cabriolet, which he purchased used in or about September 2011 for approximately $30,816 from Biener Audi in Great Neck, New York. Plaintiff's 2007 Audi A4 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted the safety and dependability of his vehicle and Audi vehicles generally. Plaintiff learned of the recall by letter from Audi in July 2016. Plaintiff contacted Crown Audi in Clearwater Florida in September 2016 but was told that replacement airbags were not available. Plaintiff's airbag replacement was completed on May 26, 2017 at Crown Audi. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

47.     Plaintiff Bladimir Busto Jr. resides in Miami, Florida. Plaintiff leased a new 2014 Volkswagen CC on May 17, 2014 for $31,070.00 from Rick Case Volkswagen in Weston, Florida. Plaintiff's 2014 Volkswagen CC was covered by a written warranty up to 36,000 miles and an extended warranty.  Prior to leasing the vehicle, Plaintiff viewed or heard commercials through the Volkswagen website, YouTube and Automobile Blogs that touted the safety and dependability of his vehicle and Volkswagen vehicles generally.  Plaintiff contacted Rick Case Volkswagen and Volkswagen of America multiple times to inquire about scheduling a repair or replacement of the airbags in his 2014 Volkswagen CC and was told that the repair or

replacement parts were not available. The value of his 2014 Volkswagen CC was diminished as a result of the Inflator Defect. Plaintiff feared driving the vehicle and traded it in on December 31, 2016 for $15,500 although it caused him to be upside down on his payments. If Plaintiff Busto had known about the Inflator Defect, he either would not have leased the 2014 Volkswagen CC or would not have paid as much as he did to lease it.

48.     Plaintiff Cheryl Butler-Adams resides in Henderson, Nevada. Plaintiff owns a 2011 Mercedes C-330, which was purchased used in or about November 2015 for approximately $18,988 from Apex Auto of Fremont, California. Plaintiff's 2011 Mercedes C-330 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff Butler-Adams also received a letter from Mercedes notifying her that the Takata frontal airbag in her 2011 Mercedes C-330 was subject to recall. Since receiving the notification from Mercedes, Plaintiff has called Mercedes every few months to check on the status of the recall.  Mercedes has told Plaintiff that no repair or replacement parts are available, and that her situation is "not that serious," and "not a priority." To Plaintiff's knowledge, the airbags in her 2011 Mercedes C-330 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

49.     Plaintiff Pattie Byrd resides in Ewing, New Jersey. Plaintiff Byrd owns a 2012 Volkswagen CC Sport, which she purchased new in August 2011 for approximately $20,000 from Hamilton Volkswagen in Hamilton, New Jersey. Prior to purchasing the vehicle, Plaintiff viewed advertisements online that touted the safety and dependability of her vehicle and Volkswagen vehicles generally. To Plaintiff Byrd's knowledge, the driver's airbag in her 2012 Volkswagen CC Sport was replaced in August 2017 through the recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the

- 14 -

Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

50.     Plaintiff Michael Cahill resides in West Hollywood, California. Plaintiff owns a 2010 Mercedes ML350, which he purchased used in or about 2011 for approximately $40,000 from Keyes European Mercedes-Benz in Van Nuys, California. Plaintiff's 2010 Mercedes ML350 was covered by a factory warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through a mailing from Takata. To Plaintiff's knowledge, the airbags in his 2010 Mercedes ML350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

51.     Plaintiff Paulette Calhoun resides in Atlanta, Georgia. Plaintiff Calhoun owns a 2011 Mercedes C-300, which she purchased used in September 2015 for approximately $16,800 from a private individual in Atlanta, Georgia. Plaintiff Calhoun purchased an extended warranty for her 2011 C-300 from Nations Auto Protection. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. To Plaintiff Calhoun's knowledge, the airbags in her 2011 C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

52.     Plaintiff Jacqueline Carrillo resides in Miami, Florida. Plaintiff Carrillo owned a 2008 Audi A4, which she purchased used on March 4, 2015 from Lorenzo Bomnin Chevrolet in Miami, Florida.  The vehicle was owned until she traded it in on June 17, 2017, causing Plaintiff to be upside down on her loan payments.  Plaintiff felt she could no longer risk her safety, especially in Miami's heat and humidity.  To Plaintiff's knowledge, the airbags in her 2008 Audi A4 have never been repaired or replaced.  The value of her 2008 Audi A4 was diminished as a

result of the Inflator Defect.  If Plaintiff Carrillo had known of the Inflator Defect, she would not have purchased the 2008 Audi A4 or would not have paid as much as she did for it.

53.     Plaintiff Robert Cervelli resides in Abington, Massachusetts. Plaintiff Cervelli owns a 2010 Mercedes E-350 Coupe, which he purchased used on September 3, 2014, for approximately $32,685 from Midway Automotive in Abington, Massachusetts. Plaintiff Cervelli's 2010 E-350 Coupe was covered by a written warranty at the time that he purchased it. Prior to purchasing the vehicle, Plaintiff viewed advertisements through the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff received a recall notice from Mercedes in August 2016, informing him that his 2010 E-350 Coupe contains Takata airbags with the Inflator Defect that are subject to recall. To Plaintiff Cervelli's knowledge, the airbags in his 2010 E-350 Coupe have not been repaired or replaced. Defendant Mercedes informed Plaintiff Cervelli that it could take up to two years before the parts are available to replace the defective airbags in his 2010 E-350 Coupe. Plaintiff's local Mercedes dealership has refused to accept Plaintiff Cervelli's vehicle as a trade in for full retail value. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

54.     Plaintiff Christopher Allen Cobb resides in Raleigh, North Carolina. Plaintiff owns a 2013 Volkswagen CC, which he purchased new on November 30, 2014 for $31,375.00 from Southern States VW in Durham, North Carolina. To Plaintiff's knowledge, the airbags in his 2013 Volkswagen CC were not replaced until August 2017.  The value of his 2013 Volkswagen CC has been diminished as a result of the Inflator Defect.  If Plaintiff Cobb had known of the Inflator Defect, he would not have purchased the 2013 Volkswagen CC or would not have paid as much as he did for it.

55.     Plaintiff Loretta Collier resides in Madison, Alabama. Plaintiff owns a 2013 Mercedes-Benz Sprinter Motor Home, which she purchased new in August 2012 for $102,474.77 from Camping World in Calera, Alabama. To Plaintiff's knowledge, the airbags in

her 2013 Mercedes-Benz Sprinter Motor Home have never been repaired or replaced. The value of her 2013 Mercedes-Benz Sprinter Motor Home has been diminished as a result of the Inflator Defect. Plaintiff sold the subject vehicle on August 3, 2016 for $65,000.  If Plaintiff Collier had known of the Inflator Defect, she would not have purchased the 2013 Mercedes-Benz Sprinter Motor Home or would not have paid as much as she did for it.

56.     Plaintiff Angela Cook resides in Columbus, Ohio. Plaintiff owns a 2009 Volkswagen CC, which she purchased used in or about November 2013 for approximately $19,000 from Hatfield Hyundai in Columbus, Ohio. Plaintiff's 2009 Volkswagen CC was covered by a factory and extended warranty. Plaintiff learned of these recalls through television commercials. To Plaintiff's knowledge, the airbags in her 2009 Volkswagen CC have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

57.     Plaintiff Sherri Cook resides in Addison, Texas. Plaintiff owns a 2009 Mercedes C-300, which she purchased new on November 14, 2008, for $48,005 from Mercedes Ewing Autohouse in Plano, Texas. Plaintiff's 2009 Mercedes C-300 was covered by a written warranty. Plaintiff Cook also purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff Cook viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls from news reports and also from a letter she received from Mercedes in or about August 2016. Since receiving the notification from Mercedes about the Takata airbag recall, Plaintiff has called Mercedes several times, in 2016 and 2017, to check on the status of the recall. Defendant Mercedes has told Plaintiff that no repair or replacement parts are available and, after expressing her concern about the dangerous condition caused by the Takata airbag, Mercedes responded that the "good news is there hasn't been a reported Mercedes airbag problem." In early December 2017, Mercedes told Plaintiff that replacement parts might be available in April 2018. The airbags in Plaintiff Cook's 2009 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the

Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

58.     Plaintiff Chloe Crater resides in Little Rock, Arkansas. Plaintiff owned a 2012 Volkswagen Passat, which she purchased used in or about November 2012 for approximately $21,844 from Owens Murphy Volkswagen in Little Rock, Arkansas. Plaintiff's 2012 Volkswagen Passat was covered by a written warranty. In addition, Plaintiff purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Volkswagen's long record of durability and safety. Plaintiff also reviewed specifications of the vehicle on the Volkswagen website before purchasing the vehicle. Plaintiff learned of these recalls through news reports and from a recall notice sent to her from Volkswagen. Plaintiff called the Owens Murphy dealership and Volkswagen's customer care line and internet chat site about scheduling a repair or replacement of the airbags in her 2012 Volkswagen Passat, and was told by both that parts are unavailable for replacement. To Plaintiff's knowledge, the airbags in her 2012 Volkswagen Passat have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

59.     Plaintiff Vernettia Davis resides in Mesquite, Texas. Plaintiff Davis owns a 2012 Mercedes E-350, which she purchased used on April 3, 2016, for approximately $26,875 from Legend Auto in Plano, Texas. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Davis received a notice from Mercedes informing her that the Takata airbags in her 2012 Mercedes E-350 contain the Inflator Defect, and are subject to recall. She has attempted to contact Mercedes to schedule a repair or replacement under the recall, but Mercedes has not responded to her inquiries. To Plaintiff Davis's knowledge, the airbags in her 2012 E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known

about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

60.     Plaintiff Dave De King resides in Gilbert, Arizona. Plaintiff owns a 2012 Volkswagen CC, which he purchased new in or about May 2011 for approximately $33,014 from San Tan Volkswagen, in Gilbert, Arizona. Plaintiff's 2012 Volkswagen CC was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed Volkswagen promotional materials at the dealership and viewed and heard television commercials that touted Volkswagen's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff called the San Tan dealership in the Fall of 2016, and twice in 2017, about the Takata airbag recall, and was told that parts were not yet available to correct the recall. To Plaintiff's knowledge, the airbags in his 2012 Volkswagen CC have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

61.     Plaintiff Linda Dean resides in Hazard, Kentucky. Plaintiff owns a 2014 Volkswagen Passat, which she purchased used in November 2014 for $14,500.00 from Tim Short Ford in Hazard, Kentucky.  To Plaintiff's knowledge, the airbags in her 2014 Volkswagen Passat have never been repaired or replaced. The value of her 2014 Volkswagen Passat has been diminished as a result of the Inflator Defect.  If Plaintiff Dean had known of the Inflator Defect, she would not have purchased the 2014 Volkswagen Passat or would not have paid as much as she did for it.

62.     Plaintiff Diego DelaCruz resides in Holland, Michigan. Plaintiff DelaCruz owns a 2011 Mercedes C-300 Sports Sedan 4matic, which he purchased used on September 6, 2014, for approximately $19,926 from Mercedes of Naperville in Naperville, Illinois. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. To Plaintiff Delacruz's knowledge, the airbags in his 2011 Mercedes C-300 Sports Sedan 4matic have not

been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

63.     Plaintiff Angela Dickie resides in Mt. Pleasant, South Carolina. Plaintiff owns a 2012 Volkswagen Passat, which she purchased used in June 2015 for $16,750.00 from Low Country VW in Mt. Pleasant, South Carolina. To Plaintiff's knowledge, the airbag in her 2012 Volkswagen Passat has never been repaired or replaced. The value of her 2012 Volkswagen Passat has been diminished as a result of the Inflator Defect.  If Plaintiff Dickie had known of the Inflator Defect, she would not have purchased the 2012 Volkswagen Passat or would not have paid as much as she did for it.

64.     Plaintiff Jody Dorsey resides in Utica, New York. Plaintiff owns a 2008 Mercedes C-300, which she purchased used in or about June 2015, for approximately $16,867 from Nimey's The New Generation in Utica, New York. Plaintiff's 2008 Mercedes C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety generally. The sales representative at Nimey's the New Generation emphasized the superior features, including safety features, of the Mercedes C-300. Plaintiff learned of these recalls through news reports, and received postcards from Mercedes in or about April 2016 and August 2016 regarding the availability of replacement parts. To Plaintiff's knowledge, the airbags in his 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

65.     Plaintiff Maureen Dowds resides in Lansdale, Pennsylvania. Plaintiff Dowds owns a 2010 Audi A5 Cabriolet, which she purchased used in October 2010, for $42,000 from Prestige Lexus of New Jersey in New Jersey. Plaintiff Dowds's 2010 Audi A5 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted the safety and dependability of her vehicle and Audi vehicles

- 20 -

generally. Plaintiff Dowds learned about the Takata airbag recalls from news reports. During a scheduled maintenance at Audi Conshohocken in or about 2016, Plaintiff asked the service manager about replacing the Takata airbags. She was told that no parts were available. Expressing her concern about driving her car indefinitely while at risk, Plaintiff Dowds then asked to have a "loaner" vehicle until airbag replacements became available. The Audi service manager told Plaintiff Dowds that "no loaner cars were available for the airbag situation," but not to worry, because "there haven't been any deaths in an Audi." To Plaintiff's knowledge, the airbags in her 2010 Audi A5 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

66.     Plaintiff Antonia Dowling resides in Bluffton, South Carolina. Plaintiff owns a 2009 Volkswagen CC, which she purchased used in July 2012 for $21,938.00 from Stokes Brown Toyota Scion of Hilton Head in Bluffton, South Carolina. To Plaintiff's knowledge, the airbags in her 2009 Volkswagen CC were replaced with a temporary newer version of the same Takata airbag on April 19, 2017. The value of her 2009 Volkswagen CC has been diminished as a result of the Inflator Defect.  If Plaintiff Dowling had known of the Inflator Defect, she would not have purchased the 2009 Volkswagen CC or would not have paid as much as she did for it.

67.     Plaintiff Heidi Elliott resides in Bronx, New York. Plaintiff Elliott leased a used 2013 Mercedes C-300, for which she paid a total of approximately $23,625. The lease began on November 14, 2016, and was originated at New Rochelle Hyundai in in New Rochelle, New York. Plaintiff Elliott's 2013 C-300 was covered by a written warranty at the time she leased it. Prior to leasing the vehicle, Plaintiff viewed or heard commercials through television that touted the safety and dependability of Mercedes vehicles generally. To Plaintiff Elliott's knowledge, the airbags in her 2013 Mercedes C-300 have not been repaired or replaced. Plaintiff is no longer leasing the vehicle as of December 8, 2017. The value of Plaintiff's vehicle has been diminished

- 21 -

as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not leased the vehicle, or would not have paid as much as she did to lease it.

68.     Plaintiff Michael Farriss resides in Henrico, Virginia. Plaintiff owns a 2005 Audi A4, which he purchased used on April 24, 2007 for approximately $26,000 in a private sale from Brandon Farriss, in Henrico, Virginia. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Audi's long record of durability and safety. Plaintiff learned about the Takata airbag recalls from a notice he received from Audi in or around July 2016. Upon learning of the problem, Plaintiff Farriss stopped allowing anyone to ride in the passenger seat of his 2005 Audi A4. Hearing nothing further, on June 1, 2017, Plaintiff Farriss communicated with Audi by email to request an update on the status of the recall. Plaintiff Farriss also filed a complaint with NTSB on the same date. Audi responded to Plaintiff's email stating that they had no specific date for the new airbags to be available. In August 2017, Plaintiff Farriss received a notice from Audi about the availability of an interim repair and that Plaintiff would be notified when a final remedy was available. On September 18, 2017, the airbag in Plaintiff's vehicle was replaced at West Broad Audi consistent with the interim remedy offered by Audi. Plaintiff has not received any notice about a final remedy. The value of his 2005 Audi A4 has been diminished as a result of the Inflator Defect. If Plaintiff Farriss had known of the Inflator Defect, he would not have purchased the 2005 Audi A4 or would not have paid as much as he did for it.

69.     Plaintiff Efrain Ferrer resides in Walnut Creek, California. Plaintiff owned a 2012 Volkswagen CC, which he purchased new in or about 2012 for approximately $37,072.35 from Volkswagen of Oakland in Walnut Creek, California. Plaintiff's 2012 Volkswagen CC was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff knew the Volkswagen brand and had viewed and heard commercials that touted Volkswagen's long record of durability and safety. When he learned of the recall, he stopped driving the 2012 Volkswagen CC and ultimately purchased another vehicle costing him $355 a month. To Plaintiff's knowledge, the airbags in his 2012 Volkswagen CC have never repaired or replaced. He sold his 2012

- 22 -

Volkswagen CC at a diminished price as a result of the Inflator Defect. The vehicle was sold through a company named Shift.  The car was ultimately sold for $14,350, an amount that Plaintiff believes is much lower than what it would have sold for had it not been affected by the recall.  Plaintiff received $13,440 from Shift.  If Plaintiff Ferrer had known of the Inflator Defect, he would not have purchased the 2012 Volkswagen CC or would not have paid as much as he did for it.

70.     Plaintiff Sam Fragale resides in Dallas, Texas. Plaintiff owns a 2014 Mercedes C-250, which he purchased used in or about October 2014, for approximately $28,950 from eCarOne in Carrollton, Texas. Plaintiff's 2014 Mercedes C-250 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls from news reports. Plaintiff contacted the Mercedes of Plano dealership on October 30, 2017, to check on the status of the recall. The dealership initially told Plaintiff that his car was not part of the recall, and that no repair or replacement parts were available. On or about November 28, 2017, Plaintiff received a notice from Mercedes regarding the airbag recall, stating that replacement parts were not available. To Plaintiff's knowledge, the airbags in his 2014 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

71.     Plaintiff Julius Fulmore resides in Greensboro, North Carolina. Plaintiff owns a 2014 Mercedes-Benz Sprinter Motor Home, which he purchased used in January 2015 for approximately $72,500 from Performance Unlimited in Wolfforth, Texas. To Plaintiff's knowledge, the airbags in his 2014 Mercedes-Benz Sprinter Motor Home have never been repaired or replaced. The value of his 2014 Mercedes-Benz Sprinter Motor Home has been diminished as a result of the Inflator Defect. If Plaintiff Fulmore had known of the Inflator Defect, he would not have purchased the 2014 Mercedes-Benz Sprinter Motor Home or would not have paid as much as he did for it.

72.     Plaintiff Mirsad Gacic resides in Chicago, Illinois. Plaintiff Gacic owns a 2010 Mercedes E-350, which he purchased used in April 2014, for approximately $29,000 from Grossinger Motors Mercedes-Benz in Normal, Illinois. Plaintiff Gacic purchased an extended warranty for the vehicle. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, brochures, and pamphlets that touted the safety and dependability of his vehicle and Mercedes vehicles generally. To Plaintiff Gacic's knowledge, the airbags in his 2010 E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

73.     Plaintiff Silvia Gil resides in Miami, Florida. Plaintiff Gil leased a 2014 Volkswagen Passat, new in December 2013 for $12,484.92.   The vehicle was leased from Esserman International Volkswagen in Miami, Florida. To Plaintiff's knowledge, the airbags in her 2014 Volkswagen Passat have never repaired or replaced. The value of her 2014 Volkswagen Passat was diminished as a result of the Inflator Defect. If Plaintiff Gil had known of the Inflator Defect, she would not have leased the 2014 Volkswagen Passat or would not have paid as much as she did for it.

74.     Plaintiff Pren Gjuraj resides in Shelton, Connecticut. Plaintiff owns a 2010 Mercedes GL450, which she purchased used in or about March 2015, for approximately $30,000 from Mercedes-Benz of Greenwich in Greenwich, Connecticut. Plaintiff's 2010 Mercedes GL450 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff called Mercedes-Benz of Greenwich to inquire about scheduling a repair or replacement of the airbags in his 2010 Mercedes GL450, and was told to call another local dealership about the potential to repair the vehicle. To Plaintiff's knowledge, the airbags in his 2010 Mercedes GL450 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had

known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

75.     Plaintiff William Goldberg resides in Seattle, Washington.  Plaintiff owns a 2011 Mercedes-Benz GLK 350, which he purchased new in approximately December 2010 or January 2011 from Barrier Mercedes k/n/a Mercedes-Benz of Bellevue in Bellevue, Washington. To Plaintiff's knowledge, the airbags in his 2011 Mercedes-Benz GLK 350 have never been repaired or replaced. Plaintiff no longer owns the vehicle, but did receive two recall notices.  He contacted Mercedes-Benz of Bellevue after receiving the notices and told them that he was concerned about his wife driving the vehicle.  He was told replacement parts were not available and they could not do anything.  Plaintiff recalls meeting with the head of the used car department and was informed that the vehicle had no value and that they were not interested in purchasing it.  Ultimately, in July 2016, the vehicle was traded in for a new GLC 300 at a diminished value of only $14,000.  Plaintiff opted for this option as he did not want his wife driving the vehicle any longer.  The dealership informed him that they could not dispose of the vehicle until the airbags were replaced/repaired.  Prior to purchasing his 2011 Mercedes-Benz GLK 350, Plaintiff viewed or heard about the vehicle's safety features through TV advertisements, print advertisements, and brochures given to him by his dealer. If Plaintiff Goldberg had known of the Inflator Defect, he would not have purchased the 2011 Mercedes-Benz GLK 350 or would not have paid as much as he did for it.

76.     Plaintiff Melinda M. Harms resides in Bloomington, Illinois. Plaintiff owns a 2008 Mercedes SLK-280, which she purchased new in or about June 2008, for approximately $47,898 from Sud's Motor Car Company Mercedes-Benz in Normal, Illinois. Plaintiff's 2008 Mercedes SLK-280 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff Harms learned of the recall from a letter she received from Mercedes in or about May 2016, notifying her that the Takata driver-side frontal airbag in Plaintiff's 2008 SLK-280 was subject to recall. Plaintiff received a postcard mailer from Mercedes in or about February 2017,

stating that Mercedes will notify her when replacement parts become available. Since then, Plaintiff Harms has contacted her dealership twice about the status of the recall. The Mercedes dealership has told Plaintiff that no repair or replacement parts are available. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

77.     Plaintiff Alandrix Harris resides in Arlington, Texas. Plaintiff Harris owns a 2010 Volkswagen Golf, which he purchased used on March 19, 2015, for approximately $18,000 from AutoNation Volkswagen in Dallas, Texas. Plaintiff Harris's vehicle is covered by a written warranty. Prior to purchasing the vehicle, Plaintiff heard or viewed commercials through television and the radio that touted the safety and dependability of his vehicle and Volkswagen vehicles generally. To Plaintiff Harris's knowledge, the airbags in his 2010 Volkswagen Golf were replaced under the recall on October 24, 2017. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

78.     Plaintiff Debrah Henry resides in San Gabriel, California. Plaintiff Henry owns a 2009 Mercedes C-300, which she purchased used on February 22, 2013, for approximately $23,000 from House of Imports Mercedes-Benz in Buena Park, California. Plaintiff Henry purchased an extended warranty for her vehicle. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Henry learned of the recalls from letters she received from Mercedes in or about May and August 2016, notifying her that the Takata driver-side and passenger-side frontal airbags in Plaintiff's 2009 C-300 were subject to recall. To Plaintiff Henry's knowledge, the airbags in her Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

79.     Plaintiff Sandra Herrell resides in Saint George, Utah. Plaintiff Herrell owned a 2012 Audi A3, which she purchased new on April 30, 2012, for approximately $32,300 from Hiley Volkswagen of Huntsville in Huntsville, Alabama. Plaintiff Herrell's 2012 Audi A3 was covered by the original manufacturer's warranty. Plaintiff Herrell also paid $750 to purchase an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, brochures, and pamphlets that touted the safety and dependability of her vehicle and Audi vehicles generally. The sales representative at Hiley Volkswagen told Plaintiff Herrell that she was purchasing a "great vehicle," and that they had a hard time keeping such vehicles in stock. Plaintiff Herrell received a recall notice from Audi in April 2016, notifying them that the Takata PSDI-5 driver frontal airbag in Plaintiff Herrell's 2012 Audi A3 was subject to recall because of the Inflator Defect. When Plaintiff Herrell and her husband contacted an Audi dealership in Las Vegas, Nevada, the dealership told them that there were no replacement airbags available for their 2012 Audi A3, and that there would not be any available for one to one-and-a-half years. To Plaintiff Herrell's knowledge, the airbags in her 2012 Audi A3 were never repaired or replaced. Plaintiff Herrell leased a new vehicle on September 5, 2016, with a payment of roughly $500 per month, because she did not feel safe driving her 2012 Audi A3. Plaintiff Herrell sold her 2012 Audi A3 back to Audi on December 1, 2016, for $19,800. The value of Plaintiff's vehicle was diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

80.     Plaintiff Charles Hudson resides in Franklin, Michigan. Plaintiff Hudson owns a 2011 Mercedes GLK-350, which he leased new beginning in or about August 2011, and then purchased in or about February 2014, for approximately $38,720 from Mercedes of Novi in Novi, Michigan. Plaintiff Hudson's 2011 Mercedes GLK-350 was covered by a written warranty. Prior to leasing and purchasing the vehicle, Plaintiff viewed or heard commercials through television and print advertisements that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Hudson received a recall notice from Mercedes in

February 2016, informing him that the Takata airbags in his 2011 GLK-350 are subject to recall due to the Inflator Defect. Mercedes has told Plaintiff Hudson multiple times via phone and email that there are no parts available to replace the Takata airbags in his vehicle. To Plaintiff Hudson's knowledge, the airbags in his 2011 Mercedes GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not leased the vehicle, or would not have paid as much as he did for it.

81.    Plaintiff Ramoncito Ignacio resides in Jacksonville, Florida. Plaintiff Ignacio owns a 2010 Volkswagen GTI, which he purchased used on March 23, 2013, for approximately $21,458 from O'Steen Volkswagen in Jacksonville, Florida. Plaintiff's 2010 Volkswagen GTI was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials through television, radio, internet, brochures and/or pamphlets that touted Volkswagen's long record of durability and safety. Plaintiff Ignacio learned about these recalls on Facebook. To Plaintiff Ignacio's knowledge, the airbags in his 2010 Volkswagen GTI have never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

82.    Plaintiff Latecia J. Jackson resides in Wichita Falls, Texas. Plaintiff Jackson owns a 2010 Volkswagen CC Sport, which she purchased used in May 2013, for approximately $21,491 from Patterson Auto Center in Wichita Falls, Texas. Plaintiff Jackson purchased an extended warranty for her 2010 Volkswagen CC Sport. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. Plaintiff also conducted internet research into the quality, safety, and durability of Volkswagen vehicles. Plaintiff Jackson learned about the Takata airbag recall from news reports, and from a notice from Volkswagen. On or about November 7, 2017, Plaintiff took her vehicle to Herb Easley Motors in Wichita Falls, Texas to have the airbag replaced. The dealership performed a repair to the driver's airbag. The value of Plaintiff's vehicle has been

diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

83.     Plaintiff Lillian Johnson resides in Harrisburg, Pennsylvania. Plaintiff Johnson owns a 2010 Mercedes E-350, which she purchased used on February 16, 2011, for approximately $47,800 from Sun Motor Cars, Inc. Mercedes in Mechanicsburg, Pennsylvania. Plaintiff Johnson's 2010 Mercedes E-350, was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, internet, brochures, and pamphlets that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Johnson received a notice from Mercedes in 2016 informing her that the Takata airbags in her 2010 E-350 are subject to recall due to the Inflator Defect. To Plaintiff Johnson's knowledge, the airbags in her 2010 Mercedes E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

84.     Plaintiff Deloris A. Jones resides in Poughkeepsie, New York. Plaintiff Jones owns a 2006 Volkswagen Passat, which she purchased used in August 2010, for $15,397 from Healy Brothers Poughkeepsie Chevrolet in Poughkeepsie, New York. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. Plaintiff Jones learned about the Takata airbag recalls from a notice she received from Volkswagen in or about late 2015 or early 2016. When she received the recall notice, Plaintiff Jones called a Volkswagen dealership to schedule the repairs. When she arrived for her appointment, she was told that no replacement parts were available, and that she would receive a second notice when replacement parts became available. She has not received any further communications from Volkswagen. To Plaintiff's knowledge, the airbags in her 2006 Volkswagen Passat have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known

about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

85.    Plaintiff Desiree Jones-Lassiter resides in Durham, North Carolina. Plaintiff Jones-Lassiter owns a 2008 Audi A4, which she purchased used in January 2011, for $25,705 from South States Volkswagen in Durham, North Carolina. Plaintiff Jones-Lassiter's 2008 Audi A4 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted the safety and dependability of her vehicle and Audi vehicles generally. In addition, the salesman at South States emphasized the features of the Audi A4, including its superior safety features. Plaintiff Jones-Lassiter learned about the Takata airbag recalls from news reports. To Plaintiff's knowledge, the airbags in her 2008 Audi A4 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

86.    Plaintiff Michael C. Kaufman resides in Boca Raton, Florida. Plaintiff owns a 2011 Mercedes E-350 Cabriolet, which he purchased used in or about May 2013, for approximately $56,000 from Delray Mercedes in Delray, Florida. Plaintiff's 2011 Mercedes E-350 was covered by a written warranty. Plaintiff Kaufman also purchased an extended warranty. Plaintiff Kaufman has owned Mercedes vehicles in the past, and has viewed and heard Mercedes advertisements touting the safety and durability of Mercedes's vehicles. The sales representative at Delay Mercedes emphasized the safety and quality of the vehicle prior to Plaintiff's purchase. Plaintiff learned of these recalls from news reports, and also from a letter he received from Defendant Mercedes in or about November 2016, notifying him that the Takata frontal airbags in Plaintiff's 2011 Mercedes E-350 were subject to recall. Plaintiff contacted the Mercedes dealership numerous times to check on the status of the recall, but has consistently been told that no airbag replacement parts are available, and that he must wait. Indeed, the dealership told him not to worry because there is "no record of anyone dying in a Mercedes yet." To Plaintiff's knowledge, the airbags in his 2011 Mercedes E-350 have not been repaired or replaced. The

value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

87.     Plaintiff Susan Knapp resides in Van Meter, Iowa. Plaintiff owned a 2011 Mercedes E-550, which she purchased new in June 2011, for approximately $77,420 from a Mercedes-Benz dealership in Des Moines, Iowa. Plaintiff's 2011 Mercedes E-550 was covered by a written warranty. Prior to purchasing her vehicle, Plaintiff Knapp viewed or heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff Knapp learned of the recall from a letter she received from Mercedes in or about May 2016, notifying her that the Takata driver-side front airbag in Plaintiff's 2011 Mercedes E-550 was subject to recall. Plaintiff also received a postcard mailer from Mercedes in or about September 2016, stating that Mercedes will notify her when replacement parts become available. After receiving the letter, Plaintiff contacted Mercedes about the timing of the airbag replacement, and was told that there was no current plan to begin installing replacement airbags, and that no other information was available regarding the timing or availability of replacement airbags. The value of Plaintiff's vehicle was diminished as a result of the Inflator Defect. On or about November 1, 2017, Plaintiff traded in her 2011 Mercedes E-550 for $22,000.  If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

88.     Plaintiff Christopher Michael Knox resides in Columbia, South Carolina. Plaintiff owns a 2009 Mercedes C-300, which he purchased used in or about September 2013, for approximately $20,000 from Sun Motor Cars, Inc. Mercedes in Mechanicsburg, Pennsylvania. Plaintiff's 2009 Mercedes C-300 was covered by a written warranty. Prior to purchasing his vehicle, Plaintiff Knox viewed and heard Mercedes advertisements in print, on television, the internet, and the radio touting the safety and durability of Mercedes's vehicles. Plaintiff learned of these recalls from news reports, and also from a letter he received from Defendant Mercedes in or about February 2017, notifying him that the Takata front airbags in Plaintiff's 2009

Mercedes C-300 were subject to recall. Plaintiff contacted the Dick Dyer Mercedes dealership several times to check the status of the recall, but has consistently been told that no airbag replacement parts are available. To Plaintiff's knowledge, the airbags in his 2009 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

89.     Plaintiff Branko Krmpotic resides in North Bergen, New Jersey. Plaintiff owns a 2012 Mercedes C-300, which he purchased used in or about January 2015, for approximately $26,500 from Prestige Motors Mercedes-Benz in Paramus, New Jersey. Plaintiff's 2012 Mercedes C-300 was covered by a written warranty. Prior to purchasing his vehicle, Plaintiff Krmpotic viewed and heard Mercedes advertisements touting the safety and durability of Mercedes's vehicles. Plaintiff learned of the recall from a letter he received from Defendant Mercedes in or about February 2017, notifying him that the Takata front airbags in Plaintiff's 2012 Mercedes C-300 were subject to recall. After receiving the letter, Plaintiff contacted Defendant Mercedes about the timing of the airbag replacement, and was told that there was no current plan to begin installing replacement airbags, and that no other information was available regarding the timing or availability of replacement airbags. To Plaintiff's knowledge, the airbags in his 2012 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

90.     Plaintiff Steve Levin resides in Evanston, Illinois.  Plaintiff Levin owned a 2009 Audi A4, which he purchased used in August 2010 for $40,000.00 from Audi Exchange in Highland Park, Florida. The vehicle was traded in at Audi Collection in Coral Gables, Florida in approximately September or October of 2016.  To Plaintiff's knowledge, the airbags in his 2009 Audi A4 have never been repaired or replaced. The value of his 2009 Audi A4 was diminished as

a result of the Inflator Defect. If Plaintiff Levin had known of the Inflator Defect, he would not have purchased the 2009 Audi A4 or would not have paid as much as he did for it.

91.     Plaintiff Celeste Lewis resides in Mansfield, Texas. Plaintiff owns a 2010 Mercedes-Benz C300, which she purchased used on June 26, 2014 for $29,799.84 from Park Place Motorcars Mercedes-Benz of Dallas in Dallas, Texas. Plaintiff viewed or heard commercials through radio, television, brochures, and pamphlets that touted the safety and dependability of her vehicle and Mercedes-Benz vehicles generally. To Plaintiff's knowledge, the airbags in her 2010 Mercedes-Benz C300 have never been repaired or replaced. Plaintiff has been told by the dealership that replacement parts are unavailable and that it is unknown as to when they will be available. The value of her 2010 Mercedes-Benz C300 has been diminished as a result of the Inflator Defect. If Plaintiff Lewis had known of the Inflator Defect, she would not have purchased the 2010 Mercedes-Benz C300 or would not have paid as much as she did for it.

92.     Plaintiff Shanetha Livingston resides in Harrison Township, Michigan. Plaintiff owns a 2008 Mercedes C-300, which she purchased new in or about September 2008, for approximately $45,000 from Mercedes-Benz of St. Clair Shores, in St. Clair Shores, Michigan. Plaintiff's 2008 Mercedes C-300 was covered by a factory warranty. Plaintiff learned of these recalls through news reports. To Plaintiff's knowledge, the airbags in her 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

93.     Plaintiff Alexander Lonergan resides in South River, New Jersey. Plaintiff owns a 2006 Mercedes C-230, which he purchased new in or about December 2005, for approximately $38,370 from Ray Catena Motor Car Corp. Mercedes-Benz in Edison, New Jersey. Plaintiff's 2006 Mercedes C-230 was covered by a written warranty. Prior to purchasing his vehicle, Plaintiff Lonergan viewed and heard Mercedes advertisements touting the safety and durability of its vehicles. Plaintiff learned of these recalls from news reports, and from a letter he received

from Mercedes, notifying him that the Takata front airbags in Plaintiff's 2006 Mercedes C-230 were subject to recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

94.    Plaintiff Scott Lusby resides in Sherman Oaks, California. Plaintiff owns a 2010 Mercedes GLK350, which he purchased used in or about 2014 for approximately $31,000 from Mercedes Calabasas in Calabasas, California. Plaintiff's 2010 Mercedes GLK350 was covered by a factory warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. Plaintiff received numerous postcards about the recall stating that scheduling a repair or replacement of the airbags in his 2010 Mercedes GLK350 was not yet available. To Plaintiff's knowledge, the airbags in his 2010 Mercedes GLK350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

95.    Plaintiff Trevor MacLeod resides in Cheboygan, Michigan. Plaintiff owned a 2006 Audi A3, which he purchased used on June 12, 2013 for approximately $14,000 from Wheeler Motors, in Cheboygan, Michigan.  Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Audi's long record of durability and safety.  To Plaintiff's knowledge, the airbag in his 2006 Audi A3 was replaced on or about November 14, 2017.  The value of his 2006 Audi A3 has been diminished as a result of the Inflator Defect.  If Plaintiff MacLeod had known of the Inflator Defect, he would not have purchased the 2006 Audi A3 or would not have paid as much as he did for it.

