**UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division**

**MDL No. 2599
Master File No.: 15-MD-02599-MORENO
S.D. Fla. Case No. 1:14-cv-24009-MORENO**

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION** | |
| **THIS DOCUMENT RELATES TO:**<br><br>**ECONOMIC LOSS TRACK CASES AGAINST VOLKSWAGEN GROUP OF AMERICA, INC. AND AUDI OF AMERICA, LLC** | |

**PLAINTIFFS' UNOPPOSED MOTION FOR PRELIMINARY APPROVAL OF
VOLKSWAGEN CLASS SETTLEMENT, PRELIMINARY CERTIFICATION OF
SETTLEMENT CLASS, AND APPROVAL OF CLASS NOTICE
AND INCORPORATED MEMORANDUM OF LAW**

**PODHURST ORSECK, P.A.**
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Matthew P. Weinshall (FBN 84783)
Stephen F. Rosenthal (FBN 131458)
John Gravante (FBN 617113)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Email:  pprieto@podhurst.com
           apodhurst@podhurst.com
           srosenthal@podhurst.com
           jgravante@podhurst.com
           mweinshall@podhurst.com
           adelriego@podhurst.com

*Chair Lead Counsel for Plaintiffs*

(Additional counsel listed below)

## TABLE OF CONTENTS

PAGE

INTRODUCTION ........................................................................................................................... 1

BACKGROUND AND PROCEDURAL HISTORY ............................................................................. 4

    A.    Factual Background. ....................................................................................... 4

    B.    Procedural History. ........................................................................................ 6

    C.    Settlement Negotiations. ................................................................................. 9

TERMS OF THE SETTLEMENT ..................................................................................................... 9

    A.    The Settlement Class.......................................................................................... 9

    B.    Settlement Fund. ............................................................................................... 10

    C.    Outreach Program. ......................................................................................... 11

    D.    Out-Of-Pocket Claims Process. ..................................................................... 12

    E.    Residual Distribution Payments....................................................................... 14

    F.    Enhanced Rental Car/Loaner Program. ........................................................ 16

    G.    Customer Support Program.............................................................................. 16

    H.    Release. ............................................................................................................. 18

    I.    Notice Program. .............................................................................................. 19

    J.    Settlement Administration. ............................................................................. 20

    K.    Attorneys' Fees and Incentive Awards for Class Representatives. ................. 21

MEMORANDUM OF LAW ........................................................................................................... 22

    A.    The Legal Standard for Preliminary Approval. ............................................ 22

    B.    The Settlement Satisfies the Criteria for Preliminary Approval. .................. 24

        1.    Class Representatives and Class Counsel Have Adequately Represented the Class. ................................................... 25

        2.    The Settlement is the Product of Good-Faith, Informed, and Arm's-Length Negotiations............................................................... 26

        3.    The Relief Provided to Class Members is Adequate........................... 27

            (a)    The Costs and Risks of Trial. ................................................. 29

            (b)    The Effectiveness of the Distribution of the Settlement Benefits. ............... 30

            (c)    Settlement Class Representative Service Awards and Attorneys' Fees. ...... 30

i

       (d)   The Settlement Represents the Full Agreement of the Parties. .................... 31

    4.   The Settlement Treats Class Members Equitably Relative to Each Other. ......... 31

C.    Preliminary Certification of the Settlement Class Is Appropriate. ............................ 32

D.    The Court Should Approve the Proposed Notice Program Because It Is Constitutionally Sound................................................................................ 35

E.    The Court Should Schedule a Fairness Hearing. ........................................ 37

CONCLUSION........................................................................................................ 37

Plaintiffs respectfully move, under Rule 23 of the Federal Rules of Civil Procedure, for preliminary approval of a proposed Settlement with Volkswagen Group of America and Audi of America, LLC (collectively "Volkswagen" or "VW"), preliminary certification of the Class defined in the Settlement, and approval of the proposed notice to the Class.[1]

This motion requests preliminary approval of a $42 million class settlement covering 1.35 million vehicles that is modeled on the seven prior settlements that this Court has previously approved in this MDL.  Like the prior settlements, it includes cash compensation to Class members, an outreach program to accelerate the removal of defective inflators, and an expansive rental car program.  The Court, in its discretion, may decide this motion without a hearing, as Rule 23 only requires a hearing for final approval, not preliminary approval and authorization of notice.  A proposed Preliminary Approval Order for the Settlement is attached as an exhibit to this motion and as Exhibit 7 to the Settlement Agreement.

## INTRODUCTION

This litigation began more than five years ago, when car owners and lessees sued Takata Corporation and its subsidiary TK Holdings, Inc. (collectively, "Takata"), and seven automotive companies, for economic damages arising from deceptive conduct concerning defective Takata airbags installed in Plaintiffs' vehicles.  A common defect that was concealed from purchasers and lessees, Plaintiffs alleged, armed Takata airbag inflators with an unreasonably dangerous propensity to deploy aggressively or rupture, expelling debris toward vehicle occupants.  Tens of millions of such airbags are now subject to recalls nationwide.  The unprecedented size of these recalls—the largest in U.S. history—bankrupted Takata, which also pled guilty to wire fraud. Seven automotive companies originally sued in the litigation—Toyota, Honda, BMW, Nissan,

---

[1] The Settlement Agreement is attached hereto as Exhibit A.  Capitalized terms not defined herein shall have the same definitions and meanings ascribed to them in the Settlement.

Mazda, Subaru, and Ford—entered into class-wide settlements in the spring and summer of 2017, and in the spring of 2018, to resolve the consumer economic loss claims asserted against them.

In the spring of 2018, after it became clear that the initial seven automakers were not alone in using defective Takata airbag inflators, vehicle owners and lessees sued an additional four automakers—Volkswagen, Mercedes-Benz, General Motors, and FCA—alleging that they too engaged in deceptive conduct and concealed the common defect in the Takata airbag inflators.

Now, after extensive negotiations in good faith, at arm's length, by counsel experienced in consumer class action matters, with the assistance of mediator, Paul Huck, Jr., and with the benefit of three years of exhaustive discovery, Plaintiffs and Volkswagen have agreed to the proposed Settlement with a value of at least $42 million for a class that covers approximately 1.35 million vehicles.

From the outset, the two objectives of this litigation have been to obtain compensation for Class Members and to mitigate the public safety hazard posed by millions of defective Takata airbags still in Class Members' vehicles.  The proposed Settlement achieves both of these objectives.  The primary features of the Settlement include the following:

- Non-Reversionary Settlement Fund: ***Volkswagen will contribute $42 million***, less a 20% credit for the Enhanced Rental Car Program described below, in cash to a non-reversionary common fund over a four-year period to pay for a state-of-the-art Outreach Program, fund cash payments to Class Members, and cover all settlement-related fees and costs.

- Outreach Program:  ***Innovative and well-funded outreach methods will be employed to maximize Class Members' recognition of the danger of not replacing the Takata airbag inflator*** in their vehicles, including but not limited to direct contact via mail, in-person visits, telephone, social media, e-mail, and text message, and multi-media campaigns using radio, television, print, and the internet.

- <u>Out-of-Pocket Claims Process</u>: ***Class Members may submit claims for the reimbursement of uncapped but reasonable expenses*** they incurred in connection with having the Recall Remedy performed on their vehicles, ranging from taxi fare and towing expenses to lost wages and child-care costs.

- <u>Residual Distributions</u>: ***Class Members also have the option of registering for a payment of up to $250 from distributions made from residual funds*** remaining in the Funds each program year, and because any residual funds cascade down from year to year, ***Class Members could receive up to $500 over the course of the Settlement***.

- <u>Enhanced Rental Car/Loaner Program</u>: ***VW will provide free rental or loaner vehicles to all Class Members whose subject vehicles have been recalled*** and who request one while awaiting a repair or when replacement parts are not available.

- <u>Customer Support Program</u>: ***VW will provide Class Members with prospective coverage for repairs and adjustments*** of current and replacement inflators, including the expense of parts and labor, for an extended period of time.

The proposed Settlement with Volkswagen is fair, reasonable, and adequate.  Indeed, it is an outstanding result for the Class.  It will provide cash recovery to Class Members and increase public safety by encouraging and incentivizing Class Members to bring their vehicles to dealerships for the Recall Remedy.  Additionally, the Class described in the Settlement satisfies all the requirements of Rule 23 for settlement purposes.  And the Notice Program designed to communicate the Settlement to the Class far exceeds all applicable requirements of law, including Rule 23 and constitutional due process.  Accordingly, Plaintiffs seek preliminary approval of the Settlement with Volkswagen, certification of the Class, approval of the Notice Program, and the setting of a schedule for the final approval process.

<u>B<small>ACKGROUND AND</small> P<small>ROCEDURAL</small> H<small>ISTORY</small></u>

A.    **Factual Background.**

This Court is keenly familiar with the facts giving rise to Plaintiffs' claims and Volkswagen's defenses. Plaintiffs reference such facts below to the extent pertinent to the issues raised in this motion.

