**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**MDL No. 2599**
**Master File No.: 15-MD-02599-MORENO**

**IN RE: TAKATA AIRBAG PRODUCT**
**LIABILITY LITIGATION**

**THIS DOCUMENT RELATES TO**:

**ALL CASES**

**PLAINTIFFS' STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO**
**VERISTAR, LLC'S APPLICATION FOR PAYMENT OF FEES AND EXPENSES**

## TABLE OF CONTENTS

INTRODUCTION ......................................................................................................................1

BACKGROUND .......................................................................................................................2

    I.   Negotiation and Entry of the Confidentiality and Data Privacy Agreement and
          Stipulated Protective Order.............................................................................................2

    II.  Planet Data's Implementation of the Protocol and Order..................................................5

    III. Veristar's Acquisition of Planet Data's Assets and Extortionate Demand.........................6

    IV. Procedural History..........................................................................................................7

    V.  Veristar's Misstatements.................................................................................................8

ARGUMENT..........................................................................................................................10

    I.   Veristar's Application Must Be Denied Under the Plain Language of This
          Court's Order. ...............................................................................................................11

    II.  Veristar's Request to Retroactively Modify This Court's Order Must Be
          Rejected........................................................................................................................12

    III. Even in Planet Data's Shoes, Veristar Is Not Entitled to Any Payment.........................13

    IV. Veristar's Unjust Enrichment Theory Must Be Rejected. ...............................................18

CONCLUSION .......................................................................................................................20

Plaintiffs' Chair Lead Counsel, on behalf of the Plaintiffs' Steering Committee ("PSC"), responds in opposition to the Application of Non-Party Veristar, LLC for payment of fees and expenses (ECF No. 4790).[1]  Veristar's outrageous demand for millions of dollars in unauthorized "fees and expenses" should be denied in its entirety.

## INTRODUCTION

Veristar's submission is lawless, citing no authority whatsoever for the multimillion-dollar unjustified windfall it seeks, and wildly counterfactual, resting on a host of verifiably inaccurate factual claims.  There is no valid basis for its astounding payment demand.

This dispute is ultimately related to this Court's March 15, 2019 Order governing the storage and handling of data from the bankrupt Takata entities.  (ECF No. 3327 (attached hereto as **Exhibit A**)) (the "Order").[2]  That Order authorized ***only*** Planet Data Solutions, Inc. to serve as custodian of the Transferred Data, and Planet Data agreed to store the global data set without charge. Veristar—an entity formed in 2019 that quickly became embroiled in litigation and has already been through Chapter 11 bankruptcy—claims to have purchased certain assets from Planet Data, including the Transferred Data.  But the Order does not permit Veristar or any other entity to step into Planet Data's role or charge fees for storing all of the Transferred Data.  And Veristar itself disclaims ever having been bound by the Order.  So, its claim for payment under the Order is illogical and baseless.

---

[1] The PSC includes Chair Lead Counsel Peter Prieto of Podhurst Orseck, P.A.; Personal Injury Track Lead Counsel Curtis Miner of Colson Hicks Eidson; Economic Damages Track Co-Lead Counsel David Boies of Boies, Schiller, & Flexner; Economic Damages Track Co-Lead Counsel Todd A. Smith Smith LaCien; James Cecchi of Carella, Byrne, Cecchi, Olstein, Brody & Agnello; Elizabeth Cabraser of Lieff, Cabraser, Heimann & Bernstein; and Roland Tellis of Baron & Budd. At various points in its Application, Veristar appears to proceed against two law firms, Podhurst Orseck, P.A. and Motley Rice LLC.  But Podhurst Orseck signed the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order, as well as the Statement of Work with Planet Data, in its capacity as Chair Lead Counsel for the Plaintiffs, on behalf of the Plaintiffs' Steering Committee.  It is unclear whether Veristar, in referencing Podhurst, seeks relief from the PSC through Podhurst, or the law firm individually.  Ultimately, the entirety of Veristar's Application should be denied for the reasons explained below, but it also provides no basis on which to proceed against the law firm individually.  In addition, although Veristar's claims against Motley Rice suffer from many of the same flaws as its claims against the PSC, this response is only submitted on behalf of the PSC, which does not include Motley Rice.

[2] Capitalized terms used but not otherwise defined herein shall have the same meaning ascribed to such terms in the Order.

So too is Veristar's request to retroactively modify the Order to substitute Veristar for Planet Data. It cites ***no legal authority*** for this request, likely because binding precedent forbids it. Regardless, even if Veristar could stand in for Planet Data, it would not be entitled to any payment. The Order's carefully negotiated Protocol was designed to avoid the very costs Veristar now seeks to recover. The Order allowed processing and hosting charges only for limited subsets of data requested by specific parties, all of which have been paid for already, not for the entire 128 terabyte data set. Planet Data's and the PSC's course of dealing for nearly two years confirms that Veristar's position is baseless, as do sworn declarations from Planet Data executives who were directly involved in negotiating and implementing the Order. Veristar's attempt to rewrite history and charge millions in unauthorized fees cannot be condoned..

Finally, Veristar cannot prevail on a theory of unjust enrichment. The doctrine of unclean hands bars its claim, given Veristar's unauthorized possession of the data and overreaching demand. The existence of the parties' Agreement also precludes this equitable theory. And Veristar conferred no benefit on the PSC, which had already obtained and ***paid for*** all relevant data before Veristar's involvement.

Veristar's Application is, regrettably, a posterchild for a Rule 11 violation. In fact, Plaintiffs intend to seek relief under Rule 11. For these reasons, as detailed below, the Court should deny Veristar's Application in full.

**B<small>ACKGROUND</small>**

## I.    Negotiation and Entry of the Confidentiality and Data Privacy Agreement and Stipulated Protective Order

In or around early 2018, the PSC began negotiating with counsel for the bankrupt Takata Entities, as well as counsel for personal injury victims, over the preservation of Takata's records, some of which could be relevant to this MDL and future actions involving personal injuries. *See* **Exhibit B** (Weinshall Declaration), ¶ 3. The Takata Entities had collected massive amounts of data. Most of the data was unprocessed, meaning that it could not be reviewed simply by hooking up the hard drives to a computer. Instead, it would need to be processed first and then hosted on a review platform, which would be cost-prohibitive for such a large data set. *Id.*, ¶ 4.

