EXHIBIT A

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division

MDL No. 2599
Master File No.: 15-MD-02599-MORENO
S.D. Fla. Case No. 15-cv-20664-MORENO
S.D. Fla. Case No. 14-cv-24009-MORENO

| | |
|---|---|
| IN RE: <br><br> TAKATA AIRBAG PRODUCT <br> LIABILITY LITIGATION | |
| THIS DOCUMENT RELATES TO: <br><br> ALL CASES | |

### ORDER GRANTING UNOPPOSED JOINT MOTION FOR ORDER APPROVING BANKRUPTCY PROTECTIVE ORDER RELATING TO DATA OF BANKRUPT TAKATA ENTITIES

THIS CAUSE came before the Court upon the unopposed motion (the "Motion")[1] of Plaintiffs and third-parties TKJP Corporation, TK Holdings, Inc., and Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems to approve the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order, effective as of October 12, 2018 (the "Bankruptcy Protective Order," attached hereto as Exhibit "1"), as more fully described in the Motion, and this Court having determined that the legal and factual bases set forth in the Motion establish good cause for the relief granted herein, and upon all of the proceedings had before the Court and after due deliberation and sufficient cause appearing therefor,

**IT IS HEREBY ORDERED THAT:**

---

[1] Capitalized terms used but not otherwise defined herein shall have the meaning ascribed to such terms in the Motion.

1. The Motion **(D.E. 3319 in 15-02599; D.E. 1254 in 14-24009; D.E. 1116 in 15-20664)** is **GRANTED** as set forth herein.

2. The Bankruptcy Protective Order shall be and hereby is entered as an order of this Court and shall bind all parties to this action in their individual capacities and will continue in full force and effect upon remand of any action.

3. The Bankruptcy Protective Order shall apply only to the data specifically referenced therein, including the PSAN Data, and shall not modify any other protective or confidentiality orders entered in these actions.

4. This Court shall retain exclusive jurisdiction to hear and determine all matters arising from or related to the implementation, interpretation, or enforcement of this Order.

**DONE AND ORDERED** in Chambers at Miami, Florida this ⎷⎩ day of March, 2019.

FEDERICO A. MORENO
UNITED STATES DISTRICT JUDGE

Copies furnished to:

Counsel of Record

2

## EXHIBIT A

## CONFIDENTIALITY AND DATA PRIVACY AGREEMENT,

## AND STIPULATED PROTECTIVE ORDER

## CONFIDENTIALITY AND DATA PRIVACY AGREEMENT,
## AND STIPULATED PROTECTIVE ORDER

This Confidentiality and Data Privacy Agreement, and Stipulated Protective Order (the "*Order*") is made as of October 12, 2018, and entered into by and among Eric D. Green, as Trustee (the "*Trustee*") of the Takata Airbag Tort Compensation Trust Fund (the "*Trust*"), Eric D. Green, as Special Master (the "*Special Master*") of the Takata Individual Restitution Fund (the "*IRF*"), Roger Frankel, as the Future Claimants' Representative (the "*FCR*"), the PSAN PI/WD Trust Advisory Committee (the "*TAC*," and together with the Trustee, Trust, and FCR, the "*Trust Parties*"), Chair Lead Plaintiffs' Counsel in *In re Takata Airbag Products Liability Litigation*, MDL No. 2599, on behalf of the Plaintiffs' Steering Committee in MDL No. 2599 (the "*MDL Counsel*"), certain automobile manufacturers and distributors who are, or may be, defendants in litigation involving Takata inflators, as identified in Schedule A hereto (the "*OEMs*"), and TKJP Corporation (*previously* Takata Corporation), a Japanese corporation (*kabushiki kaisha*), and its affiliates, subsidiaries, successors and assigns ("*TKJ*"), RTK Service LLC ("*RTKJ*"), and TK Holdings, Inc. ("*TKH*," and, together with TKJ and RTKJ, the "*Takata Entities*"), and Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems ("*JSS*") (collectively, the "*Parties*," and each a "*Party*"), through their respective undersigned representatives.

WHEREAS, the Parties anticipate that there may be discovery related to claims and other matters in the following cases, proceedings, and actions (including derivative actions, adversary proceedings, and related cases): (1) *In re TK Holdings Inc., et al.*, U.S. Bankr. Ct. Dist. Del., Case No. 17-11375-BLS (the "*Chapter 11 Case*"); (2) *In re Takata Airbag Products Liability Litigation*, U.S. Dist. Ct. S.D. Fla., MDL No. 2599, Master Case No. 15-md-02599-FAM (the "*MDL Action*"); (3) *State of Hawai'i v. Takata Corporation, et al.*, 1st Cir. Ct. Haw.

(Honolulu), Case No. 16-1-0922-05-RAN; (4) *State of Hawai'i v. Toyota Motor Corp., et al.*, 1st

Cir. Ct. Haw. (Honolulu), Case No. 17-1-0841-05-GWBC; (5) *Government of the U.S. Virgin*

*Islands v. Takata Corporation, et al.*, Super. Ct. V.I. (St. Thomas), Case No. ST-16-CV-286;

(6) *Government of the U.S. Virgin Islands v. Toyota Motor Corp., et al.*, Super. Ct. V.I.

(St. Thomas), Case No. ST-17-CV-218; (7) *State of New Mexico, ex rel. Hector Balderas v.*

*Takata Corporation, et al.*, 1st Jud. Dist. Ct. N.M. (Santa Fe), Case No. D-101-CV-2017-00176;

(8) *Takata Corporation Civil Rehabilitation Proceedings* under the Civil Rehabilitation Act of

Japan, Act No. 225 of December 22, 1999, before the 20th Dep't Civ. Div. Tokyo Dist. Ct. Japan

(the "***Japan Civil Rehabilitation Proceedings***"); and (9) all other actions or legal proceedings,

now pending or filed in the future, in the U.S. or any other country, asserting claims arising from

or related to economic loss, personal injury, or wrongful death allegedly caused by a Takata

PSAN Inflator (as that term is defined in the *Fifth Amended Joint Chapter 11 Plan of*

*Reorganization of TK Holdings Inc. and its Affiliated Debtors*, dated as of February 20, 2018

(the "***Plan***")) (the foregoing cases, proceedings, and actions, collectively, the "***Actions***"); as well

as (10) claims made pursuant to the claims procedures in the Trust and IRF, including the

procurement and use of documents, data, and materials related thereto (each a "***Claims***

***Resolution Facility***," and collectively the "***Claims Resolution Facilities***");

        WHEREAS, the Parties recognize that the Takata Entities possess data as of the

date of this Order that the Special Master, the Trust Parties, MDL Counsel, the OEMs, and

other litigants may deem useful or necessary to litigate or resolve the Actions or Claims

Resolution Facilities, including Economic Loss Claims, OEM Claims, PSAN PI/WD Claims (as

those terms are defined in the Plan), claims made pursuant to the Claims Resolution Facilities,

or other claims arising in the Actions (the "***PSAN Data***"), comprised of (i) data previously

produced in the MDL Action, to governmental entities, or in other litigation ("**Previously Produced PSAN Data**"), and (ii) Transferred Data (as defined herein) never processed, reviewed, or produced in litigation or to any governmental entity but that contains a term or terms listed on the PSAN Search Terms list as set forth at Schedule "C" ("**Unprocessed PSAN Data**"), and that the Takata Entities represent that the PSAN Data is comingled with the JSS Data (as defined herein), and that it may be impracticable for the Takata Entities to separate the PSAN Data from the JSS Data, and further that certain Confidential (as defined herein) OEM data is contained in the Previously Produced PSAN Data and may also be contained in the Unprocessed PSAN Data;

WHEREAS, in order to facilitate the Claims Resolution Facilities and the resolution of the Actions by MDL Counsel and other litigants, and in accordance with their obligations and responsibilities pursuant to the PSAN PI/WD Trust Cooperation Agreement, effective as of April 10, 2018 (the "**Trust Cooperation Agreement**"), the November 16, 2017 Asset Purchase Agreements between the Takata Entities and KSS Holdings, Inc. and related bankruptcy documents and requirements in the Chapter 11 Case and the Japan Civil Rehabilitation Proceedings, the Takata Entities and JSS have agreed to transfer all of the PSAN Data and JSS Data to Planet Data Solutions, Inc. ("**PDS**") for the discrete purpose of complying with the Protocol (as described herein) and the terms of this Order, and PDS shall act only as custodian of the PSAN Data and JSS Data on behalf of the Takata Entities and JSS;

WHEREAS, pursuant to the certain Agreement Regarding Cross Border Transfer of Personal Data, dated October 11, 2018 (the "**Data Transfer Agreement**," a copy of which is attached hereto as Exhibit 1), TKJ and RTKJ, as "**Data Transferor**," and PDS, as "**Data Recipient**" (as those terms are used in the Data Transfer Agreement), agree to comply

with the data protection laws of Japan in the transfer of data that originated in Japan or was in the possession of Japanese entities (the "***Japan Data***");

   WHEREAS, the Parties agree that any requests for the provision of Unprocessed PSAN Data to the Special Master, the Trust Parties, MDL Counsel, the OEMs, and other litigants in the Actions or Claims Resolution Facilities who agree to be bound by the terms hereof by signing the "Acknowledgment of Stipulated Protective Order," attached hereto as Exhibit 2, shall trigger a protocol in order to segregate PSAN Data from JSS Data and to separate potentially Privileged PSAN Data (as defined herein) from non-Privileged PSAN Data (the "***Protocol***," as set forth in Paragraph 3 below);

   WHEREAS, the Takata Entities represent that, except as may be provided in the global transaction documents related to the Plan, prior to entering into this agreement, the Takata Entities have not entered into any other agreements to provide any other parties access to the Unprocessed PSAN Data; and

   WHEREAS, the Parties seek to facilitate the prompt resolution of disputes over confidentiality and to permit the disclosure and use of Discovery Material (as defined herein) in accordance with the terms and conditions set forth in this Order;

**NOW, BASED ON THE FOREGOING STIPULATIONS, IT IS ORDERED:**

1.  **Scope of Order**.  This Order governs the handling of the Transferred Data; provided, however, that this Order shall not govern the handling of any Previously Produced PSAN Data, data transferred directly to the Trust by the Takata Entities or counsel to the Takata Entities, or data in the possession of the Takata Entities or JSS that is not Transferred Data.

2.     **Definitions**.

(a)     The term "*Attorneys' Eyes Only*" shall refer to any Discovery Material that the

Producing Party reasonably believes to be economically or competitively sensitive,

such as strategic planning information, negotiation strategies, proprietary software

or systems, proprietary edits or customizations to software, pricing information,

non-public product design or testing information, non-public information

consisting either of trade secrets or proprietary or highly confidential business,

financial, regulatory, or strategic information, the disclosure of which would

create a substantial risk of competitive or business injury to the Producing Party,

any OEM, or JSS.  Attorneys' Eyes Only Discovery Material may only be viewed,

reviewed, used, or possessed by (a) attorneys for the Parties actively working on

the Actions or the Claims Resolution Facilities; (b) vendors or non-attorney

personnel regularly employed by or associated with a Party's counsel and working

under the supervision and direction of counsel engaged in work relating to the

Actions or the Claims Resolution Facilities and covered by the attorney-client

privilege or attorney work product doctrine; (c) outside experts and consultants

retained by a Party's counsel to do work relating to the Actions or the Claims

Resolution Facilities; (d) the relevant court in the appropriate Action or Claims

Resolution Facility; (e) the Special Master; (f) the Trustee; (g) the FCR;

(h) Review Officers (as defined in the *Individual Restitution Fund Methodology*)

for the IRF; (i) reviewers on the Appeals Panel (as defined in the *PSAN PI/WD

Trust Distribution Procedures*) for the Trust; (j) PDS and its personnel; and

(k) any person who (I) authored, is listed as a recipient of, or is mentioned,

5

discussed, or referred to in the Attorneys' Eyes Only Discovery Material sought to be disclosed to that person, *or* (2) is or was a custodian of such document or material, *and* (3) has signed the "Acknowledgment of Stipulated Protective Order" before the material is disclosed to such person. Notwithstanding the foregoing, attorneys for the Parties actively working on the Actions or the Claims Resolution Facilities may disclose Attorneys' Eyes Only Discovery Material while on the record in a deposition of a witness taken in an Action or Claims Resolution Facility, provided that: (i) the attorney in good faith believes the witness has knowledge of the matters contained in the Attorneys' Eyes Only Discovery Material (but only as to the subject matter to which the witness is reasonably believed to have knowledge); and (ii) the witness signs the "Acknowledgment of Stipulated Protective Order" before the material is disclosed or prior to conclusion of the witness's testimony. Testimony relating to Attorneys' Eyes Only Discovery Material in any such deposition shall be designated "Confidential," "Highly Confidential," or "Attorneys' Eyes Only" under the applicable protective order in that Action or Claims Resolution Facility, or such treatment shall be sought by the attorneys in that Action.

(b)     The term "***Confidential***" shall refer to all Discovery Material, meaning that Discovery Material shall be treated as containing sensitive, non-public information, including business, commercial, technical, marketing, planning, personal, research, or financial information.

(c)     The term "***Discovery Material***" shall refer to any Transferred Data, excluding JSS Data and Personal Data, to be used, produced, or disclosed in any Action or

Claims Resolution Facility pursuant to the terms of this Order.  All Discovery

Material is hereby deemed Confidential and designated Attorneys' Eyes Only.

All Discovery Material shall be treated as containing sensitive, non-public

information, including business, commercial, technical, marketing, planning,

personal, research, or financial information of a Party or a third party.

(d)     The term "*JSS Data*" shall refer to any Transferred Data that is the property of

JSS (for the avoidance of doubt, Transferred Data that is comprised of non-PSAN-

related information is the property of JSS), including any privileged Transferred

Data for which JSS holds the applicable privilege.

(e)     The term "*Personal Data*" shall refer to Transferred Data that a Party believes in

good faith to be subject to federal, state, or foreign data protection laws.

Examples of such data protection laws include, but are not limited to: The

Gramm-Leach-Bliley Act, 15 U.S.C. § 6801 et seq. (financial information); The

Health Insurance Portability and Accountability Act, 45 CFR Part 160 and

Subparts A and E of Part 164 (medical information); The General Data Protection

Regulation (EU) 2016/679 (European Union personal information); The Personal

Information Protection and Electronic Documents Act (PIPEDA), S.C. 2000, c. 5

(Canada personal information); The Federal Law on Protection of Personal Data

Held by Private Parties (July 5, 2010) (Mexico personal information); and The

Amended Act on the Protection of Personal Information (effective as of May 30,

2017) (the "*Japanese Data Protection Laws*").  For the avoidance of doubt,

Personal Data shall include information regarding an individual (A) that may

identify a specific individual by name, date of birth, or any other description

7

1385768-v27\NYCDMS

contained in such information (including information that can be readily verified against other information and can thereby identify a specific individual) and (B) that contains an Individual Identification Code as defined under the Japanese Data Protection Laws.

(f)  The term "**Privileged PSAN Data**" shall refer to Transferred Data within any PSAN Dataset (as defined herein) that is subject to or protected by any applicable privilege, protection, or immunity that has not been waived or previously abandoned, including, but not limited to, the attorney-client privilege, the attorney work product doctrine, the joint defense privilege, and the common interest privilege, now or previously held by any Takata Entity, the Trustee, or JSS. For the avoidance of doubt, nothing in this Order shall be construed as independently recognizing, establishing, or prolonging the existence or validity of any privilege, protection, or immunity.

