EXHIBIT B

UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA
Miami Division
MDL No. 2599
Master File No.: 15-MD-02599-MORENO

IN RE: TAKATA AIRBAG PRODUCT
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

ALL CASES

**DECLARATION OF MATTHEW P. WEINSHALL IN SUPPORT OF PLAINTIFFS'
STEERING COMMITTEE'S RESPONSE IN OPPOSITION TO VERISTAR, LLC'S
APPLICATION FOR PAYMENT OF FEES AND EXPENSES**

Pursuant to 28 U.S.C. § 1746, I, Matthew P. Weinshall, hereby declare under penalty of

perjury as follows:

1.      I am a member of the law firm of Podhurst Orseck P.A. ("**Podhurst**") and submit

this declaration in support of the Plaintiffs' Steering Committee's Response in Opposition to

Veristar, LLC's Application for Payment of Fees and Expenses.

2.      I have personal knowledge of the matters stated herein.

3.      In or around early 2018, I, on behalf of the PSC, began negotiating with counsel for

the bankrupt Takata Entities, as well as counsel for personal injury victims, over the preservation

of Takata's records, some of which could be relevant to the pending MDL and future actions

involving personal injuries.

4.      The Takata Entities had collected massive amounts of data. Most of the data was

unprocessed, meaning that it could not be reviewed simply by hooking up the hard drives to a

computer. Instead, it would need to be processed first and then hosted on a review platform, which

would be cost-prohibitive for such a large data set.

1

5.      The Takata Entities also were unwilling to simply hand hard drives with the data to the Plaintiffs for two reasons. First, the collected data included documents and data that may belong to Joyson Safety Systems ("**JSS**"), since JSS purchased Takata's non-airbag assets through the bankruptcy process. And second, the data and documents might contain attorney-client privileged material, and certain Takata entities were not willing, at the time, to waive the attorney-client privilege.

6.      So, the parties negotiated a protocol that would address these issues and allow the relevant, non-privileged Takata data to be filtered from the undifferentiated data, without incurring the costs of hosting or processing the entire data set.[1] To make this solution work, a third-party needed to serve as the custodian of the data, without charging for holding the data, and be capable of processing and filtering discrete sets of the data upon request.

7.      At first, we approached the vendor that was hosting the discovery that Plaintiffs had received thus far—International Legal Services ("**ILS**").  Over the course of this MDL, the PSC has advanced more than $5.5 million for document and database services alone to ILS.  But ILS ultimately was unwilling to serve in this role. So, we considered other potential vendors and in July 2018 identified PDS, which had been working with another firm serving on the Plaintiffs' Steering Committee.

8.      PDS's executives explained to me in August 2018 that PDS viewed the engagement as an attractive opportunity, because it exposed PDS to numerous large firms on the plaintiff and defense sides, as well as numerous automakers. Evidently motivated by this significant business opportunity, PDS made an attractive offer to serve as the third-party custodian of the data: PDS

---

[1] The sizeable amount sought by Veristar in the Motion is a testament to the kind of unnecessary hosting and processing costs the protocol was designed to avoid.

offered to serve in this role—in other words, to store the data—without charge. The PSC accepted this offer.

9.      Extensive negotiations ensued involving various stakeholders—including the automakers, Takata and JSS entities, the PSC, Planet Data, and personal injury claimants.  The parties ultimately reached an agreement that was memorialized in the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order (the "Agreement"). Upon the parties' motion, the Takata bankruptcy court entered an order on November 29, 2018, adopting the Agreement as an order of the court.

10.      Consistent with Planet Data's commitment to not charge for simply storing the unprocessed data as the custodian, none of the documents submitted to the Court mention a price or fee that Planet Data would be permitted to charge for serving in this role.  Instead, the parties agreed that PDS would be authorized to charge the "Requesting Parties" for the services of processing, filtering, uploading, and if requested, hosting the discrete data sets that they requested, according to a statement of work that each requesting party would execute with PDS. A template for the statement of work was attached as an exhibit to the Stipulated Protective Order approved by the Court. The statement of work set forth the fees that PDS would be permitted to charge Requesting Parties for these discrete services. Thus, where the Stipulated Protective Order says "PDS will store the Transferred Data at MDL Counsel's expense until the termination of the MDL Action," the agreement the parties made with respect to this provision was for PDS to not charge any fee for storing the Data, but only charge the pertinent Requesting Party who requested access, on a searchable database, for specified services for the discrete portions of the Data requested under a statement of work.  Since the Protocol contemplated that the vast majority of data would remain off-line and unprocessed on hard drives, unless and until a Requesting Party stepped

forward and accepted the "processing, hosting, review [and] management" costs, the parties anticipated that the costs to merely "store the Transferred Data" would be de minimis, and Planet Data agreed to not charge the PSC for such an expense.

11.    Neither the PSC nor the Stipulated Protective Order contemplated that PDS would host the entirety of the Data on the Exego platform or an active database. Rather, the Stipulated Protective Order detailed a Protocol under which only the Data identified by a Requesting Party would be processed, filtered, and uploaded.

12.    Specifically, and briefly stated, under "Protocol Step One" in the Stipulated Protective Order, a "Requesting Party," as was the PSC here for example, would request access to certain Data, which was segregated by Takata "Custodian," and sign a Statement of Work, as the PSC did here. Then under "Protocol Step Two," PDS "shall retrieve the requested Custodian's Data from its off-line storage and shall upload said Custodian's Data onto an active PDS database." PDS would then cleanse that requested Data of privileged and other information and make the cleansed requested Data available to the Requesting Party on that active PDS database.

13.    The above protocol is reflected in the template "Statement of Work" attached to the Stipulated Protective Order, which provides in part that upon a Requesting Party's request for certain Data, that Data would then be processed and loaded into the Exego platform, with expenses charged to the Requesting Party. The PSC and PDS executed such a "Statement of Work", attached hereto as Exhibit 1.

14.    PDS, through its executives, acknowledged the above, that the only charges would be those incurred by a Requesting Party with respect to specific data. In fact, in an email exchange with the PSC during the agreement-drafting process, PDS Chief Operating Officer David Cochran, stated:

> I removed the pricing terms and conditions since, as I understand it, the Takata entities will not be invoiced for the services we provide other than the $75,000 data transfer fee from the protocol.  As discussed, the requesting parties will be invoiced for the data we process.  This agreement also references the confidentiality agreement and protective order as well as the privilege and PSAN search protocol.

This email, confirming that only "requesting parties will be invoiced for the data we process," is attached hereto as Exhibit 2.

15.     Nowhere in the Stipulated Protective Order or anywhere else is there any provision or agreement for the PSC to pay the kind of global processing and storage fees that Veristar now seeks. Indeed, PDS performed under the terms actually agreed upon by the parties—*i.e.,* that PDS would not charge a fee for storing or serving as the custodian of the Data—for approximately two years and, consistent with the agreement, PDS never attempted to charge any party for storing or serving as the custodian of the Takata Data. Rather, PDS only charged Requesting Parties, such as the PSC, for the specific, limited data sets that were identified in Statements of Work. And the PSC paid PDS in accordance with the Statements of Work it executed. This course of performance, over two years, confirms what the documents reflect—that PDS agreed to not charge anyone for serving as the Takata Data custodian, or for "processing" and "hosting on the Exego database" anything other than what a Requesting Party specifically requested and agreed to.

16.     The PSC, as a Requesting Party under the Stipulated Protective Order, sent a request to PDS on May 8, 2019, for data from a list of Takata custodians. *See* Exhibit 3 hereto, redacted to remove the names of the custodians. PDS responded with a statement of work limited to the data for the specified custodians. PDS also invoiced the PSC for just the work limited to the data for the specified custodians. *See* Exhibit 4 hereto.

17.     In fact, when PDS began charging the PSC to host the limited data set that the PSC had requested under its Statement of Work, I instructed PDS to no longer host the data set, in order

to reduce the fees payable to PDS. That email is attached hereto as Exhibit 5. In accordance with the agreement, PDS complied with this request, stopped hosting the data, and reduced the fees it was charging in subsequent invoices.

18.     A set of invoices that PDS sent the PSC, from May 14, 2019, through June 7, 2021, is attached as Exhibit 6.  The invoice amounts ranged from a low of $2,542.02 for a month in which a relatively small set of data was hosted on the Exego platform, to a high of $110,682.33 for a month in which PDS processed the bulk of the data for requested Custodians.  In total, the PSC paid PDS approximately $389,600 for its services.

19.     Even when Veristar purchased Planet Data's assets, it continued PDS's practice for several months of charging the PSC only for the relatively small subset of data that continued to be hosted on the Exego platform pursuant to the PSC's Statement of Work.  These invoices, issued from March of 2021 through December of 2021, charged the PSC $2,692.02 per month, and are attached hereto as Exhibit 7.  In total, the PSC paid Veristar $24,228.18 before this dispute arose.

20.     Several months after Veristar acquired certain assets of PDS, its representative contacted the PSC demanding payment of millions of dollars in fees for serving as the Takata Data custodian—contrary to the agreement reached and performed with PDS. I explained to Veristar's representative that it was not entitled to charge the PSC for these hosting fees and instructed Veristar to remove the data from any hosting service that incurred charges. I attempted to negotiate a resolution with Veristar, but did not hear back from Veristar after some back and forth.

21.     PDS was receiving confidential data, including data from Japan, and it was manifestly important to the parties that it was PDS, and only PDS, that handled the data. Thus, the "Agreement Regarding Cross Border Transfer of Personal Data," which is Exhibit 1 to the Stipulated Protective Order, provides at ¶ 7.2 that: "Data Recipient [*i.e.*, PDS] may not sub-

contract the performance of its obligations under this Agreement in whole or in part to any third party without the prior written consent of Data Transferor [*i.e.*, TKJP Corporation and RTK Service LLC, collectively]." Paragraph 7.2 of that same agreement further provides that even with such consented to assignment, PDS's agreement with the subcontractor has certain restrictions and that any such consented to assignment of PDS obligations "shall not affect [PDS's] duty to fulfil such obligations and [PDS] shall remain primarily responsible for the same." *Id*. ¶ 7.2.

22.    On information and belief, prior to the transfer of Data to Veristar, neither PDS nor Veristar obtained the requisite written consent to any transfer of Data to Veristar, nor obtained any court order amending the Stipulated Protective Order to substitute in Veristar for PDS.

23.    The PSC received all the Data of interest to the Takata MDL through the completion of the statements of work that the PSC was invoiced and paid for.  The PSC received no benefit from Veristar's continued storage or hosting of the Data after it acquired the assets of PDS.

24.    I held negotiations with Veristar personnel about revising the protective order to try to accommodate Veristar's concerns, but neither Takata's counsel nor Veristar ultimately followed up.

25.    On information and belief, Veristar was formed in 2019.  Prior to forming Veristar, according to federal complaints, its founders were members of CertaTech, a Florida limited liability company that engaged in the same business as Veristar, providing e-discovery services. Several federal complaints filed against Veristar across the country allege that its founders dissolved CertaTech soon after receiving a substantial investment from a third party, to retain the investment without compensating the third party, and shifted CertaTech's business to Veristar.

These complaints are attached as Exhibits 8 and 9 hereto. The third-party investor sued Veristar for fraud in the Southern District of Florida, and the case eventually settled.

26.     Within a month of its formation, Veristar purchased the assets of two other businesses—Franklin Data Ventures, Inc. and Nexem-Iconic, LLC—that also provided cloud hosting, cybersecurity, and e-discovery services. Those two companies subsequently sued Veristar in federal court in Illinois for breaching their asset purchase agreements by failing to make contractual incentive payments. The Illinois complaint is attached as Exhibit 10 hereto.

27.     Soon after the dispute with Franklin Data and Nexem-Iconic arose, Veristar's founders created another Illinois limited liability company called Veristar Global, LLC. In a lawsuit filed against Veristar by a former employee, the plaintiff alleges that Veristar Global LLC was formed to evade the liabilities of Veristar to Franklin Data and Nexem-Iconic. *See* Ex. 9.

28.     As it did with Franklin Data and Nexem-Iconic, Veristar claims that it purchased certain assets of Planet Data in early 2021.

29.     Veristar contacted the PSC in September 2021 and demanded payment of millions of dollars for Veristar's hosting of the Transferred Data. The PSC rejected Veristar's demand and explained that it violated the Agreement and the PSC's deal with Planet Data. The PSC also instructed Veristar to remove the Transferred Data from its hosting servers.

30.     Veristar filed a motion in the Delaware bankruptcy court (where Takata's bankruptcy was pending) requesting that the Stipulated Protective Order be amended to authorize Veristar to replace Planet Data and seeking payment from the PSC of more than $7 million in unauthorized fees for hosting the Transferred Data that the Stipulated Protective Order did not permit it to possess in the first place.

31.     The PSC responded in opposition to Veristar's motion in the Delaware bankruptcy court, arguing that this Court is the proper forum to resolve this dispute, because it concerns the PSC, which this Court appointed and oversees, and threatens to impede the Takata MDL over which this Court presides.  The bankruptcy court agreed and entered an order dismissing Veristar's motion.  A copy of the bankruptcy court's order is attached as Exhibit 11 hereto.

32.     In Veristar's own bankruptcy proceeding, the Takata and JSS entities filed an objection, claiming that Veristar was not authorized to possess the Transferred Data and disputing that the Transferred Data was property of Veristar's bankruptcy estate.  *See* Exhibit 12.  To resolve this objection, Veristar agreed to destroy all the processed Transferred Data in its possession and return the original hard drives to counsel for the Takata entities and stipulated to the entry of a finding of fact in the confirmation order that "None of the Veristar Entities has agreed to be bound by the terms of the Protective Order."  *Id.*  The bankruptcy court order confirming Veristar's reorganization plan includes this finding of fact.  *See* Exhibit 13 at 13.

33.     In Veristar's own bankruptcy proceeding, Veristar filed financial records with an income statement for the year 2022.  *See* Exhibit 14.  The income statement shows that in 2022, the entire company incurred $360,000 in data hosting costs for the Exego platform.  *See id.* at 8, 11.

34.     Pursuant to 28 U.S.C. § 1746, I hereby declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Dated: June 28, 2024

*/s/ Matthew P. Weinshall*
Matthew P. Weinshall

9

# EXHIBIT 1

 **PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | **PlanetData.com**

May 8, 2019

Matthew P. Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

## STATEMENT OF WORK

This Statement of Work ("SOW") has been assigned Project number **TKPOD0001**.

The following work (the "Work") will be performed by Planet Data Solutions, Inc. ("PDS") pursuant to and in accordance with the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order dated October 12, 2018, ("Confidentiality Agreement"), and the Protocol as set out in Section 3 thereof ("Protocol"), and incorporates them by reference, including the definitions and parenthetical identifications set out in the Confidentiality Agreement. The Work will be charged at the rates set forth hereunder or in Exhibit 1.

**Podhurst Orseck P.A.** ("Client") is a party to the Confidentiality Agreement or, if not, will sign and provide PDS with an ACKNOWLEDGMENT OF CONFIDENTIALITY AND DATA PRIVACY AGREEMENT, AND STIPULATED PROTECTIVE ORDER as attached to the Confidentiality Agreement as Exhibit 2.

PDS and Client will sign a Letter Agreement of the form attached as Exhibit 2 (the "Letter Agreement").

Pursuant to Step One of the Protocol, upon execution of the Letter Agreement, PDS will provide Client with the list of Transferred Data custodians ("Custodians List") that was furnished to PDS by the Takata Entities.

Client, as a Requesting Party under the Confidentiality Agreement, requests that PDS make available a Searchable Dataset containing the data of the custodian(s) listed in Exhibit 3 hereto ("Requested Custodians").

PDS will provide an estimate of the cost of the work required to produce and host a Searchable Dataset of the Requested Custodians' Data in Exego Select (Planet Data's Early Case Assessment Platform). **Client will pay PDS the retainer of 25% of the estimated costs specified in the signed Letter Agreement (the "Retainer Fee") before PDS commences further work hereunder.**

If any of a Requested Custodians' Data has already been processed and loaded into a PDS Exego Select database, PDS will:

1

 **PLANET DATA** 555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

1. create a new Exego Select database for that new Requesting Party; and
2. implement Protocol Steps Two and Three with respect to the Requested Custodian's Data if such Protocol Steps have not already been implemented. If Protocol Steps Two or Three have already been implemented, Client will be charged a per capita fee pursuant to the Cost-Sharing Provision of Protocol Step One.

If any of a Requested Custodian's Data has not been processed consistent with the previous processing specifications of a prior Requesting Party (deduplication approach, for example) and loaded into an Exego Select database, PDS will:

1. process the Requested Custodians' data for loading into a database;
   a. The processing specifications will be discussed with Client during a planning call prior to the processing of the data. Depending upon processing requirements, the already processed custodians may need additional processing (rendering of images according to specifications, deduplication approach, etc.).
2. load the data into a PDS Exego Select database; and
3. implement Protocol Steps Two and Three with respect to the data.

Pursuant to Protocol Step Four, PDS will then provide the Requesting Party access to the resulting Searchable Dataset comprised of the PSAN Dataset without the potentially Privileged PSAN Data, (the "Client Searchable Dataset TKPOD0001") in an active Exego Select database and the associated Withheld Data Log.

Any listed Custodian data in the Client Searchable Dataset TKPOD0001 will be available without storage charges for six months, and at the rate of $3 per GB per month thereafter. Access will be provided to Client on a per user charge of $75 per month.

The Client may, pursuant to Protocol Step Four, select documents within the Client Searchable Dataset TKPOD0001 to be produced to them by PDS in a standard format in accordance with the Processing Specification Addendum, attached hereto. Any page images produced will contain the following legend printed on the top right side:

**CONFIDENTIAL PSAN DATA – ATTORNEYS' EYES ONLY - SOW TKPOD0001**
**Case No.: In re Takata Product Liability Litigation, No. 15-md-2599 (S.D. Fla.)**

PDS will, pursuant to Protocol Step Five, produce and deliver the documents selected by Client in the format specified in the Processing Specification Addendum.

Client will notify PDS when it no longer needs access to the Client Searchable Dataset (Exego Select Database) TKPOD0001 and PDS will then archive the Client Searchable Dataset (Exego Select Database) TKPOD0001 at $3 per GB per month. The requesting party will pay $3 per GB per month for the active and archived Client Searchable Dataset (Exego Select Database) until such time that Client requests deletion of that database.



PLANET DATA®                    555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

**Exhibit 1**

| Description | Price |
|---|---|
| ESI Processing Services – Charges based on the extracted file size during processing, includes ingestion, de-duplication, metadata/text extraction, native file processing; delivery of metadata, text, native files, load file creation and the use of Exego® Select - ECA/Pre-Review Platform | **$25 per extracted GB** |
| Database Setup, Design, Training, User Fees | **No Charge** |
| Exego Select Monthly user fee | **$75 per user** |
| Exego Select Monthly data storage fee (First six months at no charge). The requesting party will pay $3 per GB per month for the active and archived Client Searchable Dataset (Exego Select Database) until such time that the requesting party requests deletion of that database. | **$3 per GB** |
| Technical Support includes implementation of Protocol Steps Two and Three, outputting data under Protocol Step Five, and foldering, creating searches, productions, database changes, manipulation of load files received from third party hosting or processing platforms for loading into Exego® Select or Relativity® | **$175 per hour Billed in 15-minute increments with a 15-minute minimum.** |
| Loading data processed by PDS into Exego® Select. | **No Charge** |
| Cost-sharing fees for use of previously incurred implementations of Protocol Steps Two and Three with respect to restored data | **As calculated pursuant to Protocol Step One** |
| Import of 3rd party data into Exego® Select. (Data not processed by PDS) | **$25 per GB** |
| Encrypted USB Hard Drive, Travel Expenses & Shipping | **At Cost** |
| Machine Translation | **Pricing provided upon request** |

3

 **PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | **PlanetData**.com

**Exhibit 2**

May 8, 2019

Matthew P. Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

**Re:  Services Agreement with** Podhurst Orseck P.A.
**PDS Project Number:**

Dear Mr. Weinshall:

This letter is to represent an agreement between your firm, Podhurst Orseck P.A. ("Client" or "You") and Planet Data Solutions, Inc. ("PDS"), effective as of the date of execution of this agreement (the "Agreement") for an engagement to provide services, whereby PDS personnel will provide to the Client the services as described herein and in the exhibits, addenda and related agreements referenced herein.  We understand that such services are requested by the Client in connection with its role as Chair Lead Counsel in *In re Takata Product Liability Litigation, No. 15-md-2599 (S.D. Fla.).*

The following work (the "Work") will be performed by Planet Data Solutions, Inc. ("PDS") pursuant to and in accordance with the Confidentiality and Data Privacy Agreement, and Stipulated Protective Order dated October 12, 2018, ("Confidentiality Agreement"), and the Protocol as set out in Section 3 thereof ("Protocol"), and incorporates them by reference, including the definitions and parenthetical identifications set out in the Confidentiality Agreement. The Work will be charged at the rates set forth hereunder.

**The Transferred Data[2] is Japan Data and TKH Data that consists of both processed data and original source data (unprocessed). The Transferred Data was provided to PDS in the form it was held by Deloitte (for Japan Data) and CDS (for TKH Data). Prior to the Chapter 11 and 15 cases and the commencement of the Japan Civil Rehabilitation proceeding, Deloitte processed some of the original source data for Japan Data and CDS processed some of the original source data for TKH Data (the "Processed Data").**

---

[2] Capitalized terms used but not defined herein shall have the meanings ascribed to such terms in the Confidentiality Agreement or the Statement of Work,

4



**PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

## I. Project Overview

PDS will be providing the following services (the "Services") for this project:

1. ESI processing as detailed in the companion Processing Specification Addendum and pursuant to and in accordance with the Confidentiality Agreement and the Protocol.
2. The work will be charged at the rates set forth in Exhibit 1 to the Statement of Work.
3. Culled and filtered data will be delivered to the Client's hosting platform, pursuant to Step Five of the Protocol.

## II. Planet Data Contact List

| CONTACT | TITLE | EMAIL | PHONE | FAX |
|---|---|---|---|---|
| Lori Burr | Sr. Discovery Management Consultant | LBurr@planetdata.com | 914-606-0009 | 914-593-6901 |
| David Cochran | Chief Operating Officer | DCochran@planetdata.com | 412-638-7423 | 914-593-6901 |

## III. Client Contact List

| CONTACT | TITLE | EMAIL | PHONE | FAX |
|---|---|---|---|---|
| Matt P. Weinshall | Attorney, Podhurst Orseck P.A. | mweinshall@podhurst.com | 305-358-2800 | 305-358-2382 |

## IV. Billing Information

| Invoices will be addressed to: | Other information required on invoices — internal billing numbers etc. |
|---|---|
| Matthew P. Weinshall<br>Podhurst Orseck P.A.<br>SunTrust International Center<br>One S.E. 3rd Ave., Suite 2300<br>Miami, FL 33131<br>Office: (305) 358-2800<br>Fax: (305) 358-2382<br>Email: mweinshall@podhurst.com | PDS: TKPOD0001 |

5

 **PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

## V. Project Schedule

PDS expects to begin processing of electronic documents upon receipt by PDS of an executed copy of this Agreement and the Retainer Fee from the Client.

## VI. Planet Data Terms and Conditions

1. **Pricing & Payment:** PDS shall invoice the Client the fees set forth in Exhibit 1 to the Statement of Work. Prices do not include applicable State or Federal taxes. All such fees are due and owing within thirty (30) days of the invoice date. Client shall be in default of this Agreement if payment in full is not received by PDS within sixty (60) days of the invoice date. In addition to its other remedies with respect to such default, PDS may charge Client interest at a rate of 1.5% per month, compounded monthly, if the invoice is not paid within that sixty (60) days. PDS has the right to suspend its services with three (3) days written notice if payments in full are not received on all invoices within 60 days of the invoice date. The party executing this Agreement on behalf of the Client shall be responsible for all payments under this Agreement.

2. **Client Responsibilities:** The Client agrees: (a) to use its best efforts to provide PDS with defined project specifications, (b) to demonstrate that Client is a party to the Confidentiality Agreement or, if not, to sign and provide PDS with an ACKNOWLEDGMENT OF CONFIDENTIALITY AND DATA PRIVACY AGREEMENT, AND STIPULATED PROTECTIVE ORDER as attached to the Confidentiality Agreement as Exhibit 2; (c) to use its best efforts to be reasonable in imposing demands and deadlines for the Services; (d) to report promptly to PDS any problems or errors which the Client observes or discovers with any PDS data delivery, and (e) to notify PDS, in writing, of all court orders restricting the use, distribution or disposition of the Transferred Data, pursuant to the Protocol and this Agreement, to be provided by PDS. The Client shall indemnify and hold PDS, its officers, agents and representatives harmless from all claims, actions, and causes of action, damages and fines resulting from or related to the Client's failure to so notify.

3. **Term:** This Agreement shall commence upon the date of execution by all parties and will continue until the Client gives written notice that its need for the Services is no longer required or until this Agreement has otherwise been terminated as provided herein. Upon termination, the Client shall be responsible for payment for all Services performed by PDS prior to the effective date of termination. PDS may terminate this Agreement (i) immediately if Client fails to pay any amounts owing when due, or (ii) otherwise, upon three (3) days written notice for any reason.

4. **Confidentiality:** PDS agrees to use information obtained in this engagement for the sole purpose of fulfilling its obligations under this Agreement and agrees to hold such information as confidential subject to the terms of the Confidentiality Agreement. Confidentiality obligations shall not apply to any information that enters into the public domain through no fault of PDS, which was disclosed to PDS by a third party not in breach of any obligations of confidentiality to the disclosing party, which is independently developed by PDS, or which is required to be disclosed in compliance with applicable law or court order. PDS understands that the work product and files of PDS, and its communications with You, may be protected

 **PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | **PlanetData.com**

by the doctrine of attorney-client privilege and/or attorney work product and may not be subject to discovery. Accordingly, our records and materials will be maintained by us as confidential in accordance with the terms hereof. It is agreed that those materials and all other working papers and other documents prepared or received by us pursuant to this engagement will not be disclosed by us to third parties without Client's consent, except as may be required by judicial or administrative process. Client will implement appropriate measures to protect Personal Data in accordance with the Data Protection Laws and commensurate with the Data Transfer Agreement as required by the Confidentiality Agreement.

5. **Limitation of Liability.** IN NO EVENT, with the exception of breach of confidentiality by PDS in violation of the preceding Paragraph VI.4 of this Agreement, SHALL THE LIABILITY OF PDS UNDER THIS AGREEMENT, WHETHER IN RESPECT OF A SINGLE OCCURRENCE OR A SERIES OF OCCURRENCES AND WHETHER ARISING UNDER CONTRACT OR TORT (INCLUDING ANY BREACH OF A STATUTORY DUTY) OR OTHERWISE, EXCEED TWO TIMES THE AMOUNT OF THE INVOICES THAT THE CLIENT RECEIVED FROM PDS FOR SERVICES RELATED TO THIS SPECIFIC PROJECT.

6. **Miscellaneous:** (a) Governing Law. This Agreement shall be governed by, and interpreted and construed in accordance with, the laws of the State of New York, U.S.A. without considering the New York conflicts of laws rules. Jurisdiction and venue shall be in New York, New York. (b) Entire Agreement. This Agreement, including all exhibits attached and incorporated as an integral part of this Agreement, constitutes the entire agreement of the parties with respect to the subject matter hereof, and supersedes all previous proposals, oral or written, and all negotiations, conversations or discussions heretofore had between the parties related to this agreement and the Confidentiality Order. (c) The parties have signed this Agreement effective as of the date set forth below.

7. **PDS Policy for Data Retention, Preservation and Return.** Pursuant to the requirements of PDS's SSAE 18 Level II Certification, PDS's policy for maintaining all forms of client data are as follows:

Client data forwarded to PDS on magnetic media shall be secured in our vault when not in use. This media shall be returned to the client at the end of a project or when it is no longer needed onsite at PDS. Data electronically transmitted to PDS shall be deleted from our server once the data has been ingested into our Source Data Management system (SDM) or moved to our hosting environment if the data requires no processing by PDS prior to loading to the review database. No further backups shall be made of data electronically transmitted. Productions from our review environment or other data that are posted to our FTP site for downloading by the client or affiliated parties shall be deleted from that site after 30 days without any further backup. Data resident in our SDM system will be backed up on a 100-day cycle for disaster recovery purposes but shall be retained online in the SDM system until it is no longer needed by PDS.

PDS performs backups of project processing batches. These backups are performed on a 100-day cycle for disaster recovery (DR) purposes. These DR backups are kept online until the project is either deleted or archived. Once a project has reached 180 days of inactivity, PDS

7

PLANET DATA

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

shall archive the processing batches and they shall be retained for 36 months. The client shall be notified at the time of this archiving. At the end of that time-period, if the client has not requested the data to be restored, the processing batches shall be deleted. EXEGO Select databases may be kept online for searching even when the processing batches have been deleted, however, EXEGO Select databases shall be deleted at the end of the project archive period of 36 months if they are still online. EXEGO Select databases are backed up on a 100-day cycle for DR purposes. Retention of processing batches beyond 36 months shall result in the assessment of a monthly storage fee charged to the client.

Review databases, inclusive of document production sets, are backed up daily on a 100-day cycle. The backup media is overwritten at the end of each 100-day cycle. When a client notifies PDS that an individual review database is no longer needed, PDS shall either archive the database prior to deleting it, or PDS shall delete the review database and any associated productions sets without performing any further backups. If an archive is not performed, the database shall cease to exist in any form after 100 days. The costs for creating a Relativity archive or exporting a Relativity database in a generic load format shall be borne by the client. Those costs are outlined in Exhibit 1 to the Statement of Work. PDS shall ship the backup media to the client upon completion of the archive/export process and the receipt by PDS of all funds owed by the client, including the costs associated with creating the archive or export. PDS shall maintain the original review database in a near-line state for a period not to exceed 30 days while the client confirms that the backup media has been received and is in good working order. At that time, or after 30 days from the delivery of the archive media to the client or client's representative, the version of the database maintained in a near-line state at PDS shall be deleted. The backup created by PDS can only be restored within the review environment in place at PDS. Longer retention periods can be implemented for a specific matter, upon prior written agreement. The costs associated with establishing a separate backup regime shall be borne by the client.

8.  **PDS Policy for the Protection of Client Data.**   The following defines the standard policy for the handling all forms of client data pursuant to the requirements of PDS's SSAE 18 Level II Certification.

   **Data Security:** Client data shall be encrypted when it is transferred from PDS to the Client and any other recipients of the data as designated by the Client. PDS shall use the following policies and practices to effect secure data transfers:

   **Media Delivery:** All physical media that supports the transferred data shall be encrypted using the AES-256 encryption algorithm. If media cannot be encrypted to that level, then the strongest available encryption method shall be used. This procedure requires the transfer of the password from PDS to the client in a secure manner. Our standard protocol for this shall be to send the password to only pre-designated users (as determined by the client).

   **Electronic Transfer of Client Data:** It is common to transfer client data via electronic means such as FTP and/or e-mail. For FTP transfers to PDS, the data should be

8



archived using an encrypted container (such as WINZIP and others similar applications) and then transferred via our Secure FTP Server. For data transfers to the client, PDS shall encrypt the data in a standard archive container using AES-256 encryption on our FTP site. The client should access our FTP site using secure and encrypted protocols. Our FTP site supports industry standard secure FTP (SFTP and HTTPS) transfers.

Transfer of data via e-mail is discouraged by PDS. However, should a client insist on this method of transfer, PDS shall use our standard archiving method to encrypt the data. It is our policy to send the password in a separate e-mail and only to the recipient of that encrypted data. Given the inherent insecure nature of email, the client is _strongly_ urged to only e-mail data to PDS via this secure e-mail method. PDS shall _not_ be responsible for any data breach that may occur when data is not forwarded to PDS using the secure data transfer methods described above. Data transferred to the PDS FTP site by the client, or third parties associated with the project, shall not be retained on the FTP site once downloaded to our network. If copies of the uploaded data are required, it is the responsibility of the client, or the third parties associated with the project, to maintain copies on their premises. Productions posted by PDS to the FTP site for download by the client, opposing counsel or third parties associated with the project, shall be maintained on the site for 30 days, after which this data shall be deleted from the site. Maintaining such data on the site beyond 30 days requires prior written notice to, and prior written approval by, PDS.

9. **COLLECTION AND PROCESSING OF PERSONAL DATA:** For the purposes of compliance with statutory and regulatory requirements (e.g. GDPR and other applicable laws) for the protection of natural persons with regards to the processing of personal data and on the free movement of such data, client agrees that it is responsible for compliance as the data controller. When acting as a joint controller, the client agrees that it is responsible for compliance as joint controller, under all applicable data protection laws with respect to the processing of the data. Planet Data agrees that it is responsible for compliance as the data processor under all applicable data protection laws with respect to the processing of the data. Planet Data is a data processor acting at the express direction of the client, and with the consent of the custodians to process the data for the limited purpose of the matter.



**PLANET DATA**

555 Taxter Road | Suite 425 | Elmsford, NY 10523 | 914-593-6900 | PlanetData.com

## VII. Client Acceptance Procedures

Please sign and date in the appropriate section below.  Executed signature pages should be returned to PDS via email as a PDF attachment or sent via fax to 914-593-6901.

Approved by: Podhurst Orseck P.A.

_Matthew Weinshall_
Printed Name

6/5/19
Date

Partner
Title

Executed by: Planet Data Solutions, Inc.

David S. Cochran, Chief Operating Officer
**Planet Data Solutions, Inc.**
**555 Taxter Road**
**Suite 425**
**Elmsford, NY 10523**
**P – 914-593-6900**
**F – 914-593-6901**
www.PlanetData.com

6/5/19
Date

# EXHIBIT 2

Subject: RE: Planet Data
Date:    9/7/2018 1:33 PM
From:    "MATT P. WEINSHALL" <MWeinshall@PODHURST.com>
To:      "Dave Cochran" <DCochran@planetdata.com>
Cc:      "Howard Reissner" <HReissner@planetdata.com>, "Mike Wade" <MWade@planetds.com>

---

Thanks, Dave.  Each of those points is correct.

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A**.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Dave Cochran <DCochran@planetdata.com>
**Sent:** Friday, September 7, 2018 1:31 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Cc:** Howard Reissner <HReissner@planetdata.com>; Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Matt,

I have attached the draft SOW with our changes.

1. We have no changes to the terms and conditions you incorporated.
2. I wanted to confirm the following below on the cost-sharing.
   a. Per the protocol, the cost-sharing applies only to the processing of the data, whether it be raw data that has not been processed or the 12TBs of data that has already been processed and imported into Exego Select.
      i. Technical support is billed directly to the requesting party outside of the cost-sharing agreement.
      ii. Exego Select storage is billed directly to the requesting party outside of the cost-sharing agreement.
      iii. Any other PDS services that a requesting party may request that is outside the processing of the data as noted in point one above, will be billed directly to the requesting party.

We will be providing comments on the "Proposed Agreement between PDS and Takata" shortly.

Thanks,

Dave

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Friday, September 07, 2018 1:24 PM
**To:** Dave Cochran <DCochran@planetdata.com>
**Cc:** Howard Reissner <HReissner@planetdata.com>
**Subject:** RE: Planet Data

Dave,

Do you have an ETA on the revised documents?  Thanks.

--Matt

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Dave Cochran <DCochran@planetdata.com>
**Sent:** Thursday, September 6, 2018 4:51 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Cc:** Howard Reissner <HReissner@planetdata.com>
**Subject:** RE: Planet Data

Matt,

Thanks.  We thought is it was a good discussion also.  If it's OK with you, give me this evening to make some revisions to that document and I will send it to you in the morning before you send it along.   Please let me know if that works.

Thanks,

Dave

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**

**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Thursday, September 06, 2018 4:47 PM
**To:** Dave Cochran <DCochran@planetdata.com>
**Cc:** Howard Reissner <HReissner@planetdata.com>
**Subject:** Re: Planet Data

Dave,

Thanks for the call today.  If it's ok with you, I'd like to send the draft of the statement of work to the OEMs with the qualification that it is still being revised by PDS and is subject to change, just to get their input on the document and move things along.  Does that work for you?  Thanks.

—Matt

On Sep 6, 2018, at 12:45 PM, Dave Cochran <DCochran@planetdata.com> wrote:

> Matt,
>
> For our call today, Howard Reissner, our CEO will join us too.  We can use our conference line and it is:
>
>> 914 593 6238, conference room 757 and the access code is 107
>
> Thanks!
>
> Dave
>
> **David S. Cochran**
> **Executive Vice President, Chief Operating Officer**
> **Direct:  412-531-5728**
> **Mobile:  412-638-7423**
>
> **Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
> **DCochran@PlanetData.com | www.PlanetData.com**
>
> ---
>
> **From:** Dave Cochran
> **Sent:** Wednesday, September 05, 2018 9:16 PM
> **To:** 'MATT P. WEINSHALL' <MWeinshall@PODHURST.com>
> **Cc:** Caroline Bartlett <CBartlett@carellabyrne.com>; Mike Wade <MWade@planetds.com>
> **Subject:** RE: Planet Data
>
> Great.  Thanks

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Wednesday, September 05, 2018 9:15 PM
**To:** Dave Cochran <DCochran@planetdata.com>
**Cc:** Caroline Bartlett <CBartlett@carellabyrne.com>; Mike Wade <MWade@planetds.com>
**Subject:** Re: Planet Data

Thanks, Dave.  3:30 pm tomorrow works perfectly.  You can reach me on my cell-617-251-6256. Thanks.

On Sep 5, 2018, at 9:00 PM, Dave Cochran <DCochran@planetdata.com> wrote:

> Thanks Matt.  I will review the material you sent.  Can I call you at 3:30 tomorrow?
>
> **David S. Cochran**
> **Executive Vice President, Chief Operating Officer**
> **Direct:  412-531-5728**
> **Mobile:  412-638-7423**
>
> **Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
> **DCochran@PlanetData.com | www.PlanetData.com**
>
> ---
>
> **From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
> **Sent:** Wednesday, September 05, 2018 8:27 PM
> **To:** Dave Cochran <DCochran@planetdata.com>; Caroline Bartlett <CBartlett@carellabyrne.com>
> **Cc:** Mike Wade <MWade@planetds.com>
> **Subject:** RE: Planet Data
>
> Dave,
>
> I'm sorry we didn't get a chance to talk today.  I spent some time reviewing the documents you sent last week.  I've attached a draft of a term sheet with Takata that I believe Takata's counsel will be ok with, based on their prior comments—I didn't work off the draft you sent for that, but I think it accomplishes the same objectives.  I've also attached a draft of a statement of work that largely incorporates the statement of services you sent as Exhibit 2—I tracked the changes to the terms/conditions in section 6 with redline.  I also included the applicable price terms from your proposal in Exhibit 1 to the statement of work—I have some questions about the price terms that I didn't include.  I think we can use your specification addendum as Exhibit 3 to the statement of work.  I've also inserted

some answers to your questions below.  After you've had a chance to review this, let's speak tomorrow, if you're available.  Other than a call between 2-3pm, I'm free anytime until around 4:30pm tomorrow.  Thanks.

--Matt

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A**.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Dave Cochran <DCochran@planetdata.com>
**Sent:** Tuesday, August 28, 2018 9:44 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>; Caroline Bartlett <CBartlett@carellabyrne.com>
**Cc:** Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Hi Matt,

I have attached the draft agreements for your review as well as more detailed questions on the protocol implementation process.

1. Draft agreement for the Takata entities.  The agreement would be between Planet Data and Baker McKenzie, TKJP Corporation (previously Takata Corporation), a Japanese corporation (kabushiki kaisha), and its affiliates, subsidiaries, successors and assigns ("TKJ"), RTK Services LLC ("RTKJ"), and TK Holdings, Inc. ("TKH," and, together with TKJ and RTKJ, the "Takata Entities"), and Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems ("JSS"). We will need to discuss whether we will have one Master Agreement between the group and Planet Data or individual Agreements with each entity.
   a. I removed the pricing terms and conditions since, as I understand it, the Takata entities will not be invoiced for the services we provide other than the $75,000 data transfer fee from the protocol.   As discussed, the requesting parties will be invoiced for the data we process.  This agreement also references the confidentiality agreement and protective order as well as the privilege and PSAN search protocol.  This is correct, as reflected in the draft I've attached.

2. Draft Planet Data Statement of Services for the requesting parties. This is a two part document.
   a. Part one (PDS SOS Contract) is the actual agreement that provides the pricing and the terms and conditions for the

requesting parties.   We would also request a retainer as outlined in the protocol (which we can discuss the appropriate amount at a later time). This is largely incorporated as Exhibit 2 to the statement of work.  A retainer is fine—please insert a provision for that in Exhibit 2 or the statement of work where you think it fits.

b. Part two (PDS SOS Specifications) is the specification document, that our Project Manager would discuss with each requesting party on the metadata fields we would provide, deliverable format and other project specifications.  Depending on the requesting party requirements, this document could change for each requesting party's requirements.  The process would be:

i.   This information would be discussed with each requesting party during a planning call as they identify what custodian or set of data we are processing for each party.

ii.   There is a reference in the protocol that discusses providing the same data to multiple parties without re-processing the data.  The reason I raise this is the potential for data differences due to deduplication requirements.  For example, if a requesting party asked for custodian A and B and wanted global dedupe across both custodians and another party requested the same custodians but only wanted custodian dedupe, the results of the data output would be different.  So in this instance, we would need to process the data again for each party.  I think that's fine—the requesting party could either accept the version that was already produced and pay the per capita cost, or it could choose to reprocess the data and pay the entire cost.  If you think this needs to be made more clear, please add language to that effect.

1. Has the committee standardized on the processing specifications regardless of who the requesting party is for examples like this or are decisions left up to each requesting party? Left to the requesting party.

iii.   Each requesting party would also have their own Exego Select (the Early Case Assessment/Pre-Review module) database to cull and filter the data prior to a final set of data being exported for their respective hosting platform.  Each requesting party will have their own Exego Select database, providing confidentiality, and will be able to search and cull the data we process.  Per our proposal, we would charge storage for Exego Select at $3 per GB per month (after the initial six months of no charge).  That is fine.

        iv.   I understand that ILS is hosting the data, but are they hosting it for all requesting parties or just the committee?  I ask this as a clarification,  since last week you indicated that we would need to deliver data in a format agreed to by the requesting party.  <span style="color:red">ILS is only hosting for the PSC.  The various automakers have their own vendors.</span>

3. Since the protocol was originally crafted as if ILS would be conducting the processing and hosting, there are some additional clarifications needed based upon Planet Data performing the processing and ILS performing the hosting.

    a. The protocol would need to be revised to bifurcate each company's role and responsibility and cost requirements since there are many references to ILS hosting the data, their creation of privilege logs, etc.  <span style="color:red">Agreed.  We will make those changes.</span>

    b. Based upon our proposal pricing and how we intended the processing to be charged, how will the cost-sharing apply since the current protocol applies to ILS only?

        i.   For example,  is the cost-sharing plan only applicable to the committee and if any other entity (such as an automobile manufacturer, etc.) requests data, would that be outside the plan?  Do you have any thoughts on how the cost-sharing plan will be implemented?  <span style="color:red">The cost-sharing would work the same as proposed in the protocol—it applies regardless of whom the requesting party is.</span>

If you have any time over the next couple days, I can call and go through this with you,  if you'd like.  I appreciate your time and we look forward to working on this engagement.

Thanks,

Dave

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Tuesday, August 28, 2018 8:57 AM
**To:** Dave Cochran <DCochran@planetdata.com>; Caroline Bartlett <CBartlett@carellabyrne.com>

**Cc:** Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Thanks, Dave.

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A**.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Dave Cochran <DCochran@planetdata.com>
**Sent:** Tuesday, August 28, 2018 7:20 AM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>; Caroline Bartlett <CBartlett@carellabyrne.com>
**Cc:** Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Thanks Matt.   I will send you some draft documents, by the end of today, for your review.

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Tuesday, August 28, 2018 12:37 AM
**To:** Dave Cochran <DCochran@planetdata.com>; Caroline Bartlett <CBartlett@carellabyrne.com>
**Cc:** Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Thanks for following up, Dave.  We're still waiting to hear back from Takata's entities, who seem to have been out of the office for the past week.  Here are answers to your questions:

1. I assume we will receive a draft of the engagement letter from the entities with their language for our review?
   I think they want you to provide a draft engagement letter—whatever you generally use, modified for the requirements of protocol, will be fine.  They will then mark it up  and send us proposed revisions.

2. When do you think we might be able to schedule an in-person planning meeting?  We will travel to any location for the meeting. This will be important for us to further define the protocol process, specifications and management of the project.  I think this makes sense to schedule once we reach an agreement with the Takata Entities on the protocol—we are still negotiating some important details, such as the search terms.

   a. We would also provide a sample proforma statement of services we would use for each party that is requesting processing. If you can provide this, that would be helpful.  We are planning to have as an exhibit to the agreement the statement of work that each party will enter into with you.

3. When do you think we might begin to receive the data?  I believe that the Takata entities are eager to transfer the data once the terms are finalized.  We have been negotiating with them for more than a month, but they have said that they want to finalize the deal within the next week or two.

Thanks again for you help.

Best,
Matt


**Matthew P. Weinshall**
**Podhurst Orseck P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Dave Cochran <DCochran@planetdata.com>
**Sent:** Monday, August 27, 2018 3:26 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>; Caroline Bartlett <CBartlett@carellabyrne.com>
**Cc:** Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Hi Matt,

I wanted to check-in to see if you needed anything further from me and if you had a chance to review the questions from Thursday.

Thanks,

Dave

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** Dave Cochran
**Sent:** Thursday, August 23, 2018 10:15 AM
**To:** 'MATT P. WEINSHALL' <MWeinshall@PODHURST.com>; Caroline Bartlett
<CBartlett@carellabyrne.com>
**Cc:** Mike Wade <MWade@planetds.com>
**Subject:** RE: Planet Data

Matt,

Thanks!  I have a couple questions.

1. I assume we will receive a draft of the engagement letter from the
   entities with their language for our review?
2. When do you think we might be able to schedule an in-person
   planning meeting?  We will travel to any location for the meeting.
   This will be important for us to further define the protocol process,
   specifications and management of the project.
   a. We would also provide a sample proforma statement of services
      we would use for each party that is requesting processing.
3. When do you think we might begin to receive the data?

We look forward to working with you on this project.

Thanks,

Dave

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Wednesday, August 22, 2018 11:01 PM
**To:** Dave Cochran <DCochran@planetdata.com>; Caroline Bartlett

<CBartlett@carellabyrne.com>
**Subject:** RE: Planet Data

Thanks, Dave. This is great. I know the Takata Entities will want a draft of an engagement letter with Planet Data as well. The agreement would be between Planet Data and Baker McKenzie, TKJP Corporation (previously Takata Corporation), a Japanese corporation (kabushiki kaisha), and its affiliates, subsidiaries, successors and assigns ("TKJ"), RTK Services LLC ("RTKJ"), and TK Holdings, Inc. ("TKH," and, together with TKJ and RTKJ, the "Takata Entities"), and Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems ("JSS"). The purpose of the agreement is to maintain the Takata Entities' privilege claims—so Planet Data would be agreeing to implement the protocol, as defined in the protective order/confidentiality agreement, and would be holding the documents as a custodian for the Takata Entities. Please let me know if you have any questions. Thanks.

--Matt

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A**.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Dave Cochran <DCochran@planetdata.com>
**Sent:** Tuesday, August 21, 2018 10:36 PM
**To:** Caroline Bartlett <CBartlett@carellabyrne.com>; MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Subject:** Planet Data

Matt,

I have attached our revised proposal based upon the discussions from yesterday. We have also reviewed the documents you sent and have no questions. We will be in compliance with the confidentiality/protective order agreement as well as the transfer agreement. There are no additional questions on the protocol or search terms you provided, although we would like to discuss these further at a planning meeting. We are available for an in-person planning meeting at your convenience.

Although the current hosting provider will not change, we can also offer those services, if requested. We also offer translation services, both machine and human, through our partner United Language Group.

Please let me know if I can provide any additional information.

Thanks,

Dave

**David S. Cochran**
**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com | www.PlanetData.com**

**From:** Caroline Bartlett <CBartlett@carellabyrne.com>
**Sent:** Tuesday, August 21, 2018 9:48 AM
**To:** MATT P. WEINSHALL (MWeinshall@PODHURST.com)
<MWeinshall@PODHURST.com>; Dave Cochran <DCochran@planetdata.com>
**Subject:** FW: Takata Document Processing Proposal


Dave – here is the materials from Matt.    Thanks.

Caroline F. Bartlett, Esq.
Carella, Byrne, Cecchi, Olstein,
 Brody & Agnello, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Direct:  973-422-5557
Main:   973-994-1700
Fax :   973-994-1744
Email: cbartlett@carellabyrne.com
Website: http://www.carellabyrne.com/


**Confidential Communication**
This electronic transmission and any related attachments: (a) are protected by the
Electronic Communications Privacy Act (18 USC §§ 2510-2521); (b) may contain
confidential and/or legally privileged information and/or attorney work-product; and
(c) are for the sole use of the intended recipient named above. If you have received
this electronic message in error, please notify the sender and delete the electronic
message.  Any disclosure, copying, distribution, or use of the contents of the
information received in error is strictly prohibited. If you have questions or require
assistance concerning this email, please contact the sender at the phone number
listed above.  Thank you.

**From:** MATT P. WEINSHALL [mailto:MWeinshall@PODHURST.com]
**Sent:** Monday, August 20, 2018 7:25 PM
**To:** Caroline Bartlett
**Cc:** PETER PRIETO; James Cecchi; Zach Bower
**Subject:** RE: Takata Document Processing Proposal

Caroline,

Attached is a draft of the protective/confidentiality order, which contains the data protocol we discussed today with Planet Data. I've also attached a draft of the data transfer agreement, which will be between Takata Japan and the vendor. And I've attached a list of PSAN search terms and privilege search terms, which are still being negotiated, for the protocol. All of these documents are drafts, subject to additional negotiations and are confidential settlement documents. Please forward them to Planet Data for their review. Thanks.

--Matt

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A.**
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

---

**From:** Caroline Bartlett <CBartlett@carellabyrne.com>
**Sent:** Monday, August 20, 2018 9:47 AM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.COM>
**Cc:** PETER PRIETO <PPrieto@podhurst.com>; J Cecchi <jcecchi@carellabyrne.com>; Zach Bower <ZBower@carellabyrne.com>
**Subject:** RE: Takata Document Processing Proposal

I'll have Dave Cochran from Planet Data send around an invite.

Caroline F. Bartlett, Esq.
Carella, Byrne, Cecchi, Olstein,
  Brody & Agnello, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Direct:  973-422-5557
Main:  973-994-1700
Fax :  973-994-1744
Email: cbartlett@carellabyrne.com
Website: http://www.carellabyrne.com/

**Confidential Communication**
This electronic transmission and any related attachments: (a) are protected by the Electronic Communications Privacy Act (18 USC §§ 2510-2521); (b) may contain confidential and/or legally privileged information and/or attorney work-product; and (c) are for the sole use of the intended recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message.  Any disclosure, copying, distribution, or use of the contents of the information received in error is strictly prohibited. If you have questions or require assistance concerning this email, please contact the sender at the phone number listed above.  Thank you.

---

**From:** MATT P. WEINSHALL [mailto:MWeinshall@PODHURST.com]
**Sent:** Monday, August 20, 2018 9:46 AM

**To:** Caroline Bartlett
**Cc:** PETER PRIETO; James Cecchi; Zach Bower
**Subject:** Re: Takata Document Processing Proposal

Anytime after 2pm today would work.  Thanks.

On Aug 20, 2018, at 8:54 AM, Caroline Bartlett <CBartlett@carellabyrne.com> wrote:

> Hi Matt,
>
> What time today works for you?
>
> Caroline
>
> Caroline F. Bartlett, Esq.
> Carella, Byrne, Cecchi, Olstein,
>   Brody & Agnello, P.C.
> 5 Becker Farm Road
> Roseland, New Jersey 07068
> Direct: 973-422-5557
> Main:  973-994-1700
> Fax :  973-994-1744
> Email: cbartlett@carellabyrne.com
> Website: http://www.carellabyrne.com/
>
>
> **Confidential Communication**
> This electronic transmission and any related attachments: (a) are protected by the Electronic Communications Privacy Act (18 USC §§ 2510-2521); (b) may contain confidential and/or legally privileged information and/or attorney work-product; and (c) are for the sole use of the intended recipient named above. If you have received this electronic message in error, please notify the sender and delete the electronic message.  Any disclosure, copying, distribution, or use of the contents of the information received in error is strictly prohibited. If you have questions or require assistance concerning this email, please contact the sender at the phone number listed above.  Thank you.
>
> ---
>
> **From:** Caroline Bartlett
> **Sent:** Friday, August 17, 2018 12:36 PM
> **To:** MATT P. WEINSHALL
> **Cc:** PETER PRIETO; James Cecchi; Zach Bower
> **Subject:** Re: Takata Document Processing Proposal
>
> Matt,
> Monday is the better day and they are available any time at your convenience. Lmk what works best for you.
>
> Sent from my iPhone
>
> On Aug 17, 2018, at 11:37 AM, MATT P. WEINSHALL <MWeinshall@PODHURST.com> wrote:

Caroline,

If the Planet Data folks are available for a call either later this afternoon, after 4pm eastern, or on Monday, I'd like to speak with them.  We are nearing an agreement with the Takata entities regarding the protocol for transferring the data, and we need to finalize which vendors will be used.  While Planet Data's search tools are interesting and seem useful, I don't think that they will be utilized in the protocol, which calls for specific steps to be taken to process selected data and then make it available to the requesting parties.  We will want to know whether Planet Data can carry out those steps and what it would charge for doing so.  Thanks.

--Matt

**Matthew P. Weinshall**
**Podhurst** Orseck **P.A**.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131
Office: (305) 358-2800
Fax: (305) 358-2382
Email: mweinshall@podhurst.com

**From:** Caroline Bartlett <CBartlett@carellabyrne.com>
**Sent:** Tuesday, July 31, 2018 10:34 AM
**To:** MATT P. WEINSHALL
<MWeinshall@PODHURST.com>; PETER PRIETO
<PPrieto@podhurst.com>; J Cecchi
<jcecchi@carellabyrne.com>; Zach Bower
<ZBower@carellabyrne.com>
**Subject:** Takata Document Processing Proposal

Hi Matt – I'm forwarding the email below to you because it pertains to the recent proposal I sent you from Planet Data for the Takata documents.  If you want to set up a call with them to discuss the efficiencies of their advanced search tools that can save on what ultimately gets hosted, I'm happy to do that.  They are very keen on getting the work and I think we'd see a pretty significant cost savings for the processing of all those Takata docs.

Caroline

Caroline F. Bartlett, Esq.
Carella, Byrne, Cecchi, Olstein,

Brody & Agnello, P.C.
5 Becker Farm Road
Roseland, New Jersey 07068
Direct:  973-422-5557
Main:  973-994-1700
Fax :  973-994-1744
Email: cbartlett@carellabyrne.com
Website: http://www.carellabyrne.com/

**Confidential Communication**
This electronic transmission and any related
attachments: (a) are protected by the Electronic
Communications Privacy Act (18 USC §§ 2510-2521);
(b) may contain confidential and/or legally privileged
information and/or attorney work-product; and (c) are for
the sole use of the intended recipient named above. If
you have received this electronic message in error,
please notify the sender and delete the electronic
message.  Any disclosure, copying, distribution, or use
of the contents of the information received in error is
strictly prohibited. If you have questions or require
assistance concerning this email, please contact the
sender at the phone number listed above.  Thank you.

---

**From:** Dave Cochran
[mailto:DCochran@planetdata.com]
**Sent:** Monday, July 30, 2018 12:11 PM
**To:** Caroline Bartlett
**Subject:** RE: Proposal

Hi Caroline,

Thanks for your time on the phone last week.  I
know its mentioned in our proposal, but the ability
to load third-party productions from opposing
counsel into Exego Select in lieu of loading them
straight into the hosting platform will save the
committee additional review storage costs.
Identifying the important information in these
productions within Exego Select and then
promoting it to the review platform could be a
significant cost and time savings.

If there is anything additional that I need to do to
secure the project, please let me know.

Thanks,

Dave

**David S. Cochran**

**Executive Vice President, Chief Operating Officer**
**Direct:  412-531-5728**
**Mobile:  412-638-7423**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**DCochran@PlanetData.com |**
**www.PlanetData.com**

---

**From:** Zoltan Horvath
**Sent:** Monday, July 23, 2018 6:57 PM
**To:** Caroline Bartlett <CBartlett@carellabyrne.com>
**Cc:** Dave Cochran <DCochran@planetdata.com>
**Subject:** Proposal

Hi Caroline,

Thank you for giving Planet Data the opportunity to submit the attached proposal for the Takata airbag matter.  The proposal contains pricing, a detailed description of Exego Select and its benefits.   I also attached an article from 2016 regarding the benefits of the Exego Select platform.  The current version of Exego offers many new features and upgrades.  We would be happy to provide a demonstration of Exego Select to the Steering Committee at their convenience.

As always, if you have any questions or concerns, please feel free to call me at (914) 593-6900.

Thank you again!

Sincerely,
Zoltan Horvath
President
Planet Data Solutions, Inc.
555 Taxter Rd |Suite 425 | Elmsford, NY 10523
Office: (914) 593-6900
Cell : (914) 830-0523
www.planetdata.com

<image001.jpg>

**Disclaimer**

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not

the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

## Disclaimer

The information contained in this communication from the sender is confidential. It is intended solely for use by the recipient and others authorized to receive it. If you are not the recipient, you are hereby notified that any disclosure, copying, distribution or taking action in relation of the contents of this information is strictly prohibited and may be unlawful.

This email has been scanned for viruses and malware, and may have been automatically archived by **Mimecast Ltd**, an innovator in Software as a Service (SaaS) for business. Providing a **safer** and **more useful** place for your human generated data. Specializing in; Security, archiving and compliance. To find out more Click Here.

# EXHIBIT 3

Subject:  RE: CONFIDENTIAL - TAKATA - CUSTODIAN LISTING

Date:  5/8/2019 3:23 PM

From:  "Lori Burr" <LBurr@planetdata.com>

To:  "MATT P. WEINSHALL" <MWeinshall@PODHURST.com>

Cc:  "Dave Cochran" <DCochran@planetdata.com>, "Dan Roose" <DRoose@planetdata.com>

Matt,

Thank you.  We will include these three on your initial requesting list as well.

Thank you,
Lori

**Lori K. Burr**
**Sr. Discovery Management Consultant**
**Direct:  914-593-6919**
**Mobile:  704-287-6668**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**LBurr@PlanetData.com | www.PlanetData.com**

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Wednesday, May 8, 2019 3:22 PM
**To:** Lori Burr <LBurr@planetdata.com>
**Cc:** Dave Cochran <DCochran@planetdata.com>; Dan Roose <DRoose@planetdata.com>
**Subject:** RE: CONFIDENTIAL - TAKATA - CUSTODIAN LISTING

Thanks, Lori. I have a few more custodians to add to the list.  Please add the following:

- TAIC
- Takata AG Legal
- Dervyn, Christophe

Thanks.

**From:** Lori Burr <LBurr@planetdata.com>
**Sent:** Wednesday, May 8, 2019 2:57 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Cc:** Dave Cochran <DCochran@planetdata.com>; Dan Roose <DRoose@planetdata.com>
**Subject:** RE: CONFIDENTIAL - TAKATA - CUSTODIAN LISTING

Matt,

Good afternoon.  We have received your request for the Protocol to be applied to specific Custodians' data.
We will prepare the Statement of Services and provide to you the retainer fee applicable today.

Thank you,

Lori

**Lori K. Burr**
**Sr. Discovery Management Consultant**
**Direct:  914-593-6919**
**Mobile:  704-287-6668**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**LBurr@PlanetData.com | www.PlanetData.com**

---

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Wednesday, May 8, 2019 2:09 PM
**To:** Lori Burr <LBurr@planetdata.com>
**Cc:** Dave Cochran <DCochran@planetdata.com>; Dan Roose <DRoose@planetdata.com>
**Subject:** RE: CONFIDENTIAL - TAKATA - CUSTODIAN LISTING

Lori,

We'd like to apply the protocol to the following custodians:

- Khandhadhia, Paresh

- Cox, David

- Roe, Frank

- Maurer, Steve

- Boucher, John

- Luke, Dal

- Walsh, Tom

- Cooper, Brian

- Hardenburg, Bob

- Bernat, Al

- Boumarafi, Moe

- Moquin, Larry

- Hall, Scott

- Phillion, Bob

- Email Snapshot (TKH Data)

- Email Backup (All Asia) (Japan Data)

- Takata (TKH Data)

- TakataNet (TKH Data)

- Testing Department (TKH Data)

- TKH      (TKH Data)

- Product Safety Group (TKH Data)

- Sales – AH (TKH Data)

- Headquarters    (Japan Data)

Please send us the retainer fee and services agreement, and please let us know when we can expect to receive the data.  Thanks.

--Matt

---

**From:** Lori Burr <LBurr@planetdata.com>
**Sent:** Tuesday, April 30, 2019 1:34 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Cc:** Dave Cochran <DCochran@planetdata.com>; Dan Roose <DRoose@planetdata.com>
**Subject:** CONFIDENTIAL - TAKATA - CUSTODIAN LISTING

Dear Mr. Weinshall,

We are sending you the Takata Custodian List per your request.  Please select the Custodians which you would like Planet Data to process and deliver.  Once we receive your selections, we will respond with the retainer fee and Statement of Services agreement for you to execute.

Thank you,
Lori

**Lori K. Burr**
**Sr. Discovery Management Consultant**
**Direct:  914-593-6919**
**Mobile:  704-287-6668**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**LBurr@PlanetData.com | www.PlanetData.com**

# EXHIBIT 4



# Original Invoice

| Date | Invoice # |
|---|---|
| 5/10/2019 | 16789 |

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| | INITIAL RETAINER INVOICE:  estimated volume of extracted data which Planet Data will process is 7736.31 GBs and the retainer fee, based upon 25% of the volume at $25 per extracted GB, is $48,351.95. | 48,351.95 | 48,351.95T |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary:  Planet Data Solutions**
**ACCOUNT  #32011264**
**Please include your invoice number with the transfer to ensure we are able to process your payment. When paying by bank wire transfer, your bank may charge a transaction fee. To avoid additional charges or delays, inquire with your bank about any transaction fees that may be incurred and include them in the total amount of your wire transfer. Unpaid wire transfer transaction fees will be added to the balance on your account.**

| **Total** | **$48,351.95** |
|---|---|

Please send all checks to our Corporate Office:
**Planet Data Solutions, Inc.**
**555 Taxter Road, Suite 425**
**Elmsford, NY 10523**

**Payment is due thirty (30) days from the invoice date.**
**Please reference the Statement of Services for the terms and conditions for this project.**

# EXHIBIT 5

| | |
|---|---|
| Subject: | RE: PLANET DATA 052020 (PROJECT # TKPOD0001) INV # 18285 |
| Date: | 6/9/2020 5:16 PM |
| From: | "Lori Burr" <LBurr@planetdata.com> |
| To: | "MATT P. WEINSHALL" <MWeinshall@PODHURST.com>, "Howard Reissner" <HReissner@planetdata.com> |

Matt,

Thank you for the notification.  Based upon our metrics, the total PRIV for the Podhurst Custodians is 847.34 GB.   We will implement this new storage charges effective with our July 2020 invoice.

Thank you,
Lori

**Lori K. Burr**
**Sr. Discovery Management Consultant**
**Direct:  914-593-6919**
**Mobile:  704-287-6668**

**Planet Data | 555 Taxter Road - Suite 425 | Elmsford, NY  10523**
**LBurr@PlanetData.com | www.PlanetData.com**

**From:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Sent:** Monday, June 8, 2020 11:25 PM
**To:** Lori Burr <LBurr@planetdata.com>; Howard Reissner <HReissner@planetdata.com>
**Subject:** RE: PLANET DATA 052020 (PROJECT # TKPOD0001) INV # 18285

Howard,

Aside from the data that is identified on the Withheld Data Log, we'd like to remove the rest of the data from the hosting platform, so that we do not incur additional monthly hosting charges for it.  We expect to reach an agreement with Takata in the near future on the Data that is identified on the Withheld Data Log.  Please let me know if you have any questions.  Thanks.

--Matt

**From:** Accounting <accounting@planetdata.com>
**Sent:** Monday, June 8, 2020 3:51 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Cc:** Victor Mas <vmas@PODHURST.com>; Lori Burr <LBurr@planetdata.com>; Howard Reissner <HReissner@planetdata.com>; Accounting < accounting@planetdata.com>
**Subject:** PLANET DATA 052020 (PROJECT # TKPOD0001) INV # 18285

Planet Data Solutions, Inc.

**Invoice**   *Due:06/30/2020*
*18285*

Amount Due: $27,305.37

Dear Matthew Weinshall :

Please find your invoice attached.

Please be advised to use the ACH option instead of Wire transfer for processing payments.

We appreciate your continued business.

Sincerely,

Planet Data Solutions, Inc.

# EXHIBIT 6

COST FUND



**PLANET DATA**
DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

# Original Invoice

| Date | Invoice # |
|------|-----------|
| 6/30/2019 | 16995 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131



PAID
AUG 1 4 2019
BY:_____

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com

| PD Project Number | Client Contact | Project Manager |
|-------------------|----------------|-----------------|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | PLANET DATA 062019 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 6,000.6 | ESI Processing Services (per extracted GB) | 25.00 | 150,015.00 |
| 50 | Project Manager/Technical Support Hours | 175.00 | 8,750.00 |
| | Including, but not limited to: | | |
| | Preparation and submission of Requested Custodian Data for ESI | | |
| | Processing; Implemention of PSAN Protocol Searches; Preparation of | | |
| | Withheld Data Logs; Preparation of Searchable Data Sets; Preparation of | | |
| | Exports of Withheld Data Logs and Searchable Data Sets for Delivery, | | |
| | including creation of load files, imaging and QC of deliverables. | | |
| | PDS Good Faith Averaged Hours: 2 hours per Requested Custodian | | |
| | TKPOD0001: 25 Requested Custodians | | |
| 1 | Hard Drive 2 TB Padlock Pro (at cost) | 220.00 | 220.00 |
| 1 | FedEx Charges | 49.28 | 49.28 |
| | Subtotal | | 159,034.28 |
| | Retainer Previously Received | | -48,351.95 |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

PAID
AUG 1 4 2019
BY:_____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | **$110,682.33** |
|-----------|-----------------|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
555 Taxter Road, Suite 425
Elmsford, NY 10523

**Payment is due thirty (30) days from the invoice date.**
**Please reference the Statement of Services for the terms and**
**conditions for this project.**

Victor Mas

| | |
|---|---|
| **From:** | MATT P. WEINSHALL |
| **Sent:** | Tuesday, August 13, 2019 6:07 PM |
| **To:** | Victor Mas |
| **Cc:** | PETER PRIETO |
| **Subject:** | FW: PLANET DATA 062019 (PROJECT # TKPOD0001) INV # 16995 |
| **Attachments:** | PLANET DATA 062019 (PROJECT # TKPOD0001) INV # 16995.pdf |

PAID
AUG 1 4 2019
BY: _____

Victor,

Please see the attached invoice from Planet Data.  It should be paid from the joint Takata expenses fund.  Please let me know once it is paid, so that I can let the vendor know.  Thanks.

--Matt

**From:** Accounting <accounting@planetdata.com>
**Sent:** Monday, July 8, 2019 8:32 PM
**To:** MATT P. WEINSHALL <MWeinshall@PODHURST.com>
**Cc:** lburr@plantdata.com; Dave Cochran <DCochran@planetdata.com>; Accounting <accounting@planetdata.com>
**Subject:** PLANET DATA 062019 (PROJECT # TKPOD0001) INV # 16995



Planet Data Solutions, Inc.

**Invoice**
*16995*        *Due 07/30/2019*

Amount Due: **$110,682.33**

PAID
AUG 1 4 2019
BY: _____

Dear Matthew Weinshall :

Please find your invoice attached.

Please be advised to use the ACH option instead of Wire transfer for processing payments.

We appreciate your continued business.

Sincerely,

Planet Data Solutions, Inc.



# Original Invoice

| | Date | Invoice # |
|---|---|---|
| | 1/7/2021 | 19010 |

OK Per AxT

**Bill To**

Motley Rice, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

PAID
JUN - 8 2021
BY:

**Client Project Name**

Case No. 2:16-cv-01356-ILRL-DMD
(Wilson et. al.)
Motely Rice, LLC
kdean@motleyrice.com
jdoneill@motleyrice.com

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| TKMOT0001 | Kevin R. Dean | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | PLANET DATA 122020 (PROJECT # TKMOT0001) | 0.00 | 0.00 |
| 329.51 | Exego Storage (per GB) | 3.00 | 988.53 |
| | WAIVED for 6-month period beginning August 1, 2019. | | |
| | Charges will incur beginning February 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | October 2020 - Reduced to Priv Data Only | | |
| 2 | Monthly User Fees (per user) | 75.00 | 150.00 |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | **$1,138.53** |
|---|---|

Please send all checks to our Corporate Office:
**Planet Data Solutions, Inc.**
**17 Skyline Drive**
**Hawthorne, NY 10532**

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and
conditions for this project.



# Original Invoice

**PLANET DATA**
DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

| Date | Invoice # |
|------|-----------|
| 1/31/2020 | 17810 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**PAID** MAR 1 9 2020
BY:_____

**Client Project Name**

Takata
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com

| PD Project Number | Client Contact | Project Manager |
|-------------------|----------------|-----------------|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | PLANET DATA 012020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 6,000.6 | Exego Storage (per GB) | 3.00 | 18,001.80 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

**PAID** MAR 1 9 2020
BY:_____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| Total | $18,001.80 |
|-------|-----------|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
555 Taxter Road, Suite 425
Elmsford, NY 10523

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and
conditions for this project.



**PLANET DATA**
DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

# Original Invoice

| Date | Invoice # |
|------|-----------|
| 2/29/2020 | 17962 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com

PAID
MAR 1 9 2020
BY: _____

| PD Project Number | Client Contact | Project Manager |
|-------------------|----------------|-----------------|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | PLANET DATA 022020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 6,000.6 | Exego Storage (per GB) | 3.00 | 18,001.80 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| 3,101.19 | Exego Storage (per GB) | 3.00 | 9,303.57 |
| | WAIVED for 6-month period beginning August 1, 2019. | | |
| | Charges will incur beginning February 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

PAID
MAR 1 9 2020
BY: _____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | $27,305.37 |
|-----------|------------|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
555 Taxter Road, Suite 425
Elmsford, NY 10523

**Payment is due thirty (30) days from the invoice date.**
**Please reference the Statement of Services for the terms and**
**conditions for this project.**



# Original Invoice

| Date | Invoice # |
|------|-----------|
| 5/10/2019 | 16789 |

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

| PD Project Number | Client Contact | Project Manager |
|-------------------|----------------|-----------------|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| | INITIAL RETAINER INVOICE: estimated volume of extracted data which Planet Data will process is 7736.31 GBs and the retainer fee, based upon 25% of the volume at $25 per extracted GB, is $48,351.95. | 48,351.95 | 48,351.95T |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
**Please include your invoice number with the transfer to ensure we are able to process your payment. When paying by bank wire transfer, your bank may charge a transaction fee. To avoid additional charges or delays, inquire with your bank about any transaction fees that may be incurred and include them in the total amount of your wire transfer. Unpaid wire transfer transaction fees will be added to the balance on your account.**

| **Total** | **$48,351.95** |
|-----------|----------------|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
555 Taxter Road, Suite 425
Elmsford, NY 10523

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and conditions for this project.

*TAKATA COST ACCT.*



# Original Invoice

| Date | Invoice # |
|------|-----------|
| 7/31/2020 | 18418 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com
vmas@podhurst.com

PAID
AUG 1 1 2020
BY: _____

| PD Project Number | Client Contact | Project Manager |
|-------------------|----------------|-----------------|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | PLANET DATA 072020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 847.34 | Exego Storage (per GB) | 3.00 | 2,542.02 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | July 2020 - Reduced to Priv Data Only | | |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

PAID
AUG 1 1 2020
BY: _____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | **$2,542.02** |
|-----------|---------------|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
555 Taxter Road, Suite 425
Elmsford, NY 10523

**Payment is due thirty (30) days from the invoice date.**
**Please reference the Statement of Services for the terms and**
**conditions for this project.**

*TAKATA COST FUND*



# PLANET DATA
### DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

**Original Invoice**

PAID JUN 1 9 2020
BY:_____

| Date | Invoice # |
|---|---|
| 5/31/2020 | 18285 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com
vmas@podhurst.com

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | PLANET DATA 052020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 6,000.6 | Exego Storage (per GB) WAIVED for 6-month period beginning July 1, 2019. Charges will incur beginning January 1, 2020. Per the executed Statement of Services, the Exego Select Monthly data storage fee (First six months at no charge) at $3 per GB per month. | 3.00 | 18,001.80 |
| 3,101.19 | Exego Storage (per GB) WAIVED for 6-month period beginning August 1, 2019. Charges will incur beginning February 1, 2020. Per the executed Statement of Services, the Exego Select Monthly data storage fee (First six months at no charge) at $3 per GB per month. | 3.00 | 9,303.57 |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

PAID JUN 1 9 2020
BY:_____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer to ensure we are able to process your payment. When paying by bank wire transfer, your bank may charge a transaction fee. To avoid additional charges or delays, inquire with your bank about any transaction fees that may be incurred and include them in the total amount of your wire transfer. Unpaid wire transfer transaction fees will be added to the balance on your account.

| **Total** | **$27,305.37** |
|---|---|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
555 Taxter Road, Suite 425
Elmsford, NY 10523

**Payment is due thirty (30) days from the invoice date.**
**Please reference the Statement of Services for the terms and conditions for this project.**

ALINA

TAKATA COST RECPT



# PLANET DATA
### DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

# Original Invoice

| | Date | Invoice # |
|---|---|---|
| | 8/31/2020 | 18560 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com
vmg@podhurst.com

PAID
SEP - 9 2020
BY:_____

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | PLANET DATA 082020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 847.34 | Exego Storage (per GB) | 3.00 | 2,542.02 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | July 2020 - Reduced to Priv Data Only | | |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

OK per MPW

PAID
SEP - 9 2020
BY:_____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | $2,542.02 |
|---|---|

Please send all checks to our Corporate Office:
**Planet Data Solutions, Inc.**
**555 Taxter Road, Suite 425**
**Elmsford, NY 10523**

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and
conditions for this project.

*TAKATA*



**PLANET DATA**
DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

# Original Invoice

| Date | Invoice # |
|------|-----------|
| 10/31/2020 | 18756 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com
vmas@podhurst.com

| PD Project Number | Client Contact | Project Manager |
|-------------------|----------------|-----------------|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|----------|-------------|------|--------|
| 1 | PLANET DATA 102020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 847.34 | Exego Storage (per GB) | 3.00 | 2,542.02 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | July 2020 - Reduced to Priv Data Only | | |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

PAID
NOV - 6 2020
BY:_____

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| Total | $2,542.02 |
|-------|-----------|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
17 Skyline Drive
Hawthorne, NY 10532

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and
conditions for this project.

TAKATA COST ACCT



# Original Invoice

PLANET DATA™
DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

| Date | Invoice # |
|---|---|
| 11/30/2020 | 18949 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com
srmas@podhurst.com

PAID
DEC 1 1 2020
BY: _____

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| TKPOD0001 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | PLANET DATA 112020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 847.34 | Exego Storage (per GB) | 3.00 | 2,542.02 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | July 2020 - Reduced to Priv Data Only | | |
| 2 | Monthly User Fees (per user) | 75.00 | 150.00 |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

OK Per MPW

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary: Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | $2,692.02 |
|---|---|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
17 Skyline Drive
Hawthorne, NY 10532

**Payment is due thirty (30) days from the invoice date.**
**Please reference the Statement of Services for the terms and**
**conditions for this project.**



# Original Invoice

| | Date | Invoice # |
|---|---|---|
| | 1/7/2021 | 19009 |

**Bill To**

Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Miami, FL 33131

*PAID JUN - 8 2021 BY:_____*

*OK Per AXT*

**Client Project Name**

Takata:
In re Takata Product Liability
Litigation, No. 15-md-2599 (S.D. Fla.)
mweinshall@podhurst.com
vmas@podhurst.com

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| 000 | Matthew P. Weinshall | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | PLANET DATA 122020 (PROJECT # TKPOD0001) | 0.00 | 0.00 |
| 847.34 | Exego Storage (per GB) | 3.00 | 2,542.02 |
| | WAIVED for 6-month period beginning July 1, 2019. | | |
| | Charges will incur beginning January 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | July 2020 - Reduced to Priv Data Only | | |
| 2 | Monthly User Fees (per user) | 75.00 | 150.00 |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

**ACH Transfers to our Bank:**
**BANK: The Westchester Bank**
**2001 Central Park Avenue, Yonkers, NY 10710**
**ABA # 021914544**
**Beneficiary:  Planet Data Solutions**
**ACCOUNT #32011264**
Please include your invoice number with the transfer
to ensure we are able to process your payment. When
paying by bank wire transfer, your bank may charge a
transaction fee. To avoid additional charges or delays,
inquire with your bank about any transaction fees that
may be incurred and include them in the total amount
of your wire transfer. Unpaid wire transfer
transaction fees will be added to the balance on your
account.

| **Total** | **$2,692.02** |
|---|---|

Please send all checks to our Corporate Office:
**Planet Data Solutions, Inc.**
**17 Skyline Drive**
**Hawthorne, NY 10532**

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and
conditions for this project.

*TOTAL $ 3,830.55*



# Original Invoice

DISCOVERY MANAGEMENT SOLUTIONS
www.PlanetDS.com
800-688-2812

OK Per AxT

| Date | Invoice # |
|---|---|
| 1/7/2021 | 19010 |

**Bill To**

Motley Rice, LLC
28 Bridgeside Blvd.
Mount Pleasant, SC 29464

PAID
JUN -8 2021
BY:

**Client Project Name**

Case No. 2:16-cv-01356-ILRL-DMD
(Wilson et. al.)
Motely Rice, LLC
kdean@motleyrice.com
jdoneill@motleyrice.com

| PD Project Number | Client Contact | Project Manager |
|---|---|---|
| TKMOT0001 | Kevin R. Dean | Lori Burr |

| Quantity | Description | Rate | Amount |
|---|---|---|---|
| 1 | PLANET DATA 122020 (PROJECT # TKMOT0001) | 0.00 | 0.00 |
| 329.51 | Exego Storage (per GB) | 3.00 | 988.53 |
| | WAIVED for 6-month period beginning August 1, 2019. | | |
| | Charges will incur beginning February 1, 2020. | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | |
| | October 2020 - Reduced to Priv Data Only | | |
| 2 | Monthly User Fees (per user) | 75.00 | 150.00 |
| | Out-of-state sale, exempt from sales tax | 0.00% | 0.00 |

**ACH Transfers to our Bank:**
BANK: The Westchester Bank
2001 Central Park Avenue, Yonkers, NY 10710
ABA # 021914544
Beneficiary: Planet Data Solutions
ACCOUNT #32011264
Please include your invoice number with the transfer to ensure we are able to process your payment. When paying by bank wire transfer, your bank may charge a transaction fee. To avoid additional charges or delays, inquire with your bank about any transaction fees that may be incurred and include them in the total amount of your wire transfer. Unpaid wire transfer transaction fees will be added to the balance on your account.

| **Total** | **$1,138.53** |
|---|---|

Please send all checks to our Corporate Office:
Planet Data Solutions, Inc.
17 Skyline Drive
Hawthorne, NY 10532

Payment is due thirty (30) days from the invoice date.
Please reference the Statement of Services for the terms and conditions for this project.

# EXHIBIT 7

*ALINA*

*TAKATA COST ACCT.*

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL 60462

VERISTAR

# INVOICE

**PAID**
MAR 1 0 2021
BY: _____

| | |
|---|---|
| INVOICE | VS 1098 |
| DATE | 03/07/2021 |
| TERMS | Net 30 |
| DUE DATE | 04/06/2021 |

BILL TO

Matthew Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Re: No. 15-md-2599 (S.D. Fla.)
Miami, FL 33131

SHIP TO

Matthew Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Re: No. 15-md-2599 (S.D. Fla.)
Miami, FL 33131

DATE RANGE:
2/1/2021 - 2/28/2021

MATTER NAME:
TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB)<br>Exego Storage (per GB)<br>WAIVED for 6-month period beginning July 1, 2019.<br>Charges will incur beginning January 1, 2020.<br>Per the executed Statement of Services, the Exego Select Monthly data<br>storage fee (First six months at no charge) at $3 per GB per month.<br>July 2020 - Reduced to Priv Data Only | 847.34 | 3.00 | 2,542.02 |
| | Monthly User Fee<br>Monthly User Fees (per user) | 2 | 75.00 | 150.00 |

If sending payment by check, please make payable to:
Veristar, LLC and sent to 9501 West 144th Place. Suite 202 Orland Park, IL
60462.

**BALANCE DUE**                    **$2,692.02**

If sending payment by ACH Wire Transfer, please use the following
account information:
Account Name:
Veristar, LLC
9501 West 144th Place, Suite 202
Orland Park, IL 60462

Account Number: 2891532562
Routing (ABA): 071925402
Account Type: Checking

Bank Name:
Hinsdale Bank and Trust CO. N.A,
9801 W. Higgins, Box 32
Rosemont, IL 60018

Reference Info: Veristar, LLC



**PAID**
MAR 1 0 2021
BY: _____

*MPW Approved* ✓

This account receivable has been assigned to, and is owned by or subject to security interest of. Paychex Advance LLC, doing business as
Advance Partners. and is payable only in United States Dollars.

ALINA

TAKATA COST ACCOUNTS

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL  60462

VERISTAR 

## INVOICE

PAID
APR 1 9 2021
BY: _____

| | |
|---|---|
| INVOICE | CM 58 |
| DATE | 04/08/2021 |
| TERMS | Net 30 |
| DUE DATE | 05/08/2021 |

BILL TO
Matthew Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Re: No. 15-md-2599 (S.D. Fla.)
Miami, FL  33131

SHIP TO
Matthew Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Re: No. 15-md-2599 (S.D. Fla.)
Miami, FL  33131

O/C Pen   MPW

DATE RANGE:
3/1/2021 - 3/31/2021

MATTER NAME:
TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB) | 847.34 | 3.00 | 2,542.02 |
| | Exego Storage (per GB) | | | |
| | WAIVED for 6-month period beginning July 1, 2019. | | | |
| | Charges will incur beginning January 1, 2020. | | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | | |
| | July 2020 - Reduced to Priv Data Only | | | |
| | Monthly User Fee | 2 | 75.00 | 150.00 |
| | Monthly User Fees (per user) | | | |

If sending payment by check, please make payable to:
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

BALANCE DUE

**$2,692.02**

If sending payment by ACH Wire Transfer, please use the following account
information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1026148695
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

PAID
APR 1 9 2021
BY: _____

This account receivable has been assigned to, and is owned by or subject to security interest of, Paychex Advance LLC, doing business as Advance Partners, and is payable only in United States Dollars.

*ALIN*

*TAKATA COST ACCT.*

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL  60462



**VERISTAR**

PAID

MAY 1 3 2021

## INVOICE

BY: ------------------

| BILL TO | SHIP TO |
|---|---|
| Matthew Weinshall | Matthew Weinshall |
| Podhurst Orseck P.A. | Podhurst Orseck P.A. |
| SunTrust International Center | SunTrust International Center |
| One S.E. 3rd Ave., Suite 2300 | One S.E. 3rd Ave., Suite 2300 |
| Re: No. 15-md-2599 (S.D. Fla.) | Re: No. 15-md-2599 (S.D. Fla.) |
| Miami, FL  33131 | Miami, FL  33131 |

| INVOICE | CM 103 |
|---|---|
| DATE | 05/03/2021 |
| TERMS | Net 30 |
| DUE DATE | 06/02/2021 |

| DATE RANGE: | MATTER NAME: |
|---|---|
| 4/1/2021 - 4/30/2021 | TKPOD0001 |

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB)<br>Exego Storage (per GB)<br>WAIVED for 6-month period beginning July 1, 2019.<br>Charges will incur beginning January 1, 2020.<br>Per the executed Statement of Services, the Exego Select Monthly data<br>storage fee (First six months at no charge) at $3 per GB per month.<br>July 2020 - Reduced to Priv Data Only | 847.34 | 3.00 | 2,542.02 |
| | Monthly User Fee<br>Monthly User Fees (per user) | 2 | 75.00 | 150.00 |

If sending payment by check, please make payable to:
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

**BALANCE DUE**          **$2,692.02**

If sending payment by ACH Wire Transfer, please use the following account
information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1029148695
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

This account receivable has been assigned to, and is owned by or subject to security interest of, Paychex Advance LLC, doing business as
Advance Partners, and is payable only in United States Dollars.

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL  60462

VERISTAR

# INVOICE

**BILL TO**

Matthew Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Re: No. 15-md-2599 (S.D. Fla.)
Miami, FL  33131

**SHIP TO**

Matthew Weinshall
Podhurst Orseck P.A.
SunTrust International Center
One S.E. 3rd Ave., Suite 2300
Re: No. 15-md-2599 (S.D. Fla.)
Miami, FL  33131

| | |
|---|---|
| **INVOICE** | VS 1207 |
| DATE | 06/01/2021 |
| TERMS | Net 30 |
| DUE DATE | 07/01/2021 |

*[handwritten: ALIWA]*

*[stamp: PAID JUN - 8 2021 BY: _____]*

*[handwritten: TAKATA O/C PER AxT]*

DATE RANGE:
5/1/2021 - 5/31/2021

MATTER NAME:
TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB) | 847.34 | 3.00 | 2,542.02 |
| | Exego Storage (per GB) WAIVED for 6-month period beginning July 1, 2019. Charges will incur beginning January 1, 2020. Per the executed Statement of Services, the Exego Select Monthly data storage fee (First six months at no charge) at $3 per GB per month. July 2020 - Reduced to Priv Data Only | | | |
| | Monthly User Fee | 2 | 75.00 | 150.00 |
| | Monthly User Fees (per user) | | | |

If sending payment by check, please make payable to:
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

**BALANCE DUE**          **$2,692.02**

If sending payment by ACH Wire Transfer, please use the following account
information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1029148695
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL  60462

VERISTAR

# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| Matthew Weinshall | Matthew Weinshall | INVOICE | VS 1327 |
| Podhurst Orseck P.A. | Podhurst Orseck P.A. | DATE | 08/05/2021 |
| SunTrust International Center | SunTrust International Center | TERMS | Net 30 |
| One S.E. 3rd Ave., Suite 2300 | One S.E. 3rd Ave., Suite 2300 | DUE DATE | 09/04/2021 |
| Re: No. 15-md-2599 (S.D. Fla.) | Re: No. 15-md-2599 (S.D. Fla.) | | |
| Miami, FL  33131 | Miami, FL  33131 | | |

DATE RANGE:          MATTER NAME:
7/1/2021 - 7/31/2021     TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB)<br>Exego Storage (per GB)<br>WAIVED for 6-month period beginning July 1, 2019.<br>Charges will incur beginning January 1, 2020.<br>Per the executed Statement of Services, the Exego Select Monthly data<br>storage fee (First six months at no charge) at $3 per GB per month.<br>July 2020 - Reduced to Priv Data Only | 847.34 | 3.00 | 2,542.02 |
| | Monthly User Fee<br>Monthly User Fees (per user) | 2 | 75.00 | 150.00 |

If sending payment by check, please make payable to:
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

**BALANCE DUE**          **$2,692.02**

If sending payment by ACH Wire Transfer, please use the following account
information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1029148695
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

This account receivable has been assigned to, and is owned by or subject to security interest of, Paychex Advance LLC, doing business as
Advance Partners, and is payable only in United States Dollars.
Page 1 of 1

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL  60462

VERISTAR

# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| Matthew Weinshall | Matthew Weinshall | INVOICE | VS 1500 |
| Podhurst Orseck P.A. | Podhurst Orseck P.A. | DATE | 11/02/2021 |
| SunTrust International Center | SunTrust International Center | TERMS | Net 30 |
| One S.E. 3rd Ave., Suite 2300 | One S.E. 3rd Ave., Suite 2300 | DUE DATE | 12/02/2021 |
| Re: No. 15-md-2599 (S.D. Fla.) | Re: No. 15-md-2599 (S.D. Fla.) | | |
| Miami, FL  33131 | Miami, FL  33131 | | |

DATE RANGE:
9/1/2021 - 10/31/2021

MATTER NAME:
TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB) | 847.34 | 3.00 | 2,542.02 |
| | Exego Storage (per GB) - SEPTEMBER 2021 | | | |
| | WAIVED for 6-month period beginning July 1, 2019. | | | |
| | Charges will incur beginning January 1, 2020. | | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | | |
| | July 2020 - Reduced to Priv Data Only | | | |
| | | | | |
| | Monthly User Fee | 2 | 75.00 | 150.00 |
| | Monthly User Fees (per user) - SEPTEMBER 2021 | | | |
| | | | | |
| | Exego Storage (per GB) | 847.34 | 3.00 | 2,542.02T |
| | Exego Storage (per GB) - OCTOBER 2021 | | | |
| | WAIVED for 6-month period beginning July 1, 2019. | | | |
| | Charges will incur beginning January 1, 2020. | | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | | |
| | July 2020 - Reduced to Priv Data Only | | | |
| | | | | |
| | Monthly User Fee | 2 | 75.00 | 150.00 |
| | Monthly User Fees (per user) - OCTOBER 2021 | | | |

If sending payment by check, please make payable to:
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

If sending payment by ACH Wire Transfer, please use the following account
information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1029148895
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

| SUBTOTAL | 5,384.04 |
|---|---|
| TAX | 0.00 |
| TOTAL | 5,384.04 |
| BALANCE DUE | **$5,384.04** |

This account receivable has been assigned to, and is owned by or subject to security interest of, Paychex Advance LLC, doing business as
Advance Partners, and is payable only in United States Dollars.

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL  60462

VERISTAR

# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| Matthew Weinshall | Matthew Weinshall | INVOICE | VS 1270 |
| Podhurst Orseck P.A. | Podhurst Orseck P.A. | DATE | 07/06/2021 |
| SunTrust International Center | SunTrust International Center | TERMS | Net 30 |
| One S.E. 3rd Ave., Suite 2300 | One S.E. 3rd Ave., Suite 2300 | DUE DATE | 08/05/2021 |
| Re: No. 15-md-2599 (S.D. Fla.) | Re: No. 15-md-2599 (S.D. Fla.) | | |
| Miami, FL  33131 | Miami, FL  33131 | | |

DATE RANGE:                MATTER NAME:
6/1/2021 - 6/30/2021       TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB) | 847.34 | 3.00 | 2,542.02 |
| | Exego Storage (per GB) | | | |
| | WAIVED for 6-month period beginning July 1, 2019. | | | |
| | Charges will incur beginning January 1, 2020. | | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | | |
| | July 2020 - Reduced to Priv Data Only | | | |
| | Monthly User Fee | 2 | 75.00 | 150.00 |
| | Monthly User Fees (per user) | | | |

If sending payment by check, please make payable to:          BALANCE DUE          **$2,692.02**
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

If sending payment by ACH Wire Transfer, please use the following account
information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1029148695
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

This account receivable has been assigned to, and is owned by or subject to security interest of, Paychex Advance LLC, doing business as
Advance Partners, and is payable only in United States Dollars.

**Veristar LLC**

9501 West 144th Place, Suite 202
Orland Park, IL 60462

VERISTAR

# INVOICE

| BILL TO | SHIP TO | | |
|---|---|---|---|
| Matthew Weinshall | Matthew Weinshall | INVOICE | VS 1548 |
| Podhurst Orseck P.A. | Podhurst Orseck P.A. | DATE | 11/30/2021 |
| SunTrust International Center | SunTrust International Center | TERMS | Net 30 |
| One S.E. 3rd Ave., Suite 2300 | One S.E. 3rd Ave., Suite 2300 | DUE DATE | 12/30/2021 |
| Re: No. 15-md-2599 (S.D. Fla.) | Re: No. 15-md-2599 (S.D. Fla.) | | |
| Miami, FL 33131 | Miami, FL 33131 | | |

DATE RANGE:          MATTER NAME:
9/1/2021 – 10/31/2021     TKPOD0001

| DATE | SERVICE ITEM DESCRIPTION | QTY | RATE | AMOUNT |
|---|---|---|---|---|
| | Exego Storage (per GB) | 847.34 | 3.00 | 2,542.02 |
| | Exego Storage (per GB) - NOVEMBER 2021 | | | |
| | WAIVED for 6-month period beginning July 1, 2019. | | | |
| | Charges will incur beginning January 1, 2020. | | | |
| | Per the executed Statement of Services, the Exego Select Monthly data | | | |
| | storage fee (First six months at no charge) at $3 per GB per month. | | | |
| | July 2020 - Reduced to Priv Data Only | | | |
| | Monthly User Fee | 2 | 75.00 | 150.00 |
| | Monthly User Fees (per user) - OCTOBER 2021 | | | |

If sending payment by check, please make payable to:
AP F/B/O Veristar and send to P.O. Box 823473 Philadelphia, PA 19182-3473.

If sending payment by ACH Wire Transfer, please use the following account information:
Account Name:
Paychex Advance, LLC
3401 Enterprise Parkway, 5th Floor
Cleveland, OH 44122

Account Number: 1029148695
Routing (ABA): 43000096
Account Type: Checking

Bank Name:
PNC Bank, N.A.
500 First Ave
Pittsburgh, PA 15219

Reference Info: Veristar, LLC

| | |
|---|---|
| SUBTOTAL | 2,692.02 |
| TAX | 0.00 |
| TOTAL | 2,692.02 |
| BALANCE DUE | **$2,692.02** |

This account receivable has been assigned to, and is owned by or subject to security interest of, Paychex Advance LLC, doing business as Advance Partners, and is payable only in United States Dollars.

# EXHIBIT 8

# EXHIBIT 3

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF FLORIDA
# MIAMI DIVISION

JULISA, LLC,

      Plaintiff,

v.                            Case No. 1:20-cv-23203-CMA

RICHARD AVERS; CHARLES
GARDINER; TEFFT SMITH;
KEN WITTENBERG, KENNY
WITTENBERG; and VERISTAR, LLC,

      Defendants.

---

## AMENDED COMPLAINT

---

Plaintiff Julisa, LLC, sues Richard Avers, Charles Gardner, Tefft Smith, Ken Wittenberg, Kenny Wittenberg ("Individual Defendants"), and Veristar, LLC, and states:

### Parties

1.    Plaintiff LLC is a limited liability company organized pursuant to the laws of the State of Delaware. At all times material to this complaint, Julisa maintained its offices in and conducted its business from Florida, and all its members and its manager resided in Florida.

2.    Defendant Tefft Smith is a resident of Washington, D.C.

3. Defendants Richard Avers, Charles Gardiner, Ken Wittenberg, and Kenny Wittenberg, are residents of the State of Illinois.

4. Defendant Veristar, LLC ("Veristar") is a limited liability company organized pursuant to the laws of the State of Illinois.

## In Personam Jurisdiction

5. All Defendants are subject to Florida long-arm jurisdiction pursuant to section 48.193(1)(a)2, Florida Statutes in that:

a. All Defendants participated in a conspiracy to commit tortious acts in the State of Florida.

b. In furtherance of the aforesaid conspiracy, one or more of the Defendants committed the tortious acts described in paragraphs 7 through 21 below in the State of Florida.

c. Pursuant to Florida law, the acts of a co-conspirator in furtherance of a conspiracy to commit a tort are attributable to all other members of the conspiracy for purposes of long-arm jurisdiction.

6. Individual Defendants are subject to Florida long-arm jurisdiction pursuant to section 48.193(1)(a)7, Florida Statutes in that:

a. Individual Defendants breached a contract in Florida by failing to perform acts required by the contract to be performed in Florida as more fully set forth in paragraphs 32 through 35 below.

b.      Defendants Avers and Wittenberg breached a contract in Florida by violating their fiduciary duties of loyalty and care to plaintiff as required by section 605.04091, Florida statutes, and incorporated into the contract by Florida law, as more fully set forth in paragraphs 36 and 37 below.

## Facts Common to All Counts

7.      Plaintiff and Individual Defendants were members of CertaTech, LLC, a limited liability company organized under the laws of the State of Florida ("CertaTech"). Individual Defendants held the majority of membership interests in CertaTech until it was dissolved on October 4, 2019. Plaintiff and all Individual Defendants signed and were bound by an operating agreement, a copy of which is attached hereto ("Operating Agreement".)

8.      CertaTech was in the business of providing support services to law firms and corporate legal departments. As of March 2018, CertaTech had contracts with a substantial number of customers in multiple states including Florida.

9.      On March 20, 2018, Plaintiff invested $250,000 for a 5% share of CertaTech, for which it received a subscription agreement and acknowledgement of receipt of $250,000 from Defendant Avers acting as president of CertaTech. On May 21, 2018, Plaintiff purchased another 3% share from member John Tober for $127,500.

10.   At some time prior to September 2019, Individual Defendants conspired to defraud Plaintiff out of its interests in CertaTech, and to retain the value of those interests for themselves without compensating Plaintiff or providing it with rights to which it was entitled by both contractual agreement and Florida law.

11.   Individual Defendants, acting collectively and in furtherance of the aforesaid conspiracy, devised a scheme to create a new limited liability company to be named Veristar and to effectively shift business from CertaTech to Veristar without Plaintiff's knowledge or involvement.

12.   At some time prior to September 24, 2019, Individual Defendants communicated with each other without notifying Julisa and agreed to dissolve CertaTech.

13.   On September 24, 2019, Defendant Avers sent CertaTech members notice of a CertaTech member meeting to be held on October 4, 2019, for the purpose of "meeting to vote to dissolve, wind up and liquidate the company effective immediately." The notice was the first information received by Plaintiff that dissolution of CertaTech was being considered and said nothing about the scheme to continue the business in another name.

14.   On October 1, 2019, Individual Defendants caused documents to be filed with the Illinois Department of State creating Veristar, LLC. with Defendants Avers, Gardner, Smith, and Kenny Wittenberg as members and Avers and Ken

Wittenberg as managers. Plaintiff was not told about the creation of Veristar or invited to become a member.

15.     On October 4, 2019, Defendant Kenny Wittenberg commenced a telephonic meeting of the members of CertaTech. None of the other Individual Defendants attended the meeting, but Whittenberg possessed proxies from the other Individual Defendants representing a majority of the membership interests of CertaTech. Whittenberg voted his own and all proxy votes to dissolve CertaTech. Papers dissolving the company were filed by Defendant Avers later the same day with the Florida Department of State.

16.      In an effort to create a legitimate justification for dissolution of CertaTech, Individual Defendants took steps to manufacture evidence of insolvency of the company, as demonstrated by the following:

        a.     Individual Defendants caused Veristar's resident agent, who was an accountant, to prepare an insolvency opinion and provided him with cherrypicked documents.  The accountant issued an unaudited opinion that carried the disclaimer: "Much of the financial information was incomplete and not reconciled completely."

        b.     Despite the fact that the member meeting was noticed on September 24, 2019 for the purpose of "meeting to vote to dissolve, wind up and liquidate the company effective immediately," the insolvency opinion was not

delivered by the accountant until after 5 p.m. the evening before the October 4, 2019 meeting at which Individual Defendants voted to dissolve the company.

        c.    When the attorney for CertaTech was asked on behalf of Plaintiff at the October 4, 2019 meeting why the company was being dissolved in the absence of credible evidence of insolvency, the attorney responded, "the members have made their decisions. The decision is to dissolve. There doesn't need to be a reason."

        d.    Individual Defendants have not appointed a liquidator or taken appropriate action to wind up CertaTech's activities and affairs and to protect the interests of its members and creditors as required by Florida law and the Operating Agreement.

    17.    Having voted to dissolve CertaTech, Defendants engaged in a course of conduct with the intent and effect of causing employees, customer accounts, equipment, good will, office space, and other assets of CertaTech to be acquired by Veristar for no consideration. Knowledge of these actions was withheld from Plaintiff and Plaintiff received no interest in Veristar and no compensation for the value of assets received by Veristar.

    18.    At some time before or immediately after the dissolution of CertaTech, Individual Defendants notified customers of CertaTech that the company was being dissolved.

19.    Defendants took the following steps to retain the former CertaTech business for Veristar, all without Plaintiff's knowledge or acquiescence:

a.    Defendants Avers and Ken Wittenberg, as CertaTech managers, released the customers from their contractual obligations to CertaTech

b.    Defendants notified the former CertaTech customers that Veristar was a successor company and that services that had been provided by CertaTech would continue to be available from Veristar.

c.    Defendants solicited CertaTech's former customers to shift their business to Veristar.

d.    Veristar continued to provide the same services to former CertaTech customers as had been provided by CertaTech on the same terms and for the same compensation.

e.    Veristar employed former CertaTech employees.

f.    Veristar received former CertaTech assets, customer accounts, equipment, office space and good will for no consideration.

g.    Defendants continued to operate the business of former CertaTech with no material changes except the name and the elimination of Plaintiff and three other members.

h.    Veristar acquired a company Individual Defendants had negotiated to acquire on behalf of CertaTech before its dissolution.

20.    Plaintiff was not offered and did not receive compensation of any kind relating to its interests in CertaTech.

21.    As more fully described below, the aforesaid acts of Defendants constituted tortious and unlawful conduct under Florida law and a breach of the CertaTech Operating Agreement. Plaintiff suffered damages in excess of $375,000 as a proximate result of such conduct.

22.    Plaintiff has engaged the services of Greenberg Traurig, P.A. and agreed to pay such firm attorneys' fees for prosecuting this action.

**Count I**
**Conspiracy to Defraud**
**(All Defendants)**

23.    The acts described in paragraphs 7 through 21 constitute constructive fraud under Florida law.

24.    All Defendants were aware of and participated in the aforesaid conspiracy to tortiously injure Plaintiff, and the acts of a co-conspirator in furtherance of a conspiracy to commit a tort are attributable to all other members of the conspiracy under Florida law.

**Count II**
**Breach of Fiduciary Duty**
**(All Individual Defendants)**

25.    CertaTech was a Florida manager-managed limited liability company.

26.     As managers of CertaTech, Defendants Avers and Ken Wittenberg owed a fiduciary duty of loyalty and care to Plaintiff pursuant to section 605.04091, Florida Statutes, and common law.

27.     The acts described in paragraphs 7 through 21 constitute a violation of Aver's and Ken Wittenberg's fiduciary duties to Plaintiff.

28.     All Individual Defendants were aware of the fiduciary obligations owed to Plaintiff by Avers and Wittenberg and knowingly participated in the conspiracy to violate those obligations as described in paragraphs 7 through 21.

**Count III**
**Unlawful Commercial Practices**
**(All Defendants)**

29.     The acts of Defendants described in paragraphs 7 through 21 constitute unconscionable, unfair, and deceptive acts and practices that offend established public policy of the State of Florida.

30.     The conduct described in paragraphs 7 through 21 violated section 501.204, Florida Statutes.

**Count IV**
**Civil Conspiracy**
**(All Individual Defendants)**

31.     Florida law recognizes civil conspiracy to commit a tort as an independent cause of action.

32. All Individual Defendants knowingly and willingly participated in the conspiracy to commit the tortious acts described in paragraphs 7 through 21.

### Count V
### Breach of Contract
### Fiduciary Duty
### (Defendants Avers and Ken Wittenberg)

33. At all times material hereto, Defendants Avers and Ken Wittenberg were managers of CertaTech, a manager-managed limited liability company.

34. Section 605.04091, Florida Statutes imposes upon managers of a manager-managed limited liability company a fiduciary duty of loyalty and care to all members of the company.

35. Section 605.04091, Florida Statutes, was incorporated into the Operating Agreement and binding on Defendants Avers and Wittenberg pursuant to 14.9 of the Operating Agreement and Florida law.

36. The acts of Defendants Avers and Wittenberg described in paragraphs 7 through 21 constitute a violation of their fiduciary duties of loyalty and care to Julisa and a breach of their obligations under the Operating Agreement.

### Count VI
### Breach of Contract
### Winding Up Affairs

37. Section 12 of the Operating Agreement provided that the company was required within ninety days of dissolution to wind up its affairs in an

orderly manner, liquidate its assets, satisfy the claims of its creditors and members, and distribute remaining property to the members. The Operating Agreement required that all the aforesaid actions be done under the oversight of a liquidator who is required to fully account for the company's liabilities and property.

38.     Individual Defendants have failed to comply with the aforesaid requirements of the Operating Agreement, which constitutes a breach of their contractual obligations to Julisa.

### Count VII
### Unjust Enrichment
### (Defendants Avers, Gardner, Smith, and Kenny Wittenberg)

39.     By the conduct described in paragraphs 7 through 21, Defendants have received the value of Plaintiff's interest in the assets of CertaTech without entitlement and without paying compensation to Plaintiff.

40.     As a result of the aforesaid acts, Defendants have been unjustly enriched at Plaintiff' expense by receiving property rightfully belonging to Plaintiff.

Wherefore, Plaintiff demands judgment:

 (a)  Awarding Plaintiff compensatory and punitive damages;

 (b)  Ordering disgorgement of all compensation received by Defendants from former customers of CertaTech and all value of Plaintiff's interest in CertaTech;

(c) Ordering disgorgement of all distributions received by Individual Defendants;

(d) Issuing a mandatory injunction requiring Individual Defendants to comply with their contractual obligations relating to winding down the affairs of CertaTech;

(e) Awarding attorneys' fees and costs.

### Jury Trial Demand

Plaintiff demands jury trial of all issues.

/s/ Barry Richard
BARRY RICHARD, FBN 0105599
richardb@gtlaw.com
FRED HARRIS, FBN 253359
harrisf@gtlaw.com
GREENBERG TRAURIG, P.A.
101 East College Avenue
Tallahassee, FL 32301
Telephone (850) 222-6891
boydw@gtlaw.com
greenel@gtlaw.com
flservice@gtlaw.com
*Attorneys for Plaintiff*

# CERTIFICATE OF SERVICE

I certify that the foregoing was filed via CM/ECF which served the following persons this 24th day of August, 2020.

William B. Graham, Esquire
Jeffrey A. Foster, Esquire
Carr Allison
305 South Gadsden Street
Tallahassee, FL 32301-1811
bgraham@carrallison.com
jfoster@carrallison.com
jstephens@carrallison.com
lkustel@carrallison.com
*Attorneys for Defendants*

Jordan S. Cohen, Esquire
Wicker Smith
515 East Las Olas Boulevard, Suite 1400
Fort Lauderdale, FL 33301
jcohen@wickersmith.com
mcarlo@wickersmith.com
*Attorneys for Defendants*

/s/ Barry Richard
**BARRY RICHARD**

# EXHIBIT 9

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| DANIEL PANITZ | ) | |
| | ) | |
| Plaintiff, | ) | No. |
| | ) | |
| v. | ) | |
| | ) | |
| VERISTAR LLC, VERISTAR GLOBAL | ) | |
| LLC, RICHARD AVERS, ROBERT | ) | JURY TRIAL DEMANDED |
| LEUSER, KENNETH WITTENBERG, | ) | |
| WILLIAM HEALY, and MARK | ) | |
| BELONGIA, | ) | |
| | ) | |
| Defendants. | ) | |

## COMPLAINT AND JURY DEMAND

NOW COMES the Plaintiff, DANIEL PANITZ ("Plaintiff") by and through his attorneys, THE LAW OFFICES OF MICHAEL LEE TINAGLIA, LTD., and complaining against Defendants, VERISTAR LLC, VERISTAR GLOBAL LLC, RICHARD AVERS, ROBERT LEUSER, KENNETH WITTENBERG, WILLIAM HEALY, and MARK BELONGIA, states as follows:

## NATURE OF THE ACTION

1.      This action is brought to recover damages sustained by Plaintiff as a result of Defendants fraudulently inducing Plaintiff to enter into in an employment agreement and then also breaching that agreement by failing to pay Plaintiff amounts due and owing Plaintiff under the terms of the agreement.

2.      Plaintiff also brings this action to recover unpaid wages pursuant to the Illinois Wage Payment and Collection Act, 820 ILCS 115/1 et seq. ("IWPCA") and the supporting Illinois Department of Labor Regulations, 56 Ill. Admin. Code 300 et seq.

3.    This action is also brought to recover injury and damage resulting from retaliation in violation of Section 115/14 of the IWPCA (*820 ILCS 115/4*).

## JURISDICTION AND VENUE

4.    Jurisdiction is proper based on Diversity of Citizenship pursuant to 28 U.S.C. § 1332. The amount in controversy in this matter exceeds $75,000, exclusive of interest and costs, and the citizenship of all Defendants is diverse from that of Plaintiff.

5.    Venue is proper in the Northern District of Illinois pursuant to 28 U.S.C. § 1391(a).

6.    Plaintiff requests and demands a jury for all claims and legal issues.

## PARTIES

7.    Plaintiff is an adult individual who, at all times relevant to this Complaint, has been domiciled in and a citizen of the State of Connecticut.

8.    Defendant, VERISTAR LLC ("VERISTAR") is a limited liability company that was organized under the laws of the State of Illinois.  VERISTAR maintains its principal place of business at 9501 W. 144th Place, Orland Park, IL 60462, Suite 202, and for purposes of diversity jurisdiction is a citizen of Illinois.

9.    Defendant, VERISTAR GLOBAL LLC ("VERISTAR GLOBAL") is a limited liability that was organized under the laws of the State of Illinois.  VERISTAR GLOBAL maintains its principal place of business at 9501 W. 144th Place, Orland Park, IL 60462, Suite 202, and for purposes of diversity jurisdiction is a citizen of Illinois.  VERISTAR GLOBAL does business under the assumed name, Veralocity.

10.    Defendant, RICHARD AVERS ("Avers"), is an individual domiciled in and a citizen of the State of Illinois.  Avers was a co-founder of VERISTAR, and at all times since VERISTAR's formation, Avers has served as the President of VERISTAR.

11.     Defendant, KENNETH WITTENBERG ("Wittenberg"), is an individual domiciled in and a citizen of the State of Illinois.  Wittenberg was a co-founder of VERISTAR, and all at times relevant, Wittenberg was the Vice President of Finance and Acquisitions for VERISTAR.

12.     Defendant, ROBERT LEUSER ("Leuser"), is an individual domiciled in and a citizen of the State of Illinois.  At all times relevant, Leuser was Avers' father-in-law and an investor in and manager of VERISTAR.

13.     Defendant, WILLIAM HEALY ("Healy"), is an individual domiciled in and a citizen of the State of Illinois.  At all times relevant, Healy was a certified public accountant, owner of William R. Healy, CPA, PC ("Healy PC"), and an investor in and manager of VERISTAR.  At all times relevant, Healy PC's office was located at 9501 W. 144th Place, Orland Park, IL  60462, Suite 202, and Healy was the registered agent for both VERISTAR and VERISTAR GLOBAL.

14.     Defendant, MARK BELONGIA ("Belongia"), is an individual domiciled in and a citizen of the State of Illinois.  Belongia is an attorney licensed to practice law in the State of Illinois, and at all times relevant, Belongia acted as legal counsel for VERISTAR.

## FACTUAL ALLEGATIONS

### A.  Defendants Avers and Wittenberg Form VERISTAR and enter into an Asset Purchase Agreement with Franklin Data Ventures, Inc. and Nexem-Iconic, LLC.

15.     On or around October 1, 2019, Avers and Wittenberg formed VERISTAR as a limited liability company organized under the laws of the State of Illinois.  At all relevant times, VERISTAR was a provider of data solutions and technology powered legal services.

16.   On or around October 25, 2019, VERISTAR entered into an Asset Purchase Agreement ("APA") with Franklin Data Ventures, Inc. ("Franklin Data") and Nexem-Iconic, LLC ("Nexem"), two businesses that provided services in the nature of cloud hosting, cybersecurity, and e-discovery.  A copy of the APA is attached as **Exhibit 1** to this Complaint.

17. Pursuant to the APA, VERISTAR agreed to purchase all of Franklin Data's and Nexem's business operating assets and liabilities. VERISTAR also agreed to pay Franklin Data and Nexem certain incentive payments upon VERISTAR reaching certain revenue milestones by specific dates. So that Franklin Data and Nexem could monitor VERISTAR's progress towards the revenue milestones, the APA required VERISTAR to provide Franklin Data and Nexem monthly accounting statements of VERISTAR's revenue and to provide Franklin Data and Nexem with access to VERISTAR's books and records. Any failure by VERISTAR to make any payments due under the APA constituted an event of default, as did any failure by VERISTAR to provide monthly accounting statements or allow access to its books and records.

18. In connection with the APA, VERISTAR executed a Security Agreement with Franklin Data, a copy of which is attached as **Exhibit 2** to this Complaint. Pursuant to the Security Agreement, VERISTAR granted Franklin Data a security interest in the assets VERISTAR purchased pursuant to the APA.

**B. VERISTAR breaches the APA and fails to cure its breaches.**

19. On August 19, 2021, Franklin Data and Nexem gave written notice to VERISTAR by letter to Avers, requesting access to the books and records of VERISTAR on a date certain. VERISTAR refused to permit Franklin Data and Nexem to access VERISTAR's books and records as required by the APA. As a result, on August 30, 2021, VERISTAR was provided written notice of its breach of the APA. However, VERISTAR failed to cure its breach.

**C. Avers, Leuser, Wittenberg and Healy decide to form a new entity in which to transfer VERISTAR's employees, assets, customer accounts, equipment, and office space to attempt to evade liability to Franklin Data and Nexem.**

20. After they received Franklin Data's and Nexem's notice of default in August of 2021, Avers, Leuser, Wittenberg, and Healy decided to form a new company separate from

VERISTAR, through which they would offer identical services to those offered by VERISTAR. On information and belief, Avers, Leuser, Wittenberg, and Healy decided to form this new company with the intention of transferring VERISTAR's employees, assets, customer accounts, equipment and office space and dissolve VERISTAR should Franklin Data and Nexem continue to assert their contractual rights against VERISTAR. VERISTAR's objective was to frustrate Franklin Data's and Nexem's ability to recover under the contracts that VERISTAR had executed.

21.     Plaintiff's good faith belief regarding Avers,' Leuser's, Wittenberg's, and Healy's intentions in deciding to form a new company separate from VERISTAR is supported by the fact that Avers and Wittenberg were credibly accused of similar machinations in connection with their formation of VERISTAR in October of 2019.

22.     Prior to VERISTAR's formation on October 1, 2019, Avers and Wittenberg were also members of CertaTech, LLC ("CertaTech"), a Florida Limited Liability Company that provided services identical to VERISTAR's.

23.     On or around, April 8, 2020, Julisa, LLC ("JULISA"), a Delaware Limited Liability Company, filed suit in Leon County, Florida against VERISTAR, Avers, Wittenberg, and several other individual defendants under theories of Conspiracy to Defraud, Breach of Fiduciary Duty, Unlawful Commercial Practices, and Unjust Enrichment.  That JULISA suit was docketed case number 2020 CA 000681.

24.   The JULISA lawsuit was removed to the U.S. District Court for the Northern District of Florida, and later transferred to the U.S. District Court for the Southern District of Florida.

25.     On or around August 24, 2020, JULISA filed an Amended Complaint ("Amended Complaint") in the JULISA lawsuit, a copy of which is attached as **Exhibit 3.**  Pursuant to the

Amended Complaint, JULISA asserted claims for 1) Conspiracy to Defraud; 2) Breach of
Fiduciary Duty; 3) Unlawful Commercial Practices; 4) Civil Conspiracy; 5) Breach of
Contract/Fiduciary Duty; 6) Breach of Contract/Winding Up Affairs; and, 7) Unjust Enrichment.

26.     Underlying the claims JULISA brought pursuant to the Amended Complaint are a
number of factual allegations, including the following:

a)  JULISA and the individual defendants were members of CertaTech, a Florida Limited
    Liability Company.  The individual defendants held the majority of membership
    interests in CertaTech.  *Ex. 3, ¶7.*

b)  In March of 2018, Julisa, LLC invested $250,000 for a five percent share of
    CertaTech.  *Ex. 3, ¶9.*

c)   At some time prior to September 2019, and unbeknownst to JULISA, the individual
    Defendants devised a scheme whereby they would dissolve CertaTech, create
    VERISTAR with the individual Defendants as members, and effectively shift
    CertaTech's business to VERISTAR.  The goal of the individual defendants was to
    retain the value of JULISA's investment without compensating JULISA or providing
    it with rights to which it was entitled by both contractual agreement and applicable law.
    *Ex. 3, ¶¶10-12.*

d)  On September 24, 2019, Avers sent CertaTech members notice of a CertaTech
    member meeting to be held on October 4, 2019 for the purpose of meeting to vote to
    dissolve, wind up and liquidate the company effective immediately.  *Ex. 3, ¶13.*

e)  On October 1, 2019, unbeknownst to JULISA, the individual defendants caused
    documents to be filed with the Illinois Secretary of State creating VERISTAR.  *Ex. 3,
    ¶14.*

f)  On October 4, 2019, Wittenberg commenced a telephonic meeting of CertaTech's members, and voted for himself and by proxy for the other individual Defendants to dissolve CertaTech.  Papers dissolving CertaTech were filed by Avers with the Florida Department of State.  *Ex. 3, ¶15.*

g)  The individual defendants took steps to retain former CertaTech business for VERISTAR.  *Ex. 3, ¶19.*

h)  JULISA was not offered and did not receive compensation of any kind relating to its interests in CertaTech.  *Ex. 3, ¶20.*

27.  While the JULISA case was pending in the Southern District of Florida, the District Court did not have occasion to make a ruling, based on the evidence, as to the truth of the allegations underlying JULISA's Amended Complaint.  On or around February 1, 2021, the District Court dismissed the JULISA case after the parties reported that they had reached a settlement through the assistance of a mediator.

28.  JULISA brought the JULISA case and filed the Amended Complaint through its attorney, Barry Richard, an experienced attorney with Greenberg Traurig, P.A., a reputable firm. Plaintiff in this action reasonably believes that Mr. Richard would not have made the allegations he did on behalf of JULISA without supporting evidence or a good faith basis that discovery would reveal supporting evidence.

29.  Moreover, there is no discernible reason Avers, Leuser, Wittenberg, and Healy would want to form a new limited liability company that performed the same services as VERISTAR if they were not trying to evade an obligation owed to third parties like Franklin Data and Nexem.

30.     Finally, the timing of Avers,' Leuser's, Wittenberg's and Healy's decision to
dissolve VERISTAR and form a new entity, which coincided with their receipt of the notice of
default from Franklin Data and Nexem, strongly suggests that the decision related to the notice of
default and the obligations owed Franklin Data and Nexem under the APA.

**D.  In early September of 2021, shortly after receiving Franklin Data's and Nexem's
Notice of Default, representatives of VERISTAR begin communicating with
Plaintiff regarding possible employment.**

31.     Shortly after receiving the notice of default from Franklin Data and Nexem, in
September of 2021, Plaintiff and VERISTAR began communicating, through a recruiter named
Michael Potters ("Potters"), regarding the possibility of hiring Plaintiff.

32.     At the time such communications commenced, Plaintiff was employed by
UnitedLex Corporation ("UnitedLex") as its Senior Vice President, Litigation and Investigations.
UnitedLex was also a provider of data solutions and technology powered legal services, and a
competitor of VERISTAR.

33.     The initial communications through Potters resulted in the scheduling of in-person
meetings, in the Chicago-area, between Plaintiff and persons affiliated with VERISTAR, including
Avers and Leuser.  The in-person meetings took place on October 6 and October 7 of 2021.

34.     During the aforementioned meetings, both Avers and Leuser represented to
Plaintiff, that they were interested in hiring him to replace Avers as CEO and President of
VERISTAR.  Those representation were false, as Avers was looking to hire an individual to
preside over an assetless spinoff company that was not even in existence at the time, and Leuser,
as Avers' son-in-law and a VERISTAR manager and investor, was aware of that fact.

35.     Avers and Leuser also represented to Plaintiff that VERISTAR was a ten million
dollar going concern, and not a start-up company.  However, most of VERISTAR's existing

business had been acquired as a result of the purchase of assets from Franklin Data and Nexem, and at no time, however, did either Avers or Leuser inform Plaintiff that Franklin Data and Nexem were asserting that VERISTAR was in breach of the APA and Security Agreement, which could result in Franklin Data repossessing all of the assets VERISTAR purchased pursuant to the APA.

36.     Believing that the in-person meetings went well, and under the impression, based on the representations made to him by Avers and Leuser, that they were looking to hire him as President and CEO of VERISTAR, a ten million dollar going concern, Plaintiff, on October 8, 2021, forwarded a proposed employment agreement to Potters, which Potters forwarded on to Avers on October 11, 2021.  The proposed agreement, a copy of which is attached as **Exhibit 4**, provided, plainly, that Plaintiff was to be president of VERISTAR.

37.     Between October 11, 2021 to early November of 2021, Plaintiff continued to communicate with individuals affiliated with VERISTAR regarding Plaintiff's prospective employment.  In none of those communications did any individual affiliated with VERISTAR represent to Plaintiff an intention to hire Plaintiff as anything other than as President and CEO of VERISTAR.  Moreover, in none of those communications did any of the individuals affiliated with VERISTAR inform Plaintiff that Franklin Data and Nexem were asserting that VERISTAR was in default under the APA.

38.     During that same period of October 11, 2021 to early November of 2021, Plaintiff requested detailed information from VERISTAR's Chief Operating Officer, Sandra Chu ("Chu"), to determine whether VERISTAR's capabilities were in line with the needs of the prospective customers Plaintiff anticipated bringing to VERISTAR.  Chu, with the help of other VERISTAR employees, provided information regarding VERISTAR in response to Plaintiff's inquiries.  The information requested by Plaintiff and provided by Chu pertained solely to VERISTAR, and not

to any other entity or prospective entity.  In none of those communications did Chu or any other individual affiliated with VERISTAR inform Plaintiff that Franklin Data and Nexem were asserting that VERISTAR was in default under the APA.

39.     On or around October 25, 2021, Avers introduced Wittenberg and Plaintiff via email, and shortly afterward, Plaintiff and Wittenberg had a telephone conversation.  At the time Wittenberg began communicating with Plaintiff, Wittenberg was aware that Avers and Leuser had falsely represented to Plaintiff that VERISTAR wanted to hire him as their new President and CEO.  Wittenberg was further aware that Avers and Leuser intended that Plaintiff be hired as President and CEO of a new company to be formed.  However, Wittenberg did not inform Plaintiff of Avers' and Leuser's true intentions, and when Plaintiff made references during his communications with Wittenberg indicating that Plaintiff believed VERISTAR wanted to hire him as its new President and CEO, Wittenberg said nothing to correct Avers' and Leuser's misrepresentations. That is because correcting Plaintiff's understanding would have risked compromising the plan to spin off a new company from VERISTAR as part of a scheme to frustrate Franklin Data's and Nexem's efforts to enforce the APA and Security Agreement.

40.     In October of 2021, around the time Avers introduced Wittenberg and Plaintiff, Avers also introduced Healy and Plaintiff.

41.     On or around November 1, 2021, Plaintiff, Avers and Healy participated in a conference call at Avers' insistence.  Prior to attending the call, Avers and Leuser made Healy aware that Avers and Leuser had falsely represented to Plaintiff that VERISTAR wanted to hire him as their new President and CEO.  Healy was further made aware that Avers and Leuser intended that Plaintiff be hired as President and CEO of a new company to be formed.  However, Healy did not inform Plaintiff of Avers' and Leuser's true intentions, and when Plaintiff made

statements during the November 1, 2021 conference call indicating he believed VERISTAR wanted to hire him as its new President and CEO, Healy said nothing to correct Avers' and Leuser's misrepresentations.

42.     On or around November 11, 2021, Healy sent Plaintiff an email in which he stated that in anticipation of Plaintiff "coming on board", he wanted "to make sure we have a cohesive plan going forward." Healy then provided Plaintiff with certain benchmarks he wanted Plaintiff to address. Copied on Healy's email were Avers and Leuser.

43.     That same day, November 11, 2021, Plaintiff responded to Healy's email with information pertaining to the benchmarks provided by Healy in his email. The information provided by Plaintiff indicated that Plaintiff believed he was to work for VERISTAR and not a start-up company. Indeed, in response to a question about additional support staff needed, Plaintiff asked for a <u>current</u> organizational chart. Moreover, in response to an inquiry as to when the first sales could be expected, Plaintiff responded that it would "depend upon Veristar's <u>current</u> client base/matters in flight/new matters, and for new clients (such as those I will seek to onboard at the earliest), our <u>current</u> and ongoing ability to deliver services which meet their needs. (Emphasis Added). Such responses would make no sense if Plaintiff believed he would be hired as President of a startup lacking <u>current</u> customers and employees, and not an established company.

44.     Despite having received and read Plaintiff's November 11, 2021 email response, and despite being aware of the plan to make Plaintiff the president of a start-up that they planned to spin off from VERISTAR, Healy communicated nothing to Plaintiff to correct the misrepresentations made to Plaintiff by Avers and Leuser, not even when Healy requested to meet with Plaintiff in Connecticut in November of 2021.

45.     Healy's failure to correct the misrepresentations made by Avers and Leuser was willful and deliberate.  Healy was aware of the goal of spinning off a new company from VERISTAR as part of a scheme to frustrate Franklin Data's and Nexem's efforts to enforce the APA and Security Agreement.  As a VERISTAR manager and investor, Healy assisted Avers' and Wittenberg's scheme as he had a financial interest in VERISTAR impeding Franklin Data and Nexem's attempts to enforce the APA.

**E.  Plaintiff and Avers execute an Employment Agreement.**

46.     In November of 2021, Belongia forwarded Plaintiff a draft Employment Agreement that Belongia had prepared at Avers' request.    The signature page of the draft agreement plainly indicated that the agreement was to be signed by Rick Avers on behalf of "Veristar, LLC," and the term "Veristar" was used throughout the agreement.  However, the preamble indicated that the agreement was between Plaintiff and "Veristar Global, LLC."  At the time Belongia forwarded the draft agreement to Plaintiff, no entity named Veristar Global, LLC existed, and a search of the Illinois Secretary of State's business entity database would not have revealed an entity named Veristar Global, LLC that was separate and distinct from VERISTAR.

47.     As VERISTAR's counsel, Belongia was aware that Avers and Leuser desired to hire Plaintiff to be President and CEO of a start-up company that had yet to be formed, and not VERISTAR.  Belongia was also aware that Franklin Data and Nexem were asserting that VERISTAR was in breach of the APA and that VERISTAR had not cured that breach in response to notices from Franklin Data and Nexem.  Belongia also knew that Plaintiff was unaware of either of those facts.  However, Belongia did not apprise Plaintiff of either of those facts.

48.     Moreover, Belongia intentionally drafted an Employment Agreement in such a manner that 1) would cause a reasonable person in Plaintiff's position to conclude from the

language of the document that they were agreeing to employment with VERISTAR and not a separate non-existent entity, and 2) would provide Avers with a basis to later assert, <u>after</u> Plaintiff had already taken the steps of signing the agreement, leaving his lucrative job with UnitedLex, and starting to perform under the Agreement, that Plaintiff had actually agreed to serve as President of the newly formed entity Veristar Global. Belongia drafted the Employment Agreement as he did and deliberately concealed Avers' true intentions in order to assist Avers' and Leuser's efforts to mislead Plaintiff into believing he was being hired as President and CEO of VERISTAR and not a new start-up company.

49.     On November 30, 2021, Plaintiff forwarded Avers and Belongia proposed revisions to the Employment Agreement. Plaintiff did not propose changing the preamble to specify VERISTAR as the party to the agreement because 1) the representations made to Plaintiff by Avers and Leuser clearly indicated an intention to hire Plaintiff as President and CEO of VERISTAR, 2) the word "Veristar" was used throughout the agreement, and 3) the signature page clearly indicated that the document was to be signed on behalf of VERISTAR. Moreover, no entity named "Veristar Global, LLC" even existed. Simply put, Plaintiff had no reason to believe that, under the language of the agreement as drafted by Belongia, he would be agreeing to serve as President of any company other than VERISTAR.

50.     Plaintiff executed a finalized version of the Employment Agreement and forwarded it to Avers on December 4, 2021. Avers responded by informing Plaintiff that he would have the Employment Agreement executed on his end. Avers also asked Plaintiff for a plan regarding his first four months of employment. Plaintiff prepared and forwarded the requested four-month plan, which he prepared with a core assumption that he was to be President and CEO of VERISTAR and would have access to the operational base of the ten-million-dollar annual revenue stream and

attendant client relationships. After Plaintiff executed the final version of the Employment Agreement and forwarded it to Avers, Plaintiff gave notice to UnitedLex that he was leaving his employment with that company.

51. After receiving Plaintiff's four-month plan, Mr. Avers executed the employment agreement and forwarded the fully executed signature page to Plaintiff on December 8, 2021. A copy of that fully executed employment agreement (hereinafter referred to as "the Employment Agreement") is attached as **Exhibit 5** to this Complaint. That same day, December 8, 2021, unbeknownst to Plaintiff, VERISTAR GLOBAL was formed as an Illinois limited liability company.

52. The Employment Agreement provides that Plaintiff was to receive compensation in a number of forms, including but not limited to, the following:

    a. Plaintiff was to receive an annual base salary of three hundred thousand dollars;

    b. Plaintiff was to receive a signing bonus of Seventy Thousand Dollars ($70,000), to be paid in installments, with a first installment of fifty thousand dollars ($50,000) payable on April 1, 2022, and a second installment of twenty thousand dollars ($20,000) payable on July 1, 2022;

    c. Plaintiff was entitled to three weeks paid annual vacation, which was to accrue in Plaintiff's first year of employment at a rate of one day per month of service;

    d. Plaintiff was to receive fully subsidized health insurance;

    e. Plaintiff was to receive a ten percent membership interest in VERISTAR, which Plaintiff was to receive no later than January 1, 2023.

53. The Employment Agreement also provides that Plaintiff's employment could be terminated if Plaintiff did not reach certain revenue milestones by certain dates.

54.     Per the Employment Agreement, if Plaintiff's employment is terminated without cause, Plaintiff is to be paid all base salary, benefits and commissions accrued under the agreement as of the termination date, and in addition, Plaintiff shall be entitled to a severance payout equal to Six (6) months of base salary from the date of termination.

55.     On or around January 3, 2022, Plaintiff began to perform what he believed to be his obligation under the Employment Agreement – namely to act as President and CEO of VERISTAR.  However, shortly after beginning his work, Plaintiff was made aware, for the first time, that Avers' true intent was that Plaintiff serve as President and CEO of VERISTAR GLOBAL, a newly formed start-up with no revenue, and not the more established company, VERISTAR.

56.     After learning that Avers' true intention was to have him serve as CEO and President of VERISTAR GLOBAL as opposed to VERISTAR, Plaintiff believed he had been the victim of a bait and switch.  In particular, Plaintiff was concerned that since Avers expected him to be president of an assetless start-up company and not an established company with an existing book of business, the revenue milestones he had negotiated under the assumption that he was being hired as President of VERISTAR were unreasonable and unattainable.  As a result, Plaintiff attempted to negotiate amendments to the Employment Agreement to make the terms of the agreement consistent with his being hired to be president of a start-up rather than an established company.  Such amendments consisted primarily of adjusting the revenue milestones Plaintiff was required to meet to reflect the fact that Plaintiff was heading a start-up, not an established company with existing customers.

57.     Avers rejected Plaintiff's proposed amendments to the Employment Agreement.

58.     On August 31, 2022, Plaintiff's counsel, Michael Tinaglia, emailed Belongia a letter within which Mr. Tinaglia informed Belongia that Plaintiff has not been fully compensated per the terms of the Employment Agreement.  In that letter, Mr. Tinaglia also informed Belongia that he was preparing to file, on Plaintiff's behalf, a lawsuit against VERISTAR and the involved managers.

59.     After receiving the aforementioned letter from Mr. Tinaglia, Belongia forwarded it to Avers.

60.     On September 2, 2022, Avers sent Plaintiff an email informing Plaintiff that Avers was in receipt of a letter from Plaintiff's attorney dated August 31, 2022, and that Plaintiff's employment was terminated.  A copy of Avers' September 2, 2022 email is attached as **Exhibit 6** to this Complaint.

61.     Plaintiff's termination was the result of Avers' receipt of the letter from Plaintiff's attorney, as well as oral complaints Plaintiff made to VERISTAR personnel regarding failure to timely pay him wages to which he was entitled, and the termination was without cause.

62.     Plaintiff has not received all the compensation to which he was entitled under the terms of the Employment Agreement, including but not necessarily limited to the following:

a)      Plaintiff has not received any portion of the Signing Bonus described in Paragraph 52 above;

b)      While Plaintiff was to receive fully subsidized health insurance, pay stubs Plaintiff received show that the costs for the health insurance were deducted from Plaintiff's paycheck and then paid back to Plaintiff as "commissions."  That practice is not contemplated by the terms of the Employment Agreement and subjects Plaintiff to tax liability for phantom commission payments and therefore additional damages;

c)   Plaintiff has not received the severance payment equal to Six (6) months of base salary, even though he is entitled to that payment under the terms of the Employment Agreement due to being terminated without cause.

63. When Plaintiff did receive some of the compensation to which he was entitled, such compensation was issued through Exego International, LLC ("Exego"), a company that VERISTAR had previously acquired.

64. On or around September 16, 2022, Plaintiff received a letter dated September 10, 2022 and bearing the letterhead of a company called Insperity.  Within the letter, it was written that Plaintiff's employment with "EXEGO INTERNATIONAL ,LLC and Insperity" ended on September 2, 2022.  A copy of the letter is attached as **Exhibit 7** to this Complaint.

65.  On or around February 11, 2022, Franklin Data and Nexem filed suit against VERISTAR in the U.S. District Court for the Central District of California.  Per that suit, which was docketed as Case No. 8:22-cv-00215, Franklin Data and Nexem seek damages and repossession of the assets VERISTAR purchased under the APA. That action remains pending. Plaintiff had no knowledge of that lawsuit until after he received Avers' September 2, 2022 termination email.

**COUNT I**
**FRADULENT INDUCEMENT**
**(Against Defendants VERISTAR, AVERS and LEUSER)**

66. Plaintiff reasserts and realleges and incorporates paragraphs 1 through 65 of the Complaint as and for this paragraph 66 of this Count I as if fully set forth herein.

67.     The statements made by Avers and Leuser to Plaintiff during their in-person meetings in October of 2021, that they were looking to hire Plaintiff as President and CEO of

VERISTAR, were false statements of fact. Avers and Leuser were in fact looking to hire an individual to be President and CEO of a separate start-up company, not VERISTAR.

68.     Avers and Leuser were aware that the aforementioned statements they made to Plaintiff were false at the time they were made.

69.     Avers and Leuser made the aforementioned statements to induce Plaintiff to leave his then-employer, UnitedLex, and to assist them in spinning off a new company with no customers or assets.   Indeed, Avers and Leuser were both aware that Avers was looking to hire Plaintiff to be the President of a start-up company that was being formed to avoid obligations VERISTAR owed to Franklin Data and Nexem.

70.     Plaintiff reasonably relied on the truth of the statements made by Avers and Leuser in deciding to sign the Employment Agreement and leave his position with UnitedLex.

71.     Plaintiff would not have signed the Employment Agreement and left his position with UnitedLex were it not for Avers' and Leuser's representations that they wished to hire him as President and CEO of VERISTAR.

72.     Plaintiff has sustained damages because of Avers' and Leuser's misrepresentations in that Plaintiff lost the compensation he would have otherwise received from UnitedLex had he not left his employment with that company.   In 2020, Plaintiff earned over $2 million in compensation from UnitedLex, and Plaintiff would have earned a comparable rate of pay from January 1, 2022 to date, had Plaintiff not been induced to leave his position with UnitedLex to work for VERISTAR. That amount far exceeds the total amount of compensation Plaintiff was paid under the Employment Agreement during the same period.   Moreover, since receiving the termination notice from Avers, Plaintiff has no income, which would not have been the case had he not left UnitedLex based on Avers' and Leuser's misrepresentations.

73. Plaintiff is entitled to recover his damages from VERISTAR, the entity on whose behalf Avers and Leuser appeared to be acting when making their misrepresentations to Plaintiff.

74. Plaintiff is also entitled to recover his damages from Avers and Leuser personally.

75. A court may pierce the veil of limited liability and impose liability on individuals where liability would otherwise be limited when there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and circumstances exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.

76. Here, for the following reasons, the separate personalities of VERISTAR and VERISTAR GLOBAL and Avers and Leuser do not exist such that there is a unity of interest between both individuals and the two companies:

    a. Both VERISTAR and VERISTAR GLOBAL are inadequately capitalized to meet the liabilities of both companies;

    b. Both VERISTAR AND VERISTAR GLOBAL are insolvent;

    c. Avers and Leuser failed to observe corporate formalities regarding VERISTAR and VERISTAR GLOBAL;

    d. The other officers and directors of both VERISTAR AND VERISTAR GLOBAL exercise minimal to no independent authority, and cater to the whims of Avers and Leuser;

    e. Avers and Leuser commingled funds of both VERISTAR and VERISTAR GLOBAL, as evidenced by the fact that paychecks for employees of both companies were issued by Exego, a company owned by VERISTAR;

f.   Both VERISTAR AND VERISTAR GLOBAL were formed for the purpose of diverting assets to the detriment of creditors;

g.   Both VERISTAR AND VERISTAR GLOBAL function as facades for the operation of Avers and Leuser; and,

h.   Such additional reasons as Plaintiff may learn in discovery in this matter.

77. Adherence to the fiction of a separate existence of VERISTAR AND VERISTAR GLOBAL would sanction a fraud, promote injustice, or promote inequitable consequences.

78.  The conduct of VERISTAR, Avers and Leuser was willful and wanton and against the public policy of the State of Illinois.  In addition to compensatory damages, Plaintiff also seeks, and is entitled to an award of punitive damages against VERISTAR, Avers and Leuser.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants VERISTAR LLC, Richard Avers and Robert Leuser, for the following relief:

a.   An award of compensatory damages, in an amount to be determined at trial, for the income Plaintiff had to forgo from his job with UnitedLex when he signed the Employment Agreement in reliance on Avers' and Leuser's misrepresentations;

b.   An award of punitive damages in an amount to be determined at trial;

c.   An award of reasonable attorneys' fees and costs; and

d.   Such additional or alternative relief as this Honorable Court deems just and proper under the instant circumstances.

## COUNT II
## AIDING AND ABBETING FRAUDULENT INDUCMENT
### (Against Defendants Wittenberg, Healy, and Belongia)

79.     Plaintiff reasserts and realleges and incorporates paragraphs 1 through 78 of the Complaint as this paragraph 79 of this Count II, as if fully set forth herein.

80.  At all relevant times, Wittenberg, Healy and Belongia were aware of Avers' and Leuser's scheme to hire an individual to unwittingly be CEO and President of a new company to be formed for the purpose of transferring VERISTAR's employees, assets, customer accounts, equipment and office space and dissolve VERISTAR should Franklin Data and Nexem continue to assert their rights to damages and repossession of assets against VERISTAR as a result of VERISTAR's uncured breaches of the APA.

81.  Wittenberg, Healy and Belongia were also aware that Avers and Leuser, in furtherance with the aforementioned scheme, made misrepresentations to Plaintiff to make him believe they wanted to hire him as CEO and President of VERISTAR, when in fact their intention was to make him CEO and President of a spinoff company.

82.  Despite having the aforementioned awareness of Avers' and Leuser's scheme, Wittenberg, Healy, and Belongia deliberately assisted Avers and Leuser in that scheme by intentionally failing to correct Avers' and Leuser's misrepresentations when communicating with Plaintiff.

83.  Belongia provided additional assistance to Avers' and Leuser's scheme by intentionally drafting an Employment Agreement in such a manner that 1) would cause a reasonable person in Plaintiff's position to conclude from the language of the document that they were agreeing to employment with VERISTAR and not a separate non-existent entity, and 2) would provide Avers with a basis to later assert, <u>after</u> Plaintiff had already taken the steps of

signing the agreement, leaving his lucrative job with UnitedLex, and starting to perform under the Agreement, that Plaintiff had actually agreed to serve as President of the newly formed entity Veristar Global.

84. Belongia drafted the Employment Agreement as he did and deliberately concealed Avers' true intentions to assist Avers' and Leuser's efforts to mislead Plaintiff into believing he was being hired as President and CEO of VERISTAR and not a new start-up company.

85. As an attorney licensed to practice in the State of Illinois, at all relevant times, Belongia was required, in his actions as an attorney, to abide by the Illinois Rules of Professional Conduct.

86. At all relevant times, there existed Rule 4.1 of the Illinois Rules of Professional Conduct, which provides as follows:

**Rule 4.1  Truthfulness in Statements to Others**

In the course of representing a client a lawyer shall not knowingly:

(a) make a false statement of material fact or law to a third person; or

(b) fail to disclose a material fact when disclosure is necessary to avoid assisting a criminal or fraudulent act by a client, unless disclosure is prohibited by Rule 1.6.

*Ill. Sup. Ct. R. Prof'l Conduct, R 4.1.*

87. While Plaintiff was not Belongia's client, pursuant to Rule 4.1, Belongia had an obligation to disclose to Plaintiff the fact that Avers and Leuser had made misrepresentations to him regarding their intentions to hire him as CEO and President of VERISTAR.  Belongia not only failed to make that disclosure to Plaintiff, but by his actions in drafting the Employment Agreement as he did, he actively assisted Avers and Leuser in their fraudulent scheme.

88.  Wittenberg, Healy and Belongia are therefore liable to Plaintiff for assisting Avers'

and Leuser's fraudulent misrepresentations, as they were all aware, not only of the misrepresentations themselves, but also that the misrepresentations were made in connection with a larger fraudulent scheme to avoid liability to Franklin Data and Nexem.

89. Plaintiff is entitled to recover his damages from Wittenberg, Healy and Belongia personally.

90. A court may pierce the veil of limited liability and impose liability on individuals where liability would otherwise be limited where there is such a unity of interest and ownership that the separate personalities of the corporation and the individual no longer exist, and circumstances exist such that adherence to the fiction of a separate corporate existence would sanction a fraud, promote injustice, or promote inequitable consequences.

91. Piercing the veil of limited liability is warranted as to Wittenberg, Healy and Belongia. At all relevant times, Wittenberg, Healy and Belongia acted with full knowledge of Avers' and Leuser's misrepresentations, and all three men ratified and acquiesced in those actions. Moreover, all three men were aware of the true lack of a separate corporate existence of VERISTAR and VERISTAR GLOBAL, and all three men nevertheless allowed the perpetuation of these fictions. They cannot therefore assert the protections of limited liability otherwise afforded in the case of entities such as limited liability companies.

92. The conduct of Wittenberg, Healy and Belongia was willful and wanton and against the public policy of the State of Illinois. In addition to compensatory damages, Plaintiff also seeks, and is entitled to an award of punitive damages against Wittenberg, Healy and Belongia.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants Kenneth Wittenberg, William Healy, and Mark Belongia for the following relief:

a. An award of compensatory damages, in an amount to be determined at trial, for the income Plaintiff had to forgo from his job with UnitedLex when he signed the Employment Agreement in reliance on Avers' and Leuser's misrepresentations;

b. An award of punitive damages in an amount to be determined at trial;

c. An award of reasonable attorneys' fees and costs; and

d. Such additional or alternative relief as this Honorable Court deems just and proper under the instant circumstances.

## COUNT III
## <u>BREACH OF CONTRACT</u>
### (Against Defendants VERISTAR, VERISTAR GLOBAL, AVERS, LESUER, WITTENBERG, and HEALY)

93. Plaintiff reasserts and realleges and incorporates paragraphs 1 through 92 of the Complaint as and for this paragraph 93 of this Count III, as if fully set forth herein.

94. To the extent that the Employment Agreement is construed to be between VERISTAR GLOBAL and Plaintiff, VERISTAR GLOBAL is in breach of the Employment Agreement by failing to pay Plaintiff amounts due and owing Plaintiff under the Employment Agreement, as alleged in Paragraph 52, and Plaintiff may recover such unpaid amounts from VERISTAR GLOBAL.

95. To the extent that the Employment Agreement is construed to be between VERISTAR and Plaintiff, VERISTAR is in breach of the Employment Agreement by failing to pay Plaintiff amounts due and owing Plaintiff under the Employment Agreement, as alleged in Paragraph 52, and Plaintiff may recover such unpaid amounts from VERISTAR.

96. However, even if the Employment Agreement is not construed to be between VERISTAR and Plaintiff, Plaintiff may nevertheless recover unpaid amounts and other damages under Employment Agreement from VERISTAR.

97.     Regardless of whether the Employment Agreement is construed to be between Plaintiff and VERISTAR or Plaintiff and VERISTAR Global, Avers, Leuser, Wittenberg, and Healy can be held personally liable for either entity's obligations under the Employment Agreement.

98.     The Employment Agreement also provides that in any court action at law or equity that is brought by one of the parties to the Employment Agreement to enforce or interpret the provisions of the Employment Agreement, the prevailing party will be entitled to reasonable attorneys' fees, in addition to any other relief to which that party may be entitled.

99. VERISTAR and VERISTAR GLOBAL breached the Employment Agreement in a number of ways, including, but not limited to the following;

     a.   Failing to pay Plaintiff's Signing Bonus;

     b.   Failing to provide fully subsidized health insurance by improperly deducting the costs for the health insurance from Plaintiff's paychecks and paying them back to Plaintiff as commissions, thereby subjecting Plaintiff to tax liability for the Plaintiffs.

     c.   Failing to pay Plaintiff the severance payment after terminating him without cause.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants VERISTAR LLC, VERISTAR GLOBAL LLC, Richard Avers, Robert Leuser, Kenneth Wittenberg, and William Healy for the following relief:

     a.   An award of compensatory damages, in an amount to be determined at trial, for the unpaid amounts due and owing Plaintiff under the terms of the Employment Agreement;

     b.   An award of reasonable attorneys' fees and costs; and

c.      Such additional or alternative relief as this Honorable Court deems just and proper under the instant circumstances.

### COUNT IV
### VIOLATION OF THE IWPCA
**(Against Defendants VERISTAR, VERISTAR GLOBAL, AVERS, LEUSER, WITTENBERG, and HEALY)**

100.    Plaintiff reasserts and realleges and incorporates paragraphs 1 through 99 of the Complaint as and for this paragraph 100 of this Count IV, as if fully set forth herein.

101.    At all relevant times, there existed the Illinois Wage Payment and Collection Act, *820 ILCS 115/1 et seq.*

102.    At all relevant times, Plaintiff was an "employee" as that term is defined under the IWPCA (*820 ILCS 115/2*).

103.    At all relevant times, the Defendants against whom this Count IV is brought were "employers," as that term is defined under the IWPCA (*820 ILCS 115/2*).

104.    Under the IWPCA, all wages earned by an employee during a semi-monthly or bi-weekly pay period shall be paid to such employee not later than thirteen days after the end of the pay period in which such wages were earned.  *820 ILCS 115/4.*

105.    Plaintiff earned both the $50,000 and $20,000 installments of his signing bonus by continuing his employment, by the April 1, 2022 and July 1, 2022 deadlines, respectively.

106.    The signing bonus constitutes "wages" as that term is defined under the IWPCA.

107.    Plaintiff was never paid the installments of his signing bonus during the pay periods corresponding with the earning of those payments, nor within thirteen days thereafter.  In fact, Plaintiff has never been paid either of the installments.

108.    Defendants' continued failure to pay any part of the signing bonus to Plaintiff is a Violation of Section 4 of the IWPCA.  *820 ILCS 115/4.*

109.     Under the IWPCA, "final compensation" is defined as wages, salaries, earned commissions, earned bonuses, and the monetary equivalent of earned vacation and earned holidays, and any other compensation owed to the employee by the employer pursuant to an employment contract or agreement. *820 ILCS 115/2.*

110.     The IWCPA requires every employer to pay the final compensation of separated employees in full, at the time of separation, if possible, but in no case later than the next regularly scheduled payday for such expenses. *820 ILCS 115/5.*

111.     The IWCPA also provides that, unless otherwise provided in a collective bargaining agreement, whenever a contract of employment or employment policy  provides for paid vacations, and an employee resigns or is terminated without having taken all vacation time earned in accordance with such contract of employment or employment policy, the monetary equivalent of all earned vacation shall be paid to him or her as part of his or her final compensation at his or her final rate of pay, and no employment contract of employment policy shall provide for forfeiture of earned vacation time upon separation.

112.     Plaintiff did not receive his final compensation at the time of his termination on September 2, 2022, nor by the next regularly scheduled payday following his termination.  In fact, Plaintiff has not received his final compensation at all, including, but not limited to, the following components:

      a.  Plaintiff's signing bonus;

      b.   Plaintiff's severance payment owed for being terminated without cause;

      c.  Cash payment for Plaintiff's unused paid vacation days.

113.      The failure to timely pay Plaintiff his final compensation is a violation of Section Five of the IWPCA.  *820 ILCS 115/5.*

114.    Pursuant to Section 14 of the IWPCA, any employee not timely paid wages, final compensation or wage supplements by his or her employer as required by the Act shall be entitled to recover in a civil action, the amount of such underpayments and damages of 5% of the amount of any such underpayments for each month following the date of payment during which such underpayments remain unpaid.  Such employee may also recover costs and all reasonable attorney's fees.  *820 ILCS 115/14(a).*

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants VERISTAR LLC, VERISTAR GLOBAL LLC, Richard Avers, Robert Leuser, Kenneth Wittenberg, and William Healy for the following relief:

a.    An award of compensatory damages, in an amount to be determined at trial, for all unpaid wages and final compensation not timely paid to Plaintiff;

b.    Statutory damages of 5% of the amount of all unpaid wages and final compensation not paid to Plaintiff for each month during which such wages and final compensation remain unpaid;

c.    An award of reasonable attorneys' fees and costs; and

d.    Such additional or alternative relief as this Honorable Court deems just and proper under the instant circumstances.

### COUNT V
### RETALIATION UNDER THE IWPCA
**(Against Defendants VERISTAR, VERISTAR GLOBAL,**
**AVERS, LEUSER, WITTENBERG, and HEALY)**

115.    Plaintiff reasserts and realleges and incorporates paragraphs 1 through 114 of the Complaint as and for this paragraph 115 of this Count V, as if fully set forth herein.

116.    Subsection 14(c) of the IWPCA prohibits an employer, or any agent of an employer, from discharging or discriminating against any employee because that employee has made a

complaint to his employer, or because that employee has instituted a proceeding under or related to the IWPCA. *820 ILCS 115/4(c).*

117. An employee who has been unlawfully retaliated against shall be entitled to recover, in a civil action, all legal and equitable relief as may be appropriate. In a civil action, such employee shall also recover costs and all reasonable attorney's fees. *820 ILCS 115/4(c).*

118. Avers, Leuser, Wittenberg, and Healy made the decision to terminate Plaintiff not for cause, but because Plaintiff complained to them orally regarding the failure to timely pay him all the wages to which he was entitled under the Act and because they received a letter from Plaintiff's attorney seeking payment of unpaid wages. There was no cause to terminate Plaintiff, and the termination occurred only days after Defendants were made aware of the letter from Plaintiff's attorney. Moreover, per the email in which Avers notified Plaintiff of his termination, Avers said nothing about Plaintiff being terminated for cause, but Avers did make a reference to the attorney letter.

119. By terminating Plaintiff's employment for the reasons they did, VERISTAR, VERISTAR GLOBAL, Avers, Leuser, Wittenberg, and Healy illegally retaliated against Plaintiff in violation of the IWPCA.

120. Plaintiff was damaged because of the retaliatory termination in that he lost benefits and compensation that he otherwise would have received had a not been terminated, including but not limited to the following:

    a. The base salary that Plaintiff would otherwise have continued earning had his employment not been terminated;

    b. Commissions and bonuses that Plaintiff would otherwise have earned had his employment not been terminated;

    c.  Health insurance, which was cancelled the same day Plaintiff was terminated, causing Plaintiff to incur, at his own expense, alternative health insurance;

    d.  A ten percent membership interest in VERISTAR, which Plaintiff would have received no later than January 1, 2023 had he not been terminated.

121.    The conduct of Avers, Leuser, Wittenberg, and Healy in retaliating against Plaintiff was willful and wanton and against the public policy of the State of Illinois.

WHEREFORE, Plaintiff respectfully requests that this Honorable Court enter judgment in his favor and against Defendants VERISTAR LLC, VERISTAR GLOBAL LLC, Richard Avers, Robert Leuser, Kenneth Wittenberg, and William Healy for the following relief:

    a.  An award of compensatory damages, in an amount to be determined at trial, for the income Plaintiff had to forgo from his job with UnitedLex when he signed the Employment Agreement in reliance on Avers' and Leuser's misrepresentations;

    b.  An award of punitive damages in an amount to be determined at trial;

    c.  An award of reasonable attorneys' fees and costs; and

    d.  Such additional or alternative relief as this Honorable Court deems just and proper under the instant circumstances

Date: September 23, 2022           Respectfully submitted,
                         Daniel Panitz, Plaintiff,

                         By: s/Michael Tinaglia
                            One of His Attorneys

MICHAEL LEE TINAGLIA
BRIAN J. OLSZEWSKI
Law Offices of Michael Lee Tinaglia Ltd.
444 N. Northwest Hwy., Suite 350
Park Ridge, IL 60068
Tel: (847) 692-0421 | Fax: (847) 685-8440
mltinaglia@tinaglialaw.com
bolszewski@tinaglialaw.com

# EXHIBIT 10

1  Robert N. Ives, Esq., State Bar No: 104154

**FILED**
CLERK, U.S. DISTRICT COURT

2/11/2022

CENTRAL DISTRICT OF CALIFORNIA
BY: _____ DTA _____ DEPUTY

*FEE PAID*

2  IVES & ASSOCIATES
3  105 Avenida de la Estrella, Suite 2B
   San Clemente, CA  92672-3985
   Tel: (949) 366-6677
4  Fax: (949) 366-6262
   Email: ives@iveslegal.com

5

6  Attorneys for Plaintiffs, FRANKLIN DATA
   VENTURES, INC. and NEXEM-ICONIC, LLC

7                **UNITED STATES DISTRICT COURT**

8          **FOR THE CENTRAL DISTRICT OF CALIFORNIA**

9

10 FRANKLIN DATA VENTURES, INC.,     CASE NO.:  8:22-cv-00215-CJC-JDEx
   and NEXEM-ICONIC, LLC
11                                    1. BREACH OF CONTRACT;

12                                    2. BREACH OF PROMISSORY
                                      NOTES;
13        Plaintiffs,
                                      3. BREACH OF SECURITY
14                                    AGREEMENT, DEMAND FOR
   vs.                               POSSESSION OF COLLATERAL,
15                                    AND JUDICIAL FORECLOSURE;

16 VERISTAR, LLC, an Illinois Limited
   Liability Company
17                                    JURY TRIAL DEMANDED

18        Defendants

19

20

21

22

23 Plaintiffs, FRANKLIN DATA VENTURES, INC. ("FDV") and NEXEM-

24 ICONIC, LLC ("N-I"), allege as follows:

25                        **JURISDICTION**

26        1.     This Court has original subject matter jurisdiction of this case based

27 on Diversity of Citizenship pursuant to 28 USC §1332. The amount in controversy

28

                                1.

in this matter exceeds $75,000, exclusive of interest and costs, and the citizenship of all defendants is diverse from that of all plaintiffs.

## **VENUE**

1. Venue is proper in this District and all parties in this action are subject to personal jurisdiction in this District Court because Plaintiffs and Defendant stipulated and agreed thereto in a signed, written agreement that is the subject of this action. Specifically, FDV and N-I (collectively "Sellers") and VERISTAR, LLC ("Purchaser"), executed an Asset Purchase Agreement ("APA") entitled "Confidential Letter Agreement re: Sale of Assets of Franklin Data Ventures, Inc." dated October 25, 2019, that provides at page 8, in pertinent part: "Any legal suit, action or proceeding arising out of or based upon this Agreement of the transactions contemplated hereby may be instituted in the federal courts of the United Stated of America or the courts of the State of California in each case located in Orange County, California and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding." A true and correct copy of the APA is attached hereto and incorporated herein by this reference as though set forth herein at length as Exhibit 1.

## **PARTIES**

2. Plaintiff FRANKLIN DATA VENTURES, INC. is a corporation in good standing duly incorporated in the State of Texas, with its principal place of business located in Orange County, California. FDV is a citizen both of the state of Texas and of the state of California.

3. Plaintiff NEXEM-ICONIC, LLC ("N-I") is a duly formed Georgia Limited Liability Company with its principal place of business located in Georgia. N-I is a citizen of the state of Georgia.

4. Plaintiffs are informed and believe, and based thereon allege, that Defendant VERISTAR is an Illinois corporation doing business in the state of

Illinois. Based on such information and belief, VERISTAR is a citizen of the state of Illinois.

5.      The identity, true names, and capacities of other defendants, whether individual, corporate, associate, or otherwise, are unknown to Plaintiffs at this time, and Plaintiff will move the Court for leave to amend this complaint at a later time to name such defendants or to correct the spelling or capacity of named defendants.

6.      Plaintiffs are informed and believe and based thereon allege that at all times mentioned in this Complaint, each Defendant was the officer, director, agent, representative, employer, conspirator and/or alter ego of each other defendant, and in acting and omitting to act, did so with the express, implied or ostensible authority, consent or ratification of their principals, or within the scope of his or her employment responsibilities and/or for the benefit of their principals and that each and all are jointly and severally liable to Plaintiffs under applicable relational theories, including but not limited to conspiracy, *respondeat superior* and/or vicarious liability.

## **STATEMENT OF FACTS**

7.      On or about October 25, 2019, Plaintiffs FDV and N-I, on the one hand, and Defendant VERISTAR, on the other hand, executed the APA. VERISTAR thereby purchased Sellers' business operating assets and liabilities. The purchased business provided services in the nature of cloud hosting, cybersecurity, and e-discovery ("Business").

8.       The APA provided, at pages 1 through 3, that Purchaser would deliver certain payments as consideration for the purchase of Sellers' Business, including but not limited to the following:

> ***"(c)      Promissory Note One:*** Purchaser will provide Seller with a Secured Promissory Note substantially in the form attached hereto as Exhibit "B" ("Note One"), in the principal amount of Nine-Hundred Fifty Thousand Dollars ($950,000) bearing an interest rate of four (4%)

percent. Note One will have semi-annual payments in March and September according to the schedule below:

| | | | Interest | Date of Payment |
|---|---|---|---|---|
| $950,00 | $79,167 | $870,833 | $19,000 | 3/1/2020 |
| $870,833 | $79,167 | $791,667 | $17,417 | 9/1/2020 |
| $791,667 | $79,167 | $712,500 | $15,833 | 3/1/2021 |
| $712,500 | $79,167 | $633,333 | $14,250 | 9/1/2021 |
| $633,333 | $79,167 | $554,167 | $12,667 | 3/1/2022 |
| $554,167 | $79,167 | $475,000 | $11,083 | 9/1/2022 |
| $475,000 | $79,167 | $395,833 | $9,500 | 3/1/2023 |
| $395,833 | $79,167 | $316,667 | $7,917 | 9/1/2023 |
| $316,667 | $79,167 | $237,500 | $6,333 | 3/1/2024 |
| $237,500 | $79,167 | $158,333 | $4,750 | 9/1/2024 |
| $158,333 | $79,167 | $79,167 | $3,167 | 3/1/2025 |
| $79,167 | $79,167 | $0 | $1,583 | 9/1/2025 |
| | $950,000 | | | |
| | | | $123,500 | |

**(d)   *Growth Incentive:*** Within ten (10) days of November first of each year beginning in 2020, the Parties shall calculate the gross revenue of the Business. The "Gross Revenue" of the Business shall be calculated as the total gross sales generated by the Business less write-offs. If the following thresholds are met, Purchaser will pay the corresponding incentive payment to Seller beginning in on November 15, 2020:

    a.  If Gross Revenue the first 12 months is $2,000,000 or more, then a $50,000 incentive is earned;

    b.  If the Gross Revenue the second 12 months is $2,400,000 or more, then a $50,000 incentive is earned;

    c.  If the Gross Revenue the third 12 months is $2,800,000 or more, then a $50,000 incentive is earned;

    d.  If the Gross Revenue the fourth 12 months is $3,200,000 or more, then a $50,000 incentive is earned;

    e.  If the Gross Revenue the fifth 12 months is $3,600,000 or more, then a $50,000 incentive is earned; and

    f.  If the Gross Revenue the sixth 12 months is $4,000,000 or more, then a $50,000 incentive is earned

If the Gross Revenue generated from the Business during each twelve-

4.

month  period is less than the minimum threshold above, Seller shall not earn an incentive payment for that period. The maximum incentive payout over the course of six years post-closing (the "Incentive EligibilityPeriod") shall be capped at $300,000.

During the Incentive Eligibility Period, Purchaser shall use its  best efforts  to grow the Business and shall not divert prospective business opportunities to another person or entity or use resources of the  Business (such as Relativity or the hosting environment) to the detriment of or in competition with the Business. Purchaser shall use commercially reasonable means to maximize the profitability of the business when making expenditures for the operation of the business. The Parties understand and agree that if the Business does not have the technological  ability to servicea client's needs, an outside third party may be contracted by Purchaser and such conduct does not violate this section.

*(e)  **Promissory Note Two:*** Purchaser will provide Seller or Seller's designee with a Secured Promissory Note substantially  in the form attached  hereto  as Exhibit "C", in the principal amount of $426,664.14 at Closing bearing an interest rate of five and one half (5.5) percent and is payable in monthly installments of $7,053.79 on the 1st day of each month beginning on November 1, 2019 and continuing through August 1, 2025, unless earlier paid in full, in which case there will be no early payment penalties or further interested payment liabilities after the principal amount is paid. . These payments are contingent on Seller remitting the amount of these payments towards the debt it owes on an SBA note bearing the same principal and interest payments. A copy of the SBA note attached hereto as Exhibit "D". If Seller defaults on the SBA note, Seller must notify Purchaser of same and allow Purchaser, in its sole discretion, to assume the payments on this note to protect its interests."

9.      The APA provided, at page 3, that Purchaser was required to provide Seller monthly accounting statements of gross revenue of the business and provide seller access to the books and records of the business:

"**(h)  *Financial Reporting***: Purchaser agrees to provide Seller with an accounting of the Gross Revenue of the Business each month no later than the fifteenth day of the following month. Purchaser shall provide Seller with

5.

Complaint

access to the books and records of the Business as requested at reasonable times and upon twenty-four hour's advance notice. If the Gross Revenue of the Business declines to less than $400,000 (cumulative) over a consecutive rolling one hundred twenty-day period of time, Purchaser shall have the right to repurchase the assets for the sum of $1.00 and which shall serve to extinguish any future obligations of Purchaser."

10.     The APA further provided the following with respect to Events of Default:

**"(k)  *Event of Default:*** An event of Default shall occur if Purchaser (1) defaults on any of the obligation above, or (2) transfers, assigns, sells or otherwise divests any of the assets of the Business prior the satisfaction of all of Purchaser's obligations to Seller herein without the prior written consent of Seller which consent shall not be unreasonably withheld. Nothing herein shall be construed to prohibit Purchaser from pre-paying any financial obligation to Seller or Lan-Tech, Inc. If an event of default occurs, Seller must give written notice of same to Purchaser. Purchaser then has 10 business days to cure said default. If the event of Default after due notice and failure to cure, all payments hereunder shall be accelerated and become immediately due and payable without further order or notice."

**FIRST CLAIM**
**Breach of the APA**
**(Against VERISTAR, LLC)**

11.     Plaintiffs incorporate herein by reference Paragraphs 1 through 10 as though fully set forth at length.

12.     Plaintiffs have performed all the terms and conditions of the APA except those that were waived, excused, justified or prevented by the conduct of Defendant VERISTAR or except as excused by subsequent events and/or operation of law or equity.

13.     On August 19, 2021 Sellers gave written notice by letter to Rick Avers, President and Managing Member of VERISTAR, requesting that Purchaser provide Seller with access to the books and records of the business on September 1, 2021, as required by Section 9 of the APA. On August 27, 2021 FDV served a written notice that Sellers' inspection of books and records was rescheduled to occur on August 30, 2021 at an agreed time and location in Chicago, Illinois.

14.     Defendant VERISTAR breached the terms of the APA by failing and refusing to permit Sellers to inspect the books and records of the business, other than a brief report of revenue, as and when noticed or at all.

15.     On August 30, 2021 VERISTAR gave written notice to VERISTAR of the breach by Purchaser by failing to provide the books and records of the business for inspection. VERISTAR failed to cure this default in performance of the terms of the APA, either by producing the books and record of the business or by making any agreement or arrangement to do so, within ten (10) business days thereafter. VERISTAR's failure to produce the books and records of the business upon Seller's reasonable demand and its failure to timely cure such default was an uncured Event of Default under section (k) of the APA.

16.     On December 8, 2021 Sellers sent to Purchasers via FedEx mail written notice of multiple defaults in performance of Purchaser's payment obligations under the terms of the APA, specifying that Purchaser failed to timely remit to Sellers monthly payments due under the terms of Note Two. Sellers' written notice of defaults in payment stated that VERISTAR failed to remit the November 1, 2021 monthly payment due under Note Two, in the amount of $7,053.79 and failed to remit the December 1, 2021 monthly payment due under Note Two, in the amount of $7,053.79. Together, these defaults in payments totaled $14,107.58.

17.     Defendant VERISTAR failed to timely cure their defaults in payments owed under Note Two within ten (10) business days after its receipt of written

7.

Complaint

notice thereof, as required under Article (k) of the APA. VERISTAR also failed to cure the same defaults in payments of Note Two within thirty (30) days, plus extension per method of service, of its receipt of written notice thereof as required under Article 5(a) of Note Two. Based on information and belief, VERISTAR has also failed to make other payments due under the terms of Note Two despite written notice of such defaults in payment. VERISTAR's failure to pay the regular monthly payments under Note Two and failure to timely cure such defaults in payment after due notice are "uncured" Events of Default under section (k) of the APA and under Article 5(b) of Note Two. The APA also provides at Section K, and Sellers assert hereby, that where there has been an uncured default, "all payments hereunder shall be accelerated and become immediately due and payable without further order or notice."

18.    In the December 8, 2021 letter to VERISTAR, Sellers also demanded, based on its reasonable concern over Purchaser's non-performance of periodic payments and audit obligations, that VERISTAR provide unequivocal and adequate assurances of its intention to perform and be bound by the APA and promissory Note Two. Despite such requests for adequate assurances, VERISTAR provided no assurances nor any response to such request whatsoever. Seller's letter advised Purchaser that its failure to provide adequate assurances of performance and unequivocal confirmation of Purchaser's willingness to be bound by the APA and Note Two would be, and is now, regarded and treated by Seller as an implied repudiation of the APA and Note Two. Such implied repudiation constitutes and, in filing this action, is treated by Seller as, a total breach of each of the referenced agreements.

19.    On December 30, 2021 Sellers sent a letter via FedEx mail notifying VERISTAR that because of its uncured Events of Default, as identified in paragraphs 13 through 18 above, and pursuant to Article (k) of the APA, all of VERISTAR's remaining payment obligations under Note One and Note Two were,

Complaint

as stated in the APA, "accelerated and become immediately due and payable without further order or notice." The December 30, 2021, letter demanded payment of the total amount of principal and interest due under Note One and Note Two through December 30, 2021 and daily interest thereafter until paid in full, to wit:

> • **Note One**: $633,333.00 of principal, plus $8,374. 03 in interest earned through December 30, 2021, totaling $641,707.03. The letter also demanded that payoff amount include interest accruing under the note's terms from December 30, 2021 to date of payment at $70.37 per day.

> • **Note Two**: $295,694.02 of principal, plus $4,020.25 in interest earned through December 30, 2021, totaling $299,741.27. The letter also demanded that payoff amount include interest accruing under the note's terms from December 30, 2021 to date of payment at $44.56 per day.

20.     As a direct, legal, and proximate result of the foregoing breaches of the APA, Plaintiff has been damaged in the amount set forth in paragraph 19, above, and in such other and further respects as may be adduced at the time of trial according to proof.

21.     Pursuant to the terms of the APA, Plaintiffs are entitled to recover, and seek by this averment, reasonable attorney's fees and costs incurred to enforce the terms of the APA and to obtain a declaration of the rights of the parties, including but not limited to prosecution of this action.

### SECOND CLAIM
Breach of Promissory Notes
(By Plaintiff FDV Against All Defendants)

22.     Plaintiffs hereby incorporate by this reference Paragraphs 1 through 21 of this Complaint as though fully set forth at length at this point.

Count One
Breach of Secured Promissory Note One

23.     On October 25, 2019 Defendant VERISTAR executed and delivered to FDV a secured promissory note ("Note One") in the principal amount

9.

Complaint

of $950,000.00. The note required VERISTAR to make payments of principal and interest at a rate of four (4) percent per annum on March 1 and September 1 of each year for five (5) years. Specifically, it required VERISTAR to make ten (10) semi-annual payments of $79,167.00 each, plus interest as provided in paragraph 8 of this complaint. Such payment chart is incorporated herein as though set forth at length at this point. A true and correct copy of Note One is attached hereto as Exhibit 2 and is incorporated herein by this reference as though set forth at length at this point.

24.  Under the terms of the APA, all payment obligations for the sale of the Business, including all payments due under Note One, shall be accelerated and become due without further notice or order immediately upon Purchaser's failure to timely cure any default(s) in performance of Purchaser's obligations as specified in Articles (a) through (j) of the APA.

25.  Defendant VERISTAR failed to timely cure duly noticed events of default by failing to cooperate with Plaintiff's requests that they provide access to the business books and records and cure defaults in payments due under Note Two within ten (10) business days of written notice thereof, as required under Article (k) of the APA. VERISTAR also failed to cure the default in payments due under Note Two within thirty (30) days, plus extension per method of service, after FDV duly provided written notice of the defaults in payment, as required under Article 5(a) of Note Two. VERISTAR's failure to provide access to books and records and to timely pay the regular monthly payments under Note Two, and its subsequent failure to timely cure such defaults after due notice to do so, constituted uncured Events of Default under both under section (k) of the APA and under Article 5(b) of Note Two.

26.  Plaintiff FDV has fully performed all of its obligations due under the APA, promissory Note One, and promissory Note Two, except those that were waived, excused, justified or prevented by the conduct of Defendant VERISTAR

or except as excused by subsequent events and/or operation of law or equity. The uncured Events of Default by VERISTAR referenced above and the implied repudiation of the APA, Note One and Note Two caused all payment obligations under Note One to be accelerated and to become due immediately without further order or notice.

27.     On December 30, 2021Seller's attorney sent a letter to Purchaser communicating a demand for immediate satisfaction of all accelerated payment obligations, as authorized under the APA. Demand was specifically made for full payment of Note One, as follows: $633,333.00 of principal, plus $8,374. 03 in interest earned through December 30, 2021, totaling $641,707.03. The letter also demanded that payoff amount include interest accruing under the note's terms from December 30, 2021 to date of payment at $70.37 per day.

28.     Despite Seller's demand for payoff, Purchaser has failed and refused to perform its payment obligation under Note One.

29.     As a proximate result of Defendant's breach of Note One by non-payment FDV has suffered damages of $633,333.00 of principal, $8,374. 03 in interest earned through December 30, 2021, totaling $641,707.03, plus $70.37 per day in interest accruing since said date.

30.     Pursuant to the terms of the APA and applicable statutory law, Plaintiffs are entitled to recover, and seek by this averment, reasonable attorney's fees and costs incurred to enforce the terms of the APA and to obtain a declaration of the rights of the parties, including but not limited to prosecution of this action.

Count Two<br>Breach of Secured Promissory Note Two

31.     On October 25, 2019 Defendant VERISTAR executed and delivered to FDV a promissory note entitled Secured Promissory Note Two ("Note Two") in the principal amount of $426,664.14. Note Two required VERISTAR to make regular monthly payments of principal and interest at a rate of five and one-

11.<br>Complaint

half (5.5%) percent per annum on the first day of each month in the sum Seven Thousand Fifty-Three and .79 Dollars ($7,053.79) commencing on November 1, 2019 and continuing thereafter through August 1, 2025 unless earlier paid in full. A true and correct copy of Note Two is attached hereto as Exhibit 3 and is incorporated herein by this reference as though fully set forth at length at this point.

32.     Under the terms of the APA, Article (k), all payment obligations for the sale of the Business, including but not limited to all payments due under Note Two, shall be accelerated and become due without further notice or order immediately upon Purchaser's failure to timely cure any default(s) in performance of Purchaser's obligations as specified in Articles (a) through (j) of the APA.

33.     Defendant VERISTAR failed to timely cure duly noticed events of default by failing to cooperate with Plaintiff's requests that they provide access to the business books and records and cure defaults in payments due under Note Two within ten (10) business days of written notice thereof, as required under Article (k) of the APA. VERISTAR also failed to cure the default in payments due under Note Two within thirty (30) days, plus extension per method of service, after FDV duly provided written notice of the defaults in payment, as required under Article 5(a) of Note Two. VERISTAR's failure to provide access to books and records and to timely pay the regular monthly payments under Note Two, and its subsequent failure to timely cure such defaults after due notice to do so, constituted uncured Events of Default under both under section (k) of the APA and under Article 5(b) of Note Two.

34.     Plaintiff FDV has fully performed all of its obligations due under the APA, promissory Note One, and promissory Note Two, except those that were waived, excused, justified or prevented by the conduct of Defendant VERISTAR or except as excused by subsequent events and/or operation of law or equity. The uncured Events of Default by VERISTAR referenced above and the implied

repudiation of the APA, Note One, and Note Two caused all payment obligations under Note One to be accelerated and to become due immediately without further order or notice.

35.     On December 30, 2021 Seller's attorney sent a letter to Purchaser communicating a demand for immediate satisfaction of all accelerated payment obligations under the APA. Demand was specifically made for payment of all amounts due under Note Two, as follows: $295,694.02 of principal, $4,020.25 in interest earned through December 30, 2021, totaling $299,741.27, plus $44.56 per day in interest accruing since said date.

36.     Despite Seller's demand for full and complete payoff of Note Two, Purchaser failed and refused to perform such obligation respecting Note One.

37.     As a proximate result of Defendant's breach of Note Two by non-payment FDV has suffered damages of $295,694.02 of principal, $4,020.25 in interest earned through December 30, 2021, totaling $299,741.27, plus $44.56 per day in interest accruing since said date.

38.     Pursuant to the terms of the APA and applicable statutory law, Plaintiffs are entitled to recover, and seek by this averment, reasonable attorney's fees and costs incurred to enforce the terms of the APA and to obtain a declaration of the rights of the parties, including but not limited to prosecution of this action.

**THIRD CLAIM**
Breach of Security Agreement, Demand for Possession
of Collateral, and Judicial Foreclosure
[Against All Defendants]

39.     Plaintiffs hereby incorporate by this reference Paragraphs 1 through 38 of this Complaint as though fully set forth at length at this point.

40.     On or about October 25, 2019 Plaintiff FDV entered into a Security Agreement with Defendant consisting of the Security Agreement and underlying promissory notes – the Balloon Note, Note One, and Note Two. A true and correct

copy of the Security Agreement is attached hereto as Exhibit 4 and is incorporated herein by this reference as though fully set forth at length at this point. Note One and Note Two, attached hereto as Exhibits 2 and 3, respectively, are also incorporated herein by this reference as though fully set forth at length at this point.

41.    Under the terms of the Security Agreement VERISTAR promised, without limitation hereby, to secure the loan payment obligations of Note One and Note Two with pledged collateral. As security for the loan payments prescribed by the Promissory Notes (the "Obligations"), VERISTAR pledged to FDV a security interest in and to specific Collateral. The Security Agreement defines the Collateral as the "Purchased Assets" identified in the APA. The description of Purchased Assets, as set forth in the APA, including all Schedules and Exhibits to the APA that further detail the Purchased Assets comprising the Collateral under the Security Agreement, is incorporated herein by this reference as though fully set forth at this point.

42.    Plaintiff duly filed a UCC-1 Financing Statement with the Office of the Secretary of State of Illinois ("UCC-1") to perfect FDV's security interest in the Collateral under the Security Agreement on October 31, 2019. A true and correct copy of the UCC-1 is attached hereto as Exhibit 5 and is incorporated herein by this reference as though fully set forth at length at this point. As a result of such filing Plaintiff FDV has duly perfected its security interest in the Collateral in VERISTAR's possession and is entitled to immediate turnover and possession of all such Collateral.

43.    Plaintiff FDV has fully performed all of its obligations due under the APA, promissory Note One, and promissory Note Two, except those that were waived, excused, justified or prevented by the conduct of Defendant VERISTAR or except as excused by subsequent events and/or operation of law or equity. As a result of the above-described uncured Events of Default, the resulting acceleration

of all amounts due under Note One and Note Two, and Defendant's failure and refusal to pay the full amount of principal and interest due under Notes One and Note Two despite Plaintiff FDV's written demand for such performance, Defendant has defaulted in its performance of the Security Agreement and is in material breach thereof.

44.    Although Defendant remains at present in possession of the Collateral subject to Plaintiff's security interest, as a further result of Defendant's uncured Events of Default as aforementioned, Plaintiff is entitled to all remedies specified in the Security Agreement, Article 4 (a), without limitation, and to relief afforded under applicable provisions of the California Uniform Commercial Code, Article 9. FDV is entitled to immediate possession of the Collateral. Plaintiff has, per the Security Agreement, and has perfected by duly recording the UCC-1, an immediately enforceable security interest in the Collateral. Plaintiff has delivered a written demand for VERISTAR that it surrender and turnover of possession of all Collateral to FDV, but VERISTAR has failed and refused to deliver FDV possession of all or any part of the Collateral.

45.    As a result of Defendant's default and refusal to turn over the Collateral as required by the Security Agreement and applicable stator law, the Plaintiff is entitled to an order of the Court granting provisional relief by writ of possession requiring Defendant to immediately surrender and turn over possession of all Collateral to Plaintiff FDV.

46.    As a result of Defendant's default in payment and refusal to turn over the Collateral Plaintiff is entitled the assistance of this Court to enforce FDV's security rights in all of the property pledged as security for the Obligations, including by judicial foreclosure of all of the Defendant's rights in the Collateral through public sale thereof by the proper judicial officer.

47.    As a further proximate and foreseeable result of Defendant's improper and unlawful conduct, and also according to the provisions of the Security

Agreement, Plaintiff is entitled to its reasonable attorneys' fees and costs for prosecuting this action.

**WHEREFORE**, Plaintiffs pray for judgment against Defendants, and each of them, as follows:

As to the FIRST CLAIM:

1.      For compensatory damages for breach of the APA, including damages for total breach and acceleration of Note One, in the amount of $633,333.00 of principal, $8,374.03 in interest earned through December 30, 2021, totaling $641,707.03, plus $70.37 per day in interest accruing since said date;

2.      For compensatory damages for breach of the APA, including damages for total breach and acceleration of Note Two, in the amount of $295,694.02 of principal, $4,020.25 in interest earned through December 30, 2021, totaling $299,741.27, plus $44.56 per day in interest accruing since said date.

As to the SECOND CLAIM - Count One:

3.      For compensatory damages for breach and acceleration of Note One, in the amount of $633,333.00 of principal, $8,374.03 in interest earned through December 30, 2021, totaling $641,707.03, plus $70.37 per day in interest accruing since said date;

As to the SECOND CLAIM - Count Two:

4.      For compensatory damages for breach and acceleration of Note Two, in the amount of $295,694.02 of principal, $4,020.25 in interest earned through December 30, 2021, totaling $299,741.27, plus $44.56 per day in interest accruing since said date.

As to the THIRD CLAIM:

5.      For compensatory damages for breach of the APA, including damages for total breach and acceleration of Note One, in the amount of $633,333.00 of principal, $8,374.03 in interest earned through December 30, 2021, totaling $641,707.03, plus $70.37 per day in interest accruing since said date;

Complaint

6.     For compensatory damages for breach of the APA, including damages for total breach and acceleration of Note Two, in the amount of $295,694.02 of principal, $4,020.25 in interest earned through December 30, 2021, totaling $299,741.27, plus $44.56 per day in interest accruing since said date.

7.     For an order of the Court granting provisional relief by writ of possession requiring Defendant to immediately surrender and turn over possession of all Collateral to Plaintiff FDV;

8.     For an order of the Court granting judicial foreclosure of all of the Defendant's rights in the Collateral through public sale thereof by the proper judicial officer.

As to ALL CLAIMS:

9.     For Attorney's Fees incurred in this action;

10.    For costs of suit;

11.    For such other and further relief as the court may deem just and proper.

PLAINTIFFS DEMAND JURY TRIAL

Date:  February 7, 2022            **IVES & ASSOCIATES**

/s/
_____
Robert N. Ives, Attorneys for
Plaintiffs, FRANKLIN DATA
VENTURES, INC. and NEXEM-
ICONIC, LLC

Complaint

# EXHIBIT 1

Exhibit 1 - Page 18



October 25, 2019

Mr. Rick Avers, Manager
Veristar LLC
9501 W. 144th Place
Orland Park, IL 60462

***Confidential Letter Agreement re: Sale of Assets of Franklin Data Ventures, Inc.***

Dear Mr. Avers:

This letter sets forth the terms of the confidential agreement ("Agreement") between **Veristar, LLC,** an Illinois Limited Liability Company, (the "Purchaser"), and **Franklin Data Ventures, Inc.,** a Texas Corporation, and **Nexem-Iconic, LLC,** a Georgia Limited Liability Company (collectively referred to as the "Seller"), comprising the purchase of certain operating assets and liabilities of the Seller which provides cloud hosting, cybersecurity and e-discovery services (the "Services"). The Purchaser and the Seller are each a "Party" and shall be collectively referred to as the "Parties" herein.

This Agreement shall become effective October 25, 2019 at 12:00 Midnight. (the "Closing"). In consideration for the purchase of the assets of Seller ("Purchased Assets") used to provide the Services to its clients (the "Business") described more fully below, the Parties agree as follows:

(a) ***Cash Payment at Closing:*** On October 25, 2019 Purchaser shall pay by wire transfer the sum of One Hundred Thousand US Dollars ($100,000) to Seller.

(b) ***Balloon Payment (0% interest) at end of 12 months Note:*** Purchaser will provide to Seller a balloon payment of Fifty Thousand Dollars ($50,000) on October, 25 2020 as per the terms of the Secured Balloon Payment Note attached as Exhibit "A" (the "Balloon Note"). The payment of $50,000 is contingent upon the Business generating gross revenue (as defined below) of at least $1,600,000 between November 1, 2019 and October 31, 2020. The Note shall be reduced proportionately if the revenue generated by the Business is less than $1,600,000. For example, if the revenue generated by the Business is $1,500,000, the Balloon Note payment to Seller shall be reduced by 1/16th.

(c) ***Promissory Note One:*** Purchaser will provide Seller with a Secured Promissory Note substantially in the form attached hereto as Exhibit "B" ("Note One"), in the principal amount of Nine-Hundred Fifty Thousand Dollars ($950,000) bearing an interest rate of four (4%) percent. Note One will have semi-annual payments in March and September according to the schedule below:

Exhibit 1 - Page 19

|  |  |  | Interest | Date of Payment |
|---|---|---|---|---|
| $950,000 | $79,167 | $870,833 | $19,000 | 3/1/2020 |
| $870,833 | $79,167 | $791,667 | $17,417 | 9/1/2020 |
| $791,667 | $79,167 | $712,500 | $15,833 | 3/1/2021 |
| $712,500 | $79,167 | $633,333 | $14,250 | 9/1/2021 |
| $633,333 | $79,167 | $554,167 | $12,667 | 3/1/2022 |
| $554,167 | $79,167 | $475,000 | $11,083 | 9/1/2022 |
| $475,000 | $79,167 | $395,833 | $9,500 | 3/1/2023 |
| $395,833 | $79,167 | $316,667 | $7,917 | 9/1/2023 |
| $316,667 | $79,167 | $237,500 | $6,333 | 3/1/2024 |
| $237,500 | $79,167 | $158,333 | $4,750 | 9/1/2024 |
| $158,333 | $79,167 | $79,167 | $3,167 | 3/1/2025 |
| $79,167 | $79,167 | $0 | $1,583 | 9/1/2025 |
|  | $950,000 |  |  |  |
|  |  |  | $123,500 |  |

**(d) *Growth Incentive*:** Within ten (10) days of November first of each year beginning in 2020, the Parties shall calculate the gross revenue of the Business. The "Gross Revenue" of the Business shall be calculated as the total gross sales generated by the Business less write-offs. If the following thresholds are met, Purchaser will pay the corresponding incentive payment to Seller beginning in on November 15, 2020:

    a. If Gross Revenue the first 12 months is $2,000,000 or more, then a $50,000 incentive is earned;

    b. If the Gross Revenue the second 12 months is $2,400,000 or more, then a $50,000 incentive is earned;

    c. If the Gross Revenue the third 12 months is $2,800,000 or more, then a $50,000 incentive is earned;

    d. If the Gross Revenue the fourth 12 months is $3,200,000 or more, then a $50,000 incentive is earned;

    e. If the Gross Revenue the fifth 12 months is $3,600,000 or more, then a $50,000 incentive is earned; and

    f. If the Gross Revenue the sixth 12 months is $4,000,000 or more, then a $50,000 incentive is earned

If the Gross Revenue generated from the Business during each twelve-month period is less than the minimum threshold above, Seller shall not earn an incentive payment for that period. The maximum incentive payout over the course of six years post closing (the "Incentive Eligibility Period") shall be capped at $300,000.

During the Incentive Eligibility Period, Purchaser shall use its best efforts to grow the Business and shall not divert prospective business opportunities to another person or entity or use resources of the Business (such as Relativity or the hosting environment) to the detriment of or in

competition with the Business. Purchaser shall use commercially reasonable means to maximize the profitability of the business when making expenditures for the operation of the business. The Parties understand and agree that if the Business does not have the technological ability to service a client's needs, an outside third party may be contracted by Purchaser and such conduct does not violate this section.

(e) ***Promissory Note Two:*** Purchaser will provide Seller or Seller's designee with a Secured Promissory Note substantially in the form attached hereto as Exhibit "C", in the principal amount of $426,664.14 at Closing bearing an interest rate of five and one half (5.5) percent and is payable in monthly installments of $7,053.79 on the 1st day of each month beginning on November 1, 2019 and continuing through August 1, 2025, unless earlier paid in full, in which case there will be no early payment penalties or further interested payment liabilities after the principal amount is paid. . These payments are contingent on Seller remitting the amount of these payments towards the debt it owes on an SBA note bearing the same principal and interest payments. A copy of the SBA note attached hereto as Exhibit "D". If Seller defaults on the SBA note, Seller must notify Purchaser of same and allow Purchaser, in its sole discretion, to assume the payments on this note to protect its interests.

(f) ***Assumption of Remaining Payments on Lan-Tech, LLC. Promissory Note and Earn-Out:*** Seller has disclosed to Purchaser that Lan-Tech, Inc., has a secured interest in the assets of Nexem-Iconic, LLC from a purchase agreement dated June 30, 2018. (the "LT Note"). Purchaser has agreed to assume the outstanding obligations owed by Nexem-Iconic, LLC to Lan-Tech, Inc., with respect to Promissory Note and to accurately calculate and pay the remaining quarterly Earn-out to Lan-Tech, LLC (the "Lan-Tech Obligations") as of the Closing until paid in full. Seller represents the following in connection with the Lan-Tech Obligations: (i) the payments of $3,290.35 per month on Lan-Tech Obligations are up to date as of the Closing; (ii) Lan-Tech has consented to the assumption; (iii) Exhibit "E" is a true and correct copy of Lan-Tech Promissory Note (Purchaser shall be responsible for $29,610.) and (iv) Exhibit "F" is a true and correct copy of the Earn-out obligation due to Lan-Tech and the formula for calculating the EBITDA for the quarterly payments. (Purchaser shall be responsible for the remaining Earn-Out of up to $42,283.53.)

(g) ***Maximum Payout:*** The maximum payout to Seller under this Agreement is $2,100,000. This includes: $100,000 cash at Closing; $50,000 balloon note at end of year 1; $950,000 promissory note and $123,500 interest on said promissory note,; Secured Promissory Note Two of approximately $500,000; the assumption of the Iconic note of approximately $32,000; the assumption of the Iconic earn-out of approximately $65,000; and Revenue Growth incentive of $300,000.

(h) ***Financial Reporting:*** Purchaser agrees to provide Seller with an accounting of the Gross Revenue of the Business each month no later than the fifteenth day of the following month. Purchaser shall provide Seller with access to the books and

3

Exhibit 1 - Page 21

records of the Business as requested at reasonable times and upon twenty-four hour's advance notice. If the Gross Revenue of the Business declines to less than $400,000 (cumulative) over a consecutive rolling one hundred twenty-day period of time, Purchaser shall have the right to repurchase the assets for the sum of $1.00 and which shall serve to extinguish any future obligations of Purchaser.

(i) *Consulting Agreement with Matthew W. Blake:* Matthew W. Blake may from time to time refer future business opportunities to Purchaser and the Parties may collaborate on new business ventures, mergers and/or acquisitions subject to mutual written agreement of the Parties.

(j) *Employment of Existing Employees:* Seller shall pay all of the Business's expenses through October 31, 2019, including the compensation to Seller's employees. Thereafter, Purchaser agrees to offer full-time employment to the following key employees of the Business: Todd Tabor, Ryan Schnieber, Scott Tarbell and Paul Renzulli. Purchaser agrees to offer employment to Henry Dicker and Gary Wellman through the end of 2019 in order to facilitate the transition of the Business. (Employment terms to be determined by Purchaser.)

(k) *Event of Default:* An event of Default shall occur if Purchaser (1) defaults on any of the obligation above, or (2) transfers, assigns, sells or otherwise divests any of the assets of the Business prior the satisfaction of all of Purchaser's obligations to Seller herein without the prior written consent of Seller which consent shall not be unreasonably withheld. Nothing herein shall be construed to prohibit Purchaser from pre-paying any financial obligation to Seller or Lan-Tech, Inc. If an event of default occurs, Seller must give written notice of same to Purchaser. Purchaser then has 10 business days to cure said default. If the event of Default after due notice and failure to cure, all payments hereunder shall be accelerated and become immediately due and payable without further order or notice.

At the time of Closing, Seller will sell, assign, transfer, convey and contribute to Purchaser, and Purchaser will purchase and accept from the Seller, all title and interest in the Purchased Assets, free and clear of all liens Except for the liens disclosed herein. Seller agrees to sign all documents and instruments, and otherwise take all steps reasonably requested to effectively convey good and marketable title of the Purchased Assets to Purchaser.

Purchased Assets shall include all tangible assets "as-is", and rights owned, held, or used in the conduct of the Business except for the property identified on Schedule "4", including: (i) inventory, equipment, servers, spare parts, operating supplies, furniture, fixtures, equipment, leasehold improvements (to the extent not fixtures attached to a leased premises), equipment under capital leases, computer equipment, and computer hardware, used or useable in, or relating to the Business as more fully identified on Schedule "1"; (ii) marketing, sales materials, price lists and forms used in the Business; and (iii) contracts with all clients and prospective clients of the Business, as fully listed on Schedule "2".

Purchased Assets shall also include the intangible assets listed on Schedule 3, including

4

Exhibit 1 - Page 22

without limitation: (i) the exclusive rights, title and interest in and to the intellectual property of the Business, including, but not limited to, logos, branding, marketing, the website URLs, copyrights, trademarks, business processes, methods of operations, manuals, forms, confidential information, and trade secrets; (ii) the exclusive right to use the names FRANKLIN DATA, FRANKLIN DATA VENTURES, FRANKLIN-SCARAB, ICONIC, and iPRESERVEIT (iii) the assignable software rights, work product, any other intangibles, to the extent they are legally assignable; (iv) all permits of the Seller used in connection with, or otherwise related to the Purchased Assets to the extent legally transferable or assignable to Purchaser; (v) the Purchased Assets as a going concern, and (vi) the goodwill of the Business.

Attachment "4" contains a list of contracts, property and intellectual property which is part of the Business or used in the Business which will be retained by the Seller at Closing or which belongs to a third-party and not subject to this Agreement.

Seller shall retain all cash-on-hand relating to the Business and all accounts receivable generated through October 31, 2019.

Except as otherwise agreed herein, expenses and liabilities of the Business incurred prior to the Closing will be paid by the Seller. Expenses and liabilities of the Business incurred after the Closing will be paid by the Purchaser. Third-party contracts, licenses and leases used in the Business which are being assumed by the Purchaser are identified on Schedule "5" ("Assumed Contracts"). Deposits and prepayments on Assumed Contracts will be returned to the Seller as soon as commercially reasonable but no later than 30 (thirty) days after the Closing.

Seller covenants, represents and warrants to Purchaser the following: (i) the Seller has all requisite power and authority to carry on the Business and to own and use the assets and property owned and used by it, including the Purchased Assets; (ii) the Seller has the consent of its board members and authority to execute and deliver this Agreement and to consummate the transaction; (iii) there are no other corporate proceedings on the part of the Seller or the Business necessary to approve and authorize the transaction; (iv) this Agreement has been duly executed and delivered by the Seller and constitutes a valid and binding agreement, enforceable against the Seller in accordance with its terms; (v) except where licensed from a third-party provider, Seller has good title to the Purchased Assets with full right to convey such property free and clear of all liens; (vi) seller has not assigned, pledged, encumbered, or otherwise transferred or purported to transfer to any person, firm, or corporation whatsoever, any of the Purchased Assets nor any rights, claims, or privileges to be transferred hereunder; and (vii) Seller is not currently under contract or other similar agreements regarding the sale of the Business or the Purchased Assets.

Seller has delivered to Purchaser certain books and records concerning the revenue generated by the Business ("Financial Records"). All Financial Records provided to Purchaser are complete, accurate, and not misleading in any material respect, and if Seller shall discover at any time that any of such financial records are not materially complete and accurate, or are misleading, then Seller shall promptly notify Purchaser in writing. Seller further represents that all Financial Records presented to Purchaser: (i) are in accordance with the Seller's books

and records; (ii) present fairly the financial position of the Business as of the times and for the periods referred to therein as to the revenue generated by the Business; and (iii) do not reflect any revenue other than from bona fide activities with customers of the Business in the ordinary course.

Schedule "2" contains an accurate and complete list of all the current clients and prospective clients of the Business. All contracts with the clients listed on Schedule "2" (each a "Client Contract") have arisen in the ordinary course of business with a valid, bona fide arrangement to undertake the Services contemplated therein. No Client Contract has been canceled or is subject to a breach by the other party which would materially affect the benefits to the Business under such contract, and the Seller has no knowledge of any anticipated or threatened breach by any other party to any Client Contract which would materially affect the benefits to the Purchased Assets under such contract; no customer has indicated in writing or orally to the Seller or any agent of the Seller that it shall stop or decrease the rate of business done with the Seller or that it desires to renegotiate its Client Contract on an adverse basis to the Seller; the Seller has performed its obligations in all respects required to be performed as or prior to the date hereof in connection with the Client Contracts and is not in default under or breach thereunder; the Seller has no present reasonable expectation or intention of non-performance of any obligation in any Client Contract; each Client Contract is a legal, valid, binding, enforceable obligation of the Seller and is in full force and effect and will continue as such following the consummation of the transactions contemplated hereby subject to any applicable consents relating to assignment to Purchaser; no unfilled customer order or commitment obligating the Seller to perform Services is likely to result in a loss on or after the Closing. Seller has no knowledge of any pending or threatened claim or demand by a client or vendor relating to the Business or the Purchased Assets.

The Seller represents it has not received any written communications during the past five (5) years of any infringement by the Seller relating to the Business (including inducing, contributory or vicarious infringement) of any Intellectual Property that is owned or licensed by any third-party. The Seller has all licenses or similar agreements or arrangements necessary for the conduct of the Business, either as licensee or licensor, for the Intellectual Property. Except as otherwise disclosed herein, with respect to each item of owned Intellectual Property relating to the Purchased Assets: (i) the Seller possesses right, title and interest in and to the item, free and clear of any lien; (ii) the item is in good standing and is not subject to any outstanding order, past due payment, decision or agreement in any restricting manner, including restricting the transfer, commercialization, enforcement or licensing thereof; (iii) no legal or administrative proceeding is pending or, to the Seller's knowledge, threatened, that challenges the legality, validity, enforceability of, or the Seller's ownership of or right to use or otherwise exploit, the item; and (iv) each such item is presently pending or in force in accordance with its terms. No license, sublicense, covenant, agreement, or permission has been granted or entered into by the Seller to any third-party other than Purchaser with respect of any item of owned Intellectual Property.

The Seller represents it has paid, or will pay, all taxes, fees, levies, duties, charges or other like assessments of any kind whatsoever applicable to the Business or the Purchased Assets, and will pay when due through the Closing all taxes relating to operation of the

6

Exhibit 1 - Page 24

Business accrued prior to Closing or as negotiated with the taxing authority. There are no liens for taxes on any of the Purchased Assets. There are no pending or to the Seller's knowledge threatened proceedings against the Purchased Assets with respect to taxes. With respect to any periods for which tax returns have not yet been required to be filed or for which taxes are not yet due and payable and other than with respect to the transaction contemplated in this Agreement, the Seller has only incurred liabilities for taxes in the ordinary course of the Business and in a manner and at a level consistent with prior periods. The tax returns due on behalf of the Business due after the Closing shall be prepared and filed by Seller, and shall be consistent in all respects with past practices. No audits or other proceedings are ongoing or, to the Seller's knowledge, threatened with respect to any taxes. Purchaser is not assuming any of Seller's Benefit Plans or Benefit Plan obligations and Seller agrees to undertake the requisite actions satisfy all legal duties relative to the closure or satisfaction of its obligations relating to its Benefit Plans.

The Purchaser covenants, represents and warrants to Seller the following: Purchaser is a duly licensed Illinois Limited Liability Corporation validly existing and in good standing under the laws of Illinois. The Purchaser has all requisite power and authority to acquire and operate the Business and to own and use the Purchased Assets. The Purchaser has full corporate power and authority to execute and deliver this Agreement and other transaction documents and to consummate the Agreement. The board of directors of Purchaser has duly authorized the execution and delivery of this Agreement and all other transaction documents to which the Purchaser is a Party and the consummation of the Agreement (including the purchase of the Purchased Assets), and no other corporate proceedings on the part of the Purchaser are necessary to approve and authorize the transaction. This Agreement has been duly executed and delivered by the Purchaser, enforceable against the Purchaser in accordance with its terms.

Neither the execution, delivery or performance of this Agreement by Purchaser nor the consummation by Purchaser of the transactions nor compliance as and when due with any of the provisions of this Agreement shall (i) conflict with or result in any breach of any provision of Purchaser's Articles of Incorporation and Bylaws or (ii) result in a violation or breach of, or constitute a default under, any of the terms, conditions or provisions of any agreement or other instrument or obligation to which Purchaser is a Party or by which Purchaser or any of Purchaser's properties or assets may be bound or an event that would, with notice or lapse of time or both, constitute such a default.

As an inducement to Purchaser to enter into this Agreement, Matthew Blake agrees that, for a period of two (2) years following the Closing, neither he nor any officer, director or shareholder of any business, trust, entity or organization he owns, controls or has an interest (other than a publicly traded Seller), shall engage, directly or indirectly (except in conjunction with the activities of Purchaser) in: (i) the sales of cloud hosting, cybersecurity or e-discover services, including activities, or marketing or selling products or services that are competitive with the services or are otherwise of the type conducted, authorized, offered, or provided by the Business; (ii) any business operations which compete with the Business.

Matthew Blake further agrees that, for a period of two (2) years following the Closing, neither he nor any officer, director or shareholder of any business, trust, entity or organization

Exhibit 1 - Page 25

he owns, controls or has an interest (other than a publicly traded Seller), shall solicit any clients of the Business, nor solicit, recruit, or attempt to hire employees or independent contractors or consultants, either previously engaged by the Business in the past two years or then engaged by the Purchaser, nor offer employment to or otherwise encourage employees or independent contractors or consultants to leave their employment with the Purchaser.

The foregoing covenants are not intended to and do not apply to services provided by Matthew Blake in connection with serving in the capacity of an expert witness in a litigation matter.

The Seller and Purchaser agree that they will not disparage (i) one another or their affiliates, nor their officers, employees, independent contractors or consultants, nor (ii) the products or services of, or methods or techniques of doing business.

Purchaser does hereby agree for itself, its successors, and assigns, to jointly and severally indemnify, defend, and save Seller, its agents, officers, successors and assigns, harmless from and against (i) any and all claims, judgments, damages, settlements, losses, liabilities, costs and expense, including attorney's fees and disbursements, whenever asserted, in connection with the Business or the Purchased Assets with respect to actions, events or circumstances arising after the Closing except where otherwise agreed herein; (ii) any claims, judgments, liabilities, costs, expenses, attorney's fees or demands relative to the obligations owing to Lan-Tech, LLC under the assumed Promissory Note Two and the Earn-Out; and (iii) any material breach or non-fulfillment of a representation, warranty or covenant in this Agreement.

The Seller hereby agrees for itself, its successors, and assigns, to jointly and severally indemnify, defend, and save Purchaser, its agents, officers, successors and assigns, harmless from and against (i) any and all claims, judgments, damages, settlements, losses, liabilities, costs and expense, including attorney's fees and disbursements, whenever asserted, in connection with the Business or the Purchased Assets with respect to actions, events or circumstances arising on or prior to the Closing except where otherwise agreed herein; and (ii) any material breach or non-fulfillment of a representation, warranty or covenant in this Agreement.

Each Party hereto shall bear its own expenses in connection with the completion of the transactions contemplated herein. Neither Party is represented by any brokers nor is a finder's fee involved with this transaction, the sale of assets, or acquisition of the Purchased Assets generally.

This Agreement shall be governed by and construed in accordance with the laws of the State of California without regard to any otherwise applicable choice of laws principles and rules. Any legal suit, action or proceeding arising out of or based upon this Agreement or the transactions contemplated hereby may be instituted in the federal courts of the United States of America or the courts of the State of California in each case located in Orange County, California and each Party irrevocably submits to the exclusive jurisdiction of such courts in any such suit, action or proceeding.

If a Party to this Agreement is required to bring any proceeding to enforce any of the terms hereof or to obtain a declaration of the parties' respective rights and obligations hereunder, the prevailing Party shall be entitled to recover and the non-prevailing Party shall pay to the prevailing Party all attorneys' fees and expenses incurred by that Party in connection with that proceeding plus interest on past due payments, where applicable, at a rate of ten (10) percent per annum in addition to any other available relief.

It is understood and agreed that money damages would not necessarily be a sufficient remedy for any breach by a Party or any of their respective affiliates, subsidiaries, directors, officers, employees, representatives or agents. The Parties shall therefore be entitled to obtain equitable relief, including an injunction or specific performance, as a remedy for any such breach in accordance with the terms hereof without the necessity of posting any bond. Such remedies shall not be deemed to be the exclusive remedies for a breach hereof but shall be in addition to all other remedies available at law or equity.

Both Parties agree to keep the terms of this Agreement confidential, and agree not to disclose this Agreement or any its terms to any third parties except to lenders, investors, counsel, accountants and financial advisers as may be necessary to operate the Business, consummate the terms of this Agreement or as required by law. Notwithstanding the foregoing, Purchaser may authorize disclosure of the existence of an agreement without divulging any monetary terms for the purpose of transitioning clients and vendor contracts to the new owner.

This Agreement sets forth the entire agreement between the parties and fully supersedes any and all prior agreements or understandings, written or oral, between the parties pertaining to the subject matter of this Agreement.

This Agreement may be executed in several counterparts and by facsimile or PDF signature, all of which taken together constitute a single agreement between the parties. Each signed counter-part, including a signed counterpart reproduced by reliable means (including facsimile and PDF), will be considered as legally effective as an original signature.

This Agreement, the Promissory Notes and all other financial obligations may not be assigned, changed, amended, terminated, augmented, rescinded or discharged (other than by performance), in whole or in part, except by a writing executed by the Parties hereto, or their legal successors. No waiver of any of the provisions or conditions of this Agreement or any of the rights of a Party hereto shall be effective or binding unless such waiver shall be in writing and signed by the Party claimed to have given same or consented thereto.

Should any provision of this Agreement be declared or be determined by any court of competent jurisdiction to be illegal, invalid, or unenforceable, the legality, validity and enforceability of the remaining parts, terms, or provisions shall not be affected, and the illegal, unenforceable, or invalid part, term or provision shall be deemed not to be a part of this Agreement.

This Agreement shall be interpreted in accordance with the plain meaning of its terms

9

Exhibit 1 - Page 27

and not strictly for or against any of the Parties to this Agreement. The parties acknowledge and agree for purposes of such construction, each has equally participated in the process of crafting the language of this Agreement.  In the event an ambiguity or question of intent or interpretation arises, this Agreement shall be construed as if drafted jointly by the Parties hereto, who have each consulted their own counsel, and no presumption or burden of proof shall arise favoring or disfavoring any Party by virtue of the authorship of any of the provisions of this Agreement.

After Closing, both Parties agree to cooperate to execute any other agreements or documents and/or to take such further actions which may be reasonably necessary in order to effectuate the consummation of the transactions contemplated by this Agreement.  All representations, warranties, covenants and agreements contained in this Agreement and all related rights to indemnification shall survive the Closing.

This Agreement shall be binding upon and shall inure to the benefit of the Parties and their legal heirs and approved successors and assigns.

Signed and Agreed,

**Matthew W. Blake**
**President of Franklin Data Ventures, Inc. and Nexem-Iconic, LLC**

Signed and Agreed on October 25, 2019.

**Veristar, LLC**

By: Rick Avers
Its:  Manager

| | |
|---|---|
| Ex. A | Balloon Note 1 |
| Ex. B | Promissory Note, Security Agreement, Amort. Sched 1 |
| Ex. C | Promissory Note, Security Agreement, Amort. Sched 2 |
| Ex. D | SBA Note |
| Ex. E | Lan Tech Promissory Note 2 |
| Ex. F | Lan Tech Earn Out Obligation and payment calculation |
| Schedule 1 | Inventory and Equipment |
| Schedule 2 | Client List and Prospect List |
| Schedule 3 | Intellectual Property List |
| Schedule 4 | Property Retained by Seller at Closing |
| Schedule 5 | Assumed Third-Party Contracts |

10

Exhibit 1 - Page 28

## EXHIBIT "A"

## SECURED BALLOON NOTE

$50,000

October 25, 2019

FOR VALUE RECEIVED, **VERISTAR, LLC** ("Maker"), promises to pay **FRANKLIN DATA VENTURES, INC.,** ("Payee"), at 4100 MacArthur Blvd., Suite 150, Newport Beach, CA 92660, or at such other place as may be designated in writing by Payee, the principal sum of ($50,000) subject to certain contingencies and adjustments as more fully detailed in the Asset Purchase Agreement (the "APA") between Maker and Payee dated October 25, 2019.

1.     <u>Payment.</u>  Upon fulfillment of the contingencies and subject to the adjustments specified in the APA, Maker shall pay Payee the sum of $50,000 on or before October 25, 2020.

2.     <u>Security and Recourse</u>.  Maker executes contemporaneously with this Note the Security Agreement in the form attached and incorporated herein by reference (the "Security Agreement").

3.     <u>Default and Acceleration</u>.  At Payee's option, the full principal balance shall, upon notice and demand to Maker, become due and payable and may be collected immediately, time being of the essence of this Note, upon the occurrence of one or more of the events listed below (each a "Default"):

(a)     The filing by Maker of a voluntary petition or any answer seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code of 1978, 11 U.S.C., Section 1091 et. seq., as hereafter amended (the "Bankruptcy Code"), or under any other insolvency act or law, state or federal, now or hereafter existing or any other action of Maker indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by Maker for, the appointment by consent or acquiescence of, a custodian, receiver or trustee for all or a substantial part of Maker's property; or

(b)     If Maker makes any assignment for the benefit of its creditors; or

(c)     The filing of an involuntary petition against Maker seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code, or under any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a custodian, receiver or trustee for all or a substantial part of Maker's property; the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and either (i) the continuance of any of such events for sixty (60) days undismissed, undischarged or unbonded, or (ii) within such sixty (60) day period, the entry of any order for relief under the Bankruptcy Code in any such case or proceeding.

(d)     If Maker sells, transfers or assigns the any of the assets which are the subject of the APA to a third-party without the written consent of Payee.

(e)     If Maker closes or liquidates its business for any reason.

1

Exhibit 1 - Page 29

sixty (60) days undismissed, undischarged or unbonded, or (ii) within such sixty (60) day period, the entry of any order for relief under the Bankruptcy Code in any such case or proceeding.

     (e)     If Maker sells, transfers or assigns the any of the assets which are the subject of the Asset Purchase Agreement to a third-party without the written consent of Payee.

     (f)     If Maker closes or liquidates its business for any reason.

Upon any such event of Default, Payee shall be entitled to exercise the rights and remedies available to it at law and equity as set forth in this Note and the Security Agreement.

     4.     <u>Prepayment</u>.  Maker may prepay this Note in whole or in part at any time without premium or penalty. Any payments shall first be applied to accrued and unpaid interest. Any excess prepayments in advance of any principal will be applied to reduce the outstanding principal amount of this Note.

     5.     <u>Notice and Demand; Default Interest; Attorneys' Fees</u>.  Maker waives demand, protest and notice of demand, protest and nonpayment of this Note except as expressly provided herein.  In the event this Note is collected by legal action through an attorney at law, costs of collection, including reasonable attorney's fees, shall be paid by Maker, not to exceed ten percent (10%) of the outstanding principal balance at the time of Default.

     6.     <u>No Waiver</u>.  The failure of Payee in one or more instances to insist upon strict compliance by Maker with the terms of this Note, or indulgence granted from time to time, shall not constitute a waiver by Payee of any term or right hereunder or otherwise impair or limit the rights of Payee hereunder.

     7.     <u>Notices</u>.  All notices, demands or other communications of any type required or permitted under this Note shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item, return receipt requested, to the addresses specified below.  The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing Notice are as follows:

**Maker:**

Veristar, LLC
9501 W. 144th Place
Orland Park, IL 60462
Attn: Rick Avers

**Payee:**

Franklin Data Ventures, Inc.,
4100 MacArthur Blvd. Suite 150
Newport Beach, CA 92660
ATTN:  Matthew W. Blake

2

Exhibit 1 - Page 30

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with Federal Express or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein. Either party hereto may change the address for notice specified above by notice given as provided herein to the other party.

8.    <u>Binding Effect</u>.  This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of Payee, its heirs, successors and assigns.  This Note may be transferred or assigned at the discretion of Payee

9.    <u>Governing Law and Jurisdiction</u>.  This Note shall be construed and enforced in accordance with the laws of the State of California and Maker agrees that any controversy surrounding this Note shall be resolved before the Courts in the County of Orange, State of California.

IN WITNESS WHEREOF, the Maker has set its hand and seal, all as of the date first set forth above.

Maker:

Veristar, LLC

By:  _____
     Rick Avers
     Its:  Manager

3

Exhibit 1 - Page 31

**EXHIBIT "B"**

**SECURED PROMISSORY NOTE**

$950,000                                                                                     October 25, 2019

FOR VALUE RECEIVED, **VERISTAR, LLC** ("Maker"), promises to pay **FRANKLIN DATA VENTURES, INC.,** ("Payee"), at 4100 MacArthur Blvd., Suite 150, Newport Beach, CA 92660, or at such other place as may be designated in writing by Payee, the principal sum of NINE HUNDRED AND FIFTY THOUSAND DOLLARS ($950,000.00).

1.     Payment.  Maker shall make ten semi-annual payments on this Promissory Note (the "Note") of principal and interest at a rate of four (4) percent per annum on March 1 and September 1 of each year for five (5) years.  The payments shall be Seventy-Nine Thousand One Hundred Sixty-Seven Dollars ($79,167) plus interest as scheduled in Section (c) of the Asset Purchase Agreement between Maker and Payee dated October 25, 2019 ("Asset Purchase Agreement") and shall commence on March 1, 2020 and continue thereafter through September 1, 2025 (the "Maturity Date") unless earlier paid in full.

2.     Security and Recourse.  Maker executes contemporaneously with this Note the Security Agreement in the form attached and incorporated herein by reference (the "Security Agreement").

3.     Default and Acceleration.  At Payee's option, the full remaining principal balance shall, upon notice and demand to Maker, become due and payable and may be collected immediately, time being of the essence of this Note, upon the occurrence of one or more of the events listed below (each a "Default"):

(a)     If Maker fails to pay any installment when due hereunder, and such default in payment continues for a period of more than thirty (30) days after written notice from Payee of such default; or

(b)     The filing by Maker of a voluntary petition or any answer seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code of 1978, 11 U.S.C., Section 1091 et. seq., as hereafter amended (the "Bankruptcy Code"), or under any other insolvency act or law, state or federal, now or hereafter existing or any other action of Maker indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by Maker for, the appointment by consent or acquiescence of, a custodian, receiver or trustee for all or a substantial part of Maker's property; or

(c)     If Maker makes any assignment for the benefit of its creditors; or

(d)     The filing of an involuntary petition against Maker seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code, or under any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a custodian, receiver or trustee for all or a substantial part of Maker's property; the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and either (i) the continuance of any of such events for

1

Exhibit 1 - Page 32

      (e)     If Maker sells, transfers or assigns the any of the assets which are the subject of the Asset Purchase Agreement between Maker and Payee dated October 25, 2019 to a third-party without the written consent of Payee.

      (f)     If Maker closes or liquidates its business for any reason.

Upon any such event of Default, Payee shall be entitled to exercise the rights and remedies available to it at law and equity as set forth in this Note and the Security Agreement.

      6.    <u>Prepayment</u>. Maker may prepay this Note in whole or in part at any time without premium or penalty. Any payments shall first be applied to accrued and unpaid interest. Any excess prepayments in advance of any principal will be applied to reduce the outstanding principal amount of this Note.

      7.    <u>Notice and Demand; Default Interest; Attorneys' Fees</u>. Maker waives demand, protest and notice of demand, protest and nonpayment of this Note except as expressly provided herein. In the event this Note is collected by legal action through an attorney at law, costs of collection, including reasonable attorney's fees, shall be paid by Maker, not to exceed ten percent (10%) of the outstanding principal balance at the time of Default.

      8.    <u>No Waiver</u>. The failure of Payee in one or more instances to insist upon strict compliance by Maker with the terms of this Note, or indulgence granted from time to time, shall not constitute a waiver by Payee of any term or right hereunder or otherwise impair or limit the rights of Payee hereunder.

      9.    <u>Notices</u>. All notices, demands or other communications of any type required or permitted under this Note shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item, return receipt requested, to the addresses specified below. The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing Notice are as follows:

**Maker:**

Veristar, LLC
9501 W. 144th Place
Orland Park, IL 60462
Attn: Rick Avers

**Payee:**

Franklin Data Ventures, Inc.,
4100 MacArthur Blvd. Suite 150
Newport Beach, CA 92660
ATTN: Matthew W. Blake

2

Exhibit 1 - Page 33

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with Federal Express or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein. Either party hereto may change the address for notice specified above by notice given as provided herein to the other party.

     10.    <u>Binding Effect</u>.  This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of Payee, its heirs, successors and assigns.  This Note may be transferred or assigned at the discretion of Payee

     11.    <u>Governing Law and Jurisdiction</u>.  This Note shall be construed and enforced in accordance with the laws of the State of California and Maker agrees that any controversy surrounding this Note shall be resolved before the Courts in the County of Orange, State of California.

IN WITNESS WHEREOF, the Maker has set its hand and seal, all as of the date first set forth above.

                      Maker:

                      Veristar, LLC

                      By:    _____
                              Rick Avers
                              Its:  Manager

3

Exhibit 1 - Page 34

## EXHIBIT "C"

## SECURED PROMISSORY NOTE TWO

$426,664.14                                                    October 25, 2019

FOR VALUE RECEIVED, **VERISTAR, LLC** ("Maker"), promises to pay **FRANKLIN DATA VENTURES, INC.,** ("Payee"), at 4100 MacArthur Blvd., Suite 150, Newport Beach, CA 92660, or at such other place as may be designated in writing by Payee, the principal sum of ($426,664.14).

1.      Payment.   Maker shall make monthly payments on this Promissory Note (the "Note") of principal and interest at a rate of five and one-half (5.5) percent per annum on the first day of each month in the sum Seven Thousand Fifty-Three and .79 Dollars ($7,053.79) commencing on November 1, 2019 and continuing thereafter through August 1, 2025 (the "Maturity Date") unless earlier paid in full.

4.      Security and Recourse.  Maker executes contemporaneously with this Note the Security Agreement in the form attached and incorporated herein by reference (the "Security Agreement").

5.      Default and Acceleration.   At Payee's option, the full remaining principal balance shall, upon notice and demand to Maker, become due and payable and may be collected immediately, time being of the essence of this Note, upon the occurrence of one or more of the events listed below (each a "Default"):

(a)      If Maker fails to pay any installment when due hereunder, and such default in payment continues for a period of more than thirty (30) days after written notice from Payee of such default; or

(b)      The filing by Maker of a voluntary petition or any answer seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code of 1978, 11 U.S.C., Section 1091 et. seq., as hereafter amended (the "Bankruptcy Code"), or under any other insolvency act or law, state or federal, now or hereafter existing or any other action of Maker indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by Maker for, the appointment by consent or acquiescence of, a custodian, receiver or trustee for all or a substantial part of Maker's property; or

(c)      If Maker makes any assignment for the benefit of its creditors; or

(d)      The filing of an involuntary petition against Maker seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code, or under any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a custodian, receiver or trustee for all or a substantial part of Maker's property; the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and either (i) the continuance of any of such events for sixty (60) days undismissed, undischarged or unbonded, or (ii) within such sixty (60) day period, the entry of any order for relief under the Bankruptcy Code in any such case or proceeding.

1

Exhibit 1 - Page 35

Upon any such event of Default, Payee shall be entitled to exercise the rights and remedies available to it at law and equity as set forth in this Note and the Security Agreement.

4.  <u>Prepayment</u>.  Maker may prepay this Note in whole or in part at any time without premium or penalty. Any payments shall first be applied to accrued and unpaid interest. Any excess prepayments in advance of any principal will be applied to reduce the outstanding principal amount of this Note.

5.  <u>Notice and Demand; Default Interest; Attorneys' Fees</u>.  Maker waives demand, protest and notice of demand, protest and nonpayment of this Note except as expressly provided herein.  In the event this Note is collected by legal action through an attorney at law, costs of collection, including reasonable attorney's fees, shall be paid by Maker, not to exceed ten percent (10%) of the outstanding principal balance at the time of Default.

6.  <u>No Waiver</u>.  The failure of Payee in one or more instances to insist upon strict compliance by Maker with the terms of this Note, or indulgence granted from time to time, shall not constitute a waiver by Payee of any term or right hereunder or otherwise impair or limit the rights of Payee hereunder.

7.  <u>Notices</u>.  All notices, demands or other communications of any type required or permitted under this Note shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item, return receipt requested, to the addresses specified below. The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing Notice are as follows:

**Maker:**

Veristar, LLC
9501 W. 144th Place
Orland Park, IL 60462
Attn: Rick Avers

**Payee:**

Franklin Data Ventures, Inc.,
4100 MacArthur Blvd. Suite 150
Newport Beach, CA 92660
ATTN: Matthew W. Blake

2

Exhibit 1 - Page 36

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with Federal Express or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein. Either party hereto may change the address for notice specified above by notice given as provided herein to the other party.

      8.    <u>Binding Effect</u>.  This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of Payee, its heirs, successors and assigns.  This Note may be transferred or assigned at the discretion of Payee

      9.    <u>Governing Law and Jurisdiction</u>.  This Note shall be construed and enforced in accordance with the laws of the State of California and Maker agrees that any controversy surrounding this Note shall be resolved before the Courts in the County of Orange, State of California.

IN WITNESS WHEREOF, the Maker has set its hand and seal, all as of the date first set forth above.

                    Maker:

                    Veristar, LLC

                    By:    _____
                              Rick Avers
                              Its:  Manager

Exhibit 1 - Page 37

## EXHIBIT "D"

SBA Promissory Note

1

Exhibit 1 - Page 38



200199447377300650

# PROMISSORY NOTE

| Principal | Loan Date | Maturity | Loan No | Call / Coll | Account | Officer | Initials |
|---|---|---|---|---|---|---|---|
| $625,200.00 | 08-25-2015 | 08-25-2025 | | | | | |

References in the boxes above are for Lender's use only and do not limit the applicability of this document to any particular loan or item.
Any item above containing "****" has been omitted due to text length limitations.

**Borrower:** FRANKLIN DATA, LLC
1382 W 9th St Ste 400
Cleveland, OH  44113

**Lender:** Wells Fargo Bank, National Association
SBA Lending
121 S. Market Street, 7th Floor
San Jose, CA  95113

**Principal Amount: $625,200.00**                    **Date of Note: August 25, 2015**

**PROMISE TO PAY.** FRANKLIN DATA, LLC ("Borrower") promises to pay to Wells Fargo Bank, National Association ("Lender"), or order, in lawful money of the United States of America, the principal amount of Six Hundred Twenty-five Thousand Two Hundred & 00/100 Dollars ($625,200.00), together with interest on the unpaid principal balance from August 25, 2015, until paid in full.

**PAYMENT.** Borrower will pay this loan in accordance with the following payment schedule, which calculates interest on the unpaid principal balances as described in the "INTEREST CALCULATION METHOD" paragraph using the interest rates described in this paragraph: 6 monthly consecutive interest payments, beginning October 15, 2015, with interest calculated on the unpaid principal balances using an interest rate of 5.500% per annum; 113 monthly consecutive principal and interest payments of $7,053.79 each, beginning April 15, 2016, with interest calculated on the unpaid principal balances using an interest rate of 5.500% per annum; and one principal and interest payment of $7,031.12 on August 25, 2025, with interest calculated on the unpaid principal balances using an interest rate of 5.500% per annum. This estimated final payment is based on the assumption that all payments will be made exactly as scheduled; the actual final payment will be for all principal and accrued interest not yet paid, together with any other unpaid amounts under this Note. Unless otherwise agreed or required by applicable law, payments will be applied first to any accrued unpaid interest; then to principal; and then to any late charges. Borrower will pay Lender at Lender's address shown above or at such other place as Lender may designate in writing.

**INTEREST CALCULATION METHOD.** Interest on this Note is computed on a 365/365 simple interest basis; that is, by applying the ratio of the interest rate over the number of days in a year (366 during leap years), multiplied by the outstanding principal balance, multiplied by the actual number of days the principal balance is outstanding. All interest payable under this Note is computed using this method.

**PREPAYMENT FEE.** Upon prepayment of this Note, Lender is entitled to the following prepayment fee: When in any one of the first three years from the date of initial disbursement Borrower voluntarily prepays more than 25% of the outstanding principal balance of the loan, Borrower must pay to Lender on behalf of SBA a prepayment fee for that year as follows:

a. During the first year after the date of initial disbursement, 5% of the total prepayment amount;
b. During the second year after the date of initial disbursement, 3% of the total prepayment amount; and
c. During the third year after the date of initial disbursement, 1% of the total prepayment amount. Except for the foregoing, Borrower may pay all or a portion of the amount owed earlier than it is due. Early payments will not, unless agreed to by Lender in writing, relieve Borrower of Borrower's obligation to continue to make payments under the payment schedule. Rather, early payments will reduce the principal balance due and may result in Borrower's making fewer payments. Borrower agrees not to send Lender payments marked "paid in full", "without recourse", or similar language. If Borrower sends such a payment, Lender may accept it without losing any of Lender's rights under this Note, and Borrower will remain obligated to pay any further amount owed to Lender. All written communications concerning disputed amounts, including any check or other payment instrument that indicates that the payment constitutes "payment in full" of the amount owed or that is tendered with other conditions or limitations or as full satisfaction of a disputed amount must be mailed or delivered to: Wells Fargo Bank, National Association, BBG-Winston-Salem Loan Ops Center, MAC #D4004-03D, Attn:  Accounting, 401 Linden Street, 3rd Floor Winston Salem, NC 27101-4157.

**LATE CHARGE.** If a payment is 10 days or more late, Borrower will be charged 5.000% of the unpaid portion of the regularly scheduled payment.

**INTEREST AFTER DEFAULT.** Upon default, the total sum due under this Note will continue to accrue interest at the interest rate under this Note, with the final interest rate described in this Note applying after maturity, or after maturity would have occurred had there been no default.

**DEFAULT.** Each of the following shall constitute an event of default ("Event of Default") under this Note:

**Payment Default.** Borrower fails to make any payment when due under this Note.

**Other Defaults.** Borrower fails to comply with or to perform any other term, obligation, covenant or condition contained in this Note or in any of the related documents or to comply with or to perform any term, obligation, covenant or condition contained in any other agreement between Lender and Borrower.

**Default in Favor of Third Parties.** Borrower or any Grantor defaults under any loan, extension of credit, security agreement, purchase or sales agreement, or any other agreement, in favor of any other creditor or person that may materially affect any of Borrower's property or Borrower's ability to repay this Note or perform Borrower's obligations under this Note or any of the related documents.

**False Statements.** Any warranty, representation or statement made or furnished to Lender by Borrower or on Borrower's behalf under this Note or the related documents is false or misleading in any material respect, either now or at the time made or furnished or becomes false or misleading at any time thereafter.

**Death or Insolvency.** The dissolution of Borrower (regardless of whether election to continue is made), any member withdraws from Borrower, or any other termination of Borrower's existence as a going business or the death of any member, the insolvency of Borrower, the appointment of a receiver for any part of Borrower's property, any assignment for the benefit of creditors, any type of creditor workout, or the commencement of any proceeding under any bankruptcy or insolvency laws by or against Borrower.

**Creditor or Forfeiture Proceedings.** Commencement of foreclosure or forfeiture proceedings, whether by judicial proceeding, self-help, repossession or any other method, by any creditor of Borrower or by any governmental agency against any collateral securing the loan. This includes a garnishment of any of Borrower's accounts, including deposit accounts, with Lender. However, this Event of Default shall not apply if there is a good faith dispute by Borrower as to the validity or reasonableness of the claim which is the basis of the creditor or

Exhibit 1 - Page 39

# PROMISSORY NOTE
## (Continued)

Page 2

forfeiture proceeding and if Borrower gives Lender written notice of the creditor or forfeiture proceeding and deposits with Lender monies or a surety bond for the creditor or forfeiture proceeding, in an amount determined by Lender, in its sole discretion, as being an adequate reserve or bond for the dispute.

**Events Affecting Guarantor.** Any of the preceding events occurs with respect to any Guarantor of any of the indebtedness or any Guarantor dies or becomes incompetent, or revokes or disputes the validity of, or liability under, any guaranty of the indebtedness evidenced by this Note.

**Adverse Change.** A material adverse change occurs in Borrower's financial condition, or Lender believes the prospect of payment or performance of this Note is impaired.

**Insecurity.** Lender in good faith believes itself insecure.

**LENDER'S RIGHTS.** Upon default, Lender may declare the entire unpaid principal balance under this Note and all accrued unpaid interest immediately due, and then Borrower will pay that amount.

**ATTORNEYS' FEES; EXPENSES.** Lender may hire or pay someone else to help collect this Note if Borrower does not pay. Borrower will pay Lender that amount. This includes, subject to any limits under applicable law, Lender's attorneys' fees and Lender's legal expenses, whether or not there is a lawsuit, including attorneys' fees, expenses for bankruptcy proceedings (including efforts to modify or vacate any automatic stay or injunction), and appeals. Borrower also will pay any court costs, in addition to all other sums provided by law.

**GOVERNING LAW.** This Note will be governed by federal law applicable to Lender and, to the extent not preempted by federal law, the laws of the State of California without regard to its conflicts of law provisions. This Note has been accepted by Lender in the State of California.

**COLLATERAL.** Borrower acknowledges this Note is secured by the following collateral described in the security instruments listed herein:

(A)  a Deed of Trust dated August 25, 2015, to a trustee in favor of Lender on real property located in Orange County, State of California. That agreement contains the following due on sale provision: Lender may, at Lender's option, declare immediately due and payable all sums secured by the Deed of Trust upon the sale or transfer, without Lender's prior written consent, of all or any part of the Real Property, or any interest in the Real Property. A "sale or transfer" means the conveyance of Real Property or any right, title or interest in the Real Property; whether legal, beneficial or equitable; whether voluntary or involuntary; whether by outright sale, deed, installment sale contract, land contract, contract for deed, leasehold interest with a term greater than three (3) years, lease-option contract, or by sale, assignment, or transfer of any beneficial interest in or to any land trust holding title to the Real Property, or by any other method of conveyance of an interest in the Real Property. If any Borrower is a corporation, partnership or limited liability company, transfer also includes any change in ownership of more than twenty-five percent (25%) of the voting stock, partnership interests or limited liability company interests, as the case may be, of such Borrower. However, this option shall not be exercised by Lender if such exercise is prohibited by applicable law.

(B)  inventory, chattel paper, accounts, equipment and general intangibles described in a Commercial Security Agreement dated August 25, 2015.

**PAYMENT DUE DATE DEFERRAL.** Payment invoices will be sent on a date (the "billing date") which is prior to each payment due date. If this Note is booked near or after the billing date for the first scheduled payment, Lender may, in its sole discretion, defer each scheduled payment date and/or the maturity date by one or more months.

**FINANCIAL INFORMATION.** All information furnished by Borrower to Lender in connection with the application for credit was true and accurate in every material respect as of the date the information was furnished, and no material facts were omitted so as to make the information incomplete or misleading. There has been no material adverse change to Borrower's financial condition since the date of the most recent submitted statement. Borrower agrees to provide to Lender, upon request, financial statements prepared in a manner and form acceptable to Lender, and copies of such tax returns and other financial information and statements as may be requested by Lender. Financial statements and tax returns submitted to Lender shall be signed and dated by Borrower and any other party preparing such financial statements or tax returns, or otherwise authenticated to Lender's satisfaction. Each financial statement shall give an accurate and complete picture of Borrower's financial condition as of the statement's date, with ownership accurately reflected. Borrower shall also furnish such other information regarding Borrower (and Borrower's general partners or members, if any), Borrower's business operations, the Collateral, and the use of loan proceeds as may be requested by Lender. Borrower warrants that all financial statements and information provided to Lender are and will be accurate, correct and complete. Borrower will permit Lender and Lender's agents and contractors to examine, audit and copy Borrower's books, accounts, records (including electronic records), and computer software programs used to generate the records, including any records in the possession of a third party, at any reasonable time upon request, and will provide to Lender copies of any records Lender requests, all at no cost to Lender.

**LINE ADVANCES.** Notwithstanding anything to the contrary, requests for advances communicated to any office of Lender by any person believed by Lender in good faith to be authorized to make the request, whether written, verbal, telephonic or electronic, may be acted upon by Lender, and Borrower will be liable for sums advanced by Lender pursuant to such request. Such requests for advances shall be deemed authorized by Borrower, and Lender shall not be liable for such advances made in good faith, and with respect to advances deposited to the credit of any deposit account of Borrower, such advances, when so deposited, shall be conclusively presumed to have been made to or for the benefit of Borrower regardless of the fact that persons other than those authorized to request advances may have authority to draw against such account.

Lender may in its discretion allow Borrower to request and receive advances even if applicable loan conditions are not satisfied, and/or the advance results in violation of loan agreements or covenants, and even though the advance may cause the principal balance to exceed the maximum principal amount of the Note. In such cases, Lender shall not be deemed to have waived such loan conditions, requirements or covenants, and Lender may strictly enforce all such loan conditions, requirements and covenants at any time in its discretion. If at any time the outstanding balance of the Note should exceed the maximum principal amount available to Borrower under the Note, then Lender may require Borrower to immediately make a payment in an amount sufficient to reduce the principal balance to an amount which does not exceed said maximum principal amount.

Borrower agrees to indemnify and hold Lender harmless from and against all damages, liabilities, costs and expenses (including attorney's fees) arising out of any claim by Borrower or any third party against Lender in connection with Lender's performance of advances as described above.

**CREDIT BUREAU INQUIRIES.** The parties hereto, and each individual signing below in a representative capacity, agree that Lender may obtain business and/or personal credit reports and tax returns on each of them in their individual capacities.

**FURTHER ASSURANCES.** The undersigned agrees to (i) do all things deemed necessary by Lender in order to fully document the loan evidenced by the Note and any related agreements, and will fully cooperate concerning the execution and delivery of security agreements, stock powers, instructions and/or other documents pertaining to any collateral intended to secure the indebtedness, (ii) assist in the cure of any defects in the execution, delivery or substance of the Note and related agreements, and in the creation and perfection of any liens, security interests or other collateral rights securing the Note, and (iii) pay Lender immediately upon demand the full amount of all charges, costs and expenses (to include

Exhibit 1 - Page 40

**PROMISSORY NOTE**
**(Continued)**

Page 3

fees paid to third parties) expended or incurred by Lender to monitor Lender's interest in any real or personal property pledged as collateral for the Note, including without limitation all costs of appraisals.

**CONSENT TO SELL LOAN.** The parties hereto agree: (a) Lender may sell or transfer all or part of this loan to one or more purchasers, whether related or unrelated to Lender, without notice and without the consent of the parties; (b) Lender may provide to any purchaser, or potential purchaser, any information or knowledge Lender may have about the parties or about any other matter relating to this loan obligation, without notice, and the parties waive any rights to privacy it may have with respect to such matters; (c) the purchaser of a loan will be considered its absolute owner and will have all the rights granted under the loan documents or agreements governing the sale of the loan; (d) the purchaser of a loan may enforce its interests irrespective of any claims or defenses that the parties may have against Lender; and (e) to waive all notices of sale of the loan, as well as all notices of any repurchase, and all rights of offset or counterclaim that the parties have now or later against Lender or against any purchaser of the loan.

**FACSIMILE AND COUNTERPART.** This document may be signed in any number of separate copies, each of which shall be effective as an original, but all of which taken together shall constitute a single document. An electronic transmission or other facsimile of this document or any related document shall be deemed an original and shall be admissible as evidence of the document and the signer's execution.

**DOCUMENT DELIVERY AND ELECTRONIC TRANSMISSION OF DOCUMENTS.** Each party or person signing this agreement (referred to in this paragraph as "you") agrees that Lender may, in its sole discretion, rely upon any document, report, financial statement, tax return, agreement or other communication ("Document") physically delivered to Lender by mail, hand delivery or delivery service which Lender in good faith believed was sent by you or any of your representatives or employees. Similarly, Lender may, in its sole discretion, rely upon any Document sent by email, facsimile or other electronic means to Lender which Lender in good faith believed was sent by you or any of your representatives or employees. Lender may treat the Document as genuine and authorized to the same extent as if it was an original document validly executed or authenticated as genuine by you. Lender may from time to time in its sole discretion reject any such Document and require a signed original, or require you to provide acceptable authentication of any such Document before accepting or relying on same. You understand and acknowledge that there is a risk that Documents sent by electronic means may be viewed or received by unauthorized persons, and you agree that by sending Documents by electronic means, you shall be deemed to have accepted this risk and the consequences of any such unauthorized disclosure.

**COMMUNITY AND OTHER PROPERTY.** In addition to the rights of Lender under any applicable community property laws, Borrower, Guarantor or Grantor who is a Married Person and who has an interest in marital or community property under applicable law acknowledges and agrees that his/her obligation as a Borrower, Guarantor or Grantor is incurred in the interest of and to benefit the marital community (or domestic partnership, if applicable), and expressly agrees that recourse may be had against his or her separate property and his or her rights in community property and community assets for all of his or her obligations to Lender, in addition to any other property that may be subject to rights of Lender. Borrower and Guarantor also agree not to, without Lender's prior written consent, enter into any community property agreement which alters the separate or community property character of any of such party's property. For the purpose of this provision, "Married Person" means a person in a spousal relationship and shall include parties to a duly registered and/or legally recognized same-sex civil union, domestic partnership, and other terms, whether or not gender-specific in a spousal relationship, that denote spousal relationship, as those terms are used throughout the laws, codes and regulations of states and/or jurisdictions that recognize legally married same-sex couples, civil unions and/or domestic partnerships, and any references herein to a married person or marital status shall be deemed to also include the applicable corresponding term, or other reference relating to a party to a civil union or domestic partnership. With respect to the Guaranty only, to the extent this provision may conflict with another provision contained in the Guaranty, that other provision of the Guaranty shall control.

**SECURITY INTEREST AND RIGHT OF SETOFF.** In addition to all liens upon and rights of setoff arising by law, Borrower pledges and grants to Lender as security for Borrower's indebtedness and obligations under the Note (excluding any consumer obligations subject to the Federal Truth In Lending Act) a security interest and lien upon all monies, securities, securities accounts, brokerage accounts, deposit accounts and other property of Borrower now or hereafter in the possession of or on deposit with Lender or any Wells Fargo affiliate, whether held in a general or special account or for safekeeping or otherwise, excluding however all IRA and Keogh accounts. No security interest, lien or right of setoff will be deemed to have been waived by any act or conduct on the part of Lender, or by any neglect to exercise such right, or by any delay in so doing, and every right of setoff, lien and security interest will continue in full force and effect until specifically waived or released by Lender in writing.

**LOAN FEE AUTHORIZATION.** Borrower shall pay to Lender any and all fees as specified in the "Disbursement Request and Authorization" executed by Borrower in connection with this Note. Such fees are non-refundable and shall be due and payable in full immediately upon Borrower's execution of this Note.

**ADDITIONAL EVENTS OF DEFAULT.** In addition to the Events of Default described herein, the following shall be an Event of Default if applicable: (i) Borrower, any Guarantor or any grantor of collateral securing the Note fails to comply with any terms or conditions of any agreement with Lender or any Wells Fargo Affiliate; (ii) Borrower or any Guarantor revokes or disputes the validity of any of its liabilities or obligations under any Note, related agreement, or any other agreement with Lender or any Wells Fargo Affiliate; (iii) any change in ownership of an aggregate of twenty-five percent (25%) or more of the common stock, members' equity or other ownership interest in Borrower or any general partner of Borrower or any Guarantor, (iv) the withdrawal, resignation or expulsion of any one or more of the general partners in Borrower or any Guarantor with an aggregate ownership interest in Borrower or such Guarantor of twenty-five percent (25%) or more; or (v) Borrower or any Guarantor or any chairman, CEO, CFO, president, manager or general partner of Borrower or any Guarantor, nor any officer, member, or shareholder with an ownership interest of 25% or more of Borrower or any Guarantor, has been or is convicted of a felony. For purposes of this provision Wells Fargo Affiliate shall mean Wells Fargo & Company and any present or future subsidiary of Wells Fargo & Company.

**EXECUTION OF DOCUMENTS, CONSULTATION WITH COUNSEL.** Each party hereto acknowledges and agrees that he/she/it has had an opportunity to review and consider the terms and provisions of this agreement and each related loan document, to consult with counsel of his/her/its choice, if desired, and to suggest changes to the structure and terms of the agreements. Each party hereto warrants and agrees that his/her/its execution of this agreement and any related loan documents is made voluntarily and with full knowledge of the significance and effect of such agreements.

**ARBITRATION AGREEMENT.** Arbitration - Binding Arbitration. Lender and each party to this agreement hereby agree, upon demand by any party, to submit any Dispute to binding arbitration in accordance with the terms of this Arbitration Program. Arbitration may be demanded before the institution of a judicial proceeding, or during a judicial proceeding, but not more than 60 days after service of a complaint, third party complaint, cross-claim, or any answer thereto, or any amendment to any of such pleadings. A "Dispute" shall include any dispute, claim or controversy of any kind, whether in contract or in tort, legal or equitable, now existing or hereafter arising, relating in any way to any aspect of this agreement, or any related note, instrument or agreement incorporating this Arbitration Program (the "Documents"), or any renewal, extension, modification or refinancing of any indebtedness or obligation relating thereto, including without limitation, their negotiation, execution, collateralization, administration, repayment, modification, extension, substitution, formation, inducement, enforcement, default or termination, or any request for additional credit. This provision is a material inducement for the parties entering into the transactions relating to this Agreement. In the event of a court ordered arbitration, the party requesting arbitration shall be responsible for timely filing the demand for arbitration and paying the appropriate filing fee within 30 days of the abatement order or the time specified by the court; the party's failure to do so shall result

# PROMISSORY NOTE
## (Continued)

Page 4

in that party's right to demand arbitration being automatically terminated with respect to such Dispute.  DISPUTES SUBMITTED TO ARBITRATION ARE NOT RESOLVED IN COURT BY A JUDGE OR JURY. TO THE EXTENT ALLOWED BY APPLICABLE LAW, THE PARTIES IRREVOCABLY AND VOLUNTARILY WAIVE ANY RIGHT THEY MAY HAVE TO A TRIAL BY JURY WITH RESPECT TO ANY DISPUTE ARBITRATED PURSUANT TO THIS ARBITRATION PROGRAM.

**A.  Governing Rules.**  Any arbitration proceeding will (i) be governed by the Federal Arbitration Act (Title 9 of the United States Code), notwithstanding any conflicting choice of law provision in any of the documents between the parties; and (ii) be conducted by the American Arbitration Association ("AAA"), or such other administrator as the parties shall mutually agree upon, in accordance with the AAA's commercial dispute resolution procedures, unless the claim or counterclaim is at least $1,000,000.00 exclusive of claimed interest, arbitration fees and costs, in which case the arbitration shall be conducted in accordance with the AAA's optional procedures for large, complex commercial disputes (the commercial dispute resolution procedures or the optional procedures for large, complex commercial disputes are referred to herein, as applicable, as the "Rules").  If there is any inconsistency between the terms hereof and the Rules, the terms and procedures set forth herein shall control.  Arbitration proceedings hereunder shall be conducted at a location mutually agreeable to the parties, or if they cannot agree, then at a location selected by the AAA in the state of the applicable substantive law primarily governing the Note.  Any party who fails or refuses to submit to arbitration following a demand by any other party shall bear all costs and expenses incurred by such other party in compelling arbitration of any Dispute.  The arbitrator shall award all costs and expenses of the arbitration proceeding.

**B.  No Waiver of Provisional Remedies, Self-Help and Foreclosure.**  The arbitration requirement does not limit the right of any party to (i) foreclose against real or personal property collateral; (ii) exercise self-help remedies relating to collateral or proceeds of collateral such as setoff or repossession; or (iii) obtain provisional or ancillary remedies such as replevin, injunctive relief, attachment or the appointment of a receiver, before during or after the pendency of any arbitration proceeding.  This exclusion does not constitute a waiver of the right or obligation of any party to submit any Dispute to arbitration or reference hereunder, including those arising from the exercise of the actions detailed in sections (i), (ii) and (iii) of this paragraph.

**C.  Arbitrator Qualifications and Powers.**  Any arbitration proceeding in which the amount in controversy is $5,000,000.00 or less will be decided by a single arbitrator selected according to the Rules, and who shall not render an award of greater than $5,000,000.00.  Any Dispute in which the amount in controversy exceeds $5,000,000.00 shall be decided by majority vote of a panel of three arbitrators; provided however, that all three arbitrators must actively participate in all hearings and deliberations.  Every arbitrator shall be a neutral practicing attorney or a retired member of the state or federal judiciary, in either case with a minimum of ten years experience in the substantive law applicable to the subject matter of the Dispute.  The arbitrator will determine whether or not an issue is arbitratable and will give effect to the statutes of limitation in determining any claim.  In any arbitration proceeding the arbitrator will decide (by documents only or with a hearing at the arbitrator's discretion) any pre-hearing motions which are similar to motions to dismiss for failure to state a claim or motions for summary adjudication.  The arbitrator shall resolve all Disputes in accordance with the applicable substantive law and may grant any remedy or relief that a court of such state could order or grant within the scope hereof and such ancillary relief as is necessary to make effective any award.  The arbitrator shall also have the power to award recovery of all costs and fees, to impose sanctions and to take such other action as the arbitrator deems necessary to the same extent a judge could pursuant to the Federal Rules of Civil Procedure, the applicable state rules of civil procedure, or other applicable law.  Judgment upon the award rendered by the arbitrator may be entered in any court having jurisdiction.  The institution and maintenance of an action for judicial relief or pursuit of a provisional or ancillary remedy shall not constitute a waiver of the right of any party, including the plaintiff, to submit the controversy or claim to arbitration if any other party contests such action for judicial relief.

**D.  Discovery.**  In any arbitration proceeding discovery will be permitted in accordance with the Rules.  All discovery shall be expressly limited to matters directly relevant to the Dispute being arbitrated and must be completed no later than 20 days before the hearing date.  Any requests for an extension of the discovery periods, or any discovery disputes, will be subject to final determination by the arbitrator upon a showing that the request for discovery is essential for the party's presentation and that no alternative means for obtaining information is available.

**E.  Class Proceedings and Consolidations.** No party hereto shall be entitled to join or consolidate disputes by or against others in any arbitration, or to include in any arbitration any dispute as a representative or member of a class, or to act in any arbitration in the interest of the general public or in a private attorney general capacity.

**F.  Small Claims Court.**  Any party may require that a Dispute be resolved in Small Claims Court if the Dispute and related claims are fully within that court's jurisdiction.

**G.  Real Property Collateral.**  Notwithstanding anything herein to the contrary, no Dispute shall be submitted to arbitration if the Dispute concerns indebtedness secured directly or indirectly, in whole or in part, by any real property unless (a) the real property is located outside the states of California, Connecticut, Idaho, Kansas, Montana, Nevada, South Dakota, Virginia or Utah, or (b) the holder of the mortgage, lien or security interest specifically elects in writing to proceed with the arbitration, or (c) all parties to the arbitration waive any rights or benefits that might accrue to them by virtue of the single action rule statute of the applicable state, thereby agreeing that all indebtedness and obligations of the parties, and all mortgages, liens and security interests securing such indebtedness and obligations, shall remain fully valid and enforceable. If any such Disputes are not referred to arbitration, then any provision in such mortgage or deed of trust providing for referral of Disputes to a referee or master under the laws of California, Connecticut, Idaho, Kansas, Montana, Nevada, South Dakota, Virginia or Utah shall be applicable to such Disputes.

**H.  State Specific Provisions:**

**If Delaware, Pennsylvania or Virginia law governs the Dispute, the following provision is applicable if there is a Confession of Judgment in any note, guaranty or other Documents subject to this Arbitration Program: Confession of Judgment.**  Notwithstanding anything herein to the contrary, the arbitration requirement does not limit or preclude the right of Lender to confess judgment pursuant to a warrant of attorney provision set forth in any note, guaranty or other Documents.  No party shall have the right to demand binding arbitration of any claim, dispute or controversy seeking to (i) strike-off or open a judgment obtained by confession pursuant to a warrant of attorney contained in any note, guaranty or other Documents, or (ii) challenge the waiver of a right to prior notice and a hearing before judgment is entered, or after judgment is entered, but before execution upon the judgment.   Any claims, disputes or controversies challenging the confession of judgment shall be commenced and prosecuted in accordance with the procedures set forth, and in the forum specified by the applicable state rules of civil procedure or other applicable law.

**If Maryland law governs the Dispute, the following provision is applicable if there is a Confession of Judgment in any note, guaranty or other Documents subject to this Arbitration Program: Confession of Judgment.**  Notwithstanding anything herein to the contrary, the arbitration requirement does not limit or preclude the right of Lender to confess judgment, and no party shall have the right to demand binding arbitration of any claim, dispute or controversy seeking to open a judgment obtained by confession.  Nothing herein, including the arbitration requirement, shall limit the right of any party to foreclose judicially or non-judicially against any real or personal property collateral, or exercise judicial or non-judicial power of sale rights.  No provision regarding submission to a jurisdiction and/or venue in any court or the waiver of any right to trial by jury is intended or shall be construed to be in derogation of the provisions for arbitration of any dispute.  Any claim or counterclaim or defense raised in connection with Lender's exercise of any rights set forth in any note, guaranty or other Documents subject to this Arbitration Program shall be subject to the arbitration requirement.

**If South Carolina law governs the Dispute, the following provision is included: WAIVER OF JURY TRIAL.  NOTWITHSTANDING ANYTHING HEREIN TO THE CONTRARY, WITHOUT INTENDING IN ANY WAY TO LIMIT THE PARTIES' AGREEMENT TO ARBITRATE ANY DISPUTE AS SET FORTH IN THIS AGREEMENT, TO THE EXTENT ANY DISPUTE IS NOT SUBMITTED TO ARBITRATION OR IS DEEMED BY THE**

ARBITRATOR OR BY ANY COURT WITH JURISDICTION TO BE NOT ARBITRABLE OR NOT REQUIRED TO BE ARBITRATED, LENDER AND EACH PARTY TO THIS AGREEMENT WAIVE TRIAL BY JURY IN RESPECT OF ANY SUCH DISPUTE AND ANY ACTION ON SUCH DISPUTE. THIS WAIVER IS KNOWINGLY, WILLINGLY AND VOLUNTARILY MADE BY LENDER AND EACH PARTY, AND LENDER AND EACH PARTY HEREBY REPRESENT THAT NO REPRESENTATIONS OF FACT OR OPINION HAVE BEEN MADE BY ANY PERSON OR ENTITY TO INDUCE THIS WAIVER OF TRIAL BY JURY OR TO IN ANY WAY MODIFY OR NULLIFY ITS EFFECT.  THIS PROVISION IS A MATERIAL INDUCEMENT FOR THE PARTIES ENTERING INTO THE LOAN DOCUMENTS.  LENDER AND EACH PARTY TO THIS AGREEMENT ARE EACH HEREBY AUTHORIZED TO FILE A COPY OF THIS SECTION IN ANY PROCEEDING AS CONCLUSIVE EVIDENCE OF THIS WAIVER OF JURY TRIAL.  EACH PARTY FURTHER REPRESENTS AND WARRANTS THAT IT HAS BEEN REPRESENTED IN THE SIGNING OF THIS AGREEMENT AND IN THE MAKING OF THIS WAIVER BY INDEPENDENT LEGAL COUNSEL, OR HAS HAD THE OPPORTUNITY TO BE REPRESENTED BY INDEPENDENT LEGAL COUNSEL SELECTED OF ITS OWN FREE WILL, AND THAT IT HAS HAD THE OPPORTUNITY TO DISCUSS THIS WAIVER WITH COUNSEL.

**i.  Miscellaneous.**  To the maximum extent practicable, the AAA, the arbitrators and the parties shall take all action required to conclude any arbitration proceeding within 180 days of the filing of the Dispute with the AAA.  No arbitrator or other party to an arbitration proceeding may disclose the existence, content or results thereof, except for disclosures of information by a party required in the ordinary course of its business or by applicable law or regulation.  If more than one agreement for arbitration by or between the parties potentially applies to a Dispute, the arbitration provision most directly related to the documents between the parties or the subject matter of the Dispute shall control.   This arbitration provision shall survive the repayment of the Note and the termination, amendment or expiration of any of the Documents or any relationship between the parties.

**SUPPLEMENT TO APPLICATION OF PAYMENT.** Notwithstanding any provision in this Note to the contrary Lender will apply each installment payment first to pay interest accrued to the day Lender receives the payment, then to bring principal current, then to pay any late fees, and will apply any remaining balance to reduce principal.

**LOAN PREPAYMENT.** Notwithstanding any provision in this Note to the contrary:

**Borrower may prepay this Note.** Borrower may prepay 20 percent or less of the unpaid principal balance at any time without notice. If Borrower prepays more than 20 percent and the Loan has been sold on the secondary market, Borrower must:

a. Give Lender written notice;
b. Pay all accrued interest; and
c. If the prepayment is received less than 21 days from the date Lender receives the notice, pay an amount equal to 21 days' interest from the date lender receives the notice, less any interest accrued during the 21 days and paid under subparagraph b., above.

If Borrower does not prepay within 30 days from the date Lender receives the notice, Borrower must give Lender a new notice.

**SMALL BUSINESS ADMINISTRATION (SBA).** When SBA is the holder, this Note will be interpreted and enforced under federal law, including SBA regulations. Lender or SBA may use state or local procedures for filing papers, recording documents, giving notice, foreclosing liens, and other purposes. By using such procedures, SBA does not waive any federal immunity from state or local control, penalty, tax or liability. As to this Note, Borrower may not claim or assert against SBA any local or state law to deny any obligation, defeat any claim of SBA, or preempt federal law.

**SBA ARBITRATION.** The parties specifically agree that the provisions of this Arbitration Program are not applicable to any dispute between any party and the U.S. Small Business Administration (the "SBA"), including but not limited to, any dispute with the SBA after purchase of the loan by the SBA.

**NON-REVOLVING LINE OF CREDIT.** This Note evidences a non-revolving line of credit.  Principal amounts repaid may not be reborrowed.  Once the total amount of principal has been advanced, Borrower is not entitled to further loan advances.  Advances under this Note may be requested either orally or in writing by Borrower or an authorized person.  Lender may, but need not, require that all oral requests be confirmed in writing. All communications, instructions, or directions by telephone or otherwise to Lender are to be directed to Lender's office shown above.  Borrower agrees to be liable for all sums either:  (A)  advanced in accordance with the instructions of an authorized person or (B) credited to any of Borrower's accounts with Lender.  The unpaid principal balance owing on this Note at any time may be evidenced by endorsements on this Note or by Lender's internal records, including daily computer print-outs.

**FINAL PAYMENT.** If a final payment amount is set out in the Payment section of this Note, Borrower understands that it is an estimate, and that the actual final payment amount will depend upon when payments are received and other factors.

**SUCCESSOR INTERESTS.**  The terms of this Note shall be binding upon Borrower, and upon Borrower's heirs, personal representatives, successors and assigns, and shall inure to the benefit of Lender and its successors and assigns.

**GENERAL PROVISIONS.**  If any part of this Note cannot be enforced, this fact will not affect the rest of the Note.  Lender may delay or forgo enforcing any of its rights or remedies under this Note without losing them.  Borrower and any other person who signs, guarantees or endorses this Note, to the extent allowed by law, waive any applicable statute of limitations, presentment, demand for payment, and notice of dishonor. Upon any change in the terms of this Note, and unless otherwise expressly stated in writing, no party who signs this Note, whether as maker, guarantor, accommodation maker or endorser, shall be released from liability.  All such parties agree that Lender may renew or extend (repeatedly and for any length of time) this loan or release any party or guarantor or collateral; or impair, fail to realize upon or perfect Lender's security interest in the collateral; and take any other action deemed necessary by Lender without the consent of or notice to anyone.  All such parties also agree that Lender may modify this loan without the consent of or notice to anyone other than the party with whom the modification is made.  The obligations under this Note are joint and several.

Exhibit 1 - Page 43

# PROMISSORY NOTE
## (Continued)

Page 6

PRIOR TO SIGNING THIS NOTE, BORROWER READ AND UNDERSTOOD ALL THE PROVISIONS OF THIS NOTE.  BORROWER AGREES TO THE TERMS OF THE NOTE.

BORROWER ACKNOWLEDGES RECEIPT OF A COMPLETED COPY OF THIS PROMISSORY NOTE.

BORROWER:


FRANKLIN DATA, LLC


By:_____
    Matthew W. Blake, Managing Member of FRANKLIN
    DATA, LLC

Exhibit 1 - Page 44

## EXHIBIT "E"

Lan-Tech Promissory Note

## EXHIBIT "C"

### SECURED PROMISSORY NOTE TWO

$75,000                                                                                   June 30, 2018

      FOR VALUE RECEIVED, **NEXEM-ICONIC, LLC** ("Maker"), promises to pay **LAN-TECH, INC.,** ("Payee"), at P.O. Box 942, Acworth, GA 30301, or at such other place as may be designated in writing by Payee, the principal sum of SEVENTY-FIVE THOUSAND AND NO/100 DOLLARS ($75,000).

      1.    Interest. The unpaid outstanding principal balance shall bear interest at the FIVE PERCENT (5%) per annum from the date hereof.

      2.    Payment.  Maker shall pay monthly installments of interest and principal for Twenty-Four months (24) months in the sum of THREE THOUSAND TWO HUNDRED AND NO/100 DOLLARS ($3,290) commencing on August 1, 2018 and continuing on the same day of each consecutive month through July 1, 2020.  On July 1, 2020 (the "Maturity Date"), unless earlier paid in full, all of the then outstanding principal balance together with all accrued but unpaid interest shall be fully due and payable.

      3.    Security and Recourse.  Maker executes contemporaneously with this Note the Security Agreement in the form attached to the Purchase Agreement entered into on June 30, 2018 by and among the Maker, the Payee and the Stockholder (the "Purchase Agreement") as Exhibit "D" and incorporated herein by reference (the "Security Agreement").

      4.    Default and Acceleration.  At Payee's option, the full remaining principal balance shall, upon notice and demand to Maker, become due and payable and may be collected immediately, time being of the essence of this Note, upon the occurrence of one or more of the events listed below (each a "Default"):

      (a)    If Maker fails to pay any installment when due hereunder, and such default in payment continues for a period of more than thirty (30) days after written notice from Payee of such default provided, however, if Maker has provided notice to Payee or any stockholder (each a "Stockholder") of a material breach of the Purchase Agreement and such breach shall have remained uncured in any respect for thirty (30) days from such notice, then Maker may cease payment of all installments due hereunder; or

      (b)    The filing by Maker of a voluntary petition or any answer seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code of 1978, 11 U.S.C., Section 1091 et. seq., as hereafter amended (the "Bankruptcy Code"), or under any other insolvency act or law, state or federal, now or hereafter existing or any other action of Maker indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by Maker for, the appointment by consent or acquiescence of, a custodian, receiver or trustee for all or a substantial part of Maker's property; or

      (c)    If Maker makes any assignment for the benefit of its creditors; or

1

Exhibit 1 - Page 46

(d)    The filing of an involuntary petition against Maker seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code, or under any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a custodian, receiver or trustee for all or a substantial part of Maker's property; the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and either (i) the continuance of any of such events for thirty (30) days undismissed, undischarged or unbonded, or (ii) within such thirty (30) day period, the entry of any order for relief under the Bankruptcy Code in any such case or proceeding.

Upon any such event of Default, Payee shall be entitled to exercise the rights and remedies available to it at law and equity as set forth in this Note and the Security Agreement.

5.    Prepayment.  Maker may prepay this Note in whole or in part at any time without premium or penalty. Any payments shall first be applied to accrued and unpaid interest. Any excess prepayments in advance of any principal will be applied to reduce the outstanding principal amount of this Note.

6.    Limitation on Interest.  The provisions of this Note and of all agreements between Maker and Payee, whether now existing or hereafter arising and whether written or oral, are hereby expressly limited so that in no contingency or event whatsoever, whether by reason of demand or acceleration of the maturity of this Note or otherwise, shall the amount paid, or agreed to be paid (hereinafter referred to as "Interest"), to Payee for the use, forbearance or retention of the money loaned under this Note exceed the maximum amount permissible under applicable law. If the performance or fulfillment of any provision hereof or of any agreement between Maker and Payee shall, at the time performance or fulfillment of such provision is due and from any circumstance whatsoever, exceed the limit for Interest prescribed by law or otherwise transcend the limit of validity prescribed by applicable law, then such obligation to be performed or fulfilled shall automatically be reduced to such limit. Further, if Payee shall ever receive anything of value from any circumstance whatsoever that is deemed Interest by applicable law in excess of the maximum lawful amount, an amount equal to any excessive Interest shall be applied to the reduction of the principal balance owing under this Note (whether or not then due) or at the option of Payee be paid over to Maker, and not to the payment of Interest. All Interest (including any amounts or payments deemed to be Interest), contracted for, charged, taken, reserved, paid or agreed to be paid to Payee shall, to the extent permitted by applicable law, be amortized, prorated, allocated and spread throughout the full term of this Note, including any extensions or renewals hereof, until payment in full of the principal balance of this Note so that the Interest thereof for such full period will not exceed the maximum amount permitted by applicable law.

7.    No Waiver.  The failure of Payee in one or more instances to insist upon strict compliance by Maker with the terms of this Note, or indulgence granted from time to time, shall not constitute a waiver by Payee of any term or right hereunder or otherwise impair or limit the rights of Payee hereunder.

8.    Notices.  All notices, demands or other communications of any type required or permitted under this Note shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item,

2

Exhibit 1 - Page 47

return receipt requested, to the addresses specified below. The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing Notice are as follows:

**Maker:**

Nexem-Iconic, LLC
4100 MacArthur Blvd. Suite 150
Newport Beach, CA 92660
ATTN: Matthew W. Blake

**Payee:**

Lan-Tech, Inc.
P.O. Box 942
Acworth, GA 30101
Attn: David Moon

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with Federal Express or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein. Either party hereto may change the address for notice specified above by notice given as provided herein to the other party.

9.   Binding Effect. This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of Payee, its heirs, successors and assigns, provided that this Note may not be transferred or assigned without the express written consent of Maker in its sole and absolute discretion. Any attempted assignment not in accordance with this Section shall be void and without effect.

10.   Governing Law. This Note shall be construed and enforced in accordance with the laws of the State of Georgia.

IN WITNESS WHEREOF, the Maker has set its hand and seal, all as of the date first set forth above.

Maker:

Nexem-Iconic, LLC

By:   _____
          Matthew W. Blake
          Its: Manager

3

Exhibit 1 - Page 48

## EXHIBIT "F"

Lan-Tech Earn-Out

1

Exhibit 1 - Page 49

installments of Three Thousand Two Hundred and Ninety Dollars ($3,290) on the first day of each month beginning on August 1, 2018 and culminating on July 1, 2020 as reflected in the Second Promissory Note attached hereto as Exhibit "C" (the "Second Note"). The First Note and the Second Note (collectively "The Notes") shall be evidenced by a Security Agreement in the form attached hereto as Exhibit "D". In the event of a default on the First Note or the Second Note which is the result of (1) a decision to close the Business, or (2) the result of a service disruption occasioned by the negligence of Purchaser's employees resulting in the loss of a majority of the clients of the business, then the Notes shall be amended to be guaranteed by Nexem Corporation.

(C) Earn-Out: In addition to the Purchase Price, as additional consideration for the purchase, Nexem shall pay Seller a quarterly Earn-Out of twenty-five (25%) of the EBITDA from the cloud hosting services generated by the Purchased Assets beginning in month 7 and ending in month 24, not to exceed in the aggregate sum of $75,000, ("Earn-Out"). If the total Earn-Out paid to Seller is less than $75,000 at the end of the 24 months, the Earn-Out term will automatically be extended for an additional twelve (12) months or until the cumulative Earn-Out reaches $75,000, whichever is sooner.

EBITDA is defined as earnings before interest, taxes, depreciation and amortization and shall be calculated in the manner as more fully described in the example attached as Exhibit "E" which shall cap quarterly office overhead at 15% of quarterly revenue. The first Earn-Out will be paid in January 2019 for the EBIDA of the fourth quarter of 2018 and shall be paid quarterly thereafter. Earn-out payments shall be paid to Seller by ACH or wire transfer twenty (20) business days following the end of each calendar quarter.

2. *Purchased Assets:*

(a) "Purchased Assets" shall mean, subject to the exclusions in Section 2(c) below, all tangible assets, property, and rights owned, held, or used in the conduct of the Business. Purchased Assets shall include, without limitation: (i) servers, computer equipment, computer hardware, inventory, projectors, parts, cables, wires, operating supplies, furniture, fixtures, equipment, leasehold improvements (to the extent not fixtures attached to leased premises), relating to the Business as identified on Exhibit "N"; (ii) the Client List and Active Prospect List; and (iii) all of the Company's right, title and interest in, to or under the Assumed Contracts, including without limitation all Customer Contracts and going forward contracts or arrangements with customers of the Business including all pipeline;

(b) Purchased Assets shall also include intangible assets, subject to the exclusions in 2(c) below: (i) the exclusive rights, title and interest in and to the Intellectual Property of the Business, including without limitation patents, copyrights, trademarks, business processes, methods of operations, manuals, forms, confidential information, and trade secrets associated with cloud hosting services and document management services to the extent they pertain to the cloud hosting services; (ii) the exclusive right to use the name "iconic network"; (iii) the log-in passwords, access rights, assignable software, work product, any other intangibles associated with the cloud hosting services and the Assumed Contracts (iv) all permits of the Company used in connection with, or otherwise related to the Business to the extent legally transferable or assignable to Purchaser; (v) the Business as a going concern, and (v) goodwill.

(c) Excluded Assets: Seller cash, Seller's Account Receivables through the date of Close, the domain www.lan-tech.com, the phone number (770) 514-0400, and all other assets not listed on Exhibits "L" and "M" (the "Excluded Assets"). Seller shall have seventy-five (75) days from the date of Close to remove any electronic data stored on servers and equipment included in the Purchased Assets which is not associated with the Business assets being sold.

2

Exhibit 1 - Page 50

## Schedule 1

## Inventory and Equipment

Exhibit 1 - Page 51

**GEORGIA ICONIC LOCATION**

| Model | Service Tag | Name | |
|---|---|---|---|
| **Servers** | | | |
| PowerEdge R810 | CNLRRR1 | VNWARE 2 | |
| PowerEdge R810 | BKGX4V1 | VMWARE 3 | |
| PowerEdge R820 | 5KPLBY1 | VMWARE 4 | |
| PowerEdge R820 | JKVC182 | VMWARE 5 | |
| | | | |
| **Storage** | | | |
| EqualLogic PS-6100 | 55STXR1 | | |
| EqualLogic PS-6100 | F5W5XV1 | | |
| Nexem Synology DS1618+ | 1850QFRWQBG8Q | | |
| | | | |
| **Switches** | | | |
| PowerConnect 5548 | CMZ4VS1 | Data | |
| PowerConnect 5548 | 3W76VS1 | Data | |
| PowerConnect 6248 | D0F0VS1 | ISCSI | |
| PowerConnect 6248 | 6VM0VS1 | iSCSI | |
| Sonicwall NSA 2400 | BD8X9C6G | SonicWall 1 | 0017C5C085A0 |
| Sonicwall NSA4650 | | | 2CB8ED075F80 |

**List of Equipment not include**

| Model | Service Tag | Name |
|---|---|---|
| Sonicwall NSA 2400 | | SonicWall 2 |
| PowerConnect 6224 | 4T9PTS1 | |
| PowerConnect 6224 | GS90TS1 | |
| Synology 8 DISK SAN | 15B0MHN209502 | |
| PowerEdge 2950 | STCCVH1 | VMWARE 1 |

Exhibit 1 - Page 52

**GEORGIA RELATIVITY**

| Model Switches | Name | Service Tag |
|---|---|---|
| | DR SWITCH | |

| Servers | | |
|---|---|---|
| Dell R820 | VMHOST7 | GVN38Y1 |
| PowerEdge 2950 | ONR-RL-IMGCH-02 | 2NQCPJ1 |
| R510 | VMHOST14 | CZ5KXP1 |
| PowerEdge 610 | TWIX (Crossover) | 40YNMN1 |
| R710 | ONR-RL-AN-02 | DVHYJM1 |
| R710 | ONR-RL-FS-01 | DVJWJM1 |
| MD1200 | FS-01 ARRAY 01 | FZ21FN1 |
| MD1200 | FS-01 ARRAY 02 | 8SD2K02 |
| R710 | ONR-RL-SQL-01 | 9H40LM1 |
| PowerEdge R720 | VMHOST8 | B1PYDZ1 |
| PowerEdge R720 | VMHOST10 | B1P0FZ1 |

Exhibit 1 - Page 53

**NEWPORT**      **3RD FLOOR**

**Servers**

| R510 | AlienVault | 89HCJS1 |
| R610 | Forensic03 | 294TNL1 |
| R710 | XEN1 | 60NZKM1 |
| R710 | LAWSQL1 | 95ZGTL1 |
| R610 | Forensic02 | 3T7ZMS1 |
| R610 | Onboard1 | 9SM0YQ1 |
| R610 | IQAPP01 | 5B44TR1 |
| R610 | Forensic1 | 5B51TR1 |
| NX3100 | Storage2 | 2XC0BR1 |
| R710 | Storage1 | 37FYKM1 |
| R710 | OldLawSQL | CBS3FQ1 |
| R710 | Xen2 | 37FXKM1 |
| R610 | IQAPP02 | 5B42TR1 |
| | Xen6 | |

Exhibit 1 - Page 54

## NEWPORT SUITE 150

| Model | Name | Service Tag |
|---|---|---|
| **Switches** | | |
| Cisco Catalyst 2960G | F0C1222Y69R | |
| Procurve Switch 2848 | j4904a | |
| HP Procurve Switch 2848 | sg503sk013 | |
| Cisco Catalyst 2948G-GE-TX | JPE1047Y068 | |
| LINKSYS LGS326 | | |
| Sonic Wall NSA3500 | 0017C5D82E88 | |
| DellPowerConnect 6224 | 15LP6M1 | |
| DellPowerConnect 6224 | F5LP6M1 | |
| Sonic Wall TZ600 | 18B16907DC98 | |
| | | |
| **Servers** | | |
| PowerEdge 1950 | ONRFW1 | G3L5SB1 |
| Dell R710 | VMHOST3 | BR9YWQ1 |
| Dell R710 | VMHOST5 | 8R9DJS1 |
| PowerEdge 1950 | ONRDC1 | 7QSRJH1 |
| Dell PowerEdge 720 | VMHOST12 | B1RZDZ1 |
| Dell PowerEdge 720 | POSQL01 | 18Y5CZ1 |
| Dell R510 | POFS1 | B2XD3M1 |
| Dell R510 | POFS2 | 1CK5WN1 |
| Dell R510 | C1FS2 | 18SZFN1 |
| Dell R510 | POFS4 | 3CK5WN1 |
| PowerEdge 2950 | Skittles | TVH1RB1 |
| R510 | WIPE | 89HFJS1 |
| R510 | WIPE | 89HDJS1 |
| R710 | VMHOST1 | FJDF8P1 |
| R710 | ONRCOLLECTOR | 630MML1 |
| HP PROLIANT DL380 | C1SFTP | USE612N92F |
| PowerEdge 1750 | No Name | 2F5NW41 |
| PowerEdge 1950 | DINO | 7B3WCG1 |
| R720 | VMHOST13 | B1RYDZ1 |
| R720 | VMHOST11 | B1S0FZ1 |
| R710 | VMHOST9 | B1NZDZ1 |
| R510 | C1FS1 | CXNW3M1 |
| E310 | GALLARDO | 6HK7FN1 |
| R510 | CAMEL | G5JBFN1 |
| R510 | AUSBU2 | 2CK5WN1 |
| ESX5-1 | R510 | 30HHNQ1 |
| ESX5-2 | R510 | JT4WPQ1 |
| ESX5-3 | R510 | 20HHNQ1 |
| ESX5-4 | R510 | 1KKHNQ1 |
| NetAPP Controller | SAN1 | 1574594668 |

Exhibit 1 - Page 55

| NetAPP Controller | SAN2 | 1575047704 |
| NetAPP Disk shelf - 1 | Shell 1 | SHU0954293N0ED2 |
| NetAPP Disk shelf - 2 | Shell 2 | SHU0954293N0EDE |
| NetAPP Disk shelf - 3 | Shell 3 | SHU0954293N0EDE |
| NetAPP Disk shelf - 4 | Shell 4 | SHU0954293N0EDR |

**Storage**

| Equilogic PS6500 | POSAN | 9QG4HJ1 |
| POWERVAULT 3220 | LIVE FILE SERVER H | 1B11DZ1 |
| POWERVAULT 1200 | LIVE ARRAY 01 | 1B03DZ1 |

Exhibit 1 - Page 56

Schedule 2

Client and Prospect List

Exhibit 1 - Page 57

## Franklin Data Ventures, Inc.
## Client List

ALM LLC

Arnold & Itkin

Atkinson, Andelson, Loya, Ruud & Romo

Baldwin Haspel Burke & Mayer LLC

Callahan Blaine - File 3670-02

Canterbury Consulting

CertaTech

Cirks Construction

Cotton Bledsoe Tighe & Dawson

County of Orange

Crain Caton & James

Crivello Carlson, S.C.

Dame Law PC

Duggan Shadwick Doerr & Kurlbaum LLC

Dworken & Bernstein, Co., L.P.A.

Eaton Corp

Fisher Broyles

Frank Sims & Stolper LLP

Fried, Rogers & Goldberg, LLC

Galloway Johnson Tompkins Burr & Smith

Gray Reed - Brod

Henrico MK, LLC

JC ATM Services, LLC

Jorge Barrera Claim

Lewis Brisbois Bisgaard & Smith LLP

Liskow Lewis

Martin Disiere Jefferson & Wisdom (MDJW)

Pepple & Waggoner Ltd

PFCMA/Emerson

Police Motor Escorts, Inc.

Recon Consruction

Richard Wingate- Hallman & Wingate

STG/ Scandanavian Tobacco Group

Tracey & Fox Law Firm

Ulmer & Berne

Underwood, Jones & Scherrer, P.L.L.C.

Exhibit 1 - Page 58

## Nexem-Iconic, LLC
## Client List

| Customer |
| --- |
| Adam L. Cleveland, P.C. |
| Chandler Law, LLC |
| Collier/Shannan |
| Dan Cron Law Firm, P.C. |
| Dana Jackel, PC |
| Doucet & Associates |
| DWH Legal Ltd |
| Edwards Cohen |
| Florida Family Law Clinic |
| Fujioka-Lilley Law Firm |
| Garson Law Group |
| Greenstein & Associates |
| Greg Bobbs |
| Iden Law Firm |
| Jack Wuerstle, P.C. |
| Kumar, Prabhu, Patel & Banerjee, LLC |
| Law Office of William A. Davis |
| Lieske, Lieske, & Ensz |
| Lubliner Kish PLLC |
| Mauricio Beugelmans, Esq. |
| McClure, Qualey & Rodack |
| Nye & Associates, PLLC |
| Rainey & Phillips |
| Sage Patent Group, PLLC |
| The Johnson Kurlander Legal  Group, LLC |
| Wagner, Johnston & Rosenthal, P.C. |
| Wallace &  Morrison, LLP |
| Craig Wagner |
| Dana Jackel, PC |
| Florida Family Law |
| Garson and Jacobs |
| Adam L. Cleveland, P.C. |
| Shannan Collier |
| DWH Legal Ltd |
| Dan Cron Law Firm, P.C. |
| Douglas Chandler |
| Doucet and Associates LLP |
| Edwards Cohen P.A. |

Exhibit 1 - Page 59

**PROSPECT LIST**

Green Hasson & Jenks
Mcquire Woods, LLP
Gibbons
Payday
Alera Group
Nagel Rice
Genova Burns
Withum Smith & Brown
CohnReznick
EisnerAmper
PillsburyWinthrop
Winston & Strawn
Crowell Mooring

| Liskow Lewis | Main New Orleans E | Partners |
| Sheehy Ware Pappas | Houston, TX | Steven Grubbs |
| Underwood, Jones & Scherrer | Houston, TX | Russ Jones |
| Knobbe Martens | Los Angeles, CA | Perry Smith |
| Wade Clark & Mulcahy | New York, New York | Vivian Truetsky |
| Javerbaum Wurgaft Hicks | | |

Exhibit 1 - Page 60

Schedule 3

Intellectual Property Conveyed in Sale

1. iPreserveit
2. Names Franklin Data, Franklin Data Ventures, Franklin-Scarab and Iconic

Exhibit 1 - Page 61

## Schedule 4

### Property Retained by Seller at Closing

1. Accounts Receivables through Closing.
2. Fixtures, furniture and tangible property other than inventory on Schedule 1 in Franklin's offices.
3. Laptops and equipment used by Franklin employees in their home offices.

Exhibit 1 - Page 62

<u>Schedule 5</u>

<u>Assumed Third-Party Contracts</u>

1.  Cloud 9
2.  Relativity
3.  Worldox (no written contract; pay-as-you-go monthly on Todd's CC)
4.  Intermedia (no written contract E-Mail Service for Clients of Nexem-Iconic)
5.  JT Communications Lease
6.  Windstream (can't find contract)
7.  Cogent (Month-to-Month)
8.  Blacklight (https://app.hubspot.com/quotes/7lCa7o3ZQjulZ_3MOrjA)
9.  AccessData/FTK
10. Magnet/Axiom
11. InfoSec/SecuirtyIQ
12. Oxygen Detective
13. SplahTop
14. Microsoft Licenses (SPLA)
15. Office 360 (in name of Nexem but can port e-mail addresses)
16. Kaseya
17. Lexis/Nexis

Exhibit 1 - Page 63

# EXHIBIT 2

Exhibit 2 - Page 64

EXHIBIT "B"

SECURED PROMISSORY NOTE

$950,000                                                                          October 25, 2019

FOR VALUE RECEIVED, **VERISTAR, LLC** ("Maker"), promises to pay **FRANKLIN DATA VENTURES, INC.,** ("Payee"), at 4100 MacArthur Blvd., Suite 150, Newport Beach, CA 92660, or at such other place as may be designated in writing by Payee, the principal sum of NINE HUNDRED AND FIFTY THOUSAND DOLLARS ($950,000.00).

1.      Payment.  Maker shall make ten semi-annual payments on this Promissory Note (the "Note") of principal and interest at a rate of four (4) percent per annum on March 1 and September 1 of each year for five (5) years.  The payments shall be Seventy-Nine Thousand One Hundred Sixty-Seven Dollars ($79,167) plus interest as scheduled in Section (c) of the Asset Purchase Agreement between Maker and Payee dated October 25, 2019 ("Asset Purchase Agreement") and shall commence on March 1, 2020 and continue thereafter through September 1, 2025 (the "Maturity Date") unless earlier paid in full.

2.      Security and Recourse.  Maker executes contemporaneously with this Note the Security Agreement in the form attached and incorporated herein by reference (the "Security Agreement").

3.      Default and Acceleration.  At Payee's option, the full remaining principal balance shall, upon notice and demand to Maker, become due and payable and may be collected immediately, time being of the essence of this Note, upon the occurrence of one or more of the events listed below (each a "Default"):

(a)      If Maker fails to pay any installment when due hereunder, and such default in payment continues for a period of more than thirty (30) days after written notice from Payee of such default; or

(b)      The filing by Maker of a voluntary petition or any answer seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code of 1978, 11 U.S.C., Section 1091 et. seq., as hereafter amended (the "Bankruptcy Code"), or under any other insolvency act or law, state or federal, now or hereafter existing or any other action of Maker indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by Maker for, the appointment by consent or acquiescence of, a custodian, receiver or trustee for all or a substantial part of Maker's property; or

(c)      If Maker makes any assignment for the benefit of its creditors; or

(d)      The filing of an involuntary petition against Maker seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code, or under any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a custodian, receiver or trustee for all or a substantial part of Maker's property; the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and either (i) the continuance of any of such events for

1

Exhibit 2 - Page 65

  (e)  If Maker sells, transfers or assigns the any of the assets which are the subject of the Asset Purchase Agreement between Maker and Payee dated October 25, 2019 to a third-party without the written consent of Payee.

  (f)  If Maker closes or liquidates its business for any reason.

Upon any such event of Default, Payee shall be entitled to exercise the rights and remedies available to it at law and equity as set forth in this Note and the Security Agreement.

  6.  <u>Prepayment</u>.  Maker may prepay this Note in whole or in part at any time without premium or penalty. Any payments shall first be applied to accrued and unpaid interest. Any excess prepayments in advance of any principal will be applied to reduce the outstanding principal amount of this Note.

  7.  <u>Notice and Demand; Default Interest; Attorneys' Fees</u>.  Maker waives demand, protest and notice of demand, protest and nonpayment of this Note except as expressly provided herein.  In the event this Note is collected by legal action through an attorney at law, costs of collection, including reasonable attorney's fees, shall be paid by Maker, not to exceed ten percent (10%) of the outstanding principal balance at the time of Default.

  8.  <u>No Waiver</u>.  The failure of Payee in one or more instances to insist upon strict compliance by Maker with the terms of this Note, or indulgence granted from time to time, shall not constitute a waiver by Payee of any term or right hereunder or otherwise impair or limit the rights of Payee hereunder.

  9.  <u>Notices</u>.  All notices, demands or other communications of any type required or permitted under this Note shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item, return receipt requested, to the addresses specified below.  The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing Notice are as follows:

**Maker:**           **Payee:**

Veristar, LLC         Franklin Data Ventures, Inc.,
9501 W. 144th Place       4100 MacArthur Blvd. Suite 150
Orland Park, IL 60462      Newport Beach, CA 92660
Attn: Rick Avers        ATTN: Matthew W. Blake

Exhibit 2 - Page 66

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with Federal Express or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein. Either party hereto may change the address for notice specified above by notice given as provided herein to the other party.

10.     _Binding Effect_.  This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of Payee, its heirs, successors and assigns.  This Note may be transferred or assigned at the discretion of Payee

11.     _Governing Law and Jurisdiction_.  This Note shall be construed and enforced in accordance with the laws of the State of California and Maker agrees that any controversy surrounding this Note shall be resolved before the Courts in the County of Orange, State of California.

IN WITNESS WHEREOF, the Maker has set its hand and seal, all as of the date first set forth above.

Maker:

Veristar, LLC

By: _____
        Rick Avers
        Its:  Manager

3

Exhibit 2 - Page 67

# EXHIBIT 3

Exhibit 3 - Page 68

## EXHIBIT "C"

## SECURED PROMISSORY NOTE TWO

$426,664.14                                                                October 25, 2019

     FOR VALUE RECEIVED, **VERISTAR, LLC** ("Maker"), promises to pay **FRANKLIN DATA VENTURES, INC.,** ("Payee"), at 4100 MacArthur Blvd., Suite 150, Newport Beach, CA 92660, or at such other place as may be designated in writing by Payee, the principal sum of ($426,664.14).

     1.    <u>Payment.</u>  Maker shall make monthly payments on this Promissory Note (the "Note") of principal and interest at a rate of five and one-half (5.5) percent per annum on the first day of each month in the sum Seven Thousand Fifty-Three and .79 Dollars ($7,053.79) commencing on November 1, 2019 and continuing thereafter through August 1, 2025 (the "Maturity Date") unless earlier paid in full.

     4.    <u>Security and Recourse</u>.  Maker executes contemporaneously with this Note the Security Agreement in the form attached and incorporated herein by reference (the "Security Agreement").

     5.    <u>Default and Acceleration</u>.  At Payee's option, the full remaining principal balance shall, upon notice and demand to Maker, become due and payable and may be collected immediately, time being of the essence of this Note, upon the occurrence of one or more of the events listed below (each a "Default"):

     (a)    If Maker fails to pay any installment when due hereunder, and such default in payment continues for a period of more than thirty (30) days after written notice from Payee of such default; or

     (b)    The filing by Maker of a voluntary petition or any answer seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code of 1978, 11 U.S.C., Section 1091 et. seq., as hereafter amended (the "Bankruptcy Code"), or under any other insolvency act or law, state or federal, now or hereafter existing or any other action of Maker indicating its consent to, approval of, or acquiescence in, any such petition or proceeding; the application by Maker for, the appointment by consent or acquiescence of, a custodian, receiver or trustee for all or a substantial part of Maker's property; or

     (c)    If Maker makes any assignment for the benefit of its creditors; or

     (d)    The filing of an involuntary petition against Maker seeking liquidation, reorganization, arrangement, readjustment of its debts or for any other relief under the Bankruptcy Code, or under any other insolvency act or law, state or federal, now or hereafter existing; or the involuntary appointment of a custodian, receiver or trustee for all or a substantial part of Maker's property; the issuance of a warrant of attachment, execution or similar process against any substantial part of the property of Maker; and either (i) the continuance of any of such events for sixty (60) days undismissed, undischarged or unbonded, or (ii) within such sixty (60) day period, the entry of any order for relief under the Bankruptcy Code in any such case or proceeding.

1

Exhibit 3 - Page 69

Upon any such event of Default, Payee shall be entitled to exercise the rights and remedies available to it at law and equity as set forth in this Note and the Security Agreement.

4.   <u>Prepayment</u>.  Maker may prepay this Note in whole or in part at any time without premium or penalty. Any payments shall first be applied to accrued and unpaid interest. Any excess prepayments in advance of any principal will be applied to reduce the outstanding principal amount of this Note.

5.   <u>Notice and Demand; Default Interest; Attorneys' Fees</u>.  Maker waives demand, protest and notice of demand, protest and nonpayment of this Note except as expressly provided herein.  In the event this Note is collected by legal action through an attorney at law, costs of collection, including reasonable attorney's fees, shall be paid by Maker, not to exceed ten percent (10%) of the outstanding principal balance at the time of Default.

6.   <u>No Waiver</u>.  The failure of Payee in one or more instances to insist upon strict compliance by Maker with the terms of this Note, or indulgence granted from time to time, shall not constitute a waiver by Payee of any term or right hereunder or otherwise impair or limit the rights of Payee hereunder.

7.   <u>Notices</u>.  All notices, demands or other communications of any type required or permitted under this Note shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item, return receipt requested, to the addresses specified below.  The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing Notice are as follows:

**Maker:**

Veristar, LLC
9501 W. 144th Place
Orland Park, IL 60462
Attn: Rick Avers

**Payee:**

Franklin Data Ventures, Inc.,
4100 MacArthur Blvd. Suite 150
Newport Beach, CA 92660
ATTN:  Matthew W. Blake

2

Exhibit 3 - Page 70

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with Federal Express or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein. Either party hereto may change the address for notice specified above by notice given as provided herein to the other party.

8. <u>Binding Effect</u>. This Note shall be binding upon Maker, its successors and assigns, and shall inure to the benefit of Payee, its heirs, successors and assigns. This Note may be transferred or assigned at the discretion of Payee

9. <u>Governing Law and Jurisdiction</u>. This Note shall be construed and enforced in accordance with the laws of the State of California and Maker agrees that any controversy surrounding this Note shall be resolved before the Courts in the County of Orange, State of California.

IN WITNESS WHEREOF, the Maker has set its hand and seal, all as of the date first set forth above.

Maker:

Veristar, LLC

By: _____
      Rick Avers
      Its: Manager

3

Exhibit 3 - Page 71

# EXHIBIT 4

Exhibit 4 - Page 72

## SECURITY AGREEMENT

THIS SECURITY AGREEMENT (the "Security Agreement") is entered into as of October 25, 2019, between **VERISTAR, LLC.,** An Illinois Limited Liability Corporation authorized to transact business in California ("Maker"), and **FRANKLIN DATA VENTURES, INC.** a Texas corporation ("Secured Party"). Collectively Maker and Secured Party are referred to as the "Parties".

W I T N E S S E T H :

**WHEREAS**, pursuant to that certain Asset Purchase Agreement dated October 25, 2019 by and between Maker and Secured Party (the "Purchase Agreement"), Maker is acquiring certain assets of Secured Party as described in the Purchase Agreement;

**WHEREAS**, as part of the Purchase Price (as defined in the Purchase Agreement), Maker has executed one Balloon Payment Note and two Secured Promissory Notes of even date herewith, payable to Secured Party (the "Promissory Notes"); and

**WHEREAS**, this Security Agreement is being entered into pursuant to Sections (b), (c) and (e) of the Purchase Agreement.

**NOW, THEREFORE,** in consideration of the mutual promises, covenants, and agreements herein contained and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, it is agreed as follows:

1. Creation of Security Interest. As security for the loans represented by the Promissory Notes (the "Obligation"), Maker hereby grants a security interest in and to the Collateral (as defined below) in favor of Secured Party to secure the full and prompt payment of the Obligation, as effective as of the Closing Date specified in the Purchase Agreement.

2. Definition of "Collateral". As used herein, "Collateral" shall mean those Purchased Assets as defined in the Purchase Agreement in which Maker has an interest.

3. Event of Default. An "Event of Default" shall exist under this Security Agreement upon the happening of any of the following events or conditions:

    (a) If Maker fails to perform or discharge any of its covenants or obligations under this Security Agreement; or

    (b) If any Default shall occur under any of the Promissory Notes.

4. Rights and Remedies on Event of Default.

    (a) During the continuance of an Event of Default, Secured Party, with notice to Maker (as provided below), shall have the rights and remedies of a secured party to: (i) sell or otherwise dispose of all or any part of the Collateral, either at public or private sale, in lots or in bulk, for cash or for credit, with or without warranties or representations, and upon such terms and conditions as are commercially

Exhibit 4 - Page 73

reasonable, and (ii) purchase the Collateral at any such sale for fair value in full satisfaction of the Obligation.  Maker agrees that a notice sent at least fifteen (15) days before the time of any intended public sale or of the time after which any private sale or other disposition of the Collateral is to be made shall be reasonable notice of such sale or other disposition.  The proceeds of any such sale or other Collateral disposition shall be applied (i) first, to the reasonable expenses of sale, (ii) then, to the Obligation, and (iii) lastly, to the payment of any other amounts required by applicable law.  Secured Party shall pay Maker any surplus proceeds of such sale or other disposition.

(b)     Any sale, whether under any power of sale hereby given or by virtue of judicial proceedings, shall operate to divest all Maker's right, title, interest, claim and demand whatsoever, either at law or in equity, in and to the Collateral sold, and shall be a perpetual bar, both at law and in equity, against Maker, its successors and assigns, and against all persons and entities claiming the Collateral sold or any part thereof under, by or through Maker, its successors or assigns.

(c)     All of Secured Party's rights and remedies with respect to the Collateral, whether established hereby or by any other agreements, instruments or documents or by law shall be cumulative and may be exercised singly or concurrently.

5.     <u>Governing Law and Jurisdiction</u>.  This Security Agreement shall be construed according to the UCC, and all obligations of the parties created hereunder are to be construed and enforced in accordance with the laws in the State of California, without giving effect to its conflict of laws principles.  The parties agree the state courts located in, or the federal courts serving, Orange County, California, shall be the sole and exclusive forum for any suit or proceeding to enforce this Security Agreement and each party submits to the personal jurisdiction of said courts for that limited purpose.

6.     <u>Amendment</u>.  Neither this Security Agreement nor any part hereof may be changed, waived, or amended except by an instrument in writing signed by Secured Party and by Maker; and waiver on one occasion shall not operate as a waiver on any other occasion.

7.     <u>Notices</u>.  All notices, consents, demands or other communications of any type under this Security Agreement shall be in writing and shall be deemed effectively delivered when (i) delivered by hand, or (ii) deposited with a reputable overnight courier service, for overnight delivery, or (iii) mailed to such person by United States Mail, postage prepaid, as a certified item, return receipt requested, to the addresses specified below.  The addresses of the parties for purposes of any notices required or convenient hereunder are set out below. In addition to and without limitation hereof, either party may designate one additional person or notice address. Said addresses and persons for purposes of providing notice are as follows:

Maker:                                  Secured Party:

Veristar, LLC                           Franklin Data Ventures, Inc.,
9501 W. 144th Place          4100 MacArthur Blvd. Suite 150

2

Exhibit 4 - Page 74

Orland Park, IL 60462                   Newport Beach, CA 92660
Attn: Rick Avers                        ATTN:  Matthew W. Blake

                                        With a copy (which shall not constitute notice to
                                        Secured Party) to: ccanty@nexem.com

Any notice deposited in the United States Mail (postage prepaid, certified mail, return receipt requested) shall be effective when mailed but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for five (5) calendar days in excess of any time limit provided herein. Any notice deposited with FedEx or similar overnight courier service, for overnight delivery, shall be effective when deposited with such service, but if the recipient is required or permitted to respond or perform any act in response to the notice within a limited time period, the time period during which the recipient may respond or perform any act shall be extended for two (2) calendar days in excess of any time limit provided herein.  Any notice recipient hereto may change the address for notice specified above by notice given as provided herein to the other recipients.

8.  Successors and Assigns.  This Security Agreement shall be binding upon, and inure to the benefit of, the parties hereto and their respective successors and assigns; provided that Maker may not transfer or assign this Security Agreement without the express written consent of the Secured Party.  Any attempted assignment not in accordance with this Section shall be void and without effect.

9.  Time of Essence.  Time is of essence in this Security Agreement and in the performance of the Obligation.

10. Termination.  At such time as the Obligation shall have been paid in full, the Collateral shall be released from the liens created hereby, and this Agreement and all obligations of the Secured Party and the Maker hereunder shall terminate, all without delivery of any instrument or any further action by any party, and all rights to the Collateral shall revert to the Maker.  At the request and sole expense of the Maker following any such termination, the Secured Party shall deliver to the Maker any Collateral held by the Secured Party hereunder, and execute and deliver to the Maker such documents as the Maker shall reasonably request to evidence such termination.

(Continued on Next Page)

3

Exhibit 4 - Page 75

IN WITNESS WHEREOF, the Parties have executed this Security Agreement the date set forth above.

**MAKER:**
**Veristar, LLC**

By: _____
Rick Avers, It's Managing Member

**SECURED PARTY:**
**Franklin Data Ventures, Inc.**

By: _____
Matthew W. Blake, It's President

4

Exhibit 4 - Page 76

# EXHIBIT 5

Exhibit 5 - Page 77

RECEIVED

IL SECRETARY OF STATE

UNIFORM COMMERCIAL CODE

10/31/19     17:03

$20.00    Electronic

## UCC FINANCING STATEMENT

FOLLOW INSTRUCTIONS

**24908313**                    FS

| A. NAME & PHONE OF CONTACT AT FILER (optional) |
|---|
| Cheryl Canty                    949-336-4329 |

| B. E-MAIL CONTACT AT FILER (optional) |
|---|
| ccanty@nexem.com |

C. SEND ACKNOWLEDGMENT TO:  (Name and Address)

ccanty@nexem.com

4100 MacArthur Blvd., Suite 150

Newport Beach, CA, 92660

THE ABOVE SPACE IS FOR FILING OFFICE USE ONLY

1. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

| | 1a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | Veristar, LLC | | | | |
| | 1b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 1c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 9501 W. 144th Place | Orland Park | IL | 60462 | USA |

2. DEBTOR'S NAME: Provide only one Debtor name (2a or 2b) (use exact, full name; do not omit, modify, or abbreviate any part of the Debtor's name); if any part of the Individual Debtor's name will not fit in line 2b, leave all of item 2 blank, check here ☐ and provide the Individual Debtor information in item 10 of the Financing Statement Addendum (Form UCC 1Ad)

| | 2a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | | | | | |
| | 2b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 2c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| | | | | |

3. SECURED PARTY'S NAME (or NAME of ASSIGNEE of ASSIGNOR SECURED PARTY): Provide only one secured party name (3a or 3b)

| | 3a. ORGANIZATION'S NAME | | | | |
|---|---|---|---|---|---|
| OR | Franklin Data Ventures, Inc. | | | | |
| | 3b. INDIVIDUAL'S SURNAME | FIRST PERSONAL NAME | ADDITIONAL NAME(S)/INITIAL(S) | | SUFFIX |

| 3c. MAILING ADDRESS | CITY | STATE | POSTAL CODE | COUNTRY |
|---|---|---|---|---|
| 4100 MacArthur Blvd., Suite 150 | Newport Beach | CA | 92660 | USA |

4. COLLATERAL: This financing statement covers the following collateral:
ALL ASSETS, ACCOUNTS AND CONTRACT RIGHTS OF THE DEBTOR WHETHER NOW OR HEREAFTER EXISTING OR ACQUIRED, AND ALL CHATTEL PAPER AND INSTRUMENTS, WHETHER NOW OR HEREAFTER EXISTING OR ACQUIRED, AND ALL INVENTORY AND EQUIPMENT OF DEBTOR WHETHER NOW OR HEREAFTER EXISTING OR ACQUIRED, AND ALL INTEREST OF THE DEBTOR IN ANY GOODS THE SALE OR LEASE OF WHICH MAY GIVE RISE TO ANY ACCOUNTS OR ASSETS AND ALL INTANGIBLES RELATING TO THE ABOVE TOGETHER WITH ALL PRODUCTS AND PROCEEDS THEREOF.

5. Check only if applicable and check only one box: Collateral is ☐ held in a Trust (see UCC1Ad, item 17 and instructions) ☐ being administered by a Decedent's Personal Representative

6a. Check only if applicable and check only one box:
☐ Public-Finance Transaction ☐ Manufactured-Home Transaction ☐ A Debtor is a Transmitting Utility

6b. Check only if applicable and check only one box:
☐ Agricultural Lien ☐ Non-UCC Filing

7. ALTERNATIVE DESIGNATION (if applicable): ☐ Lessee/Lessor ☐ Consignee/Consignor ☑ Seller/Buyer ☐ Bailee/Bailor ☐ Licensee/Licensor

8. OPTIONAL FILER REFERENCE DATA:

FILING OFFICE COPY - UCC FINANCING STATEMENT (Form UCC1)  (Rev. 04/20/11)

Exhibit 5 - Page 78

# EXHIBIT 11

**IN THE UNITED STATE BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | | |
|---|---|---|
| IN RE: | § | Chapter 15 |
| | § | |
| TAKATA CORPORATION, *et al.*, | § | Case No. 17-11713 (BLS) |
| | § | Jointly Administered |
| Debtors in a foreign proceeding. | § | |
| | § | |
| In re: | § | Chapter 11 |
| | § | |
| TK Holdings, INC. *et al.*, | § | Case No. 17-11375 (BLS) |
| | § | Jointly Administered |
| Debtors. | § | |
| | § | **RE: Docket No(s).:** |
| | § | |

**ORDER GRANTING TAKATA MDL ACTION PLAINTIFFS' MOTION TO DISMISS
OR ABATE THE CONTESTED MATTER COMMENCED BY VERISTAR, LLC'S
MOTION FOR RELIEF UNDER STIPULATED PROTECTIVE ORDER**

AND NOW, this _____ day of _____, 202__, upon consideration of

the Takata MDL Action Plaintiffs' Motion to Dismiss or Abate the Contested Matter Commenced

by Veristar, LLC's Motion for Relief Under Stipulated Protective Order [Ch. 11 Dkt. No. 4884;

Ch. 15 Dkt. No. 224] (the "Motion"), and the additional submissions of the parties in connection

with the Motion, and the arguments of counsel on the Motion at the hearing held on December 14,

2022 (the "Hearing"):

1.　　　For the reasons set forth on the record of the Hearing, the Motion is GRANTED;

2.　　　Veristar, LLC's Motion for Relief Under Stipulated Protective Order [Ch. Dkt. No.

4774; Ch. 15 Dkt. No. 199] ("Veristar Motion") is DENIED without prejudice;

3.　　　All parties' rights, claims and defenses in connection with the subject matter of the

Veristar Motion are reserved in their entirety.

**BRENDAN L. SHANNON**
**UNITED STATES BANKRUPTCY JUDGE**

**Dated: December 21st, 2022**
**Wilmington, Delaware**

# EXHIBIT 12

Marian F. Harrison
US Bankruptcy Judge

Dated: 3/23/2023

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | Case No. 3:23-bk-00413 |
| VERISTAR, LLC, *et al.,* | ) | Chapter 11 (Subchapter V) |
| | ) | Judge Marian F. Harrison |
| Debtors. | ) | Jointly Administered |

## AGREED ORDER
### STIPULATION REGARDING (I) DESTRUCTION AND RETURN OF TAKATA ENTITIES' TRANSFERRED DATA AND (II) RESOLVING OBJECTION TO CONFIRMATION

This stipulation (this "***Stipulation***") is made and entered into as of March 17, 2023, by Veristar, LLC, Veristar TN, LLC, and Veristar Global, LLC (collectively, "***Veristar Entities***"), Exego, Inc. ("***Exego***"), TKJP Corporation ("***TKJP***"), TK Holdings, Inc. ("***TKH***" and, together with TKJP, the "***Takata Entities***"), and Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems ("***JSS***"), which hereby agree as follows:

**1.** The Veristar Entities will include the findings of fact and decretal provisions set forth in Exhibit "A" hereto (the "***Stipulated Language***")[1] in any proposed order confirming a plan of reorganization with respect to the Veristar Entities.

**2.** As described more fully in the Stipulated Language, the Takata Entities and JSS object to the Joint Plan of Reorganization proposed by the Veristar Entities (as such plan may be modified or amended, the "***Chapter 11 Plan***") to the extent that it purports to treat the Transferred Data and the Original Drives as property of the estate of any of the Veristar Entities; purports to revest the Transferred Data and Original Drives in the Veristar Entities free and clear of liens, claims, and interests; and does not require the

---

[1] Any capitalized terms used but not defined herein shall have the meanings ascribed to them in the Stipulated Language.

1

return of the Original Drives and the destruction of the Transferred Data. This Stipulation, once executed, will be filed with the United States Bankruptcy Court for the Middle District of Tennessee (the "***Tennessee Bankruptcy Court***") and will be deemed to constitute an objection to the Chapter 11 Plan, which objection shall be resolved by inclusion of the Stipulated Language in an order confirming the Chapter 11 Plan.

3.      The Veristar Entities will not modify the Stipulated Language without the prior written consent of the Takata Entities and JSS.

4.      The Veristar Entities agree that, by appearing before the Tennessee Bankruptcy Court for the purposes of entering into or enforcing this Stipulation and the terms of the Stipulated Language or otherwise to protect their rights with respect to the Original Drives and the Transferred Data, the Takata Entities and JSS will not be submitting themselves to the jurisdiction of the Tennessee Bankruptcy Court for any other purpose, and none of the Veristar Entities will make such argument.

5.      Upon entry of a confirmation order containing the Stipulated Language, the Takata Entities and JSS shall be deemed to have waived and released any claims against any of the Veristar Entities and Exego arising from the possession and processing of the Transferred Data or the holding of the Original Drives by any of the Veristar Entities or their affiliates, other than any claims arising from a breach of this Stipulation.

6.      Upon entry of an order confirming a plan with respect to the Veristar Entities, Exego and the Veristar Entities shall be deemed to have waived and released any claims against any of the Takata Entities and JSS arising from the possession and processing of the Transferred Data or the holding of the Original Drives, other than any claims arising from a breach of this Stipulation.

2

7.      This Stipulation reflects the complete agreement between the parties. No other statements or promises that are not contained in this Stipulation will be valid or binding, unless those promises are reduced to writing and signed by the parties. This Stipulation may not be modified or amended except by a writing signed by the parties. The parties also specifically agree that they may not orally agree to waive the writing requirement set forth in this paragraph.

8.      This Stipulation may be signed in one or more counterparts, each of which shall be deemed an original and all of which together shall be considered one and the same instrument. Moreover, this Stipulation may be executed by the exchange of email or facsimile signatures, which shall be deemed original signatures.

9.      Upon the filing of this Stipulation with the Tennessee Bankruptcy Court, the Veristar Entities shall cause the Stipulation to be served by email on the entities set forth on Exhibit "B" hereto (the "***MDL List***") and all persons and entities that have filed notices of appearance in the Veristar Entities' chapter 11 cases. A copy of this Stipulation is being provided to those parties identified in Exhibit B hereto who are listed as Notice parties in Section 23 of the Delaware Bankruptcy Protective Order (Exhibit B excludes those parties who are signatories to this Stipulation). The Veristar Entities shall also cause a copy of the Confirmation Order, once entered, to be served on the entities set forth on the MDL List in the same manner as and concurrently with service on other parties in interest in the chapter 11 cases.

3

Agreed to by:

**Veristar, LLC**

_(signature)_
_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

_Counsel for Veristar, LLC_

**Veristar Global, LLC**

_(signature)_
_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215

_Counsel for Veristar Global, LLC_

**TKJP Corporation**

_____

Debra A. Dandeneau
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018

_Counsel for TKJP Corporation_

**Joyson Safety Systems Acquisition LLC**

_____

Lawrence Buonomo
Deputy General Counsel
Joyson Safety Systems
2025 Harmon Road
Auburn Hills, MI 48326

**Veristar TN, LLC**

_(signature)_
_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

_Counsel for Veristar TN, LLC_

**Exego, Inc.**

_____

Richard Avers
Chief Executive Officer
Email: ravers@veristar.tech
9501 West 144th Place
Orlando Park, IL 60462

**TK Holdings, Inc.**

_____

D. Ross Hamilton, Jr.
Tuggle Duggins P.A.
400 Bellemeade Street, Suite 800
P.O. Box 2888 - 27402
Greensboro, NC  27401

_Counsel for TK Holdings, Inc._

4

Agreed to by:

**Veristar, LLC**

_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

_Counsel for Veristar, LLC_

**Veristar Global, LLC**

_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215

_Counsel for Veristar Global, LLC_

**TKJP Corporation**

_____

Debra A. Dandeneau
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018

_Counsel for TKJP Corporation_

**Joyson Safety Systems Acquisition LLC**

_____

Lawrence Buonomo
Deputy General Counsel
Joyson Safety Systems
2025 Harmon Road
Auburn Hills, MI 48326

**Veristar TN, LLC**

_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

_Counsel for Veristar TN, LLC_

**Exego, Inc.**

_____

Richard Avers
Chief Executive Officer
Email: ravers@veristar.tech
9501 West 144th Place
Orlando Park, IL 60462

**TK Holdings, Inc.**

_____

D. Ross Hamilton, Jr.
Tuggle Duggins P.A.
400 Bellemeade Street, Suite 800
P.O. Box 2888 - 27402
Greensboro, NC  27401

_Counsel for TK Holdings, Inc._

4

Agreed to by:

| **Veristar, LLC** | **Veristar TN, LLC** |
|---|---|
| _____ | _____ |
| Robert J. Gonzales (robert@emerge.law) | Robert J. Gonzales (robert@emerge.law) |
| Nancy B. King (nancy@emerge.law) | Nancy B. King (nancy@emerge.law) |
| EmergeLaw, PLLC | EmergeLaw, PLLC |
| 4235 Hillsboro Pike, Suite 350 | 4235 Hillsboro Pike, Suite 350 |
| Nashville, Tennessee 37215 | Nashville, Tennessee 37215 |
| (615) 815-1535 | (615) 815-1535 |
| | |
| _Counsel for Veristar, LLC_ | _Counsel for Veristar TN, LLC_ |

**Veristar Global, LLC**                    **Exego, Inc.**

_____          _____

Robert J. Gonzales (robert@emerge.law)    Richard Avers
Nancy B. King (nancy@emerge.law)          Chief Executive Officer
EmergeLaw, PLLC                           Email: ravers@veristar.tech
4235 Hillsboro Pike, Suite 350            9501 West 144th Place
Nashville, Tennessee 37215                Orland Park, IL 60462

_Counsel for Veristar Global, LLC_

**TKJP Corporation**                       **TK Holdings, Inc.**

_(signature)_
_____          _____

Debra A. Dandeneau                         D. Ross Hamilton, Jr.
Baker McKenzie LLP                         Tuggle Duggins P.A.
452 Fifth Avenue                           400 Bellemeade Street, Suite 800
New York, NY 10018                         P.O. Box 2888 - 27402
                                           Greensboro, NC  27401
_Counsel for TKJP Corporation_
                                           _Counsel for TK Holdings, Inc._

**Joyson Safety Systems Acquisition LLC**

_____

Lawrence Buonomo
Deputy General Counsel
Joyson Safety Systems
2025 Harmon Road
Auburn Hills, MI 48326

4

Agreed to by:

**Veristar, LLC**

_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

_Counsel for Veristar, LLC_

**Veristar Global, LLC**

_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215

_Counsel for Veristar Global, LLC_

**TKJP Corporation**

_____

Debra A. Dandeneau
Baker McKenzie LLP
452 Fifth Avenue
New York, NY 10018

_Counsel for TKJP Corporation_

**Joyson Safety Systems Acquisition LLC**

_____

Lawrence Buonomo
Deputy General Counsel
Joyson Safety Systems
2025 Harmon Road
Auburn Hills, MI 48326

**Veristar TN, LLC**

_____

Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

_Counsel for Veristar TN, LLC_

**Exego, Inc.**

_____

Richard Avers
Chief Executive Officer
Email: ravers@veristar.tech
9501 West 144th Place
Orland Park, IL 60462

**TK Holdings, Inc.**

_____

D. Ross Hamilton, Jr.
Tuggle Duggins P.A.
400 Bellemeade Street, Suite 800
P.O. Box 2888 - 27402
Greensboro, NC  27401

_Counsel for TK Holdings, Inc._

4

Agreed to by:

**Veristar, LLC**                                    **Veristar TN, LLC**

_____                   _____

Robert J. Gonzales (robert@emerge.law)     Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)           Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC                            EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350             4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215                 Nashville, Tennessee 37215
(615) 815-1535                             (615) 815-1535

_Counsel for Veristar, LLC_                _Counsel for Veristar TN, LLC_

**Veristar Global, LLC**                   **Exego, Inc.**

_____                   _____

Robert J. Gonzales (robert@emerge.law)     Richard Avers
Nancy B. King (nancy@emerge.law)           Chief Executive Officer
EmergeLaw, PLLC                            Email: ravers@veristar.tech
4235 Hillsboro Pike, Suite 350             9501 West 144th Place
Nashville, Tennessee 37215                 Orland Park, IL 60462

_Counsel for Veristar Global, LLC_

**TKJP Corporation**                       **TK Holdings, Inc.**

_____                   _____

Debra A. Dandeneau                         D. Ross Hamilton, Jr.
Baker McKenzie LLP                         Tuggle Duggins P.A.
452 Fifth Avenue                           400 Bellemeade Street, Suite 800
New York, NY 10018                         P.O. Box 2888 - 27402
                                           Greensboro, NC  27401

_Counsel for TKJP Corporation_             _Counsel for TK Holdings, Inc._

**Joyson Safety Systems Acquisition LLC**

_____

Lawrence Buonomo
Deputy General Counsel
Joyson Safety Systems
2025 Harmon Road
Auburn Hills, MI 48326

4

**EXHIBIT A**

**Stipulated Language to be inserted into the Veristar Confirmation Order**

**Findings of Fact to Be Included in Confirmation Order**

**A.**     On November 29, 2018, the United States Bankruptcy Court for the District of Delaware entered an Order approving that certain Confidentiality and Data Privacy Agreement, and Stipulated Protective Order, effective as of October 12, 2018 (the "***Delaware Bankruptcy Protective Order***"), in the chapter 15 case pending on behalf of TKJP Corporation ("***TKJP***") as Case No. 17-11713 [Doc. No. 174] and the chapter 11 case of TK Holdings, Inc. ("***TKH***" and, together with TKJP, the "***Takata Entities***") pending as Case No. 17-11375 [Doc. No. 3498].

**B.**     The Delaware Bankruptcy Protective Order provided for the storage of certain data that might be needed in connection with pending and future cases involving defective "PSAN inflators." In 2018, pursuant to the Delaware Bankruptcy Protective Order, the Takata Entities delivered a total of 94 hard drives of data (the "***Original Drives***") to Planet Data Solutions Inc. ("***PDS***"). The Original Drives consist of 83 hard drives delivered by TKJP to PDS and eleven hard drives delivered by TKH to PDS.

**C.**     On March 15, 2019, the United States District Court for the Southern District of Florida ("***FLSD***") entered the Delaware Bankruptcy Protective Order as an Order of the FLSD in the MDL case *In Re: Takata Airbag Products Liability Litigation*, No. 15-MD-02599, [Doc. No. 3327] (together with the Delaware Bankruptcy Protective Order, the "***Protective Order***").

**D.**     The Protective Order governs the transfer, storage, processing, access and disposal of the Original Drives and all of the data contained thereon.

1

**E.**      On or about February 9, 2021, Veristar, LLC acquired certain assets of PDS and, as a result of the acquisition, came into possession of the Original Drives and certain data processed from the Original Drives (which is defined as the "Transferred Data" in Art. 3 of the Delaware Bankruptcy Protective Order). None of the Veristar Entities has agreed to be bound by the terms of the Protective Order.

**F.**      The Takata Entities have argued that the Veristar Entities are not properly in possession of the Transferred Data and Original Drives. Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems ("***JSS***") purchased certain of the assets of the Takata Entities and asserts that confidential information pertaining to such assets and belonging to JSS is contained in the Transferred Data and the Original Drives. The Takata Entities and JSS also have asserted that the Transferred Data and the Original Drives are not property of the estate of any of the Veristar Entities.

**G.**      The Takata Entities and JSS have asked Veristar Entities to destroy all remotely (cloud) stored processed Transferred Data, as well as all physical media on which any Transferred Data (processed or unprocessed) was stored (excluding the Original Drives), and to return the Original Drives to TKH.

**H.**      The parties have engaged in good faith arms' length discussions to resolve the concerns of the Takata Entities and JSS with respect to the Transferred Data and the Original Drives.

**I.**      On March 17, 2023, the Takata Entities, JSS, Exego, Inc., and the Veristar Entities entered into a Stipulation, which has been filed in this Court [Doc. No. ___] (the "***Stipulation***"). The Stipulation is deemed to be an objection to confirmation of the Joint Plan of Reorganization of the Veristar Entities (as such plan may be modified or amended)

2

and requires the inclusion herein of certain findings and decretal provisions to resolve such objection.

**Decretal Provisions to Be Included in Confirmation Order**

1.     Immediately upon entry of this Order, the Veristar Entities shall be authorized to destroy, or cause to be destroyed, all remotely (cloud) stored processed Transferred Data. Within seven (7) days after the date hereof, the Veristar Entities shall deliver to counsel for the Takata Entities and JSS a certification in form and substance consistent with the following:

> The remotely (cloud) stored processed Transferred Data was destroyed using [explain method of destruction] on [Date] by [Name of person or entity that destroyed the data]. As a result of the destruction of the remotely (cloud) stored processed Transferred Data, it is impossible to recall or recover the data, and the only extant copy of the data resides on the Original Drives.
>
> In addition to the Original Drives, the Transferred Data also was stored on the following physical media: [list physical media]. All such physical media have been destroyed using [Explain method of destruction] on [Date] by [Name of person or entity that destroyed the media].

2.     Within 7 days after the date hereof, the Veristar Entities shall cause the Original Drives to be delivered via FedEx to the following address:

> TKH
> c/o D. Ross Hamilton
> Tuggle Duggins P.A.
> 400 Bellemeade Street, Suite 800
> P.O. Box 2888 – 27402
> Greensboro, NC 27401

3.     The Veristar Entities and their successors shall not object to any efforts of the Takata Entities to obtain approval from the MDL Court permitting TKH to destroy the Original Drives.

4.     Effective immediately upon entry of this Order, the Veristar Entities and their respective estates shall be deemed to release any and all claims against any of the Takata Entities or JSS arising from the possession and processing of the Transferred

Data or the holding of the Original Drives, other than any claims arising from a breach of the Stipulation. Nothing herein shall limit the Veristar Entities' claims or rights to payment for data storage or otherwise, except that no such claims or rights may be made or enforced against any of the Takata Entities or JSS.

4

**EXHIBIT B**
**The MDL List**

| | |
|---|---|
| If to the Trust: | PSAN PI/WD Trust |
| | Eric D. Green |
| | Resolutions, LLC |
| | 125 High Street, Suite 2205 |
| | Boston, Massachusetts 02110 |
| | ericdgreen@resolutionsllc.com |

with a copy (which alone will not constitute notice) to:

David J. Molton
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
dmolton@brownrudnick.com

| | |
|---|---|
| If to the Special Master: | Special Master |
| | Eric D. Green |
| | Resolutions, LLC |
| | 125 High Street, Suite 2205 |
| | Boston, Massachusetts 02110 |
| | ericdgreen@resolutionsllc.com |

with a copy (which alone will not constitute notice) to:

David J. Molton
Brown Rudnick LLP
Seven Times Square
New York, New York 10036
dmolton@brownrudnick.com

| | |
|---|---|
| If to MDL Counsel: | Peter Prieto |
| | Podhurst Orseck, P.A. |
| | SunTrust International Center |
| | One S.E. 3rd Ave, Suite 2300 |
| | Miami, FL 33131 |
| | pprieto@podhurst.com |

with a copy (which alone will not constitute notice) to:

Matthew P. Weinshall
Podhurst Orseck, P.A.
SunTrust International Center
One S.E. 3rd Ave, Suite 2300

1

Miami, FL 33131
mweinshall@podhurst.com

If to the FCR:        Roger Frankel
                      Frankel Wyron, LLP
                      2101 L Street, NW Suite 800
                      Washington, DC 20037
                      rfrankel@frankelwyron.com

                      with a copy (which alone will not constitute notice) to:

                      Richard H. Wyron
                      Frankel Wyron, LLP
                      2101 L Street, NW Suite 800
                      Washington, DC 20037
                      rwyron@frankelwyron.com

If to TAC:            Kevin Dean
                      Motley Rice LLC
                      28 Bridgeside Blvd.
                      Mount Pleasant, SC 29464
                      Kdean@motleyrice.com

**OEMS**

BMW of North America,     Tom Branigan
LLC                        Matthew Berard
                           Bowman and Brooke LLP
                           41000 Woodward Ave., Ste 200 E
                           Bloomfield Hills, Michigan 48304
                           Thomas.Branigan@bowmanandbrooke.com
                           Matthew.Berard@bowmanandbrooke.com

                           Ann Marie Dias-Lebrun
                           BMW of North America, LLC
                           300 Chestnut Ridge Road
                           Woodcliff Lake, New Jersey 07677
                           annmarie.dias-lebrun@bmwna.com

FCA US LLC f/k/a           Mark Werling
Chrysler Group LLC         Office of the General Counsel
                           FCA US LLC
                           1000 Chrysler Drive
                           Auburn Hills, MI 48326
                           mark.werling@fcagroup.com

2

with copy to:

Brian D. Glueckstein
Sullivan & Cromwell LLP
125 Broad Street
New York, NY 10004
gluecksteinb@sullcrom.com

Ford Motor Company

Andrew S. Pride
Legal Affairs Director
Canada, Mexico and South America
Ford Motor Company
313-248-2248
Apride1@ford.com

and

R. Kent Warren
McGuireWoods LLP
201 North Tryon Street Suite 3000
Charlotte, NC 28202-2146
kwarren@mcguirewoods.com

and

John H. Thompson
McGuire Woods LLP
2001 K Street, NW Suite 400
Washington, DC 20006
jthompson@mcguirewoods.com

Honda Motor Co., Ltd.
on behalf of itself and its
affiliates

Michael C. Andolina
Sidley Austin LLP
1 South Dearborn St.
Chicago, IL 60603
mandolina@sidley.com

Mazda Motor
Corporation

Charles S. Kim
Mazda North American Operations
200 Spectrum Center Dr., Suite 100
Irvine, CA 92618
Ckim1@mazdausa.com

Mercedes-Benz USA
LLC

Troy M. Yoshino
Squire Patton Boggs (US) LLP
275 Battery Street, Suite 2600

3

|                                                          |                                                                                                                                                                                                                 |
|----------------------------------------------------------|-----------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------------|
|                                                          | San Francisco, CA 94111<br>troy.yoshino@squirepb.com                                                                                                                                                            |
| Mitsubishi Motors Corporation                            | Paul, Weiss, Rifkind, Wharton & Garrison, LLP<br>1285 Avenue of the Americas<br>New York, NY 10019-6064                                                                                                          |
| Nissan Motor Co., Ltd.                                   | E. Paul Cauley, Jr.<br>Jude T. Hickland<br>Mark E. Killingsworth<br>Drinker Biddle & Reath, LLP<br>1717 Main St., Suite 5400<br>Dallas, Texas 75201<br>Paul.Cauley@dbr.com<br>Jude.Hickland@dbr.com<br>Mark.Killingsworth@dbr.com |
| Subaru Corporation                                       | Terri Claybrook<br>Director-Associate General Counsel<br>Subaru of America, In.<br>One Subaru Drive<br>Camden, New Jersey 08103-9800                                                                             |
| Toyota Motor Corporation on behalf of itself and its affiliates | Terri S. Reiskin<br>Dykema Gossett PLLC<br>1301 K Street NW, Suite 1100<br>Washington, DC 20005<br>treiskin@dykema.com<br><br>Derek S. Whitefield<br>Dykema Gossett PLLC<br>333 South Grand Avenue, Suite 2100<br>Los Angeles, CA 90071<br>dwhitefield@dykema.com |
| Volkswagen Group of America, Inc.                        | Suhana S. Han<br>Sullivan & Cromwell LLP<br>125 Broad Street<br>New York, NY 10004-2498<br>hans@sullcrom.com                                                                                                    |

4

This Order has been electronically
signed. The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# EXHIBIT 13

Marian F. Harrison
US Bankruptcy Judge

Dated: 4/20/2023

# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

IN RE:                              )
                                    )          Case No. 3:23-bk-00413
VERISTAR, LLC, *et al.,*            )          Chapter 11 (Subchapter V)
                                    )          Judge Marian F. Harrison
Debtors.                    )          Jointly Administered

## ORDER CONFIRMING DEBTORS'
## THIRD AMENDED JOINT PLAN OF REORGANIZATION

This matter came before the Court on April 18, 2023 at 9:00 AM, to consider confirmation of the *Debtors' Third Amended Joint Plan of Reorganization* (the "Plan") (Docket No.136) filed on April 17, 2023 by Veristar, LLC, Veristar Global, LLC and Veristar TN, LLC (hereinafter "Debtors"). The Plan amends prior versions of the Plan including *Debtors' Joint Plan of Reorganization* filed on February 5, 2023 (Docket No. 12), *Debtors' First Amended Joint Plan of Reorganization* filed on March 9, 2023 (Docket No. 65), and *Debtors' Second Amended Joint Plan of Reorganization* filed on March 21, 2023 (Docket No. 87). The Plan is further amended as set forth hereinbelow (the "Amendments"), which Amendments the Court has determined are not material changes to the Plan and therefore re-solicitation under 11 U.S.C. §1125 is not necessary. **The Confirmation Order contains provisions that modify and alter the provisions of the Plan, which may affect your rights, claims or interests in this case. Be advised that you have fourteen (14) days from the date of entry of this Confirmation Order to file an appeal**

of its entry. **If you fail to timely file an appeal within such fourteen (14) day period, this Confirmation Order shall automatically become a non-appealable final order.**[1]

The Court has reviewed the evidence presented and the entire record of this case, including the testimony proffered by the Debtors. Having considered the evidence presented, the arguments of counsel, and being otherwise fully advised in the premises, after notice and a hearing, the Court finds and concludes as follows.

## PLAN AMENDMENTS

**The Plan shall be and is hereby amended as follows:**

1.  **Section 2.1 of the Plan** is amended to add a new subsection (e) as follows: (e) **Substantial Contribution Claim**. Richard French and Howard Reissner (or their designee) shall have an Allowed Claim pursuant to 11 U.S.C. § 503(b)(3)(D) in the amount of $20,000.00 that shall be paid in full on the Effective Date of the Plan.

2.  **Section 4.3 of the Plan** is deleted in its entirety and the following is substituted therefor:

**Class 3 – Secured Claim of Franklin Data Ventures, Inc. and Nexem-Iconic, LLC**. The Class 3 Claim shall be Allowed in the amount of $500,000.00 and shall be fully paid from Disposable Income as follows: $60,000.00 on the Effective Date of the Plan and the balance of $440,000.00 with interest at 8% per annum over a period not to exceed 3 years. The Class 3 Claim shall be secured by a properly perfected first-priority lien on all of Debtors' assets that were acquired in connection with the 2019 transaction between Veristar, LLC and the Class 3 Claimant, including but not limited to client contracts

---

[1] Substantial Consummation, as defined by the Plan, does not occur until on or after the Effective Date as defined in the Plan.

identified in the 2019 transaction documents and the cash, accounts receivable, and proceeds attributable to those client contracts. The Class 3 Claimant shall have the right, at its sole cost, to amend its security agreement and UCC-1 financing statement in accordance with these terms. The Class 3 Claimant shall have an Allowed Deficiency Claim in the amount of $695,929.38, which shall be classified and treated under Class 4 of the Plan. If, at any time during the 3 years following entry of the Confirmation Order, the Debtors sell the Veristar business or there is a change of control (defined as a sale to an external party other than the Class 3 Claimant or an affiliated person or entity, or Richard Avers becomes less than a majority owner in Veristar, LLC other than as a result of a transaction with the Class 3 Claimant or an affiliated person or entity) then if and to the extent the Class 3 Claimant has not already been fully paid, it shall receive at the closing of such transaction the sum of $200,000.00 which shall be applied to reduce its Deficiency Claim.

   3. **Sections 1.27 and 6.1 of the Plan** are modified only with respect to percentage distributions of recoveries from the Takata MDL Collection Action, which shall be as follows:

    a. 50% to Debtors

    b. 20% to Class 4 Unsecured Creditors

    c. 5% to Franklin Data Ventures, Inc.

    d. 25% to Richard French and Howard Reissner (or their designee)

   4. **Effect of Amendments on Class 4**. Under the Plan, Class 4 shall receive all Disposable Income that remains after satisfaction of the Class 3 Claim. Based on the amendments set forth in this Confirmation Order, as more fully set forth in Section 1.27

of the Plan, Disposable Income that will remain for Class 4 consists of $26,122, plus a maximum of $428,176 of funds designated on the Budget as "contingency" that are not actually expended at the end of the Commitment Period, plus 20% of any recovery from the Takata MDL Collection Action. The possible distribution to unsecured creditors may be somewhere between 1% to 13%, not including the Takata MDL Collection Action recovery or the contingency recovery, and further taking into account that the bar dates for filing claims has not passed, this is an estimate only.

<strong><u>FINDINGS OF FACTS & CONCLUSIONS OF LAW</u></strong>

A.  **<u>Jurisdiction</u>**.  This Court has jurisdiction over this matter under 28 U.S.C. §§ 157 and 1334, the United States District Court's general order of reference, and other various applicable provisions of the Bankruptcy Code[2] and the Federal Rules of Bankruptcy Procedure ("FRBP").

B.  **<u>Venue</u>**.  Venue is proper before this Court under 28 U.S.C. §§ 1408 and 1409.

C.  **<u>Notice</u>**.  The Court finds that Debtors provided due, adequate, and sufficient notice of the Plan. The method of service and solicitation of acceptance of the Plan, notice of the hearing to consider confirmation of the Plan, and notices of all other deadlines or requirements relating thereto (collectively, the "Confirmation Deadlines") were in compliance with the FRBP, were adequate and reasonable under the circumstances of this case, and no further or additional notice of the confirmation hearing or the confirmation deadlines was necessary or required.

_____

[2] The term "Bankruptcy Code" refers to the applicable section(s) of 11 U.S.C. § 101, *et. seq.* unless otherwise indicated.

D.   **Objections to Confirmation**. Formal and informal objections to Confirmation of the Plan were raised by the following parties: (1) the Takata Entities (Docket No. 88); (2) Richard French and Howard Reissner (Docket No. 98); (3) Franklin Data Ventures, Inc. (Docket No. 92); and (4) the United States Trustee (Docket No. 91). All formal and informal objections have been rendered moot, withdrawn, resolved or overruled by the Court.  As part of the resolution, Richard French and Howard Reissner, and Franklin Data Ventures, Inc., agree and hereby change their respective ballots to vote in favor of the Plan, and the Court recognizes such accepting ballots, thereby making this a consensual confirmation pursuant to 11 U.S.C. § 1191(a). Resolution of objections and modifications of the Plan with respect to any particular creditor or Class that occurred after the filing of the Plan did not adversely affect the treatment of any other creditor or Class in any way not previously noticed by the Plan.

E.   **Resolution of Other Pending Matters**. The treatment provided in the Plan as amended by this Confirmation Order fully resolves all matters pending before the Court between the Debtors and Franklin Data Ventures, Inc. ("FDV"), and the Debtors and Richard French and Howard Reissner (the "PD Creditors"). The following matters shall be disposed of as indicted below:

1.   FDV's 1111(b) Election (Docket No. 124) is hereby resolved on the terms set forth in Section 4.3 of the Plan as amended hereinabove;

2.   FDV's Expedited Motion to Redesignate "Attorney's Eyes Only" (AEO) Material and Remove All Confidentiality Designations (Docket No. 127), and PD Creditors' Joinder thereto (Docket No. 130) are hereby withdrawn;

3.      Debtors' Objection to FDV's Claim No. 9 (Docket No. 135) is hereby withdrawn;

4.      FDV's Motion to Prohibit Use of Cash Collateral (Docket No. 93) and Debtors' response thereto (Docket No. 120) are hereby withdrawn;

5.      PD Creditors' Reservation of Rights (Docket No. 86) filed in response to the Agreed Order Stipulation Regarding (I) Destruction and Return of Takata Entities' Transferred Data and (II) Resolving Objection to Confirmation (Docket No. 88) is hereby withdrawn.

6.      Any other pending contested matters between Debtors and FDV and Debtors and PD Creditors in these Subchapter V Cases are hereby withdrawn or otherwise resolved.

For sake of clarity, all of the above matters are concluded as provided herein upon entry of the Confirmation Order.

F.      **Proper Classification of Claims – 11 U.S.C. §§ 1122 and 1123**.  The Plan adequately and properly identifies and classifies all claims. Pursuant to 11 U.S.C. § 1122(a), the claims placed in each class are substantially similar to other claims in each such class. Pursuant to 11 U.S.C. § 1123(a)(1), valid legal and business reasons exist for the various classes of claims created under the Plan and such classification does not unfairly discriminate among holders of claims. The classification of claims in the Plan is reasonable.

G.      **Specified Unimpaired Classes – 11 U.S.C. § 1123(a)(2)**. The Plan specifies all classes or claims or interests that are not impaired under the plan.

H. **Specified Treatment of Impaired Classes – 11 U.S.C. § 1123(a)(3)**. The Plan specifies the treatment of all classes of claims or interests that are impaired under the Plan.

I. **No Discrimination – 11 U.S.C. § 1123(a)(4)**. The Plan provides for the same treatment of claims or interests in each respective class unless the holder of a particular claim or interest has agreed to a less favorable treatment of such claim or interest.

J. **Implementation of the Plan – 11 U.S.C. § 1123(a)(5)**. Article VI of the Plan provides adequate means for the Plan's implementation.

K. **Non-Voting Equity Securities/Allocation of Voting Power – 11 U.S.C. § 1123(a)(6)**. The Plan does not provide for the issuance of non-voting equity securities and so this section is inapplicable.

L. **Interests of the Creditors, Equity Security Holders, & Public Policy – 11 U.S.C. § 1123(a)(7)**. The Plan contains only provisions that are consistent with the interests of creditors and equity security holders and with public policy with respect to the manner of selection of any officer, director, or trustee under the Plan and any successor to such officer, director, or trustee.

M. **Assumption & Rejection – 11 U.S.C. § 1123(b)(2)**. Article VII of the Plan, pursuant to § 365 of the Bankruptcy Code, provides for the assumption, rejection, or assignment of any executory contract or unexpired lease of the Debtor not previously rejected under such section.

N. **Additional Plan Provisions – 11 U.S.C. § 1123(b)(6)**. Each of the provisions of the Plan is appropriate and not inconsistent with the applicable provisions of the Bankruptcy Code.

O. **Principal Purpose of the Plan – 11 U.S.C. § 1129(d)**. The principal purpose of the Plan is not the avoidance of taxes or the avoidance of the application of section 5 of the Securities Act of 1933.

P. **Subchapter V Plan Requirements – 11 U.S.C. § 1189**. The Plan complies with § 1189 because it was filed by the Debtors not later than 90 days after the order for relief under Chapter 11.

Q. **Contents of a Subchapter V Plan – 11 U.S.C. § 1190**. In compliance with § 1190, the Plan includes: (1) a brief history of the business operations of the Debtors, (2) a liquidation analysis, and (3) projections with respect to the ability of the Debtors to make payments under the Plan.

R. **Satisfaction of Conditions – 11 U.S.C. § 1191(a)**. The Court finds that the Plan satisfies the applicable requirements of 11 U.S.C. § 1129(a). As a result, the Plan is confirmed under § 1191(a). With respect to the applicable provisions of § 1129(a), the Court finds and concludes as follows:

S. **11 U.S.C. § 1129(a)(1) and (a)(2)**. The Plan and the Plan proponent comply with the applicable provisions of the Bankruptcy Code.

T. **11 U.S.C. § 1129(a)(3)**. The Plan was proposed in good faith and not by any means forbidden by law.

U. **11 U.S.C. § 1129(a)(4)**. Any payment made or to be made by the Debtors, for services or for costs and expenses in or in connection with the case, or in connection

with the Plan and incident to the case, has been approved by, or is subject to the approval of, the Court as reasonable.

V.    **11 U.S.C. § 1129(a)(5)**.  The Plan has disclosed the identity and affiliations of any individual proposed to serve, after confirmation of the Plan, as a director, officer, or voting trustee of the Debtors.

W.    **11 U.S.C. § 1129(a)(6).**  This section is not applicable.

X.    **11 U.S.C. § 1129(a)(7)**.  The Plan provides that, with respect to each impaired class of claims or interests, each holder of a claim or interest of such class has accepted the Plan, or will receive or retain under the Plan on account of such claim or interest property of a value, as of the effective date of the Plan, that is not less than the amount that such holder would so receive or retain if the Debtors were liquidated under chapter 7 of this title on such date.

Y.    **11 U.S.C. § 1129(a)(9)**.  Except to the extent that the holder of a particular claim has agreed to a different treatment of such claim, the Plan provides that with respect to Administrative Claims, the Plan provides that all allowed administrative fees and expenses will be paid on the Effective Date or as soon as practicable thereafter, unless the holder agrees or shall have agreed to other treatment of such claim. Alternatively, Administrative Claims not paid in full on the Effective Date shall be fully paid over a period not to exceed 3 years following the Effective Date.

Z.    **11 U.S.C. § 1129(a)(11)**.  Confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors under the Plan, unless such liquidation or reorganization is proposed in the Plan.

AA.    **11 U.S.C. § 1129(a)(12)**.  All fees payable under 28 U.S.C. § 1930, as determined by the Court at the hearing on confirmation of the Plan, have been paid or the Plan provides for the payment of all such fees on the effective date of the Plan.

BB.    **Requirements for Secured Claims – 11 U.S.C. § 1191(c)**. With respect to the secured claims, if any, the Plan meets the requirements of 11 U.S.C. § 1129(b)(2)(A).

    1.    As of the Effective Date of the Plan –

    a.    The Plan provides that all projected disposable income of the Debtors to be received in 3 years, beginning on the date that the first payment is due under the Plan will be applied to make payments under the Plan; or

    b.    The Court finds that the Debtors have provided appropriate projections which provide for the Debtors' "disposable income" under the Plan defined as the income that is received by the Debtors and that is not reasonably necessary to be expended for the maintenance or support of the Debtors or dependent of the Debtors; or the domestic support obligation that first becomes payable after the date of the filing of the petition and/or for the payment of expenditures necessary for the continuation, preservation, or operation of the business of the Debtors.

    2.    The Debtors will be able to make all payments under the Plan, or there is a reasonable likelihood that the Debtors will be able to make all payments under the Plan, and the Plan provides appropriate remedies the event that the payments are not made.

CC.     **Specific Provisions Relating to Agreed Order Stipulation Regarding (I) Destruction and Return of Takata Entities' Transferred Data and (II) Resolving Objection to Confirmation (Docket No. 88).**

A.  On November 29, 2018, the United States Bankruptcy Court for the District of Delaware entered an Order approving that certain Confidentiality and Data Privacy Agreement, and Stipulated Protective Order, effective as of October 12, 2018 (the "Delaware Bankruptcy Protective Order"), in the chapter 15 case pending on behalf of TKJP Corporation ("TKJP") as Case No. 17-11713 [Doc. No. 174] and the chapter 11 case of TK Holdings, Inc. ("TKH" and, together with TKJP, the "Takata Entities") pending as Case No. 17-11375 [Doc. No. 3498].

B.  The Delaware Bankruptcy Protective Order provided for the storage of certain data that might be needed in connection with pending and future cases involving defective "PSAN inflators." In 2018, pursuant to the Delaware Bankruptcy Protective Order, the Takata Entities delivered a total of 94 hard drives of data (the "Original Drives") to Planet Data Solutions Inc. ("PDS"). The Original Drives consist of 83 hard drives delivered by TKJP to PDS and eleven hard drives delivered by TKH to PDS.

C.  On March 15, 2019, the United States District Court for the Southern District of Florida ("FLSD") entered the Delaware Bankruptcy Protective Order as an Order of the FLSD in the MDL case In Re: Takata Airbag Products Liability Litigation, No. 15-MD- 02599, [Doc. No. 3327] (together with the Delaware Bankruptcy Protective Order, the "Protective Order").

D.  The Protective Order governs the transfer, storage, processing, access and disposal of the Original Drives and all of the data contained thereon.

E. On or about February 9, 2021, Veristar, LLC acquired certain assets of PDS and, as a result of the acquisition, came into possession of the Original Drives and certain data processed from the Original Drives (which is defined as the "Transferred Data" in Art. 3 of the Delaware Bankruptcy Protective Order). None of the Veristar Entities has agreed to be bound by the terms of the Protective Order.

F. The Takata Entities have argued that the Veristar Entities are not properly in possession of the Transferred Data and Original Drives. Joyson Safety Systems Acquisition LLC d/b/a Joyson Safety Systems ("JSS") purchased certain of the assets of the Takata Entities and asserts that confidential information pertaining to such assets and belonging to JSS is contained in the Transferred Data and the Original Drives. The Takata Entities and JSS also have asserted that the Transferred Data and the Original Drives are not property of the estate of any of the Veristar Entities.

G. The Takata Entities and JSS have asked Veristar Entities to destroy all remotely (cloud) stored processed Transferred Data, as well as all physical media on which any Transferred Data (processed or unprocessed) was stored (excluding the Original Drives), and to return the Original Drives to TKH.

H. The parties have engaged in good faith arms' length discussions to resolve the concerns of the Takata Entities and JSS with respect to the Transferred Data and the Original Drives.

I. On March 17, 2023, the Takata Entities, JSS, Exego, Inc., and the Veristar Entities entered into a Stipulation, which has been filed in this Court [Doc. No. 88] (the "Stipulation"). The Stipulation is deemed to be an objection to confirmation of the

Joint Plan of Reorganization of the Veristar Entities (as such plan may be modified or amended) and requires the inclusion herein of certain findings and decretal provisions to resolve such objection.

**Accordingly, the Court ORDERS:**

1.   <u>**Confirmation**</u>.  The Plan, as amended herein, is confirmed under 11 U.S.C. § 1191(a). The Plan is incorporated into this Confirmation Order as an exhibit. In the event of any inconsistency between the Plan and this Confirmation Order, the provisions of this Confirmation Order are controlling.

2.   <u>**Discharge of the Subchapter V Trustee**</u>.  Pursuant to 11 U.S.C. § 1183, the services of the Subchapter V Trustee in these cases shall terminate when the Plan has been substantially consummated, except that the United States Trustee may reappoint a trustee as needed for performance of duties under § 1183(b)(3)(C) and § 1185(a).  Not later than 14 days after the Plan is substantially consummated, the Debtors shall file with the Court and serve on the Subchapter V Trustee, the United States Trustee, and all parties in interest notice of such substantial consummation.

3.   <u>**Binding Effect of Plan**</u>.  Pursuant 11 U.S.C. § 1141(a), except as provided in §§ 1141(d)(2) and (3), the provisions of the Plan as of the Effective Date, bind the Debtors, and any creditor, whether or not the claim or interest of such creditor is impaired under the Plan and whether or not such creditor has accepted the Plan.

4.   <u>**Re-vesting of Property**</u>.  Under 11 U.S.C. § 1141(b), except as otherwise provided in the Plan or in this Confirmation Order, all property of the estate vests in the Debtors as of the date of entry of this Confirmation Order. Except as provided in §§ 1141(d)(2) and (3) and except as otherwise provided in the Plan or in this Order, after

confirmation of the Plan, the property dealt with by the Plan is free and clear of all claims and interests of creditors.

5.     **Post-Confirmation Operation of Business**. Except as otherwise provided in the Plan or in this Confirmation Order, on and after the date of entry of this Confirmation Order, the Debtors may operate their business and may use, acquire, and dispose of property free of any restrictions of the Bankruptcy Code and Bankruptcy Rules and in all respects as if there were no pending case under any chapter or provisions of the Bankruptcy Code. The Debtors are entitled to retain and compensate professionals without the necessity of further approval of this Court. Except as set forth in the Plan concerning objections to claims, the Debtors may also settle or compromise any claims without Court approval.

6.     **Injunction and Discharge**. Except as otherwise expressly provided in the Plan or in this Confirmation Order, as of the Effective Date: (i) the Debtors shall be discharged from any debt to the fullest extent provided by 11 U.S.C. § 1141(d); To the extent the discharge provisions set forth in the Plan are inconsistent with this Confirmation Order, 11 U.S.C. § 1141(d), or any other provision of the Bankruptcy Code, this Order, 11 U.S.C. § 1141(d), 11 U.S.C. § 1192, and the Bankruptcy Code shall control.

7.     **Disbursing Agent**.   Under 11 U.S.C. § 1194(b), except as otherwise provided in the Plan or the Confirmation Order, the Debtors shall make payments under the Plan.

8.     **United States Trustee Guidelines**. The Debtors must comply with the guidelines set forth by the Office of the United States Trustee until the closing of this case by the issuance of a Final Decree by the Bankruptcy Court.

9.      **Effect of Confirmation Order on Plan**.  The failure to reference or address all or part of any particular provision of the Plan herein has no effect on the validity, binding effect, or enforceability of such provision and such provision has the same validity, binding effect, and enforceability as every other provision of the Plan. To the extent that any inconsistencies exist between the terms of the Plan and this Confirmation Order, the terms of this Confirmation Order shall control.

10.     **Executory Contracts and Leases**. Except as otherwise provided in a separate order of the Court, all executory contracts and unexpired leases not otherwise rejected are deemed assumed as of the Effective Date.

11.     **Service of Confirmation Order**.  Debtors' counsel is directed to serve a copy of this Order on all parties within 24 hours after entry and thereafter file a certificate of service.

12.     **Documents Required to Effectuate Plan**.  The Debtors are authorized to execute any and all documents reasonably required to effectuate the provisions of the Plan, this Confirmation Order, or prior Orders of this Court.

13.     **Modification After Confirmation**. Under 11 U.S.C. § 1193(c), the Debtors may modify the Plan at any time within 3 years but may not modify the Plan so that the Plan as modified fails to meet the requirements of 11 U.S.C. § 1191(b). The Plan as modified becomes the Plan only if circumstances warrant such modification and the Court, after notice and a hearing, confirms such plan, as modified, under 11 U.S.C. § 1191(b).

14.     **Specific Provisions Relating to Agreed Order Stipulation Regarding (I) Destruction and Return of Takata Entities' Transferred Data and (II) Resolving Objection to Confirmation (Docket No. 88).**

1.  Immediately upon entry of this Order, irrespective of the Effective Date, the Veristar Entities shall be authorized to destroy, or cause to be destroyed, all remotely (cloud) stored processed Transferred Data. Within seven (7) days after the date hereof, the Veristar Entities shall deliver to counsel for the Takata Entities and JSS a certification in form and substance consistent with the following:

    The remotely (cloud) stored processed Transferred Data was destroyed using [explain method of destruction] on [Date] by [Name of person or entity that destroyed the data]. As a result of the destruction of the remotely (cloud) stored processed Transferred Data, it is impossible to recall or recover the data, and the only extant copy of the data resides on the Original Drives.

    In addition to the Original Drives, the Transferred Data also was stored on the following physical media: [list physical media]. All such physical media have been destroyed using [Explain method of destruction] on [Date] by [Name of person or entity that destroyed the media].

2.  Within 7 days after the date hereof, irrespective of the Effective Date, the Veristar Entities shall cause the Original Drives to be delivered via FedEx to the following address:

    TKH
    c/o D. Ross Hamilton
    Tuggle Duggins P.A.
    400 Bellemeade Street, Suite 800
    P.O. Box 2888 – 27402
    Greensboro, NC 27401

3.  The Veristar Entities and their successors shall not object to any efforts of the Takata Entities to obtain approval from the MDL Court permitting TKH to destroy the Original Drives.

4.  Effective immediately upon entry of this Order, the Veristar Entities and their respective estates shall be deemed to release any and all claims against any of the Takata Entities or JSS arising from the possession and processing of the Transferred Data or the holding of the Original Drives, other than any claims arising from a breach of the Stipulation. Nothing herein shall limit the Veristar Entities' claims or rights to payment for data storage or otherwise, except that no such claims or rights may be made or enforced against any of the Takata Entities or JSS.

15.  **Jurisdiction**.  The Bankruptcy Court retains jurisdiction to:

   a.  Resolve issues with respect to the Debtors' substantial consummation of the Plan and to the extent the Debtors seek to amend or modify the Plan;

   b.  Resolve any motions, adversary proceedings, or contested matters, that are pending as of the date of substantial consummation;

   c.  Adjudicate objections to claims;

   d.  Resolve disputes with respect to any and all injunctions created as a result of confirmation of the Plan;

   e.  Adjudicate modifications of the Plan under 11 U.S.C. § 1193;

   f.  Review and consider issues associated with the Debtors' final report and entry of final decree, and to enter a final decree; and

   g.  Enter such orders as the Court deems necessary or appropriate with respect to enforcement of the Plan.

IT IS SO ORDERED.

> **THIS ORDER WAS SIGNED AND ENTERED ELECTRONICALLY AS INDICATED AT THE TOP OF THE FIRST PAGE**

APPROVED FOR ENTRY:


*/s/ Robert J. Gonzales*
Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

ATTORNEYS FOR DEBTORS

This Order has been electronically
signed.  The Judge's signature and
Court's seal appear at the top of the
first page.
United States Bankruptcy Court.

# **EXHIBIT 14**

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| IN RE: | ) | Case No. 3:23-bk-00413 |
| | ) | |
| VERISTAR, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | Case No. 3:23-bk-00412 |
| | ) | |
| VERISTAR TN, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| IN RE: | ) | Case No. 3:23-bk-00414 |
| | ) | |
| VERISTAR GLOBAL, LLC, | ) | Chapter 11 (Subchapter V) |
| | ) | Judge Marian F. Harrison |
| Debtor. | ) | Joint Administration Requested |

<u>**NOTICE OF FILING FINANCIAL STATEMENTS PURSUANT TO 11 U.S.C. § 1187(a)**</u>

Pursuant to 11 U.S.C. § 1187(a) and 11 U.S.C. § 1116(1)(A)-(B), Debtors Veristar, LLC, Veristar TN, LLC, and Veristar Global, LLC attach hereto the following documents:

| Debtor | Balance Sheet | Statement of Operations | Statement of Cash Flow | Most Recent Tax Return |
|---|---|---|---|---|
| **Veristar, LLC** | X | X | X | X |
| **Veristar TN, LLC** | Not Maintained | Not Maintained | Not Maintained | None Filed |
| **Veristar Global, LLC** | X | X | X | X |

Nothing contained in the attached documents shall be construed as an admission or otherwise shall be deemed a statement against interest for purposes of the Federal Rules

of Evidence. The Debtors reserve the right to amend these documents for any purpose upon further diligence and inquiry, to include, in connection with any proceeding in these Chapter 11 cases.

## VERIFICATION

Pursuant to 28 U.S.C. § 1746 and 11 U.S.C. § 1116(1)(B), I declare under penalty of perjury under the laws of the United States of America that the statements made herein are true and correct to the best of my knowledge and that Debtor Veristar TN, LLC does not, in the ordinary course of business, prepare or maintain a Balance Sheet, a Statement of Operations, or a Cash Flow Statement, and has not filed federal tax return.

**VERISTAR, LLC**
**VERISTAR TN, LLC**
**VERISTAR GLOBAL, LLC**

*/s/ Ben Gardner*
By: Ben Gardner
Its: Chief Financial Officer
Executed on:  February 5, 2023

***************************

Respectfully submitted,

*/s/ Robert J. Gonzales*
Robert J. Gonzales (robert@emerge.law)
Nancy B. King (nancy@emerge.law)
EmergeLaw, PLLC
4235 Hillsboro Pike, Suite 350
Nashville, Tennessee 37215
(615) 815-1535

ATTORNEYS FOR DEBTORS

## <u>CERTIFICATE OF SERVICE</u>

This document was electronically served on all parties consenting to the Court's CM/ECF system.

/s/ Robert J. Gonzales
Robert J. Gonzales

# Veristar LLC
## Balance Sheet
### As of December 31, 2022

| | Veristar<br>Total | Exego<br>Total | Veralocity<br>Total | Total |
|---|---|---|---|---|
| **ASSETS** | | | | |
| **Current Assets** | | | | |
| **Bank Accounts** | | | | |
| 200 Wintrust - Operating | 104,808.77 | -7.35 | 0.00 | 104,801.42 |
| **Total Bank Accounts** | $ 104,808.77 | -$ 7.35 | $ 0.00 | $ 104,801.42 |
| **Accounts Receivable** | | | | |
| 1200 Accounts Receivable (A/R) | 2,304,912.61 | 0.00 | 0.00 | 2,304,912.61 |
| 1220 Accrued Revenue | 378,119.50 | 0.00 | 0.00 | 378,119.50 |
| **Total Accounts Receivable** | $ 2,683,032.11 | $ 0.00 | $ 0.00 | $ 2,683,032.11 |
| **Other Current Assets** | | | | |
| 1312 Investment in Exego, LLC | 0.00 | 0.00 | 0.00 | 0.00 |
| 1330 Due from Exego, LLC | 1,467,240.84 | -1,467,240.84 | 0.00 | 0.00 |
| 1360 Due from Veralocity | 31,429.97 | 304,462.65 | -335,892.62 | 0.00 |
| 1365 Advance Partner Accrued 10% Reserve due on Factored Receivables | 62,967.89 | 0.00 | 0.00 | 62,967.89 |
| 1515 Pre-paid Relativity Fees | 202,049.39 | 0.00 | 0.00 | 202,049.39 |
| 1530 Undeposited Funds | -1,340.25 | 0.00 | 0.00 | -1,340.25 |
| 1531 Undeposited Funds - Veristar #2 | -0.10 | 0.00 | 0.00 | -0.10 |
| 1532 Undeposited Funds - Veristar #3 | -0.25 | 0.00 | 0.00 | -0.25 |
| **Total Other Current Assets** | $ 1,762,347.49 | -$ 1,162,778.19 | -$ 335,892.62 | $ 263,676.68 |
| **Total Current Assets** | $ 4,550,188.37 | -$ 1,162,785.54 | -$ 335,892.62 | $ 3,051,510.21 |
| **Fixed Assets** | | | | |
| 1710 Computers | 155,700.57 | 100,000.00 | 0.00 | 255,700.57 |
| 1890 Accumulated Depreciation | -58,738.00 | -28,572.00 | 0.00 | -87,310.00 |
| **Total Fixed Assets** | $ 96,962.57 | $ 71,428.00 | $ 0.00 | $ 168,390.57 |
| **Other Assets** | | | | |
| 1920 Organization Costs | 20,815.00 | 0.00 | 0.00 | 20,815.00 |
| 1980 Goodwill - Franklin | 1,814,604.23 | 700,000.00 | 0.00 | 2,514,604.23 |
| 1990 Accumulated Amortization | -401,999.75 | -93,334.08 | 0.00 | -495,333.83 |
| **Total Other Assets** | $ 1,433,419.48 | $ 606,665.92 | $ 0.00 | $ 2,040,085.40 |
| **TOTAL ASSETS** | $ 6,080,570.42 | -$ 484,691.62 | -$ 335,892.62 | $ 5,259,986.18 |

**LIABILITIES AND EQUITY**

**Liabilities**

**Current Liabilities**

**Accounts Payable**

| | | | | |
|---|---:|---:|---:|---:|
| 2100 Accounts Payable (A/P) | 904,591.32 | 401.69 | 0.00 | 904,993.01 |
| **Total Accounts Payable** | $ 904,591.32 | $ 401.69 | $ 0.00 | $ 904,993.01 |
| **Credit Cards** | | | | |
| 2200 Credit Card XX3585 | 6,577.27 | 0.00 | 0.00 | 6,577.27 |
| **Total Credit Cards** | $ 6,577.27 | $ 0.00 | $ 0.00 | $ 6,577.27 |
| **Other Current Liabilities** | | | | |
| 2000 Wintrust - Line of Credit | 100,000.00 | 0.00 | 250,000.00 | 350,000.00 |
| 2310 Due to Planet Data | 14,107.38 | 0.00 | 0.00 | 14,107.38 |
| 2350 Sales Tax Payable | -118,470.54 | 0.00 | 0.00 | -118,470.54 |
| 2370 Ohio Department of Revenue Payable | 83,483.81 | 0.00 | 0.00 | 83,483.81 |
| 2380 Out Of Scope Agency Payable | 1,223.37 | 0.00 | 0.00 | 1,223.37 |
| 2390 Texas State Comptroller Payable | 168,523.49 | 0.00 | 0.00 | 168,523.49 |
| **Total 2350 Sales Tax Payable** | $ 134,760.13 | $ 0.00 | $ 0.00 | $ 134,760.13 |
| 2400 Accrued Expenses | 5,000.00 | 0.00 | 0.00 | 5,000.00 |
| 2410 Accrued Commissions Payable | 15,000.00 | 0.00 | 0.00 | 15,000.00 |
| 2500 Loan Payable - Rick Avers | 45,080.00 | 0.00 | 0.00 | 45,080.00 |
| 2510 Loan Payable - Charlie Gardner | 400,000.00 | 0.00 | 0.00 | 400,000.00 |
| 2540 Loan Payable - Tefft Smith | 225,000.00 | 0.00 | 0.00 | 225,000.00 |
| 2570 Loan Payable - William R. Healy | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| 2590 Loan Payable - Relativity Note Reimbursement | 81,579.83 | 0.00 | 0.00 | 81,579.83 |
| **Total Other Current Liabilities** | $ 1,120,527.34 | $ 0.00 | $ 250,000.00 | $ 1,370,527.34 |
| **Total Current Liabilities** | $ 2,031,695.93 | $ 401.69 | $ 250,000.00 | $ 2,282,097.62 |
| **Long-Term Liabilities** | | | | |
| 2030 Note Payable - Promissory Note One | 633,333.00 | 0.00 | 0.00 | 633,333.00 |
| 2040 Note Payable - Promissory Note Two | 296,700.67 | 0.00 | 0.00 | 296,700.67 |
| Note Payable - Planet Data | 0.00 | 800,000.00 | 0.00 | 800,000.00 |
| **Total Long-Term Liabilities** | $ 930,033.67 | $ 800,000.00 | $ 0.00 | $ 1,730,033.67 |
| **Total Liabilities** | $ 2,961,729.60 | $ 800,401.69 | $ 250,000.00 | $ 4,012,131.29 |
| **Equity** | | | | |
| 3100 Member Equity - Rick Avers | 0.00 | 0.00 | 0.00 | 0.00 |
| 3200 Member Equity - Charles Gardner | 50,000.00 | 0.00 | 0.00 | 50,000.00 |

| | | | | |
|---|--:|--:|--:|--:|
| **3300 Member Equity - Tefft Smith** | 100,000.00 | 0.00 | 0.00 | 100,000.00 |
| **3400 Member Equity - Ken Wittenberg Jr.** | 55,000.00 | 0.00 | 0.00 | 55,000.00 |
| **3500 Member Equity - Mark Plaehn** | 50,000.00 | 0.00 | 0.00 | 50,000.00 |
| **3600 Members' Equity** | 2,526,825.47 | -786,314.36 | 0.00 | 1,740,511.11 |
| **Net Income** | 337,015.35 | -498,778.95 | -585,892.62 | -747,656.22 |
| **Total Equity** | $ 3,118,840.82 | -$ 1,285,093.31 | -$ 585,892.62 | $ 1,247,854.89 |
| **TOTAL LIABILITIES AND EQUITY** | $ 6,080,570.42 | -$ 484,691.62 | -$ 335,892.62 | $ 5,259,986.18 |

Friday, Jan 20, 2023 12:26:52 PM GMT-8 - Accrual Basis

VERISTAR, LLC
FOR THE YEARS ENDED DECEMBER 31, 2022

| | Veristar | Exego | Veralocity | Total |
|---|---|---|---|---|
| **CASH FLOWS FROM OPERATING ACTIVITIES:** | | | | |
| Net income (loss) | | $ (498,779) | $ (585,892) | $ (1,084,671) |
| Adjustments to reconcile net income (loss) to net cash provided by operating activities: | | | | |
| Depreciation | 33,410 | 14,286 | - | 47,696 |
| Amortization | 134,482 | 46,667 | - | 181,149 |
| (Gain) on sale of assets | (1,200) | - | - | (1,200) |
| (Increase) decrease in: | | | | |
| Accounts receivable - net | (60,725) | - | - | (60,725) |
| Other receivables | 165,504 | | | 165,504 |
| Prepaid expenses | 81,590 | - | - | 81,590 |
| Accrued revenue | 131,102 | | | 131,102 |
| Increase (decrease) in: | | | | |
| Accounts payable | 863,935 | - | - | 863,935 |
| Other payables | 12,603 | | | 12,603 |
| Accrued expenses | 34,742 | - | - | 34,742 |
| NET CASH PROVIDED (USED) BY OPERATING ACTIVITIES | 1,395,443 | (437,826) | (585,892) | 371,725 |
| **CASH FLOWS FROM INVESTING ACTIVITIES:** | | | | |
| Purchase of computers | (1,497) | - | - | (1,497) |
| Proceeds from sale of /fixed assets/investment property | 1,200 | - | - | 1,200 |
| (Advances to)/Payments from affiliates | (772,675) | 437,350 | 335,892 | 567 |
| NET CASH PROVIDED (USED) BY INVESTING ACTIVITIES | (772,972) | 437,350 | 335,892 | 270 |
| **CASH FLOWS FROM FINANCING ACTIVITIES:** | | | | |
| Payments on long-term debt | (78,419) | - | - | (78,419) |
| Advances on short-term debt | 100,000 | - | 250,000 | 350,000 |
| Payments on short-term debt | (1,139,984) | - | - | (1,139,984) |
| NET CASH PROVIDED (USED) BY FINANCING ACTIVITIES | (1,118,403) | - | 250,000 | (868,403) |
| NET DECREASE IN CASH | (495,932) | (476) | - | (496,408) |
| CASH AT BEGINNING OF YEAR | 263,726 | 469 | - | 264,195 |
| CASH AT END OF YEAR | $ (232,206) | $ (7) | $ - | $ (232,213) |

# Veristar LLC
## Profit and Loss
### January - December 2022

| | Veristar<br>Total | Exego<br>Total |
|---|---:|---:|
| **Income** | | |
| 4150 Consulting - Professional Services | 50,758.75 | 0.00 |
| 4200 Data Collection | 88,028.35 | 0.00 |
| 4250 Data Hosting - Relativity | 3,165,205.73 | 0.00 |
| 4300 Data Processing | 1,967,712.22 | 0.00 |
| 4350 Desktop as a Service | 50,764.30 | 0.00 |
| 4400 Hosting and Processing Revenue | 472.50 | 0.00 |
| 4500 Managed Review | 610,114.25 | 0.00 |
| 4650 Sales | 196,455.46 | 360,000.00 |
| 4750 Shipping | 130.00 | 0.00 |
| Uncategorized | -5,000.00 | 0.00 |
| 4660 Takata Bankruptcy Claim | 0.00 | 0.00 |
| **Total Income** | **$ 6,124,641.56** | **$ 360,000.00** |
| **Cost of Goods Sold** | | |
| 5100 Cost of Goods Sold | 36,206.40 | 0.00 |
| 5200 Data Hosting - Relativity COGS | 556,534.72 | 0.00 |
| 5225 Data Hosting - Exego COGS | 360,000.00 | 0.00 |
| 5250 Data Processing COGS | 556,990.44 | 0.00 |
| 5300 Desktop as a Service COGS | 91,336.35 | 0.00 |
| 5500 Operations Labor | | |
| 5510 Labor - India | 0.00 | 109,107.10 |
| 5520 Wages | 0.00 | 429,284.31 |
| 5530 Payroll Taxes | 0.00 | 58,434.10 |
| 5540 Payroll Processing Fees | 0.00 | 300.68 |
| **Total 5500 Operations Labor** | **$ 0.00** | **$ 597,126.19** |
| 5500 Managed Review COGS | | |
| 5600 Temp Attorney Costs | | |
| 5650 Employee Health & Benefits | 17,980.89 | 0.00 |
| 5700 Gross Wages | 456,014.28 | 0.00 |
| 5750 Payroll Processing Fees | 16,448.49 | 0.00 |
| 5800 Payroll Taxes | 44,688.97 | 0.00 |
| **Total 5600 Temp Attorney Costs** | **$ 535,132.63** | **$ 0.00** |
| **Total 5500 Managed Review COGS** | **$ 535,132.63** | **$ 0.00** |
| **Total Cost of Goods Sold** | **$ 2,136,200.54** | **$ 597,126.19** |
| **Gross Profit** | **$ 3,988,441.02** | **-$ 237,126.19** |
| **Expenses** | | |
| 6000 Labor Expenses | | |
| 6010 Commissions | 137,171.31 | 9,493.39 |
| 6015 Bonus | 75,000.00 | 0.00 |
| 6020 Employee Health & Benefits | 28,662.89 | 0.00 |
| 6030 Insperity Payroll Related Expenses | 408,575.12 | 142.26 |
| 6040 Office Wages | 9,518.82 | 0.00 |
| 6050 Officer Wages | 298,934.52 | 31,666.63 |

| | | | |
|---|---|---:|---:|
| 6060 Payroll Processing Fees | | 4,404.12 | 0.00 |
| 6070 Payroll Taxes | | 14,335.09 | 3,899.30 |
| **Total 6000 Labor Expenses** | $ | **976,601.87** $ | **45,201.58** |
| 6100 Office & Facilities Expense | | 714.19 | |
| 6110 Rent & Lease | | 293,949.70 | 0.00 |
| 6120 Repair & Maintenance | | 437.63 | 0.00 |
| 6130 Utilities | | 2,353.21 | 0.00 |
| **Total 6100 Office & Facilities Expense** | $ | **297,454.73** $ | **0.00** |
| 6200 Operating Expenses | | | |
| 6210 General Operating Expenses | | 81.95 | 0.00 |
| 6230 Bank Charges & Fees | | 2,833.43 | 88.20 |
| 6240 Charitable Contributions | | 199.00 | 0.00 |
| 6250 Credit Card Charges & Fees | | 326.36 | 0.00 |
| 6260 Insurance Expenses - General Business, E&O, Etc. | | 28,643.67 | 0.00 |
| 6270 Meals | | 18,966.68 | 0.00 |
| 6290 Taxes & Licenses | | 6,939.29 | 0.00 |
| **Total 6210 General Operating Expenses** | $ | **57,990.38** $ | **88.20** |
| 6300 Legal & Professional Fees | | 24,647.83 | 0.00 |
| 6310 Accounting Expenses | | 131,238.67 | 0.00 |
| 6320 Business Development Consultant Expense | | 177,671.90 | 0.00 |
| 6330 Legal Expenses | | 539,555.18 | 0.00 |
| **Total 6300 Legal & Professional Fees** | $ | **873,113.58** $ | **0.00** |
| 6400 Supplies & Postage Expenses | | | |
| 6410 Equipment Expenses | | 115,390.39 | 0.00 |
| 6420 Office Supplies Expenses | | 3,794.25 | 0.00 |
| 6430 Shipping Expenses | | 4,481.90 | 0.00 |
| 6440 Software License Expense | | 499,474.79 | 0.00 |
| **Total 6400 Supplies & Postage Expenses** | $ | **623,141.33** $ | **0.00** |
| 6500 Telecomm Expenses | | | |
| 6520 Internet Service Expenses | | 11,101.00 | 0.00 |
| 6530 Phone Expenses | | 2,654.86 | 0.00 |
| 6540 Website Expense | | 877.34 | 0.00 |
| **Total 6500 Telecomm Expenses** | $ | **14,633.20** $ | **0.00** |
| 6600 Travel & Transport Expenses | | 2,867.93 | |
| 6610 Auto | | 14,162.92 | 0.00 |
| 6620 Flight Expenses | | 10,739.87 | 0.00 |
| 6630 Lodging Expenses | | 10,953.75 | 0.00 |
| 6640 Travel Meals | | 2,895.98 | 0.00 |
| **Total 6600 Travel & Transport Expenses** | $ | **41,620.45** $ | **0.00** |
| **Total 6200 Operating Expenses** | $ | **1,610,498.94** $ | **88.20** |
| 6800 QuickBooks Payments Fees | | 1,739.26 | 0.00 |
| 6900 Sales Expenses | | | |
| 7000 Advertising & Marketing Expense | | 52,560.30 | 0.00 |
| Recruiting | | 0.00 | 0.00 |
| 7100 Client Gifts | | 1,583.15 | 0.00 |
| 7300 Sales Related Entertainment Expenses | | 3,735.46 | 0.00 |
| 7400 Sales Related Meal Expenses | | 1,468.46 | 0.00 |
| 7600 Sales Rep Costs | | | |

| | | |
|---|---:|---:|
| 7605 Bonus | 2,643.00 | 0.00 |
| 7610 Employee Health & Benefits | 7,750.10 | 0.00 |
| 7620 Gross Wages | 279,020.31 | 124,789.46 |
| 7630 Payroll Processing Fees | 4,072.92 | -35.36 |
| 7640 Payroll Taxes | 27,808.99 | 16,931.34 |
| **Total 7600 Sales Rep Costs** | **$ 321,295.32** | **$ 141,685.44** |
| **Total 6900 Sales Expenses** | **$ 380,642.69** | **$ 141,685.44** |
| Patent Expenses | 0.00 | -7,775.45 |
| 7800 Uncategorized Expense | 14,233.25 | 0.00 |
| Guaranteed payments | 75,000.00 | 0.00 |
| **Total Expenses** | **$ 3,356,170.74** | **$ 179,199.77** |
| **Net Operating Income** | **$ 632,270.28** | **-$ 416,325.96** |
| **Other Income** | | |
| 8100 Other Income - CC Rewards | 400.00 | 0.00 |
| Gain (Loss) on Sale of Assets | 1,200.00 | 0.00 |
| **Total Other Income** | **$ 1,600.00** | **$ 0.00** |
| **Other Expenses** | | |
| 7900 Other Expenses | 25,429.86 | 0.00 |
| 8300 Amortization Expense | 134,481.75 | 46,667.04 |
| 8500 Depreciation Expense | 33,410.00 | 14,286.00 |
| 8600 Financing Expenses | | |
| 8610 Advance Partners Admin Fee | 15,439.11 | 0.00 |
| 8620 Advance Partners Fees and Interest | 84,783.89 | 0.00 |
| 8640 Interest Paid | 3,240.21 | 21,499.95 |
| **Total 8600 Financing Expenses** | **$ 103,463.21** | **$ 21,499.95** |
| 9000 State Income Tax | 70.11 | 0.00 |
| **Total Other Expenses** | **$ 296,854.93** | **$ 82,452.99** |
| **Net Other Income** | **-$ 295,254.93** | **-$ 82,452.99** |
| **Net Income** | **$ 337,015.35** | **-$ 498,778.95** |

Friday, Jan 20, 2023 12:28:21 PM GMT-8 - Accrual Basis

| Veralocity Total | Total |
|---:|---:|
| 0.00 | 50,758.75 |
| 0.00 | 88,028.35 |
| 0.00 | 3,165,205.73 |
| 0.00 | 1,967,712.22 |
| 0.00 | 50,764.30 |
| 0.00 | 472.50 |
| 0.00 | 610,114.25 |
| 0.00 | 556,455.46 |
| 0.00 | 130.00 |
| 0.00 | -5,000.00 |
| 0.00 | 0.00 |
| $ 0.00 | $ 6,484,641.56 |
| 0.00 | 36,206.40 |
| 0.00 | 556,534.72 |
| 0.00 | 360,000.00 |
| 0.00 | 556,990.44 |
| 0.00 | 91,336.35 |
| 0.00 | 109,107.10 |
| 0.00 | 429,284.31 |
| 0.00 | 58,434.10 |
| 0.00 | 300.68 |
| $ 0.00 | $ 597,126.19 |
| 0.00 | 17,980.89 |
| 0.00 | 456,014.28 |
| 0.00 | 16,448.49 |
| 0.00 | 44,688.97 |
| $ 0.00 | $ 535,132.63 |
| $ 0.00 | $ 535,132.63 |
| $ 0.00 | $ 2,733,326.73 |
| $ 0.00 | $ 3,751,314.83 |
| 71,662.58 | 218,327.28 |
| 0.00 | 75,000.00 |
| 25,324.54 | 53,987.43 |
| 0.00 | 408,717.38 |
| 211,363.60 | 220,882.42 |
| 0.00 | 330,601.15 |

|  |  |
|---:|---:|
| 1,371.93 | 5,776.05 |
| 20,064.54 | 38,298.93 |
| $ 329,787.19 | $ 1,351,590.64 |
| 0.00 | 714.19 |
| 0.00 | 293,949.70 |
| 0.00 | 437.63 |
| 0.00 | 2,353.21 |
| $ 0.00 | $ 297,454.73 |
| 0.00 | 81.95 |
| 0.00 | 2,921.63 |
| 0.00 | 199.00 |
| 0.00 | 326.36 |
| 0.00 | 28,643.67 |
| 1,089.36 | 20,056.04 |
| 0.00 | 6,939.29 |
| $ 1,089.36 | $ 59,167.94 |
| 0.00 | 24,647.83 |
| 0.00 | 131,238.67 |
| 84,986.60 | 262,658.50 |
| 6,035.00 | 545,590.18 |
| $ 91,021.60 | $ 964,135.18 |
| 0.00 | 115,390.39 |
| 1,852.10 | 5,646.35 |
| 0.00 | 4,481.90 |
| 0.00 | 499,474.79 |
| $ 1,852.10 | $ 624,993.43 |
| 0.00 | 11,101.00 |
| 0.00 | 2,654.86 |
| 0.00 | 877.34 |
| $ 0.00 | $ 14,633.20 |
| 910.31 | 3,778.24 |
| 0.00 | 14,162.92 |
| 0.00 | 10,739.87 |
| 0.00 | 10,953.75 |
| 0.00 | 2,895.98 |
| $ 910.31 | $ 42,530.76 |
| $ 94,873.37 | $ 1,705,460.51 |
| 0.00 | 1,739.26 |
| 93,901.86 | 146,462.16 |
| 55,000.00 | 55,000.00 |
| 0.00 | 1,583.15 |
| 0.00 | 3,735.46 |
| 0.00 | 1,468.46 |

|  |  |  |  |
|---|---:|---|---:|
|  | 0.00 |  | 2,643.00 |
|  | 0.00 |  | 7,750.10 |
|  | 0.00 |  | 403,809.77 |
|  | 0.00 |  | 4,037.56 |
|  | 0.00 |  | 44,740.33 |
| $ | 0.00 | $ | 462,980.76 |
| $ | 148,901.86 | $ | 671,229.99 |
|  | 0.00 |  | -7,775.45 |
|  | 12,330.20 |  | 26,563.45 |
|  | 0.00 |  | 75,000.00 |
| $ | 585,892.62 | $ | 4,121,263.13 |
| -$ | 585,892.62 | -$ | 369,948.30 |
|  | 0.00 |  | 400.00 |
|  | 0.00 |  | 1,200.00 |
| $ | 0.00 | $ | 1,600.00 |
|  | 0.00 |  | 25,429.86 |
|  | 0.00 |  | 181,148.79 |
|  | 0.00 |  | 47,696.00 |
|  | 0.00 |  | 15,439.11 |
|  | 0.00 |  | 84,783.89 |
|  | 0.00 |  | 24,740.16 |
| $ | 0.00 | $ | 124,963.16 |
|  | 0.00 |  | 70.11 |
| $ | 0.00 | $ | 379,307.92 |
| $ | 0.00 | -$ | 377,707.92 |
| -$ | 585,892.62 | -$ | 747,656.22 |

| Form **1065** | | **U.S. Return of Partnership Income** | | OMB No. 1545-0123 |
|---|---|---|---|---|
| | | For calendar year 2021, or tax year beginning _____, 2021, ending _____, 20 ____ | | **2021** |
| Department of the Treasury Internal Revenue Service | | ► Go to *www.irs.gov/Form1065* for instructions and the latest information. | | |

| **A** Principal business activity | | | **D** Employer identification no. |
|---|---|---|---|
| DATA MANAGEMENT | **Type or Print** | VERISTAR, LLC<br>9501 WEST 144TH PLACE, SUITE 202<br>ORLAND PARK, IL 60462 | 9749 |
| **B** Principal product or service | | | **E** Date business started |
| HOST & ANALYZE | | | 11/01/2019 |
| **C** Business code number | | | **F** Total assets (see instructions) |
| 518210 | | | $ 5,529,466. |

**G** Check applicable boxes: **(1)** ☐ Initial return **(2)** ☐ Final return **(3)** ☐ Name change **(4)** ☐ Address change **(5)** ☐ Amended return

**H** Check accounting method: **(1)** ☒ Cash **(2)** ☐ Accrual **(3)** ☐ Other (specify) ► _____

**I** Number of Schedules K-1. Attach one for each person who was a partner at any time during the tax year ► 5

**J** Check if Schedules C and M-3 are attached ► ☐

**K** Check if partnership: **(1)** ☐ Aggregated activities for section 465 at-risk purposes **(2)** ☐ Grouped activities for section 469 passive activity purposes

**Caution:** Include **only** trade or business income and expenses on lines 1a through 22 below. See the instructions for more information.

| | | | | | | |
|---|---|---|---|---|---|---|
| **INCOME** | **1 a** Gross receipts or sales | | **1a** | 6,015,927. | | |
| | **b** Returns and allowances | | **1b** | | | |
| | **c** Balance. Subtract line 1b from line 1a | | | | **1c** | 6,015,927. |
| | **2** Cost of goods sold (attach Form 1125-A) | | | | **2** | 3,594,214. |
| | **3** Gross profit. Subtract line 2 from line 1c | | | | **3** | 2,421,713. |
| | **4** Ordinary income (loss) from other partnerships, estates, and trusts (attach statement) | | SEE STATEMENT 1 | | **4** | −679,870. |
| | **5** Net farm profit (loss) (attach Schedule F (Form 1040)) | | | | **5** | |
| | **6** Net gain (loss) from Form 4797, Part II, line 17 (attach Form 4797) | | | | **6** | |
| | **7** Other income (loss) (attach statement) | | SEE STATEMENT 2 | | **7** | 900. |
| | **8** **Total income (loss).** Combine lines 3 through 7 | | | | **8** | 1,742,743. |
| **DEDUCTIONS (SEE INSTRUCTIONS FOR LIMITATIONS)** | **9** Salaries and wages (other than to partners) (less employment credits) | | | | **9** | 997,009. |
| | **10** Guaranteed payments to partners | | | | **10** | 178,448. |
| | **11** Repairs and maintenance | | | | **11** | 11,704. |
| | **12** Bad debts | | | | **12** | |
| | **13** Rent | | | | **13** | 315,244. |
| | **14** Taxes and licenses | | SEE STATEMENT 3 | | **14** | 100,990. |
| | **15** Interest (see instructions) | | | | **15** | 68,743. |
| | **16a** Depreciation (if required, attach Form 4562) | | **16a** | 105,921. | | |
| | **b** Less depreciation reported on Form 1125-A and elsewhere on return | | **16b** | | **16c** | 105,921. |
| | **17** Depletion (**Do not deduct oil and gas depletion.**) | | | | **17** | |
| | **18** Retirement plans, etc. | | | | **18** | |
| | **19** Employee benefit programs | | | | **19** | 23,261. |
| | **20** Other deductions (att stmt) | | SEE STATEMENT 4 | | **20** | 1,533,882. |
| | **21** **Total deductions.** Add the amounts shown in the far right column for lines 9 through 20 | | | | **21** | 3,335,202. |
| | **22** **Ordinary business income (loss).** Subtract line 21 from line 8 | | | | **22** | −1,592,459. |
| **TAX AND PAYMENT** | **23** Interest due under the look-back method — completed long-term contracts (attach Form 8697) | | | | **23** | |
| | **24** Interest due under the look-back method — income forecast method (attach Form 8866) | | | | **24** | |
| | **25** BBA AAR imputed underpayment (see instructions) | | | | **25** | |
| | **26** Other taxes (see instructions) | | | | **26** | |
| | **27** **Total balance due.** Add lines 23 through 26 | | | | **27** | |
| | **28** Payment (see instructions) | | | | **28** | |
| | **29** **Amount owed.** If line 28 is smaller than line 27, enter amount owed | | | | **29** | |
| | **30** **Overpayment.** If line 28 is larger than line 27, enter overpayment | | | | **30** | |

**Sign Here**

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than partner or limited liability company member) is based on all information of which preparer has any knowledge.

Signature of partner or limited liability company member _____ Date _____

May the IRS discuss this return with the preparer shown below? See instructions. ☒ Yes ☐ No

| **Paid Preparer Use Only** | Print/Type preparer's name | Preparer's signature | Date | Check ☒ if self-employed | PTIN |
|---|---|---|---|---|---|
| | WILLIAM R. HEALY | | | | P00027600 |
| | Firm's name ► WILLIAM R. HEALY, CPA, PC | | | Firm's EIN ► 36-3683706 | |
| | Firm's address ► 9501 WEST 144TH PLACE, STE 202<br>ORLAND PARK, IL 60462 | | | Phone no. (708) 349-1700 | |

BAA For Paperwork Reduction Act Notice, see separate instructions.   Filed 02/05/23   Entered 02/05/23 18:46:28   Desc   Form **1065** (2021)

Exhibit D   Page 1 of 39

Form 1065 (2021) VERISTAR, LLC                                                                 9749          Page **2**

| Schedule B | Other Information |
|---|---|

**1** What type of entity is filing this return? Check the applicable box:

| | | | | Yes | No |
|---|---|---|---|---|---|
| **a** ☐ Domestic general partnership | | **b** ☐ Domestic limited partnership | | | |
| **c** ☒ Domestic limited liability company | | **d** ☐ Domestic limited liability partnership | | | |
| **e** ☐ Foreign partnership | | **f** ☐ Other ▶ | | | |

**2** At the end of the tax year:

**a** Did any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, or tax-exempt organization, or any foreign government own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **X**

**b** Did any individual or estate own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership? For rules of constructive ownership, see instructions. If "Yes," attach Schedule B-1, Information on Partners Owning 50% or More of the Partnership . . . . . . . . . . . . . . . . . . . . . . . . . . . **X**

**3** At the end of the tax year, did the partnership:

**a** Own directly 20% or more, or own, directly or indirectly, 50% or more of the total voting power of all classes of stock entitled to vote of any foreign or domestic corporation? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (iv) below. . . . . . . . . . . . . . . . . . . . . . . . . **X**

| (i) Name of Corporation | (ii) Employer Identification Number (if any) | (iii) Country of Incorporation | (iv) Percentage Owned in Voting Stock |
|---|---|---|---|
| | | | |
| | | | |
| | | | |
| | | | |

**b** Own directly an interest of 20% or more, or own, directly or indirectly, an interest of 50% or more in the profit, loss, or capital in any foreign or domestic partnership (including an entity treated as a partnership) or in the beneficial interest of a trust? For rules of constructive ownership, see instructions. If "Yes," complete (i) through (v) below. . . . . . . **X**

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
| CROSSKEY SECURITY, LLC | ******2157 | DSRGRD ENT | U.S. | 100.000 |
| | | | | |
| | | | | |
| | | | | |

**4** Does the partnership satisfy **all four** of the following conditions?

| | | Yes | No |
|---|---|---|---|
| **a** The partnership's total receipts for the tax year were less than $250,000. | | | |
| **b** The partnership's total assets at the end of the tax year were less than $1 million. | | | |
| **c** Schedules K-1 are filed with the return and furnished to the partners on or before the due date (including extensions) for the partnership return. | | | |
| **d** The partnership is not filing and is not required to file Schedule M-3. . . . . . . . . . . . | | | **X** |

If "Yes," the partnership is not required to complete Schedules L, M-1, and M-2; item F on page 1 of Form 1065; or item L on Schedule K-1.

**5** Is this partnership a publicly traded partnership, as defined in section 469(k)(2)? . . . . . . . . . . . . . . . . **X**

**6** During the tax year, did the partnership have any debt that was canceled, was forgiven, or had the terms modified so as to reduce the principal amount of the debt? . . . . . . . . . . . . . . . . . . . . . . . . **X**

**7** Has this partnership filed, or is it required to file, Form 8918, Material Advisor Disclosure Statement, to provide information on any reportable transaction? . . . . . . . . . . . . . . . . . . . . . . . . . . . **X**

**8** At any time during calendar year 2021, did the partnership have an interest in or a signature or other authority over a financial account in a foreign country (such as a bank account, securities account, or other financial account)? See instructions for exceptions and filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). If "Yes," enter the name of the foreign country. ▶ . . . . . . . . . . . . . . . . **X**

**9** At any time during the tax year, did the partnership receive a distribution from, or was it the grantor of, or transferor to, a foreign trust? If "Yes," the partnership may have to file Form 3520, Annual Return To Report Transactions With Foreign Trusts and Receipt of Certain Foreign Gifts. See instructions . . . . . . . . . . . . . . . . **X**

**10a** Is the partnership making, or had it previously made (and not revoked), a section 754 election? . . . . . . . . . . . . **X**

See instructions for details regarding a section 754 election.

**b** Did the partnership make for this tax year an optional basis adjustment under section 743(b) or 734(b)? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions . . . . . . . . . . . . **X**

BAA                                        PTPA0112  10/04/21                              Form **1065** (2021)

Form 1065 (2021)  VERISTAR, LLC                                                                9749                    Page 3

| **Schedule B** | **Other Information** *(continued)* | | | Yes | No |
|---|---|---|---|---|---|

| | | Yes | No |
|---|---|---|---|
| | **c** Is the partnership required to adjust the basis of partnership assets under section 743(b) or 734(b) because of a substantial built-in loss (as defined under section 743(d)) or substantial basis reduction (as defined under section 734(d))? If "Yes," attach a statement showing the computation and allocation of the basis adjustment. See instructions. . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **11** | Check this box if, during the current or prior tax year, the partnership distributed any property received in a like-kind exchange or contributed such property to another entity (other than disregarded entities wholly owned by the partnership throughout the tax year) . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐ | | |
| **12** | At any time during the tax year, did the partnership distribute to any partner a tenancy-in-common or other undivided interest in partnership property?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **13** | If the partnership is required to file Form 8858, Information Return of U.S. Persons With Respect to Foreign Disregarded Entities (FDEs) and Foreign Branches (FBs), enter the number of Forms 8858 attached. See instructions    ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | |
| **14** | Does the partnership have any foreign partners? If "Yes," enter the number of Forms 8805, Foreign Partner's Information Statement of Section 1446 Withholding Tax, filed for this partnership.  ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ | | X |
| **15** | Enter the number of Forms 8865, Return of U.S. Persons With Respect to Certain Foreign Partnerships, attached to this return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | | |
| **16a** | Did you make any payments in 2021 that would require you to file Form(s) 1099? See instructions. . . . . . . . . . . . . . | X | |
| **b** | If "Yes," did you or will you file required Form(s) 1099?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | X | |
| **17** | Enter the number of Forms 5471, Information Return of U.S. Persons With Respect To Certain Foreign Corporations, attached to this return . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► | | |
| **18** | Enter the number of partners that are foreign governments under section 892.► ☐ | | |
| **19** | During the partnership's tax year, did the partnership make any payments that would require it to file Forms 1042 and 1042-S under chapter 3 (sections 1441 through 1464) or chapter 4 (sections 1471 through 1474)?. . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **20** | Was the partnership a specified domestic entity required to file Form 8938 for the tax year? See the Instructions for Form 8938 | | X |
| **21** | Is the partnership a section 721(c) partnership, as defined in Regulations section 1.721(c)-1(b)(14)?. . . . . . . . . . . . . . . | | X |
| **22** | During the tax year, did the partnership pay or accrue any interest or royalty for which one or more partners are not allowed a deduction under section 267A? See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . If "Yes," enter the total amount of the disallowed deductions . . . . . . . . . . . . . . . . . . . . ►$ _ _ _ _ _ _ | | X |
| **23** | Did the partnership have an election under section 163(j) for any real property trade or business or any farming business in effect during the tax year? See instructions. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **24** | Does the partnership satisfy one or more of the following? See instructions . . . . . . . . . . . . . . . . . . . . . . | | X |
| | **a** The partnership owns a pass-through entity with current, or prior year carryover, excess business interest expense. | | |
| | **b** The partnership's aggregate average annual gross receipts (determined under section 448(c)) for the 3 tax years preceding the current tax year are more than $26 million and the partnership has business interest. | | |
| | **c** The partnership is a tax shelter (see instructions) and the partnership has business interest expense. If "Yes" to any, complete and attach Form 8990. | | |
| **25** | Is the partnership attaching Form 8996 to certify as a Qualified Opportunity Fund?. . . . . . . . . . . . . . . . . . . . If "Yes," enter the amount from Form 8996, line 15 . . . . . . . . . . . . . . . . . . . . ►$ | | X |
| **26** | Enter the number of foreign partners subject to section 864(c)(8) as a result of transferring all or a portion of an interest in the partnership or receiving a distribution from the partnership . . . . . . . . . . . . . . . . . . . . . . . . ► Complete Schedule K-3 (Form 1065), Part XIII, for each foreign partner subject to section 864(c)(8) on a transfer or distribution. | | |
| **27** | At any time during the tax year, were there any transfers between the partnership and its partners subject to the disclosure requirements of Regulations section 1.707-8?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | X |
| **28** | Since December 22, 2017, did a foreign corporation directly or indirectly acquire substantially all of the properties constituting a trade or business of your partnership, and was the ownership percentage (by vote or value) for purposes of section 7874 greater than 50% (for example, the partners held more than 50% of the stock of the foreign corporation)? If "Yes," list the ownership percentage by vote and by value. See instructions. Percentage: _ _ _ _ _ _ _ _ _ _ _ _ By Vote _ _ _ _ _ _ _ _ _ _ _ By Value _ _ _ _ _ _ _ | | X |
| **29** | Is the partnership electing out of the centralized partnership audit regime under section 6221(b)? See instructions. If "Yes," the partnership must complete Schedule B-2 (Form 1065). Enter the total from Schedule B-2, Part III, line 3 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► 5 If "No," complete Designation of Partnership Representative below. | X | |

**Designation of Partnership Representative** (see instructions)
Enter below the information for the partnership representative (PR) for the tax year covered by this return.

Name of PR  ►

U.S. address of PR  ►                                                                U.S. phone number of PR  ►

If the PR is an entity, name of the designated individual for the PR  ►

U.S. address of designated individual  ►                                             U.S. phone number of designated individual  ►

BAA                                                                                                       Form **1065** (2021)

DRAFT-NM (watermark)

Form 1065 (2021)   VERISTAR, LLC                                                      ▮9749                  Page **4**

| Schedule K | Partners' Distributive Share Items | | | Total amount |
|---|---|---|---|---|
| | **1** Ordinary business income (loss) (page 1, line 22)................................... | | **1** | −1,592,459. |
| | **2** Net rental real estate income (loss) (attach Form 8825) ............................ | | **2** | |
| | **3a** Other gross rental income (loss)................. | **3a** | | |
| | **b** Expenses from other rental activities (attach stmt) .................. | **3b** | | |
| | **c** Other net rental income (loss). Subtract line 3b from line 3a........... | | **3c** | |
| | **4** Guaranteed payments: **a** Serv ces **4a** 178,448. **b** Cap tal **4b** | | | |
| **Income (Loss)** | **c** Total. Add lines 4a and 4b ....................................... | | **4c** | 178,448. |
| | **5** Interest income........................................................ | | **5** | |
| | **6** Dividends and dividend equivalents: **a** Ord nary dividends............. | | **6a** | |
| | **b** Qualif ed dividends **6b** **c** Dividend equivalents **6c** | | | |
| | **7** Royalties.............................................................. | | **7** | |
| | **8** Net short-term capital gain (loss) (attach Schedule D (Form 1065)).......... | | **8** | |
| | **9a** Net long-term capital gain (loss) (attach Schedule D (Form 1065)) ......... | | **9a** | |
| | **b** Collectibles (28%) gain (loss)................. | **9b** | | |
| | **c** Unrecaptured section 1250 gain (attach statement) ............ | **9c** | | |
| | **10** Net section 1231 gain (loss) (attach Form 4797) ........................... | | **10** | |
| | **11** Other income (loss) (see instructions)   Type ▶ | | **11** | |
| **Deduc- tions** | **12** Section 179 deduction (attach Form 4562)................................ | | **12** | |
| | **13a** Contributions............................................ SEE STATEMENT 5 | | **13a** | 3,631. |
| | **b** Investment interest expense........................................... | | **13b** | |
| | **c** Section 59(e)(2) expenditures: **(1)** Type ▶ _____ **(2)** Amount ▶ | | **13c(2)** | |
| | **d** Other deductions (see instructions)   Type ▶ _____ SEE STATEMENT 6 | | **13d** | 25,740. |
| **Self- Employ- ment** | **14a** Net earnings (loss) from self-employment ................................ | | **14a** | −588,128. |
| | **b** Gross farming or fishing income........................................ | | **14b** | |
| | **c** Gross nonfarm income................................................ | | **14c** | |
| **Credits** | **15a** Low-income housing credit (section 42(j)(5))............................. | | **15a** | |
| | **b** Low-income housing credit (other)..................................... | | **15b** | |
| | **c** Qualified rehabilitation expenditures (rental real estate) (attach Form 3468, if applicable).. | | **15c** | |
| | **d** Other rental real estate credits (see instructions)   Type ▶ | | **15d** | |
| | **e** Other rental credits (see instructions)............   Type ▶ | | **15e** | |
| | **f** Other credits (see instructions) ..................   Type ▶ | | **15f** | |
| **International Transactions** | **16** Attach Schedule K-2 (Form 1065), Partners' Distributive Share Items-International, and check this box to indicate that you are reporting items of international tax relevance .......... ☐ | | | |
| **Alternative Minimum Tax (AMT) Items** | **17a** Post-1986 depreciation adjustment ..................................... | | **17a** | |
| | **b** Adjusted gain or loss................................................. | | **17b** | |
| | **c** Depletion (other than oil and gas)..................................... | | **17c** | |
| | **d** Oil, gas, and geothermal properties − gross income........................ | | **17d** | |
| | **e** Oil, gas, and geothermal properties − deductions......................... | | **17e** | |
| | **f** Other AMT items (attach stmt)......................................... | | **17f** | |
| **Other Infor- mation** | **18a** Tax-exempt interest income ........................................... | | **18a** | |
| | **b** Other tax-exempt income ...........SEE STATEMENT 7 | | **18b** | 1,503,382. |
| | **c** Nondeductible expenses.............................................. | | **18c** | 6,715. |
| | **19a** Distributions of cash and marketable securities ........................... | | **19a** | |
| | **b** Distributions of other property......................................... | | **19b** | |
| | **20a** Investment income.................................................... | | **20a** | |
| | **b** Investment expenses ................................................. | | **20b** | |
| | **c** Other items and amounts (attach stmt)           SEE STATEMENT 8 | | | |
| | **21** Total foreign taxes paid or accrued ..................................... | | **21** | |

**BAA**                        PTPA0134   10/04/21                        Form **1065** (2021)

Form 1065 (2021)   VERISTAR, LLC                              ▮9749        Page 5

## Analysis of Net Income (Loss)

| 1 | Net income (loss). Combine Schedule K, lines 1 through 11. From the result, subtract the sum of Schedule K, lines 12 through 13d, and 21 | | | | 1 | −1,443,382. |

| 2 Analysis by partner type: | (i) Corporate | (ii) Individual (active) | (iii) Individual (passive) | (iv) Partnership | (v) Exempt Organization | (vi) Nominee/Other |
|---|---|---|---|---|---|---|
| a General partners | | | | | | |
| b Limited partners | | −1,188,008. | −255,374. | | | |

## Schedule L — Balance Sheets per Books

| Assets | Beginning of tax year (a) | (b) | End of tax year (c) | (d) |
|---|---|---|---|---|
| 1 Cash | | 263,810. | | 309,131. |
| 2a Trade notes and accounts receivable | 1,314,333. | | 3,014,028. | |
| b Less allowance for bad debts | | 1,314,333. | | 3,014,028. |
| 3 Inventories | | | | |
| 4 U.S. government obligations | | | | |
| 5 Tax-exempt securities | | | | |
| 6 Other current assets (attach stmt) SEE ST 9 | | 129,616. | | 1,194,401. |
| 7a Loans to partners (or persons related to partners) | | | | |
| b Mortgage and real estate loans | | | | |
| 8 Other investments (attach stmt) SEE ST 10 | | | | −679,870. |
| 9a Buildings and other depreciable assets | 48,282. | | 154,203. | |
| b Less accumulated depreciation | 5,080. | 43,202. | 25,328. | 128,875. |
| 10a Depletable assets | | | | |
| b Less accumulated depletion | | | | |
| 11 Land (net of any amortization) | | | | |
| 12a Intangible assets (amortizable only) | 1,830,419. | | 1,830,419. | |
| b Less accumulated amortization | 143,381. | 1,687,038. | 267,518. | 1,562,901. |
| 13 Other assets (attach stmt) | | | | |
| 14 Total assets | | 3,437,999. | | 5,529,466. |
| **Liabilities and Capital** | | | | |
| 15 Accounts payable | | 229,528. | | 47,841. |
| 16 Mortgages, notes, bonds payable in less than 1 year | | 75,000. | | 100,000. |
| 17 Other current liabilities (attach stmt) SEE ST 11 | | 855,502. | | 1,261,538. |
| 18 All nonrecourse loans | | | | |
| 19a Loans from partners (or persons related to partners) | | 545,080. | | 670,080. |
| b Mortgages, notes, bonds payable in 1 year or more | | 1,614,004. | | 1,090,032. |
| 20 Other liabilities (attach stmt) SEE ST 12 | | | | 2. |
| 21 Partners' capital accounts | | 118,885. | | 2,359,973. |
| 22 Total liabilities and capital | | 3,437,999. | | 5,529,466. |

## Schedule M-1  Reconciliation of Income (Loss) per Books With Income (Loss) per Return
Note: The partnership may be required to file Schedule M-3. See instructions.

| 1 Net income (loss) per books | 2,091,088. | 6 Income recorded on books this year not included on Schedule K, lines 1 through 11 (itemize): | |
|---|---|---|---|
| 2 Income included on Schedule K, lines 1, 2, 3c, 5, 6a, 7, 8, 9a, 10, and 11, not recorded on books this year (itemize): STATEMENT 13 | 1,026,573. | a Tax-exempt interest $ STATEMENT 15    4,634,793. | 4,634,793. |
| 3 Guaranteed payments (other than health insurance) | 152,708. | 7 Deductions included on Schedule K, lines 1 through 13d, and 21, not charged against book income this year (itemize): | |
| 4 Expenses recorded on books this year not included on Schedule K, lines 1 through 13d and 21 (itemize): a Depreciation $ | | a Depreciation $ 85,673. | |
| b Travel and entertainment $ 6,215. STATEMENT 14    500. | 6,715. | 8 Add lines 6 and 7 | 85,673. 4,720,466. |
| 5 Add lines 1 through 4 | 3,277,084. | 9 Income (loss) (Analysis of Net Income (Loss), line 1). Subtract line 8 from line 5 | −1,443,382. |

## Schedule M-2  Analysis of Partners' Capital Accounts

| 1 Balance at beginning of year | 118,885. | 6 Distributions: a Cash | |
|---|---|---|---|
| 2 Capital contributed: a Cash | 150,000. | b Property | |
| b Property | | 7 Other decreases (itemize): | |
| 3 Net income (loss) (see instructions) | −1,443,382. | STATEMENT 17 | 1,205,744. |
| 4 Other increases (itemize): STATEMENT 16 | 1,503,382. | 8 Add lines 6 and 7 | 1,205,744. |
| 5 Add lines 1 through 4 | 328,885. | 9 Balance at end of year. Subtract line 8 from line 5 | −876,859. |

BAA                    PTPA0134  10/04/21                     Form 1065 (2021)

| Form **1125-A**<br>(Rev. November 2018)<br>Department of the Treasury<br>Internal Revenue Serv ce | **Cost of Goods Sold**<br><br>► **Attach to Form 1120, 1120-C, 1120-F, 1120S, or 1065.**<br>► **Go to *www.irs.gov/Form1125A* for the latest information.** | OMB No. 1545-0123 |
|---|---|---|

| Name<br>VERISTAR, LLC | | Employer identification number<br>█████9749 |
|---|---|---|

| | | | |
|---|---|---|---|
| **1** | Inventory at beginning of year ................................................................ | **1** | |
| **2** | Purchases ........................................................................................ | **2** | |
| **3** | Cost of labor .................................................................................... | **3** | 1,677,997. |
| **4** | Additional section 263A costs (attach schedule) ...................................... | **4** | |
| **5** | Other costs (attach schedule) ............................ SEE STATEMENT 18 ..... | **5** | 1,916,217. |
| **6** | **Total.** Add lines 1 through 5 ................................................................ | **6** | 3,594,214. |
| **7** | Inventory at end of year ...................................................................... | **7** | |
| **8** | **Cost of goods sold.** Subtract line 7 from line 6. Enter here and on Form 1120, page 1, line 2 or the appropriate line of your tax return. See instructions ...................................... | **8** | 3,594,214. |

**9a** Check all methods used for valuing closing inventory:

    *(i)*   [X] Cost

    *(ii)*   [ ] Lower of cost or market

    *(iii)*   [ ] Other (Specify method used and attach explanation.) ► _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _

  **b** Check if there was a writedown of subnormal goods ................................................. ► [ ]

  **c** Check if the LIFO inventory method was adopted this tax year for any goods (if checked, attach Form 970) ..................... ► [ ]

  **d** If the LIFO inventory method was used for this tax year, enter amount of closing inventory computed under LIFO ...................................................................................... **9d** |

  **e** If property is produced or acquired for resale, do the rules of section 263A apply to the entity? See instructions ...... [ ] Yes [X] No

  **f** Was there any change in determining quantities, cost, or valuations between opening and closing inventory? If "Yes," attach explanation ................................................... [ ] Yes [X] No

**BAA  For Paperwork Reduction Act Notice, see instructions.**          Form **1125-A** (Rev. 11-2018)

DO NOT MAIL

CPCZ0401L  09/26/18

**SCHEDULE B-1**
**(Form 1065)**
(Rev. August 2019)
Department of the Treasury
Internal Revenue Service

**Information on Partners Owning 50% or More of the Partnership**
► Attach to Form 1065.
► Go to *www.irs.gov/Form1065* for the latest information.

OMB No. 1545-0123

| Name of partnership | Employer identification number (EIN) |
|---|---|
| VERISTAR, LLC | ▮▮▮▮ 9749 |

**Part I**   **Entities Owning 50% or More of the Partnership** (Form 1065, Schedule B, Question 2a (Question 3a for 2009 through 2017))

Complete columns (i) through (v) below for any foreign or domestic corporation, partnership (including any entity treated as a partnership), trust, tax-exempt organization, or any foreign government that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Entity | (ii) Employer Identification Number (if any) | (iii) Type of Entity | (iv) Country of Organization | (v) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|---|
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |
|  |  |  |  |  |

**Part II**   **Individuals or Estates Owning 50% or More of the Partnership** (Form 1065, Schedule B, Question 2b (Question 3b for 2009 through 2017))

Complete columns (i) through (iv) below for any individual or estate that owns, directly or indirectly, an interest of 50% or more in the profit, loss, or capital of the partnership (see instructions).

| (i) Name of Individual or Estate | (ii) Identifying Number (if any) | (iii) Country of Citizenship (see instructions) | (iv) Maximum Percentage Owned in Profit, Loss, or Capital |
|---|---|---|---|
| RICHARD AVERS | ***-**-**** | UNITED STATES | 80.000 |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |
|  |  |  |  |

**BAA For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**   Schedule **B-1** (Form 1065) (Rev. 8-2019)

**SCHEDULE B-2**
**(Form 1065)**
December 2018)
Department of the Treasury
Internal Revenue Service

# Election Out of the Centralized Partnership Audit Regime
► Attach to Form 1065 or Form 1066.
► Go to *www.irs.gov/Form1065* for the instructions and the latest information.

OMB No. 1545-0123

| Name of partnership | Employer Identification number (EIN) |
|---|---|
| VERISTAR, LLC | ▮▮▮9749 |

Certain partnerships with 100 or fewer partners can elect out of the centralized partnership audit regime if each partner is an individual, a C corporation, a foreign entity that would be treated as a C corporation were it domestic, an S corporation, or an estate of a deceased partner. For purposes of determining whether the partnership has 100 or fewer partners, the partnership must include all shareholders of any S corporation that is a partner. By completing Part I, you are making an affirmative statement that all of the partners in the partnership are eligible partners under section 6221(b)(1)(C) and have provided all of the information on this schedule. See the instructions, including the instructions for the treatment of real estate mortgage investment conduits (REMICs), for more details.

**Part I**  **List of Eligible Partners**
Use the following codes under Type of Eligible Partner:
I — Individual   C — Corporation   E — Estate of Deceased Partner
F — Eligible Foreign Entity   S — S corporation

| Name of Partner | Taxpayer Identification Number (TIN) | Type of Eligible Partner (Code) |
|---|---|---|
| 1 RICHARD AVERS | ***-**-**** | I |
| 2 KENNETH WITTENBERG | ***-**-**** | I |
| 3 TEFFT SMITH | ***-**-**** | I |
| 4 CHARLIE GARDNER | ***-**-**** | I |
| 5 MARK PLAEHN | ***-**-**** | I |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |
| 13 | | |
| 14 | | |
| 15 | | |

*Continued on Part IV*

**Part II**  **List of S Corporation Shareholders** (For each S corporation partner, complete a separate Part II and separate Part V, if needed.)
Use the following codes under Type of Person:
I — Individual E — Estate of Deceased Shareholder T — Trust O — Other

Name of
S Corporation Partner ►                                      TIN of Partner ►

| Name of Shareholder | Shareholder TIN | Type of Person (Code) |
|---|---|---|
| 1 | | |
| 2 | | |
| 3 | | |
| 4 | | |
| 5 | | |
| 6 | | |
| 7 | | |
| 8 | | |
| 9 | | |
| 10 | | |
| 11 | | |
| 12 | | |

*Continued on Part V*

**Part III**  **Total Number of Schedules K-1 Required To Be Issued.**  See Instructions.

| | | | |
|---|---|---|---|
| 1 | Total of Part I and all Parts IV Schedules K-1 required to be issued by the partnership . . . . . . . . . . . . . . . | 1 | 5 |
| 2 | Total of Part II and all Parts V Schedules K-1 required to be issued by any S corporation partners . . . . . . . . | 2 | |
| 3 | **Total. Add line 1 and line 2** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | 3 | 5 |

**Note:** If line 3 is more than 100, the partnership cannot make the election under section 6221(b).

BAA For Paperwork Reduction Act Notice, see the instructions for Form 1065. PTPA0612 05/23 Schedule B-2 (Form 1065) (12-2018)

Exhibit D   Page 8 of 39

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Service

**2021**

For calendar year 2021, or tax year

651121

☐ Final K-1    ☐ Amended K-1    OMB No. 1545-0123

| beginning | / | / 2021 | ending | / | / |

**Partner's Share of Income, Deductions, Credits, etc.**
► See separate instructions.

## Part I   Information About the Partnership

**A** Partnership's employer identification number
84-3239749

**B** Partnership's name, address, city, state, and ZIP code

VERISTAR, LLC
9501 WEST 144TH PLACE, SUITE 202
ORLAND PARK, IL 60462

**C** IRS center where partnership filed return ►E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

## Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
***-**-****

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

RICHARD AVERS
228 S. CLAY STREET
HINSDALE, IL 60521

**G** ☒ General partner or LLC member-manager    ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner    ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?  INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 80 % | 80 % |
| Loss | 80 % | 80 % |
| Capital | 80 % | 80 % |

Check if decrease is due to sale or exchange of partnership interest . . . . . ►☐

**K** Partner's share of liabilities:

|  | Beginning | Ending |
|---|---|---|
| Nonrecourse . . . . . . $ | 1,351,204. | $ 952,025. |
| Qualified nonrecourse financing . . . . . . $ |  | $ |
| Recourse . . . . . . $ | 270,080. | $ 45,080. |

Check this box if Item K includes liability amounts from lower tier partnerships . . . . . ►☐

**L** **Partner's Capital Account Analysis**

Beginning capital account . . . . . . . . . . $ 6,613.
Capital contributed during the year . . . . . $
Current year net income (loss) . . . . . . . . $ -1,124,164.
Other increase (decrease) (attach explanation) . . . $ 212,060.
SEE ATTACHED
Withdrawals and distributions . . . . . . . . . $( )
Ending capital account . . . . . . . . . . . $ -905,491.

**M** Did the partner contribute property with a built-in gain (loss)?
☐ Yes  ☒ No  If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . . . . . . . . . . . . . $
Ending . . . . . . . . . . . . . . . . . . . . . $

## Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Item | Value | # | Item | Value |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | -1,273,967. | 14 | Self-employment earnings (loss) A | -551,624. |
| 2 | Net rental real estate income (loss) |  |  |  |  |
| 3 | Other net rental income (loss) |  | 15 | Credits |  |
| 4a | Guaranteed payments for services | 178,448. |  |  |  |
| 4b | Guaranteed payments for capital |  | 16 | Schedule K-3 is attached if checked. . . . . . . . . ☐ |  |
| 4c | Total guaranteed payments | 178,448. | 17 | Alternative minimum tax (AMT) items |  |
| 5 | Interest income |  |  |  |  |
| 6a | Ordinary dividends |  |  |  |  |
| 6b | Qualified dividends |  | 18 | Tax-exempt income and nondeductible expenses |  |
| 6c | Dividend equivalents |  | B | | 1,202,706. |
| 7 | Royalties |  | C | | 5,372. |
| 8 | Net short-term capital gain (loss) |  |  |  |  |
| 9a | Net long-term capital gain (loss) |  | 19 | Distributions |  |
| 9b | Collectibles (28%) gain (loss) |  |  |  |  |
| 9c | Unrecaptured section 1250 gain |  | 20 | Other information |  |
| 10 | Net section 1231 gain (loss) |  | AG* | STMT |  |
| 11 | Other income (loss) |  | N* | STMT |  |
|  |  |  | Z* | STMT |  |
| 12 | Section 179 deduction |  | 21 | Foreign taxes paid or accrued |  |
| 13 | Other deductions |  |  |  |  |
| A | | 2,905. |  |  |  |
| M | | 25,740. |  |  |  |

**22** ☐ More than one activity for at-risk purposes*
**23** ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**
www.irs.gov/Form1065
**Schedule K-1 (Form 1065) 2021**
PTPA0312L  08/11/21

PARTNER 1

VERISTAR, LLC ▮▮▮▮9749

SCHEDULE K-1 (FORM 1065) 2021 ·········· **SUPPLEMENTAL INFORMATION** ·········· PAGE 2

**ITEM L**
**PARTNER'S CAPITAL ACCOUNT ANALYSIS**
**OTHER INCREASE (DECREASE)**

**OTHER INCREASE**
```
TAX-EXEMPT INTEREST AND/OR TAX-EXEMPT OTHER INCOME...................... $   1,202,706.
                                                        TOTAL $   1,202,706.
```

**OTHER DECREASE**
```
CAPITAL ACCOUNT ADJUSTMENT TO TAX BASIS.......................... $     832,566.
GUARANTEED PAYMENTS (OTHER THAN HEALTH INSURANCE) ........................     152,708.
NON-DEDUCTIBLE EXPENSES.................................................       5,372.
                                                        TOTAL $     990,646.

                                                   NET TOTAL $     212,060.
```

**BOX 20, CODE N**
**BUSINESS INTEREST EXPENSE**
**INCLUDED AS A DEDUCTION ON THE FOLLOWING LINE(S)**

```
BELOW IS DEDUCTIBLE BUSINESS INTEREST EXPENSE FOR INCLUSION
IN THE SEPARATE LOSS CLASS FOR COMPUTING ANY BASIS LIMITATION
(DEFINED IN SECTION 704(D), REGULATION SECTION 1.163(J)-6(H)).

SCHEDULE K-1, LINE 1................................................ $      54,995.
```

**BOX 20, CODE AG**
**GROSS RECEIPTS FOR SECTION 448(C)**

```
THE FOLLOWING INFORMATION IS PROVIDED IN ORDER TO FIGURE THE
GROSS RECEIPTS TEST UNDER SECTION 448(C).

GROSS RECEIPTS FOR SEC. 448(C): CURRENT TAX YEAR................................   4,813,462.
GROSS RECEIPTS FOR SEC. 448(C): 1ST PRIOR TAX YEAR.............................   3,493,639.
GROSS RECEIPTS FOR SEC. 448(C): 2ND PRIOR TAX YEAR.............................      12,471.
GROSS RECEIPTS FOR SEC. 448(C): 3RD PRIOR TAX YEAR (NOT IN EXISTENCE)..
```

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

SPSL1201L  06/08/21

**Statement A—QBI Pass-through Entity Reporting (Schedule K-1, Box 20, Code Z)**

| Partnership's name: VERISTAR, LLC | | | Partnership's EIN: ██████9749 |
|---|---|---|---|
| Partner's name:   RICHARD AVERS | | | Partner's identifying number: ***–**–**** |

| Partner's share of: | VERISTAR, LLC<br>☐ PTP<br>☐ Aggregated<br>☐ SSTB | EXEGO INTERNATIONAL, LLC<br>☐ PTP<br>☐ Aggregated<br>☐ SSTB | ☐ PTP<br>☐ Aggregated<br>☐ SSTB |
|---|---|---|---|
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | −730,071. | −543,896. | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss) . . . . . . . | | | |
| Other income (loss) . . . . . . . . . . . | | | |
| Section 179 deduction . . . . . . . . . | | | |
| Other deductions . . . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . . . . . . | 2,140,005. | 464,258. | |
| **UBIA of qualified property** . . . . . . . . . . . . . . . | 123,363. | 62,402. | |
| **Section 199A dividends** | | | |

| Partner's share of: | ☐ PTP<br>☐ Aggregated<br>☐ SSTB | ☐ PTP<br>☐ Aggregated<br>☐ SSTB | ☐ PTP<br>☐ Aggregated<br>☐ SSTB |
|---|---|---|---|
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | | | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss) . . . . . . . | | | |
| Other income (loss) . . . . . . . . . . . | | | |
| Section 179 deduction . . . . . . . . . | | | |
| Other deductions . . . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . . . . . . | | | |
| **UBIA of qualified property** . . . . . . . . . . . . . . . | | | |

PARTNER 1

BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1065.

VERISTAR, LLC    84-3239749

## 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| RICHARD AVERS | ***–**–**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) | –543,896. | | | |
| | Net rental real estate income (loss) | | | | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Dividend equivalents | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| **Deductions** | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Excess business interest expenses | | | | |
| | Other deductions | | | | |
| **Self-Employment** | Net earnings (loss) from self-employment | | | | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (C)   Section 42(j)(5) | | | | |
| | (D)   Other | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Biofuel producer credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

PTPL1102L  12/02/21

VERISTAR, LLC    84-3239749

# 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | | Partner's identification number |
|---|---|---|
| RICHARD AVERS | | \*\*\*-\*\*-\*\*\*\* |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Alternative Minimum Tax (AMT) Items | Post-1986 depreciation adjustment | | | | |
| | Adjusted gain or loss | | | | |
| | Depletion (other than oil and gas) | | | | |
| | Oil, gas and geothermal properties — gross income | | | | |
| | Oil, gas and geothermal properties — deductions | | | | |
| | A.C.E. depreciation adjustment | | | | |
| | A.C.E. adjusted gain or (loss) | | | | |
| | Accel. depreciation on real property placed in service before 1987 | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987 | | | | |
| | Other AMT items | | | | |
| Tax-Exempt Inc & Non-deductible Exp | Tax-exempt interest income | | | | |
| | Other tax-exempt income | | | | |
| | Nondeductible expenses | | | | |
| Other Information | Investment income | | | | |
| | Investment expenses | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships | | | | |
| | Recapture of low-income housing credit — other | | | | |
| | Section 704(c) information | | | | |
| | Section 751 gain (loss) | | | | |
| | Section 1(h)(5) gain (loss) | | | | |
| | Deemed section 1250 unrecaptured gain | | | | |
| | Excess taxable income | | | | |
| | Excess business interest income | | | | |
| | Gross receipts for Section 448(c): current year | | | | |
| | Foreign taxes paid or accrued | | | | |
| | Supplemental Information: | | | | |
| | | | | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PTPL1103L  12/22/21

651121

| | | |
|---|---|---|
| Schedule K-1 **(Form 1065)** Department of the Treasury Internal Revenue Service | **2021** For calendar year 2021, or tax year | ☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123 |

**Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items**

beginning / / 2021   ending / /

**Partner's Share of Income, Deductions, Credits, etc.**
► See separate instructions.

| Part I | Information About the Partnership |
|---|---|
| A | Partnership's employer identification number ████9749 |
| B | Partnership's name, address, city, state, and ZIP code VERISTAR, LLC 9501 WEST 144TH PLACE, SUITE 202 ORLAND PARK, IL 60462 |
| C | IRS center where partnership filed return ►E-FILE |
| D | ☐ Check if this is a publicly traded partnership (PTP) |

| Part II | Information About the Partner |
|---|---|
| E | Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.) ***-**-**** |
| F | Name, address, city, state, and ZIP code for partner entered in E. See instructions. KENNETH WITTENBERG 22W271 GLEN PARK ROAD GLEN ELLYN, IL 60137 |
| G | ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member |
| H1 | ☒ Domestic partner   ☐ Foreign partner |
| H2 | If the partner is a disregarded entity (DE), enter the partner's: TIN ___ Name ___ |
| I1 | What type of entity is this partner? INDIVIDUAL |
| I2 | If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . ☐ |
| J | Partner's share of profit, loss, and capital (see instructions): |

| | Beginning | Ending |
|---|---|---|
| Profit | 3 % | 3 % |
| Loss | 3 % | 3 % |
| Capital | 3 % | 3 % |

Check if decrease is due to sale or exchange of partnership interest . . . . . ►

K Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 50,670. | $ 35,701. |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ | $ |

Check this box if Item K includes liability amounts from lower tier partnerships . . . . . ☐

| L | Partner's Capital Account Analysis |
|---|---|
| Beginning capital account | $ 56,091. |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ -47,883. |
| Other increase (decrease) (attach explanation) | $ 12,837. SEE ATTACHED |
| Withdrawals and distributions | $( ) |
| Ending capital account | $ 21,045. |

M Did the partner contribute property with a built-in gain (loss)? ☐ Yes ☒ No If "Yes", attach statement. See instructions.

N Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . $ ___
Ending . . . $ ___

| # | | |
|---|---|---|
| 1 | Ordinary business income (loss) -47,774. | 14 Self-employment earnings (loss) A -27,378. |
| 2 | Net rental real estate income (loss) | |
| 3 | Other net rental income (loss) | 15 Credits |
| 4a | Guaranteed payments for services | |
| 4b | Guaranteed payments for capital | 16 Schedule K-3 is attached if checked. . . ☐ |
| 4c | Total guaranteed payments | 17 Alternative minimum tax (AMT) items |
| 5 | Interest income | |
| 6a | Ordinary dividends | |
| 6b | Qualified dividends | 18 Tax-exempt income and nondeductible expenses B 45,101. |
| 6c | Dividend equivalents | |
| 7 | Royalties | C 201. |
| 8 | Net short-term capital gain (loss) | |
| 9a | Net long-term capital gain (loss) | 19 Distributions |
| 9b | Collectibles (28%) gain (loss) | |
| 9c | Unrecaptured section 1250 gain | 20 Other information AG* STMT |
| 10 | Net section 1231 gain (loss) | N* STMT |
| 11 | Other income (loss) | Z* STMT |
| 12 | Section 179 deduction | 21 Foreign taxes paid or accrued |
| 13 | Other deductions A 109. | |

22 ☐ More than one activity for at-risk purposes*
23 ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**   www.irs.gov/Form1065   Schedule K-1 (Form 1065) 2021   PTPA0312L 08/11/21

VERISTAR, LLC ████ 9749

SCHEDULE K-1 (FORM 1065) 2021

**SUPPLEMENTAL INFORMATION**

PAGE 2

**ITEM L**
**PARTNER'S CAPITAL ACCOUNT ANALYSIS**
**OTHER INCREASE (DECREASE)**

**OTHER INCREASE**

| | | |
|---|---|---:|
| TAX-EXEMPT INTEREST AND/OR TAX-EXEMPT OTHER INCOME | $ | 45,101. |
| TOTAL | $ | 45,101. |

**OTHER DECREASE**

| | | |
|---|---|---:|
| CAPITAL ACCOUNT ADJUSTMENT TO TAX BASIS | $ | 32,063. |
| NON-DEDUCTIBLE EXPENSES | | 201. |
| TOTAL | $ | 32,264. |
| NET TOTAL | $ | 12,837. |

**BOX 20, CODE N**
**BUSINESS INTEREST EXPENSE**
**INCLUDED AS A DEDUCTION ON THE FOLLOWING LINE(S)**

BELOW IS DEDUCTIBLE BUSINESS INTEREST EXPENSE FOR INCLUSION
IN THE SEPARATE LOSS CLASS FOR COMPUTING ANY BASIS LIMITATION
(DEFINED IN SECTION 704(D), REGULATION SECTION 1.163(J)-6(H)).

| | | |
|---|---|---:|
| SCHEDULE K-1, LINE 1 | $ | 2,062. |

**BOX 20, CODE AG**
**GROSS RECEIPTS FOR SECTION 448(C)**

THE FOLLOWING INFORMATION IS PROVIDED IN ORDER TO FIGURE THE
GROSS RECEIPTS TEST UNDER SECTION 448(C).

| | |
|---|---:|
| GROSS RECEIPTS FOR SEC. 448(C): CURRENT TAX YEAR | 180,505. |
| GROSS RECEIPTS FOR SEC. 448(C): 1ST PRIOR TAX YEAR | 131,011. |
| GROSS RECEIPTS FOR SEC. 448(C): 2ND PRIOR TAX YEAR | 468. |
| GROSS RECEIPTS FOR SEC. 448(C): 3RD PRIOR TAX YEAR (NOT IN EXISTENCE) | |

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SPSL1201L  06/08/21

**Statement A—QBI Pass-through Entity Reporting (Schedule K-1, Box 20, Code Z)**

| Partnership's name: VERISTAR, LLC | | | Partnership's EIN: ▆▆9749 |
|---|---|---|---|
| Partner's name:   KENNETH WITTENBERG | | | Partner's identifying number: *** – ** – * * * * |

| | VERISTAR, LLC <br> ☐ PTP <br> ☐ Aggregated <br> ☐ SSTB | EXEGO INTERNATIONAL, LLC <br> ☐ PTP <br> ☐ Aggregated <br> ☐ SSTB | ☐ PTP <br> ☐ Aggregated <br> ☐ SSTB |
|---|---|---|---|
| **Partner's share of:** | | | |
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | –27,378. | –20,396. | |
| Rental income (loss)........... | | | |
| Royalty income (loss)......... | | | |
| Section 1231 gain (loss)....... | | | |
| Other income (loss).......... | | | |
| Section 179 deduction......... | | | |
| Other deductions............. | | | |
| **W-2 wages**.................... | 80,250. | 17,410. | |
| **UBIA of qualified property** ................ | 4,626. | 2,340. | |
| **Section 199A dividends** | | | |

| | ☐ PTP <br> ☐ Aggregated <br> ☐ SSTB | ☐ PTP <br> ☐ Aggregated <br> ☐ SSTB | ☐ PTP <br> ☐ Aggregated <br> ☐ SSTB |
|---|---|---|---|
| **Partner's share of:** | | | |
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | | | |
| Rental income (loss)........... | | | |
| Royalty income (loss)......... | | | |
| Section 1231 gain (loss)....... | | | |
| Other income (loss).......... | | | |
| Section 179 deduction......... | | | |
| Other deductions............. | | | |
| **W-2 wages**.................... | | | |
| **UBIA of qualified property** ................ | | | |

PARTNER  2

VERISTAR, LLC    84-3239749

# 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| KENNETH WITTENBERG | ***-**-**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) | −20,396. | | | |
| | Net rental real estate income (loss) | | | | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Dividend equivalents | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| **Deductions** | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Excess business interest expenses | | | | |
| | Other deductions | | | | |
| **Self-Employment** | Net earnings (loss) from self-employment | | | | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (C)   Section 42(j)(5) | | | | |
| | (D)   Other | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Biofuel producer credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

VERISTAR, LLC   84-3239749

## 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner s Name | Partner s identification number |
|---|---|
| KENNETH WITTENBERG | ***-**-**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Alternative Minimum Tax (AMT) Items | Post-1986 depreciation adjustment | | | | |
| | Adjusted gain or loss | | | | |
| | Depletion (other than oil and gas) | | | | |
| | Oil, gas and geothermal properties — gross income | | | | |
| | Oil, gas and geothermal properties — deductions | | | | |
| | A.C.E. depreciation adjustment | | | | |
| | A.C.E. adjusted gain or (loss) | | | | |
| | Accel. depreciation on real property placed in service before 1987 | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987 | | | | |
| | Other AMT items | | | | |
| Tax-Exempt Inc & Nondeductible Exp. | Tax-exempt interest income | | | | |
| | Other tax-exempt income | | | | |
| | Nondeductible expenses | | | | |
| Other Information | Investment income | | | | |
| | Investment expenses | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships | | | | |
| | Recapture of low-income housing credit — other | | | | |
| | Section 704(c) information | | | | |
| | Section 751 gain (loss) | | | | |
| | Section 1(h)(5) gain (loss) | | | | |
| | Deemed section 1250 unrecaptured gain | | | | |
| | Excess taxable income | | | | |
| | Excess business interest income | | | | |
| | Gross receipts for Section 448(c): current year | | | | |
| | Foreign taxes paid or accrued | | | | |
| | Supplemental Information: | | | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PTPL1103L   12/22/21

651121

| **Schedule K-1** (Form 1065) Department of the Treasury Internal Revenue Service | **2021** For calendar year 2021, or tax year | ☐ Final K-1   ☐ Amended K-1 | OMB No. 1545-0123 |
|---|---|---|---|

beginning / / 2021   ending / /

**Partner's Share of Income, Deductions, Credits, etc.**
► See separate instructions.

### Part I   Information About the Partnership

**A** Partnership's employer identification number
████ 9749

**B** Partnership's name, address, city, state, and ZIP code

VERISTAR, LLC
9501 WEST 144TH PLACE, SUITE 202
ORLAND PARK, IL 60462

**C** IRS center where partnership filed return ► E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II   Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
***-**-****

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

TEFFT SMITH
655 FIFTEENTH STREET
WASHINGTON, DC 20005-5793

**G** ☐ General partner or LLC member-manager   ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner? INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | **Beginning** | **Ending** |
|---|---|---|
| Profit | 5 % | 5 % |
| Loss | 5 % | 5 % |
| Capital | 5 % | 5 % |

Check if decrease is due to sale or exchange of partnership interest . . . . . ►

**K** Partner's share of liabilities:

|  | **Beginning** | **Ending** |
|---|---|---|
| Nonrecourse | $ 84,450. | $ 59,502. |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 125,000. | $ 225,000. |

Check this box if Item K includes liability amounts from lower tier partnerships . . . . . ►

**L** **Partner's Capital Account Analysis**

Beginning capital account . . . . . . . . . . $ 1,818.
Capital contributed during the year . . . . . $ 100,000.
Current year net income (loss) . . . . . . . . $ -79,805.
Other increase (decrease) (attach explanation) . $ 21,394.
SEE ATTACHED
Withdrawals and distributions . . . . . . . . $( )
**Ending capital account** . . . . . . . . $ 43,407.

**M** Did the partner contribute property with a built-in gain or (loss)?
☐ Yes   ☒ No   If "Yes," attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . . . . . . . . . . . . $
Ending . . . . . . . . . . . . . . . . . . . . . $

### Part III   Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| # | Description | Amount | # | Description | Amount |
|---|---|---|---|---|---|
| 1 | Ordinary business income (loss) | -79,623. | 14 | Self-employment earnings (loss) | |
| 2 | Net rental real estate income (loss) | | | | |
| 3 | Other net rental income (loss) | | 15 | Credits | |
| 4a | Guaranteed payments for services | | | | |
| 4b | Guaranteed payments for capital | | 16 | Schedule K-3 is attached if checked . . . . . . . . . ☐ | |
| 4c | Total guaranteed payments | | 17 | Alternative minimum tax (AMT) items | |
| 5 | Interest income | | | | |
| 6a | Ordinary dividends | | | | |
| 6b | Qualified dividends | | 18 | Tax-exempt income and nondeductible expenses | |
| 6c | Dividend equivalents | | B | | 75,169. |
| 7 | Royalties | | C | | 336. |
| 8 | Net short-term capital gain (loss) | | | | |
| 9a | Net long-term capital gain (loss) | | 19 | Distributions | |
| 9b | Collectibles (28%) gain (loss) | | | | |
| 9c | Unrecaptured section 1250 gain | | 20 | Other information | |
| 10 | Net section 1231 gain (loss) | | AG* | STMT | |
| 11 | Other income (loss) | | N* | STMT | |
| | | | Z* | STMT | |
| 12 | Section 179 deduction | | 21 | Foreign taxes paid or accrued | |
| 13 | Other deductions | | | | |
| A | | 182. | | | |

**22** ☐ More than one activity for at-risk purposes*
**23** ☐ More than one activity for passive activity purposes*
*See attached statement for additional information.

For IRS Use Only

**BAA For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**   www.irs.gov/Form1065   **Schedule K-1 (Form 1065) 2021**

PTPA0312L   08/11/21

PARTNER 3

VERISTAR, LLC ▮▮▮▮9749

SCHEDULE K-1 (FORM 1065) 2021      **SUPPLEMENTAL INFORMATION**      PAGE   2

**ITEM L**
**PARTNER'S CAPITAL ACCOUNT ANALYSIS**
**OTHER INCREASE (DECREASE)**

**OTHER INCREASE**
TAX-EXEMPT INTEREST AND/OR TAX-EXEMPT OTHER INCOME...................... $      75,169.
     TOTAL $      75,169.
**OTHER DECREASE**
CAPITAL ACCOUNT ADJUSTMENT TO TAX BASIS...................................... $      53,439.
NON-DEDUCTIBLE EXPENSES........................................................      336.
     TOTAL $      53,775.

     NET TOTAL $      21,394.

**BOX 20, CODE N**
**BUSINESS INTEREST EXPENSE**
**INCLUDED AS A DEDUCTION ON THE FOLLOWING LINE(S)**

BELOW IS DEDUCTIBLE BUSINESS INTEREST EXPENSE FOR INCLUSION
IN THE SEPARATE LOSS CLASS FOR COMPUTING ANY BASIS LIMITATION
(DEFINED IN SECTION 704(D), REGULATION SECTION 1.163(J)-6(H)).

SCHEDULE K-1, LINE 1................................................................. $      3,437.

**BOX 20, CODE AG**
**GROSS RECEIPTS FOR SECTION 448(C)**

THE FOLLOWING INFORMATION IS PROVIDED IN ORDER TO FIGURE THE
GROSS RECEIPTS TEST UNDER SECTION 448(C).

GROSS RECEIPTS FOR SEC. 448(C): CURRENT TAX YEAR................................. 300,841.
GROSS RECEIPTS FOR SEC. 448(C): 1ST PRIOR TAX YEAR.............................. 218,352.
GROSS RECEIPTS FOR SEC. 448(C): 2ND PRIOR TAX YEAR.............................. 779.
GROSS RECEIPTS FOR SEC. 448(C): 3RD PRIOR TAX YEAR (NOT IN EXISTENCE)..

* * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * * *

SPSL1201L  06/08/21

**Statement A—QBI Pass-through Entity Reporting (Schedule K-1, Box 20, Code Z)**

| Partnership's name: VERISTAR, LLC | | Partnership's EIN: ███9749 |
|---|---|---|
| Partner's name:   TEFFT SMITH | | Partner's identifying number: ***–**–**** |

| Partner's share of: | VERISTAR, LLC<br>☐ PTP  ☐ Aggregated  ☐ SSTB | EXEGO INTERNATIONAL, LLC<br>☐ PTP  ☐ Aggregated  ☐ SSTB | ☐ PTP  ☐ Aggregated  ☐ SSTB |
|---|---|---|---|
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | −45,629. | −33,994. | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss). . . . . . . | | | |
| Other income (loss). . . . . . . . . . . | | | |
| Section 179 deduction. . . . . . . . | | | |
| Other deductions. . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . . . | 133,750. | 29,016. | |
| **UBIA of qualified property** . . . . . . . . . . . . . . . | 7,710. | 3,900. | |
| **Section 199A dividends** | | | |

| Partner's share of: | ☐ PTP  ☐ Aggregated  ☐ SSTB | ☐ PTP  ☐ Aggregated  ☐ SSTB | ☐ PTP  ☐ Aggregated  ☐ SSTB |
|---|---|---|---|
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | | | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss). . . . . . . | | | |
| Other income (loss). . . . . . . . . . . | | | |
| Section 179 deduction. . . . . . . . | | | |
| Other deductions. . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . . . | | | |
| **UBIA of qualified property** . . . . . . . . . . . . . . . | | | |

PARTNER 3

VERISTAR, LLC ████ 9749

## 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

Note: The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| TEFFT SMITH | ***-**-**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | ████3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) | −33,994. | | | |
| | Net rental real estate income (loss) | | | | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Dividend equivalents | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| **Deductions** | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Excess business interest expenses | | | | |
| | Other deductions | | | | |
| **Self-Employment** | Net earnings (loss) from self-employment | | | | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (C)   Section 42(j)(5) | | | | |
| | (D)   Other | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Biofuel producer credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

PTPL1102L  12/02/21

VERISTAR, LLC   ████ 9749

## 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| TEFFT SMITH | ***-**-**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | ████537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| Alternative Minimum Tax (AMT) Items | Post-1986 depreciation adjustment | | | | |
| | Adjusted gain or loss | | | | |
| | Depletion (other than oil and gas) | | | | |
| | Oil, gas and geothermal properties — gross income | | | | |
| | Oil, gas and geothermal properties — deductions | | | | |
| | A.C.E. depreciation adjustment | | | | |
| | A.C.E. adjusted gain or (loss) | | | | |
| | Accel. depreciation on real property placed in service before 1987 | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987 | | | | |
| | Other AMT items | | | | |
| Tax-Exempt Inc & Non-deductible Exp | Tax-exempt interest income | | | | |
| | Other tax-exempt income | | | | |
| | Nondeductible expenses | | | | |
| Other Information | Investment income | | | | |
| | Investment expenses | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships | | | | |
| | Recapture of low-income housing credit — other | | | | |
| | Section 704(c) information | | | | |
| | Section 751 gain (loss) | | | | |
| | Section 1(h)(5) gain (loss) | | | | |
| | Deemed section 1250 unrecaptured gain | | | | |
| | Excess taxable income | | | | |
| | Excess business interest income | | | | |
| | Gross receipts for Section 448(c): current year | | | | |
| | Foreign taxes paid or accrued | | | | |
| | Supplemental Information: | | | | |

****************************************

PTPL1103L  12/22/21

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Serv ce

**2021**

For calendar year 2021, or tax year

651121

| | Final K-1 | | Amended K-1 | OMB No. 1545-0123 |

beg nning ___/___/ 2021    ending ___/___/___

**Partner's Share of Income, Deductions, Credits, etc.**
► See separate instructions.

### Part I  Information About the Partnership

**A** Partnership's employer identification number
█████9749

**B** Partnership's name, address, city, state, and ZIP code

VERISTAR, LLC
9501 WEST 144TH PLACE, SUITE 202
ORLAND PARK, IL 60462

**C** IRS center where partnership filed return ►E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

### Part II  Information About the Partner

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
***-**-****

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

CHARLIE GARDNER
1295 SUNVIEW LANE
KENILWORTH, IL 60043

**G** ☐ General partner or LLC member-manager  ☒ Limited partner or other LLC member

**H1** ☒ Domestic partner  ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner? INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

| | Beginning | Ending |
|---|---|---|
| Profit | 11 % | 11 % |
| Loss | 11 % | 11 % |
| Capital | 11 % | 11 % |

Check if decrease is due to sale or exchange of partnership interest . . . . . ►

**K** Partner's share of liabilities:

| | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 185,790. | $ 130,904. |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ 150,000. | $ 400,000. |

Check this box if Item K includes liability amounts from lower tier partnersh ps . . . . . ►☐

**L** Partner's Capital Account Analysis

| | |
|---|---|
| Beginning capital account | $ 3,998. |
| Capital contributed during the year | $ 50,000. |
| Current year net income (loss) | $ -175,569. |
| Other increase (decrease) (attach explanation) | $ 47,068. |
| | SEE ATTACHED |
| Withdrawals and distributions | $( ) |
| Ending capital account | $ -74,503. |

**M** Did the partner contribute property with a built-in gain or (loss)?
☐ Yes  ☒ No  If "Yes", attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . . . . . . . . . . . . . $
Ending . . . . . . . . . . . . . . . . . . . . . . $

### Part III  Partner's Share of Current Year Income, Deductions, Credits, and Other Items

| | | | |
|---|---|---|---|
| 1 | Ordinary business income (loss) −175,170. | 14 | Self-employment earnings (loss) |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 15 | Credits |
| 4a | Guaranteed payments for services | | |
| 4b | Guaranteed payments for capital | 16 | Schedule K-3 is attached if checked. . . . . . . . . . . . . . ☐ |
| 4c | Total guaranteed payments | 17 | Alternative minimum tax (AMT) items |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | 18 | Tax-exempt income and nondeductible expenses |
| 6c | Dividend equivalents | | B _____ 165,372. |
| 7 | Royalties | | C _____ 739. |
| 8 | Net short-term capital gain (loss) | 19 | Distributions |
| 9a | Net long-term capital gain (loss) | | |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | 20 | Other information |
| | | | AG* STMT |
| 10 | Net section 1231 gain (loss) | | N* STMT |
| 11 | Other income (loss) | | Z* STMT |
| 12 | Section 179 deduction | 21 | Foreign taxes paid or accrued |
| 13 | Other deductions | | |
| | A _____ 399. | | |
| 22 | ☐ More than one activity for at-risk purposes* | | |
| 23 | ☐ More than one activity for passive activity purposes* | | |
| *See attached statement for additional information. | | | |

For IRS Use Only

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**   www.irs.gov/Form1065   **Schedule K-1 (Form 1065) 2021**

PTPA0312L   08/11/21

VERISTAR, LLC ▮▮▮▮▮9749

SCHEDULE K-1 (FORM 1065) 2021

**SUPPLEMENTAL INFORMATION**

PAGE 2

**ITEM L**
**PARTNER'S CAPITAL ACCOUNT ANALYSIS**
**OTHER INCREASE (DECREASE)**

**OTHER INCREASE**

| | | |
|---|---|---|
| TAX-EXEMPT INTEREST AND/OR TAX-EXEMPT OTHER INCOME.......... | $ | 165,372. |
| TOTAL | $ | 165,372. |

**OTHER DECREASE**

| | | |
|---|---|---|
| CAPITAL ACCOUNT ADJUSTMENT TO TAX BASIS......................... | $ | 117,565. |
| NON-DEDUCTIBLE EXPENSES......................................... | | 739. |
| TOTAL | $ | 118,304. |
| NET TOTAL | $ | 47,068. |

**BOX 20, CODE N**
**BUSINESS INTEREST EXPENSE**
**INCLUDED AS A DEDUCTION ON THE FOLLOWING LINE(S)**

BELOW IS DEDUCTIBLE BUSINESS INTEREST EXPENSE FOR INCLUSION
IN THE SEPARATE LOSS CLASS FOR COMPUTING ANY BASIS LIMITATION
(DEFINED IN SECTION 704(D), REGULATION SECTION 1.163(J)-6(H)).

| | | |
|---|---|---|
| SCHEDULE K-1, LINE 1.......................................... | $ | 7,562. |

**BOX 20, CODE AG**
**GROSS RECEIPTS FOR SECTION 448(C)**

THE FOLLOWING INFORMATION IS PROVIDED IN ORDER TO FIGURE THE
GROSS RECEIPTS TEST UNDER SECTION 448(C).

| | |
|---|---|
| GROSS RECEIPTS FOR SEC. 448(C): CURRENT TAX YEAR................ | 661,851. |
| GROSS RECEIPTS FOR SEC. 448(C): 1ST PRIOR TAX YEAR............. | 480,375. |
| GROSS RECEIPTS FOR SEC. 448(C): 2ND PRIOR TAX YEAR............. | 1,715. |
| GROSS RECEIPTS FOR SEC. 448(C): 3RD PRIOR TAX YEAR (NOT IN EXISTENCE).. | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

**Statement A—QBI Pass-through Entity Reporting (Schedule K-1, Box 20, Code Z)**

| Partnership's name: VERISTAR, LLC | | | Partnership's EIN: ███ 9749 |
|---|---|---|---|
| Partner's name:   CHARLIE GARDNER | | | Partner's identifying number: * * * – * * – * * * * |

| Partner's share of: | VERISTAR, LLC<br>☐ PTP<br>☐ Aggregated<br>☐ SSTB | EXEGO INTERNATIONAL, LLC<br>☐ PTP<br>☐ Aggregated<br>☐ SSTB | ☐ PTP<br>☐ Aggregated<br>☐ SSTB |
|---|---|---|---|
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | –100,385. | –74,786. | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss) . . . . . . . | | | |
| Other income (loss) . . . . . . . . . . | | | |
| Section 179 deduction . . . . . . . . | | | |
| Other deductions . . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . | 294,251. | 63,835. | |
| **UBIA of qualified property** . . . . . . . . . . . . . . | 16,962. | 8,580. | |
| **Section 199A dividends** | | | |

| Partner's share of: | ☐ PTP<br>☐ Aggregated<br>☐ SSTB | ☐ PTP<br>☐ Aggregated<br>☐ SSTB | ☐ PTP<br>☐ Aggregated<br>☐ SSTB |
|---|---|---|---|
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | | | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss) . . . . . . . | | | |
| Other income (loss) . . . . . . . . . . | | | |
| Section 179 deduction . . . . . . . . | | | |
| Other deductions . . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . | | | |
| **UBIA of qualified property** . . . . . . . . . . . . . . | | | |

PARTNER  4

BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1065.   Case 8:23-cv-00413, Doc. 14-4 Filed 02/05/23   Entered 02/05/23 18:46:26   Statement A (Form 1065) (2021)

Exhibit D   Page 26 of 39

VERISTAR, LLC  9749

# 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| CHARLIE GARDNER | ***-**-**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) | −74,786. | | | |
| | Net rental real estate income (loss) | | | | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Dividend equivalents | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| **Deductions** | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Excess business interest expenses | | | | |
| | Other deductions | | | | |
| **Self-Employ-ment** | Net earnings (loss) from self-employment | | | | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (C)   Section 42(j)(5) | | | | |
| | (D)   Other | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Biofuel producer credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

VERISTAR, LLC ▬▬9749

Page 2

## 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner s Name | Partner s identification number |
|---|---|
| CHARLIE GARDNER | ***–**–**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | ▬3537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Alternative Minimum Tax (AMT) Items** | Post-1986 depreciation adjustment. . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Adjusted gain or loss. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Depletion (other than oil and gas). . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Oil, gas and geothermal properties — gross income . . . . . . . | | | | |
| | Oil, gas and geothermal properties — deductions. . . . . . . . . . | | | | |
| | A.C.E. depreciation adjustment. . . . . . . . . . . . . . . . . . . . . . | | | | |
| | A.C.E. adjusted gain or (loss). . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Accel. depreciation on real property placed in service before 1987 . . . . . | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987 . . . . . | | | | |
| | Other AMT items. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **Tax-Exempt Inc & Nondeductible Exp** | Tax-exempt interest income . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Other tax-exempt income. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Nondeductible expenses. . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| **Other Information** | Investment income. . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Investment expenses . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships . . . . . . . . | | | | |
| | Recapture of low-income housing credit — other . . . . . . . . . . | | | | |
| | Section 704(c) information . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Section 751 gain (loss). . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Section 1(h)(5) gain (loss). . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Deemed section 1250 unrecaptured gain . . . . . . . . . . . . . . . | | | | |
| | Excess taxable income. . . . . . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Excess business interest income . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Gross receipts for Section 448(c): current year. . . . . . . . . . . . | | | | |
| | Foreign taxes paid or accrued . . . . . . . . . . . . . . . . . . . . . . | | | | |
| | Supplemental Information: | | | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PTPL1103L   12/22/21

**Schedule K-1**
**(Form 1065)**
Department of the Treasury
Internal Revenue Servｃe

**2021**

For calendar year 2021, or tax year

beｇnning ___/___/2021 ending ___/___/___

651121

☐ Final K-1   ☐ Amended K-1   OMB No. 1545-0123

**Partner's Share of Income, Deductions, Credits, etc.**
► See separate instructions.

| Part I | Information About the Partnership |
|---|---|

**A** Partnership's employer identification number
84-3239749

**B** Partnership's name, address, city, state, and ZIP code

VERISTAR, LLC
9501 WEST 144TH PLACE, SUITE 202
ORLAND PARK, IL 60462

**C** IRS center where partnership filed return ►E-FILE

**D** ☐ Check if this is a publicly traded partnership (PTP)

| Part II | Information About the Partner |
|---|---|

**E** Partner's SSN or TIN (Do not use TIN of a disregarded entity. See instructions.)
\*\*\*-\*\*-\*\*\*\*

**F** Name, address, city, state, and ZIP code for partner entered in E. See instructions.

MARK PLAEHN
10300 S. TRIPP AVENUE
OAK LAWN, IL 60453

**G** ☒ General partner or LLC member-manager   ☐ Limited partner or other LLC member

**H1** ☒ Domestic partner   ☐ Foreign partner

**H2** ☐ If the partner is a disregarded entity (DE), enter the partner's:
TIN _____ Name _____

**I1** What type of entity is this partner?   INDIVIDUAL

**I2** If this partner is a retirement plan (IRA/SEP/Keogh/etc.), check here . . . ☐

**J** Partner's share of profit, loss, and capital (see instructions):

|  | Beginning | Ending |
|---|---|---|
| Profit | 1 % | 1 % |
| Loss | 1 % | 1 % |
| Capital | 1 % | 1 % |

Check if decrease is due to sale or exchange of partnership interest . . . . . ►

**K** Partner's share of liabilities:

|  | Beginning | Ending |
|---|---|---|
| Nonrecourse | $ 16,890. | $ 11,900. |
| Qualified nonrecourse financing | $ | $ |
| Recourse | $ | $ |

Check this box if Item K includes liability amounts from lower tier partnersh ps. . . . . ☐

**L** **Partner's Capital Account Analysis**

| | |
|---|---|
| Beginning capital account | $ 50,365. |
| Capital contributed during the year | $ |
| Current year net income (loss) | $ -15,961. |
| Other increase (decrease) (attach explanation) | $ 4,279. |
| | SEE ATTACHED |
| Withdrawals and distributions | $( ) |
| Ending capital account | $ 38,683. |

**M** Did the partner contribute property with a built-in gain (loss)?
☐ Yes   ☒ No   If "Yes", attach statement. See instructions.

**N** Partner's Share of Net Unrecognized Section 704(c) Gain or (Loss)
Beginning . . . . . . . . . . . . . . . . . . . . . $
Ending . . . . . . . . . . . . . . . . . . . . . . $

| Part III | Partner's Share of Current Year Income, Deductions, Credits, and Other Items |
|---|---|

| # | Description | # | Description |
|---|---|---|---|
| 1 | Ordinary business income (loss) -15,925. | 14 | Self-employment earnings (loss) A -9,126. |
| 2 | Net rental real estate income (loss) | | |
| 3 | Other net rental income (loss) | 15 | Credits |
| 4a | Guaranteed payments for services | | |
| 4b | Guaranteed payments for capital | 16 | Schedule K-3 is attached if checked. . . . . . . . . ☐ |
| 4c | Total guaranteed payments | 17 | Alternative minimum tax (AMT) items |
| 5 | Interest income | | |
| 6a | Ordinary dividends | | |
| 6b | Qualified dividends | 18 | Tax-exempt income and nondeductible expenses |
| 6c | Dividend equivalents | | B 15,034. |
| 7 | Royalties | | C 67. |
| 8 | Net short-term capital gain (loss) | | |
| 9a | Net long-term capital gain (loss) | 19 | Distributions |
| 9b | Collectibles (28%) gain (loss) | | |
| 9c | Unrecaptured section 1250 gain | 20 | Other information |
| 10 | Net section 1231 gain (loss) | | AG* STMT |
| 11 | Other income (loss) | | N* STMT |
| | | | Z* STMT |
| 12 | Section 179 deduction | 21 | Foreign taxes paid or accrued |
| 13 | Other deductions A 36. | | |
| | | 22 | ☐ More than one activity for at-risk purposes* |
| | | 23 | ☐ More than one activity for passive activity purposes* |
| | | *See attached statement for additional information. | |

**BAA  For Paperwork Reduction Act Notice, see the Instructions for Form 1065.**   www.irs.gov/Form1065   **Schedule K-1 (Form 1065) 2021**

PTPA0312L  08/11/21

For IRS Use Only

VERISTAR, LLC 84-3239749

SCHEDULE K-1 (FORM 1065) 2021                    **SUPPLEMENTAL INFORMATION**                    PAGE  2

**ITEM L**
**PARTNER'S CAPITAL ACCOUNT ANALYSIS**
**OTHER INCREASE (DECREASE)**

**OTHER INCREASE**

| | | |
|---|---|---:|
| TAX-EXEMPT INTEREST AND/OR TAX-EXEMPT OTHER INCOME...................... | $ | 15,034. |
| | TOTAL $ | 15,034. |

**OTHER DECREASE**

| | | |
|---|---|---:|
| CAPITAL ACCOUNT ADJUSTMENT TO TAX BASIS....................................... | $ | 10,688. |
| NON-DEDUCTIBLE EXPENSES................................................................ | | 67. |
| | TOTAL $ | 10,755. |
| | | |
| | NET TOTAL $ | 4,279. |

**BOX 20, CODE N**
**BUSINESS INTEREST EXPENSE**
**INCLUDED AS A DEDUCTION ON THE FOLLOWING LINE(S)**

BELOW IS DEDUCTIBLE BUSINESS INTEREST EXPENSE FOR INCLUSION
IN THE SEPARATE LOSS CLASS FOR COMPUTING ANY BASIS LIMITATION
(DEFINED IN SECTION 704(D), REGULATION SECTION 1.163(J)-6(H)).

| | | |
|---|---|---:|
| SCHEDULE K-1, LINE 1................................................................ | $ | 687. |

**BOX 20, CODE AG**
**GROSS RECEIPTS FOR SECTION 448(C)**

THE FOLLOWING INFORMATION IS PROVIDED IN ORDER TO FIGURE THE
GROSS RECEIPTS TEST UNDER SECTION 448(C).

| | |
|---|---:|
| GROSS RECEIPTS FOR SEC. 448(C): CURRENT TAX YEAR................................ | 60,168. |
| GROSS RECEIPTS FOR SEC. 448(C): 1ST PRIOR TAX YEAR.............................. | 43,670. |
| GROSS RECEIPTS FOR SEC. 448(C): 2ND PRIOR TAX YEAR.............................. | 156. |
| GROSS RECEIPTS FOR SEC. 448(C): 3RD PRIOR TAX YEAR (NOT IN EXISTENCE).. | |

*****************************************

SPSL1201L   06/08/21

**Statement A—QBI Pass-through Entity Reporting (Schedule K-1, Box 20, Code Z)**

| Partnership's name: VERISTAR, LLC | Partnership's EIN: 84-3239749 |
|---|---|
| Partner's name:   MARK PLAEHN | Partner's identifying number: ***-**-**** |

| | VERISTAR, LLC | EXEGO INTERNATIONAL, LLC | |
|---|---|---|---|
| | ☐ PTP | ☐ PTP | ☐ PTP |
| | ☐ Aggregated | ☐ Aggregated | ☐ Aggregated |
| | ☐ SSTB | ☐ SSTB | ☐ SSTB |
| **Partner's share of:** | | | |
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | -9,126. | -6,799. | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss). . . . . . . | | | |
| Other income (loss). . . . . . . . . . | | | |
| Section 179 deduction. . . . . . . . | | | |
| Other deductions. . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . . . . . | 26,750. | 5,803. | |
| **UBIA of qualified property** . . . . . . . . . . . . . . . . | 1,542. | 780. | |
| **Section 199A dividends** | | | |

| | | | |
|---|---|---|---|
| | ☐ PTP | ☐ PTP | ☐ PTP |
| | ☐ Aggregated | ☐ Aggregated | ☐ Aggregated |
| | ☐ SSTB | ☐ SSTB | ☐ SSTB |
| **Partner's share of:** | | | |
| **QBI or qualified PTP items subject to partner-specific determinations:** | | | |
| Ordinary business income (loss) | | | |
| Rental income (loss) . . . . . . . . . . | | | |
| Royalty income (loss) . . . . . . . . . | | | |
| Section 1231 gain (loss). . . . . . . | | | |
| Other income (loss). . . . . . . . . . | | | |
| Section 179 deduction. . . . . . . . | | | |
| Other deductions. . . . . . . . . . . . | | | |
| **W-2 wages** . . . . . . . . . . . . . . . . . . . . . | | | |
| **UBIA of qualified property** . . . . . . . . . . . . . . . . | | | |

PARTNER 5

VERISTAR, LLC    84-3239749

# 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner's Name | Partner's identification number |
|---|---|
| MARK PLAEHN | ***-**-**** |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 85-4283537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | A | B | C | D |
| **Income (Loss)** | Ordinary business income (loss) | -6,799. | | | |
| | Net rental real estate income (loss) | | | | |
| | Other net rental income (loss) | | | | |
| | Guaranteed payments | | | | |
| | Interest | | | | |
| | Ordinary dividends | | | | |
| | Qualified dividends | | | | |
| | Dividend equivalents | | | | |
| | Royalties | | | | |
| | Net short-term capital gain (loss) | | | | |
| | Net long-term capital gain (loss) | | | | |
| | Collectibles (28%) gain (loss) | | | | |
| | Unrecaptured section 1250 gain | | | | |
| | Net section 1231 gain (loss) | | | | |
| | Other income (loss) | | | | |
| **Deductions** | Section 179 deduction | | | | |
| | Charitable contributions | | | | |
| | Investment interest expense | | | | |
| | Section 59(e)(2) expense: Intangible Drilling costs | | | | |
| | Section 59(e)(2) expense: Dry Hole expense | | | | |
| | Other section 59(e)(2) expenses | | | | |
| | Excess business interest expenses | | | | |
| | Other deductions | | | | |
| **Self-Employment** | Net earnings (loss) from self-employment | | | | |
| | Gross farming or fishing income | | | | |
| | Gross nonfarm income | | | | |
| **Credits** | Low-income housing credit: | | | | |
| | (C)  Section 42(j)(5) | | | | |
| | (D)  Other | | | | |
| | Qualified rehabilitation expenditures related to rental real estate act. | | | | |
| | Other rental real estate credits | | | | |
| | Other rental credits | | | | |
| | Work opportunity credit | | | | |
| | Biofuel producer credit | | | | |
| | Disabled access credit | | | | |
| | Empowerment zone employment credit | | | | |
| | Credit for increasing research activities | | | | |
| | Credit for employer Soc. Sec. tax paid on certain employee tips | | | | |
| | Orphan drug credit | | | | |
| | Enhanced oil recovery credit | | | | |
| | Indian employment credit | | | | |
| | Small employer pension plan startup costs credit | | | | |
| | Credit for employer-provided childcare | | | | |
| | Alternative motor vehicle credit | | | | |
| | Other credits | | | | |

PTPL1102L  12/02/21

VERISTAR, LLC    84-3239749

**Page 2**

# 2021 PARTNER'S SHARE OF INVESTMENT IN PASSTHROUGH ENTITIES

**Note:** The amounts on this schedule are provided for informational purposes only. These amounts are already included on Schedule K-1.

| Partner s Name | | Partner s identification number |
|---|---|---|
| MARK PLAEHN | | \*\*\*–\*\*–\*\*\*\* |

| | Name of Passthrough Entity | Employer Identification No. | Type of Entity | Final K-1 |
|---|---|---|---|---|
| A | EXEGO INTERNATIONAL, LLC | 85-4283537 | NON PASSIVE | |
| B | | | | |
| C | | | | |
| D | | | | |

| | | Passthrough Entities | | | |
|---|---|---|---|---|---|
| | | **A** | **B** | **C** | **D** |
| **Alternative Minimum Tax (AMT) Items** | Post-1986 depreciation adjustment.......................... | | | | |
| | Adjusted gain or loss.................................. | | | | |
| | Depletion (other than oil and gas)....................... | | | | |
| | Oil, gas and geothermal properties — gross income....... | | | | |
| | Oil, gas and geothermal properties — deductions......... | | | | |
| | A.C.E. depreciation adjustment.......................... | | | | |
| | A.C.E. adjusted gain or (loss).......................... | | | | |
| | Accel. depreciation on real property placed in service before 1987...... | | | | |
| | Accel. depr. on leased personal prop. placed in service before 1987...... | | | | |
| | Other AMT items....................................... | | | | |
| **Tax-Exempt Inc & Non-deductible Exp** | Tax-exempt interest income............................. | | | | |
| | Other tax-exempt income................................ | | | | |
| | Nondeductible expenses................................ | | | | |
| **Other Information** | Investment income..................................... | | | | |
| | Investment expenses.................................. | | | | |
| | Recapture of low-income housing credit — 42(j)(5) partnerships....... | | | | |
| | Recapture of low-income housing credit — other.......... | | | | |
| | Section 704(c) information............................. | | | | |
| | Section 751 gain (loss)................................ | | | | |
| | Section 1(h)(5) gain (loss)............................. | | | | |
| | Deemed section 1250 unrecaptured gain................. | | | | |
| | Excess taxable income................................. | | | | |
| | Excess business interest income....................... | | | | |
| | Gross receipts for Section 448(c): current year........... | | | | |
| | Foreign taxes paid or accrued......................... | | | | |
| | Supplemental Information: | | | | |

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

PTPL1103L   12/22/21

Form **4562**

Department of the Treasury
Internal Revenue Serv ce      (99)

**Depreciation and Amortization**
**(Including Information on Listed Property)**
► Attach to your tax return.
► Go to *www.irs.gov/Form4562* for instructions and the latest information.

OMB No. 1545-0172

**2021**

Attachment
Sequence No.  **179**

Name(s) shown on return
VERISTAR, LLC

Identifying number
84-3239749

Business or activity to wh ch this form relates
FORM 1065

| Part I | **Election To Expense Certain Property Under Section 179** |
|---|---|

Note: If you have any listed property, complete Part V before you complete Part I.

| | | | |
|---|---|---|---|
| 1 | Maximum amount (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **1** | 1,050,000. |
| 2 | Total cost of section 179 property placed in service (see instructions) . . . . . . . . . . . . . . . . . . . . . . . . . | **2** | |
| 3 | Threshold cost of section 179 property before reduction in limitation (see instructions) . . . . . . . . . . . . . . . . . . | **3** | 2,620,000. |
| 4 | Reduction in limitation. Subtract line 3 from line 2. If zero or less, enter -0- . . . . . . . . . . . . . . . . . . . . . . . . | **4** | |
| 5 | Dollar limitation for tax year. Subtract line 4 from line 1. If zero or less, enter -0-. If married filing separately, see instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **5** | |

| 6 | (a) Description of property | (b) Cost (business use only) | (c) Elected cost |
|---|---|---|---|
| | | | |
| | | | |

| | | | |
|---|---|---|---|
| 7 | Listed property. Enter the amount from line 29 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **7** | |
| 8 | Total elected cost of section 179 property. Add amounts in column (c), lines 6 and 7. . . . . . . . . . . | **8** | |
| 9 | Tentative deduction. Enter the **smaller** of line 5 or line 8. . . . . . . . . . . . . . . . . . . . . . . . . . | **9** | |
| 10 | Carryover of disallowed deduction from line 13 of your 2020 Form 4562 . . . . . . . . . . . . . . . . . . | **10** | |
| 11 | Business income limitation. Enter the smaller of business income (not less than zero) or line 5. See instrs . . | **11** | |
| 12 | Section 179 expense deduction. Add lines 9 and 10, but don't enter more than line 11 . . . . . . . . . . . . | **12** | |
| 13 | Carryover of disallowed deduction to 2022. Add lines 9 and 10, less line 12. . . . . . . ► | **13** | |

Note: Don't use Part II or Part III below for listed property. Instead, use Part V.

| Part II | **Special Depreciation Allowance and Other Depreciation** (Don't include listed property. See instructions.) |
|---|---|

| | | | |
|---|---|---|---|
| 14 | Special depreciation allowance for qualified property (other than listed property) placed in service during the tax year. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **14** | 105,921. |
| 15 | Property subject to section 168(f)(1) election . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **15** | |
| 16 | Other depreciation (including ACRS) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **16** | |

| Part III | **MACRS Depreciation** (Don't include listed property. See instructions.) |
|---|---|

**Section A**

| | | | |
|---|---|---|---|
| 17 | MACRS deductions for assets placed in service in tax years beginning before 2021 . . . . . . . . . . . . | **17** | |
| 18 | If you are electing to group any assets placed in service during the tax year into one or more general asset accounts, check here . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ► ☐ | | |

**Section B — Assets Placed in Service During 2021 Tax Year Using the General Depreciation System**

| (a) Classification of property | (b) Month and year placed n service | (c) Basis for depreciat on (bus ness/investment use only — see nstruct ons) | (d) Recovery period | (e) Convent on | (f) Method | (g) Deprec at on deduction |
|---|---|---|---|---|---|---|
| **19a** 3-year property . . . . . . . . . | | | | | | |
| **b** 5-year property . . . . . . . . . | | | | | | |
| **c** 7-year property . . . . . . . . . | | | | | | |
| **d** 10-year property . . . . . . . . | | | | | | |
| **e** 15-year property . . . . . . . . | | | | | | |
| **f** 20-year property . . . . . . . . | | | | | | |
| **g** 25-year property . . . . . . . . | | | 25 yrs | | S/L | |
| **h** Residential rental | | | 27.5 yrs | MM | S/L | |
| property . . . . . . . . . . . . . | | | 27.5 yrs | MM | S/L | |
| **i** Nonresidential real | | | 39 yrs | MM | S/L | |
| property . . . . . . . . . . . . . | | | | MM | S/L | |

**Section C — Assets Placed in Service During 2021 Tax Year Using the Alternative Depreciation System**

| | | | | | | |
|---|---|---|---|---|---|---|
| **20a** Class life . . . . . . . . . . . . . | | | | | S/L | |
| **b** 12-year . . . . . . . . . . . . . | | | 12 yrs | | S/L | |
| **c** 30-year . . . . . . . . . . . . . | | | 30 yrs | MM | S/L | |
| **d** 40-year . . . . . . . . . . . . . | | | 40 yrs | MM | S/L | |

| Part IV | **Summary** (See instructions.) |
|---|---|

| | | | |
|---|---|---|---|
| 21 | Listed property. Enter amount from line 28 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | **21** | |
| 22 | **Total.** Add amounts from line 12, lines 14 through 17, lines 19 and 20 in column (g), and line 21. Enter here and on the appropriate lines of your return. Partnerships and S corporations — see instructions . . . . . . . . . . | **22** | 105,921. |
| 23 | For assets shown above and placed in service during the current year, enter the portion of the basis attributable to section 263A costs . . . . . . . . . . . . . . . . | **23** | |

BAA For Paperwork Reduction Act Notice, see separate instructions.    FDIZ0812  12/05/23    Form **4562** (2021)

| Form 4562 (2021) | VERISTAR, LLC | 84-3239749 | Page **2** |
|---|---|---|---|

| **Part V** | **Listed Property** (Include automobiles, certain other vehicles, certain aircraft, and property used for entertainment, recreation, or amusement.) |
|---|---|

**Note:** For any vehicle for which you are using the standard mileage rate or deducting lease expense, complete **only** 24a, 24b, columns (a) through (c) of Section A, all of Section B, and Section C if applicable.

**Section A — Depreciation and Other Information (Caution:** See the instructions for limits for passenger automobiles.**)**

| **24 a** Do you have evidence to support the business/investment use claimed? | ☐ Yes ☐ No | **24b** If 'Yes,' is the evidence written? | ☐ Yes ☐ No |
|---|---|---|---|

| (a) Type of property (list vehicles first) | (b) Date placed in service | (c) Business/investment use percentage | (d) Cost or other basis | (e) Basis for depreciation (business/investment use only) | (f) Recovery period | (g) Method/ Convention | (h) Depreciation deduction | (i) Elected section 179 cost |
|---|---|---|---|---|---|---|---|---|
| **25** Special depreciation allowance for qualified listed property placed in service during the tax year and used more than 50% in a qualified business use. See instructions . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **25** | | | | | | | | |
| **26** Property used more than 50% in a qualified business use: | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **27** Property used 50% or less in a qualified business use: | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| | | | | | | | | |
| **28** Add amounts in column (h), lines 25 through 27. Enter here and on line 21, page 1 . . . . . . . . . . . . . . . **28** | | | | | | | | |
| **29** Add amounts in column (i), line 26. Enter here and on line 7, page 1. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **29** | | | | | | | | |

**Section B — Information on Use of Vehicles**

Complete this section for vehicles used by a sole proprietor, partner, or other 'more than 5% owner,' or related person. If you provided vehicles to your employees, first answer the questions in Section C to see if you meet an exception to completing this section for those vehicles.

| | (a) Vehicle 1 | | (b) Vehicle 2 | | (c) Vehicle 3 | | (d) Vehicle 4 | | (e) Vehicle 5 | | (f) Vehicle 6 | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| **30** Total business/investment miles driven during the year (**don't** include commuting miles). . . . . . . . . . . . . . . . . . | | | | | | | | | | | | |
| **31** Total commuting miles driven during the year. . . . . . . | | | | | | | | | | | | |
| **32** Total other personal (noncommuting) miles driven . . . . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | |
| **33** Total miles driven during the year. Add lines 30 through 32 . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | |
| | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No | Yes | No |
| **34** Was the vehicle available for personal use during off-duty hours?. . . . . . . . . . . . . . . . . . | | | | | | | | | | | | |
| **35** Was the vehicle used primarily by a more than 5% owner or related person? . . . . . . . . . | | | | | | | | | | | | |
| **36** Is another vehicle available for personal use? . . . . . . . . . . . . . . . . . . . . . . . | | | | | | | | | | | | |

**Section C — Questions for Employers Who Provide Vehicles for Use by Their Employees**

Answer these questions to determine if you meet an exception to completing Section B for vehicles used by employees who **aren't** more than 5% owners or related persons. See instructions.

| | Yes | No |
|---|---|---|
| **37** Do you maintain a written policy statement that prohibits all personal use of vehicles, including commuting, by your employees?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **38** Do you maintain a written policy statement that prohibits personal use of vehicles, except commuting, by your employees? See the instructions for vehicles used by corporate officers, directors, or 1% or more owners . . . . . . . . . . . . . | | |
| **39** Do you treat all use of vehicles by employees as personal use? . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **40** Do you provide more than five vehicles to your employees, obtain information from your employees about the use of the vehicles, and retain the information received? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | |
| **41** Do you meet the requirements concerning qualified automobile demonstration use? See instructions . . . . . . . . . . . . . . . . . | | |
| **Note:** If your answer to 37, 38, 39, 40, or 41 is 'Yes,' don't complete Section B for the covered vehicles. | | |

| **Part VI** | **Amortization** |
|---|---|

| (a) Description of costs | (b) Date amortization begins | (c) Amortizable amount | (d) Code section | (e) Amortization period or percentage | (f) Amortization for this year |
|---|---|---|---|---|---|
| **42** Amortization of costs that begins during your 2021 tax year (see instructions): | | | | | |
| | | | | | |
| | | | | | |
| **43** Amortization of costs that began before your 2021 tax year . . . . . . . . . . . . . . . . . . . . . . | | | | **43** | 124,137. |
| **44 Total.** Add amounts in column (f). See the instructions for where to report . . . . . . . . . . . . . . . . . . . . | | | | **44** | 124,137. |

FDIZ0812L 07/12/21

Form **4562** (2021)

| 2021 | FEDERAL STATEMENTS | PAGE 1 |
|---|---|---|

| | VERISTAR, LLC | 84-3239749 |
|---|---|---|

**STATEMENT 1**
**FORM 1065, LINE 4**
**ORDINARY INCOME FROM PASSTHROUGH K-1S**

```
EXEGO INTERNATIONAL, LLC
9501 W. 144TH PLACE, STE 202
ORLAND PARK, IL 60462
******3537....................................................  $    -679,870.
                                              TOTAL $    -679,870.
```

**STATEMENT 2**
**FORM 1065, LINE 7**
**OTHER INCOME (LOSS)**

```
MISCELLANEOUS .............................................  $        900.
                                              TOTAL $        900.
```

**STATEMENT 3**
**FORM 1065, LINE 14**
**TAXES AND LICENSES**

```
LICENSES AND PERMITS......................................  $        793.
PAYROLL TAXES.............................................        96,681.
STATE TAX................................................         3,516.
                                              TOTAL $     100,990.
```

**STATEMENT 4**
**FORM 1065, LINE 20**
**OTHER DEDUCTIONS**

```
ADVERTISING..............................................  $      4,474.
AMORTIZATION.............................................       124,137.
BANK CHARGES.............................................         2,498.
BONUS EXPENSE............................................        52,501.
COMMISSIONS..............................................        77,708.
CROSSKEY EXP.............................................       238,664.
FACTORING FEES...........................................        96,785.
GIFTS...................................................          2,026.
INSURANCE................................................        14,332.
INTERNET/WEBSITE.........................................        20,094.
LEGAL AND PROFESSIONAL...................................       696,540.
MEALS...................................................         16,729.
MISCELLANEOUS............................................         5,316.
OFFICE EXPENSE...........................................         4,911.
PAYROLL PROCESSING FEES..................................        18,287.
POSTAGE.................................................          5,050.
SOFTWARE FEE.............................................       120,081.
TELEPHONE................................................         9,274.
TRAVEL..................................................         22,545.
UTILITIES...............................................          1,930.
                                              TOTAL $   1,533,882.
```

| **2021** | **FEDERAL STATEMENTS** | **PAGE 2** |
|---|---|---|

**VERISTAR, LLC**         84-3239749

**STATEMENT 5**
**FORM 1065, SCHEDULE K, LINE 13A**
**CHARITABLE CONTRIBUTIONS**

```
CASH CONTRIBUTIONS - 60% LIMITATION...............................  $      3,631.
                                                          TOTAL  $      3,631.
```

**STATEMENT 6**
**FORM 1065, SCHEDULE K, LINE 13D**
**OTHER DEDUCTIONS**

```
PARTNER HEALTH INSURANCE...........................................  $     25,740.
                                                          TOTAL  $     25,740.
```

**STATEMENT 7**
**REV. PROC. 2021-48 INFORMATION**
**FORGIVENESS OF PAYCHECK PROTECTION PROGRAM LOANS**

```
VERISTAR, LLC
84-3239749
9501 WEST 144TH PLACE, SUITE 202
ORLAND PARK, IL 60462

APPLYING SECTION 3.01(3) OF REV. PROC. 2021-48 FOR TAXABLE YEAR 2020.
TAX-EXEMPT INCOME FROM PPP FORGIVENESS TREATED AS RECEIVED/ACCRUED: $20,883.
FORGIVENESS OF THE PPP LOAN HAS BEEN GRANTED AS OF THE DATE THE RETURN IS FILED.

APPLYING SECTION 3.01(3) OF REV. PROC. 2021-48 FOR TAXABLE YEAR 2021.
TAX-EXEMPT INCOME FROM PPP FORGIVENESS TREATED AS RECEIVED/ACCRUED: $1,503,382.
FORGIVENESS OF THE PPP LOAN HAS BEEN GRANTED AS OF THE DATE THE RETURN IS FILED.
```

**STATEMENT 8**
**FORM 1065, SCHEDULE K, LINE 20C**
**OTHER REPORTABLE ITEMS**

```
GROSS RECEIPTS FOR SEC. 448(C): CURRENT TAX YEAR...............  $  6,016,827.
GROSS RECEIPTS FOR SEC. 448(C): 1ST PRIOR TAX YEAR............     4,367,047.
GROSS RECEIPTS FOR SEC. 448(C): 2ND PRIOR TAX YEAR............        15,589.
GROSS RECEIPTS FOR SEC. 448(C): 3RD PRIOR TAX YEAR (NOT IN EXISTENCE)
```

**BUSINESS INTEREST EXPENSE (INFORMATIONAL ONLY FOR BASIS LIMITATIONS)**
```
INCLUDED AS A DEDUCTION ON THE FOLLOWING LINES(S)

SCHEDULE K, LINE 1...........................................        68,743.
```

| 2021 | FEDERAL STATEMENTS | PAGE 3 |
|---|---|---|

**VERISTAR, LLC**                                                    84-3239749

**STATEMENT 9**
**FORM 1065, SCHEDULE L, LINE 6**
**OTHER CURRENT ASSETS**

| | BEGINNING | ENDING |
|---|---|---|
| DUE FROM AFFILIATES | $        511. | $     725,996. |
| PREPAID RELATIVITY FEE | 0. | 255,325. |
| PREPAID TAKADA | 0. | 28,315. |
| RESERVE ON FACTORED RECEIVABLES | 129,105. | 184,765. |
| TOTAL | $     129,616. | $   1,194,401. |

**STATEMENT 10**
**FORM 1065, SCHEDULE L, LINE 8**
**OTHER INVESTMENTS**

| | BEGINNING | ENDING |
|---|---|---|
| EXEGO INTERNATIONAL, LLC | $          0. | $    -679,870. |
| TOTAL | $          0. | $    -679,870. |

**STATEMENT 11**
**FORM 1065, SCHEDULE L, LINE 17**
**OTHER CURRENT LIABILITIES**

| | BEGINNING | ENDING |
|---|---|---|
| ACCRUED EXPENSES | $      8,988. | $      60,239. |
| DUE TO AFFILIATE | 0. | 1,504. |
| FACTORED RECEIVABLES DUE TO FACTOR | 794,809. | 1,139,984. |
| PAYROLL LIABILITIES | 2,462. | 32. |
| SALES TAX PAYABLE | 49,243. | 59,779. |
| TOTAL | $     855,502. | $   1,261,538. |

**STATEMENT 12**
**FORM 1065, SCHEDULE L, LINE 20**
**OTHER LIABILITIES**

| | BEGINNING | ENDING |
|---|---|---|
| ROUNDING | $          0. | $          2. |
| TOTAL | $          0. | $          2. |

**STATEMENT 13**
**FORM 1065, SCHEDULE M-1, LINE 2**
**INCOME ON SCHEDULE K NOT ON BOOKS**

| | |
|---|---|
| CASH BASIS ADJUSTMENT - BEGINNING | $   1,026,573. |
| TOTAL | $   1,026,573. |

DO NOT MAIL

| 2021 | FEDERAL STATEMENTS | PAGE 4 |
|---|---|---|

| | VERISTAR, LLC | 84-3239749 |
|---|---|---|

**STATEMENT 14**
**FORM 1065, SCHEDULE M-1, LINE 4**
**EXPENSES ON BOOKS NOT ON SCHEDULE K**

| | | |
|---|---|---|
| POLITICAL CONTRIBUTION | $ | 500. |
| | TOTAL $ | 500. |

**STATEMENT 15**
**FORM 1065, SCHEDULE M-1, LINE 6**
**INCOME ON BOOKS NOT ON SCHEDULE K**

| | | |
|---|---|---|
| CASH BASIS ADJUSTMENT - ENDING | $ | 3,131,411. |
| PAYCHECK PROTECTION PROGRAM LOAN FORGIVEN | | 1,503,382. |
| | TOTAL $ | 4,634,793. |

**STATEMENT 16**
**FORM 1065, SCHEDULE M-2, LINE 4**
**OTHER INCREASES**

| | | |
|---|---|---|
| TAX-EXEMPT INTEREST AND/OR TAX-EXEMPT OTHER INCOME | $ | 1,503,382. |
| | TOTAL $ | 1,503,382. |

**STATEMENT 17**
**FORM 1065, SCHEDULE M-2, LINE 7**
**OTHER DECREASES**

| | | |
|---|---|---|
| CAPITAL ACCOUNT ADJUSTMENT TO TAX BASIS | $ | 1,046,321. |
| GUARANTEED PAYMENTS (OTHER THAN HEALTH INSURANCE) | | 152,708. |
| NON-DEDUCTIBLE EXPENSES | | 6,715. |
| | TOTAL $ | 1,205,744. |

**STATEMENT 18**
**FORM 1125-A, LINE 5**
**OTHER COSTS**

| | | |
|---|---|---|
| COMPUTER RENTAL | $ | 7,516. |
| CONSULTANTS | | 13,017. |
| DATA COLLECTION | | 1,139. |
| DATA HOSTING | | 994,850. |
| DATA PROCESSING | | 200,794. |
| DESKTOP SERVICE | | 113,523. |
| DISASTER RECOVERY | | 27,250. |
| EDISCOVERY | | 4,390. |
| EMPLOYEE BENEFITS | | 38,330. |
| OTHER COST OF SALES | | 303,815. |
| PAYROLL PROCESSING FEE | | 55,164. |
| PAYROLL TAXES | | 156,429. |
| | TOTAL $ | 1,916,217. |