# Exhibit 3

**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IN RE TAKATA AIRBAG PRODUCTS LIABILITY LITIGATION** | MDL No. 2599<br><br>Master File No. 15-2599-MD-MORENO<br><br>S.D. Fla. Case No. 14-24009-CV-MORENO<br>(Economic Loss Track) |

## EXPERT REPORT OF MARK WARNER, M.S.M.E.

Dated: October 31, 2021

## I.  PROFESSIONAL QUALIFICATIONS

I, Mark H. Warner, was asked by outside counsel[1] for Mercedes-Benz USA, LLC ("MBUSA") to provide my professional, expert opinions in this matter.  I hold a Bachelor's degree in Manufacturing Engineering and a Master's degree in Mechanical Engineering.  I am co-inventor of US patent 5224732: Inflatable Restraint System for Side Impact Crash Protection.   My publications include numerous papers related to automotive crash technology, including crash pulse analysis and accident reconstruction.  I have presented many of these research publications at the Society of Automotive Engineers World Congress, an international symposium of engineers and scientists.  I have been a Crash Test Engineer for over 20 years and have personally performed over 200 full-scale automotive crash tests.  I have also performed hundreds of airbag deployment tests.  My career focus has been automotive safety and accident reconstruction. Over more than 30 years, I have investigated accidents in China, Turkey, Mexico, Canada, and every state in the US.  I have a thorough understanding of the history and challenges inherent to airbag inflator technology.

My Curriculum Vitae is attached as Appendix I. My consideration materials are listed in Appendix II. My testimonial experience in the last four years is listed in Appendix III.  My hourly rate in this case is $350 per hour plus expenses.  My compensation is not dependent on my opinions or the outcome of this case.

---

[1] Squire Patton Boggs (US) LLP.

## II.    SUMMARY OF OPINIONS

I was requested by outside counsel for MBUSA to provide my professional opinions on certain matters relevant to the above-captioned case.  Specifically, I have been asked to address the fundamentals of airbag design, including (i) the choice of PSAN as a suitable propellant, (ii) the recalled Takata airbag modules installed in certain Mercedes-Benz vehicles, spanning model years 2005-2017 ("Class Vehicles"),[2] (iii) possible relevant differences between Mercedes-Benz vehicles and other vehicle brands with respect to the Takata airbag inflators, and (iv) the variable and complex factors relating to Takata airbag inflator rupture events.

I will show in detail, and on the basis of my experience, knowledge, expertise and publicly available information, that the choice of PSAN as a propellant was a technically proper and logical one, that Takata airbag inflators containing PSAN installed in Mercedes-Benz vehicles is not evidence of a defect, much less a defect common to all of the Class Vehicles, and that airbags (including the recalled airbags) continue to save lives and prevent injuries worldwide.  I will also show that Mercedes-Benz vehicles are conspicuously different from other vehicles with Takata airbag inflators.  I will also show that the very rare inflator rupture incidents do not establish a defect in the Takata airbag inflators installed in Mercedes-Benz vehicles.

## III.    MBUSA DOES NOT DESIGN OR MANUFACTURE MERCEDES-BENZ VEHICLES

As an initial matter, MBUSA is the retailer, warrantor and distributor of Mercedes-Benz vehicles in the United States.  It does not design or manufacture Mercedes-Benz vehicles, including the Class Vehicles, or any of their component parts.[3]  As such, MBUSA

---

[2] The variants of inflators in recalled driver- and passenger-side Takata airbag modules installed in Mercedes-Benz passenger vehicles are designated PSDI-5 and PSPI-2, respectively; the variants of inflators in recalled driver- and passenger-side Mercedes-Benz Sprinters (MY2010-2017) are designated SDI and SPI, respectively. *See* MBUSA's Responses and Objections to Plaintiffs' First Set of Requests for Admission.

[3] E.g., MBUSA's Objections and Responses to Plaintiffs' Interrogatory Nos. 1, 5. Daimler AG designs and manufactures Mercedes-Benz vehicles, including the Class Vehicles. I am informed that Daimler AG was dismissed from this case.

was not involved in the research, design, development, analysis or testing of Takata airbag modules, or their component parts, installed in the Class Vehicles.[4]  Thus, MBUSA has "no department, division, or group with knowledge of facts regarding the development, design, manufacture, assembly, comparison, testing, or analysis of Takata airbags."[5]  Nor did MBUSA ever have any communications with Takata about such things.[6]  Plaintiffs' expert, Mr. Renz, agreed that it is the designer and manufacturer of the vehicles who has information about "the development, qualification and acceptance of inflator technology" not the U.S. entity responsible for marketing and distributing the finished vehicles; he requested such information but understood MBUSA did not have it.[7]  As such, the documents he relies upon as to MBUSA are listed in an appendix to his report, which lists only defect information reports and NHTSA recalls for Mercedes-Benz vehicles.[8]  One of plaintiffs' other experts, Mr. Baglini—who provided opinions principally as to GM—also acknowledged that MBUSA, as the distributor not the designer or manufacturer of Mercedes-Benz vehicles, would not have communications with component suppliers or be in possession of design, manufacture and specification documents for Takata airbag inflators such as Design Validation and Product Validation reports.[9]

