# Exhibit 9

Page 1

```
 1            UNITED STATES DISTRICT COURT FOR THE
                 SOUTHERN DISTRICT OF FLORIDA
 2                       MDL No. 2599
 3           Master File No. 15-2599-MDMORENO
            S.D. Fla. Case No. 15-20664-CV-MORENO
 4                  (Personal Injury Track)
            S.D. Fla. Case No. 14-24009-CV-MORENO
 5                   (Economic Loss Track)
 6   IN RE:
 7   TAKATA AIRBAG PRODUCTS
 8   LIABILITY LITIGATION
 9   _____/
10
11                           Remote Proceeding
                             Fort Lauderdale, Florida
12                           September 23, 2020
                             9:05 a.m. - 4:45 p.m.
13
14        VIDEO DEPOSITION OF BIBI ANALIL (MB U.S.A.)
15                    (via teleconference)
16        Taken before SUZANNE VITALE, R.P.R., F.P.R.
17   and Notary Public for the State of Florida at Large,
18   pursuant to Notice of Taking Deposition filed in the
19   above cause.
20
21
22
23
24
25
```

Page 34

1     MR. BOWER:  I'll strike that.
2  BY MR. BOWER:
3     Q.  While you were working on vehicle
4  compliance with U.S. test requirements, did you have
5  any role in preparing information or documents to
6  U.S. regulators?
7     A.  No.
8     Q.  Did you provide any information that was
9  then passed on to regulators in your role?
10    A.  Not that I know of.
11    Q.  You mentioned earlier that you get test
12 results.
13       Were these results you're referring to
14 tests conducted by BMW?
15    A.  Yes.
16    Q.  And those tests were frontal crash tests;
17 is that correct?
18    A.  In the beginning, yeah.  At the end, it
19 was brakes.
20    Q.  Focusing on the beginning point just for
21 the time being, would those frontal crash test
22 results include airbag function?
23    A.  No.
24    Q.  Why not?
25    A.  Because I was only responsible for the

Page 35

1  regulatory requirement, which is 208, which is the
2  crash test.
3     Q.  Does the crash test incorporate in any way
4  the performance of the airbags?
5     A.  I mean, the airbag has to deploy.
6     Q.  Does the airbag also have to deploy
7  without causing injury to the occupant?
8        MR. KNAPP:  Object to form.
9        THE WITNESS:  It has to meet test
10    requirements, which -- which I couldn't tell
11    you right now off the top of my head.
12 BY MR. BOWER:
13    Q.  It's safe to assume, though, that if an
14 airbag had a defect that caused it to disassemble
15 and injure the occupant, that wouldn't be a passing
16 result, would it?
17       MR. KNAPP:  Object to form and
18    argumentative.
19       You can answer, Bibi, if you understand
20    the question.
21       THE WITNESS:  I mean, it's not really a
22    question I can answer.
23 BY MR. BOWER:
24    Q.  Are you aware, as you sit here today, of
25 whether any of the vehicles you worked on in Germany

Page 36

1  have been recalled due to the Takata airbag defect?
2     A.  I'm not aware of anything, no.
3     Q.  You're not aware, one way or the other,
4  whether those vehicles have been recalled?
5     A.  No.
6     Q.  Not something you ever checked on,
7  correct?
8     A.  No.
9     Q.  Are you aware that BMW has recalled
10 vehicles related to the Takata defect for model
11 years 2000 to 2013?
12       MR. KNAPP:  Object to form.
13       THE WITNESS:  No.  I didn't look at the
14    years that they were recalled.  I was more
15    concentrated at Mercedes at this point, so I'm
16    not really thinking about BMW.
17 BY MR. BOWER:
18    Q.  What do you mean, "I was more concentrated
19 at Mercedes at this point"?
20    A.  Well, I'm working at Mercedes right now.
21    Q.  When did you first hear that there might
22 be an issue with Takata airbags, either at BMW or
23 Mercedes, do you recall?
24    A.  When I started at Mercedes, at one point.
25 I don't remember exactly when.

