# Exhibit 24

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
MDL No. 2599
Master File No. 15-MD-02599-FAM
S.D. Fla. Case No. 14-CV-24009-FAM

IN RE TAKATA AIRBAG PRODUCTS
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:
ECONOMIC LOSS TRACK CASES

and

STEPHANIE PUHALLA, et al.,
individually and on behalf of
all others similarly situated,

      Plaintiffs,
vs.

VOLKSWAGEN AKTIENGESELLSCHAFT,
VOLKSWAGEN GROUP OF AMERICA,
AUDI AKTIENGESELLSCHAFT, AUDI OF
AMERICA, LLC MERCEDES-BENZ USA,
LLC, and DAIMLER AG,

      Defendants.
_____/


REMOTE VIDEOTAPED DEPOSITION OF

SUSAN TERRY-KNAPP

APPEARING REMOTELY FROM DALLAS COUNTY, IOWA
Pages 1 through 279

Friday, September 18, 2020
10:09 a.m. - 6:09 p.m.

Stenographically Reported By:
Denise Sankary, RPR, RMR, CRR

APPEARING REMOTELY FROM PINELLAS COUNTY, FLORIDA

Susan Terry Knapp
September 18, 2020

90 to 93

Page 90

```
1     Q.  Did you do any type of research on the
2  vehicle before you purchased it?
3     A.  Well, I probably looked for the model and
4  what it looked like before I went in to look at
5  them, sure.
6     Q.  Okay.  Would you have done that online?
7     A.  Well, yeah, probably got online to see
8  what the model number was and what the features
9  were.
10    Q.  Okay.  In other words, when you went into
11  the dealership, did you go specifically for an E550,
12  or did you just go into the dealership and say,
13  "Let's see Mercedes what has" kind of thing?
14    A.  I wanted to see the sizes of the
15  convertibles.  I didn't want real small.
16    Q.  Did you look at any other convertibles
17  besides the E -- the Mercedes E550?
18    A.  I think they had a smaller version on
19  the -- on the lot.
20    Q.  You don't recall the model number on that?
21    A.  No.
22    Q.  Okay.  Did you look at any
23  non-Mercedes-Benz vehicles?
24    A.  I don't -- I don't recall.
25    Q.  Okay.  And, again, just to try and jog
```

Page 91

```
1  your memory, in other words, did you go out and look
2  at BMWs or something like that and decided on the
3  Mercedes, or did you plan on buying a Mercedes?
4     A.  I don't recall how that went.  I might
5  have seen one on the road and liked -- liked what I
6  saw and thought it was the size that would
7  accommodate my needs.
8     Q.  Okay.  Going back to the time period when
9  you purchased the 2011 Mercedes, do you know if you
10  went to any other dealerships and looked at any
11  other specific vehicles or makes of vehicles?
12    A.  I can't say that I didn't.  I might have.
13    Q.  Going back to the research question, did
14  you look at anything like Consumer Reports or
15  JD Power and Associates, anything like that?
16    A.  No.
17    Q.  Are you familiar with the acronym NHTSA?
18  Do you know what that is?
19    A.  No.
20    Q.  Okay.  I'll represent to you it's a
21  federal agency named the National Highway Traffic
22  and Safety Administration.
23        Does that ring a bell at all?
24    A.  No.
25    Q.  In purchasing the 2011 Mercedes, would you
```

Page 92

```
1  have gone to NHTSA's website for any reason?
2     A.  No, I won't recall.
3     Q.  You referenced earlier that there was a
4  brochure that you looked at.  Tell me what you
5  recall about reviewing the brochure.  Did you look
6  at it before you made the purchase, as you were
7  making the purchase, anything like that that you
8  recall?
9     A.  I don't recall when I saw -- first saw it.
10    Q.  Did you receive the brochure at the
11  dealership?
12    A.  I'm guessing it was in the car.
13    Q.  Okay.
14    A.  They probably gave me a brochure when I
15  was looking at the different models of convertibles.
16  I might have taken that with me, but I would not --
17  that's something I wouldn't have kept.  I'm -- I'm
18  assuming that the brochure for the car was in the
19  car --
20    Q.  Okay.
21    A.  -- when I purchased it.
22    Q.  By "brochure," you're talking about -- you
23  know, obviously you work in marketing.  You're
24  talking about a marketing piece as opposed to the
25  owner's manual or something like that; is that
```

Page 93

```
1  correct?
2     A.  Right.
3     Q.  Okay.  All right.  But, again, you say
4  that it may have been the car.  Is it possible that
5  you actually purchased the car and then the brochure
6  was in there after you made the purchase?
7     A.  It's possible.
8        MS. BAEZA:  Objection to form.
9  BY MR. ZAGER:
10    Q.  Let's go ahead and grab Exhibit 4, which
11  is the thicker packet of documents that have been
12  produced.  Let's go ahead and go to the documents
13  starting with Knapp 14.  And just let me know when
14  you're there.
15    A.  You're talking to Rosie or myself?
16    Q.  You.
17    A.  Me?  Okay.  All right.
18    Q.  Let me know when you're --
19    A.  What's your question?
20    Q.  Let me know when you're at Knapp 14 of
21  Exhibit 4.
22    A.  Yeah.  Knapp 14?
23    Q.  Yep.
24    A.  Yeah, okay.
25    Q.  Specifically, Knapp 14 through -- the last
```

Susan Terry Knapp
September 18, 2020                                                    98 to 101

Page 98

```
1    from 12:35 p.m to 1:16 p.m.)
2         THE VIDEOGRAPHER:  Okay.  We are now back
3    on the video record at 5:16 p.m. in the UTC
4    time standard.
5    BY MR. ZAGER:
6         Q.  Ms. Knapp, we took a break so that you
7    could take a look at the brochure that's marked as
8    Knapp 14 through 33 in Exhibit 4, and then we also
9    took a meal break.  Did you get a chance to look
10   through the brochure?
11        THE COURT REPORTER:  I'm sorry.  Can we go
12   off the record for one second.
13        MR. ZAGER:  Sure.
14        THE VIDEOGRAPHER:  No problem.  We are now
15   off the record at 5:16 p.m. UTC time.
16        (Recess taken.)
17        THE VIDEOGRAPHER:  Okay.  We are now back
18   on the video record at 5:17 p.m. UTC time
19   standard.
20   BY MR. ZAGER:
21        Q.  Ms. Knapp, we took a short lunch break,
22   and then we also were going to give you some time to
23   take a look at Knapp 14 through 33 in Exhibit 4.
24   Did you get a chance to look through that document?
25        A.  Yes, I looked through it some.
```

