# Exhibit 35

Paulette Calhoun
September 24, 2020

```
 1                UNITED STATES DISTRICT COURT
                  SOUTHERN DISTRICT OF FLORIDA
 2                       Miami Division

 3
      IN RE:  TAKATA AIRBAG PRODUCTS   MDL No. 2599
 4    LIABILITY LITIGATION             Master File No.
                                       15-MD-02599-FAM
 5    THIS DOCUMENT RELATES TO:        S.D. Fla. Case No.
      ECONOMIC LOSS TRACK CASES        14-CV-24009-FAM
 6
      and
 7
      STEPHANIE PUHALLA, et al.,
 8    individually and on behalf of
      all others similarly situated,
 9
                         Plaintiffs,
10
      vs.
11
      VOLKSWAGEN AKTIENGESELLSCHAFT,
12    VOLKSWAGEN GROUP OF AMERICA,
      AUDI AKTIENGESELLSCHAFT, AUDI
13    OF AMERICA, LLC, MERCEDES-BENZ
      USA, LLC, and DAIMLER AG,
14
                         Defendants.
15
_____
16

17
      REMOTE VIDEOTAPED          PAULETTE CALHOUN
18    DEPOSITION OF:

19    DATE TAKEN:                September 24, 2020

20    TIME:                      9:00 a.m. to 4:56 p.m.

21    PLACE:                     Witness appeared remotely from
                                 Fulton County, Georgia
22
      BEHALF OF:                 The Defendant(s)
23
      REPORTER:                  Michelle R. Hordinski, RMR,
24                               CRR, appearing remotely from
                                 Lee County, Florida
25
```

Paulette Calhoun
September 24, 2020                                      45

```
 1    time that you remember?
 2         A.    I remember one just back in 2019.
 3         Q.    Was that an accident involving the 2011
 4    vehicle we're here to talk about today?
 5         A.    Yes, it was an accident.  I was involved in a
 6    car crash where I was hit from behind.
 7         Q.    And where did you file the lawsuit that
 8    followed the 2019 accident?
 9         A.    I filed it in the state of Georgia, I guess,
10    through my attorney.
11         Q.    What is your attorney's name?
12         A.    Robert Akomah.
13         Q.    Can you please spell the last name?
14         A.    A-K-O-M-A-H.  A as in apple, K as in Kevin, O
15    as in Oscar, M as in mother, A as in apple, H as in
16    Harry.
17         Q.    Thank you.  We'll talk more about that later.
18               One thing I do want to ask you now is, is that
19    lawsuit still ongoing?
20         A.    No.
21         Q.    Was the lawsuit settled?
22         A.    Yes, it was.
23         Q.    And who was the defendant in that lawsuit?
24    Who did you sue?
25         A.    USAA.  That was the other insured's -- other
```

Paulette Calhoun
September 24, 2020                                    60

1          Q.   My notes indicate that in 2004 you bought a
2    1999 CL500, correct?
3          A.   That is correct.
4          Q.   In 2015 you bought your first 2011 C300,
5    right?
6          A.   That's correct.
7          Q.   And then in 2019 you bought your second 2011
8    C300, right?
9          A.   That is correct.
10         Q.   And when I made reference to a 2017 purchase,
11   I was mistaken, and what I meant was the 2019 purchase
12   of the second 2011 C300, okay?
13         A.   Okay.  That is correct.
14         Q.   When -- before we broke, Ms. Calhoun, we were
15   talking about the purchase of the second 2011 C300, and
16   I believe you told me that the person that sold the
17   vehicle to you was a gentleman by the name of Bobby
18   Scott; is that correct?
19         A.   That is incorrect.  His name is Bobby F.,
20   initial, Coates, C-O-A-T-E-S, Bobby with a Y.
21         Q.   Thank you.
22         A.   Okay.
23         Q.   How did you learn that this vehicle was for
24   sale at this time?
25         A.   I think I got him on Auto Trader.  I got him

Paulette Calhoun
September 24, 2020                                    66

1     Q.    Where did you take the vehicle to have the

2     airbag replaced?

