**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**MDL No. 2599**
**Master File No.: 15–MD–02599–MORENO**

**IN RE: TAKATA AIRBAG PRODUCT**
**LIABILITY LITIGATION**

**THIS DOCUMENT RELATES TO**:

**ECONOMIC LOSS TRACK CASES**
**AGAINST <u>MERCEDES–BENZ USA, LLC</u>**

**PLAINTIFFS' RESPONSE TO**
**MERCEDES–BENZ USA, LLC'S STATEMENT OF UNDISPUTED MATERIAL FACTS**
**AND PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO**
**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT,**
**PURSUANT TO LOCAL RULE 56.1**

1

Pursuant to Rule 56 and Local Rule 56.1, Plaintiffs hereby respond to Mercedes Benz USA, LLC's Statement of Undisputed Material Facts ("SOF") (ECF No. 4802), without admitting that any of MBUSA's statements are material.   Plaintiffs' responses to MBUSA's Statement are followed by Plaintiffs' Statement of Material Facts in opposition to MBUSA's motion.

## I.   <u>Plaintiffs' Response to MBUSA's Statement of Undisputed Material Facts</u>

1.   Disputed, in part.  The statement is misleading to the extent MBUSA attempts to suggest that MBUSA's role is limited to just those three aspects.  For example, MBUSA's Quality Engineering Center ("QEC") is also involved in meeting and sharing information with Daimler, MBUSI, and their suppliers.  (*See infra* PSOF, ¶¶ 144–57.)

2.   Disputed.  The cited evidence does not support the claim that MBUSA does not own or control other Mercedes-Benz dealerships, nor does it support the claim that all but one of its dealerships are independently operated without MBUSA involvement or control.  ECF No. 4339-20 (Deposition of David Tait ("Tait Dep. Tr.")) at 98:19–99:6 (claiming "dealers are independently owned" without ever referring to or admitting that MBUSA directly owns and controls at least one authorized Mercedes-Benz dealership, Mercedes-Benz Manhattan). The evidence only supports that MBUSA is the direct owner of and controls at least one authorized Mercedes-Benz dealership—MBUSA's subsidiary Mercedes-Benz Manhattan.  *See* ECF No. 4339-3 (MBUSA 30(b)(6) Deposition of Mark Aikman ("Aikman Dep. Tr.")) at 22:7–15. In addition, MBUSA controls many aspects of dealer activities, including whether, and under what circumstances, a Mercedes dealership can sell a certified pre-owned vehicle.  ECF No. 4339-20 (Tait Dep. Tr.) at 97:7–9.

3.   Undisputed.

4.   Disputed. The cited references do not support the proffered statement regarding airbags.   MBUSA's Objections and Responses to Plaintiffs' Interrogatory at No. 4 is limited to design, manufacturing and assembly and its answer to interrogatory No. 7 is limited to inflator and inflator propellant testing, design and research and does not cover airbag testing or analysis.  ECF No. 4258-2 (MBUSA's Objs. And Resps. To Pl.'s Interrogs.) at No. 4, No. 7. With respect to testing, MBUSA was involved in the collection of certain Takata airbags for testing and it attended meetings with NHTSA where testing results were discussed. *See* Ex. 1 (9/24/2020 Deposition of Thomas Brunner ("Brunner Dep. Tr.")) at 144:7–148:4. MBUSA was even involved in visiting Takata airbag testing facilities in the United States.   *See* Ex. 2 (MBUSA_00153443) at

MBUSA_00153463 ("VCA Tom Brunner and DAG/Holger Boehme visited Takata USA and received overview of testing facility[.]").

5.     Disputed.  MBUSA visited Takata airbag testing facilities in the United States and received an overview of the facility.  *See* Ex. 2 (MBUSA_00153443) at MBUSA_00153463. MBUSA also met with Takata at MBUSA's QEC in Jacksonville, Florida to prepare for at least one new Mercedes-Benz vehicle launch, which included sharing supplier and vehicle information between MBUSA, Takata, Daimler, MBUSI, and other entities.  (*See infra* PSOF, ¶¶ 150–57.)  One of the materials shared with Takata at MBUSA's QEC evidenced that online data submitted by Takata, such as 8D reports, was online data that MBUSA quality engineers likely have had access to.  *See id.*; *see also* Ex. 3 (CUST038_PRIV00093198).

6.     Disputed.  This statement is misleading to the extent it fails to acknowledge that MBUSA admitted it did know that at least some of its Mercedes-Benz vehicles sold in the United States were equipped with Takata airbags by no later than July 2014.  *See, e.g.*, ECF No. 4180, ¶ 7; **Ex. 4** (Brunner 2020 Dep. Tr. Ex. 25) at TKH-MDL-0003214060.  Then as discussed *infra* in detail, MBUSA knew that its vehicles were equipped with Takata airbag inflators. For example, MBUSA and Takata communicated regarding Department of Transportation ("DOT") letters for Takata's airbag inflators placed in Mercedes-Benz vehicles sold in the United States.  (*See infra* PSOF, ¶¶ 130–31.)  MBUSA also issued a series of prior recalls, all of which evidenced its knowledge that Mercedes-Benz vehicles sold in the United States were equipped with Takata airbag inflators.  (*See id.*, ¶¶ 133–35.)  MBUSA also communicated with Takata on at least one Supplier Day at MBUSA's QEC in Jacksonville, Florida in preparation for a new Mercedes-Benz vehicle launch.  (*See id.*, ¶¶ 150–57.)  MBUSA also worked with Daimler at MBUSA's QEC and coordinated with Takata regarding MBUSI's warranty claims, including claims relating to Takata's airbags.  (*See id.*, ¶¶ 144–49.)  MBUSA was also responsible for engineers in Germany, ensuring MBUSA had access to and control of engineering and technical information regarding its vehicle components.  (*See id.*,) ¶¶ 124–25.  Lastly, in MBUSA's unique role as Daimler's "Designated Agent," MBUSA always had control and access to all of the information Daimler had, including information regarding its suppliers.  (*See id.*)

7.     Disputed, in part.  First, the statement is misleading because it was MBUSA, not Daimler AG, that issued the voluntary recall of Mercedes-Benz vehicles equipped with the Takata airbag modules in February 2016 (*see, e.g.*, **Ex. 5** (16V-363); **Ex. 6** (16V-081); **Ex. 7** (17V-017)),

following Takata's January 2016 report admitting there was a defect.  Second, MBUSA's cited evidence does not support its claim that "there had been no inflator ruptures or other issues . . . in any Mercedes-Benz vehicle" because MBUSA only cited a declaration claiming that there had been no "confirmed" ruptures or "confirmed" issues of the type in Takata's report.  *See* ECF No. 4801-10 (Brunner Decl.), ¶ 6.

8.      Disputed, in part.  The cited support does not identify Daimler as the entity responsible for redesigning airbag inflators with a different propellant, instead referring only to the "manufacturer of Mercedes-Benz vehicles." ECF No. 4801-10 (Brunner Decl.), ¶ 7. As discussed *infra*, MBUSI—located directly across the street from MBUSA—is also a manufacturer of the Mercedes-Benz vehicles sold in the United States. (*Infra* PSOF, ¶¶ 136–37.)  The statement is also misleading because the cited evidence does not preclude MBUSA's involvement in redesigning the airbag inflators. For example, it was MBUSA and not Daimler that made the decision whether to push for a like-for-like replacement inflator or whether to wait for the final GUNI replacement inflator.  *See* **Ex. 8** (MBUSA_00083957) at MBUSA_00083958; ECF No. 4339-13 (Deposition of Bibi Analil ("Analil Dep. Tr.")) at 195:18–24.

9.      Disputed, in part.  The cited support does not identify Daimler as the entity responsible for redesigning airbag inflators with a different propellant, instead referring only to the "manufacturer of Mercedes-Benz vehicles." *See generally* ECF No. 4801-10 (Brunner Decl.). MBUSI is also a manufacturer of the Mercedes-Benz vehicles sold in the United States. (*Infra* PSOF, ¶ 136.)  Although MBUSA claims that the manufacturer redesigned the airbag modules "with the approval and acknowledgement of NHTSA," MBUSA's sole cited support—Brunner's declaration—cites no support for that claim. ECF No. 4801-10 (Brunner Decl.), ¶ 7.

10.    Undisputed.

11.    Undisputed.

12.    Undisputed.


**PLAINTIFF THERESA MARIE RADICAN (RHODE ISLAND & CONNECTICUT, HAWAII, MAINE, NEBRASKA, OKLAHOMA, VERMONT, VIRGINIA WEST, VIRGINIA)**

13.    Undisputed.

14.    Undisputed.

15.     Disputed, in part. Plaintiff Radican stated she purchased the Class Vehicle because she was happy with the other two Mercedes-Benz vehicles that she already owned. ECF No. 4339-52 (Deposition of Theresa Marie Radican ("Radican Dep. Tr.")) at 61:8–11.  But, she stated, "had [she] known about the defective airbag in [her] Mercedes vehicle, [she] would have purchased another vehicle that did not contain Defective Airbags."  ECF No. 4259-20 (Radican's Resps & Objs. To MBUSA's Interrogatories) at No. 11

16.     Disputed. Although Plaintiff Radican stated she did not research online about the car, Plaintiff Radican did view commercials through radio, television and the internet that touted the safety and dependability of the subject vehicle and MBUSA's vehicles in general. ECF No. 4259-20 (Radican's Resps & Objs. To MBUSA's Interrogatories) at No. 2.  And she testified, in response to whether she could "recall any specific commercials [she] looked at before purchasing the car," that "I'm sure – I watch a lot of television, so I'm sure there must have been commercials about Mercedes' new design or I never would have known about it."  ECF No. 4339-52 (Radican Dep. Tr.) at 154:17–22.

17.     Undisputed.

18.     Disputed, in part. Plaintiff Radican called and set up an appointment as soon as she learned of the recall. *Id.* at 99:18–21.

19.     Undisputed.

20.     Disputed, in part. Plaintiff Radican paid more for the car than it was worth based on the defective airbags it contained. *See* ECF No. 4336.7 (Expert Report of Robert Renz ("Renz Rept."), ¶¶ 24, 66–68; *see generally* ECF No. 4336.8 (Expert Report of James Baglini ("Baglini Rept.")); ECF No. 4336.58 (Dubé Rept.)**.**

21.     Undisputed.

22.     Disputed, in part. Plaintiff objected to Interrogatory No. 8 as a premature contention interrogatory; she also objected to it as overbroad and unduly burdensome, as it was seeking information not relevant and not likely to lead to the discovery of admissible evidence." ECF No. 4259-20 (Radican's Resps. & Objs. To MBUSA's Interrogatories) at No. 8.  Plaintiff Radican contends that the Class Vehicle she purchased with a defective airbag is worth less than a similar car that did not contain a defective airbag. *Id.* at No. 10.

23.     Undisputed.

**PLAINTIFF DAPHNE BRIDGES (NORTH CAROLINA & COLORADO, UTAH, VIRGINIA, WEST VIRGINIA, WISCONSIN)**

24.     Undisputed.

25.     Disputed, in part.  Plaintiff Bridges did testify that she relied on representations made by MBUSA dealership sales personnel who assured her that her Class Vehicle was "a good vehicle, had long durability, [was] a safe vehicle."  ECF No. 4339-60 (Deposition of Daphne Bridges ("Bridges Dep. Tr.")) at 162:14–18.

26.     Disputed, in part. MBUSA sold Plaintiff Bridges a Mercedes-Certified Pre-Owned Class Vehicle with undisclosed, defective airbags, failing to comply with MBUSA's express warranty.  MBUSA's express warranty was also inadequate when MBUSA failed to immediately replace her defective airbags.

27.     Undisputed.

28.     Disputed, in part.  Although Plaintiff Bridges stated her husband did sometimes ride in the car with her, her daughter did not like driving the Class Vehicle and her daughter did not ask to drive it. *Id.* at 122:21–123:15.

29.     Disputed, in part. This statement is misleading to the extent it implies her Class Vehicle's airbags were not defective. Plaintiff Bridges contends that the airbags in her Class Vehicle were defective at the point of purchase and of a lesser quality than represented. *See* ECF No. 4336.7 (Renz Rept.), ¶¶ 24, 66–68; *see generally* ECF No. 4336.8 (Baglini Rept.); ECF No. 4336.58 (Dubé Rept.)**.**

30.     Disputed. Plaintiff Bridges paid more for the car than it was worth based on the defective airbag it contained. *See* ECF No. 4336.7(Renz Rept.), ¶¶ 24, 66–68; *see generally* ECF No. 4336.8 (Baglini Rept.). Plaintiff Bridges began putting additional miles on her other car upon learning her Class Vehicle contained defective airbags. ECF No. 4339-60 (Bridges Dep. Tr.) at 141:12–15.

31.     Disputed, in part. While Plaintiff Bridges testified that the valuation of her Class Vehicle from the Mercedes dealer was "close to" what her own research suggested, she never claimed that this valuation met or acceded this amount.  *Id.* at 135:6–19.

32.     Undisputed.

**PLAINTIFFS JOHN ("JACK") & NANCY PHILLIPS (OREGON)**

33.     Undisputed.

34.     Disputed.  Plaintiff J. Phillips testified he looked at "ads that advertised R350s" and that they were "quite effusive in saying that the car was high quality." ECF No. 4339-50 (Deposition of John Phillips) ("Phillips Dep. Tr.") at 61:8–13. The Mercedes ads and materials— touting safety and quality—that he saw during his research played a role in his decision to buy his Class Vehicle. *Id.* at 64:2–8, 64:23–65:10.  Plaintiff J. Phillips specifically recalled that the 2010 Mercedez-Benz R350 ads touted that it was "a high quality safe car, yes, absolutely." *Id.* at 66:13– 21; *see also id.* 40:10–16.

35.     Undisputed.

36.     Disputed, in part. Plaintiff J. Phillips stated that he repeatedly asked for the recall remedy, but that he always received an excuse why the dealership would not perform it. *Id.* at 91:8, 22.

37.     Disputed, in part. Although Plaintiff J. Phillips stated the defective airbags never deployed abnormally, he stressed that he and his wife "were psychologically injured by the fact that it might go off.  That's a scary thing.  It could kill us." *Id.* at 69:24–70:1.

38.     Disputed, in part.  Although Plaintiff J. Phillips' insurer declared the vehicle a total loss and paid him only $12,153 for its value, Mr. Phillips testified that he had asked for $17,000 based on what he thought the Class Vehicle was worth. *Id.* at 49:23-50:1. Plaintiff J. Phillips replaced his Class Vehicle with a non-Mercedes vehicle, a Kia Niro. *See id.* at 50:10-14.

39.     Disputed, in part. Plaintiff J. Phillips paid more for the Class Vehicle than it was worth based on the defective airbags it contained. *See* ECF No. 4336.7 (Renz Rept.), ¶¶ 24, 66-68; *see generally* ECF No. 4336.8 (Baglini Rept.); ECF No. 4336.58 (Dubé Rept.)**.**

40.     Undisputed.

41.     Undisputed.

42.     Undisputed.

43.     Undisputed.

**PLAINTIFF SUSAN KNAPP (IOWA)**

44.     Undisputed.

45. Disputed, in part. The cited references do not support the statement. Plaintiff Knapp was unsure if a specific brochure produced to Defendant was received by her before or during the purchase of her vehicle. *See* ECF No. 4339-35 (Deposition of Susan Knapp ("Knapp Dep. Tr.")) at 24:19–25:1, 92:3–9. Plaintiff Knapp recalled receiving a brochure at the dealership prior to her purchase of the Class Vehicle but did not believe she retained it. *Id.* at 92:14–21. Plaintiff Knapp also conducted online research as to the Class Vehicle and believed she discussed the safety of the Class Vehicle with dealership personnel at the time of purchase. *Id.* at 88:14–89:3, 90:1–9.

46. Undisputed.

47. Disputed, in part. Plaintiff Knapp did not drive her Class Vehicle for over a year due to the Takata airbag issue, during which time the vehicle lost value. *Id.* at 114:14–18, 205:23–206:8, 207:2–3, 254:14–257:7. Moreover, Plaintiffs' expert's damages methodology can be applied to calculate Plaintiff Knapp's damages. ECF No. 4336.58 (Dubé Rept.)**.**

48. Disputed, in part. Plaintiff Knapp was aware of Takata airbag problems in 2016 due to, at minimum, a New York Times article. ECF No. 4339-35 (Knapp Dep. Tr.) at 141:15–143:1, 254:1–22. Plaintiff Knapp's testimony is unclear as to whether she was aware that there was a recall in 2016 affecting her Class Vehicle. *Id.* at 209:17–210:2; ECF No. 4258-21 (Knapp's Resps. & Objs. To MBUSA's Interrogs.) at No. 4.

