**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
MDL NO. 2599
Master File No.: 15-MD-02599-MORENO**

IN RE: TAKATA AIRBAG PRODUCT
LIABILITY LITIGATION

THIS DOCUMENT RELATES TO:

ECONOMIC LOSS TRACK CASES
AGAINST <u>FCA US, LLC</u>

**<u>PLAINTIFFS' RESPONSE TO FCA US LLC'S STATEMENT OF MATERIAL FACTS
AND PLAINTIFFS' STATEMENT OF ADDITIONAL FACTS IN OPPOSITION TO
FCA US LLC'S MOTION FOR SUMMARY JUDGMENT AGAINST ALL ECONOMIC
LOSS PLAINTIFFS IN GEORGIA AND NORTH CAROLINA AND UNDER THE
LAWS OF COLORADO, UTAH, WEST VIRGINIA, AND WISCONSIN PURSUANT TO
LOCAL RULE 56.1</u>**

Pursuant to Rule 56 and Local Rule 56.1, Plaintiffs hereby respond to Defendant FCA US LLC's ("FCA") Statement of Material Facts in Support of Its Motion for Summary Judgment Against All Economic Loss Plaintiffs in Georgia and North Carolina and Under the Laws of Colorado, Utah, West Virginia, and Wisconsin Pursuant to Local Rule 56.1 [ECF No. 4798], without admitting that any of FCA's statements are material. In the interest of efficiency and brevity, Plaintiffs do not repeat but instead incorporate by reference Paragraphs 1 through 70, 72, and 330 through 542 of its prior Responses to FCA's Statements of Material Facts (**D.E. 4253**), except for the specific paragraphs identified below. For clarity of the record, Plaintiffs provide below the undisputed material facts for the three named Plaintiffs whose claims remain at issue in this litigation: Georgia Plaintiffs Michelle Gibson and Debra Johnson and North Carolina Plaintiff Laquintha O'Neal.

71. Undisputed.

73. Disputed, in part. Although, as of July 19, 2024, FCA had completed 93.0 percent of the recall repairs of Takata airbags for the total population of 10,984,858 inflators in FCA vehicles ((ECF No. 4798-1) (Decl. of Chris Freeman) ¶ 6), it is unclear whether the total population will increase, and thus the completion rate will decrease, as additional inflators are added to the population. Moreover, there still remain over one million unrepaired airbags, evidencing FCA's slow pace of implementing airbag repairs. *See id.* This figure is especially troubling in light of the three confirmed fatalities in FCA Class Vehicles due to Takata airbag ruptures. *See infra* PSOF ¶¶ 126–127, 129, 132. Indeed, only after so many years of dragging its feet and downplaying the danger of PSAN-based propellant did FCA finally issue an advisory urging some of its consumers to stop driving their FCA vehicles due to the danger posed by the dangerous PSAN- based airbags in its Class Vehicles. *See infra* PSOF ¶¶ 125–133.

74. Disputed, in part. Ms. Gibson's vehicle is subject to three or more relevant recalls, including but not limited to FCA Recall 18V-021 and FCA Recall 19V-018. *See, e.g.*, (ECF No. 4338-9) (FCA Recall 15V-313); (ECF No. 4338-63) (FCA Recall 16V-352); (ECF No. 4338-65) (FCA Recall 18V-021); (ECF No. 4338-24) (FCA Recall 19V-018).

75. Undisputed.

76. Undisputed.

77. Disputed, in part. Although U.S. Auto Sales is not owned or apparently controlled by FCA, it is affiliated with FCA to the extent that it sells FCA vehicles, including the 2010 Dodge Charger purchased by Ms. Gibson. (ECF No. 4338-75) (Gibson Dep. Tr.) at 114:23–115:2.

