**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**MDL No. 2599**
**Master File No.: 15-MD-02599-MORENO**

| |
|---|
| IN RE: TAKATA AIRBAG PRODUCT LIABILITY LITIGATION |
| THIS DOCUMENT RELATES TO: |
| ECONOMIC LOSS TRACK CASES AGAINST <u>MERCEDES-BENZ USA, LLC</u> |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**MERCEDES-BENZ USA, LLC'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ..................................................................................................................1

ARGUMENT.........................................................................................................................3

I. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUES OF KNOWLEDGE, DAMAGES, AND STANDING.........................................................................................................3

    A. MBUSA Cannot Escape Liability By Pretending It Was Ignorant of the Inflator Defect. ......................................................................................3

        1. Genuine Issue of Material Fact Exist to MBUSA's Knowledge of the Inflator Defect. ..................................................................3

        2. MBUSA Is Legally Responsible for the Knowledge of Daimler and Takata. .......................................................................7

        3. MBUSA's Proclaimed Ignorance Satisfies the Scienter Requirement. ........................................................................9

    B. The Recall Did Not Eliminate Plaintiffs' Overpayment Damages................................10

    C. MBUSA's Prudential Mootness Arguments Conflict with Prevailing Law. ...........................................................................................14

II. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF RADICAN'S CLAIMS..................................16

    A. MBUSA's Motion Should Be Denied as to the Rhode Island Claims. ........................16

        1. Ms. Radican's Death Does Not Permit Dismissal of Her Claims....................16

        2. Ms. Radican's Damages are Cognizable. .......................................19

        3. Genuine Issues of Material Fact Preclude Summary Judgment as to Ms. Radican's Rhode Island Fraud Claim. .................................20

        4. Ms. Radican's Rhode Island Statutory Claim Is Timely. ...............................21

    B. MBUSA's Motion Should Be Denied as to Ms. Radican's *Zantac* Claims. ...........................................................................................22

        1. Summary Judgment on the *Zantac* Claims Cannot Precede Class Certification..................................................................22

        2. Genuine Issues of Material Fact Preclude Summary Judgment as to Connecticut Claims.......................................................23

        3. Genuine Issues of Material Fact Preclude Summary Judgment as to Hawaii Claims. ............................................................24

        4. Genuine Issues of Material Fact Preclude Summary Judgment as to Maine Claims. ............................................................24

5.     Genuine Issues of Material Fact Preclude Summary Judgment as to Nebraska Claims. ..................................................................25

6.     Genuine Issues of Material Fact Preclude Summary Judgment as to Oklahoma Claims. .................................................................26

7.     Genuine Issues of Material Fact Preclude Summary Judgment as to Vermont Claims. ..................................................................27

8.     Genuine Issues of Material Fact Preclude Summary Judgment as to West Virginia Claims. ............................................................28

III.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF BRIDGES'S CLAIMS. ...............................29

  A.  MBUSA's Motion Should Be Denied as to Plaintiff Bridges's North Carolina Claims. ...............................................................29

    1.     Ms. Bridges Has Cognizable Damages. .........................................29

    2.     Genuine Issues of Material Fact Preclude Summary Judgment as to Reliance and MBUSA's Duty to Disclose. ................................30

  B.  MBUSA's Motion Should Be Denied as to Ms. Bridges's *Zantac* Claims. .................................................................31

    1.     Genuine Issues of Material Fact Preclude Summary Judgment as to the Colorado Fraud Claim. ..................................................31

    2.     Genuine Issues of Material Fact Preclude Summary Judgment as to the Utah Fraud Claim .......................................................32

    3.     Genuine Issues of Material Fact Preclude Summary Judgment as to the Virginia Fraud Claim. ...................................................32

    4.     Genuine Issues of Material Fact Preclude Summary Judgment as to the Wisconsin Fraud Claim. .................................................33

IV.  GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AS TO THE CLAIMS OF THE REMAINING PLAINTIFFS. ....................................................................34

  A.  MBUSA's Motion Should Be Denied as to the Phillipses' Oregon Claims. .................................................................34

  B.  MBUSA's Motion Should Be Denied as to Ms. Knapp's Iowa Claims. ......................36

  C.  MBUSA's Motion Should Be Denied as to Mr. Goldberg's Washington Claims. .................................................................36

  D.  MBUSA's Motion Should Be Denied as to Ms. Taylor's Mississippi Claims. .................................................................37

  E.  MBUSA's Motion Should Be Denied as to Ms. Calhoun's Georgia Claims. .................................................................40

CONCLUSION .................................................................................................................40

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Allen v. Roberts Constr. Co., Inc.*,
   532 S.E.2d 534 (N.C. Ct. App. 2000) ................................................................................30

*Atkins v. City of Chicago*,
   547 F.3d 869 (7th Cir. 2008) ............................................................................................17

*Baldassari v. Produce Terminal Realty Corp.*,
   282 N.E.2d 649 (Mass. 1972) .............................................................................................8

*Bell v. First Columbus Nat. Bank*, 493 So. 2d 964, 970 (Miss. 1986) .........................................39

*Big Apple BMW, Inc. v. BMW of N. Am., Inc.*,
   974 F.2d 1358 (3d Cir. 1992) .............................................................................................8

*Bullow v. Gladding*,
   100 A. 249 (R.I. 1917) ......................................................................................................17

*Burbo v. Harley C. Douglass, Inc.*,
   106 P.3d 258 (Wash. Ct. App. 2005) ...............................................................................37

*CF Sales, Inc. v. Cent. Puget Sound Reg'l Transit Auth.*,
   169 Wash. App. 1017 (Wash. Ct. App. 2012) ..................................................................37

*Chamber of Commerce v. U.S. Dep't of Energy*,
   627 F.2d 289 (D.C. Cir. 1980) .........................................................................................14

*CNH Cap. Am., LLC v. Wilmot Farming Ventures, LLC*, No. CIV.A. 07-0611, 2008 WL
   2386166, at *6 (W.D. La. June 11, 2008) ..........................................................................8

*Cooper v. Schlesinger*,
   111 U.S. 148 (1884) ...........................................................................................................9

*Corona v. Esposito*,
   230 A. 2d 624 (Conn. Cir. Ct. 1966) ..................................................................................9

*Crawford v. FCA US LLC*,
   No. 2:20-CV-12341, 2021 WL 3603342 (E.D. Mich. Aug. 13, 2021) .............................12

*Crawford v. FCA US LLC*,
   No. 2:20-CV-12341, 2024 WL 919830 (E.D. Mich. Mar. 4, 2024) .................................15

*Douglas Asphalt Co. v. QORE, Inc.*,
   657 F.3d 1146 (11th Cir. 2011) .......................................................................................31

*Eckert v. Flair Agency, Inc.*,
  909 P.2d 1201 (Okla. Civ. App. 1995) ............................................................................ 9

*Escareno v. Carl Nolte Sohne GmbH & Co.*,
  77 F.3d 407 (11th Cir. 1996) ....................................................................................... 17

*F.T.C. v. Freecom Commc'ns, Inc.*,
  401 F.3d 1192 (10th Cir. 2005) .................................................................................... 10

*First Atl. Mgmt. Corp. v. Dunlea Realty Co.*,
  507 S.E.2d 56 (N.C. Ct. App. 1998) .............................................................................. 29

*Flores v. FCA US LLC*,
  No. 19-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020) ............................................ 15

*Forbes v. Par Ten Group, Inc.*,
  394 S.E. 2d 643 (N.C. 1990) ....................................................................................... 10

*Forsyth v. Associated Grocers of Colorado, Inc.*,
  724 P.2d 1360 (Colo. App. 1986) ................................................................................... 9

*Four R Cattle Co. V. Mullins*,
  570 N.W. 2d 813 (Neb. 1997) ........................................................................................ 9

*Garris v. Smith's G & G, LLC*,
  941 So. 2d 228 (Miss. Ct. App. 2006) ............................................................................ 39

*Gast v. Rogers-Dingus Chevrolet*,
  585 So. 2d 725 (Miss. 1991) ........................................................................................ 39

*Greene v. Heithoff*,
  808 N.W.2d 754 (Iowa Ct. App. 2011) ............................................................................ 11

*Hadley v. Chrysler Grp., LLC*,
  624 F. App'x 374 (6th Cir. 2015) ............................................................................. 14, 15

*Hardy v. Toler*,
  218 S.E.2d 342 (N.C. 1975) ......................................................................................... 29

*Holcomb v. Hoffschneider*,
  297 N.W.2d 210 (Iowa 1980) ........................................................................................ 36

*Holland Furnace Co. v. Korth*,
  262 P.2d 772 (Wash. 1953) ......................................................................................... 10

vi

*Hutton v. Hydra-Tech, Inc.*,
  2018 WL 1363842 (M.D.N.C. Mar. 15, 2018) ....................................................30

*In re Citibank Aug. 11, 2020 Wire Transfers*,
  520 F. Supp. 3d 390 (S.D.N.Y. 2021) ...............................................................7

*In re Gen. Motors LLC Ignition Switch Litig.*,
  339 F. Supp. 3d 262 (S.D.N.Y. 2018) ..............................................................38

*In re Parmalat Sec. Litig.*,
  477 F. Supp. 2d 602 (S.D.N.Y. 2007) ...............................................................7

*In re Takata Airbag Prod. Liab. Litig.*,
  193 F. Supp. 3d 1324 (S.D. Fla. 2016) .............................................................38

*In re Takata Airbag Prod. Liab. Litig.*,
  255 F. Supp. 3d 1241 (S.D. Fla. 2017) .............................................................38

*In re Takata Airbag Prod. Liab. Litig.*,
  462 F. Supp. 3d 1304 (S.D. Fla. 2020) .............................................................38

*In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*,
  325 F.R.D. 136 (D.S.C. 2018)...........................................................................30

*Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.*,
  479 F. App'x 955 (11th Cir. 2012) ...................................................................14

*Jarman v. United Indus. Corp.*,
  98 F. Supp. 2d 757 (S.D. Miss. 2000) ..............................................................38

*Kenney v. Medlin Const. & Realty Co.*,
  315 S.E.2d 311 (N.C. App. Ct. 1984)................................................................29

*Kirksey v. Schindler Elevator Corp.*,
  2016 WL 7116223 (S.D. Ala. Dec. 6, 2016)........................................................8

*Kooloian v. Suburban Land Co.*,
  873 A.2d 95 (R.I. 2005)....................................................................................19

*Lengyel v. Lint*,
  280 S.E.2d 66 (W. Va. 1981)............................................................................10

*Lizarazo v. Miami-Dade Corr. & Rehab. Dep't*,
  878 F.3d 1008 (11th Cir. 2017)........................................................................16

*Long v. Dell, Inc.*,
  93 A.3d 988 (R.I. 2014) ..................................................................................................10

*Long v. McAllister*,
  319 N.W.2d 256 (Iowa 1982) ........................................................................................36

*Manning v. Mortg. Elec. Registration Sys., Inc.*,
  196 Wash. App. 1043 (Wash. App. Ct. 2016) .............................................................37

*Martin v. Tikka*,
  500 P.2d 1209 (Or. 1927) ..............................................................................................10

*Marx v. Elkader Co-op. Co.*,
  No. 01-0287, 2002 WL 663690 (Iowa Ct. App. Apr. 24, 2002) ..................................11

*McCabe v. Daimler Ag*,
  No. 1:12-CV-2494-MHC, 2015 WL 11199196 (N.D. Ga. Aug. 19, 2015) ..................15

*McCormick v. City of Portland*,
  82 P.3d 1043 (Or. Ct. App. 2004) .................................................................................35

*McInnis & Co. v. W. Tractor & Equip. Co.*,
  388 P.2d 562 (Wash. 1964) ............................................................................................37

*Mission Prod. Holdings, Inc. v. Tempnology, LLC*,
  139 S. Ct. 1652 (2019) ...................................................................................................14

*Mooneyham v. Progressive Gulf Insurance Co.*,
  910 So. 2d 1223 (Miss. App. 2005) ...............................................................................39

*Morabit v. Hoag*,
  80 A.3d 1 (R.I. 2013) .....................................................................................................20

*Moses H. Cone Mem'l Hosp. Operating Corp. v. Conifer Physician Servs., Inc.*,
  No. 1:13CV651, 2017 WL 1378144 (M.D.N.C. Apr. 11, 2017) ..................................29

*Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Garber*,
  45 F. App'x 564 (9th Cir. 2002) ......................................................................................4

*Newstone Dev., LLC v. E. Pac., LLC*,
  140 A.3d 100 (R.I. 2016) ...............................................................................................19

*Nguyen v. Nissan N. Am., Inc.*,
  932 F.3d 811 (9th Cir. 2019) .........................................................................................38

*Nguyen v. U.S. D.E.A.*,
    No. 1:0 CV 00026 MP AK, 2005 WL 2143970 (N.D. Fla. Sept. 1, 2005)..............................17

*Ollerman v. O'rourke Co., Inc.*,
    288 N.W.2d 95 (Wis. 1980) ........................................................................................10

*Progressive Country Mut. Ins. Co. v. Goodyear Tire & Rubber Co.*,
    No. 5:19-CV-913, 2021 WL 3371108 (N.D. Ohio Aug. 2, 2021) ...........................................38

*Rafferzeder v. Zellner*,
    613 S.E.2d 229 (Ga. Ct. App. 2005)......................................................................................11

*Raymo v. FCA US LLC*,
    475 F. Supp. 3d 680 (E.D. Mich. 2020)..................................................................................12

*Reich v. Dep't of Conservation & Nat. Res., State of Ala.*,
    28 F.3d 1076 (11th Cir. 1994) ...............................................................................................3

*Reich v. Dep't of Conservation & Nat. Res., State of Ala.*,
    28 F.3d 1076, 1082 (11th Cir. 1994) ....................................................................................3

*Richardson v. Clayton & Lambert Mfg. Co.*,
    634 F. Supp. 1480 (N.D. Miss. 1986)....................................................................................38

*Ridley v. Wendel*,
    795 S.E.2d 807 (N.C. Ct. App. 2016) ....................................................................................29

*Sharp v. FCA US LLC*,
    No. CV 21-12497, 2022 WL 14721245 (E.D. Mich. Oct. 25, 2022) ......................................14

*Shaver v. N.C. Monroe Const. Co.*,
    306 S.E.2d 519 (N.C. Ct. App. 1983)....................................................................................29

*Shelter Ins. Co. v. Ford Motor Co.*,
    2006 WL 318821 (N.D. Miss. Feb. 9, 2006) .........................................................................38

*Shoppe v. Gucci America, Inc.*,
    14 P.3d 1049 (Haw. 2000) .....................................................................................................9

*Silas v. Sheriff of Broward Cnty., Fla.*,
    55 F.4th 872 (11th Cir. 2022)................................................................................................16

*Simonsen v. Sandy River Auto, LLC*,
    413 P.3d 982 (Or. Ct. App. 2018) .........................................................................................35

*Slater v. Bielsky*,
 183 Cal. App. 2d 523 (Cal. Ct. App. 1960) ........................................................................4

*Smith v. Badlam*,
 22 A.2d 161 (Vt. 1941) ..................................................................................................10

*Sophie F. Bronowiski Mulligan Irrevocable Tr. v. Bridges*,
 44 A.3d 116 (R.I. 2012) ................................................................................................20

*Sprinkle v. N.C. Wildlife Res. Comm'n*,
 600 S.E.2d 473 (N.C. Ct. App. 2004) ............................................................................29

*State v. Apotex Corp.*,
 282 P.3d 66 (Utah 2012) ...............................................................................................10

*Sullivan v. Oregon Landmark-One, Ltd.*,
 856 P.2d 1043 (Or. Ct. App. 1993) ................................................................................35

