**UNITED STATES DISTRICT COURT FOR THE**
**SOUTHERN DISTRICT OF FLORIDA**
**Miami Division**
**MDL No. 2599**
**Master File No.: 15-MD-02599-MORENO**

**IN RE: TAKATA AIRBAG PRODUCT**
**LIABILITY LITIGATION**

**THIS DOCUMENT RELATES TO**:

**ECONOMIC LOSS TRACK CASES**
**AGAINST <u>GENERAL MOTORS, LLC</u>**

**PLAINTIFFS' RESPONSE IN OPPOSITION TO**
**GM'S MOTION FOR SUMMARY JUDGMENT**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

BACKGROUND ...................................................................................................................2

I.   THE TAKATA PSAN INFLATORS IN GM CLASS VEHICLES ARE DEFECTIVE.....................................................................................................2

II.  GM WAS AWARE OF THE INFLATOR DEFECT IN CLASS VEHICLES BUT FAILED TO DISCLOSE IT TO PLAINTIFFS AND CLASS MEMBERS......................................................................................4

III. GM UNIFORMLY MARKETED THE CLASS VEHICLES AS SAFE. ...........................7

ARGUMENT....................................................................................................................9

I.   GM'S STANDING AND MOOTNESS ARGUMENTS LACK MERIT. .........................9

    A.  Plaintiffs Have Article III Standing. ...............................................9

    B.  Plaintiffs' Claims for Monetary Relief Foreclose GM's Mootness Attack.........................................................................................12

II.  GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' DAMAGES...................................................14

    A.  The Court Should Reject GM's Endless Effort To Reargue This Court's Prior *Daubert* Rulings.........................................................14

    B.  The Recall Did Not Eliminate Plaintiffs' Overpayment Damages...............15

III. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON MR. SIBLEY'S LOUISIANA CLAIM. ...............................22

    A.  Mr. Sibley's Claim is Timely. ....................................................22

    B.  GM Is Liable as a "Seller" Under Louisiana Law. ...............................23

    C.  The Court Should Deny GM's Motion To Reconsider Class Certification..........................................................................24

IV. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE GEORGIA CLAIMS. ................................................25

    A.  Ms. Lodge's Bankruptcy Petition Does Not Preclude Her Claim. ...............25

    B.  Triable Issues of Fact Exist as to the Duty to Disclose and Reliance...........26

V.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY
      JUDGMENT ON THE ALABAMA CLAIM. ................................................................28

   A.   Plaintiffs Need Not Wait For A Catastrophic Rupture To Bring Their
         Claim......................................................................................................................28

   B.   Triable Issues of Fact Exist as to GM's Duty to Disclose and Reliance........................30

CONCLUSION ................................................................................................................................33

<u>**TABLE OF AUTHORITIES**</u>

**Cases**

*Aetna Cas. & Sur. Co. v. Cantrell*,
  399 S.E.2d 237 (Ga. Ct. App. 1990)......................................................27

*Amin v. Mercedes-Benz USA, LLC*,
  301 F. Supp. 3d 1277 (N.D. Ga. 2018)...................................................27

*Aucoin v. Southern Quality Homes, LLC*,
  984 So.2d 685 (La. 2008) ......................................................................24

*Beth Israel v. Bartley, Inc.*,
  579 So. 2d 1066 (La. Ct. App. 1991) ...............................................22, 23

*Blair-Naughton L.L.C. v. Diner Concepts, Inc.*,
  369 F. App'x 895 (10th Cir. 2010) .......................................................20

*Bloomgarden v. Allstate Fire & Cas. Ins. Co.*,
  499 F. Supp. 3d 1160 (S.D. Fla. 2020)..................................................11

*Blue Cross & Blue Shield of Alabama v. Weitz*,
  913 F.2d 1544 (11th Cir. 1990)..............................................................22

*Brasher v. Sandoz Pharms. Corp.*,
  2001 WL 36403362 (N.D. Ala. Sept. 21, 2001) ...................................32

*Brown v. Hyundai Motor Am.*,
  2019 WL 4126710 (D.N.J. Aug. 30, 2019).............................................27

*Burge v. Par. of St. Tammany*,
  187 F.3d 452 (5th Cir. 1999)..................................................................11

*Cardenas v. Toyota Motor Corp.*,
  No. 18-22798, 2021 WL 5811741 (S.D. Fla. Dec. 6, 2021)...................14

*Carriuolo v. Gen. Motors Co.*,
  823 F.3d 977 (11th Cir. 2016).........................................................14, 16

*Chamber of Commerce v. U.S. Dep't of Energy*,
  627 F.2d 289 (D.C. Cir. 1980) ...............................................................12

*Cheng v. BMW of N. Am., LLC,*
   No. CV 12-09262, 2013 WL 3940815 (C.D. Cal. July 26, 2013)...........................................11

*Cole v. Gen. Motors Corp.,*
   484 F.3d 717 (5th Cir. 2007)...........................................................................................11

*Cornelious v. Bailey Lincoln-Mercury, Inc.,*
   566 So. 2d 85 (La. Ct. App. 1990) ...................................................................................18

*Crawford v. FCA US LLC,*
   No. 2:20-CV-12341, 2021 WL 3603342 (E.D. Mich. Aug. 13, 2021) ...................................16

*Debernardis v. IQ Formulations,*
   942 F.3d 1076 (11th Cir. 2019) ..................................................................... 9, 10, 11

*Delta Chevrolet, Inc. v. Wells,*
   371 S.E.2d 250 (Ga. Ct. App. 1988)................................................................................28

*Earl v. Boeing Co.,*
   53 F.4th 897 (5th Cir. 2022) ..................................................................................... 10, 11

*Ehrlich v. Roby Motors Co.,*
   117 So. 590 (La. 1928) ...................................................................................................18

*Ex parte Household Retail Servs. Inc.,*
   744 So. 2d 871 (Ala. 1999).............................................................................................33

*First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., Inc.,*
   899 F.2d 1045 (11th Cir. 1990).......................................................................................31

*Flores v. FCA US LLC,*
   No. 19-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020) ............................................13

*Ford Motor Co. v. Rice,*
   726 So. 2d 626 (Ala. 1998) .......................................................................................21, 30

*Griffin v. Coleman Oldsmobile, Inc.,*
   424 So. 2d 1116 (La. Ct. App. 1982) ...............................................................................18

*Hadley v. Chrysler Grp., LLC,*
   624 F. App'x 374 (6th Cir. 2015) ..............................................................................12, 13

*Hinton ex re. Hinton v. Monsanto Co.,*
   813 So.2d 827 (Ala. 2001).............................................................................................30

*Hutto v. Shedd,*
    353 S.E.2d 596 (Ga. Ct. App. 1987)......................................................................21

*In Matter of Motors Liquidation Co.,*
    829 F.3d 135 (2d Cir. 2016).................................................................................23

*In re 3M Combat Arms Earplug Prods. Liab. Litig.,*
    2021 WL 753563 (N.D. Fla. Feb. 2, 2021)...........................................................27

*In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.,*
    54 F.4th 28 (1st Cir. 2022)...........................................................................11, 12

*In re Ford Motor Co. Vehicle Paint Litig.,*
    1996 WL 426548 (E.D. La. July 30, 1996)..........................................................32

*In re Gen. Motors LLC Ignition Switch Litig.,*
    No. 14-MD-2543, 2016 WL 874778 (S.D.N.Y. Mar. 3, 2016) ..............................23

*In re Takata Airbag Prod. Liab. Litig.,*
    193 F. Supp. 3d 1324 (S.D. Fla. 2016).................................................................28

*In re Takata Airbag Prod. Liab. Litig.,*
    255 F. Supp. 3d 1241 (S.D. Fla. 2017).................................................................28

*In re Takata Airbag Prod. Liab. Litig.,*
    396 F. Supp. 3d 1101 (S.D. Fla. 2019)...........................................................28, 29

*In re Takata Airbag Prods. Liab. Litig.,*
    524 F. Supp. 3d 1266 (S.D. Fla. 2021).................................................................26

*In re Volkswagen Timing Chain Prod. Liab. Litig.,*
    2017 WL 1902160 (D.N.J. May 8, 2017)............................................................27

*Indep. Life & Accident Ins. Co. v. Harrington,*
    658 So. 2d 892 (Ala. 1994).................................................................................31

*Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.,*
    479 F. App'x 955 (11th Cir. 2012) .....................................................................12

*Jackson Co. v. Faulkner,*
    315 So. 2d 591 (Ala. Civ. App. 1975).................................................................32

*John Thurmond & Assocs., Inc. v. Kennedy,*
    668 S.E.2d 666 (Ga. 2008)..................................................................................21

*Leon v. Cont'l AG,*
   301 F. Supp. 3d 1203 (S.D. Fla. 2017) ............................................................... 11, 13

*Lewis v. Mercedes-Benz USA, LLC,*
   530 F. Supp. 3d 1183 (S.D. Fla. 2021) ...................................................................... 9

*Mason v. Chrysler Corp.,*
   653 So. 2d 951 (Ala. 1995) ...................................................................................... 31

*McCabe v. Daimler Ag,*
   No. 1:12-CV-2494-MHC, 2015 WL 11199196 (N.D. Ga. Aug. 19, 2015) ...................... 13, 27

*Menville v. Stephens Chevrolet, Inc.,*
   300 So. 2d 858 (La. Ct. App. 1974) .......................................................................... 18

*Mission Prod. Holdings, Inc. v. Tempnology, LLC,*
   139 S. Ct. 1652 (2019) ............................................................................................. 12

*Monopoli v. Mercedes-Benz USA, LLC,*
   2022 WL 409484 (N.D. Ga. Feb. 10, 2022) ............................................................. 27

*Moore v. Lovein Funeral Home, Inc.,*
   852 S.E.2d 876 (Ga. Ct. App. 2020) ......................................................................... 28

*Nguyen v. Nissan N. Am., Inc.,*
   932 F.3d 811 (9th Cir. 2019) .................................................................................... 29

*Persad v. Ford Motor Co.,*
   2018 WL 3428690 (E.D. Mich. July 16, 2018) .......................................................... 27

*Peters v. Amoco Oil Co.,*
   57 F. Supp. 2d 1268 (M.D. Ala. 1999) ..................................................................... 31

*Pfizer, Inc. v. Farsian,*
   682 So. 2d 405 (Ala. 1996) ...................................................................................... 30

*Philips v. Ford Motor Co.,*
   No. 14-CV-02989-LHK, 2016 WL 693283 (N.D. Cal. Feb. 22, 2016) ...................... 12, 17

*Raymo v. FCA US LLC,*
   475 F. Supp. 3d 680 (E.D. Mich. 2020) .................................................................... 16

*S. Bakeries, Inc. v. Knipp,*
   852 So. 2d 712 (Ala. 2002) ...................................................................................... 30

*Sater v. Chrysler Grp. LLC*,
   No. 14-cv-700, 2016 WL 7377126 (C.D. Cal. Oct. 25, 2016)..................................................17

*Sharp v. FCA US LLC*,
   No. CV 21-12497, 2022 WL 14721245 (E.D. Mich. Oct. 25, 2022).......................................12

*Slater v. United States Steel Corp.*,
   871 F.3d 1174 (11th Cir. 2017).................................................................................................26

*Smith v. Haynes & Haynes P.C.*,
   940 F.3d 635 (11th Cir. 2019)...................................................................................................26

*Storey v. Cap. Link Mgmt., LLC*,
   No. 2:21-CV-293-SPC-NPM, 2021 WL 4862667 (M.D. Fla. Oct. 19, 2021).........................26

*Summit Auto Sales, Inc. v. Draco, Inc.*,
   2017 WL 3896691 (N.D. Ala. Sept. 6, 2017) ...........................................................................31

*Tobacco II Cases*,
   207 P.3d 20 (Cal. 2009)............................................................................................................32

*TransUnion LLC v. Ramirez*,
   141 S. Ct. 2190 (2021)................................................................................................................9

*Weidman v. Ford Motor Co.*,
   No. 18-CV-12719, 2022 WL 1071289 (E.D. Mich. Apr. 8, 2022).........................................16

*Winzler v. Toyota Motor Sales USA, Inc.*,
   681 F.3d 1208 (10th Cir. 2012)...........................................................................................12, 13

*Womack & Adcock v. 3M Bus. Prods. Sales, Inc.*,
   316 So. 2d 795 (La. Ct. App. 1975) .........................................................................................24

**Statutes**

La. Civ. Code Ann. art. 2534.B.................................................................................................22

La. Civ. Code Ann. art. 2545....................................................................................................24

O.C.G.A. § 23-2-53...................................................................................................................26

**Other Authorities**

13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3, p. 2 (3d ed.
   2008) .........................................................................................................................................12

### INTRODUCTION[1]

Defendant General Motors, LLC pervasively marketed its vehicles as safe for more than a decade, calling specific attention to the purported safety-enhancing features of its advanced airbags. But that marketing was misleading.  GM had equipped its vehicles with dangerous airbag inflators packed with ammonium nitrate, an unstable explosive notorious for bombs and deadly industrial accidents.

