**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA
MIAMI DIVISION
MDL NO. 2599
Master File No.: 15-MD-02599-MORENO**

**IN RE: TAKATA AIRBAG PRODUCT
LIABILITY LITIGATION**

**THIS DOCUMENT RELATES TO:**

**ECONOMIC LOSS TRACK CASES
AGAINST <u>FCA US, LLC</u>**

**<u>PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANT FCA US, LLC'S MOTION FOR SUMMARY JUDGMENT</u>**

## <u>TABLE OF CONTENTS</u>

INTRODUCTION ...................................................................................................................1

ARGUMENT..........................................................................................................................2

I.   PLAINTIFFS HAVE ESTABLISHED A TRIABLE FACT AS TO WHETHER
     THEY SUFFERED ECONOMIC INJURY UNDER GEORGIA OR NORTH
     CAROLINA LAW. ....................................................................................................14

    A.   The Court Should Reject FCA's Repackaged *Daubert* Arguments. ...................14

    B.   The Recall Did Not Eliminate Plaintiffs' Overpayment Damages.......................18

II.  FCA'S STANDING AND MOOTNESS ARGUMENTS LACK MERIT. ....................22

    A.   Plaintiffs Have Article III Standing ....................................................................22

    B.   Plaintiffs' Claims for Monetary Relief Foreclose FCA's Mootness
        Attack. .................................................................................................................26

III. GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY
     JUDGMENT ON THE ADDITIONAL ISSUES IN FCA'S MOTION ........................29

    A.   Genuine Issues of Material Fact Preclude Summary Judgment on FCA's
        Liability for Plaintiffs' Fraud and Consumer Protection Claims.........................29

        1.   Triable Issues of Fact Exist as to FCA's Affirmative
            Misrepresentations. .........................................................................................29

        2.   Triable Issues of Fact Exist as to FCA's Duty to Disclose. ...........................32

    B.   Genuine Issues of Material Fact Preclude Summary Judgment on the
        Adequacy of the Georgia Plaintiffs' Presuit Notice.............................................34

    C.   Genuine Disputes of Material Fact Preclude Summary Judgment on the
        Timeliness of Plaintiff Gibson's Claims. .............................................................34

IV.  THE COURT SHOULD DENY FCA'S MOTION FOR SUMMARY
     JUDGMENT AS TO THE ADDITIONAL STATES.....................................................35

    A.   In the Additional States, Plaintiffs Suffer Fraud Damages When They
        Pay More Than the Value of What They Received at the Point of Sale..............35

    B.   Car Owners in Utah and Wisconsin Do Not Need to Wait for Their
        Airbags to Explode Before Bringing a Fraud Claim............................................37

    C.   Wisconsin Recognizes a Duty to Disclose in Consumer Transactions.................39

CONCLUSION...................................................................................................................40

## INTRODUCTION[1]

FCA pervasively marketed its vehicles as safe for more than a decade, calling specific attention to the purported safety-enhancing features of its advanced airbags. In reality, however, FCA had equipped its vehicles with dangerous airbag inflators packed with ammonium nitrate, an unstable explosive notorious for bombs and deadly industrial accidents. FCA's engineers, having witnessed ballistic test failures, were well aware of the unreasonable safety risks that these inflators posed, but FCA prioritized their lower cost over the safety of its customers. As a result, FCA has received notice of more than **50** ruptures in FCA vehicles. The consequences have been catastrophic, resulting in deaths, brain damage, and blindness.

FCA's deceptive, outrageous conduct caused Plaintiffs Michelle Gibson and Debra Johnson (Georgia) and Laquintha O'Neal (North Carolina) to overpay for their FCA vehicles.[2] Plaintiffs seek to recover their economic losses in this action.

---

[1] Unless otherwise indicated, all internal citations and quotations are omitted and all emphases are added. "PSOF" refers to the Statement of Facts that Plaintiffs are filing with this response.

[2] FCA inserts a puzzling footnote in its response regarding the sale order in its predecessor's bankruptcy. (ECF No. 4797 at 1 n.1.) While the three remaining Plaintiffs own vehicles that were manufactured by FCA, members of the certified class own vehicles that were manufactured by Old Chrysler, as long as those class members purchased their Class Vehicles *after* the date of the bankruptcy sale order. FCA's footnote hints at a desire to preserve some argument about Old Chrysler's bankruptcy. But such subtlety is insufficient to preserve an argument for summary judgment. *See Tims v. LGE Cmty. Credit Union*, 935 F.3d 1228, 1240 n.8 (11th Cir. 2019) (finding an argument raised only as a "fleeting reference in a footnote" was "insufficient to preserve [the] argument for appeal").

In any event, FCA's prior efforts to evade liability through Old Chrysler's bankruptcy were properly rejected by this Court. *See In re Takata Airbag Prod. Liab. Litig.*, 464 F. Supp. 3d 1291, 1321 (S.D. Fla. 2020) (concluding that FCA failed to address "Plaintiffs' core contention that FCA's post-closing wrongful conduct is actionable—a contention supported by interpretive case law") (citing *In re Old Carco LLC*, 582 B.R. 838, 845 (Bankr. S.D.N.Y. 2018) ("At bottom, a post-Closing breach of an independent duty gives rise to a post-Closing right to payment, and the 'free and clear' provisions of the Sale Order cannot cut off New Chrysler's liability for its own wrongful, post-Closing conduct.")); *accord Castleman v. FCA US LLC*, No. 2:18-cv-00342-JNP-PMW, 2019 WL 1406611, at *4 (D. Utah Mar. 28, 2019) ("The Sale Order is not so broad as to preclude FCA's liability for post-Sale duty to warn."). The Second Circuit's on-point decision in *Elliott v. General Motors* LLC *(In re Motors Liquidation Co.)*, 829 F.3d 135 (2d Cir. 2016), *cert. denied sub nom. Gen. Motors LLC v. Elliott*, —U.S.—, 137 S. Ct. 1813 (2017), comports with this Court's decision, holding that GM's indistinguishable sale order did not bar claims that were based on New GM's post-petition conduct, or claims of used car purchasers who had purchased vehicles

1

Plaintiffs' claims should proceed to trial. FCA's arguments on damages are unavailing because the law of Georgia and North Carolina is different than the law of the states the Court previously addressed, as FCA implicitly conceded when it omitted these states from its first iteration of the argument. In addition, FCA's standing and mootness challenges conflict with Supreme Court and Eleventh Circuit precedent. And FCA's various other arguments run into genuine disputes of material fact that preclude summary judgment.

The Court should also deny FCA's motion as to the laws of Colorado, Utah, West Virginia, and Wisconsin (the "Additional States"). Genuine disputes of material fact preclude summary judgment on damages as to claims arising under the Additional States' laws, and FCA misconstrues whether Utah and Wisconsin impose additional barriers to relief. These arguments largely reiterate ones that this Court has repeatedly rejected. FCA's motion for summary judgment should be denied.

## **BACKGROUND**

Frontal airbags, including those installed in the Plaintiffs' vehicles, contain four major sub-systems: (1) an inflator; (2) a fabric bag that inflates; (3) a cover that matches the car's interior and tears open in a controlled way when the bag is inflating; and (4) an electronic sensor system that detects rapid deceleration that is consistent with a crash scenario. (ECF NO. 4253, ¶ 404.) There are also sensors that are mounted in each vehicle that are responsible for triggering the airbags when they, and the airbag control unit, detect situations that are consistent with a crash scenario. (ECF NO. 4253, ¶ 405.) When a situation consistent with a crash scenario is detected, the sensors send a signal to the ignitor. *Id.* at ¶ 406. This signal triggers the igniter to detonate a chemical compound (the propellant) which generates a gas that causes the airbag cushion to rapidly inflate. *Id.* ¶ 407. This detonation of the propellant enables the entire event to occur in approximately 30-40 milliseconds for a driver-side system and approximately 60-90 milliseconds for a passenger-side system. *Id.* ¶ 408.

---

manufactured by Old GM after the closing of the GM Sale Order. Plaintiffs' claims here fit into both permissible categories.

FCA, dissatisfied with this Court's ruling, took a second swing in the bankruptcy court, which it asked to provide "assistance" and "set the guideposts" for this Court. (ECF No. 4132-1, ¶¶ 1, 4.) But the bankruptcy court rejected FCA's arguments too, concluding that "FCA should only get one bite at the apple" and that it was appropriate "to defer to the decision" of this Court with respect to Plaintiffs' claims against FCA. (ECF No. 4146-1 at 1, 14.)

The Defective Airbags installed in Plaintiffs' vehicles utilize a propellant known as ammonium nitrate, a volatile chemical compound often found in agricultural fertilizer and explosive mixtures used in mining. (ECF NO. 4253, ¶¶ 409-10.) It is common knowledge that ammonium nitrate explosions have caused deadly industrial calamities for at least 100 years. (ECF NO. 4253, ¶¶ 422-24.) Airbag manufacturers had avoided using ammonium nitrate because its inherent volatility makes it dangerous to use in a vehicle safety device with a singular purpose of protecting human life. (ECF NO. 4253, ¶¶ 464.) Nonetheless, FCA disregarded the danger of using ammonium nitrate in airbag inflators, in order to meet the business demands of production schedules and sales objectives. (ECF NO. 4253, ¶¶ 474-78, 490.)

As discussed in detail below, this callous disregard for safety in the name of profits resulted in numerous instances of the Takata inflators exploding in Chrysler vehicles, sending shrapnel throughout vehicles' passenger cabin which seriously injured and even killed occupants.

I.      **FCA Marketed Plaintiffs' Vehicles As Safe.**

FCA is one of the largest automotive manufacturers in the U.S. Even in the midst of a global pandemic and chip shortage that has no doubt hurt the sales of all automotive manufacturers, FCA sold 1,777,394 vehicles in the U.S. in 2021 alone. (ECF NO. 4253, ¶ 330). These sales were the result of FCA's extensive marketing efforts. Bruce Velisek, FCA's Director of Retail Marketing, testified in this litigation that FCA's annual marketing budget is in excess of one billion dollars and that the objective in spending this money is to get consumers to purchase FCA's vehicles. (ECF NO. 4253, ¶¶ 332.)

Plaintiffs' vehicles were a part of FCA's nationwide marketing campaigns that were intended to reach and did reach unsuspecting consumers across the U.S.

A.      **FCA Advertises its Vehicles as Safe Through Numerous Media Forms and Channels**

FCA organizes its marketing effort into three tiers: (i) tier one is its national advertising, which is typically brand advertising; (ii) tier two is its retail advertising, which is direct consumer advertising; and (iii) tier three is its dealership advertising. (ECF NO. 4253, ¶¶ 334.) FCA spares no expense when it comes to marketing its vehicles. With an annual budget in excess of one *billion* dollars, FCA has the knowledge and capability to reach consumers through various media forms and channels such as television print, radio, and digital advertising, banner and targeted social advertisements, and online videos. (ECF NO. 4253, ¶¶ 335.)

FCA also promotes its vehicles through press releases and its brand-specific websites, which it drives traffic to with the assistance of an outside agency. (ECF NO. 4253, ¶¶ 336.) FCA disseminates press releases for its vehicles with the expectation that they will be picked up, republished, and eventually reviewed by consumers. (ECF NO. 4253, ¶¶ 337.) While FCA's methods may vary, one thing is consistent in all of its advertisements: FCA promotes the safety of its vehicles. (ECF NO. 4253, ¶¶ 339.)

One important marketing tool FCA uses is promotional brochures. At one point or another, a consumer who has visited a car dealership or an auto show has seen, been directed to, or has been handed a glossy, promotional brochure touting all of the features of a particular vehicle. *Id.* ¶ 341. FCA—and not the dealership—is responsible for developing these promotional brochures. (ECF NO. 4253, ¶ 342.) Safety is a common and important theme highlighted by FCA in its marketing and advertising materials. Brochures, manuals, and advertisements submitted in support of Plaintiffs' motion for class certification (ECF Nos. 4198-4201) confirm the essential uniformity of FCA's marketing message regarding the safety of its vehicles and airbags.

## B.   FCA Conducted Extensive Consumer Research and Determined that Safety is an Important Buying Factor to Consumers.

Statements regarding safety are prevalent in FCA's marketing and advertising materials, including in materials that it created for Class Vehicles. FCA's focus on vehicle safety is deliberate. It has identified through its research that safety is a very important factor to consumers. FCA uses the acronym "SUVPS" to describe what it has identified as the five general buying motives of a consumer: ***safety***, utility, value, performance, and styling. (ECF NO. 4253, ¶ 359.)

FCA's understanding that safety is a primary factor in consumers' purchasing decisions is the result of extensive and broad market research. Within FCA's product planning group is an entire consumer research division. (ECF NO. 4253, ¶ 360.) The consumer research division is responsible for studying both potential and actual owners of FCA vehicles, and conducting general market research. (ECF NO. 4253, ¶ 361.) Some of its research methods include conjoint surveys and contacting sales managers at its dealerships in the production cycle of its vehicles. (ECF NO. 4253, ¶ 363.) FCA depends on its sales managers to help identify "the highest rate or highest combination of various features, what they think will sell for their market." (ECF NO. 4253, ¶ 364.)

### C.    FCA Provides Extensive, Uniform Sales Training to Dealership Employees Regarding Vehicle Safety.

As noted above, FCA recognizes five general buying motives of a consumer—***safety***, utility, value, performance, and styling. Given that safety is the first buying motive identified in this acronym, it comes as no surprise that FCA goes great lengths to not only market and advertise its vehicles as safe through traditional marketing channels, it also trains the salespeople at its dealerships on how to sell a consumer on the idea that its vehicles are safe.

The Chrysler Academy Learning Center ("CALC") is an internal training group at FCA that is responsible for, among other things, training salespeople at FCA dealerships on how to sell its vehicles. (ECF NO. 4253, ¶ 371.) The CALC provides both online and in-person training to dealership employees. (ECF NO. 4253, ¶ 372.) FCA produced numerous CALC training documents for Plaintiffs' vehicles in this litigation. Those documents include countless talking points regarding the safety of Plaintiffs' Vehicles, such as identifying safety as one of seven "Key Reasons to Buy"; fostering the perception of FCA as being among the premier leaders in automotive safety and security; and assuring consumers that the vehicle's safety features, including airbags, create "an incredibly safe vehicle." (ECF NO. 4253, ¶¶ 375-81, 385-92.)

