# EXHIBIT NO. 1

```
                                                              Page 1
 1
 2    UNITED STATES DISTRICT COURT
      SOUTHERN DISTRICT OF FLORIDA
 3    MIAMI DIVISION
      ------------------------------------------------
 4
 5
      IN RE:
 6
 7       TAKATA AIRBAG PRODUCTS
         LIABILITY LITIGATION
 8
      ------------------------------------------------
 9
      This Document Relates to
10    Whitaker et al. V.
      General Motors Co. et al.
11
12    MDL No. 2599
      Master File No. 15-MD-2599-MORENO
13    S.D. Fla. Case No. 1:14-cv-2409-FAM

      ------------------------------------------------
14
15                           September 8, 2020
                             11:03 a.m.
16
17
18
19          VIDEOCONFERENCE DEPOSITION of
20    TOMMY RIVERS, taken by Defendants,
21    pursuant to Notice, held at 1460 Barclay
22    Road, Alpine, Alabama before Wayne Hock, a
23    Notary Public of the State of New York.
24
25
```

|   |   |
|---|---|
|   | Page 64 |

```
                               T. Rivers
 1
 2        Q.    Do you recall about what year
 3   you stopped paying for OnStar?
 4        A.    I don't.
 5        Q.    When you initially purchased the
 6   Avalanche, was having OnStar important to
 7   you?
 8        A.    Yes.
 9        Q.    Why was having OnStar important
10   to your purchase?
11        A.    Well, any breakdowns on the
12   road, as opposed to the accident I had,
13   they had called the proper authorities to
14   help me in that situation.
15        Q.    So were you satisfied with the
16   performance of OnStar when you needed it?
17        A.    Yes.
18        Q.    I'd like to ask you some
19   questions about the research you did
20   before you purchased the Avalanche.
21              Do you recall about how long you
22   spent researching vehicles before you
23   purchased the Avalanche?
24        A.    I really don't remember because
25   it was collective effort with the wife and
```

Page 65

1                    T. Rivers
2    myself.
3         Q.    Would you say you were searching
4    for vehicles for multiple months?
5         A.    That would be close.
6         Q.    And do you recall how you went
7    about researching vehicles when you were
8    looking to purchase a car in 2010?
9         A.    She is the guru on that.  She
10   does all the LTVs, what they have leather
11   seats, what have you.
12        Q.    So I'll start with her.
13              Do you recall how she went about
14   researching vehicles?
15        A.    She would pull up a Chevrolet
16   net sales lots on the Internet, on her
17   laptop, and she would just go down the
18   list and pull up names and see what they
19   sold for, see what they had to offer, you
20   know, price-wise.
21        Q.    And do you recall what kind of
22   research you did when you would do
23   research before purchasing the Avalanche?
24        A.    Mine was none and nil.  We done
25   it as a collective unit.

```
                                            Page 69
 1                    T. Rivers
 2       Q.    And do you recall reviewing any
 3   advertisements about the Avalanche before
 4   you purchased the Avalanche?
 5       A.    No, I don't.
 6       Q.    Did you see any advertising for
 7   GM before purchasing the Avalanche?
 8       A.    No.
 9       Q.    Did you -- would you say that
10   you relied on any advertising when you
11   were making the decision to purchase the
12   Avalanche?
13       A.    No, no.
14       Q.    So besides the ratings that you
15   mentioned and the listings on the
16   Internet, was there any other information
17   you relied on when you were deciding which
18   car to purchase?
19       A.    No.
20       Q.    Do you recall how you decided to
21   purchase specifically from Harbin
22   Chevrolet?
23       A.    No, I don't remember.
24       Q.    Did you visit any other
25   dealership before you purchased the
```

