# EXHIBIT A

Laquintha S. O'Neal
09/03/2020
1

Page 1

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF FLORIDA

MIAMI DIVISION

IN RE: TAKATA AIRBAG PRODUCT LIABILITY

LITIGATION

PRODUCTS LIABILITY LITIGATION

This Document Relates to All Economic Loss Class
Actions and:
_____X

BRIDGET BOYD, et al., individually and on behalf
of all others similarly situated,

                         Plaintiffs,

          v.

FCA US LLC,
                    Defendants.
_____X

MDL NO.: 2599

Master File No.15- MD 2599-FAM

S.D. Fla. Case No. 1:14-cv-24009-FAM
_____X


            ZOOM VIDEOCONFERENCE VIDEOTAPED

          DEPOSITION of LAQUINTHA S. O'NEAL

                 SEPTEMBER 3, 2020


                  16:02 UTC Time

Job No.:  313347
Pages:  1 - 219
Reported By: Renee Harris, CSR, RPR

Page 2

A P P E A R A N C E S:

CARELLA, BYRNE, CECCHI, OLSTEIN, BRODY & ANGNELLO, PC

Attorneys for Plaintiffs

5 Becker Farm Road

Roseland, New Jersey 07068-1739

BY:   BRIAN FENLON, ESQ.

PHONE 973-994-1700

E-MAIL  bfenlon@carellabyrne.com

SULLIVAN & CROMWELL LLP

Attorneys for FCA US LLC

125 Broad Street

New York, New York 10004-2498

BY:   AKASH M. TOPRANI, ESQ.

PHONE 212-558-4000

E-MAIL  toprania@sullcrom.com

ALSO PRESENT:
    Dan Macom, The Videographer

Page 213

15    V01 Safety Recall Notice

16    NHTSA Letter, February 7, 2019    213

17    Offender History Report    213

Page 3

---------------- I N D E X -----------------

| WITNESS | EXAMINATION BY | PAGE |
|---|---|---|
| LAQUINTHA S. O'NEAL | MR. TOPRANI | 6 |

----------------- EXHIBITS -------------------

| O'NEAL | | PAGE |
|---|---|---|
| 1 | Plea Agreement | 39 |
| 2 | Amended Complaint | 777 |
| 3 | Response to First RFPs | 39 |
| 4 | Bates O'NEAL_000004 - 6 | 213 |
| 5 | Interrogatories | 777 |
| 6 | Bates O'NEAL_000016 | 213 |
| 7 | Bates O'NEAL_000007 - 11 | 213 |
| 8 | Bates O'NEAL_000019 - 25 | 213 |
| 9 | Bates O'NEAL_000031 | 213 |
| 10 | Bates O'NEAL_000015 | 213 |
| 11 | Bates O'NEAL_000017 - 18 | 213 |
| 12 | National Statistics | 213 |
| 13 | Bates O'NEAL_000047 | 213 |
| 14 | Bates O'NEAL_000043 - 46 | 213 |

Page 4

----------------- EXHIBITS -------------------

| O'NEAL | | PAGE |
|---|---|---|

Page 73

PROCEEDINGS

A.  It was a total loss.

Q.  So did you or your brother collect any money from insurance for that vehicle?

A.  No.

Q.  Did you ever drive that vehicle?

A.  No.

Q.  Were you ever a passenger in that vehicle?

A.  Yes.

Q.  How many times, roughly?

A.  Three or four times.

Q.  Do you know where your brother found that car?

A.  Carmax.

Q.  So did you go with your brother to buy that car at Carmax?

A.  Yes.  I had to be there, yes.

Q.  And do you know why your brother bought that car?

A.  No.

Q.  So since 2015, you bought your Dodge Charger and you co-signed for that Nissan Altima, no other cars; right?

A.  Right.

Page 74

PROCEEDINGS

Q.  So before you purchased the Dodge Charger in 2015, did you own another vehicle?

A.  Yes.

Q.  What car was that?

A.  Chrysler 300.

Q.  And how long did you own that vehicle?

A.  About four years.

Q.  So about 2011 to 2015.  Does that sound about right?

A.  Yes.

Q.  Okay.  Where did you get the Chrysler 300?

A.  Auto King in Charlotte, North Carolina.

Q.  Did you buy it -- do you know what model year it was?

A.  It was a 2009.

Q.  So did you buy it used?

A.  Yes.

Q.  Do you know how much you paid for it?

A.  Around about 14,000.

Q.  And did you finance it?

A.  Yes.

Q.  What were the finance terms?

A.  I do not remember.

Page 75

PROCEEDINGS

Q.  Do you remember what your monthly payment was?

A.  About 350.

Q.  Did you pay off the vehicle before you disposed of it?

A.  Yes.

Q.  Why did you buy the Chrysler 300?

A.  It was a good car.  Had good safety features, and Dodge was a good brand, I thought -- well, Chrysler was a good brand.

