**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**

| | |
|---|---|
| **IN RE: TAKATA AIRBAG PRODUCTS LIABILITY LITIGATION**<br><br>**THIS DOCUMENT RELATES TO: ECONOMIC LOSS TRACK CASES AGAINST VOLKSWAGEN/AUDI DEFENDANTS** | **Case No. 1:15-md-02599-FAM** |

FILED BY ___ D.C.
AUG 27 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

# FINAL STATUS REPORT BY THE SETTLEMENT SPECIAL ADMINISTRATOR ON THE VOLKSWAGEN/AUDI OUTREACH PROGRAM

## FINAL STATUS REPORT FILED AUGUST 25, 2026

The Settlement Special Administrator of the Volkswagen/Audi Settlement Agreement (the "Settlement Agreement") submits this Final Status Report to the Court to provide information and insight as to the efforts and results of the Outreach Program under the Settlement Agreement, along with some of the major learnings and takeaways from the last several years[1].

As mentioned in prior Reports, the Outreach Program was designed through discussion with the Parties, the National Highway Traffic Safety Administration, and the Independent Monitor of the Takata recalls. The Program utilized techniques and approaches not previously applied in the recall industry, with a focus on personalized, targeted direct campaigns aimed at increasing the volume of outreach attempts per consumer via traditional and non-traditional channels. The goal was to maximize the recall remedy completion rate to the extent practicable given the applicable provisions of the Settlement Agreement. Consistent with this, the Settlement Special Administrator and Outreach Program vendors regularly conferred and communicated with

[1] The data and information contained in this report is generally as of the end of Q2 2026.

Volkswagen/Audi to coordinate concerted efforts to ensure that outreach to affected vehicle owners was conducted as efficiently and as effectively as possible with continual improvement to the overall process.

**1. Background**

Although this Court is extremely familiar with the history of the Takata inflator recall, a brief summary of the background will be helpful in setting the context for the Outreach Program and their results. Approximately 67 million defective Takata airbag inflators have been under recall in the United States across 19 vehicle manufacturers, making this the largest automotive recall in history. To date, there have been 28 deaths along with several hundred injuries linked to this safety recall in the United States alone. Reports further indicate that there have been at least 36 deaths worldwide.

At commencement of the Outreach Program under the Settlement Agreement in April 2022, Volkswagen/Audi had been notifying owners of vehicles affected by the Takata recall for several years. Shortly after the beginning of the Outreach Program, approximately 75.83% of these dangerous and defective inflators had been either repaired or otherwise accounted for as scrapped, stolen, or exported in accordance with guidelines from the National Highway Traffic Safety Administration.[2]

Many of the owners who had not had the recall remedy performed at this point had been contacted numerous times (*i.e.*, dozens of times). Despite this, they had failed to act. Moreover, the affected vehicles spanned model years 2006 to 2018, meaning that they naturally had changed hands multiple times, making it more difficult to identify the correct owners of the vehicles. Where

[2] The Third Amendment to the Coordinated Remedy Order, December 9, 2016, at 26, https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/final_public_-_third_amendment_to_the_coordinated_remedy_order_with_annex_a-corrected_12.16.16.pdf

the correct owners could be identified, they often had little to no direct relationship with the automobile manufacturers, meaning that they were reticent to bring their vehicles to branded dealerships to have the Recall Remedy performed.

While there had been substantial industry-wide outreach performed prior to the implementation of the Outreach Program, there was little information in the way of attribution and reporting on what type of outreach activities resulted in improvements in response, appointment, and remedy rates. Because this type of attribution and reporting was not widely utilized, it was initially difficult to evaluate what various tactics, cadence, sequencing, and creative materials did or did not "speak to" the individual recipients of the outreach materials. With significant input, effort, and collaboration from Volkswagen/Audi, the Outreach Program was able to drastically improve upon the processes utilized at the time to maximize the completion of Recall Remedies in Takata affected vehicles.