96.    Plaintiff Justin Maestri resides in Oxnard, California. Plaintiff Maestri owned a 2010 Mercedes E-63, which he purchased used on December 26, 2014, for approximately $68,900 from W.I. Simonson Mercedes in Santa Monica, California. Plaintiff Maestri purchased an extended warranty for his 2010 E-63. Prior to purchasing the vehicle, Plaintiff viewed

- 34 -

advertisements through the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Maestri received a letter from Mercedes in May 2016, informing him that his 2010 Mercedes E-63 contains Takata airbags with the Inflator Defect that are subject to recall. Concerned for his family's safety, Plaintiff Maestri stopped using his 2010 Mercedes E-63 as a family transport vehicle upon learning of the recall. To Plaintiff Maestri's knowledge, the airbags in his 2010 Mercedes E-Class have not been repaired or replaced. Plaintiff visited and called approximately twenty (20) dealerships before he found one that would buy his 2010 Mercedes E-63 from him. Plaintiff Maestri sold his 2010 Mercedes E-63 to Rusnak Westlake Porsche in Thousand Oaks, California on November 15, 2017, at a loss of $7,726.73. The value of Plaintiff's vehicle was diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

97.     Plaintiff Bassam Makhoul, resides in East Lansing, Michigan. Plaintiff Makhoul owns a 2010 Mercedes GLK-350, which he purchased used on July 5, 2012, for approximately $26,480 from Mercedes-Benz Okemos Auto Collection in Okemos, Michigan. Plaintiff Mahkoul's 2010 GLK-350 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff did not receive notice of the Defective Airbags or Inflator Defect. Plaintiff later received a letter from Mercedes informing him that his 2010 GLK-350 contained Takata airbags with the Inflator Defect that are subject to recall. To Plaintiff Makhoul's knowledge, the airbags in his 2010 GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

98.     Plaintiff Michael McBride resides in Marshall, Michigan. Plaintiff McBride owns a 2006 Audi A4, which he purchased used in or about 2012 for approximately $13,000 from Young Chevrolet in Owosso, Michigan. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted the safety and dependability of Audi vehicles. To Plaintiff McBride's knowledge, the driver's airbag in his vehicle have not been replaced or repaired. The

value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

99.     Plaintiff Sean McGinity resides in Piedmont, California. Plaintiff McGinity owns a 2013 Volkswagen GTI, which he purchased used in April 2016, for approximately $23,000 from Momentum Auto Group Volkswagen in Fairfield, California. Plaintiff McGinity purchased an extended warranty that covers his 2013 GTI. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, brochures, and pamphlets that touted the safety and dependability of his vehicle and Volkswagen vehicles generally. To Plaintiff McGinity's knowledge, the airbags in his 2013 Volkswagen GTI have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

100.    Plaintiff Kenneth Melde resides in Peachtree Corners, Georgia. Plaintiff Melde owns a 2012 Mercedes E-350 Cabriolet, which he purchased used on April 12, 2014, for approximately $36,500 from Bob King Buick-GMC in Wilmington, North Carolina. Plaintiff Melde purchased an extended warranty that covered his 2012 E-350 Cabriolet. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, brochures, and the internet that touted the safety and dependability of his vehicle and Mercedes vehicles generally. Plaintiff Melde contacted his local Mercedes dealership to inquire about the Takata airbag recall, and was told that it would be years before replacement parts are available for the airbags in his 2012 E-350 Cabriolet. To Plaintiff Melde's knowledge, the airbags in his 2012 E-350 Cabriolet have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

101.    Plaintiff Glenn Miller resides in Bronx, New York. Plaintiff owns a 2012 Volkswagen Passat, which he purchased used in or about August 2015, for approximately

$16,000 from Teddy Volkswagen in Bronx, New York. Plaintiff's 2012 Volkswagen Passat was covered by a written warranty. Plaintiff learned of these recalls through email correspondence from Volkswagen. To Plaintiff's knowledge, the driver side airbag in his 2012 Volkswagen Passat has been repaired or replaced under the recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

102.     Plaintiff Annette Montanaro resides in Buffalo, New York. Plaintiff Montanaro owns a 2008 Audi A4, which she purchased used on March 28, 2009, for $27,495 from Schmitt's Audi Volkswagen in Buffalo, New York. Plaintiff Montanaro's 2008 Audi A4 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television, radio, and the internet that touted the safety and dependability of her vehicle and Audi vehicles generally. Among other safety features, these advertisements touted the number of airbags in Audi vehicles. The sales representative at Schmitt's emphasized the superior safety features of the Audi A4. Plaintiff Montanaro received a letter from Defendant Audi in April 2017, notifying her that the Takata passenger frontal airbag in her 2008 Audi A4 was subject to recall due to the Inflator defect. To Plaintiff's knowledge, the passenger side airbag in her 2008 Audi A4 was replaced on June 6, 2017, through the recall. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

103.     Plaintiff Malia Moore resides in Old Hickory, Tennessee. Plaintiff Moore owns a 2010 Volkswagen Passat, which she purchased used in March 2012, for $18,525 from Whitewater Motor Company in Milan, Indiana. Plaintiff Moore's 2010 Volkswagen Passat was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. In addition, Plaintiff Moore conducted internet research into the quality, safety, and durability of the Volkswagen Passat. Plaintiff Moore learned about the Takata airbag recall at a

Volkswagen dealership during an unrelated service visit. To Plaintiff's knowledge, the airbags in her 2010 Volkswagen Passat have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

104.    Plaintiff Diana Myers resides in Glendale, Arizona. Plaintiff owns a 2008 Mercedes C-350, which she purchased new in or about March 2008, for approximately $43,399 from Bill Heard Chevrolet, Inc. in Scottsdale, Arizona. Plaintiff's 2008 Mercedes C-350 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard television commercials that touted Mercedes's long record of durability and safety. In addition, a sales representative at the dealership emphasized the superior quality and safety features of the newly remodeled C-Class vehicles, specifically including airbag safety. Plaintiff Myers learned of the recall from a letter she received from Defendant Mercedes in or about April 2016, notifying her that the Takata driver-side front airbag in Plaintiff's 2008 Mercedes C-350 was subject to recall. Since then, Plaintiff Myers has asked the Mercedes of Arrowhead dealership in Peoria, Arizona about the status of the recall. The dealership has told Plaintiff that no repair or replacement parts are available. To Plaintiff's knowledge, the airbags in her 2008 Mercedes C-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

105.    Plaintiff Delola Nelson-Reynolds resides in Evanston, Illinois. Plaintiff Nelson-Reynolds owns a 2010 Volkswagen CC, which she purchased used in February 2015, for $16,000 from Golf Mill Ford in Niles, Illinois. Plaintiff Nelson-Reynold's 2010 Volkswagen CC was covered by a written warranty. In addition, Plaintiff purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. In addition, Plaintiff Nelson-Reynolds conducted internet research into the quality, safety, and durability of the Volkswagen

CC. Plaintiff Nelson-Reynolds learned about the Takata airbag recall at a Volkswagen dealership during an unrelated routine service visit. To Plaintiff's knowledge, the airbags in her 2010 Volkswagen CC have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

106.   Plaintiff Kristen Nevares resides in San Diego, California. Plaintiff Nevares owns a 2012 Mercedes GLK-350, which she purchased new on September 1, 2012, for approximately $45,233 from Mercedes-Benz of Escondido in Escondido, California. Prior to purchasing the vehicle, Plaintiff Nevares viewed advertisements through the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Nevares received a recall notice from Mercedes informing her that the Takata airbags in her 2012 GLK-350 are subject to recall due to the Inflator Defect. To Plaintiff Nevares's knowledge, the airbags in her 2012 GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

107.   Plaintiff Nikki Norvell resides in Mercer Island, Washington.  Plaintiff owns a 2011 Audi Q5 that she purchased new in October 2010 for $45,125.00 from Brazelton Auto/Audi Central in Houston, Texas.  Plaintiff learned of the Inflator Defect in her Audi Q5 in April 2016, not by defect notice from Audi but as a result of contacting a local Volvo dealership to inquire about selling the Audi Q5 in order to downsize to a smaller vehicle.  At that time, Volvo refused to offer Plaintiff an estimated resale value for the Audi Q5, informing her that the vehicle was subject to the Inflator Defect and, as a result, severely depreciated in resale value. The Volvo dealership would not buy the vehicle or accept it as a trade-in.  When Plaintiff contacted Audi Central dealership, they too refused to buy or trade-in the vehicle.  The Audi Central Service Manager offered Plaintiff a loaner vehicle until the defect was corrected given the severity of the defect, but then Audi rescinded that offer. For the next eleven months, Plaintiff pleaded extensively to Audi Central for a safe replacement or repair of the Inflator

- 39 -

Defect since the Audi Q5 was the vehicle in which she drove her young child. Audi Central offered no such repair or replacement, nor a timeline for the repair or replacement; and would not provide Plaintiff with a substitute loaner vehicle.  In March 2017, a Washington-based Audi dealer agreed to exchange the airbag for a temporary replacement.  The dealer acknowledged that the replacement itself was subject to the same defect. In May 2017, Audi performed an interim repair on the Driver's Side Airbag.  Plaintiff remains unable to sell the Audi Q5 due to the Inflator Defect's stigma.  The value of her 2011 Audi Q5 has been diminished as a result of the Inflator Defect.  If Plaintiff Norvell had known of the Inflator Defect, she would not have purchased the 2011 Audi Q5 or paid as much as she did for it.

108.    Plaintiff George O'Connor resides in Wesley Chapel, Florida. Plaintiff O'Connor owns a 2011 Volkswagen Eos, which he purchased new in April 2011, for $37,955 from Kuhn Volkswagen in Tampa, Florida. Plaintiff O'Connor's 2011 Volkswagen Eos was covered by a written warranty. In addition, Plaintiff purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. In addition, Plaintiff O'Connor conducted extensive internet research on and read magazine articles about the quality, safety, and durability of the Volkswagen Eos. Plaintiff O'Connor learned about the Takata airbag recall from notices he received from Volkswagen. After receiving recall notices in April 2016 and April 2017, Plaintiff contacted both Kuhn Volkswagen and Volkswagen corporate to inquire about scheduling a repair or replacement of the 2011 Volkswagen Eos airbags. Kuhn initially told Plaintiff that parts were not available, and that it was "no big deal, eventually they would get to the severe cases first." After receiving a second recall notice, Plaintiff again called Kuhn, who told him that there were still no parts available. Plaintiff contacted Reeves Volkswagen, who told him that they would add his name to a waiting list, but that they had no idea how long it would take to get replacement airbags or even how many others were on the waiting list. Finally, on April 21, 2017, Plaintiff contacted Volkswagen corporate, who made arrangements for an interim remedy to be installed in Plaintiff's 2011 Volkswagen Eos. The value of Plaintiff's

vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

109.    Plaintiff Christine Palmer resides in Danbury, Connecticut. Plaintiff Palmer owns a 2013 Volkswagen Passat, which she purchased new in November 2013, for approximately $26,000 from New Milford Volkswagen, in New Milford, Connecticut. Plaintiff Palmer's 2013 Volkswagen Passat was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. Plaintiff Palmer learned about the Takata airbag recall from notices she received from Volkswagen. Plaintiff contacted New Milford Volkswagen to inquire about scheduling a repair or replacement of the 2013 Volkswagen Passat airbags, and was told that vehicles in her area of the Northeast would be the last to be repaired. To Plaintiff's knowledge, the airbags in her 2013 Volkswagen Passat have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

110.    Plaintiff Aaron Patillo resides in Hixson, Tennessee. Plaintiff owns a 2010 Mercedes E-350, which he purchased used in or about May 2016, for approximately $20,000 from Prestige Auto in Chattanooga, Tennessee. Plaintiff's 2010 Mercedes E-350 was covered by a written warranty. Plaintiff Patillo viewed and heard Mercedes advertisements touting the quality, safety and durability of Mercedes's vehicles. Plaintiff Patillo learned of the recall from news reports. On or about October 28, 2017, Plaintiff Patillo sent a certified letter to Defendant Mercedes in Atlanta, Georgia, seeking information regarding his vehicle's airbags. To date, Plaintiff has not received a response from Mercedes. To Plaintiff's knowledge, the airbags in her 2010 Mercedes E-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator

Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

111.    Plaintiff Omeko Pearson resides in Alexander City, Alabama. Plaintiff Pearson owns a 2007 Mercedes C-230 Sport, which he purchased used on or about April 20, 2013, for approximately $14,690 Kimpco Auto in Alexander City, Alabama. Prior to purchasing the vehicle, Plaintiff did not receive notice of the Defective Airbags or Inflator Defect. On information and belief, Plaintiff received recall notices for the airbags in August and October 2017. To Plaintiff Pearson's knowledge, the airbags in his 2007 C-230 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

112.    Plaintiffs John F. and Nancy D. Phillips reside in Veronia, Oregon. Plaintiffs Phillips own a 2010 Mercedes R-350 Blue TEC, which they purchased used on May 24, 2014, for approximately $29,500 from a private party in Portland, Oregon. Prior to purchasing the vehicle, Plaintiffs viewed or heard commercials through television, brochures, and pamphlets that touted the safety and dependability of their vehicle and Mercedes vehicles generally. To Plaintiffs' knowledge, the airbags in their 2010 R-350 Blue TEC have not been repaired or replaced. The value of Plaintiffs' vehicle has been diminished as a result of the Inflator Defect. If Plaintiffs had known about the Inflator Defect, they either would have not purchased the vehicle, or would not have paid as much as they did for it.

113.    Plaintiff Shanella Prentice resides in Whitman, Massachusetts. Plaintiff Prentice owns a 2014 Mercedes C-300, which she purchased used in March 2016, for approximately $23,500 from Herb Chambers Honda of Seekonk in Seekonk, Massachusetts. Plaintiff Prentice's 2014 C-300 was covered by the original manufacturer's warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff received a recall notice in or about October 2017. To Plaintiff Prentice's knowledge, the airbags

in her 2014 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

114.    Plaintiff Stephanie Puhalla resides in St. Petersburg, Florida. Plaintiff Puhalla owns a 2009 Volkswagen CC, which she purchased used in September 2014, for approximately $23,535 from Carmax in Clearwater, Florida. Plaintiff Puhalla's 2009 Volkswagen CC was covered by a written warranty. Plaintiff purchased an extended warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. Plaintiff also conducted internet research into the quality, safety and durability of Volkswagen vehicles. Plaintiff Puhalla learned about the Takata airbag recall from news reports initially, and then from a notice from Volkswagen. Plaintiff contacted Lokey Volkswagen in Clearwater, Florida, several times to inquire about scheduling a repair or replacement of the 2009 Volkswagen CC airbags, and was told each time that airbag parts were not available. To Plaintiff's knowledge, the airbags in her 2009 Volkswagen CC have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

115.    Plaintiff Theresa Marie Fusco Radican resides in Port Saint Lucie, Florida. Plaintiff owns a 2008 Mercedes C-300, which she purchased new in or about October 2007, for approximately $41,208 from Inskip Autocenter Mercedes-Benz, in Warwick, Rhode Island. Plaintiff's 2008 Mercedes C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard television commercials that touted Mercedes's long record of durability and safety. Plaintiff Radican learned of the recall from a letter she received from Mercedes in or about July 2016, notifying her that the Takata passenger-side front airbag in Plaintiff's 2008 Mercedes C-350 was subject to recall. Prior to that, Mercedes sent a letter to Plaintiff Radican regarding her driver-side airbag recall. Plaintiff Radican contacted the

- 43 -

Mercedes of Fort Pierce dealership about the status of the recall. The dealership told Plaintiff that no repair or replacement parts are available. To Plaintiff's knowledge, the airbags in her 2008 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

116.    Plaintiff Jeffery Reeves resides in Bogalusa, Louisiana. Plaintiff owns a 2011 Mercedes GL450, which he purchased used in or about February 2014, for approximately $35,000 from Bill Hood Chevrolet in Covington, Louisiana. Plaintiff's 2011 Mercedes GL450 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard commercials that touted Mercedes's long record of durability and safety. Plaintiff learned of these recalls through news reports. To Plaintiff's knowledge, the airbags in his 2011 Mercedes GL450 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

117.    Plaintiff Michael Riddick resides in Raleigh, North Carolina. Plaintiff Riddick owns a 2009 Volkswagen CC, which he purchased used on January 9, 2012, for approximately $26,639 from Leith Volkswagen of Raleigh in Raleigh, North Carolina. Plaintiff Riddick's 2009 Volkswagen CC was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed advertisements through the internet that touted the safety and dependability of his vehicle and Volkswagen vehicles generally. Plaintiff received a recall notice from Volkswagen informing him that the Takata airbags in his 2009 Volkswagen CC are subject to recall due to the Inflator Defect. To Plaintiff Riddick's knowledge, the airbags in his 2009 Volkswagen CC have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

118.    Plaintiff Mary Jackson Robinson resides in Groveland, Florida. Plaintiff owns a 2013 Mercedes C-250, which she purchased used in or about November 2016, for approximately

- 44 -

$23,800 from Carmax, in Orlando, Florida. Plaintiff's 2013 Mercedes C-250 was covered by a written warranty. Plaintiff Robinson purchased an extended warranty for her 2013 Mercedes C-250. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. To Plaintiff's knowledge, the airbags in her 2013 Mercedes C-250 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

119.    Plaintiff Charles Sakolsky resides in Boynton Beach, Florida. Plaintiff Sakolsky leases a 2017 Volkswagen CC for approximately $474 per month. The lease began on December 31, 2016, and was originated at Gunther Volkswagen in Coconut Creek, Florida. Plaintiff Sakolsky's 2017 Volkswagen CC is covered by a written warranty. Plaintiff Sakolsky received a notice from Defendant Volkswagen at the time of lease origination, stating that the airbags in his 2017 Volkswagen CC "DO NOT pose a current safety risk and will perform as intended if needed." To Plaintiff Sakolsky's knowledge, the airbags in his 2017 Volkswagen CC have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not leased the vehicle, or would not have paid as much as he did for it.

120.    Plaintiff Curtis Scott resides in Vancouver, Washington. Plaintiff Scott owns a 2013 Mercedes GLK-350, which he purchased used in January 2016, for approximately $34,000 from Mercedes of Portland in Portland, Oregon. Plaintiff Scott's 2013 GLK-350 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff did not receive notice of the Defective Airbags or Inflator Defect. To Plaintiff Scott's knowledge, the airbags in his 2013 GLK-350 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, he either would have not purchased the vehicle, or would not have paid as much as he did for it.

121.    Plaintiff Holly Stotler resides in Tinley Park, Illinois. Plaintiff owned a 2006 Audi A3, which was purchased used in April 2015 for $17,994.64 from Auto Gallery Chicago in Addison, Illinois.  The vehicle was owned until June 14, 2017, when it was involved in a significant auto accident which totaled the vehicle.  The airbags did not deploy in the accident. To Plaintiff's knowledge, the airbags in her 2006 Audi A3 were never repaired or replaced, as the dealership informed her that no replacement parts were available. The value of her 2006 Audi A3 was diminished as a result of the Inflator Defect.  If Plaintiff Stotler had known of the Inflator Defect, she would not have purchased the 2006 Audi A3 or would not have paid as much as she did for it.

122.    Plaintiff Bettie Taylor resides in Waynesboro, Mississippi. Plaintiff owns a 2010 Mercedes C-300, which she purchased used in or about May 2012, for approximately $28,690 from Bo Haarala Autoplex in Meridian-Forrest, Mississippi. Plaintiff's 2013 Mercedes C-300 was covered by a written warranty. Plaintiff Taylor purchased an extended warranty for her 2010 Mercedes C-300. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements that touted Mercedes's long record of durability and safety. Plaintiff Taylor learned of the recall from a letter she received from Mercedes in or about September 2016, notifying her that the Takata front airbags in Plaintiff's 2010 Mercedes C-300 were subject to recall, but that no replacement parts were available. To Plaintiff's knowledge, the airbags in her 2010 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

123.    Plaintiff Harper Tucker resides in Charleston, South Carolina. Plaintiff owns a 2010 Audi Q5, which he purchased used on July 26, 2013 for $22,650 from Florida Cars located in Clearwater, Florida.  To Plaintiff's knowledge, the airbags in his 2010 Audi Q5 have never been repaired or replaced. The value of his 2010 Audi Q5 has been diminished as a result of the Inflator Defect.  If Plaintiff Tucker had known of the Inflator Defect, he would not have purchased the 2010 Audi Q5 or would not have paid as much as he did for it.

124.    Plaintiff Maria de Lourdes Viloria resides in Laredo, Texas. Plaintiff Viloria owns a 2011 Mercedes C-300, which she purchased new on August 26, 2011, for approximately $44,042 from Powell Watson Mercedes-Benz in Laredo, Texas. Plaintiff Viloria's 2011 C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through radio, television, and the internet that touted the safety and dependability of her vehicle and Mercedes vehicles generally. To Plaintiff Viloria's knowledge, the passenger-side airbag in her 2011 C-300 was replaced on November 11, 2012, after a car accident, but the driver-side airbag in her 2011 C-300 has never been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

125.    Plaintiff Chloe Wallace resides in Carrollton, Texas. Plaintiff Wallace owns a 2012 Volkswagen Passat, which she purchased used in February 2015, for approximately $14,900 from Auto Merchant in Plano, Texas. Prior to purchasing the vehicle, Plaintiff viewed or heard commercials through television and radio that touted Volkswagen's long record of durability and safety. Plaintiff also conducted internet research into the quality, safety, and durability of Volkswagen vehicles. Plaintiff Wallace learned about the Takata airbag recall from a notice from Volkswagen. Plaintiff contacted Volkswagen dealerships in Frisco and Lewisville, Texas to inquire about scheduling a repair or replacement of the 2012 Volkswagen Passat airbags, and was told that she was on a waiting list for replacement airbags. To date, Plaintiff has not been contacted about the availability of the replacement. To Plaintiff's knowledge, the airbags in her 2012 Volkswagen Passat have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

126.    Plaintiff Marcela Warmsley resides in Lancaster, California. Plaintiff Warmsley owns a 2011 Mercedes C-300, which she purchased used in July 2015, for approximately

$17,000 from West Coast Auto in Montclair, California. Plaintiff Warmsley purchased an extended warranty to cover her 2011 C-300. Prior to purchasing the vehicle, Plaintiff viewed advertisements through the internet touting the safety and dependability of her vehicle and Mercedes vehicles generally. Plaintiff Warmsley received a recall notice from Mercedes informing her that the Takata airbags in her 2011 C-300 are subject to recall due to the Inflator Defect. Plaintiff attempted to taker her 2011 C-300 to her local Mercedes dealership for the recall repair, but was told that the dealership did not have the necessary parts. To Plaintiff Warmsley's knowledge, the airbags in her 2011 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

127.    Plaintiff Jennifer Wilmoth resides in Edison, New Jersey. Plaintiff owns a 2011 Mercedes C-300, which she purchased used in or about October 2015, for approximately $15,000 from Atlantic Automall, in West Islip, New York. Plaintiff's 2011 Mercedes C-300 was covered by a written warranty. Prior to purchasing the vehicle, Plaintiff viewed and heard advertisements on the internet, television, and at the dealership that touted Mercedes's long record of durability and safety. Plaintiff Wilmoth learned of the recall from a letter she received from Mercedes in or about September 2016, notifying her that the Takata front airbags in Plaintiff's 2011 Mercedes C-300 were subject to recall. When she received the letter, Plaintiff Wilmoth contacted the Mercedes dealership in Smithtown, New York, about the status of the recall. The dealership told Plaintiff that no repair or replacement parts were available, and that they would contact her when replacement airbags became available. She has not been contacted by the dealership. To Plaintiff's knowledge, the airbags in her 2011 Mercedes C-300 have not been repaired or replaced. The value of Plaintiff's vehicle has been diminished as a result of the Inflator Defect. If Plaintiff had known about the Inflator Defect, she either would have not purchased the vehicle, or would not have paid as much as she did for it.

128.   For ease of reference, the following chart organizes the Consumer Plaintiffs by the state in which they acquired their respective Class Vehicles:

| No. | State | Class Representative Plaintiff | Vehicle |
|---|---|---|---|
| 1 | Alabama | Loretta Collier | Mercedes 2013 Sprinter Motor Home |
| 2 | Alabama | Sandra Herrell | Audi 2012 A3 |
| 3 | Alabama | Omeko Pearson | Mercedes 2007 C-230 Sport |
| 4 | Arizona | Dave De King | Volkswagen 2012 CC |
| 5 | Arizona | Diana Myers | Mercedes 2008 C-350 |
| 6 | Arkansas | Chloe Crater | Volkswagen 2012 Passat |
| 7 | California | Cheryl Butler-Adams | Mercedes 2011 C-330 |
| 8 | California | Michael Cahill | Mercedes 2010 ML350 |
| 9 | California | Efrain Ferrer | Volkswagen 2012 CC |
| 10 | California | Debrah Henry | Mercedes 2009 C-300 |
| 11 | California | Scott Lusby | Mercedes 2010 GLK-350 |
| 12 | California | Justin Maestri | Mercedes 2010 E-63 |
| 13 | California | Sean McGinity | Volkswagen 2013 GTI |
| 14 | California | Kristen Nevares | Mercedes 2012 GLK-350 |
| 15 | California | Marcela Warmsley | Mercedes 2011 C-300 |
| 16 | Connecticut | Pren Gjuraj | Mercedes 2010 GL450 |
| 17 | Connecticut | Christine Palmer | Volkswagen 2013 Passat |
| 18 | Florida | Bladimir Busto, Jr. | Volkswagen 2014 CC |
| 19 | Florida | Jacqueline Carrillo | Audi 2008 A4 |
| 20 | Florida | Ramoncito Ignacio | Volkswagen 2010 GTI |
| 21 | Florida | Silvia Gil | 2014 Volkswagen Passat |
| 22 | Florida | Michael C. Kaufman | Mercedes 2011 E-350 |
| 23 | Florida | Steven Levin | 2009 Audi A4 |
| 24 | Florida | George O'Connor | Volkswagen 2011 Eos |
| 25 | Florida | Stephanie Puhalla | Volkswagen 2009 CC |
| 26 | Florida | Mary Jackson Robinson | Mercedes 2013 C-250 |
| 27 | Florida | Charles Sakolsky | Volkswagen 2017 CC |
| 28 | Florida | Harper Tucker | Audi 2010 Q5 |
| 29 | Georgia | Paulette Calhoun | Mercedes 2011 C-300 |
| 30 | Illinois | Diego DelaCruz | Mercedes 2011 C-300 Sports Sedan 4matic |
| 31 | Illinois | Mirsad Gacic | Mercedes 2010 E-350 |
| 32 | Illinois | Melinda M. Harms | Mercedes 2008 SLK-280 |
| 33 | Illinois | Delola Nelson-Reynolds | Volkswagen 2010 CC |
| 34 | Illinois | Holly Stotler | Audi 2006 A3 |
| 35 | Indiana | Malia Moore | Volkswagen 2010 Passat |
| 36 | Iowa | Susan Knapp | Mercedes 2011 E-550 |
| 37 | Kentucky | Linda Dean | Volkswagen 2014 Passat |
| 38 | Louisiana | Jeffery Reeves | Mercedes 2011 GL450 |
| 39 | Massachusetts | Ericka Black | Mercedes 2013 C-250 |
| 40 | Massachusetts | Robert Cervelli | Mercedes 2010 E-350 |
| 41 | Massachusetts | Shanella Prentice | Mercedes 2014 C-300 |
| 42 | Michigan | Charles Hudson | Mercedes 2011 GLK-350 |
| 43 | Michigan | Shanetha Livingston | Mercedes 2008 C-300 |

| No. | State | Class Representative Plaintiff | Vehicle |
|-----|-------|-------------------------------|---------|
| 44 | Michigan | Trevor MacLeod | Audi 2006 A3 |
| 45 | Michigan | Bassam Makhoul | Mercedes 2010 GLK-350 |
| 46 | Michigan | Michael McBride | Audi 2006 A4 |
| 47 | Mississippi | Bettie Taylor | Mercedes 2010 C-300 |
| 48 | New Jersey | Darren Boyd | Mercedes 2009 ML350 |
| 49 | New Jersey | Pattie Byrd | Volkswagen 2012 CC Sport |
| 50 | New Jersey | Maureen Dowds | Audi 2010 A5 Cabriolet |
| 51 | New Jersey | Branko Krmpotic | Mercedes 2012 C-300 |
| 52 | New Jersey | Alexander Lonergan | Mercedes 2006 C-230 |
| 53 | New York | Edward J. Burki | Audi 2007 A4 |
| 54 | New York | Jody Dorsey | Mercedes 2008 C-300 |
| 55 | New York | Heidi Elliott | Mercedes 2013 C-300 |
| 56 | New York | Deloris A. Jones | Volkswagen 2006 Passat |
| 57 | New York | Glenn Miller | Volkswagen 2012 Passat |
| 58 | New York | Annette Montanaro | Audi 2008 A4 |
| 59 | New York | Jennifer Wilmoth | Mercedes 2011 C-300 |
| 60 | North Carolina | Daphne Bridges | Mercedes 2014 C-250 |
| 61 | North Carolina | Christopher Allen Cobb | Volkswagen 2013 CC |
| 62 | North Carolina | Desiree Jones-Lassiter | Audi 2008 A4 |
| 63 | North Carolina | Kenneth Melde | Mercedes 2012 E-350 Cabriolet |
| 64 | North Carolina | Michael Riddick | Volkswagen 2009 CC |
| 65 | Ohio | Randy Brown | Mercedes 2008 C-300 |
| 66 | Ohio | Angela Cook | Volkswagen 2009 CC |
| 67 | Oregon | John F. & Nancy D. Phillips | Mercedes 2010 R-350 Blue TEC |
| 68 | Oregon | Curtis Scott | Mercedes 2013 GLK-350 |
| 69 | Pennsylvania | Dave Battinieri | Volkswagen 2014 Passat |
| 70 | Pennsylvania | Lillian Johnson | Mercedes 2010 E-350 |
| 71 | Pennsylvania | Christopher Michael Knox | Mercedes 2009 C-300 |
| 72 | Rhode Island | Theresa Marie Fusco Radican | Mercedes 2008 C-300 |
| 73 | South Carolina | Angela Dickie | Volkswagen 2012 Passat |
| 74 | South Carolina | Antonia Dowling | Volkswagen 2009 CC |
| 75 | Tennessee | Aaron Patillo | Mercedes 2010 E-350 |
| 76 | Texas | Tiffany Bolton | Mercedes 2012 GL 450 |
| 77 | Texas | Sherri Cook | Mercedes 2009 C-300 |
| 78 | Texas | Vernettia Davis | Mercedes 2012 E-350 |
| 79 | Texas | Sam Fragale | Mercedes 2014 C-250 |
| 80 | Texas | Julius Fulmore | Mercedes 2014 Sprinter Motor Home |
| 81 | Texas | Alandrix Harris | Volkswagen 2010 Golf |
| 82 | Texas | Latecia J. Jackson | Volkswagen 2010 CC Sport |
| 83 | Texas | Celeste Lewis | Mercedes 2010 C300 |
| 84 | Texas | Nikki Norvell | Audi 2011 Q5 |
| 85 | Texas | Maria de Lourdes Viloria | Mercedes 2011 C-300 |
| 86 | Texas | Chloe Wallace | Volkswagen 2012 Passat |
| 87 | Virginia | Michael Farriss | Audi 2005 A4 |
| 88 | Washington | William Goldberg | Mercedes 2011 GLK 350 |
| 89 | Wisconsin | April Rockstead Barker | Volkswagen 2012 Passat |

## GENERAL FACTUAL ALLEGATIONS

### I.   Definitions

129.   Plaintiffs bring this action on behalf of themselves, and all persons similarly situated who purchased or leased Class Vehicles (defined below). Plaintiffs seek redress individually, and on behalf of those similarly situated, for economic losses stemming from Defendants' manufacture, sale or lease, and false representations or omissions concerning the defective airbags in the Class Vehicles, including, but not limited to, diminished value. Plaintiffs, on behalf of themselves and those similarly situated, seek to recover damages and statutory penalties and injunctive relief/equitable relief.

130.   "Class Vehicles" refers to all vehicles in the United States that have Defective Airbags (defined below) that were manufactured, sold, or leased by Defendants.

131.   "Defective Airbags" refers to all airbag modules (including inflators) manufactured by Takata ("Takata airbags") that use ammonium nitrate as the propellant in their inflators, including (a) all airbags subject to the recalls identified in the table in paragraph 133 below; (b) all Takata airbags in Defendants' vehicles subject to recalls, relating to Takata's May 18, 2015, DIRs; the Coordinated Remedy Order issued by NHTSA in *In re Docket No. NHTSA-2015-0055 Coordinated Remedy Program Proceeding*, and amendments thereto, concerning Takata's ammonium-nitrate inflators; and the Consent Order issued by NHTSA in *In re EA 15-001 Air Bag Inflator Rupture*, and any amendments thereto; and (c) all Takata airbags in Defendants' vehicles subject to any subsequent expansion of pre-existing recalls, new recalls, amendments to pre-existing DIRs, or new DIRs, announced prior to the date of an order granting class certification, relating to the tendency of such airbags to over-aggressively deploy or rupture.

132.   All Defective Airbags contain the Inflator Defect. As a result of the Inflator Defect, Defective Airbags have an unreasonably dangerous tendency to (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to

occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

133.   The following table identifies, to the best of Plaintiffs' understanding, and without the benefit of discovery, the vehicles either recalled or scheduled to be recalled by Defendants, the type(s) of front airbags that were included in the recall for each vehicle (driver side, passenger side, or both), and, upon information and belief, the model of Takata ammonium nitrate inflator at issue (*e.g.*, SDI, PSDI-5, etc.):

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Volkswagen | 16V-078 | Audi | A5 Cabriolet | 2010-2011 | Driver (SDI) |
| Volkswagen | 16V-078 | Audi | Q5 | 2009-2012 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | CC | 2009-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Eos | 2012-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Jetta SportWagen and Golf | 2010-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Passat | 2012-2014 | Driver (SDI) |
| Volkswagen | 16V-078 | Volkswagen | Passat Sedan and Wagon | 2007-2010 | Driver (SDI) |
| Volkswagen | 16V-079 | Audi | A3 | 2005-2013 | Driver (PSDI-5) |
| Volkswagen | 16V-079 | Audi | A4 Cabriolet | 2006-2009 | Driver (PSDI-5) |
| Volkswagen | 16V-079 | Audi | RS4 Cabriolet | 2008 | Driver (PSDI-5) |
| Volkswagen | 16V-079 | Audi | S4 Cabriolet | 2007-2009 | Driver (PSDI-5) |
| Volkswagen | 16V-079 | Volkswagen | Passat Sedan and Wagon | 2006 | Driver (PSDI-5) |
| Volkswagen | 16V-382 | Audi | A4 | 2004-2008 | Passenger (PSPI) |
| Volkswagen | 16V-382 | Audi | A6 | 2005-2011 | Passenger (PSPI) |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Volkswagen | 17V-032 | Audi | A4 Avant | 2005-2008 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | A4 Cabriolet | 2007-2009 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | A4 Sedan | 2005-2008 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | A6 Avant | 2006-2009 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | A6 Sedan | 2005-2009 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | RS4 Cabriolet | 2008 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | RS4 Sedan | 2007-2008 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | S4 Avant | 2005-2008 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | S4 Cabriolet | 2007-2009 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | S4 Sedan | 2005-2008 | Passenger (PSPI) |
| Volkswagen | 17V-032 | Audi | S6 Sedan | 2007-2009 | Passenger (PSPI) |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Volkswagen | Amended Annex A | Audi | A6 Avant | 2010-2011 | Passenger (PSPI) |
| Volkswagen | Amended Annex A | Audi | A6 Sedan | 2010-2011 | Passenger (PSPI) |
| Volkswagen | Amended Annex A | Audi | R8 | 2017 | Driver (SDI) |
| Volkswagen | Amended Annex A | Audi | S5 Cabriolet | 2010-2012 | Driver (SDI) |
| Volkswagen | Amended Annex A | Audi | S6 Sedan | 2010-2011 | Passenger (PSPI) |
| Volkswagen | Amended Annex A | Audi | TT | 2016-2017 | Driver (SDI) |
| Volkswagen | Amended Annex A | Volkswagen | CC | 2015-2017 | Driver (SDI) |
| Volkswagen | Amended Annex A | Volkswagen | GTI | 2009-2013 | Driver (SDI) |
| Daimler | 16V-081 | Mercedes-Benz | AMG C63 | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | AMG E63 | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | AMG SLK55 | 2007-2008 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C230 | 2005-2007 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C230 Kompressor | 2005 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C300 | 2008-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C300 4Matic | 2008-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C300 4matic Sedan | 2008-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | C320 | 2005 | Driver (PSDI-5) |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | C350 | 2006-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C350 Sedan | 2008-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | C63 AMG | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | C63 AMG Sedan | 2008-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | E350 | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E350 4Matic | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E350 Cabriolet | 2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E350 Cabriolet | 2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | E550 | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E550 | 2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | E550 4Matic | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E550 Cabrio | 2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E550 Coupe | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | E63 AMG | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GL320 Diesel | 2009-2010 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GL350 BlueTec 4Matic | 2011-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GL350 Diesel | 2011-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GL450 | 2009-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GL450 4Matic | 2009-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GL550 | 2009-2012 | Driver (PSDI-5) |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | GL550 4Matic | 2009-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 | 2010-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 | 2010-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 4Matic | 2010-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | GLK350 4Matic | 2010-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-081 | Mercedes-Benz | ML320 BlueTec 4Matic | 2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML320 BlueTec 4Matic | 2009-2010 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML320 Diesel | 2009-2010 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML350 | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML350 4Matic | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML350 4Matic | 2012-2014 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML450 4Matic Hybrid | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML450 Hybrid | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML550 | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML550 4Matic | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML63 AMG | 2009-2009 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | ML63 AMG | 2010-2011 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R 320 Diesel | 2009 | Driver (PSDI-5) |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 16V-081 | Mercedes-Benz | R 320 Diesel | 2010 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R320 CDI 4Matic | 2009-2010 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R320 CDI 4Matic | 2010 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R350 | 2009 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R350 | 2010-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R350 4Matic | 2009 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | R350 4Matic | 2010-2012 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | SLK280 | 2007-2008 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | SLK350 | 2007-2008 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | SLK55 AMG | 2007-2008 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | SLS AMG GT | 2013-2014 | Driver (PSDI-5) |
| Daimler | 16V-081 | Mercedes-Benz | AMG ML63 | 2009-2011 | Driver (PSDI-5) |
| Daimler | 16V-363 | Mercedes-Benz | E350 Convertible | 2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-363 | Mercedes-Benz | E350 Coupe | 2010-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-363 | Mercedes-Benz | E550 Coupe | 2010-2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-363 | Mercedes-Benz | SLS | 2011-2014 | Driver (PSDI-5) |
| Daimler | 16V-363 | Mercedes-Benz | SLS | 2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-363 | Mercedes-Benz | SLS AMG | 2011 | Both (PSDI-5 /PSPI-2) |
| Daimler | 16V-363 | Mercedes-Benz | SLS AMG Cabrio | 2012 | Driver (PSDI-5) |
| Daimler | 16V-363 | Mercedes-Benz | SLS AMG Coupe | 2011-2014 | Driver (PSDI-5) |

| Manufacturer | Recall | Make | Model | Model Years | Side(s) |
|---|---|---|---|---|---|
| Daimler | 17V-017 | Mercedes-Benz | E350 Cabriolet | 2012 | Driver (PSDI-5) |
| Daimler | 17V-017 | Mercedes-Benz | E350 Cabriolet | 2012 | Both (PSDI-5 /PSPI-2) |
| Daimler | 17V-017 | Mercedes-Benz | E350 Coupe | 2012 | Both (PSDI-5 /PSPI-2) |
| Daimler | 17V-017 | Mercedes-Benz | E350 Coupe 4Matic | 2012 | Both (PSDI-5 /PSPI-2) |
| Daimler | 17V-017 | Mercedes-Benz | E550 Cabrio | 2012 | Driver (PSDI-5) |
| Daimler | 17V-017 | Mercedes-Benz | E550 Coupe | 2012 | Driver (PSDI-5) |
| Daimler | Amended Annex A | Mercedes-Benz | C-Class | 2009-2010, 2013 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | C-Class | 2010-2014 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Cabrio | 2013 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Coupe | 2013 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Coupe | 2010 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | GLK Class | 2010-2015 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | SLS-Class | 2013 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Cabrio | 2011-2017 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | E-Class Coupe | 2010-2017 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | GLK Class | 2013 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | GLK Class | 2010 | Passenger (PSPI-2) |
| Daimler | Amended Annex A | Mercedes-Benz | SLS Class | 2015 | Driver (PSDI-5) |
| Daimler | Amended Annex A | Mercedes-Benz | SLS Class | 2011-2015 | Passenger (PSPI-2) |

134.    As recently as January 2018, Defendants and Takata announced additional large recalls, identified as 18E-001, -002, and -003.