In late 2014, a number of plaintiffs, on behalf of themselves and all others similarly situated, sued several automotive companies, including BMW, Ford, Honda, Mazda, Nissan, Subaru, and Toyota, and airbag suppliers Takata Corporation and TK Holdings, Inc. ("Takata"). Several years later, after the scope of the problem expanded, similar suits were also brought against a second group of automakers, Volkswagen, Mercedes-Benz, General Motors and FCA (collectively, with the first seven automakers, the "Automotive Defendants").

Plaintiffs, who owned or leased vehicles manufactured or sold by the Automotive Defendants, allege that their vehicles were equipped with defective airbags supplied by Takata. The airbags, Plaintiffs allege, all share a common, uniform defect: the use of phase-stabilized ammonium nitrate, a notoriously volatile and unstable compound, as the propellant in their defectively designed inflators, which are supposed to release gas to inflate an airbag cushion in the milliseconds following a crash. As a result of this common defect, Takata's airbag inflators have an unreasonably dangerous propensity to rupture and expel debris toward vehicle occupants.

Following numerous field ruptures of Takata's inflators that seriously injured or killed vehicle occupants, the Automotive Defendants began to recall vehicles equipped with such inflators. Honda initiated several recalls from 2008 through 2012, claiming that the field ruptures resulted from several limited manufacturing defects. As field ruptures continued to occur, however, the recalls expanded significantly. From April 11, 2013, through May 15, 2015,

BMW, Ford, Honda, Mazda, Nissan, Subaru, and Toyota initiated and expanded recalls ultimately covering millions of vehicles.  On May 18, 2015, Takata entered into a Consent Order with NHTSA that required it to file Defect Information Reports, triggering recalls of almost 34 million inflators.  Given the size of the recalls and a shortage of replacement inflators, NHTSA also entered a Coordinated Remedy Order to prioritize which vehicles should be repaired first. Takata's Consent Order has been amended several times, expanding the recall to all inflators with non-desiccated phase-stabilized ammonium-nitrate propellant, which includes approximately 60 million inflators.

Prior to the recalls, Plaintiffs allege, neither Takata nor the Automotive Defendants disclosed this common defect to Class Members.  Instead, they repeatedly represented that their products were safe.  Plaintiffs allege that they suffered several forms of economic damages as a result of purchasing defective airbags and vehicles that were inaccurately represented to be safe. Plaintiffs overpaid for their vehicles with defective airbags and did not receive the benefit of their bargain, because the vehicles and airbags were of a lesser standard and quality than represented.  In addition, Plaintiffs suffered damages in the form of out-of-pocket expenses, including lost wages from taking time off work to bring their vehicles to dealerships for the recall, paying for rental cars and alternative transportation, and hiring child-care while the recall remedy was being performed.

Beyond suffering these economic damages, millions of Class Members remain exposed to the unreasonable risk of serious injury or death posed by defective Takata inflators that have not been removed from their vehicles.  Even though nationwide recalls have been underway for more than three years, millions of recalled airbags remain unrepaired; in fact, around 35% of the inflators in Volkswagen and Audi vehicles that have been or will be recalled have not been repaired yet, according to the most recent data published by NHTSA.  Although supply shortages

5

are partly responsible for delays in recall completion, NHTSA has also highlighted a lack of effective outreach programs from automotive companies.

### B.  Procedural History.

On October 27, 2014, a number of plaintiffs filed a class action compliant in *Craig Dunn, et al. v. Takata Corp., et al*., No. 1:14-cv-24009 (S.D. Fla.), alleging, among other things, that certain automotive companies manufactured, distributed, or sold certain vehicles containing allegedly defective airbag inflators manufactured by Takata, which contained Phase-Stabilized Ammonium Nitrate ("PSAN") propellant that degraded over time and that allegedly could, upon deployment, rupture and expel debris or shrapnel into the occupant compartment and/or otherwise affect the airbag's deployment, and that the Plaintiffs sustained economic losses as a result thereof.

The Judicial Panel on Multidistrict Litigation (the "JPML") subsequently consolidated the *Dunn* action for pretrial proceedings with additional class and individual action alleging similar or identical claims *In re Takata Airbag Products Liability Litigation*, No. 1:15-md-02599-FAM (S.D. Fla.) (MDL 2599) (the "Takata MDL"), pending before the Honorable Federico A. Moreno in the United States District Court for the Southern District of Florida. (ECF No. 1.)[2]

On March 17, 2015, the Court entered an Order Appointing Plaintiffs' Counsel and Setting Schedule, which designated Peter Prieto of Podhurst Orseck, P.A. as Chair Lead Counsel, David Boies of Boies Schiller and Flexner LLP, and Todd A. Smith of Smith Lacien LLP, as Co-Lead Counsel in the Economic Loss track; Curtis Miner of Colson Hicks Eidson as Lead Counsel for the Personal Injury track; and Roland Tellis of Baron & Budd, P.C., James Cecchi of

---

[2] Reference to "ECF No. __" concerns filings entered on the *Takata* MDL docket.

Carella, Byrne, Cecchi, Olstein, Brody & Agnello P.C., and Elizabeth Cabraser of Lieff Cabraser Heimann & Bernstein, LLP as Plaintiffs' Steering Committee members. (ECF No. 393 at 4-5.)

On January 13, 2017, Defendant Takata Corporation signed a criminal plea agreement in which it admitted, among other things, that it "knowingly devised and participated in a scheme to obtain money and enrich Takata by, among other things, inducing the victim OEMs [Original Equipment Manufacturers] to purchase airbag systems from Takata that contained faulty, inferior, nonperforming, non-conforming, or dangerous PSAN inflators by deceiving the OEMs through the submission of false and fraudulent reports and other information that concealed the true and accurate test results for the inflators which the OEMs would not have otherwise purchased as they were." *United States v. Takata Corp.*, No. 2:16-cr-20810 GCS EAS, ECF No. 23 at B-6, B-7 (E.D. Mich. Feb. 27, 2017). Takata entered a guilty plea to one count of wire fraud as part of a settlement with the U.S. Department of Justice. *See id.* at 2-3.

On June 25, 2017, TK Holdings Inc. and certain of its subsidiaries and affiliates filed for bankruptcy, each commencing a voluntary case under Chapter 11 of title 11 of the United States Code in the United States Bankruptcy Court for the District of Delaware. (*See* ECF No. 1857.) On June 26, 2017, TK Holdings Inc. filed its Notice of Bankruptcy Filing and Imposition of Automatic Stay Pursuant to Section 262(a) of the Bankruptcy Code. (*Id.*)

On August 8, 2017, Plaintiffs Brett Alters and April Rockstead Barker, et al., filed a complaint in the District of New Jersey against Volkswagen Group of America, Inc., Volkswagen AG, Takata Corporation, and TK Holdings, Inc., *Alters v. Volkswagen Group of America, Inc.*, No. 17-cv-05863 (D.N.J.) ("*Alters* Complaint"), asserting economic loss claims relating to Takata PSAN inflators in Volkswagen vehicles. The JPML transferred the *Alters* action to the *Takata* MDL on September 18, 2017. (ECF No. 2044.)

7

On March 14, 2018, Plaintiff Michael McBride, et al., filed a complaint in the Eastern District of Virginia against Audi of America, LLC, Audi AG, and Volkswagen AG, *McBride v. Audi of America, LLC*, No. 18-cv-00284 (E.D. Va.) ("*McBride* Complaint"), asserting economic loss claims relating to Takata PSAN inflators in Audi vehicles. The JPML transferred the *McBride* action to the *Takata* MDL on March 26, 2018. (ECF No. 2467.)

On March 14, 2018, Plaintiffs filed a consolidated class action complaint in the *Takata* MDL, *Puhalla v. Volkswagen AG*, No. 15-MD-2599 (S.D. Fla.) (ECF No. 2430) ("Consolidated Class Action Complaint"), bringing together the claims of Plaintiffs who filed actions that were transferred into the MDL, as well as Plaintiffs who direct filed their claims in the MDL.

Per the Court's subsequent Order (ECF No. 2651), Plaintiffs filed, on May 18, 2018, an amended *Puhalla* complaint that removed the claims of automotive recyclers, which were placed in a separate complaint in the MDL. (ECF No. 2762 ("Amended Consolidated Class Action Complaint"); *see* ECF No. 2781).

Volkswagen moved to dismiss the amended *Puhalla* complaint (ECF No. 2988), Plaintiffs filed a response (ECF No. 3034), and Volkswagen filed a reply (ECF No. 3101).  The Court heard oral argument on the motion to dismiss on December 11, 2018. (*See* ECF No. 3139.)