The Takata Entities also were unwilling to simply hand hard drives with the data to the Plaintiffs for two reasons. *Id.*, ¶ 5. First, the collected data included documents and data that may belong to Joyson Safety Systems ("JSS"), since JSS purchased Takata's non-airbag assets through

2

the bankruptcy process. *Id.* And second, the data and documents might contain attorney-client privileged material, and certain Takata entities were not willing, at the time, to waive the attorney-client privilege. *Id.*

So, the parties negotiated a protocol that would address these issues and allow the relevant, non-privileged Takata Data to be filtered from the undifferentiated data, without incurring the costs of hosting or processing the entire data set (the "Protocol"). *Id.*, ¶ 6. To make this solution work, a third-party needed to serve as the custodian of the data, without charging for holding the data, and be capable of processing and filtering discrete sets of the data upon request. *Id.*

At first, the PSC approached the vendor that was hosting the discovery that Plaintiffs had received thus far—International Legal Services ("ILS"). *Id.*, ¶ 7. Over the course of this MDL, the PSC has advanced more than $5.5 million for document and database services alone to ILS. *Id.* But ILS ultimately was unwilling to serve in this role. *Id.* So, the PSC considered other potential vendors and in July 2018 identified Planet Data, which had been working with a firm serving on the PSC. *Id.*

Planet Data's executives explained in August 2018 that Planet Data viewed the engagement as an attractive opportunity, because it exposed Planet Data to numerous large firms on the plaintiff and defense sides, as well as numerous automakers. *Id.*, ¶ 8. Evidently motivated by this significant business opportunity, Planet Data made an attractive offer to serve as the third-party custodian of the data: Planet Data offered to serve in this role—in other words, to simply store the data—without charge. *Id.* The PSC accepted this offer. *Id.*

Significantly, Planet Data's executives have attested in declarations submitted with this response that ***Planet Data agreed to store the data without charge***. *See* **Exhibit C** (Cochran Dec.); **Exhibit D** (Wade Dec.). In particular, David Cochran, who was Planet Data's Chief Operating Officer at the time and signed the Data Transfer Agreement on behalf of Planet Data, declared that "***Planet Data agreed not to charge, and Takata MDL Consel did not agree to pay a monthly storage fee*** for the entire set of Unprocessed Takata Data." Ex. C, ¶ 7 (emphasis added).

Extensive negotiations ensued involving various stakeholders—including the automakers, Takata and JSS entities, the PSC, Planet Data, and personal injury claimants. Ex. B, ¶ 9. The parties ultimately reached an agreement that was memorialized in the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order (the "Agreement"). *Id.* Upon the parties' motion, the Takata bankruptcy court entered an order on November 29, 2018, adopting the

Agreement as an order of the court. *Id.* Likewise, upon the parties' motion, this Court also entered an order on March 15, 2019 (the "Order") adopting the Agreement as an order of this Court and retained "exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order." *See* Ex. A at 2.[3] For the sake of clarity, the Agreement will generally be referred to as the Order, unless otherwise specified.

       Consistent with Planet Data's commitment to not charge for simply storing the unprocessed data as the custodian, none of the documents submitted to the Court mention a price or fee that Planet Data would be permitted to charge for serving in this role. Ex. B, ¶ 10. Instead, the parties agreed that Planet Data would be authorized to charge only the "Requesting Parties" for the services of processing, filtering, uploading, and if requested, hosting the discrete data sets that they requested, according to a "Statement of Work" that each requesting party would execute with Planet Data. *Id.*

       A template for the Statement of Work was attached as an exhibit to the Order. Ex. A at 60. The Statement of Work set forth the fees that Planet Data would be permitted to charge Requesting Parties for these discrete services. *Id.* Thus, where the Order says "[Planet Data] will store the Transferred Data at MDL Counsel's expense until the termination of the MDL Action," Ex. A at 13, the deal the parties made with respect to this provision was for Planet Data to not charge any fee for storing the Transferred Data, but only charge the pertinent Requesting Party who requested access, on a searchable database, for specified services for the discrete portions of the Transferred Data requested under a Statement of Work. Ex. B, ¶ 10. Confirming this understanding, Michael Wade, Planet Data's Chief Technology Officer at the time, attested that Planet Data "agreed to accept an initial payment from the bankrupt Takata entities and then subsequent payments from Requesting Parties for the subsets of data that they requested, according to the terms set forth in the Statement of Work, as compensation for its services with respect to the Takata Data." Ex. D, ¶ 5.

       Neither the PSC nor the Order contemplated that Planet Data would host the entirety of the Transferred Data on the Exego platform or an active database. Ex. B, ¶ 11. Rather, the Order detailed a Protocol under which only the data identified by a Requesting Party would be processed, filtered, and uploaded. *Id.* Specifically, and briefly stated, under "Protocol Step One," a

---

[3] For the sake of clarity, page citations for Exhibit A, the Order, will refer to the PDF page number.

"Requesting Party," as was PSC here for example, would request access to a subset of the Transferred Data, which was segregated by Takata "Custodian," and sign a Statement of Work, as the PSC did here.  *Id.*, ¶ 12; Ex. A at 14.  Then under "Protocol Step Two," Planet Data "shall retrieve the requested Custodian's Data from its off-line storage and shall upload said Custodian's Data onto an active PDS database." Ex. A at 16.  Planet Data would then cleanse that requested data of privileged and other information and make the cleansed requested data available to the Requesting Party on that active Planet Data database.  *Id.* at 16–18; Ex. B, ¶ 12.

Planet Data, through its executives, acknowledged that the only charges would be those incurred by a Requesting Party with respect to specific data.  Ex. B, ¶ 14.  In fact, in an email exchange with the PSC, Planet Data Chief Operating Officer David Cochran, stated:

> I removed the pricing terms and conditions since, as I understand it, the Takata entities will not be invoiced for the services we provide other than the $75,000 data transfer fee from the protocol.  As discussed, ***the requesting parties will be invoiced*** for the data we process.  This agreement also references the confidentiality agreement and protective order as well as the privilege and PSAN search protocol.

*Id* (emphasis added).  This email confirms that ***only*** "requesting parties will be invoiced for the data we process."  *Id.*  Nowhere in the Order or anywhere else is there any provision for the PSC to pay the kind of global processing and storage fees that Veristar now seeks.  *Id.*, ¶ 15.