(g)  The term "**Producing Party**" shall refer to the Takata Entity from which data produced pursuant to this Order originated, and with respect to JSS Data shall include JSS.

(h)  The term "**Receiving Party**" shall refer to the Party or Parties that receive Discovery Material.

(i)  The term "**Requesting Party**" shall refer to the Party that requests PSAN Data from PDS in accordance with the Protocol (as defined herein) for use in any Action or Claims Resolution Facility.

1385768-v27\NYCDMS

3.  **Protocol**.  On or about October 12, 2018, the Japan Data that was collected and preserved by Deloitte Tohmatsu Financial Advisory LLC ("*Deloitte*") on behalf of the Takata Entities and that is in Deloitte's possession as of October 12, 2018, will be transferred from Deloitte to PDS at the direction of TKJ and RTKJ.  On or about October 12, 2018, data that was collected and preserved by Complete Discovery Source, Inc. ("*CDS*") on behalf of the Takata Entities that is comprised of data that was created by or in the possession of the Takata Entities and that is in CDS's possession as of October 12, 2018, will be transferred from CDS to PDS at the direction of TKH (the "*TKH Data*").  The Japan Data and TKH Data (together, the "*Transferred Data*") will be transferred to PDS at the expense of the Takata Entities and JSS, up to the total combined amount of $75,000.00.  The Parties agree that, upon receipt of the Transferred Data by PDS in the form and manner as set forth in Schedule B hereto, neither the Takata Entities nor JSS shall have any obligation to pay or assume any additional costs or expenses in any way related to the Transferred Data or this Order, and the Takata Entities shall have no obligation to maintain or preserve copies of the Transferred Data, and may destroy any such copies at the individual discretion of each Takata Entity and at its own expense.  For the avoidance of doubt, the Parties agree that any costs or expenses arising after the receipt of the Transferred Data by PDS and related to the processing, hosting, review, management, or use of any kind of the Transferred Data shall not be borne by the Takata Entities or JSS.  PDS will store the Transferred Data at MDL Counsel's expense until the termination of the MDL Action.  Upon termination of the MDL Action, the Transferred Data will be transferred to TKH for storage (if possible), unless any litigant in another Action or Claims Resolution Facility, the Special Master, or the Trustee decides to extend

9

the services of PDS and such party extending the services pays the required storage fees to PDS. The Transferred Data is comprised of PSAN Data and JSS Data. In order for any Requesting Party to obtain possession of, or review, any PSAN Data, except Previously Produced PSAN Data, this Protocol must be strictly followed according to the steps (the "*Steps*" or "*Step*") outlined below and at the Requesting Party's sole cost or expense, unless otherwise specified herein. If the Takata Entities and/or JSS agree to produce or provide access to some or all of the Unprocessed PSAN Data to any other person or entity under terms that are different than those of this Protocol ("*Alternative Access Terms*"), the Takata Entities and/or JSS shall notify the Parties of the Alternative Access Terms within 5 days of agreeing to the Alternative Access Terms, and the Requesting Party shall have the option of following this Protocol or the Alternative Access Terms. The terms of this Protocol supersede any prior agreements, understandings or representations (whether written or oral) by or between the Parties to the extent they relate in any way to the Transferred Data, but do not affect or supersede the terms of any existing protective order or confidentiality order entered in any Action with respect to Previously Produced PSAN Data.

    **Protocol Step One.** PDS shall maintain a list of custodians, to be provided by the Takata Entities, from which the Transferred Data was originally collected (the "*Custodian List*") and shall provide the Custodian List to a Requesting Party upon request. A Requesting Party that desires to search for relevant PSAN Data for use in the Actions or Claims Resolution Facilities shall provide PDS with an executed *Statement of Work* substantially in the form attached hereto as Exhibit 3 (the "*SOW*"), with the requisite retainer fee as described

10

therein, and provide a copy of such SOW to the Takata Entities and JSS.  The Requesting Party shall identify a custodian or custodians from the Custodian List, from which the Requesting Party desires to search for relevant PSAN Data for the Requesting Party's use in the Actions or Claims Resolution Facilities, as required by the SOW (the "***Custodian's Data***").  Upon receipt of an SOW satisfactory to PDS, if the requested Custodian's Data has not been processed through this Protocol, PDS shall implement Protocol Steps Two and Three as to the requested Custodian's Data.  If the requested Custodian's Data has been processed through this Protocol, PDS need not repeat Protocol Steps Two and Three and shall implement the remaining Protocol Steps, but the Requesting Party shall pay to PDS its per capita proportion of the costs previously incurred for implementing Protocol Steps Two and Three as to the requested Custodian's Data, and PDS shall distribute such payment, per capita, to the Parties that previously paid the costs for implementing Protocol Steps Two and Three as to the requested Custodian's Data ("***Cost-Sharing Provision***").[1]  To ensure the proportionate distribution of costs among parties using the Transferred Data, a party to an Action or Claims Resolution Facility may not obtain Transferred Data from another party to the Action or Claims Resolution Facility without complying with the Protocol, signing the "Acknowledgment of Stipulated Protective Order" (if not already a Party to this Order), and making the

---

[1] The following example illustrates how the Cost-Sharing Provision will be implemented.  Assume the cost of implementing Protocol Steps Two and Three for a particular Custodian's Data was $12 and paid by the first Requesting Party.  If a second Requesting Party requests the same Custodian's Data, the second Requesting Party will pay $6 to PDS, which will then distribute the $6 to the first Requesting Party.  If a third Requesting Party requests the same Custodian's Data, the third Requesting Party will pay $4 to PDS, which will then distribute $2 each to the first and second Requesting Parties.

1385768-v27\NYCDMS

appropriate payment pursuant to the Cost-Sharing Provision, except as set forth in Paragraph 11, *infra*.

**Protocol Step Two.**     PDS shall retrieve the requested Custodian's Data from its off-line storage and shall upload said Custodian's Data onto an active PDS database.  PDS shall then perform a search of the uploaded Custodian's Data in order to segregate PSAN Data from JSS Data (the "***PSAN Search Terms***").[2]  The PSAN Search Terms have been agreed upon between the Takata Entities, MDL Counsel, and the OEMs.  It is intended that the resulting dataset (the "***PSAN Dataset***") will be comprised of the identified PSAN Data and shall exclude JSS Data.

**Protocol Step Three.**     PDS shall then perform a series of searches on the PSAN Dataset designed to segregate out any potentially Privileged PSAN Data using search terms (the "***Privilege Search Terms***")[3] agreed to by the Parties and provided to PDS.  The search terms consist of (i) the email domains of the Takata Entities' external counsel, (ii) the names of the Takata Entities' external counsel, (iii) the names of the Takata Entities' internal counsel, and (iv) other terms that identify potentially privileged material.  PDS shall then create a privilege log of withheld data (the "***Withheld Data Log***") which describes the nature of the potentially Privileged PSAN Data in a manner that will enable the Requesting Party to assess the possibility of privilege, pursuant to

---

[2] The list of PSAN Search Terms is attached hereto as Schedule C.
[3] The list of Privilege Search Terms is attached hereto as Schedule D.

1385768-v27\NYCDMS

Fed.R.Civ.P. 26(b)(5), including by listing which PSAN Search Terms and Privilege Search Terms are contained in each document listed on the Withheld Data Log.  For the avoidance of doubt, pursuant to the Plan and the Trust Cooperation Agreement, the Trustee holds the privilege for TKH and its affiliated debtors as to TKH data.  Upon completion of this Protocol Step Three, the Trustee may review a Withheld Data Log and the underlying material to determine whether, in his sole discretion, the Trustee will waive any potential TKH privilege as to any TKH data contained therein.  The Trustee will identify the particular TKH data as to which the Trustee has determined, in his sole discretion, to waive any potential TKH privilege (the "*Waived TKH Data*") in writing to the Requesting Party and the Requesting Party will provide written notice thereof to TKJ, TKH, and JSS (the "*Notice of Proposed Waived TKH Data*").  Unless TKJ or JSS provides an objection in writing to the Requesting Party (with a copy sent to the Trustee) to the production of any Waived TKH Data, within fourteen (14) days of receipt of the Notice of Proposed Waived TKH Data by TKJ or JSS (with an additional fourteen (14) days to be provided upon request by TKJ or JSS, if needed, due to the quantity of proposed Waived TKH Data or logistical issues) on the grounds that such data is subject to a TKJ privilege, joint TKJ-TKH privilege, or a JSS privilege: (1) the Requesting Party will inform PDS of the Waived TKH Data identified by the Trustee; (2) PDS will remove the Waived TKH Data from the Withheld Data Log; and (3) the Waived TKH Data will be included in the Searchable Dataset (as defined below) to the Requesting Party.  Any disputes regarding the TKJ privilege, joint TKJ-

13

TKH privilege, or JSS privilege will be determined by the applicable court. Until such time as the applicable court determines the issue, the Privileged PSAN Data designation remains in force as to any document subject to the TKJ or JSS objection and such documents shall be treated as subject to a TKJ or JSS privilege. For the avoidance of doubt, in the event of inadvertent disclosure of a document subject to a privilege owned by TKJ or JSS, such document shall be subject to Paragraph 14 (Inadvertent Disclosure of Personal Data or Privileged PSAN Data).

**Protocol Step Four.** PDS shall provide the Requesting Party access to the resulting dataset comprised of the PSAN Dataset without the potentially Privileged PSAN Data, and the associated Withheld Data Log (the "***Searchable Dataset***"). The Requesting Party, pursuant to its respective SOW, will be granted licenses, at a per-license cost, which will allow it to perform searches of the Searchable Dataset from which the Requesting Party may identify data it wishes to download from the PDS database for the Requesting Party's use in the appropriate Action or Claims Resolution Facility. Nothing herein shall prevent the Trustee from exercising its right to waive the privilege solely as to TKH data.

**Protocol Step Five.** PDS shall output the data identified by the Requesting Party in accordance with the terms of the SOW, including the requirement that PDS affix on the top right side of each page image a legend in the following form:

**CONFIDENTIAL PSAN DATA – ATTORNEYS' EYES ONLY - SOW [SOW number]**
**Case No.:[ ] [Matter/Claimant] Name:[ ]**

4. **Obligations Under Data Transfer Agreement**. The Parties acknowledge the Data Transfer Agreement and that it provides particular obligations upon PDS, with regard to Japan Data, to maintain confidential and otherwise protect Personal Data as required by the Japanese Data Protection Laws.

5. **Redactions**. All Personal Data and data that is clearly JSS Data on its face ("**_Clear JSS Data_**") that is found within any Discovery Material shall be redacted by the Requesting Party prior to said Discovery Material's use, production, or disclosure in any of the Actions or Claims Resolution Facilities. Any Party that desires to use Discovery Material in any way must ensure that any Personal Data and Clear JSS Data is first redacted. For the avoidance of doubt, this includes the redaction of all Personal Data, including but not limited to, sensitive personal information, such as: birth dates, driver's license numbers, social security numbers or other forms of government-issued identification numbers, credit card numbers, and information related to health or sex life. PDS shall preserve an unredacted version of all such redacted Discovery Material until the termination of the MDL Action and the termination of such other litigated matters involving private civil litigants who have obtained and are utilizing such Discovery Material. Only a Requesting Party that exposes or causes the exposure of Personal Data may be liable for its conduct in so doing.

6. **Challenges to Privileged PSAN Data Designations**. A Requesting Party may, in good faith, object to the designation of any data, including data on the Withheld Data Log, as Privileged PSAN Data. The Requesting Party must state its objection in writing, specifying (by Bates numbers or any other identifying information, if possible) the nature of its challenge and explaining the basis for each objection, with notice to the Takata

1385768-v27\NYCDMS

Entities and the Trust, as applicable. The Requesting Party shall make a good faith effort to resolve the dispute with the relevant Takata Entity or the Trust and shall provide the relevant Takata Entity or the Trust the opportunity, of at least thirty (30) days from the date the relevant Takata Entity and the Trust, as applicable, received notice of the Requesting Party's designation objection, to revise its designation before the Requesting Party raises the issue with the relevant court in the appropriate Action or Claims Resolution Facility. Upon request by the relevant Takata Entity or the Trust, and in order for the relevant Takata Entity or the Trust to evaluate the dispute, PDS shall provide the relevant Takata Entity or the Trust access to review the challenged documents from the Withheld Data Log. If the Requesting Party and the relevant Takata Entity or the Trust cannot reach agreement as to the challenged designation, the Requesting Party may move the relevant court for an order determining whether the challenged data is Privileged PSAN Data. Pending a final ruling by the court on the motion, the initial designation and the terms of this Order remain in effect. If a Takata Entity is wound down and no longer exists, or if any Takata Entity or the Trust do not respond to the motion within the time period for a response pursuant to the applicable rules of such court, when a dispute concerning data designation arises, the court may, in its discretion, perform an *in camera* review of the data and will decide whether the initial designation stands. For the avoidance of doubt, (i) the fact that any Takata Entity no longer exists does not relieve the Parties' requirement to present the dispute or issue of challenged document designations to the relevant court, nor does it have any effect on the confidentiality or privilege of any Transferred Data pursuant to applicable law; (ii) nothing in this Order, nor the inclusion of data on the Withheld Data Log, shall be construed as shifting the

16

burden to the Requesting Party to establish that any challenged document or data is not privileged, and nothing in this Order shall be construed as recognizing, establishing, or prolonging the existence or validity of any privilege, protection, or immunity; and (iii) if the Trustee waives the privilege as to TKH data, the requirements of this paragraph will not apply to such TKH data for which the Trustee waived the privilege.

7. **Challenges to Attorneys' Eyes Only Designation**.  As described above in the Paragraph 2(c) definition of Discovery Material, all Discovery Material is Confidential and designated Attorneys' Eyes Only.  Any Party may, in good faith, object to the designation of any Discovery Material as Attorneys' Eyes Only because such Party believes the Discovery Material does not warrant such protection.  The objecting Party must state its objection in writing, specifying (by Bates numbers or any other identifying information, if possible) the challenged Discovery Material and explaining the basis for each objection, identifying the intended recipient(s) of the Discovery Material and the purpose for disclosure of the Discovery Material to said recipient(s), with notice to the Producing Party, including JSS and the Takata Entities.  Notice must also be given to any OEM that is referenced in or on the face of any such Discovery Material.  The objecting Party and the Producing Party, including JSS, the Takata Entities, and any referenced OEM, shall make a good faith effort to resolve the dispute.  The objecting Party shall provide the Producing Party, JSS, the Takata Entities, and the referenced OEM the opportunity to revise the designation before raising the issue with the relevant court in the appropriate Action or Claims Resolution Facility.  If the Parties cannot reach agreement as to the designation, the objecting Party may move the relevant court for an order determining whether the Attorneys' Eyes Only designation of the challenged Discovery

Material should stand or the challenged document be marked Confidential. All Parties, including JSS, the Takata Entities, and the referenced OEM, shall be entitled to file with the relevant court such materials as they deem relevant to the determination of such challenge to the designation of Discovery Material. Pending a final ruling by the court on the motion, the Attorneys' Eyes Only designation and the terms of this Order remain in effect. If, however, neither the Producing Party, JSS, the relevant Takata Entity, nor the referenced OEM responds to the written notice of objection within ten (10) days, the Attorneys' Eyes Only designation may be removed from the particular Discovery Material identified in the objecting Party's objection and a motion need not be filed.