---

[4] E.g., MBUSA's Objections and Responses to Plaintiffs' Request for Production Nos. 4, 7; MBUSA's Objections and Responses to Plaintiffs' Interrogatory No. 11
[5] E.g., MBUSA's Objections and Response to Plaintiffs' Interrogatory No. 1.
[6] E.g., MBUSA's Objections and Responses to Plaintiffs' Interrogatory No. 4; Deposition of T. Brunner at 38:3-8, 121:9-24 (prior to the recalls applicable to Mercedes-Benz vehicles, MBUSA had no communications with Takata because "Daimler is the manufacturer of the Mercedes-Benz vehicles, [so] they have the relationship with the suppliers."); *id.* at 38:9-15 (as MBUSA is the "marketer and distributor of Mercedes-Benz vehicles in the United States, that responsibility falls onto the manufacturer of the vehicle"); Deposition of T. Lowery at 76:5-17 (Q "From 2003 to the present, your career at Mercedes-Benz USA, have you ever had any direct communications with anyone employed by Takata or any of its subsidiaries?" A. "No, sir."); Deposition of M. Aikman at 14:21-16:7, 70:5-74:15; Deposition of G. Gunther at 78:14-24, 102:25-103:9, 105:1-7.
[7] Deposition of R. Renz at 426:25-427:13, 427:22-429:25; *id.* at 420:22-421:1 ("[W]hat [response] was provided based on my specific requests for information associated with the development, qualification, and production launch of [Takata] inflators was that [MBUSA] did not have any of those pieces of information.").
[8] Deposition of R. Renz at 418:17-419:2, 430:3-8.
[9] Deposition of James Baglini at 336:14-337:21.

Other than an unrelated limited recall in 2014, MBUSA was not even aware that some Mercedes-Benz vehicles sold in the U.S. came equipped with Takata airbags, much less that the inflator propellant was PSAN, until late 2015, at or around the time the Takata airbag recall applicable to Mercedes-Benz vehicles was first announced in early 2016.[10] That some other Takata airbag recalls per media reports were initiated in the 2014 to 2015 time frame by other Original Equipment Manufacturers (OEMs) did not cause MBUSA (or Daimler AG) to believe that the Takata airbag recall could ultimately implicate Mercedes-Benz vehicles.[11]

In fact, Takata specifically informed Daimler AG that Mercedes-Benz vehicles were *not* implicated by the Takata airbag recalls for other OEMs; instead, Takata repeatedly reassured and confirmed for Daimler AG from 2013 to 2014 that Takata airbags in Mercedes-Benz vehicles were not affected by the "problem" with the recalled Takata airbags in some other OEMs' vehicles.[12]  Ultimately, Takata pleaded guilty in 2017 to a criminal felony for fraudulently deceiving the OEMs, including the manufacturer of Mercedes-Benz vehicles.[13] Among other things, Takata admitted that it "induc[ed] the victim OEMs to purchase airbag systems from Takata that contained faulty, inferior, non-performing, non-conforming, or dangerous PSAN inflators by deceiving the OEMs

---

[10] E.g., Deposition of T. Brunner at 97:14-98:1 ("[I]n general, as the distributor and marketer of [Mercedes-Benz] vehicles, we didn't have specific knowledge as to what airbags were being used in our vehicles.") and *id.* Ex. 25 (unrelated recall involving 311 vehicles); Deposition of B. Analil at 37:18-38:17, 94:6-23, 153:13-17; Deposition of T. Lowery at 32:14-19 ("I don't have any recollection of Takata before the recalls were launched."); Deposition of G. Gunther at 75:12-22; Deposition of D. Tait at 69:3-16.

[11] E.g., Deposition of T. Brunner at 98:2-99:7 ("[A]s Daimler is the manufacturer of the vehicles, they have the responsibility for following those topics. There wasn't anything that I remember would have been any kind of dialogue at the time since we had not been informed from Daimler that there were any [Mercedes-Benz] vehicles that were included in what was going on in the industry.").

[12] Daimler AG and MBUSA Motion to Dismiss Amended Complaint for Lack of Standing, Docket 2982, at 3, and Declaration of R. Cantero in Support, at Ex. A ("[W]e can herewith confirm for you that [Mercedes-Benz vehicles are] not affected by this problem."); at Ex. B ("Takata is not aware of any case in the field where a problem with a gas generator has occurred in a Daimler vehicle.").

[13] Takata Plea Agreement (February 27, 2017).

through the submission of false and fraudulent reports and other information that concealed the true and accurate test results for the inflators . . . ."[14]

## IV.    DEVELOPMENT OF AIRBAG TECHNOLOGY[15]

The concept of airbags was first initiated in the early 1950s as a means of preventing occupant injury from steering wheel and windshield impacts in frontal crashes.  Early airbag designs used compressed gas to inflate the airbag.  These designs did not perform well due to the physical limits inherent to compressed gas; specifically, the volume of gas required, and the extremely short time available for deployment was beyond the capability of existing compressed air technology.

The optimum solution to the inflation problem was reaction of chemical propellants.  Solid chemical propellants such as sodium azide (NaN3) were packaged and developed into inflator modules that could be calibrated to the timing and volume requirements for a specific vehicle and airbag design.  The *timing* of airbag deployment was (and remains) an extraordinary challenge for airbag engineers.  The technology of airbag deployment timing will not be addressed in detail here, but a brief discussion is helpful.