Page 37

1     Q.  Do you recall approximately when?
2     A.  Not really, no.
3     Q.  Do you recall approximately the year?
4     A.  I'm going to probably say like a year in
5  or -- to when I started, so 2000 -- maybe.  I don't
6  know.
7     Q.  So you started at Mercedes, it looks like,
8  around late 2011, correct?
9     A.  Yes.
10    Q.  So you think maybe late 2012 is when you
11 first became aware that there might be an issue with
12 Takata airbags?
13    A.  Yeah, possibly.  I really don't remember.
14    Q.  Well, do you recall how you might have
15 received that information or become aware that there
16 might be an issue with Takata airbags?
17    A.  Yeah.  From Tom Brunner.
18    Q.  Do you recall how you became aware?  Was
19 it an e-mail or just a passing discussion, something
20 else?
21    A.  It was probably a discussion.
22    Q.  Do you recall what you all discussed in or
23 about late 2012 regarding Takata airbags?
24    A.  No.
25    Q.  Were you aware at that time, or soon

Page 38

1  thereafter, that Takata airbags used ammonium
2  nitrate?
3      MR. KNAPP: Object to form.
4      THE WITNESS: I think I became aware when
5  Takata started filing.
6  BY MR. BOWER:
7   Q. I just want to make sure that we have a
8  clear record on that.
9      So you first became aware that Takata
10 airbags used ammonium nitrate when Takata started
11 filing -- and what do you mean by "filing"?
12  A. The 573 report or the DIR report.
13  Q. Just for the record, can you explain what
14 a DIR report is?
15  A. It's a defect report.
16  Q. And what about a 573 report?
17  A. It's the official defect report to NHTSA.
18  Q. What's the difference between a 573 report
19 and a DIR report, if any?
20  A. I'm not too sure.
21  Q. Did you conduct any audits while you were
22 working for BMW in Germany?
23      MR. KNAPP: Object to form.
24      THE WITNESS: I can't remember. I don't
25  think so. Is it on my resume?

Page 39

1  BY MR. BOWER:
2   Q. It is. We don't need to spend too much
3  time on it. Just, you know, if you have some
4  recollection, I just had a few questions on it.
5      Page 1 of your resume, two bullet points
6  up from the bottom, it says, "Preparation and
7  support of worldwide vehicles and official
8  authoritative work audits in all manufacturing
9  plants (conformity of production)."
10     Do you see that?
11  A. Yes. So that was not a physical audit.
12 It was more of an audit of -- so at the plant, they
13 have to provide COP documents to make sure those
14 documents were in line.
15  Q. By COP documents, are those certificates
16 of performance documents or something else?
17  A. Conformity of production documents.
18  Q. So were these -- strike that.
19  A. Can we take a break?
20  Q. Sure. You want to take a 10-minute break?
21  A. That would be great, yeah.
22  Q. Okay. Sure.
23     THE VIDEOGRAPHER: The time is 9:53 a.m.
24 We're going off the record.
25     (Short recess taken.)

Page 40

1      THE VIDEOGRAPHER: The time is 10:07 a.m.
2  and we're back on the record.
3  BY MR. BOWER:
4   Q. We're back on the record.
5      Do you understand you're still under oath?
6   A. Yes.
7   Q. And I just want to -- have a couple of
8  follow-up questions about your work at BMW and then
9  we can move on to Mercedes-Benz, okay?
10  A. Okay.
11  Q. Just give me a second here. My screen
12 closed. Give me a second. Okay. There we go.
13     I just want to -- I have a few follow-up
14 questions on your work for the crash testing at BMW,
15 okay?
16  A. Uh-huh.
17  Q. That was done while you were stationed in
18 Germany; is that correct?
19  A. When I had to do frontal crash testing,
20 yes.
21     So I would attend the government testing
22 at -- when I was in New Jersey, and then the R&D
23 testing when I was in Germany.
24     MR. BOWER: Can we go off the record for a
25  second?