Page 99

```
1         Q.  Okay.  Now that you've had a chance to
2    look through it more in detail, can you say whether
3    or not that is the specific version of the brochure
4    that you reviewed around the time that you purchased
5    your Mercedes-Benz E550?
6         A.  I don't think that I can say that it was
7    or it wasn't.  So at this time, I say that I -- it
8    looks like it is.  It looks like what I would
9    review.  But I'm assuming that it is.  But for the
10   record, I can't say yes or no.
11        Q.  Okay.  After taking the time to look
12   through the document, is there any content of the
13   brochure that's been marked as Exhibit Knapp --
14   well, Exhibit 4, Knapp 14 through 33, that you
15   believe is untrue or inaccurate?
16        A.  I don't know that I could say that right
17   away.  I mean, it's advertising.  I'm assuming it's
18   true.
19        Q.  But as we sit here today, there's nothing
20   in there that you believe now was inaccurate or
21   false when it was -- the information was provided to
22   you; is that fair?
23        A.  Well, yeah.  I'm not a judge of that, but
24   I'm assuming that what's in here is correct and
25   true.
```

Page 100

```
1         Q.  Right.  And I appreciate that answer, but
2    my question is a little bit different.
3         Is there anything now when you look at it
4    you go, That's not a true statement; that's a false
5    statement?
6         A.  Maybe you should rephrase that statement.
7         Q.  Sure.  Is there any factual
8    representations in Exhibit 4, specifically Knapp 14
9    through 33, the 2011 brochure, that you believe is
10   factually inaccurate or not true?
11        A.  Actually, I don't think I'm qualified to
12   make a judgment on that.
13        Q.  So there's nothing specifically in there
14   that you --
15        A.  They're talking here about hooking up to
16   your phones and your computers and this and that.
17   You know, I don't know.  Does that work?  I don't
18   know.  I never did that.  So I can't -- I can't make
19   that assumption.
20        Q.  Is there anything about the safety of the
21   vehicle or the airbag system that you believe was
22   untrue?
23        A.  Well, obviously the Takata airbags that
24   are in there are not safe, so that would be untrue.
25        Q.  Okay.  What -- what statement do you see
```

Page 101

```
1    in this brochure about the Takata airbags?
2         A.  I don't know that I saw anything about
3    Takata airbags.  You've asked me the question about
4    the airbags.
5         Q.  And I apologize if my question was
6    unclear.  I'm -- I'm not asking about the Takata
7    airbags, other than just, are they mentioned here
8    after your statement?
9         But taking it back a step, I'm wanting to
10   know if there's anything in here about the safety of
11   the vehicle or the airbag system that you believe is
12   untrue.
13        A.  So I can't -- you know what?  I'm going to
14   have to have a magnifying glass to be able to read
15   this.  And I probably -- a little bit more than 30
16   minutes to eat lunch and read through it.  So I
17   would say that I need to defer on that question --
18        Q.  Okay.  Well --
19        A.  -- or answer to that question.  No?
20        Q.  Well, I mean, unfortunately, we can't
21   really defer.  This is my one opportunity to ask you
22   questions.  Let's approach it this way.
23        You've mentioned that this is small
24   print --
25        A.  Right.
```

Susan Terry Knapp
September 18, 2020                                    102 to 105

Page 102

1    Q.   – and it's difficult to read.
2    A.   It's a copy.
3    Q.   Right.
4    A.   It's difficult to read.
5    Q.   Is it the same size of the brochure?  Is
6  the print the same size as the brochure that you
7  would have seen?
8    A.   Yeah.  I – I – is it the same size?
9  Yeah, if it was – but it's not legible.  Some of
10  this is not legible.
11    Q.   The copy that you have in your file for
12  the 2011 Mercedes, is it more legible than what your
13  counsel provided to us?
14    A.   I don't know if I have this in my file.
15    Q.   I thought earlier you said that you had a
16  copy of the brochure in your file.  Is – am I
17  incorrect on that?
18    A.   Did I say that?
19    Q.   That was my recollection.
20    A.   That I thought I had one?
21    Q.   Yes.
22    A.   Well, I said – I think I said that that
23  would be a brochure that I would have received when
24  I was looking for the car.
25    Q.   Okay.  With respect to your file that you

Page 103

1  kept on your 2011 Mercedes E550 –
2    A.   Right.
3    Q.   – did you keep a copy of the brochure in
4  there?
5    A.   I have to look.  I have not looked.
6    Q.   Okay.
7    A.   I didn't think I was allowed to have
8  notes.
9    Q.   Is your – is your file in your office
10  there in your home?
11    A.   Yes.
12    Q.   Okay.  I'll tell you what.  We will –
13  let's come back to that.  Maybe on a break I'll ask
14  you to look at that and see –
15    A.   Okay.
16    Q.   – if – if the one that you have is –
17  see if you even have it and see if it's a better
18  copy.
19    A.   Okay.  That would be great.  Thank you.
20    Q.   Okay.  We'll come back to that one.
21        In your 2011 E550, did you ever have any
22  type of accidents in that vehicle?
23    A.   No.
24    Q.   Did you ever have any incidents where you
25  bumped something in a parking lot, bumped something

Page 104

1  in the garage, anything like that?
2    A.   No.
3    Q.   Did your airbag ever malfunction in that
4  vehicle?
5    A.   No.
6        We'd have to go – I mean, I would have to
7  be in an accident for that to happen.  I'm assuming,
8  but maybe not.
9    Q.   But your – in other words, your airbag
10  never deployed for no reason, fair?
11    A.   That's correct.
12    Q.   Are you critical of any of the other
13  safety devices in your 2011 Mercedes E550?
14    A.   No.
15    Q.   Going back to when you purchased it – let
16  me see here.
17        Going back to when you purchased the
18  vehicle, you said that your husband was not present
19  when you bought it and you didn't believe that
20  anybody else was.  Did you call anybody or talk to
21  anybody else before you actually made the purchase?
22    A.   I'm sure I talked to him.  I talked to my
23  husband.  I might have asked Mark a question or two
24  about it.  I don't recall.
25    Q.   Okay.  Would that have – would those