3     A.    Mercedes-Benz of Marietta.

4     Q.    Now, this vehicle that we're talking about,

5     the two thousand -- the second 2011 vehicle is not part

6     of this lawsuit, right?

7     A.    No, it is not.

8     Q.    Did you maintain records of the repair and

9     service work in connection with the replacement of the

10    airbags on this second 2011 vehicle?

11    A.    I have them, yes.

12    Q.    At the time that you purchased the vehicle --

13    I'm sorry, Ms. Calhoun.  Are you ready to proceed?

14    A.    Yeah, I am.  I just -- somebody went by the

15    window.  I'm sorry.

16    Q.    That's okay.  I just want to make sure you're

17    okay to continue.

18    A.    Yes, sir, I am.  It was just a delivery guy

19    came over and dropped off a bag.  He was sitting in the

20    window.  I'm sorry.

21    Q.    At the time that you purchased the second 2011

22    vehicle, did you know that the airbags in the vehicle

23    were manufactured by Takata?

24    A.    I knew that there was a recall on airbags.  Do

25    you know what I'm saying?  And I'm pretty sure that

Paulette Calhoun
September 24, 2020                                67

```
 1   Takata -- you know, because I'm not too familiar with
 2   airbags, but whatever recall it was, I -- it took them
 3   so long to get the airbag that I think I just assumed
 4   that it was done or something like that until I got a
 5   letter saying, come in and get it done, so -- just
 6   thinking back.
 7        Q.   Did Mr. Coates tell you that the vehicle was
 8   subject to a Takata airbag recall?
 9        A.   I can't remember him telling me that, but
10   because I had one previously, I kind of looked it up,
11   you know, to see.
12             (A discussion was had off the record.)
13             THE WITNESS:  When I purchased the vehicle, I
14        didn't ask him, and I don't think he even mentioned
15        it.  But, you know, just being familiar with the
16        2011 and the recall on the airbag, it was just
17        something that -- it wasn't something that I -- I
18        asked him about, I don't guess.  But, you know --
19        he didn't mention it.  I don't think he mentioned
20        it.
21   BY MR. FEENEY:
22        Q.   Okay.  Just --
23        A.   I'm sorry.  Was that --
24             THE REPORTER:  I could hear that answer, yes.
25             THE WITNESS:  I'm sorry.  I'll speak clearer
```

Paulette Calhoun
September 24, 2020                                    68

```
 1        next time.
 2   BY MR. FEENEY:
 3        Q.   To clarify, Ms. Calhoun, you didn't ask
 4   Mr. Coates about the vehicle's airbags, correct?
 5        A.   I didn't ask, no.
 6        Q.   And he did not on his own tell you anything
 7   about the airbags on the vehicle in connection with the
 8   sale, correct?
 9        A.   No, he didn't.
10        Q.   Do you think that he should have told you
11   about the Takata airbags in the vehicle in connection
12   with the sale?
13        A.   I don't remember if he really told me or not,
14   but that's not something I would mention if I were
15   selling the car.  So, you know, it's just -- you don't
16   want to give the impression that it's not a safe car or
17   anything.  I'm just assuming, sir.
18        Q.   Is it fair to say, then, Ms. Calhoun, that you
19   felt the car was safe enough to drive at the time that
20   you purchased it?
21        A.   Well, it's safe to say that I had already
22   adjusted my driving habits because, you know, I knew
23   about the recall.  So yeah, basically, because I wasn't
24   going to change it after I already adjusted my driving
25   habits.  Because, you know, when you're driving around
```

Paulette Calhoun
September 24, 2020                                  105

```
 1   BY MR. FEENEY:
 2        Q.   Let me ask -- let me ask more specifically.
 3             Did you -- for example, did you make a
 4   complaint to a regulatory agency like the State Attorney
 5   General in Georgia?  That's just an example.
 6             But did you make a complaint about the vehicle
 7   to anybody during the time that you owned it?
 8             MS. DALEY:  Objection.  Form.  If you
 9        understand you can answer.
10             THE WITNESS:  Not any kind of official
11        complaint, no, that I can remember.
12   BY MR. FEENEY:
13        Q.   Did you have any complaints about the vehicle
14   during the time that you owned it?
15        A.   No.  No complaints whatsoever.
16        Q.   Approximately how many miles per year did you
17   drive during the time period that you owned the vehicle?
18        A.   Maybe 10, 12,000.
19        Q.   You've told me, Ms. Calhoun, that you
20   purchased this vehicle from Stefan Grose, correct?
21        A.   Yes.
22        Q.   And one of the service documents we looked at
23   had an address listed for him.
24             Is that the best source of information you
25   would have about what his address is?
```

Paulette Calhoun
September 24, 2020                              111

1        but it was no good, so -- I can't remember.  I

2        can't remember.