49. Undisputed.

50. Undisputed.

51. Disputed, in part. Plaintiff Knapp did not recall any statements from Willis Auto Campus. *Id.* at 185:11–14. Disputed as to whether there was a recall specific to Plaintiff Knapp's vehicle at the time. *Id.* at 209:17–210:2; ECF No. 4258-21 (Knapp's Resps. & Objs. To MBUSA's Interrogs.) at No. 4.

52. Disputed. The text quoted required magnification to be legible during the deposition, and Plaintiff Knapp stated she did not read the quoted text at the time of the transaction. ECF No. 4339-35 (Knapp Dep. Tr.) at 257:9–258:2.

53. Disputed. Plaintiff Knapp's testimony is unclear as to whether there was the ability for the recall to be performed prior to the sale of her vehicle or not. *Id.* at 209:17–210:2; ECF No. 4258-21 (Knapp's Resps. & Objs. To MBUSA's Interrogs.) at No. 4.

54. Undisputed.

**PLAINTIFF WILLIAM GOLDBERG (WASHINGTON)**

55.     Undisputed.

56.     Disputed, in part.  Plaintiff Goldberg reviewed the sales brochure, which contained a section on the safety features of the Class Vehicle, including the airbags.  ECF No. 4339-42 (Deposition of William Goldberg ("Goldberg Dep. Tr.") at 43:15–20.  Plaintiff Goldberg relied on statements made in the Class Vehicle sales brochures when he made his decision to purchase the Class Vehicle.  *Id.*  The brochure that Plaintiff Goldberg reviewed contained safety information pertaining to his Class Vehicle including its airbags.  **Ex. 9** (Goldberg Dep. Tr. Ex. 4) at 29.

57.     Disputed, in part. The cited reference does not support the statement. While Plaintiff Goldberg did testify that he received a recall notice from MBUSA, he did not testify that the notice said the repairs would be performed for free. *See* ECF No. 4339-42 (Goldberg Dep. Tr.) at 50:2–5.

58.     Disputed, in part.  Although it is undisputed that the airbags never deployed, Plaintiff Goldberg objects to the characterization that his airbags never functioned "abnormally;" Plaintiff Goldberg was forced to "trade in a car that I otherwise didn't intend to trade in" for at least a few more years because "I could not let my wife drive it [with] the airbag situation, period." *Id.* at 76:17–77:13. Plaintiff Goldberg believes the Class Vehicle would have been "in great shape" "without an airbag problem." *Id.*  Plaintiff Goldberg disputes that the vehicle was equipped with safe airbags.  *See* ECF No. 4336.7 (Renz Rept.), ¶¶ 24, 66–68; *see generally* ECF No. 4336.8 (Baglini Rept.).

59.     Disputed.  Plaintiff Goldberg suffered from the "transactional costs of having to trade in a car that I otherwise didn't intend to trade in."  ECF No. 4339-42 (Goldberg Dep. Tr.) at 76:17–21.  Further, Plaintiff's expert's damages methodology can be applied to Plaintiff Goldberg to calculate his losses.  ECF No. 4336.58 (Dubé Rept.).

60.     Undisputed.

61.     Undisputed.

**PLAINTIFF BETTIE TAYLOR (MISSISSIPPI)**

62.     Undisputed.

63.     Disputed.  Plaintiff Taylor does not have sufficient information to render an opinion regarding the relationship between Bo Haarala Autoplex and MBUSA.

64.     Undisputed.

65.     Disputed, in part.  While it is undisputed that Plaintiff Taylor recalls seeing advertisements for Mercedes-Benz vehicles generally, Plaintiff Taylor also recalled that the advertisements described Mercedes-Benz vehicles as "safe," "durable," "luxury cars."  ECF No. 4339-53 (Deposition of Bettie Taylor ("Taylor Dep. Tr.")) at 72:9–16, 73:19–23, 74:20–23.  Plaintiff Taylor testified that prior to purchasing her Class Vehicle she "relied on the safety and durability that [the advertisements] said that it – that the vehicle had." *Id.* at 75:4–75:12

66.     Undisputed.

67.     Disputed, in part.  It is undisputed that the airbags in Plaintiff Taylor's vehicle did not deploy during her ownership of the vehicle.  Plaintiff Taylor disputes that the vehicle was equipped with safe airbags.  *See* ECF No. 4336.7 (Renz Rept.), ¶¶ 24, 66–68; *see generally* ECF No. 4336.8 (Baglini Rept.).

68.     Disputed, in part. Plaintiff Taylor received notice of the recall from MBUSA back in 2016, "but they didn't have the part in, so it was … March 2018 before the part came in." *Id.* at 10:21–25, 104:16–17; *see also id.* at 105:1–7 (After receiving the recall notice, Plaintiff Taylor kept checking to see if the replacement part had arrived); **Ex. 10** (TAYLOR000005).

69.     Undisputed.

70.     Undisputed.

71.     Undisputed.

**PLAINTIFF PAULETTE CALHOUN (GEORGIA)**

72.     Undisputed.

73.     Disputed, in part.  Plaintiff Calhoun purchased her Class Vehicle because she believed Mercedes-Benz vehicles to be dependable and to have a good reputation.  ECF No. 4339-61 (Deposition of Paulette Calhoun ("Calhoun Dep. Tr.")) at 53:3, 61:6–16.

74.     Disputed. Plaintiff Calhoun reviewed all documents provided to her by the dealer at the time of purchase, and Plaintiff Calhoun recalls viewing and hearing commercials through radio, television, and internet that touted the safety and dependability of MBUSA's vehicles. ECF No. 4258-16 (Calhoun's Resps. And Objs. To MBUSA's Interrogs.) at No. 2.

75.     Undisputed.

76.     Disputed, in part.  The proffered statement is misleading to the extent it implies that Plaintiff Calhoun was able to receive the recall remedy as soon as she received the recall notice, whereas Plaintiff Calhoun repeatedly requested her recall remedy and she was forced to return multiple times. *See id.* at 187:18–25. The claim that her airbag did not factor into the valuation of her Class Vehicle is also disputed because the cited reference fails to speak to the extent to which valuation of the vehicle factored in or did not factor in the Takata airbag inflator.  The insurer's valuation amount was paid directly to Plaintiff Calhoun's financing lender, and she does not know what the valuation amount was.  *Id.* at 156:17–19, 161:18–21.  The extent to which the valuation of the vehicle factored in the Takata airbag inflator is an insurer's conclusion.

77.     Undisputed.

78.     Undisputed.

79.     Undisputed.

80.     Undisputed.

## II.     **Plaintiffs' Statement of Additional Undisputed Material Facts**

### A.  MBUSA Uniformly Marketed the Class Vehicles as Safe.

81.     MBUSA distributed for sale in Florida and the United States each of the Class Vehicles.  *See* ECF No. 4318-1 (MBUSA's Responses to Plaintiffs' First Set of Requests for Admission) (admitting distribution of recalled vehicles). MBUSA is also responsible for the sales, marketing and distribution of Mercedes vehicles in the United States.  ECF No. 4339-3 (Aikman Dep. Tr.), at 24:12–15.

82.     MBUSA sold 351,746 passenger vehicles in the U.S. in 2023 alone. *See* **Ex. 11** (Mercedes Benz USA sales – Q4 2023) (https://media.mbusa.com/releases/mercedes-benz-usa-sales-q4-2023).  These sales were the result of MBUSA's extensive marketing efforts. *See* ECF No. 4339-3 **(**Aikman Dep. Tr.) at 63:1–16.  Mark Aikman, MBUSA's General Manager of Marketing Services since 2015, admitted that his team "produces the consumer-facing marketing." *Id.* at 9:13–20, 57:7-18; *see also id.* at 57:19–58:13 (Consumer-facing marketing includes "advertising, media planning, digital content like a website, and CRM –email, snail mail" as well as television advertisement, print advertising and magazines, and digital advertisement.).

83.     MBUSA knew the safety features of the Class Vehicles, specifically including airbags, were important to customers, and touting safety was part of MBUSA's marketing

strategies. *See* ECF No. 4339-3 (Aikman Dep. Tr.) at 63:23–25. MBUSA's marketing department works with its safety engineers and its legal department to check and approve the veracity of safety-related marketing and advertising claims. *Id.* at 65:20–66:11; ECF No. 4339-13 (Analil Dep. Tr.) at 235:13–24, 237:2–5, 22–24.

84.     MBUSA is responsible for communicating to customers and dealers about recalls. ECF No. 4339-3 (Aikman Dep. Tr.) at 97:13–17.  MBUSA is also responsible for ordering replacement Takata airbags. *Id.* at 17:6–16.

85.     Bibi Analil, MBUSA's supervisor of safety engineering, admitted that safety is a core tenet of the Mercedes brand. ECF No. 4339-13 (Analil Dep. Tr.) at 206:3–6.  Customers believe that safety is a core tenet of the MBUSA brand. *Id.* at 206:7–9.  The Mercedez-Benz brand is associated with safety. *Id.* at 211:13–14. Airbags are an important safety feature. *Id.* at 240:2–4. The performance of airbags is an important safety feature. *Id.* at 240:5–8.

86.     MBUSA marketed the Class Vehicles as relatively safe, compared with similar vehicles sold by other manufacturers.

87.     MBUSA promoted the Class Vehicles through websites, like mbusa.com, which consumers visit to learn about vehicle features.  *See, e.g.,* **Ex.** 12 (Mercedes-Benz C-Class Offers Sport or Luxury Persona - C-Class – The Most Popular Mercedes-Benz) (https://media.mbusa.com/releases/release-f7aca2c14566b1be115c9f004c3f90ba-mercedes-benz-c-class-offers-sport-or-luxury-persona).  Notably, the safety features, including front airbags, are prominently mentioned. *Id.* Likewise, promotional brochures for Class Vehicles, typically distributed at dealerships and trade shows, or directly by mail to consumers, consistently referenced airbags as a safety feature and as a part of the Mercedes safety promise.  ECF No. 4339-13 (Analil Dep. Tr.) at 237:10–20).[1]  MBUSA's brochures communicate a consistent message to

---

[1] *See, e.g.*, ECF No. 4204-12 (brochure for the 2008 Mercedes-Benz C-Class, one of the Class Vehicles) at 13 (calling out the vehicle's dual-stage frontal airbags as a safety feature, describing the "high-tech innovations like advanced dual-stage front air bags . . . to help actively protect you and your passengers); *id.* (showing a rendering of the inflated frontal airbag); *id.* at 19 ("Protection: Integrated Restraint System: The C-Class features the 8-way protection of a 6-air bag system**.**  It includes dual-stage front air bags (adaptive for the passenger side) …"), *id.* at 25 (identifying airbags as a "standard" feature meant to protect customers by "deploy[ing] in response to frontal impact severity exceeding a preset deployment threshold"); ECF No. 4204-26 (brochure for the 2010 Mercedes-Benz C-Class, one of the Class Vehicles) at 3 ("A new era has begun. What drives you today is likely not the same as a few years ago. Has it changed what you drive? From sporty and daring to sophisticated and safe? This is the 2010 C-Class."); ECF No. 4204-39 (brochure for the 2011 Mercedes-Benz C-Class, one of the Class Vehicles) at 10 ("An ongoing legacy of safety innovation. Perhaps no chapter in the history of the automobile is more deeply associated

all consumers that the airbags in Mercedes-Benz vehicles are functional, reliable, and safe. (*See supra* PSOF, ¶ 87 & n.1.)  MBUSA's representations are uniform in that they promote airbags as safety features and never disclose the Inflator Defect, a fact that even MBUSA safety engineers would want to know. *See supra id.*; ECF No. 4339-13 (Analil Dep. Tr.) at 240:9–15.

88.    MBUSA's marketing of Mercedes-Benz vehicles was so uniform and consistent that it even issued Dealer Marketing Planners "[i]n an effort to keep all dealers informed and integrate local efforts with national ones." **Ex. 13** (MBUSA_00124376) at MBUSA_00124376.  The Dealer Marketing Planner was issued to dealers on a quarterly basis via NetStar network. *Id.*  MBUSA's objectives included creating the "perception" that all other vehicles were "inferior" to the promoted ones. *Id.* at MBUSA_00124377.  MBUSA's Dealer Marketing Planner included using print advertising, special marketing partnerships, online banner advertising, and special events and partnerships. *See, e.g.¸ id.* at MBUSA_00124383.  For example, MBUSA noted that there were 28.4 M impressions for the October flight of online banner advertising relating to the Mercedes-Benz Sprinter. *Id.* at MBUSA_00124387.

89.    The warranties for the Class Vehicles acknowledge, that "some states do not allow the exclusion or limitation of incidental or consequential damages or limitation on how long an implied warranty lasts, so the above limitation may not apply to you." ECF No. 4801-10 (Brunner Decl.), at Exs. A & B.

---

with Mercedes-Benz than the continuing chronicle of safety leadership. The C-Class is not just equipped with a list of safety features. It's engineered as an orchestrated system that's designed to make the most of the precious milliseconds it takes to avoid, or survive, a collision…the protection a C-Class offers could rewrite the story of your own life."); ECF No. 4204-41 (brochure for the 2011 Mercedes-Benz E-Class, one of the Class Vehicles) at 6 ("Look back over the life story of the automobile and you'll find Mercedes-Benz continually leading the way in safety innovation."); ECF No. 4204-37 (brochure for the 2010 Mercedes-Benz R-Class, one of the Class Vehicles) at 3 ("Imagine a vehicle that combines the performance of a refined sedan, the all-season confidence of an SUV, and the safety leadership of a Mercedes-Benz."); *id.* at 5 ("The R-Class has been named a Top Safety Pick by the Insurance Institute for Highway safety. Among the many reasons is the 12-way protection of its eight standard air bags."); ECF No. 4204-46 (brochure for the 2011 Mercedes-Benz GLK-Class, a Class Vehicle) at 7 ("Protective in nature. Proactive in behavior. Wherever you seek adventure in a GLK-Class, you travel with a legion of reinforcements and a legacy of safety innovation. Nine standard air bags and an army of advanced safety systems are wrapped in a high-strength steel body – all ready to respond as an integrated system of protection."); *id.* ("Advanced restraints. Nine standard air bags in the GLK-Class offer 11-way protection. Innovative pelvic air bags complement the front seat side-impact air bags, and a driver's knee air bag augments dual stage front air bags.").

**B.  MBUSA Marketed Defective Airbags as Safe on Monroney Labels.**

90.    MBUSA distributed Class Vehicles in the United States with window stickers (also known as "Monroney" labels[2]) that described the equipment and features of the Class Vehicles, knowing that MBUSA-authorized dealers would then sell Class Vehicles to consumers with these labels affixed to the Class Vehicles.

91.    As MBUSA has long been aware, its dealers are prohibited by law from removing the Monroney labels prior to the delivery of the vehicle to the end consumer.  ECF No. 4337.105 (Automobile Information Disclosure Act of 1958, 15 U.S.C. section 1233(c)); *see also* ECF No. 4339-14 (30(b)(6) Monroney Label - T. Brunner Jan. 6, 2022, Dep. Tr.), at 53:12–18.  MBUSA's corporate representative testified that MBUSA affixed Monroney stickers to Class Vehicles. *Id.* at 39:3–8.

92.    The Monroney labels, which MBUSA caused to be drafted by the MBUSA product management department, uniformly and misleadingly assured consumers and the public that the Class Vehicles had working airbags.  *See* ECF No. 4339-14 (30(b)(6) Monroney Label - T. Brunner January 6, 2022, Dep. Tr.) at 29:24–30:2; *id.* at 33:12–16.[3]  MBUSA is unaware of any Monroney label that did not have a specific call-out of the frontal airbag from 2005-2017, which is the entire time the Class Vehicles were available for sale to the public. *Id.* at 25:19–24.

93.    Because airbags were standard safety features in the Class Vehicles, MBUSA was not required to include airbags on the Monroney labels, but MBUSA product managers nonetheless chose to list airbags on the labels of all Class Vehicles knowing these features were the "most important." *See id.* at 39:20–40:4; *see also id.* at 40:6–13.

**C.  The Defect in Takata's Non-Desiccated PSAN Inflators Used in MBUSA Vehicles Creates a Serious Safety Hazard to Consumers.**

---

[2] Monroney labels are named for Oklahoma Senator Olmer Stillwell "Mike" Monroney, who sponsored the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231–33.