78. Disputed, in part. Ms. Gibson recalled viewing and hearing commercials through the radio, television, and internet that touted the safety and dependability of FCA's vehicles in general, and while she did not recall all of the specific commercials, she did view and hear these commercials *prior* to purchasing the 2010 Dodge Charger. (ECF No. 4338-101) (Gibson Ans. to FCA's First Set of Interrog.) at No. 1; (ECF No. 4338-75) (Gibson Dep. Tr.) at 51:1–52:16.[1] Ms. Gibson remembered seeing commercials for FCA vehicles, including Dodge vehicles, in 2014 and prior to that. (ECF No. 4338-75) (Gibson Dep. Tr.) at 144:13–145:13, 145:19–21, 145:25–146:23, 147:2–148:15. Ms. Gibson remembered that the representations in those FCA and Dodge commercials discussed the safety and reliability of FCA vehicles, including Dodge vehicles. *Id.* at 145:25–146:23, 147:2–148:10. Ms. Gibson also visited internet sites in 2014 regarding her Dodge vehicles, including the Dodge website and U.S. Auto website. *Id.* at 149:7–10. She also ran Google searches for the Dodge Charger. *Id.* When Ms. Gibson ran her internet searches for the Dodge Charger, she saw advertisements for the dealership and the Dodge brand. *Id.* at 149:11–20. She remembered the advertisements discussed safety and the price of the Dodge vehicle. *Id.* at 150:16–18.

79. Disputed. Although Ms. Gibson did testify at one single point in her deposition that FCA did not make any false statements to her aside from the false statements that FCA did make regarding the process of getting her airbags replaced ((ECF No. 4338-75) (Gibson Dep. Tr.) at 32:11–20), Gibson then clarified several times in her deposition that FCA did make other false

---

[1] Indeed, Ms. Gibson's "number one top concern" in deciding to purchase her 2010 Dodge Charger was safety, "[s]o when [Dodge] promoted a vehicle that was safe and free from defects, that's what [she] relied on." (ECF No. 4338-75) (Gibson Dep. Tr.) at 119:3–15, 151:21–152:4.

statements to Ms. Gibson regarding the safety of her Class Vehicle (*see supra* PSOF ¶ 78; *see infra id.* ¶ 80). Ms. Gibson also explained that, in purchasing her Class Vehicle, her "concern" was "how safe was the car" and that, in response, the sales associate gave "positive responses" to all Ms. Gibson's questions about the Class Vehicle's safety. *Id.* at 140:5–24.

80. Disputed, in part. While in her 2019 responses to FCA's first set of requests for admission, Ms. Gibson stated that she had not personally *discussed* the safety features of her 2010 Dodge Charger with the person from whom she purchased her vehicle, she later clarified in her 2020 deposition that the dealership sales associate specifically advised her that "the vehicle was safe and reliable." (ECF No. 4338-75) (Gibson Dep. Tr.) at 154:6–155:5. By the time that she purchased her Class Vehicle, Ms. Gibson had already received numerous assurances concerning the safety features in the Dodge vehicle from the various commercials and advertisements that she had observed. *Id.* at 143:24–155:5; *see also id.* at 153:6–10.

81. Undisputed.

82. Disputed, in part. While FCA provides a list identifying 64 communications, including robocalls, to Ms. Gibson purportedly advising her of the recall on her driver's side airbag, this figure is misleading as only 9 communications took place before the 2018 accident where the Class Vehicle was totaled. (ECF No. 4490-1) (Decl. of Chris Freeman) at ¶ 5, Exhibit A. Moreover, even if the notices did advise her of the recall, those notices were unhelpful and useless as no recall remedy parts were available to her. *See* (ECF No. 4338-75) (Gibson Dep. Tr.) at 181:8–23, 182:2–25. Ms. Gibson received the first airbag recall notice in mid to late 2017 at which time she started calling (and visiting) the dealerships to have her vehicle repaired with no results as there were no parts available for her Class Vehicle. *Id.* at 182:2–25 ("I even went to the dealership as well. So there was a lot of calls made between that time up to until a month before the accident").