*Tershakovec v. Ford Motor Co., Inc.*,
 79 F.4th 1299 (11th Cir. 2023) ......................................................................................13

*Thompson v. Air Power, Inc.*,
 448 S.E.2d 598 (Va. 1994) ...............................................................................................8

*Thompson v. King Feed & Nutrition Serv., Inc.*,
 105 P.3d 378 (Wash. 2005) ............................................................................................37

*United States v. Forehand*,
 577 F. App'x 942 (11th Cir. 2014) ...................................................................................4

*United States v. Johnson*,
 541 F.2d 710 (8th Cir. 1976) .........................................................................................10

*Vernon v. Qwest Commc'ns Int'l, Inc.*,
 643 F. Supp. 2d 1256 (W.D. Wash. 2009) ...............................................................30, 37

*Watson Laboratories, Inc. v. State*,
 241 So. 3d 573 (Miss. 2018) ............................................................................................9

*Weidman v. Ford Motor Co.*,
 No. 18-CV-12719, 2022 WL 1071289 (E.D. Mich. Apr. 8, 2022) ..................................12

*Winzler v. Toyota Motor Sales USA, Inc.*,
 681 F.3d 1208 (10th Cir. 2012) .................................................................................14, 15

*Young v. Toyota Motor Sales*, U.S.A.,
   472 P.3d 990 (Wash. 2020).................................................................................37

**Statutes**

Iowa Code § 714H.3 ...........................................................................................36

Iowa Code Ann. § 714H.5(1) ..............................................................................36

Miss. Code § 75–2–714(2) ..................................................................................39

Mississippi Code § 75-2-725(2) ..........................................................................38

N.C. Gen. Stat. Ann. § 75-1.1..............................................................................29

R.I. Gen. Laws § 6-13.1-5.2(a) ......................................................................19, 20

R.I. Gen. Laws § 9–1–6(3) ..................................................................................17

**Other Authorities**

13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3, p. 2 (3d ed.
   2008)..............................................................................................................14

3 Fletcher Cyc. Corp. § 814.10..............................................................................8

Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages, Equity Restitution § 3.3(1)
   (3d ed. 2018) ..................................................................................................13

**Rules**

Fed. R. Civ. P. 25(a)(1) ...................................................................................16, 17

Fed. R. Civ. P. 25(a)(3) ........................................................................................16

## INTRODUCTION[1]

For more than a decade, Defendant Mercedes-Benz USA, LLC distributed vehicles in the United States equipped with dangerous airbag inflators packed with ammonium nitrate, an unstable explosive notorious as an ingredient for bombs and deadly industrial accidents. From the start, MBUSA's parent, Daimler AG, knew the challenges and risks of placing such a volatile compound in metal cannisters within a few feet of vehicle occupants' faces. Its engineers controlled the testing and sourcing process for the inflators, received warnings about the unsuitability of ammonium nitrate, attended deployment tests where inflators ruptured, and met with the inflator manufacturer, Takata, no later than 2007 to discuss the instability of ammonium nitrate. But Daimler and MBUSA ignored these red flags, as finding an alternative airbag supplier would have raised costs and jeopardized production schedules.

Unfortunately, these inflators began rupturing in the field, shooting shrapnel at vehicle occupants, just as they did in the lab and as basic chemistry predicted. The reported injuries have been catastrophic and gruesome. A ruptured inflator in a Mercedes Benz C250, for example, resulted in a young woman losing her eye, on November 7, 2020, in Florida.

Plaintiffs knew none of this when they purchased their Mercedes vehicles. They could not have because MBUSA concealed it. Rather than disclose how dangerous its airbags were, MBUSA did the opposite. It pervasively promoted the safety of its vehicles and specifically called attention to its airbags as safety-enhancing devices. This deceptive, wrongful conduct caused Plaintiffs to overpay for their vehicles. Plaintiffs bargained and paid for defect-free, safe vehicles but received defective vehicles worth far less. Plaintiffs seek to recover these economic losses from MBUSA.

Plaintiffs' claims should proceed to trial. MBUSA's motion for summary judgment rests on arguments that this Court and others across the country have repeatedly rejected, or arguments so weak that MBUSA chose not to raise them earlier in the case. And the evidence of MBUSA's wrongdoing and Plaintiffs' damages raise genuine disputes of material fact that preclude judgment as a matter of law.

MBUSA's primary defense is to play a shameless shell game. Even though MBUSA and its parent, Daimler, argued for and secured the dismissal of Daimler on the grounds that it lacked

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted and all emphases are added. "PSOF" refers to the Statement of Facts that Plaintiffs are filing with this response.

sufficient forum contacts giving rise to Plaintiffs' claims, MBUSA now claims that Daimler, in fact, is fully responsible for the conduct giving rise to Plaintiffs' claims, so MBUSA should be dismissed as well. This tails-I-win-heads-you-lose approach mocks the judicial process. But the evidence and law are not on MBUSA's side. Documents obtained primarily from third parties reveal that, contrary to Daimler's and MBUSA's representations to this Court, both companies worked hand-in-hand to manage supplier relationships across the North American market from a base here in Florida, from at least 2006 onward. MBUSA had the technical expertise and access to technical data to make its current pleas of ignorance implausible. At a minimum, a disputed issue of fact exists as to this issue.

In addition, aside from MBUSA's own knowledge, the law permits the Court to impute Daimler's extensive notice and knowledge of the defective inflators to MBUSA, which was Daimler's exclusive agent in the United States, and through which Daimler generated billions of dollars in profits. And even if, contrary to the evidence and the law, MBUSA lacked any knowledge about the safety of Takata inflators, it still cannot escape liability under the substantive law applicable to the remaining claims, because its professed ignorance is incompatible with the unequivocal assurances of safety that it disseminated to Plaintiffs, satisfying the scienter requirement.

MBUSA also strains to squeeze the law of the remaining states through the damages argument that worked in its first motion for summary judgment. But the law of the remaining states is different than the law of the states the Court previously addressed, as MBUSA implicitly conceded when it omitted these states from its first iteration of the argument. In addition, the evidence in the record does not support MBUSA's factual position. MBUSA's belated recall does not compensate Plaintiffs for the economic losses they suffered when they overpaid for vehicles that were worth less than represented. Plaintiffs bargained for vehicles with safe airbags on day one, not ten years after the date of purchase. So, MBUSA's delayed recall did not provide Plaintiffs with what they bargained for. Plaintiffs' damages model, moreover, accounts for the recall in determining Plaintiffs' damages.

MBUSA also ignores evidence in the record to support its arguments on reliance, an inappropriate tactic at summary judgment. For example, it claims, without qualification, that Theresa Radican, the Rhode Island Plaintiff, "did *not* review any MBUSA advertising or marketing materials before her purchase." (ECF No. 4800 at 10.) But Ms. Radican's sworn interrogatory

attests that she "recall[ed] viewing and hearing commercials through the radio, television, and internet that touted the safety and dependability of the Subject Vehicle and MBUSA's vehicles in general." (PSOF ¶16.) And Ms. Radican adhered to that response at her deposition, testifying that: "I watch a lot of television, so I'm sure there must have been commercials about Mercedes' new design or I never would have known about it." *Id.* This conflicting evidence appears nowhere in MBUSA's motion, but clearly creates a dispute of fact.

MBUSA's other scattered attacks fail as well. Its insistence that an inflator rupture before it can be liable for economic losses is inconsistent with the law. Plaintiffs' claims are timely. And its various claim-specific arguments run into genuine disputes of material fact. MBUSA's motion should be denied, and except as noted herein,[2] Plaintiffs' claims should proceed to trial.

## ARGUMENT

## I.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ISSUES OF KNOWLEDGE, DAMAGES, AND STANDING.

### A.   MBUSA Cannot Escape Liability By Pretending It Was Ignorant of the Inflator Defect.

MBUSA sold into the United States more than one million vehicles with veritable grenades disguised as safety devices, and it now seeks to escape liability for common law fraud and consumer protection claims on the basis that it was ignorant of its vehicles' risks. (ECF No. 4800.) This argument fails for three reasons: first, the evidence establishes a genuine issue of material fact as to MBUSA's knowledge; second, the knowledge of MBUSA's parent, Daimler, and agent, Takata, must be attributed to MBUSA, as a legal matter; and third, MBUSA's proclaimed ignorance of its vehicles' safety risks satisfies the scienter requirement of Plaintiffs' fraud and statutory claims, to the extent such claims even have a scienter requirement.

#### 1.   Genuine Issue of Material Fact Exist to MBUSA's Knowledge of the Inflator Defect.

A defendant's knowledge or intent is generally considered a factual question best left for the jury. *See, e.g.*, *Reich v. Dep't of Conservation & Nat. Res., State of Ala.*, 28 F.3d 1076, 1082 (11th Cir. 1994) (question of actual or constructive knowledge [is] an issue of fact); *United States*

---

[2] Based on the Court's prior rulings in the MDL and evidence developed through discovery, Plaintiffs agree to dismiss the following claims: Plaintiff Calhoun's claims under Georgia law; and Plaintiff Radican's breach of implied warranty claim under Rhode Island law.

*v. Forehand*, 577 F. App'x 942, 945 (11th Cir. 2014) ("A jury may infer an intent to defraud from the defendant's conduct," and "evidence that a defendant personally profited from a fraud may provide circumstantial evidence of an intent to participate in that fraud."); *Nat'l Union Fire Ins. Co. of Pittsburgh, PA. v. Garber*, 45 F. App'x 564, 565–66 (9th Cir. 2002) (citing *Slater v. Bielsky*, 183 Cal. App. 2d 523, 527 (Cal. Ct. App. 1960)) ("intent is a question of fact reserved for the jury or trial court").

The evidence indicates that Mercedes-Benz USA (MBUSA) and Daimler were acutely aware of the defects in Takata airbag inflators used in their vehicles. Various depositions, internal documents, and communications detail the timeline and extent of their knowledge and actions related to these defective airbags.  (PSOF ¶¶ 95–200.)

The Quality Engineering Center in Jacksonville, Florida, served as a pivotal site for evaluating and ensuring the quality of Takata inflators used in Daimler vehicles. (*Id.*, ¶¶ 143–56.) Engineers and quality assurance specialists from both MBUSA and Daimler worked hand-in-hand at the Quality Engineering Center and conducted detailed assessments and audits of Takata parts. (*Id.*)  These evaluations often revealed significant issues with the inflators, further reinforcing the knowledge and concerns both companies had about the defective airbag components and ensuring a continuous flow of information between the entities.  (*Id.*)

The Jacksonville Quality Engineering Center, established in 2006, "focuses on NAFTA suppliers and the parts they produce," and analyzes US specific parts and US specific failures. (*Id.*, ¶ 151.)  Takata's Monclova, Mexico production facility, where millions of defective PSAN inflators were produced, fits within this zone of responsibility.  (*Id.*, ¶ 95; *see also id.*, ¶¶ 145–46.) Indeed, MBUSA and Daimler employees working in Jacksonville informed Takata in May 2007 that "the responsibilities for QEC part evaluation for the M-, R-, and GL-class were transferred to the Mercedes-Benz QEC in Jacksonville[,] Florida."  (*Id.*, ¶ 151.)

The Jacksonville Quality Engineering Center also played another key role in coordinating communications and meetings between MBUSA, Daimler, and Takata where they shared information regarding pre-development vehicle components in preparation for new Mercedes-Benz vehicle launches.  (*See id.*, ¶¶ 149–56.)  Takata's participation at one of the Supplier Day events in 2012 that MBUSA organized at the Quality Engineering Center evidenced Takata's elite status as one of Daimler's "Key Suppliers" of Mercedes-Benz vehicles. (*Id.*, ¶¶ 150–57, 196–98.) MBUSA, therefore, could not have been unaware that Takata's PSAN inflators were equipped in

Mercedes vehicles.

As the Court is aware, the uniform Inflator Defect is the use of phase-stabilized ammonium nitrate (PSAN), a compound known for its instability when exposed to temperature cycles and humidity, as the propellant in Takata's inflators. (*Id.*, ¶ 94.)  Over time, this degradation could cause the inflators to rupture, expelling metal fragments into the vehicle compartment, potentially causing severe injury or death.  (*Id.*, ¶ 94 n.4.)  Historical incidents covered by worldwide news media have demonstrated the dangers of ammonium nitrate, including catastrophic explosions in Texas City, West Texas, and Beirut. (*Id.*, ¶ 95.)  Takata itself experienced a significant explosion at its Monclova, Mexico airbag facility in 2006 (*id.*), a facility that Daimler inflator engineers themselves visited to perform audits before and after the explosion (*id.*, ¶¶ 105, 117).  MBUSA, and its predecessors, were well aware of the dangers posed by ammonium nitrate.

MBUSA's and Daimler's detailed knowledge of airbag inflator technology dates back to their (or their predecessors') development of the first chemical propellant airbag and the filing of a patent in 1971.  (*Id.*, ¶¶ 97–98.) Their collaboration with Takata through the joint venture Inflation Systems, Inc. provided further insights into inflator designs and issues. (*Id.*, ¶ 99.) Moreover, MBUSA's predecessor's involvement in the creation of the USCAR inflator technical requirements, alongside GM and Ford, highlighted its concerns with PSAN-based inflators due to the instability of ammonium nitrate (*id.*, ¶¶ 101–02), a concerning instability highlighted in Takata's publicly available patents filed years earlier (*id.*, ¶ 103).

This knowledge was not merely theoretical; between 2002 and 2010, Daimler engineers frequently visited Takata facilities, conducted audits, and observed tests that revealed significant issues with PSAN inflators.  (*Id.*, ¶¶ 104–22.) For example, during a visit to Takata's Monclova plant in 2006, a Daimler engineer observed an inflator becoming unusually bright, with metal parts found inside the cushion, leading to questions about the safety measures in place to prevent such occurrences. (*Id.*, ¶ 108.)  In another instance in 2006, Daimler engineers witnessed a rupture in the Takata SDI inflator during hot deployment testing. (*Id.*, ¶ 109.)  These observations raised significant concerns about the inflators' reliability and safety. (*Id.*, ¶¶ 108–12.)

In addition to these observations, Daimler's internal communications and reports further highlighted their awareness of the inflator defects. In 2007, a leading engineer at Renault, who was friends with top people at Mercedes and other European car companies, actively campaigned against the use of ammonium nitrate in airbag propellants, citing Takata's inability to stabilize the

compound. (*Id.*, ¶ 107.) Furthermore, Mercedes' own engineers required Takata to perform additional ballistic inflator tests due to concerns over "ballistic differences" and heat age testing results for the PSDI5 inflators in 2010. (*Id.*, ¶ 118.)

MBUSA, serving as Daimler's designated agent in the United States, had extensive access to engineering and technical information about the Takata airbags. (*Id.*, ¶¶ 124–30.) It was responsible for monitoring vehicle safety and submitting reports to NHTSA, including those related to Takata inflators. (*Id.*, ¶¶ 125–30, 161–162, 181–83, 188–89.) Its role in recalls and safety campaigns further underscores its awareness. (*Id.*, ¶¶ 125–126, 133–35, 182–87, 190–95.) For instance, during a 2006 recall affecting driver airbags in certain C-Class vehicles, the replacement inflators used were Takata's non-desiccated PSAN-based inflators, which were later recalled. (*Id.*, ¶ 133.)