From the start, GM knew the challenges and risks of placing such a volatile compound within metal cannisters positioned a few feet from vehicle occupants' faces. Early tests revealed showstopping ballistic variability and catastrophic disassembly. At each stage of development, the inflators failed to meet safety specifications and GM's engineers warned of the unreasonable safety risks.  But GM shut down this dissent and prioritized the lower cost of Takata's inflators over the safety of its customers.

Once Takata's inflators began rupturing in the field, as basic chemistry and the testing data predicted they would, Takata and almost every other automaker conceded their errors and recalled the inflators. But not GM. It fought with the National Highway Traffic Safety Administration (NHTSA) for more than four years, claiming that its inflators were somehow different than the 60 million others that had been recalled and shared the same structure and volatile chemistry. Meanwhile, in internal emails, GM's own engineers conceded that Takata's inflators suffered from a core design flaw and even joked about their inherently dangerous nature, likening them to ICBM missiles in North Korea. NHTSA ultimately saw through GM's flimsy arguments and rejected its petitions to deem the defective inflators inconsequential to motor vehicle safety.

Plaintiffs Tarus Sibley (Louisiana), Dyeshawn Lodge (Georgia), and Tommy and Mary Rivers (Alabama) knew none of this when they purchased their GM vehicles.  They couldn't have because GM concealed it and promoted the opposite message, the purported safety of its vehicles, specifically calling attention to its airbags as safety-enhancing devices.  This deceptive, wrongful conduct caused Plaintiffs to substantially overpay for their vehicles.  Plaintiffs seek to recover their economic losses in this action.

Plaintiffs' claims should proceed to trial. GM's motion for summary judgment rests on arguments that this Court and others across the country have repeatedly rejected. And the abundant

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted and all emphases are added. "PSOF" refers to the Statement of Facts that Plaintiffs are filing with this response.

evidence of GM's wrongdoing and Plaintiffs' damages raise genuine disputes of material fact that preclude judgment as a matter of law.

GM's arguments on damages, in particular, are unavailing, because the law in Louisiana, Georgia, and Alabama is different than the law of the states the Court previously addressed, a fact GM implicitly conceded when it omitted these states from its first iteration of the argument. Nor can GM seriously dispute that a vehicle equipped with veritable grenades in place of federally mandated safety devices is worth less than a vehicle with safe, operational airbags. GM's belated recall—issued years after Plaintiffs purchased their vehicles—does not compensate Plaintiffs for the economic losses they suffered when they overpaid for vehicles that were worth less than represented. Plaintiffs bargained for vehicles with safe airbags on ***day one***, not ten years after the date of purchase. So, GM's delayed recall did not provide Plaintiffs with what they bargained for. Plaintiffs' damages model, moreover, accounts for the recall in determining Plaintiffs' damages.

GM's other scattered attacks also fail. Its mootness argument is foreclosed by Supreme Court and Eleventh Circuit precedent. Its insistence that an inflator must rupture before it can be liable for economic losses is inconsistent with the law. Its knowledge of the defect, as well as its misleading representations regarding the safety of its vehicles, gave rise to a duty to disclose, which it repeatedly breached. The limitations in its express warranties do not absolve it of breaching implied warranties of merchantability. And its various claim-specific arguments run into genuine disputes of material fact.

GM's motion should be denied, and Plaintiffs' claims should proceed to trial.

## BACKGROUND

## I.    THE TAKATA PSAN INFLATORS IN GM CLASS VEHICLES ARE DEFECTIVE.

Takata PSAN inflators all share a uniform defect: a propellant made of phase-stabilized ammonium nitrate (PSAN), an explosive compound that becomes highly unstable when exposed to normal temperature cycles and humidity (the "Inflator Defect").  (ECF No. 4250, ¶¶ 308–11; *see also id.*, ¶¶ 322 n.160, 325, 380.)  Over time, the PSAN-based propellant degrades, which increases its burning rate during airbag deployment, causing the inflators to become so aggressive that they rupture.  (*Id.*, ¶¶ 309–10.)  An inflator rupture is comparable to a grenade explosion, resulting in metal fragments being ejected into the vehicle's cabin, posing a severe risk of injury or death to vehicle occupants. (*See id.*, ¶ 311.) There have been at least 400 injuries and 25 deaths in the United States from Takata inflator ruptures. (PSOF, ¶ 73.)

GM installed these Takata PSAN inflators in its GMT900 vehicles (the "Class Vehicles"). (ECF No. 4250, ¶ 314; *see also id.*, ¶ 15 n.1.)  The GMT900 is a specific vehicle platform that forms the structural foundation for a variety of GM trucks and sport utility vehicles, including the Chevrolet Avalanche, Cadillac Escalade, Cadillac Escalade ESV, Cadillac Escalade EXT, GMC Sierra LD, GMC Sierra HD, Chevrolet Silverado LD, Chevrolet Silverado HD, Chevrolet Suburban, Chevrolet Tahoe, GMC Yukon, and GMC Yukon XL.  (ECF No. 4182 at 5 n.4; ECF No. 4185, ¶ 11.) There are approximately six million Class Vehicles nationwide, spanning a range of GM brands and models released between 2007 and 2014. (ECF No. 4189-8.)

Beginning in May of 2015, Takata issued a series of Defect Information Reports (DIRs) through NHTSA, which required vehicle manufacturers, including GM, to recall all Takata inflators containing non-desiccated PSAN-based propellant. (ECF No. 4250, ¶ 313.)  The DIRs included all Takata inflators found in GMT900 vehicles, *i.e.*, the Class Vehicles. (*Id.*, ¶ 314.) Takata's DIRs acknowledged that its PSAN inflators posed an unreasonable risk to the safety of vehicle occupants due to their dangerous, uncontrollable propensity to rupture. (*Id.*, ¶¶ 315–16.)

Despite the DIRs, GM submitted petitions to NHTSA claiming that the defect was inconsequential to occupant safety in its GMT900 platform vehicles, arguing that design differences made the defect irrelevant. (*Id.*, ¶¶ 317–18.)  But NHTSA firmly denied these petitions in 2020, concluding, as Takata and virtually all other automakers had, that Takata PSAN inflators are universally defective and unreasonably dangerous. (*Id.*, ¶¶ 319–23.)

Dr. Harold Blomquist, an expert retained by NHTSA, confirmed that the design features GM identified as unique did not make the GMT900 inflators any safer. (*Id.*, ¶¶ 321–22.) He concluded that Takata inflators in GMT900 vehicles suffered from the same uniform defect as all other Takata PSAN inflators. (*Id.*, ¶ 322.) Blomquist confirmed that these inflators were susceptible to propellant degradation from the day they were built, progressing over time and accelerating when moisture increases inside the inflator. (*Id.*, ¶ 322 & n.160.)

NHTSA agreed with Blomquist, as did Plaintiffs' experts, Robert Renz and James Baglini. (*Id.*, ¶¶ 323, 325–26.) Renz testified that all non-desiccated Takata PSAN inflators shared a uniform defect, irrespective of vehicle design or platform. (*Id.*, ¶ 325.) He emphasized that the defect is inherent to the use of ammonium nitrate. (*Id.*) Baglini expanded on this opinion, explaining that scientific principles of chemistry, physics, and ballistics that result in propellant degradation and rupture are the same across all Takata PSAN inflators. (*Id.*, ¶ 326.)

The defect is further confirmed by extensive testing performed on inflators collected from Class Vehicles in the field by both Takata and Plaintiffs' expert, Jimmie Oxley. (*Id.*, ¶¶ 328–34.) At NHTSA's direction, Takata "compiled and summarized test results for more than 387,000 inflator tests or inspections (as of July 3, 2018), including GMT900 inflators," all of which "are contained in [Takata's Master Engineering Analysis File]." (*Id.*, ¶ 329.) The test results contained in Takata's Master Engineering Analysis File ("MEAF"), "indicat[e] that at least four inflators recovered from GMT900 vehicles … experienced abnormally high pressure during ballistic testing. (*Id.*, ¶ 330.) Those inflators included "three [SPI-YP] variant inflators and one [PSPI-L-YD] inflator returned from MY 2007 GMT 900 vehicles [and all] experienced high-pressure deployments." (*Id.*)  One of those inflators "even reached a pressure of 91[megapascal]." (*Id.*, ¶ 331.) In interpreting the GMT900 inflator's peak pressure value, NHTSA's expert, Mr. Blomquist found that "[t]he peak pressure for that test was 91 MPa, which is within 10% of the burst pressure for this inflator variant," and "characteristic of curves for Takata passenger inflators experiencing a rupture." (*Id.*)  Based on reviewing the MEAF testing data, ***NHTSA itself concluded that "the testing results indicate that these inflators—even encompassing all of the design 'advantages' claimed by GM—have and will continue to suffer propellant degradation in a manner similar to the other non-desiccated PSAN inflators***." (*Id.*, ¶ 332.)

Plaintiffs also commissioned their own tests of Takata inflators from Class Vehicles recovered from the field. (*Id.*, ¶ 333.) Plaintiffs' expert, Jimmie Oxley, a renowned explosives expert, studied 72 GMT-900 inflators taken from Class Vehicles in the field. (*Id.*) She inspected the inflators, conducted temperature cycling, exposed them to humidity, and fired them in a closed tank.  (*Id.*) Out of 72 GMT-900 inflators tested by Professor Oxley, three of them exploded in metal pieces and eight others exhibited abnormally high peak pressure deployments.  (*Id.*, ¶ 334.).

Notwithstanding this abundant evidence of the Inflator Defect, GM disputed that any defect existed in Class Vehicles in its prior motions for summary judgment.  (ECF Nos. 4489, 4799.)  It has apparently recognized the untenability of that counter-factual position, which it does not advance in its current motion.

## II.   GM WAS AWARE OF THE INFLATOR DEFECT IN CLASS VEHICLES BUT FAILED TO DISCLOSE IT TO PLAINTIFFS AND CLASS MEMBERS.

Evidence shows GM was well aware of the risks of ammonium nitrate before adopting Takata's inflators. (ECF No. 4250, ¶¶ 335–73.) In 1992, GM collaborated with Chrysler and Ford

on USCAR specifications for airbag inflators, which identified the heightened risks posed by ammonium nitrate and thus required additional, specialized testing. (*Id.*, ¶¶ 335–40.) GM's inflator expert, Leo Knowlden, was closely involved in revising these standards and knew that using a PSAN-based propellant was risky. (*Id.*, ¶¶ 338–39.)

From the outset of pre-market development, GM was aware of significant problems with Takata's inflators. (*Id.*, ¶¶ 341–52.) Internal GM correspondence acknowledged the dangers of using ammonium nitrate in airbag inflators, given its instability when exposed to temperature cycling and humidity. (*See, e.g., id.*, ¶¶ 349–52.) During the qualification process, GM learned of serious performance issues with the inflators, including their ballistic variability, which GM engineers described as a potential "showstopper." (*Id.*, ¶¶ 347.) Bob Bowser, GM's Engineering Group Manager for Truck Airbags, consistently voiced concerns about the inflator's performance throughout development. (*Id.*, ¶¶ 349–52.) He demanded Takata provide an alternative inflator from another supplier that met GM's specifications as a backup. (*Id.*, ¶¶ 350–51.)

But GM leadership sided with Takata and neutralized Bowser, ensuring the Takata inflators continued through development despite their flaws. (*Id.*) In internal correspondence, Takata personnel described Bowser as a "very dangerous" man and expressed relief that he "got shot down by [GM] Director Gay Kent" in his efforts to get an alternate inflator made by a competitor brought to the table. (*Id.*, ¶ 352 & n.191.) Indeed, nearly ten years later, in the wake of the massive recalls of these very same inflators, Bowser had the same recollection:

> [T]he result of GM's visits [to Takata's manufacturing facilities] in 2003 was to give Takata a provisional approval in mid 2003. I was against this provisional approval because Takata's inflators did not meet GM specifications. I was overruled by Gay Kent & John Calabrese and ordered to work with Takata to get them approved. Takata was unable to meet the benchmarks GM established for approval of their inflators. Despite this, Takata's provisional approval was changed in 2004 to a full approval.