### D.    FCA Marketed Defective Airbags as Safe on Monroney Labels.

FCA distributed Class Vehicles in the United States with window stickers (also known as "Monroney" labels[3]) that described the equipment and features of the vehicles, knowing that FCA-authorized dealers would then sell Class Vehicles to consumers with these labels affixed to the Class Vehicles. Indeed, as FCA has long been aware, its dealers are prohibited by law and FCA policy from removing the Monroney labels prior to the delivery of the vehicle to the end consumer. (ECF NO. 4253, ¶ 394.)

The Monroney labels, which FCA caused to be drafted, uniformly and misleadingly assured consumers that Class Vehicles had working airbags. Each sticker had a section with the heading "SAFETY," under which were listed any collision avoidance systems, running lamps, and the various airbags present in the vehicle. (ECF NO. 4253, ¶ 396.) This information suggested to any reasonable consumer that the Takata airbags installed in the Class Vehicles did not suffer from a defect and would perform their intended function during a collision. FCA's corporate

---

[3] Monroney Labels are named for Oklahoma Senator Olmer Stillwell "Mike" Monroney, who sponsored the Automobile Information Disclosure Act of 1958, 15 U.S.C. §§ 1231-1233.

representative testified that FCA affixed Monroney stickers to Class Vehicles. (ECF NO. 4253, ¶ 398.) Although FCA's corporate representative speculated that the airbags could have been removed from the list of standard features on a Monroney label in certain cases (*e.g.*, to make room for other options to be listed), she could only identify one limited-edition model of vehicle that did not have a specific call-out of the frontal airbag on its Monroney label during the entire time period the Class Vehicles were available for sale to the public. (ECF NO. 4253, ¶ 399.)

Because airbags were standard safety features in the Class Vehicles, FCA was not required to include them on the Monroney labels. (ECF NO. 4253, ¶ 400.) That FCA nonetheless chose to advertise to consumers that the Class Vehicles featured frontal airbags demonstrates that FCA was aware of the materiality of the safety feature to consumers. (ECF NO. 4253, ¶ 401.)

In addition to being uniform, the misrepresentations on Monroney labels were false and misleading because the Takata airbags installed in Class Vehicles were, in fact, defective and posed an unreasonable risk to the safety of vehicle occupants.

## II.     The Inflator Defect Creates a Serious Safety Hazard

Takata's defective airbags have been responsible for more than 400 injuries and at least 27 deaths worldwide. (ECF NO. 4253, ¶¶ 38.) As NHTSA determined, these injuries and deaths were caused by the airbag's inflator, a metal cartridge loaded with propellant wafers, which have ignited with explosive force and sent metal shards spraying throughout vehicles' passenger cabin. (ECF NO. 4253, ¶¶ 403.)

The root cause of the dangerous defect in these airbags is Takata's decision to use ammonium nitrate—an inherently volatile and unstable chemical—as a propellant in its airbag inflators. (ECF NO. 4253, ¶¶ 409-10.) Adding to its inherent volatility, ammonium nitrate is highly sensitive to temperature changes and moisture, so daily temperature swings and atmospheric moisture cause it to break down over time. (ECF NO. 4253, ¶ 413.) This breakdown "is the core, uniform safety defect associated with inflator designs that rely on an ammonium nitrate propellant." (ECF NO. 4253, ¶ 414.) The breakdown can lead to dangerous results like those described above: a violent explosion in which pieces of metal break free from the airbag housing and enter the vehicle, striking drivers, and passengers. (ECF NO. 4253, ¶ 415.)

The danger posed by ammonium nitrate in passenger vehicles has been well-known in the automotive industry for decades. (ECF NO. 4253, ¶ 416.) Even before Takata began selling its PSAN inflators, it repeatedly and publicly acknowledged ammonium nitrate's dangers. For

example, in a 1996 patent document, Takata expressed concern that an ammonium nitrate propellant would be vulnerable to temperature changes and that its casing "might even blow up." (ECF NO. 4253, ¶ 418.) Takata further admitted in a 1999 patent document that pure ammonium nitrate is "problematic" because many gas generating compositions made with it are "thermally unstable." (ECF NO. 4253, ¶ 419.) And after it had been selling the inflators for years, in a 2006 patent application, Takata discussed the need to test the performance of ammonium nitrate at various extreme temperatures because it is an unstable chemical, and these tests could reveal many problems, including "over-pressurization of the inflator leading to rupture." (*Id.*, ¶ 420.)

Moreover, Takata experienced the danger of ammonium nitrate first-hand. In 2006, a Takata ammonium nitrate gas generant storage facility in Monclova, Mexico exploded, causing significant destruction to the production facility. (ECF NO. 4253, ¶ 422.) In August 2016, a truck containing Takata airbags and propellant exploded, killing a woman and injuring others. (ECF NO. 4253, ¶ 423.) These explosions join a list of many other large-scale ammonium nitrate explosions over the years, including the April 1999 Oklahoma City domestic terrorist bombing that killed 168 people, the September 21, 2001 explosion in the AZF fertilizer plant in Toulouse, France killing 31 people, injuring thousands more and damaging multiple structures, including buildings located 450 meters from the epicenter of the explosion, the fire and explosion in West, Texas in 2013 that killed 15 people and injured more than 260 others causing widespread community damages, and the catastrophic August 4, 2020 explosion in the Port of Beirut that left death and destruction in its wake. (ECF NO. 4253, ¶ 424.)

Experts have concluded what has been obvious to FCA and Takata for years: "airbag inflators with ammonium nitrate will continue to be unsafe until ammonium nitrate is removed from them altogether." (ECF NO. 4253, ¶ 425.) Moreover, nothing Takata did during the design or development of the inflators to try to mitigate the danger was effective. (ECF NO. 4253, ¶ 427-28.) As one 2016 study reported, "[b]oth the modeling and testing of field returned inflators show that all designs of non-desiccated passenger side inflators are susceptible to degradation of the inflator materials." (ECF NO. 4253, ¶ 427.) Therefore, "all of the non-desiccated Takata PSAN inflators equipped in the Defendant automakers' vehicles, including FCA's vehicles, are defective and share a common and uniform defect." (ECF NO. 4253, ¶ 428.)

### A.  FCA Acknowledged the Takata Airbag Defect In Numerous Recalls.

FCA has instituted *at least ten recall campaigns* involving eleven vehicles (and various models of Ram Pickups) equipped with Takata airbags. (ECF NO. 4253, ¶ 431.)  These recalls were initiated in response to Takata's November 10, 2014 Part 573 Defect Information Report ("DIR") No. 14E-073 concerning "[c]ertain airbag inflators installed in frontal passenger side airbag modules from a period between April 13, 2000 (start of production) through July 31, 2004." (ECF NO. 4253, ¶ 432.) Takata's DIR stated that those airbags "could be susceptible to rupture and the front passenger air bag could deploy abnormally in a crash, increasing the risk of injury to the occupant." (ECF NO. 4253, ¶ 433.)  Beginning with FCA's May 26, 2015 recall, FCA acknowledged that the rupture could cause "injury *or death* to vehicle occupants." (ECF NO. 4253, ¶ 438.)

### B.    Expert Testimony on Takata Airbag Defects.

Multiple experts have opined about the dangerous nature of ammonium nitrate in general, and Takata airbags in particular. For example, Robert Renz, an expert in the area of the design, development, and production of automotive airbag ignitors, inflators, and micro-gas generators, rendered opinions on certain issues related to automakers' use of Takata's ammonium nitrate inflators in vehicles sold to consumers, particularly as they pertain to FCA. As to the dangerous nature of the use of ammonium nitrate as an airbag propellant, he opined as follows:

- In my expert opinion, the use of PSAN in an all-pyrotechnic automotive application, such as the Relevant Inflators, renders the component defective and unreasonably dangerous. When combined the lack of hermetic seals, rupture of the Relevant Inflators is inevitable. The root cause of the failures in the Relevant Inflators is the use of PSAN. (ECF NO. 4253, ¶ 442(a).)

- In my expert opinion, all of the non-desiccated Takata PSAN inflators equipped in the Defendant automakers' vehicles, including FCA's vehicles, are defective and share a common and uniform defect. (ECF NO. 4253, ¶ 442(b).)

- In my expert opinion, this defect, was present in all of the non-desiccated Takata PSAN inflators equipped in the Defendant automaker's vehicles, including FCA's vehicles, at the time such vehicles were initially sold. (ECF NO. 4253, ¶ 442(c).)

James Baglini, an expert in the field of energetic materials (explosives, propellants, and pyrotechnics), devices, and systems in both the Aerospace, Military, Defense  and Commercial Automotive Airbag industries, was also asked to provide analysis and opinions regarding the ammonium nitrate airbag inflator safety defect in the Takata inflators. (ECF NO. 4253, ¶ 443.) He concluded that ammonium nitrate is unsuitable for airbag inflators, reasoning that:

When ammonium nitrate based inflators leak, which they all do, the moisture ingress coupled with thermal loading and environmental cycling will defeat phase stabilization methods and lead to the inevitable degradation of the [ammonium nitrate] propellant. This is the core, uniform safety defect associated with inflator designs that rely on an ammonium nitrate propellant. In other words, ammonium nitrate cannot overcome its fundamental nature[.]

(ECF NO. 4253, ¶ 444.)

### C.     Field Incidents Involving FCA Vehicles.

By at least October 2, 2013, FCA was notified of a Takata inflator rupture in a 2006 Dodge Charger that occurred on September 7, 2013, injuring the driver. (ECF NO. 4253, ¶ 445.)

In late 2014 or early 2015, NHTSA notified FCA that a customer reported that her husband was in an accident in 2012 in which the airbag ruptured/exploded. (ECF NO. 4253, ¶ 446.) FCA failed to disclose this incident in future chronologies as well as in correspondence to Senator Bill Nelson. (ECF NO. 4253, ¶ 447.)

In just the three-year time period beginning November 2015 and November 2018, FCA submitted at least 48 Airbag Inflator Rupture Incident Reports to NHTSA detailing reports of Takata airbag ruptures in FCA vehicles in the field.  (ECF NO. 4253, ¶ 448.) Below is a sample of the injuries (and death) that the ruptures caused:

- Death as a result of the airbag rupture. (ECF NO. 4253, ¶ 449(a).)
- Brain damage after the airbags metal strap struck the occupant's head during the accident. FCA found evidence of a rupture. (ECF NO. 4253, ¶ 449(b).)
- Injuries to the face and neck after being hit by shrapnel. Plastic surgery was required to stop his arterial facial bleeding and repair his facial and neck wounds. (ECF NO. 4253, ¶ 449(c).)
- Shrapnel wounds to the abdomen, chest, armpit, and arm. Surgery was required to remove the shrapnel. (ECF NO. 4253, ¶ 449(d).)
- Small, unidentified particles present in the occupant's eye socket. The occupant's mother stated her daughter had become "totally blind." (ECF NO. 4253, ¶ 449(e).)
- An orbital fracture and tear duct laceration. (ECF NO. 4253, ¶ 449(f).)
- Injuries to the driver's eyes where debris was lodged in the driver's left eye. (ECF NO. 4253, ¶ 449(j).)
- Injuries to the face, neck, and ear. (ECF NO. 4253, ¶ 449(k).)
- A hole in the occupant's head a collapsed lung as a result of metal fragments that ejected from the airbag upon deployment. (ECF NO. 4253, ¶ 449(l).)

- Injuries to the chest and neck after being hit with "something metal" following airbag deployment. (ECF NO. 4253, ¶ 449(m).)

- A laceration to the chin due to the dispersal of metal fragments upon deployment of the airbag. (ECF NO. 4253, ¶ 449(o).)

- Eye damage from metal shrapnel, which was expelled from the airbag upon deployment. (ECF NO. 4253, ¶ 449(p).)

Tragically, the above is a small sampling of the incidents that have occurred, and representative of a short reporting period.

### III.    FCA Knew Takata's Airbags Were Defective, but it Failed to Disclose the Defect to Consumers.

For years, FCA knew about the dangerous nature of ammonium nitrate and the risk of using the chemical in airbag inflators. (ECF NO. 4253, ¶ 451.) FCA was also involved in the design verification and testing process with Takata's PSAN inflators, which exhibited problems from the beginning and repeatedly failed to meet U.S.C.A.R. specifications for over a decade. (ECF NO. 4253, ¶ 452.) Yet even after NHTSA forced FCA into action, FCA purposefully did not begin notifying owners of the defective and dangerous nature of the Takata airbags until December 19, 2014, approximately six months after FCA filed its DIR with NHTSA, because they would not have replacement parts available prior to that date. (ECF NO. 4253, ¶ 453.) NHTSA described FCA's efforts as "unacceptable and exacerbates the risk to motorists' safety." (ECF NO. 4253, ¶ 453.)

FCA engineer and Manager of Frontal Airbags and Steering Wheels for North America Joe Boyle admitted that FCA failed to disclose to consumers that it was selling vehicles that contained ammonium nitrate inflators several years after FCA knew those inflators should not be placed in vehicles. (ECF NO. 4253, ¶ 455.) Boyle also admitted that these inflators were only eventually recalled because Takata announced they were defective. (ECF NO. 4253, ¶ 456.)

### A.    It Was Common Knowledge That Ammonium Nitrate is Inherently Dangerous.

FCA has long been aware of the ballistic volatility of ammonium nitrate and the problems associated with using it as the gas generant or propellant in Takata's airbags. As described above, the scientific literature detailing the ballistic instability of ammonium nitrate is extensive and voluminous. (ECF NO. 4253, ¶ 458.) Additionally, FCA's awareness of its inherently dangerous nature is evident in its development of design specifications, which sought to tame it.