Page 78

1                    T. Rivers
2        Q.    When you purchased the
3    Avalanche, did you receive an owner's
4    manual?
5        A.    Yes.
6        Q.    Do you recall if you read the
7    owner's manual?
8        A.    Yes.
9        Q.    Would you say you read the
10   entire thing or you only looked at a few
11   pages depending on what you needed to see?
12       A.    I did not read the whole thing.
13             MR. BHATTACHARYYA: I'm going to
14       mark the next exhibit.
15             (Whereupon, a document entitled
16       2009 Chevy Avalanche Owner Manual
17       was marked T Riv Exhibit 8
18       for identification.)
19       Q.    I'm showing you what's marked as
20   Exhibit T Riv 08.
21             Do you see that on my screen?
22       A.    Yes.
23       Q.    I'll represent to you that
24   Exhibit 8 is an excerpt from a document
25   produced by GM in this case.  That is the

```
                                                   Page 131
 1                      T. Rivers
 2   out whose money is whose inside your
 3   household?
 4        A.    No.
 5        Q.    And you have been the primary
 6   driver of this vehicle since it was
 7   purchased?
 8        A.    Correct.
 9        Q.    You were asked some questions
10   and you heard me objecting a lot and I
11   just want to clarify, you were asked if
12   you paid, the quote, the appropriate
13   amount for your car.  The word
14   "appropriate" was never defined for you
15   nor was it defined as to whether it was
16   appropriate at the time you purchased it
17   or appropriate now knowing what you do
18   about the defect in your car, so I want to
19   ask you some questions about that.
20        A.    Okay.
21              MR. BHATTACHARYYA: Objection.
22       Misstates testimony.
23        Q.    Had you known about the defect
24   in the passenger side airbag of your
25   vehicle at the time of purchase, would you
```

Page 132

```
 1                    T. Rivers
 2   have bought the truck?
 3        A.    No.
 4        Q.    And since you bought wouldn't
 5   have bought the truck, this next question
 6   probably doesn't make much sense, but if
 7   you were to buy the truck, would you have
 8   paid as much as you did?
 9        A.    No.
10        Q.    If I was the salesman back when
11   you bought your truck and I said, Mr.
12   Rivers, I have a crystal ball and let me
13   tell you, you are going to get two hundred
14   thousand miles out of your truck but there
15   is a defect in your passenger side airbag
16   that, if it happens, can cause serious
17   injury or death but I'll give you a great
18   deal.
19              Would you buy the truck?
20        A.    No.
21              MR. BHATTACHARYYA: Objection.
22        Form.
23        Q.    Is there any, quote unquote,
24   appropriate amount for your truck knowing
25   what you do about the defect?
```

Page 133

1      T. Rivers
2      A.    Is there any appropriate --
3      Q.    Appropriate amount that you
4  would have paid if you knew about this
5  defect?
6      A.    Yes.
7      Q.    I think we may be talking past
8  each other.
9            Had you known at the time you
10 purchased the car that there was a
11 defective airbag in the car, would you
12 have bought it for any sum of money?
13           MR. BHATTACHARYYA: Objection.
14    Asked and answered.
15           THE WITNESS:  No.
16     Q.    Now, based upon the defect in
17 your airbag, do you believe your car to be
18 worth less money if you were to trade it
19 in or sell it privately?
20     A.    Less money, it would be worth
21 less.
22     Q.    Okay.
23           And even though you couldn't
24 define for defense counsel how much less
25 that would be, is that something that you

Page 145

CERTIFICATION BY REPORTER

1
2
3
4     I, Wayne Hock, a Notary Public of the
5  State of New York, do hereby certify:
6     That the testimony in the within
7  proceeding was held before me at the
8  aforesaid time and place;
9     That said witness was duly sworn
10 before the commencement of the testimony,
11 and that the testimony was taken
12 stenographically by me, then transcribed
13 under my supervision, and that the within
14 transcript is a true record of the
15 testimony of said witness.
16    I further certify that I am not
17 related to any of the parties to this
18 action by blood or marriage, that I am not
19 interested directly or indirectly in the
20 matter in controversy, nor am I in the
21 employ of any of the counsel.
22    IN WITNESS WHEREOF, I have hereunto
23 set my hand this 22nd day of September, 2020.
24
25         *[Signature: Wayne Hock]*