Q.  And how did you first get interested in buying that Chrysler 300?

A.  I had researched because I -- I seen one someone else had and I researched it.

Q.  Where did you do research?

A.  Internet.

Q.  Any particular sites you would look at?

A.  No.  Just Googled it.

Q.  Is there any type of web site you looked at?  Maybe was it customer reviews or some kind of professional reviews that you were looking at?

A.  No.  I just Googled it and whatever it brought up, I just clicked on it.

Q.  And what did you learn about the vehicle

Page 76

PROCEEDINGS

by Google?

A.  That it was a -- it seemed like a dependable car, and it had like all the features and the safety features and all the stuff that I was looking for.

Q.  What safety features were you looking for?

A.  Just like a good -- the braking system.  Seems like it had a good motor transmission, and you know, it had the -- both front and side airbags.

Q.  Okay.  What about the braking system did you find interesting about the Chrysler 300?

A.  That on the reviews I found, it was one of the top -- top of the lines.

Q.  The braking system was top of the line, you mean?

A.  Yeah.

Q.  Okay.  And what about the motor transmission did you find interesting about the Chrysler 300?

A.  It had a good powertrain.

Q.  And what does that mean, "a good powertrain"?

Page 77

PROCEEDINGS

A.  Just a good engine itself.  That would last long, a long-lasting engine.

Q.  And you said it was important to you that it had both front and side airbags; is that right?

A.  Yes, for my kids.

Q.  What about the front airbag do you find unique in the Chrysler 300?

A.  That it was like the front and the side.  It pretty much protected you all the way around.

Q.  Okay.  So you liked that it had a side airbag; right?

A.  Yes.

Q.  Was there anything specific about the front airbag in the Chrysler 300 that you found interesting?

A.  No.

Q.  You know every car has a front driver airbag; right?

A.  Yes.  Mm-hmm.

Q.  Right.  So every car since, you know, 1998 has had a front driver airbag?

A.  Yeah.

Q.  So there was nothing special about the Chrysler 300 for the driver airbag?

Page 78

PROCEEDINGS

MR. FENLON:  Objection to the form of the question.

You can answer.

THE WITNESS:  It just -- I just felt like it was a safe car.

BY MR. TOPRANI:

Q.  Okay.  So you mentioned that the Chrysler 300 had a good braking system, transmission, powertrain, front and side airbags.

Was there anything else about the Chrysler 300 that attracted you to that car?

A.  It looked nice.

Q.  You said you bought it at Auto King; is that right?

A.  Yes.

Q.  Okay.  Did you know that -- that that model, the Chrysler 300, was at Auto King before you went to the location?

A.  No.  I drove by and I seen it.

Q.  So you were driving by the Auto King and saw the Chrysler 300, and so you decided to go in; is that right?

A.  Yes.

Q.  So before you went to the Auto King, were

Page 79

PROCEEDINGS

you looking at any other model cars?

A.  No.

Q.  So you were pretty set on getting the Chrysler 300; right?

A.  Yes.

Q.  How many times did you go to that Auto King before you ended up purchasing that Chrysler 300?

A.  Twice.

Q.  Okay.  The first time you went, did you talk to a salesperson about the Chrysler 300?

A.  Yes.

Q.  Do you remember what that salesperson told you?

A.  That it was a good car.  And it had -- it had everything else that I was looking for.

Q.  Did the salesperson tell you about any other vehicles?

A.  No.

Q.  So that person knew that you were only interested in the Chrysler 300?

A.  Yes.

Q.  Okay.  You said Chrysler had a good brand; right?

Page 80

PROCEEDINGS

A.  Yes.

Q.  What did you think the Chrysler brand right before you bought the Chrysler 300?

MR. FENLON:  Objection to the form of the question.

You can answer.

THE WITNESS:  That it was just a good car, and it had good reviews.

BY MR. TOPRANI:

Q.  So before going into the Auto King, did you see any advertisements for the 2009 Chrysler 300?

A.  I did not.

Q.  Did you see any advertisements for any Chrysler 300 before you went to the Auto King?

A.  I did not.

Q.  Did you see any written materials about the Chrysler 300 before you went to the Auto King?

A.  No.

Q.  So other than the Internet research you did by Googling, did you see any other information about the Chrysler 300 before you went to the Auto King?