2. **<u>Overall Strategy and Deployment</u>**

Since the beginning of the Outreach Program in 2022, the Settlement Special Administrator and Outreach Program vendors have deployed thousands of individual campaigns of outreach to consumers affected by the Takata recall. Given the extensive detail provided regarding these outreach efforts in the prior Status Reports to the Court, those campaigns will not be recounted here. However, overall, this involved nearly 29 million outbound deployments across direct mail, outbound phone calls, digital impressions (*e.g.*, Facebook), email, and vehicle tagging. Affected vehicle owners were also contacted through targeted digital display (television and over-the-top advertisements). On national and regional levels, the Settlement Special Administrator and Outreach Program vendors engaged with state and local government agencies, such as Departments of Motor Vehicles, to contact affected consumers in nearly 30 states and localities.

### 3. Results and Comparison Points

Since the Outreach Program began, the Settlement Special Administrator and Outreach Program vendors have performed a total of 91,664 appointments and "warm transfers" to allow consumers to schedule appointments themselves directly with dealers, and 90,504 Recall Remedies have been completed.

In short, the overall recall closure rate described above increased to 92.78%, a nearly 17% jump from the rate at the start of the Outreach Program in 2022. This increase occurred despite the fact that approximately 152,000 additional vehicles (approximately 41,000 in January 2023 and 111,000 in January 2025) were added to the recall population during the Outreach Program, pursuant to the May 2020 Agreement between the National Highway Traffic Safety Administration and Volkswagen. In other words, the closure rate rose despite the substantial influx of recalled vehicles.[3]

To provide some context to these overall closure rates relative to rates achieved in other recalls[4], NHTSA reported that the average completion rate for recalls initiated between 2012–2022 is 65.8% by the time that a recall reaches maturity (NHTSA defines a mature recall as one with at least five quarters of completion reporting).[5] Similarly, the average completion rate for recalls on vehicles that were six to ten years old at the time of recall is 56%.[6] Notably, the majority of the

---

[3] The Agreement Between the National Highway Traffic Safety Administration and Volkswagen, dated May 5, 2020, https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/vw-nhtsa_sdi-d_agreement_signed.pdf

[4] As of this report, NHTSA's Takata Recall Spotlight page (https://www.nhtsa.gov/vehicle-safety/takata-recall-spotlight#completion-rates) has not been updated with current completion rate data since mid-2024. Consequently, the completion rate benchmarking used in the Outreach Program's prior final reporting could not be replicated with equivalent up-to-date figures for this report.

[5] "Improving Vehicle Safety Recall Completion Rates" Prepared by the U.S. Department of Transportation, National Highway Traffic Safety Administration, April 2026, at 6, https://www.nhtsa.gov/sites/nhtsa.gov/files/2026-04/Report-to-Congress-Improving-Vehicle-Safety-Recall-Completion-Rates-Report-April-2026-tag.pdf

[6] "Report to Congress: Vehicle Safety Recall Completion Rates Report" Prepared by the U.S. Department of Transportation, National Highway Traffic Safety Administration, May 2017, at 13, https://www.nhtsa.gov/sites/nhtsa.gov/files/documents/13376-recall_completion_rates_rtc-tag_final.pdf?platform=hootsuite

Takata recalls affecting Volkswagen/Audi vehicles had been open for well-beyond five quarters, with the model years of the underlying vehicles affected by the Takata inflator recall spanning from 2006 – 2018.

The methodologies to accomplish this involved several key areas. First, utilizing multiple sources of data, including vehicle registration data and public records data, to both identify and locate owners of affected vehicles was essential, especially given the age of the vehicles involved in the Takata recall. Incorporation of other relevant data points, such as location data from on-road vehicle sightings, further enhanced this vehicle owner database, which ultimately formed the backbone of the outreach process. This dataset was then further augmented through the "Why Are You Not Repairing?" website, where recipients of outreach could take a survey to notify the Outreach Program, as an example, that they no longer owned the vehicle, in which case alternative owner contact information could be utilized or sought out.