**II.    Takata's Airbags Have a Common, Uniform Defect**

**A.    Defendants Chose an Inexpensive and Dangerous Propellant**

135.    The part of the airbag at issue in this matter is the inflator. The inflator consists of a metal canister loaded with propellant wafers or pellets, and is placed in the airbag module. Upon impact, the propellant wafers or pellets ignite, triggering a chemical reaction that produces gas, which in turn inflates the fabric airbag. This process occurs within milliseconds.

136.    The following basic illustration depicts Takata's airbag module:



137.    When it began manufacturing airbags in the 1980s, Takata used sodium azide as the propellant in its inflators. In the mid-1990s, Takata began using a different propellant, called 5-aminotetrazole, due in part to toxicity issues associated with sodium azide.

138.    In the late-1990s, Takata's managers pressured its engineers in Michigan to devise a lower-cost propellant, based upon ammonium nitrate—a compound used in fertilizer and explosives.

139.    In 1999, as the ammonium nitrate design was being considered, Takata's engineering team in Moses Lake, Washington raised objections, and pointed to explosives manuals that warned of the risk of disintegration and irregular, overly-energetic combustion. As one former Takata engineer noted, "ammonium nitrate stuck out like a sore thumb," yet his team had only "a couple days" to conduct its review.

140.    In fact, ammonium nitrate is an inherently volatile and unstable chemical. Daily temperature swings are large enough for ammonium nitrate to cycle through three of its five crystalline states, adding to its volatility. It also readily absorbs moisture from the atmosphere. The chemical's sensitivity to temperature and moisture causes it to break down over time, which can lead to unpredictable and dangerous results, including violent detonations. As one explosives expert bluntly stated in *The New York Times*, ammonium nitrate is better suited to large demolitions in mining and construction, and "shouldn't be used in airbags."

141.    From the time it began investigating ammonium nitrate in the late 1990s, Takata understood these risks, and often expressed them publicly. It stated in a 1996 patent document that ammonium nitrate propellant would be vulnerable to temperature changes, and that its casing "might even blow up." Takata further recognized that "[o]ne of the major problems with the use of ammonium nitrate is that it undergoes several crystalline phase changes," one of which occurs at approximately 90 degrees Fahrenheit. If ammonium nitrate undergoes this type of temperature change, the compound may "expand[,] contract and change shape[,] resulting in growth and cracking" of the propellant that might cause an airbag inflator to "not operate properly[,] or [] even blow up because of the excess pressure generated."

- 60 -

142.    Takata further admitted, in a 1999 patent document, that pure ammonium nitrate is "problematic," because many gas generating compositions that are made with it are "thermally unstable."

143.    Similarly, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures, because it is an unstable chemical, and that such tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." The 2006 patent document purportedly contained a fix for that sort of rupturing. Notably, the alleged fix in 2006 came *after* an inflator rupture incident in 2004 that caused serious injury, and incidents continued to mount following the identification of the alleged fix. Takata submitted a patent application with other purported "fixes" as recently as 2013. These ongoing, albeit unsuccessful, efforts show that Takata knew throughout the relevant period that its airbags were defective.

144.    In a 2007 patent for allegedly phase stabilized ammonium nitrate that incorporates a scavenging additive, designed to retain moisture in an effort to prevent these catastrophic inflator ruptures, Takata representatives noted the following:

> Without the addition of the [additive], and as shown in [the patent], the ballistic curves indicate that changes occurred in the gas generant after 50 cycles. After 100 cycles the ballistic performance was very aggressive and did not meet USCAR specification. After 200 cycles the ballistic performance was so aggressive that the inflator ruptured due to extremely high internal pressures.

145.    Thus, Takata's inflators were "grenades" in the glove boxes or steering wheels of vehicles, waiting to detonate after experiencing 100 or 200 cycles of thermal cycling, which, of course, is naturally expected of cars in the real world.

146.    The use of this additive (or any other), designed to address ammonium nitrate's hygroscopic nature (affinity for moisture) is, at best, a temporary fix; at some point, the additive will no longer be able to absorb the excess moisture, and the ballistic curves will again exceed specification, leading to aggressive deployments and inflator ruptures.

147.     The only conceivable "advantage" of the compound for an airbag manufacturer and its automaker clients is that it is "cheap, unbelievably cheap." Takata had originally planned to use tetrazole as its propellant, which is not only more stable than ammonium nitrate, but yields other desired benefits, such as being more environmentally friendly. However, tetrazole was judged too expensive by Takata, and Takata executives ultimately pressured engineers in Michigan to develop a cheaper alternative.

148.     Not surprisingly, other major airbag manufacturers, including Autoliv and Key Safety Systems, reportedly avoided using ammonium nitrate as a primary propellant. Takata's representative confirmed, at a Congressional hearing in June 2015, that Takata is the only major airbag manufacturer that uses ammonium nitrate as a primary propellant in its inflators.

### B.      The Risks of the Inflator Defect Were Exacerbated by Takata's and Defendants' Abysmal Quality Control

149.     Takata and Defendants became further aware of the ammonium-nitrate propellant's instability from persistent and glaring quality control problems that Takata encountered in its manufacturing operations. The Takata plants that manufactured the airbags and inflators at issue in this Complaint include those located in Moses Lake, Washington, LaGrange, Georgia, and Monclova, Mexico. Defendants routinely visited and audited Takata's operations, frequently in response to quality and safety concerns.

150.     Beginning in 2001, engineers at Takata's Monclova, Mexico plant identified a range of problems, including rust, which they said could have caused inflators to fail. Between 2001 and 2003, Takata struggled with at least 45 different inflator problems, according to dozens of internal reports titled "potential failures" and reviewed by *Reuters*. On at least three occasions between 2005 and 2006, Takata engineers struggled to eliminate leaks found in inflators, according to engineering presentations. In 2005, Shainin, a U.S. consulting firm, found a pattern of additional problems.

151.     Underscoring Takata's reckless use of the volatile and unstable ammonium nitrate, on March 31, 2006, the Monclova, Mexico plant was rocked by violent explosions from

containers loaded with propellant. Defendants were well aware of this explosion, as detailed in § III, *infra*.

152.     Apparently, not even an accident that terrible could prompt serious and lasting improvements; in a February 2007 email to multiple colleagues, one manager at the Monclova plant stated that "[t]he whole situation makes me sick," referring to Takata's failure to implement checks it had introduced to try to keep the airbags containing the unstable and volatile ammonium nitrate propellant from failing.

153.     Takata engineers also scrambled, as late as 2009, to address its propellant issues, after "inflators tested from multiple propellant lots showed aggressive ballistics," according to an internal presentation in June 2009.

154.     Based on internal Takata documents, Takata was struggling to meet a surge in demand for its airbags. Putting profits ahead of safety, Takata exhibited shoddy and reckless behavior in the handling of its ammonium nitrate propellant. In March 2011, a Takata supervisor at the Monclova, Mexico plant sent an e-mail to other employees, stating that "[a] part that is not welded = one life less, which shows we are not fulfilling the mission." The title of the e-mail was "Defectos y defectos y defectos!!!!" (English translation: "Defects and defects and defects!!!!"). This shoddy and reckless attitude permeated all of Takata's operations and facilities.

155.     Yet handling problems at Takata facilities persisted; another manager urged employees to examine the propellant visible in a cross section of an airbag inflator, noting that "[t]he propellant arrangement inside is what can be damaged when the airbags are dropped. . . . Here you can see why it is important to handle our product properly." A 2009 presentation of guidelines on handling inflators and airbag units also stressed the dangers of mishandling them. The presentation included a link to a video that appeared to show side-curtain airbags deploying violently, sending the inflator hurtling into the car's cabin.

156.     Despite knowing that it was shipping potentially deadly products, including inflators containing unstable and volatile ammonium nitrate propellant, Takata resisted taking

back damaged or wet airbag modules, in part because it struggled to keep up with the surge in demand for its airbags, as it won big new clients, throughout the early- and mid-2000s.

**III.     Defendants' Knowledge of the Defective Airbag**

       **A.     Volkswagen**

157.   As a result of the extensive literature detailing the problems with using ammonium nitrate, Volkswagen's intimate involvement in developing specifications and testing standards for the problematic ammonium-nitrate inflators and a variety of adverse incidents, Volkswagen has long been aware of the safety problems associated with using ammonium nitrate in Takata airbags.

158.   At all relevant times, Volkswagen exercised close control over suppliers, including airbag and airbag inflator suppliers. Volkswagen prepared and maintained design specification for both the airbag and the inflator, which suppliers—like Takata—were, and are, required to meet.

159.   Volkswagen closely reviewed proposed airbag designs from Takata and employed extensive design and product validation processes before approving them for use in its vehicles. Volkswagen also regularly audited and reviewed Takata's manufacturing processes, including visits to, and checks of, Takata's facilities.

160.   Volkswagen knew, no later than March 2002, including from presentations and design meetings, that Takata used an ammonium nitrate propellant in its inflators. Takata expressly marketed ammonium nitrate as an inexpensive propellant and recognized Volkswagen's goal of reducing cost. Volkswagen also received data sheets that identified the chemical breakdown of Takata's propellant, including ammonium nitrate.

161.   Volkswagen was aware, for example, through failure mode and effects analyses, that propellant degradation could cause a loss of the inflator's structural integrity. Upon information and belief, despite the switch to a new and novel inflator propellant, Volkswagen did not revise its airbag or inflator specifications and test for flaws unique to ammonium nitrate.

162.    Volkswagen approved Takata's ammonium-nitrate inflators and installed them in Volkswagen and Audi models sold in the United States, beginning with model year 2004 vehicles for Audi, and 2006 for Volkswagen.

163.    Volkswagen had repeated quality issues with Takata beginning as far back as 2003, including failed airbag modules during testing, and unexplained, unexpected facility changes for the production of airbags, which frustrated Volkswagen. On at least one occasion in 2003, Volkswagen rejected a Takata production line after an audit.

164.    Yet quality issues continued to arise. In September 2006, Volkswagen reported a torn airbag to Takata and abnormal deployments of airbags, both at cold and ambient temperatures. Volkswagen also experienced airbag tearing in July 2007. In July 2007, a Volkswagen subsidiary in South America reported to Takata faulty inflators in side airbags, expressing concern over a flame that occurred during testing, and apparent cushion ruptures in the thorax area.

165.    In or about October 2004, 30 out of 100 ammonium-nitrate inflators came apart during bonfire testing conducted by Volkswagen. Likewise, in or about February 2009, numerous inflators ruptured during testing that Takata was performing at Volkswagen's express request.

166.    In April 2009, an inflator ruptured in Brazil during testing by Volkswagen of completed airbag modules set to be installed in vehicles. Takata communicated to Volkswagen that the suspected root cause was a low density propellant. In presentations drafted for Volkswagen, Takata also admitted worse performance of its inflator at higher temperatures and informed Volkswagen many inflator ruptures that occurred during testing at 80 and 85 degrees Celsius.

167.    Takata also informed Volkswagen that a greater propellant surface area—potentially caused by lower density—could significantly increase the burn rate and inflator pressurization, to the point of rupture. Volkswagen therefore knew in 2009 and earlier—that Takata's ammonium-nitrate propellant could be susceptible to long-term aging and degradation.

Volkswagen, in fact, raised these concerns with Takata. Volkswagen personnel in Germany considered this a high-risk situation and clearly recognized a worst-case scenario, in which portions of the inflator could explode and shoot fragments towards the occupants. Volkswagen, however not only failed to inform its consumers of these risks, issues and recalls on existing vehicles, but also continued to manufacture and sell vehicles with Defective Airbags for years to come.

168.   By model year 2012, and following discussion with Volkswagen that began in or about 2010, Takata began adding a desiccant to inflators manufactured for Volkswagen. A desiccant is a moisture control agent, and its proposed addition was yet another clear indicator of Volkswagen's knowledge that the propellant was susceptible to moisture and degradation under ordinary conditions.

169.   Volkswagen was also aware of recalls by other automakers for the same issue(s), including, for example, Honda's 2011 recall. Volkswagen suspected a risk of broader problems across Takata inflators, and even expressed that concern to Takata.

170.   In June 2015, Volkswagen reported that a Takata-made side-curtain airbag inflator, in a 2015 Volkswagen Tiguan crossover, ruptured after the driver hit a deer. News reports at the time noted that the incident stood out from previously reported Takata ruptures, because of the more recent model year of the vehicle. No later than October 2015, Volkswagen was reportedly gathering and testing Takata inflators.

171.   By February 2016, Takata and Volkswagen had issued recalls of approximately 850,000 Volkswagen and Audi vehicles; today, the total recalled population is closer to one million. Volkswagen resisted issuing a recall, informing NHTSA that the facts did not support a recall, and that certain subsets of inflators should be deemed acceptable after testing.

172.   This was not the first instance of Volkswagen downplaying the risk of Takata's inflators. In or about July 2015, Volkswagen insisted that Takata produce ammonium-nitrate inflators *without* desiccant—a move Takata strongly opposed. Indeed, as of June 2016, well after the industry had collectively recalled tens of millions of vehicles with ammonium-nitrate

inflators, Volkswagen said it was continuing to use front-airbag ammonium-nitrate inflators *without* desiccant on certain 2016 and 2017 model year cars, including the Volkswagen CC, Audi TT, and Audi R8.

173.   Nor is this the first instance in which Volkswagen has engaged in fraudulent conduct to sell vehicles.  In January 2017, Volkswagen pled guilty to three criminal felony counts of conspiracy to defraud the United States and its U.S. customers for misleading the Environmental Protection Agency and U.S. customers about whether various Volkswagen, Audi, and Porsche branded vehicles complied with U.S. emissions standards.  Volkswagen also pled guilty to obstruction of justice for destroying documents related to its scheme.

### B.    Mercedes

174.   At all relevant times, Mercedes exercised close control over suppliers, including airbag and airbag-inflator suppliers. Mercedes prepared and maintained design specifications for both the airbag and inflator, which suppliers like Takata were, and are, required to meet.

175.   Mercedes closely reviewed proposed airbag designs from Takata, and employed extensive design and product validation processes before approving them for use in its vehicles. Mercedes also regularly audited and reviewed Takata's manufacturing processes, including visits to, and checks of, Takata's facilities.

176.   Mercedes knew prior to approving the Defective Airbags that Takata used an ammonium nitrate propellant in its inflators. Takata expressly marketed ammonium nitrate as an inexpensive propellant, and recognized Mercedes's goal of reducing cost.

177.   Mercedes was intimately involved in the design and testing of the Defective Airbags prior to its approval for the airbags' use in the recalled Mercedes Class vehicles. It has a long history of involvement with, and knowledge of, the manufacturing and product design of inflators used in the vehicles that it sold. Over the years, Mercedes developed an expertise in inflator technology.

178.    In November 1988, a joint venture called Inflation Systems, Inc. ("ISI") was formed between Takata and Bayern-Chemie (of Germany) (a part of the Daimler Benz group). The original charter of ISI was to manufacture driver-side inflators in North America. The site of the manufacturing facility for ISI was LaGrange, Georgia, which was built in 1991 on property owned by Takata.

179.    Both Daimler Benz and Takata worked closely on the manufacturing and product design of Takata's inflators. Bayern-Chemie had responsibility for product design and manufacturing, while Takata used the ISI-manufactured inflators in modules that would be sold directly to automakers. Notably, ISI was operating in 1996, when Takata expressed concerns in patent documents about the risks of using ammonium nitrate in inflators.

180.    Moreover, Mercedes had its own airbag expert(s), who worked together with Takata in the development, testing, and approval of the Defective Airbags. Accordingly, Mercedes was aware of Takata's use of ammonium nitrate, including all technical details of allegedly phase stabilized ammonium-nitrate inflators, prior to its approval of the Defective Airbags for use in Mercedes Class Vehicles.

181.    Given Takata's concerns about the risks of ammonium nitrate, dating back to its 1996 patent documents, and the subsequent concerns of Mercedes engineers during the pre-approval phase of the Defective Inflators, Mercedes was, or should have been, fully aware of the dangers associated with using ammonium nitrate as a propellant in its airbag inflators.

182.    Mercedes also had specific "concerns" regarding the performance of the Defective Inflators prior to approving them for use in the Class Vehicles. These concerns—discussed internally by managers or engineers at Daimler AG in emails exchanged between employees of Daimler Chrysler and employees of Takata on May 6, 2003 and May 7, 2003—focused on the "the module having integrity during and post-deployment."

183.    Also around this time, in April and May 2003, Mercedes recognized that the defective Takata Airbags failed to meet Mercedes's own requirements for approval, as reflected by their ongoing concerns over the variability and performance issues of the Takata inflators

during pre-approval testing. Further, prior to Mercedes's approval of the Defective Inflators for installation in Mercedes Class Vehicles, Mercedes employees raised concerns to Takata that the inflator was the cause of module performance issues, including "module cover tearing," and "cushion tearing." This was consistent with testing that Takata conducted, which showed "bulging," an indicator of "high pressure."

184.    A June 15, 2005 email from a Daimler Chrysler airbag engineer to a Takata program manager, reflects that Mercedes engineers, who had pyrotechnic expertise and worked with Takata on the testing and approval processes of the Defective Airbags, were fully aware of the performance problems plaguing the inflators, and their difficulty meeting USCAR standards prior to approving the Defective Inflators for installation in the Mercedes Class Vehicles.

185.    These same Mercedes engineers repeatedly expressed concerns about the PSDI-5 inflator based on the performance of the airbags in pre-approval testing.

186.    Despite these concerns, Mercedes ultimately approved Takata's airbags for installation in Class Vehicles. As indicated in an October 20, 2004, email, Mercedes only approved Takata's airbag after Mercedes engineers agreed to forego key performance variables. Indeed, Mercedes was fully aware that the Defective Inflators could not meet its own specifications, but it nevertheless approved the defective inflators for installation in Mercedes Class Vehicles.

187.    On at least one occasion, in or about October 2006, Mercedes waived several of its own requirements and ultimately decided to accept "deviations."  As such, Mercedes was fully aware of the risks associated with ammonium nitrate, and consciously and intentionally disregarded those risks by approving the Defective Airbags for installation in the Mercedes Class Vehicles.

188.    As noted above, in March 2006, Takata's Monclova, Mexico plant was the site of massive explosions due to ammonium nitrate. Mercedes was well aware of these incidents, and therefore, the inherent danger of using ammonium nitrate. However, instead of focusing on these risks, Mercedes focused on inflator production levels. Days after the Monclova plant explosion,

on April 5, 2006, a senior Daimler engineer performed an inspection of the Monclova inflator and molding operations, including an examination of parts for any defects. He marveled at the extensive repairs to date, the fact that production was slated to begin again that evening, and that "an army" of contractors was in place to complete the work. Only a year later did Mercedes meet with Takata to discuss the changes implemented to Takata's propellant-material handling in the wake of the explosion, given the concerns over the explosive power of ammonium nitrate.

189.    At least through its 2017 model year vehicles, which Mercedes sold and continued to sell to consumers without disclosing that the vehicles contained Defective Airbags that would later be recalled, Mercedes has, throughout the class period, failed to disclose the known risks and defects of its Defective Inflators to consumers.

190.    Even after the historic recalls were announced, Mercedes continued to sell new vehicles that were equipped with Defective Airbags, including the 2016-2017 E-Class Coupe/Convertible, without informing consumers that their new cars contained these Defective Airbags. Frustratingly, even these new vehicles will be recalled, though owners and lessees will likely have to wait years for a remedy.

191.    The recalls that have been issued by Mercedes to replace the Defective Airbags have been largely ineffective. According to NHTSA's website, as of December 2017, only 2% of the affected Mercedes vehicles have been remedied.

192.    Notwithstanding recalls and notices by other manufacturers, and Mercedes's awareness of the risks and/or dangers presented by ammonium-nitrate dependent inflators, Mercedes buried its head in the sand, claiming it did not become aware of the issues requiring recalls of the Class Vehicles until January 25, 2016, when Takata submitted a DIR to NHTSA reporting a potential safety defect for SDI and PSDI-5 driver-side airbag inflators.

193.    Mercedes's denial of knowledge belies the facts and its numerous communications with Takata regarding the Inflator Defect well before January 2016.  This assertion by Mercedes, that it was unaware of the need for a recall until 2016, is false, and reflects its internal efforts to delay the safety recall and conceal from its customers the need for a

recall. Indeed, prior to 2016, Mercedes stayed silent in the face of the mountain of information available to it regarding the dangers associated with the airbags, the use of ammonium nitrate as a propellant, and its own internal discussions regarding these dangers with Takata.

194.    For example, years before Mercedes issued its first Takata recall, high level personnel at Daimler AG participated in quarterly management meetings with Takata, where information regarding airbag engineering, ballistic test results, and certain ruptures and anomalies were discussed.

195.    Also discussed at these meetings, between Mercedes and Takata, were vehicle temperature studies showing that moisture would become problematic for the main propellant well within the expected useful life of the Class Vehicles.

196.    Further, despite being fully informed about the potential dangers of the use of ammonium nitrate in Takata airbags from the time they were approved for installation in the Mercedes Class Vehicles and the mounds of evidence publicly available regarding the dangerous characteristics of ammonium nitrate, Mercedes unreasonably delayed recalling the Class Vehicles. This unreasonable delay has occurred even though Mercedes has acknowledged to consumers that "[t]he defect in [their] driver, passenger, or both driver and passenger frontal airbag inflators may cause the airbag to explode during airbag deployment[,] and could result in metal fragments striking the front occupants, possibly causing serious injury or death."

197.    In light of Mercedes's knowledge about the use of ammonium nitrate, pre-approval testing and the inability of the Defective Inflators to meet applicable standards, Mercedes should have refused to install the Defective Inflators in its vehicles and recalled Class Vehicles years before it reluctantly did.

198.    For example, Takata included Mercedes as among the automakers who were provided potentially defective inflators in a June 2014 filing with NHTSA. Yet, Mercedes claimed that its inclusion in this letter to NHTSA was a mistake.

199.    Over one million Mercedes vehicles have officially been recalled as part of the massive action arising from the installation of the Defective Airbags.

### C.     Defendants' Knowledge Through the German Car Consortium

200.    At all relevant times, Defendants Volkswagen and Mercedes, together with Porsche and BMW, belonged to a technical consortium made up of leading German car companies that, among other things, adopt and maintain technical standards for airbags and inflators. The consortium is often referred to as Arbeitskreis or the Group of Five Working Committee ("the Group of Five").

201.    On information and belief, this consortium's standards have, at minimum, contributed to Defendants' airbag and inflator testing standards during the entire time period implicated by this lawsuit. In light of these long-standing common standards and Takata's entry into the airbag market during this period, Plaintiffs allege, on information and belief, that the Group of Five members would have collectively evaluated the airbags and inflators for approval, in addition to automakers' individual efforts.

202.    Indeed, Defendants and their fellow consortium members met with Takata on at least one occasion, in or about February 2007, at which time the ammonium-nitrate airbag inflators were a topic of discussion. The parties discussed module testing, helium leak testing, and temperature- and moisture-related failure modes, of ammonium-nitrate inflators—precisely the factors and issues that eventually led to the airbag recalls—thus signaling Defendants' clear and ongoing knowledge of the unacceptable risks associated with Takata's airbags.

203.    In light of the consortium members' close working relationship on airbag and inflator issues and their joint focus, by no later than 2007, on precisely the issues that led to the recalls, Plaintiffs allege, on information and belief, that Defendants as consortium members were, or should have been, aware of ruptures and/or abnormal deployments in their respective vehicles—for example, the 2003 BMW rupture described in the next section.

**D.    Defendants' Knowledge Through Escalating Field Incidents and Recalls**

204.    As noted above, Defendants not only had knowledge of the airbag defect through their own interactions with Takata and work in the Group of Five Consortium—they also tracked Takata's interactions with other major automakers.

205.    Any cursory attention paid to Takata's track record should have further fueled their concern over ammonium-nitrate inflators. Takata airbags made it to market in model year 2001. By 2003, there were two incidents involving either rupture or aggressive deployment, including one that lead to a fatality in Arizona and another that took place in a vehicle manufactured by a Group of Five member, BMW. The BMW incident took place in Switzerland, and was jointly investigated by BMW and Takata.

206.    Additional, alarming incidents continued to mount regularly, including a rupture in 2004 in Alabama and a trio of incidents in the summer of 2007. These four incidents involved Honda vehicles, and notably, Honda filed a public standard report with U.S. safety regulators for each of them.

207.    Defendants knew or should have known of these field ruptures involving a major automakers and Defendants' key supplier. Moreover, by November 2008—well after Defendants had accumulated significant knowledge regarding the troubling risks of Takata airbags—Honda issued its first public recall in the United States. The recall notice expressly noted the risk that Takata airbags "could produce excessive internal pressure," causing "the inflator to rupture," spraying metal fragments through the airbag cushion ("2008 Recall"). Coupled with their ongoing concerns over this precise risk, Defendants had every obligation to act swiftly to protect their past and prospective consumers, yet they did not.

208.    Tragically, Defendants' failure to act was repeated serially over the next five years. Following Honda's 2008 Recall, additional ruptures occurred, many resulting in accidents, injuries, and/or fatalities. By 2009, Honda had issued its second recall in the United States, putting all automakers, including Defendants, on further notice of the Inflator Defect. This

pattern of incidents and recalls continued unabated—with increasingly larger recalls of Takata airbags issued in 2010, 2011, and 2013—but prompted no recall or actions by Defendants.

209. On April 11, 2013, Takata filed a DIR titled "Certain Airbag Inflators Used as Original Equipment." It again openly admitted concerns over propellant moisture absorption and deterioration, "over-aggressive combustion," and inflator "rupture." Shortly thereafter, six major automakers, including Nissan, Mazda, BMW, Pontiac, and Honda, issued recalls of 3.6 million vehicles containing Takata airbags. Defendants, by contrast, issued no recalls.

210. Defendants' refusal to act persisted as other automakers drastically increased their recalls in 2014. By the end of June 2014, the number of vehicles recalled due to the Inflator Defect had increased to over 6 million, a small fraction of the total recall. The number of rupture-related injuries and fatalities continued to grow as well. In the summer and fall of 2014 alone, seven incidents were widely reported, some involving individuals who had died, were rendered quadriplegic, and/or suffered severe head injuries. That pace continued in the years to come. Defendants, however, remained unconcerned about the safety of their consumers.

211. By November 18, 2014, it was clear to NHTSA that even the extensive recalls to date were insufficient. NHTSA therefore demanded a national recall of many automakers and began speaking out more forcefully against the endless delays and intransigence of automakers in the face of such a deadly risk.

212. Defendants' disinterest in resolving the issue remained and became increasingly more apparent by the month. When 10 major automakers met in December 2014, to "sort out a way to understand the technical issues involved," Volkswagen and Mercedes were shockingly absent. When many of those same automakers proceeded to jointly and publicly retain an outside consultant to finally investigate the defect, Defendants again remained on the sidelines. And when Honda announced an advertising campaign in March 2015 to promote the recall—a step it could, and should, have taken a decade ago—Defendants continued to sit on the sidelines, unconcerned with their consumers' safety.

213.     In light of ongoing testing, on May 18, 2015, Takata filed four DIRs with NHTSA and agreed to a Consent Order regarding its (1) PSDI, PSDI-4, and PSDI-4K driver airbag inflators; (2) SPI passenger airbag inflators; (3) PSPI-L passenger airbag inflators; and (4) PSPI passenger airbag inflators. Takata admitted that "a defect related to motor vehicle safety may arise in some of the subject inflators." In testimony presented to Congress following the submission of its DIRs, Takata's representative admitted that the use of ammonium nitrate is a factor that contributes to the tendency of Takata's airbags to rupture, and that as a result, Takata would phase out the use of ammonium nitrate.

214.     At this juncture, Defendants could have easily taken the obvious, relatively minimal, step of discontinuing use of ammonium nitrate Takata airbags, following almost immediately with complete recalls of all ammonium-nitrate inflators, but again they did not take that step. Takata issued additional DIRs, including in January 2016, January 2017, and January 2018.

215.     In September 2015, NHTSA was forced to contact Volkswagen and Mercedes to seek information regarding their uses of Takata airbags. Consistent with Defendants' long pattern of behavior, and despite the increasingly irrefutable evidence of the inherent, uniform defect in Takata's ammonium-nitrate inflators, Volkswagen wrote to NHTSA in February 2016, in an effort to push back against the inclusion in comprehensive recalls of its own defective vehicles. Eventually, in its Third Amended Coordinated Remedy Order, issued December 9, 2016, NHTSA expanded the recall to Volkswagen and Mercedes.

216.     As a result of Takata's admission that its inflators are defective, the total number of recalled vehicles nationwide will exceed 40 million.

217.     Over the past 15 years that Defendants, other automakers, and Takata knew of the problems affecting the safety of their airbags and there have been at least 22 deaths, and hundreds of serious injuries, linked to the Defective Airbags worldwide. As detailed above, the incidents date back to at least 2003, and involve vehicles made by numerous automakers, including the Volkswagen Defendants. Defendants knew of the Inflator Defect by virtue of these

incidents—in addition to many other sources—but failed to disclose the nature and scope of the Inflator Defect, choosing to put their customers' lives at risk in order to avoid expensive recalls.

218.  Defendants were also on notice from additional, unusual Takata airbag deployments that should have prompted further inquiry into their fitness for use. A review of publicly-available NHTSA complaints shows dozens of incidents of Takata airbags inadvertently deploying in Defendants' Class Vehicles—events likely tied to the unstable and volatile ammonium-nitrate propellant. These complaints started as early as September 2005 and involve vehicles manufactured by Acura, BMW, Dodge, Ford, Mitsubishi, Pontiac, Subaru, and Toyota. Some incidents exhibit signs that are even more directly and clearly attributable to the Inflator Defect—including airbags that caused unusual smoke and fire (or both), or deployed with such force that they caused the windshield to crack, break, or shatter.

## IV.  Defendants Sold Their Vehicles As "Safe" and "Reliable"

219.  At all relevant times, in advertisements and promotional materials, Defendants continuously maintained that their vehicles were safe and reliable, while uniformly omitting any reference to the Inflator Defect. Plaintiffs, directly or indirectly, viewed or heard such advertisements or promotional materials prior to purchasing or leasing Class Vehicles. The misleading statements and omissions about Class Vehicles' safety in Defendants' advertisements and promotional materials were material to Plaintiffs' decisions to purchase or lease Class Vehicles.

220.  Examples of Volkswagen's safety and reliability representations include the following:

a.  Brochures, including those distributed at dealerships, which regularly touted its vehicles' standard and optional airbags.

b.  A 2008 Audi A4 brochure that touted its "IIHS top safety pick" designation, and asserts it is "not just safe for its size, [but] safe for any size."

c.      A 2012 Passat brochure that promised "passive safety features to help protect you and keep you safe," and that Volkswagen will "place safety at the top of our list."

d.      A 2010 Jetta brochure that touted its "IIHS top safety pick" designation, and its use of "the latest in safety technology," as well as its multiple airbags.

e.      A 2010 VW CC brochure that touts the brand's industry-leading number of "IIHS top safety pick" designations, and "six standard airbags."

f.      A 2011 Audi A6 brochure that promises "all-encompassing safety," and highlights the vehicle's standard airbags.

g.      A 2012 Audi A3 brochure that states "we kind of have a thing for safety," and promises airbags as a standard feature.

221.    Examples of Mercedes's safety and reliability representations, which consistently remind consumers of its premium quality and recognition as a premium brand, include the following.

a.      In a May 15, 2013 Mercedes press release on the Mercedes website, Dr. Dieter Zetsche, Chairman of the Board of Management of Daimler AG and Head of Mercedes-Benz Cars said: "Rather than being about safety or aesthetics, power or efficiency, comfort or dynamism, our aspirations were 'the best or nothing' in every respect. No other car stands for the Mercedes-Benz brand promise more than the S-Class."

b.      In a June 18, 2014, Mercedes press release on the Mercedes website, Mercedes stated: "Hallmark Mercedes high level of safety- To make top-class safety available for everyone, the CLS-Class will in the future be fitted with a host of new assistance systems along with existing systems with upgraded functionality."

c.      In a March 22, 2016, Mercedes press release on the Mercedes website, Mercedes stated about its Coupe: "In keeping with the Mercedes-Benz tradition, the body forms the foundation for exemplary crash safety. A high-strength safety passenger compartment forms the core of this concept. It is surrounded by specially designed and crash-tested deformation zones, which ensure the best possible occupant safety. In addition to 3-point safety belts with

pyrotechnical and reversible belt tensioning and belt-force limitation for driver, front passenger and those in the outer rear seats, numerous airbags serve to protect the vehicle's occupants in an accident. These include combined thorax/pelvis side bags for driver and front passenger and an optimized window bag extending over both seat rows, optional side bags for the outer rear seats and a driver knee bag."

        d.     In a September 1, 2015, press release on the Mercedes website, Prof. Dr. Thomas Weber, Member of the Daimler Board of Management responsible for Group Research and Head of Mercedes-Benz claimed that "[t]he S-Class sets the pace on the global market when it comes to safety, efficiency and comfort."

        e.     In a 2011 C-Class brochure, Mercedes touted its "legacy of safety innovation," promising "top-rated safety" that is "not just equipped with a list of safety features [but] engineered as an orchestrated system that is designed to make the most of the precious milliseconds it takes to avoid, or survive, a collision."

        f.     In a 2011 M-Class brochure, Mercedes touted its "Five Star Safety." With respect to airbags in particular, the brochure promises "10-way air bag protection. . . eight air bags offer a total of 10 ways of protection."

        g.     In a 2012 S-Class Brochure, Mercedes claimed that the "S-Class is engineered not merely to meet expectations, but to redefine every measure of how an automobile… can protect its occupants." The S-Class is "engineered with visionary safety advances."

    222.    Contrary to these representations and countless others like them, Volkswagen and Mercedes failed to equip Class Vehicles with airbags that would meet these proclaimed standards and failed to disclose to consumers that their vehicles actually contained dangerous and defective airbags.

## V.      Defendants' Inadequate Recalls and Failure to Assist Impacted Consumers

### A.      Slow and Inadequate Recalls

223.    Though the first Takata Airbag related recall was launched 2009, Defendants failed to initiate a field action or recall until 2016. Defendants are finally now recalling later model years, including 2017 models, because of the inordinate safety risk posed by Takata airbags.

224.    Even those vehicles that have been recalled have little chance of being repaired in the near term. Under the recalls required under NHTSA's Coordinated Remedy Order, approximately 44 million vehicles will be recalled in the United States for the Inflator Defect.

225.    At a Congressional hearing in June 2015, Takata's representative testified that Takata was shipping approximately 700,000 replacement inflators per month and expected to increase production to 1 million replacement inflators per month by September 2015—well short of the number required to supply the ten automakers that have issued recalls.

226.    At the current rate, it will take several years to produce enough Takata inflators to fix all recalled vehicles in the U.S., even setting aside the question of whether service departments would be able to provide the necessary services in a timely manner. As recently as February 2017, for example, Mercedes sought year-long extensions for completing the recall in approximately 800,000 of its vehicles. Under the revised schedules, the remedy will not even *begin* for certain Mercedes vehicles until September 2019. Volkswagen's recalls are similarly extended out over the coming years.

227.    Not surprisingly, authorized dealers are experiencing a severe shortage of parts to replace the faulty airbags.  Dealers have been telling frustrated class members that they can expect to wait many months before their airbags can be replaced.

228.    In response to the airbag replacement shortage, certain automakers have taken the extreme step of disabling passenger airbags entirely, and putting a "Do Not Sit Here" decal in the vehicle until a proper repair can be made.  In the alternative, some automakers are advising

customers to refrain from driving their vehicles until the airbags can be replaced.  Others are providing loaner vehicles.

229.    Other automakers have also chosen to "repair" their customers' vehicles, not by providing temporary replacement vehicles or replacement parts, but by disengaging the Takata airbags entirely.

230.    Congress has voiced concerns about this serious problem. Senators Richard Blumenthal and Edward J. Markey, in a letter to the Department of Transportation ("DOT"), said they were:

> [A]larmed and astonished that NHTSA has endorsed a policy recently announced by Toyota and GM that dealers should disable passenger-side airbags and instruct against permitting passengers in the front seat if replacement parts for these airbags are unavailable. As a matter of policy, this step is extraordinarily troubling and potentially dangerous. As a matter of law . . . §30122(b) of the Motor Vehicle Safety Act (49 U.S.C.) prohibits a manufacturer from knowingly making a safety device inoperative unless the [DOT] issues a specific exemption. We are unaware of an exemption from your office in the case of Takata airbags.

### B.    Failure to Provide Replacement Vehicles

231.    The Class Vehicles are not safe to drive. They have been recalled, and yet replacement of the Defective Airbags could take years. Due to Defendants' failures, Plaintiffs and Class members are left with poor options—be without use of a vehicle; purchase, lease, or rent a new vehicle until Defendants complete the recall; or, use a vehicle with a dangerous or disabled airbag over an extended period of time.