On May 3, 2019 (ECF No. 3394), June 20, 2019 (ECF No. 3406), and May 27, 2020 (ECF No. 3834), the Court issued Orders ruling on Volkswagen's motion to dismiss. In these Orders, the Court dismissed Volkswagen AG and Audi AG for lack of personal jurisdiction, and as to Volkswagen Group of America, Inc. and Audi of America, LLC, dismissed certain claims and allowed others to proceed. (ECF No. 3406 at 95; ECF No. 3834 at 49-51.)

Plaintiffs filed the second amended *Puhalla* complaint, which reinstated claims asserted on behalf of Florida and direct-filed Plaintiffs against Volkswagen Group of America, Inc. and

Audi of America, LLC, on April 23, 2021. (ECF No. 4026) ("Second Amended Consolidated Class Action Complaint").

Written discovery and extensive document productions have taken place over the past three years (millions of pages of documents have been produced); Volkswagen has taken 17 depositions of class representatives and related individuals; and Plaintiffs have deposed at least 18 Takata witnesses and 5 Volkswagen witnesses. VW has also conducted inspection of the vehicles of the Class Representatives. The fact-discovery deadline was August 9, 2021; the deadline to complete expert discovery is November 15, 2021; and the deadline to file motions for summary judgment and class certification is December 22, 2021. (ECF Nos. 4078, 4087.)

C.   **Settlement Negotiations.**

Parallel to the hard-fought litigation track, preliminary settlement discussions began on December 11, 2020, when counsel for Plaintiffs and counsel for VW conducted an initial mediation with court-appointed mediator, Paul Huck, Jr. of Jones Day LLP. During this mediation, and in subsequent conferences between counsel, the Parties discussed their relative views of the law and facts and potential relief for the proposed Class and exchanged a series of counter-proposals. After numerous phone conferences and exchanges of information, the parties ultimately reached an agreement in principle in July of 2021. The parties then negotiated the precise terms of the Settlement Agreement for several weeks and signed the Settlement Agreement on August 31, 2021.  Negotiations between the parties were always adversarial, non-collusive, and at arm's length.

## TERMS OF THE SETTLEMENT

The terms of the Settlement are detailed in the Agreement, attached hereto as Exhibit A. The following is a summary of the material terms of the Settlement.

A.   **The Settlement Class.**

The Class is an opt-out class under Rule 23(b)(3) of the Federal Rules of Civil Procedure.

The Class is defined as:

> (1) all persons or entities who or which owned and/or leased, on the date of the issuance of the Preliminary Approval Order, Subject Vehicles distributed for sale or lease in the United States or any of its territories or possessions; and (2) all persons or entities who or which formerly owned and/or leased Subject Vehicles distributed for sale or lease in the United States or any of its territories or possessions, and who or which sold or returned, pursuant to a lease, the Subject Vehicles after February 9, 2016, and through the date of the issuance of the Preliminary Approval Order. Excluded from this Class are: (a) Volkswagen, its officers, directors, employees and outside counsel; its affiliates and affiliates' officers, directors and employees; its distributors and distributors' officers and directors; and Volkswagen's Dealers and their officers, directors, and employees; (b) Settlement Class Counsel, Plaintiffs' counsel, and their employees; (c) judicial officers and their immediate family members and associated court staff assigned to this case, any of the cases listed in Exhibit 1, or the 11th Circuit Court of Appeals; (d) Automotive Recyclers and their outside counsel and employees; and (e) persons or entities who or which timely and properly exclude themselves from the Class.

Exhibit A (§ II.A.9).

"Subject Vehicles" means those Volkswagen vehicles listed on Exhibit 9 that contain or contained Takata PSAN inflators in their driver or passenger frontal airbags that (1) have been recalled, or (ii) shall be recalled per the May 5, 2020 agreement between NHTSA and Volkswagen Group of America, Inc. regarding Takata SDI-D inflators, as indicated in Exhibit 10 to the Settlement Agreement.

Based on the number of recalled vehicles reported by VW, Plaintiffs estimate that there are at least 1.35 million members of the VW Class.

**B.   Settlement Fund.**

The Settlement requires Volkswagen to deposit a total of $42 million, less a 20% credit for the Enhanced Rental Car/Loaner Program, into a non-reversionary Qualified Settlement Fund.  Non-reversionary means that no amount of the Settlement funds will revert back or be

returned to Volkswagen. VW has agreed to deposit approximately 12% of the full Settlement Amount within 30 days of this Court's Preliminary Approval of the Settlement, to immediately fund the first year of the Outreach Program. The rest of the Settlement Fund payments will be made over a prescribed four-year schedule set forth in the Settlement. *See* Exhibit A (§ III.A.2).

The Settlement Fund will be used to pay for: (a) the Outreach Program; (b) an Out-of-Pocket Claims Process to compensate Class Members for out-of-pocket expenses relating to the Takata Airbag Inflator Recall; (c) residual cash payments to Class Members who have not incurred reimbursable out-of-pocket expenses and who register for residual payments, to the extent that there are residual amounts remaining; (d) the Enhanced Rental Car/Loaner Program, which will provide rental or loaner vehicles to Class Members at no cost when the Recall Remedy is being performed or is delayed; (e) the Notice Program; (f) claims administration, including expenses associated with the Settlement Special Administrator; (g) Court-awarded Settlement Class Counsel's fees and expenses; and (h) Court-awarded incentive awards to Class Representatives, if permitted by Eleventh Circuit law. *See* Exhibit A (§ III.A.3).

### C.  Outreach Program.

Even though the recall has been underway for several years, hundreds of thousands of Class Members remain exposed to the continuing unreasonable danger of rupturing inflators. A significant feature of the Settlement obligates Volkswagen to fund an intensive, innovative Outreach Program aimed at maximizing the removal of dangerous inflators from Class Members' vehicles. The Outreach Program will utilize traditional and non-traditional media well beyond the methods currently used by Volkswagen. The methods of outreach may include: (a) direct contact of Class Members via U.S. Mail, telephone, social media, e-mail, texting, and canvassing; (b) contact of Class Members by third parties (e.g., independent repair shops); and

(c) multi-media campaigns, such as through print, television, radio, and the internet.  *See* Exhibit A (§ III.B).

The budget for the entire Outreach Program is set at 33% of the Settlement Amount but may be adjusted subject to agreement of the Parties.  The Settlement Special Administrator will oversee and administer the Outreach Program and will engage industry-leading consultants with specialized knowledge of different outreach methods to adjust the Outreach Program to maximize its effectiveness.  In this way, the Outreach Program is designed to be flexible and nimble, geared to redirect resources to methods that prove most effective at motivating Class Members to bring their vehicles to dealerships for the Recall.  The Settlement Special Administrator is also empowered to resolve disputes between the Parties about how best to design and implement the Outreach Program.

Underscoring the public safety objective of the Settlement, VW has agreed to not wait until Final Approval and immediately fund and implement the first 12 months of the Outreach Program within 30 days of Preliminary Approval.

**D.    Out-Of-Pocket Claims Process.**

Another important feature of the Settlement is an Out-of-Pocket Claims Process, which will reimburse Class Members for reasonable out-of-pocket expenses incurred relating to the Takata Airbag Inflator Recalls.  *See* Exhibit A (§ III.D).  There are two primary benefits to the Claims Process: first, it permits Class Members to recover for the reasonable expenses they actually incurred, without limiting recovery to certain pre-determined categories or amounts; and second, it furthers the public-safety goal of incentivizing Class Members who still own or lease Subject Vehicles to bring their vehicles to a dealership for the Recall Remedy, because having the Recall Remedy performed is a prerequisite to eligibility for such a payment.  The Registration/Claim Form is straightforward, simple, and not burdensome.  *See, e.g.*, Exhibit A at

Ex. 12 thereto.  It will be provided to Class Members via the Settlement website and Volkswagen will request that VW Dealers provide the Registration/Claim Form to Class Members when they bring their vehicles there for the Recall Remedy.

The Settlement Special Administrator, as he has done in prior settlements, will oversee the Out-of-Pocket Claims Process, including the determination of types of reimbursable costs and the eligibility of claims for reimbursement.  The Parties agreed to recommend several common types of recall-related expenses for reimbursement eligibility, all of which are identified on the Registration/Claim Form:

(i)     reasonable unreimbursed rental car and transportation expenses, after requesting and while awaiting the Recall Remedy from a VW Dealer;

(ii)    reasonable towing charges to a VW Dealer for completion of the Recall Remedy;

(iii)   reasonable childcare expenses necessarily incurred while the Recall Remedy is being performed on the Subject Vehicle by the VW Dealer;

(iv)    reasonable unreimbursed out-of-pocket costs associated with repairing driver or passenger front airbags containing Takata PSAN inflators;

(v)     reasonable lost wages resulting from lost time from work directly associated with the drop off and/or pickup of a Subject Vehicle at a VW Dealer for performance of the Recall Remedy; and

(vi)    reasonable fees incurred for storage of a Subject Vehicle after requesting and while awaiting a Recall Remedy part.