## II.    Planet Data's Implementation of the Protocol and Order

For almost two years, Planet Data performed under the terms actually agreed upon by the parties—i.e., that Planet Data would not charge a fee for storing or serving as the custodian of the Transferred Data.  *Id.*  Rather, Planet Data only charged Requesting Parties, such as the PSC, for the specific, limited data sets that were identified in Statements of Work.  *Id.*  And the PSC paid Planet Data in accordance with the Statements of Work it executed.  *Id.*  This course of performance, over two years, confirms what the documents reflect—that Planet Data agreed to not charge anyone for serving as the Transferred Data custodian, or for "processing" and "hosting on the Exego database" anything other than what a Requesting Party specifically requested and agreed to.  *Id.*

Take, for example, the PSC's initial request for data under the Protocol.  The PSC, as a Requesting Party under the Stipulated Protective Order, sent a request to Planet Data on May 8, 2019, for data from a list of Takata custodians.  *Id.*, ¶ 16.  Planet Data responded with a Statement

of Work limited to the data for the specified custodians.  *Id.*  Planet Data also invoiced the PSC for just the work limited to the data for the specified custodians.  *Id.*

In fact, when Planet Data began charging the PSC to host the limited data set requested under its Statement of Work, the PSC instructed Planet Data to no longer host the data set, in order to save expenses.  *Id.*, ¶ 17.  In accordance with the Order, Planet Data complied with this request, stopped hosting the data, and reduced the fees it was charging in subsequent invoices.  *Id.*  The monthly invoices that Planet Data sent PSC, therefore, varied in amount, depending on the relative size of the data that the PSC requested for Planet Data to process or host.  *Id.*, ¶ 18.  In total, from May 14, 2019, through June 7, 2021, the PSC paid Planet Data approximately $389,600 for its services.  *Id.*

When Veristar purchased Planet Data's assets, it followed Planet Data's practice, for several months, of charging the PSC only for the relatively small subset of data that continued to be hosted on the Exego platform pursuant to the PSC's Statement of Work, making clear that Veristar itself understood the Order to not permit it to charge the PSC a global storage fee for all the Transferred Data.  *Id.*, ¶ 19.  In total, the PSC paid Veristar approximately $24,000 between March of 2021 and December of 2021.  *Id.*

Ultimately, the PSC received all the Transferred Data of interest to the Takata MDL through the completion of the Statements of Work that the PSC was invoiced and paid for.  *Id.*, ¶ 23.  The PSC received no benefit from Veristar's continued storage or hosting of the Transferred Data after it acquired the assets of Planet Data.  *Id.*

### III.    Veristar's Acquisition of Planet Data's Assets and Extortionate Demand

Veristar was formed in 2019.  *Id.*, ¶ 25.  Prior to forming Veristar, its founders were members of CertaTech, a Florida limited liability company that engaged in the same business as Veristar, providing e-discovery services.  *Id.*  According to several federal complaints filed against Veristar across the country, its founders dissolved CertaTech soon after receiving a substantial investment from a third party, to retain the investment without compensating the third party, and shifted CertaTech's business to Veristar.  *Id.*  The third-party investor sued Veristar for fraud in the Southern District of Florida, and the case eventually settled.  *Id.*

Within a month of its formation, Veristar purchased the assets of two other businesses— Franklin Data Ventures, Inc. and Nexem-Iconic, LLC—that also provided cloud hosting, cybersecurity, and e-discovery services.  *Id.*, ¶ 26.  Those two companies subsequently sued

Veristar in federal court in Illinois for breaching their asset purchase agreements by failing to make contractual incentive payments. *Id.*

Soon after the dispute with Franklin Data and Nexem-Iconic arose, Veristar's founders created another Illinois limited liability company called Veristar Global, LLC. *Id.*, ¶ 27. In a separate lawsuit filed against Veristar by a former employee, the plaintiff alleges that Veristar Global LLC was formed to evade the liabilities of Veristar to Franklin Data and Nexem-Iconic. *Id.*

As it did with Franklin Data and Nexem-Iconic, Veristar purchased certain assets of Planet Data in early 2021. *Id.*, ¶ 28. Planet Data, pursuant to the Order, Planet Data had been receiving confidential data, including data from Japan, and it was manifestly important to the parties that it was Planet Data, and only Planet Data, that handled the data. *Id.*, ¶ 21. Thus, the "Agreement Regarding Cross Border Transfer of Personal Data", which is incorporated in the Order, provides at ¶ 7.2 that: "Data Recipient [i.e., Planet Data] may not sub-contract the performance of its obligations under this Agreement in whole or in part to any third party without the prior written consent of Data Transferor [i.e., TKJP Corporation and RTK Service LLC, collectively]." Ex. A at 51. Paragraph 7.2 of that same agreement further provides that even with such consented to assignment, Planet Data's agreement with the subcontractor has certain restrictions and that any such consented to assignment of Planet Data obligations "shall not affect [Planet Data's] duty to fulfil such obligations and [Planet Data] shall remain primarily responsible for the same." *Id.*

Veristar never sought nor received this Court's or the PSC's permission to possess the Takata Data or serve as the custodian of the Takata Data or replace Planet Data under the Agreement. Ex. B, ¶ 22. Nor did Veristar obtain the consent of this Court or the PSC to begin charging a fee for holding and storing the Takata Data.

Notwithstanding the absence of any justification, Veristar contacted the PSC in September 2021 and demanded payment of millions of dollars for Veristar's hosting of the Transferred Data. *Id.*, ¶ 29. The PSC rejected Veristar's demand and explained that it violated the Agreement and the PSC's deal with Planet Data. *Id.* The PSC also instructed Veristar to remove the Transferred Data from its hosting servers. *Id.*

## IV.    Procedural History

Undeterred, Veristar filed a motion in the Delaware bankruptcy court (where Takata's bankruptcy was pending) requesting that the Stipulated Protective Order be amended to authorize

Veristar to replace Planet Data and seeking payment from the PSC of more than $7 million in unauthorized fees for hosting the Transferred Data that the Stipulated Protective Order did not permit it to possess in the first place.  *Id.*, ¶ 30.  The PSC responded in opposition to Veristar's baseless and procedurally defective motion in the Delaware bankruptcy court, arguing that this Court is the proper forum to resolve this dispute, because it concerns the PSC, which this Court appointed and oversees, and threatens to impede the Takata MDL over which this Court presides.  *Id.*, ¶ 31. The bankruptcy court agreed and entered an order dismissing Veristar's motion.  *Id.*

To bring this dispute before the Court, the PSC commenced a declaratory judgment action against Veristar on November 8, 2022.  *Podhurst Orseck, P.A. v. Veristar, LLC*, No. 22-cv-23666 (S.D. Fla.)  Veristar initially moved to dismiss the case for lack of personal and diversity jurisdiction.  (ECF No. 18, No. 22-cv-2366.)  But before the PSC could respond, Veristar itself filed for bankruptcy in the Middle District of Tennessee.  *In re Veristar, LLC*, No. 3:23-bk-00413 (Bankr. M.D. Tenn.).  Veristar's bankruptcy automatically stayed the PSC's action against Veristar.  (ECF No. 27, No. 22-cv-2366.)