8.  **Discovery Materials Agreed or Ordered Not Subject to Attorneys' Eyes Only Designation**. Pursuant to agreement of the disputing Parties in Paragraph 7, above, or by court order, Discovery Material that is not subject to the Attorneys' Eyes Only designation shall be designated Confidential. Confidential Discovery Material may only be viewed, reviewed, used, or possessed by the persons permitted to view, review, use, or possess Discovery Material designated Attorneys' Eyes Only as stated in Paragraph 2(a), above, and the following persons:

    (a)     the Parties, including members of the in-house legal departments for the Parties or their parents or affiliates, including their paralegals, investigative, technical, secretarial, and clerical personnel assisting them in the Actions or Claims Resolution Facilities;

    (b)     any person who is designated to testify in any of the Actions or Claims Resolution Facilities and is reasonably thought to have knowledge and information reasonably related thereto, for the purpose of assisting in the preparation or

examination of the witness, if such person has signed the Acknowledgement of Stipulated Protective Order; and

(c)    any other person upon order of the relevant court in the Action or Claims Resolution Facility.

9.    **Exclusive Use of Discovery Material in Actions or Claims Resolution Facilities**. Unless otherwise agreed by the Producing Party or ordered by the relevant court in an appropriate Action or Claims Resolution Facility, Discovery Material may be used by the Receiving Party solely for purposes relating to the Actions or Claims Resolution Facilities. For the avoidance of doubt, under no circumstance may Discovery Material, regardless of its designation, be used for any business, competitive, governmental, commercial, or administrative purpose or function unrelated to the Actions or Claims Resolution Facilities. Under terms determined by MDL Counsel or the Court presiding over the MDL Action, MDL Counsel, with reasonable prior notice to the Takata Entities, may provide access to Discovery Material within its possession or control (i.e., data that has been processed through the Protocol) to attorneys representing plaintiffs in connection with the Actions or Claims Resolution Facilities, as long as such attorneys agree to be bound by this Agreement and sign the "Acknowledgment of Stipulated Protective Order."

10.    **Security of Discovery Material**. Any person in possession of Discovery Material shall exercise the same care with regard to the storage, custody, or use of Discovery Material as they would apply to their own material of the same or comparable sensitivity. Receiving Parties must take reasonable precautions to protect Discovery Material from

loss, misuse and unauthorized access, disclosure, alteration, and destruction, including but not limited to:

(a)     Discovery Material in electronic format shall be maintained in a secure litigation support site(s) that applies standard industry practices regarding data security, including but not limited to application of access control rights to those persons entitled to access Discovery Material under this Order;

(b)     An audit trail of use and access to litigation support site(s) shall be maintained while the Actions and Claims Resolution Facilities are pending;

(c)     Any Discovery Material downloaded from the litigation support site(s) in electronic format shall be stored only on device(s) (*e.g.* laptop, tablet, smartphone, thumb drive, portable hard drive) that are password protected and/or encrypted with access limited to persons entitled to access Discovery Material under this Order.  If the user is unable to password protect and/or encrypt the device, then the Discovery Material shall be password protected and/or encrypted at the file level;

(d)     Discovery Material in paper format is to be maintained in a secure location with access limited to persons entitled to access Discovery Material under this Order; and

(e)     Summaries of Discovery Material, including any lists, memoranda, indices or compilations prepared or based on an examination of Discovery Material, that quote from or paraphrase Discovery Material in a manner that enables it to be identified shall be accorded the same status of confidentiality as the underlying Discovery Material.

If the Receiving Party discovers a breach of security[4] relating to the Discovery Material, the Receiving Party shall: (1) provide written notice to the Producing Party of the breach within 48 hours of the Receiving Party's discovery of the breach; (2) investigate and remediate the effects of the breach, and provide the Producing Party with assurance reasonably satisfactory to the Producing Party that the breach shall not recur; and (3) provide sufficient information about the breach that the Producing Party can ascertain the size and scope of the breach. The Receiving Party agrees to cooperate with the Producing Party or law enforcement in investigating any such security incident.

11. **Disclosure of Discovery Material in Actions or Claims Resolution Facilities**. To the extent Discovery Material is obtained by a Party via the processes for Transferred Data prescribed by this Order and is otherwise responsive to discovery requests in an Action, it shall be produced in civil discovery in the same manner as any other responsive document or data in such Party's possession, custody, or control, except that if less than all Transferred Data is requested, a Party may request the court presiding over the Action to determine whether and to what extent the Requesting Party must share in the processing costs pursuant to the Cost-Sharing Provision or otherwise, notwithstanding any applicable federal, state or local rule of civil procedure. If a Party in an Action requests *all* Transferred Data acquired by another Party pursuant to the processes prescribed in this Order, the Cost-Sharing Provision in Paragraph 3, Protocol Step One shall apply. In all other respects, the applicable federal, state or local rule of civil procedure shall apply to requests for and production of Discovery Material, except as

---

[4] Breach is defined to include, but is not limited to, the confirmed or suspected (i) disclosure or use of Discovery Material by or to an unauthorized person; and/or (ii) the loss, theft or hacking of a device containing Discovery Material.

ordered by the Court in its discretion. The use and disclosure of Discovery Material in any Action or Claims Resolution Facility shall be consistent with the terms of this Order and with any protective order or confidentiality order entered in the Action or Claims Resolution Facility in which it is sought to be used. All such Discovery Material shall be marked with the legend in Protocol Step Five and any case-specific Bates label when reproduced in any Action or Claims Resolution Facility. To the extent there is any inconsistency between this Order and any protective order or confidentiality order entered in the Action or Claims Resolution Facility in which the Discovery Material is used or disclosed, this Order shall control, except as may be ordered by the Court in the Action or Claims Resolution Facility.

12. **Use or Disclosure of Previously Produced PSAN Data**. Any Previously Produced PSAN Data can be used or disclosed in any Action or Claims Resolution Facility in any manner consistent with the terms of the *Stipulated Protective Order* or *Confidentiality Agreement* in the MDL Action or similar orders and agreements in any other Action or Claims Resolution Facility in which the Previously Produced PSAN Data was originally produced.

13. **Failure to Designate as Confidential**. The inadvertent failure of PDS or any Party to designate any document "**CONFIDENTIAL PSAN DATA – ATTORNEYS' EYES ONLY - SOW [SOW number] Case No.:[   ] [Matter/Claimant] Name:[   ]**" will not be a waiver of a claim that the document contains Confidential information, and will not prevent the Takata Entities and JSS, or any OEM whose data is contained in any such document, from designating such information as Confidential at a later date.

14. **Inadvertent Disclosure of Personal Data or Privileged PSAN Data**. Inadvertent disclosure of Personal Data or Privileged PSAN Data shall not waive any privilege, protection, or immunity otherwise applicable to the Personal Data or Privileged PSAN Data under any state, federal, or foreign law. Consistent with Rule 4.4(b) of the ABA Model Rules of Professional Conduct, a Party that receives any Privileged PSAN Data shall promptly notify the Takata Entities, JSS, and the Trust. A Takata Entity, JSS (if JSS owns the applicable privilege), or the Trust may obtain the return of any Privileged PSAN Data by notifying the recipient(s) in writing and requesting their return, sequestration, or destruction. Except as provided in this paragraph, within three (3) business days, the recipient(s) shall gather and return all copies of the Privileged PSAN Data to the Takata Entity, JSS, or the Trust (as applicable), or alternatively, destroy the Privileged PSAN Data and certify such destruction to the relevant Takata Entity, JSS, or the Trust. After Privileged PSAN Data is returned, sequestered, or destroyed pursuant to this paragraph, a Party may move the relevant court in the appropriate Action for an order compelling production of the Privileged PSAN Data, but such party may not assert as a ground for entering such an order the fact of inadvertent production. Nor may a party challenging the privilege or protection assertion assert the diligence or lack thereof of counsel in producing the document, nor the scope of such inadvertent production as a ground for waiver of the privilege or protection. If a Party requests the return, pursuant to this paragraph, of Privileged PSAN Data then in the custody of one or more other Parties, the possessing Parties shall not make further use of the Privileged PSAN Data until such time as the relevant court in the appropriate Action or Claims Resolution Facility has ruled on a motion respecting the objections.

15. **Unauthorized Disclosure**. In the event of a disclosure by a Receiving Party of Discovery Material to persons or entities not authorized by this Order to receive such Discovery Material, the Receiving Party making the disclosure shall, upon learning of the disclosure: (i) immediately notify the entity or individual to whom the disclosure was made that the disclosure contains Discovery Material subject to this Order; (ii) immediately make reasonable efforts to recover the disclosed Discovery Material as well as preclude further dissemination or use by the entity or individual to whom the disclosure was made; and (iii) immediately notify the Producing Party of the identity of the entity or individual to whom the disclosure was made, the circumstances surrounding the disclosure, and the steps taken to recover the disclosed Discovery Material and ensure against further dissemination or use thereof. Disclosure of Discovery Material other than in accordance with the terms of this Order will subject the disclosing person to such sanctions and remedies as the relevant court in the appropriate Action or Claims Resolution Facility may deem appropriate, including any equitable relief or money damages. This Paragraph 15 shall not apply where disclosure by a Receiving Party of Discovery Material is made pursuant to subpoena, demand, or other legal process.

16. **Destruction of Discovery Materials Upon Termination of an Action or Claims Resolution Facility**. Each Receiving Party's counsel shall within sixty (60) days of termination of all ongoing Actions or Claims Resolution Facilities in which such Party is involved, including any appeals, destroy all Discovery Material provided under the terms of this Order, and all extracts, abstracts, charts, summaries, notes, or copies made therefrom, and shall certify in writing to the Producing Party that such destruction has been accomplished. However, the Party's outside litigation counsel shall be allowed to

keep a complete set of all pleadings, court filings, discovery responses, transcripts, exhibits used in depositions or court, correspondence, and the attorney's work product, even if those documents include reference to or inclusion of Discovery Material (the "*Attorney's File*"), unless a Party objects within thirty (30) days of the termination of the relevant Action or Claims Resolution Facility to the outside litigation counsel's retention of any portion of the Attorney's File. The Parties shall agree to confer regarding any such objection and, in the event that it is not resolved by consent, shall bring it to the attention of the relevant court in the appropriate Action or Claims Resolution Facility for resolution. In any event, such Attorney's File shall continue to be subject to the restrictions of this Order.

17.    **Destruction Obligations**.  The requirement to destroy Discovery Material outlined in Paragraph 16 above shall not require a Receiving Party to search through emails and email attachments, or any archives or backups of electronic material that are not readily retrievable in the ordinary course of business, to identify such Discovery Material or any extracts, abstracts, charts, summaries, notes, or copies made therefrom.  With respect to other electronic material, the Parties agree that deleting Discovery Material by using the "delete" function shall be sufficient for purposes of complying with the destruction requirement of Paragraph 16.  Notwithstanding the foregoing, the Receiving Party reserves the right to destroy any Discovery Material at any time.

18.    **Subpoena to Disclose Discovery Material**.  Should a Party to this Order receive a subpoena, demand, or other process (the "*Subpoenaed Party*") in a legal or administrative proceeding demanding disclosure of Discovery Material, that Party shall provide prompt written notice within five (5) business days of receipt of the subpoena,

demand, or process and a copy of such subpoena, demand, or other process, to the Takata

Entities and JSS, and to any OEM whose data is contained in the Discovery Material.

The Subpoenaed Party shall defer compliance with the subpoena or other process until

the relevant Takata Entity, JSS, or OEM has had reasonable time to move to quash or

modify the subpoena or other process, which shall be at least ten (10) business days. The

Subpoenaed Party shall also advise the person or entity who has served the subpoena or

other process of the existence of this Order. If a motion to quash or modify is filed, the

Subpoenaed Party shall not comply with the subpoena until such time as there is a final

order requiring compliance with the subpoena or demand, or compliance is otherwise

required by law or court order. Nothing herein shall be construed as requiring the

Subpoenaed Party or anyone else subject to this Order to challenge or appeal any order

requiring production of the Discovery Material protected by this Order, or to violate any

law, rule, or order, or subject itself to any penalties for noncompliance with any legal

process or order, or to seek any relief from the relevant court in the appropriate Action or

Claims Resolution Facility.

19. **Order Remains in Force**.  This Order shall remain in force until modified, superseded,

or terminated by written consent of all of the Parties or by order of the relevant court in

the appropriate Action or Claims Resolution Facility.  This Order shall survive

termination of the Actions and the Claims Resolution Facilities.  The relevant court in the

appropriate Actions or Claims Resolution Facility shall retain jurisdiction after

termination of the Actions and Claims Resolution Facilities to enforce and modify this

Order.

1385768-v27\NYCDMS

20. **Violations of this Order**. If any person violates this Order, the aggrieved Producing Party, including its representatives, may apply to the relevant court in the appropriate Action or Claims Resolution Facility for relief. The Parties acknowledge and agree that a violation of this Order will cause the Producing Party to suffer irreparable harm for which there is no adequate legal remedy. The Parties further acknowledge that immediate injunctive relief is an appropriate and necessary remedy for violation of this Order. The Parties and any other person subject to this Order agree that the relevant court in the appropriate Action or Claims Resolution Facility shall retain jurisdiction over them for the purpose of enforcing this Order.

21. **Severability**. The invalidity or unenforceability of any provision of this Order shall not affect the validity or enforceability of any other provision of this Order. In the event that any of the provisions of this Order shall be held by any court in any Action or Claims Resolution Facility to be illegal, invalid or unenforceable, such provisions shall be limited or eliminated only to the minimum extent necessary so that this Order shall otherwise remain in full force and effect in such Action or Claims Resolution Facility.

22. **Order Effective as Binding Agreement Among Parties**. If a court in any Action or Claims Resolution Facility does not enter this Order in such Action or Claims Resolution Facility, the Parties nonetheless agree to comply with the terms of this Order as a binding contract.

23. **Notice**. Any notice required to be given by this Order shall be in writing and deemed to be duly delivered, if delivered in person, by overnight mail, by certified or registered mail, or e-mail transmission, addressed as follows:

If to the Takata Entities:

1385768-v27\NYCDMS

TK Holdings, Inc.
Mike Rains, President
111 Peyerk Court
Romeo, MI 48065
Mike.Rains@Takata.com

with a copy (which alone will not constitute notice) to:

D. Ross Hamilton, Jr.
Tuggle Duggins P.A.
100 N. Greene Street, Suite 600
Greensboro, NC 27401
RHamilton@tuggleduggins.com

If to JSS:

Joyson Safety Systems Acquisition, LLC d/b/a Joyson Safety Systems
Robert Weiss, General Counsel
Lawrence Buonomo, Assistant General Counsel
2025 Harmon Road
Auburn Hills, MI 48326
Robert.Weiss@joysonsafety.com
Larry.Buonomo@joysonsafety.com

If to the Trust:

PSAN PI/WD Trust
Eric D. Green
Resolutions, LLC
125 High Street, Suite 2205
Boston, Massachusetts 02110
ericdgreen@resolutionsllc.com

with a copy (which alone will not constitute notice) to:

David J. Molton
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
dmolton@brownrudnick.com

If to the Special Master:

Special Master
Eric D. Green
Resolutions, LLC
125 High Street, Suite 2205
Boston, Massachusetts 02110

ericdgreen@resolutionsllc.com

with a copy (which alone will not constitute notice) to:

David J. Molton
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
dmolton@brownrudnick.com

If to MDL Counsel:

Peter Prieto
Podhurst Orseck, P.A.
SunTrust International Center
One S.E. 3rd Ave, Suite 2300
Miami, FL 33131
pprieto@podhurst.com

with a copy (which alone will not constitute notice) to:

Matthew P. Weinshall
Podhurst Orseck, P.A.
SunTrust International Center
One S.E. 3rd Ave, Suite 2300
Miami, FL 33131
mweinshall@podhurst.com

If to the FCR:

Roger Frankel
Frankel Wyron, LLP
2101 L Street, NW
Suite 800
Washington, DC 20037
rfrankel@frankelwyron.com

with a copy (which alone will not constitute notice) to:

Richard H. Wyron
Frankel Wyron, LLP
2101 L Street, NW
Suite 800
Washington, DC 20037
rwyron@frankelwyron.com

If to an OEM:

To the representatives identified in Schedule A.