### A.    Deployment Timing

Accidents occur over very short periods of time.  For example, the full duration of a frontal impact crash is approximately 100-150 milliseconds (1/10th of a second).[16]  For comparison, the blink of a human eye is twice as long, and occurs in approximately 250 milliseconds (1/4th of a second).  Early in the crash, and *before* occupants begin to move toward the steering wheel or dashboard, the airbag must begin to inflate.  In total, the vehicle's safety system must sense the crash, initiate the inflator, and fully inflate the airbag between 25 and 40 milliseconds.  The airbag must be fully inflated before the occupant moves forward and contacts the airbag.  This extremely short timing requirement remains a critically important design parameter of airbag inflator modules.  *See*, *e.g.*, Exhibit A

---

[14] Takata Plea Agreement at p. 47, para. 19.
[15] References for this section are also listed in Appendix II.
[16] *See* SAE Technical Paper Series 2007-01-0724 (April 2007).

depicting a sequence of high-speed images of an exemplar Mercedes-Benz airbag deployment performed in my laboratory. In sum, the airbag remains stowed until initiated by an electronic current at zero milliseconds, then inflates fully in 26 milliseconds.

**B.     Increased Interest in Inflator Technology Was Aimed at Improving Safety**

Auto related fatalities rose dramatically in the 1960s and 1970s. For example, in the United States, auto related fatalities surpassed 50,000 per year by 1969. *See* Exhibit B-1, -2 (plots of United States motor vehicle deaths by year beginning in 1921 and through 2017). Notable are total deaths shown in red, and deaths per vehicle miles travelled (VMT) shown in blue. The downward trend in both datasets are a positive reflection on the advances in safety achieved over these many decades based, in part, on the efforts described below.

Although seat belts were available to most occupants in the 1970s, seat belt usage in the US was below 20% during this time period.[17] Legislators, scientists, and automakers debated over various solutions. Airbag technology was in its infancy. There was very little knowledge about the importance of airbag deployment timing relative to the wide variety of seating positions, occupant sizes, crash orientations, and potential for injury from airbag deployments. Airbags were viewed as an attractive "high-tech" or "space-age" solution to improve safety.

During the mid-1970s, experimental fleets of airbag-equipped vehicles were produced and driven in mainstream environments. The results were useful from a scientific standpoint, but presented more questions than answers. Even so, the attractiveness of airbags as a high-tech solution for reducing crash injuries and fatalities continued to gain favor.

In contrast to many other countries, like Australia, it was not until 1984 that the first US state (New York) enacted mandatory seat belt laws. Public awareness and use of

---

[17] *See* General Safety Belt Usage, Issue Paper, DOT HS 803 824 (March 1980).

seat belts have helped reduce auto fatalities ever since.[18]  Seat belts remain the most important and effective restraint system available today.  However, as automakers moved forward in development of safety technology and incorporated more airbags into vehicles, more was learned about airbag performance in real-world crashes.  The challenges associated with proper airbag deployment were met with better sensing and timing technology, and better propellant technologies.  As a result, airbags are now a mandatory component of vehicle restraint systems in many countries, including the United States.

### C.      Use of a Solid Chemical Propellant and the Choice of PSAN Were Aimed at Improving Safety

An airbag propellant serves the purpose of combusting chemicals in solid form into a gas that can rapidly expand the airbag in a few milliseconds.  This is required *during* impact to provide a cushion of protection to the vehicle occupant(s) as they move due to the forces in a crash.  Successfully generating the correct volume of pressurized gas to inflate an airbag, while meeting myriad other design and safety constraints, is an engineering feat of significant proportions.  In addition to chemical propellants, various airbag inflation technologies have been conceived and tested since the 1960s (for example, compressed gas).  Gas generation by solid chemical propellant has been the state-of-the-art technology for many decades.  As explained above, the concept of an airbag or inflatable restraint was originally presented in the 1950s and came to experimental production of scale in the 1970s in General Motors fleet vehicles.  Around that same time, the designer and manufacturer of Mercedes-Benz vehicles was also at the forefront of airbag development.

The use of solid chemical propellant has many beneficial design characteristics for airbag inflation.  Early solid propellants (such as sodium azide ($NaN_3$)) were effective and controllable in terms of timing and inflation, but also had disadvantages, such as creating vapor/smoke that caused post-crash irritation for many passengers.  Non-desiccated Phase-Stabilized Ammonium Nitrate ("PSAN"), the primary propellant used in the subject Takata

---

[18] *See* SAE Technical Paper Series, <u>Regulatory History of Automatic Crash Protection in FMVSS 208</u>, 950865 (February 1995).

airbag inflators, was developed as an advanced inflator propellant that created less smoke and less irritation for occupants post-deployment.  By the early 2000s, PSAN was used by Takata and incorporated in millions of vehicles manufactured by scores of OEMs worldwide.

It is my opinion that PSAN was an appropriate and viable propellant at the time it was used in airbag modules installed in Mercedes-Benz vehicles. Later on, variations in the manufacturing of the propellant and packaging of the Takata inflator modules were discovered.  Rupture events of Takata airbag inflators in some non-Mercedes-Benz vehicles occurred in circumstances involving such variations.

At the time it was installed in Mercedes-Benz vehicles, PSAN was a reasonable propellant as it met all the necessary criteria for rapid and effective inflation of airbags. Thus, the development and use of PSAN by Takata was a reasonable design choice.

That aged PSAN in exceptionally rare circumstances may have—*years later*—resulted in inflator ruptures does not detract from its use as a reasonable choice as a propellant at the time the airbag inflators at issue were installed in Mercedes-Benz vehicles, especially taking into account the many collision injuries and deaths it has prevented.