Page 41

1      THE VIDEOGRAPHER: The time is 10:09 a.m.
2  We're going off the record.
3      (Short recess taken.)
4      THE VIDEOGRAPHER: The time is 10:14 a.m.
5  and we're back on the record.
6      MR. BOWER: We've got that solved. We're
7  back on the record.
8  BY MR. BOWER:
9   Q. And I just had a couple of follow-up
10 questions on the crash testing work you did.
11     Was that work done in Germany or the
12 United States?
13     MR. KNAPP: Objection to form.
14     And just to clarify, we're talking BMW,
15  correct?
16     MR. BOWER: Correct.
17     MR. KNAPP: Thank you.
18     THE WITNESS: So when the government would
19  pick our tests to crash, I would attend that
20  for BMW North America.
21     If I -- if there was R&D testing, that was
22  done in Germany.
23     Can you hear me?
24 BY MR. BOWER:
25  Q. We got you. Thank you.

Page 94

 1  earlier with Tom regarding Takata, was that specific
 2  to Mercedes vehicles, do you recall?
 3     A.  I'm not sure what you mean.  What was the
 4  question?  Can you repeat the question?
 5     Q.  Sure.
 6         Earlier today, you testified regarding a
 7  discussion you had with Tom in or about 2012
 8  regarding Takata airbags.
 9         My question now is, do you recall whether
10  that discussion was specific to Mercedes-Benz
11  vehicles or was it a more general discussion?
12         MR. KNAPP:  Objection.  That misstates
13     prior testimony.
14         THE WITNESS:  Yeah.  I don't think it was
15     in 2012.  I think it was when I got involved in
16     Takata.  So it would have been during this
17     time.
18  BY MR. BOWER:
19     Q.  What do you mean by "this time"?
20     A.  Oh, when I got the supervisor position and
21  was getting involved in Takata.
22     Q.  And that would have been mid-2016?
23     A.  Yes.
24     Q.  By that time, had Mercedes issued any
25  recalls of Mercedes vehicles for the Takata airbag

Page 95

 1  defect?
 2     A.  I don't think so.  I don't know.
 3         When I got the supervisor position, I was
 4  basically training Corey on TREAD for a really long
 5  time, and then I slowly got into the recall aspects
 6  of it.
 7         Takata came, I think, last.  So there was
 8  a lot of time before I actually got into Takata or
 9  to understand anything about Takata.
10     Q.  In connection with -- let's just finish
11  up, I guess, our discussion on the Alliance working
12  group for a moment before I move on to the Takata
13  work.
14         Were you a member of any specific working
15  groups within the Alliance organization?
16     A.  Yeah.  So when I first started, I was part
17  of the early warning reporting group for sure.
18  Might have been for rollover, because I think that
19  was a regulation that was starting up then at that
20  time, but --
21     Q.  Were you involved in the product safety
22  group?
23     A.  Product safety group?  I could have gotten
24  e-mails from the product safety group.  I don't
25  think I attended any actual meetings.

Page 96

 1     Q.  Do you recall being on correspondence from
 2  the Auto Alliance Group regarding responses to the
 3  Takata airbag remedy program?
 4     A.  I don't think so, no.  You'll have to show
 5  me if I was.  I don't remember.
 6     Q.  Just give me a second.
 7     A.  Okay.
 8         MR. BOWER:  I entered Exhibit 12.  So just
 9     hit refresh and open that one up.
10         (Thereupon, the referred-to document was
11     marked for Identification as Plaintiffs' Exhibit
12     12.)
13  BY MR. BOWER:
14     Q.  Again, this is a Mazda North America
15  document, but you're included in the correspondence
16  there.  If you see your name, it's three rows down
17  from the top, kind of in the middle there.
18         Do you see that?
19     A.  Uh-huh.
20     Q.  This is another e-mail from the Auto
21  Alliance organization, correct?
22     A.  Yes.
23     Q.  This is -- the subject of this one is the
24  cyber legal working group meeting.
25         Do you see that?