Page 105

1  conversations have taken place while you were at the
2  dealership?
3    A.   Not necessarily.
4    Q.   Did you make more than one trip to the
5  dealership as part of this purchase?
6    A.   Yeah, I'm sure I did.
7    Q.   You don't normally just go in and buy it
8  that day?
9    A.   Well, they probably had to order it.
10    Q.   Okay.  You don't believe you bought it off
11  the lot?
12    A.   I – I don't re– I don't recall if I
13  bought it off the lot or if they had to order it.
14  I'm sure I would be very specific about what color
15  of interior I would want, typically.
16    Q.   What color was the exterior?
17    A.   It was like a – oh, the ex– – the
18  interior?
19    Q.   Exterior.
20    A.   White.
21    Q.   What color was the interior?
22    A.   More like a camel color, leather.
23    Q.   When you looked at that particular
24  vehicle, I think you said that you wanted a
25  convertible.  So obviously that was an important

Susan Terry Knapp
September 18, 2020                                    142 to 145

Page 142

1  for me that I -- you know, saved that article
2  because it was frightening.
3      Q.  Okay.  My question is a little bit
4  different.  When did you first learn that there was
5  an issue with the Takata airbags in your 2011 E550?
6  Do you know that date or that approximate time
7  frame?
8      A.  It would -- it would have been when I got
9  something from Mercedes.  One of those two
10 documents.
11     Q.  Okay.
12     A.  But there's a date on one of them.  It was
13 '18, but I read this article in 2016.
14     Q.  Right.  But the article is not talking
15 about a recall on your vehicle, correct?
16     A.  No, but -- but I knew that the Takata
17 airbag was what I had in my Mercedes.
18     Q.  How did you --
19     A.  Okay?
20     Q.  -- learn that there was a Takata airbag in
21 your Mercedes?
22     A.  I don't know.  I don't know.  I don't have
23 that in my file.  I can't tell you that.  I just
24 know that I knew it and that's what -- that was a
25 trigger for me when I saw Takata airbags, to cut the

Page 143

1  article out and keep it.
2      Q.  Okay.  Okay.  We'll -- we'll come back to
3  that.
4          All right.  Did you find any e-mails in
5  your file to Daimler AG, the manufacturer of your
6  car?
7      A.  No.
8      Q.  Did you find any e-mails to Mercedes-Benz
9  USA in your file?
10     A.  No.
11     Q.  Okay.  Did you find any e-mails to the
12 dealership in your file?
13     A.  No.
14     Q.  Okay.
15     A.  Just the note that I gave you.
16     Q.  Okay.  Based on that, you don't believe
17 that you ever sent any e-mails to either Daimler AG,
18 Mercedes-Benz USA, or the dealership?
19     A.  No.
20     Q.  No, you did not?
21     A.  No letters, no.  Just calls.
22     Q.  Did you ever --
23     A.  To the dealership.  Just the calls to the
24 dealership.
25     Q.  And let me -- let me try to shorten this a

Page 144

1  little bit.  All of your communications -- I'm just
2  trying to turn a light on here.
3          All of your communications regarding the
4  Mercedes-Benz airbag and the recall were all with
5  the dealership.  Mercedes-Benz of Des Moines,
6  correct?
7      A.  That's correct.
8      Q.  Okay.  And the only representations that
9  you believe that -- that either Daimler AG or
10 Mercedes-Benz made to you about your vehicle and the
11 airbags would have been the -- the two notices that
12 we've already looked at, correct?
13     A.  Yeah, but that one notice was not from
14 Des Moines.  It was from the vice president of
15 customer service, Mercedes-Benz USA, LLC.
16     Q.  Let's go back and take a look at
17 Exhibit 2, which is your answer to the interrogatory
18 answers.  In Exhibit 2, go to page 4 and
19 specifically Interrogatory Number 4.
20     A.  Page 4.  Where?
21     Q.  Page 4 of Exhibit 2.  And then about the
22 middle of the page, you'll see Interrogatory
23 Number 4.
24          Do you see that?
25     A.  Yes.

Page 145

1      Q.  So it states -- basically, the
2  interrogatory is asking for all communications that
3  you had at any time concerning the subject vehicle,
4  the recall, or any of the allegations in your
5  complaint with either MBUSA, the company I
6  represent, or any authorized dealers or any
7  automotive repair facilities of any kind and then
8  others.
9          And your answer down below, if you see, it
10 says, after the objections, "Plaintiff received the
11 following notices from MBUSA regarding the airbag
12 recall:  Recall notice dated December 2017.  Recall
13 notice dated January 2018."
14          Did I read that correctly?
15     A.  Yes.
16     Q.  Okay.  Set that aside and let's keep it --
17 well, first off, is that interrogatory answer
18 correct?
19     A.  Well, I'm looking at these right here.
20 This is what I have in my file.  I might have sent
21 them something I made a copy of.
22     Q.  What are you talking about?  I'm sorry.
23     A.  I'm assuming that this is my answer here,
24 recall notice, dated December 2017, that I sent them
25 something that they had a -- a date on that.

Page 166

1   Q.  When did you learn about the Takata airbag
2   recall?
3   A.  Sometime before August 2000 – let me go
4   back to your exhibit.  I believe it was in here.
5   Sometime before the Takata truck blew up.  That's in
6   my file.  Oh, here.  Sometime before August 2017.
7   Q.  Earlier when you were looking at your
8   notes, you said that -- it sounds like your first
9   call to Mercedes-Benz of Des Moines about
10  potentially trading in your vehicle --
11  A.  Yeah.
12  Q.  -- and requesting a loaner was in June of
13  2017.  Would it have been around that time that you
14  learned of the recall?
15  A.  No.  I think it was before that.
16  Q.  After you learned of the recall, but
17  before you contacted Mercedes-Benz of Des Moines in
18  June of 2017, did you do anything else regarding the
19  recall before you called Mercedes-Benz of
20  Des Moines?
21  A.  What is the dates you're speaking of?
22  Q.  I'm sorry.  That was a bad question.  Let
23  me rephrase it.
24  A.  Okay.
25  Q.  So we've talked about how you spoke to

Page 167

1   Mr. Cushinon in June of 2017.
2   A.  Right.
3   Q.  He was the general manager at
4   Mercedes-Benz of Des Moines.  You're saying you
5   believe you learned about the recall of the Takata
6   airbags at some point prior to your call with
7   Mr. Cushinon, correct?
8   A.  Yes, that's correct.
9   Q.  But you don't recall specifically what it
10  was that you received or how you learned about it;
11  is that fair?
12  A.  No.  I have – I had a letter that I was
13  looking for an attorney or someone that could help
14  me with this problem that I was having.
15  Q.  What's the date of the letter?
16  A.  The date of the letter – it's an e-mail
17  from him was --
18  MS. BAEZA:  Objection.  Privileged.
19  You can answer the date.  That's fine.
20  BY MR. ZAGER:
21  Q.  That was the question.  What's the date?
22  Go ahead.
23  A.  June 19, 2017.
24  Q.  Okay.  So that is the exact same day that
25  you spoke to Mr. Cushinon at Mercedes-Benz?