3   BY MR. FEENEY:

4        Q.   Do you recall what type of vehicle and

5   features in a vehicle you were looking for when you were

6   searching for a vehicle in September 2015?

7        A.   I knew that I had a Mercedes CL500, and it was

8   on its last leg.  So I wanted a Mercedes because I love

9   the way they drive and just all the features that they

10   offer.  And I couldn't afford a CL500 at full price or

11   even -- anyway, I just found a good car similar to my

12   CL500 that would, you know, do the job.

13        Q.   Aside from the prior experience that was

14   favorable with Mercedes vehicles, did you review any

15   advertising in connection with your purchase of the C300

16   that's at issue in this case?

17        A.   No.

18        Q.   When did you first make contact with

19   Mr. Grose, in September 2015?

20        A.   September 2015?  Probably then --

21        Q.   How did you and Mr. Grose find each other?

22        A.   I want to say Auto Trader.

23        Q.   So Mr. Grose put an ad in the Auto Trader for

24   the vehicle?

25        A.   I don't want to guess, but he had an ad

Paulette Calhoun
September 24, 2020                                    112

1    somewhere that I found.

2         Q.   Did you find it through an electronic media or

3    in paper?

4         A.   Electronic media.

5              MS. DALEY:  Objection.  Form.

6              Do you understand the question?

7              THE WITNESS:  I really don't understand

8         because I recall just finding the car.  I can't

9         remember where I found it, but I know that I found

10        it, and he had a good price on it, and --

11   BY MR. FEENEY:

12        Q.   Okay.  Let me reask the question this way.

13   Maybe it's clearer.

14             Did you find the ad online?

15        A.   I think I did, yes.

16        Q.   Do you remember the name of the website that

17   you looked at?

18        A.   I don't recall.

19        Q.   Did you initiate contact with Mr. Grose?

20        A.   I did.

21        Q.   How did you do that, by telephone?

22        A.   By telephone.

23        Q.   And what happened next?

24        A.   I set up a time to test drive.

25        Q.   During your first phone call with him, how

Paulette Calhoun
September 24, 2020                                    143

```
 1              MS. DALEY:  Yeah.
 2              THE WITNESS:  Yeah.  Because if you got it, I
 3       must have produced it somehow.
 4   BY MR. FEENEY:
 5       Q.   Thank you.
 6              And I want to just confirm that you did
 7   receive this letter in and around December of 2017 as
 8   indicated on the document.
 9       A.   Yes, I received it then, sir.
10       Q.   Is this the first notice you received of the
11   Takata airbag?
12       A.   On this vehicle?  This is the first notice I
13   remember receiving.
14       Q.   Is it possible that you received another
15   letter like this before December of 2017?
16       A.   It's always possible, but I don't remember
17   receiving one prior to.
18       Q.   As you testified today, your best recollection
19   is that this letter that we're looking at was the first
20   time you received notice about the recall on the vehicle
21   concerning the Takata airbag?
22       A.   Yes.  And basically it's just telling me what
23   to do about it.  They didn't have a part available, but
24   they just gave me instructions on what I needed to
25   actually do.
```

Paulette Calhoun
September 24, 2020                                        153

1   review Deposition Exhibit 12?

2        A.   Yes.

3        Q.   Do you recognize this exhibit?

4        A.   Yes, I do.

5        Q.   Can you please identify it for the record?

6        A.   It's a Georgia motor vehicle crash report.

7        Q.   Does Exhibit 12 reflect a police report that

8   was generated for an accident that you were involved in

9   while you were driving the subject vehicle?