[3] Each Monroney sticker had a section with the heading "SAFETY," under which were listed the various airbags present in the vehicle, suggesting to any potential consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and that the Class Vehicle's airbags would perform their intended function during a collision. *See, e.g.*, ECF No.  4092-2 (Exhibit A to the Decl. of Thomas Brunner at 6) (Monroney label for a 2017 E-400 Coupe which lists under safety and security, the advanced airbag protection system in the vehicle); *see also* **ECF No. 4339-14** (Brunner Jan. 6, 2022, Dep. Tr.), at 36:18–37:3; ECF No. 4092-2 (Exhibit B to Brunner's Declaration at 8) (Monroney label for a 2016 E 400 Coupe); **See ECF No. 4339-14**  (Brunner Jan. 6, 2022, Dep. Tr.), at 38:10–19; ECF No. 4092-2 (Exhibit C to Brunner's Declaration) (Monroney label for the 2015 E-Class Coupe); See ECF No. 4339-14 (Brunner Jan. 6, 2022, Dep. Tr.), at 38:20–39:2; **Ex. 14** (Monroney label for Class Representative Knapp's Class Vehicle).

94.     The Takata inflators at issue in this litigation use phase-stabilized ammonium nitrate (PSAN), an explosive compound that degrades and becomes highly unstable when introduced to temperature cycles and humidity. ECF No. 4336-7 (Renz Rept.) at ¶¶ 24, 36.[4]

95.     There have been several explosion accidents associated with ammonium nitrate's inherent volatility and instability, including one in Texas City on April 16, 1947 which killed 581 people, one in West Texas on April 17, 2013 that killed 15 people, and most recently, one in Beirut on August 4, 2020 that killed 220 people. *Id.* ¶¶ 24, 36. Takata itself experienced a significant explosion of the Ammonium Nitrate gas generant storage facility at Takata's airbag production facility in Monclova, Mexico on March 5, 2006, which destroyed several magazines and caused significant damage. *Id.* ¶ 36 & n.7.

96.     Ruptures in relevant Takata Inflators are known to have injured at least 400 people and caused at least 27 deaths in the United States. *See* **Ex. 15** (NHTSA, July 25, 2024, "Takata Airbag Recall Spotlight") (www.nhtsa.gov/vehicle-safety/takata-recall-spotlight); **Ex. 16** ("*Takata Airbag Recall: Everything You Need to Know*"; Consumer Reports, July 10, 2024.).

**D.  It was Common Knowledge Among Auto Companies That Ammonium Nitrate was Inherently Volatile, and Daimler Was Aware of the Defect in Takata's Non-Desiccated PSAN Inflators Prior to Adopting Them.**

97.     Mercedes had sophisticated knowledge and expertise regarding airbags using chemical propellants, evidenced through Mercedes' development of the first airbag to use chemical propellant technology. **Ex. 17** ("40 years ago: Mercedes-Benz launched the driver's airbag and seat belt tensioner in series production", December 22, 2020 ("Media Release 40 years ago")) (https://media.mbusa.com/releases/release-34b22cdf3837beba024634fab13f9b1d-40-years-ago-mercedes-benz-launched-the-drivers-airbag-and-seat); *see also* (https://media.daimler.com/marsMediaSite/en/instance/ko/25-years-passenger-airbag-at-Mercedes-Benz.xhtml?oid=9917584).  Mercedes' airbag development began in 1966, and it tested

---

[4] Over time, through customers' typical use of their vehicles, the inflators will be exposed to temperature cycling and humidity, which causes the defective PSAN-based gas generant to degrade, which in turn increases the rate at which the gas generant in the inflators burns when an airbag is deployed. *Id.* at ¶ 24. The progressive nature of the degradation process results in the inflator becoming increasingly more "aggressive" over time, until it reaches a point where the internal pressure exceeds the structural properties of the housing, resulting in a rupture. *Id.* at ¶ 43. Inflator ruptures can, and have, caused severe injury and death. *Id.* at ¶ 59. When the inflators rupture, they expel metal fragments from the inflator into the occupant compartment, striking the occupants. *Id.*

gas generation inflators and performed thousands of tests and trials on individual components over the following fifteen years, before it fitted its Mercedes vehicles with airbags in 1981. **Ex. 17** ("40 years ago: Mercedes-Benz launched the driver's airbag and seat belt tensioner in series production", December 22, 2020 ("Media Release 40 years ago")) (https://media.mbusa.com/releases/release-34b22cdf3837beba024634fab13f9b1d-40-years-ago-mercedes-benz-launched-the-drivers-airbag-and-seat); *see also* **Ex. 18** (Patent No. DE 2152902 C 2 filed by Daimler-Benz AG on October 3, 1971) ("Patent DE 2152902 C2") (describing its new patent technology). The Mercedes Benz's driver airbag achieved a milestone in passive safety due to its fundamental importance, becoming adopted by the entire industry. **Ex. 19** ("Mercedes-Benz Airbags Celebrate Their Anniversary" last accessed on 7/29/2024) (https://www.mercedes-benz.com/en/innovation/milestones/airbag-anniversaries/).

The revolutionary airbag technology described in Mercedes' patent moved away from the old pressurized gas system in airbags to airbags using sodium azide propellant gas generant, the predecessor to PSAN. *Id.* Mercedes-Benz opted for a gas generation system based on chemical propellants rather than pressurized gas to inflate the airbag, which was made from a special woven material and functioned to cushion passengers as they were thrown forward and to absorb the impact in an accident. **Ex.** 20("Mercedes-Benz safety: History of the Airbag and Restraint System," February 7, 2011) https://emercedesbenz.com/autos/mercedes-benz/classic/mercedes-benz-safety-history-of-the-airbag-and-restraint-system/.

98.     In November 2010, Mercedes-Benz published a video advertisement in English promoting Mercedes-Benz's expertise in developing and designing airbag inflators, celebrating 30 years since Mercedes invented the airbag for its vehicles. *See* (Mercedes-Benz TV: Happy birthday, airbag!) (https://youtu.be/Lw5rf26eSDU?si=Mzv-6-asUudojdNJ); *id.* (written caption describing the video as: "The airbag celebrates its 30 birthday.  In 1980 Mercedes-Benz revolutionized occupant safety.").  Mercedes claimed its airbag used an "elastic tearproof fabric." *Id.* at 00:51.

99.     For nearly a decade, Daimler even worked with Takata through a joint venture, Inflation Systems, Inc. ("ISI"), to design and manufacture driver-side inflators using sodium azide

in the United States.[5] **Ex. 21** (TKH-MDL-0000733820).  Mercedes was responsible for the design and manufacturing of the inflators, while Takata used the inflators in airbags that it sold directly to automakers.  *Id.*

100.    On May 7, 1998, Daimler-Benz Aktiengesellschaft and Chrysler Corporation signed a merger contract to form DaimlerChrysler AG ("DaimlerChrysler" or "DCX") in Auburn Hills, Michigan. **Ex. 22** ("The Merger between Daimler-Benz and Chrysler to Daimler Chrysler AG (1995 – 2007)") (https://group.mercedesbenz.com/company/tradition/company-history/1995-2007.html); **Ex. 23** ("The Culture Clash Heard 'Round the World.") (https://www.autonews.com/an-oral-history-of-the-birth-of-daimlerchrysler).

101.    In 2002, DCX along with GM and Ford collaborated on and co-wrote the USCAR inflator technical requirements and validation specifications for airbag inflators, setting forth the evaluation criteria, testing protocols, validation specifications, tolerances and gates, and other requirements that inflators must meet before OEMs can approve them for use in vehicles. ECF No. 4337-65 (USCAR Inflator Technical Specifications and Validation, SAE International, issued June 2004); *see also* **Ex. 24** (USCAR, ABOUT USCAR, https://uscar.org/about/ (last visited August 1, 2024)). Aside from requiring ballistic and hermeticity testing for all inflator propellants, DCX singled out PSAN-based inflators for additional testing due to DCX's knowledge and concerns with the propellant's affinity for moisture and instability.  *See* ECF No. 4337-65 at 24.  Specifically only for PSAN propellant, DCX required additional testing to evaluate propellant strength and burn rate, including after extended thermal cycling. *Id.* at 58–59.  DCX, GM, and Ford issued USCAR-24 in 2004, and DCX agreed to abide by USCAR-24 as the industry standard for approving and validating airbag inflators, including the requirements to address their concerns with the volatile PSAN propellants. *Id.* at 5–7.

102.    While DaimlerChrysler was helping revise these USCAR technical specifications, the inherent risks associated with using ammonium nitrate in an airbag safety device were broadly known and discussed in the industry. *See* ECF No. 4336-7 (Renz Rept.) ¶ 58; **Ex. 25** (United States Senators Blumenthal and Markey Letter to Takata dated Dec. 10, 2014) at 1 ("It is striking that these [USCAR24] specifications seem to predict the nature of Takata's airbag defect. . . . [T]he

---

[5]  The joint venture was initially with Bayern-Chemie, part of the Daimler Benz group. *Id.*  The German ownership was subsequently transferred to Temic, also part of the Daimler Benz group. *See id.* The joint venture ended in 1996,  when ISI became wholly owned by Takata.  *Id.*

authors of USCAR24 seem to demonstrate clear understanding of this potential scenario."); *id.* (noting that "concerns regarding the stability of this [ammonium nitrate] chemical have long been known" and it is "known" and "well established in the scientific literature and among experts that ammonium nitrate has a tendency to attract and absorb moisture").

103.    Takata had also publicly published patents, which were available to Daimler, MBUSA, and other OEMs, laying out similar concerns regarding PSAN.  *See, e.g.*, **Ex. 26** (1996 Patent Number 5,531,941: "Process for Preparing Azide-Free Gas Generant Composition.") at 4-5, ¶¶ 60, 65; (1999 patent assigned to Takata, "Nonazide Gas Generant Composition" Patent Number 5,872,329) at 1.  Takata's patents recognized that PSAN was so volatile it could even degrade to the point that the inflator would not operate properly or might even blow up because of the excess pressure generated. *See* ECF No. 4336-7 (Renz Rept.) ¶ 44.

### E.    Daimler Was Aware of the Inflator Defect Prior to and During the Sale of the Class Vehicles, Including Prior to MBUSA Issuing Its Recalls.

104.    Daimler Chrysler was "jointly-responsible" for certain tasks in the development of the driver's side airbag module in May 1999. **Ex. 27** (FCA_US_LLC_000055731). Among those tasks was to determine key design characteristics, conduct design verification (DV) testing, and develop test plans. *Id. See also* **Ex. 28** (FCA_US_LLC_000280272, Daimler Chrysler Source Package) at FCA_US_LLC_000280305.

105.    Between 2002 and 2003, Daimler Chrysler visited Takata's Monclova plant to conduct Process Sign-Offs ("PSO") and audits. **Ex. 29** TKH-MDL-0003953035. By the time it conducted its fifth PSO, "DCX [was] becoming very familiar and comfortable with ISI's Operations in Monclova." *Id.*

106.    In October 2006, Mercedes' W164 (the Mercedes-Benz ML series SUV) DAB Program Manager, Mr. Schremmer, visited Takata's Auburn Hills plant. **Ex. 30** TKH-MDL-000518854.

107.    In November 2006, TKH Engineering held meetings in Germany to discuss issues with "Mercedes" Engineering noting: "[Mercedes wanted] a non sympathetic ignition DAB inflator for future business. This is in DIRECT contradiction to the latest quote package that was released stating a USCAR compliant inflator. TKH Engineering will review with [Chrysler design engineer] Steve Stramm."  **Ex. 31** (TKPOD000560379) (emphasis in original); **Ex. 32** (https://www.linkedin.com/in/steve-stram-18127014/) (Steve Stram LinkedIn).  In 2007, a leading

engineer at Renault was "adamantly against the use of AN in air bag propellants" and was actively campaigning to remove Takata PSAN propellants from all European car companies. **Ex. 33** (TKH-MDL-0005413067). The engineer was "friends with top people at Mercedes, Volkswagen, etc." and he not only explained that Takata could not "stabilize the AN phase changes," but also compared the relative instability of ammonium nitrate in comparison to guanidine nitrate. *Id.*

108.    In May 2006, a Daimler Mercedes engineer visited Takata's facility to observe an airbag deployment test.   **Ex. 34** (TKH-MDL-0004704477). The Daimler Mercedes engineer observed that the inflator became unusually bright and found several holes in the cushion and some parts of the inflator inside the cushion. *Id.* The Daimler engineer requested answers as to how "metal parts came out of the inflator and burned through the cushion.  What countermeasures were installed to avoid a repetition?" *Id.*

109.    DCX was also aware of another Mercedes-Benz Vito/Viano/Sprinter Takata SDI inflator that ruptured during hot deployment testing in August 2006. *See* **Ex. 35** TKH-MDL-0003278121. The issue with this inflator rupture was "the same from a few weeks [earlier]." *Id.* DaimlerChrysler's Mr. Röhm was at the Takata Aschaffenburg plant while the testing of the second Sprinter inflator took place, and "[h]is clear statement was, that he cannot accept an inflator with such behavior" in any of the vehicles for which he is responsible. *Id.*

110.    In 2007, Daimler engineers corresponded with Takata to obtain detailed performance and ballistic data on inflators, demonstrating Daimler's engineering expertise on the issue. **Ex. 36** (TKH-MDL-0004294774); **Ex.** 37(TKH-MDL-0005036741).

111.    In 2007, Takata met with Daimler to discuss additional testing on ammonium nitrate, helium leak testing for the inflator cannisters, and the impact of humidity, demonstrating Daimler's awareness of the risk and importance of propellant degradation. **Ex. 38** (TKH-MDL-0003240950); **Ex. 39** (TKH-MDL 0003240952).

112.    In May 2007, Daimler approved the use of the PSDI-5 for the W164 program (the Mercedes-Benz M-Class mid-size SUV), admittedly, due to program timing constraints. **Ex. 40** TKH-MDL-0005548177 ("11 May [at] the big management meeting at Daimler Chrysler reporting to Dr. Schoneburg (E2) together with Konrad Sauer, Heiko Ruck… and others… Due to timing W164Mopf, DC (Mr. Bachmann) accepted to use the PSDI5…, But. DC will not accept the PSDI5 for next programs…").

113.    In 2007, Daimler granted a request from Takata to deviate from the applicable safety specifications.  **Ex. 41** (TKPOD00751202); **Ex. 42** (TKPOD00751203).

114.    Takata Petri AG (Takata's German division) informed DCX that the desired outcome with AN had not yet been fully achieved by Takata in their SDI, PSDI, SPI, PSPI, and SSI inflators. **Ex.** 43TKH-MDL-0003240950.

115.    In 2008, Daimler awarded Takata new business, switching from non-desiccated PSAN inflators (PSPI-2) to desiccated PSAN inflators (PSPI-X).  *See* **Ex. 44** (TKPOD00363444) (Takata internally reported as "good news" that the "[t]ailoring builds for the newly awarded Daimler PSPI-X business were successfully completed," including Takata having found for Daimler a configuration based on the global propellant wafer design that matched their "required PSPI-2 ballistic performance and maintained the required chamber pressure level").

116.    In December 2009, Mercedes was informed that a PSDI-5 inflator for the W164 program exhibited a lot of sparks during deployment testing and a W164 airbag cushion failed hot deployment testing. **Ex. 45**TKH-MDL-0005466672. Takata subsequently sent the cushion to Highland Industries for analysis and the findings included that the cushion had melted and deformed near the inflator opening and the cushion contained metal shard residue. **Ex. 46**TKH-MDL-0004838848 (Analysis of Mercedes Driver-Side Airbag Cushion, 12/10/2009) at 5, 15.

117.    In 2010, Mercedes' inflator engineers and specialists from Germany also visited Monclova to conduct a full-line audit where process flow charts, procedures, and "*pokey yokes*" were shown and reviewed. **Ex. 47** TKH-MDL-0004269359.

118.    In April 2010, Daimler had concerns over "ballistic differences" and heat age testing results for the PSDI5, and Daimler even required that Takata perform additional ballistic inflator tests. *See* **Ex.** 48(TKH-MDL-0005467000) at TKH-MDL-0005467001.

119.    Also in April of 2010, just four months before the scheduled start of production, "a ballistic 'flyer'" that appeared to have high moisture was found during PV testing of the PSDIX (Daimler C218). **Ex. 49** (TKH-MDL-0002386746) at TKH-MDL-0002386747.

120.    In September 2010, a PSDI-X inflator for Mercedes exhibited a ballistic anomaly during DPV testing. **Ex. 50** (TKC-MDL-0001045665).

121.    By November 2010, Daimler AG had requested a face-to-face meeting with Takata over issues that PV testing indicated that the PSDI-X inflators did not meet certain requirements after exposure to environmental conditions. **Ex. 51** (TKH-MDL-0006000199).