83. Objection and disputed. Plaintiffs object because this paragraph states a conclusion of law instead of a fact. Plaintiffs dispute this paragraph because on December 15, 2017, a copy of (ECF No. 4338-190), a statutory notice letter, was mailed via certified mail return receipt requested to FCA US LLC. In relevant part, that letter specifically advised FCA that, on behalf of Plaintiffs

and "on behalf of classes of United States residents," the letter "constitute[d] notice of violations and an intent to bring suit, including, but not limited to, under the . . . Georgia Fair Business Practices Act – Ga. Code § 10-1-399." *Id.* at 2 & n.1. Also, on January 30, 2018, a copy of (ECF No. 4338-189), a statutory notice letter, was mailed via certified mail return receipt requested to FCA US LLC. In relevant part, that second letter specifically advised FCA that, on behalf of Plaintiffs—including two plaintiffs that resided in Georgia and purchased their Class Vehicles in Georgia—as well as on behalf of a class of United States residents, the letter "constitute[d] notice of violations and an intent to bring suit, including, but not limited to, under the . . . Georgia Fair Business Practices Act – Ga. Code § 10-1-399." *Id.* at 3–4 & n.1.

84. Disputed, in part. Contrary to FCA's implication, the reason Ms. Gibson did not have her airbag replaced in her 2010 Dodge Charged was due to the lack of remedy parts; she tried, "numerous times," to have the airbag replaced but was unable to because "[n]o [dealership] ever had them." (ECF No. 4338-75) (Gibson Dep. Tr.) at 181:8–23.

85. Undisputed.

86. Undisputed.

87. Undisputed.

88. Undisputed.

89. Undisputed.

90. Undisputed.

91. Disputed, in part. Ms. Johnson researched Charger vehicles prior to purchasing, and "[she] always, always look[ed] at crash test results of the vehicle[s]." (**Ex**. 1) (Johnson Dep. Tr.) at 74:23–75:9, 82:15–17.[2]

92. Disputed, in part. In deciding to purchase her 2014 Dodge Charger, reliability and safety were the most important factors considered by Ms. Johnson. *See* PSOF, ¶ 91.

---

[2] Indeed, in deciding to purchase her 2014 Dodge Charger, reliability and safety—i.e., "that all of the . . . components of the vehicle that are supposed to keep you safe are intact and . . . are reliable . . . should you ever need them"—were the most important factors considered by Ms. Johnson, who was advised by the dealership salesperson that "[she] was making a great choice." Id. at 65:14–66:5, 114:10–13, 116:14–17.

-4-

93. Undisputed.

94. Undisputed.

95. Objection and disputed. Plaintiffs object because this paragraph states a conclusion of law instead of a fact. Plaintiffs dispute this paragraph because on December 15, 2017, a copy of (ECF No. 4338-190), a statutory notice letter, was mailed via certified mail return receipt requested to FCA US LLC. In relevant part, that letter specifically advised FCA that, on behalf of Plaintiffs and "on behalf of classes of United States residents," the letter "constitute[d] notice of violations and an intent to bring suit, including, but not limited to, under the . . . Georgia Fair Business Practices Act – Ga. Code § 10-1-399." *Id.* at 2 & n.1. Also, on January 30, 2018, a copy of (ECF No.4338-189), a statutory notice letter, was mailed via certified mail return receipt requested to FCA US LLC. In relevant part, that second letter specifically advised FCA that, on behalf of Plaintiffs— including two plaintiffs that resided in Georgia and purchased their Class Vehicles in Georgia— as well as on behalf of a class of United States residents, the letter "constitute[d] notice of violations and an intent to bring suit, including, but not limited to, under the . . . Georgia Fair Business Practices Act – Ga. Code § 10-1-399."

96. Undisputed.

97. Undisputed.

98. Disputed, in part. Ms. O'Neal's vehicle is subject to two or more relevant recalls, including but not limited to FCA Recall 16V-352, FCA Recall 18V-021, and FCA Recall 19V-018. *See, e.g.*, (ECF No. 4338-63) (FCA Recall 16V-352); (ECF No. 4338-65) (FCA Recall 18V-021); (ECF No. 4338-24) (FCA Recall 19V-018).