Internal communications between MBUSA, Daimler, and Takata reveal ongoing concerns about the safety and performance of the inflators. In April 2010, as Daimler expressed concerns over the "ballistic differences" and heat age testing results for the PSDI-5 (*id.*, ¶ 118), "a ballistic 'flyer'" that appeared to have high moisture was found during PV testing of another PSAN-based inflator (*id.*, ¶ 119). In September 2010, a PSAN-based inflator exhibited a ballistic anomaly during testing (*id.*, ¶ 120), and two months later in November, Daimler requested a face-to-face meeting with Takata to discuss their PSAN-based inflators' failure to meet certain requirements after exposure to environmental conditions (*id.*, ¶ 121). Despite Daimler's concerns, Daimler nonetheless granted Takata's request for deviations from safety specifications, approved the use of inflators due to timing constraints, and eventually required, that for several vehicle programs, Takata switch from non-desiccated PSAN inflators to desiccated PSAN inflators. (*Id.*, ¶¶ 111–16, 118–23.)

The recalls of Takata inflators by other manufacturers also highlighted the Inflator Defect, as various documents and communications indicate that MBUSA and Daimler were aware of these industry-wide recalls. (*Id.*, ¶¶ 163–65.) Starting in 2008, multiple automakers began recalling vehicles equipped with Takata airbags due to the risk of inflator ruptures. (*Id.*, ¶¶ 164, 165 & n.13.) These recalls did not go unnoticed by MBUSA and Daimler. (*Id.*, ¶¶ 164–66, 168–69, 172–73.) Rather, they were closely monitored and discussed by engineers and executives, serving as a clear indicator of the risks posed by Takata inflators in Mercedes vehicles. (*Id.*)

The evidence is clear: both MBUSA and Daimler were well aware of the Inflator Defect.

This awareness stemmed from their expertise and sophistication regarding decades of airbag inflator design and development, their development of the USCAR inflator specifications with heightened PSAN propellant testing requirements, and their deep involvement in the development, testing, and auditing of Takata PSAN inflators, coupled with direct communications with Takata. (*Id.*, ¶¶ 97–124, 127–130, 142–160.) Despite this knowledge, MBUSA marketed the Class Vehicles as paragons of safety, consistently emphasizing the importance of airbags in all consumer-facing materials. (*Id.*, ¶¶ 81–88.)  Mark Aikman, MBUSA's General Manager of Marketing Services, confirmed that safety features, especially airbags, were central to MBUSA's marketing strategy. (*Id.*, ¶¶ 83, 85.) This focus was not only apparent in advertisements but also on the Monroney labels affixed to the vehicles, which highlighted airbags as a critical safety feature. (*Id.*, ¶¶ 81–88, 90–93.)  MBUSA knew these labels would remain on the vehicles until delivery to the consumer, ensuring every buyer saw the prominent safety features listed. (*Id.*, ¶¶ 90–93.)

### 2. MBUSA Is Legally Responsible for the Knowledge of Daimler and Takata.

In addition, MBUSA does not dispute that its parent, Daimler AG, had adequate knowledge and notice of the Inflator Defect. Documents produced by Takata confirm that Daimler had sophisticated knowledge and expertise regarding airbag design and propellant validation, and that Daimler collaborated with Takata and controlled the process to source Takata inflators for Mercedes vehicles. (PSOF ¶¶ 104–123.)  As early as 2007, Daimler attended a deployment test at which an inflator ruptured, sending metal pieces of the inflator into the airbag cushion. (*Id.*, ¶ 108.) It also met with Takata in 2007 to discuss additional testing on ammonium nitrate, helium leak testing, and the impact of humidity, demonstrating its awareness of the risk and importance of propellant degradation. (*Id.*, ¶ 111.)

In addition, because Daimler controlled the sourcing process, Takata should be considered Daimler's agent with respect to the manufacture and supply of airbag inflators.  And as Takata's principal in this particular relationship, Daimler is imputed Takata's knowledge regarding the Inflator Defect. *See In re Citibank Aug. 11, 2020 Wire Transfers*, 520 F. Supp. 3d 390, 426 (S.D.N.Y. 2021) ("If a Defendant or another agent of a particular Lender acquired knowledge within the scope of its agency relationship with the Lender, that knowledge is imputable, at the moment it was acquired, to the Lender itself."); *In re Parmalat Sec. Litig.*, 477 F. Supp. 2d 602, 609 (S.D.N.Y. 2007) (holding that "[t]he general rule is that knowledge acquired by an agent acting

within the scope of his agency is imputed to his principal'") (internal quotation marks omitted).

Daimler's knowledge and notice, in turn, are properly imputed to its subsidiary, MBUSA. As explained in an authoritative treatise on corporations, "[n]otice addressed or given to a parent corporation may constitute notice to its subsidiary, or vice versa, where there is sufficient nexus between them." 3 Fletcher Cyc. Corp. § 814.10 (Parent or subsidiary corporations); *see also Baldassari v. Produce Terminal Realty Corp.*, 282 N.E.2d 649, 652 (Mass. 1972) (holding that notice to parent constituted notice to subsidiary, given "sufficient nexus" between the companies, including common office space and personnel); *Thompson v. Air Power, Inc.*, 448 S.E.2d 598, 603 (Va. 1994) ("Nexus sufficient to provide an equitable reason for disregarding the separate corporate existences is generally established by showing control, interaction, or other similar involvement between the corporations or their agents."); *Big Apple BMW, Inc. v. BMW of N. Am., Inc.*, 974 F.2d 1358, 1373 (3d Cir. 1992) ("BMW NA's ownership interests, control through corporate officers, advertising, and the subsidiaries' use of the BMW logo on their documentation, together indicate a sufficiently dominating interest in its subsidiaries.").

Given Daimler's intimate role in research, design, and manufacturing of the Plaintiffs' Vehicles, which it then sells and distributes into the United States via MBUSA, imputing Daimler's knowledge to MBUSA is entirely appropriate. For example, in *Kirksey v. Schindler Elevator Corp.*, involving a personal injury caused by the defendant's escalator, the domestic defendant advanced a similar argument as MBUSA here. It cast itself as a "separate corporation and the North American operating entity of the Switzerland-based Schindler Group," and thus argued that the court should exclude any evidence of the knowledge of the foreign parent. 2016 WL 7116223, at *6 (S.D. Ala. Dec. 6, 2016). The court rejected that motion, noting that the U.S. entity "relies on Schindler corporate for all R&D, and Schindler corporate sends all designs (which would presumably include guarding and safety features) to Schindler Elevator Corporation in the ordinary course of business without the latter even requesting them." *Id.* at *7.

In addition, imputation of a parent's knowledge to its subsidiary is driven by equitable considerations. 3 Fletcher Cyc. Corp. § 814.10 (knowledge can be imputed to subsidiary "where the corporations involved are close corporations, or where there are equitable reasons for disregarding the separate corporate entities."); *see also CNH Cap. Am., LLC v. Wilmot Farming Ventures, LLC*, No. CIV.A. 07-0611, 2008 WL 2386166, at *6 (W.D. La. June 11, 2008) (noting reluctance to impute knowledge to subsidiary where "parent did not participate in the transaction

8

giving rise to the dispute," or where the parent "had not even been named in the suit."). Here, with and on behalf of its foreign parent Daimler, MBUSA sold into the United States millions of vehicles with veritable grenades in the steering wheels, endangering countless people. Having successfully argued to excuse the foreign parent from the litigation on the basis of evolving law on personal jurisdiction, *both* companies now seek to evade liability altogether by relying on this corporate shell game. The Court can and should reject this attempt to dodge their obligations to American consumers.

### 3.   MBUSA's Proclaimed Ignorance Satisfies the Scienter Requirement.

Even if, contrary to the evidence and the law, MBUSA were as ignorant about Takata airbags as it now pretends, it would still be liable for unequivocally misrepresenting the safety of the airbags, while lacking any knowledge to support that representation.   This is because the scienter requirement for fraud is satisfied not only by evidence that "the maker know the matter is not as represented," but also by evidence "that being conscious that he has neither knowledge nor belief in the existence of the matter he chooses to assert it as a fact."   Restatement (Second) of Torts § 526 cmt. e (1977).   "This is often expressed by saying that fraud is proved if it is shown that a false representation has been made without belief in its truth or recklessly, careless of whether it is true or false."   *Id.*   This principle has been well-established for more than a century. *See, e.g.*, *Watson Laboratories, Inc. v. State*, 241 So. 3d 573, 584 (Miss. 2018) (describing scienter requirement as "the speaker's knowledge of its falsity or ignorance of its truth"); *Forsyth v. Associated Grocers of Colorado, Inc.*, 724 P.2d 1360, 1363 (Colo. App. 1986) (holding that knowledge standard met with evidence that defendant "being aware that it did not know whether it was true or false" and verdict sustained where defendant "made no effort to verify" false statement); *Cooper v. Schlesinger*, 111 U.S. 148, 152 (1884) (holding that knowledge element is satisfied when a false representation is made "without reasonable ground for believing it to be true").[3]

---

[3] *See also Corona v. Esposito*, 230 A. 2d 624, 627 (Conn. Cir. Ct. 1966) ("made without belief in its truth or recklessly made for the purpose of inducing action upon it"); *Shoppe v. Gucci America, Inc.*, 14 P.3d 1049, 1067 (Haw. 2000) ("knowledge of their falsity (or without knowledge of their truth or falsity)"); *Letellier v. Small*, 400 A.2d 371, 376 (Me. 1979) ("with knowledge of its falsity or in reckless disregard of whether it is true or false"); *Four R Cattle Co. V. Mullins*, 570 N.W. 2d 813, 816 (Neb. 1997) ("known to be false or made recklessly without knowledge of its truth and as a positive assertion"); *Eckert v. Flair Agency, Inc.*, 909 P.2d 1201, 1204 (Okla. Civ. App. 1995) ("made with *knowledge* that it is false, or made as a positive assertion *without knowledge* of

MBUSA mostly relegates authorities for its knowledge argument to a multi-page footnote. (ECF No. 4800 at 6–7 n.7.)  But its footnoted authorities do not establish that a defendant must have ironclad knowledge of a defect before being liable for misrepresenting the safety of a product under claims for fraud.[4]  To the contrary, the blackletter rule is that representing something as true—*i.e.*, that a vehicle is safe—is fraudulent if the person making the representation does not have any basis for making that representation.  According to MBUSA, that is what it does.  It claims to have no knowledge of the airbags that were placed in the vehicles it sold and marketed. How, then, could it assure purchasers that the vehicles are safe?  The law does not permit MBUSA to have it both ways.  Either way, summary judgment must be denied.

## B.   The Recall Did Not Eliminate Plaintiffs' Overpayment Damages.

It is "[c]ommon sense" that a car with a defective safety device is "worth less" than a car without a defect.  *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016). This common-sense principle validates Plaintiffs' benefit-of-the-bargain or overpayment theory of damages: Plaintiffs overpaid for their vehicles with defective Takata airbags at the time of purchase, because

---

whether it is true or false"); *Smith v. Badlam*, 22 A.2d 161, 162 (Vt. 1941) ( "Haphazard falsehood and intentional passing off belief for knowledge are of the same quality as conscious misstatement of facts and furnish the element of knowledge required to make the false representation fraudulent."); *Lengyel v. Lint*, 280 S.E.2d 66, 69 (W. Va. 1981) ("makes the statement without knowledge as to its truth or falsity, or makes it under circumstances such that he should have known of its falsity"); *Forbes v. Par Ten Group, Inc.*, 394 S.E. 2d 643, 647 (N.C. 1990) ("made with knowledge of its falsity or in culpable ignorance of its truth"); *State v. Apotex Corp.*, 282 P.3d 66, 80 (Utah 2012) ("(a) knew to be false or (b) made recklessly, knowing that there was insufficient knowledge upon which to base such a representation"); *Ollerman v. O'rourke Co., Inc.*, 288 N.W.2d 95, 99 (Wis. 1980) ("made recklessly without caring whether it was true or false"); *Martin v. Tikka*, 500 P.2d 1209, 1213 (Or. 1927) ("Pretense of knowledge by one who knows that he has not knowledge is as fraudulent as knowingly to misrepresent any other fact."); *Holland Furnace Co. v. Korth*, 262 P.2d 772, 776 (Wash. 1953) ("knowledge of its falsity or ignorance of its truth").

[4] Nor is knowledge or intent necessarily an element of Plaintiffs' statutory claims.  State consumer protection statutes generally are modeled after, and expressly give weight to federal interpretations of, the Federal Trade Commission Act, which does not have a knowledge or intent requirement. *See F.T.C. v. Freecom Commc'ns, Inc.*, 401 F.3d 1192, 1202 (10th Cir. 2005); *United States v. Johnson*, 541 F.2d 710, 712 (8th Cir. 1976); *see also Long v. Dell, Inc.*, 93 A.3d 988, 1001 (R.I. 2014) ("The DTPA does not require a showing of bad faith. It only requires an "unfair or deceptive" act or practice. While trade practices undertaken in bad faith are also likely to be unfair or deceptive, bad faith is not the statutory standard."); id. at 1003 ("The deception need not be made with intent to deceive; it is enough that the representations or practices were likely to mislead consumers acting reasonably.").

the vehicles were "worth less" than what they were deceptively marketed as—vehicles with safety-enhancing, non-defective airbags.  Plaintiffs seek to recover the amount of this overpayment, which Dr. Dubé's analysis quantifies.

In its initial motion for summary judgment, MBUSA did not contend that the cost of repair limited Plaintiffs' recoverable damages under the law of Georgia, Iowa, Mississippi, North Carolina, Oregon, or Rhode Island (ECF No. 4179 at 25 (limiting argument to nine other states)). And for good reason: the law in the remaining states does not support MBUSA's position, as explained in the state-specific sections below. Nonetheless, emboldened by the Court's prior ruling on summary judgment, MBUSA now attempts to shoehorn the law into its argument. MBUSA's strained argument, which it plainly did not believe was strong enough to advance at first, should be rejected.

As this Court held in its prior Order, the applicable measure of damages "is a matter of state law," governed by the decisions of the applicable state courts.  (ECF No. 4495 at 6.) But MBUSA cites no cases from the applicable state courts holding that the cost of repair limits a plaintiff's damages for ***claims of fraud and violation of consumer protection laws***, or that the provision of a recall repair wipes out a plaintiff's damages.

Instead, MBUSA cites numerous decisions—almost all of which involve inapplicable circumstances or causes of action—for the uncontroversial proposition that damages should not result in a windfall or double compensation for the plaintiff. (ECF No. 4495 at 4–5.)[5] But that principle is inapplicable here, because the recall did not compensate Plaintiffs for the damages they suffered and are seeking to recover.  Plaintiffs paid for vehicles marketed as having safe, operational airbags ***on day one***. Repairing the vehicles years later does not provide Plaintiffs what they bargained for—a safe, operational airbag ***on day one***. It is indisputable that the market price of a vehicle equipped with defective Takata airbags that will be replaced in ten years would be less than the market price of a vehicle equipped with safe, operational airbags from the start.