*Id.* Only a few months later, Bowser was no longer working at GM, and GM secured a promise from him never to testify against the company. (*Id.*, ¶ 352.) With Bowser gone, no alternative inflator was ever developed and the Takata PSAN inflator continued through validation testing—with disastrous results. (*Id.*, ¶¶ 352–73.)

During design and performance validation testing, Takata's inflators continued to exhibit excessive ballistic variability and failed to meet USCAR specifications. (*Id.*, ¶ 346–73.) In a

September 2004 meeting, Takata informed GM that during design validation testing the inflator ruptured and suffered a "***catastrophic disassembly***." (*Id.*, ¶ 353.) Notably, when Takata dissected inflators from the same lot as the inflator that ruptured in "catastrophic" fashion, Takata observed issues related to moisture seeping into the inflator and showing visible crystallization "oozing" from the inflator due to moisture saturation. (*Id.*, ¶ 354.) This led a GM Release Engineer to note, in 2004, that the inflator design seemed "too sensitive," and to even question the validity of Takata's testing data. (*Id.*, ¶ 355.)

Even though the inflators consistently failed to meet ballistic variability standards, GM allowed Takata to proceed. (*Id.*, ¶¶ 356–60.)  Takata had to request variances from USCAR specifications, which it could not meet.  (*Id.*, ¶¶ 359–60.) GM and Takata even decided to remove humidity resistance testing—a deviation from USCAR requirements—in the hopes of reducing the non-conformances. (*Id.*, ¶ 365.) No additional testing confirmed that Takata met USCAR-24's specifications on ballistic variability before the inflators were installed in Class Vehicles. (*Id.*, ¶ 362.)

Despite these failures, GM continued its relationship with Takata, motivated by cost benefits and internal connections. (*Id.*, ¶ 374–77.) Takata''s promise of lower costs lured GM, while Knowlden, a former Takata employee, facilitated Takata's ability to bypass GM's standards. (*Id.*) Indeed, in correspondence with GM as early as August 2003, Takata stressed the importance of resolving GM's concerns about GMT900 PSAN inflator directly with Knowlden while Bowser was out of town because Knowlden was more sympathetic to Takata. (*Id.*, ¶ 377.) Takata worked quickly to cosmetically resolve GM's issues with the inflator so that Knowlden could rubber stamp the approvals while Bowser was unavailable.  (*Id.*)

There can be no doubt that GM was aware that the PSAN inflator's ballistic variability was a direct result of temperature cycling and moisture.  (*Id.*, ¶¶ 353–73.)  For instance, the inflator consistently exhibited ballistic variability when tested in hot/cold environments. (*Id.*, ¶ 370.) Furthermore, GM's agreement to remove the USCAR required humidity resistance testing during the design validation process is perhaps most revealing. (*Id.*, ¶ 365.) Knowing that humidity degrades ammonium nitrate such that its ballistic characteristics become dangerously variable and unstable, and knowing that the inflator was demonstrating wild ballistic variability well beyond specifications during validation testing, why would GM allow the GMT900 SPI inflator to be tested without the required humidity resistance test?  The only logical conclusion is that GM knew

the only way these inflators could pass validation testing was to rig the process by removing the humidity resistance tests.

A 2020 email from Leo Knowlden, GM's engineer who supported the approval of the GMT900 inflators, all but confirms this. (ECF No. 4250, ¶ 372.) In that email, Knowlden stated, retrospectively, that had the full intent of USCAR's "hermeticity" or humidity resistance requirements been followed, then "they would have caught (or at least induced) the inflator propellant degradation early on." (*Id.*)  He also observed that the additional "propellant stability" tests required under USCAR-24, which were never completed, "should probably have a higher level of review than has been done in the past." (*Id.*, ¶ 373.)  Knowlden's comments about the removal of these critical requirements support the conclusion that GM intentionally removed them in order to manipulate the results.

By 2013, amid reports of Takata inflators exploding and causing injuries or deaths, NHTSA began encouraging recalls. (*Id.*, ¶ 378.) But GM refused. (*Id.*, ¶ 381.) Remarkably, despite GM's public refusal to acknowledge a defect, Leo Knowlden confessed to a friend at Ford his belief that the Takata inflator was inherently flawed. (*Id.*, ¶ 379.) Sharing a recent article about widespread Takata airbag recalls, Knowlden surmised that the flaw must be a "core design issue," and stated: "[a]ll I can tell you is that the article causes (process control due to a switch not thrown) is Bull S%$t." (*Id.*) Likewise, while GM was contesting the existence of the defect with NHTSA in 2016, GM's Senior Manager of External Investigations acknowledged in an internal email GM's awareness aware of the PSAN defect mechanism, noting that the inflator's design did not provide robust protection against moisture and temperature cycling.  (*Id.*, ¶ 380.)  This shocking inconsistency between GM's public and private statements continued in mid-2017, when, at the same time GM's Consolidated Petitions to NHTSA were pending, ***GM personnel joked internally about the inherently dangerous nature of Takata's ammonium nitrate-based inflators, likening them to ICBM missiles.***  (*Id.*, ¶¶ 382–83.)

## III.   GM UNIFORMLY MARKETED THE CLASS VEHICLES AS SAFE.

Contrary to its candid internal acknowledged of the Inflator Defect, GM uniformly marketed the Class Vehicles to the public as safe. (ECF No. 4250, ¶¶ 291–307.) At all times relevant to this matter, GM knew the importance of safety features, specifically including airbags, to its consumers, because it conducted market research regarding various vehicle features. (*Id.*, ¶¶ 291–93.)

GM's false representations of safety were conveyed through a variety of means, including the "Monroney" [2] window stickers GM generated and attached to each vehicle at the point-of-sale, which identified functional airbags as a safety feature. (*Id.*, ¶ 294.) The Monroney labels, which GM caused to be drafted, uniformly and misleadingly assured consumers that Class Vehicles had working airbags. (*Id.*, ¶ 295.) Each sticker had a section with the heading "SAFETY," under which were listed any collision avoidance systems, running lamps, and the various airbags present in the vehicle. (*Id.*, ¶ 294–97.) This information suggested to any reasonable consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and would perform their intended function during a collision. (*Id.*, ¶ 295.) GM's corporate representative testified that both old and new GM affixed Monroney stickers to Class Vehicles. (*Id.*, ¶ 298.) Neither GM's corporate representative, nor anyone else he had spoken to at GM had ever seen a Monroney label that did not have a specific call-out of the frontal airbag from 2007-2014, which is the entire time period the Class Vehicles were first available for sale to the public. (*Id.*, ¶ 299.)

Because airbags are standard safety features in the Class Vehicles, GM was not required to include them on the Monroney labels. (*Id.*, ¶ 300.) But GM nonetheless chose to advertise to consumers that the Class Vehicles featured frontal airbags because it was aware of the materiality of the safety feature to consumers. (*Id.*, ¶ 301.) The Monroney labels contained false and misleading information because, far from being safety-enhancing features, the Takata airbags installed in Class Vehicles were defective and posed an unreasonable risk to the safety of vehicle occupants. (*Id.*, ¶ 302.)

GM made similar representations about its airbags in promotional materials and advertisements, on its website, and in brochures and manuals. (*Id.*, ¶¶ 303–07.) GM promotes the Class Vehicles through websites, like Chevrolet.com and GMC.com, which consumers visit to learn about vehicle features. (*Id.*, ¶ 303.) Notably, the safety features, including front airbags, are prominently mentioned. (*Id.*) Likewise, manufacturer-produced promotional brochures for Class Vehicles, typically distributed at dealerships and trade shows, or directly by mail to consumers, consistently referenced safety features as a reason for consumers to purchase the Class Vehicles. (*Id.*, ¶ 304.) For example, the brochure for the 2011 Chevrolet Tahoe and Chevrolet Suburban (both Class Vehicles) called out the vehicles' dual-stage frontal air bags as a "Safety Feature" and

---

[2] Monroney Labels are named for Oklahoma Senator Olmer Stillwell "Mike" Monroney, who sponsored the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231–1233.

even showed a rendering of the inflated frontal airbags.  (*Id.*) Air bags were also identified as standard features in the brochure. (*Id.*)

Similar representations can also be found in the 2010 GMC Sierra brochure, calling out the Dual-Stage Frontal Air Bags: "*Dual-stage front air bags on Sierra 1500 models feature sensors that gauge the severity of a crash and determine whether to deploy one or two levels of inflation, helping to reduce risk of injury to passengers. (*Id.*, ¶¶ 305–06.) The brochure also stated the vehicles' airbags had NHTSA's 5-Star "Highest Possible" Frontal Crash-Test Rating, which again communicates to all consumers that the airbags are functional, reliable, and safe.  (*Id.*)

A similar pattern of emphasizing the presence of airbags in vehicles for sale may be found in brochures, advertisements, and manuals for the panoply of Class Vehicles, which are collected at ECF No. 4337-44, 4337-45. GM's representations are uniform in that they promote airbags as safety features and never disclose the Inflator Defect, as confirmed by GM's marketing representative. (ECF No. 4250, ¶ 307.)

**ARGUMENT**

## I.   GM'S STANDING AND MOOTNESS ARGUMENTS LACK MERIT.

### A.   Plaintiffs Have Article III Standing.

Supreme Court and Eleventh Circuit precedent leave no doubt that Plaintiffs have standing. GM challenges only the first requirement of standing—injury in fact.  (ECF No. 4799 at 10.)  But "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 141 S. Ct. 2190, 2204 (2021). The Eleventh Circuit has explained that "[a] person experiences an economic injury when, as a result of a deceptive act or an unfair practice, he is deprived of the benefit of his bargain." *Debernardis v. IQ Formulations*, 942 F.3d 1076, 1084 (11th Cir. 2019). "Thus, a plaintiff establishes standing by plausibly alleging that a product is defective, and plaintiff would not have purchased—or would have paid less—for the product had the existence of the defect been disclosed or not misrepresented." *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1202 (S.D. Fla. 2021) (Ruiz, J.). That is precisely what Plaintiffs have established here. As discussed in the preceding section, Plaintiffs have presented sufficient evidence to prove a defect, and the admitted expert testimony of Dr. Dubé proves how much Plaintiffs overpaid.  Accordingly, Plaintiffs have standing.

9

GM's arguments to the contrary rest on a mischaracterization of Plaintiffs' claims and decisions that are either inapplicable or inconsistent with Eleventh Circuit law.  Plaintiffs assert that GM's wrongful conduct caused Plaintiffs to overpay for their vehicles.  Contrary to GM's characterization, Plaintiffs are not suing GM for "a past risk of physical injury" that never materialized. (ECF No. 4799 at 10.) Thus, authorities holding that the mere risk of a possible or future injury is insufficient for standing are irrelevant.

GM's reliance on the Fifth Circuit's recent decision in *Earl v. Boeing Co.*, 53 F.4th 897 (5th Cir. 2022), is similarly misplaced for two reasons.  First, the facts are distinguishable.  In *Earl*, the plaintiffs brought RICO claims against Boeing and Southwest, alleging that they conspired to hide the safety risks of Boeing's MAX 8 aircraft, which caused the plaintiffs to overpay for airline tickets. (*Id.* at 900–01.) The Fifth Circuit refused to credit an economist's report on the alleged overpayment because it rested on two inferences that, in the court's view, were "implausible": first, that airlines would have continued offering the same flights on MAX 8 aircraft, but with a discount for the heightened risk that passengers would die; and second, that the FAA would have permitted airlines to fly the aircraft even with full knowledge of the defect. (*Id.* at 903.) Dr. Dubé's report, in contrast, does not rest on implausible assumptions.  Instead, it tracks reality. The disclosure that Dr. Dubé tested in his conjoint survey used the ***actual language*** of the form that a defendant had customers sign acknowledging the heightened risk of Takata airbags, and NHTSA permitted the sale of such vehicles with the disclosure.   (ECF No. 4338–202) (FCA_US_LLC_1055699); (ECF No. 4338–203) (FCA_US_LLC 0000584001); (ECF No. 4338–204) (FCA_US_LLC_10550776); (ECF No. 4253, ¶ 524.)  So, unlike the expert report in *Earl*, there is nothing implausible about Dr. Dubé's opinions.[3]

Second, to the extent *Earl* more broadly rejects an "overcharge-by-fraud" theory, as GM contends, *Earl* conflicts with the Eleventh Circuit's decision in *Debernardis*, 942 F.3d at 1084, which binds this Court. *Debernardis* holds that such an overcharge theory, "calculated based on the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered," as Plaintiffs' damages are calculated here, establishes a concrete economic injury sufficient to create

---

[3] Nor is there anything implausible about the assumption that GM would continue to offer its vehicles for sale at a steep price discount, even if it meant selling the vehicles at a loss. This would allow GM to continue to generate revenue for vehicles that would otherwise become worthless.

standing. *Id.*[4] And *Debernardis* is far from alone. A recent First Circuit decision examining the law across the country confirms that almost every circuit holds that "overpayment for a product—even one that performs adequately and does not cause any physical or emotional injury—may be a sufficient injury to support standing." *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 54 F.4th 28, 35 (1st Cir. 2022).