In 1992, FCA co-founded the United States Council for Automotive Research ("U.S.C.A.R.") with Ford and General Motors as a collaborative research umbrella for U.S. automakers, and began developing the technical specifications and validation requirements for vehicle components. (ECF NO. 4253, ¶ 460.) Notably, U.S.C.A.R.-24, which was issued in 2004, concerned the requirements for airbags, and each of the automakers agreed to abide by USCAR-24 as the industry standard for approving and validating airbag inflators. (ECF NO. 4253, ¶ 461.)

While the original drafts of the U.S.C.A.R. inflator specifications in 1999 did not explicitly reference ammonium nitrate in airbag inflators, Steve Stram at FCA and his counterparts at other U.S. automakers made numerous and substantial revisions to the specifications to address the possibility of using the chemical. (ECF NO. 4253, ¶ 462.) Recognizing its instability, the final U.S.C.A.R. specification, dated June 2004, required that "Ammonium Nitrate containing propellants shall be required to undergo **added stability evaluation** for propellant strength and burn rate stability as agreed to by the [automaker]." (ECF NO. 4253, ¶ 463.)

### B.     FCA Became Aware of Serious Problems with Takata's Airbags Through Its Involvement in Airbag Design Verification and Testing.

FCA and Takata were jointly responsible for conducting design verification testing and determining key design characteristics of the Takata airbag module. (ECF NO. 4253, ¶ 465.) After its involvement in this process, FCA became one of Takata's first customers to switch to its ammonium nitrate-based inflators, starting in or around October 2001. (ECF NO. 4253, ¶ 466.)

From the beginning, FCA's product engineers expressed concern as to the integrity of the Takata ammonium-nitrate inflator module during and post deployment, including the "borderline integrity robustness of the module" and Takata's issues in mitigating module flaming. (ECF NO. 4253, ¶ 467.) By 2002, engineers at FCA knew that Takata's inflators were causing problems after inspecting Takata's production facility and observing evidence of a deployment training which, according to FCA engineers, "clearly depicted an object departing the [driver airbag] module. (ECF NO. 4253, ¶ 468.) FCA noted the performance of the inflator was "absolutely unacceptable" and that "many [major] issues need[ed] to be addressed/explained in order to restore [FCA's] confidence in [Takata]." (ECF NO. 4253, ¶ 469.) FCA's concerns extended to the ballistic performance of the ammonium nitrate inflators. (ECF NO. 4253, ¶ 470.)

In May 2003, FCA raised serious alarm because of Takata's failure to meet U.S.C.A.R. specifications on its inflators, which were suffering "integrity" issues during and after deployment,

as well as the "ongoing quality issues" FCA was having with Takata. (ECF NO. 4253, ¶ 471.) In a deposition, Stram admitted that there would have been "serious" concerns by FCA as to whether FCA would be able to get the PSDI-4 launched in time in light of these problems. (ECF NO. 4253, ¶ 472.) Additionally, that year, Steve Stram told Takata that if it wanted to keep FCA's business, he wanted evidence to prove that Takata was progressing towards ballistic variability reduction. (ECF NO. 4253, ¶ 473.)

Despite alarms about the "borderline integrity robustness" of the airbag module, FCA pushed forward with the Takata inflators due to its vehicle production plans. (ECF NO. 4253, ¶ 474.) In July 2003, FCA and Takata discussed concerns about Takata's recent deviation request to expand U.S.C.A.R. ballistic limits for Takata's inflators to the specifications that Takata could meet, with FCA's engineers stating that the requests were "extremely wide" and "would have a significant impact on module performance." (ECF NO. 4253, ¶ 475.) Ordinarily, Takata's dangerous inflators would have never made it into Chrysler vehicles because of Takata's failure to meet U.S.C.A.R. specifications; however, despite FCA's concerns, it granted Takata the first of what would be numerous deviation requests from U.S.C.A.R. specifications for Takata inflators— this time because Takata's inflator did "not meet performance related specifications" related to sympathetic ignition, gaseous effluents, auto-ignition requirements after heat aging, flaming test, and ballistic variability." (ECF NO. 4253, ¶ 476.)

Takata's failure to meet ballistic specifications was not the only problem with the inflators. Earlier that year, in June 2005, after discovering that Takata inflators were emitting particulates during deployment testing, FCA employees were "very concerned with the level of particulate emitted by the PSDI-5 inflator[,] [which] had soot, inflator witness marks and pinholes on the bag's surface." (ECF NO. 4253, ¶ 484.) That same month, Stram told Takata that "[t]he ability of Core Restraints to allow Takata to quote Driver Airbag programs with the [ammonium nitrate inflators] on future programs or proceed on [with the inflators] is in question." (ECF NO. 4253, ¶ 485.) But that was not true, as FCA proceeded on.

Days after the March 2006 explosion at Takata's Monclova facility, Stram visited the facility to check on status and observe repairs and production lines. (ECF NO. 4253, ¶ 491.) Notably, Stram reviewed ammonium nitrate inflator lines that were located in the area of the building that lost the "majority of lengthwise walls" and noted that "an enclosure for the two inflator lines is being constructed of Plywood and corrugated metal ceiling." *Id.* Neither these

issues nor the fact that ammonium nitrate was the cause of the explosion deterred FCA from proceeding, as it was satisfied that production of the Takata airbags would resume exactly one month later, on April 5, 2006. (ECF NO. 4253, ¶ 493.)

Critically, in the fall of 2008, Honda initiated its first recall of Takata airbags in the U.S. Honda's defect description stated that the driver airbag inflator could rupture when activated. (ECF NO. 4253, ¶ 494.) Given that the Takata airbags FCA used in its vehicles contained the same ammonium nitrate propellant as used in the Honda vehicles, FCA was put on notice, but ultimately did nothing meaningful about it and instead ordered a million more ammonium-nitrate inflators from Takata. (ECF NO. 4253, ¶ 497.)

### C. After Old Chrysler's Bankruptcy Reorganization, FCA Acquired Old Chrysler's Knowledge of the Inflator Defect.

Old Chrysler filed for bankruptcy in April 2009. (ECF NO. 4253, ¶ 504.) Under Section 363 of the U.S. Bankruptcy Code, the United States Bankruptcy Court for the Southern District of New York approved the sale of substantially all of Old Chrysler's assets pursuant to the Sale Agreement. (ECF NO. 4253, ¶ 505.) Thus, FCA acquired Old Chrysler's books, records, and personnel pursuant to the sale. (ECF NO. 4253, ¶ 506.) When FCA acquired Old Chrysler's books, records, and personnel, it acquired the knowledge of Takata's defective airbags. (ECF NO. 4253, ¶ 507.)

### D. FCA Continued to Use Takata's Defective Inflators After the Bankruptcy Reorganization.

After Old Chrysler's bankruptcy reorganization, FCA continued the pattern set by Old Chrysler of collaborating with Takata on the design, development and testing of the Defective Airbags; interacted with Takata to confirm that the Defective Airbags met Old Chrysler's and FCA's design specifications; and oversaw the Defective Airbag's compliance with federal regulations. (ECF NO. 4253, ¶ 508.)

FCA's engineers knew Takata's ammonium nitrate inflator tended to exhibit "aggressive behavior" as well as there being concerns with "propellant aging" evidenced during PV testing. (ECF NO. 4253, ¶ 509.) Indeed, Takata engineer Tom Messner testified that there was an open line of communication between Takata and FCA regarding the products Takata was developing, and that he was always transparent with information regarding ammonium nitrate-based inflators in his communications. (ECF NO. 4253, ¶ 510.)

Additionally, problems with the inflators continued. In 2010, an "energetic disassembly," which is a technical term for the word explosion, occurred during PV testing. (ECF NO. 4253, ¶ 512.) In October 2011, a Chrysler vehicle experienced an inadvertent airbag deployment during a vehicle repair at a FCA plant. (ECF NO. 4253, ¶ 513.) The FCA employee working on the repair noted a hissing sound during deployment and that the connectors had melted. (ECF NO. 4253, ¶ 514.) And, in April 2013, FCA was made aware that Takata's SDI-X ammonium nitrate inflator did not meet the slope testing standards during PV testing, yet it still granted Takata's requested deviations and approved the inflator for production. (ECF NO. 4253, ¶ 515.)

Ongoing rupture incidents and further investigation led Honda to expand these recalls in 2009, 2010 and 2011, yet Takata continued to equip FCA vehicles with its airbags. (ECF NO. 4253, ¶ 516.) The problems continued until NHTSA began to force the automotive industry into action in 2013.

## ARGUMENT

## I.   PLAINTIFFS HAVE ESTABLISHED A TRIABLE FACT AS TO WHETHER THEY SUFFERED ECONOMIC INJURY UNDER GEORGIA OR NORTH CAROLINA LAW.

It is "[c]ommon sense" that a car with a defective safety device is "worth less" than a car without a defect. *Carriuolo v. Gen. Motors Co.*, 823 F.3d 977, 987 (11th Cir. 2016). This principle underlies Plaintiffs' overpayment theory of damages: Plaintiffs overpaid for their vehicles with defective Takata airbags at the time of purchase, because the vehicles were "worth less" than what they were deceptively marketed as—vehicles with safety-enhancing, non-defective airbags.[4] Plaintiffs seek to recover the amount of this overpayment, which Dr. Dubé's analysis quantifies. This Court's prior ruling, which recognized that the applicable measure of damages "is a matter of state law" (D.E. 4471 at 6), does not preclude the Remaining Plaintiffs' claims because Georgia and North Carolina law calculate damages differently than the states at issue in that Order, a fact that FCA implicitly conceded when it did not include those states in its initial iteration of this argument.

### A.   The Court Should Reject FCA's Repackaged *Daubert* Arguments.

---

[4] As discussed below, Plaintiffs are not seeking post-repair diminution in value or cost of repair damages, and therefore, GM's arguments about the propriety of those damages are irrelevant.

Adhering to its well-reasoned decision in *Cardenas v. Toyota Motor Corp.*, No. 18-22798, 2021 WL 5811741 (S.D. Fla. Dec. 6, 2021), as well as the weight of authority across the country admitting similar testimony, this Court properly ruled that Dr. Dubé's damages model is admissible and rejected Defendants' arguments that the "model does not calculate relevant damages and it is unreliable." (D.E. 4364 at 3.) Essentially ignoring this ruling, FCA repackages the lead argument from its *Daubert* motion (D.E. 4178 at 10–14) as an argument for summary judgment, claiming again that Dr. Dubé's model does not calculate "Market Value" damages (D.E. 4797 at 8–10). For the reasons set forth in Plaintiffs' *Daubert* opposition (D.E. at 4236 at 10–22), the result should be the same—FCA's motion should be denied.

Georgia measures damages for fraud claims by "the difference between what [Plaintiffs] paid for their [vehicles] and what those [vehicles] were worth at the time of purchase." *Brooks v. Dime Sav. Bank of New York*, FSB, 457 S.E.2d 706, 708 (Ga. Ct. App. 1995); *see Bennett v. D. L. Claborn Buick, Inc.*, 414 S.E.2d 12, 14 (Ga. Ct. App. 1991) (holding that the measure of damages for fraud in the sale of a car is the "difference between the actual value of the property at the time of purchase and what the value would have been if the property had been as represented"); *Horne v. Claude Ray Ford Sales, Inc.*, 290 S.E.2d 497, 498 (Ga. Ct. App. 1982) (same). The same damages measure applies to claims under the Georgia Fair Business Practices Act. *See Colonial Lincoln-Mercury Sales, Inc. v. Molina*, 262 S.E.2d 820, 822 (Ga. Ct. App. 1979) (holding that "common law damages" are recoverable under the statute) (citing *Haynes v. Elberton Motors*, 194 S.E. 884, 885 (Ga. Ct. App. 1938) ("[T]he measure of damages is the difference between the value of the thing sold at the time of delivery and what would have been its then value if the representation made by the seller had been true.")).

North Carolina law is no different. "In a fraud case, damage is the amount of loss caused by the difference between what was received and what was promised through a false representation." *First Atl. Mgmt. Corp. v. Dunlea Realty Co.*, 507 S.E.2d 56, 65 (N.C. Ct. App. 1998) (applying the same measure to a claim under the North Carolina Unfair and Deceptive Trade Practices Act, N.C. Gen. Stat. Ann. § 75-1.1); *Hardy v. Toler*, 218 S.E.2d 342, 343 (N.C. 1975) (awarding as damages under § 75-1.1 the difference between the value of "the automobile as represented and warranted" and "its actual value").

FCA insists on applying a different measure of "Market Value" damages, but the cases it relies upon involve causes of action and circumstances, such as property destruction, not at issue

here. *See Canal Ins. Co. v. Tullis*, 515 S.E.2d 649, 649 (Ga. Ct. App. 1999) (automobile crash); *Sprinkle v. N.C. Wildlife Res. Comm'n*, 600 S.E.2d 473 (N.C. Ct. App. 2004) (boat crash); *Wright v. Metro. Atlanta Rapid Transit Auth.*, 283 S.E.2d 466 (Ga. 1981) (land condemnation); *N. Carolina Dep't of Transp. v. Mission Battleground Park, DST*, 810 S.E.2d 217 (N.C. 2018) (land condemnation). The mismatch is apparent from the characterization of damages measures in these cases as comparing the condition of property before and after an injury. There is no before-and-after comparison in a fraud claim. The relevant difference is between what was delivered and what was promised.[5] Regardless, as this Court previously recognized (D.E. 4471 at 3–4, 6), it is bound to apply controlling state court decisions to Plaintiffs' claims.

Contrary to FCA's suggestion, Dr. Dubé's model aligns with the proper damages measure. It calculates the "difference between the market price actually paid for a Class Vehicle at the point of sale and the but-for market price Class Members would have paid for that Class Vehicle had they been aware of the airbag defect at the point of sale." (D.E. 4338-199 (Dubé Rept., ¶ 25).) The purchase price that Plaintiffs paid is sufficient "evidence of the value the car would have had if it had been as warranted." *Monroe v. Hyundai Motor Am., Inc*., 606 S.E.2d 894, 896 (Ga. Ct. App. 2004); *see Greene v. Carpenter, Wilson, Cannon & Blair, P.A.*, 458 S.E.2d 507, 509 (N.C. Ct. App. 1995) (holding that "[t]he purchase price of property is competent evidence of its fair market value"). And Dr. Dubé's conjoint survey and market simulation estimated the value of the vehicles that Plaintiffs actually received. (D.E. 4338-199 (Dubé Rept.) ¶¶ 25, 111, 114).) The difference between these two measures represents Plaintiffs' damages under Georgia and North Carolina law. (D.E. 4338-199 (Dubé Rept.) at Table 13.)