A.  No.

Page 117

PROCEEDINGS

A.  I just went with the sticker price.

Q.  Did you negotiate on the financing terms?

A.  No.  I went with what the bank offered.

Q.  Why didn't you negotiate the financing terms?

A.  I just went with what the bank offered.

Q.  Right.  I'm asking why you did that instead of negotiating the terms.

A.  I can't answer that.

Q.  Did you think this was a fair price for the vehicle, the sticker price?

A.  Yes.

Q.  Did you think the financing terms were fair, too?

A.  Yes.

Q.  So you were happy with the price you paid at the time you bought the Charger; is that right?

A.  Yes.

Q.  Okay.  And I'm just looking down on this document somewhere.  It says -- do you remember what day you bought this vehicle?

A.  I do not.

Q.  So if you look at the top left of this document, it says, "Contract date, March 8, 2015";

Page 118

PROCEEDINGS

is that right?

A.  Yes.

Q.  Okay.  So does that sound about right for the date you bought the Charger?

A.  Yes.

Q.  So you didn't get any discounts or rebates on the car, did you?

A.  No.

Q.  Were there any optional features on the vehicle?

A.  No.

Q.  So you took the vehicle with whatever features it had; right?

A.  Yes.

Q.  Okay.  So you said you went to the Carmax and decided you wanted to buy that vehicle, but didn't have the paperwork; right?

A.  Yes.

Q.  Okay.  After you went home following that first trip, did you do any other research on the vehicle?

A.  No.

Q.  So you didn't do Google searches on it?

A.  No.

Page 119

PROCEEDINGS

Q.  Did you hear any ads about the Dodge Charger?

A.  No.

Q.  Have you ever had --- heard ads about the Dodge Charger?

A.  No.

MR. TOPRANI:  Okay.  I'm going to mark O'Neal exhibit No. 5.  Move that to the Box.  I'm going to go ahead and share my screen now.

(Exhibit 5 was received and marked for identification on this date and is attached hereto.)

BY MR. TOPRANI:

Q.  Do you see this document, Ms. O'Neal?

A.  Yes.

Q.  Okay.  What is it?

A.  It's the inter -- integories [sic] page claim.

Q.  Okay.  So do you understand that in this case, FCA has asked you certain questions?

A.  Mm-hmm.

Q.  And you provided written responses to those questions?

Page 120

PROCEEDINGS

A.  Yes.

Q.  So I'm going to move down to Interrogatory No. 1, and if you could just read Interrogatory No. 1 and answer to No. 1, Ms. O'Neal.

A.  Read the answer to it?

Q.  The interrogatory and the answer.  Let me kind of blow that up for you.

A.  Okay.

Q.  And just let me know when you're finished.  Take your time.

A.  Okay.  I have to do -- it says "state each and every" --

Q.  You can read it in your head, Ms. O'Neal.  I'm sorry, I didn't mention it.

A.  Huh?

MR. FENLON:  Just read it to yourself, Laquintha.

THE WITNESS:  I'm sorry.

MR. FENLON:  Sometimes you get asked to do that.  Just not this time.

THE WITNESS:  Mm-hmm.

BY MR. TOPRANI:

Q.  So Interrogatory No. 1 asks you whether

Page 121

PROCEEDINGS

representations were made to you about your vehicle.

Do you understand that?

A.   Yes.

Q.   Okay.  And in your response, it says, "Plaintiff states that prior to purchasing Plaintiff's vehicle, Plaintiff recalls viewing and hearing commercials through the radio, television and Internet that touted the safety and dependability of Plaintiff's vehicle and FCA's vehicles in general, but does not recall which specific commercials.  In addition, representations regarding the vehicle were made to me at the time of purchase."

Do you see that?

A.   Yes.

Q.   Did I read that correctly?

A.   Yes.

Q.   Is this accurate?

A.   Yes.

Q.   Okay.  So this response says that you remember hearing commercials on the radio, television and Internet about the safety and dependability of the Dodge Charger.

Page 122

PROCEEDINGS

Do you understand that?

A.   Yes.

Q.   Is that true?

A.   I don't recall -- I mean, are we talking as far as like commercials?

Q.   Yeah.  So I'm asking if you recall ever viewing or hearing commercials about the safety and dependability of the Dodge Charger, the 2012 Dodge Charger that you bought?