This owner database allowed the Outreach Program to target the affected population through a comprehensive, multi-channel approach, including through mail, outbound phone, email, and social media. This helped underscore the severity of the Takata inflator recall and bolster the legitimacy of the call to action. Consistent with this, for example, engagement with State motor vehicle departments and customized letters bearing state seals significantly boosted recipients' trust in the Recall's authenticity.

Messaging also relied on specific word choices found to be more effective at conveying urgency, such as direct language describing the risk of injury or death rather than softer terms like "defective" or "faulty," along with concrete facts, including the number of deaths attributed to the Takata inflator defect, the emphasize the severity of the risk and drive recipients to act.

Beyond these more traditional channels, vehicle tagging was implemented, where recalled vehicles were spotted on the road and "tagged" with a recall notification, ensuring the driver would receive the notice even if the underlying owner contact information available to the Outreach Program was inaccurate.

As the overall remedy rate continued to increase, the creative messaging, themes, and formats, as well as their methods of delivery and packaging, were constantly tested, evaluated, and modified. Stand-out or large-format envelopes were used so outreach materials cut through mailbox clutter. Communications were personalized by name and vehicle to improve their credibility. Messaging was tightened so the recipient could clearly and quickly understand the risk and comprehend the call to action to have the Recall Remedy performed.

Messaging also sought to overcome barriers to completing the Recall Remedy by offering, where available, mobile repair services, loaner vehicles, and towing, reducing the burden and inconvenience associated with completing repairs. Outreach materials were also translated into Spanish to reach non-English-speaking populations of affected owners. Fresh outreach material was constantly introduced to avoid the message growing stale, and the call to action was reinforced throughout all stages of the recall and outreach lifecycle, with the messaging varied each time to sustain its impact.

**4. Conclusion**

The Settlement Special Administrator offers this Final Status Report to ensure that the Court is informed of the ultimate result of the Outreach Program. If the Court would find additional information helpful, the Settlement Special Administrator stands ready to provide it at the Court's convenience.

PATRICK J. HRON
Settlement Special Administrator

REC'D BY ______ D.C.
AUG 27 2026
ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

ORIGIN ID:LFTA (337) 269-0052
PATRICK HRON
104 AMARYLLIS DRIVE

LAFAYETTE, LA 70503
UNITED STATES US

SHIP DATE: 25AUG26
ACTWGT: 0.50 LB
CAD: 263434400/INET4535

BILL SENDER

TO **ANGIE E. NOBLE, CLERK OF COURT**
**WILKIE FERGUSON, JR. US COURTHOUSE**
**400 N. MIAMI AVENUE**

**MIAMI FL 33128**
(305) 523-5100 REF:
INV:
PO: DEPT:

58KJ6/C457/484B

FedEx Express

E

J261026012001uv

TRK# 0201 **8762 5580 2919**

**THU - 27 AUG 10:30A**
**MORNING 2DAY**

**SP MPBA**

**33128**
**FL-US MIA**

After printing this label:
**CONSIGNEE COPY - PLEASE PLACE IN FRONT OF POUCH**
1. Fold the printed page along the horizontal line.
2. Place label in shipping pouch and affix it to your shipment.

Use of this system constitutes your agreement to the service conditions in the current FedEx Service Guide, available on fedex.com. FedEx will not be responsible for any claim in excess of $100 per package, whether the result of loss, damage, delay, non-delivery, misdelivery, or misinformation, unless you declare a higher value, pay an additional charge, document your actual loss and file a timely claim. Limitations found in the current FedEx Service Guide apply. Your right to recover from FedEx for any loss, including intrinsic value of the package, loss of sales, income interest, profit, attorney's fees, costs, and other forms of damage whether direct, incidental, consequential, or special is limited to the greater of $100 or the authorized declared value. Recovery cannot exceed actual documented loss. Maximum for items of extraordinary value is $1,000, e.g. jewelry, precious metals, negotiable instruments and other items listed in our Service Guide. Written claims must be filed within strict time limits, see current FedEx Service Guide.