232.    As Senators Blumenthal and Markey further asserted, "all drivers deserve access to loaners or rental cars at no cost to them while they await repairs to their cars that make them safe enough to drive again."

233.    Yet, Defendants are not providing loaner or replacement vehicles on a comprehensive basis. Mercedes has expressly stated that "there is no reason to offer [] loaner vehicle[s]."

### C.   Defective Replacement Airbags

234.   Perhaps most alarming is that the replacement components manufactured by Takata that many automakers—including Defendants—are using to "repair" recalled Class Vehicles, suffer from the same Inflator Defect that plagues the parts being removed, i.e., they use ammonium nitrate as the inflator's primary propellant. Indeed, Takata admitted in its submitted DIRs, and at the June 2015 Congressional hearing, that inflators installed in recalled vehicles as replacement parts are, in fact, defective, and must be replaced yet again. Even recall notices issued in 2015 acknowledge that certain "replacement inflators are of the same design and materials as the inflators being replaced."

235.   Moreover, inspection of inflators manufactured by Takata as recently as 2014, and installed by manufacturers through the recall process, reveals that the ammonium nitrate pellets in the inflators already exhibit signs of moisture-induced instability, such as rust stains, a tendency to clump together, and size variations.  As a result, Defendants cannot reasonably assure Plaintiffs or Class members that Class Vehicles equipped with such post-recall replacement parts will be any safer than they were with the initial Defective Airbags.

236.   By way of example, Paragraph 30 of the November 2015 Consent Order provides that the NHTSA Administrator may issue final orders for the recall of Takata's desiccated phase stabilized ammonium nitrate ("PSAN") inflators, used as both original and replacement equipment, if no root cause has been determined by Takata or any other credible source, or if Takata has not otherwise shown the safety and/or service life of the parts by December 31, 2019. However, as of July 10, 2017, Takata began recalling certain desiccated PSAN inflators installed in Ford, Mazda, and Nissan vehicles.

237.   Moreover, while Takata and automakers, including Defendants, had previously assured the public that the Defective Airbags had been remedied, and that the new airbags being placed in recalled vehicles were safe, several automakers have been or will be required to recall some vehicles from model year 2013 onward because of the risk of the Takata airbags rupturing. In fact, Takata has now admitted that replacement airbags installed in some recalled vehicles are

defective as well, and cannot assure the public that replacement inflators containing ammonium nitrate are safe and not prone to rupture.

## TOLLING OF THE STATUTE OF LIMITATIONS

### I.     Fraudulent Concealment

238.    Upon information and belief, Defendants have known about the Inflator Defect in their Defective Airbags since at least the early 2000s. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate. In addition, Defendants were made aware through problems arising during the design process, testing, ruptures and other adverse events, public reports of ruptures and adverse events, and regular recalls starting no later than 2008. Defendants have concealed from, or failed to notify, Plaintiffs, Class members, and the public of the full and complete nature of the Inflator Defect.

239.    For years, Defendants did not fully investigate or disclose the seriousness of the issue, and in fact downplayed the widespread prevalence of the problem.

240.    Any applicable statute of limitations has therefore been tolled by Defendants' knowledge, active concealment, and denial of the facts alleged herein, which behavior is ongoing.

### II.     Estoppel

241.    Defendants were, and are, under a continuous duty to disclose to Plaintiffs and Class members the true character, quality, and nature of the Class Vehicles. They actively concealed the true character, quality, and nature of the vehicles; and knowingly made misrepresentations about the quality, reliability, characteristics, and performance of the vehicles. Plaintiffs and Class members reasonably relied upon Defendants' knowing and affirmative misrepresentations, and/or active concealment, of these facts. Based on the foregoing, Defendants are estopped from relying on any statute of limitations in defense of this action.

### III.   Discovery Rule

242.   The causes of action alleged herein did not accrue until Plaintiffs and Class members discovered that their vehicles had the Defective Airbags.

243.   Plaintiffs and Class members, however, had no realistic ability to discern that the vehicles were defective, until—at the earliest—the Defective Airbag exploded, or their vehicles were recalled. Even then, Plaintiffs and Class members would have had no reason to discover their causes of action because of Defendants' active concealment of the true nature of the defect, and prior knowledge of it.

### IV.   *American Pipe* Tolling

244.   A putative class action suit on behalf of a nationwide class was brought against Mercedes on June 28, 2017, and transferred into this MDL on July 27, 2017, *see Krmptoic, et al. v. Takata Corporation, et al.*, No. 2:17-cv-04771 (D.N.J.).  A putative class action suit on behalf of a nationwide class was brought against Volkswagen on August 8, 2017 and transferred into this MDL on August 8, 2017, *see Alters, et al., v. Volkswagen Group of America, Inc.*, No.: 2:17-cv-05863 (D.N.J.). At the time these actions were brought, Plaintiffs and the other Class members in this case were part of the respective classes alleged in the actions.

245.   Accordingly, pursuant to *American Pipe and Construction Co. v. Utah*, 414 U.S. 538 (1974), the claims of Mercedes Plaintiffs and other Class members were tolled from at least June 28, 2017, and the claims of Volkswagen Plaintiffs and other Class members were tolled from at least August 8, 2017.  Additional class actions filed by Plaintiffs provide additional bases for *American Pipe* tolling.

### CLASS ACTION ALLEGATIONS

246.   The Classes' claims all derive directly from a single course of conduct by Defendants. This case is about the responsibility of Defendants, at law and in equity, for their knowledge, conduct, and products. Defendants have engaged in uniform and standardized

conduct toward the Classes. They did not differentiate, in degree of care or candor, in their actions or inactions, or in the content of their statements or omissions, among individual Class members. The objective facts on these subjects are the same for all Class members. Within each Claim for Relief asserted by the respective Classes, the same legal standards govern. Additionally, many—and for some claims, all—states share the same legal standards and elements of proof, facilitating the certification of multistate or nationwide classes for some or all claims. Accordingly, Plaintiffs bring this lawsuit as a class action on their own behalf, and on behalf of all other persons similarly situated as members of the proposed Classes, pursuant to Federal Rules of Civil Procedure 23(a); and (b)(3), and/or (b)(2), and/or (c)(4). This action satisfies the numerosity, commonality, typicality, adequacy, predominance, and superiority requirements of those provisions.

## I.    **The Classes**

247.    The Consumer Plaintiffs bring this action and seek to certify and maintain it as a class action under Federal Rules of Civil Procedure 23(a); and (b)(2), and/or (b)(3), and/or (c)(4); on behalf of themselves and a Nationwide Consumer Class defined as follows:

> All persons in the United States who, prior to the date on which the Class Vehicle was recalled, (a) entered into a lease for a Class Vehicle, or (b) bought a Class Vehicle and who (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

248.    The Consumer Plaintiffs allege statewide class action claims on behalf of classes in the following states: Alabama, Arizona, Arkansas, California, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Massachusetts, Michigan, Mississippi, New Jersey, New York, North Carolina, Ohio, Oregon, Pennsylvania, Rhode Island, South Carolina, Tennessee, Texas, Virginia, Washington, and Wisconsin. Each of these State Consumer Classes is initially defined as follows:

All persons who, prior to the date on which the Class Vehicle was recalled, (a) entered into a lease for a Class Vehicle in the state of _____ (*e.g.*, Florida), or (b) bought a Class Vehicle in the state of _____ (*e.g.*, Florida) and who (i) still own or lease the Class Vehicle, or (ii) sold the Class Vehicle after the date on which the Class Vehicle was recalled, or (iii) following an accident, whose Class Vehicle was declared a total loss after the date on which the Class Vehicle was recalled.

249.   The proposed Nationwide Consumer Class and Statewide Consumer Classes and their members are sometimes referred to herein as the "Class" or "Classes."

250.   Excluded from each Class are Defendants, their employees, officers, directors, legal representatives, heirs, successors, and wholly or partly owned subsidiaries or affiliates of Defendants; Class Counsel and their employees; and the judicial officers and their immediate family members and associated court staff assigned to this case.

## II.   **Numerosity**

251.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(1). There are millions of Class Vehicles nationwide, and thousands of Class Vehicles in each of the States. Individual joinder of all Class members is impracticable.

252.   Each of the Classes is ascertainable because its members can be readily identified using registration records, sales records, production records, and other information kept by Defendants or third parties in the usual course of business and within their control. Plaintiffs anticipate providing appropriate notice to each certified Class, in compliance with Fed. R. Civ. P. 23(c)(1)(2)(A), and/or (B), to be approved by the Court after class certification, or pursuant to court order under Fed. R. Civ. P. 23(d).

## III.   **Predominance of Common Issues**

253.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(2) and 23(b)(3), because questions of law and fact that have common answers that are the same for each of the respective Classes predominate over questions affecting only individual Class members. These include, without limitation, the following:

   a.   Whether the Class Vehicles suffer from the Inflator Defect;

b.     Whether Defendants knew, or should have known, about the Inflator Defect; and, if so, how long Defendants have known of the defect;

c.     Whether Defendants had a duty to disclose the defective nature of the Class Vehicles to Plaintiffs and Class members;

d.     Whether Defendants omitted and failed to disclose material facts about the Class Vehicles;

e.     Whether Defendants' concealment of the true defective nature of the Class Vehicles induced Plaintiffs and Class members to act to their detriment by purchasing the Class Vehicles;

f.     Whether Defendants' conduct tolls any or all applicable limitations periods by acts of fraudulent concealment, application of the discovery rule, or equitable estoppels;

g.     Whether Defendants misrepresented that the Class Vehicles were safe;

h.     Whether Defendants engaged in unfair, deceptive, unlawful and/or fraudulent acts or practices in trade or commerce by failing to disclose that the Class Vehicles were designed, manufactured, and sold with defective airbag inflators;

i.     Whether Defendants' conduct, as alleged herein, was likely to mislead a reasonable consumer;

j.     Whether Defendants' statements, concealments, and omissions regarding the Class Vehicles were material, in that a reasonable consumer could consider them important in purchasing, selling, maintaining, or operating such vehicles;

k.     Whether Defendants violated each of the States' consumer protection statutes; and, if so, what remedies are available under those statutes;

l.     Whether the Class Vehicles were unfit for the ordinary purposes for which they were used, in violation of the implied warranty of merchantability;

m.     Whether Defendants' unlawful, unfair, and/or deceptive practices harmed Plaintiffs and the Classes;

- 86 -

n.      Whether the Class Vehicles suffered a diminution of value because of the Defective Airbags;

o.      Whether Defendants have been unjustly enriched by their conduct;

p.      Whether Plaintiffs and the Classes are entitled to equitable relief, including, but not limited to, a preliminary and/or permanent injunction;

q.      Whether Plaintiffs and the Classes are entitled to a declaratory judgment stating that the airbag inflators in the Class Vehicles are defective and/or not merchantable;

r.      Whether Defendants should be declared responsible for notifying all Class members of the Inflator Defect, and ensuring that all vehicles with the airbag inflator defect are promptly recalled and repaired;

s.      What aggregate amounts of statutory penalties are sufficient to punish and deter Defendants as well as to vindicate statutory and public policy;

t.      How such penalties should be most equitably distributed among Class members;

u.      Whether certain Defendants conspired with others to violate RICO; and

v.      Whether certain Defendants associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity.

## IV.   **Typicality**

254.   This action satisfies the requirements of Fed. R. Civ. P. 23(a)(3), because Plaintiffs' claims are typical of the claims of the Class members, and arise from the same course of conduct by Defendants. The relief Plaintiffs seek is typical of the relief sought for the absent Class members.

## V.     **Adequate Representation**

255.    Plaintiffs will fairly and adequately represent and protect the interests of the Classes. Plaintiffs have retained counsel with substantial experience in prosecuting consumer class actions, including actions involving defective products.

256.    Plaintiffs and their counsel are committed to vigorously prosecuting this action on behalf of the Classes, and have the financial resources to do so. Neither Plaintiffs nor their counsel have interests adverse to those of the Classes.

## VI.    **Superiority**

257.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(2), because Defendants have acted, and refused to act, on grounds generally applicable to each Class, thereby making appropriate final injunctive and/or corresponding declaratory relief with respect to each Class as a whole.

258.    This action satisfies the requirements of Fed. R. Civ. P. 23(b)(3), because a class action is superior to other available methods for the fair and efficient adjudication of this controversy. The common questions of law and of fact regarding Defendants' conduct and responsibility predominate over any questions affecting only individual Class members.

259.    Because the damages suffered by each individual Class member may be relatively small, the expense and burden of individual litigation would make it very difficult or impossible for individual Class members to redress the wrongs done to each of them individually, such that most or all Class members would have no rational economic interest in individually controlling the prosecution of specific actions, and the burden imposed on the judicial system by individual litigation—by even a small fraction of the Class—would be enormous, making class adjudication the superior alternative under Fed. R. Civ. P. 23(b)(3)(A).

260.    The conduct of this action as a class action presents far fewer management difficulties, far better conserves judicial resources and the parties' resources, and far more effectively protects the rights of each Class member than would piecemeal litigation. Compared

to the expense, burdens, inconsistencies, economic infeasibility, and inefficiencies of individualized litigation, the challenges of managing this action as a class action are substantially outweighed by the benefits to the legitimate interests of the parties, the court, and the public of class treatment in this court, making class adjudication superior to other alternatives, under Fed. R. Civ. P. 23(b)(3)(D).

261. Plaintiffs are not aware of any obstacles likely to be encountered in the management of this action that would preclude its maintenance as a class action. Rule 23 provides the Court with authority and flexibility to maximize the efficiencies and benefits of the class mechanism and reduce management challenges. The Court may, on motion of Plaintiffs or on its own determination, certify nationwide, statewide and/or multistate classes for claims sharing common legal questions; utilize the provisions of Rule 23(c)(4) to certify any particular claims, issues, or common questions of fact or law for class-wide adjudication; certify and adjudicate bellwether class claims; and utilize Rule 23(c)(5) to divide any Class into subclasses.

262. The Classes expressly disclaim any recovery in this action for physical injury resulting from the Inflator Defect without waiving or dismissing such claims. Plaintiffs are informed and believe that injuries suffered in crashes as a result of Defective Airbags implicate the Class Vehicles; constitute evidence supporting various claims, including diminution of value; and are continuing to occur because of Defendants' delays and inaction regarding the commencement and completion of recalls; and because of the installation of Defective Airbags as replacement airbags. The increased risk of injury from the Inflator Defect serves as an independent justification for the relief sought by Plaintiffs and the Classes.

## REALLEGATION AND INCORPORATION BY REFERENCE

263.    Plaintiffs reallege and incorporate by reference all of the preceding paragraphs and allegations of this Complaint, including the Nature of Claims, Factual Allegations, Tolling Allegations, and Class Action Allegations, as though fully set forth in each of the following Claims for Relief asserted on behalf of the Nationwide Class and the Statewide Classes.

## CLAIMS FOR RELIEF

I.      **Nationwide Claims**

A.      **Federal Claims**

## COUNT 1

### Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Volkswagen

264.    Plaintiffs bring this Count on behalf of themselves and the Nationwide Consumer Class against the Volkswagen Defendants.

265.    The Volkswagen Defendants are all "persons" under 18 U.S.C. § 1961(3).

266.    The Volkswagen Defendants violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Volkswagen-Takata RICO Enterprise through a pattern of racketeering activity.

267.    Plaintiffs and Class members are "person[s] injured in his or her business or property" by reason of the Volkswagen Defendants' violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The Volkswagen-Takata RICO Enterprise

268.    The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Volkswagen-Takata RICO Enterprise:

a.      The Volkswagen Defendants, who designed, manufactured, and sold millions of vehicles equipped with Defective Airbags that they knew, or were reckless in not knowing, contained the Inflator Defect, the scope and nature of which they concealed from and

misrepresented to the public and regulators for more than a decade, while falsely and inaccurately representing that their vehicles were safe, thereby deceiving Plaintiffs and Class members.

  b. Takata, who, with Volkswagen's guidance, designed, manufactured, and sold millions of Defective Airbags knowing that they contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade.

  c. The Volkswagen Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Volkswagen-Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles and actively concealing the danger and Inflator Defect from Plaintiffs and Class members.

  d. Takata's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Volkswagen-Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiffs and Class members.

269. The Volkswagen-Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4), and consists of "persons" associated together for a common purpose. The Volkswagen-Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

270. While the Volkswagen Defendants participated in the conduct of the Volkswagen-Takata RICO Enterprise, they had an existence separate and distinct from the Volkswagen-Takata RICO Enterprise. Further, the Volkswagen-Takata RICO Enterprise was separate and distinct from the pattern of racketeering in which the Volkswagen Defendants have engaged.

271.    At all relevant times, the Volkswagen Defendants operated, controlled or managed the Volkswagen-Takata RICO Enterprise, through a variety of actions. The Volkswagen Defendants' participation in the Volkswagen-Takata RICO Enterprise was necessary for the successful operation of its scheme to defraud because the Volkswagen Defendants manufactured, marketed, and sold Class Vehicles with the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

272.    The members of the Volkswagen-Takata RICO Enterprise all served a common purpose: to sell as many airbags and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the Volkswagen-Takata RICO Enterprise's members. The members of the Volkswagen-Takata RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Volkswagen-Takata RICO Enterprise benefited from the common purpose: the Volkswagen Defendants sold or leased more Class Vehicles, and received more for those vehicles, than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; Takata sold more Defective Airbags to the Volkswagen Defendants than they would have otherwise had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiffs and Class members.

**Pattern of Racketeering Activity**

273.    The Volkswagen Defendants conducted and participated in the conduct of the affairs of the Volkswagen-Takata RICO Enterprise through a pattern of racketeering activity that has lasted for more than a decade, beginning no later than 2004 and continuing to this day, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

274.    For the Volkswagen Defendants, the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States in order to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with recalling vehicles plagued by the Inflator Defect. By concealing the scope and nature of the Inflator Defect in millions of vehicles containing Defective Airbags, the Volkswagen Defendants also maintained and boosted consumer confidence in the Volkswagen and Audi brand, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped the Volkswagen Defendants sell more vehicles than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

275.    As detailed in the General Factual Allegations, the Volkswagen Defendants were well aware of the risks of using ammonium nitrate as the propellant in its inflators, but intentionally subjected Plaintiffs and Class members to those risks or consciously disregarded those risks in order to maximize their profits. Moreover, once the Inflator Defect began resulting in field and testing incidents, the Volkswagen Defendants held meetings that further revealed and/or reconfirmed the dangers associated with the Inflator Defect, but then continued to conceal the nature and scope of the Inflator Defect.

276.    To further the scheme to defraud, the Volkswagen Defendants repeatedly misrepresented and concealed the nature and scope of the Inflator Defect. The Volkswagen Defendants repeatedly described the defect as a contained issue that only manifested in certain airbags, when in fact the Volkswagen Defendants knew, or consciously disregarded knowing, that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every Takata airbag equipped in a Volkswagen vehicle.

277.    To further the scheme to defraud, the Volkswagen Defendants concealed the nature and scope of the Inflator Defect from federal regulators, enabling it to escape investigation and costs associated with recalls for more than a decade.

278.   To further the scheme to defraud, the Volkswagen Defendants would promote and tout the safety, reliability, and quality of their vehicles with airbags while simultaneously concealing the nature and scope of the Inflator Defect.

279.   To carry out, or attempt to carry out the scheme to defraud, the Volkswagen Defendants have conducted or participated in the conduct of the affairs of the Volkswagen-Takata RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.   The Volkswagen Defendants devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, writing(s) and/or signal(s), including the Volkswagen website, communications with NHTSA, statements to the press, and communications with other members of the Volkswagen-Takata RICO Enterprise, as well as advertisements and other communications to the Volkswagen Defendants' customers, including Plaintiffs and Class members; and

b.   The Volkswagen Defendants utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.   From at least 2004 through the present, Volkswagen regularly utilized the interstate and international mail and wires to ship and pay for defective inflators from Takata's facilities in Monclova, Mexico and LaGrange, Georgia to Volkswagen's facilities in Germany and Tennessee, among others located in the United States.

280.   The Volkswagen Defendants' pattern of racketeering activity in violation of the mail and wire fraud statutes included but was not limited to the following:

a.   During the relevant time period, the Volkswagen Defendants transmitted, or caused to be transmitted (which hereinafter also means that the Volkswagen Defendants acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and wire communication

travelling in interstate or foreign commerce, between its offices in Germany and/or Michigan, communications concerning the instability and volatility of ammonium nitrate, recognizing that Takata's inflators installed in Volkswagen vehicles exposed vehicle occupants to an unacceptable risk of serious injury or death.

b.      In 2002, through mail and wire communication travelling in interstate or foreign commerce, between Volkswagen's offices in Germany and/or the United States and Takata's offices in Michigan, Volkswagen and Takata discussed that Takata's inflators were made from ammonium nitrate. Volkswagen failed to timely disclose this fact to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

c.      In October 2004, and again in February 2009, Takata inflators ruptured during testing, underscoring the instability and danger of the Takata airbags. On October 27, 2004, and in or about February 2009, Volkswagen transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Germany s and Takata's offices in Michigan, communications concerning the adverse test results. Volkswagen failed to timely disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

d.      In or about February 2007, the "Group of Five Working Committee," of which Volkswagen was a member, transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between offices in Germany and/or the United States and Takata's offices in Japan and/or the United States, communications concerning ammonium-nitrate inflators, including module testing, helium leak testing, and temperature- and moisture-related failure modes, precisely the factors and issues that would eventually lead to the airbag recalls, thus signaling Volkswagen's clear and ongoing knowledge of the unacceptable risks associated with Takata's airbags. Volkswagen failed to

timely disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

e.      In or about April 2009, a Takata airbag ruptured in testing by Volkswagen in Brazil of completed airbag modules set to be installed in vehicles. Volkswagen transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Germany and/or the United States and Takata's offices in Japan and/or the United States, communications concerning the defective nature of Takata's inflators - including the admission from Takata regarding the risk of low density propellant, deteriorating performance at higher temperatures, additional ruptures at higher temperatures, risk of increased burn rate overpressurization, and rupture, susceptibility to long-term degradation, and the "high risk" situation in which inflators could explode and shoot fragments at occupants. Volkswagen failed to disclose these facts to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

f.      On or about May 11, 2009, Volkswagen transmitted, or caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, between its offices in Germany and/or the United States and Takata's offices in Michigan, communications concerning a presentation on the technical explanation of elevated inflator pressure caused by low density propellant.  Volkswagen failed to timely disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

g.      On or about May 12, 2009, Volkswagen transmitted, or caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, between its offices in Germany and/or the United States and Takata's offices in Japan and/or Michigan, communications concerning heat aging, low density propellant tablets, and propellant degradation, underscoring Volkswagen's accurate understanding of the Inflator Defect.  Volkswagen failed to timely disclose these facts and events to the public in order to

conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

h.     On or about May 19, 2009, Volkswagen transmitted, or caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, between its offices in Germany and Takata's offices in Michigan, communications concerning a potential recall of Volkswagen vehicles in Brazil for the Inflator Defect and the risk posed by Takata's ammonium-nitrate propellant.  Volkswagen failed to timely disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

i.     In or about February 8, 2010, Volkswagen transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Germany and/or the United States and Takata's offices in Japan and/or Michigan, communications concerning test results indicating that structural failures occurred in inflators during testing.  Volkswagen failed to disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

j.     In or about 2010, and continuing through at least 2012, Volkswagen transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Germany and/or the United States and Takata's offices in Japan and/or the United States, communications concerning the addition of desiccant in the ammonium nitrate propellant, a clear indicator that the propellant was susceptible to moisture-related problems. Volkswagen failed to disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

k.     On or about December 5, 2011, Volkswagen transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between its offices in Tennessee and Takata's offices in Michigan, communications

concerning the recall of ammonium-nitrate inflators by Takata and other automakers, signaling Volkswagen's actual and/or constructive knowledge of the risk of its airbags. Volkswagen failed to disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

l.      In or about February 2016, the Volkswagen Defendants caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from Volkswagen's offices in Germany and/or New Jersey or Virginia to federal regulators in Washington, D.C., regulatory filings stating that Takata inflators and airbags installed in Volkswagen vehicles should not be subject to any recalls, despite its knowledge that the airbags suffered from a common, uniform defect. Volkswagen thereby concealed the nature and scope of the Inflator Defect, in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

281.    The Volkswagen Defendants' conduct in furtherance of this scheme was intentional. Plaintiffs and Class members were directly harmed as a result of the Volkswagen Defendants' intentional conduct. Plaintiffs, Class members, and federal regulators, among others, relied on the Volkswagen Defendants' material misrepresentations and omissions.

282.    As described throughout this Complaint, the Volkswagen Defendants engaged in a pattern of related and continuous predicate acts for more than a decade. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them while providing Defective Airbags worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

283.    The predicate acts all had the purpose of generating significant revenue and profits for the Volkswagen Defendants and the Volkswagen-Takata RICO Enterprise at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by the Volkswagen Defendants through their participation in the Volkswagen-Takata

RICO enterprise, and in furtherance of its fraudulent scheme; and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Inflator Defect.

284.    By reason of and as a result of the conduct of the Volkswagen Defendants, and in particular, its pattern of racketeering activity, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.    overpayment for leased or purchased Class Vehicles, in that Plaintiffs paid for vehicles with safe airbag systems, and obtained vehicles with anything but, and were deprived of the benefit of their bargain; and

b.    the value of the Class Vehicles has diminished, thus reducing their resale value.

285.    The Volkswagen Defendants' violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT 2

**Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Volkswagen.**

286.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Consumer Class against the Volkswagen Defendants.

287.    In addition to the General Factual Allegations re-alleged and incorporated herein through the general Reallegation and Incorporation by Reference Paragraph above, Plaintiffs re-allege and incorporate the allegations set forth in Count 1.

288.    At all relevant times, Takata and the Volkswagen Defendants were associated with the Volkswagen-Takata RICO Enterprise, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the

affairs of the Volkswagen-Takata RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Takata and the Volkswagen Defendants also agreed to the objective of the conspiracy or to commit at least two racketeering predicate acts.

289.   Over the course of the past decade, the Volkswagen Defendants and Takata shared information about the Defective Airbags' inherent flaws, their inability to meet safety specifications, and abnormal airbag deployments experienced by other automakers; delayed and/or prevented the release of inculpatory information; and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed. The Volkswagen Defendants' and Takata's close cooperation on issues surrounding the Inflator Defect, their concealment of the nature and scope of the Inflator Defect, and their joint participation in predicate acts described below is evidence of the conspiracy.

## Overt Acts

290.   Volkswagen committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof. More specifically, the following conduct and overt acts demonstrate the ongoing conspiracy between Volkswagen and Takata:

a.   Volkswagen and Takata knew that propellant degradation, including through moisture and temperature, could lead to over-pressurization and rupture.

b.   Takata was aware of faulty welding and rust in the inflators produced at its plant in Monclova, Mexico, which Takata engineers believed could cause the inflators to fail. Also, between 2001 and 2003, various internal Takata reports titled "potential failures" show that Takata struggled with at least 45 inflator problems. Moreover, in 2002 Takata's Monclova, Mexico plant recorded 60 to 80 defects for every million inflators shipped to automakers-six to eight times beyond Takata's quality control limit. In 2004, Takata concealed and destroyed negative results from secret airbag tests it conducted in response to the explosion in Alabama. In light of this accumulated knowledge, Volkswagen's and Takata's willingness to install Takata inflators was reckless at best.

   c. In October 2004 and again in February 2009, Takata inflators ruptured during testing, underscoring the instability and danger of the airbags. Volkswagen and Takata discussed these adverse test results, and yet Volkswagen failed to timely disclose these facts and events to the public in order to conceal the nature and scope of the Inflator Defect.

   d. In or about February 2007, the "Group of Five Working Committee," of which Volkswagen was a member, discussed ammonium nitrate propellant with Takata, including module testing, helium leak testing, and temperature- and moisture-related failure modes—precisely the factors and issues that would eventually lead to the airbag recalls. But despite this additional, accumulated knowledge regarding the risks of the Inflator Defect, Volkswagen failed to timely disclose these facts and events to the public in order to conceal the nature and scope of the Inflator Defect.

   e. In or about April 2009, a Takata airbag ruptured in testing by Volkswagen in Brazil of completed airbag modules set to be installed in vehicles. Volkswagen and Takata communicated various concerns about the inflators, including the risk of low density propellant, deteriorating performance at higher temperatures, additional ruptures at higher temperatures, risk of increased burn rate, over-pressurization, and rupture, susceptibility to long-term degradation, and the "high risk" situation in which inflators could explode and shoot fragments at occupants. Volkswagen failed to disclose these facts to the public in order to conceal the nature and scope of the Inflator Defect.

   f. In or about 2010, and continuing through at least 2012, Volkswagen and Takata discussed the addition of a desiccant in the ammonium nitrate propellant, a clear indicator that the propellant was susceptible to moisture-related problems. Volkswagen failed to disclose these facts and events to the public in order to conceal the nature and scope of the Inflator Defect.

   g. In or about December 2011, Volkswagen and Takata discussed the recall of ammonium-nitrate inflators by Takata and other automakers. Volkswagen failed to disclose

these facts and events to the public in order to conceal the nature and scope of the Inflator Defect.

       h.    In or about February 2016, Volkswagen asserted to NHTSA that Takata inflators and airbags installed in Volkswagen vehicles should not be subject to any recalls, despite its knowledge that the airbags suffered from a common, uniform defect. Volkswagen thereby concealed the nature and scope of the Inflator Defect, in order to promote the purported safety of its vehicles.

      291.    In addition, Takata engaged in the following predicate acts in furtherance of the conspiracy:

       a.    In mid-to-late 2004, following a May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, Takata transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of Honda in California and offices of regulators in Washington, D.C., representations that the rupture was an "anomaly," even though it resulted from the Inflator Defect, thereby concealing the nature and scope of the Inflator Defect.

       b.    In November 2008, Takata caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., regulatory filings stating that approximately 4,000 vehicles subject to a 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

       c.    In December 2008, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  This letter did not sufficiently communicate the severity of the threat to life and limb, and concealed the scope and

nature of the Inflator Defect.  Owners were merely advised to make an appointment to have their vehicle repaired, with no sense of urgency.  In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

    d.  On July 29, 2009, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the earlier recall.  This report stated that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."  In light of the 100-fold recall expansion, this filing was misleading and served to conceal and/or minimize the threats posed by the Defective Airbags.

    e.  On September 16, 2009, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C. information concerning the initial, narrow recalls of Takata's inflators.  NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall.  Among other things, this letter explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter recall.  But the letter fraudulently omitted that one of those deployments caused Ashley Parham's death.  Also, the letter claimed that the manufacturing problem was limited to only one high-precision compression press.  Because Takata was by then aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving and misleading. In addition to the quality control problems stated above, during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks found in inflators in the Monclova, Mexico plant.  Once again, NHTSA, and by extension the public, were deprived of accurate and complete information.  As a result of this letter, the Office of Defect Investigation closed its investigation into these two recalls.  Takata thereby concealed the nature and scope of the Inflator Defect.

f.      On February 9, 2010, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., another recall communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."   The explanation of the defect in this communication—that two processes were used to prepare the inflator propellant and that one of them was not within specifications—was misleading in light of what Takata knew, or at least should have known in light of the extensive problems at Takata's Monclova, Mexico plant.

g.      On February 19, 2010, Takata transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan and/or Japan a response to NHTSA's November 20, 2009 letter seeking more information about earlier inflator recalls.  Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08V-593 and 09V-259 to any customers other than Honda."  This statement was patently incorrect, as over 10 manufacturers have recalled vehicles containing Defective Airbags since that statement was made.   This statement concealed the nature and scope of the Inflator Defect.

h.      On April 27, 2011, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., additional recall communications again misleadingly stating that another recall covered "all possible vehicles" with the problem.  As before, the letter to owners and lessees did not sufficiently raise a sense of urgency.  This statement concealed the nature and scope of the Inflator Defect.

i.      On April 11, 2013, Takata transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of federal regulators in Washington, D.C., misrepresentations that the defect was limited to inflators produced at a specific plant between

certain dates due to a manufacturing error, again concealing the nature and scope of the Inflator Defect.

j.      On June 11, 2014, Takata transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan or Japan to the ODI in Washington, D.C., a letter titled "Takata Support for Regional Field Actions to Address Potential Inflator Issues." Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the Virgin Islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico." Takata misleadingly omitted Ashely Parham's death in Oklahoma in May 2009, Gurjit Rathore's death in December 2009 in Virginia, and Brandi Owens's injury in October 2013 in Georgia. By focusing on areas of high humidity, this communication concealed the nature and scope of the Inflator Defect.

292.   Volkswagen and Takata agreed to and did conduct and participate in the conduct of the Volkswagen-Takata RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs and Class members, as more fully described in the prior Count and herein.

293.   As a direct and proximate result of Volkswagen's and Takata's conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.      overpayment for leased or purchased Class Vehicles, in that Plaintiffs paid for vehicles with safe airbag systems, and obtained vehicles with anything but, and have been deprived of the benefit of their bargain; and

b.      the Class Vehicles' value has diminished, thus reducing their resale value.

294.   Had Takata and/or Volkswagen been entirely forthcoming with Plaintiffs and Class members, NHTSA, and the public in a timely manner about the true nature and scope of the Inflator Defect and the grave risks it posed to countless vehicle occupants, as was their duty,

Plaintiffs would not have suffered these harms. Takata's and Volkswagen's conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension, and was committed with reckless indifference to the truth if not the outright intent to deceive.

295.   Volkswagen's and Takata's conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiffs to treble damages under 18 U.S.C. § 1964(c).

296.   The Volkswagen Defendants' violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT 3

### Violation of 18 U.S.C. § 1962(c), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Mercedes

297.   Plaintiffs bring this claim on behalf of themselves and the Nationwide Consumer Class against Mercedes.

298.   Each of the Mercedes Defendants is a "person" under 18 U.S.C. § 1961(3).

299.   Mercedes violated 18 U.S.C. § 1962(c) by participating in or conducting the affairs of the Mercedes-Takata RICO Enterprise through a pattern of racketeering activity.

300.   Plaintiffs and Class members are "person[s] injured in his or her business or property" by reason of Mercedes's violation of RICO within the meaning of 18 U.S.C. § 1964(c).

### The Mercedes-Takata RICO Enterprise

301.   The following persons, and others presently unknown, have been members of and constitute an "association-in-fact enterprise" within the meaning of RICO, and will be referred to herein collectively as the Mercedes-Takata RICO Enterprise:

a.      The Mercedes Defendants, who designed, manufactured, and sold millions of vehicles equipped with Defective Airbags that they knew, or were reckless in not knowing, contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade, while falsely and inaccurately representing that their vehicles were safe, thereby deceiving Plaintiffs and Class members.

b.      Takata, who, with Mercedes's guidance and approval, designed, manufactured, and sold millions of Defective Airbags knowing that they contained the Inflator Defect, the scope and nature of which they concealed from and misrepresented to the public and regulators for more than a decade.

c.      The Mercedes Defendants' Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Mercedes-Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiffs and Class members.

d.      Takata's Officers, Executives, and Engineers, who have collaborated and colluded with each other and with other associates in fact in the Mercedes-Takata RICO Enterprise to deceive Plaintiffs and Class members into purchasing dangerous and defective vehicles, and actively concealing the danger and Inflator Defect from Plaintiffs and Class members.

302.    The Mercedes-Takata RICO Enterprise, which engaged in, and whose activities affected interstate and foreign commerce, is an association-in-fact of individuals and corporate entities within the meaning of 18 U.S.C. § 1961(4), and consists of "persons" associated together for a common purpose. The Mercedes-Takata RICO Enterprise had an ongoing organization with an ascertainable structure, and functioned as a continuing unit with separate roles and responsibilities.

303.    At all relevant times, Mercedes operated, controlled or managed the Mercedes-Takata RICO Enterprise, through a variety of actions. Mercedes's participation in the Mercedes-Takata RICO Enterprise was necessary for the successful operation of its scheme to defraud because Mercedes manufactured, marketed, and sold Class Vehicles with the Defective Airbags, concealed the nature and scope of the Inflator Defect, and profited from such concealment.

304.    The members of the Mercedes-Takata RICO Enterprise all served a common purpose: to sell as many airbags, and vehicles containing such airbags, as possible, and thereby maximize the revenue and profitability of the Mercedes-Takata RICO Enterprise's members.

305.    The members of the Mercedes-Takata RICO Enterprise shared the bounty generated by the enterprise, i.e., by sharing the benefit derived from increased sales revenue generated by the scheme to defraud. Each member of the Mercedes-Takata RICO Enterprise benefited from the common purpose: Mercedes sold or leased more Class Vehicles, and received more for those vehicles, than it would have otherwise had the scope and nature of the Inflator Defect not been concealed; Takata sold more Defective Airbags to Mercedes than it would have otherwise had the scope and nature of the Inflator Defect not been concealed; and the dealerships sold and serviced more Class Vehicles, and sold or leased those vehicles at a much higher price, as a result of the concealment of the scope and nature of the Inflator Defect from Plaintiffs and Class members.

**Pattern of Racketeering Activity**

306.    Mercedes conducted and participated in the conduct of the affairs of the Mercedes-Takata RICO Enterprise through a pattern of racketeering activity that has lasted for more than a decade, beginning no later than 2003 and continuing to this day, and that consisted of numerous and repeated violations of the federal mail and wire fraud statutes, which prohibit the use of any interstate or foreign mail or wire facility for the purpose of executing a scheme to defraud, in violation of 18 U.S.C. §§ 1341 and 1343.

307.    For Mercedes, the purpose of the scheme to defraud was to conceal the scope and nature of the Inflator Defect found in millions of Defective Airbags in the United States in order

to sell more vehicles, to sell them at a higher price or for a higher profit, and to avoid incurring the expenses associated with recalling vehicles plagued by the Inflator Defect.

308.    By concealing the scope and nature of the Inflator Defect in millions of vehicles containing Defective Airbags, Mercedes also maintained and boosted consumer confidence in the Mercedes premium brand, and avoided remediation costs and negative publicity, all of which furthered the scheme to defraud and helped Mercedes sell more vehicles than they would otherwise have sold, and to sell them at a much higher price or for a higher profit.