*See* Exhibit A (§ III.D.3).  In addition to these categories of expenses, the Settlement Special Administrator is empowered to approve and pay for other reimbursable claims that the Settlement Special Administrator deems to be a reasonable out-of-pocket expense, and Class Members are invited to submit claims for such expenses.  *Id.* (§ III.D.2).

As far as the timing of payments to Class Members, the first set of reimbursements to eligible Class Members who have completed and filed a Registration/Claim Form will be made on a rolling basis by the Settlement Special Administrator no later than 180 days after the

13

Effective Date. Reimbursements for following years will be made on a rolling basis as claims are submitted and approved.

For the reimbursements that occur in years one through three, reimbursements will be made on a first-in-first-out basis until the Settlement Fund is depleted for that year. If there are no more funds to reimburse eligible Class Members in that particular year, then those Class Members will be moved to subsequent years for reimbursement. For reimbursements to eligible Class Members that are to occur in year four, the last year of the reimbursement process, out-of-pocket-expense payments will be made for the amounts approved by the Settlement Special Administrator, unless the approved reimbursements to eligible Class Members exceed the amount of the Settlement Fund remaining. If this event occurs, then reimbursements will be made on a *pro rata* basis until the available amount is exhausted.

**E.    Residual Distribution Payments.**

The settlement program offers Class Members an additional way to receive a cash payment. Rather than submit a claim for out-of-pocket expenses, Class Members have the option of registering for a Residual Distribution of up to $250 from the Settlement Fund. Residual Distributions will be funded with the monies remaining in the fund at the end of each of the four settlement program years, after all payments are made for the Outreach Program and for approved claims for out-of-pocket expenses. *See* Exhibit A (§ III.E).

Class Members are eligible for a Residual Distribution if they just registered for a residual payment or if they submitted claims in that year, or prior program years, that were previously rejected. Subject to certain exceptions, funds remaining after payment of the maximum residual payment to all Class Members in any given year shall be rolled over into the following year's settlement program. The settlement program will last for at least four years.

The Settlement is structured to maximize cash payments to Class Members. Any funds that remain at the end of the last settlement program year after the Residual Distribution, if any, is made, may be distributed, unless it is administratively unfeasible, on a *per capita* basis to Class Members who: (a) previously submitted claims that were paid; (b) previously submitted claims that were rejected and have not received any prior claims payments; or (c) registered for a residual payment only. Alternatively, the Parties may elect to fund additional Outreach Program activities with such remaining funds. The residual payment from this last Settlement program year is limited to $250 per Class Member, as well. Thus, it is possible for a Class Member who simply registers for Residual Distribution payments to receive $500 over the course of the Settlement—$250 from the initial Residual Distribution at the end of the program year the Class Member registers, and $250 from the final Residual Distribution at the end of the settlement program.

Finally, if there are any funds remaining in the Settlement Fund after all of the foregoing payments have been made through the last program year, those funds may be distributed to all Class Members on a *per capita* basis, unless it is administratively unfeasible. If the Settlement Special Administrator determines it to be administratively unfeasible (e.g., because the cost of distributing the remaining funds would consume them), then those funds may be distributed *cy pres*, with the Court's approval.

**F.     Enhanced Rental Car/Loaner Program.**

Another aspect of the Settlement relief—the Enhanced Rental Car/Loaner Program—is designed to address any inconvenience or additional costs certain Class Members may face in getting the Recall Remedy performed on their vehicles due to supply shortages of replacement parts or the time needed to perform the Recall Remedy.  Any Class Member who brings a recalled Subject Vehicle to a dealership for the Recall Remedy and requests a rental/loaner vehicle will be provided one for free, until the Recall Remedy is performed on the Subject Vehicle.  *See* Exhibit A (§ III.C.).  Commencing no later than the issuance date of the Preliminary Approval Order, this additional benefit furthers public safety and reduces a potential impediment to Class Members having the Recall Remedy performed on their vehicle.

In exchange for providing the Enhanced Rental Car/Loaner Program, Volkswagen will receive a credit of 20% of the Settlement Amount.  One quarter of the credit shall be applied to each of the four annual payments that VW must make into the Settlement Fund, such that the full credit is realized at the time of the Year Four Payment.

The Settlement Special Administrator is charged with monitoring VW's compliance with the Enhanced Rental Car/Loaner Program.  Every six months, VW must certify to the Settlement Special Administrator that it is complying with the program, and the Settlement Special Administrator is authorized to audit and confirm VW's compliance.

**G.     Customer Support Program.**

In addition to the monetary elements of the Settlement, Volkswagen has also agreed to provide Class Members with a Customer Support Program that provides prospective coverage for repairs and adjustments (including parts and labor) necessary to correct any defects in the materials or workmanship of (1) the Takata PSAN inflators contained in the driver or passenger front airbag modules of Subject Vehicles, or (2) replacement driver or passenger inflators

16

installed pursuant to the Takata Airbag Recall in the Subject Vehicles.  *See* Exhibit A (§ III.G.). This benefit covers two important scenarios where Class Members are at risk of incurring additional expenses if their Subject Vehicle is recalled in the future, and where they had the Recall Remedy performed, but the new inflator is in any way defective or breaks.

Eligible Class Members may begin seeking the Customer Support Program benefits 30 days after the Court's issuance of the Final Order, a date chosen to give VW sufficient lead time to coordinate with their dealers regarding how to implement this benefit.  The Customer Support Program benefit will be automatically transferred and will remain with the Subject Vehicle regardless of ownership.  It does not apply, however, if a replacement airbag inflator deploys normally.  Nor does the Customer Support Program extend to inoperable vehicles and vehicles with a salvaged, rebuilt, or flood-damaged title.

The duration of the Customer Support Program benefit for each Class Member depends on whether the Recall Remedy has already been performed and whether the Subject Vehicle contains a desiccated Takata PSAN inflator.  The Settlement provides as follows:

(i)    If the Subject Vehicle has been recalled and the Recall Remedy has been completed as of the date of the issuance of the Court's Preliminary Approval Order, then the Customer Support Program will last for 10 years measured from the date the Recall Remedy was performed on the Subject Vehicle or 150,000 miles measured from the date the Subject Vehicle was originally sold or leased by a Volkswagen Dealer ("Date of First Use"), whichever comes first.  However, each eligible vehicle will receive coverage for at least 75,000 miles measured from the date the Recall Remedy was performed on the Subject Vehicle, or two years measured from the date of the issuance of the Court's Preliminary Approval Order, whichever is later.

(ii)   If the Subject Vehicle has been or will be recalled and the Recall Remedy has not been completed as of the date of the issuance of the Court's Preliminary Approval Order, then the Customer Support Program will last for (a) 10 years from the Date of First Use, or, if the Recall Remedy is subsequently performed on the Subject Vehicle, the date the Recall Remedy is performed, or (b) 150,000 miles measured from the Date of First Use, whichever comes first. However, each eligible vehicle will receive coverage for at least 75,000 miles measured from the date the Recall Remedy was

> performed on the Subject Vehicle, or two years measured from the date of
> the issuance of the Court's Preliminary Approval Order (or from the date the
> Recall Remedy is subsequently performed, if it is), whichever is later.

Exhibit A (§ III.G).

## H.    Release.

Upon entry of final judgment, Class Members agree to give a broad release to the "Released Parties," defined essentially as Volkswagen and all related entities and persons, of all claims "regarding the subject matter of the Actions,"

> arising from, related to, connected with, or in any way involving the Claims
> or the Actions, the Subject Vehicles' driver or passenger front airbag
> modules containing desiccated or non-desiccated Takata PSAN inflators,
> and any and all claims involving the Takata Airbag Inflator Recalls that are,
> or could have been, alleged, asserted or described in the *Alters* Complaint,
> the *McBride* Complaint, the Consolidated Class Action Complaint, the
> Amended Consolidated Class Action Complaint, the Second Amended
> Consolidated Class Action Complaint, the Actions or any amendments of
> the Actions.

Exhibit A (§ VII.B).  There are two important exceptions carved from the releases:  for personal injury and physical property damage claims and for claims against certain "Excluded Parties."

First, the Settlement Agreement provides that "Plaintiffs and Class Members are *not* releasing and are expressly reserving all rights relating to claims for bodily injury, wrongful death or physical property damage (other than to the Subject Vehicle) arising from an incident involving a Subject Vehicle, including the deployment or non-deployment of a driver or passenger front airbag with a Takata PSAN inflator."  Exhibit A (§ VII.D (emphasis added)).

Second, the Settlement Agreement also reserves and does not release claims against "Excluded Parties," who are defined as Takata (and all related entities and persons) and all other automotive manufacturers and distributors (and all their related entities and persons), specifically including other, non-VW Defendants in the Action.  *See* Exhibit A (§ VII.E.).