In Veristar's bankruptcy proceeding, the Takata and JSS entities filed an objection, claiming that Veristar was not authorized to possess the Transferred Data and disputing that the Transferred Data was property of Veristar's bankruptcy estate.  Ex. B, ¶ 32.  To resolve this objection, Veristar agreed to destroy all the processed Transferred Data in its possession and return the original hard drives to counsel for the Takata entities, and stipulated to the entry of a finding of fact in the confirmation order that "None of the Veristar Entities has agreed to be bound by the terms of the Protective Order."  *Id.*  Veristar provided a signed certification, which was subsequently submitted to this Court, representing that it destroyed all the processed data on April 26, 2023.  (ECF No. 4747-3.)  And in accordance with is stipulation, the Order approving Veristar's Chapter 11 bankruptcy plan, found that "None of the Veristar Entities has agreed to be bound by the terms of the [Confidentiality and Data Privacy Agreement, and Stipulated Protective Order adopted by this Court and the Takata bankruptcy court]."  Ex. B, ¶ 32.

With its own bankruptcy proceeding complete, Veristar filed the Application in this Court on June 14, 2024 seeking payment of millions of dollars for "fees and expenses" it claims to have incurred.  (ECF No. 4790.)

## V.     Veristar's Misstatements

Veristar's Application is littered with misstatements of fact, some of which directly

contradict its own prior statements. Starting with the first paragraph in the first section—the "Summary of Relief Requested"—Veristar represents that 128 terabytes of processed Transferred Data "is currently being maintained on [Veristar's] Exego platform," and that charges for its services "continue to add up on the large amount of data [Veristar] is maintaining." (ECF No. 4790 at 2.) This statement to the Court, made on June 14, 2024, cannot be reconciled with Veristar's signed certification on April 28, 2023, also submitted to the Court, that it purged all processed Transferred Data from its system. (ECF No. 4747-3.) This contradiction reappears several times throughout Veristar's Application. (ECF No. 4790 at 8 ("Movant has continued to store the very large amount of data for more than three (3) years."); at 9 ("As of the filing of this Motion, Movant is continuing to store the Transferred Data on Movant's Exego platform in accordance with the demands of the parties."); at 10 ("Movant is in possession of the hard drives containing the Transferred Data in its original form.").)

Veristar's sworn statements regarding the cost of hosting Transferred Data on its Exego platform are also suspect. Veristar's witness attested that the company, from January 1, 2021 through April 2023, "incurred average monthly costs of an amount not less than $171,704.32 per month to maintain the Transferred Data on its Exego servers." (ECF No. 4790-1 at 7.) If this statement were accurate, Veristar would have incurred approximately $2.06 million in data hosting costs in 2022 for this project alone. But the financial records that Veristar filed with the bankruptcy court show that in 2022, the *entire company* incurred just $360,000 in data hosting costs for Exego. Ex. B, ¶ 33. Veristar's math—and the representations it has made to this Court—do not add up.

Nor does its summary of events withstand scrutiny. For example, it claims that it "has been constrained from limiting costs by destroying [Planet Data Property] pursuant to the demands of the parties and the terms of the Protocol." (ECF No. 4790 at 13.) But Veristar points to no demand from the PSC that it avoid deleting any processed data. To the contrary, PSC attorneys advised Veristar on October 27, 2021, that "the only solution is to remove the data from your computers and destroy it." (ECF No. 4790-1 at 37.) Although the PSC expressed a willingness to work with all the parties to "submit an unopposed motion with the bankruptcy court as soon as possible" (*id.*), it was ultimately the responsibility of Veristar, the entity in unauthorized possession of the Transferred Data, to seek such relief from the court. It has no basis to pass off its failure to act on other parties.

9

Ultimately, the central facts that Veristar cannot dispute are that it never received authorization to possess the Transferred Data, that none of the parties asked it to process or host the entire set of Transferred Data, and that Planet Data agreed to not charge for storing the global set of Transferred Data and followed through with that agreement for almost two years. There is no basis for Veristar's extortionate demand for payment.

<u>**ARGUMENT**</u>

Without reference to a single precedent or the articulation of a clear claim for relief, the legal basis of Veristar's demand for millions of dollars in "fees and expenses" is nonexistent. As explained below, the plain language of the existing Order cannot support the request because it only mentions Planet Data and never authorizes Veristar or any other company to step into Planet Data's role as custodian of the Transferred Data. The Order should not be modified, particularly on a retroactive basis, to approve Veristar's prior possession of the Transferred Data. Nonetheless, even in Planet Data's shoes, Veristar cannot claim entitlement to any payment under the Order, because the whole agreement, as well as the testimony of Planet Data's executives, conclusively establishes that Planet Data agreed to not charge any expenses for storing the global set of Transferred Data. Finally, Veristar cannot prevail under a theory of unjust enrichment, because it has unclean hands, it conferred no benefit on the PSC, and a contract exists that governs the parties' relationship.

Before turning to these issues, it is important to note one substantive area of agreement: this Court has subject matter jurisdiction to resolve this dispute. This Court retained "exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement" of the March 15, 2019 Order. Ex. A at 3. Since Veristar's Application involves the "implementation, interpretation, or enforcement" of the March 15, 2019 Order, this Court has ancillary jurisdiction to decide it. *See Managed Care Advisory Grp., LLC v. CIGNA Healthcare, Inc.*, 939 F.3d 1145, 1156 (11th Cir. 2019) ("[T]he district court had ancillary jurisdiction because it retained jurisdiction over the settlement agreement."); *Am. Disability Ass'n, Inc. v. Chmielarz*, 289 F.3d 1315, 1320 (11th Cir. 2002) ("[I]f the district court either incorporates the terms of a settlement into its final order of dismissal or expressly retains jurisdiction to enforce a settlement, it may thereafter enforce the terms of the parties' agreement."); *Jenkins v. Kansas City Missouri Sch. Dist.*, 516 F.3d 1074, 1082 (8th Cir. 2008) ("The District Court was well within its authority to exercise ancillary jurisdiction to enforce the terms of all of its prior orders

(including the terms of the incorporated Agreement), as well as all of the prior orders of this Court."). In addition, to the extent that Veristar's Application is construed as a motion to modify the Order under Rule 60, this Court likewise has jurisdiction. *See Affiliati Network, Inc. v. Wanamaker*, 791 F. App'x 82, 85 (11th Cir. 2019) (holding that district court "had jurisdiction to review the motions for relief and for clarification or reconsideration" pursuant to Rule 60).