1385768-v27\NYCDMS

If to the TAC:

     Kevin Dean
     Motley Rice LLC
     28 Bridgeside Blvd.
     Mount Pleasant, SC 29464
     Kdean@motleyrice.com

The foregoing is agreed to and executed by the following Parties:

**THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

By:

Name: Eric D. Green

Title: Trustee

Date: 10/11/18

**TKJP CORPORATION**

By:

Name:

Title:

Date:

**RTK SERVICE LLC**

By:

Name:

Title:

Date:

**TK HOLDINGS INC.**

By:

Name:

Title:

Date:

**FUTURE CLAIMANTS' REPRESENTATIVE**

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**PSAN PI/WD OEM ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS**

By:

Name:

Title:

Date:

31

1385768-v27\NYCDMS

The foregoing is agreed to and executed by the following Parties:

**THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

By:

Name:

Title:

Date:

**RTK SERVICE LLC**

By:

Name:

Title:

Date:

**FUTURE CLAIMANTS' REPRESENTATIVE**

By:

Name:

Title:

Date:

**PSAN PI/WD OEM ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**TKJP CORPORATION**

By: *Yoichiro Nomura*

Name: YOICHIRO NOMURA

Title: President

Date: 11 Oct. 2018

**TK HOLDINGS INC.**

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

DUPLICATE

**JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS**

By:

Name:

Title:

Date:

The foregoing is agreed to and executed by the following Parties:

**THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

By:

Name:

Title:

Date:

**TKJP CORPORATION**

By:

Name:

Title:

Date:

**RTK SERVICE LLC**

By: _Mark Un_

Name: _Makoto Ueno_

Title: _Executive Manager_

Date: _10/11/18_

**TK HOLDINGS INC.**

By:

Name:

Title:

Date:

**FUTURE CLAIMANTS' REPRESENTATIVE**

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

DUPLICATE

**PSAN PI/WD OEM ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS**

By:

Name:

Title:

Date:

1385768-v27\NYCDMS

The foregoing is agreed to and executed by the following Parties:

| | |
|---|---|
| **THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND** | **TKJP CORPORATION** |
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |
| **RTK SERVICE LLC** | **TK HOLDINGS INC.** |
| By: | By: _M. Rains_ |
| Name: | Name: Mike Rains |
| Title: | Title: President - TK Holdings Inc. |
| Date: | Date: October 10, 2018 |
| **FUTURE CLAIMANTS' REPRESENTATIVE** | **PSAN PI/WD TRUST ADVISORY COMMITTEE** |
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |
| **PSAN PI/WD OEM ADVISORY COMMITTEE** | **JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS** |
| By: | By: |
| Name: | Name: |
| Title: | Title: |
| Date: | Date: |

DUPLICATE

1385768-v27\NYCDMS

The foregoing is agreed to and executed by the following Parties:

**THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

By:

Name:

Title:

Date:

**TKJP CORPORATION**

By:

Name:

Title:

Date:

**RTK SERVICE LLC**

By:

Name:

Title:

Date:

**TK HOLDINGS INC.**

By:

Name:

Title:

Date:

**FUTURE CLAIMANTS' REPRESENTATIVE**

By: *[signature]*

Name: Richard H. Wyron

Title: Counsel for the FCR

Date: October 11, 2018

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**PSAN PI/WD OEM ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS**

By:

Name:

Title:

Date:

31

The foregoing is agreed to and executed by the following Parties:

**THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

By:

Name:

Title:

Date:

**RTK SERVICE LLC**

By:

Name:

Title:

Date:

**FUTURE CLAIMANTS' REPRESENTATIVE**

By:

Name:

Title:

Date:

**PSAN PI/WD OEM ADVISORY COMMITTEE**

By: Doug Bishop

Name: DB

Title: Assistant General Counsel
Honda North America, Inc.

Date: 10|12|18

**TKJP CORPORATION**

By:

Name:

Title:

Date:

**TK HOLDINGS INC.**

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS**

By:

Name:

Title:

Date:

31

1385768-v26\NYCDMS

The foregoing is agreed to and executed by the following Parties:

**THE TAKATA AIRBAG TORT COMPENSATION TRUST FUND**

By:

Name:

Title:

Date:

**TKJP CORPORATION**

By:

Name:

Title:

Date:

**RTK SERVICE LLC**

By:

Name:

Title:

Date:

**TK HOLDINGS INC.**

By:

Name:

Title:

Date:

**FUTURE CLAIMANTS' REPRESENTATIVE**

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**PSAN PI/WD OEM ADVISORY COMMITTEE**

By:

Name:

Title:

Date:

**JOYSON SAFETY SYSTEMS ACQUISITION, LLC D/B/A JOYSON SAFETY SYSTEMS**

By: *[signature]*

Name: Laurence S Buonomo

Title: Assistant General Counsel

Date: 10/10/2018

1385768-v26\NYCDMS

Case 1:14-cv-24009-FAM Document 1254-1 Entered on FLSD Docket 05/29/2019 Page 42 of
Case 1:14-cv-24009-FAM Document 1254-1 Entered on FLSD Docket 05/29/2019 Page 42 of
88
Case 17-11375-BLS Doc 3498-3 Filed 11/29/18 Page 60 of 111

**SPECIAL MASTER**

By:  _(signature)_

Name:  Eric D. Green

Title:   Special Master

Date:  10/11/18

**PSAN PI/WD TRUST ADVISORY
COMMITTEE**

By:

Name:

Title:

Date:

**MDL COUNSEL**

By:

Name:

Title:

Date:

The foregoing is agreed to and executed by the following OEM Parties listed on Schedule A.

**DONE AND ORDERED** in Chambers, _____, _____, this ___ of October, 2018.

_____
**UNITED STATES [BANKRUPTCY/DISTRICT] COURT JUDGE**

SPECIAL MASTER

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By:

Name:

Title:

Date:


MDL COUNSEL

By: _Peter Prieto_

Name: _Peter Prieto_

Title: _Plaintiffs' Chair Lead Counsel_

Date: _10/15/18_


The foregoing is agreed to and executed by the following OEM Parties listed on Schedule A.


**DONE AND ORDERED** in Chambers, _____, _____, this ___ of October, 2018.

_____

**UNITED STATES [BANKRUPTCY/DISTRICT] COURT JUDGE**

**SPECIAL MASTER**

By:

Name:

Title:

Date:

**MDL COUNSEL**

By:

Name:

Title:

Date:

**PSAN PI/WD TRUST ADVISORY COMMITTEE**

By: *Joseph F. Rice*

Name: Joseph F. Rice

Title:

Date: October 12, 2018

The foregoing is agreed to and executed by the following OEM Parties listed on Schedule A.

**DONE AND ORDERED** in Chambers, _____, _____, this ___ of October, 2018.

_____
**UNITED STATES [BANKRUPTCY/DISTRICT] COURT JUDGE**

1385768-v27\NYCDMS

# Exhibit 1

# Data Transfer Agreement

# AGREEMENT REGARDING CROSS BORDER TRANSFER OF PERSONAL DATA

by

## TKJP CORPORATION and RTK SERVICE LLC

### (DATA TRANSFEROR)

and

## PLANET DATA SOLUTIONS, INC.
### (DATA RECIPIENT)

# AGREEMENT REGARDING CROSS BORDER TRANSFER OF PERSONAL DATA

This agreement (the "*Agreement*") is dated 14 September 2018

**Between**

**TKJP CORPORATION ("*TKJP*") and RTK SERVICE LLC ("*RTK Service*"** together, "*Data Transferor*");

**AND**

**PLANET DATA SOLUTIONS, INC. ("*PDS*" or "*Data Recipient*").**

Data Transferor and Data Recipient each a "*Party*" and collectively referred to as the "*Parties*."

**Recitals**

A.   Whereby Data Transferor desires to transfer data, including Personal Data, to Data Recipient for the Purpose;

B.   Whereby Data Recipient desires to receive the Personal Data for the Purpose;

C.   Whereby Data Transferor requires Data Recipient to comply with various obligations and Data Recipient is agreeable to comply with such obligations;

D.   Parties agree that the transfer of the Personal Data from Data Transferor to Data Recipient shall be in accordance with the terms of this Agreement.

1.   **DEFINITIONS**

| | |
|---|---|
| Data Protection Laws | means the Japanese *Act on the Protection of Personal Information* and all applicable regulations and guidelines as amended |
| Data Subject | means the person identified by Personal Data |
| Personal Data | means any personal data as defined under the Data Protection Laws. For the avoidance of doubt, Personal Data shall include information regarding a living individual (i) that may identify a specific individual by name, date of birth, or any other description contained in such information (including information that can be readily verified against other information and can thereby identify a specific individual), or (ii) that contains an Individual Identification Code as defined under the Data Protection Laws. |
| Processing | means any process which shall include any operation or set of operations in relation to the Personal Data, including, but not limited to, the following: (a) recording or copying; |

| | (b) holding; |
| | (c) organizing, adapting or altering; |
| | (d) retrieving; |
| | (e) combining; |
| | (f) transmitting; |
| | (g) erasing or destroying |
| Purpose | means the purpose as identified in *Appendix 1 – Details of Transfer* |

## 2. DETAILS OF THE TRANSFER

2.1   The Parties agree that the details of the transfer of Personal Data as set out at *Appendix 1 – Details of Transfer* form an integral part of this Agreement.

## 3. OBLIGATIONS OF DATA RECIPIENT

3.1   Data Recipient represents, warrants and undertakes to Data Transferor that it will comply with the following obligations:

(a)   **Purpose.** Data Recipient shall only collect, use and disclose Personal Data for the Purpose as described in Appendix 1. Data Recipient's collection, use, disclosure or Processing of Personal Data for any purpose other than the Purpose is strictly prohibited.

(b)   **Protection.** Data Recipient shall take all necessary and appropriate technical and organizational measures to protect Personal Data in its possession or control in order to prevent unauthorised access, collection, use, disclosure, copying, modification, disposal or similar risks. Such measures taken by Data Recipient shall include the following items:

    (i)   Organizational Security Control Measures. Data Recipient's internal rules concerning the handling of personal information shall prohibit the unauthorized access to data systems used to store, access or process the Personal Data. Persons entitled to use such data systems shall gain access only to the Personal Data that they have a right to access, and Personal Data must not be read, copied, modified or removed without proper authorization in the course of Processing, access and storage.

    (ii)   Human Security Control Measures. Appropriate training concerning protection of Personal Data shall be provided to the Data Recipient's relevant officers and employees regularly. Data Recipient shall ensure that its employees comply with the Data Protection Laws.

    (iii)   <u>Physical Security Control Measures</u>. Unauthorized persons shall be prevented from gaining physical access to premises, buildings or rooms where data systems are located which store, access or process Personal Data.

    (iv)   <u>Technical Security Control Measures</u>. User IDs and passwords or other authentication measures shall be implemented to authenticate who has access to Data Recipient's systems used to store, access or process the Personal Data.

(c)   **Retention.** Data Recipient shall cease to retain documents containing Personal Data, or remove the means by which the Personal Data can be associated with particular individuals, as soon as it is reasonable to assume that the Purpose for which the Personal Data was collected is no longer being served by retention of the Personal Data, and retention is no longer necessary for legal or business purposes.

(d)   **Policies.** Data Recipient undertakes that it has developed and implemented policies and practices that are necessary to protect the Personal Data in accordance with the Data Protection Laws and this Agreement.

(e)   **Audit**. Upon notice by Data Transferor, Data Recipient shall permit an audit by Data Transferor or an independent third party auditor on Data Transferor's behalf with respect to Data Recipient's practices relevant to Processing of Personal Data pursuant to this Agreement.

(f)   **Disclosure.** Data Recipient shall, upon instruction by Data Transferor, provide necessary assistance to Data Transferor for disclosure of Personal Data to Data Subjects to whom the Personal Data relates upon the Data Subject's request. Data Recipient shall not disclose Personal Data to any third person nor the Data Subject without approval by Data Transferor, unless otherwise provided for in this Agreement.

(g)   **Discontinuation.** If the Purpose is found to have been violated, Data Recipient shall, upon instruction by Data Transferor, discontinue use of the Personal Data that is in the possession or control of Data Recipient.

(h)   **Claims**. Data Recipient shall, upon instruction by Data Transferor, provide assistance to Data Transferor in dealing with complaints made by Data Subjects in relation to the use and Processing of Personal Data.

(i)   **Transfer.** Where Data Recipient transfers the Personal Data to any third party that is located outside of Japan, Data Recipient shall ensure that said third party to whom the Personal Data is transferred shall implement appropriate measures to protect the Personal Data in accordance with the Data Protection Laws and commensurate with this Agreement.

4. **OBLIGATIONS OF DATA TRANSFEROR**

4.1 Data Transferor represents, warrants and undertakes to the Data Recipient that it will comply with the following obligations:

    (a) **Notification/Announcement.** Data Transferor has notified or will notify the Data Subjects of, or has publicly announced or will publicly announce, the Purpose in accordance with the Data Protection Laws;

    (b) **Information.** Data Transferor has made or shall make the following information available to Data Subjects upon request in the form of a privacy policy or other similar document which provides information on their policies and practices in relation to Personal Data protection: (i) Data Transferor's name, (ii) the Purpose, (iii) the procedures used by Data Transferor by which Data Subjects may request Data Transferor to disclose, correct or discontinue using the Personal Data it possesses, and (iv) the contact information for the purpose of handling complaints

    (c) **Disclosure/ Correction/ Discontinuation.** Data Transferor shall, upon Data Subject's request, disclose, correct or discontinue using Personal Data if necessary and appropriate; and

    (d) **Claims.** Data Transferor shall make reasonable efforts to deal with complaints by Data Subjects regarding its handling of Personal Data appropriately and swiftly.

5. **TERMINATION**

5.1 Data Transferor shall have the right to terminate this Agreement with immediate written notice, for any reason, and without prejudice to any rights or remedies it may have.

5.2 Upon termination or expiry of this Agreement, Data Recipient agrees to, at the sole discretion of Data Transferor:

    (a) return all Personal Data and the copies thereof to Data Transferor;

    (b) destroy all Personal Data in Data Recipient's possession and provide an independent third-party verification of the safe erasure and destruction of Personal Data; and/or

    (c) warrant that Data Recipient will guarantee the confidentiality of the Personal Data in its possession and will not process the Personal Data any further.