## V.    THERE IS NO COMMON EVIDENCE OF AN ALLEGED DEFECT IN TAKATA AIRBAG INFLATORS IN MERCEDES-BENZ VEHICLES

I have reviewed the reports of plaintiffs' experts Robert Renz and James Baglini in this case, and understand they claim that the subject Takata airbag inflators (i.e., those that have been recalled in the U.S.) are defective because they use PSAN as the propellant, which may degrade over time owing to variable and complex factors that could render it unstable.  For the reasons explained below, it is my opinion that those sweeping claims are scientifically unsound.

### A. Numerous Individual Factors Can Influence Propellant Degradation

Integration and design of inflators in the Takata airbag modules installed in the various types of Mercedes-Benz vehicles are different compared to other vehicle manufacturers.  *See e.g.*, Exhibit C comparing a Takata airbag inflator in a Mercedes-Benz

vehicle with Takata airbag inflators in Honda and Nissan vehicles.  There are similarities in the overall size and shape, but close-up analysis reveals significant differences between the different inflators when comparing vehicle manufacturer and model.   The various inflators in Takata airbag modules in Mercedes-Benz vehicles have different chamber designs, different initiators, different propellant wafer configurations, different cooling mesh, and different vent hole orientation.  Inflator housings are also welded at different locations and are mounted with rubber isolators that create an additional thermal and vibration barrier between the inflators and the airbag mounting fixtures.  They appear similar and they perform a similar basic function in their respective vehicles, but they are not the same.  Many of these differences result from the different design requirements between vehicles and manufacturers and/or suppliers.

The whole life cycle of a vehicle will also play a role in the protection of various inflator modules from environmental exposure.  For example, a vehicle that is commonly exposed to direct sunlight, rain, and weathering will experience wider temperature and humidity fluctuations (in general, *and* at the inflator module) than a vehicle that is garaged. The mileage, maintenance, damage history, and repairs of a vehicle can also influence these factors.  Though these are obvious, individualized differences, as a population, luxury vehicles such as Mercedes-Benz vehicles are more likely to be garaged and maintained at a higher level than non-luxury vehicles.  Plaintiff's expert, Mr. Renz, agrees that there are numerous factors at play that can affect PSAN degradation, such as various environmental factors, design factors, and vehicle details.[19]  Mr. Baglini also agrees that there are "multiple variables that affect the rate of [PSAN] degradation. It's a complex, multi-variant phenomenon."[20]

Owing to the numerous differences in airbag system and module designs between vehicle makes, it is incorrect to claim that Takata airbag modules in Mercedes-Benz

---

[19] Deposition of R. Renz at 40:17-43:24, 81:23-25 ("I have an opinion associated with the rate of [PSAN] degradation, but it's highly variable and a lot of factors."); Renz at 85:14-17 ("I would agree that how the inflator is incorporated into the design -- or into the vehicle is different. The significance of that can be highly variable.").

[20] Deposition of J. Baglini at 312:22-24, 169:11-22 ("It's a complex and multivaried equation, if you will. There's multiple factors that contribute to it. They don't all have the

vehicles will malfunction at any point in time simply because they contain PSAN as an inflator propellant.  Safety components such as airbag modules must be part of the whole-vehicle design.  Each vehicle model (and sometimes even in variations within a model designation) come with unique requirements for integrating components, including airbag modules.

With respect to vehicle design, for example, a large, heavy vehicle will have different airbag deployment requirements than a smaller vehicle.  In the same way that tires are sourced from tire manufacturers and come in a wide variety of shapes and sizes to meet the needs of the vehicle design, airbags are also specified by the manufacturer to meet certain design criteria.  The airbags are matched and calibrated to perform as designed for each specific vehicle model.  There is no such thing as a "one size fits all" approach when it comes to airbags.

Building around the airbag module, the vehicle interior components including structural members, steering and dashboard systems, and controls must be considered. Ergonomics are also important, since occupants must be able to comfortably and safely interact with the vehicle interior and controls in every situation, including during a crash. There are many variations between model types and model years, but as a general matter, because Mercedes-Benz vehicles are luxury vehicles, they include more standard equipment, layers of materials, and features in the interior of its vehicles than most other brands.  These additional components combine into a more sophisticated interior system that is different from many other vehicles.  While it is certainly not possible to correlate every effect from each of these differences to whether any particular airbag module might malfunction, it is my opinion that the sum total of these differences may explain the very small number of rupture incidents worldwide.

Each manufacturer is responsible for properly incorporating the module into vehicles' interior design and safety systems.  When an airbag deploys, high forces are experienced by the supporting structures (steering wheel / dashboard support).  These

---

same sensitivity. Some factors are more significant than other factors . . . there's a lot of complex interaction effects.").

mechanical structures are typically made of steel or aluminum, and are part of the foundational design of the vehicle.  It is my opinion that the total vehicle assemblage plays a role in the vehicle's response to environmental and temperature changes.  Mr. Baglini agrees that "how the inflator and the airbag are integrated into a vehicle . . . are factors [and] part of the overall effects of various designs in the inflator that affect its performance and [PSAN] degradation."[21]   In other words, the "vehicle model or platform" are "a significant aspect of a complex multi-varied problem."[22]

Given the numerous and varied individual factors implicated in the purported risk of PSAN degradation and inflator rupture, and the complexity of interactions of these factors, I can state to a reasonable degree of scientific certainty that the use of non-desiccated PSAN in Takata airbag inflators in Mercedes-Benz vehicles does not constitute a defect, let alone a defect common to all of the Class Vehicles.