Page 97

 1     A.  Uh-huh.
 2     Q.  Would you have been attending these
 3  meetings during this time period?
 4     A.  I probably was not.  So I was invited
 5  because you see it says early warning reporting, and
 6  I'm part of that group.
 7     Q.  Got it.  Okay.
 8     A.  It was like they invited everybody from
 9  product safety, cybersecurity, legal early warning
10  reporting, it looks like.  And then this was the
11  agenda.
12         So if I thought there was something in
13  here that I needed to attend, I would have attended
14  or like, say, Tom couldn't attend or something, and
15  he's like, hey, can you attend, take notes or
16  something, then I would have attended, but most
17  likely not.
18     Q.  And do you see on number 2 is that the
19  organization was to prepare as needed for any
20  reliance participation in or response to the Takata
21  airbag inflator coordinated remedy program?
22         Do you see that?
23     A.  Yes.
24     Q.  Would Mercedes U.S.A. have participated in
25  that at this time period?

25 (Pages 94 - 97)

Page 150

1  So I'm just wondering if you could answer
2 the question about what Mercedes-Benz can and cannot
3 do, okay?
4      A.  Okay.
5      Q.  So does Mercedes-Benz U.S.A. have the
6 ability to investigate potential issues regarding
7 the safety of its vehicles?
8      A.  Yes.  We can investigate.
9      Q.  Has Mercedes-Benz U.S.A. conducted any
10 investigations regarding the safety of Takata
11 airbags?
12         MR. KNAPP:  Object to form.
13         THE WITNESS:  Has it done any
14     investigations in regards to Takata airbags?
15         Product analysis engineers might have
16     investigated a vehicle with Takata airbags.
17     That's a possibility, yes.
18 BY MR. BOWER:
19      Q.  So I'm going to introduce another exhibit
20 here.
21      A.  Okay.
22         (Thereupon, the referred-to document was
23 marked for Identification as Plaintiffs' Exhibit
24 16.)
25 BY MR. BOWER:

Page 151

1      Q.  Let me know when you've had a chance to
2 open it and have a look at it, okay?
3      A.  We're at 16, correct?
4      Q.  Yes.  It should be Exhibit 16, and it's an
5 e-mail, appears to be from Mr. Brunner to yourself
6 on September 1, 2016.
7      A.  Okay.
8      Q.  This is on or about the time you first
9 started getting involved with the Takata airbags; is
10 that correct?
11      A.  Yes.
12      Q.  Do you recall receiving this e-mail from
13 Mr. Brunner?
14      A.  I do not.
15      Q.  You see he says, "Please do not distribute
16 or forward to anyone"?
17         Do you see that?
18      A.  Uh-huh.
19      Q.  Do you have any understanding as to why he
20 made that statement?
21      A.  No.
22      Q.  And you see you send this e-mail to
23 yourself and Allen Ambulo?
24         Do you see that?
25      A.  Yes.

Page 152

1      Q.  What was Mr. Allen Ambulo's position at
2 this time?
3      A.  He worked for me.  He's a recall
4 coordinator.
5      Q.  When you received this e-mail, did you
6 have an understanding as to why Mr. Brunner had
7 concerns about distributing or forwarding this
8 information in the e-mail?
9         MR. KNAPP:  Object to form.
10         THE WITNESS:  No.  I mean, without -- do
11     you have the document?
12 BY MR. BOWER:
13      Q.  Well, that would be my next question.
14         So no, I don't believe we have the
15 document.  I haven't been able to locate it, but it
16 appears it wasn't attached.  I don't know if you
17 have a different understanding of the e-mail, but it
18 looks to me like it was a link and not an
19 attachment.
20      A.  Yeah.  It's a link.
21      Q.  And what is that link to, do you know?
22      A.  One of the drives.
23      Q.  Is that a drive at Mercedes-Benz U.S.A.?
24      A.  Yes.  It seems so.  Like, this can be
25 different for everybody, like the S.  It could be a