Page 168

1   A.  At his advice, yes.
2   Q.  Okay.  So I guess I'm trying to understand
3   when you learned about the recall.
4   A.  I can't tell you that.  I really don't.
5   It's very vague.  It's before August 2017.
6   Q.  Okay.
7   A.  Other than that, I can't give you a date.
8   Q.  Okay.  After you learned of the recall,
9   did you contact anybody at Mercedes-Benz USA?
10  A.  No, I did not.
11  Q.  Did you contact anybody at Daimler?
12  A.  No.  I never dealt with them before.
13  Q.  Okay.
14  A.  I felt no need to.
15  Q.  Okay.  Other than these attorneys that you
16  spoke to, was there anybody else that you called
17  about the recall except for the dealership,
18  Mercedes-Benz of Des Moines?
19  A.  No.
20  Q.  So let's -- let's talk about this timeline
21  a little bit more.  So you said that you would have
22  learned about the recall at some point prior to
23  August of 2017, correct?
24  A.  Yes.
25  Q.  Okay.  When did you trade in your 2011

Page 169

1   Mercedes E550 on the Land -- on the Land Rover that
2   you bought?
3   A.  Okay.  That was 2018, I believe.  Yeah –
4   wait a second.  2019.
5   Q.  Okay.  Actually, let's -- let's do this.
6   Why don't you grab Exhibit 4.
7   A.  Yeah.
8   Q.  Actually, I'm sorry.  I told you the wrong
9   exhibit.
10  A.  Okay.
11  Q.  Grab Exhibit 5, which is the Motor Vehicle
12  Purchase Agreement with Willis Auto Campus.
13  A.  Okay.
14  Q.  Do you have that in front of you?
15  A.  Yes, I do.
16  Q.  Okay.  The top left right under "Willis
17  Auto Campus," there's a date there that says 11/1 of
18  2017, correct?
19  A.  Yes.
20  Q.  Okay.  So you would have traded in your --
21  your 2011 Mercedes-Benz E550 on the Land Rover on
22  November 1, 2017, correct?
23  A.  Right.
24  Q.  Okay.  So going back to the timeline, if
25  you learned about the recall at some point before

Page 174

1    A.  Oh, okay.  Okay.
2    Q.  Let's go back.  Let's -- again, this is
3  important.  I want to make sure we have a clear
4  timeline here.
5        According -- according to Exhibit 5 --
6    A.  Because --
7        THE COURT REPORTER:  One at a time.
8  BY MR. ZAGER:
9    Q.  According to Exhibit 5, the date that you
10  sold your 2011 Mercedes and purchased your 2018 Land
11  Rover was November 1, 2017, correct?
12    A.  That's what it says here.
13    Q.  Okay.  Now, let's go to Exhibit 2, your
14  answer, verified answer to Interrogatory Number 4.
15    A.  Okay.
16    Q.  The first recall notice that you received
17  is dated December of 2017, correct?
18    A.  Yes, that was postmarked by that.  That's
19  what it says is.
20    Q.  Okay.  So you would have sold your vehicle
21  approximately one month before you received the
22  recall notice in December of 2017, correct?
23    A.  That's not correct.  That's not correct.
24  There's something askew here because that's not
25  right.

Page 175

1    Q.  Do you have any documents showing that you
2  received notice of a recall prior to December of
3  2017?
4    A.  The only documents I have in my file are
5  the ones that you showed in your exhibits today.
6    Q.  And to be clear --
7    A.  I know it's not dated.
8    Q.  Right.  And to be clear, the documents we
9  just looked at, Exhibit 2 and Exhibit 5, both came
10  from your counsel.  This is nothing that Mercedes
11  put together.  You understand that?
12    A.  I do now that you told me that.  I had
13  notice before I sold the convertible.  It parked for
14  a year.
15    Q.  What year was it --
16    A.  Parked it for a year.
17    Q.  What -- what time frame was it parked?
18    A.  Sir --
19    Q.  Yeah?
20    A.  -- it was parked for a year before I sold
21  it.
22    Q.  Okay.  When did you park the vehicle?
23    A.  Okay.  I'm having a problem with these
24  dates, okay?  So I've got to look at this over
25  again.  So you're going to need to give me a few

Page 176

1  minutes.
2    Q.  Okay.  Do you want to go off the record?
3    A.  So I figure out why this time frame is
4  off.
5    Q.  Okay.  Let's --
6    A.  Okay?
7    Q.  You know, it's important to get accurate
8  information.  If you want to go off the record, we
9  can -- we can do that so you can take a look at that
10  information.
11    A.  Yeah, that would be good.
12        THE VIDEOGRAPHER:  We are now off the
13  video record at 7:39 p.m. in the UTC time
14  standard.
15        (Recess taken.)
16        THE VIDEOGRAPHER:  We are now back on the
17  video record at 7:45 pm. UTC time standard.
18        Go ahead.
19    A.  Okay.  So I purchased this Range Rover in
20  November of 2017.  The Mercedes -- I still had the
21  Mercedes convertible.  I don't believe that I traded
22  that in for the Range Rover.
23        Do we have something on that?
24  BY MR. ZAGER:
25    Q.  Let's go ahead and -- okay.  Let's take a

Page 177

1  look at Exhibit 5.
2    A.  Okay, Exhibit 5.
3    Q.  Yeah.  It says "Willis Auto Campus" at the
4  top left-hand corner.
5    A.  Okay, hold on.  Exhibit 2.
6        Okay, yeah, right.
7    Q.  Again, it's dated November 1, 2017,
8  correct?
9    A.  Right.
10    Q.  Go down, basically, a column, there's a
11  word that says "trade-in."
12        Do you see that?
13    A.  Yeah.
14    Q.  There's 2011 --
15    A.  Yeah.
16    Q.  -- Mercedes-Benz, correct?
17    A.  Yep.
18    Q.  E-Class, two-door --
19    A.  That's when we traded it in.  Okay.  Got
20  it.
21    Q.  It also lists the last four on the VIN as
22  0145, correct?
23    A.  Yeah, that's it.  That is it.
24    Q.  Okay.
25    A.  Okay.