10       A.   Yes, it does.

11       Q.   And I see in the -- on the very first page in

12  the upper left-hand corner a date of January 14, 2019.

13            Do you see that?

14       A.   Yes, I do.

15       Q.   And it describes there that that was the date

16  of the crash.

17            Is that in accord with your recollection of

18  when the crash occurred?

19       A.   Yes, it is.

20       Q.   Where did this accident occur that's

21  referenced in this deposition exhibit?

22       A.   Okay.  It occurred on Greenbriar Parkway

23  Southwest.  It's an overpass, Arthur Langford Parkway.

24       Q.   And describe for me how it happened in your

25  own words.

Paulette Calhoun
September 24, 2020                                          154

1          A.   My own words?  I was sitting at a traffic

2    light with one car ahead of me, and I looked in my

3    rearview mirror, and I saw this car coming.  And I

4    realized he was not going to stop.  So he rear-ended me

5    and pushed me into the car in front of me.

6          Q.   And how severe was the impact to your vehicle?

7          A.   It was pretty severe.

8          Q.   Did you have damages to the rear and the front

9    of your vehicle?

10         A.   Yes.

11         Q.   Do you have any knowledge of whether the

12   vehicle was subsequently repaired, that these damages

13   that were incurred in this accident were repaired at any

14   time?  Do you know?

15         A.   No.  The car was ultimately totaled.

16         Q.   We talked about this before, but we were

17   talking about -- there was a little bit of confusion in

18   the testimony, so I'm going to go over it again.

19              This is the instance where you received a

20   total loss payment for this vehicle from USAA; is that

21   correct?

22         A.   That is correct.

23         Q.   Do you have any records -- other than what has

24   been produced with this accident report, do you have any

25   other records that reflect that payment being made by

Paulette Calhoun
September 24, 2020                                    183

```
 1          Ms. Calhoun is getting tired, so I know it's been a
 2     long day.
 3          So this is part of the complaint, and there's
 4     paragraphs that we -- that you've seen that speak
 5     specifically to you and your name, but these are
 6     all paragraphs -- are all part of the complaint
 7     that you are a plaintiff in, that you're a class
 8     representative in, okay?
 9          So he's just asking you about parts of the
10     complaint that you are a class representative of.
11     So he's asking you about paragraph five.
12          THE WITNESS:  Okay.
13  BY MR. FEENEY:
14     Q.   Are you okay, Ms. Calhoun?
15     A.   Yes, I am.
16     Q.   Okay.  All right.
17          So, as I was saying, Ms. Calhoun, in paragraph
18  five you make this allegation that the airbags subject
19  to recall could violently explode, sometimes expelling
20  metal debris and shrapnel to unsuspecting drivers and
21  passengers.
22          Do you see that language in paragraph five?
23     A.   Okay, yes.
24     Q.   Now, we know from the earlier testimony that
25  nothing like this ever happened to your particular
```

Paulette Calhoun
September 24, 2020                                      184

1   vehicle, right?

2        A.   That's correct.

3        Q.   In fact, I believe you testified that you

4   never had any problem with your airbag at all, right?

5        A.   That's correct.

6        Q.   But do you know anybody that has had this

7   problem happen to them in their Mercedes-Benz vehicle?

8        A.   I don't know anybody personally, no.

9        Q.   Even if it's not personally, are you aware of

10  a specific instance where what you describe in paragraph

11  five happened in a Mercedes-Benz vehicle?

12       A.   No.

13       Q.   Okay.  I'm going to ask you now to look at

14  paragraph seven on the same page of the complaint,

15  Ms. Calhoun.  I'd ask you to read it and let me know

16  when you're ready and I'll ask a question about it.

17       A.   Okay.

18       Q.   Okay.  In paragraph seven, Ms. Calhoun, you

19  allege that the defendants, which includes my client,

20  MBUSA, was intimately involved in the design and testing

21  of the Takata airbag that contained the defect that

22  resulted in the recall, correct?