122.    Around the same time, Mercedes reported an LAT [Lot Acceptance Test] observation on a W164 DAB to Takata and the findings were "concerning." **Ex. 52** (TKH-MDL-0000827592); *see also* **Ex. 53** (TKH-MDL-0000827595).

123.    Issues with Takata's X-Series inflators continued into 2013. *See, e.g.*, **Ex. 54** (TKH-MDL-0000834627); **Ex. 55** (TKH-MDL-0004001343).

**F.  As Daimler's Designated Agent, MBUSA Had Access and Control to Engineering and Other Technical Information Evidencing the Inflator Defect, and MBUSA Was Responsible For Daimler Engineers in Germany.**

124.    MBUSA's general manager of engineering services was responsible for being the administrator of MBUSA's counterparts in Germany, including different engineering departments in Germany. ECF No. 4339-20 (Tait Dep. Tr.) at 21:10–22:8. MBUSA communicated directly with Daimler regarding MBUSA vehicles and their components such that MBUSA always had knowledge of as well as control and access to the information provided by Takata to Daimler, including when vehicle issues arose. *See* ECF No. 4339-20 (Tait Dep. Tr.) at 22:5–8. MBUSA employee—Department Manager for the Vehicle Compliance Department—Thomas Brunner was one of the key personnel that would communicate with Daimler engineers regarding any of the technical aspects of the vehicle components.  *See* ECF No. 4339-20 (Tait Dep. Tr.) at 64:15.

125.    MBUSA was Daimler's designated agent for Mercedes-Benz vehicles in the United States. Ex. 1 (Brunner Dep. Tr.), at 158:23–159:4.  As Daimler's "designated agent," MBUSA had access to and control of the information Daimler had regarding its suppliers and airbags. *See* Ex. 1 (Brunner Dep. Tr.) at 159:10–161:14; ECF No. 4339-20 (Tait Dep. Tr.), at 22:1–8; **Ex. 56** (Gunther Dep. Tr.), at 15:1–5, 15:10–19, 17:7–15, 17:23–18:2, 76:15–20; *see infra* (PSOF, ¶¶ 116–117, 123–124, 126–30, 133–35 152, 162, 174.).  As Daimler's "designated agent," MBUSA plays a crucial role in gathering information regarding its Takata airbags from Daimler to supply to NHTSA and other OEMs.  *See* Ex. 1 (Brunner Dep. Tr.) at 158:16–160:15. For example, MBUSA provided FCA information regarding the affected PSDI-5 inflators in Crossfire vehicles based on information MBUSA had received from Daimler that "came from Takata." **Ex. 57** (MBUSA_00031893); *see also* **Ex. 58** (MBUSA_00092986) (MBUSA was involved in the identification of affected vehicles with Takata recalled airbags.). MBUSA employee Thomas Brunner could not recall a single instance where MBUSA requested Takata airbag information

from Daimler and Daimler refused to provide information.  Ex. 1 (Brunner Dep. Tr.), at 159:23–160:1.

126.   MBUSA was responsible for monitoring safety concerns in Mercedes vehicles. ECF No. 4339-20 (Tait Dep. Tr.), at 49:19–24.  MBUSA had the discretion to investigate the safety of its vehicles and may have looked into the safety of Takata airbags. ECF No. 4339-13 (Analil Dep. Tr.), at 150:5–8, 9–17.  MBUSA was responsible for submitting 573 reports to the NHTSA. *Id.* at 141:19–21.

### G. MBUSA Could and Would Review Vehicle Component Information and the Identity of the Suppliers, as Part of MBUSA's Review to Ensure that Mercedes-Benz Vehicles are Compliant with United States' Regulations.

127.   MBUSA has a vehicle compliance department that is responsible for ensuring that Mercedes vehicles are compliant with the laws and regulations in the United States.  ECF No. 4339-3 (Aikman Dep. Tr.), at 38:6-8, 81:8-9.  The Mercedes-Benz vehicles that MBUSA distributes in the United States are required to meet various Federal Motor Vehicle Safety Standards.  **Ex. 56** (Gunther Dep. Tr.), at 14:5-16, 15:1-5.  MBUSA's vehicle compliance department is responsible for conducting spot-checks of the certification and for responding to NHTSA's requests that MBUSA check the certifications that the Mercedes-Benz vehicles MBUSA distributes in the United States meet various Federal Motor Vehicle Safety Standards.  *Id.* at 14:5-16, 15:1-5, 15:10-19.

128.   MBUSA works with its Daimler counterparts and reviews the documents provided by Daimler to MBUSA, before MBUSA submits the safety documentation to NTHSA.  **Ex. 56** (Gunther Dep. Tr.), at 15:1-5, 15:10-19. MBUSA can always request the safety certifications from Daimler for Mercedes-Benz vehicles sold in the United States, and MBUSA can review those certifications and information with its colleagues at Daimler, which would include the identity of the airbag supplier.  **Ex. 56** (Gunther Dep. Tr.), at 17:7-15, 17:23-18:2; *see id.* at 76:15-20.

### H. MBUSA's Communications with Takata in the Early 2000s, Evidencing MBUSA's Knowledge that Takata was its Airbag Inflator Supplier.

129.   In 2004, MBUSA and Takata communicated between themselves regarding Takata's PSDI-4 and PSDI-5 inflator exemption letters to be sent to the U.S. Department of Transportation ("DOT").  *See generally* **Ex. 59** (TKPOD00880802) (November 2004 MBUSA-Takata email thread referring to PSDI-4 and PSDI-5 inflators DOT letters);  **Ex. 60**(TKPOD00880803) (attached ASL, Inc. (*i.e.*, a Takata entity) PSDI-4 inflator DOT letter);  **Ex.**

**61** (TKPOD00880804) (attached ISI (*i.e.*, a Takata entity) PSDI-4 inflator DOT letter). These inflator-related communications in 2004 followed others between MBUSA and Takata from as far back as at least July 2002. *See, e.g.*, **Ex. 59** (TKPOD00880802) at 4-5 (Email referencing a "DOT Ltr, PSDI-5, Jul '02.pdf").

130.    In 2005, MBUSA communicated with Takata regarding the requisite DOT exemption letter for Takata airbag SPI and PSPI inflators in MBUSA's vehicles. *See* **Ex. 62** (TKPOD01214262); **Ex. 63** (TKPOD01214263) (attached ISI PSPI and SPI inflator DOT letter). The PSPI-2 inflators were inflators in Class Vehicles eventually subject to Takata's PSAN-based recall. ECF No. 4336-7 (Renz Rept.), at 18-23.

131.    MBUSA had at least some expertise regarding airbag inflators, evidenced, for example, by MBUSA's participation, by no later than 2004, in the "North American Automotive Hazmat Action Committee (NAAHAC[])] – an industry work group of OEMs and some suppliers" (that shared information regarding vehicle inflators). *See* **Ex. 59**(TKPOD00880802) at 1. In 2004, MBUSA even invited Takata to the NAAHAC (*see id.*), and Takata ultimately did join the group (*see* **Ex. 64** (TKPOD00537470)). From the NAAHAC meetings attended jointly by MBUSA and Takata, MBUSA knew that at least some other OEMs used Guanadine Nitrate (GuNi) as their inflator propellants. *See* **Ex. 65** (TKPOD00978610) (email);   **Ex. 66**(TKPOD00978611) at 2, 4, 5 (attachment discussing inflator supplier TRW's MSDS using GuNi propellant, and identifying the "[c]omposition/[i]nformation on ingredients"); **Ex. 67** (TKPOD00978612) at TKPOD00978612-613 (attached MSDS identifying GuNi).

132.    MBUSA and Takata continued to communicate amongst themselves regarding inflator and airbag-related regulations and vehicle information. *See, e.g.*, **Ex. 64**(TKPOD00537470) at TKPOD00537470*; see also* **Ex. 68** (CUST038_PRIV00086545); **Ex. 69** (CUST038_PRIV00086546); **Ex. 70** (TKPOD02181791); **Ex. 71** (TKPOD02181149); **Ex. 72** (TKPOD02181248); **Ex. 73** (TKPOD02181481). These communications included regulatory changes relating to airbag warning labels, caused by Takata "stir[ing] the pot . . . with NHTSA." *See id.*   **Ex. 74**(TKPOD00537470) at TKPOD00537470.

**I.   Through MBUSA's Involvement in Various Airbag Recalls from 2006 - 2014, MBUSA Knew That Takata Continued to Supply Airbags for Mercedes-Benz Vehicles in the United States.**

>    a.   **MBUSA Knew that During an Unrelated Recall in 2006 Affecting Some of the Class Vehicles, MBUSA Dealers Used Takata Airbags as Replacements, Which**

**MBUSA Claimed Complied with NHTSA Tests; These Replacement Takata Airbags Were Ultimately Takata's Defective Non-Desiccated PSAN-based, Recalled Airbags.**

133.    In March 2006, MBUSA initiated a recall, regarding a safety defect affecting drivers' airbags in "certain MY 2005–2006 C-Class vehicles with regard to the driver's airbag." **Ex. 74** (RCONL-05V560-3619) (MBUSA Safety Recall #2006020005 letter). MBUSA was involved with Daimler and NHTSA in the communications regarding the "extensive testing" of the affected airbags. *See, e.g.*, **Ex. 75**(CUST162_PRIV00000130) at 1, 25, 28, 51, 57-61. MBUSA knew that its dealers in the United States would equip the recalled vehicles with a newly developed airbag inflator (*id.* at 57-61; *see also* **Ex. 74** (RCONL-05V560-3619)), which was ultimately a Takata non-desiccated PSAN-based inflator airbag module that would be subject to recall due to its PSAN propellant (*see, e.g.*, **Ex. 76** (2005 MERCEDES-BENZ C-CLASS 2 DR | NHTSA) (NHTSA List of Recalls for the MY 2005 Mercedes-Benz C-Class) (identifying both the unrelated March 2006 recall for the airbag and the Takata PSAN-based inflator recall)). MBUSA knew or should have known the replacement airbag inflators in these Class Vehicles were Takata airbag inflators. *See* **Ex. 75**(CUST162_PRIV00000130) at 61; *id.* at 1, 25, 28, 51, 57–61; *see also* ECF No. 4339-3 (Aikman Dep. Tr.) at 22:7-18) (MBUSA owned, controlled, and operated at least one Mercedes-Benz authorized dealership).

**b.   MBUSA (Including Thomas Brunner & an Engineer) Knew that its October 2012 Recall of Mercedes-Benz Vehicles in the United States Involved a Defect in Takata's Supplied Airbags.**

134.    MBUSA knew Takata continued to supply airbags for Mercedes-Benz vehicles that MBUSA distributed in the United States, as it advised NHTSA in 2012 of a recall affecting its Takata airbags. **Ex. 77** (TKPOD00310596) at 1–3.

**c.   MBUSA (Including Mr. Brunner and an Engineering Manager) Knew that its July 2014 Recall of Mercedes-Benz Vehicles in the United States Involved a Defect in Takata's Supplied Airbag Modules.**

135.    MBUSA knew Takata continued to supply airbags for the Mercedes-Benz vehicles it distributed in the United States, as evidenced by MBUSA's issuance of a recall in 2014 for defect in the PABs supplied by Takata for MY 2014 SLK-Class and SL-Class Mercedes-Benz vehicles. *See* **Ex. 78** (CUST007_PRIV00006310 at 1, 2). Notably, this recall occurred in the midst

of the slew of Takata recalls and NHTSA investigations relating to Takata non-desiccated PSAN inflators.  (*See infra* PSOF, ¶¶ 163 & n.12, 164, 165 & n.14, 166–70.)

**J.   Some of MBUSA's Class Vehicles are Produced at Mercedes-Benz U.S. International, Inc. ("MBUSI") in Alabama; MBUSI and MBUSA Consistently Promote MBUSI as the Manufacturer of these Vehicles and MBUSA as the Distributor of Said Vehicles.**

136.   At least some of MBUSA's Class Vehicles were produced at MBUSI in Tuscaloosa or Vance, Alabama, and MBUSA promotes MBUSI as a superior manufacturing facility of its Mercedes-Benz vehicles distributed in the United States. *See* **Ex. 79**(https://media.mbusa.com/releases/release-dcf8df639d47e31c949304831f0151b8-mercedes-benz-plant-celebrates-milestone-on-valentines-day-20-years-of-production-in-alabama?channelsConstraint=channel-7b9a3b0a308b0e59265cb418c40070dc); **Ex. 80** (https://media.mbusa.com/releases/release-ea351a480f694e59964a497e248378fb-new-generation-mercedes-benz-gl-sport-utility-hits-the-road-journalists-test-drive-the-first-2013-gl-models-in-the-u-s); **Ex. 81** (MBUSA_00137451 at MBUSA_00137452); ECF No. 4339-13 (Analil Dep. Tr.) at 60:24-61:3; D.E. 4610-1 (Appendix showing MBUSA's Class Vehicles); *see also* **Ex. 82**(MBUSA_00051592) (picture of the interior of a recalled Class Vehicle showing it was "MFD by [MBUSI]" Tuscaloosa County, Alabama (USA) Under Contract for Daimler AG, Stuttgart (Germany)").  MBUSI promotes its role as limited to the *production* of "superior quality" and "safe" Mercedes-Benz vehicles, and MBUSI promotes the *purchase* of these vehicles through MBUSA.  **Ex. 83**(https://www.alabamagermany.org/membership-directory/1369/mercedes-benz-u-s-international-inc/).

**K.   MBUSA's Parts Distribution Center in Vance, Alabama—where MBUSA Engineers Work on Distributing Vehicle Parts—is Directly Across the Street from MBUSI, Providing MBUSA Geographic and Logistical Access to Information from MBUSI (and from its Cross-Functional Daimler Team) Regarding Takata's Supplied Airbags, Takata's Visits to MBUSI, and MBUSI's Visits to Takata.**

137.   MBUSA's "Vance, Alabama Parts Distribution Center (PDC) supports dealers across the United States with parts supply and houses parts inventory required for campaigns." **Ex. 84** (https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-385603.html).  MBUSA's Parts Distribution Center in Vance, Alabama is just one mile from MBUSI's Vance/Tuscaloosa manufacturing plant.  *See* **Ex. 84** (https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-385603.html) (showing a map with the

location of MBUSA's Part Distribution Center as directly across the street from MBUSI's manufacturing facilities in Vance, Alabama); **Ex. 85** (Google Maps screenshot showing a zig-zagged drive of 1.4 miles or 3 minutes distance between the two destinations).

138.    Takata visited MBUSI every year.  *See* **Ex. 86** (TKPOD00303816); *see also* **Ex. 87** (CUST021_PRIV00016231).    Daimler's "Cross Functional Team" employees working at MBUSI's plant in Vance, Alabama and MBUSI employees communicated with Takata as one of MBUSI's suppliers.  *See, e.g.*, **Ex. 88** (CUST038_PRIV00896316) at 1; **Ex. 89** (CUST038_PRIV00896317) at 1; **Ex. 90** (CUST038_PRIV00896321) at 1. MBUSI had the discretion to consider vehicle suppliers.  *See* **Ex. 91** (https://mbusi.com/supplier); *see also* **Ex. 92** (https://mbusi.com/supplier/61-supplier-zone/250-doing-business-with-mbusi-2).

**L.  MBUSI and Takata's Master Terms Direct Purchasing Agreements and Their Related Agreements Not Only Contemplated the Supply of Vehicle Components for MBUSA's Benefit, But These Agreements Also Evidence MBUSI Knew or Should Have Known of Takata's Use of PSAN Propellant, and These Agreements Were the Source of QEC Work Performed by MBUSA and Daimler.**

139.    A series of "Master Terms Direct Purchasing" agreements created by MBUSI and provided to Takata as a Mercedes-Benz vehicle supplier contemplated the supply of vehicle components for MBUSA's benefit.  *See generally* **Ex. 93** (TKH-MDL-0005456746) at TKH-MDL-0005456749. The defined terms evidence Daimler's involvement in the series of agreements between Takata and MBUSI, and MBUSI's access to Daimler's information.  *See id.*[6] Daimler's "Engineering Portal" provided for the exchange of engineering data, including product design data, between Takata as a supplier and Daimler and MBUSI as the customers. *Id.* at TKH-MDL-0005456778.