99. Undisputed.

100. Undisputed.

101. Disputed, in part. Ms. O'Neal did remember seeing commercials about the Dodge Charger *in general*, but simply did not recall seeing commercials focused exclusively on the *safety* of the Dodge Charger. (**Ex**. **2**) (O'Neal Dep. Tr.) at 124:1–12, 124:15–20. Prior to buying her

Dodge Charger, Ms. O'Neal had never seen a commercial about the 2012 Dodge Charger, but she had seen commercials about other model year Dodge Charger vehicles. *Id.* at 124:21–125:12.

102. Disputed, in part. Ms. O'Neal did discuss the features—including safety features—of her Dodge Charger with the dealership's sales representative who assisted her with the purchase of her Dodge Charger. *Id.* at 104:2–23, 105:23–106:10. Prior to her purchase, the sales representative provided Ms. O'Neal, and Ms. O'Neal reviewed, the Monroney sticker for her Dodge Charger, which disclosed information regarding the vehicle's features such as its airbags. *Id.* at 104:11–14, 105:11–22, 130:14–131:1. Indeed, in purchasing a vehicle, safety was a consideration for Ms. O'Neal, who wanted her vehicle and its airbags to protect her and her family in the event of a crash. *Id.* at 111:3–20, 112:23–113:2, 113:3–8, 111:23–112:22.

103. Disputed, in part. Although the window sticker provided by Carmax for the Class Vehicle to Ms. O'Neal only mentions overhead and side airbags and not frontal airbags (**Ex. 2**) (O'Neal Dep. Tr. at 130:14–131:8), Ms. O'Neal was aware that every car since 1998 has frontal airbags, (*id.* at 77:18–23).

104. Undisputed. Unfortunately, however, despite attempting to get her vehicle repaired the day after she received the recall notice, Ms. O'Neal was forced to wait several months—first for the replacement parts to become available and then for an appointment to be provided to her for her vehicle to be repaired (*id.* at 177:25–181:18), all while feeling unsafe and "scared" for the lives of her passengers (*see supra* PSOF at ¶ 102).

105. Undisputed.

106. Undisputed.

107. Undisputed.

## STATEMENT OF ADDITIONAL FACTS
## IN OPPOSITION TO FCA'S MOTION FOR SUMMARY JUDGMENT

I. **Plaintiffs.**

108. Plaintiffs all testified that had they known about the Inflator Defect, they would not have purchased their Class Vehicle or would have paid less for it.[3]

**Ms. Gibson**

109. Ms. Gibson did view and hear commercials through the radio, television, and internet that touted the safety and dependability of FCA's vehicles prior to purchasing her 2010 Dodge Charger. (ECF No. 4338-101) (Gibson Ans. to FCA's First Set of Interrog.) at No. 1; (ECF No. 4338-75) (Gibson Dep. Tr.) at 51:1–52:16; see also supra PSOF ¶ 78.

110. Ms. Gibson's "number one top concern" in deciding to purchase her 2010 Dodge Charger was safety, "[s]o when [Dodge] promoted a vehicle that was safe and free from defects, that's what [she] relied on." (ECF No. 4338-75) (Gibson Dep. Tr.) at 119:3–15, 151:21–152:4.

111. The dealership sales associate specifically advised Ms. Gibson that "the vehicle was safe and reliable, and it had no major recalls or anything like that." Id. at 154:6–155:5.

112. By the time that she purchased her Dodge, Ms. Gibson had already received numerous assurances concerning the safety features in Dodge vehicle from the various commercials and advertisements that she had observed. Id. at 143:24–155:5; see also id. at 153:6–10 ("I trusted in the product that they were putting out. I trusted their commercial[s]. I trusted their advertisements."). After seeing the various commercials and advertisements discussing the safety and reliability of FCA vehicles, including Dodge vehicles, and prior to purchasing her Class Vehicle (supra PSOF ¶ 78), Ms. Gibson "relied on Dodge to offer a vehicle that was safe" (ECF No. 4338-75) (Gibson Dep. Tr.) at 151:24–152:4. Ms. Gibson explained that Dodge "promoted a vehicle that was safe and free from defects, that's what [she] relied on, along with [her] research and how [she] felt at that time." Id. Ms. Gibson trusted and relied on the advertisements and on the Dodge brand. (ECF No. 4338-75) (Gibson Dep. Tr.) at 152:24–153:10 ("Dodge has been around for a long time. So I trusted in the product that they were putting out.").