No reasonable consumer would pay the same price for those two vehicles at the point of sale—when overpayment or benefit-of-the-bargain damages are measured. *See Carriuolo*, 823 F.3d at 987 (recognizing benefit of the bargain damages accrue at the time of sale—even if the

---

[5] *See Rafferzeder v. Zellner*, 613 S.E.2d 229, 231 (Ga. Ct. App. 2005) (construction defect); *Greene v. Heithoff*, 808 N.W.2d 754 (Iowa Ct. App. 2011) (breach of contract); *Marx v. Elkader Co-op. Co.*, No. 01-0287, 2002 WL 663690 (Iowa Ct. App. Apr. 24, 2002) (negligence).

fraud was later "cured"—because a "vehicle that the manufacturer knows to be safe is more valuable than a vehicle that the manufacturer perhaps anticipates will later be declared safe"); *id.* ("The injury occurs at the point of sale because the false statement allows the seller to command a premium on the sales price."). So, the provision of a recall repair years after the sale, absent compensation for the overpayment, does not place Plaintiffs in the same position that they would have been in had MBUSA not engaged in misconduct, and awarding Plaintiffs damages for the overcompensation does not result in a double recovery or windfall. *See Weidman v. Ford Motor Co.*, No. 18-CV-12719, 2022 WL 1071289, at *5 (E.D. Mich. Apr. 8, 2022) (rejecting argument that defendant's offer of free replacement meant that plaintiffs had no injury because plaintiffs sought damages for "overpayment at the point of purchase"); *Crawford v. FCA US LLC*, No. 2:20-CV-12341, 2021 WL 3603342, at *3 (E.D. Mich. Aug. 13, 2021) ("FCA's recall does not bar Plaintiffs' theory of recovery. Even if the recall were effective, Plaintiffs alleged that they were injured when they bought their trucks."); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 695 (E.D. Mich. 2020) (holding that a recall did not bar damages claims "because Plaintiffs claim their injury occurred at the point of purchase, and that the recall did not necessarily remediate the loss caused to Plaintiffs by their allegedly having to pay an additional $8,000 to $10,000 premium based on Defendants' alleged misrepresentations"); *Philips*, 2016 WL 693283, at *7–10  (holding that a recall did not reimburse plaintiffs for the loss in market value of their vehicles).

Dr. Dubé's rigorous work quantifies how much less Plaintiffs' vehicles were worth. (ECF No. 4251, ¶¶ 360–70.) Contrary to MBUSA's apparent assumption, his model did not merely analyze the impact of the Inflator Defect alone on the market price of Plaintiffs' vehicles. Rather, Dr. Dubé's model measures the market prices that would have prevailed had consumers been aware of ***both*** the existence of the Inflator Defect ***and*** the eventuality of the recall at the time of purchase. ((ECF No. 4251), ¶¶ 360–370; (ECF No. 4336-58) (Dubé Rept.), at ¶¶ 59, 111, 103, 114; (ECF No. 4336-58) (Dubé Rebut. Rept.) at ¶ 76; (ECF No. 4336-60) (Dubé Dep. Tr.) at 278:2–17, 279:5–17.) Because Dr. Dubé factored the certainty of the recall into his calculation of the price premium, the eventual occurrence of the recall cannot be used to further reduce Plaintiffs' damages. Doing so would, in effect, double count for MBUSA the benefit of the recall.  Because the recall does not reimburse Plaintiffs for the amount they overpaid for their vehicles—*i.e.*, the price premiums that Dr. Dubé calculated—it does not eliminate Plaintiffs' damages.

Consider Ms. Bridges, for example.  If the defect and time until the recall had been

disclosed at the time Ms. Bridges purchased her C250, the price would have been $4,175 less. This overpayment amount already gives MBUSA credit for the repair, so MBUSA's ultimate provision of the repair cannot further reduce Ms. Bridges's damages. Awarding her $4,175 in damages will provide appropriate compensation for her overpayment, not a windfall.

Beyond the inapplicable, general cases on windfalls and the purpose of damages, the other state law authorities that MBUSA cites do not support its attempt to limit Plaintiffs' damages to the cost of the recall repair. Indeed, most of the decisions it cites have nothing to do with the causes of action that Plaintiffs have asserted. While this Court applied decisions concerning property injuries to Plaintiffs' economic-loss claims in its prior Order (ECF No. 4471 at 13), it cited no authority for its conclusion that benefit-of-the-bargain damages are measured the same across all negligence, contract, fraud, and consumer fraud claims.[6] At a minimum, numerous decisions from state appellate courts discussed in the state-specific sections below demonstrate that there are particular measures of damages applicable to Plaintiffs' causes of action.  And as this Court previously recognized (*id.* at 3–4, 6), and the Eleventh Circuit emphasized in *Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1313 (11th Cir. 2023), this Court is bound to apply these state court decisions to Plaintiffs' claims.

Finally, MBUSA is incorrect in contending that Plaintiffs only seek benefit-of-bargain damages.  The operative complaint, which was filed after the summary judgment hearing that MBUSA cites, alleges that Plaintiffs are also seeking statutory damages under the laws of Connecticut, Hawaii, Maine, Nebraska, Oklahoma, Vermont, and West Virginia. (ECF No. 4522 at 829, 829a, 830, 830a-h, 831, 831a-h, 832, 832a-h, 833, 833a-c, 834-836, 836a-h, 837, 838, 838a, 839, 840, 840a-h, 841-842, 842a, 843, 844, 844a, 845, 845a, 846, 846a, 847, 847a-h, 848, 848a-h.) MBUSA never raises a single argument against such damages in its motion, instead relying on the mistaken assumption that Plaintiffs waived such damages claims.  But MBUSA cannot explain how Plaintiffs could have waived claims that were not even at issue at the hearing that MBUSA relies upon—indeed, such a position is illogical.  At a minimum, Plaintiffs' claims for statutory damages must proceed to trial.

---

[6] Leading treatises on the issue point in the opposite direction. *See* Dan B. Dobbs & Caprice L. Roberts, Law of Remedies: Damages, Equity Restitution § 3.3(1) (3d ed. 2018) ("To a large extent, damages ***must vary*** with the kind of harm suffered. For this reason, courts do not use a universal measure of damages. In some kinds of cases the practice is merely to state what is often called 'elements' of damages.").

C.     **MBUSA's Prudential Mootness Arguments Conflict with Prevailing Law.**

Plaintiffs' "claim[s] for money damages . . . . ensure a live controversy" that easily disposes of MBUSA's mootness argument.  *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019); 13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3, p. 2 (3d ed. 2008) ("[A] case is not moot so long as a claim for monetary relief survives"). Recovery "may be uncertain or even unlikely for any number of reasons, in this case as in others. But that is of no moment.  If there is any chance of money changing hands, [Plaintiffs'] suit remains live." *Mission Prod. Holdings, Inc.*, 139 S. Ct. at 1660. MBUSA remarkably ignores Supreme Court precedent when advancing its mootness argument, which the Eleventh Circuit has ***never*** applied to claims for damages.

MBUSA relies, instead, on several decisions that courts within this District have repeatedly and correctly distinguished, *Hadley v. Chrysler Group, LLC*, 624 F. App'x 374, 379 (6th Cir. 2015), and *Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208, 1209 (10th Cir. 2012), as well as an unpersuasive district court opinion, *Sharp v. FCA US LLC*, No. CV 21-12497, 2022 WL 14721245 (E.D. Mich. Oct. 25, 2022), that misapplies *Hadley* and *Winzler*.  The decisive flaw in MBUSA's argument is that the prudential mootness doctrine applies to requests for equitable relief, such as injunctions and declaratory judgments, ***not*** damages. *See Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.*, 479 F. App'x 955, 962 (11th Cir. 2012) ("Pursuant to the doctrine of prudential mootness, we may exercise our discretion and decline to grant ***declaratory relief*** in the context of a controversy that has become 'so attenuated that considerations of prudence and comity ... counsel the court to stay its hand, and to withhold relief it has the power to grant.'") (quoting *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)). This is because the doctrine rests on "the court's discretionary authority to grant or withhold injunctive and declaratory relief." *Chamber of Com. of U.S. of Am.*, 627 F.2d at 292.

The limitation of this doctrine to requests for declaratory and injunctive relief is evident in *Hadley*, 624 F. App'x at 379, and *Winzler*, 681 F.3d at 1209. The plaintiffs only sought "equitable relief" in *Winzler*, 681 F.3d at 1209, and the discussion of prudential mootness in *Hadley* only applied to "claims for injunctive and declaratory relief," 624 F. App'x at 379. For this reason, courts in this District have repeatedly rejected arguments like MBUSA's attempting to extend *Hadley*, *Winzler*, and the prudential mootness doctrine to claims for monetary relief.  *See, e.g.*, *Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1219 (S.D. Fla. 2017) (holding that *Winzler* is

14

"unpersuasive where plaintiffs seek recovery for losses in market value"); *accord Patlan v. BMW of N. Am., LLC*, No. CV 18-CV-09546, 2024 WL 1328012, at *5 (D.N.J. Mar. 28, 2024) ("Courts have routinely declined to apply this doctrine where plaintiffs seek not just equitable relief, but legal relief that exceeds what defendants are offering through a recall."); *McMahon v. Volkswagen Aktiengesellschaft*, No. 22CV01537 (EP) (JSA), 2023 WL 4045156, at *9 (D.N.J. June 16, 2023) ("the prudential mootness doctrine does not confer discretion on the Court to dismiss legal claims.") (internal quotation marks omitted); *McCabe v. Daimler Ag*, No. 1:12-CV-2494-MHC, 2015 WL 11199196, at *4–5 (N.D. Ga. Aug. 19, 2015) (distinguishing *Winzler* and *Hadley* on the same grounds).

Misreading *Hadley*, *Sharp* incorrectly applied the prudential mootness doctrine to the plaintiffs' damages claims. *Hadley* affirmed the dismissal of damages claims not on mootness grounds, but for a lack of evidence. 624 F. App'x at 378. The recall in *Hadley* "removed the defect upon which the plaintiffs' diminished value injury claim [was] based," and "the plaintiffs presented no evidence of diminished value in light of the repair." *Id.* So, contrary to MBUSA's misreading, *Hadley* does not stand for the broad proposition that a recall categorically eliminates damages as a matter of law; rather, it only applies when the plaintiffs present "no evidence" of damages in light of the repair, *id.*, which is not the case here.[7] Dr. Dubé's work calculated Plaintiffs' overpayment "in light of the repair," *id.*—his conjoint surveys expressly informed participants that the defective airbags would be replaced for free in the future and measured the impact of the time until repair on the amount of overpayment ((ECF No. 4338-199) (Dubé Rept.), ¶ 49 n.60)—so, unlike *Hadley*, there is no evidentiary deficiency here. *See Crawford v. FCA US LLC*, No. 2:20-CV-12341, 2024 WL 919830, at *4 (E.D. Mich. Mar. 4, 2024) (rejecting prudential mootness argument at summary judgment because "[d]iminished value damages are measured by the difference between the value of the goods as accepted and the value of the goods as warranted. Whether the defect was repaired will not impact the value of the goods as warranted"). MBUSA's prudential mootness argument should be rejected.

---

[7] *Flores v. FCA US LLC*, No. 19-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020), is inapplicable for the same reason. At the motion-to-dismiss stage, it relied on *Hadley* to conclude that the plaintiffs could not prove damages, but it had no occasion to consider evidence like Dr. Dubé's testimony demonstrating overpayment even with a recall. *Id.* at *4. *Flores* also recognized that its conclusion was inconsistent with decisions from courts within the Eleventh Circuit. *Id.* at *3 (acknowledging but not distinguishing *McCabe*, 2015 WL 11199196, at *1).

## II.  GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF RADICAN'S CLAIMS.

### A.  MBUSA's Motion Should Be Denied as to the Rhode Island Claims.

#### 1.  Ms. Radican's Death Does Not Permit Dismissal of Her Claims.

Plaintiffs' counsel were surprised and saddened to learn of Ms. Radican's passing from MBUSA's motion.  She was a devoted and responsive client and class representative.  She complied with MBUSA's extensive discovery requests, and at the age of **83**, sat for a ***five-hour*** deposition by MBUSA's counsel.  Ms. Radican passed away at the age of 86 on July 19, 2023, in Vero Beach, Florida, where she had retired, after working as a high school teacher and for her husband's business and raising five children in Rhode Island.  Fortunately, one of Ms. Radican's daughters, Kelli Radican—who is named as the Executor of Ms. Radican's will, is recognized as an heir of Ms. Radican's estate in the Summary Administration Order entered by the probate court for Ms. Radican's estate, *see In re Theresa Radican*, No.562023-CP-001178 (Fla. Cir. Ct. St. Lucie Aug. 24, 2023),  and has begun the process of being appointed personal representative under Fla. Stat. § 733.301, has committed to prosecuting her late mother's claim, as the law permits.  Accordingly, Ms. Radican, once she is appointed as personal representative, will be filing a motion to substitute for her mother under Fed. R. Civ. P. 25.

In seeking to dismiss Ms. Radican's claims, MBUSA simply disregards the law.  When a party dies in the middle of a case, Rule 25 specifies the applicable procedure, none of which MBUSA followed.  *See Silas v. Sheriff of Broward Cnty., Fla.*, 55 F.4th 872, 876 (11th Cir. 2022) ("Rule 25 facilitates the substitution of a 'proper party' to take the place of the decedent.")  First, a "statement noting [the] death," Fed. R. Civ. P. 25(a)(3), must be served on the parties and "nonparties [who] have the legal authority to step into the decedent's position in the case." *Silas*, 55 F.4th at 876.  Then, at least ninety days must be provided for those nonparties to file a motion for "substitution of the proper party."  Fed. R. Civ. P. 25(a)(1).  Only if the pertinent, notified nonparties fail to file a motion for substitution within the ninety-day (or, at the court's discretion, an even longer) period, may the court dismiss the decedent's claims.  *Id.*; *Lizarazo v. Miami-Dade Corr. & Rehab. Dep't*, 878 F.3d 1008, 1011 (11th Cir. 2017) ("District courts have discretion to extend the Rule 25 ninety-day period for substitution.").

Here, MBUSA never even started the ninety-day clock, as it never served a suggestion of death on the parties or Ms. Radican's heirs. *Atkins v. City of Chicago*, 547 F.3d 869, 874 (7th Cir.

2008) (holding that "the start gun for the 90–day race has not been fired" when the statement of death has not been served on the proper parties and nonparties). Nor did it take the courteous, professional step of informally notifying Plaintiffs' counsel of Ms. Radican's passing. Instead, it apparently siloed its discovery of Ms. Radican's death until it could pounce and wield the information as a weapon in its motion for summary judgment. But all that MBUSA has truly revealed is its lack of familiarity with the Federal Rules of Civil Procedure. In urging dismissal of Ms. Radican's claims, particularly before her heirs have been given ninety-days to file a motion for substitution, MBUSA invites reversible error. *Escareno v. Carl Nolte Sohne GmbH & Co.*, 77 F.3d 407, 411 (11th Cir. 1996) (reversing dismissal of decedent's claims).

MBUSA cannot defend its position by disputing the applicability of Rule 25, which is triggered when "a party dies and the claim is not extinguished," Fed. R. Civ. P. 25(a)(1), because under Rhode Island law,[8] Ms. Radican's death did not extinguish her claims. Rhode Island's survival statute provides that, "[i]n addition to the causes of action which at common law survive the death of the plaintiff or defendant therein, the following causes of action or actions shall also survive . . . Causes of action and actions for damages to the person or to real and personal estate." R.I. Gen. Laws § 9–1–6(3). For more than a century, "personal estate" in the statute has been construed to mean "[e]very species of property not of a freehold nature, including not only goods and chattels, but rights and credits also." *Bullow v. Gladding*, 100 A. 249, 251 (R.I. 1917) (internal quotation marks omitted). Thus, the Rhode Island Supreme Court has held that the survival statute embraces claims that a defendant deceived a plaintiff into paying more for a product than it was worth, because such claims are for "damage done by the defendant to the personal estate of the plaintiff in feloniously depriving him of the property set out and described in the [complaint]." *Id.* at 250; *id.* at 251 (holding that "the loss to the plaintiff of the sum of $2,900 by reason of his

---

[8] To determine whether a state law claim is "extinguished" under Rule 25, courts look to the law of that state. *See Nguyen v. U.S. D.E.A.*, No. 1:0 CV 00026 MP AK, 2005 WL 2143970, at *4 (N.D. Fla. Sept. 1, 2005) (examining Florida law to determine survival of Florida state law claim); *In re Baycol Prod. Litig.*, 616 F.3d 778, 785 (8th Cir. 2010) ("[I]n a diversity case, we look to state substantive law to determine whether the cause of action survives."); Wright & Miller, 7C Fed. Prac. & Proc. Civ. § 1952 (3d ed.) ("Whether the death of a party extinguishes a claim for or against the party is not a question of procedure. It is a question of substance on which the state law ordinarily governs.").

purchase of worthless stock consequent upon the false and fraudulent representations of the defendant's testatrix" survived under the statute because it is "a damage to the plaintiff's personal estate"). The Rhode Island General Assembly has codified *Bullow*'s expansive interpretation of "personal estate," confirming that it includes "money . . . choses in action, rights, credits, goods, and all other property whatsoever which by law devolve upon the executor or administrator and to any share or interest therein." R.I. Gen. Laws § 33–5–1(1).        For this reason, Rhode Island courts have concluded that it is "well settled" that claims for "fraud [and] deceit" survive a plaintiff's death under the Rhode Island survival statute. *Chu v. Legion of Christ, Inc.*, 2 F. Supp. 3d 160, 171 (D.R.I. 2014).