In fact, *Evenflo* points to an earlier Fifth Circuit decision that is indistinguishable from this case and undermines GM's argument, *Cole v. General Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007). In *Cole*, the court held that purchasers of GM vehicles with allegedly defective airbag systems had standing to sue—even though their airbags had not deployed and GM had implemented a recall that repaired the named plaintiffs' airbags. *Id.* at 719–23. Like Plaintiffs here, each *Cole* plaintiff "suffered economic injury at the moment she purchased a DeVille because each DeVille was defective." *Id.*[5] Accordingly, "*Cole* presents the better analogy for this case." *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 54 F.4th at 37.

Nor does the recall affect Plaintiffs' standing, contrary to GM's argument. It is undisputed that, even with the recall, GM has not paid Ms. Lodge the $6,363 she overpaid for her 2010 Suburban, Mr. Rivers the $10,855 he overpaid for his Avalanche, or Mr. Sibley the $9,673 she overpaid for her Sierra (ECF No. 4337–98 (Dubé Rept.) at Tables 15 & 17), so the recall has not eliminated Plaintiffs' economic damages. This key fact distinguishes *Bloomgarden v. Allstate Fire & Casualty Insurance Co.*, 499 F. Supp. 3d 1160 (S.D. Fla. 2020), in which the defendant "paid" the plaintiff the full amount to which he was entitled under an insurance agreement (*id.* at 1166); Plaintiffs have received no such payment here. Likewise, *Cheng v. BMW of North America, LLC*, No. CV 12-09262, 2013 WL 3940815 (C.D. Cal. July 26, 2013), is inapplicable because the plaintiff in that case disclaimed seeking "any monetary damages," *id.* at *4, unlike Plaintiffs here. *See Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1219–20 (S.D. Fla. 2017) (holding that *Cheng* is "unpersuasive where plaintiffs seek 'recovery for losses in market value'") (quoting *Philips v.*

---

[4] Under the reasoning of *Earl*, the Eleventh Circuit could not have found standing in *Debernardis*, because selling the drug in question violated federal law, and *Earl* would have disregarded as implausible a damages model in which the FDA nonetheless permitted the sale of that drug.

[5] *Cole* also distinguished the primary authority upon which *Earl* relied, *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315 (5th Cir. 2002), yet *Earl* failed to address *Cole*, raising questions about *Earl*'s precedential value even within the Fifth Circuit, given the prior panel rule. *See Burge v. Par. of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999).

*Ford Motor Co.*, No. 14-CV-02989-LHK, 2016 WL 693283, at *8–9 (N.D. Cal. Feb. 22, 2016)).

**B.**      **<u>Plaintiffs' Claims for Monetary Relief Foreclose GM's Mootness Attack.</u>**

Plaintiffs' "claim[s] for money damages . . . . ensure a live controversy" that easily disposes of GM's mootness argument. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 139 S. Ct. 1652, 1660 (2019); 13C C. Wright, A. Miller & E. Cooper, Federal Practice and Procedure § 3533.3, p. 2 (3d ed. 2008) ("[A] case is not moot so long as a claim for monetary relief survives"). Recovery "may be uncertain or even unlikely for any number of reasons, in this case as in others. But that is of no moment. If there is any chance of money changing hands, [Plaintiffs'] suit remains live." *Mission Prod. Holdings, Inc.*, 139 S. Ct. at 1660. GM remarkably ignores this Supreme Court precedent when advancing its mootness argument, which the Eleventh Circuit has **<u>*never*</u>** applied to claims for damages.

MBUSA relies, instead, on several decisions that courts within this District have repeatedly and correctly distinguished, *Hadley v. Chrysler Group, LLC*, 624 F. App'x 374, 379 (6th Cir. 2015), and *Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208, 1209 (10th Cir. 2012), as well as an unpersuasive district court opinion, *Sharp v. FCA US LLC*, No. CV 21-12497, 2022 WL 14721245 (E.D. Mich. Oct. 25, 2022), that misapplies *Hadley* and *Winzler*. The decisive flaw in MBUSA's argument is that the prudential mootness doctrine applies to requests for equitable relief, such as injunctions and declaratory judgments, ***not*** damages. *See Ingaseosas Int'l Co. v. Aconcagua Investing Ltd.*, 479 F. App'x 955, 962 (11th Cir. 2012) ("Pursuant to the doctrine of prudential mootness, we may exercise our discretion and decline to grant ***declaratory relief*** in the context of a controversy that has become 'so attenuated that considerations of prudence and comity ... counsel the court to stay its hand, and to withhold relief it has the power to grant.'") (quoting *Chamber of Commerce v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)). This is because the doctrine rests on "the court's discretionary authority to grant or withhold injunctive and declaratory relief." *Chamber of Com. of U.S. of Am.*, 627 F.2d at 292.

The limitation of this doctrine to requests for declaratory and injunctive relief is evident in *Hadley*, 624 F. App'x at 379, and then-Judge Gorsuch's opinion in *Winzler*, 681 F.3d at 1209. The plaintiffs only sought "equitable relief" in *Winzler*, 681 F.3d at 1209, and the discussion of prudential mootness in *Hadley* only applied to "claims for injunctive and declaratory relief," 624 F. App'x at 379. For this reason, courts in this District have repeatedly rejected arguments like GM's attempting to extend *Hadley*, *Winzler*, and the prudential mootness doctrine to claims for

monetary relief. *See, e.g.*, *Leon*, 301 F. Supp. 3d at 1219–20 (holding that *Winzler* is "unpersuasive where plaintiffs seek recovery for losses in market value"); *accord  Patlan v. BMW of N. Am., LLC*, No. CV 18-CV-09546, 2024 WL 1328012, at *5 (D.N.J. Mar. 28, 2024) ("Courts have routinely declined to apply this doctrine where plaintiffs seek not just equitable relief, but legal relief that exceeds what defendants are offering through a recall."); *McMahon v. Volkswagen Aktiengesellschaft*, No. 22CV01537 (EP) (JSA), 2023 WL 4045156, at *9 (D.N.J. June 16, 2023) ("the prudential mootness doctrine does not confer discretion on the Court to dismiss legal claims.") (internal quotation marks omitted); *McCabe v. Daimler Ag*, No. 1:12-CV-2494-MHC, 2015 WL 11199196, at *4–5 (N.D. Ga. Aug. 19, 2015) (distinguishing *Winzler* and *Hadley* on the same grounds).

Misreading *Hadley*, *Sharp* incorrectly applied the prudential mootness doctrine to the plaintiffs' damages claims. *Hadley* affirmed the dismissal of damages claims not on mootness grounds, but for a lack of evidence. 624 F. App'x at 378. The recall in *Hadley* "removed the defect upon which the plaintiffs' diminished value injury claim [was] based," and "the plaintiffs presented no evidence of diminished value in light of the repair." *Id.* So, contrary to GM's misreading, *Hadley* does not stand for the broad proposition that a recall categorically eliminates damages as a matter of law; rather, it only applies when the plaintiffs present "no evidence" of damages in light of the repair, *id.*, which is not the case here.[6] Dr. Dubé's work calculated Plaintiffs' overpayment "in light of the repair," *id.*—his conjoint surveys expressly informed participants that the defective airbags would be replaced for free in the future and measured the impact of the time until repair on the amount of overpayment ((ECF No. 4338-199) (Dubé Rept.), ¶ 49 n.60)—so, unlike *Hadley,* there is no evidentiary deficiency here. *See Crawford v. FCA US LLC*, No. 2:20-CV-12341, 2024 WL 919830, at *4 (E.D. Mich. Mar. 4, 2024) (rejecting prudential mootness argument at summary judgment because "[d]iminished value damages are measured by the difference between the value of the goods as accepted and the value of the goods as warranted. Whether the defect was repaired will not impact the value of the goods as warranted"). GM's

---

[6] *Flores v. FCA US LLC*, No. 19-10417, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020), is inapplicable for the same reason. At the motion-to-dismiss stage, it relied on *Hadley* to conclude that the plaintiffs could not prove damages, but it had no occasion to consider evidence like Dr. Dubé's testimony demonstrating overpayment even with a recall. *Id.* at *4. *Flores* also recognized that its conclusion was inconsistent with decisions from courts within the Eleventh Circuit. *Id.* at *3 (acknowledging but not distinguishing *McCabe*, 2015 WL 11199196, at *1).

prudential mootness argument should be rejected.

## II. GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON PLAINTIFFS' DAMAGES.

It is "[c]ommon sense" that a car with a defective safety device is "worth less" than a car without a defect. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016). This common sense principle underlies Plaintiffs' benefit-of-the-bargain or overpayment theory of damages: Plaintiffs overpaid for their vehicles with defective Takata airbags at the time of purchase, because the vehicles were "worth less" than what they were deceptively marketed as—vehicles with safety-enhancing, non-defective airbags. Plaintiffs seek to recover the amount of this overpayment, which Dr. Dubé's analysis quantifies.

### A. The Court Should Reject GM's Endless Effort To Reargue This Court's Prior *Daubert* Rulings.

At the most recent hearing on May 24, 2024, this Court could not have been clearer that additional attempts by Defendants to re-argue and seek reconsideration of this Court's denial of their *Daubert* motion to exclude Dr. Dubé's work would be wasteful and unwelcome. *See* 5/24/24 Hr'g Tr. At 8:7–12 ("The damages model issue . . . is no different than the past. I agree with the plaintiffs on that. So now we have even more guidance from Appellate Courts on the plaintiffs' expert, Dr. Dubé, so *I don't want to hear any argument on that because I don't think that would influence me*.") (emphasis added). Flagrantly disregarding this Court's directive, GM spends four pages of its brief doing exactly what the Court said not to do: urging, yet again, reconsideration of the Court's well-reasoned decision to admit Dr. Dubé's damages testimony. (ECF No. 4799 at 15–18.) The Court should, once again, deny GM's recalcitrant request for reconsideration.

This Court correctly rejected Defendants' arguments that Dr. Dubé's "model does not calculate relevant damages and it is unreliable" (ECF No. 4364 at 3), adhering to its well-reasoned decision in *Cardenas v. Toyota Motor Corp.*, No. 18-22798, 2021 WL 5811741, at *5 (S.D. Fla. Dec. 6, 2021), as well as the weight of authority across the country admitting similar testimony. And as the Court recognized at the May 24 hearing, this Court's ruling found additional support in a recent appellate decision, *Lytle v. Nutramax Lab'ys, Inc.*, 99 F.4th 557, 575–80 (9th Cir. 2024), which thoroughly examined Dr. Dubé's conjoint methodology, rejected arguments no different than those GM repeats here, and agreed with the district court that "Dr. Dubé's model is capable of showing damages on a class wide basis." *Id.* at 580.

Essentially ignoring this Court's *Daubert* ruling, GM repackages the lead argument in its *Daubert* motion (ECF No. 4178 at 10–14) as an argument for summary judgment, claiming again that Dr. Dubé's model does "not fit" Plaintiffs' claims (ECF No. 4799 at 15–17). For the reasons set forth in Plaintiffs' *Daubert* opposition (ECF No. at 4236 at 10–22), the result should be the same.