FCA merely repeats its unsuccessful *Daubert* argument in contending that Dr. Dubé fails to account for "unwilling sellers" or adequately consider supply-side factors. (D.E. 4797 at 9–10.) Dr. Dubé ran a complex market simulation that accounted for supply-side reactions, such as price

---

[5] And North Carolina law expressly rejects imposing common-law limitations on the measure of damages recoverable under its unfair trade practices statute—which is exactly what FCA would have this Court do. *See Poor v. Hill*, 530 S.E.2d 838, 848 (N.C. Ct. App. 2000) ("Damages on a Chapter 75 claim are not necessarily limited to those that might be had for breach of contract. [A]n action for unfair or deceptive acts or practices is a distinct action apart from fraud, breach of contract, or breach of warranty. Since the remedy was created partly because those remedies often were ineffective, it would be illogical to hold that only those methods of measuring damages could be used.").

changes in response to competition. (D.E. 4338-199 (Dubé Rept.) at 44–48.) And FCA's preferred but-for world, in which it could refuse to sell vehicles altogether or install non-defective airbags at the outset, really insists on assuming an "unwilling seller," which conflicts with the state law authorities it cites.[6] Not one of the state law decisions remotely suggests that calculating fair market value requires, or even permits, the assumption that a willing seller may refuse to sell, or that a defendant can escape liability by claiming it would have refused to manufacture the product in the first place if it had to follow the law. Using the quantities actually produced and sold in the real world, as Dr. Dubé did, is the proper approach.[7]

FCA also renews its futile *Daubert* argument that Dr. Dubé's model does not properly calculate the market value of the Class Vehicles. (D.E. 4797 at 8–10.) FCA already argued that Dr. Dubé should be excluded because his analysis uses MSRP as part of the market-value calculation. (D.E. 4178 at 16–17.) The Court, of course, denied the *Daubert* motion, rendering that argument moot. And as Plaintiffs explained at the time (D.E. 4236 at 12, 21–22), it is proper for a damages expert to use MSRP to approximate market value "because there is some correlation between MSRP and actual price." *Johannessohn v. Polaris Indus., Inc.*, 450 F. Supp. 3d 931, 973 (D. Minn. 2020); *see Johnson v. Nissan N. Am., Inc.*, 2022 WL 2869528, at *7 (N.D. Cal. July 21, 2022) ("The MSRP is an appropriate price for an expert to use in this model: it is a price the expert has decided is reasonably calculated to capture an objective value for the car in the real-world

---

[6] FCA offers nothing more than *ipse dixit* to support its remarkable claim that case—a fraud case where FCA sold products at a price premium—is akin to those involving a "forced sale" of property. The cases it cites are factually inapposite, and none of them calls into question Dr. Dubé's widely accepted methodology for **this** type of case. *See Ga. Ltd. Partners v. City Nat'l Bank*, 748 S.E.2d 131, 132 (Ga. Ct. App. 2013) (foreclosure sale of real property); *Gutherie v. Ford Equip. Leasing Co.*, 424 S.E.2d 889, 892 (Ga. Ct. App. 1992) (foreclosure sale of real property); *Surratt v. Grain Dealers Mut. Ins. Co.*, 328 S.E.2d 16, 20 (N.C. Ct. App. 1985) (actual cash value of insured property).

[7] In addition, as Plaintiffs already explained, FCA's citation to *In re General Motors LLC Ignition Switch*, 407 F. Supp. 3d 212 (S.D.N.Y. 2019), is unavailing. (D.E. 4236 at 17–20.) *Ignition Switch* is one of the only cases holding that price premium damages must incorporate the idea that a manufacturer making defective products would have made fewer products if it had known in advance that it would be caught. This Court has twice held rejected this argument as a matter of law, holding instead that such arguments go to the weight of the evidence at trial. *Cardenas*, 2021 WL 5811741, at *4–5. (*See* D.E. 4364 at 3–4 (denying Defendants' motion to exclude Dr. Dubé, which made this argument).)

under prevailing market conditions.").[8]

**B.**      **The Recall Did Not Eliminate Plaintiffs' Overpayment Damages.**

In its initial motion for summary judgment, FCA did not contend that the cost of repair limited Plaintiffs' recoverable damages under the law of Georgia and North Carolina. (D.E. 4183 at 15 (limiting argument to twelve other states).) And for good reason: the law in the remaining two states does not support FCA's position. Nonetheless, FCA now attempts to stretch the law to fit its argument. FCA's strained argument should be rejected.

As this Court held in its prior Order, the applicable measure of damages "is a matter of state law," governed by the decisions of the applicable state courts. (D.E. 4471 at 6.) But FCA cites no cases from Georgia or North Carolina state courts holding that the cost of repair limits a plaintiff's damages for claims of fraud and violation of consumer protection laws, or that the provision of a recall repair wipes out a plaintiff's damages.

Instead, FCA cites decisions for the uncontroversial proposition that damages should not result in a windfall or double compensation for the plaintiff. (D.E. 4797 at 11, 15–16.) But that principle is inapplicable here, because the recall did not compensate Plaintiffs for the damages they suffered and are seeking to recover. Plaintiffs paid for vehicles marketed as having safe, operational airbags *on day one*. Repairing the vehicles years later does not provide Plaintiffs what they bargained for—a safe, operational airbag *on day one*. It is indisputable that the market price of a vehicle equipped with defective Takata airbags that will be replaced in ten years would be less than the market price of a vehicle equipped with safe, operational airbags from the start. No reasonable consumer would pay the same price for those two different vehicles at the point of sale—when overpayment or benefit-of-the-bargain damages are measured. *See Carriuolo*, 823 F.3d at 987 (recognizing benefit of the bargain damages accrue at the time of sale—even if the fraud was later "cured"—because a "vehicle that the manufacturer knows to be safe is more valuable than a vehicle that the manufacturer perhaps anticipates will later be declared safe"); *id.* ("The injury occurs at the point of sale because the false statement allows the seller to command a premium on the sales price."). So, the provision of a recall repair years after the sale, absent

---

[8] FCA's sole citation, *Price v. L'Oreal USA, Inc.*, 2020 WL 4937464 (S.D.N.Y. Aug. 24, 2020), is not to the contrary. There, the report in question relied on MSRP data from a declaration "offered in a separate case." *Id.* at *6.

compensation for the overpayment, does not place Plaintiffs in the same position that they would have been in had Defendants not engaged in misconduct, and awarding Plaintiffs damages for the overcompensation does not result in a double recovery or windfall. *See Weidman v. Ford Motor Co.*, 2022 WL 1071289, at *5 (E.D. Mich. Apr. 8, 2022) (rejecting argument that defendant's offer of free replacement meant that plaintiffs had no injury because plaintiffs sought damages for "overpayment at the point of purchase"), *vacated on other grounds sub nom. In re Ford Motor Co.*, 86 F.4th 723 (6th Cir. 2023); *Crawford v. FCA US LLC*, 2021 WL 3603342, at *3 (E.D. Mich. Aug. 13, 2021) ("FCA's recall does not bar Plaintiffs' theory of recovery. Even if the recall were effective, Plaintiffs alleged that they were injured when they bought their trucks."); *Raymo v. FCA US LLC*, 475 F. Supp. 3d 680, 695 (E.D. Mich. 2020) (holding that a recall did not bar damages claims "because Plaintiffs claim their injury occurred at the point of purchase, and that the recall did not necessarily remediate the loss caused to Plaintiffs by their allegedly having to pay an additional $8,000 to $10,000 premium based on Defendants' alleged misrepresentations"); *Philips v. Ford Motor Co.*, 2016 WL 693283, at *7–10 (N.D. Cal. Feb. 22, 2016) (holding that a recall did not reimburse plaintiffs for the loss in market value of their vehicles).[9]

The Court should ignore FCA's invitation to discount these decisions simply because they did not arise under Georgia or North Carolina law. (D.E. 4797 at 11 n.6.) These decisions all approved fraud-based economic injury at the point of sale regardless of a subsequent recall, which as explained above is in line with Georgia and North Carolina's general approach to  benefit-of-the-bargain damages. FCA does not point to any decision explaining that this principle of law is any different in Georgia or North Carolina, so its argument that those states were not squarely at issue in Plaintiffs' citations is beside the point.

Dr. Dubé's rigorous work quantifies how much less Plaintiffs' vehicles were worth. (D.E. 4253 ¶¶ 621, 624.) Contrary to FCA's apparent assumption, his model did not merely analyze the impact of the Inflator Defect alone on the market price of Plaintiffs' vehicles. Rather, Dr. Dubé's

---

[9] For this reason, FCA's reliance on contract treatises and decisions generally defining the purpose of benefit-of-the bargain damages is misplaced. *See* 24 Williston on Contracts, § 64:1 (4th ed.); Restatement (Second) of Contracts § 347, cmt. A; *Legacy Acad., Inc. v. JLK, Inc*., 765 S.E.2d 472 (Ga. Ct. App. 2014); *Weber, Hodges & Godwin Com. Real Est. Servs., LLC v. Cook*, 650 S.E.2d 834 (N.C. Ct. App. 2007). Since Plaintiffs' overpayment damages already account for the recall repair, the summary judgment evidence establishes that the provision of the recall alone did not place Plaintiffs in the same position as they would have been in had FCA complied with the law.

model measures the market prices that would have prevailed had consumers been aware of both the existence of the Inflator Defect ***and*** the eventuality of the recall at the time of purchase. (D.E. 4253 ¶¶ 623, 625, 628–29, 631–32); D.E. 4338-199 (Dubé Rept.) ¶¶ 59, 111, 103, 114; D.E. 4338-200 (Dubé Rebut. Rept.) ¶ 76; D.E. 4338-201 (Dubé Dep. Tr.) at 278:2–17, 279:5–17.) Because Dr. Dubé factored the certainty of the recall into his calculation of the price premium, the eventual occurrence of the recall cannot be used to further reduce Plaintiffs' damages. Doing so would, in effect, double count for FCA the benefit of the recall.   Because the recall does not reimburse Plaintiffs for the amount they overpaid for their vehicles—*i.e.*, the price premiums that Dr. Dubé calculated—it does not eliminate Plaintiffs' damages.

Consider Ms. O'Neal, for example. If the defect and time until the recall had been disclosed at the time Ms. O'Neal purchased her Dodge Charger, the price would have been $3,691 less. This overpayment amount already gives FCA credit for the repair, so FCA's ultimate provision of the repair cannot further reduce Ms. O'Neal's damages. Awarding her $3,691 in damages will provide appropriate compensation for her overpayment, not a windfall.

Unable to find any applicable state law authorities that embrace its position, FCA falls back on several district court cases that are factually distinguishable and unpersuasive. Not one involves anything resembling the evidence that Plaintiffs have presented here: comprehensive expert testimony, based on a survey testing the price impact of both a challenged defect and an eventual recall to fix the defect free of additional charge, demonstrating overpayment at the point of sale.

For example, FCA cites three California district court cases, *Sater v. Chrysler Grp. LLC*, 2016 WL 7377126 (C.D. Cal. Oct. 25, 2016), *In re Toyota Motor Corp. Hybrid Brake Mktg., Sales Pracs. & Prod. Liab. Litig.*, 915 F. Supp. 2d 1151 (C.D. Cal. 2013), and *Waller v. Hewlett-Packard Co.*, 295 F.R.D. 472 (S.D. Cal. 2013). Each case predates the Ninth Circuit's decision in *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811 (9th Cir. 2019), which held that focusing on "the potential post-purchase value" of a product is improper when a benefit-of-the-bargain theory seeks to recover the amount of overpayment at the point of sale. *Id.* at 820. Additionally, not one of the cases involves any evidence resembling the Dubé report and testimony here. In *Toyota*, the plaintiff offered no evidence to support his damages theory, 915 F. Supp. 2d at 1157, unlike Plaintiffs here. And in *Waller*, the court, in a class certification decision, not at summary judgment, relied entirely on *Toyota* and speculated that an update released almost immediately after the plaintiff had purchased certain software provided the plaintiff "just what they paid for." 295 F.R.D.

at 487. But *Waller* does not help FCA because Plaintiffs here have presented an abundance of evidence from Dr, Dubé establishing that the recall—of which survey participants were made aware—did not compensate Plaintiffs for the amount they overpaid.

Finally, *Sater*, relying on *Toyota* and *Waller*, rejected a claim based on a defect that was fixed in a recall because the plaintiff would have received a double recovery if he had been permitted to both keep the benefit of the recall fix and "benefit-of-the-bargain damages for the difference in value between a non-defective truck and the defective truck." 2016 WL 7377126, at *7. The problem for FCA is that Dr. Dubé did not simply calculate "the difference in value between a non-defective truck and the defective truck," as in *Sater*. *Id.* Rather, he analyzed the difference in value, at the point of sale, between a non-defective vehicle and a defective vehicle that would eventually be fixed through a recall free of charge. (D.E. 4338-199 (Dubé Rept.) ¶¶ 25, 59, 103, 111, 114; D.E. 4338-200 (Dubé Rebut. Rept.) ¶ 76.) Indeed, the *Sater* court acknowledged the plausibility of this theory of recovery, but it had no occasion to address it because the plaintiffs had "not argued in their briefing that the value of the fully repaired trucks is less than the value of a truck that never had a defect." 2016 WL 7377126, at *8. That is precisely the evidence that Plaintiffs present here from Dr. Dubé—even factoring in the eventual full repair, a substantial price premium exists because of FCA's wrongful conduct.