A.   I mean, I've seen commercials about the Charger.

Q.   And you saw those before buying the Charger?

A.   I mean, on TV.

Q.   So, and the reason I'm asking you this, Ms. O'Neal, is just a few minutes ago, I asked you whether you saw any advertisements about the charge, and you said no.

Do you remember that?

A.   You said "safety," as far as like the safety.  So that's why I answered no.  I seen the commercials about the car itself, but not advertising safety.

Q.   Sorry.  Just give me a minute.  Okay.

Page 123

PROCEEDINGS

So a few minutes ago, Ms. O'Neal, I asked you:  "Did you hear any ads about the Charger?" And you answered no.

And I asked you, "Have you ever heard ads about the Charger?"  And you said no.

Was that -- was that the truth?

A.   From what I heard you said, have I had -- heard ads about the safety.  I have not heard about safety.

Yes, I have saw ads about the Dodge Charger on TV.

Q.   Okay.

A.   But not concerning safety.  Just the car itself.

Q.   Okay.  So let's look back at Interrogatory No. 1.  It says, "Plaintiff recalls viewing and hearing commercials through the radio, television, Internet that touted the safety and dependability of Plaintiff's vehicles."

So that's not accurate; right?

MR. FENLON:  Objection to the form of the question.

You can answer.

THE WITNESS:  No, because I didn't hear

Page 124

PROCEEDINGS

about safety.  I heard about the car -- I've seen the car commercials but not about safety.

BY MR. TOPRANI:

Q.   Okay.  So I just want to make sure that I'm summarizing this accurately.

You do remember seeing commercials about the Dodge Charger, but you don't remember seeing any commercials about the safety of the Dodge Charger; is that right?

A.   Correct.

Q.   Do you remember ever seeing commercials about the dependability of the Dodge Charger?

A.   Just the ad.  Just the regular commercial ad about the Charger, the Dodge Charger.

Q.   Got it.  And these commercials about the Dodge Charger, did you see those commercials before buying it?

A.   Yes.

Q.   Okay.  And did you see a commercial about the 2012 Dodge Charger?

A.   No.

Q.   Okay.  So you've never seen a commercial about the 2012 Dodge Charger; is that right?

Page 125

PROCEEDINGS

A.  No.  Other year Dodge Chargers, but not 2012.

Q.  So you've never seen any commercials about the model of vehicle that you bought, which is the 2012 Dodge Charger; is that right?

A.  No.  A higher year Dodge Charger, but not the 2012.

Q.  Okay.  And those commercials you saw for the higher year Dodge Charger, you saw those before you bought your Charger; is that right?

A.  Yes.

Q.  Okay.  Did you rely on those commercials when you bought your Charger?

A.  No.

Q.  Do you know if the later year Chargers have the same parts as the 2012 Dodge Charger?

A.  I do not.

Q.  Okay.  Do you know if they have the same airbag as the 2012 Dodge Charger in the later years?

A.  No.

MR. TOPRANI:  Okay.  I'm finished with that document.  Maybe now is a time to take another break.

Page 126

PROCEEDINGS

MR. FENLON:  Yeah, I think that makes sense.

THE VIDEOGRAPHER:  We are now going off the record.  The time is 15:45 UTC time.

(Short break taken.)

THE VIDEOGRAPHER:  We are now back on the record.  The time is 15:56 UTC time.

BY MR. TOPRANI:

Q.  Ms. O'Neal, before the break, we were talking about the purchase of your Dodge Charger.

Do you remember that?

A.  Yes.

Q.  So I think you said that you had that first visit to Carmax and you decided to buy the Dodge Charger, but you didn't have the documentation, so you had to go back a second time; is that right?

A.  Yes.

Q.  And after the first visit to Carmax, you didn't do any research about the Dodge Charger; right?

A.  Only what he gave me, the car salesman gave me.

Q.  When did you go back to Carmax for the

Page 127

PROCEEDINGS

second time?

A.  The next day.

Q.  And did you do another test drive of the vehicle?

A.  No.

Q.  You already knew you wanted it; right?

A.  Yes.

Q.  Okay.  And that would be March 18, 2015?

A.  Yes.

Q.  About how long did it take you on that second trip before you were able to purchase the vehicle?

A.  About two and a half hours.

Q.  And you went in with your friend; is that right?

A.  No, I went in by myself --

Q.  Okay.

A.  -- that day.

Q.  But someone else co-signed the car with you?-

A.  Yeah, yeah.  He -- yes, was there.  Yes.

Q.  So he did go with you on the second trip; right?

A.  Yes.

Page 128

PROCEEDINGS

Q.  Can you remind me of his name?

A.  Jermichael Richardson.

Q.  So Jermichael Richardson, you asked him to come with you after the first trip, or was he there with you on the first trip, as well?