309.    As detailed in the General Factual Allegations, Mercedes was well aware of the risks of using ammonium nitrate as the propellant in its inflators, but intentionally subjected Plaintiffs and Class members to those risks or consciously disregarded those risks in order to maximize its profits. Moreover, once the Inflator Defect began resulting in field incidents, Mercedes held meetings and conference calls and exchanged emails that further revealed and/or reconfirmed the dangers associated with the Inflator Defect, but then continued to conceal the nature and scope of the Inflator Defect.

310.    To further the scheme to defraud, Mercedes repeatedly misrepresented and concealed the nature and scope of the Inflator Defect. Mercedes continued to sell new vehicles equipped with Defective Inflators without informing consumers, including Plaintiffs and Class members, and repeatedly claimed to NHTSA and publicly that the Inflator Defect did not impact its vehicles, when in fact Mercedes knew, or consciously disregarded knowing, that the Inflator Defect is a fundamental, uniform defect—i.e., the reckless use of the unstable and dangerous ammonium nitrate as the propellant in the inflator—that plagues every Takata airbag equipped in a Mercedes vehicle and manifests itself across the country.

311.    To further the scheme to defraud, Mercedes concealed the nature and scope of the Inflator Defect from federal regulators, including NHTSA, enabling it to escape investigation and costs associated with recalls for more than a decade.

312.    To further the scheme to defraud, Mercedes would promote and tout the safety, reliability, and superior quality of its vehicles with airbags while simultaneously expressing

concerns privately about the same airbags, therein affirmatively concealing the nature and scope of the Inflator Defect.

313.    To carry out, or attempt to carry out the scheme to defraud, Mercedes has conducted or participated in the conduct of the affairs of the Mercedes-Takata RICO Enterprise through the following pattern of racketeering activity that employed the use of the mail and wire facilities, in violation of 18 U.S.C. § 1341 (mail fraud) and § 1343 (wire fraud):

a.      Mercedes devised and furthered the scheme to defraud by use of the mail, telephone, and internet, and transmitted, or caused to be transmitted, by means of mail and wire communications, through interstate or foreign commerce, writing(s) and/or signal(s), including, through the Mercedes website, communications with NHTSA, statements to the press, and communications with other members of the Mercedes-Takata RICO Enterprise, as well as advertisements and other communications to Mercedes's customers, including Plaintiffs and Class members; and

b.      Mercedes utilized the interstate and international mail and wires for the purpose of obtaining money or property by means of the omissions, false pretense, and misrepresentations described herein.  From at least 2004 through the present, Mercedes utilized the interstate and international mail and wires to ship and pay for defective inflators from Takata's facilities in Monclova, Mexico and LaGrange, Georgia to Mercedes facilities in Germany and Michigan, among others located in the United States.

314.    During the relevant time period, Mercedes transmitted, or caused to be transmitted (which hereinafter also means that Mercedes acted with knowledge that the use of the interstate mails and wires would follow in the ordinary course of business, or such use was reasonably foreseeable), by means of mail and wire communication travelling in interstate or foreign commerce, including between its offices in Europe and/or the United States, communications concerning the defective nature of the Takata airbags and the instability and volatility of ammonium nitrate, recognizing that Takata's inflators installed in Mercedes vehicles exposed vehicle occupants to an unacceptable risk of serious injury or death. Mercedes's pattern

of racketeering activity in violation of the mail and wire fraud statutes included but was not limited to the following:

a.       From 2003 through 2006, Mercedes transmitted or caused to be transmitted, by means of mail and wire communications traveling in interstate or foreign commerce, including between its offices in Europe and/or the United States and Takata's offices in Europe and/or the United States, communications regarding the defective nature of Takata's inflators and Mercedes's concerns involving cushion stressing, the performance of the inflator causing other module performance issues, and inflator bulging as an indication of excessively high pressure.  Such communications also concerned a major anomaly during a crash test that was blamed on a bag cushion issue, and an inflator test that resulted in the inflator producing metal parts and holes in the cushion.  Mercedes failed to timely disclose these facts and events to the public, even as it continued to receive mounting information regarding the defective inflators, in order to conceal the scope and nature of the Inflator Defect, and to promote the purported safety of its vehicles.

b.       On multiple occasions, Mercedes transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, including between its offices in Europe and/or the United States and Takata's offices in Europe, Japan, and/or the United States, communications concerning Takata's performance and production problems, including failed validation testing, variability concerns, and ballistic performance issues. Mercedes failed to disclose these facts and events to Plaintiffs, Class members, and the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles. For example:

i.       In May 2003, communications transmitted between Daimler Chrysler (in Michigan and Germany) and Takata (in Michigan and Japan) expressed Daimler Chrysler's view that the PSDI-5 was a "POS" and its concerns regarding the "integrity robustness of the module" and otherwise exhibited its dissatisfaction with the Takata inflators.

ii.     In emails dated May 6 and 7, 2003, Brandon Marriott, a Product Engineer for Daimler Chrysler, communicated to Steve Stram, another engineer at Daimler Chrysler, that a Takata ammonium-nitrate inflator had performance issues, and that Takata had not followed the procedures that Takata and Daimler Chrysler had agreed to in the Spring of 2002 regarding propellant lot acceptance testing, and as a result delivered a substantial number of "'hot' inflators that have been used in [Daimler Chrysler] VC/OOP/sled tests . . . ." Marriott further stated that this "does highlight an ongoing quality issue at LaGrange."  In a follow-up email that forwarded Marriott's 6, 2003 email to Takata employees, Stram reported that Marriott's email had been circulated to managers at Daimler Chrysler, who would have been located in the United States and Germany.  Stram's email was likewise forwarded to numerous Takata employees located in Michigan, Washington, and Georgia.

iii.    On or around September 3, 2003, Mercedes caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Michigan and Georgia, communications regarding deviations from the USCAR specifications regarding Takata's inflators, including deviations involving ballistic variability, flaming, and shock testing.

iv.     An email dated January 30, 2004, from Steve Stram, of the Driver Airbag Group at Daimler Chrysler in Michigan, to Takata employees located in Michigan, Washington, and Georgia, discussed additional performance issues with Takata's inflators and confirmed that inflators would be shipped from Monclova, Mexico to Michigan.

v.      On or around June 15, 2005, Daimler engineer Steve Stram transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Michigan, Georgia, and/or Germany, communications regarding, Takata inflator variability, deployments in which inflator fragments were expelled through airbag cushions, and the inability of Takata inflators to comply with USCAR requirements.

vi.     On or around April 5, 2006, Daimler engineer Steve Stram sent an email from Monclova, Mexico to Takata and Daimler employees in Michigan, regarding his inspection of the Monclova facility after its ammonium-nitrate-fueled explosion.  The email demonstrates Mercedes's intimate knowledge of Takata's production operations and the dangerous risks involved.

vii.     In or around May 2006, Mercedes caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between Michigan, Georgia, Washington, and/or Germany, communications regarding Mercedes approving specification deviations for Takata inflators.

c.     In or about February 2007, the "Group of Five Working Committee," of which Mercedes was a member, transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, between offices in Germany and/or the United States and Takata's offices in Japan and/or the United States, communications concerning ammonium-nitrate inflators, including module testing, helium leak testing, and temperature- and moisture-related failure modes, precisely the factors and issues that would eventually lead to the airbag recalls, thus signaling Mercedes's clear and ongoing knowledge of the unacceptable risks associated with Takata's airbags. Mercedes failed to timely disclose these facts and events to the public in order to conceal the scope and nature of the Inflator Defect and to promote the purported safety of its vehicles.

d.     In a letter dated October 28, 2014, from Takata's offices in Germany to Daimler AG in Germany, Takata informed Daimler AG "that the root cause of the gas generator issue that is currently being examined . . . is yet to be fully clarified."

e.     In an email dated December 18, 2015, from Matthias Haupt, a vice president of Takata AG, in Aschaffenburg, Germany, to Takata employees in Michigan, Haupt discusses an upcoming visit on January 12, 2016, by Professor Rodolfo Schöneburg, Head of Vehicle Safety, Durability and Corrosion Protection at Mercedes Cars, with Takata's Product

Safety Group in Armada, Michigan. In the same email, Matthias indicates that he had a telephone call on December 18, 2015 with Professor Schoneburg's secretary to confirm his itinerary for his visit to Michigan.

      f.    In an email dated January 20, 2016, from Matthias Haupt in Germany, and sent to other Takata employees in Germany and the United States, Haupt states "we had yesterday another high level meeting with Mercedes Cars Purchasing . . . . It went very well despite the bad news about the SDI and PSDI-5 but Daimler stays committed to keep us 'as a player in the industry.'"

      g.    In an email dated January 21, 2016, from Daniel Fahrbach, Executive Assistant to the Executive Vice President of Mercedes Cars Procurement and Supplier Quality at Daimler AG, to other Daimler employees and Takata employees in Germany and the United States, including Matthias Haupt of Takata, Fahrbach summarizes a January 19, 2016, meeting between Daimler and Takata and notes that, as a "technical update" on the "Actual Situation Airbag Inflators," (1) "[t]he higher the temperature is the more likely is the rupture of the inflator in the field"; (2) a "field rupture of a SDI Module in South Carolina" (a module used by "[t]he sprinter" "at the driver airbag"); and (3) "3 [PSDI 5] inflators were ruptured during testing this week . . . . 700.000 MB cars in the U.S. have this module"; and (4) "Daimler states clearly that there is a strong will to continue business with Takata."

      h.    In or about June 2014, Takata caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, including between its offices in Japan and/or the United States and federal regulators in Washington, D.C., regulatory filings that acknowledge that suspect inflators had been provided to Daimler. Yet after submitting the letter, Takata internally expressed concern regarding its inclusion of Daimler in light of an apparent agreement to take them off of the list of recipients of suspect inflators. Takata's communications further reflect that Takata and Daimler were coordinating their response about the matter to NHTSA. Moreover, by this time, Mercedes was well aware of the problems with the suspect inflators and should have instigated a full recall. Instead, Mercedes

continued to hide the true nature and scope of the defect, continued to install Takata inflators in new vehicles sold in the United States, and continued to keep the fact of the defective inflators a secret for almost another two years. Specifically, in a June 12, 2014 email sent from Matthias Haupt, a Takata vice president, to Mike Rains, Government Affairs Specialist at TK Holdings Inc. in Auburn Hills, Michigan, Haupt advises Rains that "it would be good if we can delete Daimler from the 'Preliminary Evaluation [of inflators conducted by NHTSA].'  By when can we determine that we have not supplied any suspicious parts to Daimler?" In a response email sent the same day, Rains advises Haupt that "Daimler was [mistakenly] included on our letter to NHTSA yesterday. Our records show that they are not affected by the ranges we posted." Rains advises Haupt that Daimler will be removed from the list and the letter previously sent to NHTSA would be resubmitted. In a follow-up email sent from Haupt to Rains the next day, June 13, 2014, Haupt advised Rains that Daimler told him that Daimler's attorneys in the U.S. advised that NHTSA had sent a 25-question questionnaire to Daimler. Haupt further advised Rains that he had "promised a confirmation that [Daimler is] not involved until Wednesday next week and they will refer to this statement [by Takata] when answering the questionnaire [from NHTSA]. Hopefully we can put this to bed then." In response, Rains advises Haupt that "[w]e will contact NHTSA this morning. I am very shocked about this. We verbally told [NHTSA] that Daimler should not be on the list."

i.      Just a few months later, in or about October 2014, Mercedes requested and caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, including between their offices in Europe and/or the United States and Takata's offices in Japan, Europe or the United States, information regarding the current Takata recalls that it knew or should have known was false or incomplete. Despite Mercedes internally knowing that it had approved the Takata inflators in spite of their failures and acknowledging that they were deficient, dangerous and incapable of meeting USCAR standards, Mercedes concealed the nature and scope of the Inflator Defect, and sought information from Takata that it knew was false in order to support its decision not to issue a recall.

315.     Mercedes's conduct in furtherance of this scheme was intentional. Plaintiffs and Class members were directly harmed as a result of Mercedes's intentional conduct. Plaintiffs, Class members, and federal regulators, among others, relied on Mercedes's material misrepresentations and omissions.

316.     As described throughout this Complaint, Mercedes engaged in a pattern of related and continuous predicate acts for more than a decade. The predicate acts constituted a variety of unlawful activities, each conducted with the common purpose of defrauding Plaintiffs and other Class members and obtaining significant monies and revenues from them while providing Defective Airbags worth significantly less than the purchase price paid. The predicate acts also had the same or similar results, participants, victims, and methods of commission. The predicate acts were related and not isolated events.

317.     The predicate acts all had the purpose of generating significant revenue and profits for Mercedes and the Mercedes-Takata RICO Enterprise at the expense of Plaintiffs and Class members. The predicate acts were committed or caused to be committed by Mercedes through its participation in the Mercedes-Takata RICO enterprise, and in furtherance of its fraudulent scheme; and were interrelated in that they involved obtaining Plaintiffs' and Class members' funds and avoiding the expenses associated with remediating the Inflator Defect.

318.     By reason of and as a result of the conduct of Mercedes, and in particular, its pattern of racketeering activity and scheme to defraud, Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

a.     overpayment for leased or purchased Class Vehicles, in that Plaintiffs were misled into paying for premium Mercedes vehicles with safe airbag systems, and obtained vehicles with anything but, and were deprived of the benefit of their bargain; and

b.     the values of the Class Vehicles have diminished, thus reducing their resale values.

319.     Mercedes's violations of 18 U.S.C. § 1962(c) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members

are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

## COUNT 4

### Violation of 18 U.S.C. § 1962(d), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), Against Mercedes

320.    Plaintiffs bring this claim on behalf of themselves and the Nationwide Consumer Class against Mercedes.

321.    In addition to the General Factual Allegations re-alleged and incorporated herein through the general Reallegation and Incorporation by Reference Paragraph above, Plaintiffs re-allege and incorporate the allegations set forth above in Count 3.

322.    At all relevant times, Mercedes was associated with the Mercedes-Takata RICO Enterprise, and agreed and conspired to violate 18 U.S.C. § 1962(c), that is, agreed to conduct and participate, directly and indirectly, in the conduct of the affairs of the Mercedes-Takata RICO Enterprise through a pattern of racketeering activity, in violation of 18 U.S.C. § 1962(d). Mercedes also agreed to the objective of the conspiracy or to commit at least two racketeering predicate acts.

323.    Over the course of the past decade, Mercedes and Takata shared information about the Defective Airbags' inherent flaws, their inability to meet safety specifications, and abnormal airbag deployments experienced by other automakers; delayed and/or prevented the release of inculpatory information; and maintained a consistent public posture as to the scope of vehicles affected by the Defective Airbags and the safety risks those airbags posed. Mercedes's and Takata's close cooperation on issues surrounding the Inflator Defect, their concealment of the nature and scope of the Inflator Defect, and their joint participation in predicate acts described below is evidence of the conspiracy.

**Overt Acts**

324.     Mercedes and Takata committed and caused to be committed a series of overt acts in furtherance of the conspiracy and to affect the objects thereof.

325.     More specifically, the conduct of the Defendants detailed above (including the predicate acts of mail and wire fraud), and the following conduct and overt acts, demonstrate the ongoing conspiracy between Mercedes and Takata:

a.     Mercedes and Takata knew that propellant degradation, including through moisture or temperature, could lead to over pressurization.

b.     Mercedes was also fully aware of the volatility of ammonium nitrate and visited the Monclova facility after an explosion to check on status and observe repairs and production lines.

c.     Mercedes modified its own specifications for the Takata inflators so that they would be easier for Takata to meet, by agreeing to deviations in order to get the Inflators approved for installation in the Mercedes Class Vehicles.

d.     Mercedes and Takata decided together to forego key performance requirements and resolve testing failures that they knew should have rendered the Defective Inflators unfit for approval. Specifically, Mercedes and Takata agreed to use "surrogate data" and to "assist with verbiage to close" in connection with a plan to approve the Defective Inflators for use in Class Vehicles in spite of this anomalous testing data.

e.     Senior airbags experts representing Mercedes accepted deviations in order to get the Defective Inflators approved for installation in the Mercedes Class Vehicles.

f.     Senior engineers representing Mercedes participated in deployment testing with Takata where the Takata inflators became extremely bright, melting points and holes at the cushion were observed, and parts of the inflator were found inside the cushion.

g.     Takata and Mercedes also decided together to approve deviations and to "forego key performance variables."

- 118 -

h.    Mercedes and Takata agreed to ignore tests related to ballistic performance at hot temperatures.

i.    Mercedes acknowledged that the Takata inflators using ammonium nitrate were problematic, as reflected in internal Takata emails that Mercedes was waiting for new inflator technology "like the second coming of Christ."

j.    Mercedes also regularly expressed concerns regarding inflator variability and requested variability reduction.

k.    Before approving the inflators, Mercedes aware that ISI did not follow procedures agreed to for propellant testing.

l.    In the years prior to its first recall, Mercedes regularly requested information about inflator performance issues.

m.    Mercedes was also fully aware that the Takata inflators did not comply with USCAR and that all competitor airbags did, yet failed to disclose this to Plaintiffs and Class Members.

n.    On several occasions, Mercedes indicated that the PSDI-5 inflator would not be acceptable, yet it approved it anyway.

o.    Mercedes was aware of the other recalls of the Defective Inflators, yet worked with Takata to continue to both delay recalls of the Mercedes Class Vehicles already sold and to install Defective Airbags in new Mercedes vehicles without informing consumers that its new cars had airbags that would be recalled in the future.

p.    Even after they were forced to issue a recall, Mercedes and Takata worked together to try to convince NHTSA to reduce the scope of the recall.

326.    In addition, Takata engaged in the following predicate acts in furtherance of the conspiracy:

a.    In mid-to-late 2004, following a May 2004 accident in Alabama in which a Defective Airbag ruptured and spewed metal debris at the driver, Takata transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign

commerce, from its offices in Japan and/or Michigan to the offices of Honda in California and offices of regulators in Washington, D.C., representations that the rupture was an "anomaly," even though it resulted from the Inflator Defect, thereby concealing the nature and scope of the Inflator Defect.

b.     In November 2008, Takata caused to be transmitted, by means of mail or wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., regulatory filings stating that approximately 4,000 vehicles subject to a 2008 recall included all "possible vehicles that could potentially experience the problem [of a rupturing airbag inflator]," thereby concealing the nature and scope of the Inflator Defect.

c.     In December 2008, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to vehicle owners across the country, letters stating that that "[m]etal fragments could pass through the airbag cushion material, possibly causing injury to vehicle occupants."  This letter did not sufficiently communicate the severity of the threat to life and limb, and concealed the scope and nature of the Inflator Defect.  Owners were merely advised to make an appointment to have their vehicle repaired, with no sense of urgency.  In contrast, on October 22, 2014, NHTSA urged affected vehicle owners to "act immediately on recall notices to replace defective Takata airbags."

d.     On July 29, 2009, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C. an amended report identifying an estimated 440,000 additional vehicles that should have been subject to the earlier recall.  This report stated that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."  In light of the 100-fold recall expansion, this filing was misleading and served to conceal and/or minimize the threats posed by the Defective Airbags.

e.      On September 16, 2009, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C. information concerning the initial, narrow recalls of Takata's inflators.  NHTSA wanted to know why the first recall did not include the vehicles covered by the second recall.  Among other things, this letter explained that several "additional deployments" had occurred outside of the VIN ranges of the first recall, prompting the latter recall.  But the letter fraudulently omitted that one of those deployments caused Ashley Parham's death.  Also, the letter claimed that the manufacturing problem was limited to only one high-precision compression press.  Because Takata was by then aware of the litany of problems plaguing its Monclova, Mexico plant, this "explanation" was grossly self-serving and misleading. In addition to the quality control problems stated above, during 2005 and 2006, Takata engineers struggled on three occasions to eliminate leaks found in inflators in the Monclova, Mexico plant.  Once again, NHTSA, and by extension the public, were deprived of accurate and complete information.  As a result of this letter, the Office of Defect Investigation closed its investigation into these two recalls.  Takata thereby concealed the nature and scope of the Inflator Defect.

f.      On February 9, 2010, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., another recall communication again falsely assuring NHTSA and the public that "[t]he VIN range reflects all possible vehicles that could potentially experience the problem."   The explanation of the defect in this communication—that two processes were used to prepare the inflator propellant and that one of them was not within specifications—was misleading in light of what Takata knew, or at least should have known in light of the extensive problems at Takata's Monclova, Mexico plant.

g.      On February 19, 2010, Takata transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan and/or Japan a response to NHTSA's November 20, 2009 letter

seeking more information about earlier inflator recalls.  Takata falsely and misleadingly asserted that it "ha[d] not provided any air bag inflators that are the same or substantially similar to the inflators in vehicles covered by recalls 08V-593 and 09V-259 to any customers other than Honda."  This statement was patently incorrect, as over 10 manufacturers have recalled vehicles containing Defective Airbags since that statement was made.  This statement concealed the nature and scope of the Inflator Defect.

       h.     On April 27, 2011, Takata caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from California to federal regulators in Washington, D.C., additional recall communications again misleadingly stating that another recall covered "all possible vehicles" with the problem.  As before, the letter to owners and lessees did not sufficiently raise a sense of urgency.  This statement concealed the nature and scope of the Inflator Defect.

       i.     On April 11, 2013, Takata transmitted, or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from its offices in Japan and/or Michigan to the offices of federal regulators in Washington, D.C., misrepresentations that the defect was limited to inflators produced at a specific plant between certain dates due to a manufacturing error, again concealing the nature and scope of the Inflator Defect.

       327.    On June 11, 2014, Takata transmitted or caused to be transmitted, by means of mail and wire communication travelling in interstate or foreign commerce, from Takata's offices in Michigan or Japan to the ODI in Washington, D.C., a letter titled "Takata Support for Regional Field Actions to Address Potential Inflator Issues."  Takata explained that it would "support the replacement of the identified inflators in vehicles in Puerto Rico, Florida, Hawaii, and the Virgin Islands, based on the high levels of absolute humidity in those areas," because "all six of the potentially-relevant rupture incidents had occurred in either Florida or Puerto Rico."  Takata misleadingly omitted Ashely Parham's death in Oklahoma in May 2009, Gurjit Rathore's death in December 2009 in Virginia, and Brandi Owens's injury in October 2013 in Georgia.  By

focusing on areas of high humidity, this communication concealed the nature and scope of the Inflator Defect.

328.    Mercedes and Takata agreed to and did conduct and participate in the conduct of the Mercedes-Takata RICO Enterprise's affairs through a pattern of racketeering activity and for the unlawful purpose of defrauding Plaintiffs and Class members, as more fully described above.

329.    As a direct and proximate result of Mercedes's and Takata's conspiracy and violation of 18 U.S.C. § 1962(d), Plaintiffs and Class members have been injured in their business and/or property in multiple ways, including but not limited to:

    a.    overpayment for leased or purchased Class Vehicles, in that Plaintiffs paid for vehicles with safe airbag systems, and obtained vehicles with anything but, and have been deprived of the benefit of their bargain; and

    b.    the Class Vehicles' value has diminished, thus reducing their resale value.

330.    Had Takata and/or Mercedes been entirely forthcoming with NHTSA and with the public in a timely manner about the vast scope of the Inflator Defect and the grave risks it posed to countless vehicle occupants, as was their duty, Plaintiffs would not have suffered these harms. Their conspiracy to commit mail fraud and/or wire fraud was reasonably calculated to deceive persons of ordinary prudence and comprehension, and was committed with reckless indifference to the truth if not the outright intent to deceive.

331.    Mercedes's and Takata's conspiracy to violate 18 U.S.C. § 1962(c) was committed with the specific intent to defraud, thereby entitling Plaintiffs to treble damages under 18 U.S.C. § 1964(c).

332.    Mercedes's violations of 18 U.S.C. § 1962(d) have directly and proximately caused injuries and damages to Plaintiffs and Class Members, and Plaintiffs and Class Members are entitled to bring this action for three times their actual damages, as well as injunctive/equitable relief and costs and reasonable attorneys' fees pursuant to 18 U.S.C. §§ 1964(a) and 1964(c).

**COUNT 5**

**Violation of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301 et seq.**

333.    Consumer Plaintiffs bring this Count against Defendants on behalf of members of the Nationwide Consumer Class who are residents of the District of Columbia and the following States: Alaska, Arkansas, California, Colorado, Delaware, Hawaii, Indiana, Kansas, Louisiana, Maine, Maryland, Massachusetts, Michigan, Minnesota, Mississippi, Missouri, Montana, Nebraska, Nevada, New Hampshire, New Jersey, New Mexico, New York, North Dakota, Oklahoma, Pennsylvania, Rhode Island, South Carolina, South Dakota, Texas, Utah, Virginia, West Virginia, and Wyoming.

334.    This Court has jurisdiction to decide claims brought under 15 U.S.C. § 2301 by virtue of 28 U.S.C. § 1332 (a)-(d).

335.    The Class Vehicles are "consumer products" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(1).

336.    Plaintiffs are "consumers" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(3). They are consumers because they are persons entitled under applicable state law to enforce against the warrantor the obligations of its express and implied warranties.

337.    Defendants are each a "supplier" and "warrantor" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(4)-(5).

338.    15 U.S.C. § 2310(d)(1) provides a cause of action for any consumer who is damaged by the failure of a warrantor to comply with a written or implied warranty.

339.    Defendants provided Plaintiffs and the other Class members with an implied warranty of merchantability in connection with the purchase or lease of their vehicles that is an "implied warranty" within the meaning of the Magnuson-Moss Warranty Act, 15 U.S.C. § 2301(7). As a part of the implied warranty of merchantability, Defendants warranted that the Class Vehicles were fit for their ordinary purpose as safe passenger motor vehicles, would pass without objection in the trade as designed, manufactured, and marketed, and were adequately contained, packaged, and labeled.

340.    Defendants breached these implied warranties, as described in more detail above, and are therefore liable to Plaintiffs and the Class pursuant to 15 U.S.C. § 2310(d)(1). Without limitation, the Class Vehicles share a common design defect in that they are equipped with Defective Airbags containing the Inflator Defect. Defendants have admitted that the Class Vehicles are defective in issuing their recalls, but the recalls are woefully insufficient to address the Inflator Defect.

341.    Any efforts to limit the implied warranties in a manner that would exclude coverage of the Class Vehicles is unconscionable, and any such effort to disclaim, or otherwise limit, liability for the Class Vehicles is null and void.

342.    Any limitations on the warranties are procedurally unconscionable. There was unequal bargaining power between Defendants, on the one hand, and Plaintiffs and the other Class members, on the other.

343.    Any limitations on the warranties are substantively unconscionable. Defendants knew that the Class Vehicles were defective and would continue to pose safety risks after the warranties purportedly expired. Defendants failed to disclose the Inflator Defect to Plaintiffs and the other Class members. Thus, Defendants' enforcement of the durational limitations on those warranties is harsh and shocks the conscience.

344.    Plaintiffs and each of the other Class members have had sufficient direct dealings with either Defendants or its agents (dealerships) to establish privity of contract.

345.    Nonetheless, privity is not required here because Plaintiffs and each of the other Class members are intended third-party beneficiaries of contracts between Defendants and their dealers, and specifically, of the implied warranties. The dealers were not intended to be the ultimate consumers of the Class Vehicles and have no rights under the warranty agreements provided with the Class Vehicles; the warranty agreements were designed for and intended to benefit consumers. Finally, privity is also not required because the Class Vehicles are dangerous instrumentalities due to the aforementioned defect.

346.     Pursuant to 15 U.S.C. § 2310(e), Plaintiffs are entitled to bring this class action and are not required to give Defendants notice and an opportunity to cure until such time as the Court determines the representative capacity of Plaintiffs pursuant to Rule 23 of the Federal Rules of Civil Procedure.

347.     Furthermore, affording Defendants an opportunity to cure its breach of written warranties would be unnecessary and futile here. At the time of sale or lease of each Class Vehicle, Defendants knew, should have known, or were reckless in not knowing of their misrepresentations concerning the Class Vehicles' inability to perform as warranted, but nonetheless failed to rectify the situation and/or disclose the defective design. Under the circumstances, the remedies available under any informal settlement procedure would be inadequate and any requirement that Plaintiffs resort to an informal dispute resolution procedure and/or afford Defendants a reasonable opportunity to cure their breach of warranties is excused and thereby deemed satisfied.

348.     In addition, a substantial portion, if not most, of the Plaintiffs provided written notice of breach of implied warranties and related consumer protection laws, and opportunity to cure, by letters dated November 14, 2017, November 15, 2017, and December 15, 2017 to Volkswagen, and letters dated November 14, 2017, November 15, 2017, November 28, 2017, and December 15, 2017 to Mercedes.

349.     Plaintiffs and the other Class members would suffer economic hardship if they returned their Class Vehicles but did not receive the return of all payments made by them. Because Defendants are refusing to acknowledge any revocation of acceptance and return immediately any payments made, Plaintiffs and the other Class members have not re-accepted their Defective Vehicles by retaining them.

350.     The amount in controversy of Plaintiffs' individual claims meets or exceeds the sum of $25. The amount in controversy of this action exceeds the sum of $50,000, exclusive of interest and costs, computed on the basis of all claims to be determined in this lawsuit. Plaintiffs, individually and on behalf of the other Class members, seek all damages permitted by law,

including diminution in value of their vehicles, in an amount to be proven at trial. In addition, pursuant to 15 U.S.C. § 2310(d)(2), Plaintiffs and the other Class members are entitled to recover a sum equal to the aggregate amount of costs and expenses (including attorneys' fees based on actual time expended) determined by the Court to have reasonably been incurred by Plaintiffs and the other Class members in connection with the commencement and prosecution of this action.

351.    Plaintiffs also request, as a form of equitable monetary relief, re-payment of the out-of-pocket expenses and costs they have incurred in attempting to rectify the Inflator Defect in their vehicles. Such expenses and losses will continue as Plaintiffs and Class members must take time off from work, pay for rental cars or other transportation arrangements, child care, and the myriad expenses involved in going through the recall process.

352.    The right of Class members to recover these expenses as an equitable matter to put them in the place they would have been but for Defendants' conduct presents common questions of law. Equity and fairness requires the establishment by Court decree and administration under Court supervision of a program funded by Defendants, using transparent, consistent, and reasonable protocols, under which such claims can be made and paid.

### B.    Common Law and State Law Claims Against Volkswagen

### COUNT 6

### Fraudulent Concealment

353.    Plaintiffs (excluding Florida and Pennsylvania Consumer Plaintiffs) bring this claim against Volkswagen on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Volkswagen under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

354.    As described above, Volkswagen made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

355.    Volkswagen concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

356.    Volkswagen took steps to ensure that its employees did not reveal the known Inflator Defect to regulators or consumers.

357.    On information and belief, Volkswagen still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect.

358.    Volkswagen had a duty to disclose the Inflator Defect because it:

a.    Had exclusive and/or far superior knowledge and access to the facts, and Volkswagen knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.    Intentionally concealed the foregoing from Plaintiffs and Class Members; and

c.    Made incomplete representations about the safety and reliability of the Defective Airbags and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

359.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable, and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Volkswagen not to sell or lease them vehicles that were defective or that

violated federal law governing motor vehicle safety, and to uphold its recall obligations under the Sale Agreement and governing laws.

360.    Volkswagen concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective Airbags and Class Vehicles were capable of performing safely, as represented by Volkswagen and reasonably expected by consumers.

361.    Volkswagen also misrepresented the safety and reliability of the Defective Airbags and Class Vehicles, because it either (a) knew but did not disclose the Inflator Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

362.    Volkswagen actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Volkswagen money. It did so at the expense of Plaintiffs and the Class.

363.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

364.    Had they been aware of the Defective Airbags installed in the Class Vehicles and Volkswagen's callous disregard for safety, Plaintiffs and the Class either would not have paid as much for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs and Class members did not receive the benefit of their bargain as a result of Volkswagen's fraudulent concealment.

365.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Volkswagen's concealment of, and failure to timely disclose, the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Volkswagen's conduct.

366.    The value of all Class members' vehicles has diminished as a result of Volkswagen's fraudulent concealment of the Inflator Defect and the Inflator Defect has also

made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

367.    Accordingly, Volkswagen is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

368.    Volkswagen's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Volkswagen. Volkswagen's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and effecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 7

### Negligence

369.    Consumer Plaintiffs (excluding Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, and South Carolina Consumer Plaintiffs) bring this claim against Volkswagen on behalf of themselves and the members of the Nationwide Consumer Class under the common law of negligence, as there are no true conflicts (case-dispositive differences) among various states' laws of negligence. In the alternative, Plaintiffs bring this claim against Volkswagen under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

370.    Volkswagen owed a duty of care to the Consumer Plaintiffs and Class members, who were foreseeable end users, to design and manufacture its vehicles so that they would not be defective or unreasonably dangerous to foreseeable end users, including Consumer Plaintiffs and Class members.

371.    Volkswagen breached its duty of care by, among other things:

a.    Negligently and recklessly equipping the Class Vehicles with Defective Airbags;

b.    Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended;

c.    Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.    Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

e.    Negligently and recklessly concealing the nature and scope of the Inflator Defect.

372.    Volkswagen's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Consumer Plaintiffs and Class members, as well as ongoing foreseeable damages that Consumer Plaintiffs and Class members continue to suffer to this day.

373.    As a direct, actual, and proximate result of Volkswagen's misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages, which are continuing in nature, including:

a.    the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.    the continued exposure of Consumer Plaintiffs and Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

374.    Volkswagen's negligence is ongoing and continuing, because Volkswagen continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same

serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

375.   In addition to damages, Consumer Plaintiffs and Class Members seek injunctive relief to enjoin Volkswagen from continuing its negligence by continuing to install Defective Airbags in Class Vehicles.

## COUNT 8

### Unjust Enrichment

376.   Consumer Plaintiffs (excluding those who did not purchase a Class Vehicle from a Volkswagen dealership) bring this claim on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment against Volkswagen. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

377.   Volkswagen has received and retained a benefit from the Plaintiffs and inequity has resulted.

378.   Volkswagen benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

379.   It is inequitable for Volkswagen to retain these benefits.

380.   Consumer Plaintiffs do not have an adequate remedy at law.

381.   As a result of Volkswagen's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

### C.     Common Law and State Law Claims Against Mercedes

### COUNT 9

### Fraudulent Concealment

382.    Plaintiffs (excluding Florida and Pennsylvania Consumer Plaintiffs) bring this claim against Mercedes on behalf of themselves and the members of the Nationwide Consumer Class under the common law of fraudulent concealment, as there are no true conflicts (case-dispositive differences) among various states' laws of fraudulent concealment. In the alternative, Plaintiffs bring this claim against Mercedes under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

383.    As described above, Mercedes made material omissions and affirmative misrepresentations regarding the Class Vehicles and the Defective Airbags contained therein.

384.    Mercedes concealed and suppressed material facts regarding the Defective Airbags—most importantly, the Inflator Defect, which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

385.    Mercedes took steps to ensure that its employees did not reveal the known Inflator Defect to regulators or consumers.

386.    On information and belief, Mercedes still has not made full and adequate disclosure, continues to defraud Plaintiffs and the Class, and continues to conceal material information regarding the Inflator Defect.

387.    Mercedes had a duty to disclose the Inflator Defect because it:

a.     Had exclusive and/or far superior knowledge and access to the facts, and Mercedes knew the facts were not known to or reasonably discoverable by Plaintiffs and the Class;

b.     Intentionally concealed the foregoing from Plaintiffs and Class Members; and

        c.     Made incomplete representations about the safety and reliability of the Defective Airbags and Class Vehicles, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

388.    These omitted and concealed facts were material because they would be relied on by a reasonable person purchasing, leasing, or retaining a new or used motor vehicle, and because they directly impact the value of the Class Vehicles purchased or leased by Plaintiffs and the Class. Whether a manufacturer's products are safe and reliable and whether that manufacturer stands behind its products, are material concerns to a consumer. Plaintiffs and Class Members trusted Mercedes not to sell or lease them vehicles that were defective or that violated federal law governing motor vehicle safety and to uphold its recall obligations under the Sale Agreement and governing laws.

389.    Mercedes concealed and suppressed these material facts to falsely assure purchasers and consumers that the Defective Airbags and Class Vehicles were capable of performing safely, as represented by Mercedes and reasonably expected by consumers.

390.    Mercedes also misrepresented the safety and reliability of the Defective Airbags and Class Vehicles, because it either (a) knew but did not disclose the Inflator Defect; (b) knew that it did not know whether its safety and reliability representations were true or false; or (c) should have known that its misrepresentations were false.

391.    Mercedes actively concealed or suppressed these material facts, in whole or in part, to maintain a market for its vehicles, to protect its profits, and to avoid recalls that would hurt the brand's image and cost Mercedes money. It did so at the expense of Plaintiffs and the Class.

392.    Plaintiffs and the Class were unaware of these omitted material facts and would not have acted as they did if they had known of the concealed or suppressed facts.

393.    Had they been aware of the Defective Airbags installed in the Class Vehicles, and Mercedes's callous disregard for safety, Plaintiffs and the Class either would not have paid as much for their Class Vehicles, or they would not have purchased or leased them at all. Plaintiffs

and Class members did not receive the benefit of their bargain as a result of Mercedes's fraudulent concealment.

394.    Because of the concealment or suppression and/or misrepresentation of the facts, Plaintiffs and the Class sustained damage because they own vehicles that diminished in value as a result of Mercedes's concealment of and failure to timely disclose the serious Inflator Defect in millions of Class Vehicles and the serious safety and quality issues caused by Mercedes's conduct.

395.    The value of all Class members' vehicles has diminished as a result of Mercedes's fraudulent concealment of the Inflator Defect, and made any reasonable consumer reluctant to purchase any of the Class Vehicles, let alone pay what otherwise would have been fair market value for the vehicles.

396.    Accordingly, Mercedes is liable to Plaintiffs and the Classes for their damages in an amount to be proven at trial, including, but not limited to, their lost benefit of the bargain or overpayment for the Class Vehicles at the time of purchase, the diminished value of the Defective Airbags and the Class Vehicles, and/or the costs incurred in storing, maintaining or otherwise disposing of the defective airbags.