### I.    Notice Program.

The Settlement contains a robust Class Notice Program designed to satisfy all applicable laws, including Rule 23 and constitutional due process.   Notifying Class Members of the Settlement, in both English and Spanish, will be accomplished through a combination of the Direct Mailed Notices, Publication Notice (in newspapers, magazines, and/or other media outlets), Radio Notice, notice through the Settlement website (www.AutoAirbagSettlement.com), a Long Form Notice, and other forms of notice, such as banner notifications on the internet.   The details of each form of notice are set forth in the Declaration of Cameron R. Azari, Esq., of Epiq Systems, Inc., the proposed Settlement Notice Administrator.   *See* Exhibit A, Ex. 11 thereto.

The Settlement Notice Administrator also will update the combined Settlement website for the seven prior, approved settlements with information pertaining to the Volkswagen Settlement.   The website will inform Class Members of the terms of the Settlement Agreement, their rights, dates and deadlines, and related information.   The website shall include, in .pdf format, materials agreed upon by the Parties and/or required by the Court, including the Registration/Claim Form, both in English and Spanish.   This accomplishes a reduction in administrative expense, as a new website does not need to be created and designed.

Class Members shall also receive Direct Mailed Notice, substantially in the form attached as Exhibit 2 to the Settlement Agreement, by U.S. Mail. The Direct Mailed Notice informs potential Class Members of the various ways they can obtain the Long Form Notice (via the website, mail, or a toll-free telephone number), and the general structure of the Settlement.   The Settlement Notice Administrator must also re-mail any Direct Mailed Notices returned by the U.S. Postal Service with a forwarding address, and, for returned mail without a forwarding address, research better addresses and promptly re-mail copies of the applicable notice to any

19

better addresses.

The Settlement Notice Administrator shall also establish a toll-free telephone number that will provide settlement-related information to Class Members using an Interactive Voice Response system, with an option to speak with live operators.

The Long Form Notice, attached as Exhibit 6 to the Settlement Agreement, will advise Class Members of the general terms of the applicable Settlement, including information on the identity of Class Members, the relief to be provided, and what claims are to be released; notify them of and explain their rights to opt out of or object to the Settlement; disclose the amounts of attorneys' fees and expenses that Settlement Class Counsel may seek, and individual awards to the Class Representatives, and shall explain that such fees and expenses—as awarded by the Court—will be paid from the Settlement Fund.

The Long Form Notice will also include the Registration/Claim Form. The Registration/Claim Form, attached as Exhibit 12 to the Settlement Agreement, informs the Class Member that the form must be fully completed and timely returned within the Claim Period to be eligible to obtain monetary relief pursuant to this Agreement.

To comply with the Class Action Fairness Act, the Settlement Notice Administrator shall also send to each appropriate State and Federal official the materials specified in 28 U.S.C. § 1715 and otherwise comply with its terms. The identities of such officials and the content of the materials shall be mutually agreeable to the Parties, through their respective counsel.

**J.    Settlement Administration.**

The Settlement Special Administrator is charged with administering all aspects of the Settlement, with the exception of the Notice Program, which the Settlement Notice Administrator shall handle, in coordination with the Settlement Special Administrator. The Parties agree that Patrick A. Juneau, of Juneau David APLC, who was appointed to serve as the

20

Settlement Special Administrator for the Toyota, Mazda, Subaru, Nissan, Honda, BMW, and Ford settlements, should also serve as Settlement Special Administrator, subject to the Court's approval, for this Settlement.  His responsibilities will include (1) overseeing and administering the Outreach Program, (2) auditing and confirming VW's compliance with the Enhanced Rental Car/Loaner Program, and (3) overseeing and administering the Out-of-Pocket Claims Process and Residual Distribution, a function which requires the exercise of discretion, to determine the reasonableness and eligibility of Class Members' claims for out-of-pocket expenses and to deny any fraudulent claims.  The Settlement achieves a further reduction in administrative expenses by employing the same Settlement Special Administrator to undertake these responsibilities for this Settlement and the seven prior, approved settlements.

### K.    Attorneys' Fees and Incentive Awards for Class Representatives.

Counsel for Plaintiffs and for VW did not begin to negotiate attorneys' fees and expenses until after agreeing to the principal terms set forth in the Settlement Agreement.  The Settlement Agreement provides that Settlement Class Counsel agree to limit their request to the Court for attorneys' fees and expenses to no more than 30% of the applicable Settlement Amount.[3]  Likewise, Volkswagen agrees not to oppose such a request.  Attorneys' fees and expenses awarded to Settlement Class Counsel for work done on behalf of the Class will be paid from the Settlement Fund.

The Parties agreed that the Court's resolution of the issue of attorneys' fees and expenses shall have no bearing on the Settlement Agreement.  In particular, an Order solely relating to

---

[3] This percentage is in keeping with prevailing law and practice in this Circuit.  *See*, *e.g.*, *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774-75 (11th Cir. 1991); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1365-66 (S.D. Fla. 2011); *Almanazar v. Select Portfolio Servicing, Inc.*, No. 14-cv-22586-FAM, 2016 WL 1169198, at *4 (S.D. Fla. Mar. 25, 2016).

attorneys' fees or expenses shall not operate to terminate or cancel the Settlement Agreement or affect or delay its Effective Date.

Finally, if the Eleventh Circuit vacates or reconsiders its decision in *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. 2020), Plaintiffs' counsel may petition the Court for incentive awards of up to $5,000 per Class Representative to compensate the Plaintiffs for their efforts on behalf of the Class.

## MEMORANDUM OF LAW

### A.    The Legal Standard for Preliminary Approval.

Rule 23(e) requires judicial approval for the compromise of claims brought on a class basis. "Although class action settlements require court approval, such approval is committed to the sound discretion of the district court." *In re U.S. Oil and Gas Litig.*, 967 F.2d 489, 493 (11th Cir. 1992). In exercising that discretion, courts are mindful of the "strong judicial policy favoring settlement as well as by the realization that compromise is the essence of settlement." *Bennett v. Behring Corp.*, 737 F.2d 982, 986 (11th Cir. 1984). The policy favoring settlement is especially relevant in class actions and other complex matters, where the inherent costs, delays, and risks of continued litigation might otherwise overwhelm any potential benefit the class could hope to obtain. *See, e.g.*, *Ass'n for Disabled Americans, Inc. v. Amoco Oil Co.*, 211 F.R.D. 457, 466 (S.D. Fla. 2002) ("There is an overriding public interest in favor of settlement, particularly in class actions that have the well-deserved reputation as being most complex.") (citing *Cotton v. Hinton*, 559 F.2d 1326, 1331 (5th Cir. 1977)); *see also* 4 NEWBERG ON CLASS ACTIONS § 11.41 (4th ed. 2002) (citing cases).

The purpose of preliminary evaluation of proposed class action settlements is to determine whether the settlement is within the "range of reasonableness." 4 NEWBERG § 11.26; *Almanazar*, 2015 WL 10857401, at *1. "Preliminary approval is appropriate where the proposed

settlement is the result of the parties' good faith negotiations, there are no obvious deficiencies and the settlement falls within the range of reason." *Smith v. Wm. Wrigley Jr. Co.*, No. 09-cv-60646, 2010 WL 2401149, at *2 (S.D. Fla. June 15, 2010). "Settlement negotiations that involve arm's length, informed bargaining with the aid of experienced counsel support a preliminary finding of fairness." *Almanazar*, 2015 WL 10857401, at *1. *See* MANUAL FOR COMPLEX LITIGATION, Third, § 30.42 (West 1995) ("A presumption of fairness, adequacy, and reasonableness may attach to a class settlement reached in arm's-length negotiations between experienced, capable counsel after meaningful discovery.") (internal quotation marks omitted).

When determining whether a settlement is ultimately fair, adequate, and reasonable, recently amended Rule 23(e)(2) instructs courts to consider whether: (1) "the class representatives and class counsel have adequately represented the class; [(2) the proposal was negotiated at arm's length; [(3) the relief provided for the class is adequate[;] and [(4) the proposal treats Class Members equitably relative to each other." Fed. R. Civ. P. 23(e)(2); *In re Payment Card Interchange Fee & Merchant Discount Antitrust Litig.*, 330 F.R.D. 11, 29 (E.D.N.Y. 2019). Additionally, courts in this circuit have looked to: "(1) the likelihood of success at trial; (2) the range of possible recovery; (3) the point on or below the range of possible recovery at which a settlement is fair, adequate and reasonable; (4) the complexity, expense and duration of litigation; (5) the substance and amount of opposition to the settlement; and (6) the stage of the proceedings at which the settlement was achieved." *Bennett*, 737 F.2d at 986; *see, e.g.*, *Smith*, 2010 WL 2401149, at *2. All of these factors support preliminary approval of the settlement.

Neither formal notice nor a hearing is required at the preliminary approval stage; the Court may grant such relief upon an informal application by the Parties or may conduct any

hearing in public or in chambers, at the Court's discretion. *See* MANUAL FOR COMPL. LITIG. § 13.14.