I.    **Veristar's Application Must Be Denied Under the Plain Language of This Court's Order.**

Nothing in this Court's March 15, 2019 Order authorizes the extortionate payoff that Veristar seeks. No provision of the Order authorizes an entity other than Planet Data to possess the Transferred Data and serve as its custodian under the Protocol. In fact, the Data Transfer Agreement, which is referenced in the underlying Order and attached as an exhibit, ***prohibits*** Planet Data from assigning its custodial obligations to any other entity without the parties' consent, which no party provided. *See* Ex. A at 51, § 7.1. And no provision of the Order requires payment to any entity other than Planet Data for processing and storage services under the Protocol. On these grounds alone, Veristar's unauthorized possession of the data—i.e., conduct that *violates* the Order—cannot support its demand for payment of millions of dollars—i.e., relief that the Order never provides.

The parties had good reason to specify that just a single entity—Planet Data—serve as the custodian under the Protocol, and to omit from the Order any provision allowing a successor to step into Planet Data's shoes without approval of the parties. It was critical to the Takata and JSS entities that a custodian accept the strict confidentiality and privacy obligations imposed by foreign jurisdictions, as reflected in the Data Transfer Agreement (Ex. A at 46–52), and abide by the detailed Protocol to ensure the protection of privileged and confidential materials (*id.* at 13–18).

And it was essential to the PSC that the custodian agree to the pricing structure reflected in the Protocol, under which the custodian would not charge for storing the global data set and instead would receive payment from Requesting Parties according to a Statement of Work limited to requested subsets of the data. The Order specifies Planet Data as the sole custodian because it was the sole entity, in the parties' view, that met these conditions. The parties never would have agreed on a Protocol that allowed another entity to take over the custodial role without meeting these conditions. Remarkably, however, that is exactly what Veristar aims to do, as it has

stipulated in its own bankruptcy proceeding that "None of the Veristar Entities has agreed to be bound by the terms of the [Order]."  Ex. B, ¶ 32.

Having disclaimed any obligations under the Order, which plainly does not authorize the relief it seeks, Veristar cannot simultaneously rely on it to obtain a windfall.  *See Kaneb Services, Inc. v. FSLIC*, 650 F.2d 78,81 (5th Cir.1981) ("It is recognized that under the doctrine of equitable estoppel a party with full knowledge of the facts, which accepts the benefits of a transaction, contract, . . . or order may not subsequently take an inconsistent position to avoid the corresponding obligations or effects.").  In fact, Veristar seems to acknowledge that it cannot prevail under the existing Order.  That is why Veristar prefaces its request for payment with a request to modify the Order.  But, as explained below, there is no valid reason for the Court to retroactively modify the Order to reward Veristar's extortionist strategy.  And without modification, the existing Order requires denial of Veristar's application.

**II.     Veristar's Request to Retroactively Modify This Court's Order Must Be Rejected.**

Unable to obtain its desired windfall under the existing Order, Veristar asks this Court to change the Order.  But Veristar does not merely seek a modification that would operate on a prospective basis, because the Transferred Data has been deleted or returned to the Takata entities.  So, modifying the Order on a prospective basis would accomplish nothing for Veristar—there is no longer any data for it to store going forward.  Veristar, instead, asks for something far more unusual: retroactivity, stretching back three-and-a-half years, to January 1, 2021, to somehow validate its otherwise unauthorized possession of the Transferred Data and supposedly justify its claim for payment.  (ECF No. 4790 at 14 (requesting "approv[al]" of Veristar's "assumption of Planet Data's obligations" under the Protocol "effective as of January 1, 2021").

But Veristar cites ***no authority*** supporting this extraordinary request for, in essence, a "nunc pro tunc," or "now for then," order.  Nothing.  Not a single case.  This is likely because binding precedent stands in the way.  The Eleventh Circuit recently held that "a nunc pro tunc order cannot be used to make a court action effective as of an earlier date at which the court did not actually take any relevant action."  *Rohe v. Wells Fargo Bank, N.A.*, 988 F.3d 1256, 1262 n.6 (11th Cir. 2021).  Rather, a "nunc pro tunc order merely recites court actions previously taken but not properly or adequately recorded."  *Stansell v. Revolutionary Armed Forces of Colombia*, 771 F.3d 713, 747 (11th Cir. 2014).  Of course, the Court did not approve of Veristar's assumption of Planet Data's obligations three-and-a-half years ago, so there is no "court action[] previously taken

but not properly or adequately recorded" to recite. *Id.* "Put colorfully, nunc pro tunc orders are not some Orwellian vehicle for revisionist history—creating 'facts' that never occurred in fact." *Roman Catholic Archdiocese of San Juan v. Acevedo Feliciano*, 589 U.S. 57, 65 (2020) (internal quotation mark omitted) (alteration adopted).  Veristar's unjustified request for an "Orwellian vehicle for revisionist history" must be rejected. *Id.*

So too should Veristar's request for any modification of the Order, even on a prospective basis.  As Veristar acknowledges (ECF No. 4790 at 12 n.8), the Order is akin to a court-approved settlement, as it arises from and rests on an agreement and stipulation.  But Veristar fails to address the prevailing standard for modifying such court-approved settlements, likely because it cannot—and never attempts to—satisfy the standard.

Rule 60 governs motions to modify court-approved agreements. *See McCray v. Dawson*, 953 F. Supp. 1476, 1479 (M.D. Ala. 1996) ("A consent order is subject to modification according to the same rules applicable to other judgments and orders."); *see also Johnson v. Fla.*, 348 F.3d 1334, 1341 (11th Cir. 2003) (holding that "[a] consent decree is a judgment, and thus subject to Rule 60(b)").  "The Rule 60(b) movant carries a heavy burden to show that the circumstances were sufficiently extraordinary to warrant relief." *Bradford v. Unum Life Ins. Co. of Am.*, 224 F. App'x 937, 938 (11th Cir. 2007).  But Veristar never mentions Rule 60, let alone makes any effort to show that any of the criteria of the subparts of the rule have been met.  Thus, Veristar cannot carry its burden, and its request for modification must be denied.