6. **LIQUIDATION OF TKJP AND RTK SERVICE**

6.1 In the event of liquidation of TKJP or RTK Service, the following shall occur:

    (a) If a liquidation process for TKJP occurs and is completed and TKJP ceases to exist as a legal entity, this Agreement shall continue in force and be effective as between RTK Service alone as Data Transferor and PDS as Data Recipient.

    (b) If a liquidation process for RTK Service occurs and is completed and RTK Service ceases to exist as a legal entity, this Agreement shall continue in force and be effective as between TKJP alone as Data Transferor and PDS as Data Recipient.

(c)     If both of TKJP and RTK Service cease to exist, then the obligations of the Data Transferor under this Agreement shall cease to exist.

## 7.    ASSIGNMENT, TRANSFER AND SUBCONTRACTING

7.1    This Agreement shall not be assigned or transferred in whole or in part by Data Recipient without the prior written consent of Data Transferor. Any attempt to assign or transfer this Agreement or any of Data Recipient's rights and obligations herein without such written consent is void.

7.2    Data Recipient may not sub-contract the performance of its obligations under this Agreement in whole or in part to any third party without the prior written consent of Data Transferor. In the event that such consent is granted and Data Recipient is permitted to sub-contract the performance of certain of its obligations under this Agreement, Data Recipient shall enter into a written agreement with the subcontractor which includes substantially equivalent restrictions and conditions as those set forth in this Agreement. Data Recipient shall at all times be responsible for the management of its sub-contractors and agents and for the delivery of their services and shall remain fully responsible and liable for the performance of any sub-contractor appointed by it and their acts and omissions with regard to the Personal Data. Data Recipient's delegation of any of its obligations under this Agreement to a sub-contractor or agent shall not affect the Data Recipient's duty to fulfil such obligations and Data Recipient shall remain primarily responsible for the same.

## 8.    NO PARTNERSHIP

8.1    Nothing in this Agreement is intended to create a partnership or the relationship of principal and agent or employer and employee between the Parties. None of the Parties have the authority or power to bind, to contract in the name of or to create a liability for the other in any way or for any purpose.

## 9.    SEVERABILITY

9.1    If any term or provision of this Agreement is found to be illegal, invalid or unenforceable by any court or body of competent jurisdiction or by virtue of any legislation to which it is subject or for any other reason, such term shall, insofar as it is severable from the remaining terms, be deemed omitted from this Agreement and shall in no way affect the legality, validity or enforceability of the remaining terms. If any clause is rendered illegal, invalid or unenforceable, whether wholly or in part, the Parties shall endeavour, without delay, to attain the intended result in another legally permissible manner.

## 10.    VARIATION

10.1    The Parties shall not amend or vary this Agreement except by mutual agreement in writing.

## 11.    ENTIRE AGREEMENT

11.1    This Agreement and the documents referred to herein constitute the entire agreement between the Parties relating to the subject matter of this Agreement and, save as may be

expressly referred to in this Agreement, supersedes all prior expressions of intent or undertakings, representations, negotiations, agreements or understandings, written or oral, between the Parties relating to the subject matter of this Agreement.

11.2    The Parties acknowledge that they have not relied on any representations, writings, negotiations or understandings, whether express or implied, (other than as set forth in this Agreement) in entering into this Agreement.

11.3    Nothing in this clause however shall operate or be construed to exclude or limit any liability of any person for fraud, including fraudulent misrepresentation.

## 12.    WAIVER

12.1    No delay, neglect, or forbearance on the part of either Party in enforcing or exercising against the other Party at any time or for any period of time any term or condition of this Agreement shall be or shall be deemed to be a waiver or in any way prejudice any right of that Party under this Agreement, and shall in no way affect that Party's right later to enforce or to exercise it. Any waiver by either Party of any of its rights under this Agreement must be in writing and only applies to the transaction or series of transactions expressly referred to in such waiver.

## 13.    COUNTERPARTS

13.1    This Agreement may be executed in any number of counterparts, each of which when executed and delivered is an original, but all the counterparts together constitute one and the same document.  Delivery of an executed counterpart of this Agreement by facsimile or e-mail shall be as effective as delivery of a manually executed counterpart of this Agreement.

## 14.    GOVERNING LAW

14.1    The construction, validity and performance of this Agreement and all non-contractual obligations arising from or connected with this Agreement shall be governed by, and construed in accordance with, the laws of the State of New York. The Parties agree to submit to the non-exclusive jurisdiction of the state or federal courts located in New York, New York.

**[Signature Page Follows]**

| SIGNED BY AND ON BEHALF OF<br>DATA TRANSFEROR | SIGNED BY AND ON BEHALF OF<br>DATA RECIPIENT |
|---|---|
| **TKJP CORPORATION**<br><br><br>By:<br>Name: Yoichiro Nomura<br>Title: President<br>Date:<br><br><br>**RTK SERVICE LLC**<br><br><br>By:<br>Name: Makoto Ueno<br>Title: Executive Manager<br>Date: | **PLANET DATA SOLUTIONS, INC.**<br><br><br>By:<br>Name: DAVID S COCHRAIN<br>Title: COO<br>Date: 10/10/18 |

| SIGNED BY AND ON BEHALF OF DATA TRANSFEROR | SIGNED BY AND ON BEHALF OF DATA RECIPIENT |
|---|---|
| **TKJP CORPORATION**<br><br>By:<br>Name: Yoichiro Nomura<br><br>Title: President<br><br>Date: 11. Oct 2018<br><br><br>**RTK SERVICE LLC**<br><br><br>By:<br>Name: Makoto Ueno<br><br>Title: Executive Manager<br><br>Date: | **PLANET DATA SOLUTIONS, INC.**<br><br><br>By:<br>Name:<br><br>Title:<br><br>Date: |

Case 1:15-cv-04599-FAM   Document 1254-3   Entered on FLSD Docket 05/28/2021   Page 55 of
Case 1:14-cv-24009-FAM   Document 1254-3   Entered on FLSD Docket 05/28/2021   Page 55 of
Case 1:17-md-02436-FAM   Doc 3498   Filed 11/29/18   Page 62 of 414
88

| SIGNED BY AND ON BEHALF OF DATA TRANSFEROR | SIGNED BY AND ON BEHALF OF DATA RECIPIENT |
|---|---|
| TAKATA CORPORATION<br><br>_____<br>By:<br>Name: Yoichiro Nomura<br>Title: Representative Director<br>Date:<br><br>RTK SERVICE LLC<br><br>_____<br>By:<br>Name: Makoto Ueno<br>Title: Executive Manager<br>Date: 10/11/18 | PLANET DATA SOLUTIONS, INC.<br><br>_____<br>By:<br>Name: DAVID S. COCHRAN<br>Title: CHIEF OPERATING OFFICER<br>Date: 9/14/18 |

## APPENDIX 1 - DETAILS OF TRANSFER

| | |
|---|---|
| **Categories of Data Subjects** | The Personal Data transferred concern the following categories of data subjects:<br><br>• Employees of Takata Corporation and its subsidiaries ("***Takata***") from 2014 to 2017<br><br>• Recipients of e-mail sent from certain accounts owned by Takata and used by certain Takata employees |
| **Purposes of transfer** | The transfer is made for the following purposes:<br><br>• Use by parties involved in civil lawsuits and PSAN PI/WD Claims in the United States related to injuries sustained from certain Takata PSAN airbag inflators<br><br>• Economic Loss claims |
| **Categories of Personal Data transferred** | The transferred data is data that was collected from particular custodians, employees of Takata, that were identified as possessing potentially relevant and responsive information related to the investigations, and civil and criminal lawsuits in the United States of America in relation to the manufacture, testing and sale of certain PSAN airbag inflators, as described in the Fifth Amended Joint Chapter 11 Plan of Reorganization of TK Holdings Inc. and its Affiliated Debtors [Docket No. 2116], *In re TK Holdings Inc., et al.*, U.S. Bankr. Ct. Dist. Del. Case No. 17-11375-BLS (the "***Transferred Data***").<br><br>The Transferred Data contains Personal Data, such as names, business information (*i.e.* title and work contact information), and other Personal Data as found in the ordinary course of business in the categories of data that make up the Transferred Data. |
| **Disclosure of Personal Data to be transferred** | The Personal Data transferred may be disclosed only to the following recipients or categories of recipients (the "***Subsequent Recipients***"):<br><br>• Eric Green, as Trustee for the Takata Airbag Tort Compensation Trust Fund and as Special Master of the Takata Restitution Funds;<br><br>• Takata Airbag Tort Compensation Trust Fund |

| | claimants; |
|---|---|
| | • Individual Restitution Fund claimants; |
| | • Future Claims Representative; |
| | • Appeals Panel (made up of the individual Reviewers) responsible for conducting appeals of P-OEM Claims under the Trust Distribution Procedures; |
| | • Review Officers responsible for conducting appeals of Individual Restitution Fund Claims; |
| | • Counsel for any private plaintiff in pending and related litigation including MDL 2599 counsel; |
| | • Courts, judges and court personnel involved in cases, disputes or proceedings related to the Purpose; |
| | • parties to any other proceedings related to the PSAN inflators that have executed the Acknowledgment of Confidentiality and Data Privacy Agreement, and Stipulated Protective Order, dated September [___], 2018; |
| | • outside experts and consultants retained by or through some or all of the above-listed recipients and categories of recipients to do work relating to Purpose. |
| **Location(s) where Personal Data may be transferred by Data Recipient** | **Personal Data may be transferred by the Data Recipient to any location in which the Subsequent Recipient is located or requests** |

**Exhibit 2**

**Acknowledgment of Stipulated Protective Order**

# ACKNOWLEDGMENT OF CONFIDENTIALITY AND DATA
# PRIVACY AGREEMENT, AND STIPULATED PROTECTIVE ORDER

**Court:**   [_____] (the "***Court***")

**Case No.:** [_____]

    1.    I, _____, hereby certify that I have received a copy of the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order, including the exhibits thereto (the "***CDPA Protective Order***"), entered by the U.S. Bankruptcy Court for the District of Delaware and [insert name, jurisdiction and case number of additional Court case, if applicable].

    2.    I have carefully read and understand the terms of the CDPA Protective Order or have had the terms of the CDPA Protective Order explained to me by my attorney. I agree to comply with and be bound by all terms and conditions of the CDPA Protective Order.

    3.    If I receive or am shown documents or information ("***Discovery Material***"), as defined in the CDPA Protective Order, I understand that such Discovery Material is provided or shown to me pursuant to the terms and restrictions of the CDPA Protective Order, and that it must be held in the strictest confidence, may not be further disclosed, and may only be used in the manner and for the purposes permitted by the CDPA Protective Order. I will maintain all Discovery Material that I may receive in a safe and secure manner consistent with the obligations of the CDPA Protective Order regarding such Discovery Material.

    4.    I hereby consent and submit to the jurisdiction of the U.S. Bankruptcy Court for the District of Delaware and to the Court for the resolution of any matters pertaining to the CDPA Protective Order, including any violation or alleged violation of the CDPA Protective Order.

Signature: _____    Date: _____

Name: _____    Title: _____

Employer: _____    Address: _____

_____

Email: _____    Tel. No.: _____

# Exhibit 3

# Statement of Work

## Statement of Work

This Statement of Work ("SOW") has been assigned Project number [X].

The following work (the "Work")will be performed by Planet Data Solutions, Inc. ("PDS") pursuant to and in accordance with the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order dated [MMMMM dd], 2018, ("Confidentiality Agreement"), and the Protocol as set out in Section 3 thereof ("Protocol"), and incorporates them by reference, including the definitions and parenthetical identifications set out in the Confidentiality Agreement. The Work will be charged at the rates set forth hereunder or in Exhibit 1.

[INSERT CLIENT NAME] ("Client") will sign and provide PDS with an ACKNOWLEDGMENT OF CONFIDENTIALITY AND DATA PRIVACY AGREEMENT, AND STIPULATED PROTECTIVE ORDER as attached to the Confidentiality Agreement as Exhibit 2.

PDS and Client will sign a Letter Agreement of the form attached as Exhibit 2 [(the "Letter Agreement")].

Pursuant to Step One of the Protocol, upon execution of the instant SOW, PDS will provide Client with the List of Custodians ("Custodians List") that was furnished to PDS by the Takata Entities.

Client as a Requesting Party under the Confidentiality Agreement requests that PDS make available a filtered database containing the Custodian's Data of the custodians included on the Custodians List and listed in Exhibit 3 hereto ("Requested Custodians").

PDS will provide an estimate of the cost of the work required to produce and host a Searchable Dataset of the Requested Custodians' Data. Client will pay PDS the retainer of 25% of the estimated costs specified in the signed Letter Agreement before PDS commences further work hereunder.

If any of a Requested Custodian's Data has already been processed and loaded into a PDS Exego Select database, PDS will:

1. create a new Exego Select database for that new Requesting Party; and
2. implement Protocol Steps Two and Three with respect to the Custodian's Data if they have not already been implemented. If Protocol Steps Two or Three have already been implemented, Client will be charged a per capita fee pursuant to the Cost-Sharing Provision of Protocol Step One.

If any of a Listed Custodian's Data has not been processed consistent with the previous processing specifications from the previous Requesting Party (deduplication approach, for example) and loaded into an Exego Select database, PDS will:

1. process the data for loading into a database;
    a. The processing specifications will be discussed during a planning call prior to the processing of the data. Depending upon processing requirements, the already processed custodians may need additional processing (rendering of images according to specifications, deduplication approach, etc.).
2. load the data into a PDS Exego Select database; and
3. implement Protocol Steps Two and Three with respect to the data.

Pursuant to Protocol Step Four, PDS will then provide the Requesting Party access to the resulting dataset comprised of the PSAN Dataset without the potentially Privileged PSAN Data, (the "Client Searchable Dataset SOW [number]") in an active Exego Select database and the associated Withheld Data Log.

Any Listed Custodian data in the Client Searchable Dataset SOW [number] will be available without storage charges for six months, and at the rate of $3 per GB per month after that. Access will be provided to Client on a per-license per user charge of $75 per month.

The Client may, pursuant to Protocol Step Four, select documents within the Client Searchable Dataset SOW [number] to be produced to them by PDS in a standard format attached hereto as Exhibit 4 (the Processing Specification Addendum). Any page images produced will contain the following legend printed on the top right side: ""**CONFIDENTIAL PSAN DATA – ATTORNEYS' EYES ONLY - SOW [SOW number].**"

PDS will, pursuant to Protocol Step Five, produce and deliver the documents selected by Client in the format specified in Exhibit 4 (the Processing Specification Addendum).

Client will notify PDS when it no longer needs access to the Client Searchable Dataset (Exego Select Database) SOW [number], and PDS will then archive the Client Searchable Dataset (Exego Select Database) SOW [number] at $3 per GB per month. The requesting party will pay $3 per GB per month for the active and archived Client Searchable Dataset (Exego Select Database) until such time that the requesting party requests deletion of that database.