**B. Time and Location of Production May Influence an Inflator's Propensity to Rupture**

The few initial rupture incidents that occurred between 2003 and 2011 were confined to inflators manufactured in the early 2000s.  *See* Exhibit D, page 4 "D. Early PSDI field ruptures."  These ruptures may have been caused by errors in manufacturing attributable to the Stokes and/or Gladiator press (over-compression) or failure by Takata to implement quality control measures to prevent excessive moisture (i.e., leaving propellant on Takata's assembly line over weekends/holidays).  *See* Exhibit D, page 4, "E. First PSDI recalls."  These rupture incidents and inflators have been referred to as "alpha" events and "alpha" inflators and are all limited to other OEMs.  The reported manufacturing

---

[21] Deposition of J. Baglini at 220:12-20.
[22] Deposition of J. Baglini at 293:9-294:12; *see also* Exponent, Inc., <u>Investigation of Takata Inflator Ruptures</u>, at 26 (July 2016) ("The propensity for rupture depends on several factors, including: time in service, temperature fluctuations, high environmental temperature, humidity, and solar radiation. . . . Even within a particular geographic location, propellant degradation can vary *due to individual vehicle differences and differences in their environmental exposure*.")

anomalies are unrelated to and pre-date the inflators designed and manufactured for use in Mercedes-Benz vehicles, none of which were "alpha" inflators. *See* Exhibit D page 68.

Purported rupture incidents in other OEMs' inflators may also be linked to particular production lines at certain manufacturing facilities, e.g., the plants in LaGrange, Georgia, U.S., and the Monclova plant in Coahuila, Mexico. As noted, instances of exposure of propellant to high absolute humidity during assembly were manufacturing anomalies unique to certain production lines in those plants (i.e., porosity of propellant wafers). *See* Exhibit D, page 5, "Initial passenger inflator ruptures and recalls." The La Grange, Georgia plant did not manufacture any inflators used in Mercedes-Benz vehicles and no inflators for Mercedes-Benz vehicles were manufactured on suspect production lines at the facility in Monclova, Mexico.

### C. The Very Low Risk of Inflator Rupture Is Not Evidence of a Common Defect

Takata airbags with non-desiccated PSAN inflators were installed as standard equipment in tens of millions of vehicles worldwide, including Mercedes-Benz vehicles, spanning thirteen model years. Despite billions of collective miles of driving in these vehicles, there have been an infinitesimal number of inflator ruptures. There have been only two field incidents presently believed to be ruptures in Mercedes-Benz vehicles worldwide, only one which resulted in an alleged injury and no deaths.[23] There were no

---

[23] There are approximately 1.8 million inflators in recalled Takata airbags installed in Mercedes-Benz vehicles, so this represents about one rupture per 900,000 inflators. And that does not take into account the span of years the vehicles have been driven (MYs 2005-2017) for collectively hundreds of millions of miles. Nor does it take into account the fact that most inflators have now been replaced. In 2020, there were an estimated 38,680 fatalities in automobile accidents in the U.S. *See* NHTSA, <u>Traffic Safety Facts</u>, DOT HS 813 115 (May 2021). The population of the U.S. is approximately 330 million, meaning the likelihood of being fatally injured in a motor vehicle crash (of any type) is approximately 1 in 8,532. The point is that the risk of a Takata airbag inflator rupture in a Mercedes-Benz vehicle is extraordinarily low. According to the CDC, for example, approximately one person in 500,000 are struck by lightning *each year*. *See* <u>https://www.cdc.gov/disasters/lightning/victimdata.html;https://www.weather.gov/safety/lightning-odds</u> (both last visited October 29, 2021).

confirmed ruptures of Takata inflators in Mercedes-Benz vehicles prior to the recall. Both of these incidents are still being investigated, and there have been no final conclusions as to causation or other matters.

It is unreasonable and unscientific to infer from the occurrence of a very small number of inflator ruptures that the use of non-desiccated PSAN as the propellant in Takata inflators in Mercedes-Benz vehicles renders all such inflators defective.  As noted, numerous factors may affect the performance of any particular inflator, including environmental factors, tampering or misuse, vehicle usage and condition, inflator performance requirements, design parameters and variants, mounting fixtures, vehicle construction, and other features that vary between manufacturers and between vehicle models and across model years.  The host of individualized factors make it scientifically improper to conclude that a common defect exists across all Takata airbags with non-desiccated PSAN inflators installed in Mercedes-Benz vehicles; each vehicle and inflator must be assessed individually.

I have personally inspected numerous inflators from Mercedes-Benz vehicles and airbags, including dissection and detailed photography, noting the observations I describe above (Part V.A.).  Mr. Renz did not inspect any Takata inflator in any Mercedes-Benz vehicle; nor did he know the different variants of inflators used in Mercedes-Benz vehicles.[24]  The same is true for Mr. Baglini because his "focus was primarily on GM."[25] In his report, Mr. Renz refers to MEAF data (ballistic testing data) for recalled Takata airbag inflators from Mercedes-Benz vehicles, but conceded that he could not dispute that MBUSA, as the marketer and distributor of Mercedes-Benz vehicles in the U.S., would not have any reason to know what MEAF is, let alone analyze such information because it is not in MBUSA's "wheelhouse" to do so.[26]  Mr. Renz himself did not analyze the MEAF data for Takata airbag inflators from Mercedes-Benz vehicles; in any event, the testing

---

[24] Deposition of R. Renz at 432:13-434:1
[25] Deposition of J. Baglini at 329:13-330:16.
[26] Deposition of R. Renz at 436:7-13.

results did not come out until mid-2016, well after the recalled vehicles had already been sold.[27]

According to the NHTSA 2016 recall expansion fact sheet, rupture events have only occurred in Takata airbag inflators subjected to specific and unique environmental circumstances; inflators not subjected to these fluctuating factors are not affected.  NHTSA has concluded that the [PSAN] Takata airbag inflators do not pose an unreasonable risk to safety until they reach a certain level of propellant degradation.