Page 153

1 U for me or a Z.  So you can't really go by that.
2 But recalls campaign service measures it.  That's a
3 folder in one of our drives.
4      Q.  Do you have a folder for -- strike that.
5         Does the structure on this link look
6 familiar to you, the folder structure?
7      A.  It looks familiar, yes.
8      Q.  Do you know what it refers to?
9      A.  No.  I mean, it says Takata PSAN
10 inflators.
11      Q.  Do you know what PSAN stands for?
12      A.  The ammonium nitrate inflators.
13      Q.  Do you know when you first became aware
14 that Takata inflators used ammonium nitrate?
15      A.  I do not know.  I don't remember when I
16 first knew.  Probably the same time everything was
17 filed.
18      Q.  You're a chemical engineer, correct?
19      A.  Yes.
20      Q.  Are you familiar with the issues regarding
21 ammonium nitrate?
22         MR. KNAPP:  Object to form.
23         THE WITNESS:  I'm aware of the issue here,
24     I guess.
25 BY MR. BOWER:

39 (Pages 150 - 153)

Page 246

CERTIFICATE OF OATH

STATE OF FLORIDA   )
COUNTY OF BROWARD  )

    I, the undersigned authority, certify that BIBI ANALIL personally appeared before me and was duly sworn.
    WITNESS my hand and official seal this 30th day of September, 2020.

_Suzanne Vitale_
_____
SUZANNE VITALE, R.P.R., F.P.R.
Notary Public, State of Florida
My Commission No. DD179981
Expires: 5/24/2024

Page 247

CERTIFICATE

STATE OF FLORIDA   )
COUNTY OF BROWARD  )

    I, SUZANNE VITALE, R.P.R., F.P.R. do hereby certify that I was authorized to and did stenographically report the foregoing deposition of BIBI ANALIL; that a review of the transcript was requested; and that the transcript is a true record of my stenographic notes.
    I FURTHER CERTIFY that I am not a relative, employee, attorney, or counsel of any of the parties, nor am I a relative or employee of any of the parties' attorney or counsel connected with the action, nor am I financially interested in the action.
    Dated this 30th day of September, 2020.

_Suzanne Vitale_
_____
SUZANNE VITALE, R.P.R., F.P.R.
My Commission No. DD179981
Expires: 5/24/2024

Page 248

VERITEXT FLORIDA, LLC
Two South Biscayne Blvd., Suite 2250
MIAMI, FL  33131
305-376-8800

BIBI ANALIL c/o
SQUIRE PATTON BOGGS
275 Battery Street
Suite 2600
San Francisco, California 94111-3356
Attention:  ERIC J. KNAPP, ESQ.

October 7, 2020

RE:  Takata Airbags
CASE NO.
AVAILABLE FOR READING UNTIL:  30 days

BIBI ANALIL:

    This letter is to advise you that the transcript of your deposition is available for reading and signing.
    PLEASE CALL THE ABOVE NUMBER TO MAKE AN APPOINTMENT to come to the Veritext office closest to you to read and sign the transcript.  Our office hours are 8:30 a.m. to 4:30 p.m., Monday through Friday.
    In the event other arrangements are made, please send us a notarized list of any and all corrections and/or changes, noting page and line numbers, and the reason for such changes, so that we can furnish respective counsel with a copy.
    If the reading and signing has not been completed prior to the above-referenced date, we shall conclude that you have waived the reading and signing of the deposition transcript.
    Your prompt attention to this matter is appreciated.
    SUZANNE VITALE, R.P.R., F.P.R.