Page 178

1    Q.  So in Exhibit 5 confirms you traded in
2  your 2011 Mercedes on November 1, 2017, correct?
3    A.  Right.
4    Q.  The first recall notice that you received
5  was December of 2017.  And that answer is reflected
6  in Exhibit 2, your answer verified by you, dated
7  December of 2017, correct?
8    A.  Okay.  That's the one that is
9  questionable, that date of 2017.  There's two
10  notices that we have.  One that was dated January of
11  2018, right?
12    Q.  Yep.
13    A.  And the other one didn't have a date on
14  it.
15    Q.  Correct.
16    A.  Okay.
17    Q.  But the one that's dated January -- let's
18  look at them.
19      The one that is dated January of 2018,
20  specifically Knapp 12 in Exhibit 4, says that you
21  were previously sent something in December of 2017,
22  correct?
23    A.  What page is that on?
24    Q.  Knapp 12 of Exhibit 4.
25    A.  Okay.  Yes.  That's the one that's

Page 179

1  January 2018, right?  That says they previously had
2  sent me a notice.
3    Q.  Right.  It's dated --
4    A.  "In December 2017, we sent you a notice."
5  Okay.
6    Q.  Right.  And the only other notice that you
7  have that could be the notice from December 2017 is
8  Knapp 11, correct?
9    A.  That's the only ones that I have in my
10  file.
11    Q.  Let's -- okay.
12      When you received -- well, strike that.
13      So by the time you received the notice
14  from Mercedes-Benz stating that your airbag had been
15  recalled, you no longer owned it, correct?
16    A.  I knew it before I received the notice.
17    Q.  Okay.
18    A.  The notices that we have in this file is
19  what you're referencing.  There had to be other
20  notices.  I parked the car for a year.
21    Q.  Okay.  What date did you park the car?
22    A.  Well, I traded it in in November of 2017,
23  it probably was in 2016.
24    Q.  Do you have any written record stating
25  that you parked the car starting sometime in 2016?

Page 180

1    A.  No, I don't have a written record.  Let me
2  see here.  Hold on.
3      I have a letter that I wrote to an
4  attorney in June of 2017 stating that --
5      MS. BAEZA:  Ms. Knapp --
6    A.  -- I can't --
7      MS. BAEZA:  -- don't speak about the
8  substance of the letter, please.
9  BY MR. ZAGER:
10    Q.  All right.  So with respect to your claim
11  that you parked the car in 2016, though, you do not
12  have any written record that you actually parked it
13  then, correct?
14    A.  I'm looking here.
15      I don't have a written record that I had
16  it parked for a year.
17    Q.  You don't have any type of letter that you
18  wrote to the dealership or to Mercedes-Benz saying,
19  I've -- I had to park my car, do you?
20    A.  I don't have anything written that says I
21  parked my car.
22    Q.  I understand your claim that you learned
23  sometime in 2016 about the recall, but you don't
24  know where you saw it or how you learned of it,
25  correct?

Page 181

1    A.  That's correct.
2    Q.  The letter that you were just looking at
3  to the attorney from June of 2017, did that refresh
4  your recollection on the time period when you may
5  have at least known about the recall before receipt?
6    A.  I have a -- I have a statement in there
7  saying that I had received a letter last year before
8  August.
9      MS. BAEZA:  Ms. Knapp, don't speak to the
10  substance of it.
11      Objection.  Privileged.
12  BY MR. ZAGER:
13    Q.  Do you know who would have sent you the
14  letter that you received?
15    A.  I would have assumed it would have been
16  Mercedes.
17    Q.  Just to be clear, earlier we talked about
18  the Takata documents that you had.  The first one of
19  those that you received was in November of 2017 as
20  well, correct?
21    A.  Say that again.
22      MS. BAEZA:  Objection to form.
23    A.  I'm sorry.
24  BY MR. ZAGER:
25    Q.  Sure.  The first bankruptcy notice

Susan Terry Knapp
September 18, 2020                                                    182 to 185

Page 182

1 regarding Takata that you received was dated
2 November 27, 2017, correct?
3     A.  Is it on the record?
4     Q.  It will be on the record, but if you can
5 confirm.
6     A.  Do we have an exhibit of that in here?
7     Q.  It wasn't an exhibit.  It was part of your
8 file.  You pulled out some documents from Takata,
9 and I said to put those aside because we would come
10 back to them.
11    A.  Okay.  It may be here.
12        This is on the bankruptcy?
13    Q.  Yes.
14    A.  It has a date here of 11/27/17 on one of
15 them.  Is that what you're talking about?
16    Q.  Yeah.  That would have -- you would have
17 received that bankruptcy notification after you sold
18 the 2011 Mercedes --
19    A.  Yes.  Okay.
20    Q.  -- correct?
21    A.  Correct.
22    Q.  Tell me what you recall about trading in
23 your 2011 Mercedes to Willis?
24    A.  What I recall about it?
25    Q.  Yep.