23       A.   That's correct.

24       Q.   Okay.  What do you base this allegation on?

25            MS. DALEY:  Objection.  Foundation.

Paulette Calhoun
September 24, 2020                                    185

1           You can answer if you know.

2           THE WITNESS:  I don't know.

3    BY MR. FEENEY:

4        Q.   Are you aware of any evidence that

5    Mercedes-Benz was intimately involved in the design and

6    testing of the Takata airbag that became subject to

7    recall?

8        A.   I'm not aware, no.

9           MR. FEENEY:  Okay.  I'm going to jump now

10          to -- to paragraph 231, Carlos, of the same

11          deposition exhibit.

12   BY MR. FEENEY:

13       Q.   Ms. Calhoun, can you please read paragraph

14   231, and as we've done with the others, after you're

15   done, let me know and I'll ask you a question.

16       A.   Okay.  I'm prepared, yes.

17       Q.   Okay.  In paragraph 231 of the complaint or

18   the amended complaint, you allege that the class

19   vehicles involved in this case are not safe to drive,

20   right?

21       A.   Right.

22       Q.   Okay.  Now, we've talked about and you've

23   testified to the fact that you continued to drive your

24   vehicle even while you knew that it had a Takata airbag

25   in it, right?

1      A.    Right.

2      Q.    And at that time did you take passengers in

3    your vehicle with you from time to time?

4      A.    Yes.

5      Q.    And when you did take passengers in your

6    vehicle, did you warn them that there was a Takata

7    airbag in the vehicle before you let them drive in the

8    vehicle?

9      A.    No.

10          MR. FEENEY:  Okay, Carlos.  Please jump back

11      to paragraphs 18 and 19 of the amended complaint.

12   BY MR. FEENEY:

13     Q.    Ms. Calhoun, please do as we've done and read

14   those paragraphs and let me know after you've finished

15   reading them and I will ask you questions about them.

16          Actually, Ms. -- Ms. Calhoun, I think you

17   won't have any problem with this, but I'm going to

18   withdraw that question.  And I meant to go to another

19   paragraph, so I apologize, okay?  My mistake.

20          MR. FEENEY:  Carlos, I apologize, but what I

21      meant to go to was 36 and 37, paragraphs 36 and 37.

22   BY MR. FEENEY:

23     Q.    So these paragraphs carry over two pages of

24   the complaint.  I believe Carlos has expertly displayed

25   them there so you can see them both at a glance.

Paulette Calhoun
September 24, 2020                                                    187

```
 1              Please review those paragraphs and I'll ask
 2     you my question.
 3          A.    Okay.  I've reviewed them.
 4          Q.    Okay.  In these paragraphs of the complaint
 5     you allege that you sustained out-of-pocket expenses as
 6     a result of the Takata airbag recall, right?
 7          A.    Right.
 8          Q.    What are your out-of-pocket expenses that you
 9     incurred?
10          A.    Well, taking time from work and things like
11     that, just flipping schedules.  I care for my sister,
12     and in doing and having to have to see after the airbag
13     and everything, it was just taking time off from work
14     and away from my normal duties.
15          Q.    And when -- when was it that you were taking
16     time off of work as a result of the airbag in the
17     vehicle?
18          A.    Well, whenever I took it in for repair service
19     and they didn't have a Takata airbag in, I would have
20     to -- always have to come back and come back.  And, you
21     know, that's just part of the service routine, and not
22     having it, and just -- just not having the availability
23     of the bags right away to take away from the mental
24     distress from riding in my car with airbags that are
25     defective.
```

Paulette Calhoun
September 24, 2020                                          188

1    Q.    You never took your vehicle in for a service

2    for the airbag and was told that they couldn't do it

3    because there's no repair parts, did you?

4    A.    Yes, I did.  Every time I would take my car in

5    for service, that's what I would ask, because it seemed

6    like it was such a delay in actually having the part.

7    And I said, well, maybe I missed the letter or something

8    of them telling me that the part was available.  So

9    every time I'd take it in I would ask them.

10   Q.    Okay.  But in each instance you went there for

11   some other service that you had to attend to for the

12   vehicle, right?

13   A.    That's correct.

14   Q.    And your question to them about the airbag was

15   just simply something you were doing because you

16   happened to be at the dealership at that time, right?