140.    MBUSI had access to Takata's airbag and propellant manufacturing facilities.  *See, e.g.*, *id.* at TKH-MDL-0005456755–TKH-MDL-0005456756.   For example, MBUSI's SQE employee Steven Wood visited Takata's facility with Daimler AG employees to observe the DAB run rate and VDA audit, and during the "Mercedes VDA audit[,] Mercedes rated the maturity level

---

[6]  *See e.g.*, *id.* at TKH-MDL-0005456750(l) (defining the Daimler Specifications as "[t]he technical specifications and requirements set forth in the Source Package, as amended, modified, or updated from time to time by Daimler"); *id.* at TKH-MDL-0005456753(rr) (defining Source Package as the "Commercial Requirements/Source Package and request for quote delivered to Supplier by Daimler); *id.* at TKH-MDL-0005456753(ss) (defining Specifications as "[c]ollectively, the Daimler Specifications and the Supplier Specifications . . . ").

/ risk condition red" such that "Mercedes will visit Torreon by the end of June again to review improvements on the open items." **Ex. 94** (TKPOD03255744) at TKPOD03255749–TKPOD03255750.

141. MBUSI even had the ability to require Takata to use a different propellant or to add desiccation to its PSAN-based propellant. *See* **Ex. 95** (TKH-MDL-0005456746) at TKH-MDL-0005456756.

142. In MBUSA's role as the distributor and marketing entity of the MBUSI-manufactured Mercedes-Benz vehicles in the United States, MBUSA was the intended third-party beneficiary of these agreements. For example, Takata's warranties and representations were for the benefit of "MBUSI, DAG, and any entity claiming by or through MBUSI or DAG." *See* **Ex. 95** (TKH-MDL-0005456746) at TKH-MDL-0005456789 (Section 16.6); *see also id.* at TKH-MDL-0005456787 (Section 16.2)(c); *id.* at TKH-MDL-0005456787 (Section 16.1)); *id.* at TKH-MDL-0005456788 (Section 16.8). MBUSI's warranty claims against Takata were calculated based on "the total expense to the Vehicle incurred by the MBUSA retailer," including certain factors determined by MBUSA. *See id.* at TKH-MDL-0005456789 (Section 16.7). Takata agreed to "indemnify and hold harmless MBUSI, Daimler, and any authorized distributor of the Vehicle," including for damages arising from a recall campaign relating to a defect in its product. *Id.* at TKH-MDL-0005456790 (Section 17.1). MBUSA knew or should have known of MBUSI's Master Terms Direct Purchasing agreements with Takata, not only because MBUSA's QEC performed warranty claims pursuant to those Master Terms agreements (*see infra* PSOF, ¶¶ 143–49, 151, 154), but also because MBUSA had access to MBUSI Purchase Orders between MBUSI and Takata for airbags, which referred to those Master Terms agreements and related documents (*see, e.g.*, **Ex. 96** (MBUSA_00120407)).

**M. MBUSA, Daimler, and other Quality Divisions Working at MBUSA's Quality Engineering Center ("QEC") in Jacksonville, Florida Shared Vehicle Component Quality and Warranty Information Between Themselves and MBUSI's Suppliers, Including Performing Supplier Audits and Local Parts Analysis.**

143. MBUSA's "new state-of-the-art facility" in Jacksonville, Florida linked its "core operations" and "centralize[d] several business units into one building"—including MBUSA's "Quality Evaluation Center (QEC)" and its Sales Operations Southern Regional Office. **Ex. 97** (https://media.mbusa.com/releases/release-b07cd74bf472407914cef9004c25331f-Mercedes-Benz-USA-Opens-Major-Facility-in-Jacksonville-Florida); *accord* **Ex.** **98**

(https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-329620.html).
MBUSA's quality engineers worked hand-in-hand with Daimler's quality engineers at its QEC,
including performing local parts analysis. **Ex. 97** (https://media.mbusa.com/releases/release-
b07cd74bf472407914cef9004c25331f-Mercedes-Benz-USA-Opens-Major-Facility-in-
Jacksonville-Florida).[7]  MBUSA's engineers were experienced in technical support and quality
control, and MBUSA engineers also coordinated with suppliers and Daimler's quality
organizations.  **Ex. 98** (https://group.mercedes-benz.com/careers/about-us/locations/location-
detail-page-329620.html).

144.  Consistent with the Master Terms Direct Purchasing agreement, MBUSI's Supplier
Warranty Process evidenced that QEC employees located at MBUSA's Jacksonville location had
the ability to request testing and analysis by Takata of its supplied airbags as well as the ability to
perform audits relating thereto.  *See* **Ex. 99** (CUST021_PRIV00008205) at 1, 5, 7.

145.  MBUSA and Daimler employees working at the QEC in Jacksonville informed
"Takata in May 2007[,] the responsibilities for QEC part evaluation for the M-, R-, and GL-class
were transferred to the Mercedes-Benz QEC in Jacksonville[,] Florida." **Ex. 100**
(CUST021_PRIV00005285) at 1-2.  MBUSA and Daimler quality engineers and employees
working at the QEC at MBUSA's Jacksonville, Florida location communicated with Takata,
analyzed Takata's parts, and "perform[ed] Quality Analysis Audits on a regular basis" of Takata's
facilities. *See, e.g.*, **Ex. 101** (CUST021_PRIV00011193). For example, in September 2011, Heiko
Saupe—a Daimler AG employee working at MBUSA's QEC—emailed Takata and included an
MBUSA employee in the communication regarding the QEC's analysis of Takata's warranty parts
and the scheduling of a Quality Analysis Audit at Takata, to be performed by QEC's quality
engineers.  **Ex. 101** (CUST021_PRIV00011193) at 1-2.  "The results from [the QEC's] audit would
be shared with all involved departments within [the] company." *Id.* at 2. Daimler and MBUSA

---

[7] *See also id.* ("With over 70 personnel from various engineering and logistics disciplines, representing a
diverse collection of work experience and backgrounds, the Quality Evaluation Center in Jacksonville is
one of only two operational units of its kind outside of Germany. The QEC team includes Daimler Quality
personnel, which places engineers closer to the market and to the dealers served by MBUSA. This market
proximity brings greater knowledge of market-specific issues directly into the Quality management process
through increased speed of parts evaluation and feedback to Daimler development. Local parts analysis also
helps to improve diagnostic tools and technical information . . . .").

provided various vehicle component quality and warranty documents to Takata. *See, e.g.*, **Ex. 102** (CUST021_PRIV00011195); **Ex. 103** (CUST021_PRIV00011196).

146.    Shortly after that audit to Takata's facility, Mr. Saupe advised Takata that its analysis process failed to meet Daimler requirements.    **Ex. 104** (CUST021_PRIV00006912). Takata employees internally lamented the botched audit visit, admitting Takata's issues would cause Daimler to doubt Takata's abilities as a supplier. *See, e.g., id.* ("Issues like this cast a doubt to the entire organization when it gets out.  It's not acceptable."); *id.* ("When this gets out, its going to be a black eye."). A month later in November 2011, Takata visited the QEC at MBUSA's Jacksonville location to discuss vehicle warranty issues.  *See* **Ex. 105** (CUST038_PRIV00896267) at 1; **Ex. 106** (CUST038_PRIV00862891).

147.    Daimler communications from the QEC in Jacksonville, Florida, to Takata and other MBUSI suppliers endorsed Daimler's close involvement with MBUSA.  *See, e.g.*, **Ex. 107** (CUST021_PRIV00008206) at CUST021_PRIV00008206 (May 2011 letter to suppliers).  Indeed, Daimler, MBUSI, and MBUSA employees working at the QEC in Florida or working at MBUSI the United States not only shared information regarding vehicle suppliers and warranty information, but they also overlapped in their respective roles amongst the various entities.  For example, Mathias Jens's and Florian Hohenwarter's personal profiles admit that although they were both working at the QEC in MBUSA's Jacksonville location, including involved in communications with Takata's parts for MBUSI, Mr. Jens was an MBUSA/Daimler AG employee and Mr. Hohenwarter was a Mercedes-Benz AG employee.  *Compare* **Ex. 108** (https://www.xing.com/profile/Mathias_Jens) (Mathias Jens Xing Profile), *and* **Ex. 109** ((30) Florian Hohenwarter | LinkedIn) (Florian Hohenwarter LinkedIn Profile), *with* **Ex. 99** (CUST021_PRIV00008205), *and* **Ex. 107** (CUST021_PRIV00008206) at CUST021_PRIV00008206.  Hannes Witte is another example, with Witte working as a Quality Engineer at Daimler in Germany and then at MBUSA's QEC, and subsequently working as an MBUSA employee also at the Jacksonville location.  *Compare* **Ex. 110** ((28) Hannes Witte | LinkedIn) (Hannes Witte LinkedIn). This overlapping of shared employees and transfer of knowledge between the entities is further evidenced by Mr. Witte's participation in MBUSA's QEC Supplier Day for new Mercedes-Benz vehicle launches, where Takata, Daimler, and MBUSA

shared supplier and pre-production information. (*See infra* PSOF, ¶¶ 150–57.)[8] And MBUSA's job postings evidence that MBUSA's quality engineers were responsible for interacting with suppliers and internal departments including Research & Development, performing supplier audits, and performing quality assurance. *See, e.g.*, **Ex. 111** (https://jobs.mercedes-benz.com/en/principal-quality-engineering-powertrainchassis-127056-MER000373X).

148.     Communications between Takata, MBUSA, and Daimler employees working at MBUSA's QEC further evidence MBUSA's knowledge of Takata as an airbag supplier to Mercedes-Benz vehicles MBUSA distributed. *See, e.g.*, **Ex. 116** (CUST021_PRIV0005285) at 1-2; **Ex. 117** (TKPOD03316459) at 2; **Ex. 118** (TKPOD03346422) at 10.[9]

**N.   Daimler, MBUSI, MBUSA, and Takata participated in "Supplier Day" events, including, for example, the Supplier Day event in April 2014 Regarding Mercedes-Benz's 205 line.**

149.     MBUSA's QEC met with Daimler and Takata at MBUSA's Jacksonville, Florida location in April 2014 as part of the "205 Supplier Day." *See generally* **Ex. 119** (CUST038_PRIV00093195); **Ex. 120** (CUST038_PRIV00093201).     Mr. Witte, Daimler's employee working at MBUSA'S QEC, emailed Takata and the other "205 Suppliers" on behalf of "[t]he QEC Mercedes-Benz Team" to thank them for participating in the 205 Suppliers Day visit on April 8, 2014, to MBUSA's Quality Engineering Center in Jacksonville, Florida and attaching the presentations shared with them by MBUSA and Daimler on that day. *See* **Ex. 119** (CUST038_PRIV00093195)     (QEC     email     to     suppliers);     *see     also*     **Ex.     121**

---

[8] Likewise, MBUSA's and MBUSI's employees overlapped in their roles, further evidencing the sharing of information. *See, e.g.*, **Ex. 112** ((28) Mike Capps | LinkedIn) (Mike Capps LinkedIn) (Mr. Capps identified himself an *MBUSA* Supplier Quality Manager for the last thirty years); **Ex. 113** (TKPOD00303817) at 5 (discussing feedback from Mr. Capps regarding Takata as a supplier of MBUSI); **Ex. 114** (CUST129_PRIV00017544) (2010 Quality Assurance Visit Report discussing "MBUS" employee Mr. Capps with an issue with Takata airbags at MBUSI plant). MBUSI's requirements for its Supplier Quality Engineers required its engineers to be "[r]esponsible for investigating and analyzing supplier parts to ensure quality from the development phase through the end of the life cycle by collaborating cross-functional partnerships within the company (worldwide)." **Ex. 115** (MBUSI – Supplier Quality Engineering LinkedIn Job Posting – mid-2023).

[9] *See also* **Ex. 126** ((30) Claus Falcke | LinkedIn) (Claus Falcke LinkedIn Profile) (Falcke was a Daimler quality engineer for 12 years before he began working as an MBUSA Manager of MBUSA's QEC from 2014-2016); **Ex. 127** ((30) Lisa Hutchins | LinkedIn) (Lisa Hutchins LinkedIn Profile) (Hutchins has been an *MBUSI* Accounts Payable Support Specialist since 1995 through the present); **Ex. 128** ((30) Andrew Lewandowski | LinkedIn) (Andrew Lewandowski LinkedIn Profile) (Lewandowski has been an *MBUSA* Engineering Manager since 2005 through the present).

(CUST038_PRIV00093198) (attached QEC Tool Training presentation); **Ex. 122_** (CUST038_PRIV00093199) (attached VDA Standards presentation); **Ex. 123** (CUST038_PRIV00093200) (attached Vendor Recovery Overview presentation); **Ex. 120**(CUST038_PRIV00093201) (Launch Process and Corrective Action Process Presentation); **Ex. 124** (CUST038_PRIV00093202) (Supplier Recovery System (SRS) presentation). MBUSA QEC's Deputy Department Engineering Manager drafted some of the materials shared with Takata. *See* **Ex. 125** (CUST038_PRIV00093197) at 1.

150.     The "Mercedes QEC – 205 Launch Concept & Corrective Action Process – QEC (Quality Engineer Center) 2014 Supplier Day – April 8, 2014" presentation focused on the sharing—between MBUSA, MBUSI, and Daimler—of information relating to the development phase, and the suppliers' involvement relating there. *See generally* **Ex. 120** (CUST038_PRIV00093201).[10]

151.     MBUSA promoted "Jacksonville [a]s part of the worldwide QEC network" and "[e]ach site manag[ing] the specific local suppliers." **Ex. 125** (CUST038_PRIV00093197) at 3; *see id.* (QEC Jacksonville was established in 2006, and MBUSA is QEC Jacksonville's "Host Organization."); *id.* at 5 (MBUSA's "QEC Jacksonville focuse[d] on NAFTA suppliers and the parts they produce[d] independent for the carline the parts are used for."); *id.* (QEC Jacksonville analyzed "US specific parts" and "US specific failures," and MBUSA's QEC supported "US Market Controlling" and "Parts requests from Germany."); *id.* at 6 ("Mercedes-Benz Regional Offices of Jacksonville provides home for five MBUSA departments," including two different

---

[10] *See also id.* at 1 (The 205 Global Production Setup provided for "Parts & Knowledge Transfer" between the USA, Germany, and China QEC locations); *id.* at 2 ("The QECs collaborate with all departments involved in the launch throughout the complete process."); *id.* at 3 (MBUSI, MBUSA, and other departments shared pre-production supplier information with each other and the QECs); *id.* at 4 (During the pre-launch phase, the "QEC prepare[d] Suppliers for 205 Launch and set[] up regular Meetings with Tuscaloosa [the MBUSI plant] and Sindelfingen [the Daimler plant]."); *id.* (During the Information stage, MBUSA, MBUSI, and other departments were responsible for the following: "Establish[ing] contacts with QEC for launch phase[;] Shar[ing] experiences from development and PT phase (part maturity level)[;] Shar[ing] experiences from European Launch (current)[;] Identify[ing] issues that could become a field problem."); *id.* (During the preparation stage, the chart provides for various points, including "[e]stablish contact between QEC and supplier, focus on new suppliers."); *id.* at 5 (The Launch stage further involved the "communication of results" between the supplier, MBUSI, and MBUSA.); *id.* (During the Launch stage, MBUSI and other departments performed: "[o]ngoing information exchange with EVS, SQE, MBUSA, and EMO.").

QECs."); *id.* (The "QEC-C (MBUSA/CE)" "is responsible for Warranty Controlling and, in part, Repair Quality for all 457 dealers throughout the USA."); *id.* at 7 ("A wide variety of approaches [were] used in order to resolve quality topics together with QEC's partners," including Supplier Days, Supplier Audits, Analysis Workshops, and InCar Testing."); *id.* at 9 (As of 2014, QEC staff consisted "of 17+1 team members to cover all commodities and the team's operations," including an Interior/Exterior engineer responsible for restraint systems, seats, and vendor recovery, and Andre Vignola as the "Interior Component Analyst.");[11] *id.* at 10 (Prior to 2011, the QEC had comprised over 40% additional employees).

152.   MBUSA touted QEC Jacksonville as "mastering" the two U.S. launches of the "W166 9/2011" and the "X166 9/2012," and MBUSA explained QEC Jacksonville was "awaiting" the launch of the "W205 9/2014." *Id.* at 13.

153.   The VDA-Standards presentation—shared amongst MBUSA, Daimler QEC employees, and Takata—evidenced the sharing of pre-development supplier product information, which would have included pre-development inflator and airbag information. *See* **Ex. 122** (CUST038_PRIV00093199) at 5 (The VDA-Standards presentation explained that the steps include receiving the contract ("Quotation process (contract review)" and "Def. and Draft, Product & process developments") to issuing the contract ("Pre-select suppliers; Potential analysis" and "Implementation Product/process development") to Start of Production (SOP).); *see also id.* at 4 (discussing the "external audit" process for its current suppliers and "the analysis of potential suppliers). The questions and steps discussed in the VDA-Standards presentation included "Supplier management." *Id.* at 5; *see also id.* at 6 (describing the process for analyzing defective parts).