---

[3] See, e.g., (ECF No. 4338-75) (Gibson Dep. Tr.) at 184:3–7, 184:19–185:2; (ECF No. 4338-76) (Johnson Dep. Tr.) at 201:5–20; (ECF No. 4338-87) (O'Neal Dep. Tr.) at 170:3–11.

113. Ms. Gibson continued to drive her vehicle after learning of the defect simply because "[she] had no choice. It was the only car [she] had." Id. at 196:10–14.

114. Ms. Gibson tried "numerous times" to have the airbag replaced but was unable to do so because "[n]o [dealership] ever had them." (ECF No. 4338-75) (Gibson Dep. Tr.) at 181:8–23 ("I . . . tried numerous times. I called. I went online. I called different dealerships. No one ever had them. They were swamped. They said the manufacturer only sent them a few, maybe 50 at a time. They had over 300 people trying to get the replacements. So, no, it was never replaced.").

**Ms. Johnson**

115. In deciding to purchase her 2014 Dodge Charger, the most important factors to Ms. Johnson were reliability and safety—*i.e.*, "that all of the . . . components of the vehicle that are supposed to keep you safe are intact and . . . are reliable . . . should you ever need them." (ECF No. 4513-1) (Johnson Dep. Tr.) at 65:14–66:5, 114:10–13, 116:14–17 (explaining she was advised by the dealership salesperson that "[she] was making a great choice").

116. After learning of the inflator defect, "[she] definitely did not drive the vehicle as much" and "wouldn't have driven the vehicle long distances" because doing so "felt unsafe." *Id.* at 200:15–25, 240:3–9.

**Ms. O'Neal**

117. Ms. O'Neal remembered seeing commercials about the Dodge Charger before buying it. (ECF No. 4513-2) (O'Neal Dep. Tr.) at 124:8–20.

118. Safety was a consideration for Ms. O'Neal in buying a car. *Id.* at 111:3–9. To Ms. O'Neal safety means: "[t[o keep me and my kids protected. Like with the brakes, airbags, seatbelts, things like that." *Id.* at 111:3–9. Safety to Ms. O'Neal also means to be able to avoid a crash, and if she was in a crash, that the car protects her and her children. *Id.* at 111:14–20.

119. Reliability was also an important factor when Ms. O'Neal purchased a vehicle. To Ms. O'Neal reliability means that she "can get in the car and trust it to get me to where I need to go and in a safe manner." *Id.* at 112:23–113:6.

120. It was important to Ms. O'Neal that the vehicle she purchased have both front and side airbags for her children. *Id.* at 77:4–6

121. Ms. O'Neal knew that every car since 1998 has a front driver airbag. *Id.* at 77:18–23.

122. Ms. O'Neal testified that the Dodge Charger had a reputation for being a safe car. *Id.* at 101:13–15.

123. The salesperson at the dealership told Ms. O'Neal about the safety features of the vehicle. *Id.* at 106:7–10.

124. If Ms. O'Neal had known about the inflator defect, she would not have purchased the vehicle or would not have paid as much as she did for it. *Id.* at 170:3–11.