It is likewise well-settled that Kelli Radican, as an heir and the presumptive personal representative of her mother's estate, is the proper party to continue pursuing her mother's claims. Florida law authorizes a personal representative to "[p]rosecute or defend claims or proceedings in any jurisdiction" on behalf of the estate. Fla. Stat. § 733.612(20). Thus, Florida courts have held that "[i]f a personal representative has been appointed to represent the interests of a decedent, then the personal representative is a proper party for substitution." *Burget v. Nichols*, No. 6:22-CV-1031-WWB-DCI, 2024 WL 2892945, at *1 (M.D. Fla. June 10, 2024) (citing *Metcalfe v. Lee*, 952 So.2d 624, 630 (Fla. 4th DCA 2007); *Schaeffler v. Deych*, 38 So.3d 796, 800 (Fla. 4th DCA 2010)). And even if a personal representative is appointed at a later date, Florida law makes clear that "[t]he powers of a personal representative relate back in time to give acts by the person appointed, occurring before appointment and beneficial to the estate, the same effect as those occurring after appointment." Fla. Stat. § 733.601.

Once Kelli Radican is substituted for her mother, MBUSA's standing objection falls away. "[A]n executor has standing to bring a survival claim both because the injury to his testator before death diminishes the estate and because the claim is an asset owned by the estate." *Chu*, 2 F. Supp. 3d at 172. Eleventh Circuit precedent confirms that a personal representative has standing to sue under these circumstances. *Glickstein v. Sun Bank/Miami, N.A.*, 922 F.2d 666, 670 (11th Cir. 1991), *abrogated on other grounds by Saxton v. ACF Indus., Inc.*, 254 F.3d 959 (11th Cir. 2001) ("The traditional requirement that the plaintiff show an injury in fact that is fairly traceable to the conduct of the defendant is met by the allegation in the complaint that the defendants' actions resulted in the diminishment of the assets of the estate."). Indeed, "[a] substituted party steps into the same position as the original party." *Carrizosa v. Chiquita Brands Int'l, Inc.*, 47 F.4th 1278,

1337 (11th Cir. 2022) (quoting *Ransom v. Brennan*, 437 F.2d 513, 516 (5th Cir. 1971)).  And since Ms. Radican, while she was alive, had standing to bring her claims—a fact that MBUSA does not and cannot dispute—so too does Kelli Radican, as the substituted party.

The authorities that MBUSA cites are inapplicable because they concern actions filed against or for people who had died before the actions' commencement, and thus Rule 25, which "contemplates substitution for someone who had been made a party before his death," was unavailable.  *LN Mgmt., LLC v. JPMorgan Chase Bank, N.A.*, 957 F.3d 943, 951 (9th Cir. 2020) (quoting *Mizukami v. Buras*, 419 F.2d 1319, 1320 (5th Cir. 1969)); *see Hencle v. Ditech Fin.*, No. 21-60737-CIV, 2021 WL 1397882, at *2 (S.D. Fla. Apr. 13, 2021) (dismissing frivolous case where plaintiff died before case was filed).  That is not the case here, because the action was commenced before Ms. Radican passed away.  So, Rule 25 applies.  And under Rule 25, courts routinely substitute estate representatives for class representatives who pass away during litigation. *See Est. of O'Shea through O'Shea v. Am. Solar Sol., Inc.*, No. 14CV894-L-RBB, 2021 WL 4819311, at *3 (S.D. Cal. Oct. 15, 2021).  MBUSA's arguments must be rejected.

**2. Ms. Radican's Damages are Cognizable.**

The measure of damages in Rhode Island for fraud is "the difference between the contract price and the market value of the property." *Kooloian v. Suburban Land Co.*, 873 A.2d 95, 100 (R.I. 2005). And the Rhode Island Deceptive Trade Practices Act broadly permits the recovery of "actual damages" for "any ascertainable loss of money or property." R.I. Gen. Laws § 6-13.1-5.2(a).  MBUSA cites not a single case from a Rhode Island court providing that a recall repair eliminates a plaintiff's damages for such claims.  This is dispositive under Eleventh Circuit precedent.  *See Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1313 (11th Cir. 2023) (declining "to expand state law" in the absence of state court decisions); *Guarino v. Wyeth, LLC*, 719 F.3d 1245, 1251 (11th Cir. 2013) ("[C]onsiderations of comity and federalism counsel that [federal courts] proceed gingerly when venturing into unchartered waters of state substantive law.").

Apparently recognizing the absence of support in Rhode Island law for its position, MBUSA did not raise this damages argument as to Rhode Island claims in its initial motion for summary judgment.  (ECF No. 4179 at 25 n.17.)  Still unable to find applicable authority, MBUSA relies (ECF No. 4800 at 11–12) on irrelevant decisions about claims regarding negligent construction, *Newstone Dev., LLC v. E. Pac., LLC*, 140 A.3d 100 (R.I. 2016); the intrusion of water

on real property from an adjoining landowner, *Tortolano v. DiFilippo*, 349 A.2d 48, 49 (R.I. 1975); the breach of a lease, *Sophie F. Bronowiski Mulligan Irrevocable Tr. v. Bridges*, 44 A.3d 116 (R.I. 2012); and the removal of trees and destruction of a wall on real property, *Morabit v. Hoag*, 80 A.3d 1 (R.I. 2013). None of the claims at issue in those cases involved fraud or the statute under which Plaintiffs are proceeding here. And they simply hold that a plaintiff should not receive a windfall. But Dr. Dube's analysis takes account of the recall, so the damages sought for Ms. Radican's claims would only provide compensation for her overpayment, not a windfall.

MBUSA also overlooks Plaintiffs' claim for statutory damages under the Rhode Island Deceptive Trade Practices Act (ECF No. 4026 at ¶ 848). As explained above and contrary to MBUSA's assumption, Plaintiffs never waived this claim for relief,[9] on which MBUSA has not provided any basis to grant it summary judgment. Because MBUSA sold Plaintiffs vehicles with defective airbags, an ascertainable loss is inferred, even without evidence of the particular sum, and thus statutory damages are available. *See* R.I. Gen. Laws § 6-13.1-5.2(a).

### 3. Genuine Issues of Material Fact Preclude Summary Judgment as to Ms. Radican's Rhode Island Fraud Claim.

As to Ms. Radican's fraud claim, MBUSA reiterates its misguided arguments regarding knowledge of the Inflator Defect and Ms. Radican's exposure to MBUSA advertising materials. (ECF No. 4800 at 12–13.) But, as explained above in section I(A), *supra*, MBUSA's arguments regarding its knowledge are premised on an inaccurate view of the record, which contains more than enough evidence to, at a minimum, create a genuine issue of material fact. Additionally, MBUSA mistakenly assumes, with its citation to *Women's Dev. Corp. v. City of Cent. Falls*, 764 A.2d 151, 161 (R.I. 2001), that its potential liability rests only on an omission theory, when, in fact, its liability also rests on its inaccurate representations that the airbags in Ms. Radican's vehicle were safety devices, instead of defective threats to her safety. In addition, contrary to MBUSA's assumption, it is not necessary for Plaintiffs to prove that MBUSA had actual knowledge of the Inflator Defect under Rhode Island law. Rather, in Rhode Island, "[t]he speaker need not know that the statement is false if the truth is reasonably susceptible of actual knowledge, or otherwise

---

[9] The discussion of damages at the October 21, 2022 hearing, which MBUSA references, concerned actual damages, not statutory damages. The issue of statutory damages was never raised because MBUSA never sought summary judgment on Plaintiffs' request for statutory damages— in its earlier motion or now. Although the court found a waiver as to the claims that were litigated at the hearing (ECF No. 4538 at 10), the Rhode Island claim was not addressed, and thus there is no reason to extend that ruling to it.

expressed, if, through a modicum of diligence, accurate facts are available to the speaker." *Siemens Fin. Servs., Inc. v. Stonebridge Equip. Leasing*, LLC, 91 A.3d 817, 821 (R.I. 2014). Given its close relationship with Daimler, especially through the Quality Engineering Center in Florida, there is no doubt that, "through a modicum of diligence, accurate facts [were] available" to MBUSA. *Id.*

MBUSA's argument regarding Ms. Radican's reliance on MBUSA's misleading marketing materials fares no better. In advancing this argument, MBUSA makes a fundamental error at summary judgment: it ignores evidence that supports Plaintiff's claim. Radican stated that she viewed commercials through radio, television, and the internet that touted the safety and dependability of the MBUSA vehicle model she purchased. (PSOF ¶ 16). MBUSA does not and cannot explain why this evidence of Radican's exposure to MBUSA's misleading advertisements is insufficient to establish reliance.

Nor is Ms. Radican's repeated exposure to MBUSA's misleading advertising unusual or unexpected. Indeed, a central thrust of MBUSA's marketing campaign is to convince prospective consumers to view its vehicles as safe and desirable to facilitate the very sales that they produced. (PSOF ¶¶ 81–89.) There is no dispute that MBUSA made these representations in every form imaginable—through Monroney stickers, through internet, tv, radio, through handouts, standardized sales instruction. (*Id.*, ¶¶ 81–93.)

### 4. Ms. Radican's Rhode Island Statutory Claim Is Timely.

The limitations period for Ms. Radican's fraud and statutory claims is 10 years. *See* R.I. Gen. Laws § 9-1-13(a) ("Except as otherwise specifically provided, all civil actions shall be commenced within ten (10) years next after the cause of action shall accrue, and not after."); *Bourdon's, Inc. v. Ecin Indus., Inc.*, 704 A.2d 747, 753 (R.I. 1997) ("[T]he general ten-year period of § 9–1–13(a) applies to actions for fraud or deceit.") But the limitations period does not begin to run until the cause of action "accrue[s]," R.I. Gen. Laws § 9-1-13(a),[10] which only occurs, per Rhode Island's discovery rule, when "in the exercise of reasonable diligence, the plaintiff should have discovered the injury or some injury-causing wrongful conduct." *Martin v. Howard*, 784

---

[10] The statute of repose found in subsection (b) of the provision was struck down as unconstitutional under Rhode Island's constitution by *Kennedy v. Cumberland Engineering Co., Inc.*, 471 A.2d 195 (R.I. 1984).

A.2d 291, 299 (R.I. 2001); *accord Franks v. Coopersurgical, Inc.*, --- F. Supp. 3d. ---, No. CV 22-046 WES, 2024 WL 1109055, at *16 (D.R.I. Mar. 14, 2024) (citing *Martin* and applying discovery rule to Rhode Island consumer protection claims); *Carney v. Kardinal Land, Inc.*, 813 A.2d 50, 53 (R.I. 2003) ("The statute of limitations begins to run when a party becomes aware of fraudulent conduct, or, in situations in which a reasonable person would not have discovered the legal acti[o]n prior to the time of injury, the statute begins to run at the time the injury manifests itself.") (quotation marks omitted); *Jones v. Moretti*, 711 A.2d 1156, 1157 (R.I. 1998) (same).[11]

Under these well-established principles of Rhode Island law, Ms. Radican's claim is clearly timely. Although Ms. Radican purchased her Class Vehicle new in 2007, she did not receive a recall notice identifying the defect in her vehicle until July 2016, well less than ten years before she filed suit in March 2018. (ECF No. 4259-2020) (Radican's Resps. And Objs. To MBUSA's Interrogs.) at Nos. 1, 4.); *see also* (PSOF ¶ 210). MBUSA points to no evidence suggesting that Ms. Radican could have discovered MBUSA's deceptive trade practices any earlier than July 2016. MBUSA's limitations defense against Radican, therefore, is a non-starter.[12]

### B. <u>MBUSA's Motion Should Be Denied as to Ms. Radican's *Zantac* Claims.</u>

#### 1. Summary Judgment on the *Zantac* Claims Cannot Precede Class Certification.

MBUSA's request for summary judgment on Ms. Radican's "*Zantac* claims," i.e., the claims of absent class members from states other than Rhode Island, will not be ripe until this Court rules on class certification with respect to Ms. Radican's claims. "Class certification is the action that concretely identifies the plaintiffs; before that point, any plaintiffs beyond those named in the complaint are speculative and beyond the reach of the Court's power." *Gutierrez v. Wells Fargo Bank, NA*, 889 F.3d 1230, 1238 (11th Cir. 2018). In a similar case, the Eleventh Circuit held that the district court lacked jurisdiction to rule on a motion to compel arbitration of the claims of absent, putative class members prior to class certification, because "[a]bsent class certification, there is no justiciable controversy between [the defendant] and the unnamed putative class

---

[11] MBUSA relies on *Kennedy v. Acura*, No. 01-4063, 2002 WL 31331373, at *6 (R.I. Super. Aug. 28, 2002), but that decision is neither applicable nor binding. The "underlying claim [was] essentially for breach of implied warranty." *Id.* Here, in contrast, MBUSA is alleged to have engaged in fraudulent conduct.

[12] As Plaintiffs have not moved to certify Ms. Radican's warranty claim under Rhode Island law, Plaintiffs will dismiss that single claim.

members." *In re Checking Acct. Overdraft Litig.*, 780 F.3d 1031, 1037 (11th Cir. 2015).  Under the same reasoning, this Court must first certify a class that includes purchasers with the *Zantac* claims before the Court can reach MBUSA's motion for summary judgment as to those claims.  Nonetheless, Plaintiffs will address MBUSA's faulty arguments as to those claims below, since the Court indicated that it may address class certification and summary judgment in the same Order.

## 2. Genuine Issues of Material Fact Preclude Summary Judgment as to Connecticut Claims.

MBUSA first contends that Connecticut's consumer protection statute includes a residency or in-state injury requirement that Ms. Radican cannot satisfy.  (ECF No. 4800 at 16.)  But, by definition, that requirement will be satisfied by each absent class member if the class is certified, for the class definition as to each state is limited to individuals who purchased vehicles in that state.  (ECF No. 4610 at 1–2 (class cert motion definition).).  MBUSA's position is contrary to *Zantac*, where the Eleventh Circuit discussed at length a directly on point Fourth Circuit opinion:

> Finally, the Fourth Circuit explained in *Actelion Pharmaceuticals* that a plaintiff may have failed to state a claim under a state statute's requirements by failing to reside in the state whose law it invoked, but "[n]onetheless, the claims that the plaintiffs made on behalf of class members who purchased [the drug at issue] in States other than [the states in which the plaintiffs resided] need not be stricken or disregarded;" those counts "define[d] class members' claims" and "may be considered in determining whether the plaintiffs' claims" satisfy the typicality and commonality requirements of Rule 23.