In short, GM's "willing seller" argument incorrectly accuses Dr. Dubé of failing to adequately consider supply-side factors and rests on an untenable view of the law. Dr. Dubé ran a complex market simulation that accounted for supply-side reactions, such as price changes in response to competition. (ECF No. 4337–98 (Dubé Rept.) at 44–48.) And GM's preferred but-for world, in which it could refuse to sell vehicles altogether or install non-defective airbags at the outset, really insists on assuming an "unwilling seller," which conflicts with the state law authorities it cites. Not one of the state law decisions remotely suggests that calculating fair market value requires, or even permits, the assumption that a willing seller may refuse to sell, or that a defendant can escape liability by claiming it would have refused to manufacture the product in the first place if it had to follow the law. Using the quantities actually produced and sold in the real world, as Dr. Dubé did, is the proper approach. The state court decisions that GM references simply recite the typical description of fair market value. *See, e.g. Cook v. Mixon*, 700 So. 2d 1264, 1266 (La. Ct. App. 1997) (reciting fair market value definition). Not a single one comes remotely close to suggesting that a complex market simulation like Dr. Dubé's can be disregarded at summary judgment.

As this Court made clear at the May 24 hearing, the admissibility and relevance of Dr. Dubé's testimony has been decided. GM's obstinate refusal to accept the Court's ruling only betrays its recognition that Dr. Dubé's analysis creates a disputed issue of fact as to damages that precludes summary judgment.

### B.  The Recall Did Not Eliminate Plaintiffs' Overpayment Damages.

In its initial motion for summary judgment, GM did not contend that the cost of repair limited Plaintiffs' recoverable damages under the law of Louisiana, Georgia, and Alabama. (ECF No. 4182 at 17 (limiting argument to seven other states).) And for good reason: the law in the remaining three states does not support GM's position. Nonetheless, emboldened by the Court's prior ruling on summary judgment, which remains under reconsideration, GM now attempts to stretch the law to fit its argument. GM's strained argument should be rejected.

As this Court held in its prior Order, the applicable measure of damages "is a matter of state law," governed by the decisions of the applicable state courts.  (ECF No. 4471 at 6.) But GM cites no cases from Louisiana, Georgia, or Alabama state courts holding that the cost of repair limits a plaintiff's damages for claims of fraud and violation of consumer protection laws.

Instead, GM cites numerous decisions for the uncontroversial proposition that damages should not result in a windfall or double compensation for the plaintiff. (ECF No. 4799 at 11–15.) But that principle is inapplicable here, because the recall did not compensate Plaintiffs for the damages they suffered and are seeking to recover.  Plaintiffs paid for vehicles marketed as having safe, operational airbags *on day one*. Repairing the vehicles years later does not provide Plaintiffs what they bargained for—a safe, operational airbag *on day one*.

It is indisputable that the market price of a vehicle equipped with defective Takata airbags that will be replaced in ten years would be less than the market price of a vehicle equipped with safe, operational airbags from the start. No reasonable consumer would pay the same price for those two different vehicles at the point of sale—when overpayment or benefit-of-the-bargain damages are measured. *See Carriuolo*, 823 F.3d at 987 (recognizing benefit of the bargain damages accrue at the time of sale—even if the fraud was later "cured"—because a "vehicle that the manufacturer knows to be safe is more valuable than a vehicle that the manufacturer perhaps anticipates will later be declared safe"); *id.* ("The injury occurs at the point of sale because the false statement allows the seller to command a premium on the sales price."). So, the provision of a recall repair years after the sale, absent compensation for the overpayment, does not place Plaintiffs in the same position that they would have been in had Defendants not engaged in misconduct, and thus awarding Plaintiffs damages for the overcompensation would not produce a double recovery or result in a windfall. *Weidman v. Ford Motor Co.*, No. 18-CV-12719, 2022 WL 1071289, at *5 (E.D. Mich. Apr. 8, 2022) (rejecting argument that defendant's offer of free replacement meant that plaintiffs had no injury because plaintiffs sought damages for "overpayment at the point of purchase"); *Crawford v. FCA US LLC*, No. 2:20-CV-12341, 2021 WL 3603342, at *3 (E.D. Mich. Aug. 13, 2021) ("FCA's recall does not bar Plaintiffs' theory of recovery. Even if the recall were effective, Plaintiffs alleged that they were injured when they bought their trucks."); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 695 (E.D. Mich. 2020) (holding that a recall did not bar damages claims "because Plaintiffs claim their injury occurred at the point of purchase, and that the recall did not necessarily remediate the loss caused to Plaintiffs

16

by their allegedly having to pay an additional $8,000 to $10,000 premium based on Defendants' alleged misrepresentations"); *Philips*, 2016 WL 693283, at *7–10  (holding that a recall did not reimburse plaintiffs for the loss in market value of their vehicles).

Dr. Dubé's rigorous work quantifies how much less Plaintiffs' vehicles were worth. (ECF No. 4337-98) (Dubé Rept.) at ¶¶ 101–10; (ECF No. 4250, ¶¶ 722–33, 736, 738.) Contrary to GM's apparent assumption, his model did not merely analyze the impact of the Inflator Defect alone on the market price of Plaintiffs' vehicles. Rather, Dr. Dubé's model measures the market prices that would have prevailed had consumers been aware of *both* the existence of the Inflator Defect *and* the eventuality of the recall at the time of purchase. (ECF No. 4250, ¶¶ 727–28, 731–32); (ECF No. 4337-98) (Dubé Rept.) at ¶¶ 59, 111, 103, 114; (ECF No. 4337-99) (Dubé Rebut. Rept.) at ¶ 76; (ECF No. 4337-100) (Dubé Dep. Tr.) at 278:2–17, 279:5–17.) Because Dr. Dubé factored the certainty of the recall into his calculation of the price premium, the eventual occurrence of the recall cannot be used to further reduce Plaintiffs' damages. Doing so would, in effect, double count for GM the benefit of the recall.  Because the recall does not reimburse Plaintiffs for the amount they overpaid for their vehicles—*i.e.*, the price premiums that Dr. Dubé calculated—it does not eliminate Plaintiffs' damages.

Consider Ms. Lodge, for example.  If the defect and time until the recall had been disclosed at the time Ms. Lodge purchased her Suburban, the price would have been $6,363 less.  This overpayment amount already gives GM credit for the repair, so GM's ultimate provision of the repair cannot further reduce Ms. Lodge's damages. Awarding her $6,363 in damages will provide appropriate compensation for her overpayment, not a windfall.[7]

Beyond the inapplicable, general cases on windfalls and the purpose of damages, the other state law authorities GM cites foreclose its attempt to limit Plaintiffs' damages to the cost of the recall repair.

**Louisiana**.  It is difficult to overstate how incompatible Louisiana law is with GM's position.  Indeed, three of the four cases that GM cites conclusively undercut its argument and

---

[7] Given this evidence, the reasoning of *Sater v. Chrysler Grp. LLC*, No. 14-cv-700, 2016 WL 7377126, at *7 (C.D. Cal. Oct. 25, 2016), is inapplicable. Viewed from the point of sale—for Ms. Lodge, that would be September 22, 2011—the value of what GM actually provided—a replacement airbag in 2021, ten years after the sale—is much less than what Ms. Lodge paid for— a safe, operational airbag on September 22, 2011. Awarding Ms. Lodge this difference in value provides fair compensation for GM's wrongful conduct, not a double recovery.

establish, at a minimum, that Plaintiffs may recover more than the cost of repair under the Louisiana redhibition statute and that the damages amount is a question for the trier of fact, and thus unsuitable for resolution at summary judgment.

For example, GM cites *Menville v. Stephens Chevrolet, Inc.*, 300 So. 2d 858, 861–62 (La. Ct. App. 1974), for support, but the decision directly refutes its position. *Menville* held that the cost of repairs is "***not*** necessarily the sole measure of the diminution of value" in a redhibition action involving a defective vehicle. *Id.* at 861. When the defect is serious and is not "***quickly*** and simply remedied," plaintiffs are entitled to recover for an additional reduction in price, "because a forewarned buyer would not reasonably pay the full price, reduced only by the cost of repairs, if he knew the extensive repairs of the defects would significantly curtail his use and cause him considerable inconvenience and aggravation." *Id.* at 861–62. To prove the amount of a price reduction, *Menville* explains, a plaintiff may use "expert opinion testimony," as Plaintiffs have done here, "to establish the fair value as of the time of the sale, if the defects had been known." *Id.* at 862. The trier of fact then "must set a reduced sale price which fictionally represents the fair value at the time of sale." *Id.* While *Menville* ultimately reduced the damages award, it did not limit the award to the costs of repair. *Id.*

Because GM did not repair the defective airbags in Plaintiffs' vehicles for several years, if not more than a decade, *Menville* forecloses GM's effort to limit Plaintiffs' damages to the cost of repair. *See Cornelious v. Bailey Lincoln-Mercury, Inc.*, 566 So. 2d 85, 89 (La. Ct. App. 1990) (affirming award of $1,500 in reduced purchase price for a vehicle purchased for $11,768, even with no repair costs incurred); *Griffin v. Coleman Oldsmobile, Inc.*, 424 So. 2d 1116, 1118 (La. Ct. App. 1982) (affirming award of $3,000 in reduced purchase price, even though the plaintiff did not incur repair costs).[8]

It is likewise surprising that GM relies upon *Weber v. Crescent Ford Truck Sales, Inc.*, 393 So. 2d 919, 921 (La. Ct. App. 1981), because *Weber* also strongly supports Plaintiffs' position, not GM's.  In *Weber*, the plaintiff purchased a defective truck from the defendant dealership, and after experiencing several problems with the truck that the dealership could not fix, the plaintiff "left

---

[8] The multi-year delay distinguishes this case from *Ehrlich v. Roby Motors Co.*, 117 So. 590, 592 (La. 1928) in which the defendant immediately responded to the defect and ultimately fixed it. The court also declined to award the plaintiff for a reduction in price because the plaintiff failed to present evidence of how the limited delay to repair the vehicle "would affect its original value," *id.*, which is not the case here, given Dr. Dubé's work.

the truck at the defendant's place of business and never sought its return." *Id.* at 921.  After reaching an agreement with the financing company, the plaintiff sued the dealership for redhibition and sought a "reduction in price" consisting not only of "reimbursement of expenditure for repairs," but also "damages for 'down time.'" *Id.*  Although the Lousiaina appellate court slightly reduced the damages award due to a calculation error, it *affirmed* the plaintiff's recovery of damages *beyond* the cost of repair.  *Id.* at 923.  Curiously, the section that GM cites of the opinion concerns the more extreme potential remedy of recission, under which the seller is required to "return the purchase price" to the buyer, but that amount is offset by a credit for the buyer's use of the vehicle before the recission.  *Id.* at 924.  Nothing in the opinion, however, supports limiting a plaintiff's recovery at the cost of repair, particularly when the evidence indicates that plaintiff's damages exceed the cost of repair.

The third decision cited by GM that supports Plaintiffs is *Cloud v. Huffman Motor Co.*, 416 So. 2d 266, 270 (La. Ct. App. 1982).  In *Cloud*, the plaintiff purchased a defective GMC truck from a dealership, and over the course of ten months, the dealership and GMC "repaired the vehicle several times at no cost to the plaintiff," while the plaintiff drove the vehicle "some 89,000 miles. *Id.*  Even under those circumstances, the court did ***not*** hold that the plaintiff could not recover any damages under Louisiana's redhibition statute, which is what GM's position would suggest. Rather, the court, citing *Menville*, held that in awarding the plaintiff "a reduction in the price of the vehicle," the "cost of repairing the defects" is one consideration, but "the court may also include in the judgment what it believes to be the difference between the actual sales price and the price that a reasonable buyer and seller would have agreed upon had the defect been known to them at the time of the sale."  *Id.*  The appellate court then reviewed the trial court's damages award for clear error, signaling that it is a factual question that must be resolved by the trier of fact, not a question that can be resolved as a matter of law, as GM would suggest.  *Id.* at 270 ("We cannot say that [the trial judge] was clearly wrong in this respect.").  Here, that question must be left to the jury.  In addition, *Cloud*, relying on *Weber*, held that the plaintiff was entitled to $4,655, for the 19 days that he could not use his truck while it was being fixed.  *Id.* at 270.  Such an award of damages cannot be reconciled with GM's strict repair-cost limiting view.