Similarly, in *Kommer v. Ford Motor Co.*, 2017 WL 3251598, at *5 (N.D.N.Y. July 28, 2017), a case involving defective door handles and not the type of serious safety issue here, the court held that the plaintiff could not establish that he overpaid for the vehicle because there was a remedy available to him at the time he purchased his vehicle, not, as here, years after the Plaintiffs' purchases. This is entirely consistent with Dr. Dubé's model, in which "the 'no defect' situation is synonymous with zero years until the defect may be fixed." (D.E. 4338-200 (Dubé Rebut. Rept.) ¶ 76.) In other words, "[w]hen the number of years until the defect can be fixed becomes zero, [Dr. Dubé's] model predicts zero price premium because a consuer is already eligible to have her defective car repaired." (*Id.*)

Likewise, *Thiedemann v. Mercedes-Benz USA, LLC*, 872 A.2d 783 (N.J. 2005), does not help FCA, because the plaintiffs in that case failed "to produce specific proofs to support or infer a quantifiable loss in respect of their benefit-of-the-bargain claim." *Id.* at 795. Rather than "present any expert evidence," as Plaintiffs have done here, the *Thiedemann* plaintiffs relied entirely on "subjective assertions," which were "insufficient to satisfy the requirement of an ascertainable

loss." *Id*. Contrary to FCA's suggestion, therefore, *Thiedemann* does not create a broad rule that repairs performed under a warranty preclude benefit-of-the-bargain damages for deceptive conduct, but instead unremarkably holds that a plaintiff must provide evidence of damages to state a claim under the New Jersey Consumer Fraud Act.[10]

Put simply, there is no valid authority for absolving FCA of liability under these circumstances. The law does not give car manufacturers a get-out-of-jail-free card for causing consumers to substantially overpay for dangerously defective vehicles simply by repairing the defects years, if not more than a decade, after the transactions, and only then after a massive public outcry when the impacts of its fraudulent misconduct were revealed. Rather, the existence of damages and liability depends on the evidence presented. And through Dr. Dubé's extensive work, Plaintiffs have more than carried that burden of establishing that they overpaid for their vehicles, even with the recalls. The belated recalls are no substitute for the benefit-of-the-bargain damages that Plaintiffs may recover under established law not only in this District and Circuit, but also across the country.

## II.      FCA'S STANDING AND MOOTNESS ARGUMENTS LACK MERIT.

### A.      Plaintiffs Have Article III Standing

Supreme Court and Eleventh Circuit precedent leave no doubt that Plaintiffs have standing. FCA challenges only the first requirement of standing—injury in fact. (D.E. 4797 at 17–18.) But "[i]f a defendant has caused . . . monetary injury to the plaintiff, the plaintiff has suffered a concrete injury in fact under Article III." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 425 (2021). The Eleventh Circuit has explained that "[a] person experiences an economic injury when, as a result of a deceptive act or an unfair practice, he is deprived of the benefit of his bargain." *Debernardis v. IQ Formulations*, 942 F.3d 1076, 1084 (11th Cir. 2019). "Thus, a plaintiff establishes standing by plausibly alleging that a product is defective, and plaintiff would not have purchased—or would have paid less—for the product had the existence of the defect been disclosed or not misrepresented." *Lewis v. Mercedes-Benz USA, LLC*, 530 F. Supp. 3d 1183, 1202 (S.D. Fla. 2021)

---

[10] The court's observation that "[t]he mere fact that an automobile defect arises does not establish, in and of itself, an actual and ascertainable loss," *Thiedemann*, 872 A.2d at 251, does not help FCA because Plaintiffs here do not rest their claims for damages on the "mere fact" of the Inflator Defect. Rather, Plaintiffs' claims seek to recover damages for FCA's wrongful conduct, such as its deceptive marketing, in connection with the Inflator Defect.

(Ruiz, J.). That is precisely what Plaintiffs have established here. FCA does not dispute that Plaintiffs have presented sufficient evidence to prove a defect, and the admitted expert testimony of Dr. Dubé proves how much Plaintiffs overpaid. Accordingly, Plaintiffs have standing.

FCA's arguments to the contrary rest on a mischaracterization of Plaintiffs' claims and decisions that are either inapplicable or inconsistent with Eleventh Circuit law. Plaintiffs assert that FCA's wrongful conduct deprived Plaintiffs of the benefit of their bargain and caused Plaintiffs to overpay for their vehicles. Contrary to FCA's description, Plaintiffs are not suing FCA for the mere "speculative risk" of future harm. (D.E. 4797 at 17.) Thus, authorities holding that the mere risk of a possible or future injury is insufficient for standing, such as *Clapper v. Amnesty International USA*, 568 U.S. 398, 409 (2013), are irrelevant.

Nor does the recall affect Plaintiffs' standing, contrary to FCA's argument. It is undisputed that, even with the recall, FCA has not paid Ms. Gibson the $4,050 she overpaid for her 2010 Dodge Charger, Ms. Johnson the $8,843 she overpaid for her 2014 Dodge Charger, or Ms. O'Neal the $3,691 she overpaid for her 2012 Dodge Charger (D.E. 4338-199 (Dubé Rept.) at Tables 15 & 17), so the recall has not eliminated Plaintiffs' economic damages. This key fact distinguishes *Bloomgarden v. Allstate Fire & Casualty Insurance Co.*, 499 F. Supp. 3d 1160, 1166 (S.D. Fla. 2020), in which the defendant "paid" the plaintiff the full amount to which he was entitled under an insurance agreement; Plaintiffs have received no such payment here. Likewise, *Cheng v. BMW of North America, LLC*, 2013 WL 3940815 (C.D. Cal. July 26, 2013), is inapplicable because the plaintiff in that case disclaimed seeking "any monetary damages," *id.* at *4, unlike Plaintiffs here. *See Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1219–20 (S.D. Fla. 2017) (holding that *Cheng* is "unpersuasive where plaintiffs seek 'recovery for losses in market value'") (quoting *Philips*, 2016 WL 693283, at *8–9).

Likewise, *Sugasawara v. Ford Motor Co.*, 2019 WL 3945105 (N.D. Cal. Aug. 21, 2019), is inapposite because it was decided on a motion to dismiss, not on a record with any expert testimony demonstrating overpayment at the point of sale, despite a recall. Since the Sugasawara plaintiffs merely alleged, without evidence or detail, that they had overpaid for their vehicles, the court's prediction that their vehicles' "pre-defect values ha[d] likewise been restored" by a recall reflects nothing more than its fledgling view of whether the plaintiffs' theory of harm was

"plausible." Id. at *6. [11]  Sugasawara, contrary to FCA's suggestion, was not and could not have been announcing an unflinching, universal rule of law or economics that a recall eliminates all overpayment harm, for it had and offered no evidence or authority to support such a rule. Indeed, underscoring the limited reach of its ruling and that it was only passing on the adequacy of the allegations before it, Sugasawara granted the plaintiffs leave to amend because they "could allege additional facts to establish standing." *Id.* at *6. Such "additional facts" are presented here with Dr. Dubé's work.

Moreover, it is doubtful that Sugasawara can be reconciled with its own circuit court's decision in *Nguyen v. Nissan North America, Inc.*, 932 F.3d 811 (9th Cir. 2019), which held that focusing on "the potential post-purchase value" of a product is improper when a benefit-of-the-bargain theory seeks to recover the amount of overpayment at the point of sale. Id. at 820. In either event, Sugasawara is irrelevant here, because Plaintiffs' damages evidence shows that the recall does not, in fact, compensate Plaintiffs for the amount they overpaid. See Friche v. Hyundai Motor, Am., No. 21-cv-01324, 2022 WL 1599868, at *3 (C.D. Cal. Jan. 28, 2022) ("[T]he Court respectfully disagrees with the court's holding in Sugasawara that a plaintiff cannot establish Article III standing on the theory that he would not have purchased a vehicle had he known about its defect when a defendant later repairs the vehicle's defect and restores the vehicle to the condition that the plaintiff expected when he purchased the vehicle . . . . Even if Plaintiff's Kona EV now has a non-defective battery and functions just as he expected it would, he was injured at the time of his purchase because he has pled that he would not have purchased the vehicle in the first place if he knew of its defect."); *Cf. Carriuolo v. Gen. Motors* Co., 823 F.3d 977, 987 (11th Cir. 2016) ("A vehicle that the manufacturer knows to be safe is more valuable than a vehicle that the manufacturer perhaps anticipates will later be declared safe.").

FCA's reliance on the Fifth Circuit's recent decision in *Earl v. Boeing Co.*, 53 F.4th 897 (5th Cir. 2022), is similarly misplaced for two reasons. First, the facts are distinguishable. In *Earl*, the plaintiffs brought RICO claims against Boeing and Southwest, alleging that they conspired to hide the safety risks of Boeing's MAX 8 aircraft, which caused the plaintiffs to overpay for airline tickets. *Id.* at 900–01. The Fifth Circuit refused to credit an economist's report on the alleged

---

[11] While the court was required to accept well-pled factual allegations as true, it also declined to credit allegations that it considered "conclusory." *Sugasawara*, 2019 WL 3945105, at *5.

overpayment because it rested on two inferences that, in the court's view, were "implausible": first, that airlines would have continued offering the same flights on MAX 8 aircraft, but with a discount for the heightened risk that passengers would die; and second, that the FAA would have permitted airlines to fly the aircraft even with full knowledge of the defect. *Id.* at 903. Dr. Dubé's report, in contrast, does not rest on implausible assumptions. Instead, it tracks reality. The disclosure that Dr. Dubé tested in his conjoint survey used the ***actual language*** of the form that a defendant had customers sign acknowledging the heightened risk of Takata airbags, and NHTSA permitted the sale of such vehicles with the disclosure. (D.E. 4338–202) (FCA_US_LLC_1055699); (D.E. 4338–203) (FCA_US_LLC 0000584001); (D.E. 4338–204) (FCA_US_LLC_10550776); (D.E. 4253, ¶ 524.). So, unlike the expert report in Earl, there is nothing implausible about Dr. Dubé's opinions.[12]

Second, to the extent *Earl* more broadly rejects an "overcharge-by-fraud" theory, as FCA contends, *Earl* conflicts with the Eleventh Circuit's decision in *Debernardis*, 942 F.3d at 1084, which binds this Court. *Debernardis* holds that such an overcharge theory, "calculated based on the difference in the market value of the product or service in the condition in which it was delivered and its market value in the condition in which it should have been delivered," as Plaintiffs' damages are calculated here, establishes a concrete economic injury sufficient to create standing. *Id.*[13] And *Debernardis* is far from alone: almost every circuit holds that "overpayment for a product—even one that performs adequately and does not cause any physical or emotional injury—may be a sufficient injury to support standing." *In re Evenflo Co., Inc., Mktg., Sales Pracs. & Prod. Liab. Litig.*, 54 F.4th 28, 35 (1st Cir. 2022) (collecting cases).

In fact, *Evenflo* points to an earlier Fifth Circuit decision that is indistinguishable from this case and undermines FCA's argument, *Cole v. Gen. Motors Corp.*, 484 F.3d 717, 723 (5th Cir. 2007). In Cole, the court held that purchasers of GM vehicles with allegedly defective airbag

---

[12] Nor is there anything implausible about the assumption that FCA would continue to offer its vehicles for sale at a steep price discount, even if it meant selling the vehicles at a loss. This would allow FCA to continue to generate revenue for vehicles that would otherwise become worthless. As further explained in more detail in section I.A, above, this is the proper but-for world to consider for calculating damages.

[13] Under the reasoning of *Earl*, the Eleventh Circuit could not have found standing in *Debernardis*, because selling the drug in question violated federal law, and *Earl* would have disregarded as implausible a damages model in which the FDA nonetheless permitted the sale of that drug.

systems had standing to sue—even though their airbags had not deployed and GM had implemented a recall that repaired the named plaintiffs' airbags. *Id*. at 719–23. Like Plaintiffs here, each Cole plaintiff "suffered economic injury at the moment she purchased a DeVille because each DeVille was defective." *Id*.[14] Accordingly, "Cole presents the better analogy for this case.*" Evenflo,* 54 F.4th at 37.

## B.    <u>Plaintiffs' Claims for Monetary Relief Foreclose FCA's Mootness Attack.</u>

Plaintiffs' "claim[s] for money damages ensure a live controversy" that easily disposes of FCA's mootness argument. *Mission Prod. Holdings, Inc. v. Tempnology, LLC*, 587 U.S. 370, 377 (2019); 13C C. Wright, A. Miller & E. Cooper, *Federal Practice and Procedure* § 3533.3 (3d ed. June 2024 update) ("[A] case is not moot so long as a claim for monetary relief survives."). Recovery "may be uncertain or even unlikely for any number of reasons, in this case as in others. But that is of no moment. If there is any chance of money changing hands, [Plaintiffs'] suit remains live." *Mission Prod. Holdings, Inc*., 587 U.S. at 377. FCA remarkably ignores Supreme Court precedent when advancing its mootness argument.

The decisive flaw in FCA's argument is that the prudential mootness doctrine applies to requests for equitable relief, such as injunctions and declaratory judgments, not damages. *Ingaseosas Int'l Co. v. Aconcagua Investing Ltd*., 479 F. App'x 955, 962 (11th Cir. 2012) (per curiam) ("Pursuant to the doctrine of prudential mootness, we may exercise our discretion and decline to grant declaratory relief in the context of a controversy that has become 'so attenuated that considerations of prudence and comity . . . counsel the court to stay its hand, and to withhold relief it has the power to grant.'") (quoting *Chamber of Com. v. U.S. Dep't of Energy*, 627 F.2d 289, 291 (D.C. Cir. 1980)); *see Rosen v. Mercedes-Benz USA, LLC*, 2022 WL 20766104, at *2 (N.D. Ga. Nov. 1, 2022) ("Because Plaintiffs seek damages here, the Court declines to apply the doctrine of prudential mootness."); *Leon*, 301 F. Supp. 3d at 1218 (holding that prudential mootness does not apply where plaintiffs seek "recovery for losses in market value"). This is because the doctrine rests on "the court's discretionary authority to grant or withhold injunctive

---

[14] *Cole* also distinguished the primary authority upon which *Earl* relied, *Rivera v. Wyeth-Ayerst Laboratories*, 283 F.3d 315 (5th Cir. 2002), yet *Earl* failed to address *Cole*, raising questions about *Earl*'s precedential value even within the Fifth Circuit, given the prior panel rule. *Burge v. Parish of St. Tammany*, 187 F.3d 452, 466 (5th Cir. 1999).

and declaratory relief." *Chamber of Com.*, 627 F.2d at 292. In this case, by contrast, "Plaintiffs would be left without complete relief" if their case were dismissed: the overpayment damages they claim go beyond what FCA's recall offered. *Rosen*, 2022 WL 20766104, at *2; *see Bolton v. Ford Motor Co.*, 2024 WL 3328522, at *5 (D. Del. July 8, 2024) ("Because Plaintiffs allege damages that exceed what is being offered under the 2023 recall, the Court agrees that dismissal on mootness grounds is unlikely."); *Patlan v. BMW of N. Am., LLC*, No. CV 18-CV-09546, 2024 WL 1328012, at *5 (D.N.J. Mar. 28, 2024) ("Courts have routinely declined to apply this doctrine where plaintiffs seek not just equitable relief, but legal relief that exceeds what defendants are offering through a recall."); *McMahon v. Volkswagen Aktiengesellschaft*, No. 22CV01537 (EP) (JSA), 2023 WL 4045156, at *9 (D.N.J. June 16, 2023) ("the prudential mootness doctrine does not confer discretion on the Court to dismiss legal claims.") (internal quotation marks omitted).