A.  He was there also the first trip.

Q.  Okay.  And so before you went to Carmax, did you think you might have problems with your credit, so you should get someone else to go with you; is that right?

A.  Well, no.

Q.  And so why did Mr. Richardson go with you on the first trip to Carmax?

A.  I just wanted him to.

Q.  Just for company?

A.  Yes.

Q.  Did he give you advice on what car to buy?

A.  No.

Q.  So you didn't rely on anything he told you in order to buy the Charger; is that right?

A.  Correct.

Q.  Okay.  And you knew you needed to go back for a second time to buy the car; right?

Page 129

PROCEEDINGS

A.  Yes.

Q.  And at what point did you ask Mr. Richardson to co-sign the vehicle for you?

A.  After the end and towards the first trip, they ran the credit and everything.

Q.  Okay.  So they ran a credit report on you on the first trip?

A.  Yes.

Q.  And they said you would need a co-signer; is that right?

A.  Yes.

Q.  And on the first trip, did they run a credit report on Mr. Richardson?

A.  Yes.

Q.  Okay.  And they said it would be fine if he co-signed with you?

A.  Yes.

Q.  Okay.  When you went back the second time, Mr. Richardson also had to bring additional documentation; is that right?

A.  Just his driver's license.

Q.  Okay.  That's the only documentation he needed to bring?

A.  Yes.

Page 130

PROCEEDINGS

MR. TOPRANI:  Okay.  I'm going to introduce another exhibit.  I'm going to mark O'Neal Exhibit 6.  I've uploaded that to the Box.  Sharing my screen now.

(Exhibit 6 was received and marked for identification on this date and is attached hereto.)

BY MR. TOPRANI:

Q.  Do you see my screen, Ms. O'Neal?

A.  Yes.

Q.  And do you recognize this document?

A.  Yes.

Q.  Okay.  You mentioned that the car salesperson on the first visit to Carmax gave you a sticker for the vehicle.  Is -- is this the sticker you were talking about?

A.  Yes.

Q.  Okay.  And this sticker mentions various features; right?

A.  Yes.

Q.  It mentions overhead airbags; is that right?

A.  Yes.

Q.  And side airbags?

Page 131

PROCEEDINGS

A.  Yes.

Q.  It doesn't say anything about the frontal airbags, though; right?

A.  No.

Q.  And it doesn't say anything about the passenger airbag?

A.  No.

Q.  Did the salesperson tell you anything about the frontal airbags?

A.  No.  Just what's on the paper.

Q.  Did anyone say anything to you about the frontal airbags on the 2012 Dodge Charger?

A.  No.

Q.  Okay.  So this figure, $17,998, that's the sticker price on the vehicle; is that right?

A.  Yes.

Q.  And you -- that's the amount you agreed to pay?

A.  Yes.

Q.  I'll put this away.

Okay.  At some point after purchasing the Charger, you -- you said you refinanced the vehicle; right?

A.  Yes.

Page 132

PROCEEDINGS

Q.  Okay.  Why did you refinance the vehicle?

A.  I refinanced it from my bank to get a lower car payment.

Q.  So I asked -- sorry.  You answered exactly my question.

So when did you get your car refinanced?

A.  I got it a year later after I purchased -- purchased the car.

Q.  And you said you did it in order to get a lower car payment; is that right?

A.  Yes.

Q.  Why did you want a lower car payment?

A.  Because my bank was offering me a lower car payment.

Q.  How did --

A.  So I took it.

Q.  How did you come to learn that your bank was offering a lower car payment?

A.  They contacted me --

Q.  Did they --

A.  -- saying that they could refinance my car.

Q.  Did they call you?

A.  Yes.

Laquinta Res. O'Neal
09/03/2020                                                            133 to 136

Page 133

PROCEEDINGS

Q. So just sort of out of the blue, they called you and said, "You know, we can offer you refinancing on your car"?

A. Yes.

MR. TOPRANI: Okay. I'm going to mark O'Neal Exhibit 7. Okay. I've uploaded to the Box, and I'm going to share my screen.

(Exhibit 7 was received and marked for identification on this date and is attached hereto.)

BY MR. TOPRANI:

Q. Do you see this document, Ms. O'Neal?

A. Mm-hmm.

Q. And do you recognize this document?

A. Yes.

Q. And what ---

MR. FENLON: What's the Bates page on that?