397.    Mercedes's acts were done maliciously, oppressively, deliberately, with intent to defraud, and in reckless disregard of Plaintiffs' and the Class's rights and well-being, and with the aim of enriching Mercedes. Mercedes's conduct, which exhibits the highest degree of reprehensibility, being intentional, continuous, placing others at risk of death and injury, and affecting public safety, warrants an assessment of punitive damages in an amount sufficient to deter such conduct in the future, which amount is to be determined according to proof.

## COUNT 10

### Negligence

398.    Consumer Plaintiffs (excluding Alabama, California, Florida, Illinois, Massachusetts, Michigan, Nevada, North Carolina, Pennsylvania, and South Carolina Consumer

Plaintiffs) bring this claim against Mercedes on behalf of themselves and the members of the Nationwide Consumer Class under the common law of negligence, as there are no true conflicts (case-dispositive differences) among various states' laws of negligence. In the alternative, Plaintiffs bring this claim against Mercedes under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

399.    Mercedes owed a duty of care to the Consumer Plaintiffs and Class members, who were foreseeable end users, to design and manufacture its vehicles so that they would not be defective or unreasonably dangerous to foreseeable end users, including Consumer Plaintiffs and Class members.

400.    Mercedes breached its duty of care by, among other things:

a.      Negligently and recklessly equipping the Class Vehicles with Defective Airbags;

b.      Negligently and recklessly failing to take all necessary steps to ensure that its products—which literally can make the difference between life and death in an accident—function as designed, specified, promised, and intended;

c.      Negligently and recklessly failing to take all necessary steps to ensure that profits took a back seat to safety;

d.      Negligently and recklessly failing to take all necessary steps to ensure that the Defective Airbags did not suffer from a common, uniform defect: the use of ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their inflators; and

e.      Negligently and recklessly concealing the nature and scope of the Inflator Defect.

401.    Mercedes's negligence was the direct, actual, and proximate cause of foreseeable damages suffered by Consumer Plaintiffs and Class members, as well as ongoing foreseeable damages that Consumer Plaintiffs and Class members continue to suffer to this day.

402.    As a direct, actual, and proximate result of Mercedes's misconduct, Plaintiffs and members of the proposed Class were harmed and suffered actual damages, which are continuing in nature, including:

a.    the significantly diminished value of the vehicles in which the defective and unreasonably dangerous airbags are installed; and

b.    the continued exposure of Consumer Plaintiffs and Class members to an unreasonably dangerous condition that gives rise to a clear and present danger of death or personal injury.

403.    Mercedes's negligence is ongoing and continuing, because Mercedes continues to obfuscate, not fully cooperate with regulatory authorities, and manufacture replacement airbags that are defective and unreasonably dangerous, suffering from the same serious Inflator Defect inherent in the original airbags that are at issue in this litigation, which poses an unreasonable risk of serious foreseeable harm or death, from which the original airbags suffer.

404.    In addition to damages, Consumer Plaintiffs and Class Members seek injunctive relief to enjoin Mercedes from continuing its negligence by continuing to install Defective Airbags in Class Vehicles.

## COUNT 11

### Unjust Enrichment

405.    Consumer Plaintiffs (excluding those who did not purchase a Class Vehicle from a Mercedes dealership) bring this claim on behalf of themselves and the members of the Nationwide Consumer Class under the common law of unjust enrichment, as there are no true conflicts (case-dispositive differences) among various states' laws of unjust enrichment. In the alternative, Consumer Plaintiffs bring this claim under the laws of the states where Plaintiffs and Class Members purchased their Class Vehicles.

406.    Mercedes has received and retained a benefit from the Plaintiffs and inequity has resulted.

407.    Mercedes benefitted through its unjust conduct, by selling Class Vehicles with a concealed safety-and-reliability related defect, at a profit, for more than these Vehicles were worth, to Plaintiffs, who overpaid for these Vehicles, and/or would not have purchased these Vehicles at all; and who have been forced to pay other costs.

408.    It is inequitable for Mercedes to retain these benefits.

409.    Consumer Plaintiffs do not have an adequate remedy at law.

410.    As a result of Mercedes's conduct, the amount of its unjust enrichment should be disgorged, in an amount to be proven at trial.

## II.    State Consumer Sub-Class Claims

### A.    Claims Brought on Behalf of the Alabama Consumer Sub-Class

### COUNT 12

**Violation of the Alabama Deceptive Trade Practices Act,
Ala. Code §§ 8-19-1, *et seq.***

411.    This claim is brought on behalf of the Alabama Consumer Sub-Class against Volkswagen and Mercedes.

412.    Plaintiffs and the Alabama Consumer Sub-Class are "consumers" within the meaning of Ala. Code § 8-19-3(2).

413.    Plaintiffs, the Alabama Consumer Sub-Class, and Defendants are "persons" within the meaning of Ala. Code § 8-19-3(5).

414.    The Class Vehicles and/or the Defective Airbags installed in them are "goods" within the meaning of Ala. Code. § 8-19-3(3).

415.    Defendants were and are engaged in "trade or commerce" within the meaning of Ala. Code § 8-19-3(8).

416.    The Alabama Deceptive Trade Practices Act ("Alabama DTPA") declares several specific actions to be unlawful, including:

a.     "Representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or qualities that they do not have;"

b.     "Representing that goods or services are of a particular standard, quality, or grade, or that goods are of a particular style or model, if they are of another;" and

c.     "Engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce."

Ala. Code § 8-19-5.

417.   By misrepresenting the Class Vehicles and/or the Defective Airbags as safe, and by failing to disclose and actively concealing the Inflator Defect, Defendants engaged in deceptive business practices prohibited by the Alabama DTPA, including: representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in any other unconscionable, false, misleading, or deceptive act or practice in the conduct of trade or commerce.

418.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

419.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s—including through inflator development, testing incidents,

- 139 -

and public recalls—but failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

420.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Alabama DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

421.    In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

422.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Alabama Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

423.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Alabama Consumer Sub-Class.

424.    Defendants knew or should have known that their conduct violated the Alabama DTPA.

425.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

426.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

427.   Defendants owed Plaintiffs and the Alabama Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs and the Alabama Consumer Sub-Class; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Alabama Consumer Sub-Class that contradicted these representations.

428.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

429.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Alabama Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

430.    Plaintiffs and the Alabama Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Alabama Consumer Sub-Class members either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Alabama Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

431.    Defendants' violations present a continuing risk to Plaintiffs and the Alabama Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

432.    As a direct and proximate result of Defendants' violations of the Alabama DTPA, Plaintiffs and the Alabama Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

433.    Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama Consumer Sub-Class seek monetary relief against Volkswagen and Mercedes measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $100 for each Plaintiff and each Alabama Consumer Sub-Class member.

434.    Pursuant to Ala. Code § 8-19-10, Plaintiffs and the Alabama Consumer Sub-Class seek treble damages for Defendants' intentional violations of the Alabama DTPA, and as a result of the frequency of Defendants' unlawful acts or practices and the number of persons adversely affected.

435.   Plaintiffs and the Alabama Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Alabama DTPA.

436.   In accordance with Ala. Code § 8-19-10(e), Plaintiffs' counsel, on behalf of Plaintiffs and the Alabama Consumer Sub-Class, served Defendants with notice of their alleged violations of the Alabama DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Alabama Consumer Sub-Class, and demanded that Defendants correct or agree to correct the actions described therein. Defendants have failed to do so.

**B.**      **Claims Brought on Behalf of the Arizona Consumer Sub-Class**

**COUNT 13**

**Violation of the Arizona Consumer Fraud Act,
Ariz. Rev. Stat. §§ 44-1521, *et seq.***

437.   This claim is brought by Plaintiffs, on behalf of the Arizona Consumer Sub-Class, against Volkswagen and Mercedes.

438.   Plaintiffs, the Arizona Consumer Sub-Class members, and Defendants are "persons" within the meaning of the Arizona Consumer Fraud Act ("Arizona CFA"), Ariz. Rev. Stat. § 44-1521(6).

439.   The Class Vehicles and/or the Defective Airbags installed in them are "merchandise" within the meaning of Ariz. Rev. Stat. § 44-1521(5).

440.   The Arizona CFA provides that "[t]he act, use or employment by any person of any deception, deceptive act or practice, fraud, . . . misrepresentation, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale . . . of any merchandise whether or not any person has in fact been misled, deceived or damaged thereby, is declared to be an unlawful practice." Ariz. Rev. Stat. § 44-1522(A).

441.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

442.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

443.    Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And, as alleged above, Defendants knew of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

444.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Arizona CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

445.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the

Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

446.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead, tended to create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Arizona Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

447.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Arizona Consumer Sub-Class.

448.    Defendants knew or should have known that their conduct violated the Arizona CFA.

449.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

450.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

451.    Defendants owed Plaintiffs and the Arizona Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from the Arizona Consumer Plaintiffs and the Arizona Consumer Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Arizona Consumer Sub-Class that contradicted these representations.

452. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

453. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to the Arizona Consumer Plaintiffs and the Arizona Consumer Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

454. The Arizona Consumer Plaintiffs and the Arizona Consumer Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Arizona Consumer Sub-Class members either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Arizona Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

455. Defendants' violations present a continuing risk to the Arizona Consumer Plaintiffs and the Arizona Consumer Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

456. As a direct and proximate result of Defendants' violations of the Arizona CFA, Plaintiffs and the Arizona Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

457. Plaintiffs and the Arizona Consumer Sub-Class seek monetary relief against Defendants in an amount to be determined at trial. Plaintiffs and the Arizona Consumer Sub-Class also seek punitive damages because Defendants engaged in aggravated and outrageous conduct with an evil mind.

458. Plaintiffs and the Arizona Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arizona CFA.

### C. Claims Brought on Behalf of the Arkansas Consumer Sub-Class

### COUNT 14

**Breach of the Implied Warranty of Merchantability**
**Ark. Code Ann. §§ 4-2-314 and 4-2A-212, *et seq.***

459. In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Arkansas Consumer Sub-Class against Volkswagen.

460. Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Ark. Code §§ 4-2-104(1) and 4-2A-103(3), and "seller[s]" of motor vehicles under § 4-2-103(1)(d).

461. With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Ark. Code § 4-2A-103(1)(p).

- 147 -

462.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Ark. Code §§ 4-2-105(1) and 4-2A-103(1)(h).

463.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

464.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

465.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

466.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Arkansas Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 15

**Violation of the Arkansas Deceptive Trade Practice Act**
**Ark. Code Ann. §§ 4-88-101, *et seq.***

467.    This claim is brought by Plaintiffs on behalf of themselves and the Arkansas Consumer Sub-Class against Volkswagen.

468.     Defendants, the Plaintiffs, and the Arkansas Consumer Sub-Class, are "persons" within the meaning of Arkansas Deceptive Trade Practices Act ("Arkansas DTPA"), Ark. Code Ann. § 4-88-102(5).

469.     The Class Vehicles are "goods" within the meaning of Ark. Code Ann. § 4-88-102(4).

470.     The Arkansas DTPA, Ark. Code Ann. § 4-88-107, prohibits "deceptive and unconscionable trade practices" including:

    a.     "Knowingly making a false representation as to the characteristics, . . . uses, benefits, . . . or certification of goods . . . or as to whether goods are . . . of a particular standard, quality, grade, style, or model;"

    b.     "Advertising the goods or services with the intent not to sell them as advertised;" and

    c.     "Engaging in any other unconscionable, false, or deceptive act or practice in business, commerce, or trade."

471.     By misrepresenting the Class Vehicles and/or the Defective Airbags as safe, and by failing to disclose and actively concealing the Inflator Defect, Defendants engaged in deceptive business practices prohibited by the Arkansas DTPA, including:

    a.     Knowingly making a false representation as to the characteristics, uses, and benefits of the Class Vehicles and/or the Defective Airbags;

    b.     Knowingly making a false representation as to whether the Class Vehicles and/or the Defective Airbags are of a particular standard, quality, or grade;

    c.     Advertising the Class Vehicles and/or the Defective Airbags with the intent not to sell them as advertised; and

    d.     Engaging in unconscionable, false, or deceptive act or practice in connection with the sale of the Class Vehicles and/or the Defective Airbags.

472.     As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

473.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Arkansas DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

474.     In the course of their business, Defendants willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

475.     Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Arkansas Consumer Sub-Class members, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

476.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Arkansas Consumer Sub-Class.

477.    Defendants knew or should have known that their conduct violated the Arkansas DTPA.

478.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

479.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

480.    Defendants owed Plaintiffs and the Arkansas Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Arkansas Consumer Sub-Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Arkansas Consumer Sub-Class that contradicted these representations.

481.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

482.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Arkansas Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

483.    Plaintiffs and the Arkansas Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Arkansas Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Arkansas Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

484.    Defendants' violations present a continuing risk to Plaintiffs and the Arkansas Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

485.    As a direct and proximate result of Defendants' violations of the Arkansas DTPA, Plaintiffs and the Arkansas Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

486.    Pursuant to Ark. Code Ann. § 4-88-113(f), Plaintiffs and the Arkansas Consumer Sub-Class seek monetary relief against Volkswagen and Mercedes in an amount to be determined at trial.

487.    Plaintiffs and the Arkansas Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Arkansas CPA.

D.      **Claims Brought on Behalf of the California Consumer Sub-Class**

## COUNT 16

**Violation of Song-Beverly Consumer Warranty Act for Breach of
Implied Warranty of Merchantability (California Lemon Law)**

488.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the California Consumer Sub-Class against Volkswagen and Mercedes.

489.    Plaintiffs bring this claim on behalf of themselves and the members of the California Consumer Sub-Class, under the laws of California, against Volkswagen and Mercedes with regard to Defective Vehicles that Defendants manufactured or sold.

490.    Plaintiffs and members of the California Consumer Sub-Class are "buyers" within the meaning of Cal. Civ. Code § 1791(b).

491.    The Class Vehicles are "consumer goods" within the meaning of Cal. Civ. Code § 1791(a).

492.    Defendants are "manufacturer[s]" of the Class Vehicles within the meaning Cal. Civ. Code § 1791(j).

493.    Defendants impliedly warranted to Plaintiffs and the California Consumer Sub-Class that their Class Vehicles were "merchantable" within the meaning of Cal. Civ. Code §§ 1791.1(a) and 1792; however, the Class Vehicles do not have the quality that a buyer would reasonably expect, and were therefore not merchantable.

494.    Cal. Civ. Code § 1791.1(a) states:

"Implied warranty of merchantability" or "implied warranty that goods are merchantable" means that the consumer goods meet each of the following:

(1)     Pass without objection in the trade under the contract description.

(2)     Are fit for the ordinary purposes for which such goods are used.

(3)     Are adequately contained, packaged, and labeled.

- 153 -

(4)     Conform to the promises or affirmations of fact made on the container or

label.

495.    The Class Vehicles would not pass without objection in the automotive trade because they were equipped with Defective Airbags, which among other things, have a tendency to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, leading to an unreasonable likelihood of serious bodily injury or death to vehicle occupants, instead of protecting vehicle occupants from bodily injury during accidents.

496.    Because of the Inflator Defect, the Class Vehicles are not safe to drive, and thus not fit for ordinary purposes.

497.    The Class Vehicles are not adequately labeled because the labeling fails to disclose the Inflator Defect. Defendants failed to warn about that dangerous Inflator Defect in the Class Vehicles.

498.    Defendants breached the implied warranty of merchantability by manufacturing and selling Class Vehicles equipped with Defective Airbags containing the Inflator Defect which among other things, causes the airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag. The Defective Airbags have deprived Plaintiffs and the California Consumer Sub-Class of the benefit of their bargain, and has caused the Class Vehicles to depreciate in value.

499.    Notice of breach is not required because the Plaintiffs and the California Consumer Sub-Class did not purchase their automobiles directly from Volkswagen or Mercedes. Further, on information and belief, Defendants had notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by

consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

500.   As a direct and proximate result of Defendants' breach of their duties under California's Lemon Law, Plaintiffs and the California Consumer Sub-Class received goods whose dangerous condition substantially impairs their value. Plaintiffs and the California Consumer Sub-Class have been damaged by the diminished value, malfunctioning, and non-use of their Class Vehicles.

501.   Under Cal. Civ. Code §§ 1791.1(d) and 1794, Plaintiffs and the California Consumer Sub-Class are entitled to damages and other legal and equitable relief including, at their election, the purchase price of their Class Vehicles, or the overpayment or diminution in value of their Class Vehicles.

502.   Under Cal. Civ. Code § 1794, Plaintiffs and the California Consumer Sub-Class are entitled to costs and attorneys' fees.

## COUNT 17

### Violation of the California Unfair Competition Law,
### Cal. Bus. & Prof. Code §§ 17200, *et seq.*

503.   Plaintiffs bring this claim on behalf of themselves, and the members of the California Consumer Sub-Class, against Volkswagen and Mercedes.

504.   Cal. Bus. & Prof. Code § 17200 prohibits acts of "unfair competition," including any "unlawful, unfair or fraudulent business act or practice" and "unfair, deceptive, untrue or misleading advertising. . . ." Defendants engaged in conduct that violated each of this statute's three prongs.

505.   Defendants committed an unlawful business act or practice in violation of § 17200 by their violations of the Consumer Legal Remedies Act, Cal. Civ. Code § 1750, *et seq.*, as set forth below, by the acts and practices set forth in this Complaint.

506.     Defendants also violated the unlawful prong because they have engaged in violations of the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

507.     Federal Motor Vehicle Safety Standard ("FMVSS") 573 governs a motor vehicle manufacturer's responsibility to notify NHTSA of a motor vehicle defect within five days of determining that a defect in a vehicle has been determined to be safety-related. *See* 49 C.F.R. § 573.6.

508.     Defendants violated the reporting requirements of FMVSS 573 requirement by failing to report the Inflator Defect or any of the other dangers or risks posed by the Defective Airbags within five days of determining the defect existed, and failing to recall all Class Vehicles.

509.     Defendants violated the common-law claim of negligent failure to recall, in that Defendants knew or should have known that the Class Vehicles and/or the Defective Airbags installed in them were dangerous and/or were likely to be dangerous when used in a reasonably foreseeable manner; Defendants became aware of the attendant risks after they were sold; Defendants continued to gain information further corroborating the Inflator Defect and dangers posed by them; and Defendants failed to adequately recall them in a timely manner, which failure was a substantial factor in causing harm to Plaintiffs and the California Consumer Sub-Class, including diminished value and out-of-pocket costs.

510.     Defendants committed unfair business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them. Defendants represented that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not.

511.     Defendants also violated the unfairness prong of § 17200 by failing to properly administer the numerous recalls of Class Vehicles with the Defective Airbags installed in them.

As alleged above, the recalls have proceeded unreasonably slowly in light of the safety-related nature of the Inflator Defect, and have been plagued with shortages of replacement parts, as well as a paucity of loaner vehicles available for members of the California Consumer Sub-Class whose vehicles are in the process of being repaired.

512.   Defendants violated the fraudulent prong of § 17200 because the misrepresentations and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them as set forth in this Complaint were likely to deceive a reasonable consumer, and the information would be material to a reasonable consumer.

513.   Defendants committed fraudulent business acts and practices in violation of § 17200 when they concealed the existence and nature of the Inflator Defect, dangers, and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, while representing in their marketing, advertising, and other broadly disseminated representations that the Class Vehicles and/or the Defective Airbags installed in them were reliable and safe when, in fact, they are not. Defendants' active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them are likely to mislead the public with regard to their true defective nature.

514.   Defendants violated the unfair prong of § 17200 because of the acts and practices set forth in the Complaint, including the manufacture and sale of Class Vehicles and/or the Defective Airbags installed in them, and Defendants' failure to adequately investigate, disclose and remedy, offend established public policy, and because of the harm they cause to consumers greatly outweighs any benefits associated with those practices. Defendants' conduct has also impaired competition within the automotive vehicles market and has prevented Plaintiffs and the California Class from making fully informed decisions about whether to purchase or lease Class Vehicles and/or the Defective Airbags installed in them and/or the price to be paid to purchase or lease them.

515.   Plaintiffs and the California Consumer Sub-Class have suffered injuries in fact, including the loss of money or property, as a result of Defendants' unfair, unlawful, and/or

deceptive practices. As set forth above, each member of the California Consumer Class, in purchasing or leasing Class Vehicles with the Defective Airbags installed in them, relied on the misrepresentations and/or omissions of Defendants with respect of the safety and reliability of the vehicles. Had Plaintiffs and the California Consumer Sub-Class known the truth, they would not have purchased or leased their vehicles and/or paid as much for them.

516. All of the wrongful conduct alleged herein occurred, and continues to occur, in the conduct of Defendants' businesses. Defendants' wrongful conduct is part of a pattern or generalized course of conduct that is still perpetuated and repeated.

517. As a direct and proximate result of Defendants' unfair and deceptive practices, Plaintiffs and the California Consumer Sub-Class have suffered and will continue to suffer actual damages.

518. Plaintiffs and the California Consumer Sub-Class request that this Court enter such orders or judgments as may be necessary to enjoin Defendants from continuing their unfair, unlawful, and/or deceptive practices, as provided in Cal. Bus. & Prof. Code § 17203; and for such other relief set forth below.

## **COUNT 18**

### **Violation of the Consumer Legal Remedies Act,**
### **Cal. Civ. Code §§ 1750, *et seq.***

519. Plaintiffs bring this claim on behalf of themselves and the members of the California Consumer Sub-Class, under the laws of California, against Volkswagen and Mercedes.

520. The Class Vehicles are "goods" as defined in Cal. Civ. Code § 1761(a).

521. Plaintiffs, the California Consumer Sub-Class, and Defendants are "persons" as defined in Cal. Civ. Code § 1761(c).

522. Plaintiffs and the California Consumer Sub-Class are "consumers" as defined in Cal. Civ. Code § 1761(d).

523.    California's Consumers Legal Remedies Act ("CLRA"), Cal. Civ. Code §§ 1750, *et seq.*, prohibits "unfair or deceptive acts or practices undertaken by any person in a transaction intended to result or which results in the sale or lease of goods or services to any consumer[.]" Cal. Civ. Code § 1770(a).

524.    Defendants have engaged in unfair or deceptive acts or practices that violated Cal. Civ. Code § 1750, *et seq.*, as described above and below, by among other things, representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; advertising them with the intent not to sell or lease them as advertised; and representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

525.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein, and otherwise engaged in activities with a tendency or capacity to deceive.

526.    Defendants also engaged in unlawful trade practices by representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and omitting material facts in describing them. Defendants are directly liable for engaging in unfair and deceptive acts or practices in the conduct of trade or commerce in violation of the CLRA. Defendant parent companies are also liable for their subsidiaries' violation of the CLRA, because the subsidiaries act and acted as the parent companies' general agents in the United States for purposes of sales and marketing.

527.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents,

and public recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

528.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the CLRA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

529.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the California Consumer Sub-Class.

530.    Defendants knew or should have known that their conduct violated the CLRA.

531.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

532.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

533.    Defendants owed Plaintiffs and the California Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Plaintiffs and the California Consumer Sub-Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the California Consumer Sub-Class that contradicted these representations.

534. The Class Vehicles and/or the Defective Airbags installed in them posed and/or pose an unreasonable risk of death or serious bodily injury to Plaintiffs and the California Consumer Sub-Class, passengers, other motorists, pedestrians, and the public at large, because the Defective Airbags are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

535. Defendants' unfair or deceptive acts or practices were likely to deceive reasonable consumers, including Plaintiffs and the California Consumer Sub-Class, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the California Consumer Sub-Class.

536. Defendants have also violated the CLRA by violating the TREAD Act, 49 U.S.C. §§ 30101, *et seq.*, and its accompanying regulations by failing to promptly notify vehicle owners, purchases, dealers, and NHTSA of the defective Class Vehicles and/or the Defective Airbags installed in them, and remedying the Inflator Defect.

537.     Under the TREAD Act and its regulations, if a manufacturer learns that a vehicle contains a defect and that defect is related to motor vehicle safety, the manufacturer must disclose the defect. 49 U.S.C. § 30118(c)(1) & (2).

538.     Under the TREAD Act, if it is determined that the vehicle is defective, the manufacturer must promptly notify vehicle owners, purchasers and dealers of the defect and remedy the defect. 49 U.S.C. § 30118(b)(2)(A) & (B).

539.     Under the TREAD Act, manufacturers must also file a report with NHTSA within five working days of discovering "a defect in a vehicle or item of equipment has been determined to be safety related, or a noncompliance with a motor vehicle safety standard has been determined to exist." 49 C.F.R. § 573.6(a) & (b). At a minimum, the report to NHTSA must include: the manufacturer's name; the identification of the vehicles or equipment containing the defect, including the make, line, model year and years of manufacturing; a description of the basis for determining the recall population; how those vehicles differ from similar vehicles that the manufacturer excluded from the recall; and a description of the defect. 49 C.F.R. § 276.6(b), (c)(1), (c)(2), & (c)(5).

540.     The manufacturer must also promptly inform NHTSA regarding: the total number of vehicles or equipment potentially containing the defect; the percentage of vehicles estimated to contain the defect; a chronology of all principal events that were the basis for the determination that the defect related to motor vehicle safety, including a summary of all warranty claims, field or service reports, and other information, with its dates of receipt; and a description of the plan to remedy the defect. 49 C.F.R. § 276.6(b) & (c).

541.     The TREAD Act provides that any manufacturer who violates 49 U.S.C. § 30166 must pay a civil penalty to the U.S. Government. The current penalty "is $7,000 per violation per day," and the maximum penalty "for a related series of daily violations is $17,350,000." 49 C.F.R. § 578.6(c).

542.     Defendants engaged in deceptive business practices prohibited by the CLRA, Cal. Civ. Code § 1750, *et seq.,* by failing to disclose and by actively concealing dangers and risks

posed by the Defective Airbags, by selling vehicles while violating the TREAD Act, and by other conduct as alleged herein.

543.    Defendants knew that the Class Vehicles and/or the Defective Airbags installed in them contained the Inflator Defect that could cause the airbags to violently explode and/or expel vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, but Defendants failed for many years to inform NHTSA of this defect. Consequently, the public, including Plaintiffs and the California Consumer Class, received no notice of the Inflator Defect. Defendants failed to inform NHTSA or warn the Plaintiffs, the California Consumer Class, and the public about these inherent dangers, despite having a duty to do so.

544.    Defendants' unfair or deceptive acts or practices were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the California Consumer Sub-Class members, about the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them.

545.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

546.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the California Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

547.    Plaintiffs and the California Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective

Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the California Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the California Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

548.    Plaintiffs and the California Consumer Sub-Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the California Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

549.    The recalls and repairs instituted by Defendants have not been adequate. The recall is not an effective remedy and is not offered for all Class Vehicles and other vehicles with Defective Airbags susceptible to the malfunctions described herein. Moreover, Defendants' failure to comply with TREAD Act disclosure obligations continues to pose a grave risk to Plaintiffs and the California Consumer Class.

550.    As a direct and proximate result of Defendants' violations of the CLRA, Plaintiffs and the California Consumer Sub-Class have suffered injury-in-fact and/or actual damage. Plaintiffs and the California Consumer Sub-Class currently own or lease, or within the class period have owned or leased Class Vehicles with Defective Airbags installed in them that are defective and inherently unsafe. Plaintiffs and the California Consumer Sub-Class risk irreparable injury as a result of Defendants' acts and omissions in violation of the CLRA, and these violations present a continuing risk to Plaintiffs and the California Consumer Sub-Class, as well as to the general public.

551.    In accordance with section 1782(a) of the CLRA, Plaintiffs' counsel, on behalf of Plaintiffs and the California Consumer Sub-Class, served Defendants with notice of their alleged violations of California Civil Code § 1770(a), relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the California Consumer Sub-Class, and demanded that Defendants correct or agree to correct the actions described therein. Defendants have failed to do so. Plaintiffs and the California Consumer Sub-Class therefore seek

compensatory and monetary damages to which Plaintiffs and California Consumer Sub-Class members are entitled.

E.    **Claims Brought on Behalf of the Connecticut Consumer Sub-Class**

**COUNT 19**

**Violation of the Connecticut Unlawful Trade Practices Act,
Conn. Gen. Stat. §§ 42-110A, *et seq.***

552.    This claim is brought on behalf of the Connecticut Consumer Sub-Class against Volkswagen and Mercedes.

553.    The Connecticut Unfair Trade Practices Act ("Connecticut UTPA") provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Conn. Gen. Stat. § 42-110b(a).

554.    Plaintiffs, the Connecticut Consumer Sub-Class, and Defendants are "persons" within the meaning of Conn. Gen. Stat. § 42-110a(3). Defendants are in "trade" or "commerce" within the meaning of Conn. Gen. Stat. § 42-110a(4).

555.    Defendants participated in deceptive trade practices that violated the Connecticut UTPA as described herein. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

556.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

557.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or Defective Airbags installed in them.

558.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Connecticut UTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel and/or failing to deploy, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

559.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

560.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Connecticut Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

561.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or Defective Airbags installed in them with an intent to mislead Plaintiffs and the Connecticut Consumer Sub-Class.

562.   Defendants knew or should have known that their conduct violated the Connecticut UTPA.

563.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have

included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

564.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

565.   Defendants owed Plaintiffs and the Connecticut Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Connecticut Consumer Sub-Class; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Connecticut Consumer Sub-Class that contradicted these representations.

566.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

567.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Connecticut Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more

than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

568.    Plaintiffs and the Connecticut Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Connecticut Consumer Sub-Class either would not have paid as much for their vehicles, or not purchased or leased them at all. Plaintiffs and the Connecticut Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

569.    Defendants' violations present a continuing risk to Plaintiffs, the Connecticut Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

570.    As a direct and proximate result of Defendants' violations of the Connecticut UTPA, Plaintiffs and the Connecticut Consumer Sub-Class have suffered injury-in-fact and/or actual damages.

571.    Plaintiffs and the Connecticut Consumer Sub-Class are entitled to recover their actual damages, punitive damages, and attorneys' fees pursuant to Conn. Gen. Stat. § 42-110g.

572.    Defendants acted with a reckless indifference to another's rights or wanton or intentional violation to another's rights and otherwise engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights and safety of others.

### F.    Claims Brought on Behalf of the Florida Consumer Sub-Class

### COUNT 20

**Violation of the Florida Deceptive and Unfair Trade Practices Act,**
**Fla. Stat. §§ 501.201, *et seq.***

573.    This claim is brought only on behalf of the Florida Consumer Sub-Class against Volkswagen and Mercedes.

574.   Plaintiffs and the Florida Consumer Sub-Class are "consumers" within the meaning of Florida Deceptive and Unfair Trade Practices Act ("FDUTPA"), Fla. Stat. § 501.203(7).

575.   Defendants are engaged in "trade or commerce" within the meaning of Fla. Stat. § 501.203(8).

576.   FDUTPA prohibits "[u]nfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices in the conduct of any trade or commerce. . . ." Fla. Stat. § 501.204(1). Defendants participated in unfair and deceptive trade practices that violated the FDUTPA as described herein.

577.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

578.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

579.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

580.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the FDUTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

581.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

582.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Florida Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

583.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Florida Consumer Sub-Class.

584.    Defendants knew or should have known that their conduct violated the FDUTPA.

585.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have

included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

586.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

587.    Defendants owed Plaintiffs and the Florida Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Florida Consumer Sub-Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Florida Consumer Sub-Class that contradicted these representations.

588.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

589.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Florida Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more

than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

590.     Plaintiffs and the Florida Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Florida Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Florida Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

591.     Plaintiffs and the Florida Consumer Sub-Class risk irreparable injury as a result of Defendants' act and omissions in violation of the FDUTPA, and these violations present a continuing risk to Plaintiffs, the Florida Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

592.     As a direct and proximate result of Defendants' violations of the FDUTPA, Plaintiffs and the Florida Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

593.     Plaintiffs and the Florida Consumer Sub-Class are entitled to recover their actual damages under Fla. Stat. § 501.211(2), and attorneys' fees under Fla. Stat. § 501.2105(1).

594.     Plaintiffs and the Florida Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, attorneys' fees, and any other just and proper relief available under the FDUTPA.

**G.     Claims Brought on Behalf of the Georgia Consumer Sub-Class**

**COUNT 21**

**Violation of the Georgia Fair Business Practices Act,**
**Ga. Code Ann. §§ 10-1-390, *et seq.***

595.     This claim is brought only on behalf of the Georgia Consumer Sub-Class against Mercedes.

596.   Plaintiffs and the Georgia Consumer Sub-Class are "consumers" within the meaning of Ga. Code Ann. §§ 10-1-392(6).

597.   Plaintiffs, the Georgia Consumer Sub-Class, and Defendants are "persons" within the meaning Ga. Code Ann. §§ 10-1-392(24).

598.   Defendants were and are engaged in "trade" and "commerce" within the meaning of Ga. Code Ann. §§ 10-1-392(28).

599.   The Georgia Fair Business Practices Act ("Georgia FBPA") declares "[u]nfair or deceptive acts or practices in the conduct of consumer transactions and consumer acts or practices in trade or commerce" to be unlawful, Ga. Code Ann. § 10-1-393(a), including but not limited to "representing that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have," "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . if they are of another," and "[a]dvertising goods or services with intent not to sell them as advertised," Ga. Code Ann. § 10-1-393(b).

600.   By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in unfair or deceptive practices prohibited by the FBPA, including: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them  have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; and (3) advertising them with the intent not to sell or lease them as advertised. Defendants participated in unfair or deceptive acts or practices that violated the Georgia FBPA.

601.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

602.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission

of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

603.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

604.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Georgia FBPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

605.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

606.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers,

- 174 -

including Plaintiffs and the Georgia Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

607.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Georgia Consumer Sub-Class.

608.    Defendants knew or should have known that their conduct violated the Georgia FBPA.

609.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

610.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

611.    Defendants owed Plaintiffs and the Georgia Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.    Intentionally concealed the foregoing from Plaintiffs and the Georgia Consumer Sub-Class; and/or

      c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from

Plaintiffs and the Georgia Consumer Sub-Class that contradicted these representations.

612.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

613.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Georgia Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

614.   Plaintiffs and the Georgia Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Georgia Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Georgia Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

615.   Defendants' violations present a continuing risk to Plaintiffs and the Georgia Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

616.   As a direct and proximate result of Defendants' violations of the Georgia FBPA, Plaintiffs and the Georgia Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

617.   Plaintiff and the Georgia Consumer Sub-Class are entitled to recover damages and exemplary damages (for intentional violations) per Ga. Code Ann. § 10-1-399(a).

618.    Plaintiffs and the Georgia Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, attorneys' fees, and any other just and proper relief available under the Georgia FBPA per Ga. Code Ann. § 10-1-399.

619.    In accordance with Ga. Code Ann. § 10-1-399(b), Plaintiffs' counsel, on behalf of Plaintiffs and the Georgia Consumer Sub-Class, served Defendants with notice of their alleged violations of the Georgia FBPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Georgia Consumer Sub-Class, and demanded that Defendants correct or agree to correct the actions described therein. As Defendants failed to do so, Plaintiffs seek include compensatory and monetary damages to which Plaintiffs and the Georgia Consumer Sub-Class are entitled.

### H.    Claims Brought on Behalf of the Illinois Consumer Sub-Class

### COUNT 22

**Violation of the Illinois Consumer Fraud and Deceptive Business Practices Act,
815 ILCS 505/1, *et seq.***

620.    This claim is brought on behalf of the Illinois Consumer Sub-Class against Volkswagen and Mercedes.

621.    Defendants are "persons" as that term is defined in 815 ILCS 505/1(c).

622.    Plaintiffs and the Illinois Consumer Sub-Class are "consumers" as that term is defined in 815 ILCS 505/1(e).

623.    The Illinois Consumer Fraud and Deceptive Business Practices Act ("Illinois CFA") prohibits "unfair or deceptive acts or practices, including but not limited to the use or employment of any deception, fraud, false pretense, false promise, misrepresentation or the concealment, suppression or omission of any material fact, with intent that others rely upon the concealment, suppression or omission of such material fact . . . in the conduct of trade or commerce . . . whether any person has in fact been misled, deceived or damaged thereby." 815 ILCS 505/2.

624.     Defendants participated in misleading, false, or deceptive acts that violated the Illinois CFA. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Illinois CFA.

625.     In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

626.     Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

627.     As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

628.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Illinois CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts

of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

629. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

630. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Illinois Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

631. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Illinois Consumer Sub-Class.

632. Defendants knew or should have known that their conduct violated the Illinois CFA.

633. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

634. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting

new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

635.    Defendants owed Plaintiffs and the Illinois Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Illinois Consumer Sub-Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Illinois Consumer Sub-Class that contradicted these representations.

636.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

637.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Illinois Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

638.    Plaintiffs and the Illinois Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Illinois

Consumer Sub-Class either would not have paid as much for their vehicles or not purchased or leased them at all. Plaintiffs and the Illinois Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

639.    Defendants' violations present a continuing risk to Plaintiffs and the Illinois Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

640.    As a direct and proximate result of Defendants' violations of the Illinois CFA, Plaintiffs and the Illinois Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

641.    Pursuant to 815 ILCS 505/10a(a), Plaintiffs and the Illinois Consumer Sub-Class seek monetary relief against Defendants in the amount of actual damages, as well as punitive damages because Defendants acted with fraud and/or malice and/or were grossly negligent.

642.    Plaintiffs and the Illinois Consumer Sub-Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under 815 ILCS 505/1, *et seq.*

**I.    Claims Brought on Behalf of the Indiana Consumer Sub-Class**

**COUNT 23**

**Breach of the Implied Warranty of Merchantability,
Ind. Code § 26-1-2-314**

643.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Indiana Consumer Sub-Class against Volkswagen.

644.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Ind. Code § 26-1-2-104(1).

645.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Ind. Code § 26-1-2-314.

646.     The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

647.     Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

648.     As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Indiana Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 24

### Violation of the Indiana Deceptive Consumer Sales Act,
### Ind. Code §§ 24-5-0.5-3

649.     This claim is brought only on behalf of the Indiana Consumer Sub-Class against Volkswagen.

650.     Defendants are "persons" within the meaning of Ind. Code § 24-5-0.5-2(2) and "suppliers" within the meaning of Ind. Code § 24-5-.05-2(a)(3).

651.     Plaintiffs' and Indiana Consumer Sub-Class members' purchases of the Class Vehicles are "consumer transactions" within the meaning of Ind. Code § 24-5-.05-2(a)(1).