**B.   The Settlement Satisfies the Criteria for Preliminary Approval.**

Each of the relevant Rule 23(e)(2) factors weighs in favor of Preliminary Approval of the Settlement.   First, Class Representatives and Class Counsel have adequately represented the Class.   Fed. R. Civ. P. 23(e)(2)(A).   Second, the Settlement was reached in the absence of collusion and is the product of good-faith, informed, and arm's-length negotiations by competent counsel of a vigorously contested case.   Fed. R. Civ. P. 23(e)(2)(B). Third, the relief obtained by the Settlement is more than adequate, considering the costs, risks, and delay associated with trial as well as appeal, the relief provided to the Class, and the attorneys' fees sought.   Fed. R. Civ. P. 23(e)(2)(C).[4] Fourth, the Settlement treats all Class Members equitably relative to each other. Fed. R. Civ. P. 23(e)(2)(D).

Any settlement requires the parties to balance the merits of the claims and defenses asserted against the attendant risks of continued litigation and delay.   Plaintiffs maintain that the claims asserted are meritorious, that any motion for class certification would prove successful, and that Plaintiffs would prevail if this matter proceeded to trial.   VW, however, maintains that Plaintiffs' claims are unfounded and cannot be maintained as a class action.   VW denies any potential liability and has shown a willingness to litigate Plaintiffs' claims vigorously and zealously.

The Parties have concluded that the benefits of settlement in this case outweigh the risks attendant to continued litigation, which include, but are not limited to, the time and expenses associated with proceeding to trial, the time and expenses associated with appellate review, and

---

[4] There are no agreements by the Parties that are not reflected in the Settlement.  *See* Fed. R. Civ. P. 23(e)(2)(c)(iv).

the countless uncertainties of litigation, particularly in the context of a large and complex multi-district litigation.  In sum, a preliminary review of the factors related to the fairness, adequacy, and reasonableness of the Settlement demonstrates that the Settlement fits well within the range of fairness, adequacy, and reasonableness, such that Preliminary Approval is appropriate.

1.    **Class Representatives and Class Counsel Have Adequately Represented the Class.**

Plaintiffs' interests are aligned and coextensive with those of absent Class Members.  Plaintiffs were subjected to the same conduct by Volkswagen and suffered the same injuries as absent Class Members.  More importantly, absent Class Members will equally benefit from the relief provided by the Settlement.

Class Counsel also has adequately represented the Class in this litigation and Settlement.  Counsel for each party is particularly experienced in the litigation, certification, trial, and settlement of nationwide class action cases.  Counsel zealously represented their clients' interests through protracted litigation before this Court for well over three years.

Moreover, in evaluating Class Representatives' and Class Counsel's adequacy, courts consider whether Class Counsel and Plaintiffs "had an adequate information base" before negotiating and entering into the settlement.  *See* Rule 23(e)(2)(A) advisory committee's note to 2018 amendment.  Courts thus consider the stage of proceedings at which settlement is achieved "to ensure that Plaintiffs had access to sufficient information to adequately evaluate the merits of the case and weigh the benefits of settlement against further litigation." *Lipuma v. Am. Express Co*., 406 F. Supp. 2d 1298, 1324 (S.D. Fla. 2005).

In negotiating this Settlement in particular, Settlement Class Counsel had the benefit of years of experience and a familiarity with the facts of this Action, as well as with other cases involving similar claims.  Settlement Class Counsel conducted a thorough investigation and

analysis of Plaintiffs' claims and Volkswagen's defenses and engaged in extensive formal discovery with VW. Settlement Class Counsel's review of that extensive discovery enabled them to gain an understanding of the evidence related to central questions in the case and prepared counsel for well-informed settlement negotiations. *See Francisco v. Numismatic Guaranty Corp. of America*, No. 06-61677-CIV, 2008 WL 649124, at \*11 (S.D. Fla. Jan. 31, 2008) (stating that "Class Counsel had sufficient information to adequately evaluate the merits of the case and weigh the benefits against further litigation" where counsel conducted two Rule 30(b)(6) depositions and obtained "thousands" of pages of documentary discovery).

### 2. The Settlement is the Product of Good-Faith, Informed, and Arm's-Length Negotiations.

Rule 23(e)(2)(B) requires courts to consider whether "the proposal was negotiated at arm's length." And courts have noted that class action settlement should be approved so long as a district court finds that "the settlement is fair, adequate and reasonable and is not the product of collusion between the parties." *Cotton*, 559 F.2d at 1330; *see also Lipuma*, 406 F. Supp. at 1318-19 (S.D. Fla. 2005) (approving class settlement where the "benefits conferred upon the Class are substantial, and are the result of informed, arm's-length negotiations by experienced Class Counsel").

The Settlement is the result of intensive, arm's-length negotiations between experienced attorneys who are familiar with class action litigation and with the legal and factual issues of this case. The Parties engaged in extensive, adversarial negotiations for several months, engaged an experienced mediator, and exchanged countless proposals while the litigation continued on a parallel track. These negotiations were conducted in the absence of collusion.

### 3.       The Relief Provided to Class Members is Adequate.

Any settlement requires the parties to balance the merits of the claims and defenses asserted against the attendant risks of continued litigation and delay.  Plaintiffs maintain that the claims asserted are meritorious, that any motion for class certification would prove successful, and that Plaintiffs would prevail if this matter proceeded to trial.  Volkswagen, however, maintains that Plaintiffs' claims are unfounded and cannot be litigated as a class action. Volkswagen denies any potential liability and has shown a willingness to litigate Plaintiffs' claims vigorously. The Parties have concluded that the benefits of settlement in this case outweigh the risks attendant to continued litigation, which include, but are not limited to, the time and expenses associated with proceeding to trial, the time and expenses associated with appellate review, and the countless uncertainties of litigation, particularly in the context of a large and complex litigation.   These considerations align with Rule 23(e)(2)(C)(i), which instructs courts to consider whether the costs, risks, and delay of trial and appeal militate toward a finding that the Settlement provides adequate relief to the class.

When evaluating "the terms of the compromise in relation to the likely benefits of a successful trial . . . the trial court is entitled to rely upon the judgment of experienced counsel for the parties." *Cotton*, 559 F.2d at 1330. "Indeed, the trial judge, absent fraud, collusion, or the like, should be hesitant to substitute its own judgment for that of counsel." *Id.*

Courts have determined that settlements may be reasonable even where Plaintiffs recover only part of their actual losses.  *See Behrens v. Wometco Enters., Inc.*, 118 F.R.D. 534, 542 (S.D. Fla. 1988) ("[T]he fact that a proposed settlement amounts to only a fraction of the potential recovery does not mean the settlement is unfair or inadequate."). "The existence of strong defenses to the claims presented makes the possibility of a low recovery quite reasonable." *Lipuma*, 406 F. Supp. 2d at 1323.

The value of the Settlement exceeds $42 million, a significant amount by any measure. Settlement Class Counsel have a thorough understanding of the practical and legal issues that Plaintiffs would continue to face litigating these claims against VW, including class certification and summary judgment. The approximately $42 million recovery, along with the Customer Support Program, is an outstanding result given the complexity of the Action and the significant barriers that stand between the present juncture of the litigation and final judgment: *Daubert* challenges to damage experts' methodologies; class certification; interlocutory Rule 23(f) appeal of class certification; motions for summary judgment; trial; and post-trial appeals.

The approximately $42 million value of the Settlement alone represents approximately 20% of Plaintiffs' and Class Members' estimated damages recovery under a method of calculating damages that rests on the costs of repairing the Takata airbags.[5] The additional value of the Customer Support Programs further increases the range of recovery as a percentage of the possible damages that Plaintiffs and Class Members could recover if they were to prevail all the way through trial and on appeal.

By any reasonable measure, this recovery is a significant achievement given the obstacles that Plaintiffs faced and continue to confront in the litigation. Given the substantial benefits that the Settlement provides to Class Members and the extraordinary public safety crisis that the Settlement aims to address, the Settlement is fair and represents a reasonable recovery for the Class in light of VW's defenses and the challenging and unpredictable path of litigation Plaintiffs would have faced absent a settlement.

---

[5] Alternative methods for calculating damages, many of which would yield damages far greater than a conservative method based on the prices of airbag modules, are available to Plaintiffs as well. Of course, if this case were to proceed to trial, Plaintiffs would not be limited to the most conservative measure of damages, and instead could pursue these alternative methodologies.

(a)     **The Costs and Risks of Trial.**

While Plaintiffs and Settlement Class Counsel are confident in the strength of their case, they are also pragmatic in their awareness of the various defenses available to Volkswagen, as well as the risks inherent to litigation.  VW has claimed that Plaintiffs will be unable to prove knowledge of the defect on the part of VW.  VW has also claimed that it was deceived by Takata as to the safety of its inflators, and Takata Corporation has pleaded guilty to a count of wire fraud based on testing results provided to certain automakers.  VW has argued that these charges, which portray automotive companies as "victims" and that Automotive Defendants have previously described as a "game changer," absolve VW of any liability.