### III.    Even in Planet Data's Shoes, Veristar Is Not Entitled to Any Payment.

Veristar seeks to be treated "as Planet Data's assignee" (ECF No. 4790 at 1), notwithstanding, as discussed above, textual obstacles in the Order, such as the Data Transfer Agreement's anti-assignment provision.  Even if Veristar overcame those obstacles and the Court modified the Order to retroactively substitute Veristar for Planet Data, however, it would, at most, "stand[] in the shoes of the assignor," Planet Data, and "cannot stand in any better position than [the] assignor." *Akin Bay Co. v. Von Kahle*, 180 So. 3d 1180, 1182-83 (Fla. 3d DCA 2015); *accord Madison Liquidity Invs. 119, LLC v. Griffith*, 57 A.D.3d 438, 440 (N.Y. 1st Dept. 2008) ("[A]n assignee never stands in any better position than his assignor.")[4]  This fundamental principle

---

[4] The Statement of Work between Planet Data and the PSC contains a New York choice-of-law clause. *See* Ex. B at Ex. 1 at 7.  But Veristar's Application rests on this Court's Order adopting the Agreement, which was entered in Florida.  Ultimately, however, it is unnecessary to engage in

defeats Veristar's payment demand, because, as explained below, Planet Data was not entitled to any additional payment from the PSC under the plain language of the Order, and Veristar "cannot stand in any better position than [Planet Data]." *Id.*; *see Poinciana Properties, Ltd. v. Englander Triangle, Inc.*, 437 So. 2d 214, 216 (Fla. 4th DCA 1983) ("[T]he successor landlord stands in the shoes of his predecessor. He is bound by his agreements and obligations.").

The parties agree that the Order, being the product of an agreement and stipulation, must be construed like a contract. (ECF No. 4790 at 12 n.8); *Absolute Activist Value Master Fund Ltd. v. Devine*, 998 F.3d 1258, 1268 (11th Cir. 2021) ("For the purposes of enforcement, we treat a stipulated order as though it is a contract.") (citing *United States v. ITT Cont'l Baking Co.*, 420 U.S. 223, 238 (1975) ("[A] consent decree or order is to be construed for enforcement purposes basically as a contract.")). "It is fundamental that in construing a contract, the intention of the parties must be determined from examination of the whole contract and not from the separate phrases or paragraphs." *Cali v. Meadowbrook Lakes View Condo. Ass'n B Inc.*, 59 So. 3d 363, 367 (Fla. 4th DCA 2011) (quoting *Deeb v. Field*, 311 So.2d 736, 737 (Fla. 3d DCA 1975)); *see Am. K–9 Detection Servs., Inc. v. Cicero*, 100 So.3d 236, 238–39 (Fla. 5th DCA 2012) (holding that in interpreting a contract, "courts must not read a single term or group of words in isolation"); *Kass v. Kass*, 696 N.E.2d 174, 180–81 (N.Y. 1998) (holding that in construing a contract, "[p]articular words should be considered, not as if isolated from the context, but in the light of the obligation as a whole and the intention of the parties as manifested thereby") (internal quotation marks omitted). Courts must "arrive at a reasonable interpretation of the text of the entire agreement to accomplish its stated meaning and purpose." *Cicero*, 100 So.3d 236, 238–39 (internal quotation marks omitted); *see Bucacci v. Boutin*, 933 So. 2d 580, 585 (Fla. 3d DCA 2006) ("To ascertain the intention of the parties to a contract, the trial court must examine the whole instrument, not just particular portions, and reach an interpretation consistent with reason, probability, and the practical aspects of the transaction between the parties.") (internal quotation marks omitted).

---

a choice-of-law analysis, because Florida and New York law are aligned on the fundamental principles of contract interpretation at issue here, and Veristar does not contend otherwise. *See In re Jan. 2021 Short Squeeze Trading Litig.*, 76 F.4th 1335, 1346 (11th Cir. 2023) ("And under Florida choice-of-law rules, a court need not resolve a choice-of-law dispute if there is a 'false conflict,' such that the different laws point to the same outcome under the facts of the case.").

The plain language of the Agreement, as well as its structure, make clear that Planet Data was not permitted to charge the PSC or anyone for storing the global set of Transferred Data, and instead, agreed to charge only Requesting Parties for the specific subsets of data that they requested for processing and storage, according to the terms of a Statement of Work executed by the Requesting Parties. Ex. A at 14–18. The Statement of Work template, attached as an exhibit to the Order, is the only document that contains prices for Planet Data's processing, hosting, and storage services. Ex. A at 63. In contrast, as Veristar concedes (ECF No. 4790 at 7), there is no price term anywhere in the Order or its exhibits for Planet Data to simply store the global set of Transferred Data, an omission that strongly indicates that Planet Data was not permitted to charge a fee for such storage. Likewise, the Cost-Sharing Provision of the Order carefully details, with mathematical examples, how multiple Requesting Parties that obtain the same subsets of data must pay for and split the costs of processing such data, reinforcing that Planet Data was only permitted to charge for the cost of implementing the Protocol as to such subsets of the data—i.e., "the requested Custodian's Data," not the global set of Transferred Data. *See* Ex. A at 15 & n.1. And critically, the testimony of Planet Data's own executives confirm this understanding. Ex. C, ¶ 7 (attesting that "Planet Data agreed not to charge, and Takata MDL Counsel did not agree to pay a monthly storage fee for the entire set of Unprocessed Takata Data"); Ex. D, ¶ 6 ("I am not aware of any charges for storage that were ever made to the MDL or parties for the general storage of data beyond what is outlined in the Statement of Work.").

This conclusion also follows from the structure and details of the Protocol itself. The Order makes clear that much of the Transferred Data had "never [been] processed, reviewed, or produced." Ex. A at 7. To process and continuously host the entire set of Transferred Data would have been cost-prohibitive because of its massive size. The entire objective and structure of the Protocol, then, was to avoid incurring such costs for the entire, undifferentiated set of Transferred Data, and instead to limit the processing and hosting costs to the targeted subsets of data from relevant custodians, and to have Requesting Parties bear those limited costs.

This is evident from the language describing the Protocol steps. At "Step One," a Requesting Party identifies a Custodian from which it desires to obtain data, and only upon receipt of a Statement of Work satisfactory to Planet Data does Planet Data "implement Protocol Steps Two and Three as to the requested Custodian's Data" if it "has not been processed through this Protocol" yet. Ex. A at 14. "Step Two," in turn, requires Planet Data to "retrieve the requested

15

Custodian's Data from its off-line storage" and "upload said Custodian's Data onto an active [Planet Data] database." *Id.* at 16.  So, until a Requesting Party delivers to Planet Data a Statement of Work requesting a particular custodian's data, the Protocol required that unprocessed data remain untouched and unprocessed in "off-line storage." *Id*.