**Exhibit 1**

| Description | Price |
|---|---|
| ESI Processing Services —Charges based on the extracted file size during processing, includes ingestion, de-duplication, metadata/text extraction, native file processing; delivery of metadata, text, native files, load file creation and the use of Exego® Select - ECA/Prereview/Analytics Platform | $25 per extracted GB |
| Database Setup, Design, Training, User Fees and Exego® Analytics | No Charge |
| Monthly user fee | $75 per user |
| Monthly data storage fee (First six months at no charge) | $3 per GB |
| Technical Support includes implementation of Protocol Steps Two and Three, outputting data under Protocol Step Five, and foldering, creating searches, productions, database changes, manipulation of load files received from third party hosting or processing platforms for loading into Exego® Select or Relativity® | $175 per hour Billed in 15-minute increments with a 15-minute minimum. |
| Loading data processed by PDS into Exego® Select. | No Charge |
| Cost-sharing fees for use of previously incurred implementations of Protocol Steps Two and Three with respect to restored data | As calculated pursuant to Protocol Step One |
| Import of 3rd party data into Exego® Select. (Data not processed by PDS) | $25 per GB |
| Encrypted USB Hard Drive, Travel Expenses & Shipping | At Cost |
| Machine Translation | Pricing provided upon request |

**Exhibit 2**

[INSERT DATE], 2018

Re:  Services Agreement with [INSERT CLIENT NAME]

Dear:

This letter is to present an understanding of the services for an engagement between your firm, _____ ("Client" or "You") and Planet Data Solutions, Inc. ("PDS"), effective as of the date of execution of this agreement (the "Agreement"), whereby PDS personnel will provide to the Client the services outlined in the Statement of Work ("SOW") executed in conjunction herewith.  We understand that such services are requested by the Client in connection in its role as _____ in _____.

## 1 Project Overview

PDS will be providing the following services for this project:

1. ESI processing as detailed in the companion processing specification addendum and pursuant to and in accordance with the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order dated [MMDD], 2018, ("Confidentiality Agreement"), and the Protocol as set out in Section 3 thereof ("Protocol").
2. The work will be charged at the rates set forth in Exhibit 1 of the SOW.
3. Culled and filtered data will be delivered to the requesting party's hosting platform, pursuant to Step Five of the Protocol.

## 2 Planet Data Contact List

| CONTACT | TITLE | EMAIL | PHONE | FAX |
|---------|-------|-------|-------|-----|
|         |       |       |       | 914-593-6901 |
|         |       |       |       |     |
|         |       |       |       |     |

## 3 Client Contact List

| CONTACT | TITLE | EMAIL | PHONE | FAX |
|---------|-------|-------|-------|-----|
|         |       |       |       |     |
|         |       |       |       |     |

| | | | | |
|---|---|---|---|---|
| | | | | |

## 4 Billing Information

| Invoices will be addressed to: | Other information required on invoices – internal billing numbers etc. |
|---|---|
| | TBD |

## 5 Project Schedule

PDS expects to begin processing of electronic documents upon delivery and will continue on a rolling basis until completed. This assumes that the Statement of Work is approved by the client in writing prior to the start of any processing.

## 6 Planet Data Terms and Conditions

1. **Pricing & Payment:** Planet Data Solutions, Inc. (PDS) shall invoice the Client the fees set forth in Exhibit 1 to the Statement of Work. Prices do not include applicable State or Federal taxes. All such fees are due and owing within thirty (30) days of the invoice date. Client shall be in default of this Agreement if payment in full is not received by PDS within sixty (60) days of the invoice date. In addition to its other remedies with respect to such default, PDS may charge Client interest at a rate of 1.5% per month, compounded monthly, if the invoice is not paid within that sixty (60) days. PDS has the right to suspend its services with three (3) days written notice if payments in full are not received on all invoices within 60 days of the invoice date. The party executing this Services Agreement on behalf of the client shall be responsible for all payments under this Agreement.

2. **Client Responsibilities:** The Client agrees: (a) to use its best efforts to provide PDS with defined project specifications, (b) to sign and provide PDS with an ACKNOWLEDGMENT OF CONFIDENTIALITY AND DATA PRIVACY AGREEMENT, AND STIPULATED PROTECTIVE ORDER as attached to the Confidentiality Agreement as Exhibit 2; (c) to use its best efforts to be reasonable in imposing demands and deadlines for services; (d) to report promptly to PDS of any PDS data delivery, any problems or errors which the Client observes or discovers; and (e) to notify PDS, in writing, of all court orders restricting the use, distribution or disposition of the Services, pursuant to the Protocol and this Statement of Work to be provided by PDS. The Client shall indemnify and hold PDS, its officers, agents and representatives harmless from all claims, actions, and causes of action, damages and fines resulting from or related to the Client's failure to so notify.

3. **Term:** This Agreement shall commence upon the execution date by all parties and will continue until the Client gives written notice that its need for the Services is no longer required or until this Agreement has otherwise been terminated as provided herein. Upon termination, the Client shall be responsible for payment for all Services performed by PDS prior to the effective date of termination. PDS may terminate this

Agreement (i) immediately if Client fails to pay any amounts owing when due, or (ii) otherwise, upon three (3) days written notice for any reason.

4. **Confidentiality:** PDS agrees to use information obtained in this engagement for the sole purpose of fulfilling its obligations under this Agreement and agrees to hold such information as confidential subject to the terms of the Confidentiality Agreement. Confidentiality obligations shall not apply to any information that enters into the public domain through no fault of PDS, which was disclosed to PDS by a third party not in breach of any obligations of confidentiality to the disclosing party, which is independently developed by PDS, or which is required to be disclosed in compliance with applicable law or court order. PDS understands that the work product and files of PDS, and its communications with You, are protected by the doctrine of attorney-client privilege and/or attorney work product and may not be subject to discovery. Accordingly, our records and materials will be maintained by us as confidential in accordance with the terms thereof. It is agreed that those materials and all other working papers and other documents prepared or received by us pursuant to this engagement will not be disclosed by us to third parties without Client's consent, except as may be required by judicial or administrative process. The Requesting Party will implement appropriate measures to protect the Personal Data in accordance with the Data Protection Laws and commensurate with the Data Transfer Agreement.

5. **Limitation of Liability.** IN NO EVENT with the exception of breach of confidentiality by PDS in violation of Paragraph 4 of this Agreement, SHALL THE LIABILITY OF PDS UNDER THIS AGREEMENT, WHETHER IN RESPECT OF A SINGLE OCCURRENCE OR A SERIES OF OCCURRENCES AND WHETHER ARISING UNDER CONTRACT OR TORT (INCLUDING ANY BREACH OF A STATUTORY DUTY) OR OTHERWISE, EXCEED TWO TIMES THE AMOUNT OF THE INVOICES THAT THE CLIENT RECEIVED FROM PDS FOR SERVICES RELATED TO THIS SPECIFIC PROJECT..

6. **Miscellaneous:** (a) Governing Law. This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, U.S.A. without considering the New York conflicts of laws rules. Jurisdiction and venue shall be in New York, New York. (b) Entire Agreement. This Agreement, including all exhibits attached and incorporated as an integral part of this Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes all previous proposals, oral or written, and all negotiations, conversations or discussions heretofore had between the parties related to this agreement and the Confidentiality Order. (c) The parties have signed this Agreement effective as of the date set forth below.

7. **PDS Policy for Data Retention, Preservation and Return.** Pursuant to the requirements of PDS's SSAE 18 Level II Certification, PDS's policy for maintaining all forms of client data are as follows:

Client data forwarded to PDS on magnetic media shall be secured in our vault when not in use. This media shall be returned to the client at the end of a project or when it is no longer needed onsite at PDS. Data electronically transmitted to PDS shall be deleted from our server once the data has been ingested into our Source Data Management system (SDM) or moved to our hosting environment if the data requires no processing by PDS prior to loading to the review database. No further backups shall be made of data electronically transmitted. Productions from our review environment or other data that are posted to our FTP site for downloading by the client or affiliated parties shall be deleted from that site after 30 days without any further backup. Data resident in our SDM system will be backed up on a 100-day cycle for disaster recovery purposes but shall be retained online in the SDM system until it is no longer needed by PDS.

PDS performs backups of project processing batches. These backups are performed on a 100-day cycle for disaster recovery (DR) purposes. These DR backups are kept online until the project is either deleted or archived. Once a project has reached 180 days of inactivity, PDS shall archive the processing batches and they shall be retained for 36 months. The client shall be notified at the time of this archiving. At the end of that time-period, if the client has not requested the data to be restored, the processing batches shall be deleted. EXEGO Select databases may be kept online for searching even when the processing batches have been deleted, however, EXEGO Select databases shall be deleted at the end of the project archive period of 36 months if they are still online. EXEGO Select databases are backed up on a 100-day cycle for DR

purposes. Retention of processing batches beyond 36 months shall result in the assessment of a monthly storage fee charged to the client.

Review databases, inclusive of document production sets, are backed up daily on a 100-day cycle. The backup media is overwritten at the end of each 100-day cycle. When a client notifies PDS that an individual review database is no longer needed, PDS shall either archive the database prior to deleting it, or PDS shall delete the review database and any associated productions sets without performing any further backups. If an archive is not performed, the database shall cease to exist in any form after 100 days. The costs for creating a Relativity archive or exporting a Relativity database in a generic load format shall be borne by the client. These costs are outlined in the Pricing Summary section of the Statement of Work. PDS shall ship the backup media to the client upon completion of the archive/export process and the receipt by PDS of all funds owed by the client, including the costs associated with creating the archive or export. PDS shall maintain the original review database in a near-line state for a period not to exceed 30 days while the client confirms that the backup media has been received and is in good working order. At that time, or after 30 days from the delivery of the archive media to the client or client's representative, the version of the database maintained in a near-line state at PDS shall be deleted. The backup created by PDS can only be restored within the review environment in place at PDS. Longer retention periods can be implemented for a specific matter, upon prior written agreement. The costs associated with establishing a separate backup regime shall be borne by the client.

8. **PDS Policy for the Protection of Client Data.** The following defines the standard policy for the handling all forms of client data pursuant to the requirements of PDS's SSAE 18 Level II Certification.

**Data Security:** Client data shall be encrypted when it is transferred from PDS to the client and any other recipients of the data as designated by the client. PDS shall use the following policies and practices to effect secure data transfers:

**Media Delivery:** All physical media that supports the transferred data shall be encrypted using the AES-256 encryption algorithm. If media cannot be encrypted to that level, then the strongest available encryption method shall be used. This procedure requires the transfer of the password from PDS to the client in a secure manner. Our standard protocol for this shall be to send the password to only pre-designated users (as determined by the client).

**Electronic Transfer of Client Data:** It is common to transfer client data via electronic means such as FTP and/or e-mail. For FTP transfers to PDS, the data should be archived using an encrypted container (such as WINZIP and others similar applications) and then transferred via our Secure FTP Server. For data transfers to the client, PDS shall encrypt the data in a standard archive container using AES-256 encryption on our FTP site. The client should access our FTP site using secure and encrypted protocols. Our FTP site supports industry standard secure FTP (SFTP and HTTPS) transfers.

Transfer of data via e-mail is discouraged by PDS. However, should a client insist on this method of transfer, PDS shall use our standard archiving method to encrypt the data. It is our policy to send the password in a separate e-mail and only to the recipient of that encrypted data. Given the inherent insecure nature of email, the client is strongly urged to only e-mail data to PDS via this secure e-mail

method. PDS shall <u>not</u> be responsible for any data breach that may occur when data is not forwarded to PDS using the secure data transfer methods described above. Data transferred to the PDS FTP site by the client, or third parties associated with the project, shall not be retained on the FTP site once downloaded to our network. If copies of the uploaded data are required, it is the responsibility of the client, or the third parties associated with the project, to maintain copies on their premises. Productions posted by PDS to the FTP site for download by the client, opposing counsel or third parties associated with the project, shall be maintained on the site for 30 days, after which this data shall be deleted from the site. Maintaining such data on the site beyond 30 days requires prior written notice to, and prior written approval by, PDS.

## 7 Client Acceptance Procedures

Please sign and date in the appropriate section below.  Executed signature page should be returned to PDS via email as a PDF attachment or sent via fax at 914-593-6901.

Approved by: Firm or Corporation name here

_____          _____
                                            Date

_____          _____
Printed Name                                Title

Executed by: Planet Data Solutions, Inc.

_____          _____
David S. Cochran, Chief Operating Officer   Date

**Planet Data Solutions, Inc.**

555 Taxter Road

Suite 425

Elmsford, NY 10523

P – 914-593-6900

F – 914-593-6901


www.PlanetData.com

**Exhibit 3**

Requested Custodians

[Requesting Party to Complete Based on Custodian List]

**Exhibit 4**

[PDS SOS Specifications Document]

**PLANET DATA**  555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | **PlanetData.com**

# Statement of Services
## Processing Specification Addendum

**Matter Name/Number**
**PDS Project Number**

**Prepared for:**
**Client:**
**Date:**

Prepared by:
Planet Data
555 Taxter Road - Suite 425
Elmsford, NY  10523
www.PlanetData.com
800-688-2812
914-593-6900

**Planet Data**
**XX0001**

**Table of Contents**

1 Project Overview ..................................................................................................................................... 3

2 ESI Processing and Delivery Specifications ............................................................................................. 3

3 Delivery Specifications ............................................................................................................................ 9

4 Reporting ............................................................................................................................................... 17

Planet Data
XX0001

## 1 Project Overview

PDS will be providing the following services for this project:

1. ESI processing as detailed in this specification.
2. All processed data will be posted to Planet Data's Exego Select platform where PDS staff will perform all key term culling and filtering.
3. Culled and filtered data will be delivered to the requesting party's hosting platform.

## 2 ESI Processing and Delivery Specifications

1. **General Assumptions:**
   a) All time settings will be based upon **GMT**. This setting determines the time zone to be used for processing of the data and will be reflected in the delivered metadata and tiff images. Please note that the Relativity viewer defaults to UTC (Coordinated Universal Time). Other review applications employing native file viewers may have similar default settings. This may cause the viewer to display dates and times that differ from the delivered metadata. Options are: GMT, EST, CST, PST.
   b) Planet Data will OCR image file types (PDF, JPG, GIF, etc.) that do not contain extractable text in an attempt to capture text that may be on the image.
   c) Planet Data attempts to process embedded/compound documents to extract available metadata and attached files. Embedded objects will be filtered upon delivery as selected below.

   ☐ Remove **NONE** (All extracted embedded objects <u>will</u> be delivered).
   ☐ Remove **All** (No extracted embedded objects <u>will be</u> delivered).
   ☐ Deliver **PDS Option 1**, as outlined below.
   ☐ Deliver **PDS Option 2**, as outlined below.

   Under **PDS Option 1,** the following file types will be delivered:

   All MS Office documents:

   1. MS Excel
   2. MS PowerPoint
   3. MS Word
   4. MS Visio
   5. MS Project

   Other file types:

   1. TXT
   2. RTF
   3. PDF

   Graphic Files:

   1. TIFF
   2. JPEG
   3. GIF
   4. PNG

   All e-mail formats:

   1. MSG Files



555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

**Planet Data**
**XX0001**

2. EML Files

Container and Archive Files such as the file types listed below.

1. PST, NSF etc.
2. ZIP, TAR, RAR etc.

Limited Graphic Types: (This is only for e-mails)

1. **WMF, EMF**

Under **PDS Option 2**, the following file types will be delivered:

All MS Office documents:

1. MS Excel
2. MS PowerPoint
3. MS Word
4. MS Visio
5. MS Project

Other file types:

1. TXT
2. RTF
3. PDF

Graphic Files:

1. TIFF
2. JPEG

All e-mail formats:

1. MSG Files
2. EML Files

Container and Archive Files such as the file types listed below.