## VI.   AIRBAGS HAVE SAVED AND CONTINUE TO SAVE COUNTLESS LIVES

All but approximately 30% of Mercedes-Benz vehicles subject to the Takata recall and still on the road have already had the recall repair performed free of charge. The recall has been completely rolled out so all vehicles owners who `have not yet availed themselves of the recall can do so and get a replacement airbag module for free. It is indisputable that airbags have saved and continue to save thousands of lives annually.   According to NHTSA, *even recalled Takata bags continue to save lives*.   Consider the following recommendation to consumers from the NHTSA Questions and Answers portion of the NHTSA Takata recall website:

_____

_____

**Should I ask the dealer to disable my air bag while I am waiting for a repair?**

No. It is much more likely that your air bag will perform properly and protect you in a crash than cause harm. **An air bag that is purposely disabled has a 100-percent chance of failing to provide any protection in a crash**.

_____

_____

---

[27] Deposition of R. Renz at 434:12-435:10.

*See* NHTSA Takata Recall Spotlight FAQ no. 3 (available at https://www.nhtsa.gov/equipment/takata-recall-spotlight) (last accessed October 27, 2021).

Even recalled Takata airbags will continue to prevent injury and save lives while the recall process runs its remaining course, nearing completion.

Dated: October 31, 2021

Mark H. Warner

**APPENDIX I**

**CURRICULUM VITAE**

# Mark Halford Warner, M.S.M.E.

COLLISION SAFETY ENGINEERING, LC
416 South Commerce Drive
Orem, Utah 84058
801 229 6200 Office

· Utah Class A Commercial Motor Vehicle License (CDL)

**EDUCATION**

MASTER OF SCIENCE / MECHANICAL ENGINEERING
Brigham Young University, Provo, Utah  2004

BACHELOR OF SCIENCE / MANUFACTURING ENGINEERING.
Brigham Young University, Provo, Utah  1998

ASSOCIATE OF SCIENCE (General Studies)
Utah Valley State College, Orem, Utah  1992

**PATENT**

"Inflatable Restraint System for Side Impact Crash Protection"
US Patent No. 5224732 * 6 July 1993 * Co-Inventor

**EXPERIENCE**

<u>1998 – Present</u>

Engineer, Collision Safety Engineering, LC
Automotive accident scene and vehicle investigation.  Accident reconstruction using traditional and advanced methods.  Development of advanced accident investigation tools and techniques.  Application of reconstruction and investigation methods including computerized analysis, photogrammetry, 3-dimensional digitization and mapping, micro and macro photography, and mechanical design analysis.

<u>1998 - Present</u>

President, Delta V Technology
Automotive crash testing design and management. Supervisor of testing and test facilities.  Development of new testing capabilities and processes.  Dynamic

vehicle handling analyses.  Static and dynamic testing of vehicle structures and components including wheels, seats, seat belts, airbags, doors and door latches, and other vehicle structures.

<u>1999-2000, 2005-2006</u>

Part Time Faculty – Brigham Young University, Integrated Product and Process Design Team.
> ME 475: Integrated Product and Process Design.

<u>1994 – 1998</u>

Crash Test Supervisor / Vice President, Collision Safety Engineering, Inc.
> Management duties at Collision Safety Engineering Inc. including crash test planning and supervision, shop management, and test vehicle coordination.

<u>1994 – 1998</u>

Technician, Collision Safety Engineering, Inc.
> Courtroom exhibit preparation including full-scale and small-scale vehicle models, photography, and vehicle component procurement. Hardware fabrication manager for a patented side impact crash protection device (US Patent 4,966,388)

<u>1981 – 1987</u>

Shop Technician / Mechanic, Collision Safety Engineering, Inc.
> Test vehicle and equipment fabrication, maintenance and repair.

## INVITED PRESENTATIONS

"Development of Pole Impact Testing at Multiple Vehicle Side Locations as Applied to the Ford Taurus Structural Platform" SAE International World Congress, Detroit MI, April 2006,

"Crash Pulse Analysis" presented to the Fundamentals of Vehicle Crashworthiness and Occupant Biodynamics class at Brigham Young University. Provo, Utah.  January, 2006.

"Static and Dynamic Testing Capabilities as Developed by CSE Engineers," Collision Safety Engineering, Orem, Utah.  August 2006

"Load Path Considerations for Side Crash Compatibility," SAE International World Congress and Exposition, Detroit Michigan, April 2007

"Fatal and Severe Injuries in Rear Impact: Seat Stiffness in Recent Field Accident Data" SAE International World Congress and Exposition, Detroit Michigan, April 2008

"Glass Debris in Rollover Accidents" SAE International World Congress and Exposition, Detroit Michigan, April 2008

"Pitfalls in Crash Severity Assessment" Utah Society of Professional Engineers Annual Conference.  Salt Lake City Utah, May 2009.

"Pitfalls in Crash Severity Assessment" Utah State Department of Risk Management. Salt Lake City Utah, December 2009.