Page 183

1     A.  Well, we looked -- I had a Range Rover
2 that we wanted to buy, and I had my -- we took in a
3 Range Rover or the Mercedes to them to give me a
4 price of what they would give me for trade-in.
5     Q.  Earlier you said that you normally have
6 one of your, either somebody that works in your
7 office or the -- or the gentleman who works at the
8 ranch, Mr. Schroeder, pull up a Blue Book number on
9 the value of the car that you want to trade in; is
10 that correct?
11    A.  Sometimes he does that, yes.  It's
12 Schroeder.  It's S-C-H-R-O-E-D-E-R.
13    Q.  With respect to the 2011 Mercedes-Benz
14 that you traded to Willis Auto Campus, did any of
15 your people pull for you the Blue Book value of it?
16    A.  I can't tell you that they did that.
17    Q.  Before you --
18    A.  I'm guessing maybe.
19    Q.  Okay.  Before you traded in your 2011, did
20 you do anything to determine the value that you
21 wanted to get out of it when you traded it in?
22    A.  No.  I was just not going to be driving
23 it, so I traded it in.  I was -- I was prepared to
24 take a loss on it.
25    Q.  Even though it was not under recall at the

Page 184

1 time, you were prepared to take a loss?
2     A.  It was under recall.  I had information
3 that it was under recall.  I do not have anything in
4 here to substantiate that, but I'm telling you I
5 knew there was a recall.
6     Q.  Okay.  Who did you deal with at Willis
7 Auto Campus?
8     A.  I can't tell you his name.
9     Q.  Okay.  Does the name David Baum sound
10 familiar?
11    A.  Uh-huh, it does.
12    Q.  Okay.  When you were dealing with the
13 person at Willis Auto Campus, potentially Mr. Baum,
14 did you have any discussion about the airbags in
15 your 2011 Mercedes that you were going to trade in?
16    A.  No.
17    Q.  All right.  So the airbags just never came
18 up as part of the trade-in process; is that fair?
19    A.  That's fair.
20    Q.  Did the dealership do any type of
21 inspection of the vehicle before they agreed to buy
22 it?
23    A.  Yes.
24    Q.  What did -- do you know what they did?
25    A.  I read something in here that they had

Page 185

1 looked at it.  They evaluated what the value was
2 going to be.  It was taken in to them to do that.
3     Q.  At any point in time did anyone from
4 Willis Auto Campus claim or tell you that the
5 Mercedes that you were going to trade in, the 2011,
6 was subject to a recall?
7     A.  No.
8     Q.  So when you were trading in the vehicle,
9 there was no discussion of the airbags, correct?
10    A.  That's correct.
11    Q.  When you traded in the 2011 Mercedes,
12 there was no discussion about a recall on the -- on
13 the vehicle, correct?
14    A.  Correct.  Not to my recollection.
15    Q.  Okay.  Looking at Exhibit 5, which is the
16 trade-in document, when you go down to the bottom,
17 is that your signature on Knapp 35?
18    A.  Okay.  Hold on.  I got 2 here.  I got 4,
19 2, 3, 5.  Okay.  On the first page?
20    Q.  It's probably the second page.  It's
21 actually Knapp 35, which is the full-page document.
22    A.  Okay.
23    Q.  Is that your signature at the bottom?
24    A.  Yes, it is.
25    Q.  Okay.  If you go up above, there's a text

Susan Terry Knapp
September 18, 2020
186 to 189

Page 186

1 box that says, "Buyer's Trade-In Certification."
2  A. Okay.
3  Q. The copy that you guys all provided us is
4 not very good. Are you able to read that?
5  A. Barely.
6  Q. Okay. Let's try this. I'll tell you what
7 I'm going to do. I'm going to -- are you -- on --
8 on your -- are you using a computer?
9  A. Yes.
10  Q. Do you have a full-sized screen?
11  A. Yes.
12  Q. Okay. Are you looking at me on your
13 screen?
14  A. I'm looking at -- yeah. You're at the
15 top, you and Rosie.
16  Q. Okay. Let's -- I'm going to share my
17 screen, and I think I may be able to show you a
18 better version.
19  A. Okay. Oh, yeah, that's better.
20  MR. ZAGER: Mr. Videographer, are you able
21 to zoom in on the document itself?
22  THE VIDEOGRAPHER: No, unfortunately, I'm
23 not able to.
24  MR. ZAGER: Okay.
25

Page 187

1 BY MR. ZAGER:
2  Q. Ms. Knapp, are you able to see where it
3 says, "Buyer's Trade-In Certification," on
4 Exhibit 5?
5  A. I can see part of it. I got -- I got --
6 how do I get rid of this? Over here, I think.
7  Can I move it over?
8  What -- can you read it to us?
9  Q. I can, but I want you to be able to follow
10 along. Can you --
11  A. I can follow most of it. Part of it is
12 chopped off on the right-hand side.
13  Q. Okay. What we're going to be looking at
14 is in this buyer's trade-in certification on
15 Knapp 35, which is part of Exhibit 5, we're going to
16 read paragraph -- well, first we're going to read
17 the top.
18  It says, "If you are trading in a vehicle,
19 you certify the following."
20  Did I read that correctly?
21  A. Yep.
22  Q. Let's go down to paragraph Number 2, "That
23 the airbags are intact and in working order."
24  Did I read that correctly?
25  A. You did.

Page 188

1  Q. After you received the recall
2 notifications either in December of 2017 or January
3 of 2018, did you ever call Willis Auto Campus and
4 let them know that there was a recall on the vehicle
5 that you had traded in?
6  A. No.
7  Q. So you never -- while you owned the
8 vehicle, you never replaced the airbag in your
9 vehicle; is that correct?
10  A. I couldn't get it replaced. I tried.
11  Q. But while you owned it, they never
12 performed the recall and replaced the airbag; fair?
13  A. Correct.
14  Q. Do you understand that some of the other
15 potential class members would have actually had the
16 airbags in their vehicles replaced?
17  A. That would have been nice.
18  Q. Okay. But do you understand that some of
19 the other potential class members are going to be in
20 a different position than you in that they were able
21 to get their airbags replaced and, in fact, did so?
22  MS. BAEZA: Objection to form.
23 BY MR. ZAGER:
24  Q. You can answer.
25  A. Repeat that question.

Page 189

1  Q. Sure. Do you understand or do you agree
2 that other potential class members have actually
3 replaced the airbags in their vehicles and others
4 may have not?
5  A. Okay.
6  MS. BAEZA: Objection.
7  A. I would agree with that.
8 BY MR. ZAGER:
9  Q. Okay. I know the answer to this, but I'm
10 going to -- I'm going to have to ask it. At any
11 point in time, did you perform any repairs or
12 service on your own vehicle?
13  A. No.
14  Q. You don't change your own oil?
15  A. No.
16  Q. While you owned your 2011 Mercedes, did
17 you ever have any performance issue with the airbag?
18  A. I never had an accident, so no. It never
19 went off. So, no, I did not.
20  Q. Did you ever have any warning lights that
21 appeared on your -- on your display about the
22 airbag?
23  A. No.
24  Q. Do you recall, did you ever have any
25 service performed on the vehicle -- strike that.