17   A.    I already adjusted my driving habits to

18   accommodate for driving around in an unsafe vehicle with

19   those airbags so that whenever I took it in, that was

20   something that was always on my mind.

21   Q.    I understand it was on your mind, and -- but

22   that's not the reason that you went for service in each

23   of those appointments, right?

24        You had some other reason that you went there

25   for service, correct?

Paulette Calhoun
September 24, 2020                          189

```
 1        A.   Well, you could -- yes.

 2        Q.   Ms. Calhoun, I believe I may have asked you

 3   this before, and if I have, I apologize, but do you

 4   recall the first time that you considered filing a

 5   lawsuit against MBUSA?

 6        A.   No, I don't.

 7        Q.   Do you know approximately when you had decided

 8   that you wanted to file a lawsuit against MBUSA?

 9        A.   No, I don't.

10        Q.   Do you remember anything in particular that

11   caused you to decide that you wanted to file a lawsuit

12   against MBUSA?

13        A.   No.

14        Q.   Did you undertake any efforts to enlist other

15   people to join you in seeking to represent a class of

16   people suing MBUSA?

17             MS. DALEY:  Objection.  Form.

18             THE WITNESS:  No.

19             MS. DALEY:  You can answer if you understand

20        it.

21             THE WITNESS:  No.

22   BY MR. FEENEY:

23        Q.   Did you organize any committees that had the

24   purpose of deciding whether and how to sue MBUSA as a

25   result of the Takata airbag recall?
```

WITNESS NOTIFICATION LETTER


September 30, 2020


PAULETTE CALHOUN
C/O Carolyn Daley, Esq.
Power Rogers
70 West Madison Street
Suite 5500
Chicago, Illinois 60602


IN RE:   IN RE:    Takata Airbag Product Liability
                   Litigation
         Remote deposition taken on September 24, 2020
         U.S. Legal Support Job No. 2267645


The transcript of the above proceeding is now available
for your review.


Please call to schedule an appointment between the hours
of 9:00 a.m. and 4:00 p.m., Monday through Friday, at a
U.S. Legal Support office located nearest you.


Please complete your review within 30 days.




Sincerely.


.....................................
Michelle R. Hordinski, RPR, RMR, CRR
U.S. Legal Support, Inc.
2271 McGregor Boulevard, Second Floor
Fort Myers, Florida  33901
239.332.7443



CC via transcript:
James J. Feeney, Esq.

Paulette Calhoun
September 24, 2020                                    225

ERRATA SHEET


DO NOT WRITE ON TRANSCRIPT - ENTER CHANGES HERE

IN RE:   IN RE:   Takata Airbag Product Liability
                  Litigation
DATE:    September 24, 2020

PAGE LINE   CHANGE                        REASON

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____


Under penalties of perjury, I declare that I have read my
deposition and that it is true and correct subject to
any changes in form or substance entered here.


_____
Date Signed                    PAULETTE CALHOUN

CERTIFICATE OF REPORTER


STATE OF FLORIDA                    )

COUNTY OF LEE                       )


        I, Michelle R. Hordinski, Registered Merit
Reporter and Certified Realtime Reporter, do hereby
certify that I was authorized to and did
stenographically report and electronically record the
remote deposition of PAULETTE CALHOUN; that a review of
the transcript was requested; and that the foregoing
transcript, consisting of pages 1 to 227 inclusive, is a
true record of the testimony given by the witness.
I further certify that I am not a relative, employee,
attorney or counsel of any of the parties, nor am I a
relative or employee of any of the parties' attorney or
counsel connected with the action, nor am I financially
interested in this action.


            Dated September 30, 2020.



            ................................
            Michelle R. Hordinski, RMR, CRR

CERTIFICATE OF OATH


STATE OF FLORIDA                )

COUNTY OF LEE                    )


        I, the undersigned authority, certify that

PAULETTE CALHOUN personally appeared before me on the

24th of September, 2020 and was duly sworn.


            WITNESS my hand and official seal

September 30, 2020.


            ..............................
            Michelle R. Hordinski, RMR, CRR
            Notary Public, State of Florida
            Commission #GG 196403
            Expires 6-5-22