154.   MBUSA's Vendor Recovery Overview presentation—drafted by MBUSA—explained that "vendor recovery" referred to the recovery of warranty costs due to a supplier failure, and that the "root cause analysis" had three aspects—Supplier, MBUSI, and "Design." **Ex. 123** (CUST038_PRIV00093200) at 3; *see also id.* (noting that warranty terms and conditions apply to all NAFTA suppliers, but the purchasing agreement took precedence over the supplier warranty

---

[11] Andre Vignola—the interior component analyst included in the Supplier Day presentation— identified himself as a Quality Engineer at MBUSA from 2005 through the present. **Ex. 129** ([(22) André Vignola | LinkedIn](#)) (Andre Vignola LinkedIn).

process); *id.* at 6 (discussing some of the terms of Master Terms Direct Purchasing ("MTDP") agreement, including the MBUSI warranty claim).

155.    The QEC Tool Training presentation evidenced that the online data submitted by suppliers including Takata, such as 8D reports, would have been online data that MBUSA quality engineers would have had access to.  *See generally* **Ex. 121**(CUST038_PRIV00093198).

156.    The QEC's email also attached a photograph, which is presumably the group picture between the Supplier Day attendees, including Takata and QEC employees.  **Ex. 130** (CUST038_PRIV00093196); *see also* **Ex.** 125 (CUST038_PRIV00093197) at 2 (Supplier Day agenda, identifying the "Group Picture" as an agenda item).  Takata's attendance at this Supplier Day apparently meant that Takata had been granted the rank of "Key Supplier" by Daimler and/or MBUSI, which was a special high rank that provided for close collaboration between the Mercedes entities and the suppliers.  (*See infra* PSOF, ¶¶ 196–98.)

**O.  Aside from MBUSA's Expertise Evidenced by Its QECs and PDCs, MBUSA's Quality Engineers Also Played an Active Role at MBUSA's Vehicle Preparation Centers ("VPC"), and MBUSA VPCs Communicated Directly With Takata, Such That MBUSA Had the Opportunity to Discuss the Contents of the Supplied Airbags.**

157.    MBUSA has Vehicle Preparation Centers ("VPCs") in the United States, which receive Mercedes-Benz vehicles and perform quality inspections of those vehicles prior to distributing them to Mercedes-Benz dealerships throughout the country.  **Ex. 131** (https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-329604.html) (Baltimore VPC); **Ex. 132** (https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-329622.html) (Long Beach VPC); **Ex.  133** (https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-329605.html) (Brunswick VPC). MBUSA's engineers are experienced and qualified, as the VPCs have "the ability to perform vehicle inspections, factory campaigns, . . . body and mechanical repairs." *See* **Ex. 133** (Brunswick VPC) (https://group.mercedes-benz.com/careers/about-us/locations/location-detail-page-329605.html).

158.    MBUSA communicated directly with Takata regarding the delivery of vehicle parts to MBUSA's various VPCs.  *See, e.g.*, **Ex. 134** (TKPOD00701241) (June 2002 email).

**P.  MBUSA's After-Sales Division Also Communicated With Takata Regarding Its Supplied Vehicle Parts.**

159.    In January 2014, MBUSA employee Srinivas Yalamanchi communicated directly with Takata regarding Daimler's purchase contract for vehicle parts to get delivered to a Daimler plant. *See* **Ex. 135** (TKPOD01450996); **Ex. 136** ([(24) Srinivas Yalamanchi | LinkedIn](#)) (Srinivas Yalamanchi LinkedIn Profile).

### Q. MBUSA Paid Takata Invoices for Airbags Supplied to MBUSI, Including for Years Prior to the Recalls.

160.    MBUSA paid Takata invoices for airbags and other materials provided by Takata to MBUSI for Mercedes-Benz vehicles that MBUSA would sell. *See* **Ex. 137** (TKPOD04142622) at 1-6 (Takata composite invoices for airbags); *id.* at 7-72 (Takata invoices for airbags identified as part no. A1648602402); **Ex. 138** (TKPOD04142625) (Part number A1648602402 refers to Takata driver airbags); *see also* **Ex. 139** (TKPOD04263042) at 20; **Ex. 140** (TKPOD01655024) at 3.

### R. MBUSA Performed Investigations of Vehicle Anomalies, Including Those Involving Safety Issues, and Shared the Information With Daimler.

161.    MBUSA's role includes performing investigations for vehicle anomalies, gathering evidence regarding said anomalies, and subsequently sharing this information with Daimler for a solution to be implemented in the field vehicles. *See* ECF No. 4339-20 (Tait Dep. Tr.) at 44:18–45:12. MBUSA monitors warranty or "PTSS" cases. *Id.* at 43:1–24. MBUSA would communicate with Daimler who would "get an answer based on something else that they've seen or the design" including "go[ing] to R&D, talk[ing] to an engineer, et cetera." *Id.* at 43:25–44:16.  MBUSA's job is to "supply information based on anomalies [MBUSA] see[s] in the field" through communications with Daimler, where Daimler would determine whether a reported vehicle issue was "critical" and the resolution relating thereto. *Id.* at 47:14–48:21.

162.    MBUSA's role of monitoring Mercedes vehicles in the United States was based on information they receive from dealerships and the PTS database as well as from MBUSA's own field service engineers' investigations. *Id.* at 49:14–24, 50:4–6, 50:14–18, 51:9–15, 51:22–53:7. MBUSA's field service engineers were responsible for "looking for anomalies in the dealerships" or "looking for new situations" so they would "get more information" and "create a case." *Id.* at 52:7–53:2. MBUSA performed investigations of customer claims relating to the malfunctioning of airbags in their MBUSA vehicles, which included MBUSA's engineers performing field investigations. **Ex. 141** (Lowery Dep. Tr.) at 22:21–25:7, 31:4–16.  MBUSA had the ability to

independently investigate issues regarding the safety of its vehicles.  ECF No. 4339-13 (Analil Dep. Tr.) at 149:9–150:8. MBUSA reviewed the Vehicle Owner Questionnaires (VOQs) provided from NHTSA "to manufacturers" on a weekly or monthly basis, and MBUSA met with Daimler to obtain additional information prior to MBUSA sending its MBUSA engineers to perform investigations of the interesting cases.  **Ex. 142** (Gunther Dep. Tr.) at 30:5–31:5, 31:1–6, 32:1–33:22.

S. **MBUSA Was Slow To Issue Safety Recalls For Its Vehicles Containing Defective Takata Airbags Despite Widespread Recalls By Other OEMs And Credible Evidence Of A Defect**

163.    There was a long, public history of ruptures of Takata non-desiccated PSAN inflators in vehicles in the United States, other OEMs' public recalls relating thereto, Takata's Defect Information Reports admitting a defect relating to PSAN, and NHTSA's investigations thereof.[12]

164.    Several inflator ruptures prompted Honda to publicly recall its driver airbags on November                11,                2008.                **Ex. 143**(https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/nhtsa_historical_timeline_takata_inflators.pdf) (NHTSA's Historical Timeline) at 1; *see also* **Ex. 144_** (Honda's Part 573 Safety Recall Report, Recall No. 08V-593) at 2 (admitting the Inflator Defect could cause the inflator to rupture and that "[m]etal fragments could pass through the airbag cushion material possibly causing injury to vehicle occupants").  MBUSA was concerned about whether Mercedes vehicles would be impacted by the Takata recalls, from the very first Takata recall. ECF No. 4339-20 (Tait Dep. Tr.) at 54:19–21.

165.    Additional recalls, inflator ruptures, injuries, and NHTSA investigations were covered in the media and available in the public record, continually putting MBUSA on notice of the Inflator Defect and prompting MBUSA to take action.  *See generally* **Ex. 143**(https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/nhtsa_historical_timeline_takata_infl

---

[12] Takata non-desiccated PSAN inflators began rupturing in the United States by no later than May 2004, followed by three more Takata PSAN inflator ruptures in 2007 and 2008. **Ex. 143** (https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/nhtsa_historical_timeline_takata_inflators.pdf) (NHTSA's Historical Timeline) at 1.

ators.pdf) (NHTSA's Historical Timeline).[13] By 2013, five major automakers had issued recalls of 3.6 million vehicles containing Takata airbags—yet MBUSA still took no action. *See id.* at 4.

166.    After the public announcement of Takata's first recalls, Daimler was very concerned and requested that Takata inform them pro-actively about any updates or new findings. **Ex. 145** (TKH-MDL-0004797575). In October 2014, Takata sent Daimler AG a letter informing them that "[a]ll of Takata's gas generator propellants are based on ammonium nitrate." *Id.*  On December 23, 2015, Takata admitted it "always openly communicated all technical details concerning PSAN" with Daimler and Daimler "underst[ood] the mechanism." **Ex. 146** (TKH-MDL-0004798689) ("We have had 4 meetings at ICT with Dr. Neutz and on 3 of those meetings Prof. Schoneburg attended personally. We have also communicated the junk yard events in Japan and PSDI-X issue . . . . Daimler also knows about SSI-20 issue and the one SDI issue in Malaysia.").

167.    MBUSA was aware that Daimler and MBUSI communicated with FCA and shared information identifying desiccated Takata PSAN-based inflators    *See* **Ex. 147** (MBUSA_00059256); **Ex. 148** (MBUSA_00059257); **Ex. 149** ((30) Michael Scott | LinkedIn) (Michael Scott LinkedIn profile) (Mr. Scott was an MBUSI engineer).

---

[13]  Additional Takata PSAN inflator ruptures continued to occur in 2009, requiring Honda to publicly issue two          expansions          of          its          recall.          **Ex.          143** (https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/nhtsa_historical_timeline_takata_inflators.pdf) (NHTSA's Historical Timeline) at 2. The "repeated expansions" of these recalls were so concerning that NHTSA publicly opened a Recall Query in November 2009. *Id.*  In December 2009, a Takata PSAN inflator ruptured killed a driver in Virginia, causing Honda to publicly issue another recall expansion.  *Id.*  Honda continued to publicly issue a series of public recalls, including two expansions in 2011.  *Id.* at 2-3.  At this point, more than 1 million Honda vehicles had been publicly recalled due to the Takata PSAN inflators. *Id.* at 3.  Additional Takata PSAN ruptures continued to occur in 2011, and Honda informed NHTSA in March 2013 of issues affecting the PSAN propellant in its Takata inflators.  *Id.* Takata submitted a formal notice of a defect with its non-desiccated PSAN inflators in its DIRs to NHTSA in April 2013.  *Id.* While inflator ruptures continued, NHTSA began communicating with manufacturers using Takata PSAN inflators, even convening conference calls between Takata and the OEMs. *Id.* at 4.  OEMs issued public parts collections campaigns to analyze Takata PSAN inflators in vehicles in the field.  *Id.* NHTSA also publicly opened a Preliminary Evaluation, PE14-016, to investigate Takata PSAN airbag inflator ruptures.  *Id.*  OEMs subsequently changed their parts collection campaign to public recalls of Takata PSAN inflators.  *Id.*  In November 2014, Takata submitted another DIR for additional Takata PSAN inflators, noting that its PSAN inflators' exposure to humid conditions could cause the inflators to rupture.  *See id.*  OEMs publicly expanded their recalls of Takata PSAN inflators.  *Id.* at 5.

168.    Despite being "especially concerned" that BMW had recalled their entire 3-Series, Daimler did not initiate a recall. **Ex. 150** (TKH-MDL-0004797578). Daimler's Dr. R. Schoneburg, was "extremely nervous about the situation" and requested bi-weekly meetings with Takata. *Id.*

169.    During a July 16, 2014 meeting, Takata provided Daimler a "[m]ore detailed open explanation and communication on background for last year's recalls and extension of current recalls," and "Daimler [was] very concerned about [the] ongoing inflator issue on [a] board level." **Ex. 151** (TKH-MDL0001974929) at EU CBU Daimler tab.

170.    In December 2014, Daimler even "defended Takata in front of the press at the Airbag 2014 safety conference in Karlsruhe/Germany." **Ex. 152** (TKH_MDL0000005581) (emphasis omitted).  Daimler Engineering was "irritated" by the German press's discussion regarding alternative inflator propellants. *See id.*

171.    It was not until 2016, that Daimler AG took action to protect its consumers and issued a recall; but only after it committed to "continue business with Takata." **Ex. 153** (TKH-MDL-0004798740).  MBUSA did not file its first Part 573 Safety Recall Report until February 9, 2016. **Ex. 6** (MBUSA's Part 573 Safety Recall Report, Recall No. 16V-081).

**T.  Other OEMs' Takata Recalls and Airbag Ruptures Raised Red Flags Within MBUSA, With One Deponent Admitting It Knew Takata Was one of MBUSA's Suppliers; Due to MBUSA's Concerns, Prior to Issuing MBUSA Recalls, MBUSA Sought Information Internally Within MBUSA and With Daimler.**

172.    Not only was MBUSA "always concerned" "in the very beginning of the Takata recall," but MBUSA was "always asking the question, who else is affected by that?" ECF No. 4339-20 (Tait Dep. Tr.) at 54:19–23.  After other OEMs' Takata recalls and airbag ruptures raised red flags within MBUSA, MBUSA would have sought information by communicating with Daimler, including discussing inflator failures in the United States.  *See id.* at 55:6–15; Ex. 1 (Brunner Dep. Tr.) at 111:20–114:14. MBUSA's General Manager of Engineering Services was concerned when he heard of Honda's Takata recalls because he knew Takata was one of the component manufacturers for Mercedes-Benz vehicles in the United States.  ECF No. 4339-20 (Tait Dep. Tr.) at 59:16–60:1; *see also* ECF No. 4339-13 (Analil Dep. Tr.) at 10:8–9, 37:10–21 (MBUSA's Supervisor of Safety Engineering testified she may have been aware of issues with Takata airbags as early as 2012);  After hearing about the Takata recalls and to determine whether the recall affected MBUSA, MBUSA would search for answers by asking their own MBUSA

experts.  ECF No. 4339-20 (Tait Dep. Tr.) at 54:19–55:3; *see also* **Ex. 154** (Brunner Dep. Tr. Ex. 21); Ex. 1 (Brunner Dep. Tr.) at 108:2–20.

173.    Even Mercedes-Benz authorized dealerships in the United States would have discussed the Takata recalls and affected airbags with other OEMs' dealerships, flagging these issues for their MBUSA and Daimler superiors.  *See, e.g.*, **Ex. 155** (MBUSA_00153281). Throughout the years, MBUSA and Daimler would always discuss news topics regarding what was going on in the automotive industry.  Ex. 1 (Brunner Dep. Tr.) at 98:19–99:3.

**U. MBUSA Received Information From Daimler (That Takata Provided To Daimler) Regarding Takata's PSAN-based Inflators in Mercedes Vehicles, Including Information Regarding an Inflator Rupture, Propellant Degradation, Out-Of-Spec Ballistic Test Results, and the Shift to Desiccated Inflators.**

174.    MBUSA received information from Daimler relating to Takata airbag inflators, including MBUSA inflator testing results, MBUSA's inflators' propellant burn rate data, and other information that Takata had shared with Daimler.  *See* Ex. 1 (Brunner Dep. Tr.) at 115:2–9, 116:11–15, 147:10-17.  MBUSA reviewed Takata's test data from Daimler relating to MBUSA's returned field inflators and MBUSA understood that there was evidence of propellant degradation in MBUSA's Takata inflators, at least one rupture in a tested returned MBUSA Takata inflator, and at least one other tested MBUSA Takata inflator whose ballistic curve results approached a problematic threshold. *See id.* at 150:10–152:22, 155:6–25.

175.    For example, one MBUSA and Daimler presentation to NHTSA regarding Takata's testing results of MBUSA recalled inflators, evidenced at least one MBUSA PSPI inflator rupture and another recalled MBUSA PSPI inflator that had a high burn rate value following live dissection of the inflator.  **Ex. 156** (MBUSA_00094226) at 13–14, 19; *see also* **Ex. 157** (MBUSA_00094222); **Ex. 158** (MBUSA_00094223); **Ex. 159** (MBUSA_00094226).  MBUSA routinely reviewed these types of PSAN-based inflator presentations containing data provided by Takata, including, for example, data regarding dissections of non-desiccated PSAN inflators, PSDI-5 inflators with density out of specification, some PSPI-3 inflators with increased Integrated Burn Rate, and pictures of the inflator and PSAN propellant.  *See, e.g.*, **Ex. 160** (MBUSA_00002457)    at    MBUSA_00002466    -    MBUSA_00002479;    **Ex. 161** (MBUSA_00000596) at MBUSA_00000598.