## II. Additional Facts.

125. On November 3, 2022, FCA issued a "Stop-Drive" (or "Do Not Drive") press release warning owners or custodians of MY 2005 – 2010 Dodge Magnum station wagons, Dodge Challenger coupes, and Dodge Charger and Chrysler 300 sedans who had not yet addressed Takata driver-side airbag recalls to "immediately stop driving their vehicles." (ECF No. 4513-3) (11/03/2022 FCA Stop Drive Release). FCA estimated that this Do Not Drive warning affected approximately 276,000 FCA vehicles. *Id.*

126. MOPAR also admitted that FCA's Do Not Drive warning came "after two people died in separate crashes involving similar vehicles where the defective and recalled Takata driver's side airbag exploded." (ECF No. 4513-4) (MOPAR FAQs).

127. On November 3, 2022, NHTSA issued a press release discussing FCA's 11/3/2022 Do Not Drive warning and the two confirmed deaths involving two Takata airbag rupture incidents in 2010 Dodge Chargers. (ECF No. 4513-5) (11/03/2022 NHTSA Do Not Drive Release). NHTSA explained that FCA's 11/3/2022 Do Not Drive warning "c[a]me[] after two people died in separate crashes involving 2010 Dodge Chargers where the Takata driver's side air bags exploded." (ECF No. 4513-5) (11/03/2022 NHTSA Do Not Drive Release). At that time, NHTSA

also admitted it was "aware of several other suspected inflator ruptures in vehicles from other automakers potentially due to exploding Takata air bags." *Id.*

128. In that press release discussing FCA's Do Not Drive warning, NHTSA warned that "[e]ven minor crashes can result in exploding air bags that can kill or produce life-altering injuries." *Id.*

129. On or around November 3, 2022, FCA admitted that it suspected an inflator rupture in a third case that also killed a driver of a 2010 Dodge, which occurred sometime in the last few months before this announcement.

130. On December 19, 2022, FCA issued a second warning urging owners or custodians of certain Dodge and Chrysler vehicles with unrepaired Takata driver-side air bag recalls to "immediately stop driving" the vehicles. (ECF No. 4513-6) (12/19/2022 FCA Stop Drive Release).

131. FCA's second Do Not Drive warning came after FCA confirmed a third fatality due to a Takata airbag rupture in this population of FCA vehicles. (ECF No. 4513-6) (12/19/2022 FCA Stop Drive Release). FCA admitted these FCA vehicles "are equipped with Takata air-bag inflators whose chemical properties may deteriorate over time . . . ." *Id.* FCA explained that if the inflators rupture, they can "scatter[] razor-sharp debris capable of causing serious injury or death." *Id.*

132. On December 19, 2022, NHTSA issued a press release discussing FCA's second Do Not Drive warning, where NHTSA also confirmed that one person died in a recent crash in a 2010 Chrysler 300 where the Takata's driver side airbag ruptured. (ECF No. 4513-7) (12/19/2022 NHTSA Do Not Drive Release). NHTSA confirmed that this was the third confirmed Takata airbag fatality in a FCA vehicle in 2022. *Id.* NHTSA confirmed that this was the fifth confirmed Takata airbag fatality in 2022. *Id.* Lastly, NHTSA confirmed that this was the 24th confirmed Takata airbag fatality. *Id.*

133. In that press release discussing FCA's second Do Not Drive warning, NHTSA warned that "[e]ven minor crashes can result in exploding Takata air bags that can kill or produce life-altering gruesome injuries." (ECF No. 4513-7) (12/19/2022 NHTSA Do Not Drive Release).

-11-

Dated: August 2, 2024

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
Matthew P. Weinshall (FBN 84783)
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com

apodhurst@podhurst.com
srosenthal@podhurst.com
mweinshall@podhurst.com

*Chair Lead Counsel for Plaintiffs*

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **SMITH LACIEN LLP**<br>Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel: (914) 749-8200<br>Fax: (914) 749-8300<br>Email: dboies@bsfllp.com<br>  mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307<br>Email: szack@bsfllp.com<br>  mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**<br>Elizabeth Cabraser<br>ecabraser@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:   415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| | |
|---|---|
| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC**<br>James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br>*Plaintiffs' Steering Committee* | **BARON & BUDD, PC**<br>Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J. Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br>*Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

                                                  By: */s/ Peter Prieto*
                                                        Peter Prieto