*Zantac*, 2022 WL 16729170 at *5 (discussing *Mayor of Baltimore v. Actelion Pharmas. Ltd.*, 995 F.3d 123, 134 (4th Cir. 2021) ("If the Rule 23 requirements are met, the plaintiffs could then represent the class members who sustained damages under those laws.")).

MBUSA also reprises its damages argument.  But in fraud cases, Connecticut "courts apply the benefit of the bargain measure of damages, which is the "difference in value between the property actually conveyed and the value of the property as it would have been if there had been no false representation." *Leisure Resort Tech., Inc. v. Trading Cove Assocs.*, 889 A.2d 785, 793 (Conn. 2006).  Benefit-of-the-bargain damages are also available under the Connecticut Unfair Trade Practices Act.  *See Zenon v. Mossy*, No. CV054002820S, 2008 WL 589018, at *5 (Conn. Super. Ct. Feb. 13, 2008), *aff'd*, 970 A.2d 814 (2009).  The case that MBUSA cites, in contrast, involved property damage to a vehicle as a result of a collision and a negligence claim, *Kunkel v. Digirolamo*, No. UWYCV176034485S, 2017 WL 7053946, at *1 (Conn. Super. Ct. Dec. 28,

2017)—neither a fraud claim nor a consumer protection claim. There is no support for disallowing a plaintiff's recovery of overpayment damages that factor in the repair, as Plaintiffs' damages here do. (PSOF ¶¶ 221–222, 225–226, 228.)

Finally, MBUSA notes that Connecticut's consumer protection statute has a three-year statute of limitations, which is shorter than Rhode Island's limitations period. But that issue can be addressed by limiting the class of Connecticut consumers to those who purchased Class Vehicles in the three years prior to the filing of the complaint. MBUSA is not entitled to summary judgment as to those consumers' claims.

### 3. Genuine Issues of Material Fact Preclude Summary Judgment as to Hawaii Claims.

MBUSA's damages argument is equally ineffective under Hawaii law. The measure of damages under the Hawaii consumer protection statute is the same as the measure of damages for fraud. *Leibert v. Fin. Factors, Ltd.*, 788 P.2d 833, 836–37 (Haw. 1990). "[A]s a general rule, one injured by the commission of fraud is entitled to recover such damages in a tort action as will compensate him for the loss or injury actually sustained and place him in the same position that he would have occupied had he not been defrauded." *Id.* There is no basis in Hawaii law to conclude that the repair eliminated or limits Plaintiffs' damages, and there is no evidentiary basis to reach that conclusion as a factual matter. Simply declaring that the repair made Plaintiffs "whole" when the evidence establishes the opposite would be clear error.

In addition, the Hawaii statute permits the recovery of statutory damages of $1,000 as a minimum. *See* Haw. Rev. St. § 480-13(b)(1). Plaintiffs expressly alleged such relief in their supplemental complaint, and MBUSA provides no substantive response to it.

Finally, MBUSA again notes the shorter, four-year limitations period for claims under the Hawaii consumer protection statute. But that merely warrants limiting the class of Hawaii consumers to those who purchased a vehicle within four years of the commencement of the suit. It does not support MBUSA's request for summary judgment as to those class members.

### 4. Genuine Issues of Material Fact Preclude Summary Judgment as to Maine Claims.

An award of damages under Maine Unfair Trade Practices Act is meant to compensate plaintiffs for "a loss of money or property that results from the violation." *William Mushero, Inc. v. Hull*, 667 A.2d 853, 855 (Me. 1995). The measure of damages "is the benefit of the bargain [the plaintiff] made, *i.e.*, the difference between the value of the product actually purchased and

24

the value of the product as represented." *Everest v. Leviton Mfg. Co.*, No. CV-04-612, 2006 WL 381832, at *2 (Me. Super. Jan. 13, 2006).

The case that MBUSA primarily relies upon, *Faulkingham v. Seacoast Subaru, Inc.*, 619 A.2d 987, 988 (Me. 1993), involves a breach-of-warranty claim, arising under a different statute. To the extent the case applies, however, it undercuts MBUSA's position.  In *Faulkingham*, the only damages evidence that the plaintiff presented was the cost of repairing two parts of his vehicle, one of which the dealership covered.  *Id.*  The court held that the plaintiff could recover the costs of the repair that the dealership did not perform, but not the costs of the repair that the dealer did perform.  *Id.*  If Plaintiffs were seeking to recover the costs of the inflator repair, *Faulkingham* would prevent that.  But, of course, those are not the damages Plaintiffs are seeking. Rather, Plaintiffs have presented evidence of overpayment damages that the inflator replacement did not remedy.  Like the uncompensated repair in *Faulkingham*, such damages, supported by evidence, are recoverable.

Likewise, MBUSA finds no support in *McKinnon v. Honeywell Int'l, Inc.*, 977 A.2d 420, 427 (Me. 2009).  In that case, the court affirmed summary judgment for the defendant because the plaintiff failed to present evidence of damages—indeed, the plaintiff could not even "give a specific price" he paid for the product.  *Id.*  Similarly, in *Tungate v. MacLean-Stevens Studios*, Inc., 714 A.2d 792, 798 (Me. 1998), the plaintiff had "shown no loss" from the defendant's conduct.  *Id.* at 798.  Neither case helps MBUSA because Plaintiffs here have provided the evidence that was missing in *McKinnon* and *Tungate*.  (PSOF ¶¶ 216–228).

MBUSA also reprises its "no reliance" argument, claiming that Ms. Radican did not review any MBUSA marketing materials.  (ECF No. 4800 at 18.)  But, as explained above, that position is contradicted by the evidence in the record.  MBUSA's pervasive, uniform marketing campaign is hardly "weak, inconsistent, or vague" evidence, contrary to MBUSA's suggestion.

Finally, the six-year limitations period applicable to claims under the Maine statute can be addressed in the class definition, as explained above.

### 5.  Genuine Issues of Material Fact Preclude Summary Judgment as to Nebraska Claims.

In Nebraska, "the correct measure of damages is the difference between the value of the [product] if it had been as represented and its actual value at the time of sale."  *Haarberg v. Schneider*, 117 N.W.2d 796, 799 (Neb. 1962). The case that MBUSA cites concerns damages from a negligent collision, not a civil claim for fraud. *Chlopek v. Schmall*, 224 Neb. 78, 80, 396 N.W.2d

103, 105 (1986).  In a fraud or Consumer Protection Act case, Nebraska applies "the "benefit of the bargain" rule, or the difference between the value of the property purchased if it was as represented and the property's actual value." *Little v. Gillette*, 402 N.W.2d 852, 853 (Neb. 1987). That is precisely what Plaintiffs seek to recover here.

MBUSA's attempt to invoke Neb. Rev. Stat. § 59–1617(1), which exempts certain conduct from Nebraska's Consumer Protection Act, should be rejected. "[P]articular conduct is not immunized from the operation of the Consumer Protection Act merely because the actor comes within the jurisdiction of some regulatory body, the immunity arises if the conduct itself is also regulated." *Hage v. Gen. Serv. Bureau*, 306 F. Supp. 2d 883, 890 (D. Neb. 2003) (citing *Wrede v. Exch. Bank of Gibbon*, 247 Neb. 907 (1995)); *accord S&H Distribution, LLC v. Meyer Lab'y, Inc.*, No. 8:22CV178, 2022 WL 5255323, at *4 (D. Neb. Oct. 6, 2022) (rejecting exemption argument). MBUSA merely cites a Nebraska statute that prohibits dealerships from deceptively advertising motor vehicles.  But that is insufficient to trigger the exemption, because MBUSA provides no evidence that *its* challenged, misleading conduct with respect to Class Vehicles "is also regulated" by "some regulatory body."  *Id.*

Finally, the four-year limitations period applicable to claims under the Nebraska statute can be addressed in the class definition, as explained above.

### 6.  Genuine Issues of Material Fact Preclude Summary Judgment as to Oklahoma Claims.

"The measure of damages in an action under the [Oklahoma Consumer Protection Act] is the plaintiff's actual damages."  *Robinson v. Sunshine Homes, Inc.*, 291 P.3d 628, 637 (Ok. Ct. Civ. App. 2010).  The benefit-of-the-bargain "rule of recovery, adopted in Oklahoma as a measure of damages in fraud cases, allows a plaintiff to recover the difference between the actual value received and the value the defrauded party would have received had the value actually been as represented."  *Bowman v. Presley*, 212 P.3d 1210, 1218 (Ok. 2009).

In addition, Oklahoma does not apply a universal measure of damages across all causes of action.  *See Bank of Oklahoma, N.A. v. Red Arrow Marina Sales & Serv., Inc.*, 224 P.3d 685, 695 (Ok. 2009) ("Deficiency liability and fraud damages are different remedies born of separate legal injuries, each with a distinct and independent measure of damages to satisfy the alleged harm."). So, the case that MBUSA cites concerning a different type of claim and injury—a negligence claim for "injury to personal property," *Brennen v. Aston*, 84 P.3d 99, 101 (Ok. 2003)—is irrelevant. Nonetheless, the case that MBUSA cites does not support its position.  Rather, *Brennen* confirms

that the cost of repair does not limit damages when a repair does not fully compensate a plaintiff. *Id.* at 102 ("[T]he overwhelming weight of legal authority supports the rule that damages are not limited to the cost of repairs actually made where it is shown that repairs failed to bring the property up to the condition it was in prior to the damage.").

MBUSA also attempts to revive its argument concerning manifestation of the defect. (ECF No. 4800 at 20.)  But MBUSA's argument confuses the consequences of the Inflator Defect—a malfunction of the airbag inflator that shoots metal shrapnel at vehicle occupants—with the manifestation of the Inflator Defect. The Inflator Defect has manifested in each Plaintiffs' vehicle at the point it has been purchased because the airbag is unreasonably dangerous. As this Court previously observed (in its Order on Mazda's Motion to Dismiss), "[i]f Takata had installed grenades in its airbags that may or may not explode on impact[,] a court would not require an explosion to demonstrate manifestation of a defect." *In re Takata Airbag Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016).  The only decision MBUSA cites to the contrary is *In re: Gen. Motors LLC Ignition Switch Litig.*, No. 14-MC-2543 (JMF), 2016 WL 3920353, at *36 (S.D.N.Y. July 15, 2016), is unpersuasive, because it does not cite any Oklahoma authority imposing a more demanding manifestation requirement, and instead rests on the court's general impression that other courts "have read [the Oklahoma staute] more strictly than consumer protection statutes in other states."  But the *GM* court apparently overlooked *Brannon v. Munn*, 68 P.3d 224, 226 (Okla. Civ. App. 2003), which reversed dismissal of a claim under the Oklahoma Consumer Protection Act for the sale of a vehicle that was falsely advertised.  This Court should adhere to its prior ruling on the manifestation issue.

Finally, MBUSA tries to take advantage of an exemption in the Oklahoma statute similar to that of the Nebraska statute.  (ECF No. 4800 at 20.)  But for the same reasons discussed above, MBUSA's argument should be rejected.  It makes no effort to demonstrate that its challenged conduct is regulated by any regulatory body.  *Conatzer v. Am. Mercury Ins. Co.*, 15 P.3d 1252, 1255 (Okla. Civ. App. 2000) (rejecting exemption claim of insurer because, even though insurer was generally regulated by a state agency, its challenged actions were not regulated).

### 7. Genuine Issues of Material Fact Preclude Summary Judgment as to Vermont Claims.

For fraud claims, benefit-of-the-bargain damages are available under Vermont law. *Kramer v. Chabot*, 564 A.2d 292, 294 (Vt. 1989).  But "[t]he precise measure of damages that will provide the defrauded party with the benefit of his bargain, however, depends on 'the facts and

circumstances surrounding the fraud, and the nature and extent of the injury suffered by the defrauded party.'" *Id.* (quotations omitted). Thus, when a repair does not fully compensate a plaintiff—as the evidence here establishes—damages cannot be limited to the cost of repair. *Id.*

The cases that MBUSA cites do not suggest that damages are limited to the cost of repair. Rather, one involves a claim of an automobile repair shop against an insurer for unpaid repair costs. *Parker's Classic Auto Works, Ltd. v. Nationwide Mut. Ins. Co.*, 215 A.3d 1084, 1090 (Vt. 2019). It also merely holds that the cost of repair "can be introduced as evidence of the diminution in value," not as a replacement. *Id.* Similarly, *Cushman v. Kirby*, 536 A.2d 550, 554 (Vt. 1987), undercuts its request for summary judgment, because the court determined that it is "a jury question" whether cost of repair is an adequate measure of damages in a fraud claim, and affirmed a jury verdict awarding more than cost of repair.

MBUSA also repeats its "no reliance" argument. But for the reasons explained above, *supra* section II(A)(3) , the argument should be rejected as inconsistent with the record.

### 8. Genuine Issues of Material Fact Preclude Summary Judgment as to West Virginia Claims.

The law of West Virginia allows plaintiffs to recover damages beyond the cost of repair when necessary to obtain complete compensation. *See Ellis v. King*, 184 W.Va. 227, 400 S.E.2d 235, 238 (1990) ("If, after repair, the damaged vehicle cannot be returned to its condition prior to the accident, we believe that damages for [residual] diminution in value are recoverable."). MBUSA cites *Brooks v. City of Huntington*, 768 S.E.2d 97, 106 (W. Va. 2014), but the decision undercuts its argument. The West Virginia court recognized that cost of repair does not limit recoverable damages when the repair does not provide full compensation. *Id.* at 108 (holding that plaintiff "may recover both the cost of repair and for such remaining diminution in value" when the plaintiff "can establish that the pre-damage fair market value of the residential real property cannot be fully restored by repairs"). As the West Virginia court recognized, "[t]he rationale behind permitting this variation from the general rule is that "residual" diminution in value is not duplicative of the cost of repair, *i.e.*, the property still has lost value even after it is repaired." *Id.* at 106.

In addition, Plaintiffs are entitled to statutory damages of $200 under the West Virginia consumer protection statute. W. Va. Code § 46A-1-106. MBUSA offers no valid reason to grant summary judgment on that claim.

Finally, MBUSA raises a pre-suit notice defense. But Plaintiffs' counsel sent a statutory

notice letter to MBUSA in advance of filing Plaintiffs' claims. (ECF No. 4260-16.) And regardless, MBUSA had actual notice from many sources including other consumers, its own data, car dealers, insurance companies, and the National Highway Traffic Safety Administration, among others, all of which qualified as sufficient pre-suit notice regarding the Inflator Defect. This Court has previously found that pre-suit notice can be satisfied based on these factors when addressing similar arguments raised by Ford and GM. *See In re Takata Airbag Products Liab. Litig.*, 2017 WL 775811, at *4–6 (S.D. Fla. Feb. 27, 2017); *In re Takata Airbag Prods. Liab. Litig.*, 2020 WL 3286821, at *15 (S.D. Fla. May 29, 2020). MBUSA cannot seriously contend that it would have changed its conduct had a different letter preceded this action.