GM's argument is also incompatible with *Franco v. Mercedes-Benz USA, LLC*, 258 So. 3d 1053, 1054 (La. Ct. App. 2018), which could hardly be more on-point. In that case, an individual plaintiff brought a claim for breach of warranty (called redhibition in Louisiana) against Mercedes

arising from the Takata recall.  *Id.*  The plaintiff acknowledged that Mercedes sent him a recall notice stating that "when a replacement [inflator] did become available, it would be provided to [the plaintiff] at no cost to him."  *Id.* at 1055.  Notwithstanding the recall, the plaintiff "sought to recover the total purchase price paid for the vehicle as well as other damages suffered, including emotional distress," as he "would not have bought [the vehicle] had he known of the defect."  *Id.*  The trial court dismissed the claim, accepting Mercedes's argument—no different than GM's here—that the recall effectively foreclosed the plaintiff's claim.  *Id.*

Louisiana's appellate court, however, reversed the dismissal, holding that the plaintiff adequately alleged that "the product contained a hidden defect at the time of the sale, which was not apparent on inspection, and which rendered the thing unfit for the use intended or that its use became so inconvenient that the purchaser would never had purchased the product had he known of the defect."  *Id.*  Further, when a plaintiff establishes that a seller "knows that the thing he sells has a defect but omits to declare it, or a seller who declares that the thing has a quality that he knows it does not have," the Louisiana redhibition statute entitles the plaintiff to a *cumulative* array of remedies, including "return of the price with interest from the time it was paid," reasonable expenses, "***and also . . . damages***."  *Id.* (emphasis added).  While a manufacturer like GM "is deemed to know that the thing he sells has a redhibitory defect," *id.*, Plaintiffs have also gathered abundant evidence establishing GM's pre-sale knowledge, none of which GM disputes at summary judgment.  (ECF No. 4250, ¶¶ 335–73.)

It is challenging to imagine a decision more squarely on-point.  *Franco* involves the same exact defect at issue in this case.  And it establishes that, notwithstanding the same exact recall that GM relies upon here, the ***cumulative*** remedies specified in Louisiana's redhibition statute, including damages *and* the price paid for the vehicle, remain available to Plaintiffs.  *Id.*  GM may view Mr. Sibley's damages claim of $9,673 as "unreasonable" (ECF No. 4799 at 12), but Louisiana law plainly does not.  And on this issue, Louisiana law is dispositive.  *Cf. Tershakovec v. Ford Motor Co., Inc.*, 79 F.4th 1299, 1313 (11th Cir. 2023) (declining "to expand state law" in the absence of state court decisions).

**Georgia**.  Unable to find a helpful decision from Georgia's state courts, GM cites an unpublished Tenth Circuit decision, *Blair-Naughton L.L.C. v. Diner Concepts, Inc.*, 369 F. App'x 895, 900 (10th Cir. 2010). But the Tenth Circuit misconstrued the sole Georgia authority it cited for the proposition that "the cost of putting the property in the condition for which the plaintiffs

contracted constitutes an upper limit to the amount that may be awarded." *Id.* (citing *Hutto v. Shedd*, 353 S.E.2d 596, 598 (Ga. Ct. App. 1987)). *Hutto* did not prohibit recovering damages in excess of the cost of repair. Rather, the decision was based on the evidence available at trial. *Hutto* held that the cost of repair or restoration is *one* method of proving damages, and at the particular trial in that case, the "only credible evidence" of damages showed the cost of restoration, because the plaintiffs' other evidence was inadmissible. *Id.* at 597–98. Such evidence "then constituted the upper range of the claim for damages," so the jury's verdict above that range had to be reduced.*Id.* As the Georgia Supreme Court later clarified in *John Thurmond & Associates, Inc. v. Kennedy*, 668 S.E.2d 666 (Ga. 2008), "under Georgia law, cost of repair and diminution in value are alternative, although oftentimes interchangeable, measures of damages in negligent construction and breach of contract cases. An injured party may choose to present his case using either or both methods of measuring damages, depending on his particular circumstances." *Id.* at 669.

The other Georgia authorities that GM cites either generally stand for the proposition that damages awards should not provide windfalls, which is inapplicable here, or involve claims and circumstances not at issue here.  For example, *Royal Cap. Dev. LLC v. Maryland Cas. Co.*, 728 S.E.2d 234 (Ga. 2012), concerned the interpretation of an insurance policy, and the court considered "measures of damages with respect to real property."  *Id.* at 236.  A "measure of damages with respect to real property" has nothing to do with the measure of damages for a fraud claim or violation of the Georgia consumer protection statute.

**Alabama**. *Ford Motor Co. v. Rice*, 726 So. 2d 626 (Ala. 1998), undercuts GM's argument. *Rice* held that the plaintiffs could ***not*** recover damages "measured by the cost to 'repair' the defect."  *Id.* at 627, 631. But *Rice* did reaffirm that a plaintiff may "recover damages under a fraudulent-inducement theory for a purely economic loss to a product itself based upon value that is indicated by a seller's representations but not actually received, even where the product was in fact working properly," *id.* at 631, as Plaintiffs seek here.  The other cases that GM cites from Alabama simply hold that a plaintiff should not receive a windfall.  But then GM states—without citing anything in the record—that "Alabama plaintiffs' actual losses are zero because GM replaced their allegedly defective airbag at no charge."  (ECF No. 4799 at 14.)  GM's evidence-free factual claim—that Alabama Plaintiffs' actual losses are zero—directly conflicts with Dr. Dubé's analysis, which shows that, *even with* the free repair, Alabama Plaintiffs overpaid for their vehicles.  (ECF No. 4250, ¶ 731.)  At a minimum, a dispute of fact exists that precludes summary

judgment.

### III.    GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON MR. SIBLEY'S LOUISIANA CLAIM.

####    A.    Mr. Sibley's Claim is Timely.

The statute of limitations is an affirmative defense, so GM bears the "initial burden of making a showing that the statute of limitations defense is applicable." *Blue Cross & Blue Shield of Alabama v. Weitz*, 913 F.2d 1544, 1552 (11th Cir. 1990). GM cannot satisfy its burden as to Plaintiff Sibley's breach of warranty claim under Louisiana law. Louisiana applies the discovery rule to the accrual of a claim for breach of implied warranty. *See* La. Civ. Code Ann. art. 2534.B; *Beth Israel v. Bartley, Inc.*, 579 So. 2d 1066, 1072 (La. Ct. App. 1991) ("Discovery is not presumed. It must be proven by the seller/manufacturer."); *Reed v. Gen. Motors Corp.*, 400 So. 2d 919, 920 (La. Ct. App. 1981) ("[P]rescription does not commence to run until plaintiff has actual or constructive knowledge of the tortious act, the damage and the causal relation between the tortious act and the damage."). GM points to no evidence establishing that Plaintiff Sibley was aware of the facts that would entitle him to bring suit more than one year before filing his claim.

GM relies on a preliminary recall letter that it asserts it sent to Sibley's home in July 2016, addressed to his *brother*. GM neglects to mention or cite Sibley's deposition testimony on this point: "Q. And you never received notice of a recall in the mail? A. No, ma'am." (ECF No. 4512-7 (Sibley Dep. Tr.) at 132:8–10.) To the contrary, Sibley testified that he found out about the recall in late 2017—less than one year before he brought suit—as a result of proactive inquiries he made. (*Id.*) GM also asserts that it was "public knowledge in mid-2016" that Plaintiff Sibley's 2007 GMC Sierra was subject to a recall. (ECF No. 4248 at 19.) But the evidence that GM cites for this "public knowledge" is a posting on the website www.edumunds.com and a single June 2, 2016 article that appeared somewhere in the WALL STREET JOURNAL titled "Car Makers Recall More Vehicles With Faulty Takata Air Bags." (ECF No. 4799 at 19.) GM asked Plaintiff Sibley no questions during his deposition about whether he was familiar with that relatively obscure website or whether he even reads the WALL STREET JOURNAL (not to mention whether he happened to read it that day). GM also posits that in July 2016, GM's preliminary recalls were linked to VINs on Carfax.  But again, it presents zero evidence linking Carfax's data with Mr. Sibley—no testimony, no documents, nothing. This evidence falls far short of establishing "public knowledge" as an undisputed fact, let alone whether Sibley himself knew.

Moreover, GM's own simultaneous conduct in contesting the necessity of a recall by filing numerous petitions for inconsequentiality, at a minimum, creates a genuine dispute of material fact whether a reasonable consumer should have learned of the facts giving rise to this claim sooner. *See Beth Israel*, 579 So. 2d at 1072. Even the preliminary recall letter mailed out to customers by GM states that the recall will occur "unless GM is able to prove to NHTSA's satisfaction that the inflators in its vehicles do not pose an unreasonable risk to safety." (ECF No. 4189–92.) GM amplified this message with a vigorous public defense of the safety of its inflators, via the NHTSA petitions for inconsequentiality.  (ECF No. 4250, ¶¶ 317–18.)  Since GM itself was telling customers and the government that there was no defect, it cannot simultaneously claim that those customers should have known of the existence of a defect, which itself was imperceptible to public view, as well as GM's own conflicting knowledge of the defect.  *See Reed*, 400 So. 2d at 921 (holding that prescription period did not start to run when plaintiff experienced two minor accidents from defect because the defendant reported "that no problem (defect) existed").  Under *Reed* and these facts, summary judgment on the statute of limitations defense is unwarranted.

Finally, GM's suggestion that Plaintiffs' proposed class definition somehow relates to the date on which Plaintiff Sibley became aware of the defective Takata inflator in his GM vehicle simply misstates the purpose of a class definition. As an initial matter, a class definition is not evidence that can be used to establish a material fact. Moreover, the recalls, which became operative on various dates, define which vehicles are within the scope of the class; they do not define when a particular consumer did or did not become aware of the defective Takata inflator.

**B.   <u>GM Is Liable as a "Seller" Under Louisiana Law.</u>**

GM argues that it is not liable to Plaintiff Sibley for breach of implied warranty or redhibition because he owns a used vehicle manufactured by Old GM prior to its bankruptcy in 2009. But, as the Second Circuit has explained, the mere fact of the bankruptcy does not protect GM from claims related to vehicles manufactured by Old GM, but that are involved in a sales transaction after the bankruptcy and creation of New GM.  *See In Matter of Motors Liquidation Co.*, 829 F.3d 135, 157 (2d Cir. 2016).  Nor does Louisiana law somehow absolve GM of responsibility.  GM's sole authority, *In re Gen. Motors LLC Ignition Switch Litig.*, No. 14-MD-2543, 2016 WL 874778, at *1 (S.D.N.Y. Mar. 3, 2016), is inapposite.  There, the court expressly found that "New GM neither manufactured the car nor sold the car to [the plaintiff]," and the plaintiff's "only response is that [he] was in a buyer-seller relationship with Old GM."  *Id.* at *6.

Here, Plaintiff Sibley purchased the vehicle in 2013 from a GM-authorized dealer, and thus falls squarely within the Second Circuit's holding. (ECF No. 4025, ¶ 88 (purchased from a "New GM dealership" in Louisiana).)

Additionally, as far as Plaintiffs are aware, no Louisiana court—nor any district court in this Circuit or in the 5th Circuit—has adopted the view GM espouses. More generally, under Louisiana law, the buyer of a defective vehicle may bring an action against all sellers in the chain of sales back to the original manufacturer for breach of implied warranty. *See* La. Civ. Code Ann. art. 2545 cmt.(d); *Womack & Adcock v. 3M Bus. Prods. Sales, Inc.*, 316 So. 2d 795, 796 (La. Ct. App. 1975); *see also Aucoin v. Southern Quality Homes, LLC*, 984 So. 2d 685, 693 (La. 2008) (holding that manufacturer of a defective product is independently liable to a buyer "for redhibitory defects that existed at the time of delivery to the seller"). GM can be held liable for Louisiana warranty claims brought by buyers who purchased used Old GM vehicles after 2009.

### C.  The Court Should Deny GM's Motion To Reconsider Class Certification.

Without filing a separate motion or addressing the applicable standard, GM brazenly demands reconsideration of the Court's class certification Order. The Court should swiftly deny GM's baseless request.