The limitation of this doctrine to requests for declaratory and injunctive relief is evident in two cases FCA heavily relies on, *Hadley v. Chrysler Group, LLC*, 624 F. App'x 374, 379 (6th Cir. 2015), and *Winzler v. Toyota Motor Sales USA, Inc.*, 681 F.3d 1208, 1209 (10th Cir. 2012). The plaintiffs only sought "equitable relief" in *Winzler*, 681 F.3d at 1209, and the discussion of prudential mootness in *Hadley* only applied to "claims for injunctive and declaratory relief," 624 F. App'x at 379. For this reason, courts in this circuit have repeatedly rejected arguments like FCA's attempting to extend *Hadley*, *Winzler*, and the prudential mootness doctrine to claims for monetary relief. *See, e.g. Leon v. Cont'l AG*, 301 F. Supp. 3d 1203, 1219 (S.D. Fla. 2017) (holding that *Winzler* is "unpersuasive where plaintiffs seek recovery for losses in market value"); *McCabe v. Daimler AG*, 2015 WL 11199196, at *4–5 (N.D. Ga. Aug. 19, 2015) (distinguishing *Winzler* and *Hadley* on the same grounds).

These cases are also factually distinguishable. In both *Hadley* and *Winzler*, the plaintiffs sought damages to compensate them for the cost of repair. *Hadley*, 624 F. App'x at 376; *Winzler*, 681 F.3d at 1209. That is a different category of damages, as Plaintiffs' claim that they overpaid for their vehicles at the point of sale. In addition, while the plaintiffs in *Hadley* alleged that they suffered monetary harm from the diminished value of their car, the Sixth Circuit did not credit that fact because the defendant "did not manufacture the plaintiffs' vehicle." 624 F. App'x at 378. Here, by contrast, FCA did manufacture Plaintiffs' vehicles. The *Hadley* plaintiffs also "presented no evidence of diminished value." 624 F. App'x at 378. As explained in detail above, Dr. Dubé's expert report provides such evidence here: Dr. Dubé's conjoint surveys expressly informed

participants that the defective airbags would be replaced for free in the future and measured the impact of the time until repair on the amount of overpayment. (D.E. 4338-199 (Dubé Rept.) ¶ 49 n.60.)

FCA also cites a number of distinguishable district court cases that misapplied the prudential mootness doctrine. Every single one of these cases arose on a motion to dismiss.[15] But when faced with a record at summary judgment containing evidence that the plaintiffs suffered damages beyond the cost of repair—as Plaintiffs have presented here—courts, even in the Districts receptive to the doctrine, have refused to dismiss cases as prudentially moot. *See Crawford v. FCA US LLC*, No. 2:20-CV-12341, 2024 WL 919830, at *4 (E.D. Mich. Mar. 4, 2024) (rejecting prudential mootness argument at summary judgment because "[d]iminished value damages are measured by the difference between the value of the goods as accepted and the value of the goods as warranted. Whether the defect was repaired will not impact the value of the goods as warranted").

In addition, with one exception, all of these cases come from outside of the Eleventh Circuit, in which *Ingaseosas*—which recognized that prudential mootness applies in the unique context of claims for declaratory relief—is at least persuasive authority.[16] That exception, *Ward-Richardson*, mechanically applies *Hadley* without acknowledging any of that case's distinguishing factors, discussed above. *Ward-Richardson*, 690 F. Supp. 3d at 1378. In addition, *Ward-Richardson* does not seriously grapple with the authority that supports Plaintiffs. Attempting to distinguish *McCabe*, which also hails from within the Eleventh Circuit, *Ward-Richardson* says:

---

[15] *Diaz v. Ford Motor Co.*, 2023 WL 6164455 (E.D. Mich. Sept. 21, 2023); *Ward-Richardson v. FCA US LLC*, 690 F. Supp. 3d 1372 (N.D. Ga. 2023); *Pacheco v. Ford Motor Co.*, 2023 WL 2603937 (E.D. Mich. Mar. 22, 2023); *Charlton v. LG Energy Sol. Mich., Inc.*, 2023 WL 1420726 (S.D. Cal. Jan. 31, 2023); *Sharp v. FCA US LLC*, 637 F. Supp. 3d 454 (E.D. Mich. 2022); *Flores v. FCA US LLC*, 2020 WL 7024850 (E.D. Mich. Nov. 30, 2020).

[16] In the Eleventh Circuit, "[u]npublished opinions are not considered binding precedent, but they may be cited as persuasive authority." 11th Cir. R. 36-2. Courts in this District frequently rely on unpublished opinions in the absence of controlling authority to the contrary. *See, e.g.*, *CE-1709 Midland Trail Shelbyville, KY, LLC v. Redstone, LLC*, 2022 WL 22839793, at *2 (S.D. Fla. Sept. 16, 2022) ("[W]hile *Stone* is not a published opinion, the Court relies on it as persuasive authority."); *Horowitz v. Allied Marine, Inc.*, 2023 WL 3568113, at *6 n.10 (S.D. Fla. May 19, 2023) ("Because *Herman* is persuasive authority, we'll follow our Circuit's pronouncements . . . ." (internal citation omitted)).

"[T]he *McCabe* court did not definitively hold that the prudential mootness doctrine *could never* apply to claims seeking monetary relief—it found only that the doctrine did not apply to the unique facts presented in *that* case." *Id.* That would be a surprise to the *McCabe* court, which stated (as Plaintiffs do above) that *Winzler* and *Cheng* are distinguishable because they "did not involve claims for money damages but instead sought injunctive relief." *McCabe*, 2015 WL 1199196, at *5. In addition, *McCabe* noted that where plaintiffs "plead[] that they realized a diminished value in their vehicles due to [an] alleged defect"—and they support that claim with evidence, contrary to the plaintiffs in *Hadley*—prudential mootness does not apply. *Id.* Here, Plaintiffs have proffered evidence that FCA's recall did not redress their overpayment damages, so the prudential mootness doctrine does not apply.

## III.   GENUINE ISSUES OF MATERIAL FACT PRECLUDE SUMMARY JUDGMENT ON THE ADDITIONAL ISSUES IN FCA'S MOTION

### A.   Genuine Issues of Material Fact Preclude Summary Judgment on FCA's Liability for Plaintiffs' Fraud and Consumer Protection Claims.

#### 1.   Triable Issues of Fact Exist as to FCA's Affirmative Misrepresentations.

FCA first argues that the Georgia Plaintiffs (Ms. Gibson and Ms. Johnson) and North Carolina Plaintiff (Ms. O'Neal) cannot prove their common law and consumer protection fraud claims based on misrepresentations because FCA purportedly made no such misrepresentations.[17] But FCA is mistaken. As an initial matter, FCA cannot dispute that it broadly disseminated marketing and advertising materials uniformly promoting its Class Vehicles as safe and outfitted with functioning airbags, including on Monroney Labels. (D.E. 4246 at 5–9.) Under these facts, a jury can reasonably infer reliance by Plaintiffs on affirmative misstatements made by FCA in its pervasive and false marketing campaign. *See Tobacco II Cases*, 207 P.3d 20, 40 (Cal. 2009) (holding that "where, as here, a plaintiff alleges exposure to a long-term advertising campaign, the plaintiff is not required to plead with an unrealistic degree of specificity that the plaintiff relied on particular advertisements or statements").

Indeed, FCA cites no authority requiring a plaintiff in a class action lawsuit to recall a

---

[17] As before, Plaintiffs believe that FCA has waived its instant arguments regarding the Georgia and North Carolina Plaintiffs' claims because, in its original motion for summary judgment, FCA never specifically moved for judgment on them. (D.E. 4246 at 41 (arguing waiver because FCA limited its state-specific arguments to states other than North Carolina and Georgia).)

specific misstatement made years in the past when it is undisputed that the defendant engaged in a false, uniform, and pervasive advertising campaign, as FCA did here, with respect to the safety of its vehicles and the airbags contained therein. The cases FCA relies on are inapposite. In *Bodie v. Purdue Pharma Co.*, 236 F. App'x 511 (11th Cir. 2007), a case that does not even deal with the state laws at issue, the court affirmed summary judgment against a plaintiff who only offered "highly general testimony that [the defendant] stated (in an unavailable document and on an unavailable website) that [its product] was safe and non-addictive." *Id.* at 526. In *Brazil v. Janssen Research & Development LLC*, 249 F. Supp. 3d 1321 (N.D. Ga. 2016), the court similarly granted summary judgment against a plaintiff who "d[id] not identify any statements that were misrepresentations." *Id.* at 1339. In *Breeden v. Richmond Community College*, 171 F.R.D. 189 (M.D.N.C. 1997), the court did not even deal with misrepresentations; rather, the plaintiff raised a fraud claim based on concealment. *Id.* at 195–96. In *Allison v. McGhan Medical Corp.*, 184 F.3d 1300, 1308 (11th Cir. 1999), the plaintiff admitted that she never received *any* statements directly from the defendant. And finally in *Jimenez v. Houseboat on Lanier, Inc.*, 899 S.E.2d 334, 338-9 (Ga. Ct. App. 2024), reliance on extra-contractual representations was unreasonable as a matter of law because the plaintiff had signed a purchase agreement with merger and "as is" clauses.

Here, in contrast, Plaintiffs have produced evidence of (1) Monroney labels that were affixed to each Class Vehicle that falsely and uniformly represented that the installed airbags were safety-enhancing devices, (2) deposition testimony from FCA's corporate representative about the contents of its marketing campaigns, and (3) an appendix of more than 100 misleading statements by FCA indicative of the uniform message that it disseminated. (D.E. 4246 at 5–9.) Plaintiffs have therefore presented the key evidence that was missing in *Bodie* and *Brazil*, and under both Georgia and North Carolina law, a jury may infer that the Plaintiffs relied on FCA's uniform and pervasive marketing campaign. *See Aetna Cas. & Sur. Co. v. Cantrell*, 399 S.E.2d 237, 238 (Ga. Ct. App. 1990) (holding that scheme involving "wide-spread distribution" of the same printed misrepresentation "will authorize initiation of a class action on behalf of those recipients who were collectively misled thereby"); *In re TD Bank, N.A. Debit Card Overdraft Fee Litig.*, 325 F.R.D. 136, 161 (D.S.C. 2018) (applying North Carolina law and allowing reliance to be proved by circumstantial evidence where the misrepresentation "was uniformly made").

Furthermore, each of the Georgia and North Carolina Plaintiffs have, in fact, identified misrepresentations by FCA that they viewed and relied on before purchasing their vehicles.

Georgia Plaintiff Gibson recalled viewing and hearing commercials through the radio, television, and internet that touted the safety and dependability of FCA's vehicles, and while she did not recall specific commercials, she did view and hear these commercials prior to purchasing the 2010 Dodge Charger. (PSOF ¶ 78.) Ms. Gibson also stated that she "relied on" FCA's misrepresentations because safety was her "number one top concern." (*Id.* ¶ 110.) Safety was also Georgia Plaintiff Johnson's most important concern, and before her purchase, she researched the Dodge Charger's safety features, and was advised by a salesperson who worked for an FCA-authorized dealer, that she "was making a great choice." (*Id.* ¶¶ 91, 115.) As for North Carolina Plaintiff O'Neal, safety was again a consideration, and contrary to FCA's erroneous assertion, she did in fact review the Monroney sticker for her Dodge Charger before purchase. (*Id.* ¶ 102.) She also discussed the vehicle's safety features with the dealership's sales representative. (*Id.*).

FCA cites to this Court's Order regarding class certification as to Georgia purchasers (D.E. 4688) to claim that FCA made no actionable representations to either Georgia Plaintiffs Gibson or Johnson. (D.E. 4797 at 23 n.12, 24 n.13.) In this ruling, the Court found that class members were exposed to "myriad different representations . . . that were conveyed through different mediums." *In re Takata Airbag Prod. Liab. Litig.*, 2023 WL 5625652, at *3 (S.D. Fla. Aug. 24, 2023). But the Court noted that Plaintiff Gibson "recalled viewing commercials through television and internet that touted the safety and dependability of FCA's vehicles in general prior to her purchase." *Id.* In addition, the factual record contains evidence that Plaintiff Johnson researched her vehicle prior to purchase. (PSOF ¶ 91.) Clearly, these disputed facts militate against summary judgment. *See In re 3M Combat Arms Earplug Products Liab. Litig.*, 679 F. Supp. 3d at 1326 (denying summary judgment upon finding "evidence to raise a triable question of fact as to whether Irizarry reasonably relied on Defendant's alleged misrepresentations").