MR. TOPRANI: Sure. That's O'Neal 7.

MR. FENLON: O'Neal 7. Thank you.

BY MR. TOPRANI:

Q. I'm sorry, Ms. O'Neal. What is this document?

A. It's my bank document.

Page 134

PROCEEDINGS

Q. And this is the refinancing document?

A. Yes.

Q. Okay. And it's giving you an annual percentage rate of 4.75; is that right?

A. Yes.

Q. And that's significantly lower than the rate you had from the dealership; is that right?

A. Yes.

Q. So after you got this refinancing, do you think the dealership gave you a fair price on the financing of your vehicle?

A. No.

Q. So do you think the dealership, the financing price they gave you was too high?

A. I think it was okay with my credit at the time.

Q. Now, on what date did you get the refinancing done?

A. It was in July 2015.

Q. And so on this document on the top right, it says July 2, 2015; is that right?

A. Yes.

Q. Okay. So that was less than four months after you bought the Charger; right?

Page 135

PROCEEDINGS

A. Yes.

Q. Okay. Did your credit change between March of 2015 and July of 2015?

A. Yes.

Q. Why is that?

A. I had been working on my credit, anyway, and so it went up. My score went up.

Q. Okay. Do you know what your credit score was in March of 2015?

A. I don't recall.

Q. Do you believe what your credit score was in July of 2015?

A. I don't recall.

Q. Did you know how much your credit score went up between March of 2015 and July of 2015?

A. I don't recall.

Q. Let's put that one away.

When you bought the Dodge Charger, were there any problems with the vehicle?

A. No.

MR. FENLON: Objection -- you can answer.

THE WITNESS: No.

BY MR. TOPRANI:

Q. And so you --- great.

Page 136

PROCEEDINGS

Were there any active recalls on the vehicle?

A. Not to my knowledge.

Q. So you were not advised when you bought the vehicle that there was an active recall on it?

A. No, I was not.

MR. TOPRANI: I'm going to mark O'Neal Exhibit 8, which is Bates O'Neal 19, and I'm uploading that to the Box.

(Exhibit 8 was received and marked for identification on this date and is attached hereto.)

BY MR. TOPRANI:

Q. Okay. Do you see this document, Ms. O'Neal?

A. Yes.

Q. Do you recognize this document?

A. Yes.

Q. Okay. What is this document?

A. A recall information about your car.

Q. And this is a document from Carmax; is that right?

A. Yes.

Q. And this document was provided to you

Page 217

*** ERRATA SHEET ***

NAME OF CASE:  BRIDGET BOYD v. FCA US LLC

DATE OF DEPOSITION:  SEPTEMBER 3, 2020

NAME OF WITNESS:  LAQUINTHA S. O'NEAL

Reason Codes:

　　　1.  To clarify the record.

　　　2.  To conform to the facts.

　　　3.  To correct transcription errors.

PAGE  LINE     FROM       TO        REASON

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

____|_____|_____|_____|_____

　　　　　　　　　　_____

Subscribed and sworn before me

This____day of_____,20__.

_____    _____

(Notary Public)       My Commission Expires:

Page 218

DECLARATION UNDER PENALTY OF PERJURY

　　　I, LAQUINTHA S. O'NEAL, do hereby certify
under penalty of perjury that I have read the
foregoing transcript of my deposition taken
on September 3, 2020; that I have made such
corrections as appear noted herein; that my
testimony as contained herein, as corrected,
is true and correct.

　DATED this         day of.            ,
2020, at                  .

　　　　　　_____

　　　　　　　LAQUINTHA S. O'NEAL

Page 219

STATE OF CALIFORNIA    )

　　　　　　　　　　(    Ss.

COUNTY OF LOS ANGELES  )

　　　I, RENEE HARRIS, do hereby certify that I
am a licensed Certified Shorthand Reporter, duly
qualified and certified as such by the State of
California;

　　That prior to being examined, the witness named
in the foregoing deposition was by me duly sworn
to testify to tell the truth, the whole truth, and
nothing but the truth;

　　That the said deposition was by me recorded
stenographically;

　　And the foregoing pages constitute a full,
true, complete and correct record of the testimony
given by the said witness;

　　　That I am a disinterested person, not
being in any way interested in the outcome of said
action, or connected with, nor related to any of
the parties in said action, or to their respective
counsel, in any manner whatsoever.

　　DATED: 9/28/20

　　　　_____

　　　　Renee Harris, CSR 14168, RPR