652.     Indiana's Deceptive Consumer Sales Act ("Indiana DCSA") prohibits a person from engaging in a "deceptive trade practice," which includes representing: "(1) That such subject of a consumer transaction has sponsorship, approval, performance, characteristics, accessories, uses, or benefits that they do not have, or that a person has a sponsorship, approval,

status, affiliation, or connection it does not have; (2) That such subject of a consumer transaction is of a particular standard, quality, grade, style or model, if it is not and if the supplier knows or should reasonably know that it is not; … (7) That the supplier has a sponsorship, approval or affiliation in such consumer transaction that the supplier does not have, and which the supplier knows or should reasonably know that the supplier does not have; … (b) Any representations on or within a product or its packaging or in advertising or promotional materials which would constitute a deceptive act shall be the deceptive act both of the supplier who places such a representation thereon or therein, or who authored such materials, and such suppliers who shall state orally or in writing that such representation is true if such other supplier shall know or have reason to know that such representation was false."

653.   Defendants participated in misleading, false, or deceptive acts that violated the Indiana DCSA, by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them. Defendants also engaged in unlawful trade practices by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard and quality when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct likely to deceive.

654.   Defendants' actions as set forth below and above occurred in the conduct of trade or commerce.

655.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or

omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

656.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

657.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Indiana DCSA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

658.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

659.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers,

- 184 -

including Plaintiffs and the Indiana Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

660.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Indiana Consumer Sub-Class.

661.    Defendants knew or should have known that their conduct violated the Indiana DCSA.

662.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

663.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

664.    Defendants owed Plaintiffs and the Indiana Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.    Intentionally concealed the foregoing from Plaintiffs and the Indiana Consumer Sub-Class; and/or
>
> c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from

Plaintiffs and the Indiana Consumer Sub-Class that contradicted these representations.

665.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

666.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Indiana Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

667.    Plaintiffs and the Indiana Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Indiana Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Indiana Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

668.    Defendants' violations present a continuing risk to Plaintiffs, the Indiana Consumer Sub-Class, as well as the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

669.    As a direct and proximate result of Defendants' violations of the Indiana DCSA, Plaintiffs and the Indiana Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

670.    Pursuant to Ind. Code § 24-5-0.5-4, Plaintiffs and the Indiana Consumer Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in

- 186 -

an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Indiana Consumer Sub-Class member, including treble damages up to $1,000 for Defendants' willfully deceptive acts.

671.    Plaintiffs and the Indiana Consumer Sub-Class also seek punitive damages based on the outrageousness and recklessness of Defendants' conduct and Defendants' high net worth.

672.    In accordance with IND. CODE § 24-5-0.5-5(a), Plaintiffs' counsel, on behalf of Plaintiffs and the Indiana Consumer Sub-Class, served Defendants with notice of their "curable" alleged violations of the Indiana DCSA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Indiana Consumer Sub-Class, and demanded that Defendants correct or agree to correct the actions described therein. As Defendants failed to do so, Plaintiffs seek compensatory and monetary damages to which Plaintiffs and the Indiana Consumer Sub-Class are entitled. Plaintiffs and the Indiana Consumer Sub-Class presently seek full relief for Defendants' "incurable" acts.

### J.    Claims Brought on Behalf of the Iowa Consumer Sub-Class

### COUNT 25

**Violation of the Private Right of Action for Consumer Frauds Act,**
**Iowa Code § 714H.1, *et seq.***

673.    This Claim is brought only on behalf of the Iowa Consumer Sub-Class against Mercedes.

674.    Defendants are "persons" under Iowa Code § 714H.2(7).

675.    Plaintiffs and the Iowa Consumer Sub-Class are "consumers," as defined by Iowa Code § 714H.2(3).

676.    The Iowa Private Right of Action for Consumer Frauds Act ("Iowa CFA") prohibits any "practice or act the person knows or reasonably should know is an unfair practice, deception, fraud, false pretense, or false promise, or the misrepresentation, concealment, suppression, or omission of a material fact, with the intent that others rely upon the unfair practice, deception, fraud, false pretense, false promise, misrepresentation, concealment,

- 187 -

suppression, or omission in connection with the advertisement, sale, or lease of consumer merchandise." Iowa Code § 714H.3. Defendants participated in misleading, false, or deceptive acts that violated the Iowa CFA.

677.   By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Iowa CFA.

678.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

679.   In the course of its business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

680.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

681.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Iowa CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

682.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Defective Airbags installed in the Class Vehicles were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

683.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Iowa Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

684.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Iowa Consumer Sub-Class.

685.    Defendants knew or should have known that their conduct violated the Iowa CFA.

686.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.

687.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

688.    Defendants owed Plaintiffs and the Iowa Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Plaintiffs and the Iowa Consumer Sub-Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Iowa Consumer Sub-Class that contradicted these representations.

689. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

690. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Iowa Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

691. Plaintiffs and the Iowa Consumer Sub-Class suffered ascertainable loss caused by the Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Iowa Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Iowa Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

692.    Defendants' violations present a continuing risk to Plaintiffs, the Iowa Consumer Sub-Class, as well as the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

693.    As a direct and proximate result of Defendants' violations of the Iowa CFA, Plaintiffs and the Iowa Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

694.    Pursuant to Iowa Code § 714H.5, Plaintiffs and the Iowa Consumer Sub-Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Iowa CFA; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under the Iowa CFA.

**K.      Claims Brought on Behalf of the Kentucky Consumer Sub-Class**

**COUNT 26**

**Breach of Implied Warranty of Merchantability,
Kentucky Rev. Stat. §§ 355.2, *et. seq.***

695.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Kentucky Consumer Sub-Class against Volkswagen.

696.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Kentucky Rev. Stat. §§ 355.2-105(1) and 355.2A-103(h).

697.    Volkswagen was at all relevant times a "seller" and "merchant" with respect to the Class Vehicles under Kentucky Rev. Stat. §§ 355.2-103 and 355.2-104, and, with respect to leases, is and was at all relevant times a "lessor" of the Class Vehicles under Kentucky Rev. Stat. § 355.2A-103.

698.    Plaintiffs and Class Members are "buyers" or "lessees" within the meaning of Kentucky Rev. Stat. §§ 355.2-103(1) and 355.2A-103(n).

- 191 -

699.     A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Ark. Code §§ 4-2-314 and 4-2A-212.

700.     Plaintiffs and Class Members bought or leased Class Vehicles manufactured, marketed to them, warranted, and intended to be purchased by buyers or lessees such as them, by Volkswagen, and are in privity with Volkswagen through their purchases.

701.     Plaintiffs and Class Members have had sufficient direct dealings with either Volkswagen or its agents (dealerships) to establish privity of contract between Plaintiff and Class Members and Volkswagen. Further, the written, express warranties issued by Volkswagen with buyers/lessees of the Class Vehicles as its intended beneficiaries create a direct contractual relationship between Volkswagen and Plaintiffs and Class Members.

702.     Further, Plaintiffs and Class Members are intended third-party beneficiaries of contracts between Volkswagen and its dealers; specifically, they are the intended beneficiaries of Volkswagen's express and implied warranties. The dealers were not intended to be the ultimate buyers or lessees of the Class Vehicles and have no rights under the warranties provided with the Class Vehicles; the warranties were designed for and intended to benefit the ultimate buyers and lessees only. Moreover, privity is not required where a manufacturer makes representations directly to intended buyers and lessees, as Volkswagen did here.

703.     When it sold or leased its Class Vehicles, Volkswagen extended an implied warranty to Class Members that the subject vehicles were merchantable and fit for the ordinary purpose for which they were sold or leased, pursuant to Kentucky Rev. Stat. §§ 355.2-314 and 355.2A-212.

704.     The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously

- 192 -

injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.  Moreover, because of the Inflator Defect, the Class Vehicles would not pass without objection in the trade.

705.    Any attempt by Volkswagen to disclaim the implied warranty of merchantability is unenforceable and unconscionable because it does not meet the requirements of Kentucky Rev. Stat. § 355.2-316(2).

706.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

707.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Kentucky Consumer Sub-Class have been damaged in an amount to be proven at trial.

### L.      Claims Brought on Behalf of the Louisiana Consumer Sub-Class

### COUNT 27

**Breach of the Implied Warranty of Merchantability/Warranty
Against Redhibitory Defects
La. Civ. Code Ann. art. 2520, 2524**

708.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Louisiana Consumer Sub-Class against Mercedes.

709.    At the time Plaintiffs and the Louisiana Consumer Sub-Class acquired their Class Vehicles, those vehicles had a redhibitory defect within the meaning of La. Civ. Code Ann. art. 2520, in that (a) the Class Vehicles and/or the Defective Airbags installed in them were rendered so inconvenient that Plaintiffs either would not have purchased the Class Vehicles had they known of the Inflator Defect, or, because the Defective Airbags so diminished the usefulness

and/or value of the Class Vehicles such that it must be presumed that the Plaintiffs would not have purchased the Class Vehicles, but for a lesser price.

710.   No notice of the defect is required under La. Civ. Code Ann. art. 2520, since Defendants had knowledge of the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them at the time they were sold to Plaintiffs and the Louisiana Consumer Sub-Class.

711.   Under La. Civ. Code Ann. art. 2524, a warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition, or fit for ordinary use, was implied by law in the transactions when Plaintiffs and Louisiana Consumer Sub-Class members purchased their Class Vehicles.

712.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

713.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

714.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Louisiana Consumer Sub-Class have been damaged in an amount to be proven at trial.

**COUNT 28**

**Violation of the Louisiana Unfair Trade Practices and Consumer Protection Law,
La. Rev. Stat. §§ 51:1401, *et seq.***

715.    This claim is brought only on behalf of the Louisiana Consumer Sub-Class against Mercedes.

716.    Plaintiffs, the Louisiana Consumer Sub-Class, and Defendants are "persons" within the meaning of the La. Rev. Stat. § 51:1402(8).

717.    Plaintiffs and the Louisiana Consumer Sub-Class are "consumers" within the meaning of La. Rev. Stat. § 51:1402(1).

718.    Defendants engaged in "trade" or "commerce" within the meaning of La. Rev. Stat. § 51:1402(9).

719.    The Louisiana Unfair Trade Practices and Consumer Protection Law ("Louisiana CPL") makes unlawful "deceptive acts or practices in the conduct of any trade or commerce." La. Rev. Stat. § 51:1405(A). Defendants both participated in misleading, false, or deceptive acts that violated the Louisiana CPL. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Louisiana CPL.

720.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

721.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents,

and public recalls. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

722.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Louisiana CPL. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

723.     In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

724.     Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Louisiana Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

725.     Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Louisiana Consumer Sub-Class.

726.     Defendants knew or should have known that their conduct violated the Louisiana CPL.

727.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

728.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

729.    Defendants owed Plaintiffs and the Louisiana Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Louisiana Consumer Sub-Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Louisiana Consumer Sub-Class that contradicted these representations.

730.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

731.     Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Louisiana Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

732.     Plaintiffs and the Louisiana Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Louisiana Consumer Sub-Class either would not have paid as much for their vehicles or not purchased or leased them at all. Plaintiffs and the Louisiana Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

733.     Defendants' violations present a continuing risk to Plaintiffs, the Louisiana Consumer Sub-Class, as well as the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

734.     As a direct and proximate result of Defendants' violations of the Louisiana CPL, Plaintiffs and the Louisiana Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

735.     Pursuant to La. Rev. Stat. § 51:1409, Plaintiffs and the Louisiana Consumer Sub-Class seek to recover actual damages in an amount to be determined at trial; treble damages for Defendants' knowing violations of the Louisiana CPL; an order enjoining Defendants' unfair, unlawful, and/or deceptive practices; declaratory relief; attorneys' fees; and any other just and proper relief available under La. Rev. Stat. § 51:1409.

**M.     Claims Brought on Behalf of the Massachusetts Consumer Sub-Class**

**COUNT 29**

**Breach of the Implied Warranty of Merchantability**
**Mass. Gen. Laws Ann. ch. 106, § 2-314, *et seq.***

736.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Massachusetts Consumer Sub-Class against Mercedes.

737.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mass. Gen. Laws Ann. ch. 106, § 2-104(1).

738.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mass. Gen. Laws Ann. ch. 106, § 2-314.

739.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

740.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

741.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Massachusetts Consumer Sub-Class have been damaged in an amount to be proven at trial.

**COUNT 30**

**Deceptive Acts or Practices Prohibited by Massachusetts Law,
Mass. Gen. Laws Ann. ch. 93A, §§ 1, *et seq.***

742.   This claim is brought only on behalf of the Massachusetts Consumer Sub-Class against Mercedes.

743.   Plaintiffs, the Massachusetts Consumer Sub-Class, and Defendants are "persons" within the meaning of Mass. Gen. Laws ch. 93A, § 1(a).

744.   Defendants engaged in "trade" or "commerce" within the meaning of Mass. Gen. Laws 93A, § 1(b).

745.   Massachusetts law (the "Massachusetts Act") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce." Mass. Gen. Laws ch. 93A, § 2. Defendants both participated in misleading, false, or deceptive acts that violated the Massachusetts Act. By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Massachusetts Act.

746.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

747.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

748.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective

Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

749.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Massachusetts Act. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

750.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and the serious Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

751.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Massachusetts Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

752.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Massachusetts Consumer Sub-Class.

753.   Defendants knew or should have known that their conduct violated the Massachusetts Act.

754.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

755.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

756.   Defendants owed Plaintiffs and the Massachusetts Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

        a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

        b.    Intentionally concealed the foregoing from Plaintiffs and the Massachusetts Consumer Sub-Class; and/or

        c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Massachusetts Consumer Sub-Class that contradicted these representations.

757.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

758.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Massachusetts Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

759.    Plaintiffs and the Massachusetts Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Massachusetts Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Massachusetts Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

760.    Defendants' violations present a continuing risk to Plaintiffs, the Massachusetts Consumer Sub-Class, as well as the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

761.    As a direct and proximate result of Defendants' violations of the Massachusetts Act, Plaintiffs and the Massachusetts Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

762.    Pursuant to Mass. Gen. Laws ch. 93A, § 9, Plaintiffs and the Massachusetts Consumer Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $25 for each Plaintiff and each Massachusetts Consumer Sub-Class member. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Massachusetts Consumer Sub-Class member, up to three times actual damages, but no less than two times actual damages.

763.    Plaintiffs and the Massachusetts Consumer Sub-Class also seek an order enjoining Defendants' unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, costs, and any other just and proper relief available under the Massachusetts Act.

764.    On November 14, 2017, Plaintiffs' counsel, on behalf of Plaintiffs and the Massachusetts Consumer Sub-Class, sent a letter to Defendants complying with Mass. Gen. Laws ch. 93A, § 9(3), providing Defendants with notice of their alleged violations of the Massachusetts Act relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Massachusetts Consumer Sub-Class, and demanding that Defendants correct or agree to correct the actions described therein. Because Defendants failed to remedy their unlawful conduct within the requisite time period, Plaintiffs and the Massachusetts Consumer Sub-Class seek all damages and relief to which Plaintiffs and the Massachusetts Consumer Sub-Class are entitled.

### N.    Claims Brought on Behalf of the Michigan Consumer Sub-Class

### COUNT 31

### Breach of the Implied Warranty of Merchantability
### Mich. Comp. Laws § 440.2314

765.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Michigan Consumer Sub-Class against Volkswagen and Mercedes.

766.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Mich. Comp. Laws § 440.2314(1).

767.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Mich. Comp. Laws § 440.2314.

768.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the

Defective Airbags aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

769.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

770.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Michigan Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 32

### Violation of the Michigan Consumer Protection Act, Mich. Comp. Laws § 445.903, *et seq.*

771.    This claim is brought only on behalf of the Michigan Consumer Sub-Class against Volkswagen and Mercedes.

772.    Plaintiffs and the Michigan Consumer Sub-Class are "person[s]" within the meaning of the Mich. Comp. Laws § 445.902(1)(d).

773.    At all relevant times hereto, Defendants were "person[s]" engaged in "trade or commerce" within the meaning of the Mich. Comp. Laws § 445.902(1)(d) and (g).

774.    The Michigan Consumer Protection Act ("Michigan CPA") prohibits "[u]nfair, unconscionable, or deceptive methods, acts, or practices in the conduct of trade or commerce . . . ." Mich. Comp. Laws § 445.903(1). Defendants engaged in unfair, unconscionable, or deceptive methods, acts or practices prohibited by the Michigan CPA, including: "(c) Representing that goods or services have . . . characteristics . . . that they do not have . . . .;" "(e) Representing that goods or services are of a particular standard . . . if they are of another;" "(s) Failing to reveal a material fact, the omission of which tends to mislead or deceive the

- 205 -

consumer, and which fact could not reasonably be known by the consumer;" "(bb) Making a representation of fact or statement of fact material to the transaction such that a person reasonably believes the represented or suggested state of affairs to be other than it actually is;" and "(cc) Failing to reveal facts that are material to the transaction in light of representations of fact made in a positive manner." Mich. Comp. Laws § 445.903(1). By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants participated in unfair, deceptive, and unconscionable acts that violated the Michigan CPA.

775.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

776.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

777.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and

of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Michigan CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

778.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

779.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Michigan Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

780.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Michigan Consumer Sub-Class.

781.   Defendants knew or should have known that their conduct violated the Michigan CPA.

782.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

783.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

784.   Defendants owed Plaintiffs and the Michigan Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs and the Michigan Consumer Sub-Class; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Michigan Consumer Sub-Class that contradicted these representations.

785.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

786.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Michigan Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

787.    Plaintiffs and the Michigan Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Michigan Consumer Sub-Class either would not have paid as much for their vehicles or not purchased or leased them at all. Plaintiffs and the Michigan Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

788.    Defendants' violations present a continuing risk to Plaintiffs, the Michigan Consumer Sub-Class, as well as the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

789.    As a direct and proximate result of Defendants' violations of the Michigan CPA, Plaintiffs and the Michigan Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

790.    Plaintiffs and the Michigan Consumer Sub-Class seek injunctive relief to enjoin Defendants from continuing their unfair and deceptive acts; monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $250 for Plaintiffs and each Michigan Consumer Sub-Class member; reasonable attorneys' fees; and any other just and proper relief available under Mich. Comp. Laws § 445.911.

791.    Plaintiffs and the Michigan Consumer Sub-Class also seek punitive damages against Defendants because they carried out their despicable conduct with willful and conscious disregard of the rights and safety of others. Defendants intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the Michigan Consumer Sub-Class on life-or-death matters, and concealed material facts that only they knew-all to avoid the expense and public relations nightmare of correcting a deadly flaw in the Class Vehicles and/or the Defective Airbags

installed in them. Defendants' unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.

### O.    Claims Brought on Behalf of the Mississippi Consumer Sub-Class

### COUNT 33

**Breach of the Implied Warranty of Merchantability**
**Miss. Code Ann. §§ 75-2-315 and 75-2-212, *et seq.***

792.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Mississippi Consumer Sub-Class against Mercedes.

793.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under Miss. Code Ann. §§ 75-2-104(1) and 75-2A-103(3), and "seller[s]" of motor vehicles under § 75-2-103(1)(d).

794.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under Miss. Code Ann. § 75-2A-103(1)(p).

795.    The Class Vehicles are and were at all relevant times "goods" within the meaning of Miss. Code Ann. §§ 75-2-105(1) and 75-2A-103(1)(h).

796.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to Miss. Code Ann. §§ 75-2-315 and 75-2-212.

797.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

798. Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

799. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Mississippi Consumer Sub-Class have been damaged in an amount to be proven at trial.

P.   **Claims Brought on Behalf of the New Jersey Consumer Sub-Class**

**COUNT 34**

**Breach of the Implied Warranty of Merchantability**
**N.J. Stat. Ann. § 12a:2-314**

800. In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the New Jersey Consumer Sub-Class against Volkswagen and Mercedes.

801. Defendants are merchants with respect to motor vehicles and/or airbags.

802. When Plaintiffs and the New Jersey Consumer Sub-Class purchased or leased their Class Vehicles, the transaction contained an implied warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition.

803. At the time of sale and all times thereafter, the Class Vehicles and/or the Defective Airbags installed in them were not merchantable and not fit for the ordinary purpose for which cars and airbags are used. Specifically, the Class Vehicles are inherently defective in that they are equipped with Defective Airbags with the Inflator Defect which causes, among other things, the Defective Airbags to: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag.

- 211 -

804. On information and belief, Defendants had notice of the Inflator Defect by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

805. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the New Jersey Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 35

### Violation of the New Jersey Consumer Fraud Act,
### N.J. Stat. Ann. §§ 56:8-1, *et seq.*

806. This claim is brought only on behalf of the New Jersey Consumer Sub-Class against Volkswagen and Mercedes.

807. Plaintiffs, the Sub-Class, and Defendants are or were "persons" within the meaning of N.J. Stat. Ann. § 56:8-1(d).

808. Defendants engaged in "sales" of "merchandise" within the meaning of N.J. Stat. Ann. § 56:8-1(c), (d).

809. The New Jersey Consumer Fraud Act ("New Jersey CFA") makes unlawful "[t]he act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing concealment, suppression or omission of any material fact with the intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise or real estate, or with the subsequent performance of such person as aforesaid, whether or not any person has in fact been misled, deceived or damaged thereby…" N.J. Stat. Ann. § 56:8-2. Defendants engaged in unconscionable or deceptive acts or practices that violated the New Jersey CFA as described above and below, and did so with the intent that Class members rely upon their acts, concealment, suppression or omissions.

810.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

811.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

812.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

813.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New Jersey CFA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

814.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

815.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

816.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the New Jersey Consumer Sub-Class.

817.   Defendants knew or should have known that their conduct violated the New Jersey CFA.

818.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

819.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving these highly dangerous vehicles.

820.   Defendants owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.      Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

821.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

822.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the New Jersey Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals the Inflator Defect rather than promptly remedies them.

823.    Plaintiffs and the Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

824.    Defendants' violations present a continuing risk to Plaintiffs, the Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

825.    As a direct and proximate result of Defendants' violations of the New Jersey CFA, Plaintiffs and the Class have suffered injury-in-fact and/or actual damage.

- 215 -

826.    Plaintiffs and the Class are entitled to recover legal and/or equitable relief including an order enjoining Defendants' unlawful conduct, treble damages, costs and reasonable attorneys' fees pursuant to N.J. Stat. Ann. § 56:8-19, and any other just and appropriate relief.

### Q.    Claims Brought on Behalf of the New York Consumer Sub-Class

### COUNT 36

**Breach of the Implied Warranty of Merchantability**
**N.Y. U.C.C. Law §§ 2-315 and 2-A-213, *et seq.***

827.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the New York Consumer Sub-Class against Volkswagen and Mercedes.

828.    Defendants are and were at all relevant times "merchant[s]" with respect to motor vehicles under N.Y. U.C.C. Law §§ 2-104(1) and 2-A-103(3), and "seller[s]" of motor vehicles under § 2-103(1)(d).

829.    With respect to leases, Defendants are and were at all relevant times "lessor[s]" of motor vehicles under N.Y. U.C.C. Law § 2-A-103(1)(p).

830.    The Class Vehicles are and were at all relevant times "goods" within the meaning of N.Y. U.C.C. Law §§ 2-105(1) and 2-A-103(1)(h).

831.    A warranty that the Class Vehicles were in merchantable condition and fit for the ordinary purpose for which vehicles are used is implied by law pursuant to N.Y. U.C.C. Law §§ 2-315 and 2-A-213.

832.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

- 216 -

833.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by the consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

834.   As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the New York Sub-Class have been damaged in an amount to be proven at trial.

**COUNT 37**

**Violation of the New York General Business Law,**
**N.Y. Gen. Bus. Law § 349**

835.   This claim is brought on behalf of the New York Consumer Sub-Class against Volkswagen and Mercedes.

836.   Plaintiffs and New York Sub-Class are "persons" within the meaning of New York General Business Law ("New York GBL"), N.Y. Gen. Bus. Law § 349(h).

837.   Defendants are "persons," "firms," "corporations," or "associations" within the meaning of N.Y. Gen. Bus. Law § 349.

838.   The New York GBL makes unlawful "[d]eceptive acts or practices in the conduct of any business, trade or commerce." N.Y. Gen. Bus. Law § 349. Defendants' conduct directed toward consumers, as described above and below, constitutes "deceptive acts or practices" within the meaning of the New York GBL.

839.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

840.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

841.    Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

842.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

843.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the New York GBL. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

844.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

845.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

846.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the New York Consumer Sub-Class.

847.   Defendants knew or should have known that their conduct violated the New York GBL.

848.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

849.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

850.   Defendants owed Plaintiffs and the New York Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

     a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.      Intentionally concealed the foregoing from Plaintiffs and the New York Consumer Sub-Class; and/or

c.      Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the New York Consumer Sub-Class that contradicted these representations.

851.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

852.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the New York Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

853.    Plaintiffs and the New York Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the New York Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the New York Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

854.    Defendants' violations present a continuing risk to Plaintiffs and the New York Consumer Sub-Class as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

855.     As a direct and proximate result of Defendants' violations of the New York GBL, Plaintiffs and the New York Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

856.     Plaintiffs and the New York Consumer Sub-Class also seek punitive damages against Defendants because Defendants' conduct was egregious. Defendants misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived Plaintiffs and the New York Consumer Sub-Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them. Defendants' egregious conduct warrants punitive damages.

857.     Because Defendants' willful and knowing conduct caused injury to the New York Consumer Sub-Class, the New York Consumer Sub-Class seeks recovery of actual damages or $50, whichever is greater, discretionary treble damages up to $1,000, punitive damages, reasonable attorneys' fees and costs, an order enjoining Defendants' deceptive conduct, and any other just and proper relief available under N.Y. Gen. Bus. Law § 349.

## COUNT 38

### Violation of the New York General Business Law,
### N.Y. Gen. Bus. Law § 350

858.     This claim is brought on behalf of the New York Consumer Sub-Class against Volkswagen and Mercedes.

859.     Defendants were and are engaged in the "conduct of business, trade or commerce" within the meaning of N.Y. Gen. Bus. Law § 350.

860.     N.Y. Gen. Bus. Law § 350 makes unlawful "[f]alse advertising in the conduct of any business, trade or commerce." False advertising includes "advertising, including labeling, of a commodity . . . if such advertising is misleading in a material respect," taking into account "the

extent to which the advertising fails to reveal facts material in light of  . . . representations [made] with respect to the commodity ." N.Y. Gen. Bus. Law § 350-a.

861.    Defendants caused to be made or disseminated through New York, through advertising, marketing and other publications, statements that were untrue or misleading, and that were known, or which by the exercise of reasonable care should have been known to Defendants, to be untrue and misleading to consumers, including Plaintiffs and and the New York Consumer Sub-Class.

862.    Defendants have violated § 350 because the misrepresentations and omissions regarding the Inflator Defect, and Defendants' failure to disclose and active concealment of the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, as set forth above, were material and likely to deceive a reasonable consumer.

863.    Plaintiffs and the New York Consumer Sub-Class members have suffered an injury, including the loss of money or property, as a result of Defendants' false advertising. In purchasing or leasing Class Vehicles with the Defective Airbags installed in them, Plaintiffs and the New York Consumer Sub-Class relied on the misrepresentations and/or omissions of Defendants with respect to the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them. Defendants' representations were false and/or misleading because they concealed the Inflator Defect and safety issues seriously undermining the value of the Class Vehicles. Had Plaintiffs and the New York Consumer Sub-Class known this, they would not have purchased or leased their vehicles and/or paid as much for them.

864.    Pursuant to N.Y. Gen. Bus. Law § 350 - e, Plaintiffs and the New York Consumer Sub-Class seek monetary relief against Defendants measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 each for New York Sub-Class member. Because Defendants' conduct was committed willfully and knowingly, Plaintiffs and the New York Consumer Sub-Class are entitled to recover three times actual damages, up to $10,000, for each New York Plaintiff and New York Consumer Sub-Class member.

865. Plaintiffs and the New York Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices and awarding attorneys' fees, and any other just and proper relief available under General Business Law § 350.

### R. Claims Brought on Behalf of the North Carolina Consumer Sub-Class

### COUNT 39

**Violation of the North Carolina Unfair and Deceptive Trade Practices Act,
N.C. Gen. Stat. §§ 75-1.1, *et seq.***

866. This claim is brought on behalf of the North Carolina Consumer Sub-Class against Volkswagen and Mercedes.

867. Defendants engaged in "commerce" within the meaning of N.C. Gen. Stat. § 75-1.1(b).

868. The North Carolina Unfair and Deceptive Trade Practices Act ("UDTPA") broadly prohibits "unfair or deceptive acts or practices in or affecting commerce." N.C. Gen. Stat. § 75-1.1(a). As alleged above and below, Defendants willfully committed unfair or deceptive acts or practices in violation of the North Carolina UDTPA.

869. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

870. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them

871. As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective

Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

872.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the North Carolina UDTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

873.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

874.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the North Carolina Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

875.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the North Carolina Consumer Sub-Class.

876.   Defendants knew or should have known that their conduct violated the North Carolina UDTPA.

877.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

878.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

879.   Defendants owed Plaintiffs and the North Carolina Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

      a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

      b.   Intentionally concealed the foregoing from Plaintiffs and the North Carolina Consumer Sub-Class; and/or

      c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the North Carolina Consumer Sub-Class that contradicted these representations.

880.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly

diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

881. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the North Carolina Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

882. Plaintiffs and the North Carolina Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the North Carolina Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the North Carolina Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

883. Defendants' violations present a continuing risk to Plaintiffs, the North Carolina Consumer Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

884. As a direct and proximate result of Defendants' violations of the North Carolina UDTPA, Plaintiffs and the North Carolina Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

885. Plaintiffs and the North Carolina Consumer Sub-Class seek punitive damages against Defendants because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith.

886. Defendants fraudulently and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the North Carolina Consumer Sub-Class on life-or-death matters and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the

myriad flaws in the Class Vehicles and/or the Defective Airbags installed in them. Because Defendants' conduct was malicious, willful, reckless, wanton, fraudulent, and in bad faith, it warrants punitive damages.

887.    Plaintiffs and the North Carolina Sub-Class seek an order for treble their actual damages, an order enjoining Defendants' unlawful acts and awarding costs of Court, attorneys' fees, and any other just and proper relief available under the North Carolina UDTPA, N.C. Gen. Stat. § 75-16.

### S.    Claims Brought on Behalf of the Ohio Consumer Sub-Class

### COUNT 40

### Violation of the Consumer Sales Practices Act, Ohio Rev. Code §§ 1345.01, *et seq.*

888.    This claim is brought only on behalf of the Ohio Consumer Sub-Class against Volkswagen and Mercedes.

889.    Plaintiffs and the Ohio Sub-Class are "consumers" as that term is defined in Ohio Rev. Code § 1345.01(D), and their purchases and leases of the Class Vehicles with the Defective Airbags installed in them are "consumer transactions" within the meaning of Ohio Rev. Code § 1345.01(A).

890.    Defendants are "suppliers" as that term is defined in Ohio Rev. Code § 1345.01(C). The Ohio Consumer Sales Practices Act ("Ohio CSPA"), Ohio Rev. Code § 1345.02, broadly prohibits unfair or deceptive acts or practices in connection with a consumer transaction. Specifically, and without limitation of the broad prohibition, the Act prohibits suppliers from representing (i) that goods have characteristics or uses or benefits which they do not have; (ii) that their goods are of a particular quality or grade they are not; and (iii) that the subject of a consumer transaction has been supplied in accordance with a previous representation, if it has not. *Id*. Defendants' conduct as alleged above and below constitutes unfair and/or deceptive consumer sales practices in violation of Ohio Rev. Code § 1345.02.

891.   By failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them, Defendants engaged in deceptive business practices prohibited by the Ohio CSPA, including: representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard, quality, and grade when they are not; representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not; and engaging in other unfair or deceptive acts or practices.

892.   Defendants' actions as set forth above occurred in the conduct of trade or commerce.

893.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

894.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

895.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

896.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Ohio CSPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

897.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

898.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

899.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Ohio Consumer Sub-Class.

900.    Defendants knew or should have known that their conduct violated the Ohio CSPA.

901.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have

included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

902.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

903.   Defendants owed Plaintiffs and the Ohio Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Ohio Consumer Sub-Class; and/or
>
> c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Ohio Consumer Sub-Class that contradicted these representations.

904.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

905.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Ohio Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more

than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

906.   Plaintiffs and the Ohio Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Ohio Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Ohio Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

907.   Defendants' violations present a continuing risk to Plaintiffs, the Ohio Consumer Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

908.   As a direct and proximate result of Defendants' violations of the Ohio CSPA, Plaintiffs and the Ohio Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

909.   Plaintiffs and the Ohio Consumer Sub-Class seek punitive damages against Defendants because their conduct was egregious. Defendants misrepresented the safety and reliability of millions of Class Vehicles and/or the Defective Airbags installed in them, concealed the Inflator Defect in millions of them, deceived Plaintiffs the Ohio Consumer Sub-Class on life-or-death matters, and concealed material facts that only Defendants knew, all to avoid the expense and public relations nightmare of correcting the serious flaw in millions of Class Vehicles and/or the Defective Airbags installed in them. Defendants' egregious conduct warrants punitive damages.

910.   As a result of the foregoing wrongful conduct of Defendants, Plaintiffs and the Ohio Consumer Sub-Class have been damaged in an amount to be proven at trial, and seek all just and proper remedies, including, but not limited to, actual and statutory damages, an order enjoining Defendants' deceptive and unfair conduct, treble damages, court costs and reasonable attorneys' fees, pursuant to Ohio Rev. Code §§ 1345.09, *et seq.*

**T.**      **Claims Brought on Behalf of the Oregon Consumer Sub-Class**

**COUNT 41**

**Violation of the Oregon Unlawful Trade Practices Act,**
**Or. Rev. Stat. §§ 646.605, *et seq.***

911.      This claim is brought only on behalf of the Oregon Consumer Sub-Class against Mercedes.

912.      Plaintiffs, the Oregon Consumer Sub-Class, and Defendants are persons within the meaning of Or. Rev. Stat. § 646.605(4).

913.      The Oregon Unfair Trade Practices Act ("Oregon UTPA") prohibits a person from, in the course of the person's business, doing any of the following: (e) "[r]epresent[ing] that . . . goods . . . have . . . characteristics . . . uses, benefits, . . .or qualities that the . . . goods . . . do not have . . .;" (g) "[r]epresent[ing] that . . . goods . . . are of a particular standard [or] quality . . .if the . . . goods . . . are of another;" (i) "[a]dvertis[ing] . . . goods or services with intent not to provide . . . the goods . . . as advertised . . . ;" and (u) "engag[ing] in any other unfair or deceptive conduct in trade or commerce." Or. Rev. Stat. § 646.608(1).

914.      Defendants engaged in unlawful trade practices, including representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in other unfair or deceptive acts.

915.      Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

916.      Defendants' actions as set forth above occurred in the conduct of trade or commerce.

917.     As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

918.     By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Oregon UTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

919.     In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

920.     Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective

Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

921.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Oregon Consumer Sub-Class.

922.   Defendants knew or should have known that their conduct violated the Oregon UTPA.

923.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

924.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

925.   Defendants owed Plaintiffs and the Oregon Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs and the Oregon Consumer Sub-Class; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from

- 234 -

Plaintiffs and the Oregon Consumer Sub-Class that contradicted these representations.

926.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

927.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Oregon Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

928.    Plaintiffs and the Oregon Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Oregon Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Oregon Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

929.    Defendants' violations present a continuing risk to Plaintiffs, the Oregon Consumer Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

930.    As a direct and proximate result of Defendants' violations of the Oregon UTPA, Plaintiffs and the Oregon Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

931.    Plaintiffs and the Oregon Consumer Sub-Class are entitled to recover the greater of actual damages or $200 pursuant to Or. Rev. Stat. § 646.638(1). Plaintiffs and the Oregon

Consumer Sub-Class are also entitled to punitive damages because Defendants engaged in conduct amounting to a particularly aggravated, deliberate disregard of the rights of others.

U.    **Claims Brought on Behalf of the Pennsylvania Consumer Sub-Class**

**COUNT 42**

**Breach of the Implied Warranty of Merchantability**
**13 Pa. Stat. and Cons. Stat. Ann. § 2314**

932.    In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Pennsylvania Consumer Sub-Class against Volkswagen and Mercedes.

933.    Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of 13 Pa. Stat. and Cons. Stat. Ann. § 2104.

934.    A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to 13 Pa. Stat. and Cons. Stat. Ann. § 2314.

935.    The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

936.    Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

937.    As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Pennsylvania Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 43

### Violation of the Unfair Trade Practices and Consumer Protection Law, Pa. Stat. Ann. §§ 201-1, *et seq.*

938.    This claim is brought only on behalf of the Pennsylvania Consumer Sub-Class against Volkswagen and Mercedes.

939.    Plaintiffs and the Pennsylvania Consumer Sub-Class purchased or leased their Class Vehicles with Defective Airbags installed in them primarily for personal, family or household purposes within the meaning of 73 P.S. § 201-9.2.

940.    All of the acts complained of herein were perpetrated by Defendants in the course of trade or commerce within the meaning of 73 P.S. § 201-2(3).

941.    The Pennsylvania Unfair Trade Practices and Consumer Protection Law ("Pennsylvania CPL") prohibits unfair or deceptive acts or practices, including: (v)"[r]epresenting that goods or services have   characteristics, benefits or qualities that they do not have . . .;" (vi) "[r]epresenting that goods or services are of a particular standard, quality or grade . . .  if they are of another;" (ix) "[a]dvertising goods or services with intent not to sell them as advertised;" and (xxi)"[e]ngaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or misunderstanding." 73 P.S. § 201-2(4).

942.    Defendants engaged in unlawful trade practices, including representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; representing that they are of a particular standard and quality when they are not; advertising them with the intent not to sell or lease them as advertised; and engaging in any other fraudulent or deceptive conduct which creates a likelihood of confusion or of misunderstanding.

943. In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

944. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

945. As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

946. By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Pennsylvania CPL. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

947. In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect

discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

948. Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Pennsylvania Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

949. Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Pennsylvania Consumer Sub-Class.

950. Defendants knew or should have known that their conduct violated the Pennsylvania CPL.

951. As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

952. To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

953. Defendants owed Plaintiffs and the Pennsylvania Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

    a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

    b.    Intentionally concealed the foregoing from Plaintiffs and the Pennsylvania Consumer Sub-Class; and/or

    c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Pennsylvania Consumer Sub-Class that contradicted these representations.