The dismissal of VW AG, VW's foreign parent, on personal jurisdiction grounds has also added a considerable measure of risk to Plaintiffs' case because VW AG was responsible for the design, development, and manufacture of the VW vehicles, and VW has claimed that VW AG alone is in possession or control of records concerning the design, development, and manufacture of the vehicles and inflators. VW is expected to challenge Plaintiffs' damages theories on a variety of grounds.  Based on the discovery that has been conducted to date, Plaintiffs believe that they could prevail in a litigated class certification battle.  Yet VW would assert numerous arguments against certification of all or parts of the Class, presenting risks.  Moreover, even if Plaintiffs were successful, VW would inevitably seek interlocutory review of class certification rulings via Rule 23(f) in the Court of Appeals, delaying the progress towards trial and any recovery for the Class.

The success of Plaintiffs' claims in future litigation turns on these and other questions that are certain to arise in the context of motions for summary judgment and at trial.  Protracted litigation carries inherent risks that would necessarily have delayed and endangered Class Members' monetary recovery.  Even if Plaintiffs prevailed at trial against Volkswagen, any

recovery could be delayed for years by an appeal. *See Lipuma*, 406 F. Supp. 2d at 1322 (likelihood that appellate proceedings could delay class recovery "strongly favor[s]" approval of a settlement).

This Settlement provides substantial, immediate relief to Class Members and addresses an extraordinary national public safety crisis without further delay. This settlement will speed up the recall and provide benefits to the Class Members far sooner than a litigated outcome. And some of those benefits are ones that VW could not have been compelled to deliver solely through litigation. Under the circumstances, Plaintiffs and Class Counsel appropriately determined that the Settlement reached with VW outweighs the risks of continued litigation.

        **(b)**    **The Effectiveness of the Distribution of the Settlement Benefits.**

The Settlement is ***non-reversionary***, so all available Settlement funds will be distributed to the Class. ***No unused funds will revert or be returned to VW***. This is the most effective way to ensure that Settlement benefits will go to the Class. These benefits will reach Class members in a number of ways: cash payments for out-of-pocket expenses and the Residual Distribution; free rental or loaner cars when the Recall Remedy is being performed or is delayed; an Outreach Program that will directly improve safety; and a Customer Support Program for any future problems with the replacement airbag inflators.

In addition, the distribution of Settlement proceeds will be managed by the same Settlement Special Administrator who has been effectively implementing the initial seven settlements in this MDL. The wealth of knowledge and experience that the Settlement Special Administrator has gained from the prior settlements will benefit the Class here.

        **(c)**    **Settlement Class Representative Service Awards and Attorney's Fees.**

The Eleventh Circuit's decision in *Johnson v. NPAS Sols., LLC*, 975 F.3d 1244 (11th Cir. 2020), likely prevents Plaintiffs from receiving typical service or incentive awards. But a

petition for rehearing *en banc* remains pending in *Johnson*, so if the decision is vacated or reconsidered, the Settlement permits Plaintiffs to petition the Court for incentive awards of up to $5,000 per Class Representative to compensate the Plaintiffs for their efforts on behalf of the Class. This was an accepted and common practice before *Johnson*, and the amount aligns with awards approved in similar class actions.

Similarly, the Parties' agreement that Class Counsel will seek and accept no more than 30% of the Settlement Amount in attorneys' fees and expenses, to which Volkswagen will not object, is fair, adequate, and consistent with prevailing law in the Eleventh Circuit and this District.[6]

### (d) The Settlement Represents the Full Agreement of the Parties.

There is no other agreement between the parties that is required to be identified by Rules 23(e)(3) or any agreement made in connection with the Settlement that is not part of the Settlement. The Court can, therefore, determine the fairness and adequacy of the Parties' proposal for settlement by looking solely to the Settlement.

### 4. The Settlement Treats Class Members Equitably Relative to Each Other.

The Settlement treats all Class Members equitably. Rule 23(e)(2)(D) considers "whether the apportionment of relief among Class Members take[s] appropriate account of differences among their claims," *see* Rule 23(e)(2)(D) advisory committee's note to 2018 amendment, which

---

[6] This percentage is in keeping with prevailing law and practice in this Circuit. *See*, *e.g.*, *Camden I Condo. Ass'n, Inc. v. Dunkle*, 946 F.2d 768, 774–75 (11th Cir. 1991); *Waters v. Int'l Precious Metals Corp.*, 190 F.3d 1291, 1294 (11th Cir. 1999); *In re Checking Account Overdraft Litig.*, 830 F. Supp. 2d 1330, 1365–66 (S.D. Fla. 2011); *Almanazar v. Select Portfolio Servicing, Inc.*, No. 14-cv-22586-FAM, 2016 WL 1169198, at *4 (S.D. Fla. Mar. 25, 2016).

the Settlement does.  The payments each Class Member will receive is based on the Class Member's out-of-pocket expenses actually incurred or the Residual Distribution, which provides the same amount to each Class Member in a given year.  As the claims of all Class Members are identical and arise from the same conduct, there are no pertinent differences for which to account.

**C.   Preliminary Certification of the Settlement Class Is Appropriate.**

For settlement purposes, Plaintiffs respectfully request that the Court certify the Settlement Class defined above and in the Agreement.  "A class may be certified solely for purposes of settlement [if] a settlement is reached before a litigated determination of the class certification issue." *Borcea v. Carnival Corp.*, 238 F.R.D. 664, 671 (S.D. Fla. 2006) (internal quotation marks omitted). "Confronted with a request for settlement-only class certification, a district court need not inquire whether the case, if tried, would present intractable management problems . . . for the proposal is that there be no trial." *Amchem Prods., Inc. v. Windsor*, 521 U.S. 591, 620 (1997).

Preliminary certification of a nationwide class for settlement purposes permits notice of the proposed Settlement to issue to the class to inform class members of the existence and terms of the proposed Settlement, of their right to be heard on its fairness, of their right to opt out, and of the date, time, and place of the fairness hearing.  *See* MANUAL FOR COMPL. LITIG., §§ 21.632, 21.633.  For purposes of this Settlement only, VW does not oppose class certification. For the reasons set forth below, certification is appropriate under Rules 23(a) and (b)(3).

Certification under Rule 23(a) requires that (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Under Rule 23(b)(3), certification is appropriate if the questions of law or fact common to the members of the class predominate over individual issues of law or fact and if a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

The numerosity requirement of Rule 23(a) is satisfied because the Settlement Class consists of approximately one million people throughout the United States, and joinder of all such persons is impracticable. *See* Fed. R. Civ. P. 23(a)(1); *Kilgo v. Bowman Trans.*, 789 F.2d 859, 878 (11th Cir. 1986) (numerosity satisfied where plaintiffs identified at least 31 class members "from a wide geographical area").

"[C]ommonality requires that there be at least one issue whose resolution will affect all or a significant number of the putative class members." *Williams v. Mohawk Indus., Inc.*, 568 F.3d 1350, 1355 (11th Cir. 2009) (internal quotation marks omitted); *see also Fabricant v. Sears Roebuck*, 202 F.R.D. 310, 313 (S.D. Fla. 2001) (same).  Here, the commonality requirement is satisfied because there are many questions of law and fact common to the Settlement Class that center on VW's conduct in manufacturing and selling vehicles equipped with defective Takata airbags while representing that those vehicles were safe, as alleged in the operative [Fourth] Amended Consolidated Class Action Complaint.  *See In re Checking Account Overdraft Litig.*, 275 F.R.D. 666, 673-74 (S.D. Fla. 2011).

For similar reasons, Plaintiffs' claims are reasonably coextensive with those of the absent Class Members, such that the Rule 23(a)(3) typicality requirement is satisfied.  *See Kornberg v. Carnival Cruise Lines, Inc.*, 741 F.2d 1332, 1337 (11th Cir. 1984) (typicality satisfied where claims "arise from the same event or pattern or practice and are based on the same legal theory"); *Murray v. Auslander*, 244 F.3d 807, 811 (11th Cir. 2001) (named plaintiffs are typical of the class where they "possess the same interest and suffer the same injury as the class members").  Plaintiffs are typical of absent Class Members because they were subjected to the same conduct

of Volkswagen and claim to have suffered from the same injuries, and because they will equally benefit from the relief provided by the Settlement.

Plaintiffs also satisfy the adequacy of representation requirement. Adequacy under Rule 23(a)(4) relates to: (1) whether the proposed class representatives have interests antagonistic to the class; and (2) whether the proposed class counsel has the competence to undertake this litigation. *Fabricant*, 202 F.R.D. at 314. The determinative factor "is the forthrightness and vigor with which the representative party can be expected to assert and defend the interests of the members of the class." *Lyons v. Georgia-Pacific Corp. Salaried Emp. Ret. Plan*, 221 F.3d 1235, 1253 (11th Cir. 2000) (internal quotation marks omitted). Plaintiffs' interests are coextensive with, and not antagonistic to, the interests of the Class, because Plaintiffs and absent Class Members have an equally great interest in the relief offered by the Settlement, and absent Class Members have no diverging interests. Further, Plaintiffs are represented by qualified and competent counsel with extensive experience and expertise prosecuting complex class actions, including consumer actions similar to the instant case. Settlement Class Counsel have devoted substantial time and resources to vigorous litigation of the Action from inception through the date of the Settlement.