Completely ignoring this carefully negotiated solution, Veristar claims that it "fully processed" all 128 terabytes of the Transferred Data and hosted the massive dataset on its Exego platform.  (ECF No. 4790 at 6.)  And even though such processing and on-line hosting or storage directly violated the Protocol, because no Requesting Party delivered to Planet Data a Statement of Work requesting such global processing and hosting, Veristar now seeks to recover from the PSC the very costs—millions of dollars—that the entire Protocol was designed to avoid in the first place.  To describe Veristar's position as nonsensical would be charitable.  To describe it as extortionate, however, would be accurate.

Veristar claims that its position finds support in a single sentence in the Order, read in isolation: "PDS will store the Transferred Data at MDL Counsel's expense until the termination of the MDL Action."  Ex. A at 13.  But Veristar's position runs afoul of the fundamental rule that "courts must not read a single term or group of words in isolation," *Cicero*, 100 So.3d at 238–39, but instead "must examine the whole instrument" and "reach an interpretation consistent with reason, probability, and the practical aspects of the transaction between the parties," *Bucacci*, 933 So. 2d at 585.  Reading a single sentence to impose on the PSC the entire cost of processing and hosting the global set of Transferred Data, as Veristar does, illogically nullifies every other cost-limiting and cost-sharing provision of the Protocol.  It defies "reason, probability, and the practical aspects of the transaction between the parties." *Id.*

In contrast, a reasonable construction of the sentence, informed by context, is that it clarified that neither the Takata nor the JSS entities would be responsible for additional costs relating to the Transferred Data.  The immediately preceding sentence states: "For the avoidance of doubt, the Parties agree that any costs or expenses arising after the receipt of the Transferred Data by PDS and related to the processing, hosting, review, management, or use of any kind of the Transferred Data shall not be borne by the Takata Entities or JSS."  Ex. A at 13.  Significantly, the next sentence does not make the PSC responsible for the same set of "costs or expenses," i.e., those "related to the processing, hosting, review, management, or use of any kind of the Transferred Data." *Id.*  Rather, omitting any reference to "processing, hosting, review [or] management," the

next sentence states that Planet Data will "**store** the Transferred Data at MDL Counsel's expense until the termination of the MDL Action." *Id.*  Since the Protocol contemplated that the vast majority of data would remain off-line and unprocessed on hard drives, unless and until a Requesting Party stepped forward and accepted the "processing, hosting, review [and] management" costs, the parties anticipated that the costs to merely "store the Transferred Data" would be de minimis, and Planet Data agreed to not charge the PSC for such an expense.  Ex. B, ¶ 10.  Veristar, standing in Planet Data's shoes, must be "bound by [its] agreements and obligations," *Poinciana Properties*, 437 So. 2d at 216, and cannot blur the categorical expense distinctions found in the Order.

Underscoring the unreasonableness of Veristar's position is the course of dealing between Planet Data and the PSC for almost two years.  As Veristar's witness meekly concedes in a footnote (ECF No. 4790-1 at 8 n.8), Planet Data ***never*** charged the PSC general storage fees for the entire set of Transferred Data.  Ex. B, ¶ 18; Ex. C, ¶ 7; Ex. D, ¶ 6.  Rather, Planet Data only charged the PSC expenses associated with the limited subset of requested Custodians' data covered in the Statement of Work that the PSC executed.  Ex. B, ¶ 18.  And when the PSC informed Planet Data that it no longer needed access to that data and instructed Planet Data to stop hosting it, Planet Data reduced its charges to the PSC accordingly.  *Id.*, ¶ 17.  This extensive course of dealing is completely irreconcilable with Veristar's effort to charge the PSC for hosting all 128 terabytes of the Transferred Data, and thus requires rejection of Veristar's contrary interpretation of the Order. *See Brown v. Fin. Serv. Corp., Int'l*, 489 F.2d 144, 151 (5th Cir. 1974) ("[C]ourts may look to subsequent action of the parties to determine the interpretation that they themselves placed on the contractual language.") (citing *Lalow v. Codomo*, 101 So. 2d 390, 393 (Fla. 1958) (["T]he actions of the parties may be considered as a means of determining the interpretation that they themselves have placed upon the contract."); *see also Handi-Van, Inc. v. Broward Cnty., Fla.*, No. 08-62080-CIV, 2010 WL 1223776, at *3 (S.D. Fla. Mar. 29, 2010) (Moreno, J.), *aff'd*, 445 F. App'x 165 (11th Cir. 2011) (citing *Lalow* to "consider[]" conduct of the parties "as evidence that Plaintiffs understood that the intent of the clause" in dispute); *Blackhawk Heating & Plumbing Co. v. Data Lease Fin. Corp.*, 302 So. 2d 404, 407 (Fla. 1974) ("Where the terms of a written agreement are in any respect doubtful or uncertain . . . and the parties to it have, by their own conduct, placed a construction upon it which is reasonable, such construction will be adopted by the court."); *accord Martinez v. Reynolds*, No. 21-11084, 2022 WL 1113001, at *3 (11th Cir. Apr. 14, 2022); *Hollinger*

17

*v. Hollinger*, 292 So. 3d 537, 543 (Fla. 5th DCA 2020); *Est. of Hatch by Ruzow v. Nyco Mins. Inc.*, 666 N.Y.S.2d 296, 299 (3d Dept. 1997) ("[W]here an ambiguity is present in a contract may the subsequent conduct of the parties be used to indicate their intent.").

An instructive precedent applying this principle is *Hirsch v. Jupiter Golf Club LLC*, 232 F. Supp. 3d 1243, 1252 (S.D. Fla. 2017). In that case, members of a golf club sued the new owner of the club for breaching the membership agreement. *Id.* To construe disputed provisions of the membership agreement, the court relied on the multi-year course of dealing between the members and the former owner, which had initially negotiated the agreement. *Id.* at 1255–56. The Court observed that "the practical interpretation of a contract by the parties to it for any considerable period of time before it comes to be the subject of controversy is deemed of great, if not controlling, influence." *Id.* at 1252 (quoting *Old Colony Trust Co. v. City of Omaha*, 230 U.S. 100, 118 (1913)). The Court further recognized, with particular relevance here, that "[t]he course of performance analysis is not cast aside when a contract is assigned." *Id.* Rather, "[t]he more accepted view espoused by courts seems to be that course of performance by predecessors-in-interest to a contract is relevant in interpreting the meaning of a contract, especially when that course of performance is undisputed." *Id.* (quotation marks omitted).