1. PST, NSF etc.
2. ZIP, TAR, RAR etc.

Limited Graphic Types: (This is only for e-mails)

1. **WMF, EMF**

**Please note that use of 'PDS Option 2' will eliminate the burden and expense sometimes associated with the presence of GIF and PNG files in the review application. However, none of the text that may be present in GIF and PNG files will be available for searching.**

d) **Standard Slipsheeting:** PDS will deliver a slipsheet, with a Control ID number, for the following:

- Containers such as PST, NSF, ZIP, TAR, RAR etc.
- Files which cannot be processed such as .exe, dll, etc.
- Encrypted files
- Unsupported file types

The slipsheet image will identify the following:

- File Name inclusive of original source path
- File Type



555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

**Planet Data**
**XX0001**

- Size
- Creation date
- Access Date
- Last modification date
- Slip Sheet Reason

Standard Slipsheet Reasons are as follows:

- File is encrypted and could not be read
- Unsupported/unknown file type
- Document is empty
- Document is a link (shortcut)
- Document not available for processing (shortcut or corrupt archive)
- Container type
- Opaque type (example: movie file)
- Document has only blank pages
- File is corrupt and could not be read

e) **Custom Slipsheeting:** In addition to Standard slipsheeting, PDS has the ability to perform custom slipsheeting based on file types specified prior to processing. The slipsheet info will include:

- File Types: [*Excel, CSV*]
- Verbiage on Image:
  - FILE DELIVERED NATIVELY (*Can be customized*)
  - Filename (included Yes or No)
- Meta Data Slip Reason: FILE DELIVERED NATIVELY [*Can be customized*]

f) Only the extracted contents of native container files (PST, NSF, ZIP, TAR, RAR etc.) will be delivered, not the native container file itself.

g) The entire subdirectory path (as provided in the source data) will be delivered in the original source path field.

h) All text and metadata will be delivered in UNICODE (UTF-8) format unless otherwise requested.

i) Planet Data will retain a copy of all client deliverables (processed data deliveries, productions or exports) for 30 days beyond the date of delivery.

## 2. TIFFing specifications for Microsoft Excel, Word and PowerPoint

### For Excel:

**Note:** Excel files will be delivered natively, unless otherwise specified for redaction or other purposes. TIFFs for selected native Excel files can be delivered as needed. When TIFFed, the following specification will apply:

a) We will perform pre-processing functions on MS Excel spreadsheets*:
- Set zoom factor to 80%
- Set Print Quality to 300 DPI
- Clear Print areas
- Unhide Rows, Columns, and Worksheets
- Find and unhide "Very Hidden" worksheets (Note: These are NOT visible from the MS Excel GUI, and can only be found and unhidden programmatically).
- Unlock Rows and Columns
- AutoFit Rows and Columns

 **PLANET DATA**     555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

**Planet Data**
**XX0001**

- Clear background shading
- Remove borders from cells
- Remove all Workbook and Worksheet protections.
- Will print gridlines

b) Blank pages will be automatically detected and removed.
c) Column Headers and Row Headers will be printed.
d) Comments will be printed.
e) Print orientation will be "as is" (this is the default processing setting). Optionally, this can be forced to portrait or to landscape.
f) Headers, Footers and the body of Excel spreadsheets will be searched for Date/Time auto-field items and any occurrences will be removed and replaced with the term AUTODATE. This will prevent the current date from being printed.*
g) Remove path names and replace with AUTOPATH leaving the file name in headers and footers.

**For Word:**

a) Headers, Footers and the body of Word documents will be searched for Date/Time auto-field items and any occurrences will be removed and replaced with the term AUTODATE. This will prevent the current date from being printed.*
b) Track Changes: Track Changes will be turned off by default and will not appear on the delivered images or in the document text. Optionally, Track Changes can be turned on and will appear on the delivered images and in the document text.
c) Comments will be printed.
d) Remove path names and replace with AUTOPATH leaving the file name in headers and footers.

**For PowerPoint:**

a) Headers and Footers will be searched for Date/Time auto-field items and any occurrences will be removed and replaced with the term AUTODATE. This will prevent the current date from being printed.*
b) MS PowerPoint will be printed in notes view (this view prints the notes on the same page as the slide, this is the MS Office default view). Optionally, slide view or enhanced notes view (this view prints the notes on separate pages) are available.
c) Comments will be printed.

* These steps are affected by encryption, the utilization of VBA code, and other settings within the native files that can affect the results of each of these steps.

**3.** **Processing of Microsoft Outlook files**

We process sixteen standard item types in MS Outlook, which include: AppointmentItem, ContactItem, DistListItem, DocumentItem, JournalItem, MailItem, MeetingItem, NoteItem, PostItem, RemoteItem, ReportItem, TaskRequestAcceptItem, TaskItem, TaskRequestDeclineItem, TaskRequestUpdateItem, TaskRequestItem.

**4.** **Processing Lotus NSF Files**

Lotus Notes mail repositories are processed and printed natively. We support the following Lotus Notes form: Account, Calendar Entry, Contact, Delivery Report, Document Memo, Email, ForwardToChairMgrNotice, ForwardToInviteeMgrNotice, Group, Memo, Message, NonDelivery Report, Notice, Reply, ReplyNotice, Return Receipt, ReturnNonReceipt, SoftDeleteForm, Special\_Phone, Special\_Link Message, TaskNotice, To Do, Trace Report, Tracking Request,

Due to the varied means of encryption and securing access to NSF files, it is not always possible to process an NSF file or individual items within an NSF. It may be possible to extract the meta-data and text, but not



**Planet Data**
XX0001

accurately TIFF a Lotus Notes item. When customized forms and software are used, this can prevent the proper TIFFing and/or metadata extraction of these items. If custom development is required, a $200 per hour fee will be applied following client approval.

**Important Notes on Handling Corrupt or Encrypted Outlook and NSF Files**

**In the event we encounter a corrupt .PST, .NSF or .OST file within the data, the processing batch containing the corrupt file will be placed on hold and the client will be notified by the project manager. The resolution could be a replacement file from the client or the client approving PDS to attempt to repair the file. Attempts to repair a corrupt .PST, .NSF or .OST file may result in metadata loss. In the event we encounter an encrypted .PST or .NSF container file within the data, we will attempt to break the encryption per the policy set forth in section 8 of this document. If we are unsuccessful in our attempt to break the encryption, the processing batch containing the encrypted file will be placed on hold and the client will be notified by the project manager.**

5. **Deduping**

☐ Deduping will be performed **within custodians** only.
☐ Deduping will be performed **across custodians** (globally).
☐ Deduping will NOT be performed.

De-duping is done based on MD5 and SHA1 hash values for each document. An MD5 and an SHA1 hash is applied at the document level as each file is processed. E-mail MD5's are calculated based upon the following meta-data fields: To, From, Subject, Send Date/Time, CC, BCC and Body (additional fields can be used as required). Hash values are applied at both the family and attachment level. Loose edocs are never deduped against email attachments.

6. **Password Protected Files**

We apply a mix of decryption strategies in an effort to open password protected files during processing. Encrypted files are cycled through a sequence of decryption steps. If a file cannot be decrypted in a reasonable amount of time, PDS will insert and deliver a slipsheet which identifies it as an encrypted file. If the password is broken, PDS will deliver back the original password protected/encrypted native file, if native files are part of the delivery. The password used to open the file will be delivered in the Password field. Note, this may NOT be the original password, but one that has been found programmatically that also opened the file.

7. **Language Detection**

Our processing software attempts to identify languages that are contained within a given document and outputs the name of a detected language, as well as the percentage of the document in that language. Language detection is <u>NOT</u> foolproof. The English language itself is composed of many words derived from a multiplicity of languages. False positives are possible. Currently, the workflow attempts to identify 86 languages, including English, French, German, Italian, Spanish, Dutch, Russian, Arabic, Hebrew, Chinese, Japanese, Korean, Swedish, Danish, Norwegian, Finnish, Polish, Portuguese, Greek, Hungarian, Turkish, Slovenian, Afrikaans, Hindi, Pashto, Indonesian, and Vietnamese. The full list of all 86 languages will be provided upon request.

8. **Culling / Keyword Searching / Document Marking**

Culling will be performed by PDS per the client's instructions as outlined below.

1. **System File Culling** Required:



**Planet Data**
**XX0001**

By default, system files will be culled and removed from the gross data received for processing utilizing the National Software Reference Library (NSRL) developed by the National Institute of Standards and Technology (NIST). The NSRL encompasses a repository of all types of software. It also includes a database of file profiles, i.e., "software fingerprints," that can be used to identify known and unknown files on computers, diskettes, magnetic tapes, CDs, etc., that have been seized pursuant to investigation. The system file culling step can be bypassed, if requested. Additional information about NIST and the NSRL library can be found here:

http://www.nist.gov/ts/msd/srd/nistsd28.cfm

Additional file types can be added to a secondary file culling list that can be applied separately or in tandem with the NSRL cull.

   2. **Inclusive/Exclusive Culling Required/NOT Required:**

Using **Exego Select**, files can be culled based on keywords, dates, file types, file size, as well as custodian and email domain names. Priv terms searching is also supported. Upon export from **Exego Select**, the hit terms can be copied to the output record for each document. Keyword hits can be output in two separate fields – **Search Terms Hit1** and **Search Terms Hit2** – in support of tiered searches. Hits on priv terms are stored in the **Priv Terms Hit** field. The contents of these fields are the actual search strings associated with the hit, such as **APPLE w\5 PEAR** or **ATTORNEY w\3 WORK PRODUCT**.

9. **Record Types**

   Planet Data types all electronic documents processed as one of the following record types: Email, Email Attachment, Edoc, Edoc Attachment. This information is delivered in the Record Type field.

 **PLANET DATA**          555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | **PlanetData.com**

Case 1:13-cv-04989-FAM Document 1751-3 Entered on FLSD Docket 05/28/2019 Page 80 of 88
Case 1:13-cv-04989-FAM Document 1754-3 Entered on FLSD Docket 05/28/2019 Page 80 of 88
Case 1:17-md-3498-BLS Doc 3498 Filed 11/25/18 Page 78 of 111

## 3 Delivery Specifications

Deliverables will be formatted for:

☐ Planet Data Relativity hosting solution.
☐ Client database format.

The deliverable format will be a .DAT. The metadata file will be supplied as a delimited text file containing a record for each document processed. The metadata file will be delivered by default in UNICODE UTF-8 format using the following delimiter values:

|  | Visual Rep | ASCII Value | Hex UTF-8 Value | Decimal UTF-8 Value |
|---|---|---|---|---|
| Item Separator | ; | 59 | 0x3b | 59 |
| Field Begin | þ | 254 | 0xC3 0xBE | 195 190 |
| Field End | þ | 254 | 0xC3 0xBE | 195 190 |
| Field Separator |  | 20 | 0x14 | 20 |
| CR/LF Separator | ® | 174 | 0xC2 0xAE | 194 174 |

The first row of the metadata file will contain field headers.

1. **MetaData Fields**

Wherever possible, Planet Data mines all available metadata from each file. These field values are stored in our workflow files and are available for export when composing the .DAT file. The fields outlined, below, reflect the data elements that are most frequently requested for review and production purposes. If additional fields are later required in support of a document review or production, they can be exported from our workflow for addition to the database.

| Field Name | Description |
|---|---|
| DocID | Unique document level identifier. See format in next section. Input Based on: DocID |
| DocID_BegAtt | Control ID of first native document within in a family. Only populated when a family is present. Input based on: DocID |
| DocID_EndAtt | Control ID of last native document within a family. Only populated when a family is present. Input based on: DocID |
| DocID_AttRange | The DOCID_BEGATT and DOCID_ENDATT values formatted as DOCID_BEGATT – DOCID_ENDATT. Only populated when a family is present. Input based on: DocID |
| BeginPage | Beginning page level control ID assigned to the image file for the first page of the document. Input based on: PageID |
| EndPage | Ending page level control ID assigned to the last image file for the last page of the document. Input based on: PageID |
| BeginAttachPage | Beginning page level control ID of first images file within in a family. See format in next section. Input based on: PageID |
| EndAttachPage | Ending page level control ID of last image files within a family. See format in next section. Input based on: PageID |
| Pages | Number of pages in the document (if Tiffs generated). |
| GroupID | Unique value for all documents within a family (parent and child documents). Input based on: FamilyID – see next section. |
| Parent_ID | Control ID of parent document. Only populated when a family is present. Only populated for attachments (child documents). Input based on: DocID |
| Child_ID | Control ID of attachments (child documents). Multiple values separated with semicolon. |



| | Only populated when a family is present.  Only populated for parent documents.  Input based on: DocID |
|---|---|
| Child_Name | Original file name of attachments (child documents).  Multiple values separated with semicolon.  Only populated when a family is present.  Only populated for parent documents. |
| Is_ParentDoc | Y if parent document.  Left Null if not parent document. |
| Is_ChildDoc | Y if attachment (child) document.  Left Null if not attachment. |
| Attached_Count | Number of attachments. |
| Doctype | MS Word 2003, MS Excel 2003, etc... |
| Recordtype | Edoc – (for a standalone electronic file)  Edoc Attachment – (for embedded items extracted from a standalone electronic file).  Email – (for a top level email file)  Email Attachment – (for attachments to an email) |
| MessageID | E-mail message ID generated by Microsoft Outlook or Lotus Notes. |
| InternetMessageID | For emails only, Internet message ID. |
| UTC/GMT Timezone Offset | If processed in GMT value is 0  If processed in Eastern value is -5  If processed in Central value is -6  If processed in Pacific value is -8 |
| StartDate | For Chats/Mtg. Items/Appointments. (YYYY/MM/DD). |
| StartTime | For Chats/Mtg. Items/Appointments. (HH:MM:SS). |
| EndDate | For Chats/Mtg. Items/Appointments. (YYYY/MM/DD). |
| EndTime | For Chats/Mtg. Items/Appointment. (HH:MM:SS). |
| SentDate | For E-Mails. (YYYY/MM/DD). |
| SentTime | For E-Mails. (HH:MM:SS). |
| SubmitDate | For Mtg. Items/Appointments. (YYYY/MM/DD). |
| SubmitTime | For Mtg. Items/Appointments. (HH:MM:SS). |
| ReceiveDate | For E-Mails (YYYY/MM/DD). |
| ReceiveTime | For E-Mails (HH:MM:SS). |
| CreateDate | For Edocs (YYYY/MM/DD). |
| CreateTime | For Edocs (HH:MM:SS). |
| ModDate | Last modification date for edocs (YYYY/MM/DD). |
| ModTime | Last modification time for edocs (HH:MM:SS). |
| AccessDate | Date document was last accessed. |
| AccessTime | Time document was last accessed. |
| PrintDate | Date document was last printed. |
| PrintTime | Time document was last printed. |
| ParentDate | For email families populate parent and all family members with **sent date** of parent email.  For chats, meeting Items and appointments items, populate record with the **start date** of the item.  For non-email families populate parent and all family members with **mod date** of parent file. |
| ParentTime | For email families populate parent and all family members with **sent time** of parent email.  For chats, meeting Items and appointments items, populate record with the **start time** of the item. |