"Roadway Asphalt Damage Analysis: Dynamic Evaluation of Gouge Forces" SAE International World Congress and Exposition, Detroit Michigan, April 2010.

"ATV Rollover Resistance: Testing of Side-By-Side ATV Rollover Initiations" SAE International World Congress and Exposition, Detroit Michigan, April 2010. *(SAE Outstanding Oral Presentation Award)*

"Pitfalls in Crash Severity Assessment" Utah State Bar Association Legal Seminar, Salt Lake City Utah, October 2010.

"Rollover Testing of Recreational Off-Highway Vehicles (ROVs) for Accident Reconstruction"  SAE International World Congress and Exposition, Detroit Michigan, April 2011.

"ATV Rollover Crashes: Misconceptions and Realities of Side-by-Side ATV Rollover" Continuing Legal Education Seminar, Las Vegas Nevada, September 2011.

"Milliseconds of Our Lives: The Time Base of Automotive Crash Events" Brigham Young University Civil Engineering Seminar, October 2011.

"Large Truck Crashes: Major Factors in the Automotive Safety Equation" National Association of Publicly Funded Truck Driving Schools, October 2011.

"Snowmobile Cornering and Acceleration Data from On-Snow Testing" SAE International World Congress and Exposition, Detroit Michigan, April 2015.

**PUBLICATIONS**

"Development of Pole Impact Testing at Multiple Vehicle Side Locations as Applied to the Ford Taurus Structural Platform" SAE 2006-01-0062, SAE International World Congress and Exposition, Detroit Michigan, April 2006, *Mark H. Warner, Ronald P. Nordhagen, Collision Safety Engineering LC.*

"Accident Reconstruction For Rear Pole Impacts Of Passenger Cars" SAE 2006-01-0899, SAE International World Congress and Exposition, Detroit Michigan, April 2006, *Ronald P. Nordhagen, Mark H. Warner, Thomas R. Perl, Collision Safety Engineering LC.*

"Pulse Shape and Duration in Frontal Crashes," SAE 2007-01-0724, SAE International World Congress and Exposition, Detroit Michigan, April 2007.  *Charles Y. Warner, Mark H. Warner, Charles L. Crosby, Collision Safety Engineering LC.  Michael J. Armstrong, Department of Mechanical and Aerospace Engineering, Georgia Tech University.*

"Load Path Considerations for Side Crash Compatibility" SAE 2007-01-1176, SAE International World Congress and Exposition, Detroit Michigan, April 2007.  *Charles Y. Warner, Mark H. Warner, Nathan H. Benson, Collision Safety Engineering LC.*

"Derivation of Vehicle-to-Vehicle Frontal Crash Pulse Estimates from Barrier Crash Data" SAE 2008-01-0174, SAE International World Congress and Exposition, Detroit Michigan, April 2008.  *Charles L. Crosby, Charles Y. Warner, Mark H. Warner, Collision Safety Engineering LC; Richard Galati, Brigham Young University.*

"Fatal and Severe Injuries in Rear Impact: Seat Stiffness in Recent Field Accident Data" SAE 2008-01-0193, SAE International World Congress and Exposition, Detroit Michigan, April 2008.  *Mark H. Warner, Charles Y. Warner, Collision Safety Engineering LC.*

"Glass Debris in Rollover Accidents" SAE 2008-01-0167, SAE International World Congress and Exposition, Detroit Michigan, April 2008.  *T. R. Perl, J.E. Bready, R. P. Nordhagen, M. H. Warner, Collision Safety Engineering LC.*

"Roadway Damage Force Analysis for Accident Reconstruction" SAE 2008-01-0173, SAE International World Congress and Exposition, Detroit Michigan, April 2008.  *Mark H. Warner, Charles Y. Warner, Charles L. Crosby, Collision Safety Engineering LC.*

"Roadway Asphalt Damage Analysis: Dynamic Evaluation of Gouge Forces" SAE 2010-01-0047, SAE International World Congress and Exposition, Detroit Michigan, April 2010.  *Charles L. Crosby, Mark H. Warner, Collision Safety Engineering LC.*

"ATV Rollover Resistance: Testing of Side-By-Side ATV Rollover Initiations" SAE 2010-01-0522,  SAE International World Congress and Exposition, Detroit Michigan, April 2010.  *Mark H. Warner, Collision Safety Engineering LC.*

"Rollover Testing of Recreational Off-Highway Vehicles (ROVs) for Accident Reconstruction"  SAE 2011-01-1117,  SAE International World Congress and Exposition, Detroit Michigan, April 2011.  *Mark H. Warner, Jon E. Bready, Collision Safety Engineering LC.*

"Snowmobile Cornering and Acceleration Data from On-Snow Testing" SAE 2015-01-1431,
 SAE International World Congress and Exposition, Detroit Michigan, April 2015. Mark H. Warner, Jon E. Bready, Collision Safety Engineering;  Wyatt Y Warner, Brigham Young University; Alan F. Asay, Asay Engineering.

"Carbon Monoxide Density Pattern Mapping from Recreational Boat Testing" SAE International Journal of Transportation Safety, Volume 6, Issue 2, 2018; Mark H. Warner, Collision Safety Engineering.

## TECHNICAL SEMINARS & CONTINUING EDUCATION

"Human Factors in Automotive Accidents," SAE Professional Development. Las Vegas, Nevada. February, 2000.

PC Crash Accident Reconstruction Trained, October, 2000.