Page 218

1    A. I have heard that several have them.
2    Q. If you would not have bought the 2011
3 Mercedes, do you know what vehicle you would have
4 bought?
5    A. Speculating, no, I don't know. I -- I --
6 I don't -- I liked that one, so -- wait. In 2011?
7 Say again.
8    Q. Yeah. If you wouldn't have bought the
9 2011 --
10    A. Right.
11    Q. -- because you knew there was -- you knew
12 there was an issue with the airbag --
13    A. Right.
14    Q. -- or you believe there was an issue with
15 the airbag, what vehicle would you have bought?
16    A. I would have probably -- I don't know.
17 Maybe a -- I liked having those four seats because I
18 had grandkids. You can get four people in there. I
19 would have to find something with four seats in it.
20    Q. But as far as another make or model, you
21 just don't know; fair?
22    A. Just -- no. No. Mustang even, you know.
23 I wanted a convertible, and I wanted something that
24 I can get my kids in the back seat.
25    Q. Okay. Let's go to page -- page 9 and 10

Page 219

1 of Exhibit 7. Paragraphs 36 and 37 of Exhibit 7
2 essentially allege that the plaintiffs and proposed
3 class members suffered out-of-pocket expenses.
4       Did you suffer any out-of-pocket expenses?
5    A. Myself?
6    Q. Yes.
7    A. Well, I think I probably did when I traded
8 it in.
9    Q. Well --
10    A. I think I would have --
11    Q. We've talked about the diminished value.
12    A. Yeah.
13    Q. This is a little bit different. In other
14 words --
15    A. No, I didn't have to rent another car
16 because I didn't have a car to drive. That was not
17 my case.
18    Q. Okay. So to the extent that there were
19 other class members or potential class members that
20 had out-of-pocket expenses, they're different than
21 you because you did not have any; is that fair?
22    MS. BAEZA: Objection to form.
23    A. That's fair.
24    MS. BAEZA: You can answer.
25    A. Yeah, that's -- that's a fair statement.

Page 220

1 BY MR. ZAGER:
2    Q. Okay. I think we're done with this. If
3 we have something else, I'll let you know, but I
4 think we're done with that.
5       So when was the first time that you
6 considered bringing a lawsuit against Mercedes-Benz?
7    A. You know, I can't tell you the answer to
8 that. I'm guessing that I've read something about
9 it.
10    Q. Do you know what you read?
11    A. I might have -- might have gotten a -- I
12 might have gotten an invitation to join the class
13 action suit.
14    Q. Was the invitation from an attorney that
15 was wanting to file the class action lawsuit?
16    A. I don't know that. I really don't know
17 that.
18    Q. Well --
19    A. Because -- yeah.
20    Q. -- I mean, you're sitting here as a class
21 representative.
22    A. I -- no. I wrote a letter to my friend to
23 talk about the airbags. I was having issues with
24 it, and she sent me to an attorney who was actually
25 working on the Takata airbag situation, okay? So my

Page 221

1 contacts with him was probably my first contact to
2 know that there was something going on in the way of
3 a lawsuit.
4    Q. Was that the name of the attorney that you
5 didn't recall, or what was that attorney's name?
6    A. I have his name in my file.
7    Q. Okay. Was that Mr. -- was it Gegner --
8 no. I'm sorry. That was your husband. I
9 apologize.
10    A. That was a husband.
11    Q. Okay. So the husband -- I'm sorry.
12    A. The -- strike that. It's a long day.
13       The attorney that you were sent to that
14 was involved in the Takata lawsuit, as you sit here
15 right now, you don't recall his name; fair?
16    A. No, I do not recall his name.
17    Q. Okay. Were you involved in bringing
18 individuals together for this lawsuit, class
19 members?
20    A. No.
21    Q. Okay. Had you been involved in any
22 meetings or discussions with other potential class
23 members or other people about filing this lawsuit
24 other than your counsel?
25    A. No.

Page 238

1 interrogatories.
2    A.  Sorry.
3    Q.  No problem.
4    A.  The dog was crying.
5       Exhibit 2?
6    Q.  Yes.
7    A.  Yep.  Okay.
8    Q.  Let's take a look at Interrogatory
9 Number 2, which is down at the bottom of page 3 and
10 carries over to page 4.
11   A.  Okay.
12   Q.  Your answer there says, "Plaintiff
13 reviewed all documents provided to plaintiff by the
14 dealer.  However, plaintiff does not recall what
15 these documents were."
16      Obviously, there would have been the
17 contracts for the -- for the sale.  Was there any
18 other type of document that you could think of that
19 you reviewed during the sale -- during the purchase
20 besides just the contract?
21   A.  Okay.  Okay.  Of the Mercedes E550?
22   Q.  Yeah.  When you're buying your -- yeah,
23 correct.
24   A.  And the question is?
25   Q.  Just where you say that you reviewed all

Page 239

1 documents provided to you by the dealer, I'm just
2 trying to -- and maybe you don't recall specific
3 documents.  I'm just trying to understand that --
4 have we looked at all of them?  Is there anything
5 else that you can think of that we have not seen?
6    A.  I don't -- I don't think so.  I think
7 we've seen --
8    Q.  Okay.
9    A.  -- everything that I've -- yes.
10   Q.  Okay.  You think we would have seen
11 everything that you reviewed in buying it, okay.
12      The next sentence says, "In addition,
13 Plaintiff recalls reviewing and hearing commercials
14 through the radio, television, and Internet that
15 touted the safety and dependability of the subject
16 vehicle and MBUSA vehicles in general but does not
17 recall the specific commercials."
18      Tell me what you recall about any
19 commercials that you would have seen from
20 Mercedes-Benz or marketing materials you would have
21 seen from Mercedes-Benz before you bought your 2011
22 E550.
23   A.  I can't -- I can't specifically tell you
24 what that would have been.
25   Q.  Okay.  Interrogatory Number 4, I know