176.    As part of MBUSA's engineers' monitoring of vehicle and safety issues, nothing prevented MBUSA engineers from working with the vehicle parts suppliers in North America to

review returned vehicle parts, and nothing prevented MBUSA engineers from conducting such a review with Takata airbags.  **Ex. 56** (Gunther Dep. Tr.) at 99:20–101:23.

177.    Takata inflators collected from Mercedes-Benz vehicles in the United States were sent to the QEC located at MBUSA's Jacksonville, Florida location, before the QEC shipped them out to different testing facilities.  **Ex. 161** (MBUSA_00000596) at MBUSA_00000621.

### V.  MBUSA Failed to Disclose A Deadly Defect to Its Customers That Affected Nearly 70 Million Vehicles.

178.    MBUSA was responsible for providing information to both dealers and consumers regarding the Takata recall.  ECF No. 4339-20 (Tait Dep. Tr.), at 108:89–17.  The MBUSA vehicles that it sold to U.S. consumers were recalled later than many of the OEMs. *Id.* at 163:1–7.  NHTSA was forced to affirmatively contact MBUSA regarding their use of Takata airbags in September 2015, and eventually issued a recall on MBUSA Class Vehicles in its December 9, 2016, Third Amended Coordinated Remedy Order. **Ex.** 162 (Third Amendment to the Coordinated Remedy Order, MBUSA_00001453-1520) at MBUSA_00001466.

179.    Takata's inflator defect has led to the recall of over 67 million vehicles, plagued the automotive industry for over 20 years, and caused at least 27 deaths and more than 400 injuries. **Ex. 16** ("*Takata Airbag Recall: Everything You Need to Know"*; Consumer Reports, July 10, 2024.) (https://www.consumerreports.org/cars/car-recalls-defects/takata-airbag-recall-everything-you-need-to-know-a1060713669/).  More than 1 million defective airbags have been sold to consumers by MBUSA, each of which presents "an unreasonable risk of serious injury or death." *See, e.g.*, **Ex.** 162 (Third Amendment to the Coordinated Remedy Program, MBUSA_00001453); ECF No. 4339-13 (Analil Dep. Tr.), at 144:7–12.

180.    MBUSA's own communications with vehicle owners stated that "Mercedes-Benz USA has decided that a defect, which relates to motor vehicle safety, exists in certain Model Year 2005 - 2009 vehicles." ECF No. 4339-17 (October 2016 Recall Notice 2016090001); *see also* ECF No. 4339-18 (July 2016 Recall Notice 2016070003); ECF No. 4339-19 (October 2018 Recall Notice 2018100009); ECF No. 4339-1 (September 2019 Recall Notice 2019090009).

### W. MBUSA Closely Followed Developments with NHTSA, and MBUSA Would Have Understood MBUSA's Failures Regarding Safety Recalls.

181. MBUSA is responsible for safety reporting to the U.S. government, including TREAD act reporting. Ex. 1 (Brunner Dep. Tr.) at 31:12–19. MBUSA is responsible for reporting safety issues regarding Mercedes vehicles to the United States Government. *Id.* at 31:12–16.

182. MBUSA received customer complaints alleging facial injuries from Takata airbags. *Id.* at 65:17–66:6. Although MBUSA has the obligation to issue recalls, MBUSA was behind the industry in issuing Takata recalls. ECF No. 4339-20 (Tait Dep. Tr.) at 164:6–8; at 162:12–14. MBUSA was responsible for monitoring for safety concerns in Mercedes vehicles. *Id.* at 49:24. NHSTA audited MBUSA's handling of safety recalls, including the Takata recalls. Ex. 1 (Brunner Dep. Tr.) at 44:2–6. MBUSA investigated customer allegations of injuries from Takata airbags. *Id.* at 86:9–14; 91:19–92:2.

183. MBUSA would have closely followed developments regarding NHTSA's involvement in the Takata recalls. *See* ECF No. 4339-20 (Tait Dep. Tr.) at 36:5–37:8 (It would have been "important to [MBUSA]" to know about the findings of any audit performed by NHTSA relating to MBUSA's failures regarding safety-related recalls.).

## X. MBUSA Publicly Admitted the Danger of the Inflator Defect By Announcing It Would Cease Using Takata PSAN Inflators In MY 18 or Later Models, While MBUSA Continued to Sell Mercedes Vehicles with Takata PSAN Inflators that it Knew Would be Recalled In the Future, and While MBUSA Knew More Mercedes Vehicles with Takata PSAN Inflators were Being Manufactured that it Knew Would be Recalled.

184. As of no later than June 2016, MBUSA publicly acknowledged the danger of the Defect by announcing that for any MY 18 or later MBUSA vehicles, "MBUSA is not contemplating future production of vehicles that contain non-desiccated Takata PSAN inflators for frontal airbags for sale in the US market." ECF No. 4339-20 (Tait Dep. Tr., Ex. 14 (MBUSA letter to U.S. Senator Nelson) at 1).

185. As of no later than June 2016, MBUSA announced that at least some future vehicle models would avoid altogether PSAN-based Takata inflators—regardless of the presence of added desiccant and regardless of inflator design. *See* ECF No. 4339-20 (Tait Dep. Tr., Ex. 14 (MBUSA letter to U.S. Senator Nelson) at 1).

186. Despite this acknowledged shift away from non-desiccated Takata PSAN inflators (as well as from non-Takata PSAN inflators) (*id.*), and despite MBUSA's recall of Class Vehicles containing non-desiccated driver-side PSAN Takata inflators (ECF No. 4339-20 (Tait Dep. Tr.) at

258:11-17)), MBUSA continued to sell new MBUSA vehicles it knew contained passenger-side non-desiccated PSAN inflators (ECF No. 4339-20 (Tait Dep. Tr., Ex. 14) (MBUSA letter to U.S. Senator Nelson) at 1)), and that MBUSA would later recall (ECF No. 4339-20 ((Tait Dep. Tr.) at 259:14–260:1); *see also* Ex. 1 (Brunner Dep. Tr.) at 130:24–131:24.

187.    In response to NHTSA's August 2016 request for information, MBUSA admitted that it also had "new vehicles currently in production, or scheduled to be produced, that [would] be equipped with Takata inflators that [were] not currently under recall, but [were] scheduled to be recalled under the Amendment." **Ex. 163** (MBUSA_00000405) at MBUSA_00000405-MBUSA_00000406; *see also* Ex. 1 (Brunner Dep. Tr.) at 130:5–20. MBUSA also made the same admission regarding MBUSA continuing to offer vehicles for sale that were "equipped with Takata inflators that [were] not currently under recall, but [were] scheduled to be recalled under the Amendment". **Ex. 163** (MBUSA_00000405) at MBUSA_00000405-MBUSA_00000406. MBUSA only "recommended" to its dealers that they include a disclosure to purchasers of MBUSA vehicles that MBUSA knew would be subject to future recalls. Ex. 1 (Brunner Dep. Tr.) at 131:25–132:7. MBUSA did not know whether or how many MBUSA customers were not provided the recommended disclosure advising—at the time of sale—that their MBUSA vehicles would be subject to future Takata recalls. *See* Ex. 1 (Brunner Dep. Tr.) at 132:11–133:6.

## Y.   At Least Several Years Before 2020, MBUSA Began Investigating Customer Claims Pertaining to Malfunctions of Takata Airbags, Determining Whether It Needed to Share That Information with NHTSA.

188.    At least several years before 2020, MBUSA began receiving information regarding customer claims of malfunctions pertaining to Takata airbags; MBUSA performed investigations relating thereto, including field inspections, before MBUSA determined whether it needed to share that information with NHTSA. *See* Ex. 1 (Brunner Dep. Tr.) at 74:17–23, 75:15–81:6, 85:24–86:14. After Takata's MBUSA recalls, MBUSA's product analysis engineers performed investigations regarding allegations of Takata inflator ruptures. **Ex. 141** (Lowery Dep. Tr.) at 34:10–18. If there were customer complaints of injuries from Takata airbags that MBUSA's customer assistance center received, MBUSA's product analysis engineers would review those claims. ECF No. 4339-13  (Analil Dep. Tr.) at 218:1–7, 230:3–9.

**Z.   MBUSA Investigated its Customers' Claims of Injuries Caused by Ruptured Airbags in Mercedes-Benz Vehicles, Including Working with Daimler and NHTSA on Some of These Investigations.**

189.   MBUSA worked with Daimler and NHTSA to investigate alleged Takata airbag rupture incidents in an MBUSA vehicle that may have resulted in serious injuries.  *See* ECF No. 4339-20 (Tait Dep. Tr.) at 270:1–14, *id.* at 103:20–105:25. MBUSA knew an MBUSA vehicle "[c]ustomer claim[ed] fragment from airbag left scar over eye related to Takata" in an event that took place "sometime in 2013," and MBUSA investigated this claim.  *See* Ex. 1 (Brunner Dep. Tr.) at 64:5–67:7, 73:12–22 (emphasis added); **Ex. 164** (Brunner Dep. Tr., Ex. 26) (MBUSA customer claim report) at "all data" tab, row 9019. The customer's accident and claimed injury occurred in 2013, two years before MBUSA began issuing its recalls, so the customer—identified as SR_NUM 1-513742653—called to report the injury only after he received his recall notice from MBUSA.  *See* **Ex. 165**(MBUSA_00152970) at Excel cell 55T-56T; *see also id.* at rows 55-83. The [1-513742653] customer provided to MBUSA the completed questionnaire, the police report from the accident in which he was injured, and the body shop order showing his vehicle had its Takata airbags replaced after the accident, and the customer explained he had medical records regarding the injury that he could provide to MBUSA.  *See id.* at rows 55-83.  Because the [1-513742653] customer had not kept the airbag inflator from the accident that took place two years before MBUSA issued any of its recalls and prior to the customer receiving his recall notice from MBUSA, MBUSA closed its investigation and did not formally confirm this incident as a injury due to a defective Takata airbag. *See id.*[14]

**AA.   MBUSA and MBUSI Shared Information Regarding MBUSA's Takata Recalls.**

190.   A February 2016 internal MBUSA email thread evidences the discussions between MBUSA and MBUSI regarding their media response to MBUSA's February 2016 Takata airbag

---

[14] Another customer—identified as SR_NUM 1-917631380—contacted MBUSA to report an accident that he was in where the airbag deployed and then the "airbag exploded" such that it broke his upper right arm, leading to surgery where the surgeon placed a plate and bone graph in his arm. *See id.* rows 85-86. Another customer—identified as SR_NUM 1-1169731954—called MBUSA to report an accident where her recalled Mercedes-Benz vehicle's airbag deployed and caused "various cuts from other metal fragments." *Id.* at row 142. The [1-1169731954] customer had "made every effort to have [the airbags] replace[d]" before the accident. *Id.* at row 142. The [1-1169731954] customer did not seek any evaluation or compensation or even a replacement, but instead had only contacted MBUSA because customer "'felt it was his duty' to let MB know" and the customer urged MBUSA that "if [MBUSA] [is] sincerely concerned about safety," then MBUSA should "make ever[y] effort to all that are still waiting for their air bags!" *Id.* at rows 142-43.

recall.  *See generally* **Ex. 166** (MBUSA_00092893).  One MBUSA employee advised its other MBUSA team members that after communicating with MBUSI, MBUSI recommended MBUSA make a statement providing, in relevant part, that "[t]his recall does involve vehicles built here in Vance[, Alabama], although MBUSI can't provide you with the exact specifics."  *Id.* at MBUSA_00092894.  In response to MBUSI's suggestion, MBUSA's Director of Corporate Communications instead suggested an alternative approved statement, which omitted a reference to MBUSI's admission that some of the recalled Class Vehicles were manufactured domestically. *See id.* at MBUSA_00092893.

191.    On a separate occasion, when MBUSI learned it was potentially affected by Daimler's recall, MBUSI reached out to MBUSA to determine whether it could confirm whether "Plant Tuscaloosa" was affected.    **Ex. 167**(MBUSA_00092878) at MBUSA_00092878. MBUSA's Manager of Corporate Communications responded to MBUSI's question by identifying the recalled vehicles.    *See id.*  Several months later, MBUSI again reached out to MBUSA for more information regarding the Takata airbag recall.    **Ex. 168** (MBUSA_00155814) at MBUSA_00155814.

**BB.    MBUSA had the Discretion to Push for Like-For-Like Replacement Inflators or Decide Whether to Wait for the Final GUNI Replacement Inflator, Evidencing MBUSA's Expertise and Reasonable Understanding of the Propellant Variation and the Role of Desiccant.**

192.    It was MBUSA and not Daimler that made the decision whether to push for a like-for-like replacement inflator or whether to wait for the final GUNI replacement inflator.    **Ex. 169**(MBUSA_00083957) at MBUSA_00083958.    MBUSA's expertise regarding the qualifications of inflator propellants and independent authority is also evidenced in its April 2017 response to NTHSA's tolling order.  *See, e.g.*, **Ex. 170** (MBUSA_00000266) (MBUSA Response to NHTSA tolling order) at 4.[15]

**CC.    MBUSA's QEC and Mr. Brunner (VCA) Played an Active Role in the Takata Airbag Recall, and Mr. Brunner Even Visited Takata's USA Airbag Facilities.**

---

[15] *See also id.* ("In strong collaboration between all affected divisions of the Company and with Takata, MBUSA has been able to significantly reduce the development and approval time for the GuNi-based models by . . . Establishing a new department tasked with airbag development related to the Takata recalls[;] Hiring of 20 additional engineers[;] Reducing the diversity of driver airbag modules from 19 original designs to 8 remedy designs, and reducing passenger airbag modules from 8 original designs to 3 remedy designs[.]").

193.    MBUSA's QEC and VCA played an active role in the Takata airbag recall, sharing information with Takata.  *See, e.g.*, **Ex. 171**(MBUSA_00152825) at MBUSA_00152828; Ex. 2 (MBUSA_00153443) at MBUSA_00153463.

194.    MBUSA's QEC was actively involved in recovering the recalled airbags from Mercedes dealers.  Ex. 2 (MBUSA_00153443) at MBUSA_00153463.  MBUSA was aware that the returned airbags it collected were getting tested at Takata USA, Takata Germany, and the Fraunhofer Institute in Germany, and the QEC met with Daimler relating thereto.  *See, e.g.*, **Ex. 172** (MBUSA_00098452) at MBUSA_00098455; Ex. 2 (MBUSA_00153443) at MBUSA_00153463; **Ex. 171** (MBUSA_00152825) at MBUSA_00152828.

195.    MBUSA and Daimler even jointly visited Takata USA to tour the airbag testing facility.  *See* Ex. 2 (MBUSA_00153443) at MBUSA_00153463 ("VCA Tom Brunner and DAG/Holger Boehme visited Takata USA and received overview of testing facility[.]").

**DD.    Takata Was Awarded one of Daimler's "Key Suppliers" Status, Evidencing the Close Involvement and Information Shared Between Takata, Daimler, and MBUSA's QEC.**

196.    Daimler's "external presentation" regarding the "Daimler Supplier Network" and the "Supplier Cooperation Model" evidenced the sharing of information between Daimler, other Mercedes entities, and their suppliers.  *See, e.*g, **Ex. 173** ([PowerPoint-Präsentation (mercedes-benz.com))](#) at 2.[16]  Daimler "classif[ied] suppliers as belonging to one of four groups or segments, *i.e.*, first segment as "Potential Suppliers"; second as "Suppliers"; third as "Key Suppliers" or "KS"; and fourth as "Strategic Partners" or "SP."  *Id.* at 3. Daimler admitted that the "[t]he higher a supplier ranks on the pyramid, the more opportunities and trust the supplier is met with" (*id.*) and the "closer the exchange" (*id.* at 5); *see also id.* at 4.

197.    Key Suppliers were offered "[e]xclusive insights and collaboration Cof/participation in Supplier Days," but participation at those Supplier Days was still limited to "selected" Key Suppliers.  *Id.* at 4.  As discussed *supra*, Takata participated in at least one Supplier Day at MBUSA's QEC Jacksonville location where Takata communicated with MBUSA and Daimler regarding the launch of a new Mercedes-Benz vehicle line and the requisite coordination

---

[16] When Daimler changed its name to Mercedes-Benz, a revised but similar version of the presentation was published.  *See, e.g.*, **Ex. 175** ([PowerPoint-Vorlage (mercedes-benz.com)).](#)

between Takata, MBUSA, Daimler, MBUSI, and other Mercedes-Benz entities.  (*See supra* PSOF, ¶¶ 150–57.)[17]

198.   "All key suppliers and strategic partners" were "invited to the annual Daimler Supplier Award ceremony" (**Ex. 173** (PowerPoint-Präsentation (mercedes-benz.com)) at 6), and the award ceremony was attended by "Daimler Board of Management and top executives, about 650 participants." *Id.* at 6-7.  This "[e]xclusive event" took place every year in Stuttgart, Germany.  *Id.* at 7.  The supplier award event began by no later than 2008.  *See* **Ex. 174** (https://www.polyplex.ch/english/download/Daimler_award_ppx_Eng.pdf) (Daimler Supplier Magazine dated January 2010).  Daimler Trucks awarded Takata its Supplier Award for interiors at least one year, an event that was discussed in the Daimler Supplier Magazine—a magazine for Daimler suppliers and associates.  *See generally id.*  That Daimler Supplier Magazine—to which MBUSA and MBUSI would have had access—discussed Takata as one of only five supply partners awarded the Daimler Supplier Awards 2009 from Daimler Trucks & Buses, and promoted Takata-Petri AG—with its headquarters in Japan—as having a product program focusing on airbags.  *Id.* at 3.