## III.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFF BRIDGES'S CLAIMS.

### A.   MBUSA's Motion Should Be Denied as to Plaintiff Bridges's North Carolina Claims.

#### 1.   Ms. Bridges Has Cognizable Damages.

North Carolina law supports Ms. Bridges's damages claims, notwithstanding the recall. "In a fraud case, damage is the amount of loss caused by the difference between what was received and what was promised through a false representation." *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 507 S.E.2d 56, 65 (N.C. Ct. App. 1998) (applying the same measure to a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1); *Hardy v. Toler*, 218 S.E.2d 342, 343 (N.C. 1975) (awarding as damages under § 75-1.1 the difference between the value of "the automobile as represented and warranted" and "its actual value"). Yet again, MBUSA cites not a single decision involving repair costs and the causes of action that Plaintiffs have asserted. Instead, the cases it cites involve inapplicable claims for defective construction, *Kenney v. Medlin Const. & Realty Co.*, 315 S.E. 2d 311 (N.C. App. Ct. 1984); real property damage from clay and water intrusion, *Phillips v. Chesson*, 58 S.E.2d 343 (N.C. 1950); a boat crash, *Sprinkle v. N.C. Wildlife Res. Comm'n*, 600 S.E.2d 473 (N.C. Ct. App. 2004) . The lengths to which MBUSA goes to cite cases other than those involving the actual claims at issue in this case is both impressive and telling. The two decisions that it cites involving North Carolina fraud or deceptive trade practices claims, *Ridley v. Wendel*, 795 S.E.2d 807, 813 (N.C. Ct. App. 2016), and *Shaver v. N.C. Monroe Const. Co.*, 306 S.E.2d 519, 527 (N.C. Ct. App. 1983), contain not a single word about repair costs limiting recoverable damages.

### 2. Genuine Issues of Material Fact Preclude Summary Judgment as to Reliance and MBUSA's Duty to Disclose.

MBUSA's arguments on the reliance element of Ms. Bridges's claims cannot be reconciled with the record. MBUSA engaged in a uniform and pervasive marketing scheme concerning the purported safety features of its vehicles, including the airbags contained therein. (PSOF ¶¶ 81–93.) Reliance may be inferred for Ms. Bridges based upon that uniform and pervasive marketing scheme. *See In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 161 (D.S.C. 2018) (North Carolina law). In addition, Ms. Bridges presented evidence that she saw or heard affirmative misrepresentations by MBUSA regarding the safety of its Class Vehicles, which she relied upon when purchasing her vehicle. In particular, she testified that a representative of the MBUSA-authorized dealership assured her that the vehicle was safe, and MBUSA itself facilitated the through its Mercedes-Benz Certified Pre-Owned status. (*See* PSOF ¶¶ 25–26.) And Ms. Bridges established that she would have purchased a different vehicle or paid less for the Class Vehicle had MBUSA not misled her. (*Id.*, ¶ 215.)

In addition, Ms. Bridges can prevail against MBUSA on an omissions theory. Contrary to MBUSA's suggestion, it did not need a fiduciary, confidential, or other special relationship with Plaintiffs to possess a duty to disclose the existence of the Inflator Defect. There are two major reasons why. First, as the record amply demonstrates, MBUSA did, in fact, have superior knowledge and information of the latent defect at the time of sale, and still decided not to disclose it. (PSOF, ¶¶ 97–123, 129–135, 145–183.) That creates a duty to disclose under North Carolina law. *Allen v. Roberts Constr. Co., Inc.*, 532 S.E.2d 534, 567–68 (N.C. Ct. App. 2000). Moreover, the defect was a material consideration to Plaintiffs at the time of purchase—who all testified that had they known of the defect, they would not have purchased their vehicles or would have paid less for them. (ECF No. 4195 at 16–18.) Second, MBUSA made affirmative representations regarding its Class Vehicles' safety features, including their airbags, which triggered a duty to disclose to Plaintiffs accurate and fulsome information regarding the existence of the defect. *See Hutton v. Hydra-Tech, Inc.*, 2018 WL 1363842, at *7 (M.D.N.C. Mar. 15, 2018).

MBUSA attempts to escape this obligation by contending that the vehicle was sold used. But this ignores the critical fact that it was sold by an MBUSA-authorized dealership as an MBUSA-Certified Pre-Owned Vehicle. MBUSA's authorization and certification process obligated it to disclose the defect, particularly where it disclosed all other issues with the car.

### B.   MBUSA's Motion Should Be Denied as to Ms. Bridges's *Zantac* Claims.

As with the claims that Ms. Radican's personal representative attempts to assert on behalf of purchasers in other states, it is necessary for the Court to address class certification as to the "*Zantac* claims" that Ms. Bridges seeks to assert before it reaches the question of summary judgment as to these claims.  Nonetheless, as Plaintiffs explain below, when the Court reaches that point, it should deny MBUSA's motion.

### 1.   Genuine Issues of Material Fact Preclude Summary Judgment as to the Colorado Fraud Claim.

MBUSA's damages argument fails under Colorado law.  In Colorado, the measure of damages for a fraud claim is "the difference between the value of benefits actually received under the contract and the value such benefits would have had if the false representations had been true." *Club Matrix, LLC v. Nassi*, 284 P.3d 93, 96 (Colo. App. 2011) (quotations omitted); *JW Const. Co. v. Elliott*, 253 P.3d 1265, 1272 (Colo. App. 2011) ("The measure of damages in a fraud action is the difference between the actual value of the benefits received and the value of those benefits if they had been as represented.").  Far from being a cap on recoverable damages, the cost of repair in Colorado is just an option: "With respect to the fraud and breach of warranty claims, plaintiff had a choice of remedies. He could have disaffirmed the contract and sought recission; or he could have affirmed the contract and claimed monetary damages based either on (1) the difference in value between the car he received and a 'new' car, or (2) the cost of repairing the alleged defects." *Witters v. Daniels Motors, Inc.*, 524 P.2d 632, 635 (Colo. App. 1974).

No Colorado state court, to our knowledge, has endorsed the view that repair costs limit the recoverable damages for a fraud claim.  Disregarding state law, as MBUSA requests, would conflict with the *Erie* doctrine and defy the Eleventh Circuit's directive that "[i]t is not the function of federal courts to expand state tort doctrine in novel directions absent state authority suggesting the propriety of doing so."  *Douglas Asphalt Co. v. QORE, Inc.*, 657 F.3d 1146, 1154 (11th Cir. 2011).

Even in property injury cases, as the case that MBUSA cites demonstrates, Colorado permits plaintiffs to recover damages in addition to the cost of repair when a repair does not fully compensate the plaintiffs—as the evidence here demonstrates. *Airborne, Inc. v. Denver Air Ctr., Inc.*, 832 P.2d 1086, 1092–93 (Colo. App. 1992) ("If damaged property is repairable, the plaintiff is entitled to the reasonable costs of repair ***together with*** the decrease in market value to the

property as repaired.") (emphasis added).

MBUSA's other two challenges to the Colorado claim—reliance and knowledge—rest on the same inaccurate view of the record dispelled in section III(A)(2), *supra*. The cases it cites simply hold that reliance and knowledge are elements of Colorado fraud claims. Because sufficient evidence creates a dispute of fact on these issues, summary judgment must be denied.

### 2. Genuine Issues of Material Fact Preclude Summary Judgment as to the Utah Fraud Claim.

MBUSA's damages argument is just as effective under Utah law. In Utah, the "[m]easure of damages for fraud is difference between value of property purchased and value it would have had if representations were true." *Pace v. Parrish*, 122 Utah 141, 150, 247 P.2d 273, 277 (1952); *accord Dilworth v. Lauritzen*, 424 P.2d 136, 137–38 (Utah 1967) ("Utah follows the majority rule [for damages for fraud claims], which is the difference between the actual value of what he received and the value thereof if it had been as represented."). The case that MBUSA cites, *Leishman v. Kamas Valley Lumber Co.*, 427 P.2d 747, 747 (Utah 1967), involved neither fraud nor even an automobile. Instead, it involved a breach of warranty claim for the structural failure of construction beams that broke under the weight of snow. *Id.*

And MBUSA's arguments as to reliance and its duty to disclose fail for the same reasons as they do under North Carolina law—they are premised on a view of the record that conflicts with the actual evidence.

### 3. Genuine Issues of Material Fact Preclude Summary Judgment as to the Virginia Fraud Claim.

The measure of damages for fraud claims in Virginia does not include the cost of repair. The Supreme Court of Virginia made this clear in *Klaiber v. Freemason Assocs., Inc.*, 587 S.E.2d 555, 558–59 (Va. 2003). The court endorsed the standard measure of damages for fraud claims: "the difference between the actual value of the property at the time the contract was made and the value that the property would have possessed had the [fraudulent] representation been true." *Id.* (quotations omitted). And it "expressly declined to adopt" any measure of damages that included the "costs of repair or replacement of defective elements." *Id.* at 559. The case that MBUSA cites, *Averett v. Shircliff*, 237 S.E.2d 92, 95 (Va. 1977), concerns an automobile damaged in an accident, not a fraud claim. Thus, the court's reference to the value of the automobile before and after "the property was damaged." It defies logic to apply that standard to a claim where the automobile was sold in a defective condition from the outset. Even so, the case does not help MBUSA, because it

acknowledges that the cost of repair does not limit damages when a repair does not provide full compensation. *Id.* at 96 (adopting jury instruction that "if you believe from the preponderance of the evidence that the car involved could not be restored to its former condition by repairs, the measure of damages is the difference between the market value of the car immediately before and immediately after the accident").

MBUSA also reiterates its reliance and disclosure arguments with respect to Plaintiffs' Virginia claims. But the arguments ultimately rest on a view of the record incompatible with the evidence, as explained above. *See* section III(A)(2), *supra*.

### 4. Genuine Issues of Material Fact Preclude Summary Judgment as to the Wisconsin Fraud Claim.

In Wisconsin, "[b]enefit of the bargain damages for intentional misrepresentation measure the difference between the value of the property as represented and its actual value as purchased." *Chitwood v. A.O. Smith Harvestore Prod., Inc.*, 489 N.W.2d 697, 706 (Wis. Ct. App. 1992); *accord Betterman v. Fleming Companies, Inc.*, 677 N.W.2d 673, 681 (Wis. Ct. App. 2004) ("The measure of damages for intentional misrepresentation is the benefit of the bargain. Under the benefit of the bargain rule, a plaintiff is entitled to damages equivalent to what the plaintiff would have received if the representation had been true.") (citations omitted). The cases that MBUSA cites, in contrast, do not involve fraud claims. *Laska v. Steinpreis*, 231 N.W.2d 196, 200 (Wis. 1975), is a landlord-tenant case involving injury to property. And *Blodgett v. State Farm Mut. Auto. Ins. Co.*, 646 N.W.2d 854 (Wis. Ct. App. 2002), involved a claim "for damage to property," not a fraud claim. MBUSA cites no state law authority justifying the extension of these inapplicable cases to fraud and consumer protection claims.

MBUSA also lodges its manifestation argument with response to the Wisconsin claim. But because the Inflator Defect has manifested, the Wisconsin authority that MBUSA cites is inapposite. *Tietsworth v. Harley-Davidson*, 677 N.W.2d 233, 237 (Wis. 2004) (rejecting claims for diminution in value due to a "propensity" for premature engine failure).[13] Here, Plaintiffs seek

---

[13] More generally, MBUSA's interpretation of *Tietsworth* is too expansive because its ultimate holding focuses on the economic loss rule, and it discusses manifestation only in dicta. *See Tietsworth*, 677 N.W.2d at 244. The remaining cases cited by MBUSA likewise overstate the holding of Tietsworth. *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 438, 459 (S.D.N.Y. 2017), modified on reconsideration, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 785 F. Supp. 2d 925, 932 (C.D. Cal. 2011).

compensation for present injury in the form of benefit of the bargain damages, defined as "the difference between the value of the property as represented and its actual value as purchased." *Mueller v. Harry Kaufmann Motorcars, Inc.*, 859 N.W.2d 451, 458–59 (Wis. Ct. App. 2014) (emphasis added). When a plaintiff buys a product that is defective at the time of sale, benefit-of-the-bargain damages accrue at the point of purchase. *Id.* This theory of damages applies to Plaintiffs' Wisconsin fraud claim. *See Jersild v. Aker*, 775 F. Supp. 1198, 1206 (E.D. Wis. 1991) ("On an intentional misrepresentation claim, the typical measure of damages is determined by the benefit of the bargain rule.") (cleaned up).

Nor does *Tietsworth* stand for the hardline rule that MBUSA invokes regarding a duty to disclose. Instead, *Tietsworth* expressly left "open" the question of whether a duty to disclose could extend to the sale of consumer goods. 677 N.W.2d at 239. In the near 20 years since *Tietsworth* was decided, many courts have found a duty to disclose in the sale of consumer goods under Wisconsin law. *See Weaver v. Champion Petfoods USA Inc.*, 2019 WL 2774139, at *5 (E.D. Wis. July 1, 2019); *Schmidt v. Bassett Furniture Indus.*, 2009 WL 3380354, at *10 (E.D. Wis. Oct. 20, 2009); *see also In re FCA US LLC Monostable Elec. Gearshift Litig.*, 280 F. Supp. 3d 975 (E.D. Mich. 2017). This Court should reach the same conclusion and reject MBUSA's argument to the contrary.

## IV.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT AS TO THE CLAIMS OF THE REMAINING PLAINTIFFS.

### A.   MBUSA's Motion Should Be Denied as to the Phillipses' Oregon Claims.

Jack and Nancy Phillips, husband and wife, jointly brought their Oregon claims against MBUSA. As in the case of Ms. Radican, Plaintiffs' counsel were surprised and saddened to learn, again from MBUSA's motion, that Mr. Phillips passed away during the pendency of this action. For the reasons explained above with respect to Ms. Radican, however, MBUSA is clearly wrong in seeking to capitalize on Mr. Phillips's death to dismiss his claims. Rule 25 governs the issue and must be followed. In either event, Mrs. Phillips remains in the case, and MBUSA provides no valid reason why she cannot continue as the Plaintiff. Even though Mr. Phillips was responsible for the purchase decision, the purchase was made on behalf of both parties, and both parties suffered the same monetary injury. MBUSA nonetheless complains that it was unable to depose Mrs. Phillips because she was too ill at the time. But it never moved to compel her deposition, presumably because it already deposed Mr. Phillips, who made the purchasing decision. So, it

cannot credibly claim to be prejudiced now, and it cites no authority suggesting that summary judgment would be warranted under such circumstances.

On the merits, MBUSA's arguments are ineffective.  It again ignores the record in claiming that the Phillipses were not exposed to MBUSA's misleading advertisements and thus cannot establish reliance for their fraudulent concealment and Unfair Trade Practices Act claims.  (ECF No. 4800 at 30–31.)  Mr. Phillips testified he looked at "ads that advertised R350s" and that they were "quite effusive in saying that the car was high quality." (PSOF ¶ 34.) The Mercedes ads and materials—touting safety and quality—that he saw during his research played a role in his decision to buy his Class Vehicle. (*Id.*)  He specifically recalled that the 2010 Mercedez-Benz R350 ads touted that it was "a high quality safe car, yes, absolutely."  (*Id.*)

Oregon law also recognizes that "a person who makes a misrepresentation may be liable to the intended recipients of a misrepresentation." *Estate of Schwarz v. Philip Morris Inc.*, 135 P.3d 409, 424 (Or. Ct. App. 2006); *see Am. Nat'l Bank of Denver v. Tonkin*, 592 P.2d 1008, 1012 (Or. 1979) (action for fraud can be maintained if representation was made to plaintiff "with the intention that they should be acted upon by him, or made to another person with the intention that they should be communicated to him and acted upon by him"). In Oregon, "[w]hat matters is whether the representation was intended ultimately . . . for *a particular class of persons* to which the plaintiff belongs." *Schwarz*, 135 P.3d at 424–25 (emphasis added). If a defendant intends "that members of the consumer public would rely" on its misrepresentations, it can be held liable by those intended recipients. *Id.* at 425. That is what occurred here when MBUSA concealed the Inflator Defect with the aim of inducing members of the car-buying public—like the Phillipses— to purchase the affected vehicles.