"Reconsideration is an extraordinary remedy to be employed sparingly." *Yule v. Ocean Reef Cmty. Ass'n*, No. 19-10138-CIV, 2020 WL 5216993, at *1 (S.D. Fla. Sept. 1, 2020) (Moreno, J.). "A motion for reconsideration will not be granted absent an intervening change in the law, availability of newly discovered evidence, or to correct clear error or prevent manifest injustice." *Id.*; *see Michael Linet, Inc. v. Vill. of Wellington, Fla.*, 408 F.3d 757, 763 (11th Cir. 2005) (noting that a motion for reconsideration cannot be used "to relitigate old matters" or "raise argument or present evidence that could have been raised prior to the entry of judgment"). GM points to no intervening change in the law, no new evidence, no clear error or manifest injustice. It cannot and makes no effort to meet the standard for reconsideration. Rather, it simply seeks "to relitigate old matters" that this Court has decided, a plainly improper request. *Michael Linet*, 408 F.3d at 763.

GM's request is particularly unjustified here, because it argued the same exact issue in its unsuccessful Rule 23(f) petition to the Eleventh Circuit. GM challenged this Court's finding that the limitations defense can be determined on a class-wide basis and claimed that this Court misapplied Louisiana and federal law. *See* GM Rule 23(f) Pet. at 17–20, *Whitaker v. General Motors, LLC*, No. 23-90025 (11th Cir.). And in denying GM's petition, the Eleventh Circuit

24

clearly did not deem GM's arguments meritorious enough to warrant review.  With the class streamlined to a single state and a single claim, there is no basis to reconsider the certification decision.

Moreover, this Court's treatment of the limitations issue at class certification was spot on. Because GM disputed the existence of a defect until after the case was filed, it cannot establish that class members' claims are time barred under Louisiana law. *See Reed v. Gen. Motors Corp.,* 400 So. 2d at 921.  Additionally, GM's concealment of the defect and its impact on the limitations period are class-wide issues for the factfinder to resolve, and thus not reasons to deny class certification. *See Allapattah Servs, Inc. v. Exxon Corp.*, 333 F.3d 1248, 1260 (11th Cir. 2003). Nor has GM presented any evidence demonstrating that the defense would create individualized issues that would interfere with class certification.  As the Eleventh Circuit precedent establishes, GM's statute of limitations argument "does not defeat the availability of a class action lawsuit." *Kennedy v. Tallant*, 710 F.2d 711, 718 (11th Cir. 1983).

Nor can GM find support in *State v. Ford Motor Co.*, 965 So. 2d 438 (La. Ct. App. 2007), because the automaker in that case did not uniformly deny the existence of the defect during the limitations period; instead, its "position changed through the years," giving rise to more individualized issues than exist here. *Id.* at 444. To the extent that such state court decisions are even relevant, the more applicable Louisiana authority is *Mire v. EatelCorp, Inc.*, 849 So. 2d 608, 613 (La. Ct. App. 2003), which held that a prescription defense (based on the statute of limitations) did not preclude class certification.

## IV.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE GEORGIA CLAIMS.

### A.   Ms. Lodge's Bankruptcy Petition Does Not Preclude Her Claim.

Ms. Lodge filed for Chapter 13 bankruptcy over the summer. (ECF No. 4491, ¶ 32.) On her bankruptcy schedule, she inadvertently did not include her claim in this action. (ECF No. 4250, ¶¶ 63, 65; PSOF, ¶ 36.) This was an unintentional oversight. (ECF No. 4250, ¶ 67.) Ms. Lodge is neither an attorney nor an expert in bankruptcy law. (ECF No. 4250, ¶ 64; PSOF, ¶ 36.) After GM's motion alerted Ms. Lodge to this oversight, she amended her bankruptcy schedule to include the claim. (ECF No. 4250, ¶ 67.)

Under these circumstances, GM's request to dismiss Ms. Lodge's claim based on judicial estoppel lacks merit. Judicial estoppel has a two-part test: "whether (1) the party took an

inconsistent position under oath in a separate proceeding, and (2) these inconsistent positions were calculated to make a mockery of the judicial system." *Slater v. United States Steel Corp.*, 871 F.3d 1174, 1181 (11th Cir. 2017). Even if the first requirement was satisfied with the pre-amendment version of Ms. Judge's bankruptcy schedule, that inconsistency has now been cured. And more importantly, under the revised standard for the second requirement, there is at least a disputed issue of fact as to Ms. Lodge's intent that precludes summary judgment. *Id.* at 1185.

Several factors identified in *Slater* preclude a finding that Ms. Lodge intended to mislead anyone with the omission. First, she immediately corrected the disclosure upon learning of the omission. (ECF No. 4515, ¶¶ 63–9; PSOF, ¶¶ 36–9.)) Second, she testified under oath that the omission was unintentional. (PSOF, ¶ 37.) Third, she is neither an attorney or an expert in bankruptcy law (*id.*, ¶ 36), so her "level of sophistication," *Slater*, 871 F.3d at 1185, cuts against a finding of bad faith. Fourth, she listed no other claim in which she was a plaintiff; the only other lawsuit listed was one in which a creditor had sued her. And fifth, there was no conceivable motive for her to omit the relatively small claim, because her Chapter 13 Plan called for her to "pay her creditors 100% of the debts she owed, and her debts were not discharged when her bankruptcy case was ultimately dismissed." *Smith v. Haynes & Haynes P.C.*, 940 F.3d 635, 646 (11th Cir. 2019); (PSOF, ¶ 38). Given these circumstances, "[i]t is unclear how judicial estoppel would advance the interests of equity." *Storey v. Cap. Link Mgmt., LLC*, 2021 WL 4862667, at *4 (M.D. Fla. Oct. 19, 2021).

### B.   Triable Issues of Fact Exist as to the Duty to Disclose and Reliance.

This Court has twice rejected GM's first argument that it had no duty to disclose, holding that "special circumstances" support the existence of a duty to disclose under Georgia law because individuals like Plaintiff Lodge "could not protect themselves no matter how much diligence they performed because of the hidden nature of the inflator defect." *In re Takata Airbag Prods. Liab. Litig.*, 524 F. Supp. 3d 1266, 1289 (S.D. Fla. 2021).  Indeed, a confidential or special relationship does not need to exist before a duty to disclose may be imposed.  Instead, the "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud.  The obligation to communicate *may* arise from the confidential relations of the parties *or from the particular circumstances of the case*." O.C.G.A. § 23-2-53.

Consistent with these principles, various courts applying Georgia law find that a duty to disclose may exist outside a special relationship.  *See Amin v. Mercedes-Benz USA, LLC*, 301 F.

26

Supp. 3d 1277, 1296 (N.D. Ga. 2018) ("The particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover." (internal quotation marks omitted)); *accord Monopoli v. Mercedes-Benz USA, LLC*, 2022 WL 409484, at *12 (N.D. Ga. Feb. 10, 2022); *see also Persad v. Ford Motor Co.*, 2018 WL 3428690, at *3 (E.D. Mich. July 16, 2018) ("As to Defendant's alleged superior knowledge, . . . Georgia recognize[s] a duty to disclose where a defendant has exclusive and superior knowledge.").

Here, there are numerous facts that show GM had superior knowledge of the Inflator Defect, that it concealed that information from consumers like Ms. Lodge when it pervasively and uniformly marketed its Class Vehicles as safe and outfitted with functioning airbags, and that no reasonable consumer could have discovered the latent Inflator Defect before purchase. (ECF No. 4250, ¶¶ 291–93; PSOF, ¶ 22.) This evidence distinguishes the instant case from those GM cites, in which there was no record evidence that the parties had ever communicated or interacted. *See McCabe*, 160 F. Supp. 3d at 1352; *Brown v. Hyundai Motor Am.*, 2019 WL 4126710, at *8 (D.N.J. Aug. 30, 2019); *accord Stanley v. Nissan N. Am., Inc.*, 3:23-CV-00261, 2024 WL 814496, at *8–10 (M.D. Tenn. Feb. 27, 2024).

At the very least, there is "a triable issue of fact as to whether the 'particular circumstances' of this case warrant an imposition of a duty to disclose" under Georgia law. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 753563, at *7 (N.D. Fla. Feb. 2, 2021). This conclusion is reinforced by the fact that the defect is safety-related. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017) (noting that Georgia law imposes "a duty to disclose safety defects").

GM's claim that Ms. Lodge could not have relied on any affirmative misrepresentations likewise fails because under Georgia law, courts may infer reliance where, as here, a manufacturer conducts a uniform and pervasive marketing scheme. *See Aetna Cas. & Sur. Co. v. Cantrell*, 399 S.E. 2d 237, 238 (Ga. Ct. App. 1990) (holding that a fraudulent scheme involving "wide-spread distribution" of the same printed misrepresentation "will authorize initiation of a class action on behalf of those recipients who were collectively misled thereby"). Substantial evidence shows that GM engaged in such a marketing scheme here, uniformly and pervasively advertising its Class Vehicles as safe and outfitted with functioning airbags. (ECF No. 4248 at 10–17.) The remaining authorities GM relies on are inapposite because the defendants in those cases did not engage in

27

such marketing. *See Moore v. Lovein Funeral Home, Inc.*, 852 S.E. 2d 876, 883–84 (Ga. Ct. App. 2020) (one allegedly false statement made by the defendant); *Delta Chevrolet, Inc. v. Wells*, 371 S.E. 2d 250, 251 (Ga. Ct. App. 1988) (similar).

Moreover, GM's arguments fail because, irrespective of GM's marketing scheme, Ms. Lodge testified that prior to purchasing her 2010 Chevrolet Suburban, she viewed and relied on television commercials, a brochure from GM, and websites, and that the Suburban was on her list of vehicles to consider "because of the safety features that Chevrolet offered, [and] even on the website it went by the safety features." (ECF No. 4250, ¶¶ 125–26.)

## V.   GENUINE DISPUTES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ALABAMA CLAIM.

### A.   Plaintiffs Need Not Wait For A Catastrophic Rupture To Bring Their Claim.

GM concedes that this Court already held that Alabama "would not require an explosion to demonstrate manifestation of a defect." (ECF No. 4799 at 24 (quoting *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1120 (S.D. Fla. 2019)).) Indeed, this argument has been raised by Defendants in this MDL at least *seven times* since 2015 and was rejected by the Court *each time.*[9] Nevertheless, GM recycles this argument in its motion, arguing that the "mature record" somehow changes Alabama law and warrants a different result. (ECF No. 4489 at 13–15.) It does not.

GM conflates the *consequence* of the Inflator Defect—a malfunction of the airbag inflator that shoots metal shrapnel at vehicle occupants—with the *manifestation* of the Inflator Defect. As this Court has repeatedly found, the Inflator Defect has manifested in each Plaintiff's vehicle because it renders the airbag unreasonably dangerous. For example, in its Order on Mazda's motion to dismiss, this Court correctly found that Plaintiffs need not suffer physical injuries, or worse, to maintain a claim for economic damages, reasoning that, "[i]f Takata had installed grenades in its airbags that may or may not explode on impact a court would not require an explosion to demonstrate manifestation of a defect." *In re Takata*, 193 F. Supp. 3d at 1335.

Three years later, in its Order on GM's motion to dismiss, this Court further explained that "because there was 'no way to know whether the airbags at issue would perform satisfactorily in

---

[9] *See, e.g.*, *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016) (rejecting Mazda's manifestation argument); *In re Takata Airbag Prod. Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (same).

an accident,' the Court refused to 'require an explosion to demonstrate manifestation of a defect.' *In re Takata*, 396 F. Supp. 3d at 1123. This Court went on to apply this rationale to conclude that Plaintiffs had adequately plead injury in fact, noting that, "[h]ere, Plaintiffs allege that Takata airbags installed in General Motors's vehicles contain innately unstable ammonium nitrate, and thus create an unreasonable and imminent risk of injury to vehicle occupants." *Id.* at 1120–21, 1123–24. There is no reason for this Court to deviate from its prior Orders.