Finally, FCA argues that there can be no presumption of reliance for Plaintiff O'Neal under North Carolina law. This is incorrect: "classwide proof—that the alleged misrepresentation is material and was made in a generally uniform manner to all class members—would . . . suffice in North Carolina to show actual reliance." *Rikos v. Procter & Gamble Co.*, 799 F.3d 497, 518 (6th Cir. 2015); *see also Takata*, 2023 WL 5625652, at *4 & n.2 (citing *Rikos* and reaffirming certification of class under North Carolina Unfair and Deceptive Trade Practices Act). As a factual matter, whether reliance should be presumed is at least a jury question. Plaintiff O'Neal testified that prior to purchase, she reviewed the vehicle's sticker, which disclosed information regarding

its airbags. (PSOF ¶¶ 102,103.) She also made clear that in purchasing the vehicle safety was a concern, and particularly the vehicle's airbags in the event of crash. (*Id.*) The evidence is thus at least disputed as to her reliance, and summary judgment is not warranted.[18]

### 2. Triable Issues of Fact Exist as to FCA's Duty to Disclose.

FCA next argues that Plaintiffs Gibson (Georgia) and O'Neal's (North Carolina) omission-based fraud claims fail under their respective state laws.[19] Again, FCA is mistaken.

FCA first claims that under Georgia law, a duty to disclose only arises "in a confidential or special relationship," and here, there was no such relationship between Ms. Gibson and FCA. (D.E. 4797 at 25.) But this Court has twice rejected FCA's argument that it had no duty to disclose, holding that "special circumstances" support the existence of a duty to disclose under Georgia law because individuals like Plaintiff Gibson "could not protect themselves no matter how much diligence they performed because of the hidden nature of the inflator defect." *In re Takata Airbag Prods. Liab. Litig.*, 524 F. Supp. 3d 1266, 1289 (S.D. Fla. 2021). Indeed, a confidential or special relationship does not need to exist before a duty to disclose may be imposed. Instead, the "[s]uppression of a material fact which a party is under an obligation to communicate constitutes fraud. The obligation to communicate may arise from the confidential relations of the parties or from the particular circumstances of the case." O.C.G.A. § 23-2-53 (emphasis added).

Consistent with these principles, various courts applying Georgia law find that a duty to disclose may exist outside a confidential or special relationship. *See Amin v. Mercedes-Benz USA, LLC*, 301 F. Supp. 3d 1277, 1296 (N.D. Ga. 2018) ("The particular circumstances of the case may give rise to an obligation to communicate where there is a concealment of intrinsic qualities of the article which the other party by the exercise of ordinary prudence and caution could not discover." (internal quotation marks omitted)); *Monopoli v. Mercedes-Benz USA, LLC*, 2022 WL 409484, at *12 (N.D. Ga. Feb. 10, 2022); *see also Persad v. Ford Motor Co.*, 2018 WL 3428690, at *3 (E.D.

---

[18] In the case FCA cites, the plaintiff did not allege reliance on any statements made by defendants. *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1308 (11th Cir. 1999). Here, by contrast, Plaintiff O'Neal testified that she remembered seeing commercials about the Dodge Charger before buying it and that the salesperson at the dealership told her about the safety vehicles of the car. (PSOF ¶¶ 117, 123.)

[19] While FCA does not address Plaintiff Johnson's (Georgia) omission-based fraud claims, any such arguments would fail for the same reasons FCA's arguments against Plaintiff Gibson's (Georgia) do.

Mich. July 16, 2018) ("As to Defendant's alleged superior knowledge, . . . Georgia recognize[s] a duty to disclose where a defendant has exclusive and superior knowledge.").

Here, there are numerous facts that show FCA had superior knowledge of the Inflator Defect, that it concealed that information from consumers like Ms. Gibson when it pervasively and uniformly marketed its Class Vehicles as safe and outfitted with functioning airbags, and that no reasonable consumer could have discovered the latent Inflator Defect before purchase. (D.E. 4246 at 14–20.) This evidence distinguishes this case from those cited by FCA, in which there was no record evidence that the parties had ever communicated or interacted before purchase. *See e.g., McCabe v. Daimler AG*, 160 F. Supp. 3d 1337, 1352 (N.D. Ga. 2015); *Brown v. Hyundai Motor Am.*, 2019 WL 4126710, at *8 (D.N.J. Aug. 30, 2019).

At the very least, there is "a triable issue of fact as to whether the 'particular circumstances' of this case warrant an imposition of a duty to disclose" under Georgia law. *In re 3M Combat Arms Earplug Prods. Liab. Litig.*, 2021 WL 753563, at *7 (N.D. Fla. Feb. 2, 2021).

The court in *Persad* similarly recognized that under Georgia law, "'the existence of a duty to disclose must be measured by the specific facts of the case' revealed during discovery," and distinguished *McCabe*, a case which FCA relies upon for this point. *Persad*, 2018 WL 342869, at *3 (quoting *McCabe*, 160 F. Supp. at 1350)). This conclusion is reinforced by the fact that the defect is safety-related. *See In re Volkswagen Timing Chain Prod. Liab. Litig.*, 2017 WL 1902160, at *20 (D.N.J. May 8, 2017) (noting that Georgia law imposes "a duty to disclose safety defects").

The result does not change for the Plaintiff O'Neal (North Carolina). FCA contends that a "fiduciary relationship" must exist before a court imposes a duty to disclose. (D.E. 4797 at 25.) The very case FCA cites for this proposition, however, recognizes that a duty to disclose may arise where "there is no fiduciary relationship and a party has taken affirmative steps to conceal material facts from the other" or where "there is no fiduciary relationship and one party has knowledge of a latent defect in the subject matter of the negotiations about which the other party is both ignorant and unable to discover through reasonable diligence." *Hardin v. KCS Int'l, Inc.*, 682 S.E.2d 726, 733 (N.C. Ct. App. 2009) (quotation marks omitted). Both circumstances readily apply here. Again, the evidence shows that FCA knew about and concealed the defect for years, and no reasonable consumer would have been able to discover the defect before purchase. (D.E. 4246 at 14–20.)

Moreover, FCA's arguments that it did not interact with, or take affirmative steps to

conceal information from, the Georgia and North Carolina Plaintiffs are likewise misleading. As discussed directly above, *see supra* § III.A.1, Plaintiffs all testified that they were exposed to and relied on FCA's misleading, uniform, and pervasive marketing campaign. As a result, whether omission-based or misrepresentation-based, all of the Georgia and North Carolina Plaintiffs' fraud claims should survive summary judgment.

### B.   Genuine Issues of Material Fact Preclude Summary Judgment on the Adequacy of the Georgia Plaintiffs' Presuit Notice.

FCA argues that Plaintiffs' Georgia Fair Business Practices Act claims should be dismissed because the Georgia Plaintiffs did not provide notice to FCA of their claims 30 days before filing suit. (D.E. 4797 at 26.) Plaintiffs' counsel sent FCA several letters providing statutory notice in late 2017 and early 2018, more than 30 days before the Georgia Plaintiffs' claims were filed against FCA. (PSOF ¶¶ 83, 95.) At the very least there is a genuine dispute of material fact regarding whether adequate pre-suit notice was provided to FCA, and this dispute should not be resolved on a motion for summary judgment. *See, e.g.*, *In re MyFord Touch Consumer Litig.*, 46 F. Supp. 3d 936, 976 (N.D. Cal. 2014); *Persadord Motor Co.*, 2018 WL 3428690, at *4 (E.D. Mich. July 16, 2018) (same); *see also Bank of Am., N.A. v. Cortez Heights Homeowners Ass'n*, 2020 WL 4227555, at *5 (D. Nev. July 23, 2020).

### C.   Genuine Disputes of Material Fact Preclude Summary Judgment on the Timeliness of Plaintiff Gibson's Claims.

FCA argues that Plaintiff Gibson's claim under the Georgia Fair Business Practices Act (Count 17) is barred by a two-year statute of limitations. (FCA does not contest that Georgia Plaintiff Johnson's claim under the same statute is timely.) "It is beyond dispute that" FCA bears the burden of proof to show that Plaintiff Gibson brought her claims outside of the statute of limitations. *Smith v. Duff & Phelps, Inc.*, 5 F.3d 488, 494 n.9 (11th Cir. 1993). FCA has not carried that burden here.

FCA's argument concerning Plaintiff Gibson's claim under the Georgia Fair Business Practices Act presumes that the limitations clock began running when FCA first mailed her a recall notice in July 2015. That assumption is inconsistent with this Court's earlier ruling rejecting the same argument in the context of FCA's motion to dismiss. *See In re Takata Airbag Prod. Liab. Litig.*, 464 F. Supp. 3d 1291, 1305 (S.D. Fla. 2020) ("Aside from summarily asserting the date the recall was announced and the date Reynolds's claim should have expired, FCA advances no

argument regarding when Reynolds actually received notice of the recall. And, as Plaintiffs contend, 'though the relevant recall was announced on December 9, 2016, it does not follow as a matter of law that Plaintiff Reynolds received notice on that date.'"). FCA cites no evidence establishing that Plaintiff Gibson received the notice at that time, or that the notice provided Plaintiff Gibson with sufficient information to trigger the limitations period. Moreover, Gibson testified that she did not receive a recall notice until mid- to late-2017 (PSOF ¶ 82), less than two years before she filed suit in 2018, which at a minimum gives rise to a disputed issue of fact.

In addition, FCA confuses the statute of limitations for Plaintiff Gibson's claim under the Georgia Uniform Deceptive Trade Practices Act (Count 18). A four-year statute of limitations applies to that claim, so Plaintiff's claim under the statute is timely, regardless of the timing of the recall notice. *See Wika Instrument I, LP v. Ashcroft, Inc.*, 2015 WL 11199059, at *15 (N.D. Ga. July 10, 2015) ("[A] four-year statute of limitations applies to GUDTPA claims.").

## IV. THE COURT SHOULD DENY FCA'S MOTION FOR SUMMARY JUDGMENT AS TO THE ADDITIONAL STATES.

FCA also asks the Court to grant summary judgment as to the fraud-based claims in Colorado, Utah, West Virginia, and Wisconsin (the "Additional States"). (D.E. 4797 at 27–32.) The Court should reject FCA's arguments and hold that triable questions of liability and damages exist for the claims under the law of each state.

### A. In the Additional States, Plaintiffs Suffer Fraud Damages When They Pay More Than the Value of What They Received at the Point of Sale.

First, FCA renews its *Daubert*-lite argument that Plaintiffs' fraud-based claims in the Additional States fail for lack of damages. (D.E. 4797 at 27–31.) For similar reasons to those explained above in the context of Georgia and North Carolina, the measure of fraud-based damages in these states makes clear that plaintiffs who overpaid for a defective automobile still have a pocketbook injury even if the automaker later issues a recall.[20]

**Colorado**: In Colorado, the measure of damages for a fraud claim is "the difference between the value of benefits actually received under the contract and the value such benefits

---

[20] FCA also makes the argument that for each state, the typical measure of damages does not apply because (supposedly) under Plaintiffs' damages model FCA is an unwilling seller. (D.E. 4797 at 28 n.16, 29 n.17, 30 n.19, 31 n.20.) As set out above, the cases that FCA cites do not support disregarding Plaintiffs' damages model, and Plaintiffs' benefit-of-the-bargain damages model does not treat FCA as an unwilling seller. *See supra* § I.A.

would have had if the false representations had been true." *Club Matrix, LLC v. Nassi*, 284 P.3d 93, 96 (Colo. App. 2011) (quotations omitted); *see also JW Constr. Co. v. Elliott*, 253 P.3d 1265, 1272 (Colo. App. 2011) ("The measure of damages in a fraud action is the difference between the actual value of the benefits received and the value of those benefits if they had been as represented."). Far from being a cap on recoverable damages, the cost of repair in Colorado is just an option: "With respect to the fraud and breach of warranty claims, plaintiff had a choice of remedies. He could have disaffirmed the contract and sought recission; or he could have affirmed the contract and claimed monetary damages based either on (1) the difference in value between the car he received and a 'new' car, or (2) the cost of repairing the alleged defects." *Witters v. Daniels Motors, Inc.*, 524 P.2d 632, 635 (Colo. App. 1974).

Both of the cases FCA cites involved property destruction—not fraud claims. Thus, whatever these cases have to say about the measure of damages simply does not apply. But even in property injury cases, as the case that FCA cites demonstrates, Colorado permits plaintiffs to recover damages in addition to the cost of repair when a repair does not fully compensate the plaintiffs—as the evidence here demonstrates. *Airborne, Inc. v. Denver Air Ctr., Inc.*, 832 P.2d 1086, 1092–93 (Colo. App. 1992) ("If damaged property is repairable, the plaintiff is entitled to the reasonable costs of repair ***together with*** the decrease in market value to the property as repaired.") (emphasis added).

**Utah**: In Utah, the "[m]easure of damages for fraud is the difference between the value of the property purchased and the value it would have had if the representations were true." *Pace v. Parrish*, 247 P.2d 273, 277 (Utah 1952); *accord Dilworth v. Lauritzen*, 424 P.2d 136, 137–38 (Utah 1967) ("Utah follows the majority rule [for damages for fraud claims], which is the difference between the actual value of what he received and the value thereof if it had been as represented."). The case that FCA cites, *Leishman v. Kamas Valley Lumber Co.*, 427 P.2d 747, 747 (Utah 1967), involved neither fraud nor even an automobile. Instead, it involved a breach of warranty claim for the structural failure of construction beams that broke under the weight of snow. *Id.* Again, an inapplicable property destruction case.

**West Virginia**: The law of West Virginia on this point is no different than the other states at issue: the measure of damages for fraud "is the difference between the actual value of the property received and the value if it had been as represented." *Stout v. Martin*, 104 S.E. 157, 159 (W. Va. 1920); *accord In re Gen. Motors Ignition Switch Litig.*, 339 F. Supp. 3d 262, 301

(S.D.N.Y. 2018) (applying West Virginia law). FCA cites *Brooks v. City of Huntington*, 768 S.E.2d 97 (W. Va. 2014), but the decision undercuts its argument. There, the court recognized that cost of repair does not limit recoverable damages when the repair does not provide full compensation. *Id*. at 108 (holding that plaintiff "may recover both the cost of repair and for such remaining diminution in value" when the plaintiff "can establish that the pre-damage fair market value of the residential real property cannot be fully restored by repairs"). As the West Virginia court reasoned, "[t]he rationale behind permitting this variation from the general rule is that 'residual' diminution in value is not duplicative of the cost of repair, i.e., the property still has lost value even after it is repaired." *Id*. at 106. FCA also cites *Ellis v. King*, 400 S.E.2d 235 (W. Va. 1990), which actually holds that in the case of a damaged motor vehicle, damages for diminution in value are permitted "in addition to the cost of repair." *Id.* at 239.