954.	Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

955.	Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Pennsylvania Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

956.	Plaintiffs and the Pennsylvania Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Pennsylvania Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Pennsylvania Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

957.   Defendants' violations present a continuing risk to Plaintiffs, the Pennsylvania Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

958.   As a direct and proximate result of Defendants' violations of the Pennsylvania CPL, Plaintiffs and the Pennsylvania Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

959.   Defendants are liable to Plaintiffs and the Pennsylvania Consumer Sub-Class for treble their actual damages or $100, whichever is greater, and attorneys' fees and costs. 73 P.S. § 201-9.2(a). Plaintiffs and the Pennsylvania Consumer Sub-Class are also entitled to an award of punitive damages given that Defendants' conduct was malicious, wanton, willful, oppressive, or exhibited a reckless indifference to the rights of others.

**V.     Claims Brought on Behalf of the Rhode Island Consumer Sub-Class**

**COUNT 44**

**Breach of the Implied Warranty of Merchantability**
**R.I. Gen. Laws Ann. § 6A-2-314**

960.   In the event the Court declines to certify a Nationwide Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Rhode Island Consumer Sub-Class against Mercedes.

961.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of R.I. Gen. Laws Ann. § 6A-2-314.

962.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to R.I. Gen. Laws Ann. § 6A-2-314.

963.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags aggressively deploy and/or violently explode and spray vehicle occupants

- 241 -

with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents.

964. Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

965. As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Rhode Island Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 45

### Violation of the Rhode Island Unfair Trade Practices and Consumer Protection Act
### R.I. Gen. Laws Ann. § 16-13.1, *et seq.*

966. This claim is brought only on behalf of the Rhode Island Consumer Sub-Class against Mercedes.

967. Plaintiffs and the Rhode Island Consumer Sub-Class are persons who purchased or leased one or more Class Vehicles with Defective Airbags installed in them primarily for personal, family, or household purposes within the meaning of R.I. Gen. Laws Ann. § 6-13.1-5.2(a).

968. Rhode Island's Unfair Trade Practices and Consumer Protection Act ("Rhode Island CPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce" including: (v) "[r]epresenting that goods or services have sponsorship, approval, characteristics, ingredients, uses, benefits, or quantities that they do not have . . .;" (vii) "[r]epresenting that goods or services are of a particular standard, quality, or grade . . . , if they are of another"; (ix) "[a]dvertising goods or services with intent not to sell them as advertised;" (xii) "[e]ngaging in any other conduct that similarly creates a likelihood of confusion or of misunderstanding;" (xiii) "[e]ngaging in any act or practice that is unfair or deceptive to the

- 242 -

consumer;" and (xiv) "[u]sing any other methods, acts, or practices that mislead or deceive members of the public in a material respect." R.I. Gen. Laws Ann. § 6-13.1-1(6).

969.    Defendants engaged in unlawful trade practices, including: (1) representing that the Class Vehicles have characteristics, uses, benefits, and qualities which they do not have; (2) representing that the Class Vehicles are of a particular standard and quality when they are not; (3) advertising the Class Vehicles with the intent not to sell or lease them as advertised; and (4) otherwise engaging in conduct that is unfair or deceptive and likely to deceive.

970.    Defendants' actions as set forth above occurred in the conduct of trade or commerce.

971.    In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them.

972.    As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

973.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and

of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Rhode Island CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

974.    In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the Inflator Defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

975.    Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

976.    Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Rhode Island Sub-Class.

977.    Defendants knew or should have known that their conduct violated the Rhode Island CPA.

978.    As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

979.    To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles. Defendants owed Plaintiffs and the Rhode Island Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Rhode Island Consumer Sub-Class; and/or

c.    Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Rhode Island Consumer Sub-Class that contradicted these representations.

980.    Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

981.    Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Rhode Island Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

982.    Plaintiffs and the Rhode Island Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had

they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Rhode Island Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

983.    Defendants' violations present a continuing risk to Plaintiffs, the Rhode Island Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

984.    As a direct and proximate result of Defendants' violations of the Rhode Island CPA, Plaintiffs and the Rhode Island Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

985.    Plaintiffs and the Rhode Island Consumer Sub-Class are entitled to recover the greater of actual damages or $200 pursuant to R.I. Gen. Laws Ann. § 6-13.1-5.2(a). Plaintiffs and the Rhode Island Consumer Sub-Class also seek punitive damages in the discretion of the Court because of Defendants' egregious disregard of consumer and public safety and their long-running concealment of the serious Inflator Defect and its tragic consequences.

### W.    Claims Brought on Behalf of the South Carolina Consumer Sub-Class

### COUNT 46

### Violation of the South Carolina Unfair Trade Practices Act
### S.C. Code Ann. §§ 39-5-10, *et seq.*

986.    This claim is brought on behalf of the South Carolina Consumer Sub-Class against Volkswagen.

987.    Volkswagen is a "person" under S.C. Code Ann. § 39-5-10. 2740.  The South Carolina Unfair Trade Practices Act ("South Carolina UTPA") prohibits "unfair or deceptive acts or practices in the conduct of any trade or commerce . . . ." S.C. Code Ann. § 39-5-20(a).

Volkswagen engaged in unfair and deceptive acts or practices and violated the South Carolina UTPA by failing to disclose and actively concealing the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them. Volkswagen's actions as set forth below and above occurred in the conduct of trade or commerce.

988.    In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them

989.    Prior to installing the Defective Airbags in its vehicles, Volkswagen knew or should have known of the Inflator Defect, because Takata informed Volkswagen that the Defective Airbags contained the volatile and unstable ammonium nitrate and Volkswagen approved Takata's designs.  And Volkswagen was again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags.  Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

990.    By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the South Carolina UTPA.  Volkswagen deliberately withheld the information about the propensity of the Defective

Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

991.    In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defects discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

992.    Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

993.    Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the South Carolina Sub-Class.

994.    Volkswagen knew or should have known that its conduct violated the South Carolina UTPA.

995.    As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Volkswagen's representations, omissions, statements, and commentary have

included selling and marketing the Class Vehicles as "safe" and "reliable," despite its knowledge of the Inflator Defect or its failure to reasonably investigate it.

996. To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

997. Volkswagen owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Volkswagen:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Plaintiffs; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

998. Because Volkswagen fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

999. Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the South Carolina Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more

- 249 -

than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1000.   Plaintiffs and the South Carolina Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information.  Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Volkswagen's complete disregard for safety, Plaintiffs either would not have paid as much as they did for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

1001.   Volkswagen's violations present a continuing risk to Plaintiffs, the South Carolina Sub-Class, as well as to the general public.   Volkswagen's unlawful acts and practices complained of herein affect the public interest.

1002.   As a direct and proximate result of Volkswagen's violations of the South Carolina UTPA, Plaintiffs and the South Carolina Sub-Class have suffered injury-in-fact and/or actual damage.

1003.   Pursuant to S.C. Code Ann. § 39-5-140(a), Plaintiffs seek monetary relief against Volkswagen to recover for their economic losses.  Because Volkswagen's actions were willful and knowing, Plaintiffs' damages should be trebled. *Id.*

1004.  Plaintiffs further allege that Volkswagen's malicious and deliberate conduct warrants an assessment of punitive damages because Volkswagen carried out despicable conduct with willful and conscious disregard of the rights and safety of others, subjecting Plaintiffs and the South Carolina Sub-Class to cruel and unjust hardship as a result.  Volkswagen intentionally and willfully misrepresented the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them, deceived Plaintiffs and the South Carolina Sub-Class on life-or-death

matters, and concealed material facts that only Volkswagen knew, all to avoid the expense and public relations nightmare of correcting a deadly flaws in the Class Vehicles and/or the Defective Airbags installed in them.  Volkswagen's unlawful conduct constitutes malice, oppression, and fraud warranting punitive damages.  Plaintiffs further seek an order enjoining Volkswagen's unfair or deceptive acts or practices.

## COUNT 47

### Violation of the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act
### S.C. Code Ann. §§56-15-10, et seq.

1005.  This claim is brought on behalf of the South Carolina Consumer Sub-Class against Volkswagen.

1006.  Volkswagen is a "manufacturer" as set forth in S.C. Code Ann.§ 56-15-10, as it was engaged in the business of manufacturing or assembling new and unused motor vehicles.

1007.  Volkswagen committed unfair or deceptive acts or practices that violated the South Carolina Regulation of Manufacturers, Distributors, and Dealers Act ("Dealers Act"), S.C. Code Ann. § 56-15-30.

1008.  Volkswagen engaged in actions which were arbitrary, in bad faith, unconscionable, and which caused damage to Plaintiffs, the South Carolina Sub-Class, and to the public.

1009.  Volkswagen's bad faith and unconscionable actions include, but are not limited to: (1) representing that Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have, (2) representing that they are of a particular standard, quality, and grade when they are not, (3) advertising them with the intent

- 251 -

not to sell or lease them as advertised, (4) representing that a transaction involving them confers or involves rights, remedies, and obligations which it does not, and (5) representing that the subject of a transaction involving them has been supplied in accordance with a previous representation when it has not.

1010.  Volkswagen resorted to and used false and misleading advertisements in connection with their business.  As alleged above, they made numerous material statements and omissions regarding the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Each of these statements and omissions contributed to the deceptive context of Volkswagen's unlawful advertising and representations as a whole.

1011.  Pursuant to S.C. Code Ann. § 56-15-110(2), Plaintiffs bring this action on behalf of themselves and the South Carolina Sub-Class, as the action is one of common or general interest to many persons and the parties are too numerous to bring them all before the court.

1012.  Plaintiffs and the South Carolina Sub-Class are entitled to double their actual damages, the cost of the suit, attorney's fees pursuant to S.C. Code Ann. § 56-15-110. Plaintiffs also seek injunctive relief under S.C. Code Ann. §  56-15-110.   Plaintiffs also seek treble damages because Volkswagen acted maliciously.

## COUNT 48

### Breach of the Implied Warranty of Merchantability
### S.C. Code § 36-2-314

1013.  In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the South Carolina Consumer Sub-Class against Volkswagen.

1014.   Volkswagen is and was at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of S.C. Code Ann. § 36-2-314.

1015.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to S.C. Code Ann. § 36-2-314.

1016.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

1017.   Volkswagen was provided notice of these issues by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Volkswagen issued the recalls and the allegations of the Inflator Defect became public.

1018.   As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the South Carolina Sub-Class have been damaged in an amount to be proven at trial.

**X.**     **Claims Brought on Behalf of the Tennessee Consumer Sub-Class**

**COUNT 49**

**Violation of the Tennessee Consumer Protection Act,**
**Tenn. Code Ann. §§ 47-18-101,** *et seq.*

1019.   This claim is brought only on behalf of the Tennessee Consumer Sub-Class against Mercedes.

1020.   Plaintiffs and the Tennessee Consumer Sub-Class are "natural persons" and "consumers" within the meaning of Tenn. Code Ann. § 47-18-103(2).

1021.   Defendants are "persons" within the meaning of Tenn. Code Ann. § 47-18-103(2) (the "Act").

1022.   Defendants' conduct complained of herein affected "trade," "commerce" or "consumer transactions" within the meaning of Tenn. Code Ann. § 47-18-103(19).

1023.   The Tennessee Consumer Protection Act ("Tennessee CPA") prohibits "[u]nfair or deceptive acts or practices affecting the conduct of any trade or commerce," including but not limited to: "[r]epresenting that goods or services have  . . . characteristics, [or] . . . benefits . . . that they do not have. . . ;" "[r]epresenting that goods or services are of a particular standard, quality or grade . . . if they are of another;" and "[a]dvertising goods or services with intent not to sell them as advertised." Tenn. Code Ann. § 47-18-104. Defendants violated the Tennessee CPA by engaging in unfair or deceptive acts, including representing that Class Vehicles have characteristics or benefits that they did not have; representing that Class Vehicles are of a particular standard, quality, or grade when they are of another; and advertising Class Vehicles with intent not to sell or lease them as advertised.

1024.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or

- 254 -

omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the Class Vehicles and/or the Defective Airbags installed in them.

1025.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1026.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Tennessee CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1027.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1028.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers,

including Plaintiffs and the Tennessee Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1029.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Tennessee Consumer Sub-Class.

1030.   Defendants knew or should have known that their conduct violated the Tennessee CPA.

1031.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

1032.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1033.   Defendants owed Plaintiffs and the Tennessee Consumer Sub-Class  a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Tennessee Consumer Sub-Class; and/or
>
> c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from

Plaintiffs and the Tennessee Consumer Sub-Class that contradicted these representations.

1034.   Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1035.   Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Tennessee Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1036.   Plaintiffs and the Tennessee Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Tennessee Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs did not receive the benefit of their bargain as a result of Defendants' misconduct.

1037.   Defendants' violations present a continuing risk to Plaintiffs, the Tennessee Consumer Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1038.   As a direct and proximate result of Defendants' violations of the Tennessee CPA, Plaintiffs and the Tennessee Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

1039.   Pursuant to Tenn. Code Ann. § 47-18-109(a), Plaintiffs and the Tennessee Consumer Sub-Class seek monetary relief against Defendants measured as actual damages in an

amount to be determined at trial, treble damages as a result of Defendants' willful or knowing violations, and any other just and proper relief available under the Tennessee CPA.

### Y.   Claims Brought on Behalf of the Texas Consumer Sub-Class

### COUNT 50

### Breach of the Implied Warranty of Merchantability
### Tex. Bus. & Com. Code Ann. § 2.314

1040.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought only on behalf of the Texas Consumer Sub-Class against Volkswagen and Mercedes.

1041.   Defendants are and were at all relevant times merchants with respect to motor vehicles and/or airbags within the meaning of Tex. Bus. & Com. Code Ann. § 2.104.

1042.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Tex. Bus. & Com. Code Ann. § 2.314.

1043.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used. Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

1044.   Defendants were provided notice of these issues by their knowledge of the issues, by customer complaints, by numerous complaints filed against them and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Honda issued the recalls and the allegations of the Inflator Defect became public.

1045.  As a direct and proximate result of Defendants' breach of the warranties of merchantability, Plaintiffs and the Texas Consumer Sub-Class have been damaged in an amount to be proven at trial.

## COUNT 51

**Violation of the Deceptive Trade Practices Act,**
**Tex. Bus. & Com. Code Ann. §§ 17.41, *et seq.***

1046.  This claim is brought only on behalf of the Texas Consumer Sub-Class against Volkswagen and Mercedes.

1047.  Plaintiffs and the Texas Consumer Sub-Class are individuals, partnerships and corporations with assets of less than $25 million (or are controlled by corporations or entities with less than $25 million in assets). *See* Tex. Bus. & Com. Code Ann. § 17.41.

1048.  The Texas Deceptive Trade Practices-Consumer Protection Act ("Texas DTPA") prohibits "[f]alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce," Tex. Bus. & Com. Code § 17.46(a), and an "unconscionable action or course of action," which means "an act or practice which, to a consumer's detriment, takes advantage of the lack of knowledge, ability, experience, or capacity of the consumer to a grossly unfair degree," Tex. Bus. & Com. Code Ann. § 17.45(5); Tex. Bus. & Com. Code Ann. § 17.50(a)(3). Defendants have committed false, misleading, unconscionable, and deceptive acts or practices in the conduct of trade or commerce.

1049.  Defendants also violated the Texas DTPA by: (1) representing that the Class Vehicles and/or the Defective Airbags installed in them have characteristics, uses, benefits, and qualities which they do not have; (2) representing that they are of a particular standard, quality, and grade when they are not; (3) advertising them with the intent not to sell or lease them as advertised; and (4) failing to disclose information concerning them with the intent to induce consumers to purchase or lease them.

1050.  In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags

installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive.

1051.   Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1052.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1053.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Texas DTPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags violently exploding and/or expelling vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1054.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class

Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1055.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Texas Consumer Sub-Class, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1056.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Texas Consumer Sub-Class.

1057.   Defendants knew or should have known that their conduct violated the Texas DTPA.

1058.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

1059.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1060.   Defendants owed Plaintiffs and the Texas Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a. Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b. Intentionally concealed the foregoing from Plaintiffs and the Texas Consumer Sub-Class; and/or

c. Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Texas Consumer Sub-Class that contradicted these representations.

1061. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1062. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Texas Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1063. Plaintiffs and the Texas Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Texas Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Texas Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

1064.   Defendants' violations present a continuing risk to Plaintiffs, the Texas Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1065.   As a direct and proximate result of Defendants' violations of the Texas DTPA, Plaintiffs and the Texas Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

1066.   Pursuant to Tex. Bus. & Com. Code Ann. § 17.50(a)(1) and (b), Plaintiffs and the Texas Consumer Sub-Class seek monetary relief against Defendants measured as actual damages in an amount to be determined at trial, treble damages for Defendants' knowing violations of the Texas DTPA, and any other just and proper relief available under the Texas DTPA.

1067.   For those Plaintiffs and the Texas Consumer Sub-Class members who wish to rescind their purchases, they are entitled under Tex. Bus. & Com. Code Ann. § 17.50(b)(4) to rescission and other relief necessary to restore any money or property that was acquired from them based on violations of the Texas DTPA.

1068.   Plaintiffs and the Texas Consumer Sub-Class also seek court costs and attorneys' fees under § 17.50(d) of the Texas DTPA.

1069.   In accordance with Tex. Bus. & Com. Code Ann. § 17.505(a), Plaintiffs' counsel, on behalf of Plaintiffs and the Texas Consumer Sub-Class, served Defendants with notice of their alleged violations of the Texas DTPA relating to the Class Vehicles and/or the Defective Airbags installed in them purchased by Plaintiffs and the Texas Consumer Sub-Class, and demanded that Defendants correct or agree to correct the actions described therein. As Defendants failed to do so, Plaintiffs seek compensatory and monetary damages to which Plaintiffs and the Texas Consumer Sub-Class are entitled.

### Z.   Claims Brought on Behalf of the Virginia Consumer Sub-Class

### COUNT 52

**Violation of the Virginia Consumer Protection Act**
**Va. Code Ann. §§ 59.1-196, *et seq.***

1070.   This claim is brought on behalf of the Virginia Consumer Sub-Class against Volkswagen.

1071.   Volkswagen is a "supplier" under Va. Code Ann. § 59.1-198.

1072.   The sale of the Class Vehicles with the Defective Airbags installed in them to the Class members was a "consumer transaction" within the meaning of Va. Code Ann. § 59.1-198.

1073.   The Virginia Consumer Protection Act ("Virginia CPA") lists prohibited "practices," which include: "5. Misrepresenting that good or services have certain characteristics;" "6. Misrepresenting that goods or services are of a particular standard, quality, grade style, or model;" "8. Advertising goods or services with intent not to sell them as advertised, or with intent not to sell at the price or upon the terms advertised;" "9. Making false or misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions;" and "14. Using any other deception, fraud, or misrepresentation in connection with a consumer transaction." Va. Code Ann. § 59.1-200.

1074.   Volkswagen violated the Virginia CPA by misrepresenting that the Class Vehicles and/or the Defective Airbags installed in them had certain quantities, characteristics, ingredients, uses, or benefits; misrepresenting that they were of a particular standard, quality, grade, style, or model when they were another; advertising them with intent not to sell or lease them as advertised; and otherwise "using any other deception, fraud, false pretense, false promise, or misrepresentation in connection with a consumer transaction."

- 264 -

1075.   In the course of its business, Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Volkswagen also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1076.   Prior to installing the Defective Airbags in its vehicles, Volkswagen knew or should have known of the Inflator Defect, because Takata informed Volkswagen that the Defective Airbags contained the volatile and unstable ammonium nitrate and Volkswagen approved Takata's designs.  And Volkswagen was again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags.  Volkswagen failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1077.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting itself as a reputable manufacturer that values safety, Volkswagen engaged in unfair or deceptive business practices in violation of the Virginia CPA. Volkswagen deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1078.   In the course of Volkswagen's business, it willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Volkswagen compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be a reputable manufacturer that values safety.

1079.   Volkswagen's unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Volkswagen's brands, and the true value of the Class Vehicles.

1080.   Volkswagen intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Virginia Sub-Class.

1081.   Volkswagen knew or should have known that its conduct violated the Virginia CPA.

1082.   As alleged above, Volkswagen made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading.  Volkswagen's representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as "safe" and "reliable," despite its knowledge of the Inflator Defect or its failure to reasonably investigate it.

1083.   To protect its profits and to avoid remediation costs and a public relations nightmare, Volkswagen concealed the dangers and risks posed by the Class Vehicles and/or the

Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1084.   Volkswagen owed Plaintiffs a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Volkswagen:

a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.   Intentionally concealed the foregoing from Plaintiffs; and/or

c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs that contradicted these representations.

1085.   Because Volkswagen fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished.  In light of the stigma attached to Class Vehicles by Volkswagen's conduct, they are now worth significantly less than they otherwise would be.

1086.   Volkswagen's failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Virginia Sub-Class.  A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1087.  Plaintiffs and the Virginia Sub-Class suffered ascertainable loss caused by Volkswagen's misrepresentations and its failure to disclose material information.  Had they been

aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Volkswagen's complete disregard for safety, Plaintiffs either would not have paid as much for their vehicles or would not have purchased or leased them at all.  Plaintiffs did not receive the benefit of their bargain as a result of Volkswagen's misconduct.

1088.   Volkswagen's violations present a continuing risk to Plaintiffs, the Virginia Sub-Class, as well as to the general public.  Volkswagen's unlawful acts and practices complained of herein affect the public interest.

1089.   As a direct and proximate result of Volkswagen's violations of the Virginia CPA, Plaintiffs and the Virginia Sub-Class have suffered injury-in-fact and/or actual damage.

1090.   Pursuant to Va. Code Ann. § 59.1-204, Plaintiffs and the Virginia Sub-Class seek monetary relief against Volkswagen measured as the greater of (a) actual damages in an amount to be determined at trial and (b) statutory damages in the amount of $500 for each Plaintiff and each Virginia Sub-Class member.  Because Volkswagen's conduct was committed willfully and knowingly, Plaintiffs are entitled to recover, for each Plaintiff and each Virginia Sub-Class member, the greater of (a) three times actual damages or (b) $1,000.

1091.   Plaintiffs also seek an order enjoining Volkswagen's unfair and/or deceptive acts or practices, punitive damages, and attorneys' fees, and any other just and proper relief available under General Business Law § 59.1-204, *et seq.*

**COUNT 53**

**Breach of the Implied Warranty of Merchantability**
**Va. Code Ann. § 8.2-314**

1092.   In the event the Court declines to certify a Nationwide Consumer Class under the Magnuson-Moss Warranty Act, this claim is brought on behalf of the Virginia Consumer Sub-Class against Volkswagen.

1093.   Volkswagen is and was at all relevant times a merchant with respect to motor vehicles and/or airbags within the meaning of Va. Code Ann. § 8.2-314.

1094.   A warranty that the Class Vehicles and/or the Defective Airbags installed in them were in merchantable condition was implied by law in Class Vehicle transactions, pursuant to Va. Code Ann. § 8.2-314.

1095.   The Class Vehicles and/or the Defective Airbags installed in them, when sold and at all times thereafter, were not merchantable and are not fit for the ordinary purpose for which cars and airbags are used.  Specifically, they are inherently defective and dangerous in that the Defective Airbags: (a) rupture and expel metal shrapnel that tears through the airbag and poses a threat of serious injury or death to occupants; and/or (b) hyper-aggressively deploy and seriously injure occupants through contact with the airbag, instead of protecting vehicle occupants from bodily injury during accidents.

1096.   Volkswagen was provided notice of these issues by customer complaints, by numerous complaints filed against it and/or others, by internal investigations, and by numerous individual letters and communications sent by consumers before or within a reasonable amount of time after Volkswagen issued the recalls and the allegations of the Inflator Defect became public.

As a direct and proximate result of Volkswagen's breach of the warranties of merchantability, Plaintiffs and the Virginia Sub-Class have been damaged in an amount to be proven at trial.

**AA.** **Claims Brought on Behalf of the Washington Consumer Sub-Class**

**COUNT 54**

**Violation of the Consumer Protection Act,**
**Wash. Rev. Code Ann. §§ 19.86.010,** *et seq.*

1097.   This claim is brought only on behalf of the Washington Consumer Sub-Class against Mercedes.

1098.   Defendants committed the acts complained of herein in the course of "trade" or "commerce" within the meaning of Wash. Rev. Code Ann. § 19.96.010.

1099.   The Washington Consumer Protection Act ("Washington CPA") broadly prohibits "[u]nfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." Wash. Rev. Code Ann. § 19.96.010. Defendants engaged in unfair and deceptive acts and practices and violated the Washington CPA by failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them.

1100.   In the course of their business, Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them as described herein and otherwise engaged in activities with a tendency or capacity to deceive. Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, misrepresentations, or concealment, suppression or omission of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1101.   As alleged above, Defendants have known of the Inflator Defect in the Defective Airbags since at least the early 2000s, including through inflator development, testing incidents, and public recalls. Prior to installing the Defective Airbags in their vehicles, Defendants knew or

should have known of the Inflator Defect, because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved Takata's designs. And Defendants were again made aware of the Inflator Defect in Takata's airbags not later than 2008, when Honda first notified regulators of a problem with its Takata airbags. Defendants failed to disclose and actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1102.   By failing to disclose and by actively concealing the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing them as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the Washington CPA. Defendants deliberately withheld the information about the propensity of the Defective Airbags to aggressively deploy, and/or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1103.   In the course of Defendants' business, they willfully failed to disclose and actively concealed the dangerous risks posed by the many safety issues and serious defect discussed above. Defendants compounded the deception by repeatedly asserting that the Class Vehicles and/or the Defective Airbags installed in them were safe, reliable, and of high quality, and by claiming to be reputable manufacturers that value safety.

1104.   Defendants' unfair or deceptive acts or practices, including these concealments, omissions, and suppressions of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs, about the true safety and reliability of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brands, and the true value of the Class Vehicles.

1105.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Washington Consumer Sub-Class.

1106.   Defendants knew or should have known that their conduct violated the Washington CPA.

1107.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, omissions, statements, and commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

1108.   To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy/lease the Class Vehicles, and allowed them to continue driving highly dangerous vehicles.

1109.   Defendants owed Plaintiffs and the Washington Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

> a.   Possessed exclusive knowledge of the dangers and risks posed by the foregoing;
>
> b.   Intentionally concealed the foregoing from Plaintiffs and the Washington Consumer Sub-Class; and/or
>
> c.   Made incomplete representations about the safety and reliability of the foregoing generally, while purposefully withholding material facts from Plaintiffs and the Washington Consumer Sub-Class that contradicted these representations.

1110. Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1111. Defendants' failure to disclose and active concealment of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Washington Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1112. Plaintiffs and the Washington Consumer Sub-Class suffered ascertainable loss caused by Defendants' misrepresentations and their failure to disclose material information. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants' complete disregard for safety, Plaintiffs and the Washington Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased or leased them at all. Plaintiffs and the Washington Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

1113. Defendants' violations present a continuing risk to Plaintiffs, the Washington Consumer Sub-Class, as well as to the general public. Defendants' unlawful acts and practices complained of herein affect the public interest.

1114. As a direct and proximate result of Defendants' violations of the Washington Act, Plaintiffs and the Washington Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

1115. Defendants are liable to Plaintiffs and the Washington Consumer Sub-Class for damages in amounts to be proven at trial, including attorneys' fees, costs, and treble damages, as well as any other remedies the Court may deem appropriate under Wash. Rev. Code Ann. § 19.86.090.

**BB.    Claims Brought on Behalf of the Wisconsin Consumer Sub-Class**

**COUNT 55**

**Violation of the Wisconsin Deceptive Trade Practices Act,**
**Wisc. Stat. §§ 100.18(1),** *et seq.*

1116.  This claim is brought by Wisconsin Consumer Plaintiffs individually and on behalf of the Wisconsin Consumer Class against Volkswagen.

1117.  Plaintiffs and the Wisconsin Consumer Sub-Class are consumers and members of the general public within the meaning of Wisconsin Deceptive Trade Practices Act ("WDTPA"), Wis. Stat. § 100.18(1).

1118.  The WDTPA prohibits a seller from making untrue, deceptive, or misleading statements, directly or indirectly, to the public with the intent to sell, distribute, or in any way dispose of merchandise or any other offering, or with intent to induce the public in any manner to enter into any contract or obligation relating to the purchase, sale, use, or lease of any merchandise.

1119.  Through advertisements, marketing representations, and other public communications, Defendants intended to and did misrepresent to Plaintiffs and the Wisconsin Consumer Sub-Class, at all relevant times, that the Class Vehicles they were selling were safe and defect-free in order to induce Plaintiffs and the Wisconsin Consumer Sub-Class to purchase Class Vehicles.

1120.  Defendants also engaged in unlawful trade practices by employing deception, deceptive acts or practices, fraud, and misrepresentations with intent that Plaintiffs, the Wisconsin Consumer Sub-Class, and the general public rely upon such deceptive, false, and misleading statements in connection with the sale of the Class Vehicles and/or the Defective Airbags installed in them.

1121.  Defendants knew or should have known of the Inflator Defect because Takata informed them that the Defective Airbags contained the volatile and unstable ammonium nitrate and Defendants approved the design of the airbags. Defendants were against made aware of the

Inflator Defect in the Defective Airbags not later than 2008 when Honda first notified regulators of a problem with its Takata airbags. Defendants actively concealed the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them.

1122.   By misrepresenting the Inflator Defect in the Class Vehicles and/or the Defective Airbags installed in them, by marketing the Class Vehicles as safe, reliable, and of high quality, and by presenting themselves as reputable manufacturers that value safety, Defendants engaged in unfair or deceptive business practices in violation of the WDTPA. Defendants knew about the propensity of the Defective Airbags to aggressively deploy and /or violently explode and spray vehicle occupants with lethal amounts of metal debris and shrapnel, instead of protecting vehicle occupants from bodily injury during accidents, in order to ensure that consumers would purchase the Class Vehicles.

1123.  Defendants' unfair or deceptive acts or practices, including these misrepresentations of material facts, had a tendency or capacity to mislead and create a false impression in consumers, and were likely to and did in fact deceive reasonable consumers, including Plaintiffs and the Wisconsin Consumer Sub-Class, about the true safety, reliability, and quality of Class Vehicles and/or the Defective Airbags installed in them, the quality of Defendants' brand, and the true value of the Class Vehicles.

1124.   Defendants intentionally and knowingly misrepresented material facts regarding the Class Vehicles and/or the Defective Airbags installed in them with an intent to mislead Plaintiffs and the Wisconsin Consumer Sub-Class.

1125.   Defendants knew or should have known that their conduct violated the WDTPA.

1126.   As alleged above, Defendants made material statements about the safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them that were either false or misleading. Defendants' representations, statements, and other commentary have included selling and marketing the Class Vehicles as safe and reliable, despite their knowledge of the Inflator Defect or their failure to reasonably investigate it.

1127.  To protect their profits and to avoid remediation costs and a public relations nightmare, Defendants continued to misrepresent the dangers and risks posed by the Class Vehicles and/or the Defective Airbags installed in them and their tragic consequences, and allowed unsuspecting new and used car purchasers to continue to buy or lease the Class Vehicles, and allowed Plaintiffs and the Wisconsin Consumer Sub-Class to continue driving the highly dangerous vehicles and vehicle parts.

1128.  Defendants owed Plaintiffs and the Wisconsin Consumer Sub-Class a duty to disclose the true safety and reliability of the Class Vehicles and/or the Defective Airbags installed in them because Defendants:

a.    Possessed exclusive knowledge of the dangers and risks posed by the foregoing;

b.    Intentionally concealed the foregoing from Plaintiffs and the Wisconsin Consumer Sub-Class; and/or

c.    Made misleading representations about the safety and reliability of the foregoing generally, despite knowing material facts that contradicted these representations.

1129.  Because Defendants fraudulently concealed the Inflator Defect in Class Vehicles and/or the Defective Airbags installed in them, resulting in a raft of negative publicity once the Inflator Defect finally began to be disclosed, the value of the Class Vehicles has greatly diminished. In light of the stigma attached to Class Vehicles by Defendants' conduct, they are now worth significantly less than they otherwise would be.

1130.  Defendants' misrepresentations of the dangers and risks posed by the Defective Airbags in Class Vehicles were material to Plaintiffs and the Wisconsin Consumer Sub-Class. A vehicle made by a reputable manufacturer of safe vehicles is worth more than an otherwise comparable vehicle made by a disreputable manufacturer of unsafe vehicles that conceals defects rather than promptly remedies them.

1131. Plaintiffs and the Wisconsin Consumer Sub-Class suffered ascertainable pecuniary loss caused by Defendants' misrepresentations. Had they been aware of the Inflator Defect that existed in the Class Vehicles and/or the Defective Airbags installed in them, and Defendants complete disregard for safety, Plaintiffs and the Wisconsin Consumer Sub-Class either would not have paid as much for their vehicles or would not have purchased them at all. Plaintiffs and the Wisconsin Consumer Sub-Class did not receive the benefit of their bargain as a result of Defendants' misconduct.

1132. Plaintiffs and the Wisconsin Consumer Sub-Class risk irreparable injury as a result of Defendants acts and omissions in violation of the WDTPA, and these violations present a continuing risk to Plaintiffs and the Wisconsin Consumer Sub-Class, and the general public. Defendants' unlawful acts and practices complained of herein affect the public interest. The recalls and repairs instituted by Defendants have not been adequate.

1133. As a direct and proximate result of Defendants' violations of the WDTPA, Plaintiffs and the Wisconsin Consumer Sub-Class have suffered injury-in-fact and/or actual damage.

1134. Plaintiffs and the Wisconsin Consumer Sub-Class are entitled to recover pecuniary damages, costs, and attorneys' fees under Wis. Stat. § 100.18(11)(b)(2).

1135. Plaintiffs and the Wisconsin Consumer Sub-Class also seek an order enjoining Defendants' unfair, unlawful, and/or deceptive practices, declaratory relief, and any other just and proper relief available under the WDTPA.

## **PRAYER FOR RELIEF**

Plaintiffs, on behalf of themselves and all others similarly situated, request the Court to enter judgment against Defendants, as follows:

A.     An order certifying the proposed Classes, designating Plaintiffs as the named representatives of the Classes, designating the undersigned as Class Counsel, and making such further orders for the protection of Class members as the Court deems appropriate, under Fed. R.

Civ. P. 23;

B.      A declaration that the airbags in Class Vehicles are defective;

C.      An order enjoining Defendants to desist from further deceptive distribution, sales, and lease practices with respect to the Class Vehicles, and such other injunctive relief that the Court deems just and proper;

D.      An award to Plaintiffs and Class Members of compensatory, exemplary, and punitive remedies and damages and statutory penalties, including interest, in an amount to be proven at trial;

E.      An award to Plaintiffs and Class Members for the return of the purchase prices of the Class Vehicles, with interest from the time it was paid, for the reimbursement of the reasonable expenses occasioned by the sale, for damages and for reasonable attorney fees;

F.      A Defendant-funded program, using transparent, consistent, and reasonable protocols, under which out-of-pocket and loss-of-use expenses and damages claims associated with the Defective Airbags in Plaintiffs' and Class Members' Class Vehicles, can be made and paid, such that Defendants, not the Class Members, absorb the losses and expenses fairly traceable to the recalls of the vehicles and correction of the Defective Airbags;

G.      A declaration that Defendants must disgorge, for the benefit of Plaintiff and Class Members, all or part of the ill-gotten profits they received from the sale or lease of the Class Vehicles, or make full restitution to Plaintiffs and Class Members;

H.      An award of attorneys' fees and costs, as allowed by law;

I.      An award of prejudgment and post judgment interest, as provided by law;

J.      Leave to amend this Complaint to conform to the evidence produced at trial; and

K.      Such other relief as may be appropriate under the circumstances.

## **DEMAND FOR JURY TRIAL**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiffs demand a jury

trial as to all issues triable by a jury.

DATED: May 18, 2018                    **PODHURST ORSECK, P.A.**

                                        /s/ Peter Prieto
                                       Peter Prieto (FBN 501492)
                                       Aaron S. Podhurst (FBN 63606)
                                       Stephen F. Rosenthal (FBN 131458)
                                       John Gravante  (FBN 617113)
                                       Matthew P. Weinshall (FBN 84783)
                                       Alissa Del Riego (FBN 99742)
                                       SunTrust International Center
                                       One Southeast 3rd Ave, Suite 2300
                                       Miami, Florida 33131
                                       Phone: (305) 358-2800
                                       Fax: (305) 358-2382
                                       pprieto@podhurst.com
                                       apodhurst@podhurst.com
                                       srosenthal@podhurst.com
                                       jgravante@podhurst.com
                                       mweinshall@podhurst.com
                                       adelriego@podhurst.com

                                       *Chair Lead Counsel for Plaintiffs*

| **COLSON HICKS EIDSON** | **POWER ROGERS & SMITH, P.C.** |
|---|---|
| Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | Todd A. Smith<br>tsmith@prslaw.com<br>70 West Madison St., 55th Floor<br>Chicago, IL 60602<br>T: 312-236-9381<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shuhnan, Esq. (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel: (914) 749-8200<br>Fax: (914) 749-8300<br>dboies@bsfllp.com<br>mshulman@bsfllp.com<br><br>Stephen N. Zack, Esq. (Fla. Bar. No. 145215)<br>Mark J. Heise, Esq. (Fla. Bar No. 771090)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307<br>szack@bsfllp.com<br>mheise@bsfllp.com<br><br>Richard B. Drubel, Esq.<br>Jonathan R. Voegele, Esq.<br>26 South Main Street<br>Hanover, NH 03755<br>Tel: (603) 643-9090<br>Fax: (603) 643-9010<br>rdrubel@bsfllp.com<br>jvoegele@bsfllp.com<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **BARON & BUDD, PC**<br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J.Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO,PC** | **LIEFF CABRASER HEIMANN AND BERNSTEIN LLP** |
|---|---|
| James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ   07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br><br>*Plaintiffs' Steering Committee* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>Nimish R. Desai<br>ndesai@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T: 415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>NY, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br><br>*Plaintiffs' Steering Committee* |

**CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that on May 18, 2018, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: /s/Peter Prieto
       Peter Prieto