The predominance requirement of Rule 23(b)(3) requires that "[c]ommon issues of fact and law . . . ha[ve] a direct impact on every class member's effort to establish liability that is more substantial than the impact of individualized issues in resolving the claim or claims of each class member." *Sacred Heart Health Sys., Inc. v. Humana Military Healthcare Servs., Inc.*, 601 F.3d 1159, 1170 (11th Cir. 2010) (internal quotation marks omitted). Plaintiffs satisfy the predominance requirement because liability questions common to all Class Members substantially outweigh any possible issues that are individual to each Settlement Class Member. The salient evidence necessary to establish Plaintiffs' claims is common to both the Class

34

Representatives and all members of the Class—they would all seek to prove that VW's vehicles have common defects and that VW's conduct was wrongful.  And the evidentiary presentation changes little if there are 100 Class members or 6,000,000: in either instance, Plaintiffs would present the same evidence of VW's marketing and promised warranties, and the same evidence of the Subject Vehicles' alleged defects.  *Klay v. Humana, Inc.*, 382 F.3d 1241, 1255 (11th Cir. 2004) ("[I]f common issues truly predominate over individualized issues in a lawsuit, then 'the addition or subtraction of any of the plaintiffs to or from the class [should not] have a substantial effect on the substance or quantity of evidence offered.'") (quoting *Alabama v. Blue Bird Body Co.*, 573 F.2d 309, 322 (5th Cir. 1978)).

Furthermore, resolution of thousands of claims in one action is far superior to individual lawsuits, because it promotes consistency and efficiency of adjudication. *See* Fed. R. Civ. P. 23(b)(3).  For these reasons, the Court should certify the Class defined in the Settlement.

**D.    The Court Should Approve the Proposed Notice Program Because It Is Constitutionally Sound.**

"Rule 23(e)(1)(B) requires the court to direct notice in a reasonable manner to all class members who would be bound by a proposed settlement, voluntary dismissal, or compromise regardless of whether the class was certified under Rule 23(b)(1), (b)(2), or (b)(3)."  MANUAL FOR COMPL. LITIG., § 21.312 (internal quotation marks omitted).  The best practicable notice is that which is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 314 (1950). To satisfy this standard, "[n]ot only must the substantive claims be adequately described but the notice must also contain information reasonably necessary to make a decision to remain a class member and be bound by the final judgment or opt out of the action." *Twigg v. Sears, Roebuck & Co.*, 153 F.3d 1222,

1227 (11th Cir. 1998) (internal quotation marks omitted); *see also* MANUAL FOR COMPL. LITIG., § 21.312 (listing relevant information).

The proposed Notice Program satisfies all of these criteria. As recited in the Settlement and above, the Notice Program will inform Class Members of the substantive terms of the Settlement, will advise Class Members of their options for opting-out or objecting to the Settlement, and will direct them where to obtain additional information about the Settlement. Moreover, the Notice Program was designed and is being implemented by one of the most respected Notice experts in the country, Cameron Azari of Epiq Systems, Inc.

In his declaration, attached as Exhibit 11 to the Settlement Agreement, Mr. Azari provides detailed information about the design and scope of the Notice Program, which Epiq Systems will administer. As Mr. Azari states, the program is "the best notice practicable under the circumstances of this case." Exhibit A, Ex. 11 thereto, ¶¶ 12, 56. Among other things, the program includes direct mail, the best possible form of notice (*id.*, ¶¶ 20-24), and with the addition of broadcast media, print publications, and online banners, the notice is "estimated to reach at least 95%" of the Class (*id.*, ¶ 19). Such a program is designed to exceed the requirements of constitutional due process. (*Id.*) The media campaign, moreover, provides the added benefit of supporting the broader goal of the Outreach Program to raise awareness of the recall and increase Recall Remedy completion rates.

Importantly, the Notice Program also targets a Spanish-speaking audience, with placements in Spanish-language print publications, magazines, radio, and online. (*Id.*, ¶¶ 13, 24, 25, 27, 28, 31, 35, 41.) Likewise, the Direct Mail Notice and Long Form Notice will be available in Spanish on the website. (*Id.*, ¶ 49.)

Therefore, the Court should approve the Notice Program and the form and content of the Notices appended as Exhibits 2, 6, and 8 of the Settlement Agreement.

36

### E.    The Court Should Schedule a Fairness Hearing.

The last step in the Settlement approval process is a Fairness Hearing, at which the Court will hear all evidence and argument necessary to make its final evaluation of the Settlement. Proponents of the Settlement may explain the terms and conditions of the Settlement and offer argument in support of final approval.  The Court will determine at or after the Fairness Hearing whether the Settlement should be approved; whether to enter a final order and judgment under Rule 23(e); and whether to approve Class Counsel's application for attorneys' fees and reimbursement of costs and expenses and the request for Service Awards for the Class Representatives.

Plaintiffs request that the Court schedule the Fairness Hearing for December 10, 2021, if that is convenient for the Court.  Plaintiffs will file their motion for final approval of the Settlement, and Class Counsel will file their Fee Application, no later than 45 days prior to the Fairness Hearing.

<u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs respectfully request that the Court enter an Order that:

1.    Grants preliminary approval to the Settlement;

2.    Preliminarily certifies the proposed Class defined in the Settlement pursuant to Rule 23(b)(3) and (e), for settlement purposes only, and appoints the following as Class Representatives for the VW Class: Dave DeKing, Chloe Crater, Efrain Ferrer, Christine Palmer, Bladimir Busto, Jr., Jacqueline Carrillo, Silvia Gil, Steven Levin, George O'Connor, Stephanie Puhalla, Charles Sakolsky, Delola Nelson-Reynolds, Holly Stotler, Malia Moore, Linda Dean, Trevor MacLeod, Pattie Byrd, Maureen Dowds, Annette Montanaro, Desiree Jones-Lassiter, Angela Cook, Angela Dickie, Antonia Dowling, Latecia J. Jackson, Nikki Norvell, Chloe Wallace, Michael Farriss, and April Rockstead Barker;

3.    Approves (a) the Notice Program set forth in the Settlement, (b) the form and content of the Notice as set forth in the forms attached to the Settlement

37

as Exhibits 2, 6, 8 thereto, and (c) the Registration/Claim Form attached as Exhibit 12 thereto;

4.    Approves and orders the opt-out and objection procedures set forth in the Settlement;

5.    Stays the consumer economic loss claims asserted in the Action against VW;

6.    Appoints as Settlement Class Counsel the law firms listed in the Settlement Agreement (*e.g.*, Exhibit A, § I.A.40);

7.    Schedules a Fairness Hearing for December 10, 2021, subject to the Court's availability and convenience; and

8.    Addresses the other related matters pertinent to the preliminary approval of the Settlement.

Dated: September 1, 2021                    Respectfully submitted,

                                            **PODHURST ORSECK, P.A.**

                                            _/s/ Peter Prieto_
                                            Peter Prieto (FBN 501492)
                                            Aaron S. Podhurst (FBN 63606)
                                            Stephen F. Rosenthal (FBN 131458)
                                            John Gravante (FBN 617113)
                                            Matthew P. Weinshall (FBN 84783)
                                            Alissa Del Riego (FBN 99742)
                                            SunTrust International Center
                                            One S.E. Third Ave., Suite 2300
                                            Miami, Florida 33131
                                            Phone: (305) 358-2800
                                            Fax: (305) 358-2382
                                            Email: pprieto@podhurst.com
                                                    apodhurst@podhurst.com
                                                    srosenthal@podhurst.com
                                                    jgravante@podhurst.com
                                                    mweinshall@podhurst.com
                                                    adelriego@podhurst.com

                                            _Chair Lead Counsel for Plaintiffs_

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **SMITH LACIEN LLP**<br>Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel:     (914) 749-8200<br>Fax:     (914) 749-8300<br>Email: dboies@bsfllp.com<br>          mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>James Lee (Fla. Bar No.: 67558)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel:     (305) 539-8400<br>Fax:     (305) 539-1307<br>Email: szack@bsfllp.com<br>          mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**<br>Elizabeth Cabraser<br>ecabraser@lchb.com<br>Phong-Chau Gia Nguyen<br>pgnguyen@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:     415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| | |
|---|---|
| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC**<br>James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br><br>*Plaintiffs' Steering Committee* | **BARON & BUDD, PC**<br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J. Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br><br>*Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a true and correct copy of the foregoing was filed via CM/ECF and served on all counsel of record via electronic notices generated by CM/ECF on September 1, 2021.

By: */s/ Peter Prieto*
        Peter Prieto