Under *Hirsch*, the multi-year course of performance by Planet Data and the PSC—during which Planet Data ***never*** charged the PSC a general storage fee for the entire set of the Transferred Data—must be "deemed of great, if not controlling, influence" when construing the Order. *Id.* It demonstrates that the parties did not understand the Order to authorize Planet Data to charge the PSC for anything other than the requested Custodians' data specified in the PSC's Statement of Work. This analysis "is not cast aside," but instead remains "relevant in interpreting the meaning" of the Order, even if Veristar is permitted to step into Planet Data's shoes. *Id.*

Only after taking possession of Planet Data's assets (in violation of the Order) and reading a single sentence out of context did Veristar manufacture the revisionist interpretation of the Order it now advances. The law does not permit contracts to be gamed in this manner. Veristar's disingenuous position must be rejected.

### IV.   Veristar's Unjust Enrichment Theory Must Be Rejected.

Veristar appears to vaguely advance a theory of unjust enrichment as an alternative basis for its Application, repeatedly claiming that its uncompensated efforts benefited the PSC and

referring once to "quasi-contract remedies." (ECF No. 4790 at 13.) But Veristar cannot rely on this equitable doctrine for its absurd payment demand, for three reasons.

First, the doctrine of unclean hands bars relief to Veristar. Under the doctrine, "no one shall be permitted to profit from his own fraud or wrongdoing, and [ ] one who seeks the aid of equity must do so with clean hands." *O'Halloran v. PricewaterhouseCoopers, LLP*, 969 So. 2d 1039, 1044 n.3 (Fla. 2d DCA 2007) (quotation and citation omitted); *One 32nd St. Corp. v. Stewart*, 140 N.Y.S.3d 664, 670 (N.Y. Sup. Ct. 2020) (holding that unclean hands precluded claim for unjust enrichment). "Equity will stay its hand where a party is guilty of conduct condemned by honest and reasonable men. Unscrupulous practices, overreaching, concealment, trickery or other unconscientous conduct are sufficient to bar relief." *Hensel v. Aurilio*, 417 So. 2d 1035, 1038 (Fla. 4th DCA 1982) (internal quotation marks omitted). "The conduct constituting the unclean hands 'must generally be connected with the matter in litigation and must affect the adverse party.'" *Gastaldi v. Sunvest Resort Communities, LC*, No. 08-62076-CIV, 2010 WL 457243, at *8 (S.D. Fla. Feb. 3, 2010) (quoting *McCollem v. Chidnese*, 832 So.2d 194, 196 (Fla. 4th DCA 2002)). These requirements are easily satisfied here, because Veristar taking control of the Transferred Data both violated the Order, which did not authorize Veristar's possession of the data, and served as the basis for its payment demand. Veristar also grossly overreached in seeking millions of dollars in fees for hosting the global set of Transferred Data, contrary to the terms of the Protocol.

Second, the existence of the Order, which itself adopts the parties' underlying agreement, makes the equitable theory of unjust enrichment unavailable. *Fulton v. Brancato*, 189 So. 3d 967, 969 (Fla. 4th DCA 2016) (rejecting quasi-contract and unjust enrichment theory where "the evidence established the existence of a written agreement"); *Ocean Commc'ns, Inc. v. Bubeck*, 956 So.2d 1222, 1225 (Fla. 4th DCA 2007) ("[A] plaintiff cannot pursue an equitable theory, such as unjust enrichment or quantum meruit, to prove entitlement to relief if an express contract exists."); *Kovtan v. Frederiksen*, 449 So.2d 1, 1 (Fla. 2d DCA 1984) ("It is well settled that the law will not imply a contract where an express contract exists concerning the same subject matter."); Amable v. New Sch., 551 F. Supp. 3d 299, 318 (S.D.N.Y. 2021) ("[U]nder New York law, a plaintiff may not recover under quasi-contract claims such as unjust enrichment where an enforceable contract governs the same subject matter.") (internal quotation marks omitted).

19

Finally, Veristar's supposed efforts conferred no benefit on the PSC. The PSC obtained and paid for the data of relevant Custodians more than a year before Veristar purchased Planet Data's assets, and did obtain any additional data once Veristar allegedly began processing and hosting the Transferred Data. Ex. B, ¶ 23. Whatever costs Veristar expended did not inure to the benefit of the PSC. Veristar's claims to the contrary are empty assertions, bereft of a shred of evidence. Because Veristar cannot demonstrate that the PSC "received a benefit under circumstances that made it unjust to retain it without giving compensation," it cannot prevail on a theory of quasi-contract or unjust enrichment. *Bubeck*, 956 So.2d at 1225 (internal quotation marks omitted).

<u>C</u>ONCLUSION

For the foregoing reasons, the PSC respectfully requests that the Court deny Veristar's utterly frivolous motion in its entirety.

Dated: June 28, 2024                               Respectfully submitted,

                                                   **PODHURST ORSECK, P.A.**

                                                   */s/ Peter Prieto*
                                                   Peter Prieto (FBN 501492)
                                                   Aaron S. Podhurst (FBN 63606)
                                                   Stephen F. Rosenthal (FBN 131458)
                                                   Matthew P. Weinshall (FBN 84783)
                                                   SunTrust International Center
                                                   One S.E. Third Ave., Suite 2300
                                                   Miami, Florida 33131
                                                   Phone: (305) 358-2800
                                                   Fax: (305) 358-2382
                                                   Email: pprieto@podhurst.com
                                                          apodhurst@podhurst.com
                                                          srosenthal@podhurst.com
                                                          mweinshall@podhurst.com

                                                   ***Chair Lead Counsel for Plaintiffs***

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **SMITH LACIEN LLP**<br>Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel:  (914) 749-8200<br>Fax: (914) 749-8300<br>Email: dboies@bsfllp.com<br>     mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel:  (305) 539-8400<br>Fax:  (305) 539-1307<br>Email: szack@bsfllp.com<br>     mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**<br>Elizabeth Cabraser<br>ecabraser@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:    415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC** | **BARON & BUDD, PC** |
|---|---|
| James E. Cecchi | Roland Tellis |
| jcecchi@carellabyrne.com | rtellis@baronbudd.com |
| 5 Becker Farm Road | David Fernandes |
| Roseland, NJ 07068-1739 | dfernandes@bardonbudd.com |
| T: 973 994-1700 | Mark Pifko |
| f: 973 994-1744 | mpifko@baronbudd.com |
| | 15910 Ventura Blvd., |
| | Suite 1600 |
| | Encino, CA 91436 |
| *Plaintiffs' Steering Committee* | T: 818-839-2333 |
| | |
| | J. Burton LeBlanc |
| | 9015 Bluebonnet Blvd. |
| | Baton Rouge, LA 70810 |
| | T: 225-761-6463 |
| | |
| | *Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on June 28, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto*
Peter Prieto