 **PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

**Planet Data**
**XX0001**

|  | For non-email families populate parent and all family members with **mod time** of parent file. |
|---|---|
| **Custodian** | Value to be provided by client. |
| **From** | Sender Name from e-mails and "Author" from non-emails.  For E-Mails, Planet Data displays the Display Name and in between "<" and ">" Planet Data puts the email address if it is known.<br><br>For email From = STD:senderDisplay value<br>For non-email edocs From =  STD:author value |
| **Email_From** | Sender Name from e-mails. Planet Data displays the Display Name and in between "<" and ">" Planet Data puts the email address if it is known.  (STD:senderDisplay value.) |
| **Edoc_From** | "Author" from non-emails.  (STD:author value.) |
| **To** | Valid for E-mails only.  Planet Data displays the Display Name and in between "<" and ">" Planet Data puts the email address if it is known. |
| **CC** | Valid for E-mails only. Planet Data displays the Display Name and in between "<" and ">" Planet Data puts the email address if it is known. |
| **BCC** | Valid for E-mails only.  Planet Data displays the Display Name and in between "<" and ">" Planet Data puts the email address if it is known. |
| **Organization** | "Company", "Companies" or equivalent from E-Docs only. If none exist, output nothing. |
| **Subject** | Combination of "SUBJECT" for e-mails and "Title" from E-Docs. If that does not exist, then the File Name is used. |
| **Email_Subject** | "SUBJECT" from e-mails. |
| **Edoc_Subject** | "Title" from edocs. |
| **Last Modified By** | Name of person who last modified and saved the file.  Typically available only for MS Office documents.<br><br>For email Last Modified By = field not populated<br>For non-email edocs Last modified BY = STD:lastauthor |
| **Folder** | Outlook folder. |

**PLANET DATA**   555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

Case 1:13-cv-04989-FAM Document 127-3 Entered on FLSD Docket 05/27/2022 Page 83 of 88
Case 1:13-cv-04989-FAM Document 127-3 Entered on FLSD Docket 05/27/2022 Page 83 of 88
Case 1:17-cv-3765-JLS Doc 34-3 Filed 11/25/18 Page 80 of 111

**Planet Data**
XX0001

| File Name | File name without the path. |
|---|---|
| File Size | The size in bytes of the file. |
| Orig File Extension | File extension (.xls, .doc etc...) of delivered native file. |
| File Extension | File extension (.xls, .doc etc...) determined during processing. |
| Keywords | From Edocs, only if applicable. |
| Comments_Metadata | From Edocs, only if available.  Generally applicable to MS Office file types. |
| Hash | For E-Mails, the MD5 of the e-mail and any attachments.  For E-Docs, the MD5 value of the file and any attachments. |
| Family Hash Value | For E-Mails or E-Docs containing attachments, the MD5 of the parent document. The E-Mails or E-Docs without attachments, repeat the file's MD5 value. |
| Conversation Index | If metadata value available, will be used for message thread grouping in Relativity. |
| Conversation Index Truncated Value | If metadata value available, will be used for message thread grouping in Relativity. |
| Conversation Topic | If metadata value available, field will be populated as follows:  The default is to take the value from the STD:conversationTopic field.  If STD:conversationTopic is NULL the value will be taken from the STD:subjectNormalized field. |
| Conversation Family | If metadata value available, will be used for message thread grouping in Relativity. |
| Conversation Family Truncated Value | If metadata value available, will be used for message thread grouping in Relativity. |
| Sensitivity | Sensitivity field extracted from emails |
| Unread | Indicates whether email was unread; yes/no |
| Read | Indicates whether email was registered as read by recipient; Y/N |
| Categories | From Edocs, only if available.  Generally applicable to MS Office file types. |
| Importance | Importance field extracted from emails. |
| MailStore | Original path to the mail store (including the PST or NSF filename) from which that record came; format: \MailStores\Sample.pst |
| Source | The original path of the file/document as provided in the source material.  Includes full path down to the file level but NOT the file name itself.  If the file was extracted from a PST, ZIP or the container, the container name will be part of the path. This applies to both the email and any attachments extracted from a PST.  In the case of embedded files extracted from a source file, i.e., an Excel file extracted from a PowerPoint file, the source path will be extended down to the level of the embedded file. |
| Review Folder Tree | The original path of the file/document as provided in the source material. Will include full path down to the file level. For PST/NSF files, folders will be created for all existing folders, such as Inbox, Sent Items, Deleted Items, and other subfolders that may be present. For non-email files, folders will be created for all existing folders and subfolders, such as 'My Documents' and folders that were created within in it.  In the case of embedded files extracted from a file, such as an Excel file extracted from a PowerPoint file, the folder tree path will **NOT** be extended down to the level of the embedded file. Embedded files will appear in sequence within the folder containing the original host document. |
| Alert Script | Flag field for Relativity pop-up alerting users to presence of tracked changes, comments, hidden slides, hidden worksheets, hidden rows, hidden columns, annotations, BCCs, or speaker notes.  Value:<br><br>Alert('Document contains tracked changes, comments, hidden slides, hidden worksheets, hidden rows, hidden columns, annotations, BCCs or speaker notes. Please be sure to view the document with the native application.') |

Case 1:13-cv-04999-FAM  Document 1754-3  Entered on FLSD Docket 05/07/2023  Page 41 of
Case 1:13-cv-04999-FAM  Document 1754-3  Entered on FLSD Docket 05/07/2023  Page 41 of
Case 1:17-cv-19105-FAM  Doc 3498  Filed 11/25/18  Page 84 of
88

|  | Include BCC functionality in Alert Script: Yes or No |
|---|---|
| **Has Comments or annotations** | Y/N if applicable to the document type and left null if not applicable. |
| **Has Revisions** | Y/N if applicable to the document type and left null if not applicable. |
| **Revisions Text** | Contains text from MS Word track changes and Excel revisions if the metadata is present and available.  Not currently available for MS Excel versions 2007/2010. |
| **Has hidden Worksheets or Slides** | Y/N if applicable to the document type and left null if not applicable. |
| **Has Hidden Rows** | Y/N if applicable to the document type and left null if not applicable. |
| **Has Hidden Columns** | Y/N if applicable to the document type and left null if not applicable. |
| **Has Speaker Notes** | Y/N if applicable to the document type and left null if not applicable. |
| **Has Email BCC** | Y/N if applicable to the document type and left null if not applicable. |
| **Has Embedded** | Y/N if applicable to the document type and left null if not applicable. |
| **Is Embedded** | Y/N if applicable to the document type and left null if not applicable. |
| **Is Email** | Y if applicable to the document type and left null if not applicable. |
| **Deliv Color** | Populated with a Y/N value.  Y if the delivered image is color JPG, N if the delivered image is black and white tiff. |
| **Encrypted** | Populated with a Y/N value.  Y if the source file is encrypted, N if the source file is not encrypted. |
| **Password** | A password that can be used to open the original file.  Note, this may NOT be the original password, but one that has been found programmatically that will also open the file. |
| **Protected** | Populated with a Y/N value.  Y if the source file contains protected elements, N if the source file does not. These can include protected formulas in Excel files, or PDF files that restrict editing or printing the contents. |
| **Language** | Identifiable languages found in the document, including the relative percentage. Field is populated with a single string containing the language name(s) and percentage(s). For example: *English (85%); German (15%).* |
| **Language_No%Num** | Identifiable languages found in the document. Field is populated with a single string containing the language name(s). For example: *English; German.* |
| **Slipsheet** | Populated with a Y/N value.  Y for documents that cannot be processed.  N for documents that are processed. |
| **Slipsheet Reason** | Reason document cannot be processed. |
| **Search Terms Hit1_NoHitNum** | Only populated if marking requirement option selected in section 9.<br><br>If Exego project, field will be populated with **KeyTerm1** list from Exego. Field will be populated with the actual search string(s) separated by semicolons for which a document received a hit and will **NOT** include number of hits. For example: *APPLE w\5 PEAR; ORANGE* |
| **Search Terms Hit2_NoHitNum** | Only populated if marking requirement option selected in section 9.<br><br>If Exego project, field will be populated with **KeyTerm2** list from Exego.<br><br>Field will be populated with the actual search string(s) separated by semicolons for which a |



| | document received a hit and will **NOT** include number of hits.  For example: *APPLE w\5 PEAR; ORANGE* |
|---|---|
| Priv Terms Hit_NoHitNum | Only populated if marking requirement option selected in section 9.  If Exego project field will be populated with **PrivTerm** list from Exego.  Field is populated with the actual search string(s) separated by semicolons for which a document received a hit and will **NOT** include number of hits.  For example: *Privileged; Legal.* |
| Exego Tags | Tag information from Exego. |
| PDS Batch | PDS assigned EDD or Paper delivery volume name. |
| PDS Media ID | Unique ID assigned to each piece of media or FTP delivery.  ID is assigned during media/data intake process. Media ID uses PDSMI prefix and next available number. |
| Processed by PDS | Value will be set to "Y" for all documents delivered from processing system. |
| Process Type | Value will be set to "ESI" for all documents delivered from processing system. |
| Processing Batch ID | Processing batch name.  Corresponds to project status reports. |
| Internal Doc ID | Unique internal processing system document ID. |
| Native Path | Path to the native file.  Should include absolute path information for Relativity – for example: \\Filecluster\Staging\Data\NY0000\Volume#\Native\ |
| DocText | Path to document text file.  Should include absolute path information for Relativity – for example: \\Filecluster\Staging\Data\NY0000\Volume#\Text |
| | |

2.    **Images**

| Image File Specifications | |
|---|---|
| Image Files | **Will/Will NOT** be delivered for all documents. |
| | Named after the page level Control ID. |
| | Delivered in an **Images** folder. |
| Format | ☒ Single page B/W GroupIV tiffs for all. |
| | ☐ Single page Color JPG files for all – only those that have color in native will have color in delivered JPG. |
| | ☐ Color for Color setting – B/W tiffs for non-color native, color JPG for color native. |
| | ☐ Custom – Color JPG files for select file types, B/W tiffs for everything else. |

3.    **Image Load File**

| Image Load File Specifications | |
|---|---|
| Load File Type | Opticon (Relativity Default – LFP, DII, etc., available for Non-Relativity deliveries) |

4.    **Text**

| Text File Specifications | |
|---|---|
| Text Files | Doc Level TXT files **Will** be delivered for all documents in UNICODE UTF-8 format. |
| | Named after the document level DocID. |
| | Delivered in a **Text** folder. Path is referenced in the DocText field in the metadata file. |

5.    **Native Files**

| Native File Specifications |
|---|
| |



Planet Data
XX0001

| Native Files | Will be Delivered for all documents with the exception of container and archive file types (PST, NSF, ZIP, TAR, RAR etc.). |
| | Named after the document level DocID. |
| | Delivered in a Native folder. Referenced in the Native Path field in the metadata file |

**6.    Document and Page Level ID Format**

Only one of the three ID Format Specifications below can be selected.

| ID Format Specifications – **RELATIVITY DEFAULT** | |
|---|---|
| Document Level | Assigned to each document.  Increment by one for each document. |
| Project Definition | **ABC prefix followed by an 8 digit number** |
| Start Value | ABC00000001 |
| | PDS prefix is default if not defined.  May not be delivered on all projects. |
| Page Level | Assigned to each page/image generated.  Value based on the assigned DocID and increment by one for each page using suffixes starting with page two.  The page one ID value will match the assigned DocID value. |
| Sample | Page1: ABC00000001 |
| | Page2: ABC00000001.00001 |
| | Page3: ABC00000001.00002… |
| Family/Group Level | Assigned to each family/group generated.  Increment by one for each family/group. |
| Project Definition | Prefix used for this value should be unique to the Project.  For example, project ABC0001 should use a GroupID prefix of ABC01 followed by an eight digit number. |
| | ABC01 prefix followed by an 8 digit number |
| Start Value | ABC0100000001 |

| ID Format Specifications – **Generic Profile Compatible with Concordance, etc.** | |
|---|---|
| Document Level | Assigned to each document.  Increment by one for each document. |
| Project Definition | **ABC prefix followed by an 8 digit number** |
| Start Value | ABC00000001 |
| | PDS prefix is default if not defined.  May not be delivered on all projects. |
| Page Level | Assigned to each page/image generated.  Value is NOT based on the assigned DocID and increments by one for each page (PageID). |
| Sample | Page1: PDS00000001 |
| | Page2: PDS00000002 |
| | Page3: PDS00000003… |
| Start Value | PDS00000001 |
| Family/Group Level | Assigned to each family/group generated.  Increment by one for each family/group |
| Project Definition | Prefix used for this value should be unique to the Project.  For example, project ABC0001 should use a GroupID prefix of ABC01 followed by an eight digit number. |
| | ABC01 prefix followed by an 8 digit number |
| Start Value | ABC0100000001 |

| ID Format Specifications - **Alternate Format Compatible with Concordance, etc.** | |
|---|---|
| Document Level | Assigned to each document.  Increment by one for each document. |
| Project Definition | **ABC prefix followed by an 8 digit number** |
| Start Value | ABC00000001 |
| | PDS prefix is default if not defined.  May not be delivered on all projects. |
| Page Level | Assigned to each page/image generated.   Value based on the assigned DocID and |



**Planet Data**
XX0001

| | incremented by one for each page using suffixes starting with page one. |
|---|---|
| Sample | Page1: ABC00000001.00001<br>Page2: ABC00000001.00002<br>Page3: ABC00000001.00003... |
| Family/Group Level | Assigned to each family/group generated.  Increment by one for each family/group |
| Project Definition | Prefix used for this value should be unique to the Project.  For example, project ABC0001 should use a GroupID prefix of ABC01 followed by an eight digit number.<br><br>ABC01 prefix followed by an 8 digit number |
| Start Value | ABC0100000001 |

7.   **Delivery Volume Format**

| Delivery Volume Specifications | |
|---|---|
| Format | **TBD** |
| Starting Value | TBD |
| | |
| Size Options | Select one of the following: |
| | ☒ DVD Sized (4.2GB) or smaller |
| | ☐ One Delivery volume per processed batch |

**PLANET DATA**      555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | **PlanetData.com**

**Planet Data**
XX0001

## 4 Reporting

Planet Data can provide the following standard reports as well as other reports upon request:

- **Manifest Report** - Planet Data can provide a manifest report that details the source data as staged for processing, including the file names, types and sizes associated with the media upon receipt. This report can be used to target specific file types for processing.
- **Status Report** - The status report provides batch-level as well as cumulative file counts for each custodian, including pre-cull, post-cull, extracted and post dedupe counts.
- **Post-Rip Report** – This report provides file type counts that are recorded at various steps, including receipt, post-NSRL cull, post-extraction and post dedupe.
- **Delivery Volume Report** – This report provides file type counts for individual delivery volumes, including counts by file type for the files being delivered for loading to the review database. It also includes a comprehensive slipsheet report that itemizes files that were containers (zip files and PST files, for example), or files that had blank pages, were corrupt or were encrypted and could not be open following our comprehensive decryption steps.
- **Exego Search Analysis and Export Reports** – Following searches run in Exego, produce reports that provide a detailed breakdown of the search term hits and their context. Following exports from Exego, Planet Data can provide reports confirming the source of the export and the key statistics, such as the number of records and attachments.