HVE Accident Reconstruction Trained, September, 2001.

SAE Rollover Toptec. April, SAE Professional Development. Phoenix, Arizona. April, 2002.

"Role of the Seat in Rear Crash Safety," SAE Professional Development. Troy, Michigan. December 2005.

"Safety Restraint System and Occupant Protection Concepts and Design," Dr. Lothar Groesch of Robert Bosch Corporation, Brigham Young University. March, 2005.

"The Application of the Kine-Tau Spreadsheet Program and BSAN for Crash Pulse Modeling," Dr. Charles Warner, Collision Safety Engineering, August, 2006.

"Crash Sensing Algorithms: Electronic Sensing for Air Bag Deployment in Front, "Side and Rollover Automobile Crashes," Dr. Lothar Groesch of Robert Bosch Corporation, Collision Safety Engineering. October 2006.

"Paving the Road to Accident Free Driving," Active Safety Technology: SAE International Tele / Webcast, March 2007.

"Injuries, Anatomy, Biomechanics, and Federal Regulation" SAE Professional Development, Detroit, Michigan.  April 2007.

"PhotoModeler Collision Investigation"  DCM Technical Services, Orem UT, December 2007.

"Rear Seat Occupant Safety: Belt Load Limiting and Pretensioning"  Dr. Richard Kent, University of Virginia Center for Applied Biomechanics, Orem, UT, October 2008.

"Vehicle Accident Reconstruction Methods"  SAE Professional Development, Troy, Michigan.  December 2008.

"Faro Scanner LS Training" Faro Training Services, Orem Utah, September 2009.

"Fragility, Frailty, and Environment: Distinct Challenges for Crash Injury Mitigation in an Aging Population"  Dr. Richard Kent, University of Virginia Center for Applied Biomechanics, Orem, Utah, June 2010.

"Adams-Car Vehicle Dynamics Modeling"  MSC Software Corporation,  Ann Arbor, Michigan, November - December 2010.

## PROFESSIONAL MEMBERSHIPS

Society of Automotive Engineers (SAE)
Fundamentals of Engineering Exam, State of Utah, 2001
Society for the Advancement of Materials and Process Engineering (SAMPE)
American Society of Mechanical Engineers (ASME)
International Traffic Medicine Association (ITMA)
Association for the Advancement of Automotive Medicine (AAAM)

## APPENDIX II

The documents and information I referenced, considered, and relied on in preparing this report include:

1. The Expert Report of Robert Renz (as to MBUSA) dated August 16, 2021

2. The Expert Report of James Baglini dated August 16, 2021

3. Deposition testimony of Tom Brunner, MBUSA

4. Deposition testimony of Bibi Analil, MBUSA

5. Deposition testimony of Greg Gunther, MBUSA

6. Deposition testimony of David Tait, MBUSA

7. Deposition testimony of Tim Lowery, MBUSA

8. Deposition Testimony of Chris Schraer, MBUSA

9. Deposition testimony of Mark Aikman, MBUSA

10. High speed imaging of an airbag deployment sequence (produced by M. Warner and attached as Exhibit A)

11. US Motor Vehicle Deaths Per Vehicle Mile Travelled (NHTSA / FARS data): 1921-2017 (attached as Exhibit B-1) and associated data plot (produced by M. Warner and attached as Exhibit B-2)

12. Report of TK Holdings Inc. Pursuant to Paragraph 33a of the November 3, 2015 Consent Order, dated 30 June 2016 (attached as Exhibit D)

13. References for Section IV:

    a. SAE Technical Paper Series 2007-01-0724 (April 2007)

    b. General Safety Belt Usage, Issue Paper, DOT HS 803 824 (March 1980)

c.  SAE Technical Paper Series, Regulatory History of Automatic Crash Protection in FMVSS 208, 950865 (February 1995)

d.  John Tat et al. (2021), Sodium Azide Poisoning: A Narrative Review, Clinical Toxicology, Vol. 59, No. 8, 683–697

14. Exponent, Inc., Investigation of Takata Inflator Ruptures (July 2016)

15. Takata Plea Agreement, 2:16-cr-20810-GCS-EAS Doc # 23 (February 27, 2017)

16. MBUSA's Motion to Dismiss for Lack of Standing, 1:15-md-02599-FAM Doc # 2982 (August 20, 2018), and Declaration of Raoul Cantero in support thereof, 1:15-md-02599-FAM Doc # 2986 (August 20, 2018).

17. MBUSA's Responses to Plaintiffs' Discovery Requests cited herein.

## APPENDIX III

## Mark H. Warner, MSME
### Collision Safety Engineering
### Deposition and Trial Testimony (since 2016)

| DATE | CASE | COURT |
|------|------|-------|
| 2/2016 | **Bombardier Recreational Products Inc. vs Arctic Cat Inc.** <br> *Deposition Testimony* | US District Court – Minnesota |
| 5/2016 | **Aldana vs. TCI Leasing** <br> *Deposition Testimony* | Superior Court, Riverside County California |
| 11/2017 | **Bombardier Recreational Products Inc. vs Arctic Cat Inc.** <br> *Trial Testimony* | US Federal Court – Minnesota |
| 1/2018 | **Ewing vs Decision HR Holding** <br> *Deposition Testimony* | Superior Court, Los Angeles County California |
| 4/2021 | **Darland vs Aramark.** <br> *Deposition Testimony* | US District Court – Utah District Utah |

/4/AMERICAS