Page 240

1 we've talked about it a couple of times.  But it
2 asks about all communications.  We've certainly
3 talked about the two recall notices there.  We
4 talked about your discussion with Mr. Boyd.  We
5 talked --
6    A.  Right.
7    Q.  We talked about your discussion with
8 Mr. Boyd and --
9       THE COURT REPORTER:  I'm sorry.  I didn't
10 hear you.
11      MR. ZAGER:  What?
12      THE COURT REPORTER:  I didn't hear you.
13 BY MR. ZAGER:
14   Q.  Okay.  Let me -- I'll start from the
15 beginning.  Let me move over here.
16      Looking at your answer to Interrogatory
17 Number 4 --
18   A.  Right.
19   Q.  -- we've already talked about the recall
20 notices.  We've also talked about your discussion or
21 leaving a message for Mr. Boyd.  We talked about
22 your discussion and leaving messages for the other
23 gentleman as well.  I know his first name was Aaron.
24 I'm drawing a blank on his last name now.
25      Are there any other communications that

Page 241

1 you're aware of with anybody about the recall
2 besides those communications that we've already
3 talked about?
4    A.  Well, like I said before, I knew about the
5 recall before December 2017.  I have --
6    Q.  But you've also explained before that you
7 don't know how you knew about it, correct?
8    A.  I do not know how I knew about it.  No, I
9 do not.
10   Q.  But other than the communications that I
11 just went through, the two recall notices and your
12 discussions with Mr. Boyd and Aaron at Mercedes-Benz
13 of Des Moines, is there any other discussions that
14 you could recall as you sit here today?
15   A.  Just the -- the information -- or the
16 correspondence between myself and an attorney in --
17 that was in June of 2017.
18   Q.  Okay.  What was that attorney's name
19 again?  Just --
20   A.  David Stellings.
21      THE COURT REPORTER:  David?
22      THE WITNESS:  Stellings,
23 S-T-E-L-L-I-N-G-S.
24 BY MR. ZAGER:
25   Q.  Okay.  Let's go to Interrogatory

Page 274

1    MS. BAEZA: Yes.
2    MR. ZAGER: Okay.
3    THE VIDEOGRAPHER: Going -- go ahead.
4    MR. ZAGER: Just one second.
5    For the record, we have marked Exhibits 1
6    through 7, and those have been uploaded to the
7    box, so they should be available for the
8    record. If there's any issue with that, please
9    let me know.
10   MS. BAEZA: Okay. I'm going to go --
11   THE VIDEOGRAPHER: And before I take us --
12   before I take us off the video record, I do
13   need each counsel to state whether or not
14   they're going to be ordering the transcript
15   and/or video for this deposition today.
16   MR. ZAGER: Jason Zager for Mercedes-Benz,
17   we will be ordering the transcript. And I
18   would have assumed that we had a standing
19   order, so I can't say about the video right
20   now.
21   THE VIDEOGRAPHER: No problem.
22   Ms. Baeza?
23   MS. BAEZA: Yes, we will be ordering as
24   well. Can we also have the rough, please?
25   THE VIDEOGRAPHER: Okay. I will take us

Page 275

1    off.
2    And the -- oh, sorry, and the video,
3    Ms. Baeza? Same thing, you would like the
4    video or hold off on that?
5    MS. BAEZA: Yes.
6    THE VIDEOGRAPHER: No problem.
7    Okay. I'll take us off now.
8    We're now off the record at 10:09 p.m. in
9    the UTC time standard.
10   (The proceedings concluded at 6:09 p.m.)
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 276

1
2
3            CERTIFICATE OF OATH
4
5
6    STATE OF IOWA
7    COUNTY OF DALLAS
8
9
10   I, the undersigned authority, certify
11   that SUSAN TERRY-KNAPP personally appeared before
12   me and was duly sworn on the 18th day of
13   September, 2020.
14   Signed this 1st day of October, 2020.
15
16
17   _____
     DENISE SANKARY, RPR, RMR, CRR
18   Notary Public, State of Florida
     My Commission No. GG 944837
19   Expires: 1/27/24
20
21
22
23
24
25

Page 277

1            CERTIFICATE OF REPORTER
2
3    STATE OF FLORIDA
4    COUNTY OF PINELLAS
5
6    I, DENISE SANKARY, Registered Merit
7    Reporter, do hereby certify that I was authorized
8    to and did stenographically report the foregoing
9    remote videotaped deposition of SUSAN
10   TERRY-KNAPP; pages 1 through 275; that a review
11   of the transcript was requested; and that the
12   transcript is a true record of my stenographic
13   notes.
14   I FURTHER CERTIFY that I am not a
15   relative, employee, attorney, or counsel of any
16   of the parties, nor am I a relative or employee
17   of any of the parties' attorneys or counsel
18   connected with the action, nor am I financially
19   interested in the action.
20   Dated this 1st day of October, 2020.
21
22   _____
     DENISE SANKARY, RPR, RMR, CRR
23
24
25

Page 278

1          WITNESS NOTIFICATION LETTER
2    DATE:    October 1, 2020
3    TO:     Susan Terry-Knapp
             c/o Rossana Baeza, Esquire
4         BOIES SCHILLER FLEXNER, LLP
          100 SE 2nd Street, Suite 2800
5         Miami, Florida 33131
6
7    IN RE: Takata Airbag Products Liability Litigation
          Video Deposition taken on September 18, 2020
8         U.S. Legal Support Job No. 2246781
9
10   The transcript of the above-referenced proceeding
     has been prepared and is being provided to your
11   office for review by the witness.
12   We respectfully request that the witness complete
     their review within 30 days and return the errata
13   sheet to our office at the below address or via
     email to:  southeastproduction@uslegalsupport.com.
14
15   Sincerely,
16
17   DENISE SANKARY, RPR, RMR, CRR
18   U.S. Legal Support, Inc.
     700 East Dania Beach Boulevard
19   First Floor
     Dania Beach, Florida 33004
20   813-876-4722
     southeastproduction@uslegalsupport.com
21
22   CC via transcript:
23   Jason Zager, Esquire
24
25

Page 279

        ERRATA SHEET

     DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

In Re:  TAKATA AIRBAG PRODUCTS LIABILITY LITIGATION

        Case No.:  15-MD-02599-FAM

        SUSAN TERRY-KNAPP

        September 18, 2020

PAGE  LINE      CHANGE          REASON
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

Under penalties of perjury, I declare that I have

read the foregoing document and that the facts

stated in it are true.

_____     _____
Date            SUSAN TERRY-KNAPP