### EE.   At Least One Takata Non-Desiccated PSAN Airbag Ruptured in a Class Vehicle, Causing Serious Injuries.

199.   From 2016-2018 MBUSA reported 101 safety related defects or noncompliances necessitating recalls in the United States.  ECF No. 4260-11 (Settlement Agreement), ¶1.  A field rupture of a Takata airbag occurred in a 2012 Mercedes Benz C250 Sedan on November 7, 2020.  ECF No. 4339-21 (MBUSA_00122649).

200.   In connection with a confirmed field rupture of a Takata airbag in a Mercedes vehicle, a lawsuit was filed alleging severe injuries, including significant facile injuries, due to shrapnel from the airbag rupture.  The below photographs were included in the complaint filed against MBUSA related to this confirmed rupture.

---

[17] Takata and other Key Suppliers were involved in a variety of activities regarding "Normal Business" such as "Operative Meetings" including "Supplier Review," to activities regarding more "Exclusive Business" such as "Supplier Days" involving "Supplier Forum," "TEC Day," and "Marketplace."  *See* **Ex. 173** (PowerPoint-Präsentation (mercedes-benz.com)) at 5.  At these meetings, the Suppliers would meet with Daimler's "Top Management," "Operative Management," "Experts," "GCM's," and "E3/E4" at either Daimler or external locations.  *Id.*



**FF.     If MBUSA Had Disclosed the Inflator Defect, Plaintiffs Would Not Have Purchased Their Class Vehicle or Would Have Paid Less For It.**

201.     After Plaintiff Knapp learned of the recall, Plaintiff Knapp "didn't feel safe about driving around with" "defective airbags that could kill [her]," so she no longer drove her Class Vehicle.  ECF No. 4339-35 (Knapp Dep. Tr.) at 271:15–20; *see also id.* at 171:14–18, 207:2–3. Plaintiff Knapp parked her unsafe Class Vehicle for a year waiting for an airbag replacement, and because Mercedes kept putting off the repair remedy and refused to provide her a loaner vehicle, she was forced to finally trade her Class Vehicle in for a low diminished offer due to its defective airbags.  *Id.* at 114:7–18, 156:25–158:18, 179:20, 183:22–184:5, 193:11–22, 195:19–21, 207:2–3, 210:16–24.  Despite having access to other vehicles, Plaintiff Knapp couldn't drive her Class Vehicle, which is the car that she wanted to drive.  *Id.* at 107:17–22, 108:10–14.  Plaintiff Knapp was "pretty upset that [she] . . . spent a lot of money on a vehicle that [she] had to park and [she] couldn't drive.  And [she] wasn't getting any service from Mercedes on when those airbags were going to be put in. . . . They kept putting it off and putting it off.  So [she] had a car that was sitting and depreciating and – depreciating in value every day, and I had no idea when that was going to be repaired."  *Id.* at 114:7–18.

202.     After learning of her Class Vehicle's defective airbags, Plaintiff Bridges' driving habits of her Class Vehicle changed because she began to use an alternate vehicle more and left her Class Vehicle in her garage.  ECF No. 4339-60 (Bridges Dep. Tr.), at 121:10–17; *see also id.* at 141:12–14.

203.     After Plaintiff Radican received the Takata recall notice, she put the Class Vehicle in the garage and said: "There's no way I'm going to drive this car." ECF No. 4339-52 (Radican

Dep. Tr.), at 106:15–10); *see also id.* at 79:20–24.  Because of her concerns, Plaintiff Radican was unable to use or let anyone use her Class Vehicle for two years (*id.* at 106:20–107:23), and she "felt that [the Class Vehicle] was taken away from [her] in a way" (*id.* at 131:17–19).  She felt unable to drive the Class Vehicle because "if [she] did drive it . . . the airbag could blow up and cause [her] bodily harm or maybe even death." *Id.* at 131:19–22.

204.    Once he received the recall notice, Plaintiff Goldberg did not want his wife using the Class Vehicle so she stopped using it and he could not recall a specific instance of the Class Vehicle being used after that. ECF No. 4339-42 (Goldberg Dep. Tr.), at 50:2–20.  Plaintiff Goldberg found it unacceptable that it would take approximately six months to get replacement airbags in his Class Vehicle and that the dealership refused to provide a loaner vehicle and instead expected his "wife [to] drive around in a car with potentially lethal airbags pointed at her head if she were to get in an accident for six months." *Id.* at 52:4–13; *see also id.* at 51:8–14.  Because his wife was unable to use the Class Vehicle, Plaintiff Goldberg was forced to trade it in and "there was no reason to have to buy a new car other than [he] could not let [his] wife drive [the Class Vehicle] because of the airbag situation, period."  *Id.* at 76:17–77:13.

205.    Plaintiff Radican never requested a loaner or replacement car for the two years she was without the use of her Class Vehicle because "I assumed that had I [asked], they would have charged me for it" and they never offered a loaner.  ECF No. 4339-52 (Radican Dep. Tr.) at 131:17–132:8.

206.    Plaintiff J. Phillips wrote to MBUSA requesting that they provide a loaner vehicle for him to drive until the defective airbags in his Class Vehicle were repaired, but was informed by MBUSA that they would not provide him with "alternate transportation," as they asserted that his Class Vehicle was safe to drive.  ECF No. 4339-50 (Phillips Dep. Tr.) at 102:1–20. Plaintiff J. Phillips he felt that he had paid for his Class Vehicle expecting a safe car and did not get one. *Id.* at 136:18–24.  Plaintiff J. Phillips repeated inquired about when replacement parts would become available and periodically received notices that there was a delay on the availability of replacement parts.  *Id.* at 103:19–104:3.

207.    After receiving the recall notice, Plaintiff Goldberg Contacted Mercedes-Benz and requested a loaner and "[they said they didn't – they were not in a position to provide me one." ECF No. 4339-42 (Goldberg Dep. Tr.) at 51:8–14.  Plaintiff Goldberg "believes I should have been offered – afforded a rental or a loaner until the potentially dangerous recall could be dealt with

appropriately." *Id.* at 90:24 – 91:11.  Plaintiff Goldberg was told by Mercedes-Benz that it would take more than 6 months for the replacement parts to be available "[a]nd I said, how can you expect me to have my wife drive around in a car with potentially lethal airbags pointed at her head if she were to get in an accident for six months?;" "[T]hat's not acceptable.  That's not an acceptable answer." *Id.* at 52:6–13.

208.    It took Plaintiff Taylor more than a year for the replacement parts to become available despite her following up with Mercedes-Benz on a regular basis.  (*See infra* PSOF, ¶ 68.)

209.    On January 30, 2018, a copy of **Ex. 176** a statutory notice letter, was mailed to MBUSA.  MBUSA also received a statutory notice letter dated November 28, 2017, to which its counsel responded in a letter dated December 5, 2017. **Ex. 177.**

210.    The Plaintiff from Rhode Island (Plaintiff Radican) and on behalf of proposed plaintiffs from Connecticut, Hawaii, Maine, Nebraska, Oklahoma and West Virginia did not discover, and could not have discovered in the exercise of reasonable diligence, any issues with their airbags or the bases for their consumer protection causes of action until after Mercedes sent them recall notices in 2017-2018.  *See* ECF No. 4339-52 **(**Radican Dep. Tr.) at 65:14–24; 79:15–24; 81:23–82:2; 101:21–24; 102:11–22, 17–22; 108:17–21; 118:1–14; 119:22–25; 146:12–16.

211.    The Plaintiff from Washington (Plaintiff Goldberg) did not discover, or could not have discovered in the exercise of reasonable diligence, Defendants' deception and the bases for their consumer protection causes of action until they received the recall letter for their airbags in 2016 or later.  *See* ECF No. 4339-42 (Goldberg Dep. Tr.) at 32:23–33:8; 40:4–17; 41:2–17; 47:13–18; 50:2–20; 53:16–54:3; 81:18–22; 84:7–11; 92:9–93:4.

212.    The Plaintiff from Rhode Island (Plaintiff Radican) and on behalf of proposed plaintiffs from Connecticut, Hawaii, Maine, Nebraska, Oklahoma and West Virginia did not discover, and could have discovered in the exercise of reasonable diligence, the bases for their implied warranty claims until they received the recall letter for their airbags in 2016 or later. *See* ECF No. 4339-52 **(**Radican Dep. Tr.) at 65:14-24; 79:15-24; 81:23-82:2; 101:21-24; 102:11-22, 17-22; 108:17-21; 118:1-14; 119:22-25; 146:12-16.

213.    The Plaintiff from Rhode Island (Plaintiff Radican) and on behalf of proposed plaintiffs from Connecticut, Hawaii, Maine, Nebraska, Oklahoma and West Virginia did not discover, and could not have discovered in the exercise of reasonable diligence, the basis for their unjust enrichment causes of action at the time of purchase but only much later, until they received

Defendant's recall letter.  *See* ECF No. 4339-52 (Radican Dep. Tr.) at 65:14-24; 79:15-24; 81:23-82:2; 101:21-24; 102:11-22, 17-22; 108:17-21; 118:1-14; 119:22-25; 146:12-16.

214.     The Plaintiffs from Washington and Iowa (Plaintiffs Goldberg and Knapp, respectively) did not discover, and could not have discovered in the exercise of reasonable diligence, the basis for their unjust enrichment causes of action at the time of purchase but only much later, until they received Defendant's recall letter.  *See* ECF No. 4339-42 (Goldberg Dep. Tr.) at 32:23-33:8; 40:4-17; 41:2-17; 47:13-18; 50:2-20; 53:16-54:3; 81:18-22; 84:7-11; 92:9-93:4; ECF No. 4339-35 (Knapp Dep. Tr.) at 88:6-21; 89:1-21; 140:6-8; 141:12-143:1; 180:22-181:1; 254:8-22; 255:9-256:11; 259:8-23; 271:18-20.

215.     Had Plaintiffs known about the defective airbag in Plaintiffs' Class Vehicles, Plaintiffs would have purchased another vehicle that did not contain Defective Airbags.  ECF No. 4259-20 (Radican's Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4258-21 (Knapp Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4258-16 (Calhoun's Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4184-89 (Phillips' Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4801-29 (Taylor's Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4184-119 (Goldberg's Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4184-78 (Bridges' Resps. And Objs. To MBUSA's Interrogs.) at No. 11; ECF No. 4339-53 (Taylor Dep. Tr.) at 86:5–10; ECF No. 4339-52 (Radican Dep. Tr.) at 142:17–143:5; ECF No. 4339-50 (Phillips Dep. Tr.) at 136:18–24, 145:2–10; ECF No. 4339-42 (Goldberg Dep. Tr.) at 92:16–93:4, ECF No. 4339-35 (Knapp Dep. Tr.) at 217:5–14, ECF No. 4339-60 (Bridges Dep. Tr.) at 140:23–141:4.

**GG.     Plaintiffs Were Damaged, And MBUSA's Recall Remedy Program is Inadequate to Compensate Them For Their Damages.**

216.     Dr. Dubé is a Professor of Marketing at the University of Chicago Booth School of Business. ECF No. 4336.58 (Dubé Rept.) at ¶¶ 1-10.

217.     Dr. Dubé relied on several of GM's own conjoint analysis to structure his survey. *Id.* at ¶¶ 20, 30, 46.

218.     Dr. Dubé calculated the specific damages for the named Plaintiffs, which "also demonstrates the methodology that [he] will ultimately apply to all vehicles that the Court includes in the class." *Id.* at ¶ 114.

219.     Dr. Dubé performed a "Choice-Based Conjoint Analysis" to determine consumer demand for the Class Vehicles, and then performed marketplace simulations—another commonly accepted econometric technique—to determine the price premium Plaintiffs paid for their Class Vehicles but for MBUSA's challenged misconduct regarding the Inflator Defect. *Id.* at ¶¶ 20, 30.

220.     The survey informed participants that the Class Vehicle would be repaired, free of charge, at a specified time after the purchase date. *Id.* at ¶¶ 59, 103.

221.     The price premium calculated by Dr. Dubé "measures the extent to which Class Members overpaid for a Class Vehicle at the point of sale due to the fact they were unaware of the defective airbag," and represents **"the difference between the market price actually paid for a Class Vehicle *at the point of sale* and the but-for market price Class Members would have paid for that Class Vehicle had they been aware of the airbag defect *at the point of sale.*"** *Id.* at ¶ 25 (emphasis added).

222.     "[T]he description of the alleged defect" used in Dr. Dubé's survey "specified the number of years until the option to repair will be offered," which was a "key variable" in the model. ECF No. 4336.59 (Dubé Rebut. Rept.) at ¶ 76.

223.     As part of his analysis Dr. Dubé also conducted a separate survey in which each respondent was asked to rate the importance of each of 25 different features selected from a larger set of features used by another Defendant in this litigation (GM) in its own Conjoint Analyses. ECF No. 4336.58 (Dubé Rept.) at ¶ 46.

224.     Airbag safety performance was among the top 3 highest-rated features, along with fuel economy and vehicle size. *Id.* at ¶ 47.

225.     The calculated price premium accounts for the eventual recall that GM implemented. *Id.* at 278:2-17 ("Q. If the airbag were subsequently replaced, your damage model would still say that this individual needs to be compensated for allegedly having overpaid for the vehicle initially, correct? A. That's correct. There's -- in the car feature there is a time until repair, so there is essentially an eventual future date at which they could have the airbag replaced.").

226.     In Dr. Dubé's model, "the 'no defect' situation is synonymous with zero years until the defect may be fixed." ECF No. 4336.59 (Dubé Rebut. Rept.) at ¶ 76. In other words, "[w]hen the number of years until the defect can be fixed becomes zero, [Dr. Dubé's] model predicts zero price premium because a consumer is already eligible to have her defective car repaired." *Id.* Dr. Dubé's analysis found that consumers would demand significantly reduced prices to purchase a

vehicle with a defective airbag that would remain unrepaired for several years.  ECF No. 4336.58 (Dubé Rept.) at ¶ 110.

227.    Dr. Dubé categorized the Class Vehicles into one of five segments—Sedan, Luxury Sedan, SUV, Luxury SUV, and Truck—and then applied the percentage price premium measure (based on a fixed shares approach) for the segment-year combination specific to those vehicles. *Id.* at ¶ 114; *see also id.* at ¶¶ 35, 38.

228.    The price premium is what "was paid at the moment they purchased the car. It's the premium associated with what they actually paid versus what they would have paid had they bought the car and been aware at the time of purchase that the car was defective and that the time until repair [available]." ECF No. 4337-100 (Dubé Dep. Tr., Oct. 5, 2021) at 279:5-17.

229.    James Baglini and Robert Renz, in their expert reports and testimony, both opine on the dangers of ammonium nitrate and how ammonium nitrate should not be used in airbag inflators. *See* ECF No. 4336.8 (Baglini Rept.) at § VI; *see also* ECF No. 4336.7 (Renz Rept.) at ¶¶ 84–85.

Dated: August 2, 2024

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
Matthew P. Weinshall (FBN 84783)
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com

apodhurst@podhurst.com
srosenthal@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

***Chair Lead Counsel for Plaintiffs***

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **SMITH LACIEN LLP**<br>Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel:  (914) 749-8200<br>Fax: (914) 749-8300<br>Email: dboies@bsfllp.com<br>          mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel:  (305) 539-8400<br>Fax:  (305) 539-1307<br>Email: szack@bsfllp.com<br>          mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**<br>Elizabeth Cabraser<br>ecabraser@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:     415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |
| **CARELLA BYRNE CECCHI OLSTEIN  BRODY & AGNELLO, PC**<br>James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br><br>*Plaintiffs' Steering Committee* | **BARON & BUDD, PC**<br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J. Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463 |

| | |
|---|---|
| | *Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto*

Peter Prieto