MBUSA also attempts to revive its damages argument, even though it did not raise the issue in its in initial motion for summary judgment, signaling its infirmity.  Oregon law could not more clearly reject MBUSA's position. The measure of damages under the Oregon Unlawful Trade Practices Act is "the difference between the price paid for the vehicle and the fair market value of the vehicle at the time of sale," and even "if the cost of reasonable repairs is less than the difference in value, the plaintiff still may recover the difference in value." *Simonsen v. Sandy River Auto, LLC*, 413 P.3d 982, 984 (Or. Ct. App. 2018). Ignoring this on-point precedent, MBUSA strays to a case involving real property injury from a landslide, *McCormick v. City of Portland*, 82 P.3d 1043 (Or. Ct. App. 2004).  It also cites *Morasch v. Hood*, 222 P.3d 1125, 1131 (Or. 2009),

but that decision undercuts MBUSA's position, because it rejected remediation costs as a measure of damages in a fraud case.

Finally, MBUSA briefly contends that the Phillipses' Unfair Trade Practices Act claim (but not their fraud claim) is untimely, but it fails to point to sufficient evidence to carry its burden on that defense. Under Oregon law, the limitations period for an Unfair Trade Practices Act claim runs for "one year after the discovery of the unlawful method, act or practice." Or. Stat. § 646.638. MBUSA notes that the Phillipses received a recall notice in July 2016 and filed suit in 2018. But the receipt of a recall notice does not necessarily equate to "discovery of the unlawful method, act or practice." *Id.* And MBUSA provides no evidence that Mr. or Mrs. Phillips was aware of MBUSA's deceptive conduct more than one year before they filed suit.

### B.      MBUSA's Motion Should Be Denied as to Ms. Knapp's Iowa Claims.

An Iowa "defrauded purchaser is entitled to the difference between the value the property would have had as represented and the value of the property he actually received." *Holcomb v. Hoffschneider*, 297 N.W.2d 210, 213 (Iowa 1980). The Iowa Consumer Frauds Act likewise contains a broad remedial provision, authorizing the recovery of "actual damages." Iowa Code Ann. § 714H.5(1). MBUSA cites no Iowa cases limiting damages in a fraud or Consumer Frauds Act case to repair damages. Instead, it relies on a decision involving an automobile crash, which compared repair costs to the difference in a vehicle's value before and after an accident. *Long v. McAllister*, 319 N.W.2d 256, 261 (Iowa 1982). But that measure plainly does not apply to a fraud claim in which there is no pertinent "before-and-after" comparison. The relevant difference in a fraud claim, instead, is between the value of the vehicle as represented and the value of the vehicle delivered. And MBUSA cites no Iowa authority extending *Long* to a fraud claim.

MBUSA is also incorrect in claiming that Ms. Knapp was not exposed to its misleading marketing. In fact, she recalled receiving a brochure, conducting online research, and discussing her vehicle's safety features with dealership personnel. (PSOF ¶ 45.) In addition, Iowa recognizes an omissions-based claim. Iowa Code § 714H.3. Thus, MBUSA has no valid reason to argue that she cannot establish reliance.

### C.      MBUSA's Motion Should Be Denied as to Mr. Goldberg's Washington Claims.

In Washington, the measure of damages for fraud "is the difference between the actual value of the property and what the property would have been worth without the misrepresentation."

*Burbo v. Harley C. Douglass, Inc.*, 106 P.3d 258, 265 (Wash. Ct. App. 2005); *accord McInnis & Co. v. W. Tractor & Equip. Co.*, 388 P.2d 562, 566 (Wash. 1964). Again, rather than engage with cases involving Plaintiffs' claims, MBUSA resorts to decisions regarding claims for negligence from a fire, *Thompson v. King Feed & Nutrition Serv., Inc.*, 105 P.3d 378 (Wash. 2005); and a construction accident, *CF Sales, Inc. v. Cent. Puget Sound Reg'l Transit Auth.*, 169 Wash. App. 1017 (Wash. Ct. App. 2012).

MBUSA separately argues that Mr. Goldberg's claims are time-barred.  But Washington applies the discovery rule to limitations periods.  *See Manning v. Mortg. Elec. Registration Sys., Inc.,* 196 Wash. App. 1043, *5 (Wash. App. Ct. 2016).  And MBUSA presents no argument or evidence to suggest that Mr. Goldberg was aware of the basis for a claim more than four years before filing suit.

Finally, MBUSA again ignores the record in claiming that Mr. Goldberg cannot establish reliance.  He saw commercials, conducted research, and reviewed a brochure for the vehicle model he purchased. (PSOF ¶ 56 (Goldberg Dep. Tr.) at 34:19–35:15; 43:3–20).  In addition, his reliance can be established with circumstantial evidence.  *Vernon v. Qwest Commc'ns Int'l, Inc.*, 643 F. Supp. 2d 1256, 1268 (W.D. Wash. 2009).  And his claims find further support in the duty-to-disclose that Washington law imposes under these circumstances.  *See Young v. Toyota Motor Sales*, U.S.A., 472 P.3d 990, 994 (Wash. 2020).

### D.      MBUSA's Motion Should Be Denied as to Ms. Taylor's Mississippi Claims.

Ms. Taylor has asserted claims for breach of implied warranty and fraud against MBUSA under Mississippi law.  MBUSA first seeks summary judgment on the warranty claim because it "cured" the defect.  (ECF No. 4800 at 36.)  But the authorities it cites merely provide that a seller must be given an opportunity to cure before a plaintiff seeks damages for breach of implied warranty.  *See Watson Quality Ford, Inc. v. Casanova*, 999 So. 2d 830, 834–35 (Miss. 2008).  That does not help MBUSA, because Ms. Taylor did not deny MBUSA an opportunity to cure the defect.  MBUSA had more than a decade to fix the problem, once it became apparent, and even then, MBUSA dragged its feet.  As Plaintiffs' damages evidence demonstrates, the delayed recall did not fully compensate Plaintiffs for their damages.  In addition, the cases that MBUSA cites recognize that a "seller's right to attempt cure was not without limit."  *Fitzner Pontiac-Buick-Cadillac, Inc. v. Smith*, 523 So. 2d 324, 328 (Miss. 1988).

MBUSA also repackages its manifestation argument for Mississippi law.  In 2020, this

Court rejected MBUSA's argument that Plaintiffs' Mississippi implied warranty claim should be dismissed because the Inflator Defect had purportedly not manifested. *In re Takata Airbag Prod. Liab. Litig.*, 462 F. Supp. 3d 1304, 1336 (S.D. Fla. 2020). Indeed, this argument has been raised by Defendants in this MDL at least *seven times* since 2015 and was rejected by the Court *each time*.[14] Nevertheless, MBUSA recycles this argument in its motion, (ECF No. 4800 at 36), and the Court should again reject it. *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019).

MBUSA tries to sidestep the Court's prior rulings by citing inapposite cases generally holding that so long as the vehicle or component thereof performs for a reasonable time without failing, the implied warranty was not breached. *See, e.g.*, *Jarman v. United Indus. Corp.*, 98 F. Supp. 2d 757, 767 (S.D. Miss. 2000); *Shelter Ins. Co. v. Ford Motor Co.*, 2006 WL 318821, at *7 (N.D. Miss. Feb. 9, 2006) . Here, however, the defective PSAN inflators *never* performed their sole function during the life of the vehicles—they were defective from the moment they were installed because they contained innately unstable ammonium nitrate—so it is not the case that Plaintiffs ever received the benefit of their bargain for any amount of time. As such, Plaintiffs were damaged from the moment they purchased their vehicles. *See, e.g.*, *GM Ignition Switch*, 339 F. Supp. 3d at 303; *see also Gast v. Rogers-Dingus Chevrolet*, 585 So.2d 725, 730 (Miss. 1991).

The sole case relied on by MBUSA, *Jarman*, 98 F. Supp. 2d at 757, is not persuasive. In *GM Ignition Switch*, the court rightly rejected GM's reliance on *Jarman*, noting that it "neither cited nor discussed any Mississippi state case law." *Id.* at 299-300.

Nor is there any support for MBUSA's limitations defense.  The discovery rule Ms. Taylor's implied warranty claim (Count 33). Mississippi Code § 75-2-725(2); *Richardson v. Clayton & Lambert Mfg. Co.*, 634 F. Supp. 1480, 1487 (N.D. Miss. 1986). Here, Taylor testified that she did not receive notice of the recall until 2016 (PSOF ¶ 68), approximately two years before she filed suit in March 2018. *Id.*

Turning to the fraud claim, MBUSA first questions whether Ms. Taylor can prove reliance and exposure to MBUSA's misleading advertisements.  (ECF No. 4800 at 37.)  But MBUSA overlooks evidence in the record.  Ms. Taylor testified that she recalls seeing advertisements for

---

[14] *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016) (rejecting Mazda's manifestation argument); *In re Takata Airbag Prod. Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (rejecting Honda's manifestation of defect argument "[c]onsistent with the Court's Mazda Order").

Mercedes-Benz vehicles generally, and recalled that the advertisements described Mercedes-Benz vehicles as "safe," "durable," "luxury cars." (PSOF ¶ 65.) This is more than sufficient to establish her reliance on MBUSA's misleading statements. In addition, under Mississippi law, MBUSA had a duty to disclose the existence of the Inflator Defect. Its superior knowledge of the Inflator Defect, as well as its awareness that safety is a critical concern of consumers and the inability of consumers to obtain the information themselves, gave rise to a duty to disclose. *Poe v. Summers*, 11 So. 3d 129, 134 (Miss. Ct. App. 2009).

The only Mississippi case that MBUSA cites to the contrary, *Mooneyham v. Progressive Gulf Insurance Co.*, 910 So. 2d 1223, 1227 (Miss. App. 2005), rested on the irrelevant and unremarkable proposition "that no [fiduciary] relationship [giving rise to a duty to disclose] exists between a liability insurer and a third-party liability claimant." But the case did not involve the knowledge imbalance and concealment involved here. MBUSA also points out that Ms. Taylor purchased her vehicle from a third party. But MBUSA cites no case law indicating that the sale of a defective product to a plaintiff by a third party is a factor in the court's assessment of reliance.

Finally, MBUSA throws its damages argument at Mississippi law. The measure of damages in Mississippi for fraud is "the difference between the actual value of the property and the contract price." *Garris v. Smith's G & G, LLC*, 941 So. 2d 228, 233 (Miss. Ct. App. 2006). Likewise, the measure of damages for breach of the implied warranty of merchantability is "the difference at the time and place of acceptance between the value of the goods accepted and the value they would have had if they had been as warranted." *Gast v. Rogers-Dingus Chevrolet*, 585 So. 2d 725, 730 (Miss. 1991) (quoting Miss. Code § 75–2–714(2)). Again, ignoring the applicable measure of damages for Plaintiffs' actual claims, MBUSA cites a decision involving an injury to property, in which repair costs are compared to the property's value "before and after" the injury. *Bell v. First Columbus Nat. Bank*, 493 So. 2d 964, 970 (Miss. 1986); *see Wachob Leasing Co. v. Gulfport Aviation Partners, LLC*, No. 1:15-CV-237-HSO-RHW, 2016 WL 10536040, at *5 (S.D. Miss. Nov. 29, 2016) (involving "a negligence action for destruction of personal property"). There is no way to apply this measure to a fraud claim, in which there is no injury to preexisting property and no "before and after" condition, without rewriting the state court opinion. The clear mismatch flows from the fact that a fraud claim induces a transaction, and thus creates a species of damages—overpayment—that does not exist in a negligent destruction of personal property case.

### E.     MBUSA's Motion Should Be Denied as to Ms. Calhoun's Georgia Claims.

MBUSA's various arguments against Ms. Calhoun's Georgia claims conflict with the record and the law.  MBUSA starts by arguing that Ms. Calhoun cannot establish reliance because did not see MBUSA advertisements.  (ECF No. 4800 at 38–39.) But Ms. Calhoun's sworn interrogatory responses establish otherwise (PSOF ¶¶ 74, 215), so a dispute of fact remains. MBUSA also resists its duty to disclose, because Ms. Calhoun purchased her vehicle used, but in a closely analogous case, Georgia fraud claims against Mercedes-Benz were sustained on behalf of a class of both new and used vehicle owners. *See Monopli v. Mercedes-Benz USA, LLC*, 2022 WL 409484, at \*11–12 (N.D. Ga. Feb. 10, 2022); *see also Persad v. Ford Motor Co.*, No. 17-cv-12599, 2018 WL 3428690, at \*3 (E.D. Mich. July 16, 2018) (under Georgia law, finding a duty to disclose where defendant has "exclusive and superior knowledge" of a hidden product defect); *Pinkerton & Laws Co., Inc. v. Roadway Exp., Inc.*, 650 F. Supp. 1138, 1147 (N.D. Ga. 1986). MBUSA offers no case law to support its contention that the purchase of a Class Vehicle through a third party somehow moots causation for the purposes of statutory consumer protection claims.

MBUSA's damages arguments are misguided as well.  Georgia measures damages for fraud claims by "the difference between what [Plaintiffs] paid for their [vehicles] and what those [vehicles] were worth at the time of purchase." *Brooks v. Dime Sav. Bank of New York*, FSB, 457 S.E.2d 706, 708 (Ga. Ct. App. 1995); *see Bennett v. D. L. Claborn Buick, Inc.*, 414 S.E.2d 12, 14 (Ga. Ct. App. 1991); *Horne v. Claude Ray Ford Sales, Inc.*, 290 S.E.2d 497, 498 (Ga. Ct. App. 1982). The same damages measure applies to claims under the Georgia Fair Business Practices Act. *See Colonial Lincoln-Mercury Sales, Inc. v. Molina*, 262 S.E.2d 820, 822 (Ga. Ct. App. 1979). None of MBUSA's authorities require restricting damages to the cost of repair for these claims.

Finally, MBUSA's argument regarding timeliness of Ms. Calhoun's Georgia fraud claim (it does not dispute the timeliness of her statutory claim) rests on its counterfactual position that it lacked pre-sale knowledge of the Inflator Defect.  The existence of a genuine issue of material fact as to MBUSA's knowledge, therefore, precludes summary judgment on Ms. Calhoun's fraud claim.

### CONCLUSION

For the foregoing reasons, MBUSA's motion for summary judgment should be denied.

Dated: August 2, 2024

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com
apodhurst@podhurst.com
srosenthal@podhurst.com
mweinshall@podhurst.com
adelriego@podhurst.com

***Chair Lead Counsel for Plaintiffs***

| **COLSON HICKS EIDSON** | **SMITH LACIEN LLP** |
|---|---|
| Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP** | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP** |
| David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel: (914) 749-8200<br>Fax: (914) 749-8300<br>Email: dboies@bsfllp.com<br>mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel: (305) 539-8400<br>Fax: (305) 539-1307<br>Email: szack@bsfllp.com<br>mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T: 415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC** | **BARON & BUDD, PC** |
|---|---|
| James E. Cecchi<br>jcecchi@carellabyrne.com<br>5 Becker Farm Road<br>Roseland, NJ 07068-1739<br>T: 973 994-1700<br>f: 973 994-1744<br><br><br>*Plaintiffs' Steering Committee* | Roland Tellis<br>rtellis@baronbudd.com<br>David Fernandes<br>dfernandes@bardonbudd.com<br>Mark Pifko<br>mpifko@baronbudd.com<br>15910 Ventura Blvd.,<br>Suite 1600<br>Encino, CA 91436<br>T: 818-839-2333<br><br>J. Burton LeBlanc<br>9015 Bluebonnet Blvd.<br>Baton Rouge, LA 70810<br>T: 225-761-6463<br><br><br>*Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto*
         Peter Prieto

43