GM recycles two well-worn arguments asserted by itself and other Defendants, without pointing to any changed circumstances that warrant a different result. Both arguments are unavailing. First, GM argues that "the alleged defect has not manifested in any plaintiff's vehicle nor in a single proposed class vehicle ever." (ECF No. 4799 at 24 n.31.) GM's argument fails because its conclusion that the airbags are not defective belies the evidentiary record in this case. Indeed, the evidentiary record is clear: (1) the Inflator Defect was present in *every* Class Vehicle because the airbag inflators utilize a chemical compound (ammonium nitrate) that is unstable and creates an unreasonable risk of catastrophic rupture, which has the potential to seriously injure or kill occupants of the vehicle, all of which is confirmed not just by Plaintiffs' experts, but by GM itself, which has now acknowledged in recall notices sent to consumers that the Inflator Defect may cause "injury or death to vehicle occupants;" (2) the Inflator Defect was present in *all* Class Vehicles the very first day the airbags were installed in them due to GM's use of the ammonium nitrate-based propellant; and (3) because GM did not disclose the Inflator Defect at the time of purchase, Plaintiffs overpaid for their Class Vehicles and suffered economic damages. *See Nguyen v. Nissan N. Am., Inc.*, 932 F.3d 811, 822 (9th Cir. 2019) (recognizing where, as here, the defect itself is the alleged injury rather than the cause of the injury, liability is triggered regardless of whether the defect causes performance issues); *see also Crawford v. FCA US LLC*, 2:20-CV-12341, 2024 WL 919830, at *8 (E.D. Mich. Mar. 4, 2024) (holding that "whether the defect was present in Plaintiffs' cars . . . is a genuine issue of material fact for the jury to decide").

Second, GM argues this Court's multiple and consistent prior rulings against it on this issue are "irreconcilable" with the Alabama Supreme Court's rulings. (ECF No. 4799 at 13–14.) GM's four cited cases from the Alabama Supreme Court, however, are inapposite and easily distinguished, because unlike here, those cases dealt with plaintiffs seeking damages conditional on a future event. Here, in contrast, Plaintiffs are seeking damages for an injury that occurred at the time of purchase.

29

Specifically, in *S. Bakeries, Inc. v. Knipp*, 852 So. 2d 712 (Ala. 2002), the plaintiffs brought suit against an oven owner for selling them an oven that contained asbestos when it was represented as being asbestos-free. *Id.* at 714–15. The Supreme Court of Alabama reversed summary judgment on the grounds that the plaintiffs had no present injury, which they alleged was emotional distress associated with an increased risk of cancer. *Id.* at 712. The court's holding was guided by its concern that opening up courts to cases predicated on a plaintiff's fear of contracting a future disease could have unexpected consequences. *Id.* at 718. Similarly, in *Hinton ex re. Hinton v. Monsanto Co.*, 813 So. 2d 827 (Ala. 2001), the plaintiff alleged he was exposed to polychlorinated biphenyls (PCBs), a known hazardous substance, released into the environment by the Monsanto Company. *Id.* at 828. The plaintiff did not allege he sustained any injury or illness, but instead asserted a claim for future medical monitoring to determine if he actually did sustain any injury. *Id.* at 828–29. And in *Pfizer, Inc. v. Farsian*, 682 So. 2d 405 (Ala. 1996), the plaintiff alleged that the manufacturer of his heart valve had misrepresented information regarding the valve's propensity to suffer from strut failures. *Id.* at 406. Notably, the plaintiff alleged not that the valve had any defect, only that there was a higher *risk* of valve failure than he was told. *Id.* at 408.

*Rice*, 726 So. 2d at 628, is also unavailing because the plaintiffs there "admitted that they could not point to any tangible adverse economic consequences flowing from the alleged defect, such as diminished resale value in comparison to similar vehicles." Here, in contrast, Plaintiffs have provided the report and testimony of Dr. Dubé, which shows that they suffered benefit of the bargain damages at the *point of purchase*.

GM then cites cases from other jurisdictions that purport to acknowledge Alabama's "manifest defect rule," (ECF No. 4799 at 26), but those cases similarly do not address the facts and circumstances present in this case. Put simply, the Alabama Plaintiffs are not alleging hypothetical future injuries that were present in those extra-jurisdictional cases. Thus, this Court's rationale, which it has repeatedly applied since 2015, remains no less valid at summary judgment. As discussed above, neither the evidentiary record, nor the cases that GM cites, hold otherwise.

### B.   Triable Issues of Fact Exist as to GM's Duty to Disclose and Reliance.

GM next argues that the Alabama Plaintiffs' common law fraud claim fails because (1) GM purportedly did not owe them a duty to disclose the Inflator Defect under the circumstances, and (2) they cannot prove reliance on any affirmative misrepresentations because GM allegedly never made any.  GM is flat wrong on both arguments.

***First***, with respect to GM's duty to disclose argument, "the Alabama Supreme Court 'has emphasized that where one party has superior knowledge of a fact and the other party's having the same knowledge would cause the other party to take a different course of action, then a duty to disclose arises, if the other party cannot discover the fact himself.'" *Summit Auto Sales, Inc. v. Draco, Inc.*, 2017 WL 3896691, at *12 (N.D. Ala. Sept. 6, 2017) (quoting *Indep. Life & Accident Ins. Co. v. Harrington*, 658 So. 2d 892, 896 (Ala. 1994)). Applying this standard, the *Summit* court went on to find that a seller of used vehicles had a duty to disclose a material fact that the buyer could not discover before purchase, holding, "Yankee Ford's superior knowledge, combined with Summit's inability to ascertain the vehicles' prior use, weighs in favor of a duty even though Summit is also a commercial entity." *Id.*; *see also Peters v. Amoco Oil Co.*, 57 F. Supp. 2d 1268, 1282 (M.D. Ala. 1999) (noting that under Alabama law, "a duty to disclose may exist where . . . one party has knowledge of material facts to which the other party does not have access").

GM's reliance on *Mason v. Chrysler Corp.*, 653 So. 2d 951 (Ala. 1995), for the proposition that an "arm's length transaction" negates a duty to disclose is wrong. (ECF No. 4489 at 15.) Courts applying Alabama law refuse to find the existence of such a transaction where one party has superior knowledge of a material fact. *See First Ala. Bank of Montgomery, N.A. v. First State Ins. Co., Inc.*, 899 F.2d 1045, 1059 (11th Cir. 1990) (holding that "[t]he parties were not dealing at arm's length because" the insurer "had better knowledge about the availability of this coverage than did its client," a bank); *Summit Auto Sales, Inc.*, 2017 WL 3896691, at *12 (citing to *First Alabama Bank of Montgomery, N.A.* favorably).

Here, the evidence overwhelmingly demonstrates that GM had superior knowledge of the Inflator Defect which the Rivers (and indeed, all Plaintiffs) could not reasonably ascertain before purchase. (ECF No. 4248 at 10–17.) Furthermore, as both Mr. and Mrs. Rivers testified during their depositions, they would not have purchased their Chevrolet Avalanche had they been aware of the defect. (ECF No. 4250, ¶¶ 399, 404; (PSOF, ¶ 72.)) That Takata pled guilty to "defrauding GM" is inconsequential (ECF No. 4489 at 16), because the record amply demonstrates that regardless of Takata's actions, GM knew about the Inflator Defect well before the Alabama Plaintiffs purchased their vehicle, and still intentionally concealed the Inflator Defect. (ECF No. 4250, ¶ 307; (PSOF, ¶ 48.).) Accordingly, GM had a duty to disclose.

Separately, a duty to disclose arose when GM decided to disclose information about the safety of the Alabama Plaintiffs' Chevrolet Avalanche. Under Alabama law, a duty to disclose

arises if a party "undertakes to [disclose certain facts], *either* voluntarily or in response to inquiries." *Brasher v. Sandoz Pharms. Corp.*, 2001 WL 36403362, at *10 (N.D. Ala. Sept. 21, 2001) (quoting *Jackson Co. v. Faulkner*, 315 So. 2d 591, 600 (Ala. Civ. App. 1975)).  Thus, GM is incorrect that it was under no such duty to disclose because the Alabama Plaintiffs did not specifically request information about airbags.  As *Basher* holds, GM's duty to disclose arose when it uniformly and pervasively marketed its Class Vehicles as safe and outfitted with functioning airbags, as well as when it represented on its Monroney labels that those vehicles were equipped with safety-enhancing airbags.  (ECF No. 4248 at 4–5; ECF No. 4250, ¶¶ 291–302.)

At a minimum, the Court should reject GM's instant arguments because the existence of special circumstances giving rise to a duty to disclose is a fact-based inquiry that "depends on the relationship of the parties, the value of the fact not disclosed, the relative knowledge of the parties and other circumstances."  *In re Ford Motor Co. Vehicle Paint Litig.*, 1996 WL 426548, at *27 (E.D. La. July 30, 1996).  Accordingly, the jury must be given the opportunity to weigh these facts and determine whether GM was obligated to disclose the defect under the circumstances.

*Second*, GM's argument that the Alabama Plaintiffs' affirmative misrepresentation-based fraud claim should fail because they only claim to have relied on Monroney labels from Old GM (not New GM) is likewise inaccurate.  GM cannot hide behind the bankruptcy of its predecessor for the misrepresentations on its Monroney labels, regardless of when those labels were affixed to its vehicles, because the Alabama Plaintiffs purchased their vehicle in November 2009 (ECF No. 4250, ¶ 58, 294–302; (PSOF, ¶ 1.)), *after* GM had purchased the assets of its predecessor, which included "all inventories of vehicles . . . in the possession of . . . dealers" (ECF No. 4250, ¶ 2). Further, GM's corporate representative testified that both Old and New GM affixed Monroney labels to Class Vehicles.  (ECF No. 4250, ¶ 298; (PSOF, ¶ 6.).)

Moreover, the Rivers not only relied on GM's Monroney labels when purchasing their vehicle, they also relied on GM's uniform and pervasive marketing scheme that falsely promoted its Class Vehicles as safe and outfitted with functioning airbags. (PSOF, ¶¶ 7–8.))  For example, Mrs. Rivers relied on representations regarding the Chevrolet Avalanche that she saw on the GM dealership website, as well as on the Monroney label affixed to the vehicle, which she specifically recalls promoting the vehicle's airbags. ((PSOF, ¶ 8.))  Mr. Rivers likewise relied on the Monroney label.  *Id.*  Under these facts, a jury could reasonably draw an inference of reliance from GM's uniform and pervasive marketing scheme.  *See Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009)

(holding that "where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements"); *Ex parte Household Retail Servs. Inc.*, 744 So. 2d 871, 878 (Ala. 1999) (recognizing that fraud may be proved by circumstantial evidence where misrepresentations are "uniform").

<u>C</u><small>ONCLUSION</small>

For the foregoing reasons, GM's motion for summary judgment should be denied.

Dated: August 2, 2024                              Respectfully submitted,

                                                   **P**ODHURST **O**RSECK, **P.A.**

                                                   */s/ Peter Prieto*
                                                   Peter Prieto (FBN 501492)
                                                   Aaron S. Podhurst (FBN 63606)
                                                   Stephen F. Rosenthal (FBN 131458)
                                                   Matthew P. Weinshall (FBN 84783)
                                                   Alissa Del Riego (FBN 99742)
                                                   SunTrust International Center
                                                   One S.E. Third Ave., Suite 2300
                                                   Miami, Florida 33131
                                                   Phone: (305) 358-2800
                                                   Fax: (305) 358-2382
                                                   Email: pprieto@podhurst.com
                                                          apodhurst@podhurst.com
                                                          srosenthal@podhurst.com
                                                          mweinshall@podhurst.com
                                                          adelriego@podhurst.com

                                                   ***Chair Lead Counsel for Plaintiffs***

33

| | |
|---|---|
| **COLSON HICKS EIDSON**<br>Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | **SMITH LACIEN LLP**<br>Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP**<br>David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel:  (914) 749-8200<br>Fax: (914) 749-8300<br>Email: dboies@bsfllp.com<br>mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel:  (305) 539-8400<br>Fax:  (305) 539-1307<br>Email: szack@bsfllp.com<br>mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | **LIEFF CABRASER HEIMANN & BERNSTEIN LLP**<br>Elizabeth Cabraser<br>ecabraser@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:    415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC** | **BARON & BUDD, PC** |
|---|---|
| James E. Cecchi | Roland Tellis |
| jcecchi@carellabyrne.com | rtellis@baronbudd.com |
| 5 Becker Farm Road | David Fernandes |
| Roseland, NJ 07068-1739 | dfernandes@bardonbudd.com |
| T: 973 994-1700 | Mark Pifko |
| f: 973 994-1744 | mpifko@baronbudd.com |
| | 15910 Ventura Blvd., |
| | Suite 1600 |
| *Plaintiffs' Steering Committee* | Encino, CA 91436 |
| | T: 818-839-2333 |
| | |
| | J. Burton LeBlanc |
| | 9015 Bluebonnet Blvd. |
| | Baton Rouge, LA 70810 |
| | T: 225-761-6463 |
| | |
| | |
| | *Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto*

Peter Prieto