**Wisconsin**: Finally, in Wisconsin, "[b]enefit of the bargain damages for intentional misrepresentation measure the difference between the value of the property as represented and its actual value as purchased." *Chitwood v. A.O. Smith Harvestore Prod., Inc*., 489 N.W.2d 697, 706 (Wis. Ct. App. 1992); *accord Betterman v. Fleming Companies, Inc.*, 677 N.W.2d 673, 681 (Wis. Ct. App. 2004) ("The measure of damages for intentional misrepresentation is the benefit of the bargain. Under the benefit of the bargain rule, a plaintiff is entitled to damages equivalent to what the plaintiff would have received if the representation had been true.") (citations omitted).

The cases that FCA cites, in contrast, do not involve fraud claims. *Laska v. Steinpreis*, 231 N.W.2d 196, 200 (Wis. 1975), is a landlord-tenant case involving injury to property. *Blodgett v. State Farm Mut. Auto. Ins. Co*., 646 N.W.2d 854, 2002 WL 664157, at *1 (Wis. Ct. App. 2002), involved a claim "for damage to property," not a fraud claim. Finally, *Crawford v. FCA US LLC*, 2024 WL 919830 (E.D. Mich. Mar. 4, 2024), concerned a breach of contract claim where plaintiff sought consequential damages. *Id.* at *7. Unsurprisingly, the Wisconsin case *Crawford* cited set out the measure of damages pursuant to black-letter law of contract and warranty—not fraud. *See State Farm Mut. Auto. Ins. Co. v. Ford Motor Co.*, 592 N.W.2d 201, 206 (Wis. 1999).

### B.   Car Owners in Utah and Wisconsin Do Not Need to Wait for Their Airbags to Explode Before Bringing a Fraud Claim.

On numerous occasions, the Court has rejected the argument that Plaintiffs' common law fraud claim should fail because the Inflator Defect has not manifested: "[i]f Takata had installed grenades in its airbags that may or may not explode on impact[,] a court would not require an

explosion to demonstrate manifestation of a defect." *In re Takata Airbags Prods. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016).[21] FCA does not even attempt to explain why the Court should change course now. Nor could it, as Plaintiffs have raised a genuine issue of material fact as to its allegations that the airbags used in FCA Class Vehicles contain "innately unstable ammonium nitrate, and thus create an unreasonable and imminent risk of injury to vehicle occupants" and that this defect is uniform and manifest across every Class Vehicle. *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1123–24 (S.D. Fla. 2019); PSOF (D.E. 4253) ¶¶ 403–16 (serious, uniform safety hazard posed by the use of ammonium nitrate in airbags); ¶¶ 426–28 (failure by Takata to mitigate the Inflator Defect, including in FCA Class Vehicles); ¶¶ 440–44 (expert testimony on the dangers of ammonium nitrate in airbags); id. ¶¶ 445–50 (field incidents involving FCA vehicles). There is nothing unique about the law of Utah or Wisconsin that requires a different result in those states.

**Utah**: FCA's only authority for Utah is a district court case later vacated on mootness grounds. *See Winzler v. Toyota Motor Sales USA, Inc.*, 2010 WL 3064364, at *2–3 (D. Utah Aug. 3, 2010), *vacated*, 681 F.3d 1208. Regardless, *Winzler* is inapposite because the plaintiffs did not allege common law fraud claims, requested only equitable relief, and pled only potential future harm stemming from the defect.[22] *Id.* at *1–2. In contrast, Plaintiffs here properly allege overpayment damages, which accrue at the point of purchase and are not grounded in speculative future harm. *See, e.g.*, *Pace v. Parrish*, 247 P.2d 273, 277 (Utah 1952) (stating that, in Utah, the

---

[21] See, e.g., *In re Takata Airbag Prod. Liab. Litig.*, 193 F. Supp. 3d 1324, 1335 (S.D. Fla. 2016) (rejecting Mazda's manifestation argument); *In re Takata Airbag Prod. Liab. Litig.*, 255 F. Supp. 3d 1241, 1258 (S.D. Fla. 2017) (rejecting Honda's manifestation of defect argument "[c]onsistent with the Court's Mazda Order"); *In re Takata Airbag Prod. Liab. Litig.*, 2017 WL 2406711, at *10 (S.D. Fla. June 1, 2017) (same as to Takata); *In re Takata Airbag Prod. Liab. Litig.*, 2017 WL 775811, at *4 (S.D. Fla. Feb. 27, 2017) (same as to Ford); *In re Takata Airbag Prod. Liab. Litig.*, 2016 WL 5848843, at *5 (S.D. Fla. Sept. 21, 2016) (same as to Toyota); *In re Takata Airbag Prod. Liab. Litig.*, 2016 WL 6072406, at *10 (S.D. Fla. Oct. 14, 2016) (same as to BMW); *In re Takata Airbag Prod. Liab. Litig.*, 396 F. Supp. 3d 1101, 1123 (S.D. Fla. 2019) (same as to Volkswagen, Mercedes, and GM).

[22] FCA disputes this by pointing to an aside in *Winzler* that the plaintiff "seem[ed] to claim that the potential defect in the engine has damaged her economically." (D.E. 4797 at 29 n.18 (quoting *Winzler*, 2010 WL 3064364, at *2 n.1).) The complaint in that case brought only claims for products liability and breach of warranty—not fraud. Class Action Complaint, *Winzler v. Toyota Motor Sales, U.S.A., Inc.*, 2010 WL 1626702 (D. Utah. Jan. 13, 2010). Thus, *Winzler* has nothing to say about economic damages in a fraud action like this one.

"[m]easure of damages for fraud is the difference between the value of the property purchased and the value it would have had if the representations were true").

    **Wisconsin**: Because the Inflator Defect has manifested, the Wisconsin authority that FCA cites is inapposite. *Tietsworth v. Harley-Davidson*, 677 N.W.2d 233, 237 (Wis. 2004) (rejecting claims for diminution in value due to a "propensity" for premature engine failure).[23] Here, Plaintiffs seek compensation for present injury in the form of overpayment damages, defined as "the difference between the value of the property as represented and its actual value as purchased." *Mueller v. Harry Kaufmann Motorcars, Inc.*, 859 N.W.2d 451, 458–59 (Wis. Ct. App. 2014) (emphasis added). When a plaintiff buys a product that is defective at the time of sale, benefit of the bargain damages accrue at the point of purchase. *Id.* This theory of damages applies to Plaintiffs' Wisconsin fraud claim. *See Jersild v. Aker*, 775 F. Supp. 1198, 1206 (E.D. Wis. 1991) ("On an intentional misrepresentation claim, the typical measure of damages is determined by the benefit of the bargain rule.") (cleaned up).

### C.    <u>Wisconsin Recognizes a Duty to Disclose in Consumer Transactions.</u>

    Finally, as discussed above, the named Plaintiffs have already shown that a court may find a duty to disclose under the circumstances of this case. The evidence demonstrates that FCA had superior knowledge of the Inflator Defect and deliberately concealed it. (D.E. 4516 (Resp. to Second SJ) at 17.) Further, the evidence shows that FCA disclosed partial information about its airbags, when it uniformly and pervasively marketed its vehicles as safe with functioning airbags, as well as when it represented on its Monroney labels and other materials that those vehicles were equipped with safety-enhancing airbags. (D.E. 4253 (PSOF) ¶¶ 334–55, 393–408; D.E.4246 (Response to First MSJ) at 5–9.)

    The same is true in **Wisconsin**. FCA's case, *Tietsworth*, does not stand for the hardline rule that FCA invokes, i.e., that there is no duty to disclose in the sale of consumer goods (as opposed

---

[23] More generally, FCA's interpretation of *Tietsworth* is too expansive because its ultimate holding focuses on the economic loss rule, and it discusses manifestation only in dicta. See *Tietsworth*, 677 N.W.2d at 244 (holding that while many of plaintiffs' allegations are deficient, the claim that "all of the motorcycles with the TC–88s are defective and will prematurely fail" is "arguably sufficient to state a more particularized injury"). The remaining cases cited by FCA likewise overstate the holding of Tietsworth. *In re Gen. Motors LLC Ignition Switch Litig.*, 257 F. Supp. 3d 372, 438, 459 (S.D.N.Y. 2017), modified on reconsideration, 2017 WL 3443623 (S.D.N.Y. Aug. 9, 2017); *In re Toyota Motor Corp. Unintended Acceleration Mktg., Sales Pracs., & Prod. Liab. Litig.*, 785 F. Supp. 2d 925, 932 (C.D. Cal. 2011).

to business or real estate transactions). Instead, the *Tietsworth* court expressly left "open" the question of whether a duty to disclose could extend to the sale of consumer goods. 677 N.W.2d at 239. In the near 20 years since *Tietsworth* was decided, many courts have found a duty to disclose in the sale of consumer goods. *See Weaver v. Champion Petfoods USA In*c., 2019 WL 2774139, at *5 (E.D. Wis. July 1, 2019) (upholding duty to disclose in the sale of pet food, and noting that decisions after *Tietsworth* "provide quite broad descriptions of the duty to disclose" under Wisconsin law); *Schmidt v. Bassett Furniture Indus*., 2009 WL 3380354, at *10 (E.D. Wis. Oct. 20, 2009) (imposing duty to disclose on a furniture manufacturer absent "any reason why the same general principles [of a duty to disclose] would not apply to a consumer transaction"); s*ee also In re FCA US LLC Monostable Elec. Gearshift Litig*., 280 F. Supp. 3d 975 (E.D. Mich. 2017) (upholding Wisconsin fraudulent concealment claim where defendant FCA failed to disclose a safety defect).[24] This Court should reach the same conclusion and reject FCA's argument to the contrary.

## **CONCLUSION**

For the foregoing reasons, FCA's motion for summary judgment should be denied.

---

[24] FCA's lone citation, other than *Tietsworth*, is an out-of-state district court case that misread Wisconsin precedent and that pre-dates *Weaver. See Naparala v. Pella Corp.*, 153 F. Supp. 3d 884, 894 (D.S.C. 2015).

Dated: August 2, 2024

Respectfully submitted,

**PODHURST ORSECK, P.A.**

*/s/ Peter Prieto*
Peter Prieto (FBN 501492)
Aaron S. Podhurst (FBN 63606)
Stephen F. Rosenthal (FBN 131458)
Matthew P. Weinshall (FBN 84783)
Alissa Del Riego (FBN 99742)
SunTrust International Center
One S.E. Third Ave., Suite 2300
Miami, Florida 33131
Phone: (305) 358-2800
Fax: (305) 358-2382
Email: pprieto@podhurst.com
        apodhurst@podhurst.com
        srosenthal@podhurst.com
        mweinshall@podhurst.com
        adelriego@podhurst.com

***Chair Lead Counsel for Plaintiffs***

| **COLSON HICKS EIDSON** | **SMITH LACIEN LLP** |
|---|---|
| Lewis S. "Mike" Eidson<br>mike@colson.com<br>Curtis Bradley Miner<br>curt@colson.com<br>255 Alhambra Circle, PH<br>Coral Gables, FL 33134<br>T: 305-476-7400<br><br>*Plaintiffs' Personal Injury Track Lead Counsel* | Todd A. Smith<br>tsmith@smithlacien.com<br>70 W Madison St Suite 5770,<br>Chicago, IL 60602<br>(312) 509-8900<br><br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* |
| **BOIES, SCHILLER & FLEXNER LLP** | **LIEFF  CABRASER  HEIMANN  & BERNSTEIN LLP** |
| David Boies, Esq.<br>Motty Shulman (Fla Bar. No. 175056)<br>333 Main Street<br>Armonk, NY 10504<br>Tel:  (914) 749-8200<br>Fax: (914) 749-8300<br>Email: dboies@bsfllp.com<br>    mshulman@bsfllp.com<br><br>Stephen N. Zack (Fla. Bar No. 145215)<br>100 Southeast 2nd Street, Suite 2800<br>Miami, FL 33131<br>Tel:  (305) 539-8400<br>Fax:  (305) 539-1307<br>Email: szack@bsfllp.com<br>    mheise@bsfllp.com<br><br>*Plaintiffs' Economic Damages Track Co-Lead Counsel* | Elizabeth Cabraser<br>ecabraser@lchb.com<br>275 Battery St., Suite 3000<br>San Francisco, CA 94111-3339<br>T:    415-956-1000<br><br>David Stellings<br>250 Hudson Street, 8th Floor<br>New York, NY 10012<br>212-355-9500<br>dstellings@lchb.com<br><br>*Plaintiffs' Steering Committee* |

| **CARELLA BYRNE CECCHI OLSTEIN BRODY & AGNELLO, PC** | **BARON & BUDD, PC** |
|---|---|
| James E. Cecchi | Roland Tellis |
| jcecchi@carellabyrne.com | rtellis@baronbudd.com |
| 5 Becker Farm Road | David Fernandes |
| Roseland, NJ 07068-1739 | dfernandes@bardonbudd.com |
| T: 973 994-1700 | Mark Pifko |
| f: 973 994-1744 | mpifko@baronbudd.com |
| | 15910 Ventura Blvd., |
| | Suite 1600 |
| *Plaintiffs' Steering Committee* | Encino, CA 91436 |
| | T: 818-839-2333 |
| | |
| | J. Burton LeBlanc |
| | 9015 Bluebonnet Blvd. |
| | Baton Rouge, LA 70810 |
| | T: 225-761-6463 |
| | |
| | |
| | *Plaintiffs' Steering Committee* |

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on August 2, 2024, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF. I also certify the foregoing document is being served this day on all counsel of record via transmission of Notice of Electronic Filing generated by CM/ECF.

By: */s/ Peter Prieto* _____
　　　Peter Prieto